# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:**<br><br>**BLAKE OF CHICAGO, CORP. f/k/a A.B. DICK COMPANY,** *et al.,*<br><br>                    **Debtors.** | **Chapter 11**<br><br>**Case No. 04-12002 (JLP)**<br><br>**Jointly Administered** |
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS,**<br><br>                    **Appellant,**<br><br>        **v.**<br><br>**PRESSTEK, INC.,**<br><br>                    **Appellee.** | **Appeal No. 04-CV-1566 (KAJ)** |

## VOLUME 1 OF 2
## APPENDIX TO THE OPENING BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF ITS APPEAL

Dated:  April 15, 2005
Wilmington, Delaware

THE BAYARD FIRM
Jeffrey M. Schlerf (No. 3047)
222 Delaware Ave., Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel:  302.429.4218
Fax:  302.658.6395

McGUIREWOODS LLP
Richard J. Mason, P.C.
Michael M. Schmahl
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1681
Tel:  312.849.8100
Fax:  312.849.3690

and

James H. Joseph (No. 3920)
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, PA 15222
Tel: 412.667.6000
Fax: 412.667.6050

Counsel to the Official Committee of
Unsecured Creditors of Blake of Chicago
Corp. f/k/a A.B. Dick Company, *et al.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **BLAKE OF CHICAGO, CORP. f/k/a A.B. DICK COMPANY,** *et al.,* | **Case No. 04-12002 (JLP)** |
| Debtors. | **Jointly Administered** |
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS,** | |
| Appellant, | **Appeal No. 04-CV-1566 (KAJ)** |
| v. | |
| **PRESSTEK, INC.,** | |
| Appellee. | |

## TABLE OF CONTENTS

## APPENDIX VOLUME 1 OF 2

<u>Tab #</u>                                                                                    <u>Page No.</u>

1.    Motion for Order:  (A) Authorizing Sale of Substantially All of The Assets of A.B. Dick Company and Its Wholly Owned Subsidiaries, Free and Clear of Liens, Claims and Encumbrances;  (B) Authorizing Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (C) Granting Related Relief .................................... A-0001

2.    Transcript of August 23, 2004 Evidentiary Hearing Before the Honorable Charles G. Case, II United States Bankruptcy Judge.................................................................... A-0090

584297v1

## APPENDIX VOLUME 2 OF 2

Tab #                                                                        Page No.

3.    Transcript of November 3, 2004 Hearing Before the
      Honorable John L. Peterson United States Bankruptcy
      Judge ........................................................................................    A-0379

4.    Order, Pursuant to Sections 105(a), 363(b) and (f) and
      365(f) of the Bankruptcy Code and Rules 2002(a)(2),
      (c)(1), (k) and (m), 6004 and 6006 of the Federal Rules of
      Bankruptcy Procedure, Approving (1) the Sale, Pursuant to
      the Asset Purchase Agreement Dated July 13, 2004, of (a)
      Substantially all of the Assets of the A.B. Dick Company
      and the A.B. Dick Company of Canada, Ltd., and (b) the
      Capital Stock of the A.B. Dick U.K. Limited to Silver
      Acquisitions Corp., Free and Clear of Liens, Claims,
      Encumbrances, and Interests; and (2) the Assumption and
      Assignment of Certain Executory Contracts and Unexpired
      Leases to Silver Acquisitions Corp. ........................................    A-0478

5.    Emergency Motion of Mitsubishi Imaging (MPM), Inc. for
      Order Determining Validity of Exercise of Election Under
      Postpetition Private Label Sales Agreement ..........................    A-0519

6.    Emergency Motion of Presstek, Inc. Seeking an Order
      Directing Mitsubishi Imaging (MPM) Inc. to Comply With
      This Court's Sale Order .........................................................    A-0537

7.    Objection of Presstek, Inc. to the Emergency Motion of
      Mitsubishi Imaging (MPM), Inc. for Order Determining
      Validity of Exercise of Election Under Postpetition Private
      Label Sales Agreement ...........................................................    A-0651

8.    Response of Mitsubishi Imaging (MPM), Inc. to
      Emergency Motion of Presstek, Inc. for an Order Directing
      Mitsubishi Imaging (MPM), Inc. to Comply With This
      Court's Sale Order .................................................................    A-0570

9.    Response of the Official Committee of Unsecured
      Creditors of A.B. Dick and Company to Emergency Motion
      of Mitsubishi Imaging (MPM), Inc. for Order Determining
      Validity of Election Under Postpetition Private Label Sales
      Agreement and Motion for an Order Refunding Credit to
      Estates ....................................................................................    A-0577

Tab #                                                                    Page No.

10.    Statement of the Debtors: (A) in Response to the
       Emergency Motion of Mitsubishi Imaging (MPM), Inc. for
       Order Determining Validity of Exercise of Election Under
       Postpetition Private Label Sales Agreement; (B) in Support
       of the Emergency Motion of Presstek, Inc. Seeking an
       Order Directing Mitsubishi Imaging (MPM), Inc. to
       Comply with this Court's Sale Order; and (C) in Response
       to the Emergency Motion of the Official Committee of
       Unsecured Creditors to Compel Debtors, Silver and
       Presstek to Comply with Sale Order Entered November 3,
       2004 and the Second Amendment to the Asset Purchase
       Agreement..................................................................................    A-0683

11.    Transcript of November 17, 2004 Telephone Conference
       Before the Honorable John L. Peterson United States
       Bankruptcy Judge........................................................................    A-0690

12.    Judgment Signed on November 17, 2004 Regarding Motion
       of Presstek, Inc., for Order Directing Mitsubishi Imaging,
       Inc., to Comply With This Court's Sale Order and
       Mitsubishi Imaging, Inc.'s Motion for Order Determining
       Validity of Exercises of Election Under Postpetition Private
       Label Sales Agreement ...............................................................    A-0736

13.    Amended Judgment Signed on November 23, 2004
       Regarding Motion of Presstek, Inc., for Order Directing
       Mitsubishi Imaging, Inc., to Comply With This Court's
       Sale Order and Mitsubishi Imaging, Inc.'s Motion for
       Order Determining Validity of Exercises of Election Under
       Postpetition Private Label Sales Agreement...................................    A-0738

14.    Notice of Appeal...........................................................................    A-0740

15.    Appellant Official Committee of Unsecured Creditors
       Designation of Items to be Included in the Record and
       Statement of Issues to be Presented on Appeal ..................................    A-0751

16.    Notice of Filing of First Amendment to Asset Purchase
       Agreement....................................................................................    A-0764

17.    Notice of Filing of Second Amendment to Asset Purchase
       Agreement....................................................................................    A-0767

# Tab 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------x
|  |  |  |
| In re | : | Chapter 11 |
|  | : |  |
| A.B. DICK COMPANY, *et al.,* | : | Case Nos. 04-12002 (CGC) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |
---------------------------------------------x

**MOTION FOR ORDER: (A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF**
**THE ASSETS OF A.B. DICK COMPANY AND ITS WHOLLY OWNED**
**SUBSIDIARIES, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (B)**
**AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED**
**LEASES AND <u>EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF</u>**

A.B. Dick Company ("A.B. Dick"), Paragon Corporate Holdings, Inc. ("Paragon"), Multigraphics LLC, and Interactive Media Group, Inc., the debtors and debtors in possession in the above-captioned jointly administered chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion") this Court, pursuant to sections 105(a), 363(b) and (f), and 365(f) of Title 11 (the "Bankruptcy Code") of the United States Code and Rules 2002(a)(2), (c)(1), (k), and (m), 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an Order: (A) authorizing the sale of substantially all of the assets of A.B. Dick and its wholly owned subsidiaries, free and clear of all liens, claims and encumbrances, to Silver Acquisitions Corp. ("Silver"), or to any other party that submits a higher and better offer (the "Sale"); (B) authorizing the Debtors to assume and assign to Silver certain executory contracts and unexpired leases; and (C) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 provide the statutory bases for the relief sought herein.

## BACKGROUND

2.      On July 13, 2004 (the "Petition Date"), the Debtors each filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their property and assets as debtors in possession. No trustee, examiner or committee of creditors has yet been appointed in these chapter 11 cases.

### Description of the Debtors' Businesses

3.      In 1884, Albert Blake Dick, the founder of A.B. Dick, revolutionized document reproduction when he partnered with Thomas Edison to invent the world's first mimeograph. Throughout the 20th century, A.B. Dick continued to grow its printing equipment business by pioneering a series of technological advances, including the development of printers that could reproduce photographs without negatives in the 1960's. In March 2000, A.B. Dick took on its present corporate form and significantly increased its market share when it integrated with Multigraphics Inc., another printing company.

4.      A.B. Dick is presently a leading global supplier to the graphic arts and printing industry, manufacturing and marketing equipment and supplies for the global quick print and small commercial printing markets. Its business has three product lines: (a) pre-press, press and other related equipment; (b) supplies; and (c) after-market repair service and replacement parts. A.B. Dick manufactures its own products – sold under the A.B. Dick®, Multigraphics® and Itek Graphix® brand names – and distributes certain products manufactured by third parties. A.B. Dick sells its products and services through a network of branches and independent distributors

2

in the United States, its subsidiaries in Canada and the United Kingdom, and independent distributors in other countries. Its customers include commercial, in-house and convenience printers, publishing companies, educational institutions and graphic design firms.

     5.     A.B. Dick and Interactive Media Group, Inc., corporations organized under the laws of the states of Delaware and Ohio respectively, are wholly owned, direct subsidiaries of Paragon, a privately held holding company incorporated under the laws of the state of Delaware and headquartered in Niles, Illinois. A.B. Dick is the sole member of Multigraphics LLC, a limited liability company organized under the laws of the state of Delaware, and the owner of A.B. Dick Company of Canada, Ltd. and A.B. Dick UK Limited (collectively, the "Foreign Subsidiaries"). Together with the Foreign Subsidiaries, the Debtors – who employ approximately 700 employees in their operations – collectively provide a full range of high quality prepress, press and post-press equipment, supplies and technical services to a broad national and international customer base.

<u>**Events Leading to the Chapter 11 Filing**</u>

     6.     In recent years, the Debtors began to experience weakened sales reflecting, in part, the impact of changing technologies in their industry that reduced demand for Debtors' products. This decline in sales was exacerbated by the effects of September 11, 2001 and the subsequent worldwide economic recession.

     7.     In the months preceding the commencement of the Debtors' chapter 11 cases, Debtors' management evaluated the Debtors' financial situation and determined that the value of the Debtors' businesses would be maximized if certain of the Debtors' businesses were sold on a going concern basis. In late 2003, the Debtors entered into negotiations for a going concern sale of certain of their businesses with Presstek, Inc. ("Presstek"), another manufacturer of printing equipment. During the course of these negotiations, the Debtors' financial condition continued to deteriorate such that immediately prior to the Petition Date the Debtors found themselves struggling to pay suppliers and meet payroll.

A- 0003

8.    Shortly before the Petition Date, Presstek, Silver Acquisitions Corp. ("Silver") and the Debtors entered into an Asset Purchase Agreement, pursuant to which the Debtors agreed, among other things, to the commencement of cases under chapter 11 of the Bankruptcy Code to effectuate a sale to Silver of substantially all of the assets of A.B. Dick and its wholly owned subsidiaries on a going concern basis, free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code.

## Summary of the Terms of the Proposed Sale

9.    The Debtors have determined that, in light of existing limitations on available funding for the Debtors' operations and the probable value that would be attained were the Debtors' assets to be liquidated on a piecemeal basis, that the best interests of the Debtors' creditors, customers and employees will be served by the expedient marketing and sale of the businesses and assets of A.B. Dick and its wholly owned subsidiaries (the "Assets") on a going concern basis to the purchaser making the highest and best offer.

10.    Silver (an entity owned by Presstek) and the Debtors have negotiated the terms of an Asset Purchase Agreement (the "APA," a copy of which is annexed hereto, without attachments, as Exhibit A), pursuant to which the Debtors propose to sell the Assets to Silver for $40 million (the "Purchase Price") pursuant to sections 363(b) and (f) of the Bankruptcy Code, free and clear of any interest, lien, claim, encumbrance or security interest of any other party, including but not limited to any administrative expense or priority claim asserted in the Debtors' chapter 11 cases. In addition, the Debtors will also assume and assign to Silver certain of their unexpired leases and executory contracts in accordance with section 365 of the Bankruptcy Code (collectively, the "Assigned Contracts and Leases," and, individually, an "Assigned Contract" or an "Assigned Lease").

11.    The APA also provides for the sale of substantial assets of A.B. Dick's Canadian subsidiary, as well as A.B. Dick's stock in its British subsidiary, A.B. Dick UK Limited. Neither of those Foreign Subsidiaries are debtors in possession in these chapter 11 cases. Thus, the

4

Debtors do not seek any bankruptcy protections from the Court (*e.g.*, a sale free and clear of liens) with respect to the sale of the Foreign Subsidiaries' assets or stock, as applicable.

12.     Contemporaneously herewith, the Debtors have filed a motion (the "Sales Procedures Motion") for entry of an order approving auction bidding and other procedures with respect to the proposed sale of the Assets (the "Bidding Procedures"). Among other things, the Bidding Procedures require potential bidders for the Assets to demonstrate the financial wherewithal to consummate the Sale and make a 10% cash deposit (such bidders, as defined more fully in the Bidding Procedures, being "Qualified Bidders"). If any Qualified Bidder(s) emerge, the Debtors would conduct an auction of the Assets, thereafter seeking Court approval of the highest and best bid, if any.

13.     As an incentive to Silver to undertake the costly due diligence necessary to pursue a $40 million transaction, the Bidding Procedures also require the Debtors (or Key, if it successfully credit bids for the Assets) to pay Silver a $1,200,000 break-up fee (the "Break-Up Fee")[1] and reimburse Silver's expenses up to $500,000 if Silver is outbid (or if the Debtors opt to withdraw this Motion and prosecute a plan of reorganization).

### RELIEF REQUESTED AND REASONS THEREFOR

#### Authorization of the Sale Out of the Ordinary Course of the Debtors' Businesses Pursuant to Bankruptcy Code Section 363(b)

14.     Pursuant to Bankruptcy Code sections 363(b) and (f), the Debtors seek authority to sell the Assets to Silver (or the highest and best bidder), free and clear of all liens, claims and encumbrances. Although section 363 of the Bankruptcy Code does not provide an express standard for determining whether the court should approve any particular proposed use, sale, or lease of estate property, case law consistently applies an "articulated business judgment" standard.[2]

---

[1]     Denominated a "Termination Fee" in the APA.

[2]     *See, e.g., Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); accord *Stephens Indus., Inc. v. McClung (In re McClung)*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.

A- 0005

15.    Additionally, under section 363 of the Bankruptcy Code, a court is not allowed to substitute its business judgment for that of the debtor.[3] Rather, the court is required to ascertain whether the debtor itself has articulated a valid business justification for the proposed transaction.[4] This is consistent with the "broad authority to operate the business of a debtor . . . [which] indicates congressional intent to limit court involvement in business decisions by a trustee . . . . [so that] a court may not interfere with a reasonable business decision made in good faith by a trustee."[5]

16.    The Court's power to authorize a sale under section 363(b) of the Bankruptcy Code is to be exercised at its discretion, utilizing a flexible, case-by-case approach.[6] The key consideration is the Court's finding that a good business reason exists for the sale.[7]

> [T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business . . . . Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in *Lionel*, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the assets of the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

---

[ ]    1983); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D.Utah 1981).

[3]    *See, e.g., In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678 (Bankr. S.D.N.Y. 1989); *In re Highway Equip. Co.*, 61 B.R. 58, 60 (Bankr. S.D. Ohio 1986).

[4]    *See, e.g., Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979).

[5]    *In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).

[6]    *See In re Baldwin United Corp.*, 43 B.R. 905 (Bankr. S.D. Ohio 1984).

[7]    *See Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986).

6

A- 0006

This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.[8]

17.    Here, sound business justifications support this Court's approval of the proposed sale of the Assets. The Debtors believe the proposed Sale will maximize the value of the Assets for the benefit of their estates. Moreover, the Debtors believe that a going concern sale of the Assets will generate greater value to their estates than will be received in a piecemeal liquidation. Significantly, the $40 million Purchase Price exceeds the approximately $25 million of senior debt secured by the Assets. Maximization of asset value is a sound business purpose, warranting authorization of the sale of the Assets.

18.    Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.[9] In this instance, the Bidding Procedures contemplate that following the Debtors' marketing efforts, the Assets will be submitted to an auction process to ensure that the best possible price is obtained. An auction is sufficient to establish that one has paid "value" for assets of a bankruptcy estate, where the auction sale has itself been conducted in good faith.[10] Moreover, the opportunity for competitive bidding provides assurance that the Debtors are receiving the highest and best offer for the Assets under the circumstances of their chapter 11 cases.

---

[8]    *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. BAP 1988), citing *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983).

[9]    *In re Integrated Resources Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y.), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993); *In re Atlanta Packaging Products, Inc.* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (debtor's duty with respect to sales is to obtain the highest price or greatest overall benefit for the estate); *In re Wilson Freight Co.*, 30 B.R. 971, 975 (Bankr. S.D.N.Y. 1983) (debtor's paramount duty in connection with a sale is to obtain the best price).

[10]    *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986). Moreover, the Sixth Circuit has indicated that a party would need to show fraud or collusion between the Purchaser, the other bidders and the debtor in order to demonstrate a lack of good faith. *Richards v. Swinebroad and Denton Auctioneers*, No. 84-5896, 1985 WL 13526, at *3 n.2 (6th Cir. July 3, 1985). The Debtors submit that any asset purchase agreement entered into as a result of the Bidding procedures will be an arms-length, negotiated transaction and thus entitled to the protections of section 363(m) of the Bankruptcy Code.

7

## Authorization of the Sale Free and Clear of Liens, Claims and Encumbrances Pursuant to Bankruptcy Code Section 363(f)

19.     The Debtors seek an Order authorizing the Sale free and clear of all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code. Under section 363(f), a debtor may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

> i.   applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> ii.   such entity consents;
>
> iii.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> iv.   such interest is in bona fide dispute; or
>
> v.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[11]

20.     Here, sections 363(f)(2) is satisfied with respect to the liens of KeyBank National Association ("Key"), the Debtors' senior prepetition secured lender, because Key has consented to the Sale free and clear. Section 363(f)(5) is satisfied with respect to any other liens, claims, encumbrances or security interests asserted against the Assets because they are capable of being satisfied by money, and will attach to the proceeds of the Sale in the same order of priority as existed on the Petition Date. Further, the Debtors believe that the Bidding Procedures will generate proceeds in excess of the aggregate value of all liens on the Assets, thus satisfying section 363(f)(3) with respect to all such liens. Accordingly, as at least one of the disjunctive provisions of Bankruptcy Code section 363(f) is satisfied with respect to the various interests in the Assets, the Assets can be sold free and clear of liens, claims, encumbrances and interests under section 363(f) of the Bankruptcy Code, with the liens and claims of any entity claiming an

---

[11]     *See* 11 U.S.C. §363(f).

8

A- 0008

interest therein attaching to the Sale proceeds with the same validity and priority as existed on the Petition Date pursuant to section 363(e) of the Bankruptcy Code.

**Determination of Purchaser as Good Faith Purchaser**
**Pursuant to Bankruptcy Code Section 363(m)**

21.    When a bankruptcy court authorizes a sale of assets pursuant to section 363(b), it is required to make a finding with respect to the "good faith" of the purchaser.[12] The purpose of that requirement is to facilitate the operation of section 363(m) of the Bankruptcy Code, which provides a safe harbor for purchasers of a debtor's property when the purchase is made in "good faith."

22.    The Debtors submit that Silver constitutes a good faith purchaser under section 363(m). The negotiations between the Debtors and Silver were at all times conducted at arms-length and in good faith. Silver is not an insider or affiliate of the Debtors (although the APA permits Silver to continue to employ some or all of the Debtors' management at Silver's discretion). Moreover, throughout the negotiations, the Debtors have worked diligently to maximize value to the estates. Accordingly, the Debtors respectfully request that the Court enter a finding that Silver is a good faith purchaser within the purview of Bankruptcy Code section 363(m).

23.    Additionally, the process of marketing and selling the Assets is designed to ensure a good faith sale thereof to any purchaser other than Silver. The Assets will be extensively marketed by the Debtors and Candlewood in accordance with the Bidding Procedures. Among other things, the Bidding Procedures provide for a fair auction process (if a bidder other than Silver meets certain financial and other qualifications) that will ensure an arms-length, good faith sale. The Bidding Procedures, moreover, are designed with the intent of encouraging competitive bidding, thereby maximizing value. Accordingly, the Debtors respectfully request that, if the Court approves the sale of the Assets as requested, it make a determination that the

---

[12]    *See Abbots Dairies*, 788 F.2d at 149-50.

9

purchaser is a good faith purchaser within the purview of section 363(m) of the Bankruptcy Code.

### Authorization of the Assumption and Assignment of the Assigned Leases and Contracts pursuant to Bankruptcy Code Section 365

24.    The Debtors seek authorization to assume and assign the Assigned Contracts and Leases to Silver (or the highest and best offeror) pursuant to section 365(a) of the Bankruptcy Code.

25.    Under section 365(a), a debtor may assume and assign executory contracts or unexpired leases if assumption and assignment reflects the debtor's sound business judgment.[13] The Bankruptcy Code, however, provides little guidance as to the standards to be applied by a court in approving an assumption or rejection. Drawing on law predating the enactment of the Bankruptcy Code, the predominant test is described as the business judgment rule or business judgment test.[14] The business judgment test is the same test applied to judicial review of corporate decisions outside bankruptcy.[15] This test analyzes the impact that continued performance under the executory contract or unexpired lease will have on the estate. Assumption or rejection of the contract or lease will be approved upon a mere showing that the action will benefit the estate.[16]

26.    In addition to the business judgment test, section 365(b)(1) of the Bankruptcy Code further provides that a debtor may not assume an executory contract or unexpired lease unless, at the time of assumption, the debtor: (a) cures defaults; (b) compensates the non-debtor

---

[13]    *See Sharon Steel Corp. v. National Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (standard for assuming or rejecting leases is the business judgment test).

[14]    *See In re Kong*, 162 B.R. 86, 94 (Bankr. E.D.N.Y. 1993); *In re Minges*, 602 F.2d 38 (2nd Cir. 1979); *In re Child World*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re Stable Mews Assocs.*, 41 B.R. 594 (Bankr. S.D.N.Y. 1984).

[15]    *See Johnson v. Fairco Corp.*, 61 B.R. 317 (N.D. Ill. 1986).

[16]    *See In re Chestnut Ridge Plaza Assocs., L.P.*; 156 B.R. 477 (Bankr. W.D. Pa. 1993) (test is best interest of the estate*); Bezanson v. Metropolitan Ins. & Annuity Co.*, 952 F.2d 1 (1st Cir. Me. 1991), *reh'g, en banc, denied*, 1992 U.S. App. LEXIS 14625 (1st Cir. Jan. 7, 1992), *cert. denied*, 120 L. Ed. 2d 871, 112 S. Ct. 2994 (U.S. 1992); *but see In re Klein Sleep Products, Inc.*, 78 F.3d 18 (2nd Cir. 1996) (assumption should not permitted until confirmation in chapter 11 reorganization context).

10

party to the lease or contract for any actual pecuniary loss resulting from defaults; and (c) provides adequate assurance of future performance.[17]

27.    In the present case, the Debtors seek not only to assume the Assigned Contracts and Leases, but also to assign the Assigned Contracts and Leases to Silver or the highest and best bidder.  Section 365(f) of the Bankruptcy Code addresses assumption of executory contracts and unexpired leases and provides, in pertinent part:

> (1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection
> . . . .
>
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.[18]

28.    As set forth in section 365(f) of the Bankruptcy Code, the assignment of a properly assumed contract or lease is to be permitted by the Court only if the debtor has assumed the contract or lease in compliance with all of the terms of section 365 of the Bankruptcy Code and if the debtor provides the other party to the contract or lease with adequate assurance of future performance by the assignee of the contract or lease.[19]

29.    Here, in accordance with the Bidding Procedures, the Debtors will have filed and served a schedule of the Assigned Contracts and Leases on all parties to such agreements as soon as is practicable, and in no event later than ten (10) days prior to the hearing on this Motion (the "Sale Hearing"), which schedule will include the Debtors' calculation of the amount they believe

---

[17]    See 11 U.S.C § 365(b)(1).

[18]    11 U.S.C. § 365(f)(1)-(2).

[19]    See 11 U.S.C. § 365(f)(2).

11

A- 0011

must be paid to cure all defaults under each of the Assigned Contracts and Leases (collectively, the "Cure Amounts"). As set forth more specifically in the Bidding Procedures, parties to the Assigned Leases and Contracts who do not object to the Debtors' calculation of Cure Amounts will be bound to accept those calculations.

30. The Debtors have not completed their calculation of the Cure Amounts. However, the Cure Amounts will be calculated and scheduled to include what the Debtors believe are any actual or pecuniary losses from an existing defaults, if any, under the Assigned Contracts and Leases. Consequently, the amounts necessary to pay the Cure Amounts as scheduled or determined by the Court will compensate or provide adequate assurance that the Debtors will compensate the appropriate party for any such actual or pecuniary loss.

31. Any assumption and assignment of an Assigned Contract or Assigned Lease will be subject to any applicable provisions of the Bankruptcy Code. The proposed terms and conditions set forth herein are designed to ensure that the assignees, if any, are financially able and prepared to undertake all of the obligations of the Assigned Contracts or Leases. In addition, the availability of the Sale Hearing gives the Court and other parties in interest an appropriate opportunity to evaluate any assignment issues.

32. The Debtors assert that under the circumstances, the Assigned Contracts and Leases can be properly assumed in compliance with section 365 of the Bankruptcy Code. First, as set forth above, the assumption of the Assigned Contracts and Leases by the Debtors complies with the requirements of section 365 because assumption clearly satisfies the "business judgment test." The Debtors' satisfaction of the business judgment test is demonstrated by the benefit to the Debtors' estates which will accrue as a result of the Debtors' ability to close the Sale on the terms and in the manner provided in the Bidding Procedures and from the savings realized as a result of: (a) the purchaser's assumption of the Debtors' obligations under the Assigned Contracts and Leases; and (b) the avoidance of a potential rejection damages claims and possible administrative expense claims.

12

33.    Second, all monetary defaults under the Assigned Contracts and Leases will be cured because, at the time of assumption, the Debtors anticipate that funds will be available from the Purchase Price to pay all Cure Amounts owing on the Assigned Contracts and Leases.

34.    Third, given the primary purpose of section 365(f)(2) of the Bankruptcy Code, the Debtors believe that the requirement of adequate assurance of future performance will be easily satisfied. Adequate assurance of future performance is to be determined on a case by case basis to insure that the other party to the contact or lease gets the benefit of the bargain for which he has contracted.[20] A landlord or a party to a contract, however, is not entitled to greater rights than are given by the lease or contract.[21] Specifically, the Bidding Procedures are designed to produce a Sale to a purchaser that will have sufficient financial wherewithal not only to close the Sale, but also to perform all of the Debtors' obligations under each of the Assigned Contracts and Leases.[22] Under these circumstances, the Debtors submit that the requisite adequate assurances of future performance pursuant to section 365 of the Bankruptcy Code with respect to the potential assumption and assignment of the Assigned Contracts or Leases will be demonstrated at the Sale Hearing. Accordingly, the Court should authorize the assumption and assignment of the Assigned Contracts and Leases to Silver or the highest and best bidder.

**Waiver of 10-Day Stays of Bankruptcy Rules 6004(g) and 6006(d)**

35.    The Debtors request that the Court enter an Order waiving the 10-day stays of Bankruptcy Rules 6004(g) and 6006(d). In light of the structure afforded by the Bidding Procedures and the opportunity for objections to this Motion prior to the hearing thereon, such waiver is appropriate under the circumstances.

---

[20]    *See Chera v. 991 Blvd. Realty Corp. (In re National Shoes, Inc.)*, 20 B.R. 55,59 (Bankr. S.D.N.Y. 1982).

[21]    *See In re Lafayette Radio Electronics Corp.*, 9 B.R. 993 (Bankr. E.D.N.Y. 1981).

[22]    *See In re Bygaph*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) (Congress intended that the words "adequate assurance" be given a practical, pragmatic construction, and is to be determined under the facts of each particular case").

13

A- 0013

## NOTICE

36.   No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been given to: (a) the United States Trustee for this region; (b) the Debtors' thirty largest unsecured creditors; and (c) KeyBank National Association, agent for the proposed postpetition lenders and prepetition lender. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

37.   No prior request for the relief sought in this Motion has been made to this or to any other court.

14

A- 0014

WHEREFORE, the Debtors respectfully request entry of an Order: (A) authorizing the sale of substantially all of the assets of the Debtors, free and clear of all liens, claims and encumbrances, to Silver, or to any other party that submits a higher and better offer; (B) authorizing the Debtors to assume and assign to Silver the Assigned Leases and Contracts; and (C) granting such other and further relief as the Court deems just and proper.

Dated: Cleveland, Ohio         Respectfully submitted,
     July 22, 2004

                                */s/ H. Jeffrey Schwartz*
                                H. Jeffrey Schwartz  (OBR #0014307)
                                John A. Gleason  (OBR #0039150)
                                Michael D. Zaverton  (OBR #0038597)
                                BENESCH, FRIEDLANDER,
                                  COPLAN & ARONOFF LLP
                                2300 BP Tower
                                200 Public Square
                                Cleveland, OH  44114-2378
                                (216) 363-4500
                                (216) 363-4588 (Facsimile)
                                jschwartz@bfca.com
                                jgleason@bfca.com
                                mzaverton@bfca.com

                                Proposed Attorneys for A.B. Dick Company, *et al.*,
                                Debtors and Debtors in Possession

                                      and

                                */s/ Frederick B. Rosner*
                                Frederick B. Rosner, Esq.  (No. 3995)
                                JASPAN SCHLESINGER HOFFMAN LLP
                                1201 North Orange Street, Suite 1001
                                Wilmington, DE  19801
                                Telephone:  302-351-8000/8005
                                Facsimile:  302-351-8010
                                frosner@jshllp-de.com

                                Proposed Local Counsel for A.B.Dick Company,
                                *et al*, Debtors and Debtors in Possession

15

# EXHIBIT A

Execution Version

ASSET PURCHASE AGREEMENT

BY AND AMONG

PRESSTEK, INC.,

SILVER ACQUISITIONS CORP.,

PARAGON CORPORATE HOLDINGS, INC.,

A.B. DICK COMPANY,

INTERACTIVE MEDIA GROUP, INC.

AND

A.B. DICK COMPANY OF CANADA, LTD.

DATED AS OF JULY 13, 2004

**Execution Version**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this *"Agreement"*) is entered into as of July 13, 2004, by and among Presstek, Inc., a Delaware corporation (*"Platinum"*), Silver Acquisitions Corp., a Delaware corporation (*"Purchaser"*), Paragon Corporate Holdings, Inc., a Delaware corporation (*"Parent"*), A.B. Dick Company, a Delaware corporation and a wholly-owned subsidiary of Parent (*"Seller"*), A.B. Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of Seller (*"Canada Sub"*) and Interactive Media Group, Inc., an Ohio corporation and a wholly-owned subsidiary of Parent (*"IMG"* and together with Canada Sub and Seller, the *"Sellers"*). Platinum, Purchaser, Parent and the Sellers may be referred to herein individually as a *"Party"* or collectively as the *"Parties."*

## RECITALS

WHEREAS, Seller expects to file, pursuant to the terms of this Agreement, in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*), a petition in bankruptcy under Chapter 11 of the Bankruptcy Code (as hereinafter defined);

WHEREAS, the Sellers currently wish to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Assets (as hereinafter defined), together with the Assumed Liabilities (as hereinafter defined), of Seller upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Purchaser wishes to purchase and take delivery of such Assets and Assumed Liabilities upon such terms and subject to such conditions; and

WHEREAS, the Parties expect that the Assets will be sold pursuant to a Sale Order (as hereinafter defined) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include the assumption and assignment of certain executory contracts, unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

## 1. DEFINITIONS AND USAGE OF CERTAIN TERMS

1.1 <u>Definitions</u>. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

*"Accounts Receivable"* means (i) all trade accounts receivable and other rights to payment from customers of Seller or its Subsidiaries and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Seller or its Subsidiaries, and (ii) all other accounts or notes receivable of Seller or its Subsidiaries and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

*"Affiliate"* means with respect to any Person, any Person which directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

"*Ancillary Agreements*" means either of or both the "Seller Ancillary Agreements" and the "Platinum Ancillary Agreements" as the context requires.

"*Bankruptcy Action*" means the occurrence of any of the following events with respect to any Seller: (i) the appointment of a receiver, trustee or liquidator for all or a substantial part of its assets; (ii) the making of a general assignment for the benefit of creditors; (iii) the filing of any petition or commencement of any proceeding for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions, or extensions; or (iv) the filing against it of any petition or the commencement of any proceeding against it for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions or extensions.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

"*Bankruptcy Court*" has the meaning set forth in the preface above.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules.

"*Breach*" means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

"*Business*" means the business conducted by the Sellers on the date hereof.

"*Business Day*" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are permitted or required to be closed.

"*Cash Equivalents*" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by an agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year after the date of acquisition thereof; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year after the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Corporation or Moody's Investors Service, Inc. (or, if at any time neither Standard & Poor's Corporation nor Moody's Investors Service, Inc. shall be rating such obligations, then from such other nationally recognized rating services reasonably acceptable to the DIP Lenders) and not listed in Credit Watch published by Standard & Poor's Corporation; (iii) commercial paper, other than commercial paper issued by the Seller or its Subsidiaries, maturing no more than ninety (90) days after the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 or P-1 from either Standard & Poor's Corporation or Moody's Investors Service, Inc. (or, if at any time neither Standard & Poor's Corporation nor Moody's Investors Service, Inc. shall be rating such obligations, then the highest rating; from such other nationally recognized rating services reasonably acceptable to the DIP Lenders); (iv) domestic and Eurodollar certificates of deposit or time deposits or bankers' acceptances maturing within ninety (90) days after the date of acquisition thereof issued by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia or Canada having combined capital and surplus of not less than $500,000,000; (v) repurchase obligations of the type referred to in clauses (i) through (iv) above; and (vi) money market

2

and mutual funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above and cash.

"*Chapter 11 Case*" means the voluntary case which will be commenced by Seller under Chapter 11 of the Bankruptcy Code pursuant to this agreement and the Bankruptcy Court.

"*Closing Date*" means the date on which the Closing actually takes place.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Competing Bid*" has the meaning set forth in Section 8.3(c) hereof.

"*Competing Bidder*" has the meaning set forth in Section 8.3(c) hereof.

"*Confidential Information*" means any and all of the following information of Seller or its Subsidiaries, Parent, Purchaser or Platinum that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically, or otherwise, or otherwise made available by observation, inspection or otherwise by either party (Purchaser and Platinum on the one hand or Seller and Parent collectively on the other hand) or its representatives (collectively, a "*Disclosing Party*") to the other party or its representatives (collectively, a "*Receiving Party*"):

      (a)    all information that is a trade secret under applicable trade secret or other law;

      (b)    all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, software and computer software and database technologies, systems, structures and architectures;

      (c)    all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, Contracts, the names and backgrounds of key personnel, and personnel training techniques and materials, however documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication; and

      (d)    all notes, analyses, complications, studies, summaries, and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, on any information included in the foregoing.

"*Contract*" means, with respect to any Person, any written agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation, promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

"*Control*" (including with correlative meaning, Controlled by and under common Control with) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or

3

cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"*DIP Financing*" means that certain $7,000,000 senior secured loan facility dated July __, 2004 between Seller as borrower and KeyBank, N.A. as agent for the DIP Lenders.

"*DIP Lenders*" means KeyBank, N.A. and Platinum.

"*Effective Time*" means 11:59 p.m. on the Closing Date.

"*Encumbrance*" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership.

"*Environment*" means soil, land surface or subsurface strata, surface waters (including navigable waters and ocean waters), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"*Environmental, Health and Safety Liabilities*" means any cost, damages, expense, liability, obligation, or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law, which either results from a notice or claim by a Governmental Authority or other Third Party or application of any Environmental Law or Occupational Safety and Health Law, including those consisting of or relating to:

    (a)    any environmental, health, or safety matter or condition (including on-site or off-site contamination, safety and health matters, and regulation of chemical substances or products);

    (b)    fine, penalty, judgment, award, settlement, legal or administrative proceeding, damage, loss, claim, demand or response, remedial, or inspection cost or expense arising under any Environmental Law or Occupational Safety and Health Law;

    (c)    financial responsibility under any Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any cleanup, removal, containment, or other remediation or response actions ("*Cleanup*") required by any Environmental Law or Occupational Safety and Health Law and for any natural resource damages; or

    (d)    any other compliance, corrective, or remedial measures required under any Environmental Law or Occupational Safety and Health Law.

The terms "*removal*," "*remedial*," and "*response action*" include the types of activities covered by the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq., as amended ("*CERCLA*") and "remediation standard" means a numerical standard that defines the concentrations of Hazardous Materials that are permitted to remain without liability in any environmental media after completion of all investigation, remediation and/or containment of a release of Hazardous Materials.

"*Environmental Law*" means any applicable environmental or health and safety related Legal Requirement, including those requiring or relating to:

4

(a)    advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or Hazardous Materials, violations of discharge limits, or other prohibitions and the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b)    preventing or reducing to acceptable levels the release of Hazardous Materials into the Environment, including such discharges, emissions and releases under permits and licenses issued by a Governmental Authority;

(c)    reducing the quantities, preventing the discharge, emission or release, or minimizing the hazardous characteristics of wastes that are generated and complying with waste disposal and recycling requirements;

(d)    assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)    assuring that any Hazardous Materials are properly containerized, used and stored;

(f)    protecting resources, species, or ecological amenities;

(g)    reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances;

(h)    cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or

(i)    making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self appointed representatives of the public interest to recover for injuries done to public assets.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means any entity which is a member of: (i) a "controlled group of corporations", as defined in Section 414(b) of the Code; (ii) a group of entities under "common control", as defined in Section 414(c) of the Code; or (iii) an "affiliated service group", as defined in Section 414(m) of the Code, or treasury regulations promulgated under Section 414(o) of the Code, any of which includes Seller or any Subsidiary of Seller.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Facilities*" means any real property, leasehold or other interest in real property currently owned or operated by any Person including the Tangible Personal Property currently being used or operated by Seller or its Subsidiaries at the respective locations of the Real Property specified in Section 3.13. Notwithstanding the foregoing, for purposes of Sections 3.24 and 11.6, "*Facilities*" shall mean any real property, leasehold or other interest in real property currently or formerly owned or operated by Seller or its Subsidiaries, including the Real Property and Tangible Personal Property being used or operated by Seller or its Subsidiaries at the respective locations of the Real Property specified in Section 3.13.

"*Final Order*" shall mean an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to

5

appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for reargument has been taken or been made and is pending for argument.

"*GAAP*" means U.S. generally accepted accounting principles, applied on a consistent basis from period to period.

"*Governmental Authority*" means any: (a) nation, state, commonwealth, province, territory, county, municipality or district; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"*Governmental Authorization*" any approval, consent, ratification, waiver, license, permit or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"*Ground Lease*" means any long term lease of land in which most of the rights and benefits comprising ownership of the land and the improvements thereon or to be constructed thereon, if any, are transferred to the tenant for the term thereof.

"*Ground Lease Property*" means any land, improvements and appurtenances subject to a Ground Lease in favor of Seller or its Subsidiaries.

"*Inventories*" all inventories of the Seller or its Subsidiaries, wherever located, including all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by Seller or its Subsidiaries in the production of finished goods.

"*Investment*" means, with respect to any Person, (i) any purchase or other acquisition by that Person of Securities, or of a beneficial interest in Securities, issued by any other Person, (ii) any purchase by that Person of all or substantially all of the assets of a business conducted by another Person, and (iii) any direct or indirect loan, advance (other than prepaid expenses, accounts receivable, advances to employees and similar items made or incurred in the ordinary course of business as presently conducted) or capital contribution by that Person to any other Person, including all indebtedness to such Person arising from a sale of property by such Person other than in the ordinary course of its business. The amount of any Investment shall be the original cost of such Investment, plus the cost of all additions thereto less the amount of any return of capital or principal to the extent such return is in cash with respect to such Investment without any adjustments for increases or decreases in value or write-ups, write-downs or write-offs with respect to such Investment.

"*knowledge*" when used with respect to any entity, means the actual knowledge of the directors and executive officers of such entity after due inquiry, and when used with respect to Seller shall also mean the actual knowledge of the directors and officers of Parent after due inquiry and when used with respect to Purchaser, shall also mean the actual knowledge of the executive officers of Platinum after due inquiry.

"*Land*" means all parcels and tracts of land in which Seller or any of its Subsidiary has an ownership interest.

6

A- 0023

"*Lease*" means any Real Property Lease or any lease or rental agreement, license, right to use or installment and conditional sale agreement to which Seller or any Subsidiary is a party and any other Seller Contract pertaining to the leasing or use of any Tangible Personal Property.

"*Legal Requirement*" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, ordinance, by-law, principle of common law, regulation, statute, or treaty.

"*Liability*" with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"*Limited*" means A.B.Dick UK Limited, a wholly-owned subsidiary of Seller organized in the United Kingdom.

"*Material Adverse Effect*" means

(a) if Seller shall fail to recognize a minimum of (i) $8,200,000 in revenue from its U.S. operations (or $11,000,000 on a consolidated basis) for the month of July, 2004, (ii) $8,750,000 in revenue from its U.S. operations (or $11,500,000 on a consolidated basis) for the month of August, 2004 and (iii) $9,750,000 in revenue from its U.S. operations (or $12,750,000 on a consolidated basis) for the month of September, 2004, measured in each case in accordance with GAAP; but excluding in each case any "Material Adverse Effect" arising from or related to the outbreak of civil unrest, hostilities, terrorist activities, or war (whether or not formally declared) which causes, in a measurable manner, the Material Adverse Effect, or

(b) any inability of the Seller to transfer to the Purchaser, and the Purchaser to acquire, the Assets, or

(c) any material increase or other material adverse change in the nature of the Assumed Liabilities, taken as a whole.

"*Occupational Safety and Health Law*" means any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"*Order*" any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"*Permitted Encumbrance*" means the encumbrances identified on Section 2.1 of the Seller Disclosure Schedule, together with the following: (i) any liens of mechanics, suppliers, vendors, materialmen, laborers, employees, repairmen and other like liens arising in the ordinary course of Seller's business securing obligations which are not due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings if and to the extent that an adequate reserve shall have been made therefor on Seller' balance sheet; (ii) liens incurred or deposits to secure the performance of surety and appeal bonds, bids, leases, performance and return money bonds and similar obligations, in

7

each case in the ordinary course of business, consistent with past practice as and to the extent that adequate reserves have been made therefor on Seller' balance sheet; (iii) purchase money liens incurred in the ordinary course of business, consistent with past practice as and to the extent that adequate reserves have been made therefor on Seller' balance sheet; and (iv) with respect to Real Property, privileges, easements, rights of way, licenses, covenants, zoning and other restrictions of record, which individually or in the aggregate, do not affect the current uses or marketability of the Real Property.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or any government or any agency or political subdivision thereof.

"*Petition Date*" means the date on which the Seller files the Chapter 11 Case.

"*Proceeding*" any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private).

"*Real Property*" means the Land and improvements and all appurtenances thereto and any Ground Lease Property.

"*Real Property Lease*" means any Ground Lease or Space Lease.

"*Record*" means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"*Release*" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, or dumping into the Environment.

"*Restricted Payment*" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of capital stock of, partnership interest of or other equity interest of Seller or its Subsidiaries now or hereafter outstanding (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of capital stock of, partnership interest of or other equity interest of, Seller or its Subsidiaries now or hereafter outstanding, (iii) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any permitted subordinated indebtedness, (iv) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of capital stock of, partnership interest of or other equity interest of, Seller or its Subsidiaries now or hereafter outstanding, or (v) any other payment or distribution made by Sellers to Parent or to another Affiliate of Sellers (other than inter-company loans permitted under the DIP Financing).

"*Sale Order*" shall mean one or more orders of the Bankruptcy Court, in form and substance reasonably satisfactory to Platinum, and Purchaser and consistent with the terms of this Agreement, (i) authorizing the sale of the Assets to Purchaser, free and clear of any and all Liens, (ii) finding that Purchaser is a good faith purchaser of the Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated, (iii) approving the assignment to and assumption by Purchaser of the Assumed Contracts and declaring that all Assumed Contracts are valid and binding and in full force and effect, (iv) determining that Purchaser is not a successor to Seller or otherwise liable for any of the Retained Liabilities or Excluded Assets and

8

permanently enjoining each and every holder of any of the Retained Liabilities or Excluded Assets from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Purchaser or the Purchased Assets related thereto, and (v) the consummation of the transactions contemplated herein.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securities Laws*" means the Securities Act, the Exchange Act, the Investment Company Act of 1940, as amended, the Investment Advisors Act of 1940, as amended, the Trust Indenture Act of 1939, as amended, and the rules and regulations of the SEC and any other Governmental Authority promulgated thereunder.

"*SEC*" means the United States Securities and Exchange Commission.

"*Seller Contract*" means any Contract: (a) to which Seller or its Subsidiaries is a party; or (b) by which Seller or its Subsidiaries or any of their assets is bound or subject to any obligation.

"*Seller Disclosure Schedule*" means that Disclosure Schedule dated as of the date hereof and provided by Parent and Seller to Platinum and Purchaser simultaneously with the execution and delivery of this Agreement.

"*Space Lease*" means any lease or rental agreement pertaining to the occupancy of any improved space on any Land.

"*Securities*" means any stock, shares, voting trust certificates, bonds, debentures, notes or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or any certificates of interest, shares, or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire any of the foregoing, but shall not include any evidence of the DIP Financing.

"*Seller Employee Plans*" means, collectively, (i) each "employee benefit plan", as defined in Section 3(3) of ERISA; and (ii) all other written or formal plans, enforceable policies or practices or Contracts involving direct or indirect compensation or benefits (including any employment Contracts entered into between Seller or any Subsidiary of Seller and any employee of Seller or any Subsidiary of Seller) currently or previously maintained, contributed to or entered into by Seller or any Subsidiary of Seller under which Seller or any Subsidiary of Seller of any ERISA Affiliate has any present or future Liability.

"*Subsidiary*" means, when used with reference to any Person, any corporation more than fifty percent (50%) of the outstanding voting securities of which, or any partnership, limited liability company, joint venture or other entity more than fifty percent (50%) of the total equity interest of which, is directly or indirectly owned or Controlled by such Person.

"*Tangible Personal Property*" means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned or leased by a Person (wherever located and whether or not carried on such Person's books), together with any express or implied warranty by the manufacturers or Seller or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

9

"**Third Party**" means a Person that is not a party to this Agreement or an Affiliate of a party to this Agreement.

"**Third Party Claim**" means any claim against any Indemnified Person by a Third Party, whether or not involving a Proceeding.

"**Threat of Release**" mean a substantial likelihood of a Release which requires action to prevent or mitigate damage to the Environment which may result from such Release.

    1.2 <u>Usage</u>

        (a) <u>Interpretation</u>.  In this Agreement, unless a clear contrary intention appears:

           (i)     the singular number includes the plural number and <u>vice versa</u>;

           (ii)    references to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

           (iii)   reference to any gender includes each other gender;

           (iv)   reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

           (v)    reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement and reenactment of such section or other provision; provided, however, that the foregoing shall not apply in instances in which the Legal Requirement refers to a specific date, time or period;

           (vi)   "hereunder", "hereof", "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision thereof;

           (vii)   "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

           (viii)  "or" is used in the inclusive sense of "and/or";

           (ix)   with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding";

           (x)    references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto, and

           (xi)   all references to "dollars" or "$" shall mean U.S. dollars.

10

A- 0027

(b) <u>Accounting Terms and Determinations</u>. Unless otherwise specified herein, all accounting terms used therein shall be interpreted and all accounting determinations thereunder shall be made in accordance with GAAP.

(c) <u>Legal Representation of the Parties</u>. This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party shall not apply to any construction or interpretation hereof.

## 2.   SALE AND TRANSFER OF ASSETS; CLOSING

2.1 <u>Assets to be Sold</u>. Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Sellers shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances (including those set forth on <u>Schedule 2.1</u>), and Purchaser shall purchase and acquire from Sellers, Sellers' right, title and interest in and to all of Sellers' property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, including the following (but excluding the Excluded Assets (as defined below)):

(a) all Real Property and Real Property Leases described in <u>Section 2.1(a) of the Seller Disclosure Schedule</u> currently owned or leased by Seller or any of its Subsidiaries (the "*Assumed Real Estate*"), but excluding the Real Property and Real Property Leases relating to Seller's facilities in Rexdale, Ontario and Henrietta, New York (together, the "*Excluded Real Estate Interests*");

(b) all Tangible Personal Property of Seller and its Subsidiaries, including those items described in <u>Schedule 2.1(b) of the Seller Disclosure Schedule</u>;

(c) all Inventories of Sellers and their Subsidiaries;

(d) all Accounts Receivable of Sellers and their Subsidiaries, including all intercompany receivables due to Seller;

(e) all Seller Contracts set forth on <u>Schedule 2.1(e) of the Seller Disclosure Schedule</u>, and all other Seller Contracts and outstanding offers or solicitations made by or to Seller to enter into any Contract after the date hereof that are made in accordance with the provisions of this Agreement, in each case which are assignable by their terms or with respect to which consent to assignment is obtained (the "*Assumed Seller Contracts*");

(f) all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to Purchaser, including those listed in <u>Section 3.5(c) of the Seller Disclosure Schedule</u>;

(g) all data and Records related to the operations of Seller, including client and customer lists and Records, referral sources, research and development reports and Records, production reports and Records, service and warranty Records, equipment logs, operating guides and manuals, financial and accounting Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records (all in the state in which such records and information presently exists) and, subject to Legal Requirements, copies of all personnel Records and other Records described in Section 2.2(m);

11

A- 0028

(h) all of the intangible rights and property of Seller, including Intellectual Property Rights (as defined in Section 3.15), good-will, telephone and telecopy numbers to the extent transferable, and e-mail addresses, websites and listings and those items listed in Section 3.15(b) of the Seller Disclosure Schedule;

(i) All rights (including all Intellectual Property Rights) of the Seller in and to the trademarks, service marks, trade names, trade dress and other names and brand identifiers held or used by any of the Seller or its Subsidiaries, including, without limitation, the name "A.B. Dick Company," "A.B. Dick Company of Canada, Ltd." and "A.B. Dick UK Limited" and the applications and registrations therefore identified in Section 3.15(b) of the Seller Disclosure Schedule (collectively, the "*Marks*"), and further including all filings associated therewith and all specimens, samples, illustrations and files, correspondence, records or other documentation arising from or relating to such registrations, applications, and filings;

(j) all insurance benefits, including rights and proceeds, arising from or relating to the Assets or the Assumed Liabilities prior to the Effective Time, unless expended in accordance with this Agreement;

(k) all claims of Seller against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or non-contingent;

(l) all rights of Seller relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof which are not excluded under Section 2.2(g);

(m) all of the capital stock of Limited; and

(n) certain assets of Canada Sub, as more fully described on a schedule to be provided by Purchaser prior to the Closing.

All of the foregoing property and assets are herein referred to collectively as the "*Assets*".

Notwithstanding the foregoing, the transfer of the Assets pursuant to this Agreement shall not include the assumption of any Liability in respect thereof unless the Purchaser expressly assumes such Liability pursuant to Section 2.4(a).

2.2 Excluded Assets  Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "*Excluded Assets*") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets, and shall remain the property of Seller after the Closing:

(a) all cash and cash equivalents;

(b) except for Limited, the shares of capital stock of each Subsidiary of Seller;

(c) all of the Seller Contracts listed in Schedule 3.21 of the Seller Disclosure Schedule, with the specific exception of the Assumed Seller Contracts described in Section 2.1(e) (the "*Excluded Seller Contracts*");

(d) all current claims for refund of Taxes and other governmental charges of whatever nature;

12

A- 0029

(e) all rights in connection with and assets of the Seller Employee Plans);

(f) all rights of Seller under this Agreement, the Bill of Sale, the Assignment and Assumption Agreement and the Escrow Agreement;

(g) the Excluded Real Property Interests and all Governmental Authorizations relating exclusively to the operation of such Real Property;

(h) personal property and assets expressly designated in Schedule 2.2(h) of the Seller Disclosure Schedule;

(i) any prepaid or current assets relating to directors' fees, affiliate company charges and bank fees and charges;

(j) claims against third parties to the extent related solely to any Excluded Asset or Excluded Liabilities;

(k) all insurance policies, including all rights, benefits and proceeds thereunder (except to the extent specified in Section 2.1(j) and (k));

(l) Seller's corporate seals, stock Record books, corporate Record books containing minutes of meetings of directors and stockholders; Tax returns and Records, books of account and ledgers and such other Records having to do solely with the Seller's organization or stock capitalization or Excluded Assets or Excluded Liabilities;

(m) all personnel Records and other Records that Seller is required by law to retain in its possession; and

(n) Seller's claims, causes of action, choices of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance action under any other applicable provisions of the Bankruptcy Code.

2.3 Consideration. The consideration for the Assets (the "*Purchase Price*") will be Forty Million Dollars ($40,000,000), which is payable in cash and by converting any amount of principal, interest or any other obligation (including, without limitation, fees or costs) which is owed by Seller or Parent to Platinum or its Affiliates on account of the DIP Financing, and the assumption of the Assumed Liabilities as provided in Section 2.4.

2.4 Liabilities.

(a) Assumed Liabilities. Subject to Section 2.4(b) and effective as of the Effective Time, Purchaser shall assume and become responsible for and shall thereafter pay, perform, and discharge in accordance with their terms the following Liabilities of Seller (the "*Assumed Liabilities*"):

(i) Any liability arising after the Effective Time under the Assumed Real Estate Leases;

(ii) any Liability to Seller's customers under written warranty agreements in the forms disclosed in Section 3.17 of the Seller Disclosure Schedule given by Seller to its customers in the ordinary course of business prior to the Effective Time;

13

(iii)   any Liability arising after the Effective Time under the Assumed Seller Contracts; and

(iv)   any Liability of Seller described on <u>Schedule 2.4(a)(iv)of the Seller Disclosure Schedule</u>.

(b) <u>Retained Liabilities</u>.  The Retained Liabilities shall remain the sole responsibility of and shall be retained by Seller.  *"Retained Liabilities"* shall mean every Liability of Seller and every Liability of any Subsidiary of Seller, other than the Assumed Liabilities, including:

(i)   any Liability arising out of or relating to products of Seller to the extent manufactured or sold prior to the Effective Time other than to the extent assumed under Section 2.4(a)(ii), (iii), or (iv);

(ii)   any Liability for Taxes, including (A) any Taxes arising as a result of Seller's, Limited's or any Subsidiary's operation of its business or ownership of the Assets prior to the Effective Time, (B) subject to Section 12.1, any Taxes that will arise as a result of the sale of the Assets pursuant to this Agreement and (C) any deferred Taxes of any nature;

(iii)   any Liability under any Seller Contract (other than the Assumed Seller Contracts) and including without limitation any Liability arising out of or relating to Seller's credit facilities, trade payables, indebtedness for money borrowed, amounts due to Affiliates or any security interest related thereto;

(iv)   any Environmental, Health and Safety Liabilities, in each case relating to a period or occurrence prior to the Effective Time relating to Seller or its predecessors, Subsidiaries or Affiliates, the operation of the Business, or the leasing, ownership or operation of any Real Property, including, without limitation any such liabilities related to any Real Property listed on <u>Schedule 3.13(c) of the Seller Disclosure Schedule</u>;

(v)   any Liability under the Seller Employee Plans or relating to payroll, vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits, or any other employee plans or benefits of any kind for Seller's employees or former employees, or both;

(vi)   any Liability under any employment, severance, retention or termination agreement with any employee of Seller or any of its Affiliates;

(vii)   any Liability arising out of or relating to any employee grievance whether or not the affected employees are hired by Purchaser;

(viii)   any Liability of Seller to any Affiliate of Seller;

(ix)   any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Seller, Parent or any Subsidiary;

(x)   any Liability to distribute or otherwise apply all of any part of the consideration received hereunder;

14

A- 0031

(xi)    any Liability arising out of any Proceeding pending as of the Effective Time, whether or not set forth in the Seller Disclosure Schedule;

(xii)    any Liability of Seller under this Agreement or any other document executed in connection with the transactions contemplated hereby;

(xiii)    any Liability of Seller based upon Seller's acts or omissions occurring after the Effective Time; and

(xiv)    any Liability of Seller not specifically described above but which may otherwise be set forth in Schedule 2.4(b).

2.5 <u>Deposit</u>. An earnest money deposit (the "*Deposit*") in the amount of Two Million Dollars ($2,000,000) shall be paid by Purchaser on the entry of the Sale Procedures Order (as defined in Section 8.1) into an escrow account in accordance with customary escrow agreement (the "*Escrow Agreement*"). The Deposit shall be applied to the Purchase Price payable by Purchaser on the Closing Date. If this Agreement shall be terminated by any Party hereto pursuant to Sections 11.1(a), (b), (c), (d), (e)(B), (f) or (g), or in the event that a Person other than Purchaser or an Affiliate of Purchaser purchases all or any portion of the Assets, then the Deposit shall be returned to Purchaser. If this Agreement shall be terminated by Seller pursuant to Section 11.1(e)(A), hereof, the Deposit shall be paid to Seller. Notwithstanding any other provision to the contrary contained herein, the Deposit shall be the sole and exclusive remedy of Seller against Platinum and Purchaser under this Agreement.

2.6 <u>Tax Allocation of Purchase Price</u>. Purchaser and Seller agree that the Purchase Price shall be allocated among the Assets in accordance with an allocation to be prepared by Purchaser and agreed upon by Seller and Parent, which agreement shall not be unreasonably withheld. Such allocation shall be in accordance with Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder and such other laws as may be applicable to the Assets of Canada Sub. Purchaser and Seller shall report and file all of their respective Tax Returns (including amended Tax Returns and claims for refund) consistent with such allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any taxing authority or in any other proceedings). Purchaser and Seller shall cooperate in the filing of any forms (including Forms 8594) with respect to such allocation. Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation, and shall not be an admission of and shall not be evidence of the value of any of the Assets in the Seller's Chapter 11 Case or any other related proceeding, and shall be for Tax purposes only; provided, however, that the portion of the Purchase Price allocated to the Assets to be purchased from IMG or from Canada Sub shall be paid directly to those entities.

2.7 <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of McDermott Will & Emery LLP in Boston, Massachusetts commencing at 9:00 a.m. local time on the Monday following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date as Purchaser and Seller may mutually determine (the "*Closing Date*"). The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within fifteen (15) calendar days after the Bankruptcy Court has entered the Sale Order approving such sale to Purchaser.

A- 0032

### 3.  REPRESENTATIONS AND WARRANTIES OF SELLER

In connection with this Section 3, all representations and warranties of Seller set forth in the following Sections 3.1 through 3.28 shall apply to both IMG and to Seller. Except as set forth in the Seller Disclosure Schedule delivered to Platinum and Purchaser herewith, the parts of which are numbered to correspond to the Section numbers of this Agreement and which thereby qualify the corresponding representations and warranties contained in this Article 3, Seller hereby represents and warrants to Platinum and Purchaser, subject to the effects of the anticipated filing of the Chapter 11 Case, as follows:

3.1  Organization and Good Standing.  Seller and each Subsidiary of Seller is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority, and all requisite qualifications to do business as a foreign corporation, to conduct its business in the manner in which its business is currently being conducted, except where the failure to be so organized, existing or in good standing or to have such power, authority or qualifications would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect on Seller.  All jurisdictions in which Seller and each Subsidiary of Seller is duly qualified or registered to do business as a foreign corporation is listed on Section 3.1 of the Seller Disclosure Schedule.  Seller has delivered or made available to Platinum a true and correct copy of its certificate of incorporation and bylaws and similar governing instruments of each of its Subsidiaries, each as amended to date (collectively, the "*Seller Charter Documents*"), and each such instrument is in full force and effect.  Neither Seller nor any Subsidiary is in violation of any of the provisions of the Seller Charter Documents.

3.2  Subsidiaries and Guaranties.  Each of Seller's Subsidiaries are listed on Section 3.2 of the Seller Disclosure Schedule, each of which is directly or indirectly wholly-owned by Seller.  Except as set forth in Section 3.2 of the Seller Disclosure Schedule, Seller does not have any other Subsidiaries or any interest, direct or indirect, in any corporation, partnership, joint venture, limited liability company or other business entity.  Section 3.2 of the Seller Disclosure Schedule indicates the jurisdiction of organization of each entity listed therein and Seller's direct or indirect equity interest therein.

3.3  [Intentionally Omitted]

3.4  Power, Authorization and Non-Contravention.

(a)  Seller and each Subsidiary of Seller has the requisite corporate power, legal capacity and authority to: (i) carry on its business as now conducted; (ii) own, operate and lease its properties in the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under all Seller Contracts constituting Assets to be purchased under Section 2.1, and (iv) upon entry of the Sale Order (as defined in Section 8.1(b)) enter into and perform its obligations under this Agreement and all agreements to which it is or will be a party that are required to be executed pursuant to or in connection with this Agreement (the "*Seller Ancillary Agreements*"); except in the case of clause (iii) of this Section 3.4 where the failure to have such power, capacity or authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller, the Business or the Assets.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate and stockholder action on the part of Seller.  The written consent of Parent, as the sole stockholder of Seller, a certified copy of which has previously been delivered to Purchaser, is sufficient for the approval of the transactions contemplated hereby by Seller's stockholders and no other approval of any holder of any

16

securities of Seller is required in connection with the consummation of the transactions contemplated hereby.

(b) No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by Seller or any Subsidiary of Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for: (i) the consents set forth in Section 3.4(b) of the Seller Disclosure Schedule, (ii) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state Securities (or related) Laws and the Antitrust Filings and (iii) such other consents, authorizations, filings, approvals and registrations which if not obtained or made would not be material to Seller, Platinum or Purchaser or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

(c) Upon entry of the Sale Order, this Agreement and the Seller Ancillary Agreements are, or when executed and delivered by Seller and Canada Sub and the other parties thereto will be, valid and binding obligations of Seller and Canada Sub (to the extent a party thereto) enforceable against Parent, Seller and Canada Sub (to the extent a party hereto) in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization, or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies; provided, however, that the Seller Ancillary Agreements will not be effective until the earlier of the Effective Time or the date provided for therein.

3.5 No Violation of Charter Documents and Contracts; Compliance with Legal Authorizations; Governmental Authorizations.

(a) Neither the execution and delivery of this Agreement or any Seller Ancillary Agreement, nor the consummation of the transactions provided for herein or therein will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of any provision of the Seller Charter Documents, as currently in effect, except as set forth in Section 3.5 of the Seller Disclosure Schedule, or any material Assumed Seller Contract.

(b) Except as set forth in Section 3.5(b) of the Seller Disclosure Schedule:

(i) Each of Seller and each Subsidiary of Seller is, and, to Seller's knowledge, at all times since January 1, 2000 has been, in material compliance with each Legal Requirement that is or was applicable to it or to the conduct of operation of its business or the ownership or use of any of the Assets;

(ii) no event has occurred or circumstance currently exists that (with or without notice or lapse of time) constitutes or will result in a violation by Seller or any Subsidiary of Seller of, or a failure on the part of Seller or any Subsidiary of Seller to comply with, any applicable material Legal Requirement; and

(iii) Each of Seller and each Subsidiary of Seller has not received, at any time since January 1, 2000, any written notice or, to Seller's knowledge, other communication from any Governmental Authority or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply by Seller or any Subsidiary of Seller with, any applicable material Legal Requirement.

17

(c) Section 3.5(c) of the Seller Disclosure Schedule contains a complete and accurate list of each material Governmental Authorization that are collectively necessary to permit Seller to lawfully conduct and operate its business in the manner it currently conducts and operates its business and to permit Seller to own and use the Assets in the manner in which it currently owns and uses such Assets. To Seller's knowledge, each Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule is valid and in full force and effect. Except as set forth in Section 3.5(c) of the Seller Disclosure Schedule:

(i) Each of Seller and each Subsidiary of Seller is, and at all times since January 1, 2000 has been, in full compliance with all of the material terms and requirements of each Governmental Authorization identified or required to be identified in Section 3.5(c) of the Seller Disclosure Schedule;

(ii) To Seller's knowledge, no event has occurred since January 1, 2000 or circumstance currently exists that (with or without notice or lapse of time) (A) constitutes or will result directly or indirectly in a violation of or a failure to comply with any material term or requirement of any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule, or (B) will result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule;

(iii) Seller has not received, at any time since January 1, 2000, any written notice or, to Seller's knowledge, other communication from any Governmental Authority or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply by Seller or any Subsidiary of Seller with any term or requirement of any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule; and

(iv) all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities, except to the extent that such failure would not have a Material Adverse Effect on Seller.

3.6 Documents and Disclosures.

(a) Seller has made available to Platinum for examination true and complete copies of all documents and information listed in the Seller Disclosure Schedule, as well as (i) Seller's minute book containing all records of all proceedings, consents, actions and meetings of the stockholders, the Board of Directors and any committees of the Board of Directors of Seller; (ii) all Governmental Authorizations, permits, Orders and consents issued by any regulatory agency or other Governmental Authority with respect to Seller and (iii) all of the foregoing documents and information with respect to the Subsidiaries.

18

A- 0035

office for use by Seller in administering the remainder of the Chapter 11 Case. Purchaser shall not be obligated to provide Seller with any secretarial staff, computer access or other support services, except access to an external telephone line, as needed.

## 7.  ADDITIONAL COVENANTS

### 7.1 Non-Competition, Non-Solicitation and Non-Disparagement.

(a)  Non-Competition. For a period of five (5) years after the Closing Date, neither Seller nor Parent shall, anywhere in the world, directly or indirectly invest in, own, manage, operate, finance, control, advise, or render services to, or guarantee the obligations of, any Person engaged in or planning to become engaged in the Business or any business that competes with the Business; provided, however, that Seller or Parent may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Exchange Act.

(b)  Non-Solicitation. For a period of five (5) years after the Closing Date, neither Seller nor Parent shall, directly or indirectly:

(i)    solicit the business of any Person who is an active customer of Purchaser; or

(ii)    cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Seller on the Closing Date or within the year preceding the Closing Date to cease doing business with Purchaser, to deal with any competitor of Purchaser, or in any way interfere with its relationship with Purchaser.

(c)  Non-Disparagement. After the Closing Date, the Parties will not disparage the other parties or any of their respective shareholders, directors, officers, employees or agents.

(d)  Modification of Covenant. If a final Order of a Governmental Authority of competent jurisdiction determines that any term or provision contained in Section 7.1(a) through (c) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration, or geographic area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 7.1 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 7.1 is reasonable and necessary to protect and preserve Purchaser's legitimate business interests and the value of the Assets and to prevent any unfair advantage being conferred on Seller or Parent.

7.2 Further Assurances. Parent and Seller agree that if, at any time before or after the Effective Time, Platinum considers or is advised that any further deeds, assignments or assurances are reasonably necessary or desirable to vest, perfect or confirm in Purchaser's assumption of the Assumed Liabilities, Parent and Seller shall execute and deliver all such proper deeds, assignments and assurances and do all other things reasonably necessary to vest, perfect or confirm title to such property or rights in Purchaser and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement. In addition, from and after the Closing Date, Seller agrees that it will (i) remit to Purchaser

40

A- 0036

all checks or payments received by it subsequent to the Effective Time which constitute Purchaser's assumption of the Assumed Liabilities s and (ii) collect any and all insurance proceeds resulting from claims relating to the business which constitutes Purchaser's assumption of the Assumed Liabilities and remit such sums directly to Purchaser. Platinum and Purchaser agree that if, at any time before or after the Effective Time, Seller considers or is advised that any further instruments of assumption or assurances are reasonable necessary or desirable to confirm Purchaser's assumption of the Assumed Liabilities, Platinum and Purchaser shall execute and deliver all such proper instruments and assurances and do all other things reasonably necessary to confirm Purchaser's assumption of the Assumed Liabilities, and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement.

7.3 <u>Filings</u>. The parties agree that, based upon the current facts known to them, no Antitrust Filings (as hereinafter defined) nor Other Filings (as hereinafter defined) are required. Notwithstanding the foregoing, in the event that Antitrust Filings (as hereinafter defined) or Other Filings (as hereinafter defined) are required, as promptly as practicable after the date of this Agreement, each of Parent, N.E.S. Investment Co., Sellers and Platinum will prepare and file (i) with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice Notification and Report Forms relating to the transactions contemplated herein if required by the HSR Act, as well as comparable notification forms required by the merger notification or control laws and regulations of any other applicable jurisdiction (the "*Antitrust Filings*") and (ii) any other filings required to be filed by them under the Exchange Act, the Securities Act or any other Federal, state or foreign laws relating to the transactions contemplated by this Agreement (the "*Other Filings*"). Parent, Sellers and Platinum each shall promptly supply the other with any information which may be required in order to effectuate any filings pursuant to this Section 7.3. Neither Platinum nor any of its Affiliates on the one hand, nor Parent nor any of its Affiliates on the other hand, shall be under any obligation to make proposals, execute or carry out agreements or submit to orders providing for the sale or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets or categories of assets of such party or any of its Affiliates, or imposing or seeking to impose any limitation on the ability of Platinum or any of its Affiliates or subsidiaries on the one hand or Parent or any of its Affiliates or subsidiaries on the other hand, to conduct their business or own such assets or to acquire, hold or exercise full rights of ownership of the Assets to be acquired.

## 8. BANKRUPTCY PROCEDURES, ETC.

8.1 <u>Motion and Notice Regarding Approval of Bid Procedures</u>. On or before July 15, 2004, Seller shall file a motion (the "*Sale Procedures Motion*") and give sufficient notice in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules seeking Bankruptcy Court approval of sale and bidding procedures consistent with the terms of this Section 8, including, without limitation, the Termination Fee described in Section 8.10 and the Expense Reimbursement described in Section 8.9, and Seller shall seek prompt entry of an order of the Bankruptcy Court granting the Sale Procedures Motion (the "*Sale Procedures Order*"), which approves bid procedures substantially similar to those requested in the Sale Procedures Motion after sufficient notice has been given. Upon approval of the sale and bidding procedures, Seller shall distribute a copy of the Sale Procedures Order (in the form of notice approved by the Bankruptcy Court) to all entities who have expressed an interest in acquiring the Assets.

8.2 <u>Motion and Notice Regarding Sale of Acquired Assets and Assumption and Assignment of Certain Acquired Assets</u>. On or before July 15, 2004, Seller shall file a motion (the "*Sale Motion*") and give sufficient notice in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules seeking Bankruptcy Court approval pursuant to Bankruptcy Code Section 363 of (1) a sale of the Assets to the Purchaser, and (2) to the extent required under the Bankruptcy Code or other

41

applicable law, approval pursuant to Bankruptcy Code Section 365 of assumption and assignment of certain of the Assets in accordance with the terms and conditions of this Agreement, Seller shall seek prompt entry of an order of the Bankruptcy Court granting the Sale Motion (the "*Sale Order*") after sufficient notice has been given.

8.3 No Talk/No Shop Provision. From the date of this Agreement through the approval or non-approval of Sale Procedures Order by the Bankruptcy Court, Seller shall cease any and all activities, discussions or negotiations with any parties with respect to the sale of Seller's Assets or business and neither Seller nor its employees, consultants, agents or representatives shall solicit, accept or in any way seek to further any offer to purchase any Assets of Seller, or any other entity to be formed through the restructuring of Seller or take any other action inconsistent with the transactions contained in this Agreement.

8.4 Determination of "Qualifying Bidder" Status. In order to participate in the bidding process and be deemed a "Qualifying Bidder,"[1] each bidder other than the Purchaser, must, on or before the Bid Deadline (defined below) deliver to counsel to the Seller, Benesch, Friedlander, Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, OH 44114-2378, Attn: H. Jeffrey Schwartz, Esq. ("*BFCA*"):

(a) an earnest money deposit in the amount of 10% of the gross amount of the purchase price set forth in such bid (the "*Qualified Bidder Deposit*") by cashier's or certified check (made payable to the Seller) or wire transfer of immediately available fund, which deposit shall be held by an escrow agent selected by Seller in accordance with the terms of an escrow agreement to be provided by Seller;

(b) a written offer or group of offers (a "*Qualifying Bid*") that:

i. states that such Qualifying Bidder offers to purchase the Assets upon the terms and conditions as substantially set forth in this Agreement or through a merger or alternative structure on such different or additional terms as appropriate and desirable, for such transaction structure (which terms and conditions shall be no less favorable to Seller as the terms and conditions contained in the Agreement);

ii. states that such Qualifying Bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisition of the Assets on terms and conditions no less favorable to Seller than the terms and conditions contained in the Agreement;

iii. states that such Qualifying Bidder is financially capable of consummating a transaction substantially similar to the transactions contemplated by this Agreement;

iv. contains such financial and other information that will allow Seller to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated;

---

[1] The Purchaser will be deemed a Qualifying Bidder and the Agreement constitutes a Qualifying Bid for all purposes.

42

A- 0038

v.   is likely to result in a value to Seller that is more than the aggregate of the value of the sum of: (1) the Purchase Price; plus (2) $1,200,000 (the maximum amount of the Termination Fee; plus: (C) $500,000 (the maximum amount of the Expense Reimbursement); plus (D) $400,000;

vi.  does not contain any due diligence or financing contingencies of any kind; and

vii. contains evidence that the bidder has received debt and/or equity funding commitments sufficient in the aggregate to finance the purchase of the assets proposed to be acquired, which evidence may include, without limitation, evidence of sources of equity or debt financing for payment of the purchase price, copies of commitment letters, and the identity of contact persons at the financing institutions issues such commitment letters.

At Seller's sole discretion, bids that do not substantially conform to the foregoing and the procedures set forth in the Sales Procedures Order may not be accepted. Seller shall have the right to negotiate with any bidder with respect to clarification or enhancement of such bidder's bid.

8.5 Requests for Information: All potential bidders shall be required to submit any requests for information with respect to Seller's Businesses or Assets or requests for access to Seller's employees, management or officers and directors to discuss Seller's businesses or Assets directly to Candlewood Partners ("*Candlewood*"), the Seller's financial consultants, and in no event shall any bidders be granted any such access other than by means of access through Candlewood. From the date of the approval of the Bidding Procedures Order, (1) if Seller supplies any information regarding Seller's Business to a potential bidder not heretofore given to Purchaser, Seller shall further provide Purchaser with a copy of such information within 24 hours of providing that information to any other potential bidder; and (2) with respect to any bid, term sheet, or written expression of interest by any other party for any Asset or Assets of Seller, or any other reorganization proposal, submitted prior to the Bid Deadline (defined below), Seller shall provide Purchaser with prompt notice of such proposal and a copy of such proposal within 48 hours of Seller's receipt thereof.

8.6 Bid Deadline.

(a) All Qualifying Bids must be submitted to BFCA so as to be received not later than 5:00 p.m. (prevailing Eastern Time) on September 21, 2004 (the "*Bid Deadline*"). After the expiration of the Bid Deadline, BFCA shall promptly provide copies of all bids received to (i) Seller's Delaware counsel, (ii) Purchaser's Delaware counsel, (iii) John J. Egan, III McDermott Will & Emery LLP, 28 South Street, Boston, Massachusetts 02109 and Stephen B. Selbst, McDermott Will & Emery LLP, 50 Rockefeller Plaza, New York, New York 10020 and (iv) counsel for KeyBank N.A., Alan R. Lepene, Esq., Thompson Hine LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114-1291.

(b) If Seller does not receive any Qualifying Bids by the Bid Deadline, counsel for Seller shall report the same to the Bankruptcy Court and Seller shall proceed to seek prompt entry of the Sale Order authorizing consummation of the transactions contemplated by this Agreement.

8.7 Auction. In the event that Seller timely receives one or more Qualifying Bids other than the bid of Purchaser, Seller shall conduct an auction (the "*Auction*"). The Auction will take place no later than 10:00 a.m. (prevailing Eastern time) on September 27, 2004 at the offices of Benesch,

43

A- 0039

Friedlander, Coplan & Aronoff LLP in Cleveland, Ohio or at such other place, date and time as may be designated in writing by the Seller. The Auction shall be governed by the following procedures:

(a) only Seller, representatives of KeyBank, N.A., representatives of the Creditors' Committee, if any, and any Qualifying Bidders (and the professionals for each of the foregoing) shall be entitled to attend and be heard at the Auction;

(b) only the Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(c) the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

(d) bidding shall commence at an amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

(e) Qualifying Bidders may then submit successive bids;

(f) the minimum bidding increment shall be $200,000; and

(g) the Auction shall continue until there is only one offer that the Seller determines, subject to Bankruptcy Court approval, is the highest and/or best Qualifying Bid (the "*Prevailing Bid*"). In making this decision, Seller shall consider without limitation the amount of the purchase price, the form of consideration being offered, the likelihood of the Bidder's ability to close a transaction and, the timing thereof, and the net benefit to Seller's estate. The Qualifying Bidder that submits the Prevailing Bid shall become the "*Prevailing Bidder*," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable asset purchase agreement. Within one (1) day after adjournment of the Auction, the Prevailing Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made.

8.8 Sale Hearing. The Prevailing Bid (or if no Qualifying Bid other than that of Purchaser is received, the offer made by Purchaser) will be subject to approval by the Bankruptcy Court. The Sale Hearing (as defined herein) shall be held not later than September 30, 2004 and may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

8.9 Expense Reimbursement: In the event of a termination of this Agreement pursuant to Sections 11.1(d)(B) and (C) only, Seller will reimburse the Purchaser for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by Platinum and Purchaser in connection with the transactions contemplated by the Agreement, up to a maximum of $500,000 (the "Expense Reimbursement").

8.10   Termination Fee: In the event of a termination of this Agreement pursuant to Sections 11.1(d)(B) and (C) only, Seller will be obliged to pay Purchaser an amount equal to $1,200,000, plus the Expense Reimbursement (the "*Termination Fee*"). The Termination Fee shall be due and payable in accordance with Paragraph 11.2 herein. Seller's obligation to pay the Termination Fee shall be given administrative expense priority pursuant to 11 U.S.C. Section 507(a)(1).

A- 0040

8.11    Defense of Orders.  Seller, at its sole cost and expense, shall defend the Sale Procedures Order and the Sale Order in the event that Purchaser elects, in its sole discretion, to close the purchase of the Assets notwithstanding the pendency of any motion for reconsideration or appeal of such Orders and shall promptly reimburse Purchaser for its reasonable attorneys' fees and costs in entering an appearance and in participating in such reconsideration or appeal.

## 9.  CONDITIONS TO OBLIGATIONS OF SELLER

Seller's and Parent's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Seller, but only in writing signed on behalf of Seller by an authorized officer):

9.1  Accuracy of Representations and Warranties.  Each of the representations and warranties of Platinum and Purchaser set forth in Article 4 of this Agreement shall be true and correct in all material respects (or in all respects, to the extent any such representation and warranty is already qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date.

9.2  Covenants.  Platinum and Purchaser shall have performed and complied in all material respects with all of its covenants contained in Article 6 on or before the Closing Date.

9.3  Absence of Material Adverse Effect.  No material adverse effect with respect to Platinum shall have occurred since May 31, 2004 and be continuing but excluding any material adverse effect arising from or related to the public announcement of the transactions contemplated by this Agreement or the DIP Financing, the outbreak of civil unrest, hostilities, terrorist activities, or war (whether or not formally declared) which causes, in a measurable manner, the material adverse effect.

9.4  Compliance with Law.  There shall be no Order by any Governmental Authority or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

9.5  Government Consents.  There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other actions, as may be required to consummate the sale of Assets by any regulatory authority having jurisdiction over the Parties and the actions herein proposed to be taken, including but not limited to satisfaction of all requirements under applicable Securities Laws and state "Blue Sky" or securities laws.

9.6  Absence of Litigation.  No litigation or proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement.  No litigation or proceeding shall be pending which could reasonably be expected to have a material adverse effect on Platinum that has not been previously disclosed to Seller herein.

9.7  Sale Order.  The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order.

45

A- 0041