# Tab 2



1

2           UNITED STATES BANKRUPTCY COURT
                DISTRICT OF DELAWARE

3

4  IN RE:               .      Chapter  11

5  A.B. Dick Company, Inc.,   .

6        Debtor(s).      .    Bankruptcy #04-12002 (CGC)
  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

7                     Wilmington, DE

8                 August 23, 2004
                   9:30 a.m.

9
          TRANSCRIPT OF EVIDENTIARY HEARING

10   BEFORE THE HONORABLE CHARLES G. CASE, II
         UNITED STATES BANKRUPTCY JUDGE

11

12  APPEARANCES:

13  For the Debtor(s):       John A. Gleason, Esq.
                     Benesch Friedland Coplan
14                 & Aronoff, LLP
                     2300 BP Tower
15                 200 Public Square
                     Cleveland, OH 44114
16
                 John F. Stock, Esq.
17                 Benesch Friedland Coplan
                     & Aronoff, LLP
18                 88 E. Broad St.-Ste. 900
                     Columbus, OH 43215
19

20                 H. Jeffrey Schwartz, Esq.
                     Benesch Friedland Coplan
21                 & Aronoff, LLP
                     2300 BP Tower
22                 200 Public Square
                     Cleveland, OH 44114
23
                 Frederick B. Rosner, Esq.
24                 Jaspan Schlesinger Hoffman, LLP
                     1201 North Orange Street-Ste. 1001
25                 Wilmington, DE 19801

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

2

```
 1    For The Official Committee:   Richard Mason, Esq.
      of Unsecured Creditors        McGuire Woods, LLP
 2                                  77 West Wacker Drive-Ste. 4100
                                    Chicago, IL 60601
 3
                                    James P. Ricciardi, Esq.
 4                                  McGuire Woods, LLP
                                    77 West Wacker Drive-Ste. 4100
 5                                  Chicago, IL 60601

 6                                  Shawn R. Fox, Esq.
      (Via telephone)               McGuire Woods, LLP
 7                                  7th Fl.
                                    1345 Avenue of the Americas
 8                                  New York, NY 10105

 9                                  Jeffrey Schlerf, Esq.
                                    The Bayard Firm
10                                  222 Delaware Ave.-Ste. 900
                                    Wilmington, DE 19801
11
      For MHR Capital Partners:     Eric M. Kay, Esq.
12                                  Stroock Stroock & Lavan, LLP
                                    180 Maiden Lane
13                                  New York, NY 10038

14                                  Anna Taruschio, Esq.
                                    Stroock Stroock & Lavan, LLP
15                                  180 Maiden Lane
                                    New York, NY 10038
16
                                    Megan N. Harper, Esq.
17    (Via telephone)               Landis Rath & Cobb, LLP
                                    919 Market Street
18                                  Wilmington, DE 19899

19    For Key Bank, NA:             Robert Folland, Esq.
                                    Thompson Hine, LLP
20                                  3900 Key Center
                                    127 Public Square
21                                  Cleveland, OH 44114

22                                  Alan R. Lepene, Esq.
                                    Thompson Hine, LLP.
23                                  3900 Key Center
                                    127 Public Square
24                                  Cleveland, OH 44114

25
```

A- 0091



3

|   |   |   |
|---|---|---|
| 1 | | Jami B. Nimeroff, Esq. |
| 2 | (Via telephone) | Buchanan Ingersoll, PC<br>1835 Market Street-14th Fl.<br>Philadelphia, PA 19103 |
| 3 | | |
| 4 | | David E. Wilks, Esq.<br>Buchanan Ingersoll, PC |
| 5 | (Via telephone) | The Nemours Building<br>1007 North Orange Street-Ste. 1110<br>Wilmington, DE 19801 |
| 6 | | |
| 7 | For Presstek, Inc.: | Stephen B. Selbst, Esq.<br>McDermott Will & Emery<br>50 Rockefeller Plaza |
| 8 | | New York, NY 10020 |
| 9 | | Gary Ravert, Esq. |
| 10 | (Via telephone) | McDermott Will & Emery<br>50 Rockefeller Plaza<br>New York, NY 10020 |
| 11 | | |
| 12 | | Francis A. Monaco, Jr., Esq.<br>Monzack & Monaco, PA |
| 13 | (Via telephone) | 400 Commerce Center<br>Twelfth & Orange Streets<br>Wilmington, DE 19899 |
| 14 | | |
| 15 | | James Scafide, Esq.<br>In-House Counsel |
| 16 | | Presstek, Inc.<br>55 Executive Drive<br>Hudson, NH 03051 |
| 17 | | |
| 18 | For Mitsubishi: | Thomas G. Whalen, Jr., Esq.<br>Stevens & Lee, PC |
| 19 | (Via telephone) | 300 Delaware Ave.-Ste. 800<br>Wilmington, DE 19801 |
| 20 | | Robert Lapowsky, Esq.<br>Stevens & Lee, PC |
| 21 | (Via telephone) | 1818 Market Street-29th Fl.<br>Philadelphia, PA 19103 |
| 22 | | |
| 23 | For Acting U.S. Trustee:<br>(Roberta A. DeAngelis) | David Klauder, Esq.<br>U.S. Trustee's Office |
| 24 | | 844 King Street-Ste. 2313<br>Lock Box 35 |
| 25 | | Wilmington, DE 19801 |

A- 0092



4

```
1                          Joseph J. McMahon, Jr., Esq.
                           U.S. Trustee's Office
2                          844 King Street-Ste. 2313
                           Lock Box 35
3                          Wilmington, DE 19801

4    Audio Operator:       Brandon J. McCarthy

5    Transcribing Firm:    Writer's Cramp, Inc.
                           6 Norton Rd.
6                          Monmouth Jct., NJ 08852
                           732-329-0191
7
     Proceedings recorded by electronic sound recording, transcript
8    produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

5

```
                              Index
                                               Further
                   Direct  Cross  Redirect  Recross  Redirect

Witnesses For
 Creditors' Committee:

   Mr. Carlston
   (by Mr. Mason)          219              235
   (by Mr. Gleason)               229
   (by Mr. Selbst)                233
   (by Mr. Lepene)                234


Witnesses For The
 Debtor:

   Mr. Knipp
   (by Mr. Stock)          45               108
   (by Mr. Mason)                 83
   (by Mr. Selbst)                106
   (by Mr. Lepene)                107

   Mr. Pollack
   (by Mr. Gleason)        114              205
   (by Mr. Mason)                 166                       214

   Mr. Pollack (cont'd)
   (by Mr. Mason)                 195
   (by Mr. Selbst)                200
   (by Mr. Lepene)                203


   Voire Dire
  .Mr. Pollack
   (by Mr. Gleason)        111
```

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| D-1 | August 2004 Forecast | * | 211 |
| D-2 | Asset Purchase Agreement | * | 211 |
| | | | |
| C-A | April 27, 2004 Letter | * | 218 |
| C-B | Stock Purchase Agreement | * | 218 |

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

A- 0094

6



```
1    C-C    Document from Books & Records        *    218
     C-D    Signature - Stock Purchase Agreement *    218
2

3   SUMMATION BY:

4      Mr. Gleason         244
       Mr. Selbst          250
5      Mr. Lepene          257
       Mr. Ricciardi       259
6      Mr. Kay             269

7

8
    THE COURT:  Finding       272
9

10
    *  Marked at previous hearing
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Writer's Cramp, Ina.*

*Certified Court Transcribers*

*732-329-0191*

7

1    THE CLERK: 04-12002, AB Dick.

2    (Pause in proceedings)

3    THE COURT: All right. Good morning.

4    (Pause in proceedings)

5    THE COURT: All right then, let's proceed.

6    MR. GLEASON: Thank you, good morning, Your Honor.

7    John Gleason, Benesch, Friedland, Coplan & Aronoff on behalf of

8    the Debtors. The first matter on the amended notice of agenda

9    for this morning is a motion that the Debtors have filed to

10   reject a certain unexpired -- or certain unexpired leases of

11   non-residential real property. This matter is going to be,

12   pursuant to Your Honor, adjourned until the September 13th date

13   that we have. And at that time we will ask -- assuming we are

14   out of that facility, ask for a retroactive rejection to August

15   31st so that we can avoid the September rent.

16   THE COURT: All right. Has the Landlord been involved

17   in those discussions?

18   MR. GLEASON: We have advised the Landlord. And I

19   understand that we are discussing that with them now.

20   THE COURT: Is the Landlord aware of your request that

21   the matter be adjourned? Is there anybody here on behalf of

22   the Landlord?

23   MR. ROSNER: Your Honor, Fred Rosner, Jaspan

24   Schlesinger. We served out that motion by Federal Express.

25   And we also served the agenda on the Landlord. We're not

A- 0096

8

1  asking for any relief today.  This is just a status conference.

2  We're trying to vacate that premise by the end of the month.

3  If we're successful in that effort, we come back on the 13th,

4  report to the Court, and then ask that the Order authorizing

5  the rejection be retroactive to the date we vacated.  And again

6  the idea is to not incur charges going into September.

7  THE COURT:  I understand that.  All right, thank you.

8  The way counsel had presented it, it sounded as if it was being

9  continued on the understanding that the retroactive nature of

10  the rejection would be approved at that time.  And I'm not

11  making any substantive decision with regard to that at this

12  hearing today.

13  MR. GLEASON:  I understand, Your Honor.

14  MR. MASON:  Good morning, Judge Case.  For the record,

15  my name is Richard J. Mason.  I'm with McGuire Woods, and we

16  represent -- or we are proposed counsel to the Creditor's

17  Committee.

18  THE COURT:  We've never gotten an Order signed for

19  you, Mr. Mason?  Or is that still subject to dispute at this

20  point?

21  MR. MASON:  Judge, I don't believe it's subject to

22  dispute.  It's just that I think that we have presented the

23  only motion in this case that has not been termed an emergency

24  motion, and therefore, it has been scheduled for the middle of

25  September.  And so we are still proposed counsel, but subject

A- 0097

1   to that limitation.  The Committee has not been consulted on

2   this motion.  We may have some technical objections to it

3   concerning who is actually the tenant under this lease.  And

4   we're just gonna reserve our rights.  And we have no problems

5   with this being put over to September 13th.  We will attempt to

6   work out something with the Debtor.  If not, we may want to

7   file at least a limited objection on this motion.

8          MR. ROSNER:  Fred Rosner again.  We will notice that

9   the hearing is going to be continued to the 13th, and we'll

10  have a new objection deadline to give the Committee an

11  opportunity to weigh in.

12         THE COURT:  All right, thank you.  The matter will be

13  continued to September 13th on the terms and conditions stated

14  on the record.

15         MR. GLEASON:  Thank you, Your Honor.  The last two

16  matters on the agenda are the Debtor's motion for entry of a

17  final Order approving Debtor-In-Possession financing, and the

18  Debtor's motion for Order approving bidding procedures.  These

19  matters have been adjourned on several occasions.  And although

20  the parties have made progress with respect to an overall

21  agreement, there are still a few open issues.  As indicated by

22  Your Honor at the last hearing, we are prepared to introduce

23  evidence today to establish the need for the requested relief,

24  as well as the fact that the requested relief is fair,

25  reasonable, and adequate given the circumstances of these

A- 0098

1  cases.  I would first like to advise the Court of the
2  significant modifications the Debtors believe we have
3  successfully negotiated with respect to these matters.  Rather
4  than file a reply, Your Honor, the Debtors were successful in
5  negotiating with both Key and Presstek.  There were
6  negotiations -- I won't go into them -- with all of the other
7  parties.  Again pursuant to Your Honor's admonishment at the
8  last hearing, I think all parties were involved in the
9  discussions.  The Debtors with Presstek and Key we believe have
10  been successful in getting three major modifications that we
11  believe address the objecting parties' concerns, as well as the
12  overriding concerns held by the Debtors in these cases.
13      The Debtors were able first to negotiate an extended
14  marketing process with bids now being due October 27th, and a
15  sale hearing being held, subject to Your Honor's calendar, the
16  first week of November.  Second, we have firmed up the Asset
17  Purchase Agreement by revising the definition of "inventory"
18  for purposes of the working capital test.  Presstek and Key
19  have agreed to include up to $2.5 million of pre-paid inventory
20  in this definition, as long as that inventory is received by
21  November 30th.  That ties into the Mitsubishi agreement that we
22  spoke about at the last hearing, Your Honor.  The Debtors
23  believe this modification will enable them to comply with the
24  terms of the Asset Purchase Agreement.
25      Finally, we also negotiated a modification to the Debtor-

1   In-Possession financing package so that pre-paid inventory

2   constitutes inventory included in the borrowing base.  Again,

3   the Debtors are confident this will enable them to satisfy the

4   reasonable representations and warranties that are contained in

5   the Asset Purchase Agreement.  I should note also that the

6   parties have agreed to extend the term of the D-I-P, or the

7   maturity date of the D-I-P through November 15th, which we

8   believe is more than sufficient to get us through the marketing

9   process.  With -- this is a backdrop, Your Honor.  Again, the

10  Debtors believing that they have addressed the three major

11  issues that the Debtors also had concern with at the time these

12  documents were negotiated, but didn't have a whole lot of

13  leverage to deal with them.  The Debtors also made

14  modifications to the proposed bid procedures.  They have been

15  circulated.  And although --

16          THE COURT:  Let me just ask a question --

17          MR. GLEASON:  Sure.

18          THE COURT:  -- counsel.  I heard an indication on the

19  line that there may have been somebody who joined the

20  conference.  Is there anybody new on the telephone?  Is there

21  anybody on the telephone?

22          UNIDENTIFIED SPEAKER:  Yes.  Yes, Your Honor.

23          THE COURT:  Okay.  Well I heard the sound that we

24  often hear when it's time to -- to indicate that somebody had

25  joined.  Is there anybody who just joined the conference?  If

1  so, please speak up.  All right, well maybe we lost somebody

2  instead of joining somebody.  Okay, sorry, counsel, go ahead.

3         MR. GLEASON:  Thank you, Your Honor.  Although the

4  final document has not yet been agreed to by the Committee or

5  MHR, the Debtors have negotiated a revised Form of Order with

6  Presstek that we believe addresses the legitimate concerns

7  raised by various parties, that will enable the Debtors to

8  fully market their assets.  Should I continue or --

9         THE COURT:  Did we just have somebody join the

10 teleconference?  Is there anybody new on the telephone?  All

11 right, go ahead, Mr. Gleason.

12        MR. GLEASON:  Again, we believe we've addressed the

13 legitimate concerns raised by the various parties, which will

14 enable the Debtors to fully market their assets while at the

15 same time preserve the going concern value of the Debtors'

16 businesses.  I have a copy of a proposed Form of Order which we

17 have blacklined to the one that was submitted to the Court with

18 the motion, if I may approach.

19        THE COURT:  All right.  Well I think I have the

20 blackline of the D-I-P Order.

21        MR. GLEASON:  Right.  And I have a blackline of the

22 Bid Procedures Order.

23        THE COURT:  Okay.

24        MR. GLEASON:  May I approach?  I believe all the

25 parties have one.  If anybody needs an extra copy, I do have

1    some, and I will leave them.  It's the one -- for the parties

2    in the Courtroom -- the one that we circulated this morning.

3    If I may, Your Honor, just go through the provisions and the

4    changes that have been made.  A lot of them are self-

5    explanatory, so I will just hit the substantive ones.  In

6    paragraph 4 of the revised bid procedures, Presstek has agreed

7    that they will guarantee the obligations of Silber pursuant to

8    the Asset Purchase Agreement.  That was one of the issues that

9    was raised by some of the parties.  In various paragraphs

10   throughout the bid procedures, the first place in paragraph 5,

11   the Debtors have agreed that with respect to many if not most

12   of the decisions concerning the bids and whether they're a

13   qualifying bid, and any other decisions that need to be made

14   with respect to the bid procedures, that they will do that

15   after consultation with the Committee, MHR, and Key Bank.  That

16   is kind of an overriding change throughout the document.

17       In paragraph 2(B)(i) it is -- the bid procedures have been

18   revised to show that the bids would be due October 27th.  We

19   then change the terms of the Asset Purchase Agreement that

20   other parties need to submit, so that it is not substantially

21   in the form of the Asset Purchase Agreement that was negotiated

22   pre-petition, but just that it is no less favorable than

23   negotiated pre-petition.  We have reduced the initial minimum

24   overbid amount by $200,000.  We have changed the deposit

25   amounts so that all bidders, including Silber and any of the

14

1  bidders that submit a bid, their deposits are the same 5%.
2  Previously other bidders had to place a 10% deposit.  On page 5
3  of the blackline, Your Honor, in paragraph C, again this has
4  the provision that we will provide information, as well as all
5  of the bids, to the Committee, MHR, Key Bank, and other
6  qualifying bidders.  The one change I would indicate, after
7  discussions here this morning, the Debtors have agreed to take
8  out the words "upon request" in both places in that paragraph.
9  We had had that in there so that people would request, and then
10  we would be able to keep track.  But we have agreed that we
11  will just provide that information to all of those parties.
12      The next major modification again ties to the time frame
13  in paragraph D.  We will conduct the auction on October 29th.
14  I would indicate for the Court that as of now we do have it
15  being held at our offices in Cleveland.  We will in
16  consultation with the parties -- after we see where the bids
17  are coming from and the Court's calendar when we may be able to
18  have a sale hearing, that location may change.  And I think the
19  Order contemplates that.  Let's see.  Just going to -- the
20  other -- we had indicated a bidding increment increase of not
21  less than $200,000, which was one of the issues raised by some
22  of the parties.  With respect to paragraph E, which begins on
23  page 6 but then continues on page 7, Presstek has agreed that
24  their termination fee, as well as their expense reimbursement
25  fee, only lasts for a period of six months, so that if the

A- 0103

1   Debtors do not go forward with Presstek or Silber, and then

2   close a transaction either pursuant to another sale or pursuant

3   to a Plan of Reorganization let's say seven months down the

4   line, these bid protections would not be payable to Presstek.

5   The sale hearing date has been changed also, Your Honor,

6   although we have left that bracketed as, of course, subject to

7   Your Honor's calendar.

8        I think the -- well, two more substantive issues there.

9   One is that with respect to the cure amounts, the Debtors have

10  agreed that we -- Silber is requesting some additional

11  information.  We will provide that information as soon as

12  possible.  And Silber has agreed that within 15 days of that

13  time, they will provide us the list of executory contracts and

14  leases that they would like the Debtors to assume and assign.

15  We will submit that list prior to October 1st, which we believe

16  will give all parties enough time to look at the list and look

17  at the Debtors' cure amount.  And then that is an issue that

18  would be decided or would be before the Court at the sale

19  hearing.  We've also agreed to publish notice of the hearing at

20  least 45 days prior to the bid deadline in the Wall Street

21  Journal and a trade publication.  And finally, although not on

22  here, another issue that was raised this morning that the

23  Debtors will change, is that to the extent the Bid Procedures

24  Order conflicts with the terms of the Asset Purchase Agreement,

25  we will have a provision that the Bid Procedures Order governs.

16

1    So we believe the Debtors have made significant progress

2    with respect to the Bid Procedures Order.  And we've addressed

3    the overriding concerns that the Debtors had.  With respect to

4    the proposed final D-I-P Order, Your Honor, the Debtors and

5    other parties -- again, all parties have been involved in

6    discussions.  We've had depositions, and there's been a lot of

7    work done within the last week.  And in addition to the

8    business terms that I described earlier, the change in the

9    definition of collateral and inventory, which we believe will

10   enable the Debtors to satisfy the reps and warranties in the

11   Asset Purchase Agreement, there were various modifications made

12   to the D-I-P Order.  And although I believe the Committee and

13   MHR may continue to take issue with certain provisions, the

14   Debtors believe these provisions are reasonable under the

15   circumstances, are consistent with applicable bankruptcy and

16   non-bankruptcy law, and are balanced by the limitations and

17   protections afforded the Debtors and other Parties-In-Interest.

18   Again, as has been the Debtors' main goal since the beginning,

19   before this case was filed, the Debtors' overriding concern is

20   to obtain reasonable post-petition financing in order to

21   maintain the going concern value of their business.  As we

22   believe the evidence this morning or this afternoon will

23   demonstrate, we have accomplished this goal.  With respect to

24   the individual items in the D-I-P Order, I would, if the Court

25   would like, turn the podium over to counsel for the Post-

17

1   Petition Lenders to address those.  And then as I indicated, we

2   are prepared to introduce testimony and other evidence to

3   support our motions.

4         THE COURT:  All right.  Are we're gonna counsel for

5   the -- and then we can hear from you kind of in an omnibus way,

6   Mr. Mason.  How does that sound?

7         MR. MASON:  Thank you, Judge.

8         MR. LEPENE:  Good morning, Your Honor, Alan Lepene

9   with the law firm of Thompson Hine on behalf of Key Bank.  Your

10  Honor, we have engaged in extensive discussions with the

11  objecting parties, and with counsel for Presstek, our co-D-I-P

12  Lender.  And I believe we have reached an agreement in

13  principle with respect to all of the points that were in

14  contention.  We have drafted a revised Order, but we have not

15  reached final agreement on the language, although I expect that

16  that will occur hopefully this morning or early this afternoon

17  so that we would be in a position to present an agreed Order to

18  the Court.  I can review, and then would ask others to

19  supplement to the extent that I have left anything out or mis-

20  state anything, the basic points that were in issue as raised

21  by the objecting parties, and how those have been resolved.

22  And I will be brief with respect to that.

23        THE COURT:  All right.  Before we go into that, sorry

24  to keep interrupting.  I want to ask the people on the

25  telephone, can you hear me?  This is Judge Case.

1    UNIDENTIFIED SPEAKER:  Yes, Judge, I can.

2    UNIDENTIFIED SPEAKER:  Yes.

3    THE COURT:  Is Mr. Metu Cobiashi on the phone?

4    MR. COBIASHI:  Yes, Cobiashi is here.

5    THE COURT:  All right, thank you, Mr. Cobiashi.  We

6    were trying to make sure you made it on the telephone.  All

7    right, go ahead, counsel.

8    MR. LEPENE:  Okay, thank you, Your Honor.  And right

9    now I am looking at the supplemental objection that was filed

10    by MHR, which lists about 10 basic objections that they had.  I

11    will just take these in order, and then review some of the

12    additional objections that the Committee had raised.  The first

13    point that had been raised by MHR related to the adequate

14    protection provisions, and the provision in the proposed Order

15    for post-petition interest payments, replacement liens, and

16    payments to professionals.  And issues were being raised as to

17    whether the full panoply of those rights should be given to Key

18    Bank in its capacity as Pre-Petition Lender.  We have agreed to

19    those provisions, including the payment of post-petition

20    interest, replacement liens, and payments to professionals.

21    The payments to professionals will be subject to a review

22    process that will be memorialized in the Order, relative to the

23    ability to raise issues regarding the reasonableness of fees,

24    and ultimately if objections are raised, to put those issues

25    before the Court for decision.

19

1   THE COURT:  Now, when you say "we have agreed," who is

2   we?

3   MR. LEPENE:  I believe all of the objecting parties.

4   And that would be MHR and the Committee.

5   THE COURT:  All right.  Just want to make sure I'm

6   clear here.

7   MR. SCHLERF:  Your Honor, Jeffrey Schlerf for the

8   Committee, good morning.  Your Honor, I spoke to David Kaluder

9   of the U.S. Trustee's Office shortly before the hearing, and

10  explained what I thought was a resolution with Key Bank.  And

11  he was comfortable with the compromises we made.  And I

12  understand that he's not pressing his objection.

13  THE COURT:  All right.

14  MR. LAPOWSKY:  Judge?

15  THE COURT:  Mr. Kaluder, are you on the phone?

16  MR. LAPOWSKY:  This is Bob Lapowsky.  I just want to

17  make sure that -- Mitsubishi had also filed a limited

18  objection.

19  THE COURT:  I'm sorry.  Excuse me, I'm sorry.  Whoever

20  is speaking is very hard to hear.  I'm sorry.  So speak up much

21  more clearly and loudly.

22  MR. LAPOWSKY:  Judge, this is Bob Lapowsky.  Can you

23  hear me now?

24  THE COURT:  Yes.

25  MR. LAPOWSKY:  I'm from Stevens & Lee, and we

1   represent Mitsubishi.  We had filed a limited objection to the

2   D-I-P Motion, raising only the issue of protecting our set-off

3   rights.  And there was a provision put in the Interim Order

4   that covered our objection.  But I'm listening to counsel

5   recite that they filed objections.  And I didn't hear him make

6   reference to Mitsubishi.  I'm hoping that it's because we

7   intend to roll that provision --

8            THE COURT:  Well --

9            MR. LAPOWSKY:  -- forward.  But I just want to make

10  sure that there is another objection out there, and it's from

11  Mitsubishi.  I also have some -- have one comment on something

12  that Mr. Gleason said, but I can save that until later.

13           THE COURT:  All right, thank you.  So Item #A on page

14  3 of the MHR objection, you're indicating, Mr. Lepene, has been

15  resolved by an agreement that those payments can be made with

16  the payments to professionals subject to reasonableness review.

17  Is that correct?

18           MR. LEPENE:  That is our understanding of the

19  agreement, Your Honor.

20           THE COURT:  All right, let's go on to the next one

21  then.

22           MR. LEPENE:  Okay.  The next one related to the

23  position that the objecting parties took that the post-petition

24  credit agreement improperly provided that it would be a

25  termination event under the D-I-P credit agreement if Key

1   Bank's pre-petition indebtedness was not paid in full under a

2   Plan of Reorganization.  What we have agreed to is that if a

3   Plan were to be filed, instead of pursuit of the 363 sale

4   process that -- outside of a Plan, that is before the Court, it

5   would in fact be a termination event, and the Debtors' rights

6   to continue to use cash based on Key Bank's agreement would

7   cease at that time.  However, at that point the Debtor would

8   have the right to seek authority to use cash.  We would have

9   the right to oppose that.  The issue would be one of adequate

10  protection, as if we were back to the first day of this case at

11  that point arguing over the use of cash collateral.

12          THE COURT:  So it would not trigger the need to --

13  under that circumstance, to pay -- or the requirement of paying

14  the debt in full.

15          MR. LEPENE:  That's correct.

16          THE COURT:  So that provision would be removed, and

17  basically the parties would be left with their remedies under

18  the cash collateral provisions of 363.

19      .   MR. LEPENE:  That is correct, Your Honor.  And

20  whatever other provisions might be available under the

21  Bankruptcy Code.

22          THE COURT:  Sure.  Whatever the parties rights are,

23  for them to seek the use of cash collateral, and you to require

24  that your interest be adequately protected.

25          MR. LEPENE:  The third point was that Key Bank in its

1    capacity as Pre-Petition Lender should not have consent rights

2    over any sale outside the ordinary course.  And we have agreed

3    that Key Bank in its capacity as Pre-Petition Lender would not

4    have any such consent rights with respect to sales.  Our

5    consent to sale procedures would be a requirement, and

6    qualified by our consent not being unreasonably withheld.  So

7    it would be limited to consent with respect to sale procedures

8    that would be adopted or put before the Court.

9        Point 4, the objecting parties raise an issue with respect

10    to the provision of the D-I-P Order providing for payments on

11    account of pre-petition indebtedness outside of and prior to a

12    Plan.  And, Your Honor, this relates to the provisions in the

13    Order upon closing of a sale that would provide for payment of

14    Key's pre-petition debt from the sale proceeds.  What we have

15    provided -- and this relates to another point, but I will

16    mention this now -- is we've set up a period for the Committee

17    to investigate Key Bank's security interest, the validity of

18    its claims and so forth.  We have now agreed to extend that to

19    November 1st, without any right of any further extension.  We

20    were seeking finality with respect to that.  If -- what we have

21    agreed to, and it's included in the Order -- if there is no

22    challenge to our security interest or our claims by the

23    November 1st date, then the Order would provide that we would

24    be paid consistent with our position of being, or holding a

25    first priority security interest in the assets that are being

23

1   sold. If a challenge were to be filed by that particular date,

2   the funds would then be escrowed pending a ruling by the Court

3   on the challenge that had been raised as to whether we did in

4   fact have a first priority security interest, or whether there

5   was some issue with respect to the validity of our claim. So I

6   believe that is how we have resolved that particular issue.

7       The next point, the objecting parties raised the issue

8   regarding the Order preventing the Committee from using funds

9   that are subject to a carve out for professional fees. They

10  objected to an exclusion or a restriction on those funds being

11  used to pursue claims against Presstek as a prospective buyer

12  of assets, as opposed to its capacity as a lender -- a D-I-P

13  lender. My understanding is, again based on our agreement,

14  that the objecting parties have agreed to withdraw that

15  particular objection.

16      The next point on the list, Your Honor, the objecting

17  parties raised an issue regarding the use of cash collateral on

18  a post-termination basis. And this really relates to the point

19  that I addressed previously. What happens if there is a

20  termination event? And the Order does provide a number of

21  events of default which constitute termination events. We have

22  agreed that we, the Lenders, would provide five days notice of

23  a termination event. During that five day period, the Debtor

24  would have the right to use cash collateral. Its right to use

25  cash collateral would expire at the end of that five day

1  period.  But the Debtor would have the right -- presumably

2  would seek to exercise that right if it felt it was

3  appropriate, to come before the Court to seek authority to use

4  cash collateral.  And again it would be the same issue.  We

5  would have the right to oppose.  The issue would be presumably

6  whether our interests are adequately protected.  We would be

7  back to square one at that particular point in time.

8      The next point deals with the 506(C) waiver which was

9  included in the proposed Order.  And in light of the agreement

10  that we have reached, and the concessions that we have made, my

11  understanding is that the objecting parties have agreed that

12  there would be included a 506(C) waiver, again as a quid pro

13  quo for the various concessions that have been made in terms of

14  the provisions of this particular Order.

15      The next point that was raised was what the objecting

16  parties believe was a lack of justification for an increase in

17  the Lender's super priority claims by the amount of carve out

18  funds that are paid to professionals.  We have agreed to leave

19  this provision in.  And there's really a very simple

20  explanation for that.  To the extent that there are

21  unencumbered funds available to pay professional fees, they are

22  to be used first before resort to the carve out.  However, if

23  at the time those fees are to be paid there are not

24  unencumbered funds available, we have agreed prior to our

25  receiving any distribution on our claim that we would cover the

1  unpaid professional fees that are subject to the carve out.

2  But that would result in a corresponding increase in our super

3  priority administrative expense claim in order to implement the

4  principle that the first source of payment for professional

5  fees are unencumbered assets.  And so on that basis the

6  provision that we have in the Order will remain.

7      The next point was raised by the objecting parties as to

8  whether this Order would bind a Chapter 7 Trustee.  We believe,

9  and my understanding that the objecting parties have agreed,

10  that it would be binding upon the Estate and any successor to

11  the Estate.  That is something that we require so that we have

12  some finality and assurance with respect to what has been

13  negotiated here.  It's my understanding that has been agreed

14  to.

15      And finally in terms of this list, there was an issue as

16  to what the maturity date of the D-I-P financing would be.  We

17  have agreed to extend to November the 15th to accommodate the

18  revised bid procedure and sale process timeline.  Those were

19  the points that MHR had raised.  There were some additional

20  points raised by the Committee.  I'm not sure that they

21  necessarily found their way into any specific paper that I can

22  point to right now, but let me just touch on those, and then

23  I'll turn the podium over to others to comment.  One of the

24  issues that was raised related to standing on the part of the

25  Committee or a Trustee to pursue claims, and a desire that we

A- 0114

1  have a provision in this Order that recognizes the standing to

2  pursue claims on behalf of the Estate.  We have no problem with

3  that, and the Order will contain such a provision.  I've

4  indicated with respect to the investigation period -- that was

5  something the Committee had specifically raised -- that we have

6  agreed to extend that period to November 1st.  But that is

7  without any right to seek or obtain any further extension.

8        And then there is an issue with respect to the budget for

9  professional fees.  This relates primarily to the payment of

10  those fees prior to a termination event.  And there was some

11  concern expressed on the part of the Committee as to whether

12  all of the anticipated fees were included within the budget.

13  And if there was a shortfall, how would funds to allocated, and

14  so forth.  I don't know that we have a specific resolution.

15  We, on the part of the Lenders, believe it's primarily an issue

16  that affects the Debtor and its professionals, and the

17  Committee and its professionals, although there is the

18  provision that the Bank's professionals will be paid as we had

19  discussed before, pursuant to a provision of this Order.  But I

20  think what we have said is we will work together.  If we can

21  address the budget issue today with the Debtor and its

22  financial advisor, and reach some kind of appropriate

23  understanding with respect to that, that would be fine.  If we

24  cannot reach an agreement, I think we've agreed to defer that

25  and work towards a resolution.  Again I think to a large extent

1  it's a matter not so much for the Post-Petition Lenders as it

2  is for the Debtor and the Committee and their professionals.

3  One other point I should mention in --

4         THE COURT:  So restating that, it means what?

5         MR. LEPENE:  I wish I knew.  I think it's that further

6  works needs to be done, Your Honor, to first of all find out

7  whether all of the anticipated and estimated fees are in the

8  budget, and then agree on a mechanism to provide for payment to

9  the extent of available funds to cover those professional fees.

10 Again, this is all prior to a termination event.  The way the

11 carve out works, once there is a termination event, then there

12 is thereafter a finite dollar amount that is established to

13 cover fees.  But I think this is one that we need to have some

14 further work on.  I think the feeling of the various parties

15 though is that that should not hold up the entry of an Order

16 today if everything else falls into place, so that we can have

17 a final D-I-P Order.  It may then be subject to some further

18 supplementation as we further address this particular issue.

19     •  The last point that I would mention is we did agree,

20 relative to the provision that Mitsubishi had raised regarding

21 set-off rights, and that there was no effort being made by

22 virtue of priming liens that were created in this Order, to

23 prime Mitsubishi's set-off rights.  That was contained in the

24 bridge Order that we put on last week.  We will continue that.

25 And we have agreed that we would expand that to other vendors

28

1    who are similarly situated. So it will be a generic provision

2    as opposed to just limited to Mitsubishi. And, Your Honor,

3    that is based on my notes where we are in terms of the

4    agreement. The Order that we have presented attempts -- is

5    blacklined. But again, that is not something that the parties

6    have yet signed off on, so there may be further work with

7    respect to language to accomplish all of this.

8         MR. MASON: Judge, I would defer to Mr. Selbst or

9    somebody from Presstek if they want to say anything in terms of

10    clarification so that we have the supporters of the motion

11    first, and then you could hear us.

12        MR. SELBST: Thank you, Mr. Mason. Good morning, Your

13    Honor, Stephen Selbst, McDermott, Will & Emery for Presstek.

14        THE COURT: I think you need to speak up, Mr. Selbst,

15    because of our telephone connection.

16        MR. SELBST: I'm sorry. I will try to do so, Your

17    Honor. Mr. Lepene's understanding and recitation of the Order

18    is correct. I want to make two points. And I simply want to

19    confirm that point number one that I had understand that was

20    acceptable to both MHR and the Committee was that no D-I-P

21    funds would be used to sue Presstek either in its capacity as a

22    lender or in its capacity as a proposed purchaser of the

23    assets. Is that correct?

24        MR. MASON: Yes.

25        MR. SELBST: Okay. And secondly, Your Honor, so that

1  there is no misunderstanding about this, Presstek's willingness
2  to continue as a D-I-P Lender is conditioned expressly in our
3  papers on a bid procedures Order being entered today.  We are
4  here as the stalking horse.  But if Your Honor does not enter
5  the bid procedures Order, we're not prepared to continue to
6  serve as a Lender.  Thank you.
7         THE COURT:  All right.  Is there anybody else who is a
8  proponent of the motion who wishes to be heard before we hear
9  from the Committee and MHR?  If not, go ahead, Mr. Mason, or
10 whoever is going to speak on behalf of the Committee.
11        MR. MASON:  Thank you, Judge.  Once again, Richard J.
12 Mason, McGuire Woods, proposed counsel for the Creditor's
13 Committee.  Judge, at the outset of this case these two motions
14 were presented to the Court.  And both of these motions, in the
15 opinion of the Committee, contain some over-reaching
16 provisions.  If you had granted the motions as originally
17 proposed, the Bank and Presstek would have tied up this Estate,
18 there would have been automatic -- lapses of the automatic stay
19 if we didn't operate on the schedule that was proposed, there
20 would have been other onerous provisions imposed on the Estate.
21 In addition, the sale would be coming up in the next few weeks,
22 and the concept of an auction would have been just a ruse.
23 Fortunately, we've been able to persuade the Debtor, Presstek,
24 and the Bank to back off on a number of these over-reaching
25 provisions.  And the Committee is satisfied with a number of

1   the changes.

2       Now to bring this thing into focus, what the Committee is

3   concerned about at this point is, number one, the

4   conditionality of the bid that is being submitted by Presstek.

5   The evidence is going to show that Presstek has many, many ways

6   of getting out of the contract.  And we believe that as a

7   result of the conditionality that the Court should not grant

8   bid protection to Presstek.  Number two, although we are

9   satisfied with the November 15th date being the outside date

10  for closing and being the time that the D-I-P loan comes due,

11  we are not entirely happy with the October 27 and 29th date,

12  and so that has become an issue of concern for us.

13      Now, Mr. Selbst made a comment just before he sat down to

14  the effect that in the event that Your Honor does not approve

15  the sale procedure Order in a form that is acceptable to Mr.

16  Selbst, then Presstek reserves the right to undermine the D-I-P

17  Order and to not make D-I-P loans.  We believe that Presstek

18  has no such right.  I would direct Your Honor's and the

19  parties' attention to Your Honor's July 15, 2004 interim Order.

20  That Order contains a provision in paragraph 39 that says in

21  the event that any inconsistency between the provisions of this

22  interim Order and the provisions of the post-petition financing

23  documents, the provisions of this interim Order shall control.

24  On page 26 of that Order, paragraph 19(R) and (S) read that the

25  financing is conditioned on failure by the Debtors to obtain an

1  Order -- an Order -- approving sale procedure on or before

2  August 29, 2004; and (S), failure by the Debtors to obtain an

3  Order on or before September 30, 2004 that authorizes the

4  Debtors to sell substantially all of their assets.

5      We believe that these provisions indicate that if Your

6  Honor approves the sale procedure Order, under any terms, that

7  the D-I-P financing does have to go ahead.  We also believe

8  that in many other instances Presstek has also committed to

9  extend the D-I-P.  And we will present evidence and materials

10  as to those commitments to the extension of the D-I-P as

11  proposed earlier this morning.  Now, the way that we've divided

12  up the responsibilities among the Committee is that my

13  colleague, Mr. Ricciardi, will lead the objection to the sale

14  procedures Order, and Mr. Schlerf of The Bayard Firm will

15  address the D-I-P Order.  So at this point I don't believe that

16  Mr. Ricciardi has any further comments.  But I believe that Mr.

17  Schlerf may have a few further comments about the D-I-P.

18      MR. SCHLERF:  Hello again, Your Honor, Jeffrey Schlerf

19  for the Committee.  Your Honor, I just wanted to supplement

20  just to a small extent what Mr. Lepene -- his characterization

21  of our resolution.  With respect to adequate protection

22  payments, we are adding a proviso in the Order that there -- an

23  event such as the -- it turns out the Pre-Petition lender is

24  undersecured, or the Committee challenges its liens, then the

25  Committee has the right, or the Debtors have the right to

1  revisit the issue of adequate protection.  That was the first

2  point I wanted to make.

3      Secondly, counsel described a situation where the

4  Committee challenges the Bank's liens.  And there would be an

5  escrow until that lawsuit was resolved.  I'd like the

6  opportunity to talk a bit more in detail with Mr. Lepene about

7  that, because there might be some reasons why, depending on the

8  scope of the lawsuit, that might not be right for the Bank to

9  have all of its debt escrowed.  There might be other reasons

10  why -- I think there needs to be some mechanics that are

11  discussed.  And I think we can probably resolve that between

12  now and when we present the Order.  I think this was an

13  oversight, Your Honor.  Just to make clear, though, that

14  avoidance actions will remain unencumbered.  Not only the D-I-P

15  Lender's liens, but also they won't be able to get recoveries

16  via their super priority claim -- pursuant to that claim.  If

17  they had a general unsecured claim, they would be able to get a

18  recovery that way, but not either through their lien or super

19  priority claim.

20      With respect to standing, Your Honor, we just want the

21  Order to make clear that whatever rights the Debtors have, the

22  Committee or a subsequent Trustee would have standing in the

23  shoes of the Debtor, as far as standing goes.  He agreed to

24  increase the carve out amounts.  I believe it's $100,000 for

25  the Debtors' professionals, and $75 for the Committee's

1  professionals.

2        THE COURT:  You mean 75,000?

3        MR. SCHLERF:  Yes.  That would not be an improvement.

4  Also, we believe this is already the current version of the

5  Order, Your Honor, but with respect to the lifting of the

6  automatic stay in the event of a termination event, what we've

7  done is we've kind of bifurcated that in that if there is a

8  termination event with respect to the post-petition, that there

9  would be the five-day notice period with the opportunity to go

10  before Your Honor on the issue of whether there has actually

11  been in fact a termination event.  With respect to taking

12  action with respect to the pre-petition, Your Honor, that would

13  be something that there would be a longer period, a 20-day

14  period, with the opportunity for a full-blown hearing under

15  Section 362, Your Honor, as opposed to just limited to the idea

16  of whether there's been a termination event.

17        The last point, Your Honor, just to supplement a little

18  bit further about this discussion that we need to have

19  regarding the budgeting of professional fees, paragraph 14

20  discusses -- it's a long paragraph, but it has in there a

21  discussion about weekly escrows of individual professionals.

22  But the Committee has not actually been privy to what the

23  actual budgeted amounts are for the Committee in general.  And

24  to add to that a little bit, I believe since the budget for

25  professional fees is put together, the Committee has retained

A- 0122

34

1    Jeffries as our financial advisor.  And so we want to make

2    sure, Your Honor, that professional fees are reasonable and

3    adequate vis-a-vis the Committee's people.  With that, Your

4    Honor, I think that -- we've put on the record what our

5    resolution is, subject to there being, I guess, two Debtor-In-

6    Possession Lenders.

7            MR. KAY:  Good morning, Your Honor, Eric Kay from

8    Stroock Stroock & Lavan for MHR.  Just want to -- I'm really

9    following up on what Mr. Mason said about the obligations of

10   Presstek to continue as D-I-P Lender in this case.  As you may

11   recall, Judge, the focus at the first day hearing was on the

12   two hats worn by Presstek.  Not only a D-I-P Lender, but also a

13   prospective purchaser.  And the concern expressed by MHR in its

14   objection to the interim D-I-P Order was the ability of

15   Presstek to lock up the sale to itself without a process,

16   without a reasonable process, based upon its -- the hat it's

17   worn as a D-I-P Lender.  And how Presstek was seeking to do

18   that was in the provisions of the proposed D-I-P Order.  And I

19   would focus on paragraph 19(R) of the proposed D-I-P Order

20   which provided that not only did the Court need to enter an

21   Order approving the sales procedures on or before August 27th,

22   but that Order had to provide a break-up fee to Presstek, it

23   had to provide an expense reimbursement to Presstek, it had to

24   provide the bidding increments, and it had to provide, you

25   know, other elements of what would normally be in a bidding

A-0123

1  procedures Order for a qualifying bid.  And as we expressed to

2  Your Honor, this caused us great concern because if Presstek

3  didn't get that Order, it would have the ability to pull the

4  financing and essentially lock up the assets without a real

5  process.

6      And the way that was resolved is we stripped out of the

7  Order all of those requirements.  All that is remaining in the

8  entered Interim Order is, as Mr. Mason suggested, that the

9  Court must enter an Order approving sale procedures by August

10 27th.  It doesn't say what that Order needs to provide.  And

11 that gave us comfort that Presstek, as long as the Order was

12 entered, would be there and would continue to provide the

13 financing, and hopefully would be there as a stalking horse

14 bidder.  Presstek is now informing us that no, if the Order is

15 not to our liking we could just walk and we could pull our

16 financing.  But I submit, Your Honor, that's simply not what

17 the Order says.  And I would note that at the first day hearing

18 Mr. Selbst indicated that they are prepared to abide by the

19 Court's determination as to what fair sale procedures are --

20 period, full stop.  So I submit, Your Honor, that after the

21 hearing on the bid procedures, if you enter an Order that

22 obviously the Court deems reasonable, that Presstek does not

23 have the ability to pull its financing, whether it has problems

24 with that Order or not.  It's committed to going forward on the

25 D-I-P.  And, you know, what it does with its bid, I don't know.

36

1   But it's at least committed to going forward with the D-I-P

2   financing.  That's all I have.  Obviously we'll have much more

3   in connection with the bid procedures.

4       THE COURT:  So let me see if I can crystalize for

5   myself where we are here.  With regard to the D-I-P Order

6   itself, which relates to two lenders, Key and Presstek, it

7   appears that perhaps subject to some tweaking there is

8   agreement among the Lenders, the Debtor, and the objectors,

9   including the United States Trustee, concerning how those

10  matters are going to be resolved.  With regard to the bid

11  procedures motion, some of the issues have in fact been

12  resolved, particularly the timing issues, it sounds like,

13  although there is some continuing concern by the Committee as

14  to the October dates.  There is also some proposed resolution

15  of incremental amounts and so on.  What the initial starting

16  overbid has to be.  But not all of those issues, particularly

17  the issues having to do with certain bid protections with

18  regard to Presstek have not been resolved in terms of the

19  amount of a break-up fee or the expense reimbursement, among

20  others.  So what we need to do today is to have a hearing on

21  the bid procedures motion, not so much on the D-I-P.  I mean

22  the D-I-P issues have been fundamentally resolved, except to

23  the extent that there seems to be a difference between the

24  parties.  That is to say Mr. Selbst saying there has to be a

25  bid procedure Order satisfactory to us in order for us to

A- 0125

1  consent to the continuation of the D-I-P, and the objectors

2  saying that's not true.  So that's an issue I need to address

3  and resolve.

4          MR. SELBST:  That's correct from our perspective, Your

5  Honor.

6          THE COURT:  I heard Mr. Selbst say that's correct from

7  his perspective.  And I take it that's correct too.

8          MR. KAY:  That is correct from MHR's perspective.

9          MR. MASON:  Judge, I -- the only comment that I would

10  have is I'm not quite sure --

11          THE COURT:  Make sure you're speaking towards the

12  microphone.

13          MR. MASON:  I'm -- excuse me.  I'm looking at Mr.

14  Ricciardi.  I don't believe that there is still an open issue

15  on incremental bidding.  Is that correct?

16          MR. RICCIARDI:  No, there is not an open issue.

17          MR. MASON:  Yes.  Your Honor, we agree with your

18  comments, except that I believe that the parties have reached

19  agreement on incremental bidding.  The two matters that the

20  Committee is concerned about in the sales procedure are the

21  conditionality of the offer, and whether or not there should be

22  bid protections given as a result of that conditionality, and

23  again the August -- I mean the October 27th or 29th dates.

24          THE COURT:  And by bid protections you fundamentally

25  mean a break-up fee.  Is that right?

38

1    MR. MASON:  The break-up fee, and the expense

2  reimbursement.

3        THE COURT:  Expense reimbursement.

4        MR. MASON:  Yes.

5        THE COURT:  Those are the two aspects of bid

6  protection.  We've already done away with the no shop clause,

7  if I understand.

8        MR. MASON:  Yes, Your Honor.

9        THE COURT:  And other types of bid protections that

10  were in the initial thing are gone.  But there's still the

11  issue of the break-up fee, the reasonableness of that, and

12  whether or not it's appropriate given the fact that the

13  Committee believes that there are too many outs for Presstek

14  even to be entitled to a break-up fee.  In other words, your

15  position is if they're gonna get a break-up fee, they've got to

16  be more locked in than you believe they are.

17        MR. MASON:  Precisely, Judge, thank you.  And, Your

18  Honor, we are prepared to put on evidence.

19        MR. LAPOWSKY:  Judge, this is Robert Lapowsky.  Can I

20  be heard briefly on the D-I-P?

21        THE COURT:  Yes.  I'm sorry.  Start again, counsel,

22  and identify yourself.

23        MR. LAPOWSKY:  Robert Lapowsky for Mitsubishi, just

24  with a brief comment on the D-I-P Order.

25        THE COURT:  Okay.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0127

1  MR. LAPOWSKY:  Judge, the issue that we had raised in

2  our written objection sounds like it has been covered.  That is

3  the protection of set-off rights.  But when I was listening

4  earlier today I heard for the first time the resolution of the

5  issue of the counting of inventory that's been what they say

6  pre-paid.  And that's fine with Mitsubishi, provided that it's

7  understood, and if there's nothing in the Order that would

8  conflict with the notion that the title to that inventory --

9  because I think they are primarily talking about Mitsubishi

10  inventory -- remains with Mitsubishi until it's fully paid for.

11  So they can -- the Lenders certainly can do whatever they want

12  to do in terms of counting towards borrowing basis, or that

13  type of thing.  But I just wanted to make sure that it was

14  clear on the record that we would not be sort of backdooring

15  some type of title or accelerated passage of title for this

16  inventory that's going to be counted towards the borrowing

17  base.

18  MR. GLEASON:  Your Honor, I wish I was smart enough to

19  think about that.  No, it's pre-paid deposits, and --

20  THE COURT:  I think the issue here, if I understood

21  it, was how that pre-paid inventory was going to be accounted

22  for purposes of whether or not certain ratios that were

23  required to be achieved under the APA had or had not been

24  achieved, thereby providing an out to Presstek to go forward.

25  MR. GLEASON:  Right.  We are not looking to take title

1   to Mitsubishi's --

2       THE COURT: So you're not trying to change whatever

3   rights the sellers of the inventory may have, but rather simply

4   have agreed on the treatment of the pre-paid inventory for

5   purposes of compliance with the reps and warranties of the APA.

6       MR. SELBST: Your Honor, it's both the APA and the D-

7   I-P. You know, in addition to be qualifying as inventory for

8   the working capital adjustment under the Asset Purchase

9   Agreement, it is also inventory for borrowing base purposes

10  under the D-I-P loan.

11      THE COURT: Right.

12      MR. SELBST: And, Your Honor, I do want to correct one

13  thing. I believe my client had only agreed to two and not two

14  and a half million dollars on the pre-paid.

15      MR. LAPOWSKY: Judge, it sounds like everyone is in

16  agreement. And I would just ask that I be included on the

17  circulation list for the proposed Form of Order.

18      THE COURT: All right. Does that clarification by Mr.

19  Selbst as to the amount of the pre-paid inventory give

20  heartburn to anybody? Is that contrary to anybody's

21  understanding of what the deal was?

22      MR. GLEASON: No, that's fine. That's sufficient,

23  Your Honor.

24      MR. LEPENE: Your Honor, if I might, Alan Lepene on

25  behalf of Key Bank, just to raise one issue. And it may fall

41

1  in the category of tweaking, but I do rise to make this point.
2  With respect to this issue regarding escrow, once the Bank's
3  collateral has been sold and proceeds have been received, if a
4  challenge is raised, and we are awaiting a ruling from the
5  Court, the first time that I have heard any suggestion that the
6  full amount of our debt, what is owed to us, would not be
7  escrowed from the proceeds was when Mr. Schlerf stood up here
8  to raise that issue with you, and suggested that he wanted to
9  talk to me about it. We have been engaged in discussions all
10 week.  This is the first time that I've heard that.  And this
11 is a point that I think is more than just tweaking from the
12 Bank's standpoint.
13         THE COURT:  I understand.  And what we're gonna do is
14 take a short break here in a moment so you can in fact discuss
15 that.  I must admit I didn't understand that.  I mean I
16 understood what Mr. Schlerf was saying, but I didn't understand
17 what he was trying -- I didn't understand why he was saying it,
18 because if in fact what was done here was there was an
19 adversary proceeding lawsuit filed to challenge Key's liens or
20 its debt or recharacterize it or whatever it is you're gonna
21 try to do to it, until there's a determination of that lawsuit,
22 I didn't understand why just because of an allegation made in
23 the lawsuit the amount that would be escrowed should be smaller
24 than the full amount of the debt.  And that's what --
25         MR. SCHLERF:  Your Honor , Jeffrey Schlerf again.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*752-929-0191*

A- 0130

42

1    THE COURT:   --I understood you saying.

2    MR. SCHLERF:   I actually was thinking of an example

3  that would favor Key, and that there would be less in the

4  escrow and more in their hands.   But I want to think through

5  whether there are other situations that might favor us.

6    MR. LEPENE:   I withdraw my objection, Your Honor.

7    (Laughter)

8    MR. SCHLERF:   I'm not limiting it to that example,

9  Your Honor.

10    THE COURT:   Funny how those things happen, you know.

11  Before -- I want to take a short break to allow the parties,

12  now that they've heard all of their things, to discuss how best

13  to proceed with the presentation of evidence.   Maybe that's

14  already happened.   But also to deal with those questions.   But

15  I also want to ask Mr. Selbst before we go on, what his

16  response is to the position of the Committee and MHR that there

17  is no linkage between the D-I-P and a satisfactory bid

18  procedures Order.

19    MR. SELBST:   Your Honor, right now the interim Order

20  that Mr. Mason referred to said that there had to be a sale

21  Order entered by September 30th.

22    THE COURT:   A sale.

23    MR. SELBST:   A sale Order, not a bid procedures Order.

24  Unless we have a bid procedures Order that is acceptable to my

25  client, our view is we're not prepared to waive that provision.

2

44

1    THE COURT:  Yeah, well I'm sure that's true.

2    (Laughter)

3    THE COURT:  All right.  I do want to take about a 10

4  minute break.  I also need to advise the parties that I have a

5  commitment over the lunch hour starting at about 12:00 or 12:15

6  that shouldn't take too long, but -- so we'll have to take a

7  break at that point.  But there is -- I had a trial scheduled

8  this afternoon that I was juggling, but it's now been vacated,

9  so we have the time available this afternoon to make sure that

10 an adequate record is made on these points.

11    MR. SELBST:  Thank you.

12    (Recess)

13    THE COURT:  Please be seated.  All right.  Are we

14 ready to proceed with the evidence?

15    MR. STOCK:  We are, Your Honor.

16    THE COURT:  Okay, well let's proceed.

17    MR. STOCK:  Good morning, Your Honor, my name is John

18 Stock.  I'm with the Columbus office of Benesch, Friedland.

19 I'm one of the lawyers for the Debtors, and I will be handling

20 the first witness.  Our first witness is Gregory T. Knipp, K-N-

21 I-P-P, the CFO of A.B. Dick Company and Paragon Corporate

22 Holdings, Inc.

23    THE COURT:  All right, Mr. Knipp, please come forward

24 here to the Courtroom Deputy and be sworn.

25    GREGORY T. KNIPP, DEBTORS' WITNESS, SWORN

1    THE COURT:  All right, Mr. Knipp, please take a seat

2  in the witness chair to my right, and speak up clearly into the

3  microphone as our proceedings are being recorded today.  Okay,

4  Mr. Stock.

5    MR. STOCK:  Thank you, Your Honor.

6                DIRECT EXAMINATION

7  BY MR. STOCK:

8  Q.  Mr. Knipp, please state your full name, and business

9  address so we have it in the record.

10  A.  My full name is Gregory T. Knipp, K-N-I-double P, at A.B.

11  Dick Company in Niles, Illinois, at 60 -- 7400 Caldwell Avenue.

12  60714 is the zip code.

13  Q.  You are currently the Chief Financial Officer of A.B. Dick

14  Company, correct?

15  A.  Yes, I am.

16  Q.  And you are also CFO of Paragon Corporate Holdings, Inc.?

17  A.  Yes, I am.

18  Q.  How long have you held those positions?

19  A.  Since January of 2000.

20  Q.  In your position as CFO for both those corporations, are

21  you familiar with the finances of A.B. Dick and Paragon

22  Holdings during the period of time --

23  A.  Yes, I am.

24  Q.  -- since you've held -- are you familiar with the business

25  operations of those corporations while you have been CFO for

1    them?

2    A.  Yes, I am.

3    Q.  Greg, I'd like to first give the Judge and others in the

4    Court some idea of your educational experience and your

5    employment history.  Please tell us what your educational

6    background is.

7    A.  Okay.  I have a Bachelor of Science degree in accounting

8    from Bradley University.  I have an MBA from the University of

9    Chicago, concentration in finance and international business.

10   And I'm a Certified Public Accountant.

11   Q.  You currently have that certification of CPA?

12   A.  Yes, I do.

13   Q.  Would you describe for us, give us a general overview, if

14   you will, of your professional employment?

15   A.  Sure.  I graduated in 1977 from Bradley University, at

16   which time I went to work for the public accounting firm of

17   Pete, Marwick & Mitchell for four years until 1981.  From 1981

18   to 1987 I was a financial analyst, as well as a treasury

19   manager.  I got promoted to treasury manager for Masonite

20   Corporation.  From 1987 I joined A.M. International, Inc., a

21   $1.2 billion revenue company that manufactured, distributed

22   printing equipment and supplies to the graphic arts industry.

23   During that time at A.M. International I hired in as a

24   directory of treasury operations.  In 1994 I was promoted to

25   Assistant Treasurer.  And in 1995 I was promoted to Treasurer.

1  1997 I received a promotion to CFO of the company which had

2  downsized significantly over the years.  A.M. International did

3  file for bankruptcy in 1993, and they divested several

4  divisions.  And I became CFO with Multi Graphics division.

5  That division was ultimately sold to A.B. Dick Company in

6  January of 2000, at which time I was asked to stay on as CFO of

7  the A.B. Dick/Paragon companies.

8  Q.  In your position as CFO for A.B. Dick and Paragon -- and

9  I'll just use those short names -- labels to describe them --

10 would you please give the Court an overview of your employment

11 responsibilities?

12 A.   Okay.  My employment responsibilities are the finances of

13 the company, ranging from financial reporting at which time --

14 when I first joined, it was FCC reporting -- treasury, which

15 includes banking relationships, insurance, taxes, employee

16 benefits, and general review of divestitures and acquisitions.

17 Q.  All right.  Now I'd like to shift to eliciting some

18 testimony regarding the business operations of A.B. Dick

19 Company.  Let me first ask is Paragon Corporate Holdings, Inc.

20 a corporation that engages in business activity?

21 A.   It's a holding company for A.B. Dick Company, which indeed

22 is in business activity.

23 Q.  What are the primary business activities of A.B. Dick

24 Company?

25 A.   A.B. Dick Company is a manufacturer and a distributor and

Knipp - Direct                          48

1  service company to the graphic arts industry.  They make small

2  printing presses and digital plate makers.  They sell

3  consumables and provide service to the press rooms of small to

4  large printers throughout the country and the world.

5  Q.  And then my understanding of it upon the primary business

6  activities is having three prongs.  One, as you indicated,

7  manufacturing and selling printing equipment.

8  A.  Right.

9  Q.  That's one of the prongs, correct?

10  A.  That's correct.

11  Q.  Now with respect to that prong of the business, is that

12  business activity carried on under any formal division or

13  subsidiary corporate structure?

14  A.  No.  The way the companies work, it's a -- we call it the

15  three legged stool.  It's an equipment business, which is

16  similar to a razor blade theory.  The equipment business is the

17  razor.  The consumables and service is the annuity tail you get

18  off by placing equipment out in the marketplace from which you

19  get the service business as well as the consumable business.

20  Q.  With respect to the manufacturing and selling leg of the

21  stool, if you will, could you give us a description of -- I

22  guess I would call it the obsolescence position of A.B. Dick

23  generally with respect to that segment of the industry?

24      MR. MASON:  Your Honor, I'm gonna object to this

25  question on the grounds that there's no foundation that this

A- 0137

1  gentleman is in a position to start speculating as to the

2  obsolescence of a particular industry.

3        THE COURT:  Overruled.

4  A.  Okay.  A.B. Dick is going through a transformation like all

5  companies in the graphic arts business which was once a very

6  analog business where it involved film and cameras and things

7  of that nature.  It's now become a digital world out there

8  where things are -- press copies and press production is

9  generated from the PC applications.  A.B. Dick has a strong

10  portfolio of analog clients out there still.  That business

11  will still stay around for a while.  It becomes more of a trade

12  on the analog side.  And there are a lot of tradesman out

13  there, if you will, that still use that type of equipment.

14  However, during the time over the last 20 years the shift has

15  been going from analog to digital.  Analog is more expensive to

16  maintain, and it requires a lot of consumables to utilize the

17  press room.  Digital is a lot less, and companies are making

18  that transformation.  As such, A.B. Dick's business, in

19  particular its service business has experienced yearly declines

20  of 9, 10% which is in line with the industry average, where all

21  the companies out there, and printers, are going from an analog

22  based technology to a digital based technology.

23  BY MR. STOCK:

24  Q.  I want to move now our focus to the funding of A.B. Dick's

25  corporate operation.

1  A.  Okay.

2  Q.  In your tenure as CFO, what has been the primary source of

3  the funding of the operation?

4  A.  Okay.  Our primary sources are revolving credit agreement

5  with Key Bank, Corporate Finance out of Cleveland Ohio, and we

6  also had a small relative contingent of cash balances that we

7  received from the sale of a subsidiary back in the year 2000.

8  Paragon Corporate Holdings also owned a company called Curtis

9  Industries, which was in the automotive parts business.  And

10  when they sold that business, they received proceeds that were

11  available to the company.

12  Q.  Tell us how the funding facility with Key Bank was

13  structured, that is with respect to borrowing base.

14  A.  Okay.

15  Q.  How that was measured.

16  A.  It's what they call an asset-based facility whereby the

17  borrowings are limited to a formula based on the value of your

18  receivables and your inventory.  This is domestic only.

19  Basically they look at the perpetual balances of the

20  receivables, as well as the inventory.  And they will lend at a

21  certain advance rate on those balances.  In particular,

22  inventories that are around 60 cents on the dollar, receivables

23  that are not service contract related at 80 cents on the

24  dollar, and receivables that relate to extension of service

25  contracts at 50 cents on the dollar.

1  Q.  In your tenure as CFO of A.B. Dick, what has been the level

2  of borrowing from Key Bank with respect to A.B. Dick's

3  operation?

4  A.  In the 20,000,000 plus range.

5  Q.  Was this credit facility between A.B. Dick and Key Bank

6  memorialized in a written agreement?  Was there a written

7  credit agreement?

8  A.  Yes, yes, there is.

9  Q.  What was the tenure of the agreement or agreements between

10 A.B. Dick and Key Bank?

11 A.  The original agreement was to expire on April 15th, 2003.

12 Again, I came on board in January of 2000.  However, at that

13 time the company had not met its financial covenants.  It was

14 in violation.  And Key Bank continually waived those covenants.

15 And as a result, when it expired -- it was due to expire on

16 April of 2003 -- they extended it for one year roughly.

17 Q.  When the credit facility was extended in April of 2003 for

18 one year, had A.B. Dick had discussions with the Bank

19 concerning extending that credit facility for longer than one

20 year?

21 A.  I think we desired that, but given the situation of the

22 company and that we hadn't met our financial covenants -- also

23 at that time our liquidity became an issue.  And I think the

24 Bank -- I know the Bank was reluctant to go out any longer than

25 that.

1  Q.  Would the Bank agree to extend the facility more than one

2  year?

3  A.  No, they would not.

4  Q.  Let's talk about the uses to which the credit funds were

5  put.

6  A.  Okay.

7  Q.  What use was made of the money that was borrowed from Key

8  Bank?

9  A.  To fund the operations of the company which -- day to day,

10  you know, expenses of the company, plus inventory requirements

11  and what they call working capital requirements.

12  Q.  Was payroll a substantial expense for A.B. Dick during this

13  period?

14  A.  Yes, it is, and it was.  Today it averages about $2.6

15  million a month.

16  Q.  Going back to calendar year 2003, how many employees did

17  A.B. Dick Company have?

18  A.  At the beginning of the year they had about 850 employees

19  domestically, and about another 200 internationally, for near

20  1,000.

21  Q.  All right.  How about by the end of calendar year 2003?

22  A.  Okay.  They were down to about 800, 804, 805, somewhere in

23  there.

24  Q.  How did the reduction in numbers come about?

25  A.  I'm sorry, did I say 850 to start?

1   Q.   Yes.

2   A.   Yeah, 850 down to 800, yes, that's correct.

3   Q.   Why was there a reduction in numbers? How did that come

4   about?

5   A.   Okay.  What happened was -- is that the company in December

6   of 2003 had about a $5.8 million liquidity cushion.  Liquidity

7   cushion is defined as what your borrowing base is, minus your

8   utilizations under the facility, which included revolving loans

9   as well as letters of credit.  That number in and of itself was

10  about three or three and a half million dollars.  On top of

11  that, the company had cash balances of about two to two and a

12  half, for somewhere -- a total liquidity balance of about five

13  and a half million dollars.

14  Q.   What sort of annual revenues are we talking about?

15  A.   Okay.  The company is about 190,000,000 in revenues.  It

16  consists of about 55,000,000 on equipment, or 50,000,000 on

17  equipment, 55,000,000 on service and parts, and 85,000,000 on

18  consumable supplies.

19  Q.   With respect to the 5,000,000 or thereabouts cushion that

20  you refer to --

21  A.   Right.

22  Q.   -- as CFO did you consider that a large cushion, a small

23  cushion, what --

24  A.   No, we did not.  For a company that has that level of

25  revenues, having a $5,000,000 liquidity cushion is very thin.

Knipp - Direct                                    54

1   And especially in our circumstance where our projected EBITDA

2   for that year, 2003, was supposed to be about $7,000,000.  Of

3   that $7,000,000 though, we have an up front requirement for the

4   year of about two and a half million to cover interest expense.

5   We also have to pay off some what they call old liabilities

6   from the acquisition of Multi Graphics, which was acquired in

7   January of 2000, of about two to two and a half million a year.

8   So if you take those two items right by themselves, that's

9   $5,000,000 of the 7 that gets used for cash that gets consumed

10  out of the EBITDA balance.  Then what happens is at least

11  $2,000,000 roughly to fund the rest of the operations.  And

12  that means everything else has to go right in terms of the

13  revenue projections.  And when you start missing your revenue

14  projections, the liquidity falls accordingly.

15  Q.  So in essence are you telling us the $5,000,000 cushion

16  represents a margin of error for meeting budget?

17  A.  Well, margin of error for just keeping above zero, keeping

18  a positive liquidity balance.

19  Q.  With respect --

20  A.  I can answer that.  The margin of error -- or the budget

21  was projected to come in at about -- started the year at 5.8

22  and was supposed to end about 5.1.  That was the 2003 budget in

23  terms of total liquidity.  So --

24  Q.  With respect to the borrowing base as it's defined in the

25  credit facility with Key Bank, did A.B. Dick do any sort of

1 budgeting so as to police its operations, if you will, with

2 respect to the budget --

3 A.  Yes, it did.

4 Q.  -- or the borrowing base?

5 A.  When it did its annual budget it would calculate to

6 determine what its earnings were going to be for the year, its

7 EBITDA, and roll it into what they call a liquidity forecast

8 month by month which projects out on a monthly basis what the

9 cushion would be.  Where it started at 5,000,000 and where it

10 would end by 5.1 million at the end of the year.  But that was

11 projected month to month based on the activities of the budget.

12 Q.  And why did A.B. Dick do that budgeting?

13 A.  It's required to for the Bank, for one thing.  Plus it

14 gives you a scorecard as to what you're supposed to be tracking

15 to on a day to day basis when you operate your business.

16 Q.  During calendar years 2003 and into 2004, would A.B. Dick

17 have been able to operate its business on an ongoing basis

18 without the Key Bank credit facility?

19 A.  No, it would not have.

20 Q.  Now, in late 2002 did A.B. Dick Company begin to experience

21 problems in meeting this budget?

22 A.  Yes, it did.  In year 2002 it missed its budget by about

23 $3,000,000 -- it's EBITDA budget.  And that left it with, like

24 I said before, about 5.5, $5.8 million of total liquidity.  In

25 2003 though it ran into further problems.  It missed its

Knipp - Direct                                          56

1   service business revenues by about $4.8 million.  It missed its

2   equipment -- and by the way, when you miss your service

3   business revenues, that's a direct fall through to the bottom

4   line of about 90%, because the fixed cost on that is your

5   installed base of service people that are out in the field.

6   And that is a fixed salary that you pay no matter what.  So

7   when you miss the revenue side, that falls right through to the

8   bottom line.  Equipment fell by about four and a half million,

9   and having a margin impact of about a million and a half

10  dollars.  And supplies fell a million and a half, having a

11  margin impact of about a half a million.  If you take those

12  three things together, that's about four and a half million

13  dollars of liquidity that left the company because it did not

14  meet its revenue targets.

15  Q.  What is the significance of that, or was the significance

16  of that for A.B. Dick with respect to its credit facility at

17  Bank One -- or, excuse me, Key Bank?

18          THE COURT:  Are we talking now about 2003 or --

19          MR. STOCK:  We are talking end of calendar year 2003,

20  Your Honor.

21  A.  Basically, as you can imagine, with the -- missing the

22  revenue targets like we did, we violated the bank covenants,

23  the financial covenants.  The Bank did grant quarterly waivers

24  of those at the time.  However, it did decrease the liquidity

25  quite a bit.  When you start the year with $5.8 million of

A- 0145

1  liquidity and you end up, you know, utilizing 4.5 million just

2  on margin loss alone because of lower sales, our liquidity by

3  the end of 2003 was at about 1,400,000. And of that 1,400,00,

4  it was basically zero under the Key Bank facility, and about

5  1,400,000 of cash balances that were left with the company at

6  the time.

7  BY MR. STOCK:

8  Q.  And when you say it was zero liquidity under the Key Bank

9  facility?

10  A.  Yeah.  That means at the time, December of 2003, our total

11  borrowing base minus the utilization, which is revolver debt

12  plus letters of credit, was at zero.

13  Q.  So there was no -- are you telling us there was no more

14  credit that A.B. Dick was entitled to under the credit

15  facility?

16  A.  That's correct -- under the current formulas of the

17  revolving credit agreement.

18  Q.  And that's as of end of calendar year 2003.  Is that

19  correct?

20  A.  Right.

21  Q.  Okay.  Now you mention that the service leg of the

22  business, as we're calling that, was under budget by I think

23  you said $4.6 million?

24  A.  Yes.

25  Q.  Why was that?

1  A.  Basically it goes back to what I referred to before as the

2  old technology.  There's these old analog -- they call systems

3  machines -- that had very expensive service contracts with

4  them.  And those machines, they've been out in the field for 10

5  to 20 years.  And there is a phenomenon in the way where all

6  these printers who own those machines are shutting them down

7  and replacing them with lower price technologies on the digital

8  side.  So you're replacing an expensive contract with a less

9  expensive contract.  So, therefore, you get the net decline

10  between the two.

11  Q.  Did this shrinking of the business service leg at the end

12  of 2003 relate to one or a few large customers?

13  A.  No, many customers.  It was an industry-wide phenomenon.

14  Q.  What actions did A.B. Dick take in response to being in a

15  situation at the end of calendar year 2003 where budget had

16  been missed and the lending facility from Key Bank had been

17  tapped out?

18  A.  Well during 2003 -- and this wasn't just a miss that

19  happened at the end of the year.  It happened throughout the

20  year.  And the company reduced head count, reductions in force

21  by about 50 people in 2003, and also instituted a company-wide

22  reduction in its overhead spending, namely in its advertising,

23  its travel, and its outside professional fees for engineering

24  services in our Rochester, New York facility.

25  Q.  All right.  This brings us to the end of 2003.  Let's talk

1  now about the beginning of calendar year 2004.  Does the

2  financial position of A.B. Dick improve or does it get worse?

3  A.  It gets worse.  We entered that year, as I mentioned, with

4  about 1,400,000 in cash, zero availability under our credit

5  line.  The budget for 2004 is about $6,000,000 of EBITDA.  That

6  EBITDA number included -- to get there, we had to take out

7  three and a half million dollars of costs which were

8  anticipated in the budget, which is about 100 employees that

9  would go through a reduction in force.  That budget also was

10 very much what they call back-end loaded in that it made most

11 of the $6,000,000 in the second half of the year.  So it was

12 understood going into the calendar year 2004 that we would be

13 operating on a very tight basis with marginal liquidity, break

14 even liquidity.  You get to -- and then what happened was is

15 that at that time the payables, the accounts payable levels of

16 the company were at about 45 to 50% past due.  And that was up

17 from what we call our normal level within our company of 25 to

18 30%.  Having said that, the vendors were not willing to extend

19 terms any longer, or extend us out in terms of dating the

20 payables to them.  And they started demanding payment.  And as

21 a consequence, the liquidity fell.  And the sales fell out

22 because we couldn't acquire inventory to support sales,

23 especially in our equipment business.  Through June 30th our

24 equipment business fell by about $8,000,000 to budget.  And

25 that's about a $2,000,000 margin miss.  So if you start the

1   year with about 1,400,000 of liquidity, and you miss $2,000,000

2   in margin to extend your equipment business alone, that takes

3   you down to zero quickly.  And that's where we ended up.

4   Q.  Okay.  You've done a nice job of giving us a general

5   overview.  I now want to take the Court through some specific

6   concrete numbers so that we can make a record as to precisely

7   what was happening month by month in the first five or six

8   months of 2004.

9        MR. STOCK:  Your Honor, I have an exhibit I'd like to

10  have the witness identify.  May I approach?

11       THE COURT:  All right.  Do the other parties have a

12  copy of the exhibit?

13       MR. STOCK:  They do.

14       MR. GLEASON:  Your Honor, this has been produced to

15  the other parties previously.  We are handing them a copy,

16  but --

17       (Pause in proceedings)

18  BY MR. STOCK:

19  Q.  Mr. Knipp, I've handed you what has been marked as

20  Exhibit- 1.  I guess we'll call it Debtor's Exhibit-1.  Would

21  you please identify this for the record?

22       (Debtor's Exhibit-1 previously marked for identification)

23  A.  Okay.  This is what we call our August 2004 forecast that

24  we prepared about two weeks ago.  And it's something we did as

25  part of the bankruptcy process.  We wanted to take another look

Knipp - Direct                    61

1  at the business after we filed the D-I-P budget, and to go out

2  through the end of October.  The original D-I-P budget only

3  went out to October 16th.

4  Q.  What I'm interested in for our purposes here today, Greg,

5  is not projections, but actual financial figures.  So let's

6  turn to the fifth page of this.  One, two, three, four, five.

7  A.  Okay.

8        MR. MASON:  Judge, I think it would assist the parties

9  if Mr. Stock would represent that this is the same document

10 that was produced in Mr. Pollack's deposition.

11       MR. STOCK:  It is.

12       MR. MASON:  Okay.

13 BY MR. STOCK:

14 Q.  Greg, we've gone to page five.  Do you see that there?

15 A.  Yes, I do.

16 Q.  Paragon Corporate Holdings {comma}, Inc. Cash Flow

17 {slash}/Liquidity Analysis.

18 A.  Yes.

19 Q.  Now, there's an asterisk.  And it indicates at the note

20 that the figures exclude foreign subsidiaries.  So which

21 corporation -- A.B. Dick Company's operations would be included

22 in this?

23 A.  Well basically what this schedule is, the top box is a roll

24 forward of our cash flow, month to month.

25 Q.  Okay.

A- 0150

1  A.  The bottom box shows -- I mean as it's labeled, liquidity.

2  And the way this works though is that the cash flow that's

3  shown up above represents the A.B. Dick domestic subsidiary as

4  well as the Paragon Corporate entity.  The foreign subsidiaries

5  are shown through one line, which is a line as you see there

6  that says, "increase/decrease of intercompany subsidiaries."

7  The cash to and from them flow through that line on a net

8  basis.

9  Q.  Let's start with the cash flow analysis.

10 A.  Okay.

11      MR. MASON:  I'm sorry, we're having a little

12 difficulty following.  I don't know if we're on the same page.

13      MR. STOCK:  Page five.  The fifth page.

14      MR. MASON:  Okay, but not a numbered page?

15      MR. STOCK:  No.  It's one, two --

16      MR. MASON:  I see.

17      MR. STOCK:  -- three, four, fifth page in.

18      MR. MASON:  Thank you very much.

19      MR. STOCK:  Paragon Corporate Holdings, Inc. Cash Flow

20 (slash)/Liquidity.  Is that what you have?

21      MR. MASON:  Thank you.

22 BY MR. STOCK:

23 Q.  Greg, let's take the Court through the cash flow analysis.

24 Let's start with the column that says, "Actual December '03."

25 A.  Okay.  The bottom number at the bottom of that first box