1   represents our ending what we call net debt position as of

2   December '03.  And that was made up at the time there of

3   revolver borrowings of 22,459,000, and the cash balance that I

4   referred to before of 1,428,000.  And what you do, you see the

5   21,031,000 net number goes up to the top of the next column.

6   And --

7   Q.   Start with the --

8   A.   January of '04.

9   Q.   The revolver debt there.

10  A.   Right, the net cash position of the company with net debt

11  position.

12  Q.   Now with respect to actual December '03, the middle number

13  in the parenthesis, $22,459,000 --

14  A.   Right.  That's the same number from above.  The debt

15  number.

16  Q.   Okay.

17  A.   The borrowing number.  The number right below that, the

18  1,304,000 is the amount of letters of credit that Key Bank was

19  extending on our behalf.  So our total utilization with the

20  Bank at that time was 23,763,000.

21  Q.   That's in the liquidity analysis portion in the same column

22  below?

23  A.   That's correct.

24  Q.   Now we move up to -- let's start with Actual January '04

25  Cash Flow.

Knipp - Direct                                    64

1    A.  Okay.

2    Q.  Take us through those numbers.

3    A.  Okay.  What those basically show you is what are the

4    elements of cash flow on a month to month basis.  And what

5    we've done here basically is EBITDA, which is the EBITDA of the

6    domestic company only, and the Paragon Corporate -- do you want

7    me to take you through each line item, or --

8    Q.  Let's go through the line items for the first column.

9    We're not going to do it for all of them.

10   A.  Okay.

11   Q.  Just so we have a point of reference --

12   A.  Okay.

13   Q.  -- for this.

14   A.  The EBITDA number is, you know, our earnings for that month

15   on a domestic basis, which includes the A.B. Dick's sub

16   domestically as well as the Paragon Corporate Holdings

17   corporate entity.  And they lost $621,000.  That's a cash

18   outflow.  During the month, the company liquidated its

19   receivables.  It went down by 2,184,000.  That's a cash

20   generator of cash.  Inventories during that same period went up

21   by 580,000.  So that shows a negative 580.  And at the same

22   time, accounts payable went up as well.  And what sometimes

23   happens in a business when your inventories go up, your

24   payables go up commensurate with that because you get terms

25   when you buy the inventory.  The deferred service balance there

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Knipp - Direct                                  65

1   that you see, deferred service revenue, is 924,000 negative.

2   And that has to do with our service business where we're

3   getting less money from pre-paid service contracts.  It's the

4   issue of the 4.6 million in the prior year continuing on into

5   January of this year.

6   Q.  Okay.

7   A.  And then the other represents basically a pay down of

8   payroll at the end of the month.  We had a payroll close to the

9   end of the month, and that's what that represents.

10  Q.  All right.

11  A.  The -- also shows if you go down to the next -- and by the

12  way, that subtotal there of 87,000 is typically what you call

13  your cash flow from your operations.  And you get down below

14  that, and you go and you look --

15  Q.  The (87,000) {in parenthesis} means you're negative 87,000?

16  A.  Negative 87.  Virtually break even at that point.  But

17  basically what you did there, you liquidated your receivables

18  due to a lower sales volume probably.  You collected cash and

19  you didn't put receivables back with new billings.  The capital

20  expenditure line is just what it is.  It's payment for

21  property, plant and equipment, which we kept to a minimum

22  obviously because of the precarious cash situation we were in,

23  and liquidity position.  The capital lease obligation is paid

24  down on the leases that we have on our balance sheet.  And the

25  increase within our company subsidiaries, or decrease, that

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0154

Knipp - Direct                                              66

1   number means -- the 473 means that we were able to get cash out

2   of our foreign subs to help keep the business running during

3   this time.  So if you add all those up you get a net cash flow

4   for the month of January of 115,000.  And if you take the

5   21,031,000 number at the top of the page of the January column,

6   add the 115 to it, you'll get the 20,916,000 which is the very

7   bottom number of the top box.  That's the mechanics of this

8   schedule.

9   Q.   I'm sorry, tell me that number again.

10  A.   Oh, it's the 21,031,000 which is the number at the top.

11  Q.   Right.

12  A.   That's the net debt number to start the month.

13  Q.   Okay.

14  A.   We add 115,000 in positive cash flow overall.

15  Q.   All right, on the total line.

16  A.   On the total line.

17  Q.   Okay.

18  A.   And then you come down to the ending net cash revolver per

19  balance sheet of 20,916,000 negative.

20  Q.   Okay.

21  A.   And the component is -- basically is that during that time

22  you can see the cash component of that 20,916,000 is 987 versus

23  1,400,000 to start the month.

24  Q.   Sure.

25  A.   So you we spent cash, and we also changed the revolver

A- 0155

1    balances.

2    Q.  Okay.  Now let's follow --

3         THE COURT:  Let me interrupt for a moment.

4         MR. STOCK:  Yes.

5         THE COURT:  Does the intercompany number represent

6    overall positive cash flow from those subsidiaries' operations?

7    Or is that just the amount of money you were able to extract

8    from your foreign subsidiaries?

9    A.  It could be both.

10        THE COURT:  So it doesn't necessarily mean the Debtor

11   operating at a positive cash flow of 473.  That's just what you

12   were able to --

13   A.  Yeah.

14        THE COURT:  -- squeeze out of the rock.

15   A.  Yes, Your Honor.  Basically what happens here is I think --

16   I don't have it right in front of me -- but what they did

17   during the month, they probably made a couple hundred thousand

18   dollars.  Of that 200,000 they transferred 473 out of earnings

19   and the other 200 out of their own cash reserves.

20   BY MR. STOCK:

21   Q.  Let's go down to the liquidity analysis and see where that

22   left the corporation as a result of the cash flow set forth

23   above.  Revolving loans.  You start out with 21,903,000 in

24   January '04?

25   A.  Well that's the ending January number.  We started at the

Knipp - Direct                                    68

1  number to the left of that, which is the Actual December '03.

2  Q.  Right, okay.

3  A.  Total borrowings were 22,459,000 plus letters of credit of

4  1,304,000 to come up with 23,763,000.

5  Q.  Okay.

6  A.  So that's the ending December number --

7  Q.  Right.

8  A.  -- which is beginning January.

9  Q.  Okay.

10  A.  Then below that you see the borrowing base, which is the

11  calculation, the advanced formula based on receivables and

12  inventory that the company had.  And if you take the difference

13  between those two, you can see there that we had a positive

14  16,000 which is basically you're out of money.

15  Q.  You're over in the December of '03 column.  Is that

16  correct?

17  A.  Yes, I am.

18  Q.  Okay.

19  A.  Yeah.

20  Q.  So you -- December of '03 column, if you look to the line

21  in the liquidity analysis, potential available credit line,

22  that is a reference to the credit available to A.B. Dick from

23  Key Bank under the credit facility?

24  A.  That's correct.

25  Q.  And that would be $16,000 is all that's left on that line?

A- 0157

1  A.   Yes, on a $200,000,000 revenue company.

2  Q.   Okay.  Now how about at the end of January '04 liquidity

3  analysis?  Where was A.B. Dick with respect to the borrowing

4  base and the extent --

5  A.   Okay.

6  Q.   -- of the credit line with Key Bank?

7  A.   The report there shows that we were under -- we're over-

8  advanced, if you will, by $63,000, which means our utilization

9  exceeded our borrowing base formula.  However, there's a lag in

10  reporting this.  At the time that we actually came upon the end

11  of January we probably had a couple hundred thousand dollars of

12  favorable liquidity that got chewed up once we closed the books

13  at the end of the month.

14  Q.   Okay.  I don't want to go through each of the lines --

15  A.   Right.

16  Q.   I don't want to go through each of the lines --

17  A.   Right.

18  Q.   -- with respect to actual February, March, April, May and

19  June.  Those figures are all on that exhibit, correct?

20  A.   Right, that's correct.

21  Q.   All right, why don't you just read for us the liquidity

22  position of Paragon Corporate Holdings with respect to the Key

23  Bank credit line for those months?

24  A.   Okay, January was a negative $63,000, February was a

25  negative $7,000, March was a negative $3,000, April was a

Knipp - Direct                        70

1  negative $313,000, May was a negative $1. -- $1 million,

2  212,000 and June was a negative $3 million, 98,000.

3  Q.  As CFO of these corporations, what does that tell you?

4  A.  We're out of money.

5  BY THE COURT:

6  Q.  Well, you're more than out of money.

7  A.  Yes.

8  Q.  What -- was there a source of funding those -- that

9  negative liquidity?

10 A.  Basically, what happened here --

11 Q.  In other words, were there advances in excess of what the

12 formula allowed --

13 A.  Yes, there were.

14 Q.  -- from Key Bank?

15 A.  But we didn't know it -- the way this always happens is

16 that if you get a week or so to true everything up and at the

17 time, what happens is that you true up -- there's certain

18 reserves that get taken out of your gross inventory and your

19 gross receivable balances.  For instance, on the receivables,

20 they exclude receivables that are over 90 days old.  We don't

21 know what those are until two days after month end.  So what

22 this means here is that at the time, our over 90's may have

23 gone up -- over 90 day old receivables may have gone up at the

24 time we closed business on Friday, but we didn't know it until

25 after the fact.  And so, on -- with Heinset, we are over

A- 0159

1    advanced, but at the time, we didn't know we were until a few

2    days after month end.

3    BY MR. STOCK:

4    Q.  All right, now you testified earlier that the credit

5    facility was extended in April of 2003 for a year, so that

6    means it's, by it's terms, to expire in April 2004, correct?

7    A.  That's correct.

8    Q.  During this period we're studying?

9    A.  Right.

10   Q.  All right.  Did you have -- did you meet with Key Bank to

11   discuss with them extending the credit?

12   A.  Yes, we did.  I personally visited them in March of 2004,

13   based on the anticipated end date of April 15, 2004 under the

14   facility.

15   Q.  You mentioned before (indiscern.) of the forecasting or

16   modeling --

17   A.  Right.

18   Q.  -- with respect to the credit facility.  When you met with

19   Key Bank did you have a forecast or --

20   A.  Yes, we did.

21   Q.  -- model for purposes of your discussion?

22   A.  That was the --

23          MR. MASON:  Your Honor, I'm gonna object.  Your Honor,

24   this is all very interesting information and I think it's

25   something that ought to be covered at some point, but as I

1   understand it, the issue before the Court is whether or not we

2   have a reasonable bid protection to Presstek. And all this

3   information, at this point, seems to be irrelevant to that

4   particular issue. So, if there's some transitional issues that

5   we've got to cover, some basic information, I don't mind going

6   through it. I think we've already covered the basic

7   information at this point. We're beyond the scope of what I

8   think the hearing is intended to cover.

9          THE COURT: Well, I'll overrule the objection. I

10  assume that counsel is laying the foundation for the issues

11  that need to be resolved and will not take more time than is

12  necessary to do that.

13         MR. STOCK: Yes, and I will simply take my cue from

14  the Court, Your Honor. It's my understanding that at the

15  initial exchange of papers on these motions, there was some

16  questioning as to the good faith of the Debtor. And I think as

17  well, though it's not my water to carry, of Presstek and the

18  terms of the initial deal. If we're now being told that that's

19  no longer an issue and that is all irrelevant, then I don't

20  need to make a record here as to the dire straits and the lack

21  of alternatives that A.B. Dick Company had when they attempted

22  to negotiate this deal in July.

23         THE COURT: I -- personally, I think that's relevant

24  and I'm interested in knowing about it. And I think we ought

25  to move along. We don't need to over build the record on that.

1  But we're up to a point here in April of '04 where the -- where
2  the Key Bank line was expiring by its own terms as I understand
3  it.
4          MR. STOCK:  Right.
5          THE COURT:  In April there was a substantial jump
6  negatively in the liquidity, and in May, June, July, that
7  becomes a torrent in the next few months there.
8          MR. MASON:  Yes.
9          MR. KNIPP:  That's correct.
10         THE COURT:  So, I mean, I'm interested in
11 understanding why that happened, how that happened.
12         MR. KNIPP:  Okay.
13         THE COURT:  What the background of that was and then
14 the -- then tie into whatever business decisions the Debtor was
15 making with regard to post, you know -- the timing of the
16 filing in the middle of all of this and then the negotiation of
17 the post-petition financing and understanding how that all
18 works together.
19         MR. STOCK:  And --
20         THE COURT:  Which I assumed is where you were going.
21         MR. STOCK:  I'm trying to get there as ardently as I'm
22 capable, Your Honor.  I'll try to move along.
23 BY MR. STOCK:
24 Q.  What did the forecast show --
25 A.  Okay.

Knipp - Direct                                    74

1  Q.  -- that you were sharing with Key Bank at that time you

2  were attempting to renew the credit line in April of '04?

3  A.  Basically show that the liquidity would be negative in the

4  months of July and August.

5  Q.  Was the discussion with Key Bank -- was the basis upon

6  which you were discussing additional lending continuing normal

7  billing concern operations of A.B. Dick?

8  A.  Well, the issue at the time was is when we met Key Bank had

9  been monitoring the company's discussions with Presstek in

10  regard to the sale of the company to Presstek.  The

11  negotiations had gone on for quite a long time, this is my

12  understanding of it.  The -- I should point out that the

13  negotiations were, in fact, handled at the ownership level of

14  A. B. Dick Paragon, and I was brought in from the operations

15  side to talk about the operating side of the business.  But

16  they were concerned about the lack of progression in getting to

17  a final sale of the Presstek transaction.  And on that basis

18  alone, they at that point in time -- we met that day in March,

19  and they came back a few days later and said that they would

20  extend the bank agreement until the middle of July under the

21  assumption that the Presstek sale would be consummated by then.

22       THE COURT:  We're going to have to stop in a few

23  minutes.

24  A.  Yeah.

25       THE COURT:  So let me just ask you, if I could ask --

A- 0163

1    MR. STOCK:  Absolutely, Your Honor.

2    THE COURT:  -- a couple of questions, at this point.

3  BY THE COURT:

4  Q.  When did the negotiations first start, if you know, with

5  regard to the sale of the business to Presstek?

6  A.  Okay, I heard, from -- that they started in the summer of

7  last year.

8  Q.  You were not personally involved?

9  A.  No, I did not get involved until December.  I was brought

10  under a confidentiality --

11  Q.  December of '03?

12  A.  '03, under a confidentiality agreement.

13  Q.  So, at the time that you became specifically, personally

14  involved --

15  A.  Right.

16  Q.  -- it was your understanding that it had been going on for

17  a period of months?

18  A.  Yes.

19  Q. • And then after that, do you have personal knowledge about

20  what happened with regard to those negotiations?

21  A.  Not directly, no.  I was not involved in the direct

22  negotiations.

23  Q.  And what was your role in connection with the initial

24  Presstek deal?

25  A.  I provided due diligence information in terms of the

1  operations of the company over the past 3 or 4 years.

2  Q.  Did you understand the structure of the proposed deal, the

3  price to be paid, the manner in which it was to be done --

4  A.  I had heard --

5  Q.  -- and that sort of thing?

6  A.  -- the number out at one point -- it's around $63 million

7  at one point, and that changed though.  It -- from what I

8  understand it -- and I -- this could be maybe rumor -- is that

9  I heard it would start out as an asset purchase then it went to

10 a stock purchase.

11 Q.  But you were not, in any event --

12 A.  No.

13 Q.  -- directly involved in that?

14 A.  No.

15 Q.  So you're not really the one with the knowledge of how all

16 of that happened to the extent --

17 A.  Right.

18 Q.  -- that's relevant?

19 A.  Right.

20        MR. MASON:  You did?

21 BY THE COURT:

22 Q.  But at some point, we were involved in the discussions with

23 Key Bank about the extension of the loan beyond the maturity in

24 April?

25 A.  Well, what happened there was that the meeting we had in

Knipp - Direct                              77

1  March -- attending that meeting with me were Frank Sefina, the

2  Chairman of Paragon Corporate Holdings, Inc. and John Fountain,

3  who is a Board Member for Paragon Corporate Holdings.  I

4  attended with them to provide operational financial support to

5  the meeting.

6  Q.  You were physically present at the meeting?

7  A.  Yes, I was.

8  Q.  And as a result of that meeting, you say there was an

9  extension until July?

10 A.  'Til about July 15th, I recall, yes.

11 Q.  And that was in connection with the underlying assumption

12 that the business plan was to sell the business to Presstek --

13 A.  Yes.

14 Q.  -- and that the deal would put together one way or the

15 other by then?

16 A.  Right.

17 Q.  Okay.

18      MR. STOCK:  Thank you, Your Honor.

19 BY MR. STOCK:

20 Q.  Advances were made by Key Bank after --

21 A.  Okay --

22 Q.  -- the agreement to an extension is --

23 A.  Yes, what happened was, as you can see on the schedule

24 here, we were negative 300,000 and the end of April, which was

25 a timing issue.  However, we actually jumped up to 1.2 million

A- 0166

1  in May.  And what Key Bank had agreed to do through amendments

2  to the agreement, they gave us two $1 million over advances in

3  the month of May, which means is that the formula for the

4  borrowing base wasn't sufficient and therefore, they just --

5  they extended beyond the terms of the original agreement.

6  Q.  Was there a million dollar over advance in June?

7  A.  Yes there was.

8  Q.  Approximately when was that?

9  A.  Around June -- the middle of June -- June 18th.  Our

10  payroll was on June 18th, so I gotta believe it was right

11  around that time.

12  Q.  Payroll is 1.3 million twice a month?

13  A.  Yes it is.

14  Q.  Okay.

15  A.  Or every other Friday.

16  Q.  Every other Friday?

17  A.  Right.

18  Q.  How -- what were you to do or -- what was going to be the

19  source of funds for the next payroll to come due on July 2?

20  A.  Okay, on July 2nd, the day before pay day, I received a

21  call from our banker, Mike Lugley.  He asked me how things were

22  for the payroll the next day.  I said we needed about -- I

23  recall at the time -- around 900,000.  Michael informed me that

24  the bank was only willing to extend a half a million dollars,

25  and that was the limit that they were gonna go on the over

1  advance.  So, that would be cumulative three and a half million

2  dollars of over advance.

3  Q.  So you were $400 short for payroll?

4  A.  400,000, which I had to delay freight payments, which are

5  due every Friday and -- that was a couple hundred thousand.

6  And I was able to extract some cash out of our foreign

7  subsidiary in Canada on a temporary basis.  You know, one of

8  these things were you give it to me today, I'll give it back to

9  you next week to cover your payroll, Canada's payroll.

10 Q.  The next $1.3 million payroll would be due 14 days later.

11 A.  On June -- July 16th.

12 Q.  What contingencies did you have at that point --

13 A.  We had none.

14 Q.  -- and what -- let me continue.

15 A.  Oh, sorry.

16 Q.  Once Key Bank told you they would not lend any money?

17 A.  We had no contingencies, we had no sources of liquidity.

18        THE COURT:  Is that a good place to stop for the mid-

19 day break?

20        MR. STOCK:  Yes, Your Honor.  I literally think I may

21 have two, three questions.

22        THE COURT:  All right.

23        MR. STOCK:  I'm done on my direct.

24        THE COURT:  Let's go ahead.  Do that.

25 BY MR. STOCK:

1  Q.  Well, had you, on behalf of A.B. Dick, attempted to obtain

2  financing for operations from a source other than Key prior to

3  this point?

4  A.  Yes, a year and a half before that, in the Fall of 2002,

5  the company, largely through the owners, NES Investment

6  Company, had contacted Foothill Capital as well as a company

7  called Surberus, who are -- they lend to financially distressed

8  companies, often referred to as lenders of last resort.  And

9  they declined to extend financing to us.

10  Q.  So in July 2004, once Key Bank told you they would not lend

11  anymore, were you aware of any other source --

12  A.  No, I was not.

13  Q.  -- to obtain funds for payroll?

14  A.  No.

15  BY THE COURT:

16  Q.  Do you know if there was an effort made again in July of

17  2004 to contact lenders such as Foothill or Surberus?

18  A.  I do not know.

19  BY MR. STOCK:

20  Q.  How was the financial position of A.B. Dick back in late

21  2002, early 2003 when Foothill and Surberus turned down A.B.

22  Dick compared to its financial situation in July 2004?

23  A.  Well, at that time we had, under the borrowing advance

24  formulas Key Bank, we had about $5 million liquidity; $3

25  million under the bank line and about $2 million in cash -- $2½

1  million dollars of cash.

2  Q.  That was when you were turned down?

3  A.  Yes.

4  Q.  Okay.  And how about July 2004, how was the financial

5  position from here?

6  A.  We were over advanced by $3½ million dollars.

7  Q.  Substantially worse financial position?

8  A.  Yes.

9  Q.  Okay.  What happened next, to your knowledge?

10 A.  That was on July 2nd.  We met our payroll, we just squeaked

11 by.  And within the next week and a half, we filed bankruptcy

12 on July 13.

13 Q.  Was there a press release upon the filing of the

14 bankruptcy?

15 A.  Yes, there was.

16 Q.  Okay.  Upon the filing of the bankruptcy and the press

17 release announcing the filing of the bankruptcy, have you as

18 CFO of A.B. Dick Company or Paragon Corporate Holdings, been

19 approached by anyone other than Presstek to buy the stock or

20 the assets of those corporations?

21 A.  I have not.

22        MR. STOCK:  No further questions, Your Honor.  Thank

23 you.

24        THE COURT:  All right, thank you.  We'll take a break

25 at this point.  As I say, the afternoon is clear.  I know that

1  probably is not great for some people's plane reservations but

2  that's the way it goes.  I will try to be back maybe by 1:15

3  and we'll stop -- start no later than 1:30 this afternoon and

4  then, as I say, we have the afternoon to proceed.  Thank you.

5  We'll be adjourned.

6      (Court in recess)

7          THE COURT:  Please be seated.  Are you ready to

8  proceed with Mr. Knipp?

9          MR. MASON:  Yes, Judge.  Some of the parties have

10 asked me if we can get some idea of the Court's scheduling.  I

11 know that it's difficult to predict because the Court doesn't

12 know how long this hearing is going to take place, nor do the

13 parties.  But how long would you expect to go, Your Honor,

14 if --

15         THE COURT:  Well, I expect to go as long as it takes

16 to get it done.

17         MR. MASON:  Okay.

18         THE COURT:  I don't know what that means but, really,

19 I don't think I have any time tomorrow.  And I don't have any

20 time on Wednesday, and I'm leaving on Thursday morning.  So

21 today is your day, and if that means we go until it's dark,

22 then we go until it's dark.

23         MR. MASON:  Okay.

24         THE COURT:  Okay?

25         MR. MASON:  That's helpful, Your Honor.

CROSS EXAMINATION

BY MR. MASON:

Q. Good afternoon, Mr. Knipp. Mr. Knipp, in or about May of 2004, how much was the -- how much was the debt owed to the bank?

A. I don't have that number off the top of my head. I can say that the over advance was in the million-two range. I don't have that exhibit with me, I didn't bring it back.

Q. Okay. I'm gonna give you --

A. Yeah.

Q. Is there something that would refresh your recollection?

A. Yeah.

Q. And that's the Exhibit-1 that you looked at a little bit earlier?

A. Yes, yeah.

Q. I don't have the precise copy that you were given.

A. Okay.

Q. I'm giving you a copy that is --

     THE COURT: What happened to the Exhibit?

     MR. GLEASON: Where is it? I don't know.

     THE COURT: We haven't admitted this Exhibit. Do you want admit this Exhibit, Counsel?

     MR. STOCK: Well, I would move after the end of the -- his testimony to admit it, yes. We stipulated, I believe, as to -- was this authenticity or not?

Knipp - Cross                                    84

1          THE COURT:  Do we have an issue with regard to this?

2  Is there an objection to the admissibility of this evidence?

3          MR. MASON:  Judge, we may have.  The document has

4  many, many different pages in it, and I think at the end of

5  this cross examination I would have a better idea of whether

6  we're gonna have an objection --

7          THE COURT:  Well where's the -- the exhibit that he

8  was referring to before?  Let's make sure we're dealing with

9  the same thing as we had before.

10      (Counsel confer)

11          MR. MASON:  Thank you, Judge.  We have the deposition

12  version of the same document.

13      (Debtor's Exhibit-1 previously marked for identification)

14  BY MR. MASON:

15  Q.  Mr. Knipp, do you now have Exhibit #1?

16  A.  Yes, I do.

17  Q.  And does that refresh your recollection as to what the debt

18  was to the bank as of May 1, 2004?

19  A.  Yes it does.

20  Q.  And what was that debt?

21  A.  Including the letters of credit, $20 million, 934.

22  Q.  How much was it for June 2004?

23  A.  June was at $23 million, 148,000.

24  Q.  And July?

25  A.  $22 million, 953,000.

1  Q.  And approximately how much was it as of the time of the

2  filing of the bankruptcy?

3  A.  $23 million, 112.  Somewhere around there.

4  Q.  Okay.  And at the time of the filing of the bankruptcy,

5  approximately how much in accounts receivable did A.B. Dick

6  have that was subject to the bank security interest?

7  A.  I say $18 million, roughly.

8  Q.  Okay.

9  A.  Domestic receivables, that is.

10  Q.  And are those the only receivables that are subject to the

11  bank security interest?

12  A.  Yes.

13  Q.  And how about the inventory that is -- there was as of the

14  time of filing the bankruptcy, subject to --

15  A.  Net inventory -- inventory net or reserves -- I want to say

16  in the $11 to $12 million range.

17  Q.  And was there equipment at the time of the filing of

18  bankruptcy that the bank alleged a security interest in?

19  A.  Yes.

20  Q.  And what was the cost of that equipment?

21  A.  Well, the net book value's around $3.2 million.

22  Q.  And by the way, when we spoke about the (indiscern.) being

23  $12 million as of the time of the bankruptcy, was that at the

24  lower of cost or market?

25  A.  Yes it is.

1 Q.  What other significant assets has the bank claimed security

2 interest in as of the time of the filing of bankruptcy?

3 A.  Those are the major assets.  I do know that -- that we have

4 stock in our foreign subsidiaries, and I'm not exactly sure

5 whether they had an interest in that stock or not, Canada and

6 the UK.

7 Q.  And now, does the -- does A.B. Dick have intellectual

8 property rights?

9 A.  Yes.

10 Q.  Does it have patents?

11 A.  Yes.

12 Q.  And approximately how many patents does it have?

13 A.  I can't answer that.

14 Q.  Can you give us some estimate?  Is it more than 25?

15 A.  I don't want to speculate.  I don't know.

16 Q.  Are you aware of any new and innovative patents of A.B.

17 Dick?

18 A.  No, I mean, we are working together with Presstek on a

19 joint development of a metal plate maker using Presstek's laser

20 imaging technology, but that is not our patent, that is their

21 patent.

22 Q.  Was there an agreement between Presstek and A.B. Dick

23 concerning the development of that plate maker?

24 A.  Yes there is.

25 Q.  And have you seen that agreement?

1  A.  Yes.

2  Q.  And what -- can you summarize the terms of it?

3  A.  I cannot.

4  Q.  When was that agreement entered into, approximately?

5  A.  I'm not exactly sure.  I believe in the springtime.  I have

6  not focused on that agreement though, I just know of it.

7  Q.  In the Spring of 2004?

8  A.  Yes.  It could be earlier.

9  Q.  And are you familiar with any effort by Presstek to

10 terminate that agreement?

11 A.  No I'm not.

12     (Pause in proceedings)

13 Q.  Now, many of the products that are produced by A.B. Dick --

14 or, I'm sorry, strike that.  Many of the products that are

15 produced for A.B. Dick by its suppliers, are subject to A.B.

16 Dick's patents, are they not?

17 A.  Yes.  I wouldn't say many, I know of some.

18 Q.  All right, now you earlier testified that beginning around

19 2 -- December of 2003, you began to work on the due diligence

20 for a stock or asset sale?

21 A.  Early December, yes.

22 Q.  Okay, and that was Presstek?

23 A.  Yes.

24 Q.  I'm gonna show you what we've marked as Committee Exhibit-A

25 for identification of which appears to be a letter dated April

Knipp - Cross                          88

1   27, 2004 and a draft Stock Purchase Agreement.

2       (Committee's Exhibit-A previously marked for
3   identification)

4           MR. MASON:  Your Honor, I have already previously told
5   the parties --

6           MR. SELBST:  I don't have copies of these, Mr. Mason.

7           MR. MASON:  I'm sorry, Mr. Selbst.  I believe that I
8   have a copy for you, but I don't have copies generally for
9   everybody.

10          THE COURT:  Is this what was attached to your
11  objection?

12          MR. MASON:  Yes, it was, Your Honor.  You do,
13  therefore, have a copy?

14          THE COURT:  I don't think I have a printed out copy so
15  I would need one if you have -- but, just for the benefit of
16  other parties, if you have that objection.

17          MR. SELBST:  I don't have an objection with it.

18          MR. MASON:  Uhm --

19          THE COURT:  How many copies do you have?

20          MR. MASON:  Your Honor, unfortunately -- I have one
21  for Mr. Selbst and there is one for the Court and -- I
22  apologize for --

23          THE COURT:  Have we marked one too?

24          MR. MASON:  Yes, and I've given it to the witness.
25  This would be Committee Exhibit-A.

Knipp - Cross                                        89

1       THE COURT:  Yes, let's call this A.  We'll have -- the

2  Debtors exhibits will be numerical, these will be alphabetic.

3       MR. MASON:  Thank you, Your Honor.

4  BY MR. MASON:

5  Q.  Now, first of all, have you ever seen this before?

6  A.  No, I have not.

7  Q.  You've never seen the cover letter?

8  A.  No.

9  Q.  And have you ever seen the Stock Purchase Agreement?

10 A.  I received a draft of the stock purchase agreement sometime

11 around the first half of May.  I had attended a meeting in New

12 York when they were doing negotiations with MHR's offices.  And

13 based on that meeting, it was decided that I should get a copy

14 of that agreement.

15 Q.  And does this appear to be a copy of the agreement which

16 you received?

17 A.  The fact that it says "Stock Purchase Agreement" that's all

18 I can say, I mean --

19 Q.  Well can you -- can you take a couple of --

20      MR. MASON:  Let me advise the Court that Mr. Gleason

21 and I have agreed that this document is authentic, that it

22 is -- was in books and records, although Mr. Gleason has

23 reserved his right to object to the admission of this document

24 on the grounds of relevancy.

25      MR. GLEASON:  I would state for the record, Your

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1 Honor, it was in the Debtors books and records.  That does not

2 mean that Mr. Knipp ever saw it.

3 BY MR. MASON:

4 Q.  Mr. Mitt -- Mr. Knipp, does that appear to be the agreement

5 that you saw, the draft agreement, in or about May of 2004?

6 A.  Well, that was 2 or 3 months ago and I mean, yeah, I mean,

7 it's a Stock Purchase Agreement.  Whether it's the same

8 agreement, I can't tell you that.

9 Q.  Okay.  Mr. Knipp, you -- you earlier testified that you

10 were generally familiar with a Stock Purchase Agreement between

11 A.B. Dick and Presstek, is that right?

12 A.  Generally familiar, I was aware of it.

13 Q.  You were aware of it?

14 A.  Yes.

15 Q.  I'd like to turn your attention to page 10 of Exhibit-A,

16 and in particular, focus you on paragraph 2.2, which is titled

17 "Consideration".

18     (Witness examines document)

19 BY MR. MASON:

20 Q.  Mr. Knipp, in the early portion of paragraph 2.2, there

21 appears to be a purchase price for the stock of A.B. Dick of

22 $22 million, 600,000 in cash and $18 million, 500,000 in

23 Presstek stock.  Do you see that?

24 A.  Yes, I do.

25 Q.  Is that consistent with your understanding of the agreement

1 that was proposed to A.B. Dick by Presstek in April or May of

2 2004?

3 A.  I had heard of terms in that -- that level, yes.

4 Q.  And I'd like to also turn your attention to page 50 of this

5 agreement, and in particular, paragraph 9.14, titled "Other

6 Indebtedness".  And that paragraph seems to indicate that

7 Presstek would not be assuming either the Key Bank debt or the

8 obligations of A.B. Dick to certain note holders.  Is that your

9 understanding of the way the Stock Purchase Agreement we've

10 earlier discussed --

11 A.  I was never given a clarification as what -- how the debt

12 was gonna be dissolved.

13 Q.  Now, in April 2004, what was the debt of A.B. Dick other

14 than the debt owed to Key Bank and to the note holders?

15 A.  You mean A.B. Dick or Paragon?  'Cause A.B. Dick has no

16 debt other than the fact that it's got trade payables and some

17 accrued liabilities and the deferred service obligations.

18 Q.  Okay.  Well, what were the -- then let me ask you this --

19 what were -- what was the debt of A.B. Dick in April 2004?

20 A.  A.B. Dick on it's books would have had accounts payable,

21 would have had accrued liabilities, it would have had differed

22 service revenue, it would have had some capital lease

23 obligations and it would have had probably an inter-company

24 balance owing to Paragon.

25 Q.  I'm looking at the 15th page of Exhibit-1.

1    THE COURT:  1 or A?  Oh, 1.

2    MR. MASON:  This is 1.

3    MR. GLEASON:  What's it say on the bottom right there?

4    MR. MASON:  Ah, it doesn't say anything.

5    MR. GLEASON:  In the little -- to the top --

6    MR. KNIPP:  To the top -- "Reconsolidated" or "US"?

7 BY MR. MASON:

8 Q.  Down in the right-hand corner it says, "2004 FCST

9 Board.xls/bsus --

10 A.  Okay.

11 Q.  Do you see that?

12 A.  Yes.

13 Q.  Okay, am I'm correct in reading this to mean, under

14 "Current Liabilities," that as of April 2004, the total current

15 liabilities of A.B. Dick were approximately $39 million?

16 A.  It says here the current liabilities are $40 million, 500.

17 On May, you're saying?

18 Q.  I'm sorry, I said in April.

19 A.  Oh, April -- 30 million, 981, yes.

20 Q.  Okay.  And for May?

21 A.  $40 million.

22 Q.  $40 million, 504,000?

23 A.  Right, right.

24 Q.  And for June, $37 million, 899,000?

25 A.  Correct.

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-929-0191

1  Q.  Is that correct?

2  A.  Yes.

3  Q.  And is this consistent with your recollection of how much

4  debt A.B. Dick had under current liabilities as of those days?

5  A.  Yes.

6      (Pause in proceedings)

7      MR. MASON:  Now Judge, again, a little commentary.  I

8  just received a copy of the signed Stock Purchase Agreement

9  from Mr. Gleason and I think we just have a little bit of a

10 communication gap.  I thought he was gonna give me a copy with

11 the signature on it.  So I only have a non-signed copy, which

12 is titled "Execution Copy" and I just received it.  And it's my

13 understanding that we have stipulated that this is also part of

14 books and records of A.B. Dick, and Mr. Gleason is reserving

15 his right to argue that this document is irrelevant.

16     MR. GLEASON:  Your Honor, let me make up what I'm --

17 kind of colloquy on this -- but this document was produced to

18 the Committee last week, was identified by the Committee's

19 general -- or the Debtor's general counsel.  The Committee was

20 advised at that time that the Debtors did not have a signed

21 copy of that document.  We would look for a signed copy and

22 provide it.  2 days ago, we advised the Committee that we did

23 not have a signed copy of the agreement, although we had signed

24 signature pages.  Because what happened, I believe -- Mr. Knipp

25 can testify to this -- he was sent signature pages, signed the

1   signature pages and sent them back.  Those pages were being

2   held pending consummation of the agreement if it ever was

3   consummated, which it was not.  So, I guess to be clear, this

4   is a document that is in the books and records of the company.

5   We do not have a signed copy of that agreement.  Mr. Mason does

6   have the signature pages for this document, as well as several

7   other documents that were (indiscern.).

8           MR. SELBST:  John, identify signed by whom and not

9   signed by whom.

10          MR. GLEASON:  Yes, it was the signature pages that we

11  provided, signed by Greg Knipp, on behalf of A.B. Dick.  We do

12  understand that there's a signature page that was signed by

13  Paragon as well.  It was not signed by Presstek or Silver.

14          MR. MASON:  I just wanted to point out to the Court

15  that I only have one copy of this document, and I am sorry that

16  I don't have more copies.  But in any event, I -- now, Mr.

17  Knipp --

18          THE COURT:  Is this different from Committee Exhibit-

19  A?

20          MR. MASON:  It is different in non-material respects,

21  Your Honor.  There are some blanks in Committee Exhibit-A that

22  seem to be filled in Committee Exhibit-B.

23          THE COURT:  Okay.

24  BY MR. MASON:

25  Q.  All right, Mr. Knipp, I'm now gonna show you what we've

Knipp - Cross                          95

1  marked as Committee Exhibit-B and ask you if you are familiar

2  with that document?

3      (Committee's Exhibit-B previously marked for

4  identification)

5  A.  I did sign signature pages to a Stock Purchase Agreement

6  that I believed to be the execution copy, but I have not

7  actually seen any Stock Purchase Agreement other than that one

8  that was sent to me in early part of May.

9  Q.  I'm now gonna show you what we've marked as Committee

10 Exhibit-D, and the record should reflect that I've skipped over

11 C; we'll go back to C.

12     (Committee's Exhibit-D previously marked for

13 identification)

14     MR. MASON:  Your Honor -- then I have another copy for

15 anybody who wants to take a look at it.

16     (Pause in proceedings)

17     THE COURT:  That's his signature?

18     MR. MASON:  That's his signature.

19     THE COURT:  Okay.

20 BY MR. MASON:

21 Q.  First of all, Mr. Knipp, is that your signature on

22 Committee Exhibit-D?

23 A.  Yes, it appears to be.

24 Q.  And is this your understanding the -- of the document that

25 you signed agreeing on behalf of A.B. Dick to the Stock

A-0184

1   Purchase Agreement, which we marked as Exhibit-B?

2   A.  Yes.

3   Q.  Thank you.

4       (Pause in proceedings)

5   Q.  And were you granted authority by A.B. Dick to sign that

6   signature page, Exhibit-D?

7   A.  Yes I am.  Yes I was.

8   Q.  I'm now gonna show you what we've marked as A.B. Dick --

9   I'm sorry, that's Committee Exhibit-C.

10      (Committee's Exhibit-C previously marked for

11  identification)

12  A.  Okay.

13      MR. MASON:  And Your Honor, I will represent to the

14  Court again that Mr. Gleason and I agreed that this is an

15  authentic document that was taken out of the books and records

16  of A.B. Dick.  And again, I believe that Mr. Gleason's only

17  possible objection to this is on the grounds of relevancy.

18      MR. GLEASON:  We do stipulate the authenticity, Your

19  Honor.

20      THE COURT:  I'm sorry, I didn't understand what you

21  said, Mr. Gleason.

22      MR. GLEASON:  We do stipulate to the authenticity of

23  the document.

24      THE COURT:  Okay, thank you.

25  BY MR. MASON:

A- 0185

1  Q.  On the third page of Exhibit-C, there is a letter dated

2  June 22nd, 2004 signed by what appears to be a gentleman named

3  Musa Emusa.  Do you see that?

4  A.  Yes, I do.

5  Q.  Have you ever seen this letter before?

6  A.  I'm not sure.  I saw a letter right around this time that

7  talked about -- I'm trying to read the whole letter through --

8  is this where Presstek has declined to go through with the

9  transaction?

10 Q.  That was my question to you.

11 A.  Yeah, I heard of that and I didn't read the letter very

12 closely, I just heard there was a letter, yeah.

13 Q.  What was your understanding of Presstek's willingness to go

14 ahead with the Stock Purchase Agreement that we've marked as

15 Exhibit-B in or about June 2004?

16 A.  It was my understanding that they decided not to go through

17 with the transaction based on circumstances that they learned

18 or -- at that point in time.  I don't want to use the word

19 "learned," but whatever they -- for whatever reason.

20 Q.  Did you attend a dinner of Presstek and A.B. Dick

21 executives in Chicago shortly after the filing of the

22 bankruptcy?

23 A.  Yes I did.

24 Q.  And was Presstek's president there?

25 A.  Yes they were -- yes he was.

1   Q.  And who is that?

2   A.  Ed Marino.

3   Q.  And was A.B. Dick's then president there?

4   A.  Yes he was.

5   Q.  And what is his name?

6   A.  Brian Long.

7   Q.  And where was that meeting?

8   A.  A restaurant -- I don't recall the name of the restaurant,

9   it was -- there's several in that area near our offices in

10  Niles, Illinois.

11  Q.  Okay.

12  A.  It was actually in Rosemont, Illinois, that's where the

13  restaurant was at.

14  Q.  All right, and who else was present?

15  A.  Musa Emusa was there from Presstek; Michael McCarthy from

16  Presstek; and then the executive staff of A.B. Dick Company.

17  Q.  How many executives from A.B. Dick were present?

18  A.  Without giving a specific count, probably around 10, eight

19  to 10.

20  Q.  And at that meeting, did you hear Presstek's president tell

21  Mr. Long, the President of --

22          MR. GLEASON:  Objection, Your Honor, this is -- he's

23  trying to elicit hearsay.  He's seeking a declaration by a

24  statement made by a Presstek executive who's clearly not in

25  this Courtroom.

1  MR. MASON:  Judge, I -- this would be a party

2  admission to be admission against interest.  Presstek is here.

3  They're a party to this proceeding.

4  THE COURT:  Overruled.

5  BY MR. MASON:

6  Q.  At that meeting, did you hear Presstek's President tell Mr.

7  Brian Long, A.B. Dick's President --

8  THE COURT:  Why don't you just ask him if he heard

9  anything from the one to the other, rather than ask --

10  A.  What I heard was a general statement to that effect.

11  THE COURT:  To what effect?

12  A.  It wasn't directed directly at Mr. Long necessarily.

13  THE COURT:  I just -- first I want to know whether or

14  not you heard some conversation as a foundational matter then

15  you can ask the follow-up question.

16  BY MR. MASON:

17  Q.  Did you hear any conversation --

18  A.  Yes, I did.

19  Q.  -- among the parties?  Did you hear Mr. Marino, the

20  President of Presstek, say anything to Mr. Long, the President

21  of A.B. Dick?

22  A.  He -- he made a comment to that effect, what you just

23  indicated about the CFO -- CEO.  But he didn't necessarily, as

24  I recall, look directly --

25  THE COURT:  I don't understand --

1    A.    -- at Mr. Long.

2            THE COURT:  -- what you said.

3            MR. MASON:  Mr. Knipp, I --

4            THE COURT:  He hasn't -- he hadn't said anything yet.

5    A.    Oh, okay.

6            MR. MASON:  I think you were anticipating --

7    A.    Okay.

8            MR. MASON: -- my question.

9    A.    All right.

10   BY MR. MASON:

11   Q.    Would you please describe to the Court as best you recall

12   what statement you heard being made by Mr. Marino to Mr. Long?

13   A.    Well -- what did you ask me before -- so I'm perfectly

14   clear on this?

15   Q.    Yes.  Did you hear Mr. Marino say anything to Mr. Long at

16   that meeting, yes or no?

17   A.    Not directly to Mr. Long.

18   Q.    Did you hear Mr. Marino say anything to the executives

19   assembled at that meeting?

20   A.    He said a lot of things.

21   Q.    Okay.  Did you hear him say anything about the longevity of

22   a CEO of a company?

23   A.    Yes, I did.

24   Q.    And what did he say, to the best of your recollection?

25   A.    The average longevity of a CEO is 4 years, or 4.2 years, or

1  something to that effect.

2  Q.   Okay.  And was Mr. Long there at that time this statement

3  was made?

4  A.   Yes he was.

5  Q.   And did Mr. Long later get fired by A.B. Dick?

6  A.   He was terminated, yes.

7  Q.   Okay.  And how much after that meeting was he terminated?

8  A.   It was around the end of July.  That meeting was on July

9  14th, the dinner meeting was.

10 Q.   Okay.  So the dinner meeting was the day after the filing

11 of the bankruptcy.  At the dinner meeting, Mr. Marino made that

12 statement and 2 weeks later, Mr. Long was discharged?

13 A.   Yes.

14 Q.   What does each -- you talked about the three-legged stool,

15 describing the operations of A.B. Dick.  What does each of the

16 leg of the stool generate in revenue and EBITDA, E-B-I-T-D-A?

17 A.   Okay, they are -- let me just think about if for a

18 second -- in 2003, equipment business generated about $50

19 million in revenue.  And when you define EBITDA, it's a very

20 subjective number, but it was definitely negative on the

21 equipment side, okay?  And the reason why I say it's -- it's

22 subjective is -- there's a lot of common costs that get shared

23 amongst the three business units.  And it's up to the holder to

24 decide how they want to allocate those cost out.  But needless

25 to say that the -- the equipment business lost -- could lose

Knipp - Cross                                        102

1   money anywhere from, you know, 5 to 13, 14 million, depending
2   on how you allocate the cost.  The supplies business is about
3   $85 million and probably makes around 9 -- on that same basis -
4   - in the $9 million, $10 million range.  And --
5   Q.  That's 9 to 10 million positive?
6   A.  Positive, yes.
7   Q.  EBITDA?
8   A.  Yes, and the service business, that's about a $55 million
9   business, companywide.  And that probably generates at least 5
10  to 10 million itself.
11  Q.  So, the supply division, if I could call it that, and the
12  service division, if I could call it that, generates EBITDA of
13  somewhere between 15 and $20 million a year?
14  A.  Combined?
15  Q.  Yes.
16  A.  On a -- that allocation basis, yes, but again, that can
17  range probably 10 -- 5 million down to 10 to 20 million, I
18  guess, depending on how you look at it.
19  Q.  Has the company management considered shutting down the
20  losing division and continuing to operate the more profitable
21  divisions?
22  A.  No, not to my recollection, not in my discussions.
23  Q.  Now --
24  A.  I need to explain something there though --
25  Q.  How --

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

A- 0191

1   A.   Okay.

2   Q.   Now, you earlier testified that somebody tried to find

3   Debtor-In-Podssession financing for A.B. Dick, is that correct?

4   A.   Yes.

5   Q.   And were you involved in that?

6   A.   Providing due diligence information.  But the discussions

7   with the powers to be from the lending institutions were

8   handled through the ownership structure of Paragon.

9   Q.   And what -- how long did these discussions take place?

10  A.   Well, when I got involved, it was probably in the late fall

11  of the year 2000, and they terminated in the early winter of

12  2003.

13  Q.   I'm sorry, Mr. Knipp, I think that maybe we got our days a

14  little bit confused.  Did you mean to say that you commenced

15  discussions in the year 2000?

16  A.   2002, I'm -- did I -- I meant to say 2002.

17  Q.   I'm asking you, and I'm just looking for clarification --

18  A.   Yeah.

19  Q.   I'm asking you -- you had earlier testified that it was

20  your understanding that A.B. Dick had approached two potential

21  sources of Debtor-In-Possession lending for this bankruptcy.

22  A.   Right.

23  Q.   And I'm asking you when that approach took place, as best

24  you know?

25  A.   The Fall of 2002.

1   Q.   The Fall of 2002?

2   A.   Yeah.

3   Q.   And when did those discussions end?

4   A.   I'm not exactly sure.   I was asked for information from

5   time to time, but I believe they ended right -- January,

6   February of 2003.

7   Q.   Okay.

8   A.   About the same time that Key Bank, our current lender, gave

9   us an amendment to our existing agreement.

10  Q.   Okay.   So, since January or February of 2003, there has

11  been no effort by A.B. Dick, as best you know, to find the

12  Debtor-In-Possession financing lender --

13  A.   I don't want to say, the best I know --

14  Q.   -- other than by Presstek?

15  A.   The -- as I mentioned before, the ownership structure

16  conducts inquiries on their own to find alternative sources of

17  financing.   Whether they've done that or not, I can't tell you.

18  But I do know that they engage in those kind of discussions

19  from time to time.

20  Q.   And so this company was -- the implication of your

21  statement is that the company was considering bankruptcy as

22  early as late 2002?

23  A.   No, I can't say that, I don't know that at all.

24  Q.   Well you said that you were participating in due diligence

25  for Debtor-In-Possession lending --

1  A.  No, no, alternative financing to the Key Bank agreement,

2  the Key Bank Revolving Credit Agreement.  Under no -- make it

3  clear, if I said before it was Debtor-In-Possession financing,

4  it was not, it was just financing.

5  Q.  I see.

6  A.  Regular --

7  Q.  And so my question to you, and I don't mean to confuse you

8  --

9  A.  Yeah.

10  Q.  I want to make sure that the record is clear --

11  A.  Yeah.

12  Q.  Did you ever participate in an effort by doing due

13  diligence or otherwise to obtain Debtor-In-Possession

14  financing for this bankruptcy proceeding?

15  A.  No, I did not.

16      (Pause in proceedings)

17          MR. MASON:  Your Honor, if I could just have one

18  minute?

19    ▸ (Pause in proceedings)

20  BY MR. MASON:

21  Q.  Currently, how much money is borrowed on the Debtor-In-

22  Possession, the line?

23  A.  Right now, it's probably around zero.

24  Q.  Was there ever any money borrowed from the Debtor-In-

25  Possession line?

1  A.  I believe a week ago it was up towards a million dollars.

2  Q.  Okay, but it's down to zero at this point?

3  A.  Yeah, it fluctuates based on the timing of payrolls.

4  Q.  Mr. Knipp, thank you.

5          MR. MASON:  Judge, thank you.

6          THE COURT:  Do we have other cross examination?

7                     CROSS EXAMINATION

8  BY MR. SELBST:

9  Q.  Good afternoon, Mr. Knipp.  My name is Stephen Selbst, I

10 represent Presstek.  Mr. Knipp, I want to direct your attention

11 back to the meeting where you testified to a few moments ago

12 between Presstek executives and A.B. Dick executives.  At that

13 meeting, did you ever hear anyone from Presstek tell anyone at

14 A.B. Dick to fire Mr. Long?

15 A.  No.

16 Q.  Did you ever hear it at any other time?

17 A.  No.

18 Q.  Did you ever hear about anyone at Presstek telling A.B.

19 Dick to fire Mr. Long?

20 A.  No.

21 Q.  Thank you.  Now, I also want to direct your attention to

22 the various forms of the Stock Purchase Agreement that were the

23 subject of your earlier testimony.  Did you ever see a signed

24 signature page from Presstek to that Agreement?

25 A.  No I did not.

1    ME. SELBST:  Nothing further.

2                  CROSS EXAMINATION

3  BY MR. LEPENE:

4  Q.  Mr. Knipp, I just have one or two questions.  You testified

5  in response to a question from Mr. Mason that at the time of

6  the filing, that bank debt was about 23 million, do you recall

7  that?

8  A.  Yes.

9  Q.  And you testified that the receivables at that time were

10 about 18 million, do you recall that?

11 A.  Yes.

12 Q.  And that's on a book basis, is that correct?

13 A.  That's -- 18 million is the gross number.  I'd say net or

14 reserves are probably closer to 16½ to 17.

15 Q.  Okay.  And inventory at that time, you testified, was 11 to

16 12 million?

17 A.  Yes.

18 Q.  Again, on a book basis?

19 A.  Yes.

20 Q.  Okay.  You don't have any idea, do you, if this company

21 were to cease operating and were to liquidate, what the

22 recoveries --

23 A.  No, I don't.

24 Q.  -- would be and it's receivables?  Let me finish the

25 question.

1   A.   Okay.

2   Q.   You don't have any idea what that would be, do you?

3   A.   No.

4   Q.   And the same with the inventory, if this company were to

5   cease to operate and were to be liquidated, you don't have any

6   idea of what the recovery on the inventory would be, do you?

7   A.   No.

8   Q.   Thank you.

9            MR. STOCK:   Redirect, Your Honor.

10                    REDIRECT EXAMINATION

11  BY MR. STOCK:

12  Q.   Greg, Mr. Mason asked you whether the company had

13  considered shutting down the less profitable division, I

14  believe was the term that he used.

15  A.   Right.

16  Q.   Was there any -- is there any formal division of functions

17  under A.B. Dick?

18  A.   No.

19  Q.   Okay.

20  A.   Let me say this, though.  There are different operating VPs

21  that run the equipment business, the service business and the

22  supplies business, but they're not formal legal divisions.

23  Q.   And why has that not been considered?

24            MR. MASON:   Your Honor, I'm gonna object to that

25  question.  There's been no foundation.  This gentleman has

1  testified --

2        THE COURT:  Sustained.  If you lay foundation, or if

3  he knows why, then he can testify.

4  BY MR. STOCK:

5  Q.  Do you know why?

6  A.  Can you repeat the question please?

7  Q.  Yes.  Mr. Mason asked you whether or not the company has

8  considered shutting down a less profitable division.

9  A.  Right.

10 Q.  Remember that?

11 A.  Yes.

12 Q.  He apparently thought you may have knowledge regarding that

13 and I'm following up.

14 A.  No.

15 Q.  Do you have knowledge regarding that?

16 A.  No I don't.

17 Q.  Okay.

18        MR. STOCK:  No further questions.

19        THE COURT:  I have a couple of questions.

20 BY THE COURT:

21 Q.  Mr. Knipp, from the time the case was filed, can you give

22 me a history of what's been drawn and re-paid on the DIP line?

23 A.  I don't have those numbers exactly but I would anticipate

24 that probably a million to a million and a half has been drawn

25 on the DIP line and re-paid; it fluctuates up and down.

Knipp - Redirect                                                   110

1   Q.  That's re-paid from collection of receivables?

2   A.  Yes it is.

3   Q.  Right now it's at zero?

4   A.  Yes.

5   Q.  You would expect it to go -- do you expect the company to

6   be back into the line sometime soon?

7   A.  Yes.

8   Q.  Does that come on a bi-weekly basis, having to do with

9   inventory?

10  A.  Well it has to do with the business plan as well.  Yes,

11  we're -- our forecast shows that we're going to be buying more

12  inventory to fund Mitsubishi and other vendors to get product

13  in and --

14  Q.  What do your forecasts show that you will actually meet on

15  the DIP line between now and November?

16  A.  I want to say 5 to $6 million.

17  Q.  On a revolving basis, up and down?

18  A.  Yes, but tracking upwards.

19  Q.  And what are the primary purposes for which that money will

20  be used?

21  A.  To buy inventory and also to fund the operations of the

22  business.  The business is expected to lose money in the next 3

23  months.

24  Q.  And also to pay the costs of the bankruptcy case?

25  A.  Those are included in that, yes.

A- 0199

1  Q.  And to pay the inventory?

2  A.  Yes.

3  Q.  Purchase inventory?

4  A.  Yes.

5  Q.  Okay, thank you.

6         THE COURT:  Any questions from anybody based upon my

7  questions to the witness?

8         ALL:  (No verbal response).

9         THE COURT:  If not, you can step down, Sir.

10        MR. KNIPP:  Do I leave these Exhibits here?

11        THE COURT:  Please leave them there, yes.  All right,

12  what's next?

13        MR. GLEASON:  Your Honor, the Debtors would call Glenn

14  Pollack.

15        THE COURT:  Mr. Pollack, come forward here to the

16  Courtroom Deputy to be sworn.

17        GLENN POLLACK, DEBTOR'S WITNESS, SWORN

18        THE COURT:  Mr. Pollack, please take a seat to my

19  right in the witness chair and speak up clearly into the

20  microphone.  Okay, Mr. Gleason.

21        MR. GLEASON:  Thank you, Your Honor.

22                    VOIR DIRE

23  BY MR. GLEASON:

24  Q.  Could you please state your name for the record?

25  A.  Glenn Pollack.

Pollock - Voir Dire                           112

1   Q.  Can you describe for the Court your educational background
2   after high school?
3   A.  I received a degree in Accounting from Boston University
4   and I'm a Certified Public Account, currently inactive.
5   Q.  Can you describe before the Court your work history after
6   high school?
7   A.  My employment after college began with Touche, Ross as an
8   accountant in Boston in 1980.  In 1983 I went to work as the
9   CFO of a troubled advertising agency.  In 1984 I joined Sideman
10  & Associates, a workout firm in Cleveland, Ohio.  That firm
11  merged into Price Waterhouse in 1988 or 1989.  I remained with
12  Price Waterhouse in their workout consulting group.  In 1990 I
13  became the CEO of one of the Price Waterhouse workout clients,
14  called A & W Foods.  That business ran until October of '94.
15  Then I opened Pollack & Associates, a financial advisory firm.
16  That business was merged into a middle market investment bank
17  by the name of Brown, Gibbons & Lange in 1996.  In 2001 I
18  formed Candlewood Partners with two other gentleman.
19  Q.  Can you describe for the Court your experience with
20  distressed companies?
21  A.  Since 1984, I have been at a variety of companies --
22  troubled companies -- CEO, Receiver, Chapter 11 Trustee,
23  Financial Advisor, Investment Banker, Consultant for a wide
24  variety of clients.
25  Q.  Let's turn to the -- to your experience in bankruptcy

1  matters.  You indicate a Chapter 11 Trustee, are there any

2  other type of bankruptcy related as opposed to out of

3  bankruptcy related matters?

4  A.  I've been a Receiver, I have also acted as Financial

5  Advisor and Investment Banker for a number of Chapter 11

6  Debtors.

7  Q.  Can you describe for the Court generally what a Financial

8  Advisor does on behalf of a Debtor in bankruptcy, both pre- and

9  post-petition?

10  A.  Yes.  Depending upon the timeframe in the case in which

11  you're hired, your activities might include helping management

12  and the Board analyze their strategic options, helping to

13  develop forecasts, help to develop financing alternatives, to

14  the extent it's appropriate, begin the production of a selling

15  memorandum, the assembly of a list of interested parties,

16  negotiations with potential parties.  There's a wide variety of

17  activities.

18  Q.  Those last items you mentioned, are they also related to

19  what an Investment Banker does in bankruptcy or are they

20  separate?

21  A.  They are related to an Investment Banker; there's an

22  interesting line.

23  Q.  Have you ever been involved in a 363 sale process?

24  A.  Yes.

25  Q.  Can you give the Court an idea of how many of those sale

Pollack - Direct                                114

1  processes you have been involved in?

2  A.  Over the last 20 years it's certainly been more than 30.

3  Q.  Have you been involved in Plans of Reorganization?

4  A.  Yes.

5  Q.  Approximately how many?

6  A.  Over the last 20 years, five to 10, 15.

7  Q.  Have you ever testified as an expert witness with respect

8  to bankruptcy transactions?

9  A.  Yes.

10  Q.  In what cases?

11  A.  I don't recall all of them, but Optical Datacom, General

12  Industries --

13  Q.  Where -- let's step back -- where was Optical Datacom?

14  A.  Delaware.  General Industries, Delaware.  Often my

15  testimony would be proffered.  It was last week in Manhattan,

16  in Ohio, in a variety -- I don't recall all of them, sorry.

17          MR. GLEASON:  Your Honor, at this time, I would like

18  to term Mr. Pollack as an expert witness with respect to

19  financial advisory and investment banking services in

20  bankruptcy.

21          THE COURT:  Any objection?

22          MR. MASON:  No objection, Your Honor.

23          THE COURT:  All right, he will be so designated.

24                    DIRECT EXAMINATION

25  BY MR. GLEASON:

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  Q.  Mr. Pollack, can you describe your understanding of the

2  general focus of a 363 sale?

3  A.  A 363 sale is typically used as a vehicle to maximize the

4  value -- the going concern value of an estate by providing for

5  -- providing an opportunity for a buyer to acquire assets

6  businesses without regard to the liabilities, and therefore, to

7  pay the largest price possible while the liabilities are dealt

8  with at a later time based on the value received in the sale.

9  Q.  Have you been involved in 363 sales where a stalking horse

10  has been used?

11  A.  Yes.

12  Q.  Can you describe for the Court your understanding of why a

13  stalking horse would be used in a 363 sale?

14  A.  A stalking horse is often used to establish a base -- for

15  two reasons.  One is to establish a baseline value that other

16  bidders can view as a target that they must over-achieve if

17  they wish to acquire the assets.  And two, it is often used as

18  a method to advise all the Parties-In-Interest that the

19  business will continue operating and it's a business that

20  should be supported and yes, it is in Chapter 11 today, but

21  here's a stalking horse that will provide for an ongoing

22  business and therefore allow it to maintain its going concern

23  value -- going concern value during the auction process.

24  Q.  Would you say there's a typical process used with respect

25  to 363 sales?

1  A.  Yes.

2  Q.  Could you describe that process?

3  A.  The process depends a little bit on the level of activity,

4  pre and post, but it typically includes an investment banker or

5  some other party producing a list of potential interested

6  parties, distributing a teaser to those parties.  In our -- in

7  our shop, we use the teaser as an introduction then we call

8  every single party to invite them to sign a confidentially

9  agreement and receive a copy of the Selling Memorandum, which

10  we prepare with the company, which describes the business and

11  the opportunities.  After they have evaluated that, we

12  typically, for those who are interested, facilitate further

13  diligence, review of certain files, meet management, see the

14  company's operations, etc.  We participate and attempt to

15  forment negotiations towards a value greater than the stalking

16  horse, if there is one.  We facilitate those discussions and

17  try and bring as many parties as possible to an auction that

18  will create an environment to maximize the  going concern value

19  of the estate, the assets they're selling.

20  Q.  Is there a typical timeframe involved in any 363 sale

21  process?

22  A.  I think they vary widely.

23  Q.  What considerations go into deciding what an appropriate

24  timeframe might be in a particular case?

25  A.  The size and complexity of the business.  The amount of

1 pre-filing marketing that has occurred.  The company's ability
2 -- the Debtor's ability to sustain its operations.  The terms
3 under which the stalking horse bid, if there is one, provide.
4 The nature of the potential interested parties.  You know,
5 specifically, if all of the parties are foreign, then you might
6 expect to have a longer marketing process to accommodate their
7 needs.  If all of the parties are going to be financial, you
8 could have a much shorter marketing period because those
9 parties are able to move quicker.  There's a wide variety of --
10 Q.  Is there any one consideration that's more important than
11 others?
12 A.  I think the over-riding consideration would be the
13 maintenance of the going concern value of the Debtor.
14 Q.  When you say maintenance of the going concern value, what
15 do you mean?
16 A.  Most Debtors have -- have operations that lose money and
17 they have a limited amount of financing.  And so there's a
18 limited amount of time that they can remain in operation,
19 maintain the -- we'll call it the run rate, the amount of
20 business they're doing and -- within the financing they have
21 available.
22 Q.  In your experience, does a going concern sale of a business
23 as opposed to a piece-meal liquidation, generally result in
24 more value from estate?
25 A.  It generally does.

Pollack - Direct                                    118

1  Q.  Why is that?

2  A.  Piece-meal liquidation typically results in the sale of

3  assets at or below their book value.  And it's based on a party

4  who believes that they can either buy those assets and

5  liquidate them for a price greater than what they bought them,

6  or can buy those assets and re-start a business off those

7  assets.  The typical sale as a going concern, the buying party

8  is paying at some level for good will, for the on-going

9  operations of the business.

10 Q.  You had, I believe, were in the Courtroom when Mr. Knipp

11 was testifying and referenced the razor/razor blade situation?

12 A.  Yes.

13 Q.  Is that, in your experience, -- how does that play into

14 whether you have a going concern or a piece-meal liquidation?

15 A.  The ability to continue servicing the -- the -- providing

16 the razor blades to the razor customers is critical in

17 maintaining the ongoing going concern value.  If you were to

18 stop providing the service of the equipment in the field, some

19 other party would likely step into that void and that customer

20 would be gone from the Debtor forever, or for some period of

21 time, certainly.

22 Q.  What if you were to stop selling the equipment that you

23 service?  Is it the same?

24      MR. MASON:  Your Honor, I'm gonna object.  I'm trying

25 to figure out what relevancy that this line questioning has to

1  the question the whether or not Presstek is entitled to bid

2  protection, which I think is supposed to be the focus of this

3  hearing.

4          THE COURT:  Overruled.  I assume that counsel will

5  soon get to his point.

6          MR. GLEASON:  Thank you, Your Honor.

7  A.  Could you repeat the question?

8  BY MR. GLEASON:

9  Q.  Yes.  You, I believe, testified that if you get rid of the

10  service you will lose customers that are buying the equipment.

11  Is the same true if you get rid of the equipment, you may lose

12  the service?

13  A.    In the razor blade/razor model, the assumption is once the

14  equipment or razor is out in the field, until its use expires

15  in the field, you'll be able to supply it with razor blades and

16  continue to service it.  So, although your market would dwindle

17  as those businesses took the equipment out of service, you

18  would continue to have the ability to sell into that market.

19  Q.  But then when the razor is gone, would you want to also

20  then sell another razor?

21  A.    You would.

22  Q.  Because then you can sell razor blades?

23  A.  It's -- it's an annuity stream.  You create a new annuity

24  stream -- the opportunity for a new annuity stream every time

25  you sell one of the pieces of equipment or razors.

Pollack - Direct                                    120

1  Q.  Mr. Pollack, let's turn to the Debtors in these cases.

2  When did you first learn of these Debtors?

3  A.  I believe it was 1998 or 1999.

4  Q.  How did you first learn of these Debtors?

5  A.  Paragon hired my former firm to sell Curtis Industries on

6  its behalf.

7  Q.  When did that engagement end?

8  A.  My recollection is somewhere between '98 and late '99.

9  Q.  Did you subsequently become involved with the Debtors

10  again?

11  A.  Yes, I did.

12  Q.  When was that?

13  A.  Sometime between late '99 and 2000.

14  Q.  And what were you asked to do at that time?

15  A.  To advise them with respect to the negotiations with their

16  bondholders.

17  Q.  And what happened with that engagement -- or during that

18  engagement?

19  A.  We advised Paragon, with respect to its alternative and --

20  its alternatives and its negotiating strategies.  We assisted

21  them in their negotiations with MHR as the primary bond holder.

22  And the company completed an exchange of those bonds with, I

23  believe, 97 or 98% of the bond holders sometime in August 2001.

24  Q.  What was your next engagement or involvement with the

25  Debtors?

A- 0209

1   A.   I don't recall the exact date, I believe it was in 2002,

2   that the Paragon Board informally approached us and asked if we

3   could introduce them to any lenders.  We did, in fact, arrange

4   a meeting with them and Surberus.  We did not have a formal

5   engagement letter or a formal relationship at that time.

6   Subsequent to that --

7   Q.   Let me just step for a second --

8   A.   Yeah.

9   Q.   Are you aware of anything that transpired from those

10  informal negotiations or  the introductions that you made at

11  the request of the Debtors?

12  A.   I know there were meetings, there were discussions, I'm not

13  aware of any -- of any transaction arising out of those

14  meetings.

15  Q.   When were you next contacted, if at all, by the Debtors?

16  A.   My firm was contacted, I believe, in September of 2003.

17  Q.   And what, if anything, were you asked to do at that time?

18  A.   We were asked to advise the Debtor with respect to its

19  strategic alternatives directly as a result of their receiving

20  an expression of interest from Presstek earlier in the summer.

21  Q.   And what did your engagement consist of at that time?

22  A.   We helped the Debtor in moving its discussions along with

23  Presstek.  We added -- we acted as an interface between the

24  Debtor and Presstek for a limited period of time.  We helped

25  the Debtor begin to look at -- it wasn't the Debtor at that