1  required -- related to the enforceability.  If it's absolutely

2  unenforceable in an expression of interest or an offer I would

3  wholeheartedly agree.

4  Q.  Are you familiar with paragraph 10 of the APA?

5  A.  I have read it.

6  Q.  Do you have a copy there?

7  A.  I do.

8  Q.  If I could turn your attention to it.  That's on page 46 of

9  the APA.

10 A.  Yes.

11 Q.  Do you see there are 13 different conditions --

12 A.  Yes.

13 Q.  -- 13 different numbered paragraphs?

14 A.  Yes.

15 Q.  All right, now just directing your attention to paragraph

16 10.1 on page 46, do you see there that the obligations of the

17 purchaser are dependant upon the accuracy of representations

18 and warranties?  Do you see that?

19 A.  I see the paragraph.

20 Q.  But you understand that if any one of those representations

21 or warranties proves to be untrue in any material respect, the

22 purchaser has the right to cancel the contract without any

23 liabilities to the estate?  Is that your understanding?

24 A.  That would be my understanding.

25 Q.  Now, 10.1 refers us back to paragraph 3.  Do you see that?

1  Paragraph 3 starts on page 16.

2  A.  Yes.

3  Q.  See that?  And it goes to page 33; 17 pages.  Do you see

4  that?

5  A.  I do.

6  Q.  Do you see the 28 paragraphs of representations and

7  warranties on those 17 pages?

8  A.  I do.

9  Q.  In all your years in as a bankruptcy professional have you

10  ever seen a Section 363 Asset Sale that had so many

11  representations and warranties?

12  A.  I have seen them, especially when there are assets not

13  inside of the estate that are being sold as well.

14  Q.  Now, between the time of your engagement with A.B. Dick and

15  today, what effort have you made to determine of these 17 pages

16  of representations and warranties are true and will remain true

17  up to the time of closing?

18  A.  I have focused my attention on the financial conditions

19  contained in the APA.  And I have, I think, been fairly

20  specific in my testimony today about the efforts to negotiate

21  and the success in negotiating the modifications to both the

22  APA and the DIP agreement with respect to the financial

23  conditions.

24  Q.  And the financial conditions are not contained in paragraph

25  3 of the APA, are they?

1  A.  I think they're referenced in another paragraph.

2  Q.  They're referenced in paragraph 10.12, are they not?

3  A.  They are.

4  Q.  So your focus has not been on the 17 pages of

5  representations and warranties in paragraph 3, is that your

6  testimony?

7  A.  It is.

8  Q.  As you sit here today, then, what assurance can you give to

9  the Committee, to MHR, to the other Creditors of the estate and

10 to this Court that these representations are currently true and

11 that they will remain true up to the time of the closing?

12 A.  I can't speak to that.

13 Q.  Thank you.  Now, some of these representations and

14 warranties, in my experience, are somewhat unusual.  I just

15 want to direct your attention to paragraph 3.12 on page 20.  Do

16 you see sub-paragraph A?

17 A.  I do.

18 Q.  "Seller and each subsidiary of seller has timely filed all

19 material Federal, State, Local and Foreign returns," and so

20 forth.  What investigation have you done to make certain that

21 all these tax returns have been filed?

22 A.  I don't believe that was my responsibility.  I've made no

23 investigation.

24 Q.  Okay.  And I'd also like you to turn your attention to

25 paragraph 3.14 on page 22.  And I'm looking specifically, for

Pollack - Cross                    181

1  instance, at 13.14(A) sub 2.  "To the sellers knowledge, except

2  as set forth in section 3.14 of the seller disclosure schedule,

3  since the base balance sheet date, there has not been with

4  respect to seller or any subsidiary of seller {little 2} any

5  encumbrance placed on any of the properties of seller or any

6  subsidiary except permitted encumbrances."  See that?

7  A.  I do.

8  Q.  Now, isn't the sale supposed to be free and clear of all

9  liens and encumbrances?

10  A.  It is.

11  Q.  Can you imagine how Presstek would be injured if it turned

12  out that there was some undisclosed lien?

13          MR. GLEASON:  Your Honor, I think that calls for

14  speculation.

15  A.  I'm not a lawyer.

16          THE COURT:  Overruled.

17  A.  I'm not a lawyer.  I can't speak to what liens might

18  interfere that the Court has or doesn't have jurisdiction over,

19  what liens might be in foreign assets they're being sold that

20  are not party to this proceeding.  I can't speculate on that.

21  Is it not -- one question though, is it not subject to a

22  materiality clause?

23          MR. MASON:  Your Honor, I move to strike the witnesses

24  testimony on the grounds that there was no question.

25          THE COURT:  Granted.

Pollack - Cross                                          186

1  than that which it can use to borrow money, buy inventory, and

2  include in its inventory and meet the calculation.

3  Q.  So it's your view -- well, let's take a look at the section

4  titled Combined U.S. and Canada under Working Capital Closing

5  Covenants.

6  A.  Yes.

7  Q.  Do you see that?

8  A.  I do.

9  Q.  That's the second to last at the bottom in bold title,

10 Combined U.S. and Canada?

11 A.  I see it.

12 Q.  And that shows, does it not, that in August and September

13 A.B. Dick is not going to make the working capital closing

14 covenants, does it not?

15 A.  It does -- well, no, it shows that under this analysis that

16 the forecast from operations would require the Debtor to borrow

17 $436,000 more on its line, buy inventory, and include that

18 inventory in its calculation to meet the test.  That's what it

19 shows to me.

20 Q.  All right, and how about in September?

21 A.  I'm sorry, that was September.  I apologize.  That was --

22 September 30th is the last date out here.  And if you look

23 where you pointed me to, Combined U.S. and Canada, you look at

24 the covenant line, it's a test of $22.7 million.  Tt shows here

25 that we would be -- that the Debtors would be $436,000 short,

A- 0271

Pollack - Cross                    182

BY MR. MASON:

Q.  Now, Mr. Pollack, turning your attention back to paragraph 10, page 46 at 10.2, do you see how there the enforceability of the agreement against Presstek is subject to certain covenants described in 10.2?

A.  It says, "Seller shall have performed and complied in all material respects with all the covenants contained in Article 5 on or before the closing date, and Platinum shall have received a certificate to such effect executed on behalf of seller by the President, Chief Executive Officer, or Chief Financial Officer of seller."

Q.  So it's your understanding that Presstek's obligations under the APA are conditioned upon the performance of these covenants in paragraph 5?

A.  In all material respects.

Q.  And -- now let's go back to paragraph 5, beginning on page 34, going on 5 pages to paragraph 38.  Do you see those 12 covenants?

A.  Uhm-hum.  Yes.

Q.  Now, between the time that you wee retained and today, what efforts have you made to make certain that those covenants will be complied with continuously from the time of the -- from today up to the time of closing?

A.  With respect to 5.2, conduct of business, I have spent quite a bit of time assisting the Debtors in negotiating with

Pollack - Cross                    183

1  its vendor base and with its lenders to allow it to conduct its

2  business in a fashion that would allow it to meet this. And I

3  believe, given the concessions made today, have achieved a

4  basis for the Debtor to go forward and do that.

5  Q.  Okay, so that covers one of the, I believe, 12 paragraphs.

6  Mr. Pollack, as you sit here today, what assurance can you give

7  the Committee, MHR and the other Creditors of this estate and

8  the Court that these covenants contained in paragraph 5 of the

9  APA will be met and kept up to the time of the closing?

10 A.  I can give no assurance.

11 Q.  Thank you.  Now, I'd like to send you back to paragraph 10

12 of the APA and have you focus on paragraph 10.12, one of the

13 other conditions on which you earlier testified about.  And I

14 think we have generally referred to 10.12 as the working

15 capital condition.  See that on page 47?

16 A.  I do.

17 Q.  Now, I believe it was your testimony on direct examination

18 that with the $2 million concession given by Presstek that it

19 was your view that this condition will be met and will not

20 prevent the enforcement of the APA?

21 A.  I think my testimony was with the $2 million concession and

22 the $2½ million concession in the APA, based on the company's

23 forecast, it would be able to -- and its current operations, it

24 would be able to meet that test.

25 Q.  You said the $2½ million in the APA, did you mean the $2½

A- 0273

1   million --

2   A.  I'm sorry.

3   Q.  -- concession in the Debtor-In-Possession --

4   A.  I did, I'm sorry.

5   Q.  -- lending arrangement.

6   A.  2 million in the APA, 2½ million in the DIP.

7   Q.  Now, I'd like to turn you back to A.B. Dick Exhibit-1 --

8   A.  Yes.

9   Q.  -- which is titled (indiscern.) corporate holdings in

10  August 2004 forecast.

11  A.  Yes.

12      (Debtor's Exhibit-1 previously marked for identification)

13  Q.  You've made reference to that.  Did you assist in the

14  preparation of this?

15  A.  No.  In the revisions -- in the revised documents, no.

16  Q.  But I'm asking you whether you assisted in the preparation

17  of this Exhibit --

18  A.  No.

19  Q.  -- the projections and --

20  A.  The original ones, not these.

21  Q.  Okay.  And is it your understanding that these, that is

22  A.B. Dick Exhibit Number 1, is based in part on the earlier

23  version of this that you worked on?

24  A.  Yes.

25  Q.  I'd like you to go to the fourth page.  Do you see that,

1   it's sort of an up-and-down page?

2   A.  Yes.

3   Q.  And it's titled Asset Purchase Agreement Covenant Review?

4   A.  Yes.

5   Q.  Do you see that?

6   A.  Yes.

7   Q.  Did you work on this?

8   A.  No.

9   Q.  Do you have any reason to believe this is inaccurate?

10  A.  No, but I would like to explain the meaning of it as I see

11  it.

12  Q.  Okay.

13  A.  This page analyzes the Debtor's projections as they are.

14  And to analyze -- in my view, to analyze whether or not the

15  Debtor will be able to meet the tests, one has to look at both

16  the result of this analysis and the available credit under the

17  DIP at the same timeframe.  And so the reason I say that is

18  that the Debtor has the right to buy inventory so long as it

19  has available funds and use that inventory to include it in

20  this calculation so that it can make this calculation.  So if

21  you were to look at the, for instance, the September

22  calculation, you'll see the working capital closing covenant.

23  And you look under covenant, cushion and deficit and you'll see

24  it's short $317,000.  You can then look on one of the other

25  pages and you will see that the Debtor has availability greater

A- 0275

1 and if you turn one page back on the third page, there is no

2 line for September 30th, but if you look at the week ending

3 October 2nd and you go all the way down to the bottom, there's

4 as forecast of $973,000 of funds available to borrow.  And so

5 it could borrow the $460,000, buy inventory, include the

6 inventory in the test and meet the test, and still have some

7 small amount of room on its line.  It never has a large amount

8 of room.

9 Q.  And where in the budget that's approved under the Debtor-

10 In-Possession arrangement does the company have the right to

11 spend that money?

12 A.  It's allowed to -- under the DIP budget it's allowed on a

13 cumulative basis to make the total of all these -- the total

14 disbursements included in the DIP budget.

15 Q.  But can you show me where either in Exhibit-1 or in any

16 other document that the Debtor has the power to --

17 A.  Buy inventory?

18 Q.  -- make those expenditures?

19 A.  To buy inventory?

20 Q.  Yes.

21 A.  Sure, in the -- on the third page -- do you have the

22 original forecast?

23 Q.  Yes.

24 A.  Okay, I believe it doesn't go -- it only goes through some

25 date in September, I think.  Or maybe October 15th.  But you'll

1   see there's a line under operating disbursements for inventory.

2   The Debtor can buy inventory there, and actually the Debtor can

3   use -- my understanding of the DIP arrangement is the Debtor

4   can use its full allocation of disbursements on a cumulative

5   basis at any time for reasonable business purposes.  And buying

6   inventory is a -- you know, my understanding would be a

7   reasonable business purpose.

8   Q.  So it's your understanding that the budget permits the

9   Debtor to borrow all the way -- borrow it's entire line of

10  credit if it sees fit in a particular month?

11  A.  No.  My understanding of the DIP arrangement is that the

12  borrowings are limited to $7 million coupled with specific over

13  advance allowances.  And in this case, on the week ending

14  October 2nd, the adjusted over advance allowance provides room

15  of $973,000.  So there's $973,000 that the Debtor is allowed to

16  spend.  And that's you know -- buying inventory would be an

17  acceptable -- and in fact, it could buy the inventory today,

18  $463,000, have the inventory there on September 30th and meet

19  the covenant.  It's a timing activity as to when the inventory

20  is purchased.  Furthermore, if the inventory that's pre-paid

21  comes in earlier, then there's even more room on the DIP line

22  because inventory advances are only -- only provide 60% -- the

23  ratio to actual dollars spent to collateral available to borrow

24  on is 60%.  And at October 2nd, there is $1.8 million of pre-

25  paid inventory.  So actually it's -- that material likely will

1    not be here.  But if it were here, approximately $750,000 in

2    additional funds would be available to the Debtors.  But

3    because of the requirement, primarily Mitsubishi, it's limited.

4         MR. MASON:  Your Honor, if I could just have one

5    minute please.

6        (Pause in proceedings)

7    BY MR. MASON:

8    Q.  All right, Mr. Pollack now again directing you attention to

9    the fourth page of Exhibit-1, A.B. Dick Exhibit-1.  Do you see

10   the emboldened title U.K.?

11   A.  I do.

12   Q.  And do you see that there's a negative percentage along the

13   side the percent cushion/deficit --

14   A.  I do.

15   Q.  -- for U.K.?

16   A.  I do.

17   Q.  I have no further questions about that.  Now taking --

18   drawing your attention back to paragraph 10 of the APA.

19     •  (Witness locates document)

20   Q.  And directing your attention to paragraph 10.3 on page 46,

21   do you see that?

22   A.  I do.

23   Q.  There's a condition related to the absence of a material

24   adverse effect, do you see that?

25   A.  I do.

1   Q.  All right.  And material adverse effect is described on
2   page 70 of the APA, isn't it?
3   A.  It is.
4   Q.  And the material adverse effect focuses primarily on the
5   timing of shipments, does it not?
6   A.  (No verbal response).
7   Q.  The timing and the amount of shipments on a monthly basis?
8   A.  Sales.
9   Q.  I'm sorry, sales.
10  A.  Yes.
11  Q.  Now, suppose a shipment of approximately $2 million of
12  product scheduled for August 31st were to slip by a day and not
13  be sent until September, and everything else was the same as
14  projected, would the Debtors miss this test?
15  A.  Could you repeat that question?
16  Q.  Suppose a shipment of $2 million of product scheduled for
17  August 31st were to slip by a day and were not shipped until
18  the next month, isn't it true that the Debtor would miss this
19  particular test, this material adverse effect test?
20  A.  No, it depends on the amount of sales that had occurred in
21  the month up until that point.
22  Q.  And how do you define sales?
23  A.  Sales are the recording of revenue.
24  Q.  So if you write up a sale in a month but you don't ship it
25  for a couple of months, it's still included in the sales on the

Pollack - Cross                                    191

1   material adverse effect is your understanding (indiscern.)?

2   A.   That wasn't what I said.  What I said was it depends on the

3   volume of -- the question I heard was if $2 million scheduled

4   to be sold on the last day of the month went to the next day of

5   the month, would they miss the test.  My response is that

6   depends on the volume of revenue the company had experienced

7   prior to the last day of the month.

8   Q.   If as a result of the timing of a shipment you did not meet

9   the shipping or sales revenue under the material adverse effect

10  clause, is that a conceivable means for Presstek to back out of

11  the agreement?

12  A.   My understanding is if we don't -- if the Debtors do not

13  achieve these revenue targets, Presstek is not obligated to

14  close.

15  Q.   And that's regardless of whether you exceed the sales

16  revenues, say in September, but fall short of them in August?

17  A.   That's correct.

18  Q.   Even though on a combined basis, the average sales revenues

19  would be greater than or equal to the levels required by

20  material adverse effect?

21  A.   Correct.

22  Q.   Thank you.  Now, there was some testimony about the razor

23  and the razor blade.  You've been involved in this business

24  since the middle of June, is that what you said?

25  A.   No.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1  Q.  Okay.  How long -- how many weeks have you actually worked

2  for this business?

3  A.  I was first involved with these businesses personally in

4  either 1999 or 2000.  The year 2000.  The engagement with

5  respect to the current bankruptcy commenced on June 29th, 2004.

6  Q.  All right, is it your testimony that it's impossible to

7  split up the divisions or the functions of this business

8  because of the so-called razor and razor blade effect, as you

9  described in your direct testimony?

10  A.  No, I don't believe I said that.

11  Q.  So it's conceivable that this business could be broken up

12  into different parts, some of which are profitable and some of

13  which are not?

14  A.  That's my view.

15  Q.  And when you worked up the offering memorandum, you

16  actually came to the conclusion that two out of the three

17  divisions have a positive EBITDA, E-B-I-T-D-A, of approximately

18  $14 million a year?

19  A.  That's not true.

20  Q.  Okay.  How much did they have for the last year?

21  A.  Well, I didn't come up with anything.

22  Q.  Okay.

23  A.  We asked the company to prepare an analysis of the business

24  lines and what their operating results would be.  The company

25  made certain assumptions and delivered that to us and we have

1  included that in the Selling Memorandum because we believe it's

2  important -- very important information for prospective buyers

3  to understand.

4  Q. And what was the company's projection as to the EBITDA for

5  the two profitable divisions?

6  A. I would need the book to refresh my memory.

7  Q. Do you have a book here in the Courtroom?

8  A. I have a draft. I might have a copy, yes.

9  Q. I wonder if you could take it and see if it refreshes your

10  recollections of the answer.

11       THE COURT: It's all right.

12  A. Yeah, we could that.

13       MR. MASON: Thank you, Your Honor.

14    (Witness reviews document)

15       MR. MASON: Your Honor, perhaps this would be a good

16  time to take a short break.

17  A. I found it.

18       THE COURT: Well, we are going to take a break soon

19  here.

20       MR. MASON: I would like a chance to look at it as

21  well.

22       THE COURT: All right, how much more do you have here,

23  Counsel?

24       MR. MASON: I would say about 3 or 4 minutes, Judge.

25       THE COURT: And then we're going to have some -- do we

Pollack - Cross                              194

1    have anybody else who wants to cross examine?

2           MR: SELBST:  I will want to discuss the (indiscern.),

3    Your Honor.

4           THE COURT:  And how much time do you thing you're

5    going to take?

6           MR. SELBST:  My question will be very short.

7           THE COURT:  Then will we have any redirect?

8           MR. GLEASON:  Just about 5 minutes at most.

9           MR. LEPENE:  Your Honor, I will have just a couple of

10   questions.

11          THE COURT:  And then what about further witnesses.

12          MR. GLEASON:  From the Debtor's standpoint, that is

13   all of our witnesses, Your Honor.  And we'd just move for the

14   admission of our exhibits.

15          THE COURT:  What about from the other parties?

16          MR. MASON:  Judge, we have one witness.

17          THE COURT:  All right, is that all we have then is we

18   have the remainder of this witness and then one more witness?

19   Okay, we'll take a 10 minute break until 10 minutes to 5.

20   Everybody stretch their legs and let Mr. Mason look at that.

21   Let everybody focus of the goal line.

22      (Court in recess)

23          THE COURT:  Be seated.  All right, Mr. Mason, are we

24   ready here?

25          MR. MASON:  Yes I am, Judge.  Judge, the witness is

1    going to use a confidential memorandum to refresh his

2    recollection, and I think you've already heard testimony that

3    this memorandum's only (indiscern.) the parties who've signed

4    the confidentiality agreement, so in order to maintain the

5    confidentiality of this I don't intend to mark this document as

6    an exhibit or anything like that.  But it will be used to

7    refresh the recollection.

8                    CROSS EXAMINATION - (CONT'D)

9    BY MR. MASON:

10   Q.  Mr. Pollack, does that memorandum refresh your recollection

11   so that you can answer my question about what the proposed or

12   EBITDA or forecasted EBITDA for 2004 is for the three parts of

13   the A.B. Dick business?

14   A.  It does.

15   Q.  Okay.  And what are those three parts?

16   A.  Supplies business for 2004 is projected at 4.6 million,

17   service and parts is projected at 7.8 million, and the

18   equipment business is projected to have a loss of 13.3 million.

19   Q.  So if we look at sales and -- sale of supplies and service,

20   the so-called EBITDA would be just under $12½ million annually?

21   A.  Approximately, yes.

22   Q.  And isn't it true that purchasers of businesses ordinarily

23   fashion their offers based on some multiple of EBITDA?

24   A.  Very often.

25   Q.  And as I understand it, in addition to the EBITDA

A- 0284

1  opportunities, the opportunities to acquire the EBITDA and

2  acquire the A.B. Dick business (indiscern.) inventory,

3  intellectual property rights, equipment and other tangible

4  assets, is that correct?

5  A.  If they bought all of the assets.

6  Q.  Just one more brief line of questioning, Mr. Pollack.  In

7  negotiating bid protections, wouldn't you agree that the

8  reasonableness of a break-up fee is dependant upon how high the

9  price is in the proposed contract?

10 A.  Could you repeat that?

11 Q.  Yeah.  In fashioning or in negotiating or agreeing to a

12 break-up fee, wouldn't you say that the amount of the offer

13 that would be rewarded with the break-up fee should be to some

14 extent dependant upon the amount of the offer?

15      THE COURT:  You mean the amount of the break-up fee

16 should be dependant upon the amount of the offer?

17      MR. MASON:  Exactly.  Thank you, Judge.

18 A.  Since they're typically and often expressed and negotiated

19 as a percentage of the purchase price, I would say yes.

20 BY MR. MASON:

21 Q.  But if the offer that came from the stalking horse was far

22 below what you believe to be the fair market value of the

23 assets, would you be inclined to give a greater break-up fee or

24 a lesser break-up fee?  All other things being equal.

25 A.  I would think that I wouldn't give anything, but you would

1  negotiate for a break-up fee that would be consistent with the

2  market, which is 2 to 3% expressed -- which is an amount

3  expressed as 2 to 3% of the purchase price without judgment as

4  to whether it's small or large.

5  Q.  So your testimony is that you would give a break-up fee for

6  any kind of an offer, but you'd only give it as a percentage of

7  the amount of the offer?

8  A.  No.  You asked me what I would negotiate for, at least

9  that's what I understood the question to be.  Maybe you should

10 ask it again.

11 Q.  My question is, is the reasonableness of the break-up fee,

12 the amount of the break-up fee, dependant upon the

13 reasonableness of the amount of the offer for the purchase

14 price -- for the purchased assets?

15 A.  It would be my opinion that if a Debtor is willing to

16 accept a stalking horse bid, the Debtor then believes that that

17 stalking horse bid provides some level of value to the estate.

18 Either it's a high bid, better than they could do elsewhere,

19 it's a bid significant enough to sustain the going concern

20 value, or that stalking horse bid provides some value to the

21 estate.  Given that the typical break-up fee is expressed as a

22 percentage of the bid price, I think that the break-up fee that

23 results is -- after the application of the percentages to the

24 price being paid is a reasonable way of developing an

25 appropriate amount.

1  Q.  So you think a break-up fee should be reward -- should be

2  awarded if it's reasonable?

3  A.  Correct.

4  Q.  Okay.  Now, do you think that the reasonableness of the

5  amount of the break-up fee should be dependant on the length of

6  time that the offer from a stalking horse remains open?

7  A.  Remains open after an auction?

8  Q.  No, remains open from the time of the execution of the

9  Asset Purchase Agreement to the time of closing.

10 A.  I think it's all relative to the specific facts and

11 circumstances.  I've been involved in transactions with break-

12 up fees that have had short gestation periods and some with

13 very long.

14 Q.  Well, for instance, all other things being equal, if the

15 offer was only open for 2 days, would you be inclined to pay a

16 greater or a lesser break-up fee than if the offer remained

17 open for 3 months?

18 A.  I think that the percentage that you would apply might

19 increase if it was 3 months over 2 days, as extreme examples.

20 Q.  All right.  And would you agree that the reasonableness of

21 the amount of the break-up fee should be dependant upon the

22 conditionality of a stalking horse bid?

23 A.  I think if you accept a stalking horse bid, you should

24 accept it -- in my experience, if you're going to negotiate

25 one, you should negotiate one which you believe you can close.

A- 0287

1    Therefore, the application of the range that we discussed

2    before to the purchase price is an appropriate way of

3    developing that as well.

4    Q.  All right, so what you're saying is you'd pay the same

5    break-up fee regardless of the degree of conditionality of the

6    break-up -- of the stalking horse bid?

7    A.  If -- it's my opinion -- you're asking me my opinion?

8    Q.  Yes.

9    A.  My opinion is if you negotiate a stalking horse bid, it

10   should be one that you expect you can close based on your

11   negotiations and where you are.  To negotiate one you don't

12   believe you can close does not seem to me to be fruitful.

13   Q.  Mr. Pollack, do you think that the amount of the break-up

14   fee should be dependant upon the extent of the liability of the

15   stalking horse under its stalking horse bid?

16   A.  I think all of the elements you're identifying contribute

17   to the analysis of whether or not a break-up fee should be

18   included in a stalking -- in the arrangements related to a

19   stalking horse bid.  So all of the considerations you've

20   identified are ones that one should consider, take into

21   account.  And it still comes down to a range of 2 to 3% of the

22   consideration being an appropriate range, in my experience.

23          MR. MASON:  Judge, I have no further questions.

24          THE COURT:  Okay.  Mr. Selbst.

25                      CROSS EXAMINATION

1  BY MR. SELBST:

2  Q.  Good afternoon, Mr. Pollack.

3  A.  Good afternoon.

4  Q.  In the negotiation, to the extent that you were involved

5  with Presstek in the Debtors and in management, did Presstek

6  offer at any time any consideration to any member -- to any of

7  the old equity holders in these companies or to any employees,

8  senior management, for example?

9  A.  Not to my knowledge.

10  Q.  And you've testified that you have extensive experience in

11  negotiating 363 sales and in other transactions.  In your

12  experience, were the Debtors represented by experienced

13  counsel?

14  A.  Yes.

15  Q.  In your experience, were these negotiations over the terms

16  of the APA and over the bidding procedures, were they the

17  result of arm's length negotiations?

18  A.  Yes.

19  Q.  Now, we've heard a lot of testimony, partly from you,

20  partly from Mr. Knipp, about concessions that were made by

21  Presstek and by Key Bank to resolve some of the various

22  objections that were raised to the bidding procedures and to

23  the DIP.  And you have testified and Mr. Knipp has testified

24  about the changes in the DIP and the changes in the APA and the

25  changes to the bid procedures.  In exchange for all of these

1  various and sundry concessions, did Presstek ask or receive

2  anything in exchange or in consideration?

3  A.  No, not to my knowledge.

4  Q.  Now, Mr. Mason just spend a fair amount of time talking

5  with you about the conditionality of the book, as he referred

6  to as the agreement.  And I believe you testified that in your

7  experience, the (indiscern.) and the warranties were within

8  normal range of what is negotiated between a buyer and a

9  seller, is that correct?

10 A.  Yes.

11 Q.  I want to talk a little bit about the break-up fee again.

12 Is it your understanding that Presstek gets the break-up fee if

13 it terminates the agreement because various conditions are not

14 satisfied?

15 A.  No.

16 Q.  What are the conditions under which Presstek gets the

17 break-up fee, Mr. Pollack?

18 A.  My understanding is if the Debtor proposes a plan whose

19 value exceeds their offer within 6 months, Presstek is entitled

20 to receive their break-up fee.  If the auction is held and

21 Presstek is not the winning bidder and the company closes, the

22 estate closes with some other bidder, they are entitled to the

23 break-up fee, and if no auction is held and the assets are sold

24 to some other party within 6 months, they're entitled to the

25 break-up fee.

Pollack - Cross                    202

1  Q.  I want to make sure I got that right.  So if Presstek

2  simply says G company didn't make the sales targets, you didn't

3  make the working capital targets, Presstek doesn't get the

4  break-up fee, does it?

5  A.  That's my understanding.

6  Q.  Now, you've testified the Presstek has been involved in

7  negotiations with the company since December of '03, is that

8  correct?

9  A.  Mr. Knipp did.

10 Q.  I thought you said you also had knowledge of that.

11 A.  Actually, my understanding was they sent a letter of

12 interest in the summer of 2003.

13 Q.  Okay.  Are you aware that Presstek has disclosed publicly

14 that it has spent more than $1.2 million to date on this

15 acquisition?

16 A.  Yes.

17 Q.  Do you know what the source of that disclosure is?

18 A.  Their financial statements.

19 Q.  And where were those financial statements published?

20 A.  They're part of their SEC filings.

21 Q.  Thank you.  And are you aware the Presstek held an analysts

22 call on July 13th about the transaction?

23 A.  I had heard that.

24 Q.  Based on your involvement in negotiations, do you consider

25 Presstek to be a committed buyer?

1  A.  Yes.

2  Q.  And based on your involvement in these negotiations, in

3  your overall experience of the cases, similar cases, do you

4  consider that Presstek did the stalking horse bid to provide

5  value to this estate?

6  A.  Yes.

7  Q.  Do you consider Presstek (indiscern.) stalking horse bid?

8  A.  Yes.

9  Q.  Taken as a whole, do you think the bidding procedures,

10 including the break-up fees and the expense reimbursements that

11 have been negotiated in this case, are fair?

12 A.  The ones that are on the table today?

13 Q.  Yes.

14 A.  Taken as a whole, I do.

15       MR. SELBST:  I have no further questions, Your Honor.

16       THE COURT:  All right, anybody else?  Okay, yes sir.

17       MR. LEPENE:  Thank you, Your Honor.

18                    CROSS EXAMINATION

19 BY MR. LEPENE:

20 Q.  Mr. Pollack, you testified on direct examination that you

21 were of the view that the Debtor-In-Possession financing being

22 provided would be sufficient to maintain the going concern

23 value if the sale process was concluded on November 15th.

24 A.  As amended, yes.

25 Q.  By November 15th?

1  A.   Yeah, if the financing arrangements as amended --

2  Q.   Right.

3  A.   -- yes.

4  Q.   Why, in your view, is it essential that the sale process be

5  concluded by November 15 given the facts and circumstances

6  (indiscern.).

7  A.   I believe Mr. Knipp testified that the company is losing

8  money each month and that's my understanding as well.  It's

9  projected to lose money.  The considerations in a process like

10 this have to include what happens during the marketing period,

11 the pendency of the sale to the employees, vendors and

12 customers.   To the extent the sale becomes an amorphous

13 timeless or extended time period with an uncertain outcome,

14 employees tend to migrate to other positions to ensure their

15 own livelihood.  Customers, to a large degree, consider and

16 sometimes act on their own needs to ensure that their equipment

17 or whatever else will be serviced and maintained and will

18 not -- on a regular basis by reliable vendor so as not to

19 impact their own business.  Buyers as I said before, get tired;

20 after a period of time they want finality as well.  They don't

21 want to wait another week for three more prospective parties.

22 Q.   Are these the factors that cause you to conclude that this

23 company is in a very precarious financial condition at this

24 point?

25 A.   These, coupled with its limited financial ability to

1  sustain its operations.

2          MR. LEPENE:  That's all I have, Your Honor, thank you.

3          MR. GLEASON:  Just a few redirect, Your Honor.

4                    REDIRECT EXAMINATION

5  BY MR. GLEASON:

6  Q.  Mr. Pollack, I want to address a few issues raised by Mr.

7  Mason.  During your exam, Mr. Mason asked a series of questions

8  with respect to the August 27th and September 30th dates

9  contained in the Asset Purchase Agreement.  Do you recall that?

10  A.  Yes.

11  Q.  Now, the bid procedures order could have been entered much

12  earlier than August 27th, isn't that true?

13  A.  Yes.

14          MR. MASON:  Your Honor, I'm going to object.

15          THE COURT:  Overruled.  Let's just get through it.

16  BY MR. GLEASON:

17  Q.  Do you know when the Debtors filed their Bid Procedures

18  Motion?

19  A.  I believe it was within a couple of days of the

20  commencement of the case.

21  Q.  Would it surprise you if it was filed the day of the case?

22  A.  No.  That's when I thought, I wasn't certain.

23  Q.  Is it your understanding that the Debtors anticipated the

24  bid procedures would be entered long before August 27th?

25  A.  Yes.  In all of our discussions we had an expectation that

1  those procedures would be entered into relatively quickly

2  allowing for the -- a more fuller time period to market the

3  assets.  And in fact, August 27th, my recollection was

4  discussed as a very outside date to make sure that there was

5  plenty of opportunity to allow for mishaps.  And in -- the

6  eventuality of mishaps resulted in an early negotiation of the

7  no-shop, which resulted in the very same opportunity.

8  Q.  That was my next -- when the Debtors learned that that

9  would not happen by -- not happen as soon as the Debtors

10 originally thought, they negotiated a (indiscern.) no-shot?

11 A.  Correct.

12 Q.  Next, Mr. Mason made that statement the estate was willing

13 to pay Presstek 4.25% so it could market the assets for that

14 period, from August 27th to September 30th.  Do you recall

15 that?

16 A.  Yes.

17 Q.  The Debtors aren't paying for the right to market their

18 assets, are they?

19 A.  No.

20 Q.  Rather, isn't a break-up fee intended to compensate a

21 bidder for its time, expense, and effort in developing an Asset

22 Purchase Agreement, setting a base line by which other bids can

23 be judged?

24 A.  Yes.

25 Q.  Is that what's happened in this case?

Pollack - Redirect                    207

1  A.   Yes.

2  Q.   Now Mr. Mason asked various questions about the

3  representations and the warranties in the Asset Purchase

4  Agreement.  Do you recall that?

5  A.   Yes.

6  Q.   And I believe you testified earlier that the

7  representations and warranties are common in transactions such

8  as this.

9  A.   Yes.

10 Q.   And in fact, without going through all of the

11 representations and warranties, many of these have a

12 materiality provision attached, do they not?

13 A.   Yes.

14 Q.   And many others are simply confirming the documents

15 provided by the sellers are accurate.

16       MR. MASON:  Judge; I have to object.  This is the most

17 leading direct testimony that I have ever encountered.  I mean,

18 I think -- I understand we want to get through with this, but I

19 believe that the witness should be testifying and Mr. Gleason

20 shouldn't be testifying.

21       MR. GLEASON:  No problem, Your Honor.

22       THE COURT:  Sustained.

23 BY MR. GLEASON:

24 Q.   Mr. Pollack, do you understand -- do you have an

25 understanding of whether some of the representations and

1   warranties relate to lists provided by the Debtors?  Maybe to

2   move through this, let's turn to section 3.18 on page 26.

3   A. 3 -- on what page?

4   Q.  Page 26.

5   A.  Yes.

6   Q.  What is that representation require the Debtors to do?

7   A.  3.18?

8   Q.  Yes.

9   A.  Provide lists of employees, suppliers and customers.

10  Q.  That is totally within the seller's control?

11  A.  It is.  It's a list of the seller's customers, suppliers

12  and employees.

13  Q.  I don't want to spend any more time with that.  You're

14  under -- you're -- again, your belief is that the

15  representations and warranties contained in this Asset Purchase

16  Agreement are standard for these types of transactions?

17  A.  Yes.

18  Q.  With respect to these representations and warranties, Mr.

19  Mason asked what you were going to do to ensure that they were

20  met.  Do you recall that?

21  A.  Yes.

22  Q.  That is not your obligation, is it?

23  A.  No.

24  Q.  Is it your understanding, however, that the representations

25  and warranties were accurate at the time the Asset Purchase

1  Agreement was executed?

2  A.  That's my understanding.

3  Q.  Do you have any reason to believe that the representations

4  and warranties won't be accurate at the time of closing?

5  A.  I do not.

6  Q.  Mr. Mason also talked about the material adverse effect

7  clause.  Does this clause enable the Debtors to manage their

8  business?

9  A.  The clause sets targets that the Debtor can clearly manage

10 to.  I don't believe it facilitates the management of the

11 Debtor, but it does provide specific targets that the Debtor

12 can manage its operations to.  In other words, to successfully

13 meet.

14 Q.  And is that different from other material adverse effect or

15 MAT clauses that you've seen in other agreements?

16 A.  Yes.

17 Q.  Mr. Pollack, in your opinion, does the fact that Presstek

18 is providing Debtor-In-Possession financing, does that fact

19 make it more or less likely that Presstek will close this

20 transaction?

21 A.  To me, that fact represents Presstek's interest in

22 requiring the assets is real and a substantial interest.

23 Q.  And did Presstek (indiscern.) because of alleged violations

24 of the however many pages of representations and warranties --

25 does Presstek get their break-up fee?

A- 0298

1   A.   I don't believe so.

2   Q.   Finally, as you sit here today, do the Debtors believe that

3   they can meet the revenue targets and other requirements

4   contained in the Asset Purchase Agreement and close this

5   transaction?

6   A.   Given the modifications achieved today, they do.

7   Q.   Finally, Mr. Mason talked a lot about the fair market value

8   of the assets.  Mr. Pollack, what is the definition of fair

9   market value?

10  A.   I believe it's what a willing buyer is prepared to pay a

11  willing seller.

12  Q.   As we sit here today, does anyone know what the fair market

13  value of these assets are?

14  A.   I don't believe so.

15  Q.   In your opinion, what is the best way for these Debtors to

16  determine either the fair market value -- which we're in

17  bankruptcy process, we may not be able to satisfy that

18  definition -- but at a minimum, the best value the Debtors can

19  reasonably expect to receive based on the facts and

20  circumstances of these cases?

21  A.   The execution of an appropriate auction process.

22  Q.   And do you believe we have negotiated an effective auction

23  process in these cases?

24  A.   I do, given all the modifications, all the changes that

25  have been represented today.

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

A- 0299

Pollack - Redirect                211

1    MR. GLEASON: Thank you, I have nothing further, Your

2 Honor. (Indiscern.) other than I need to move the admission of

3 our exhibits which are Debtor's Exhibit-1, which is the August

4 forecast which has been identified by Mr. Knipp. Should I hand

5 them up individually, Your Honor, or do you want me to go

6 through all of them.

7    THE COURT: Let's go through all of them.

8    MR. GLEASON: Okay. Exhibit-2, which is the Asset

9 Purchase Agreement which was also identified by both Mr. Knipp

10 and Mr. Pollack. And those are the only two at this point,

11 Your Honor.

12    THE COURT: Any objection?

13    MR. MASON: No objection, Your Honor.

14    THE COURT: All right. It's ordered admitting 1 and 2.

15    (Debtor's Exhibit-1 admitted into evidence)

16    (Debtor's Exhibit-2 admitted into evidence)

17    THE COURT: I have a couple of questions for the

18 witness before he steps down.

19 BY THE COURT:

20 Q. Mr. Pollack, tell me again what you think the opening bid

21 is.

22 A. The first overbid?

23 Q. No, what their opening bid is.

24 A. $40 million.

25 Q. All right. And what is the amount necessary for an initial

A- 0300

Pollack - Redirect                                    212

1 overbid to be higher and better under the newly renegotiated

2 terms?

3 A.   A bid on the exact same terms on the exact same documents?

4 Q.   Apples and apples.

5 A.   41-9.

6 Q.   So it's a million-nine is the hurdle amount?

7 A.   I believe so, yes.

8 Q.   And at a million-nine, that provides more value to the

9 estate -- excuse me, 41-nine, that provides more value to the

10 estate, even taking into account the payment of the break-up

11 fee?

12 A.   Yes.

13 Q.   And the break-up fee is calculated on what number -- let's

14 just use those numbers.  Let's say what happens is Presstek

15 opens 40 million.  Buyer X comes in and says 41-nine, and

16 Presstek passes.  What -- how would you calculate the break-up

17 fee and expense reimbursement?

18 A.   I would calculate it as a percentage of the total

19 consideration.  You would take 1.2 million plus whater they

20 demonstrate, and I would assume it would be all 500,000.

21 That's 1.7 million divided by --

22 Q.   That's in consideration of what their last bid was, not of

23 what the new bid was, correct?

24 A.   Correct.  That's how it's been calculated.  There --

25 Q.   So it's 1.2 million plus the documented expenses up to

A- 0301

Pollack - Redirect                      213

1 | 500,000?

2 | A.  Right.

3 | Q.  So that would be in this case $1.7 million?

4 | A.  Correct.

5 | Q.  The 200,000 provides then the incremental amount that makes

6 | this is a higher and better bid.

7 | A.  Correct.

8 | Q.  When was the original no-shop provision to expire?

9 | A.  Upon the entry of a Sales Procedures Motion.

10 | Q.  Well, let's say the Sales Procedures Motion had been

11 | entered as part of the first day orders, would the no-shop have

12 | gone into effect at that point?

13 | A.  It would have gone away at that point.  It would have -- it

14 | terminated with the entry of an order, so it would have -- the

15 | marketing process -- the Debtors and we as their agent would

16 | have been allowed to have discussions with third parties on the

17 | entry of that order.

18 | Q.  So the delay and the entry of the bid procedures order also

19 | then delayed, shortened, the marketing time until there was a

20 | waiver of the no-shop by Presstek?

21 | A.  Correct.

22 | Q.  Now you indicated in questions from Mr. Selbst that you

23 | were aware that Presstek had made public disclosures regarding

24 | how much money had actually been spent?

25 | A.  Yes.

A- 0302

1  Q.  Do you know from those public disclosures whether there was

2  any allocation made between the first deal and the second deal?

3  A.  I do not know.

4  Q.  Okay, I don't have any other questions.

5       THE COURT:  Anybody have any follow-up questions based

6  upon those?

7       MR. MASON:  If I may, Your Honor,

8                    RECROSS EXAMINATION

9  BY MR. MASON:

10 Q.  Mr. Pollack, the Motion for the sale procedures order was

11 not presented to the Court on the first day of this case or

12 when the first day orders were presented, were they?

13 A.  My testimony was I didn't recall and I think Counsel

14 refreshed my memory and said it was.

15      MR. MASON:  Your Honor, the record -- if they

16 stipulate on this --

17      MR. GLEASON:  It's the filing issue.  They were filed

18 on the first day, we did not make them a first day order.  It

19 was contemplated, though, that we would have a hearing in --

20 later in July, prior to August and have them -- have the bid

21 procedures entered, unfortunately we weren't able to do that.

22      THE COURT:  I'm sure this is a knowable fact.  When I

23 mentioned first day, I was not suggesting that they were

24 presented on the first day.  I was just trying to understand

25 the operation of the agreement.

1          MR. MASON:   The record --

2          THE COURT:   What I don't remember is the first hearing

3   at which they were potentially presented, but it was then

4   adjourned.

5          MR. MASON:   That's correct, Judge, and I think we can

6   stipulate that the first time it was presented was in August,

7   approximately 2 weeks ago, and that the --

8          THE COURT:   Is that the first time they were on the

9   calendar, on the agenda?

10         MR. GLEASON:   I think that was the first time they

11  were on the agenda, Your Honor, but I believe a lot happened

12  and we did not anticipate the fights we received with the

13  interim DIP.   And there was a lot of negotiations with that and

14  dates were pushed at that point.   So again, our intention was

15  to have the bid procedures entered before -- in late July, but

16  given what has happened, we were not able to do that.

17         MR. MASON:   Judge, I don't know what the intention

18  was, but I will tell you, and I'm quite emphatic about this,

19  that we have -- the Committee has never requested a

20  (indiscern.).

21         THE COURT:   All right.   We don't need -- I'm opening a

22  can of worms that does not need to be addressed.

23         MR. MASON:   The record will be clear on that.

24         THE COURT:   All right.   I think the facts are that the

25  Bid Procedure Motion was filed at the beginning of the case.

1   It was then calendared.  It's been continued.  It's been

2   adjourned from time to time.  As I understand it, the no-shop

3   would have gone away with the entry of the order, but the

4   modifications to the order that have been presented today have

5   only been negotiated within the last 48 hours basically.  Or

6   whatever it is.  The final agreement on these changes --

7          MR. GLEASON:  The final agreement, although the no-

8   shop was done a while ago, Your Honor.

9          THE COURT:  I understand that.  But with regard to the

10  other issues we've talked about which are the overbid, for

11  example, and the October 27, October 29 and November 30th

12  dates, all of those things were just presented to me for the

13  first time today.

14         MR. GLEASON:  Those were presented.  I would say that

15  some of -- like the minimum overbid issue, some of the other --

16  I won't say minor issues -- but issues other than the

17  timeframe, those were actually in a draft of a bid procedures

18  order that was circulated to parties back at the August 12th

19  hearing, or before the August 12th hearing so --

20         THE COURT:  You would agree with me that in terms of

21  the final resting place for those concessions, other than the

22  ones where they have not been agreed to, was when they were

23  presented today.

24         MR. MASON:  That's correct, Judge.  Mr. Ricciardi

25  tells me that the statement that I just made in Court is

A- 0305

1  inaccurate.  Apparently while I was out of town there was an

2  agreement that was -- there was an agreement by the Committee

3  to continue the Motion on the sale procedures order from August

4  5th to August 12th.  So I was not aware of that because I was

5  on vacation.  So I do want to correct --

6          THE COURT:  All right, well let's -- anybody else have

7  anything for Mr. Pollack, or are we going to let him off the

8  hot seat?  All right, let's let him of the hot seat and let's

9  call the next, which I understand to be the final witness.

10          MR. MASON:  Your Honor, as long as we're admitting

11 evidence, I do not believe it would appropriate for me to move

12 the admission of the Committee Exhibit-A, Committee Exhibit-B,

13 Committee Exhibit-C, and Committee Exhibit-D.  Committee

14 Exhibit-A, as you may recall, is the package containing the

15 letter from the president of Presstek to A.B. Dick Company's

16 Board of Directors and others containing a 427 (indiscern.) of

17 a Stock Purchase Agreement.  Exhibit-B, which we only have one

18 copy of and I'm happy to give it to the Court, is the so-called

19 execution copy of the Stock Purchase Agreement, which was in

20 the Debtors books and records.  I'm skipping over C and going

21 to D.  D is the signature page signed by Mr. Knipp, again, also

22 in the Debtor Books and Records containing the signature that

23 was identified by Mr. Knipp himself.  And then C contained a

24 memo and letter from (indiscern.) Vice President of Presstek in

25 which he makes comments on Presstek's unwillingness to sign the

1   Stock Purchase Agreement.  I would move the admission of those

2   documents.  As I understand it, the Debtor perhaps wanted a

3   word on the relevance of those documents.

4         MR. GLEASON:  Thank you, Your Honor, John Gleason on

5   behalf of the Debtors.  I can't see the relevance of these

6   documents, but at the same time I -- I guess it would really go

7   the weight that the Court should afford these documents.  And I

8   would just state for the record that these are documents that

9   relate to an agreement that was never executed and is not

10   before the Court and would ask then that the Court, although we

11   don't have an objection to their admission, that the Court give

12   them the weight that they are due.

13         MR. MASON:  Judge, I think I heard Mr. Gleason say he

14   doesn't have any objection to their admission.

15         THE COURT:  Well, to the extent he has an objection,

16   it's a relevancy objection, which is overruled, and it's

17   ordered admitting the four documents.

18         MR. MASON:  Thank you.

19       (Committee's Exhibit-A admitted into evidence)

20       (Committee's Exhibit-B admitted into evidence)

21       (Committee's Exhibit-C admitted into evidence)

22       (Committee's Exhibit-D admitted into evidence)

23         THE COURT:  Let's proceed.

24         MR. MASON:  Mr. Carlston.

25         THE COURT:  Mr. Carlston, come forward here to the

1  Courtroom Deputy please to be sworn.

2       DANE CARLSTON, CREDITOR COMMITTEE'S WITNESS, SWORN

3       THE COURT:  Please take a seat on the witness chair.

4  Speak up clearly into the microphone.

5                       DIRECT EXAMINATION

6  BY MR. MASON:

7  Q.  Mr. Carlston, would you please state your name and your

8  business address?

9  A.  Dane Carlston.  My business address is on 520 Madison

10 Avenue in New York.

11 Q.  What's your current occupation?

12 A.  I'm a managing director and co-head of the restructuring

13 and recapitalization group at Jeffries.

14 Q.  And could you please describe Jeffries as an organization?

15 A.  Jeffries employs approximately 1500 people.  A New York

16 Stock Exchange company engaged in the business of investment

17 banking advisory services, and sales and trading operations.

18 We raise capital for companies.  The group that I co-manage

19 focuses on advising distressed companies and restructurings and

20 recapitalizations.

21 Q.  Approximately how much people are in your group?

22 A.  Approximately 25.

23 Q.  What is your educational background since high school?

24 A.  I received a Bachelor of Arts from the University of Utah

25 and an MBA from UCLA with a concentration in finance.

A- 0308

1  Q.  And when did you graduate with your degree, with your MBA?

2  A.  In 1992.

3  Q.  And could you briefly describe for the Court your work

4  history since school?

5  A.  For the last 13 years I've been employed with two firms.

6  My first -- the first firm that I joined was Channin & Company.

7  Channin & Company is a firm that is engaged in restructuring

8  advisory services to both Debtors and Creditors.  I left

9  Channin and Company in 1998 and joined Jeffries & Company where

10  I'm engaged in the same types of activities in addition to

11  capital raising.

12  Q.  Approximately how many sales of distressed businesses have

13  you worked on over your career?

14  A.  The group that I oversee has executed approximately $5

15  billion of distressed M&A transactions.  I personally have been

16  involved in about $2 billion of M&A transactions in the last 4

17  years.

18  Q.  And how many transactions approximately?

19  A.  In the last 4 years that's probably 10 transactions.

20  Q.  And prior to the last 4 years, if you were to take a look

21  at your entire career, could you estimate approximately how

22  many distressed business sales you've been involved in?

23  A.  Probably double that amount.

24  Q.  Would you identify some of the specific bankruptcy sales

25  you have worked on in the past 5 years, identifying the

1  business and your role in it?

2  A.  Sure.  OSI Group was filed in Saint Louis.  I testified in

3  connection with that matter and was qualified as an expert

4  there.  Destiny International was filed in Delaware.  I

5  testified there.  Budget Group filed in Delaware.  We

6  represented the Unsecured Creditor's Committee.  Diamond Brands

7  filed in Delaware.  We advised the company.  Darby Cycle filed

8  in Delaware.  We advised the Creditor's Committee.  Silver

9  Cinemas filed in Delaware.  We advised the company.  Espire

10 filed in Delaware.  We advised the Creditors Committee.  Those

11 are what come to mind immediately.

12 Q.  Did the Budget Group assignment involve a Section 363 sale

13 or a sale in the Bankruptcy Court?

14 A.  They did.

15 Q.  And how about Diamond Group?

16 A.  Diamond Brand was ultimately consummated through a plan of

17 reorganization.

18 Q.  And how about Darby Cycle?

19 A.,  Through a 363 sale and a plan of reorganization.

20 Q.  Silver Cinemas?

21 A.  Through a 363 sale.

22 Q.  And how about this -- I think it was Espire?

23 A.  Through is 363 sale.

24 Q.  So is it safe to say that you are familiar with the process

25 of selling distressed businesses in bankruptcy proceedings?

1  A.   I am.

2  Q.   Typically, and I don't want to belabor, get into a lot of

3  detail on this, but could you just tell me what the process is,

4  what phases the sale procedure goes through, briefly?

5  A.   Sure.   The whole M&A process is really engaged to yield

6  highest and best value and maximized value for all Creditors,

7  and it's a process that usually commences with, particularly in

8  the case of a distressed company, helping the market to

9  understand the nuances of what went wrong with the company.

10 Oftentimes it involves a lot more intensive due diligence to

11 understand that company as a result of the distress, and so the

12 first -- the initial stage with one where the investment banker

13 does their own due diligence on the company, prepares the

14 company for a sale, and we usually engage in a 30-day marketing

15 process where buyers are identified, Confidentiality Agreements

16 are sent out, a teaser is sent out, an offering memorandum is

17 sent out to those who execute Confidentiality Agreements, all

18 with the purpose of moving it into the next phase where

19 potential acquirers are invited in to do due diligence on the

20 company, and the last stage is one where the intent is to move

21 interested parties to a contractual phase so that they can

22 close on the asset.

23 Q.   Are you familiar with the concept of bid protection?

24 A.   I am.

25 Q.   And would you describe what you believe to be bid

1  protection?

2  A.  Bid protection is designed to award a stalking-horse bidder

3  with appropriate protections to induce them to enter into a

4  contractual agreement with the seller first.

5  Q.  And what forms can bid protection take?

6  A.  A break-up fee, minimum overbid protections, oftentimes the

7  buyer has the ability to construct an Asset Purchase Agreement.

8  Q.  What's the significance of constructing an Asset Purchase

9  Agreement?

10  A.  Ultimately that's the template that is relied upon and used

11  by other parties when they're looking at the asset.

12  Q.  In your experience in the sale of a distressed business

13  with a stalking-horse bidder, what is a typical range of

14  break-up fees?

15  A.  I think the average range if you were to take a number of

16  cases that have been filed around the country is somewhere in

17  the neighborhood of 2.4 to 2.5%.

18  Q.  And when you say 2.4 to 2.5% would that include expense

19  reimbursement?

20  A.  It would.

21  Q.  Did you hear Mr. Pollack testify that in his opinion the

22  typical range is 2 to 3%?

23  A.  I did.

24  Q.  Okay.  And you think the average is about 2.4 to 2.5%?

25  A.  Oddly, it makes sense.  It falls right in the middle of his

A- 0312

1  range.

2  Q.  Now, in your experience -- I'm sorry, I withdraw the

3  question.  When you represent the seller or Creditors Committee

4  of a distressed business in bankruptcy what factors do you

5  consider in determining the appropriateness of the break-up

6  fee?

7  A.  Certainly one of the issues is finality of the bidding

8  structure, knowing that they will have the wherewithal to close

9  on a transaction, and contractually they'll be obligated to do

10  so.  The extent to which they have valued the business.  Is it

11  a bid that's fully valued?  Is it a bid that represents a

12  marginal bid that's on the cusp of value, things like that.

13  Q.  What affect, if any, does the length of time the Purchase

14  Agreement from the stalking-horse bidder remains open -- what

15  affect might that have on the break-up fee?

16  A.  Well, I think -- the break-up fee is really an insurance

17  policy to protect the buyer from getting outbid by another

18  purchaser.  The longer is sale process remains open the

19  potential for that likelihood increases.

20  Q.  How did you first become familiar with the A.B. Dick

21  bankruptcy?

22  A.  It may have been through an industry rag that we read, but

23  my first concrete recollection is a phone call from one of the

24  Creditors asking us to interview with the Committee.

25  Q.  And do you remember approximately when that took place?

1  A.  It would have been shortly after the Committee organized,

2  and as I recall that was around the third week of July.

3  Q.  And were you ultimately retained by the Committee?

4  A.  We were.

5  Q.  Have you reached agreement with the Committee as to the

6  terms of your compensation and the scope of our employment?

7  A.  We have.

8  Q.  And would you please describe, briefly, what the basic

9  economic terms of your proposed retention are and what the

10 scope of your responsibilities are?

11 A.  Sure.  In a nutshell, it's a monthly retainer of $100

12 thousand and a transaction fee based on value generated, and

13 the way it's structured is that we would get no transaction fee

14 if the bid that's on the table with Presstek simply closed.  We

15 would have to create an alternative bidder or a bid of higher

16 value.  And the scope of our responsibilities is outlined in

17 our engagement letter, but in summary, it is to familiarize

18 ourselves with the business and to the extent that there is a

19 sale process that is pursued we are to assist in that process

20 and provide support to the company's adviser in making sure

21 that the asset is marketed fairly.

22 Q.  Does your organization have connections with potential

23 purchasers in the printing industry?

24 A.  We have a group that covers financial sponsors and

25 strategic acquires, and it's our custom to circulate the

1   opportunity within Jeffries to that group so that they can

2   identify the list of potential acquires, and we would then

3   forward those names to the company.

4   Q.   And is it your understanding that you would also provide

5   advice to the Committee as to the advisability of various

6   offers as they come in?

7   A.   We would.

8   Q.   Do you understand that you cannot be compensated or obtain

9   expense reimbursement for your work unless the Court ultimately

10  approves your retention?

11  A.   I understand that thoroughly.

12  Q.   Are you familiar with the Asset Purchase Agreement between

13  and among Presstek and its affiliates and A.B. Dick and its

14  affiliates dated as of July 13th, 2004?

15  A.   I have reviewed it, yes.

16  Q.   Are you familiar with the bid protections for Presstek and

17  its affiliates in that agreement?

18  A.   I am.

19  Q.   And what are the basic bid protections?

20  A.   The bid protections as outlined by Mr. Pollack are the

21  break-up fee of $1.2 million, $500 thousand of reimbursed

22  expenses, a minimum overbid of $200 thousand, and a series of

23  dates by which the Debtor has to comply.

24  Q.   Are you familiar with the purchaser's conditions to closing

25  that are set forth in paragraph 10 in the -- I'll call it the

1  APA, the Asset Purchase Agreement that we just referred to?

2  A.  Yes.

3  Q.  And based on your experience of working on sales of

4  distressed businesses, how would you describe the degree of

5  conditionality, or as you put it finality, of the APA?

6  A.  Well, one of reasons, in my experience, that acquires and

7  sometimes insist that companies get acquired through a 363 is

8  because the Bankruptcy Court has the power and authority to

9  expunge certain liabilities and provide protections to a buyer,

10 and so the degree to which the reps and warranties are outlined

11 in section 10 leaves open the possibility that the acquire

12 could potentially opt out of the contract if all those

13 conditions are not met.  Conditions like, for example, as all

14 of us who've worked with distressed companies before, we know

15 that sometimes employees leave because of the situation in

16 which the company is in, and there are conditions in the reps

17 and warranties that provide for an out in the event that

18 employees -- certain employees leave, or if an employee has

19 advised a superior and that superior has not in turn advised

20 the purchaser of those events, then that is in the reps and

21 warranties a condition under which the acquirer could exercise

22 an out.

23 Q.  On a scale of say, 1-to-10, with 10 being the most

24 conditional type of (inaudible) and 1 being the least

25 conditional, how would you evaluate the APA?

1  A.  You know, I've been watching the Olympics for the last week

2  and I'm still not that good at judging precisely with a score.

3  It seems like the conditions here outlined are substantial and

4  excessive and leave room for -- leave room that ideally the

5  Debtor or nobody should want, for the potential acquire to opt

6  out of the agreement, if all these conditions are not met.

7  Q.  Since Jeffries was first contacted by the Committee in this

8  case, generally, what have you done to understand the nature of

9  the proposed sale on the APA in the prepare for today's

10  testimony?

11  A.  We met with the company and their financial adviser one

12  week after getting retained for an introductory meeting.  We

13  had a follow on meeting a week after that.  We've reviewed

14  materials that were sent to us in conjunction with the due

15  diligence list that we sent out, and we've been conducting

16  on-going reviews of that material.

17  Q.  Based on your knowledge, skill, experience, training, and

18  education, and the preparation you have done in advance of your

19  testimony here today, do you have an opinion as to whether the

20  awarding of the proposed break-up fee and expense reimbursement

21  under the APA is necessary to preserve or enhance the value of

22  the A.B. Dick Estate?

23  A.  I think break-up fees are appropriate where there is

24  finality.  I think break-up fees have to be earned, and they're

25  earned by proposing finality to the extent that there are

1  conditions that the company may or may not meet, I don't think

2  it's appropriate to award a break-up fee.

3              MR. MASON:  If I could have one minute, Judge.  That

4  concludes the direct of Mr. Carlston, Your Honor.

5              THE COURT:  All right.  Do we have cross examination?

6              MR. GLEASON:  Yes, just briefly, Your Honor.

7                          CROSS EXAMINATION

8  BY MR. GLEASON:

9  Q.  Good afternoon, Mr. Carlston.

10  A.  Good afternoon.

11  Q.  We met last week.  How are you today?

12  A.  I'm well.

13  Q.  Would you agree that whether a sale process is appropriate

14  in a given case is dependent upon the facts and circumstances

15  of that particular case?

16  A.  I would.

17  Q.  Isn't it true that the availability of funding for the

18  continued operations is an important consideration in

19  determining whether a sale process is appropriate in a given

20  case?

21  A.  Yes.

22  Q.  I was -- getting ahead of myself.  Mr. Carlston, has

23  Jeffries filed a Retention Motion in this case?

24  A.  If we haven't I think it's due shortly.

25  Q.  And isn't it true that Jeffries was retained by the

1 Committee on August 2nd?

2 A.  It's true.

3 Q.  Are you aware that the Committee was formed on July 23rd?

4 A.  I'm aware of that.

5 Q.  I believe you've described for the Court the terms of

6 Jeffries' compensation.  As I understand it then Jeffries only

7 receives retainers if the stalking-horse bid is approved?

8 A.  If the stalking -- if the sale closes as is we only get our

9 retainers, because presumably we didn't do much to make it

10 close.

11 Q.  Those retainers are a minimum of $300 thousand though,

12 aren't they?

13 A.  That's correct.

14 Q.  Mr. Carlston, did you review the objection filed by the

15 Committee with respect to Candlewood's fee application?

16 A.  I did not.

17 Q.  Are you aware that the Committee outlined Jeffries'

18 compensation terms in that objection?

19 A.  I didn't review the motion.

20 Q.  So I take it you're not aware there was absolutely no

21 mention of a monthly retainer being payable to Jeffries in that

22 objection?

23 A.  I didn't review it.

24 Q.  I believe you testified earlier today that when you get

25 involved in a process you start by doing due diligence, and

1  then a 30-day marketing period, is that correct?

2  A.  Generally, yes.

3  Q.  Does the extent of due diligence that is required, is that

4  different in different cases?

5  A.  Absolutely.

6  Q.  So if, in fact, there was a great deal of due diligence

7  with respect to a company pre-petition, and the company had

8  organized due diligence rooms, prepared documents, gathered

9  things together in a certain location, would that reduce the

10  amount of time you might need to do due diligence

11  post-petition?

12  A.  Depending on the state of the information gathered and

13  what's been put together for potential acquires to look at,

14  yes.

15  Q.  With respect to the representations and warranties, is it

16  your understanding, or isn't it true that if Presstek or Silver

17  terminates the Asset Purchase Agreement because of an alleged

18  violation of the representations and warranties they will not

19  receive the break-up fee?

20  A.  That's correct.

21  Q.  Mr. Carlston, are you familiar with -- strike that.  Mr.

22  Carlston, I believe you testified that you were the financial

23  adviser in -- to the Committee and budget?

24  A.  Yes.

25  Q.  Do you recall whether or not there were covenants,