54

1  if you know you're selling the Enron pipeline assets, you know,

2  if you know you're selling a valuable entity that people have

3  expressed interest in before, then you have a reasonable belief

4  that the market may be able to dictate the value of this

5  company. But Mr. Polleck, who used to be right there -- Mr.

6  Polleck had tried to sell this company twice before. I mean,

7  he was engaged when he was with Brown Gibbons in 2000, he was

8  re-engaged in '03, he knew that there were likely not going to

9  be a bunch of other bidders. And so leaving it to just

10 Presstek was not a very good exercise of business judgment.

11 After Presstek breached the SPA and the Escrow Agreement, it

12 then not -- then says an APA where it requires a release of

13 that very valuable asset. I'll talk a minute about what

14 apparently Mr. Rhillips said to the Board, although, that was

15 apparently not substantiated with any legal analysis or any

16 factual analysis. We've done our own legal and factual

17 analysis on the claim and, by the way, Your Honor, MHR is a

18 third-party beneficiary of the APA as to a certain amount, and

19 MHR will be pursuing its rights against Presstek for a breach

20 of the Stock Purchase Agreement under its rights as a third-

21 party beneficiary. I don't believe and I don't want to say it

22 definitively so that it can be used against me, I don't believe

23 that we can sue for the full amount under the SPA but we are a

24 third-party beneficiary and we will be pursuing Presstek.

25     THE COURT: Well, what if I-- in order of approving



*Welter's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

A- 0432

55

1  the sale, what if I assign that claim to your client and let

2  you proceed against Presstek?

3      MR. D. ROSNER:  Then we would most likely withdraw our

4  objection to the sale.  And I can make a quick phone call and

5  get you that answer but I'm pretty sure --

6      THE COURT:  Well --

7      MR. D. ROSNER:  -- that would be the answer.

8      THE COURT:  -- there's not going to be time for a

9  phone call.  You take it or leave it.

10      MR. D. ROSNER:  We'll take it.

11      THE COURT:  Just like they're going to take it or

12  leave it.

13      MR. D. ROSNER:  We'll take it.

14      THE COURT:  Okay.

15      MR. D. ROSNER:  Okay.  In terms of the claim, the

16  claim that we're talking about now and the validity of the

17  claim and the materiality of the claim, and why one cannot, I

18  think the Chief Restructuring Officer testified that when he's

19  a Chapter 11 Trustee, he does not just abandon claims for no

20  consideration and here he recognizes that he neither evaluated

21  nor accepted a valuation of that claim.  But I would look no

22  further, Your Honor, than the -- I don't know how many pages

23  this is -- this is what Presstek filed on midnight,

24  approximately midnight, maybe it was like ten o'clock --

25      THE COURT:  Yes.

Writer's Cramp, Inc.
Certified Court Transcribers
731-529-0191



1    MR. D. ROSNER: -- I'm not sure, right before the

2  hearing yesterday to explain all the reasons that it doesn't

3  think there is a good claim. Now, you know, I'm not saying

4  that we should have a mini-trial on the claim right now, but

5  you've seen what we say, you see Presstek has not dismissed

6  this in a page but they've spent quite a bit of time trying to

7  explain what their defenses are to the claim. That would tell

8  you right there, you know that you've got a tryable claim and

9  it's one that's being released without consideration as

10 procured by the actual purchaser here. But now we can actually

11 add insult to injury to what Presstek actually did. Presstek,

12 just days before the bankruptcy, five days I believe, to be

13 exact, before the bankruptcy was filed before this Court,

14 Presstek used its 11 months of due diligence to all of a sudden

15 (quote) "discover" that A.B. Dick was insolvent and if A.B.

16 Dick was insolvent it could then terminate, so-called terminate

17 the joint -- the valuable Joint Development Agreement that

18 we've heard for this Vector product and for a new valuable line

19 of products. They could terminate it and keep it from other

20 bidders. Now we know it's valuable. Everyone's testified that

21 it's valuable. We also know that Comvest in their bid said,

22 "That's a very important contract. We need that." Presstek

23 terminated it five days before the bankruptcy while they're in

24 contract to buy all of the assets on the basis that they've

25 just discovered that the company was insolvent. The company's

57

1  been insolvent for three years, they pled that in their

2  complaint against us. The company was insolvent when it

3  entered into the Joint Development Agreement. The company was

4  insolvent the entire 11 months that Presstek was doing due

5  diligence, but five days before the bankruptcy when they knew

6  there would be other bidders that would be coming in to look at

7  this, Presstek terminated it and stripped the Debtor of this

8  asset. Of course the Debtor hasn't really analyzed whether it

9  could -- whether that termination was valid. Debtor hasn't

10 analyzed whether that --

11        MR. PHILLIPS: Your Honor --

12        MR. D. ROSNER: -- termination was actually --

13        MR. PHILLIPS: -- we are going so far beyond the

14 record here --

15        THE COURT: I -- that's true.

16        MR. PHILLIPS: -- in terms of what Mr. Rosner is

17 offering here. He is, in fact, and I would be happy to put Mr.

18 Rosner on the stand if he does want to testify as to all the

19 supposed bids that he's offering in this closing.

20        MR. D. ROSNER: I think the facts are set forth in the

21 declaration in the exhibits that were attached to the

22 declaration. Every fact that I'm talking about, the witnesses

23 testified that they didn't evaluate whether the Joint

24 Development Agreement, whether that termination was valid. The

25 Chief Restructuring Officer -- I asked him about it, whether it

A- 0435

58

1  was valid, whether it had been looked into. So I don't know

2  what fact you're talking about, but that's the fact that I was

3  just explaining.

4         THE COURT: Go ahead.

5         MR. D. ROSNER: Thank you, Your Honor. Your Honor, we

6  believe that the contention that a Purchaser can insulate its

7  bad conduct by setting a scheme into motion, having that bad

8  conduct move right up until the date that it signs the Asset

9  Purchase Agreement and then having set the scheme in place, but

10  not necessarily doing anything more during the sale processes,

11  is a spurious type of allegation. It really just gets rid of

12  the whole idea of who is a good faith Purchaser and who's not.

13  One cannot, Your Honor, possibly, in my opinion, strong arm an

14  insolvent company into a corner, exacerbate its leverage to

15  breach a Purchase agreement, fraudulently procure a default,

16  cuts its offer literally in half, demand a release from

17  liability, terminate the Debtor's most valuable contract to

18  restrict it from other bidders and then obtain this Court,

19  which is a Court of equity as we all know, this Court's

20  imprimatur as a good faith purchaser. If that's the case, if

21  that can happen, there is no good faith requirement in this

22  Court, there is no Abbott's Dairies in this Court, if Presstek

23  can actually get a good faith finding. Second, there really is

24  no real value being provided to the Unsecures. Well, we've

25  just seen that even the little value that the unsecureds



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

59

1   thought they were getting on our behalf, I would note, has been
2   retraded again today.  So even that -- even the 3½ million
3   doesn't sound like it's there.  But is the 3½ million actually
4   there?  The administrative expenses of this estate are already
5   somewhere -- projected to be somewhere between 900 to $1.5
6   million over budget.  What else is going on in this Estate
7   besides this sale?  The Debtors have sued MHR so there's a
8   lawsuit against us right now that's pending.  We've answered
9   and so that's one lawsuit that's out there.  The Debtors
10  apparently, I learned, they haven't had time to analyze the
11  termination under the Joint development agreement, but I
12  learned yesterday they filed a Motion to amend their complaint
13  against MHR to add a new count.  So that's kind of a second
14  lawsuit.  The Debtors have also sued the class -- sued in a
15  class action other note holders so that's now a third lawsuit.
16  The Unsecured Creditors have sued the Lenders.  So that's a
17  fourth lawsuit.  And we haven't gotten to a plan, we haven't
18  gotten to a disclosure statement, we haven't gotten to an
19  analysis of preferences and fraudulent conveyances.  My
20  experience, this is experiential, that $3½ million is not
21  going to be there.  There's going to be possibly a residual
22  interest for unsecured Creditors in a litigation trust that
23  they want to fund or get to a contingency.  But that is very
24  scarce resources under this sale plan right now.  And remember,
25  all the employees are being terminated under the APA so this

60

1  view of, "We must be a going concern, we must preserve jobs and
2  we must protect the unsecured Creditors," versus this
3  liquidation, this is a liquidation.  That's what's happening
4  and, frankly, if you didn't approve the sale, which you
5  shouldn't approve the sale, what they would do is they'd cobble
6  something together.  They'd go back to Comvest, they'd go back
7  to Harbor, they'd do something but it wouldn't be releasing
8  Presstek, it wouldn't be giving up every right this Estate has,
9  it'd be right sizing the leverage a little bit so that the
10  Unsecured Creditors could actually accomplish something in this
11  case other than sue MHR which is what the company's been doing.
12  Fair value.  The Debtors have said this is fair value because
13  the market has spoken.  We heard about the market speaking for
14  quite awhile, well, I would instruct counsel, I'm sure he
15  remembers, is that a market only speaks correctly when it's a
16  fully disclosed market.  That's what the SEC is for, that's
17  what registration statements are for and that's what in
18  bankruptcy typically disclosure statements are for, is to make
19  sure there's full disclosure so that a market can react.  Okay.
20  There's been no disclosure about the claim against Presstek.
21  People didn't know about the claim against Presstek.  People
22  didn't know the value of the claim against Presstek.  What the
23  purpose of the release in section 13.17 of the APA was.  That
24  wasn't available to the market.  People weren't bidding on that
25  basis.  Judge Case, you know, counsel pointed out what Judge



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

61

1  Case -- some certain findings that Judge Case made on August

2  23rd. He didn't know about the claim against Presstek that was

3  being released. He didn't know that Key Bank had actually

4  consented. He didn't know that the procured default that

5  Presstek had argued was actually false. He didn't hear about

6  the terminated Joint Development agreement. These things were

7  not available to the market, so I would tell you that the

8  market did not speak. This is not just an inefficiency of a

9  market. It's a nondisclosed market and, therefore, you cannot

10 find that there's been fair value 'cause there's been no fair

11 valuation of the claims that's been shared with bidders. No

12 legal analysis, no factual analysis, no documents provided,

13 nothing. We discovered it in discovery. We called the

14 unsecured Creditors and said, "Pay attention. This is real.

15 This looks good. This looks right." The Unsecured Creditors

16 then got involved and said, "You know what? You're right.

17 This does look real, this does look good, let's go." And then

18 they objected to the sale, too, and they were ready to sell out

19 for what they settled for yesterday which doesn't sound like

20 they got. We're not, 'cause we value the claim, much higher

21 than that and we don't think Presstek is -- we don't think that

22 this is a fair sale of these assets. Remember, there is an

23 alternative. The chief restructuring officer testified that

24 the trend of the company now is turning to cash flow positive.

25 This is the trough but we're heading in -- it sounds like the



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

62

1   company is trending out. There's no question that -- remember
2   that Presstek is the D-I-P Lender here. They didn't pick
3   November 15th by accident. I mean, there's a design here.
4   This is the last step of the scheme, not the first step of the
5   scheme. So this is all procured to leverage this Court into
6   making -- there being no decision other than being able to
7   sell. That's the very thing that happened in <u>Abbott's Dairies</u>
8   that the Court said is ripe with possibilities of collusion,
9   when the company walks in with an Interim Agreement and says to
10  the Court, "We have no choice, Your Honor. We're out of money,
11  the Interim Agreement says we have to do this and we have to do
12  it now." The Judge, Bankruptcy Judge signed the Order. Third
13  Circuit reversed it and said, "You can't do that. You can't
14  just come in with no good faith and leverage a company and
15  leave the Bankruptcy Judge with no option." There are options
16  here. We've got a room full of professionals here that will
17  come up with the options. How to replace the D-I-P financing,
18  how to extend the D-I-P financing. Believe me, Key Bank's not
19  gonna be coming in here to be seeking foreclosure on these
20  assets tomorrow. They're gonna work something out. We don't
21  have to approve Presstek as the only possibility right now.
22  And release the claim. No fair value, no good faith, no
23  benefit to the Estate, and I would say all of that adds up to
24  no legitimate business purpose for being here. Thank you, Your
25  Honor.

*Walter's Cramp, Ina.*
Certified Court Transcribers
732-389-0191

63

1    THE COURT: This gentleman had -- I'll give him the

2  floor.

3    MR. LAPOWSKY: Thank you, Your Honor, and I'll be very

4  brief. Robert Lapowsky, Stevens and Lee, for Mitsubishi. Your

5  Honor, I just wanted to point out that we had filed a limited

6  objection to the sale that related to a resale license that we

7  obtained under a post-petition agreement that was entered into

8  between Mitsubishi and A.B. Dick. And that resale license

9  gives us the ability, after the termination of that post-

10 petition agreement, to use A.B. Dick's intellectual property to

11 resell what I will call pipeline inventory, that is inventory

12 that A.B. Dick had ordered from Mitsubishi but not yet fully

13 paid for and as to which title was not transferred. The resale

14 license gives Mitsubishi the right to resell that inventory to

15 third parties using A.B. Dick trademarks, A.B. Dick patented

16 technology. That was part of the agreement that was approved

17 by Judge Case on August 16th and there is an Order entered with

18 the disagreement attached to it. So we had filed an objection

19 saying, "If you're selling free and clear, including selling

20 the intellectual property of A.B. Dick free and clear of

21 interests, let's just make sure that the interest that we have

22 that's created by the resale agreement isn't wiped out, and

23 I've had -- I've discussed this issue with counsel to A.B.

24 Dick. I think we have an agreement that that's not what is

25 intended and that the Order, assuming an Order is entered,

*Walter's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191



64

1   would include a savings provision to make clear that the resale
2   license is not affected by the free and clear nature of the
3   sale. So on that point, all I'm asking is that to the extent
4   an Order is circulated for approval, that we be included on the
5   circulation list to the extent that the resale license is
6   protected. We will have no other objection to the entry of the
7   Order. If it's not included, then our objection stands and
8   there's been no adequate protection proposed for the
9   divestiture of our rights under the resale license so our
10  position would be absent a savings clause. You can't approve
11  the sale free and clear of our interests under the Resale
12  Agreement. The second thing that I wanted to mention just
13  briefly, Your Honor, is that there's been some discussion about
14  the Mitsubishi Supply Agreement. Here it's important to
15  understand there are two Mitsubishi agreements. There's a pre-
16  petition agreement, Supply Agreement, and the post-petition
17  agreement. The resale license I just spoke about arises under
18  the post-petition agreement. The agreement that you've heard
19  reference to is the pre-petition agreement, and that's the one
20  that has a cure amount due under it and Mr. Gleason got up to
21  say that it was the Debtor's position that the pre-petition
22  agreement was not an executory contract. And I just wanted to
23  point out to Your Honor that that's different. It's a
24  different position than what they've taken earlier in the case.
25  In fact, the post-petition agreement approved by Judge Case has

65

1  a specific savings clause in it which preserves to A.B. Dick

2  the right to seek assumption or assumption and assignment of

3  the pre-petition agreement and the Order entered on August 16th

4  specifically references that reservation of rights and

5  continues it. So I'm not here to say that it is or is not an

6  executory contract. I'm only here to say that previously in

7  this case, A.B. Dick has taken the position with us and

8  required that it be incorporated in this post-petition

9  agreement, the position that the pre-petition agreement is

10 executory. Thank you, Your Honor.

11        THE COURT: Thank you.

12        MR. GLEASON: Your Honor, may I address that point

13 real quick on behalf of the Debtors? Very early on in this

14 case, Mitsubishi, the largest Unsecured Creditor, attempted to

15 force the Debtors to make a decision right away. The Debtors

16 refused to do that. We reserved our rights. The Order that

17 was entered, specifically reserved the Debtor's rights. No

18 determination was made. And after the Debtors looked at it,

19 that is when we then filed our scheduled executory contracts.

20 So to stand up here and say that we're taking a different

21 position, I think, is inappropriate. They had tried to force

22 us to do something very early in the case. We reserved our

23 rights. That's all we did. And the other thing, we did have

24 an agreement with respect to the post-petition license which I

25 told Mr. Lapowsky yesterday we had an agreement with. So I



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1   think that's also a nonissue.

2           THE COURT:  Counsel?

3           MR. FOLLAND:  Thank you, Your Honor.  I'm Bob

4   Folland --

5           MR. FIRESTONE:  Your Honor --

6           MR. FOLLAND:  -- on behalf of --

7           THE COURT:  Hold on.  Yes?  Who's speaking?

8           MR. FIRESTONE:  Your Honor, this is David Firestone.

9   At the appropriate point, I'd like to request the Court's

10  permission --

11          THE COURT:  All right.  I've got a couple --

12          MR. FIRESTONE:  -- (inaudible) very brief statement of

13  no more than one minute.

14          THE COURT:  Why don't you got right now with your one-

15  minute statement, is that all right?

16          MR. FIRESTONE:  Thank you.

17          THE COURT:  You can stay right there and listen.

18          MR. FIRESTONE:  First, Your Honor, I'm not, at this

19  point, trying to assert any legal right to either support or

20  oppose the proposed sale of Presstek.  Second, I don't know

21  whether approval or disapproval of that proposed sale would be

22  in the best interest of the 39 non-union retirees of which my

23  mother is one of the healthcare beneficiaries of their health

24  plan.  I do know I would be thrilled to hear Presstek tell this

25  Court that given the total dollar value of this sale, it would,

1  in good faith, continue the retiree health benefit plan for the

2  small number of people involved, and I would ask the Court to

3  use whatever discretionary authority it might have in the

4  approval process or otherwise to protect the health insurance

5  benefits that these retirees have relied on for many years.

6  There ought to be a way, Your Honor, to achieve an equitable

7  result for this small number of elderly people.  Thank you for

8  hearing me.

9          THE COURT:  Thank you.  Now counsel.

10         MR. FOLLAND:  Thank you, Your Honor.  Robert Folland

11  of Thompson Hine on behalf of Key Bank, Your Honor.  And I

12  would like to speak to provide some argument that also provides

13  some context from the bank's position for all of this.  First,

14  I want to make sure the record is that we are clear as to what

15  was put in the record today.  Notwithstanding what I've heard

16  from MHR a few minutes ago, I believe the offer is fairly clear

17  from Presstek with respect to $40 million cash, an additional

18  enhancement of value which was testified and put into the

19  record of at least $3½ million.  Now there may be additional

20  enhancement and I think there may be a disagreement at this

21  point between the Creditors' Committee and Presstek with

22  respect to cures that would be going outside of the Estate.

23  But there's no dispute that we're well in excess of $40

24  million.  The evidence that was put in here just a few minutes

25  ago with Mr. Polleck was clear as well in that his judgment

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

68

1   viewing the Presstek offer side by side with Harbor and with

2   Comvest, it was the best obtainable, even if we were to go

3   through a process with a plan of reorganization as untenable

4   and all the problems that exist with respect to that.  And the

5   reason why there are problems, Your Honor, and the thing that

6   we have to be clear of in this case, is we are looking at a

7   Debtor that is in a very precarious position.

8          THE COURT:  Are you pulling the plug on it on November

9   15th?

10          MR. FOLLAND:  Yes, Your Honor.  We are not providing -

11  - we are not the primary D-I-P Lender in this case.  We were

12  prepared to pull the plug before the case was filed.  It is

13  irresponsible for MHR to stand up and say we are in a room full

14  of professionals, we'll figure something out.  We have been in

15  this bankruptcy case since July, Your Honor, and this has been

16  a very arduous process, Your Honor.  But this case faces a very

17  real threat and a very likelihood of liquidation if the sale is

18  not approved.  We've heard testimony as to what a liquidation

19  value is.  We've heard the midpoint is $16 million.  In that

20  case, the unsecured Creditors don't get anything.  We've got an

21  insolvent Estate, administratively insolvent, and we've got a

22  secured Lender that's going to be receiving a substantial

23  haircut on what it's owed.  Your Honor, this case does not

24  provide a forum where adequate protection can be provided.

25  We've -- notwithstanding what we just heard about this case



*Walter's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1  being cash positive, I believe the actual testimony was that

2  there was a significant burn rate.  I believe that that's what

3  we heard yesterday.  There would be no ability to provide

4  adequate protection.  There would be no ability past the 15th

5  to use cash collateral.  There will be no ability to prime Key

6  Bank.  There will be no ability to provide alternate D-I-P

7  financing.  We've heard the Debtor has looked for alternate D-

8  I-P financing.  To date, they haven't found it.  We heard Mr.

9  Polleck testify the litany of the financial institutions that

10  he's gone to and he's investigated.  Nothing has come up.  We

11  are at a very precarious time in this case.  You know, there's

12  a lot of noise going on, there's a lot of allegations back and

13  forth, there's a lot of lawsuits.  Let's not lose the sight of

14  what we're here to do today.  We're here today to get the best

15  deal that's possible for the benefit of all Creditors.

16  Considering all the other constituencies, employees and the

17  like, that's obviously not my concern or not my primary

18  concern.  I'll let the Debtor speak to that.  But we have to be

19  focused on what the big picture is.  We're here on a sale

20  hearing, and Key Bank believes that this is the last and best

21  opportunity for this company to produce results for the

22  Creditors and I believe the business judgment test has been

23  satisfied.  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        MR. LOIZIDES:  Good morning, Your Honor.  Chris



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-529-0191*

A- 0447

70

1  Loizides for Esko-Graphics which is a Committee member. Esko

2  had filed a limited protective objection to the sale. If the

3  Court does not approve the sale, obviously our limited

4  objection is moot and perhaps, therefore, we could consider it

5  after the Court rules on the MHR objection. I would also say

6  that we also support the -- as a Committee member, we also

7  support the Committee's position in this matter as well. I'd

8  also mention that if the sale is approved, we have -- I have

9  worked out a stipulation with the Committee, with the Debtors

10  and with Presstek resolving our objection, and depending on

11  what the Court's ruling is with respect to the larger issues,

12  I'd like to present that later at the hearing at the

13  appropriate time.

14          THE COURT:  Anyone else?  Counsel for --

15          MR. SELBST:  Your Honor --

16          THE COURT:  -- Presstek?

17          MR. SELBST:  -- Stephen Selbst for Presstek. Despite

18  the arguments that have been made by MHR, Your Honor, the

19  record is quite clear. There's a ton of business purpose that

20  supports this transaction. The Debtor's business was failing.

21  It was failing in 2003, it was failing pre-petition, and

22  unfortunately, it's continued to fail in 2004. One month of

23  $300,000 of EBITDA does not make a successful business. The

24  evidence was unrebutted. These Debtors have lost money in

25  Chapter 11, they're going to continue to lose money between now



1   and whenever somebody else takes over their business or until
2   they liquidate.  That's what the testimony was.  The
3   allegations by MHR that my client improperly terminated the
4   stock Purchase Agreement weren't in the record.  Where I went
5   to law school, lawyers' allegations and papers aren't evidence.
6   There's no evidence about that.  We responded to those
7   allegations.  We disagreed.  I heard MHR's counsel say, not for
8   the first time, they're going to sue my client.  That's never
9   happy news for a client, but we understand that and we're
10  prepared to take that fight on as and when we get there.  But
11  that's not the issue for today.  The issue for today is not the
12  alleged wrongful termination.  You don't have a record on that.
13  Your issue today is whether to approve this asset Purchase
14  agreement.  'And here the evidence is quite clear and, again,
15  despite the attempts to muddy the record, the evidence was
16  uncontrovert.  There was a full and fair auction and no other
17  bidder showed up.  Yeah, we had a couple of proposals, but both
18  Mr. Polleck and Mr. Gray said, they were too indefinite, they
19  both had financing contingencies, and you just heard Keith say
20  they're not staying in this credit, and they would take months
21  to consummate during which time the Debtors will continue to
22  lose money.  We've had an auction.  It's been a fair auction.
23  My client has stayed by this company for almost 16 months.
24  It's prepared to close on its agreement today.  And it thinks
25  that it made a fair offer.  There is absolutely nothing that

72

1   suggests bad faith in the conduct of this auction.

2       THE COURT:  Well, is it going to --

3       MR. SELBST:  Nothing.

4       THE COURT:  -- is it going to close, if the Order

5   provides that you're going to cap out those cures of 500,000?

6       MR. SELBST:  I have -- my client, Mr. Muso, who is the

7   Chief financial Officer, has been in contact with the CEO.

8       THE COURT:  Because that's what the Order's going to

9   provide.

10      MR. SELBST:  I understand that, Your Honor, and I had

11  not had an opportunity actually to confer with him about that.

12  I wanted to address the legal arguments first --

13      THE COURT:  All right.

14      MR. SELBST:  -- if I may.  As I said, the argument

15  that it wasn't a fair auction because there was no information

16  about this alleged lawsuit, is a red herring.  Creditors don't

17  buy lawsuits.  The bid Procedure Order said, "Buy the business,

18  buy the business assets."  If there isn't a stake claim here

19  and it's pursued, so be it.  But by -- but Creditors don't buy

20  lawsuits.  And that's why that argument is entirely specious.

21  We do have answers, Your Honor, about the escrow Agreement.  It

22  is our contention, of course, that my client did nothing

23  whatsoever improper about the termination.  But that's not

24  really the issue.  The issue respectfully is whether there's a

25  business purpose here, and we believe the record of the

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0450

73

1  Debtor's continuing losses and the fact that there is no
2  realistic alternative here, fully supports the Debtor's
3  business judgment that a sale of their assets is the only
4  realistic answer here. Yeah, there is -- as I said, there were
5  these fly-by-night possibilities but they're not real, they're
6  not funded and they're not here today. The time to settle
7  these assets is now. And I want to respond to one other
8  comment that Mr. Rosner made, in one other line of argument.
9  He suggested that somehow Presstek magically engineered this
10 date for the closing date. The fact of the matter's quite
11 different. As he should know, MHR and the Committee objected
12 pretty vehemently to the original sale schedule. We were
13 looking for a faster sale schedule. We agreed back in August to
14 this date to accommodate the Creditors' concerns that there
15 wasn't going to be a fair auction. Judge Case said, "You know
16 what? I agree the Debtors need more time." And we went along
17 with that. But to somehow suggest we picked this date to
18 engineer it, is an errant attempt to rewrite history. We
19 weren't thrilled by that, but we did it because we thought it
20 was the right thing for the Estate. By the same token, there
21 comes a time when all the nonsense has to end. The allegations
22 will get decided in some other Courtroom. But the issue today
23 is to sell the assets, and we believe the Debtor has fully
24 satisfied its burden and we fully -- and we also believe that
25 the record fully satisfies the fact that Presstek acted in good



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0451

74

1  faith, and I will be clear that unless there is a finding of

2  good faith, Presstek is not prepared.  We're not going to be --

3  we are not prepared to close absent of finding of good faith as

4  a purchaser.

5         THE COURT:  Now you want to close by November the 5th?

6         MR. SELBST:  We would like to, Your Honor.  We --

7         THE COURT:  Who picked that date?

8         MR. SELBST:  Pardon me?

9         THE COURT:  Who picked that date?

10        MR. SELBST:  In consultation with the Debtors we did,

11 Your Honor.  I mean, obviously it's within the Court's

12 discretion but here's the reason and we said it in our papers.

13 The business has lost money, is losing money, the

14 administrative expenses will be cut off when we close, and in

15 addition to that, and although Your Honor hasn't heard

16 testimony in great measure about it, as we said in our papers,

17 during the Debtor's long slide that began in 2003, they -- at

18 one point were -- had been stopped on shipments by 160 vendors.

19 They could not fill customer orders.  There were and are

20 employee morale issues and many, many of these A.B. Dick

21 employees, if Your Honor approves the sale, are gonna come to

22 work for Presstek.  There's a real business reason.  We want to

23 put our management team in there.  We want to repair the frayed

24 relationships with the vendors, with the customers, and with

25 the employees.  And those, Your Honor, I submit, are legitimate

*Welter's Cramp, Inc.*

Certified Court Transcribers

731-529-0191

1  reasons why we need an expedited closing.

2         THE COURT:  Okay.

3         MR. SELBST:  Thank you, Your Honor.

4         THE COURT:  Now let's hear from the Debtor.

5         MR. STOCK:  Your Honor, I will be succinct.  Where are

6  we now after all this testimony, all the argument, all the

7  pounding on the table?  We are where we were at the start, back

8  where the United States Supreme Court says we must be under

9  LaSalle:  market determines value.  The market determines the

10  value.  Presstek stands -- or, excuse me, MHR stands here by

11  itself saying, "Ignore the business judgment of the Debtors.

12  Ignore the business judgment of the Debtor's financial

13  advisors.  Ignore the business judgment of the Creditors

14  Committee. 'Ignore the business judgment of the Committee's

15  financial advisors.  Ignore the business judgment of the senior

16  Secured Lender.  Ignore this Court's determination that the

17  sale process that it ordered will bring highest and best value.

18  We know best.  We know better than the Court in setting up a

19  sale procedure.  We know better than the Debtors.  We know

20  better than the senior secured Lender.  We know better than the

21  Creditors Committee."  Well, that's not the law.  The law is,

22  is there is a sound business judgment for the Debtors to do

23  this?  And in exercising their sound business judgment, they

24  must obtain highest and best value and the Court, in this case,

25  and the Court in every case now following the Supreme Court



*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  knows that the only way you do that is through the market. And

2  we've done it through the market and this is the highest and

3  best value. Everything else is merely opinion. And in this

4  case, MHR's sole self-interested opinion. With respect to good

5  faith, Your Honor, requires two things: arm's length

6  negotiation, integrity in the sale process. You've heard ad

7  nauseam about the negotiations, you've heard ad nauseam about

8  the sale process. I'm not going to repeat that. But the Court

9  itself at the sales procedure hearing, again, identified the

10 value that this stalking horse process has brought to this

11 Estate. Judge Case said, "I think the evidence suggests that

12 there is value of a substantial sort that has been brought to

13 the table." If we look at the difference, let's say the

14 Debtors just noticed up a 363 sale or an action and said,

15 "Whoever's going to show up, come and show up. We're going to

16 try to sell the assets." I think the fact that there is this

17 deal negotiated with Presstek is a materially better

18 circumstance than that. It has added value. And that $40

19 million deal has been enhanced. MHR says, without producing

20 any evidence to support its alleged business judgment, "We've

21 got this great claim out there. It's a pig in the poke. We're

22 not here presenting evidence as to its value. We're not here

23 presenting -- we're not willing -- we're not proffering any

24 evidence as to the probability of success, but trust us.

25 Ignore the business judgment of all these other constituents.

77

1    We've got no obligations to them.  We've got no duty to protect
2    them.  In fact, we're adversary to them.  But we stand up here
3    and, by God, Your Honor, forget all that.  Forget the market.
4    We know better.  We can't prove it to you.  We didn't bring any
5    witnesses, but we know better.  That's not the law.  The market
6    has spoken.  This is the best deal.  It is the highest and best
7    value and it should be authorized by the Court.  With respect
8    to another pig in the poke, well, let's just put this off
9    another week so that Comvest or someone else might come
10   strolling up.
11           THE COURT:  I'm not going to put it off.
12           MR. STOCK:  Thank you, Your Honor.  I won't need to
13   address that, then.  For the reasons that I've just discussed,
14   that you've heard from other counsel and based on the evidence,
15   we request that the Court authorize the sale.  The closing date
16   of November 5 is essential as you heard in the testimony.  The
17   Estates will incur additional millions of dollars of expense if
18   it has to go back to November 15 when the D-I-P expires and,
19   therefore, we ask that you authorize the sale free and clear of
20   liens and waive the ten-day stays.  Thank you, Your Honor.
21           THE COURT:  Let me ask this.  What does the sale
22   provide as to the continued obligation of the Buyer to these
23   retiree health -- retirees' health benefits?
24           MR. STOCK:  Can someone speak --
25           THE COURT:  Are you going to get cut off?

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191



1       MR. STOCK:  -- to the status of that?  Federal Cobra

2  Rights is what I hear Mr. Schwartz saying.

3       THE COURT:  What is it?

4       MR. STOCK:  Federal Cobra Rights.  Can you address

5  that, Jeffrey?

6       MR. SCHWARTZ:  Good morning, Your Honor, Jeffrey

7  Schwartz of Benesch Friedland on behalf of the Debtors-In-

8  Possession.  We had filed, to answer your question directly,

9  the APA does not contain a provision assuming retiree welfare

10  benefit plan obligations of the Estate.  We had previously

11  filed a motion to terminate that welfare benefit plan.  The

12  amount in controversy was relatively not substantial so when

13  that gentleman who phoned in earlier raised an objection at

14  first, we're just gonna carry the motion, and then we decided to

15  just withdraw it, and then see what the outcome of the sale

16  process was, and then based on the sales proceeds and so forth

17  revisit that.  So, to answer Your Honor's question directly and

18  clearly, this sale does not contain an assumption of any

19  retiree benefit plan of the obligations of the Estate

20       THE COURT:  Okay.

21       MR. SCHWARTZ:  Thank you. Your Honor

22       MR. STOCK:  I have no further comments, Your Honor,

23  thank you.

24       THE COURT:  All right.  Anyone else?

25       MS. MCKINLEY:  Briefly, Your Honor.  My name is Karen

1   McKinley from Richards Layton & Finger on behalf of Data Card

2   Corporation.  Data Card Corporation filed an objection to the

3   sale to protect its rights in an Escrow Agreement -- I'm sorry,

4   an escrow which was entered in pursuant to an agreement between

5   Data Card and Multigraphics, which was one of the Debtors.  If

6   the Debtors will represent on the record that the sale will

7   have no effect to the escrow we can withdraw our objection.

8        MR. GLEASON:  Yes, again, Your Honor, John Gleason on

9   behalf of the Debtors.  I spoke with someone representing Data

10   Card as well as the State of Ohio, who had also filed a similar

11   objection, and we did agree to say for the record that the

12   sale, if approved by Your Honor, will not affect the escrow --

13        THE COURT:  Does that have to do with that

14   environmental escrow claim?

15        MR. GLEASON:  Yes, and it is not affecting that

16   escrow.

17        THE COURT:  All right.

18        MS. MCKINLEY:  Thank you, Your Honor.

19        THE COURT:  Final speech.

20        MR. RICCIARDI:  Your Honor, may we request a brief

21   recess?

22        THE COURT:  I want to see a proposed Order.  I'm

23   going to be leaving here early tomorrow morning.

24        MR. SCHWARTZ:  Yes, Your Honor, we have a draft

25   Order.



*Wilter's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

80

1    THE COURT:  I'm going to -- you better put a
2    provision in there that I believe that the language stated on
3    page 8 of this auction and the representation made by the Buyer
4    relative to the responsibility of curing all contracts will be
5    capped at $500 thousand, and anything over that amount will be
6    the obligation of the Buyer.  And number two, the litigation,
7    proposed litigation against Presstek for a violation, or what
8    they allege to be a cause of action for violating the Stock
9    Purchase Agreement, will be assigned to MHR.
10    MR. RICCIARDI:  Your Honor, you're talking about the
11    Estate's --
12    THE COURT:  Nobody else wants it --
13    MR. RICCIARDI:  -- claims?
14    THE COURT:  -- and nobody else says it's got any
15    value.
16    UNIDENTIFIED SPEAKER:  Your Honor, if I --
17    THE COURT:  That will be in lieu of your claim.
18    UNIDENTIFIED SPEAKER:  Your Honor we also have not --
19    MR. D. ROSNER:  In lieu of our objection, correct,
20    Your Honor?
21    THE COURT:  In lieu of your claim.  You have a claim
22    of 18 million, you're the largest Creditor, I'm giving you the
23    (indiscern.) then you won't have a claim against the Estate.
24    MR. D. ROSNER:  We'll look at the language, Your
25    Honor, thank you.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

81

1      THE COURT:  Pardon me?

2      MR. D. ROSNER:  We'll look at the language, thank

3  you, Your Honor.

4      THE COURT:  All right.

5      MR. RICCIARDI:  Your Honor, we haven't seen any

6  proposed Order.

7      THE COURT:  You have what?

8      MR. RICCIARDI:  We have not seen any proposed Order.

9      THE COURT:  I haven't either.

10      MR. RICCIARDI:  Okay.

11      THE COURT:  Why don't you -- you want to get together

12  and get an order?  Do you have a proposed Order?

13      MR. SELBST:  Your Honor, may I ask one question for

14  clarification?

15      THE COURT:  Sure.

16      MR. SELBST:  The agreement -- the Asset Purchase

17  Agreement currently provides for a release of the Estate's

18  claim against Presstek of all Estate claims.  Are you saying

19  that you are not prepared to approve that, Your Honor?

20      THE COURT:  No.

21      MR. SELBST:  Okay.  Your Honor, Presstek is not

22  prepared to go forward with that claim.

23      THE COURT:  Why not?

24      MR. SELBST:  Because --

25      THE COURT:  You said you'd defend it.



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1    MR. SELBST:    We would defend any -- we would defend

2    a claim against MHR. We don't believe -- we bargained for a

3    release of the Estate claim. We think MHR may have a claim

4    which they identified as a claim under the Stock Purchase

5    Agreement, but it is absolutely part of the bargain for

6    consideration that we have a release from the Estate, and

7    without it Presstek is not prepared to proceed, Your Honor.

8            THE COURT:    So they have a third-party beneficiary

9    case against you.

10           MR. SELBST:    They claim they do.

11           THE COURT:    Well, that's not release, is it?

12           MR. SELBST:    Pardon me?

13           THE COURT:    That's not subject to release.

14           MR. SELBST:    That's not subject to release, I agree

15   with that, Your Honor.

16           MR. D. ROSNER:    However, Your Honor, if I may speak

17   to that.

18           THE COURT:    Yes.

19           MR. D. ROSNER:    That's a $3½ million claim. Our

20   third-party beneficiary claim is limited to one provision of

21   the contract. We do not have third-party beneficiary contract.

22   It's my understanding (indiscern.) contract. That's the claim

23   that we've been talking about today.

24           THE COURT:    What page are you on?

25           MR. SELBST:    Your Honor, I believe it's section --

83

1    MR. D. ROSNER:  Section 1317.

2    MR. SELBST:  -- 1317, yes.  We agree about one thing.

3    MR. D. ROSNER:  Read it a few times.  It's the claim

4 that Mr. Phillips describes as remote.

5    THE COURT:  What page is it?

6    MR. D. ROSNER:  Fifty-four, Your Honor.

7  (Recess)

8    THE COURT:  Now where are we?

9    MR. D. ROSNER:  We're okay with what the Court had

10 indicated.  MHR.

11    THE COURT:  All right.  Let me consider that.

12    MR. D. ROSNER:  Thank you, Your Honor.

13    THE COURT:  Are you all going to get together and

14 give me an order by noon?

15    MR. SELBST:  Yes, we will, Your Honor.

16    THE COURT:  We have some other matters, don't we?  We

17 have some other matters on this agenda?

18    MR. F. ROSNER:  Very briefly, Your Honor, Fred

19 Rosner, Jaspan Schlesinger Hoffman, rejoining the record.  The

20 outstanding -- there are two other motions, I think, which are

21 items #4 on the agenda --

22    THE COURT:  Wait until I get there.

23    MR. F. ROSNER:  -- which is a motion -- actually, I

24 think we received no objection on item #4 --

25    THE COURT:  That's for extending the time for

84

1 removing actions to the Courts?

2      MR. F. ROSNER: Yeah, that's just a routine, and

3 we'll just submit an Order on that in due course. Item #5 is

4 the proposed retention of Ernst & Young to complete the year

5 2003 financial review. We received two limited objections.

6 Both those objections are resolved as follows: Ernst & Young,

7 of course, will be submitting a fee application --

8      THE COURT: You're withdrawing that, aren't you?

9      MR. F. ROSNER: No, no, we'd like to go forward.

10 There were two objections, but they were resolved.

11      THE COURT: Right. They claim there's a pre-petition

12 interest by this firm.

13      MR. F. ROSNER: Ernst & Young has agreed to waive

14 that to allow them to go forward to complete the year 2003 --

15      THE COURT: I've been through that ball game before.

16      MR. F. ROSNER: Your Honor, the retention of Ernst &

17 Young is condition to --

18      THE COURT: They're either disinterested or they're

19 not. You have one big fight going on right now where we did

20 this and they were going to waive it and it came up to bite us

21 and now it's up in the Circuit Court review to stop the whole

22 thing.

23      MR. F. ROSNER: Well, the Office of United States

24 Trustee has agreed to --

25      THE COURT: Are they a pre-petition Creditor?

*Walter's Cramp, Inc.*
*Certified Court Transcribers*
*733-329-0191*



85

1    MR. F. ROSNER: They've waive that claim, so they are

2  not. They're not, they're owned nothing by reason of the

3  waiver, so they're disinterested, and it is a condition to the

4  Asset Purchase Agreement.

5    THE COURT: All right. Let's hear the U.S. Trustee's

6  response.

7    MR. KLAUDER: Your Honor, David Klauder for the

8  United States Trustee's office. Our response dealt with two

9  issues. We take the position that the waiver of the

10  pre-petition claim is appropriate, and they meet the

11  requirements of 327 and the disinterested requirement. We --

12  our two issues dealt with the reasonableness of the hourly

13  rates that were proposed --

14    THE COURT: The 675 or something like that?

15    MR. KLAUDER: Yeah, and the proposal went all the way

16  up to possibly $1000 an hour. We wanted to preserve the rights

17  to object to the reasonableness of the rates themselves come

18  fee application time that to make sure that the application

19  will be subject to 330. I spoke to an attorney for Ernst &

20  Young and they have agreed to that that the rates are not gonna

21  be ruled per se reasonable today, and that we can address that

22  issue if need be at fee application time.

23    THE COURT: What are they building in their pre-

24  petition claim under the big rate?

25    MR. KLAUDER: I'm not sure where the rates are coming



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*792-329-0191*

A- 0463

86

1   from, but it's definitely a concern to our office.  But that

2   issue will be reserved to the time when we know what they have

3   done and the rates that they are charging.  The second issue

4   dealt with a connection with Key Bank, the pre-petition lender.

5   Again, I spoke with Ernst & Young.  They have assured me that

6   that is unrelated to the Debtors and that there is no --

7   essentially the team that will be working -- the team from

8   Ernst & Young that will be working on the Debtor's project is

9   completely separate from the team that is working on the Key

10  Bank project and that a supplemental affidavit will be filed in

11  the coming days that addresses those concerns.  So with that,

12  we feel that our response has been --

13          THE COURT:  Where are they going to build the Chinese

14  wall?

15          MR. KLAUDER:  I'm sorry?

16          THE COURT:  Where are they going to build the Chinese

17  wall?  In what office?

18          MR. KLAUDER:  Well, I mean, we did talk about the

19  possibility of an ethical wall.  We did not -- our office felt

20  that was not necessarily needed based on the disclosures that

21  were made to us, but we'll certainly yield to Your Honor on

22  that.

23          THE COURT:  All right.

24          MR. KLAUDER:  So with that our response has been

25  resolved.



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

87

1    THE COURT:  All right.

2    MR. KLAUDER:  Thank you.

3    MR. JOSEPH:  Your Honor, James Joseph of the

4  Committee.  Very briefly, the Committee shared the same

5  concerns with respect to the hourly rates.  Tying into that

6  issue, the application was initially filed seeking retention on

7  terms where their compensation would be approved and subject to

8  a section 328(a) review.  It's our understanding that, in fact,

9  it's subject to section 330, and I think that that's absolutely

10  necessary given the rate issue that the Committee and the U.S.

11  Trustee have raised.  And it's our understanding that, in fact,

12  the Debtors do agree that Ernst & Young's compensation will be

13  reviewed under section 330 and not section 328(a).

14    THE COURT:  I think you submitted to me an Order

15  relative to #4.  It's probably in this maize of papers

16  somewhere.  I may have left it in Chambers.

17    MR. F. ROSNER:  Your Honor, there's -- unless the

18  Court has further questions, conclude the presentation on the

19  Ernst & Young, and there's a bunch of clean-up Orders, and

20  there's one other motion.  So what I would propose to do is get

21  through the last motion and then hand up Forms of Order to Your

22  Honor for the open agenda items.

23    THE COURT:  Okay.

24    MR. F. ROSNER:  The last motion then, Your Honor, is

25  the motion by the Debtors to execute a certain shareholder

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191



A- 0465

88

1  resolution in connection with the A.B. Dick subsidiary in
2  Canada, A.B. Dick Company of Canada. That entity is governed
3  by a certain Canadian Business Corporation Act and there's a
4  requirement that entity be solvent at closing otherwise it
5  would expose the directors to liability. So, A.B. Dick asked
6  permission to execute a shareholder consent which actually
7  would, you know, allow us to close, to make a long story short,
8  and I don't think we have any opposition to that. Also the
9  fact that as part of the bid enhancements there's gonna be a
10 certain amount of the sale proceeds are allocated to that
11 particular entity to address that problem presented, otherwise
12 presented by the Canadian Business Corporation Act. We would
13 like to submit an Order on that as well. The other items, Your
14 Honor, that I'd like to address very briefly are sort of in the
15 nature of housekeeping. When we were last before Judge Case he
16 approved a Form of Order that would allow the payment of a Key
17 Executive Retention Program. We've had dialogue with Committee
18 and we now have a consensual Form of Order, an Order that at
19 least reflects Judge Case's ruling, if there's no objection to
20 that from the Committee. So I would refer to that as the KERP
21 Order. I'd like to hand that up as well. There also was a
22 motion some time ago in connection with one of the adversary
23 proceedings, a Motion to Quash certain subpoenas, and that's
24 been resolved through a stipulated Protective Order. We
25 submitted that. I think in the transition it might have got

A- 0466

89

1   lost in the shuffle.  I do have that Form of Order as well.
2   So, shall I approach with those Orders, or does the Court have
3   questions about it?
4          THE COURT:  I don't have -- they may be in the
5   binder, but I know I saw an Order relative to operations of the
6   shareholders.  I'll have to go look.
7          MR. F. ROSNER:  Well, I have --
8          THE COURT:  Have you got some orders there?
9          MR. F. ROSNER:  I do, but I don't want to have, you
10  know, the same orders --
11         THE COURT:  Why don't you get them to me when you --
12  by noon or some time today.
13         MR. F. ROSNER:  I have them presently with me.
14         THE COURT:  All right.  Pass them up then.  I'll
15  look.
16         MR. F.ROSNER:  Your Honor, I'm gonna hand up --
17         MR. JOSEPH:  Your Honor, just very briefly again,
18  James Joseph of McGuire Woods for the Committee.  With respect
19  to the -- what Mr. Rosner has called the KERP Order, I do want
20  to be clear, and I believe that the Certification of Counsel
21  that was submitted with that Order on Monday clarifies that the
22  Committee agrees that that Form of Order reflects Judge Case's
23  ruling.  That does not mean the Committee consents to the
24  relief.  The Committee, in fact, objected, and the Judge made a
25  ruling over the Committee's objection, but we are merely

1   agreeing that the Form of Order reflects his ruling and nothing
2   more.  Secondly, there's a matter, before we start handing up
3   Forms of Order, previously the Committee had filed an
4   application to retain Executive Sounding Board as its financial
5   advisors.  With the hearings the past couple days I haven't had
6   a chance to check the docket, but I do know that, I believe it
7   was last week, we submitted a Certification of No Objection.
8   The objection deadline had passed, and we would -- I think we
9   submitted that with the Form Of Order, and we request that that
10  be entered as well.
11          MR. F. ROSNER:  Your Honor, I do have an Order
12  Authorizing the Extension of Time to Remove Actions.  I do have
13  a form of the Stipulated Protective Order, which obviously is
14  consensual relief.  I do have a Form of Order with respect to
15  the Ernst & Young retention, and I've deleted the references to
16  328, will be subject to 327, and I do have the Form of Order,
17  Your Honor, authorizing the severance program for the
18  employees.
19          THE COURT:  All right.  Submit them up here now and
20  I'll sign them.
21          MR. F. ROSNER:  Thank you, Your Honor.
22          MR. LOIZIDES:  Your Honor, Chris Loizides again for
23  Esko Graphics.  There was also another thing on the agenda, our
24  Motion to Compel Assumption or Rejection, and that motion has
25  been resolved in conjunction with the resolution of our

1   objection to the sale, and we have the stipulation.  I need to

2   get a couple signatures on that, along with an Order approving

3   that that we'd like to hand up.

4       (Pause in proceedings)

5           THE COURT:  On the Order for Ernst & Young I've added

6   the -- I've authorized their employment subject to any

7   objection as to the reasonableness of the E&Y hourly rate.

8           MR. F. ROSNER:  Thank you, Your Honor, that's fine.

9           THE COURT:  As to the Order under 281452 for removal,

10  that date will be extended to February 11th.

11          MR. F. ROSNER:  January 11th?

12          THE COURT:  Pursuant to the order.

13          MR. F. ROSNER:  Thank you, Your Honor.

14      (Pause in proceedings)

15          MR. F. ROSNER:  Your Honor, one last -- Your Honor,

16  Your Honor, can I set some omnibus dates or should I just

17  contact Chambers for those?  Further hears dates, we would set,

18  you know, would Your Honor be back in Delaware, for example --

19          THE COURT:  That first week in December.

20          MR. F.ROSNER:  First week in December.

21          THE COURT:  First week in February.

22          MR. F. ROSNER:  I'll contact Chambers and get dates

23  for omnibus hearings.  Thank you, Your Honor.

24          THE COURT:  Unless you want to come and watch tennis.

25          MR. F.ROSNER:  I'd love to.

92

```
1            UNIDENTIFIED SPEAKER:  I do.

2            MR. F. ROSNER:  I'd love to.

3    (Recess)

4            THE CLERK:  All rise.

5            THE COURT:  Please be seated.  I have two Orders.

6    One was submitted by the Debtor, and the other by MHR.  I've

7    read both Orders.  Have the respective parties had an

8    opportunity to read the Debtor's Order?

9            UNIDENTIFIED SPEAKER:  No.

10           THE COURT:  You haven't?

11           MR. JOSEPH:  The Committee has, Your Honor.

12           THE COURT:  The Committee has, and how does the

13   Committee feel?

14           MR. JOSEPH:  The Committee does not believe that

15   paragraphs R, on page 7 --

16           THE COURT:  What page?  What page?

17           MR. JOSEPH:  Page 7.  Paragraph R, and then --

18           MR. F. ROSNER:  I apologize.  I think that --

19           THE COURT:  Have you distributed this Order to

20   anybody?

21           MR. JOSEPH:  No, they haven't.  I should say quickly,

22   we appreciate you are indulgence, Your Honor.  Paragraph R, and

23   there's a corresponding paragraph 6 on page 9, the part -- a

24   large part of the issue outstanding remains based on the

25   uncertainty between the parties as to exactly what Your Honor
```



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

93

1   intended with respect not only to the half million dollar cure

2   cap, but whether in fact Your Honor agreed with the Committee's

3   view that Presstek had in fact committed to assume, if not owe,

4   a substantial number of what we would call the vendor contacts,

5   and this --

6         THE COURT:  I read the -- I left it in Chambers, but

7   that said all contracts.

8         MR. JOSEPH:  Excuse me, Your Honor?

9         THE COURT:  That's right, you're right.

10        MR. JOSEPH:  So with that we believe that paragraphs

11  R -- paragraph R on page 7 and paragraph 6 on page 9 do not

12  accurately reflect the Presstek committed bid at the auction

13  and need to be revised accordingly.  With respect to the MHR

14  Order, I've not had a chance to review it, but in concept I've

15  discussed it with counsel to MHR.  The Committee does not

16  oppose the provisions that MHR has added, but believe that

17  paragraphs -- I think that contains the same paragraphs R and

18  6, and those should be revised in that Order, if that's the one

19  Your Honor is inclined to accept.

20        THE COURT:  Well, that Order's the same as this

21  except that they rewrite paragraph 13.17 --

22        MR. JOSEPH:  Exactly, exactly.

23        THE COURT:  I -- after mulling this over I went back

24  and read the agreement, the APA, and it's very specific about

25  the releases from the beginning of the world to the end of the

*Walter's Cramp, Inc.*
Certified Court Transcribers
732-329-0191



1    world, and when I said, well, you take the claim, I shouldn't

2    have said that because I didn't have any knowledge of the

3    release clause.  So irrespective of that, that matter is off

4    the table.

5        MR. JOSEPH:  So with respect then --

6        THE COURT:  But now where do we stand on this cap for

7    the contracts and 500,000?  If you don't want to live by the

8    agreement you may, at the auction, and that's what I'm going to

9    do.  I'm going to make you live to it, if you don't want to,

10   appeal it, but that's the word your representative made as far

11   as I'm concerned.  It's very specific.

12       MR. SELBST:  Your Honor, respectfully, my client

13   believes that they were reserving the right to designate other

14   contracts to be assumed and not to be assumed, and respectfully

15   if Your Honor is saying that he will only condition the sale

16   upon the assumption of all contracts Presstek's not prepared to

17   proceed.

18       THE COURT:  Well, you rewrite this Order to include

19   the specific language that was said at the auction hearing on

20   page 9, and I'll sign that Order.  If you don't want to go

21   along with it then I think you're going to entice some very

22   serious litigation.

23       MR. SELBST:  I understand Your Honor, very clearly.

24       THE COURT:  I'm going to have to reject your proposed

25   Order relative to the assumption of the contract, and you can



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

95

1    -- then that leaves you with just the right to appeal, I guess.

2    MR. D. ROSNER:  Right.  Then that means we're not

3    obviously withdrawing our objections to --

4    THE COURT:  No, you're objecting to this deal in the

5    record, and you're not withdrawing any objection.

6    MR. D. ROSNER:  Right.  And also we're not

7    withdrawing our claim for 18.3 million.

8    THE COURT:  You're not withdrawing your claim.

9    MR. D. ROSNER:  Thank you, Your Honor.

10    MR. SCHLERF:  Your Honor, Jeffrey Schlerf for the

11    Bayard Firm.  Our firm -- for the Committee.  Our firm and I

12    personally handled negotiations regarding the

13    Debtor-In-Possession financing in the Final Order.  Your Honor,

14    somebody referenced the fact that the Committee has filed a

15    complaint against the Key Bank as the Pre-Petition Secured

16    Lender challenging, primarily challenging the perfection of its

17    liens against some of its pre-petition collateral, and I'm not

18    asking for Your Honor to do anything with respect to that

19    lawsuit, it was just filed two days ago, other than the fact

20    that it really highlights two points that apply to the sale and

21    in particular what happens at closing.  Number one -- and

22    there're two points that I was planning on putting in the

23    Order, but with the rush and everything here we are.  One is

24    that the application of the proceeds is subject to the final

25    Debtor-In-Possession Order in Court, including paragraph 24,



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*731-329-0191*

96

1   which provides that, "If the Committee on a timely basis," and

2   we did on a timely basis, "file a challenge to the liens of Key

3   Bank then the amount that otherwise would go towards their

4   pre-petition collateral is set aside in escrow in an

5   interest-bearing account until that lawsuit is resolved."  So I

6   wanted to Order to make clear that that in fact applies to the

7   application of the proceeds.  Number two, Your Honor, there's

8   an issue regarding allocation of the proceeds, because what the

9   Committee does not want to have is have the Debtor and the

10  Purchaser agree between now and the closing or after the

11  closing to allocate value to some collateral and not to others

12  because to the extent that impacts the collateral that we're

13  challenging and saying the bank does not have a prior perfected

14  lien we don't want less value to go to those assets than

15  others.  So our suggestion was gonna be in the Order, Your

16  Honor, to say that any allocation of the proceeds of the sale

17  to the extent it related to pre-petition collateral that that

18  allocation would be subject to order of the Court, or as

19  otherwise agreed between the Debtor, the Committee, and the

20  Buyer.

21        MR. FOLLAND:  Your Honor, this is Rob Folland on

22  behalf of Key Bank.  I absolutely have no problem agreeing with

23  the terms of the D-I-P Order.  Obviously they are what they

24  are.  I'm surprised the Committee has not discussed these

25  points with me prior to this very late hour.  However, with



A- 0474

97

1  respect to changing the allocation which is specifically

2  provided for in the APA, I would say the APA speaks for its,

3  and I do not believe there should be provisions put into the --

4  into this Order that would reserve allocation.  The Debtor and

5  Presstek are free to allocate however they want.

6          MR. SCHLERF:  Your Honor, just to explain.  We're

7  bringing this up now because we were not aware, really, there

8  was a real Order to present to Your Honor until about 11

9  o'clock this morning, so this is one of many issues that we

10  thought of over the last two hours, weren't meaning to sandbag

11  Key Bank or anybody else.

12          THE COURT:  Okay.

13          MR. SELBST:   Your Honor, respectfully, we're

14  troubled by this suggestion by the Committee for a couple of

15  reasons.  Number one, as Your Honor may be aware there are

16  Canadian assets that are being purchased here.  Unless there's

17  a sufficient allocation to the Canadian assets there's a risk

18  that the Canadian entity would be insolvent with the result

19  that my client would have success reliability for a certain of

20  those liabilities.  Secondly, as between the Buyer and the

21  Seller, there are tax issues involved in the allocations to

22  assets.  The contract is quite clear that the Debtor and the

23  Buyer can allocate under the APA, and while I agreed with the

24  Committee that we wouldn't allocate more than $3.2 million to

25  the Canadian assets other than that I don't think the Committee



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

A- 0475

98

1    respectfully has a right to intervene in the allocation

2    negotiation.

3        THE COURT:  Is that correct?

4        MR. SCHLERF:  We did have an agreement on the

5    proceeds of the Canadian subsidiary, Your Honor.  We're not

6    saying the Committee should dictate what the allocation should

7    be.  What we're saying is, proposing is, that there be a

8    three-way discussion involving the Committee, and if we have a

9    disagreement we would put the issues before Your Honor.  That's

10   all we're suggesting.

11       THE COURT:  Okay.  Then I'm going to have to

12   follow --

13       UNIDENTIFIED SPEAKER:  I want to say that's

14   inconsistent with the APA.

15       THE COURT:  -- the APA.  If it's in the APA that will

16   govern.  If there's a dispute down the line then we'll hear it.

17       MR. JOSEPH:  I think the issue would simply be

18   whether the allocation proposed would be legitimately for

19   tax --

20       THE COURT:  Yes.

21       MR. JOSEPH:  -- purposes versus some issue based on

22   the adversary.

23       THE COURT:  You want to put this other language in?

24       MR. F. ROSNER:  We actually sent somebody back to the

25   office to make that change.



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

A- 0476

99

```
 1          THE COURT:  Okay.  Well, bring it to me -- I've got a
 2   hearing at 2, and so --
 3          MR. F. ROSNER:  You want to do it --
 4          THE COURT:  Anytime before 5 o'clock.  Is that all
 5   right?
 6          UNIDENTIFIED SPEAKER:  That's fine.
 7          THE COURT:  You know what I want?  I want the
 8   specific language that was stated at the auction in this
 9   agreement.
10          MR. SCHWARTZ:  Verbatim.
11          UNIDENTIFIED SPEAKER:  Understood, Your Honor.
12          THE COURT:  Verbatim.
13          UNIDENTIFIED SPEAKER:  Yes, Sir.
14          THE COURT:  And I'll sign that Order and you can get
15   on with the sale and money and whatever else you have to do.
16          UNIDENTIFIED SPEAKER:  Thank you.
17          THE COURT:  All right.
18          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.
19      (Court adjourned)
20
21                  CERTIFICATION
     I certify that the foregoing is a correct transcript from the
22   electronic sound recording of the proceedings in the above-
     entitled matter.
23
24   _____           11-24-04
     Signature of Transcriber           Date
26
```

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

A- 0477