# Tab 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE A. B. DICK COMPANY, ET AL., Debtors | : CHAPTER 11<br>:<br>: Case No. 04-12002 (JLP)<br>: JOINTLY ADMINISTERED<br>: |

**EMERGENCY MOTION OF MITSUBISHI IMAGING (MPM), INC. FOR ORDER DETERMINING VALIDITY OF EXERCISE OF ELECTION UNDER POSTPETITION PRIVATE LABEL SALES AGREEMENT**

Mitsubishi Imaging (MPM), Inc. ("**Mitsubishi**"), by and through its counsel, hereby moves for an order determining the validity of a purported exercise of an election by A.B. Dick Company ("**ABD**") under that certain Private Label Sales Agreement dated August, 2004, by and between Mitsubishi and ABD, on the following bases:

1. This court has jurisdiction over the matters raised herein pursuant to 28 U.S.C. §1334(b). Venue is properly set in this court pursuant to 28 U.S.C. §1409(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A),(M),(N) and (O).

2. Mitsubishi and ABD are parties to an agreement (the "**Postpetition Private Label Sales Agreement**") dated August, 2004. Capitalized terms used but not defined herein shall have the meanings stated in the Postpetition Private Label Sales Agreement.

3. Pursuant to the Postpetition Private Label Sales Agreements, among other things, (a) during the term thereof, Mitsubishi agreed to sell and ABD agreed to purchase certain Products from Mitsubishi, (b) pursuant to paragraph 8F thereof, ABD agreed to pay one-third of the total invoice price of all Product identified in any Purchase Order upon acceptance by Mitsubishi of the Purchase Order, one-third within three business days of notification that Product was ready for loading on vessels for shipment to the United States and the balance within three business days of notice of arrival in the United States, (c) pursuant to paragraph 8B

1

SL1 492309v1/21172.001

thereof, title to all Product remained with Mitsubishi until delivery to ABD's distribution center, (d) pursuant to paragraph 12A(2)(d) thereof, Mitsubishi had the right to terminate the Postpetition Private Label Sales Agreement immediately upon sale by ABD of substantially all of its assets by providing notice (a "**Termination Notice**") to ABD, (e) pursuant to paragraph 12C thereof, within ten days of delivery by Mitsubishi of a Termination Notice, ABD had the right to exercise an election (the "**Pipeline Purchase Election**") to purchase all inventory subject to outstanding Purchase Orders not yet fully paid for by ABD (the "**Pipeline Product**") for the full balance remaining due, and (f) pursuant to paragraph 8F thereof, after termination of the agreement, Mitsubishi was granted certain rights to resell the Pipeline Product as to which a Pipeline Purchase Election had not been made and ABD was granted certain rights to a refund (the "**Pipeline Refund**") of a portion of the amounts paid by ABD on account of such Pipeline Product. A copy of the Postpetition Private Label Sales Agreement is attached hereto (without exhibits), marked Exhibit "A" and made part hereof.

4. On November 5, 2004, ABD sold substantially all of its assets to Silver Acquisitions Corp, a subsidiary of Presstek Inc ("**Presstek**"), however, the Postpetition Private Label Sales Agreement was not assigned to Silver or Presstek and remains a contract between ABD and Mitsubishi.

5. On November 5, 2004, following closing on the sale of substantially all of ABD's assets, Mitsubishi sent a Termination Notice to ABD. At the time that Mitsubishi provided the Termination Notice, and to the time of this motion, ABD had paid $2,545,774.94 on account of Pipeline Product and owed an additional amount of $2,255,397.07 on account of such Pipeline Product. Absent the exercise to the Pipeline Purchase Election, ABD will be entitled to a

2

SL1 492309v1/21172.001

Pipeline Refund of some portion of the $2,545,774.94 paid by ABD on account of the Pipeline Product..

6. On November 10, 2004, Presstek purported to exercise the Pipeline Purchase Election and, by wires dated November 9, 2004 and November 10, 2004, Presstek transferred the sum of $2,255,397.07 (the "**Presstek Payments**") to Mitsubishi, purporting to represent payment in full for the Pipeline Product. On November 11, 2004, Mitsubishi advised Presstek in writing that, because the Postpetition Private Label Sales Agreement was not assigned by ABD to Presstek (or anyone else), only ABD could exercise the Pipeline Purchase Option and further advising that Mitsubishi would either hold the Presstek Payments or return them, at Presstek's option, pending determination whether the Pipeline Purchase Election has been exercised. To date, Presstek has not requested return of the Presstek Payments and Mitsubishi continues to hold them.

7. On the morning of November 12, 2004, ABD purported to exercise the Pipeline Purchase Election with a direction to release the Pipeline Product to Presstek. However, in the afternoon of November 12, 2004, ABD advised Mitsubishi that it was withdrawing the Pipeline Purchase Election. ABD's withdrawal of the election followed receipt by counsel to ABD of an email from counsel to the Official Committee of Unsecured Creditors of ABD (the "**Committee**") stating that the Committee considered the Pipeline Refund to be a valuable asset of the ABD estate which had not been purchased by Silver or Presstek and further stating the Committee's position that any exercise of the Pipeline Purchase Option was outside the ordinary course of ABD's business and required court approval pursuant to Section 363 of the Bankruptcy Code. In response, Presstek has asserted that it believes that it has purchased the Pipeline

3

Inventory and any rights ABD may have to the Pipeline Refund. The Committee has disputed that position

8. Finally, in the evening of November 12, 2004, following receipt by counsel to ABD of an undertaking by Presstek to hold the ABD estate harmless, under certain circumstances, ABD advised Mitsubishi that it was reinstating its Pipeline Purchase Election.

9. It is Mitsubishi's understanding that the Committee continues to take the position the Pipeline Purchase Election is invalid.

10. If Mitsubishi were to honor the pending Pipeline Purchase Election, it would be obligated to give ABD credit for the approximately $2.5 million paid by ABD prior to termination of the Postpetition Private Label Sales Agreement, sell the Pipeline Inventory to ABD for the approximately $2.2 million remaining due and release the Pipeline Inventory to Presstek. That result is fair assuming that the pending Pipeline Purchase Election is valid and, as a result, by giving credit for the approximately $2.5 million paid by ABD, Mitsubishi is relieved of any liability on account of the Pipeline Refund obligation. However, if Mitsubishi honors the pending Pipeline Purchase Election and it is later determined that, as asserted by the Committee, the Pipeline Purchase Election was invalid, Mitsubishi would be in the position of having provided the approximately $2.5 million credit but retaining a potential liability for the Pipeline Refund. Obviously, such result is patently unfair and not contemplated by the Postpetition Private Label Sales Agreement.

11. Under the circumstances, Mitsubishi is entitled to a determination whether the Pipeline Purchase Election tendered by ABD is valid so that Mitsubishi can discharge its obligations under the Postpetition Private Label Sales Agreement. Such determination is required on an expedited basis because Mitsubishi has been advised by Presstek that it urgently needs the

Pipeline Product and has threatened to sue Mitsubishi for any damages resulting from failure by Mitsubishi to release the Pipeline Product to Presstek. While Mitsubishi does not believe it has any liability to Presstek (or anyone else), prompt resolution of the dispute is in the interest of all parties.

WHEREFORE, Mitsubishi respectfully requests an Order (i) determining, whether the pending Pipeline Purchase Election is valid, and (ii) granting such other relief as is just and proper.

Dated:  November 15, 2004               STEVENS & LEE, P.C.

*Thomas G. Whalen, Jr.*
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 425-3304
Fax: (610) 371-8512
E-mail: tgw@stevenslee.com

and

Robert Lapowsky, Esquire
1818 Market St., 29th Floor
Philadelphia, PA 19103
Tel: (215) 751-2866
Fax: (610) 371-7958
E-mail: rl@stevenslee.com

*Attorneys for Mitsubishi Imaging (MPM), Inc.*

5

SL1 492309v1/21172.001

## PRIVATE LABEL SALES AGREEMENT

THIS PRIVATE LABEL SALES AGREEMENT made and entered into as of this ___ day of August, 2004, by and between MITSUBISHI Imaging (MPM), Inc., a Delaware Corporation, with its principal office at 555 Theodore Fremd Avenue, Rye, NY 10580 (hereinafter referred to as "MITSUBISHI") and A.B. Dick Company, a Delaware corporation, with its principal offices at 7400 Caldwell Avenue, Niles, IL 60714-4690 U.S.A. (hereinafter referred to as "A.B.DICK")

### WITNESSETH:

WHEREAS, MITSUBISHI is engaged in the sales of certain private label PRODUCTS (as that term is defined below) which A.B.DICK desires to purchase and distribute; and

WHEREAS, MITSUBISHI and A.B. DICK are parties to an agreement (the "Prepetition Agreement") dated October 1, 2002, pursuant to which MITSUBISHI agreed to sell and A.B. DICK agreed to purchase Products; and

WHEREAS, on July 13, 2004, A.B. DICK filed a petition for relief under Chapter 11 of the United States Bankruptcy Code; and

WHEREAS, A.B. DICK has not yet assumed or rejected the Prepetition Agreement; and

WHEREAS, MITSUBISHI is willing to continue to sell PRODUCTS to A.B.DICK for resale upon the terms and conditions herein contained; and

WHEREAS, A.B.DICK is desirous of selling PRODUCTS to the owners of A.B. DICK's Plate Makers, Digital Platesetters and other Imagesetters; and

WHEREAS, A.B.DICK has facilities and programs for training those engaged in the sale of PRODUCTS and in the technology and use of Plate Makers, Digital Platesetters, Imagesetters and PRODUCTS.

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

### 1. PRODUCTS; TERRITORY

The TERRITORY shall mean the United States, Canada and Latin America (Mexico, Central and South America, and the Caribbean).

PRODUCTS shall mean photo-sensitive, silver offset plate material manufactured by MITSUBISHI Paper Mills Ltd. ("hereinafter referred to as "MPM") for A.B.DICK, and sometimes referred to as A.B.DICK brand or trade names, including "MEGA", "MEGATEK", "MEGAPRO", "MEGA Plus" and improvements to such products, provided such improved products are silver-based. A list of all PRODUCTS included within this Agreement and their

specifications is set forth in Exhibit A to this Agreement, which may be modified from time to time by written agreement of both parties.

### 2. SALES BETWEEN MITSUBISHI AND A.B.DICK

Subject to the provisions of this Agreement, MITSUBISHI shall sell and A.B.DICK shall purchase PRODUCTS for distribution in the TERRITORY only.

### 3. RELATIONSHIP BETWEEN MITSUBISHI AND A.B.DICK

The relationship between MITSUBISHI and A.B.DICK is solely that of seller and buyer. A.B.DICK is an independent contractor and nothing in this Agreement shall be construed to make A.B.DICK an agent, partner or employee of MITSUBISHI. Neither party has the authority to nor shall conclude any contract or agreement or make any commitment, representation or warranty on behalf of or which binds the other party, and neither party may act, or hold itself out as having the authority to act, in the name of or on behalf of the other party.

### 4. SALES PROMOTION; MINIMUM QUANTITIES

A.B.DICK shall use its best commercial efforts actively to promote the sales of PRODUCTS in the TERRITORY in an effective and aggressive manner and shall use its best commercial efforts to purchase at least the minimum quantities of PRODUCTS set forth below. As both parties recognize that changes in market conditions or technology shifts beyond the reasonable control of either party may affect the reasonableness of the minimum quantities set forth in Exhibit C, these minimum amounts will be reviewed and (if required) adjusted annually. The foregoing notwithstanding, A.B. DICK's failure to make the minimum level of purchases as set forth in Exhibit C may be grounds for the adjustment of prices in accordance with the provisions of paragraph 8(D) herein

### 5. STOCK TO BE MAINTAINED

A.B.DICK shall purchase from MITSUBISHI and maintain at its warehouse facility(ies) or distribution center(s) in the United States or Canada at all times adequate stock of PRODUCTS to fulfill its reasonably anticipated sales or other requirements within the TERRITORY.

### 6. FORECASTS; INFORMATION

A.B.DICK shall provide to MITSUBISHI by the tenth calendar day of each month a non-binding forecast detailing its estimated requirements for PRODUCTS for the subsequent six months. A.B.DICK shall furnish MITSUBISHI from time to time upon request, with information with respect to past and forecast sales and inventory of PRODUCTS, and other activities of A.B.DICK under and in support of this Agreement in the TERRITORY.

### 7. TRAINING

A.B.DICK shall provide at its expense necessary training with respect to the technology and use of PRODUCTS to all persons who are engaged in the sales of PRODUCTS

under or for A.B.DICK, including without limitation, the sales staffs of any subsidiaries, affiliated companies, resellers, distributors, sales representatives, dealers or other distribution channels utilized or engaged by A.B.DICK hereunder.

### 8. TERMS OF SALE

A. The prices of PRODUCTS to be purchased hereunder are set forth on Exhibit A. All prices are, and shall be paid, in US dollars and are FOB A.B.DICK distribution center (currently Des Plaines, IL.)

B. All PRODUCTS shall be packed for international shipment at MITSUBISHI's expense. Shipping costs to the A.B.DICK distribution center, insurance during transit, and import duties shall be paid by MITSUBISHI. Title and risk of loss of PRODUCTS shall pass to A.B.DICK at delivery to destination.

C. MITSUBISHI may increase prices at any time upon ninety (90) days' prior written notice to A.B.DICK. Except as provided in subparagraph D, MITSUBISHI shall not increase prices by more than five (5%) percent in any calendar year during the effective period of this Agreement. Orders placed by A.B.DICK prior to the effective date of a price increase shall be shipped and billed at the prices in effect at the time the Purchase Order was submitted. Orders placed by A.B.DICK during the notification period shall not exceed one and one half (1½) times its normal monthly order volume, based on trailing twelve (12) month period.

D. In the event that the exchange rate between US Dollars and Japanese Yen substantially changes, the parties shall agree in good faith on appropriate increases or decreases in price to account for such changes, without regard to the percentage limitations of subparagraph (C) of this paragraph 8 provided, however, any price change agreed to resulting from fluctuations in the exchange rate between U.S. Dollars and Japanese Yen shall be fixed for a period of at least ninety (90) days from the effective date of such change. In the event that A.B. DICK's monthly orders repeatedly do not meet the minimum quantities specified in Exhibit C including any adjustments agreed to, MITSUBISHI may at its option on sixty (60) days written notice to A.B.DICK increase prices in accordance with Exhibit D.

E. A.B.DICK or entities designated pursuant to this Agreement shall, on the Effective Date (as defined below), (i) resubmit Purchase Orders ##P261576, P261577 and P262005 (the "Existing Purchase Orders"), which had originally been submitted under the Prepetition Agreement and which shall be treated as Purchase Orders submitted under this Agreement, and (ii) submit additional Purchase Orders for Product (the "August Purchase Orders"). MITSUBISHI will take all reasonable steps to have the Products subject to Existing Purchase Orders available for shipment from Japan during the last week of August and first week of September, 2004 and the Products subject to the August Purchase Orders available for shipment from Japan during the last week of October and first week of November, 2004. If A.B. DICK desires air transportation of Product subject to any Purchase Order, A.B. DICK will so advise MITSUBISHI in writing, by facsimile, that it requests delivery by air and, in such event. A.B. DICK will pay the cost of the air transportation. As to any other purchase orders (the "Additional Purchase Orders" and, together with the Existing Purchase Orders and the August

Purchase Orders, the "Purchase Orders"), such must be placed within the first ten calendars days of each month beginning in September, 2004 and must be delivered to MITSUBISHI by facsimile or overnight courier service. Unless the Additional Purchase Order is rejected or acceptance is delayed by MITSUBISHI in writing (with reasons given) within five (5) business days of receipt, the ordered PRODUCTS will be made by MPM and shipped from Japan approximately 60 calendar days from the date of the Additional Purchase Order. The ordered PRODUCTS will be delivered to A.B. DICK's distribution center promptly after arrival into the US and clearance through US Customs. Without the written consent of MITSUBISHI, which may be withheld in MITSUBISHI's sole discretion, A.B. DICK shall not place any Purchase Orders after the earlier of the date which is five days prior to the scheduled hearing (or any continued hearing date) on A.B. DICK's motion to sell substantially all of its assets to Silver Acquisition Corp or a higher bidder and December 31, 2004.

      F. One-third (1/3) of the total invoice price of all Product identified in any Purchase Order shall be paid by A.B. DICK to MITSUBISHI upon acceptance of the Purchase Order. Another one-third (1/3) of the total (extension) price for each line item on each Purchase Order shall be paid no more than three (3) business days after notification by facsimile to A.B. DICK that all Product identified in such line item are ready for loading onto a vessel or vessels for shipment to the United States. The notice shall state the name of the vessel(s) and the port(s) at which the Products are to be loaded. The balance of the total (extension) price for a line item shall be paid no later than three (3) business days after notification to A.B. DICK by facsimile that the vessel(s) carrying such Product has (have) arrived at the port(s) within the domestic United States where the Products are to be off-loaded which port shall be the port of Chicago. All payments shall be made by wire transfer to an account or accounts designated by MITSUBISHI from time to time. If A. B. DICK fails to make timely payment to MITSUBISHI on or before the due date for any payment, MITSUBISHI may send a notice of default to A.B. DICK by facsimile and overnight courier. If the noticed default is not cured by payment in full delivered to MITSUBISHI within three (3) business days of the date of the notice of default, then MITSUBISHI, at its sole option and discretion, and in addition to any other remedies it may have, may upon notice to A.B. DICK to be delivered by facsimile within ten (10) days of the date of such notice of default, either (i) cancel the Purchase Order with regard to the Product not paid for and return all monies paid by A.B.DICK towards such Product, less MITSUBISHI's costs of manufacturing, procuring, converting, shipping, returning and/or disposing of such Product plus any duty, demurrage or Customs charges, third party charges and other related costs; or (ii) sell such Product to third parties for MITSUBISHI's own account (or authorize a MITSUBISHI related entity to sell such Product to third parties) as A.B. DICK branded goods pursuant to the Resale License (defined below) or without the A.B. DICK brand. In the event that MITSUBISHI fails to affirmatively elect to proceed under option (i) or (ii) above in a timely manner, MITSUBISHI shall be deemed to have elected to proceed under option (ii). Upon the sale of such Product by MITSUBISHI pursuant to subparagraph (ii) above, MITSUBISHI will reimburse A.B. DICK for any payments A.B. DICK made to MITSUBISHI towards the total (extension) price of such Product, less any costs or expenses incurred by MITSUBISHI with regard to such Product which costs and expenses were incurred as a result of A.B. DICK's default, such as demurrage, dockage, warehouse and/or additional shipping expenses (collectively, the "MITSUBISHI Default Charges"). To the extent any MITSUBISHI Default Charges exceed the total of payments received by MITSUBISHI in connection with the sale of Product, MITSUBISHI shall have a claim against A. B. DICK which shall be entitled to an

administrative expense priority in the A.B. DICK bankruptcy proceedings. In connection with any sale of Product under subparagraph (ii) above utilizing the A.B. DICK brand, A.B. DICK hereby grants to MITSUBISHI (and any MITSUBISHI related entity effecting sale under subparagraph (ii)) a perpetual, worldwide royalty free license (the "Resale License") to use A.B. DICK trademarks and patented technology to the extent necessary to complete and sell such Product. The foregoing is a grant of a license only and neither MITSUBISHI nor any other entity shall be deemed to have acquired any ownership interest or other right not specifically granted herein in any of the said intellectual property by reason of the said license. At any time on or after termination of this Agreement, MITSUBISHI may elect, at its sole option and discretion exercised by facsimile notice delivered within ten (10) days of such termination, to exercise the rights granted pursuant to subparagraphs (i) or (ii) above as to all undelivered Product subject to the any outstanding Purchase Orders as to which an election has not already been made or been deemed made. Absent timely election by MITSUBISHI, MITSUBISHI shall be deemed to have elected to exercise rights after termination under subparagraph (ii). A.B.DICK shall be liable for interest on any overdue payment from the due date through the date payment is made in full in immediately available funds. Interest shall be calculated on a daily basis at the then-prevailing US prime rate plus two and one half (2.5%) percent. (In the event there is a discrepancy or dispute as to the appropriate prime rate, the prime rate quoted by the Wall Street Journal shall govern.)

    G. The parties understand and agree that MITSUBISHI is not extending any credit line to A. B. DICK.

    H. PRODUCTS listed in Exhibit A are standard sizes. In the event A.B.DICK requests a size or specifications not listed on Exhibit A, A.B.DICK shall provide the request in writing to MITSUBISHI and include a new product code number, label artwork and a forecast of projected orders. Any such request is subject to MITSUBISHI's approval and the parties' agreement on pricing, and if other than standard sizes or specifications a longer lead time.

    I. At A.B. DICK's request, MITSUBISHI will drop ship PRODUCTS to location(s) designated by A.B.DICK and accepted by MITSUBISHI upon terms and conditions to be mutually agreed.

    J. In recognition of the cost savings resulting from the large volume of past and current purchases of Products by A.B.DICK from MITSUBISHI, A.B.DICK shall be entitled to prices in the TERRITORY which are at least equal to the most favorable price offered by MITSUBISHI to any private label or OEM customer in such TERRITORY, provided A.B.DICK continues to purchase a reasonably larger volume of PRODUCTS in such TERRITORY than any other private label or OEM customer of MITSUBISHI. The prices offered by MITSUBISHI or its parent company to a customer pursuant to a private label agreement existing as of May 29, 2003 and any extensions or renewals of such agreement shall not be considered in determining the prices required to be offered to A.B DICK under this subparagraph J. This subparagraph shall not apply to products over 23" in roll width or products principally offered into a non competing market.

### 9. TRADEMARKS

A. A.B.DICK shall sell or market PRODUCTS under its own trademarks or trade names as listed in Exhibit B or under such other trademarks or trade names as the parties may from time to time agree. MITSUBISHI shall affix to the packaging of PRODUCTS, in accordance with written instructions to be supplied by A.B.DICK, such A.B.DICK trademarks, trade names, color schemes, logos or labels as may be designated by A.B.DICK (collectively referred to herein as the "A.B.DICK MARKS"), and which shall remain the exclusive property of A.B.DICK. MITSUBISHI will not sell products to others using any of the A.B.DICK MARKS, or in any packaging which incorporates a color scheme confusingly similar to A.B. DICK's, without A.B. DICK's prior written permission. A.B.DICK shall not (and shall not cause or knowingly permit any third party to) affix any trademark or trade name to any PRODUCTS purchased hereunder different from the trademark or trade name affixed by MITSUBISHI to such PRODUCTS. The restriction of the foregoing sentence shall not apply to PRODUCTS which have been manufactured solely to A.B. DICK's proprietary specifications, provided however, with regard to any such PRODUCT, that (a) A.B.DICK gives MITSUBISHI prior written notice of such PRODUCT, the trademark(s), trade name(s), label(s) or brand(s) such PRODUCT is to be sold under, and by whom. MITSUBISHI shall affix to the packaging of PRODUCTS, in accordance with written instructions to be supplied by A.B.DICK, such trademarks, trade names, color schemes, logos or labels as may be designated by A.B.DICK pursuant to the foregoing sentence. MITSUBISHI reserves the right to reject any trademark(s), trade name(s), label(s), brand(s), including designs which may appear inappropriate to the nature of the product and/or may harm the image of the product and/or the MITSUBISHI trademark(s) or trade name(s). MITSUBISHI also reserves the right to reject if the volume for such trade mark(s), trade names(s), label(s) or brand(s) is unreasonably small.

B. A.B.DICK represents and warrants to MITSUBISHI and MPM that use of the A.B.DICK MARKS in accordance with this Agreement or A.B. DICK's written instructions shall not constitute an infringement of any copyright, trademark, patent or any other intellectual property rights of any third party (collectively referred to as "Intellectual Property Rights"). Should any claim or dispute be asserted or arise from or in connection with an alleged infringement of any Intellectual Property Rights of a third party relating to the use of the A.B.DICK MARKS, A.B.DICK shall indemnify, defend, and hold MITSUBISHI and MPM harmless from and against any and all losses, costs, liabilities, damages, and expenses, including reasonable attorneys fees and costs, suffered, incurred or to be incurred by either or both of them in response to such a claim or dispute.

C. A.B.DICK shall not use, directly or indirectly, in whole or in part, alone or in combination with any other words, letters, symbols or designs, the name "MITSUBISHI" or the initials (with or without periods between the letters) "MII", "MPM," or "MC", the trademark "THREE DIAMONDS" (words or design) or any other trademark or trade name that is owned or used by MITSUBISHI or MPM, in any way in connection with A.B. DICK's goods or business, including the sale, promotion, labeling or packaging of the PRODUCTS, or otherwise as part of A.B. DICK's corporate or business name or affairs, except in the manner and only to the extent that MITSUBISHI may specifically grant written consent in advance.

D. In the event that A.B.DICK discontinues a particular size or type of PRODUCT or this Agreement terminates for any reason, A.B.DICK shall purchase from MITSUBISHI, at the cost of procurement, up to six (6) months' supply of fully or partially completed empty packaging and/or labels in MPM's and/or MITSUBISHI's possession, or in the process of being manufactured or shipped, at the time of MITSUBISHI's receipt of notice of the discontinuance or termination.

## 10. ASSIGNMENT OF AGREEMENT AND PREPETITION AGREEMENT

This Agreement shall not be assigned by either party without the prior written consent of the other. Each party reserves all rights to seek (in the case of A.B. DICK ) or oppose (in the case of MITSUBISHI) assumption and assignment of the Prepetition Agreement pursuant to the provisions of Section 365 of the Bankruptcy Code. In that regard, MITSUBISHI does not concede that the Prepetition Agreement is an executory contract subject to assumption or assumption and assignment and asserts that, in any event, under the Prepetition Agreement, MITSUBISHI has the unilateral right to set A.B DICK's credit line and that, prior to the filing of the A.B. DICK bankruptcy petition, the A.B. DICK credit line was reduced to $0. MITSUBISHI also reserves the right to move to compel assumption or rejection of the Prepetition Contract at any time.

## 11. EFFECT OF FAILURE TO ENFORCE AGREEMENT

The failure of either party to enforce at any time or for any period of time any of the provisions of this Agreement, or any of its rights hereunder, shall not be construed as a waiver of such provisions or the right of the party thereafter to enforce each and every such provision.

## 12. EFFECTIVE PERIOD; TERMINATION; DUTY TO MITIGATE

A. This Agreement shall be effective on the date (the "Effective Date") which is the later to occur of (i) the date first written above, and (ii) the date of entry of an order or orders of the Bankruptcy Court presiding over the A.B. DICK bankruptcy proceedings, in form and substance acceptable to MITSUBISHI, approving execution and delivery of this Agreement by A.B. DICK, and shall continue in effect thereafter, unless and until earlier terminated in accordance with the provisions of this Agreement. The foregoing notwithstanding, and in addition to any other rights or remedies either party may have at law or in equity:

1. either party may terminate this Agreement at any time and for any or no reason upon not less than six (6) months' prior written notice to the other party; and

2. MITSUBISHI may terminate this Agreement at any time upon (a) conversion of A.B. DICK's pending bankruptcy proceedings to a case under chapter 7 of the Bankruptcy Code, (b) the appointment of a trustee in the pending A.B. DICK bankruptcy proceedings, (c) the declaration of a default under the DIP Facility (as defined in that certain Interim Order Authorizing Certain Debtors and Debtors in Possession to Enter into Post-Petition Credit Agreement ...entered on July 15, 2004, or any other post petition financing approved by

the Bankruptcy Court (a "Replacement DIP Facility") or termination of A.B. DICK's ability to borrow under the DIP Facility unless the A.B. DICK has substantially equivalent borrowing ability under a Replacement DIP Facility reasonably acceptable to MITSUBISHI, (d) the sale of any substantial portion of A.B. DICK's assets unless, contemporaneously, this Agreement is assigned to the buyer (it being understood that MITSUBISHI reserves all rights to object to any such assignment), (e) the entry of any order granting relief from the automatic stay allowing any person to enforce rights against any substantial portion of A.B. DICK's assets; (f) the appeal of the order of the Bankruptcy Court approving this Agreement, (g) the failure of A.B. DICK to make timely payments totaling in excess of fifty (50%) percent of the value of all outstanding Purchase Orders, and (h) the entry of any order of the Bankruptcy Court which approves assumption or assumption and assignment of the Prepetition Agreement or which subordinates any rights of setoff which MITSUBISHI might have to any other lien, it being understood that A.B.DICK does not concede that MITSUBISHI has any setoff rights.

3. MITSUBISHI may terminate this Agreement upon three (3) days notice by facsimile and overnight courier upon the appointment of an examiner in A.B. DICK's pending bankruptcy proceedings.

4. Either party may terminate this Agreement at any time in the event that the other party fails to perform any material obligation under this Agreement and fails to cure such breach or default within thirty (30) days of written notice of such breach or default from the non-breaching party.

5. A.B. DICK may terminate this Agreement immediately upon sale of substantially all of the assets of A.B. DICK.

B. Termination of this Agreement shall not affect any rights of MITSUBISHI under this Agreement to indemnification, to sell off Product (except to the extent A.B. DICK exercises its rights under paragraph 12(C) hereof) or which, by their nature, require enforcement after termination. In the event this Agreement is terminated, neither party shall be liable to the other for compensation, reimbursement, and/or damages on account of the loss of prospective profit on anticipated sales and/or on account of expenditures, investments, leases, and/or any type of commitments made in connection with the business of the other party in anticipation of business under this Agreement. UPON TERMINATION OR IN THE EVENT OF A BREACH OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES, EVEN IF THE PARTY IS APPRISED OF THE LIKELIHOOD THEREOF.

C. Upon termination of this Agreement for any reason other than termination by MITSUBISHI pursuant to paragraph 12 (A)(2)(g) above, A.B. DICK shall have the right, exercisable by written notice sent by facsimile and overnight courier and delivered to MITSUBISHI within ten (10) days of said termination, to purchase all Product subject to any outstanding Purchase Order identified in such notice by paying MITSUBISHI an amount equal to the total invoice price of the Product identified in such Purchase Orders less the sums already paid against the said Purchase Orders pursuant to paragraph 8(F) above. The said payment shall be wire transferred to MITSUBISHI on the same day that the said notice is sent. Upon receipt of

such notice and payment, MITSUBISHI shall complete manufacture of the subject Product and ship such Product to A.B.DICK pursuant to the terms of this agreement.

D. [OMITTED].

13. WARRANTY

A. MITSUBISHI represents and warrants that PRODUCTS to be sold to A.B.DICK under this Agreement shall be free from defects in material and workmanship for a period of fifteen (15) months from date of manufacture and shall be in full conformance with the specifications set forth in Exhibit A at the time of shipment to A.B.DICK.

B. MITSUBISHI agrees to replace any PRODUCTS, which are proved to be defective under normal uses during such warranty period, provided a claim of an alleged defect is made to MITSUBISHI within 15 months from date of manufacture, and provided further, that upon request by MITSUBISHI, A.B.DICK shall return to MITSUBISHI at no cost to A.B.DICK any such PRODUCTS. This replacement is the sole remedy of A.B.DICK in the event of any defective goods or breach of warranty.

C. In the event that MITSUBISHI finds PRODUCTS to be defective before A.B.DICK sells PRODUCTS to their customers, and MITSUBISHI decides to recall such defective PRODUCTS, MITSUBISHI shall inform A.B.DICK in writing of such decision and shall indicate the specific PRODUCTS and batch numbers. MITSUBISHI shall also advise A.B.DICK on the recommended manner of disposal or return of such PRODUCTS.

D. MITSUBISHI shall not be responsible for any claims whatsoever arising out of or in relation to PRODUCTS purchased by A.B.DICK hereunder when such claims are determined to relate to a machine design problem.

E. THE PROVISIONS OF THIS PARAGRAPH 13 STATE MITSUBISHI'S SOLE OBLIGATION AND A.B. DICK'S AND ITS CUSTOMERS' SOLE AND EXCLUSIVE REMEDY IN THE EVENT THERE IS A PRODUCT THAT IS DEFECTIVE, DOES NOT CONFORM TO SPECIFICATIONS OR IS IN BREACH OF ANY WARRANTY. IN NO EVENT SHALL MITSUBISHI BE LIABLE FOR ANY DIRECT, SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES FOR PERSONAL INJURY OR INJURY TO PROPERTY ARISING OUT OF OR INCURRED BY A.B.DICK, ITS CUSTOMERS OR ANY THIRD PARTY IN CONNECTION WITH THE BREACH OF ANY WARRANTIES CONTAINED IN THIS AGREEMENT OR ANY DEFECT IN ANY PRODUCTS.

F. MITSUBISHI shall have no liability under any warranty or this Agreement with respect to any PRODUCTS which meet product specifications, which have been modified, altered by A.B.DICK or any of its customers, or which have been damaged through misuse, abuse, accident, neglect, or mishandling by A.B.DICK or any of its customers.

G. THE UNDERTAKINGS IN THIS PARAGRAPH 13 BY MITSUBISHI ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES WHETHER

WRITTEN, ORAL, EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### 14. OMITTED

### 15. PRODUCT CHANGES

MITSUBISHI shall make no modifications affecting the performance of the PRODUCTS without A.B. DICK's prior written consent, which consent shall not be unreasonably withheld or delayed. Any other changes in the product specifications must be communicated to A.B.DICK through both written materials and additional technical training provided by MITSUBISHI at its expense prior to implementation of such change.

### 16. SETTLEMENT OF DISPUTES

Any dispute, controversy or claim arising out of or relating to this Agreement or the parties' relationship, which cannot be settled amicably, shall be finally determined by binding arbitration in accordance with the Commercial Dispute Resolution Procedures of the American Arbitration Association then in effect. The arbitration panel shall consist of three neutral arbitrators, and the place of the arbitration shall be New York, New York. The award may be confirmed in any court of competent jurisdiction.

### 17. FORCE MAJEURE

Neither MITSUBISHI nor A.B.DICK shall be liable for failures or delays in delivery of PRODUCTS due to causes beyond its reasonable control, such as acts of God, acts of civil or military authority, fires, strikes, lockouts or labor disputes, floods, epidemics, quarantine, restrictions, war, riot, delays in transportation, car shortages and inability due to causes beyond its reasonable control to obtain necessary labor, materials or manufacturing facilities. In the event of any such delay, the date of delivery shall be extended for a period equal to the time lost by reason of the delay.

### 18. NOTICE

Any notice or other communication required or permitted under this Agreement shall be in writing and deemed to have been duly given if it is delivered personally or sent by overnight courier service, by registered or certified mail, return receipt requested and postage prepaid or by facsimile (receipt confirmed by transmittal equipment) as set forth below (or as may be otherwise designated by the parties hereto from time to time by written notice to the other party) and shall be deemed to have been given the date of delivery if personally delivered; the next business day if sent by overnight courier service, three (3) business days after the date if sent by registered or certified mail; and the date of transmission if sent by facsimile during normal business hours, and if not, then the next business day after transmission.

Notices to MITSUBISHI shall be addressed as follows:

MITSUBISHI Imaging (MPM), Inc.
Graphic Arts Division

555 Theodore Fremd Avenue
Rye, New York 10580
Attention: Jillian H. Acord, V.P. Sales Administration/Corporate Planning
Facsimile: (914) 921-2495

With a copy to: ~~Akiyoshi Shima,~~ Hiroshi Tomimasu President and CEO

Notices to A.B.DICK shall be addressed as follows:

A.B.DICK Company
7400 Caldwell Avenue
Nile, Illinois 60714-4690
Attention: Jeffrey Herden, General Counsel and Secretary
Facsimile: (847) 647-0634

With a copy to:

Benesch, Friedlander, Coplan & Aronoff LLP
2300 BP Tower
200 Public Square
Cleveland Ohio 44114-2378
Attn: H. Jeffrey Schwartz, Esq.
Facsimile: (216)-363-4588

### 19. GOVERNING LAW

All questions arising out of or under this Agreement and the parties' relationship shall be governed by the laws of the State of New York, without regard to its conflicts of law principles.

### 20. ENTIRE AGREEMENT

This Agreement represents the entire agreement between the parties hereto with respect to the PRODUCTS in the Territory and, with respect to Purchase Orders placed hereunder, supersedes any other agreement or understanding, written or verbal, that the A.B.DICK and MITSUBISHI and/or any related entities may have had with respect to the PRODUCTS in the Territory, including, without limitation, the Prepetition Agreement, the Sales Distribution Agreement between MITSUBISHI Corporation and A.B.DICK, dated January 1, 1990, and amended December 31, 1994, with respect to the United States, Canada and Latin America only; the Sales Distribution Agreement between MITSUBISHI Corporation and A.B.DICK, dated May 1, 1996, with respect to the United States, Canada and Latin America only; and the Sales Distribution Agreement between MITSUBISHI and A.B.DICK, dated January 1, 1998, in its entirety. The foregoing notwithstanding, if the Prepetition Agreement is assumed or assumed and assigned, the terms of the Prepetition Agreement shall control except as to any Purchase Orders submitted prior to the date of such assumption or assumption and assignment, such Purchase Orders to continue to be controlled by the terms hereof.

## 21. MODIFICATION OF AGREEMENT

No modification, nor any future representation, promise or agreement in connection with the subject matter of this Agreement shall be binding on either party hereto unless made in writing and signed on its behalf by its duly authorized representative.

## 22. EXECUTION

A. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute and the same instrument.

B. The captions and headings in this Agreement are for convenience of reference only and shall not affect the construction or interpretation of any provision hereof.

(SIGNATURE PAGE FOLLOWS)

A- 0535

IN WITNESS WHEREOF, both parties have caused this Agreement by their respective officers thereunto duly authorized as of the day and year first above written.

| A.B.DICK COMPANY | MITSUBISHI IMAGING (MPM), INC. |
|---|---|
| /s/ | /s/ |
| President and CEO | Hiroshi Tomimasu<br>President and CEO |

Doc 1231297 Ver 1

A- 0536