# Tab 7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

————————————————————X
In re:                                    )
                                          )      Chapter 11
A.B. DICK COMPANY., *et al.*,             )      Case Nos. 04-12002 (JLP)
                                          )      (Jointly Administered)
                                          )
                        Debtors.          )   Hearing Date: 11/17/04 at 11:30 a.m.
————————————————————X  Objection Deadline: 11/17/04 at 11:30 a.m.

## OBJECTION OF PRESSTEK, INC. TO THE EMERGENCY MOTION OF MITSUBISHI IMAGING (MPM), INC. FOR ORDER DETERMINING VALIDITY OF EXERCISE OF ELECTION UNDER POSTPETITION PRIVATE LABEL SALES AGREEMENT, Re: Docket No. 496

Presstek, Inc. ("Presstek"), by and through its undersigned counsel, McDermott Will

& Emery LLP and Monzack and Monaco, P.A., hereby files this objection (the "Objection") to the

Emergency Motion ("Motion") of Mitsubishi Imaging (MPM), Inc. ("Mitusbishi") for Order

Determining Validity of Exercise of Election Under Postpetition Private Label Sales Agreement, and

respectfully represents as follows:

### PRELIMINARY STATEMENT

1.       By its Objection, Presstek disputes[1] that Mitsubishi needs a judicial

determination to interpret the plain language of the rights and obligations contained in this Court's

sale order, dated November 3, 2004 (the "Sale Order), the Asset Purchase Agreement (as defined

below) related thereto, and a certain postpetition Private Label Sales Agreement (as defined below)

between A.B. Dick Company ("ABD" or "Debtors") and Mitsubishi.  Mitsubishi's claimed

uncertainty is unsupported by the underlying documents, and its failure to deliver products (the

"Product") to Presstek has already caused, and continues to cause, Presstek substantial harm.

---

[1] On November 15, 2004, Presstek filed an emergency motion with this Court seeking relief related to the relief sought
by Mitsubishi.  Presstek's motion seeks to compel Mitsubishi to comply with the Sale Order and deliver, as directed by
ABD, certain critical products in Mitsubishi's possession for which Presstek has paid.
NYK 935272-1 069646.0011

2.    Mitsubishi's alleged uncertainty regarding the validity of ABD's exercise of an option (the "Option") under the Private Label Sales Agreement relates to (i) a right to a potential refund allegedly enjoyed by Debtors and (ii) the Committee's assertion that the election of the Option is an action outside of the ordinary course of business requiring court approval. In each case, the documents conveying substantially all of the ABD assets (the "Assets") to Presstek make clear that any interest that ABD had in the Product in Mitsubishi's possession was sold to Presstek or, alternatively, any refund due to the Debtors is an Asset under the Asset Purchase Agreement that was sold to Presstek. Moreover, the existence of any such refund is illusory. As a result, the exercise of the Option should not be considered a transaction outside of the ordinary course of the Debtors' business that requires this Court approval; this Court has already given any necessary approval when it entered the Sale Order.

## BACKGROUND

3.    On July 13, 2004 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered.

4.    On July 23, 2004, the United States Trustee appointed the Committee.

5.    On the Petition Date, the Debtors, Presstek, Silver Acquisition Corp. ("Silver"), Paragon Corporate Holdings, Inc., A.B. Dick Company, Interactive Media Group, Inc. and A.B. Dick of Canada, LTD. entered into an Asset Purchase Agreement (as amended thereafter, the "Asset Purchase Agreement") whereby Silver, a wholly-owned subsidiary of Presstek, would purchase substantially all of the assets of the Debtors in a section 363 sale in the course of the Debtors' chapter 11 cases.

6.    On November 2nd and 3rd, 2004, this Court conducted a hearing on the approval of Presstek as the prevailing bidder and approved the sale to Presstek. On November 3,

- 2 -

38508

2004, the Court entered the Sale Order authorizing the sale of substantially all of ABD's assets to Presstek pursuant to the Asset Purchase Agreement and on November 5, 2004, the Debtors closed the sale of substantially all of their Assets.

### DISCUSSION

7.      On November 3, 2004, this Court approved Presstek's offer to acquire substantially all of the assets of ABD, and entered the Sale Order approving the transaction. Included among the assets that Presstek acquired from the Debtors were the Debtors' inventories and the Debtors' rights to partially pre-paid orders. Presstek closed on its acquisition of the ABD business on November 5, 2004.

8.      Prior to the sale, the Debtors issued purchase orders totaling $4,801,171.94 to Mitsubishi for custom made plate material pursuant to a post-petition sales agreement, and pursuant to that agreement, paid Mitsubishi $2,545,774.94, with a balance of $2,255, 397 to be paid upon delivery. The equipment that Mitsubishi makes for the ABD business is customized to fit with ABD's existing product line; no other manufacturer produces these parts.

9.      When Presstek closed its acquisition of the ABD business, it discovered that ABD had no inventory of Mitsubishi parts, and that the pending order from Mitsubishi would be the first opportunity to acquire this inventory. Receipt of the Mitsubishi inventory is critical to Presstek in its efforts to restart the ABD business because, at the time of the closing, ABD had unfilled customer orders that could not be satisfied until the Mitsubishi inventory arrived. An inability to satisfy customer orders was a key factor in the Debtors' deterioration and was one of the causes of their chapter 11 filing. For Presstek, rebuilding customer relationships by timely satisfying customer orders is an important hurdle in regaining customer trust and acceptance.

10.      On November 5, 2004, Mitsubishi sent a notice to the Debtors purporting to terminate to that certain postpetition Private Label Sales Agreement between Mitsubishi and ABD,

- 3 -

38508

dated as of August 2004 (the "Private Label Sales Agreement"[2]).  That purported termination gave

the Debtors the right to elect to purchase the inventory in question (defined above as the "Option").

The Debtors have made that election, and Presstek has agreed to fund the balance of the purchase

price due to Mitsubishi. But Mitsubishi, with the support of the Official Committee of Unsecured

Creditors, has not agreed to deliver the inventory, thus threatening grave harm to Presstek's

acquisition.

### Arguments of Mitsubishi and the Creditors' Committee

11.     The Motion addresses two arguments advanced by Mitsubishi and the

Creditors' Committee against delivering the Product to the possession of Presstek.  First, they argue

that pursuant to the terms of the Private Label Sales Agreement, title never passed to the Debtors, the

Debtors are entitled to a refund, and that such refund is not an asset that was sold to Presstek because

it arises under a contract that was not assumed by Presstek.  Second the Committee and Mitsubishi

argue that the exercise of the Option under the Private Label Sales Agreement is a transaction that

requires court approval pursuant to section 363 of the Bankruptcy Code.  They argue that the

exercise of the Option is outside of the ordinary course of business because it would result in the

forfeiture by the Debtors' estate of a potentially substantial refund.  For the reasons set forth below,

each of the arguments fails.

### The Termination of the Private Label Sales
### Agreement and the Sale of the Debtors' Assets to Presstek

12.     The Private Label Sales Agreement provides that the agreement may be

terminated by Mitsubishi at any time upon "the sale of any substantial portion of [ABD's] assets[.]"

(Ex. 1. at Section 12.A.2).  On November 5, 2004, Mitsubishi sent a letter to Jeffrey Herden, the

Debtors' general counsel and secretary,[3] which purported to terminate  the Private Label Sales

---

[2] A copy of the Private Label Sales Agreement is attached hereto as Exhibit "1."
[3] A copy of the letter is attached hereto as Exhibit "2."

- 4 -

38508

Agreement (the "Termination Letter"). According to the Termination Letter, ABD had ten days to exercise the Option to purchase the Product (as defined in the Private Label Sales Agreement) by paying the balance due of $2,255,397.

13.     The Private Label Sales Agreement provides that in the event of a termination, ABD "shall have the right, exercisable by written notice . . . delivered to Mitsubishi within ten (10) days of . . . termination, to Purchase all Product subject to any outstanding Purchase Order identified in such notice by paying Mitsubishi an amount equal to the total purchase price of the Product identified in such Purchase Orders less sums already paid . . ."

14.     After the closing of the sale of the Assets, Presstek discovered that ABD had been completely sold out of the inventory that was manufactured by Mitsubishi for at least 20 days. Because the Product is specially made to ABD's specifications, the orders for the Product cannot be timely filled by any other manufacturer except Mitsubishi. In recognition of this emergent need, Presstek effected two wire transfer payments totaling $2,255,397 to Mitsubishi for the Product: the first on November 8, 2004 in the amount of $354,946.28; and the second on November 10, 2004 in the amount of $1,900,450.79. The total sums wired represented the total amounts outstanding due for the Product for which ABD had made deposits under the Private Label Sales Agreement.

15.     ABD fully complied with all conditions necessary to effect the exercise of the Option by delivering a letter to Mitsubishi dated November 12, 2004 (the "Option Letter").[4] The Option Letter provided that Mitsubishi was authorized to release the Product to Presstek, specifically referencing the purchase orders now at issue. Mitsubishi has refused to deliver such Product to the possession of Presstek. After the Committee and Mitsubishi raised the issues regarding a potential

---

[4] A copy of the letter is attached hereto as Exhibit "3."

- 5 -

38508

refund, the Debtors withdrew the election of the Option, but then reinstated[5] the election of the Option when Presstek agreed to indemnify the estates in connection with any potential refund.

**The Products in Mitsubishi's Possession and**
**the Purported Right to a Refund Under the Private Label Sales Agreement**

16.     Mitsubishi's argument that there is a refund owing to the Debtors' estates begs the question of whether there is any legitimate dispute over the rights to the Product itself. Because if the Product is delivered to Presstek, as requested by the Presstek and Debtors, the potential refund, if any, becomes moot. Only if the Court determines that Presstek did not acquire the Product among the assets does the Court reach the issue of a right to refund under the Private Label Sales Agreement.

17.     But a plain reading of the Asset Purchase Agreement refutes the Committee's arguments relating to refunds. Section 2.1 of the Asset Purchase Agreement provides that Presstek acquired all of the Seller's[6] "right, title and interest in and to all of the Seller's property and assets, real personal or mixed, tangible and intangible, of every kind and description, wherever located, including[7] the following (but excluding the Excluded Assets . . . ) [in relevant part]:

> (c)     all Inventories of Sellers and their Subsidiaries; . . .
>
> (k)     all claims of Seller against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or non-contingent; . . .
>
> (l)     all rights of Seller relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof which are not excluded under Section 2.2(g) [relating solely to real property interests] (collectively, . . . the "Assets")."

---

[5] In an abundance of caution, on November 15, 2004, Stephen Gray  faxed a new notice of the exercise of the Option in accordance with the Private Label Sales Agreement.
[6] All capitalized terms used herein but not defined herein shall have the meaning ascribed to them in the Asset Purchase Agreement, as amended.
[7] "Including" is itself a defined term meaning "including without limiting the generality of any description preceding such term[.]"

- 6 -

38508

18. "Inventory" is defined term in Section 1.1 of the Asset Purchase Agreement and means "all inventories of the Seller or its Subsidiaries, wherever located, including all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by the Seller or its Subsidiaries in the production of finished goods." The language of the Asset Purchase Agreement is explicit and includes inventory in whatever state of production and all rights to refunds, without limitation. The language simply does not provide a carve out for deposits or refunds due under contracts that the Debtors did not assume.

19. Further, Mitsubishi's argument that the retention of title by Mitsubishi cuts off Presstek's rights does not provide a basis for Mitsubishi's failure to perform after the Option was exercised. Whatever interest the Debtors had in the Product passed to Presstek at closing. The availability and exercise of the Option makes bare legal title a moot issue, because the Debtors validly exercised the Option and the goods have been paid for in full. Pursuant to the Private Label Sales Agreement, Mitsubishi was obligated to deliver the Product following the exercise. No construction of the Asset Purchase Agreement permits the view that the Debtors' estates retained any interest in the Product after closing.

## The Adjustment to Working Capital and the Inclusion of Prepaid Inventory

20. The August 2004 amendment to the Asset Purchase Agreement relating to prepaid inventory makes it clear that Mitsubishi and the Creditors' Committee were aware that prepaid inventory was intended to be included among the assets Presstek was purchasing under the . Asset Purchase Agreement. When the Private Label Sales Agreement was entered into, Mitsubishi required the Debtors to make substantial prepayments for new orders. This requirement bothered the Debtors and the Committee because, under the original Asset Purchase Agreement, the Debtors had to maintain a working capital level of $22,700,000 as a closing condition, and the amount of any such prepayments did not count toward satisfying this requirement. The Committee and the Debtors

- 7 -

38508

contended that by excluding the prepayments from the definition of inventory for purposes of this test, it was highly unlikely that the Debtors would have been able to comply with this covenant in the Asset Purchase Agreement.

21.     This issue was raised by the Committee at the hearing held August 23, 2004 to approve the bid procedures in these cases. At that time, the Committee had strongly objected to the alleged "conditionality" of the Asset Purchase Agreement and expressed the concern that Presstek would use such a breach of this covenant to terminate the Asset Purchase Agreement. In light of this concern, Presstek agreed to include pre-paid inventory in the definition of working capital up to the amount of $2.5 million.

22.     In addition, the Committee argued that if Presstek had not made this concession, and the Debtors had managed to satisfy the working capital test, Presstek would have acquired the prepaid inventory without giving the Debtors any credit for it, which, the Committee contended, would have given Presstek a windfall.   In light of this history, it is clear that the Committee and Mitsubishi were fully aware that pre-paid inventory was intended to be included among the assets sold to Presstek.

23.     Further, if Presstek was not going to get the benefit of that prepaid inventory, it would have had no reason to agree to the amendment to the Asset Purchase Agreement. The Creditors' Committee and the Debtors specifically pushed Presstek to agree to this amendment, and Mitsubishi, which participated in the hearing held on August 23, 2004, made no objection. Neither should be heard now to argue that the Product is not among the assets that Presstek purchased.

24.     As the Committee itself contended, if prepaid inventory was not included in the definition of inventory, the Debtors would not have satisfied a condition required for closing. Having benefited from the bargains they made, the Committee and Mitsubishi cannot be allowed now to renege on their agreements. To allow that result would be to grant the Committee an

- 8 -

38508

unjustified windfall. Therefore, the Court should find that the prepaid inventory presently in the possession of Mitsubishi was an Asset that was sold to Presstek and that when Presstek paid the full balance of the purchase price Mitsubishi was obligated to deliver it to Presstek.

### Approval Pursuant to Section 363 of the Bankruptcy Code

25.    Section 363 (b)(1) of the Bankruptcy Code provides that the use, sale, or lease of property of the estate outside of the ordinary course of business requires court approval. In light of the plain language of the Sale Order and Asset Purchase Agreement, as amended, the Committee's position that this Court's approval is required to exercise the Option does not withstand scrutiny. The Assets, as well as any related interest, including specifically refunds and deposits, have already been sold. The Asset Purchase Agreement is unambiguous. The unfinished and finished goods in Mitsubishi's possession were specifically included in the Debtors' inventory, because the definition of inventory in the Asset Purchase Agreement included in all finished goods and work in progress. Further, prepaid inventory was specifically included in the definition of inventory when the working capital test was adjusted in August. Therefore, the court should overrule any objections, which are based on section 363 of the Bankruptcy Code, to the delivery of the Product as per the instructions in the Option Letter. The Court clearly approved this transaction when it approved the Sale Order.

### Refunds Under the Private Label Sales Agreement

26.    Mitsubishi's claim that a refund is due under the Private Label Sales Agreement is not supported by the language of the agreement and, in any event, such refund, if it exists, was an Assets that was purchased by Presstek under the Asset Purchase Agreement. In support of its assertion that the Private Label Sales Agreement provides for a refund to ABD, Mitsubishi points to section 8.F, which states that if ABD fails to make a payment, Mitsubishi may (i) cancel the Purchase Order with regard to the Product not paid for and return all monies paid by

- 9 -

3B508

[ABD] toward such Product, less Mitsubishi's costs *less Mitsubishi's costs of manufacturing, procuring, converting, shipping returning an/or disposing of such Product plus any duty, demurrage or Customs charges, third party charges and other related costs . . .which costs and expenses were incurred as a result of [ABD's default]. . .* [emphasis supplied]; or (ii) sell such Products to third parties for Mitsubishi's own account . . ."

27.    There is no true market for the Product in a sale under clause (ii).  The Product is specially manufactured for ABD machines and is not used or useful by any third parties (with the exception of the direct customers of the ABD business).  Accordingly, a sale of the Product to an unrelated third party is neither practical nor, for all intents and purposes, commercially possible.  Moreover, Presstek, which is the obvious buyer of the Product, has agreed to pay full price for the Product.

28.    In the event Mitsubishi fails to affirmatively elect either option, Mitsubishi is deemed to elect option (ii).  (Id.)  Upon the sale of the Product pursuant to option (ii), Mitsubishi will reimburse ABD for any payments ABD "made to Mitsubishi towards the total (extension) price of such product, *less any costs or expenses incurred by Mitsubishi with regard to such Product . . . .* "[emphasis supplied]."  (Id.)  Thus, any right of refund is subject to Mitsubishi's rights to deducts its costs with regard to such Product.

29.    Upon information and belief, of the $4.3 million in inventory ordered under the Private Label Sales Agreement (the "Subject Inventory"), (i) inventory costing $1.5 million is located in a warehouse in the Chicago, Illinois area and Mitsubishi has been paid 2/3 of the purchase price for such inventory, (ii) inventory costing $1.8 million is currently in transit from Japan and Mitsubishi has been paid 2/3 of the purchase price for such inventory, and (iii) inventory costing

- 10 -

38508

A- 0660

$1.0 million is currently in process in Japan and Mitsubishi has been paid 1/3 of the purchase price for such inventory.

30.     Upon information and belief, given standard industry norms related to profit margins, Mitsubishi's costs (including costs of manufacturing, procuring, converting, shipping, returning and/or disposing of such Product, plus any duty, demurrage or customs charges, third party charges and other related costs) relating to the Product likely equal or exceed the amounts which have been paid to Mitsubishi as deposits to date. Accordingly, upon (i) a sale to any third party or (ii) a return of the deposits less such costs, the amount of such refund claimed by the Creditors' Committee is likely to be nominal at most, illusory for all practical purposes.

31.     However, and as noted briefly above, to address the concerns of the Committee, Debtors' counsel, and Mitsubishi regarding a potential refund on November 15, 2004, Presstek issued the following blanket, unqualified, and absolute indemnification of the estates in connection with the exercise of the Option:

> This letter confirms that you have reinstated the exercise of the purchase option under Private Label Sales Agreement between Mitsubishi and A.B. Dick based on Presstek's agreement that it will hold the estate harmless and put the estate in a position of no prejudice, legal, financial or otherwise, as if the option had never been exercised, if it is adjudicated by final and unappealable judgment that the estates of A.B. Dick are entitled to a refund pursuant to the Private Label Sales Agreement. Presstek further agrees that this agreement is absolute and unqualified. Please confirm that based on this agreement the purchase option is reinstated.

## CONCLUSION

32.     The Sale Order and the Asset Purchase Agreement clearly state of the Debtor's inventory and all inventory and all rights to prepaid assets, such as the Product in the possession of Mitsubishi, that Presstek purchased all relevant interests in the product that Mitsubishi is withholding at the Creditors' Committee's direction. The Asset Purchase Agreement provides that inventory, where ever located and in what ever state of finish, is included in "Inventory." Presstek

- 11 -

38508

purchased all Inventory under the Asset Purchase Agreement. Even if the Court accepts Mitsubishi's argument that title did not pass, Presstek purchased the Debtors' interest to that property, what ever that interest amounts to. Mitsubishi's argument that a refund may be owing to the estate fails because the Private Label Sales Agreement does not provide for a refund in the event of a termination and, even if it did, which it does not, Presstek purchased all refunds and deposits. No wordsmithing by Mitsubishi or the Creditors' Committee can change the plain language of the Asset Purchase Agreement in this regard.

33.     Finally, Mitsubishi and the Creditors' Committee are estopped from making the arguments they have advanced in defense of their positions. They specifically negotiated for the August amendment to the Asset Purchase Agreement that resulted in prepaid inventory being counted as working capital. They cannot now disavow the meaning of prepaid inventory when that term was the centerpiece of a material concession made by Presstek, without which, the Debtors would have been in breach of a condition to closing.

- 12 -

38508

A- 0662

WHEREFORE, Presstek respectfully requests that the Court enter an order (i) denying

the Motion; (ii) directing Mitsubishi to deliver the Product to Presstek in accordance with the Option

Letter; and (iii) granting such other and further relief as may be just or proper.

Dated: November 16, 2004                MONZACK AND MONACO, P.A


                                        _/s/ Francis A. Monaco, Jr.__
                                        Francis A. Monaco, Jr. (#2078)
                                        1201 Orange Street, Ste. 400
                                        Wilmington, DE 19801
                                        (302) 656-8162

                                        McDERMOTT WILL & EMERY LLP
                                        Stephen B. Selbst
                                        Lawrence Slattery
                                        Gary Ravert
                                        50 Rockefeller Plaza
                                        New York, New York 10020
                                        (212) 547-5400

                                        *Of Counsel*
                                        *Attorneys for Presstek, Inc.*

- 13 -

38508

# EXHIBIT A

## PRIVATE LABEL SALES AGREEMENT

THIS PRIVATE LABEL SALES AGREEMENT made and entered into as of this ___ day of August, 2004, by and between **MITSUBISHI Imaging (MPM) , Inc.,** a Delaware Corporation, with its principal office at 555 Theodore Fremd Avenue; Rye, NY 10580 (hereinafter referred to as "MITSUBISHI") and **A.B. Dick Company,** a Delaware corporation, with its principal offices at 7400 Caldwell Avenue, Niles, IL 60714-4690 U.S.A. (hereinafter referred to as "A.B.DICK")

### WITNESSETH:

WHEREAS, MITSUBISHI is engaged in the sales of certain private label PRODUCTS (as that term is defined below) which A.B.DICK desires to purchase and distribute; and

WHEREAS, MITSUBISHI and A.B. DICK are parties to an agreement (the "Prepetition Agreement") dated October 1, 2002, pursuant to which MITSUBISHI agreed to sell and A.B. DICK agreed to purchase Products; and

WHEREAS, on July 13, 2004, A.B. DICK filed a petition for relief under Chapter 11 of the United States Bankruptcy Code; and

WHEREAS, A.B. DICK has not yet assumed or rejected the Prepetition Agreement; and

WHEREAS, MITSUBISHI is willing to continue to sell PRODUCTS to A.B.DICK for resale upon the terms and conditions herein contained; and

WHEREAS, A.B.DICK is desirous of selling PRODUCTS to the owners of A.B. DICK's Plate Makers, Digital Platesetters and other Imagesetters; and

WHEREAS, A.B.DICK has facilities and programs for training those engaged in the sale of PRODUCTS and in the technology and use of Plate Makers, Digital Platesetters, Imagesetters and PRODUCTS.

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

### 1. PRODUCTS; TERRITORY

The TERRITORY shall mean the United States, Canada and Latin America (Mexico, Central and South America, and the Caribbean).

PRODUCTS shall mean photo-sensitive, silver offset plate material manufactured by MITSUBISHI Paper Mills Ltd. ("hereinafter referred to as "MPM") for A.B.DICK, and sometimes referred to as A.B.DICK brand or trade names, including "MEGA", "MEGATEK",

1

SL1 468834v3/00000.000

A- 0665

"MEGAPRO", "MEGA Plus" and improvements to such products, provided such improved products are silver-based. A list of all PRODUCTS included within this Agreement and their specifications is set forth in Exhibit A to this Agreement, which may be modified from time to time by written agreement of both parties.

## 2. SALES BETWEEN MITSUBISHI AND A.B.DICK

Subject to the provisions of this Agreement, MITSUBISHI shall sell and A.B.DICK shall purchase PRODUCTS for distribution in the TERRITORY only.

## 3. RELATIONSHIP BETWEEN MITSUBISHI AND A.B.DICK

The relationship between MITSUBISHI and A.B.DICK is solely that of seller and buyer. A.B.DICK is an independent contractor and nothing in this Agreement shall be construed to make A.B.DICK an agent, partner or employee of MITSUBISHI. Neither party has the authority to nor shall conclude any contract or agreement or make any commitment, representation or warranty on behalf of or which binds the other party, and neither party may act, or hold itself out as having the authority to act, in the name of or on behalf of the other party.

## 4. SALES PROMOTION; MINIMUM QUANTITIES

A.B.DICK shall use its best commercial efforts actively to promote the sales of PRODUCTS in the TERRITORY in an effective and aggressive manner and shall use its best commercial efforts to purchase at least the minimum quantities of PRODUCTS set forth below. As both parties recognize that changes in market conditions or technology shifts beyond the reasonable control of either party may affect the reasonableness of the minimum quantities set forth in Exhibit C, these minimum amounts will be reviewed and (if required) adjusted annually. The foregoing notwithstanding, A.B. DICK's failure to make the minimum level of purchases as set forth in Exhibit C may be grounds for the adjustment of prices in accordance with the provisions of paragraph 8(D) herein

## 5. STOCK TO BE MAINTAINED

A.B.DICK shall purchase from MITSUBISHI and maintain at its warehouse facility(ies) or distribution center(s) in the United States or Canada at all times adequate stock of PRODUCTS to fulfill its reasonably anticipated sales or other requirements within the TERRITORY.

## 6. FORECASTS; INFORMATION

A.B.DICK shall provide to MITSUBISHI by the tenth calendar day of each month a non-binding forecast detailing its estimated requirements for PRODUCTS for the subsequent six months. A.B.DICK shall furnish MITSUBISHI from time to time upon request, with information with respect to past and forecast sales and inventory of PRODUCTS, and other activities of A.B.DICK under and in support of this Agreement in the TERRITORY.

2

A- 0666

## 7. TRAINING

A.B.DICK shall provide at its expense necessary training with respect to the technology and use of PRODUCTS to all persons who are engaged in the sales of PRODUCTS under or for A.B.DICK, including without limitation, the sales staffs of any subsidiaries, affiliated companies, resellers, distributors, sales representatives, dealers or other distribution channels utilized or engaged by A.B.DICK hereunder.

## 8. TERMS OF SALE

A. The prices of PRODUCTS to be purchased hereunder are set forth on Exhibit A. All prices are, and shall be paid, in US dollars and are FOB A.B.DICK distribution center (currently Des Plaines, IL.)

B. All PRODUCTS shall be packed for international shipment at MITSUBISHI's expense. Shipping costs to the A.B.DICK distribution center, insurance during transit, and import duties shall be paid by MITSUBISHI. Title and risk of loss of PRODUCTS shall pass to A.B.DICK at delivery to destination.

C. MITSUBISHI may increase prices at any time upon ninety (90) days' prior written notice to A.B.DICK. Except as provided in subparagraph D, MITSUBISHI shall not increase prices by more than five (5%) percent in any calendar year during the effective period of this Agreement. Orders placed by A.B.DICK prior to the effective date of a price increase shall be shipped and billed at the prices in effect at the time the Purchase Order was submitted. Orders placed by A.B.DICK during the notification period shall not exceed one and one half (1½) times its normal monthly order volume, based on trailing twelve (12) month period.

D. In the event that the exchange rate between US Dollars and Japanese Yen substantially changes, the parties shall agree in good faith on appropriate increases or decreases in price to account for such changes, without regard to the percentage limitations of subparagraph (C) of this paragraph 8 provided, however, any price change agreed to resulting from fluctuations in the exchange rate between U.S. Dollars and Japanese Yen shall be fixed for a period of at least ninety (90) days from the effective date of such change. In the event that A.B. DICK's monthly orders repeatedly do not meet the minimum quantities specified in Exhibit C including any adjustments agreed to, MITSUBISHI may at its option on sixty (60) days written notice to A.B.DICK increase prices in accordance with Exhibit D.

E. A.B.DICK or entities designated pursuant to this Agreement shall, on the Effective Date (as defined below), (i) resubmit Purchase Orders ##P261576, P261577 and P262005 (the "Existing Purchase Orders"), which had originally been submitted under the Prepetition Agreement and which shall be treated as Purchase Orders submitted under this Agreement, and (ii) submit additional Purchase Orders for Product (the "August Purchase Orders"). MITSUBISHI will take all reasonable steps to have the Products subject to Existing Purchase Orders available for shipment from Japan during the last week of August and first week of September, 2004 and the Products subject to the August Purchase Orders available for shipment from Japan during the last week of October and first week of November, 2004. If A.B.

3

SL1 468834v3/00000.000

A- 0667

DICK desires air transportation of Product subject to any Purchase Order, A.B. DICK will so advise MITSUBISHI in writing, by facsimile, that it requests delivery by air and, in such event. A.B. DICK will pay the cost of the air transportation. As to any other purchase orders (the "Additional Purchase Orders" and, together with the Existing Purchase Orders and the August Purchase Orders, the "Purchase Orders"), such must be placed within the first ten calendars days of each month beginning in September, 2004 and must be delivered to MITSUBISHI by facsimile or overnight courier service. Unless the Additional Purchase Order is rejected or acceptance is delayed by MITSUBISHI in writing (with reasons given) within five (5) business days of receipt, the ordered PRODUCTS will be made by MPM and shipped from Japan approximately 60 calendar days from the date of the Additional Purchase Order. The ordered PRODUCTS will be delivered to A.B. DICK's distribution center promptly after arrival into the US and clearance through US Customs. Without the written consent of MITSUBISHI, which may be withheld in MITSUBISHI's sole discretion, A.B. DICK shall not place any Purchase Orders after the earlier of the date which is five days prior to the scheduled hearing (or any continued hearing date) on A.B. DICK's motion to sell substantially all of its assets to Silver Acquisition Corp or a higher bidder and December 31, 2004.

      F. One-third (1/3) of the total invoice price of all Product identified in any Purchase Order shall be paid by A.B. DICK to MITSUBISHI upon acceptance of the Purchase Order. Another one-third (1/3) of the total (extension) price for each line item on each Purchase Order shall be paid no more than three (3) business days after notification by facsimile to A.B. DICK that all Product identified in such line item are ready for loading onto a vessel or vessels for shipment to the United States. The notice shall state the name of the vessel(s) and the port(s) at which the Products are to be loaded. The balance of the total (extension) price for a line item shall be paid no later than three (3) business days after notification to A.B. DICK by facsimile that the vessel(s) carrying such Product has (have) arrived at the port(s) within the domestic United States where the Products are to be off-loaded which port shall be the port of Chicago. All payments shall be made by wire transfer to an account or accounts designated by MITSUBISHI from time to time. If A. B. DICK fails to make timely payment to MITSUBISHI on or before the due date for any payment, MITSUBISHI may send a notice of default to A.B. DICK by facsimile and overnight courier. If the noticed default is not cured by payment in full delivered to MITSUBISHI within three (3) business days of the date of the notice of default, then MITSUBISHI, at its sole option and discretion, and in addition to any other remedies it may have, may upon notice to A.B. DICK to be delivered by facsimile within ten (10) days of the date of such notice of default, either (i) cancel the Purchase Order with regard to the Product not paid for and return all monies paid by A.B.DICK towards such Product, less MITSUBISHI's costs of manufacturing, procuring, converting, shipping, returning and/or disposing of such Product plus any duty, demurrage or Customs charges, third party charges and other related costs; or (ii) sell such Product to third parties for MITSUBISHI's own account (or authorize a MITSUBISHI related entity to sell such Product to third parties) as A.B. DICK branded goods pursuant to the Resale License (defined below) or without the A.B. DICK brand. In the event that MITSUBISHI fails to affirmatively elect to proceed under option (i) or (ii) above in a timely manner, MITSUBISHI shall be deemed to have elected to proceed under option (ii). Upon the sale of such Product by MITSUBISHI pursuant to subparagraph (ii) above, MITSUBISHI will reimburse A.B. DICK for any payments A.B. DICK made to MITSUBISHI towards the total (extension) price of such Product, less any costs or expenses incurred by MITSUBISHI with

4

SL1 468834v3/00000 000

A- 0668

regard to such Product which costs and expenses were incurred as a result of A.B. DICK's default, such as demurrage, dockage, warehouse and/or additional shipping expenses (collectively, the "MITSUBISHI Default Charges"). To the extent any MITSUBISHI Default Charges exceed the total of payments received by MITSUBISHI in connection with the sale of Product, MITSUBISHI shall have a claim against A. B. DICK which shall be entitled to an administrative expense priority in the A.B. DICK bankruptcy proceedings. In connection with any sale of Product under subparagraph (ii) above utilizing the A.B. DICK brand, A.B. DICK hereby grants to MITSUBISHI (and any MITSUBISHI related entity effecting sale under subparagraph (ii)) a perpetual, worldwide royalty free license (the "Resale License") to use A.B. DICK trademarks and patented technology to the extent necessary to complete and sell such Product. The foregoing is a grant of a license only and neither MITSUBISHI nor any other entity shall be deemed to have acquired any ownership interest or other right not specifically granted herein in any of the said intellectual property by reason of the said license. At any time on or after termination of this Agreement, MITSUBISHI may elect, at its sole option and discretion exercised by facsimile notice delivered within ten (10) days of such termination, to exercise the rights granted pursuant to subparagraphs (i) or (ii) above as to all undelivered Product subject to the any outstanding Purchase Orders as to which an election has not already been made or been deemed made. Absent timely election by MITSUBISHI, MITSUBISHI shall be deemed to have elected to exercise rights after termination under subparagraph (ii). A.B.DICK shall be liable for interest on any overdue payment from the due date through the date payment is made in full in immediately available funds. Interest shall be calculated on a daily basis at the then-prevailing US prime rate plus two and one half (2.5%) percent. (In the event there is a discrepancy or dispute as to the appropriate prime rate, the prime rate quoted by the Wall Street Journal shall govern.)

G. The parties understand and agree that MITSUBISHI is not extending any credit line to A. B. DICK.

H. PRODUCTS listed in Exhibit A are standard sizes. In the event A.B.DICK requests a size or specifications not listed on Exhibit A, A.B.DICK shall provide the request in writing to MITSUBISHI and include a new product code number, label artwork and a forecast of projected orders. Any such request is subject to MITSUBISHI's approval and the parties' agreement on pricing, and if other than standard sizes or specifications a longer lead time.

I. At A.B. DICK's request, MITSUBISHI will drop ship PRODUCTS to location(s) designated by A.B.DICK and accepted by MITSUBISHI upon terms and conditions to be mutually agreed.

J. In recognition of the cost savings resulting from the large volume of past and current purchases of Products by A.B.DICK from MITSUBISHI, A.B.DICK shall be entitled to prices in the TERRITORY which are at least equal to the most favorable price offered by MITSUBISHI to any private label or OEM customer in such TERRITORY, provided A.B.DICK continues to purchase a reasonably larger volume of PRODUCTS in such TERRITORY than any other private label or OEM customer of MITSUBISHI. The prices offered by MITSUBISHI or its parent company to a customer pursuant to a private label agreement existing as of May 29, 2003 and any extensions or renewals of such agreement shall not be considered in determining

5

SL1 468834v3/00000.000

A- 0669

the prices required to be offered to A.B DICK under this subparagraph J. This subparagraph shall not apply to products over 23" in roll width or products principally offered into a non competing market.

## 9. TRADEMARKS

A.  A.B.DICK shall sell or market PRODUCTS under its own trademarks or trade names as listed in Exhibit B or such other trademarks or trade names as the parties may from time to time agree. MITSUBISHI shall affix to the packaging of PRODUCTS, in accordance with written instructions to be supplied by A.B.DICK, such A.B.DICK trademarks, trade names, color schemes, logos or labels as may be designated by A.B.DICK (collectively referred to herein as the "A.B.DICK MARKS"), and which shall remain the exclusive property of A.B.DICK.  MITSUBISHI will not sell products to others using any of the A.B.DICK MARKS, or in any packaging which incorporates a color scheme confusingly similar to A.B. DICK's, without A.B. DICK's prior written permission.  A.B.DICK shall not (and shall not cause or knowingly permit any third party to) affix any trademark or trade name to any PRODUCTS purchased hereunder different from the trademark or trade name affixed by MITSUBISHI to such PRODUCTS.  The restriction of the foregoing sentence shall not apply to PRODUCTS which have been manufactured solely to A.B. DICK's proprietary specifications, provided however, with regard to any such PRODUCT, that (a) A.B.DICK gives MITSUBISHI prior written notice of such PRODUCT, the trademark(s), trade name(s), label(s) or brand(s) such PRODUCT is to be sold under, and by whom.  MITSUBISHI shall affix to the packaging of PRODUCTS, in accordance with written instructions to be supplied by A.B.DICK, such trademarks, trade names, color schemes, logos or labels as may be designated by A.B.DICK pursuant to the foregoing sentence.   MITSUBISHI reserves the right to reject any trademark(s), trade name(s), label(s), brand(s), including designs which may appear inappropriate to the nature of the product and/or may harm the image of the product and/or the MITSUBISHI trademark(s) or trade name(s). MITSUBISHI also reserves the right to reject if the volume for such trade mark(s), trade names(s), label(s) or brand(s) is unreasonably small.

B.  A.B.DICK represents and warrants to MITSUBISHI and MPM that use of the A.B.DICK MARKS in accordance with this Agreement or A.B. DICK's written instructions shall not constitute an infringement of any copyright, trademark, patent or any other intellectual property rights of any third party (collectively referred to as "Intellectual Property Rights"). Should any claim or dispute be asserted or arise from or in connection with an alleged infringement of any Intellectual Property Rights of a third party relating to the use of the A.B.DICK MARKS, A.B.DICK shall indemnify, defend, and hold MITSUBISHI and MPM harmless from and against any and all losses, costs, liabilities, damages, and expenses, including reasonable attorneys fees and costs, suffered, incurred or to be incurred by either or both of them in response to such a claim or dispute.

C.  A.B.DICK shall not use, directly or indirectly, in whole or in part, alone or in combination with any other words, letters, symbols or designs, the name "MITSUBISHI" or the initials (with or without periods between the letters) "MII", "MPM," or "MC",  the trademark "THREE DIAMONDS" (words or design) or any other trademark or trade name that is owned or used by MITSUBISHI or MPM, in any way in connection with A.B. DICK's goods or business,

6

A- 0670

including the sale, promotion, labeling or packaging of the PRODUCTS, or otherwise as part of A.B. DICK's corporate or business name or affairs, except in the manner and only to the extent that MITSUBISHI may specifically grant written consent in advance.

          D. In the event that A.B.DICK discontinues a particular size or type of PRODUCT or this Agreement terminates for any reason, A.B.DICK shall purchase from MITSUBISHI, at the cost of procurement, up to six (6) months' supply of fully or partially completed empty packaging and/or labels in MPM's and/or MITSUBISHI's possession, or in the process of being manufactured or shipped, at the time of MITSUBISHI's receipt of notice of the discontinuance or termination.

### 10. ASSIGNMENT OF AGREEMENT AND PREPETITION AGREEMENT AND WAIVER OF CERTAIN CLAIMS UNDER PREPETITION AGREEMENT

          This Agreement shall not be assigned by either party without the prior written consent of the other. Each party reserves all rights to seek (in the case of A.B. DICK ) or oppose (in the case of MITSUBISHI) assumption and assignment of the Prepetition Agreement pursuant to the provisions of Section 365 of the Bankruptcy Code. In that regard, MITSUBISHI does not concede that the Prepetition Agreement is an executory contract subject to assumption or assumption and assignment and asserts that, in any event, under the Prepetition Agreement, MITSUBISHI has the unilateral right to set A.B DICK's credit line and that, prior to the filing of the A.B. DICK bankruptcy petition, the A.B. DICK credit line was reduced to $0. MITSUBISHI also reserves the right to move to compel assumption or rejection of the Prepetition Contract at any time. A.B. DICK hereby waives any claims against MITSUBISHI to the extent related to actions of MITSUBISHI on or after July 13, 2004 which are based on rights of A.B.DICK under the Prepetition Agreement. All other claims of A.B. Dick are preserved.

### 11. EFFECT OF FAILURE TO ENFORCE AGREEMENT

          The failure of either party to enforce at any time or for any period of time any of the provisions of this Agreement, or any of its rights hereunder, shall not be construed as a waiver of such provisions or the right of the party thereafter to enforce each and every such provision.

### 12. EFFECTIVE PERIOD; TERMINATION; DUTY TO MITIGATE

          A. This Agreement shall be effective on the date (the "Effective Date") which is the later to occur of (i) the date first written above, and (ii) the date of entry of an order or orders of the Bankruptcy Court presiding over the A.B. DICK bankruptcy proceedings, in form and substance acceptable to MITSUBISHI, approving execution and delivery of this Agreement by A.B. DICK, and shall continue in effect thereafter, unless and until earlier terminated in accordance with the provisions of this Agreement. The foregoing notwithstanding, and in addition to any other rights or remedies either party may have at law or in equity:

          1. either party may terminate this Agreement at any time and for any or no reason upon not less than six (6) months' prior written notice to the other party; and

7

SL1 468834v3/00000.000

2. MITSUBISHI may terminate this Agreement at any time upon (a) conversion of A.B. DICK's pending bankruptcy proceedings to a case under chapter 7 of the Bankruptcy Code, (b) the appointment of a trustee in the pending A.B. DICK bankruptcy proceedings, (c) the declaration of a default under the DIP Facility (as defined in that certain Interim Order Authorizing Certain Debtors and Debtors in Possession to Enter into Post-Petition Credit Agreement ...entered on July 15, 2004, or any other post petition financing approved by the Bankruptcy Court (a "Replacement DIP Facility") or termination of A.B. DICK's ability to borrow under the DIP Facility unless the A.B. DICK has substantially equivalent borrowing ability under a Replacement DIP Facility reasonably acceptable to MITSUBISHI, (d) the sale of any substantial portion of A.B. DICK's assets unless, contemporaneously, this Agreement is assigned to the buyer (it being understood that MITSUBISHI reserves all rights to object to any such assignment), (e) the entry of any order granting relief from the automatic stay allowing any person to enforce rights against any substantial portion of A.B. DICK's assets; (f) the appeal of the order of the Bankruptcy Court approving this Agreement, (g) the failure of A.B. DICK to make timely payments totaling in excess of fifty (50%) percent of the value of all outstanding Purchase Orders, and (h) the entry of any order of the Bankruptcy Court which approves assumption or assumption and assignment of the Prepetition Agreement or which subordinates any rights of setoff which MITSUBISHI might have to any other lien, it being understood that A.B.DICK does not concede that MITSUBISHI has any setoff rights.

3. MITSUBISHI may terminate this Agreement upon three (3) days notice by facsimile and overnight courier upon the appointment of an examiner in A.B. DICK's pending bankruptcy proceedings.

4. Either party may terminate this Agreement at any time in the event that the other party fails to perform any material obligation under this Agreement and fails to cure such breach or default within thirty (30) days of written notice of such breach or default from the non-breaching party.

5. A.B. DICK may terminate this Agreement immediately upon sale of substantially all of the assets of A.B. DICK.

B. Termination of this Agreement shall not affect any rights of MITSUBISHI under this Agreement to indemnification, to sell off Product (except to the extent A.B. DICK exercises its rights under paragraph 12(C) hereof) or which, by their nature, require enforcement after termination. In the event this Agreement is terminated, neither party shall be liable to the other for compensation, reimbursement, and/or damages on account of the loss of prospective profit on anticipated sales and/or on account of expenditures, investments, leases, and/or any type of commitments made in connection with the business of the other party in anticipation of business under this Agreement. UPON TERMINATION OR IN THE EVENT OF A BREACH OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES, EVEN IF THE PARTY IS APPRISED OF THE LIKELIHOOD THEREOF.

C. Upon termination of this Agreement for any reason other than termination by MITSUBISHI pursuant to paragraph 12 (A)(2)(g) above, A.B. DICK shall have the right,

8

SL1 468834v3/00000.000

A- 0672

exercisable by written notice sent by facsimile and overnight courier and delivered to MITSUBISHI within ten (10) days of said termination, to purchase all Product subject to any outstanding Purchase Order identified in such notice by paying MITSUBISHI an amount equal to the total invoice price of the Product identified in such Purchase Orders less the sums already paid against the said Purchase Orders pursuant to paragraph 8(F) above. The said payment shall be wire transferred to MITSUBISHI on the same day that the said notice is sent. Upon receipt of such notice and payment, MITSUBISHI shall complete manufacture of the subject Product and ship such Product to A.B.DICK pursuant to the terms of this agreement.

   D. [OMITTED].

13. WARRANTY

   A. MITSUBISHI represents and warrants that PRODUCTS to be sold to A.B.DICK under this Agreement shall be free from defects in material and workmanship for a period of fifteen (15) months from date of manufacture, and shall be in full conformance with the specifications set forth in Exhibit A at the time of shipment to A.B.DICK.

   B. MITSUBISHI agrees to replace any PRODUCTS, which are proved to be defective under normal uses during such warranty period, provided a claim of an alleged defect is made to MITSUBISHI within 15 months from date of manufacture, and provided further, that upon request by MITSUBISHI, A.B.DICK shall return to MITSUBISHI at no cost to A.B.DICK any such PRODUCTS. This replacement is the sole remedy of A.B.DICK in the event of any defective goods or breach of warranty.

   C. In the event that MITSUBISHI finds PRODUCTS to be defective before A.B.DICK sells PRODUCTS to their customers, and MITSUBISHI decides to recall such defective PRODUCTS, MITSUBISHI shall inform A.B.DICK in writing of such decision and shall indicate the specific PRODUCTS and batch numbers. MITSUBISHI shall also advise A.B.DICK on the recommended manner of disposal or return of such PRODUCTS.

   D. MITSUBISHI shall not be responsible for any claims whatsoever arising out of or in relation to PRODUCTS purchased by A.B.DICK hereunder when such claims are determined to relate to a machine design problem.

   E. THE PROVISIONS OF THIS PARAGRAPH 13 STATE MITSUBISHI'S SOLE OBLIGATION AND A.B. DICK'S AND ITS CUSTOMERS' SOLE AND EXCLUSIVE REMEDY IN THE EVENT THERE IS A PRODUCT THAT IS DEFECTIVE, DOES NOT CONFORM TO SPECIFICATIONS OR IS IN BREACH OF ANY WARRANTY. IN NO EVENT SHALL MITSUBISHI BE LIABLE FOR ANY DIRECT, SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES FOR PERSONAL INJURY OR INJURY TO PROPERTY ARISING OUT OF OR INCURRED BY A.B.DICK, ITS CUSTOMERS OR ANY THIRD PARTY IN CONNECTION WITH THE BREACH OF ANY WARRANTIES CONTAINED IN THIS AGREEMENT OR ANY DEFECT IN ANY PRODUCTS.

9

A- 0673

F.  MITSUBISHI shall have no liability under any warranty or this Agreement with respect to any PRODUCTS which meet product specifications, which have been modified, altered by A.B.DICK or any of its customers, or which have been damaged through misuse, abuse, accident, neglect, or mishandling by A.B.DICK or any of its customers.

G.  THE UNDERTAKINGS IN THIS PARAGRAPH 13 BY MITSUBISHI ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES WHETHER WRITTEN, ORAL, EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### 14.  OMITTED

### 15.  PRODUCT CHANGES

MITSUBISHI shall make no modifications affecting the performance of the PRODUCTS without A.B. DICK's prior written consent, which consent shall not be unreasonably withheld or delayed.  Any other changes in the product specifications must be communicated to A.B.DICK through both written materials and additional technical training provided by MITSUBISHI at its expense prior to implementation of such change.

### 16.  SETTLEMENT OF DISPUTES

Any dispute, controversy or claim arising out of or relating to this Agreement or the parties' relationship, which cannot be settled amicably, shall be finally determined by binding arbitration in accordance with the Commercial Dispute Resolution Procedures of the American Arbitration Association then in effect.  The arbitration panel shall consist of three neutral arbitrators, and the place of the arbitration shall be New York, New York.  The award may be confirmed in any court of competent jurisdiction.

### 17.  FORCE MAJEURE

Neither MITSUBISHI nor A.B.DICK shall be liable for failures or delays in delivery of PRODUCTS due to causes beyond its reasonable control, such as acts of God, acts of civil or military authority, fires, strikes, lockouts or labor disputes, floods, epidemics, quarantine, restrictions, war, riot, delays in transportation, car shortages and inability due to causes beyond its reasonable control to obtain necessary labor, materials or manufacturing facilities. In the event of any such delay, the date of delivery shall be extended for a period equal to the time lost by reason of the delay.

### 18.  NOTICE

Any notice or other communication required or permitted under this Agreement shall be in writing and deemed to have been duly given if it is delivered personally or sent by overnight courier service, by registered or certified mail, return receipt requested and postage prepaid or by facsimile (receipt confirmed by transmittal equipment) as set forth below (or as may be otherwise designated by the parties hereto from time to time by written notice to the other party) and shall be deemed to have been given the date of delivery if personally delivered;

10

SLI 468834v3/00000 000

A- 0674

the next business day if sent by overnight courier service, three (3) business days after the date if
sent by registered or certified mail; and the date of transmission if sent by facsimile during
normal business hours, and if not, then the next business day after transmission.

Notices to MITSUBISHI shall be addressed as follows:

MITSUBISHI Imaging (MPM), Inc.
Graphic Arts Division
555 Theodore Fremd Avenue
Rye, New York 10580
Attention: Jillian H. Acord, V.P. Sales Administration/Corporate Planning
Facsimile: (914) 921-2495

With a copy to: Hiroshi Tomimasu President and CEO

Notices to A.B.DICK shall be addressed as follows:

A.B.DICK Company
7400 Caldwell Avenue
Nile, Illinois 60714-4690
Attention: Jeffrey Herden, General Counsel and Secretary
Facsimile: (847) 647-0634

With a copy to:

Benesch, Friedlander, Coplan and Aranoff LLP
2300 BP Tower
200 Public Square
Cleveland Ohio 44114-2378
Attn: Jeffrey Schwartz, Esq.
Facsimile: 216-363-4588

### 19. GOVERNING LAW

All questions arising out of or under this Agreement and the parties' relationship
shall be governed by the laws of the State of New York, without regard to its conflicts of law
principles.

### 20. ENTIRE AGREEMENT

This Agreement represents the entire agreement between the parties hereto with
respect to the PRODUCTS in the Territory and, with respect to Purchase Orders placed
hereunder, supersedes any other agreement or understanding, written or verbal, that the
A.B.DICK and MITSUBISHI and/or any related entities may have had with respect to the
PRODUCTS in the Territory, including, without limitation, the Prepetition Agreement, the Sales
Distribution Agreement between MITSUBISHI Corporation and A.B.DICK, dated January 1,

11

SL1 468834v3/00000.000

1990, and amended December 31, 1994, with respect to the United States, Canada and Latin America only; the Sales Distribution Agreement between MITSUBISHI Corporation and A.B.DICK, dated May 1, 1996, with respect to the United States, Canada and Latin America only; and the Sales Distribution Agreement between MITSUBISHI and A.B.DICK, dated January 1, 1998, in its entirety. The foregoing notwithstanding, if the Prepetition Agreement is assumed or assumed and assigned, the terms of the Prepetition Agreement shall control except as to any Purchase Orders submitted prior to the date of such assumption or assumption and assignment, such Purchase Orders to continue to be controlled by the terms hereof.

### 21. MODIFICATION OF AGREEMENT

No modification, nor any future representation, promise or agreement in connection with the subject matter of this Agreement shall be binding on either party hereto unless made in writing and signed on its behalf by its duly authorized representative.

### 22. EXECUTION

A. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute and the same instrument.

B. The captions and headings in this Agreement are for convenience of reference only and shall not affect the construction or interpretation of any provision hereof.

(SIGNATURE PAGE FOLLOWS)

12

SL1 468834v3/00000 000

A- 0676

IN WITNESS WHEREOF, both parties have caused this Agreement by their respective officers thereunto duly authorized as of the day and year first above written.

A.B.DICK COMPANY                        MITSUBISHI IMAGING (MPM), INC.

/s/ _____            /s/ _____
President and CEO                        Hiroshi Tomimasu
                                         President and CEO

13

SL1 468834v3/00000.000

NOV-12-2042  10:03    AB Dick Co - Legal    847 779 2073    P.01/03

# AB**DICK**.

A.B.Dick Company
7400 Caldwell Avenue ◆ Niles, IL 60714-4690 ◆ (847) 779-1900

# FAX

NUMBER of PAGES INCL. COVER:  3

**DATE:**    November 12, 2004

**TO:**    Jillian Accord         **FAX:** **1-914-921-2495**

Dr. Hiroshi Tomimasu        **1-914-921-2495**

Robert Lapowsky, Esq.        **1-610-371-7958**

Jim Scafide, Esq.        **1-603-595-2602**

Gary O. Ravert, Esq.        **1-212-547-5444** ✓

**FROM:**    Jeffrey S. Herden        **TEL:** (847) 779-2224
General Counsel & Secretary        **FAX:** (847) 779-2073

### Message:

Please review attached letter.  If you have any questions or comments, please contact me immediately.

Jeff Herden

CONFIDENTIALITY NOTE: The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the original message to us at the address above via the postal service. Thank you.

PAGE 1/3 * RCVD AT 11/12/2004 11:10:33 AM [Eastern Standard Time] * SVR:RF/2 * DNIS:500 * CSID:847 779 2073 * DURATION (mm-ss):01-48

A- 0678

**AB DICK**®

**A.B.Dick Company**

November 12, 2004                                      **VIA FAX 1-914-921-2495**

MITSUBISHI Imaging (MPM), Inc.
Graphic Arts Division
555 Theodore Fremd Avenue
Rye, New York 10580

Attention: Jillian H. Acord, V.P. Sales Administration/Corporate Planning

Dear Jillian:

I am in receipt of the letter from Dr. Hiroshi Tomimasu, dated November 5, 2004, which purports to provide notice of termination of that certain Private Label Sales Agreement, dated as of August, 2004, between Mitsubishi Imaging (MPM), Inc. and A.B. Dick Company (the "Agreement") in accordance with paragraph 12A(2)(d) thereof based upon the sale by A.B. Dick of substantially all of its assets.

Please direct your attention to paragraph 12C of the Agreement, which provides, among other things, that A.B. Dick "shall have the right, exercisable by written notice . . . delivered to MITSUBISHI within ten (10) days of . . . termination, to Purchase all Product subject to any outstanding Purchase Order identified in such notice by paying MITSUBISHI an amount equal to the total purchase price of the Product identified in such Purchase Orders less sums already paid . . ."

I am aware that you have received a letter from Mr. Edward J. Marino, President and CEO of Presstek, Inc. ("Presstek"), dated November 10, 2004, in which he requests that you release to Presstek the Product in certain outstanding purchase orders, the total invoice amount of which is $2,255, 397 (two million, two hundred and fifty five thousand, three hundred and ninety dollars).

I am also aware that you have received from representatives of Presstek, Inc., or its subsidiaries, two wire transfer payments totaling $2,255, 397 (two million, two hundred and fifty five thousand, three hundred and ninety seven dollars): the first on November 8, 2004 in the amount of $354,946.28 (three hundred and fifty four thousand, nine hundred and forty six dollars and twenty eight cents); and the second on November 10, 2004 in the amount of $1,900,450.79 (one million, nine hundred thousand, four hundred and fifty dollars and seventy nine cents). The total amount wired represents the outstanding amounts due for the Product in outstanding Purchase Orders numbered 267409, 267411, 270466, 270467, 272994, and 273001.



A.B.Dick Company

MITSUBISHI Imaging (MPM), Inc.
November 12, 2004
Page Two

You are hereby notified of the following:

1. I am an officer of the A.B. Dick Company (the "Company") and, as such, authorized to speak for the Company.

2. Pursuant to the terms of paragraph 12C of the Agreement, the Company has exercised its right to purchase Product as indicated therein.

3. You are hereby authorized to release to Presstek the Product in outstanding Purchase Orders numbered 267409, 267411, 270466, 270467, 272994, and 273001.

Very truly yours,

Jeffrey S. Herden
General Counsel and Secretary
A. B. Dick Company

Cc:    Dr. Hiroshi Tomimasu, President and CEO (Fax No. 914-921-2495)
       Robert Lapowsky, Esq. (Fax No. 610-371-7958)
       Jim Scafide, Esq. (Fax No. 603-595-2602)
       Gary O. Ravert (Fax No. 212-547-5444)
       Lynne Gehrke (via messenger)
       David Vanderwiel (via messenger)

Worldwide Headquarters  •  7400 Caldwell Avenue  •  Niles, Illinois 60714

PAGE 3/3 * RCVD AT 11/12/2004 11:10:33 AM [Eastern Standard Time] * SVR:RF/2 * DNIS:509 * CSID:847 779 2073 * DURATION (mm-ss):01-48          TOTAL P.03

A- 0680

 **ABDICK®**

**A.B.Dick Company**

---

November 12, 2004                    **VIA FAX 1-914-921-2495**

MITSUBISHI Imaging (MPM), Inc.
Graphic Arts Division
555 Theodore Fremd Avenue
Rye, New York  10580

Attention:  Jillian H. Acord, V.P. Sales Administration/Corporate Planning

Dear Jillian:

I am in receipt of the letter from Dr. Hiroshi Tomimasu, dated November 5, 2004, which purports to provide notice of termination of that certain Private Label Sales Agreement, dated as of August, 2004, between Mitsubishi Imaging (MPM), Inc. and A.B. Dick Company (the "Agreement") in accordance with paragraph 12A(2)(d) thereof based upon the sale by A.B. Dick of substantially all of its assets.

Please direct your attention to paragraph 12C of the Agreement, which provides, among other things, that A.B. Dick "shall have the right, exercisable by written notice . . . delivered to MITSUBISHI within ten (10) days of . . . termination, to Purchase all Product subject to any outstanding Purchase Order identified in such notice by paying MITSUBISHI an amount equal to the total purchase price of the Product identified in such Purchase Orders less sums already paid . . ."

I am aware that you have received a letter from Mr. Edward J. Marino, President and CEO of Presstek, Inc. ("Presstek"), dated November 10, 2004, in which he requests that you release to Presstek the Product in certain outstanding purchase orders, the total invoice amount of which is $2,255, 397 (two million, two hundred and fifty five thousand, three hundred and ninety dollars).

I am also aware that you have received from representatives of Presstek, Inc., or its subsidiaries, two wire transfer payments totaling $2,255, 397 (two million, two hundred and fifty five thousand, three hundred and ninety seven dollars): the first on November 8, 2004 in the amount of $354,946.28 (three hundred and fifty four thousand, nine hundred and forty six dollars and twenty eight cents); and the second on November 10, 2004 in the amount of $1,900,450.79 (one million, nine hundred thousand, four hundred and fifty dollars and seventy nine cents).  The total amount wired represents the outstanding amounts due for the Product in outstanding Purchase Orders numbered 267409, 267411, 270466, 270467, 272994, and 273001.

---

A- 0681

NOV-12-2042  10:04    AB Dick Co - Legal                    847 779 2073    P.03/03



A.B.Dick Company

MITSUBISHI Imaging (MPM), Inc.
November 12, 2004
Page Two

You are hereby notified of the following:

1. I am an officer of the A.B. Dick Company (the "Company") and, as such, authorized to speak for the Company.

2. Pursuant to the terms of paragraph 12C of the Agreement, the Company has exercised its right to purchase Product as indicated therein.

3. You are hereby authorized to release to Presstek the Product in outstanding Purchase Orders numbered 267409, 267411, 270466, 270467, 272994, and 273001.

Very truly yours,

Jeffrey S. Herden
General Counsel and Secretary
A. B. Dick Company

Cc:    Dr. Hiroshi Tomimasu, President and CEO (Fax No. 914-921-2495)
       Robert Lapowsky, Esq. (Fax No. 610-371-7958)
       Jim Scafide, Esq. (Fax No. 603-595-2602)
       Gary O. Ravert (Fax No. 212-547-5444)
       Lynne Gehrke (via messenger)
       David Vanderwiel (via messenger)

Worldwide Headquarters • 7400 Caldwell Avenue • Niles, Illinois 60714

PAGE 3/3 * RCVD AT 11/12/2004 11:10:33 AM [Eastern Standard Time] * SVR:RF/2 * DNIS:500 * CSID:847 779 2073 * DURATION (mm-ss):01-48       TOTAL P.03

A- 0682