UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:**<br><br>**BLAKE OF CHICAGO, CORP. f/k/a A.B. DICK COMPANY,** *et al.,*<br><br><div align="center">**Debtors.**</div> | **Chapter 11**<br><br>**Case No. 04-12002 (JLP)**<br><br>**Jointly Administered** |
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS,**<br><br><div align="center">**Appellant,**</div><br>**v.**<br><br>**PRESSTEK, INC.,**<br><br><div align="center">**Appellee.**</div> | **Appeal No. 04-CV-1566 (KAJ)** |

**OPENING BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF ITS APPEAL**

Dated:  April 15, 2005
Wilmington, Delaware

THE BAYARD FIRM
Jeffrey M. Schlerf (No. 3047)
222 Delaware Ave., Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel:  302.429.4218
Fax:  302.658.6395

McGUIREWOODS LLP
Richard J. Mason, P.C.
Michael M. Schmahl
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1681
Tel:  312.849.8100
Fax:  312.849.3690

and

James H. Joseph (No. 3920)
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, PA  15222
Tel:  412.667.6000
Fax:  412.667.6050

Counsel to the Official Committee of
Unsecured Creditors of Blake of Chicago
Corp. f/k/a A.B. Dick Company, *et al.*

# TABLE OF CONTENTS

<div align="right">Page</div>

| | | | |
|---|---|---|---|
| I. | | Statement of the Nature and Stage of Proceeding | 1 |
| II. | | Summary of Argument | 5 |
| III. | | Statement of Facts | 6 |
| | A. | The Mitsubishi Private Label Sales Agreement | 6 |
| | B. | The Sale and the Consistent Exclusion of the Private Label Sales Agreement from the Sale | 7 |
| | C. | Mitsubishi's Termination of the Private Label Sales Agreement and the Debtors'/Presstek's Purported Exercise of the Pipeline Purchase Option | 11 |
| | D. | The November 17, 2004, Hearing and the Bankruptcy Court's Ruling | 13 |
| IV. | | Argument | 15 |
| | A. | Introduction and Standard of Review | 15 |
| | B. | The Debtors Held No Interest in the Refund or the Pipeline Product Independent of the Private Label Sales Agreement and Therefore Could Convey No Such Interests to Presstek | 16 |
| | C. | It is Undisputed That the Private Label Sales Agreement Was Excluded From the Sale and Was Not Assigned to Presstek Pursuant to the Sale Order | 18 |
| | D. | Under Third Circuit Precedent, Presstek Could Not Have Obtained Rights Derived From the Private Label Sales Agreement Absent An Assignment Thereof | 19 |
| | E. | The Record Is Clear That the Debtors and Presstek Had No Intention To Convey The Pipeline Product | 21 |
| | F. | The Debtors and Presstek Acknowledged That Inclusion of the Pipeline Product in the Working Capital Covenant is Not Relevant to The Rights to the Pipeline Product Under the Private Label Sales Agreement | 24 |
| V. | | Conclusion | 26 |

# TABLE OF AUTHORITIES

## FEDERAL CASES

*America Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d
76 ................................................................................................................... 15

*Butner v. U.S.*, 440 U.S. 48 (1979), cited by *Integrated Solutions, Inc. v.*
*Service Support Specialties, Inc.*, 124 F.3d 487 ............................................. 16

*In re CellNet Data Systems, Inc.*, 327 F.3d 242 ................................................. 20

*Columbia Broad. System v. Stokely-Van Camp, Inc.*, 522 F.2d 369 ................... 23

    *id* ................................................................................................................. 23

*Dweck v. Pacificorp Capital, Inc.*, 1998 WL 88742 (S.D.N.Y. March 2,
1998), *citing Vanleigh Carpet Corp., v. Gene Schoor's Iron Forgen*,
318 N.Y.S.2d 402 ............................................................................................. 18

*McCarron v. Federal Deposit Insurance Corp.*, 111 F.3d 1089 ......................... 22

*Mellon Bank, N.A. v. Metropolitan Communications, Inc.*, 945 F.2d 635 .......... 15

*Nova Hut, a.s. v. Kaiser Group International Inc.* (In re Kaiser Group
Int'l), 307 B.R. 449 ......................................................................................... 15

*Ross v. LaRouche Industries, Inc.* (In re La Rouche Industries, Inc.), 307
B.R. 774 ........................................................................................................... 15

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 ............... 23

*In re Telegent, Inc.*, 282 B.R. 765 ....................................................................... 23

*U.S. v. Vastola*, 989 F.2d 1318 ............................................................................. 23

*Universal Minerals, Inc., v. C.A. Hughes & Co.*, 669 F.2d 98 ........................... 15

## FEDERAL STATUTES

28 U.S.C. § 158 ..................................................................................................... 15

## STATE STATUTES

N.Y.U.C.C. § 2-403 ............................................................................................... 18

The Official Committee of Unsecured Creditors of Blake of Chicago Corp. f/k/a A.B. Dick Company, *et al.*[1] (the "Committee"), the appellant herein, submits this Opening Brief[2] in Support of the Committee's appeal from the November 17 and 23, 2004, Judgments (respectively, the "Judgment" and "Amended Judgment") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") ruling that Presstek, Inc. and Silver Acquisitions Corp., its wholly owned acquisition subsidiary (collectively "Presstek")[3] could purchase from debtor A.B. Dick Company $5 million in property that A.B. Dick Company did not own.    The Bankruptcy Court based this conclusion on its determination that Presstek had obtained certain rights in the property notwithstanding the undisputed fact that such rights derived exclusively from a vendor contract that Presstek and its subsidiary expressly excluded from the sale.    The essence of this appeal is whether the Bankruptcy Court's ruling improperly deprived the creditors of the Debtors of as much as $2.5 million that they should have received, which amount may represent as much as 10% of the aggregate claims held by these creditors.

## I.    Statement of the Nature and Stage of Proceeding

On July 13, 2004 ("Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). (A.B. Dick Company's Vol. Pet. for Relief at D.I. 1 in case no. 04-12002; Paragon's Vol.

---

[1] There are four affiliated debtors in these jointly-administered cases include A.B. Dick Company (case no. 04-12002), Paragon Corporate Holdings, Inc. ("Paragon") (case no. 04-12006), Multigraphics LLC ("Multigraphics") (case no. 04-12003), and Interactive Media Group, Inc. ("Interactive Media") (04-12005).    For ease of reference, each and all of these debtors are referred to interchangeably and collectively in this Brief as the "Debtors" unless the specific debtor is otherwise noted.

[2] Filed contemporaneously herewith is an Appendix, with pages numbered "A-____."    All references herein to the record cite to the applicable page or pages in the Appendix.

[3] For ease of reference, Presstek, Inc. and Silver Acquisitions Corp. are referred to interchangeably and collectively in this Brief as "Presstek."

Pet. for Relief at D.I. 1 in case no. 04-12006; Multigraphics' Vol. Pet. for Relief at D.I. 1 in case no. 04-12003; Interactive Media's Vol. Pet. for Relief at D.I. 1 in case no. 04-12005). Also on the Petition Date, the Debtors and Presstek entered into an asset purchase agreement (the "Sale Agreement") for the sale of substantially all of the Debtors' assets. (Sale Agreement attached as Exhibit A to the Debtors' Mot. for Order: (A) Authorizing Sale of Substantially All of the Assets of A.B. Dick Company and Its Wholly Owned Subsidiaries, Free and Clear of Liens, Claims and Encumbrances; (B) Authorizing Assumption and Assignment of Certain Unexpired Leases and Executory Contract; and (C) Granting Related Relief at A-0017 through A-0089).

In August of 2004, after the Petition Date and after the execution of the Sale Agreement, the Debtors and Mitsubishi Imaging (MPM), Inc. ("Mitsubishi") entered into a Private Label Sales Agreement (the "Private Label Sales Agreement") governing the terms on which Mitsubishi would supply products to the Debtors on a postpetition basis. On November 3, 2004, the Bankruptcy Court entered an order (the "Sale Order") approving the sale (the "Sale") of substantially all of the Debtors' operating business assets to Presstek. (Sale Order at A-0478 through A-0518). The Sale Order expressly excluded the Private Label Sales Agreement from assignment to Presstek. (Sale Order ¶ 9 at A-0488). The closing ("Closing") of the Sale occurred on November 5, 2004.

On November 5, 2004 (Mitsubishi Motion ¶ 5 at A-0520), Mitsubishi gave the Debtors notice of its termination of the Private Label Sales Agreement (Private Label Sales Agreement ¶ 12A(2)(d) at A-0530 through A-0531), subject to the Debtors' right to exercise an option (the "Pipeline Purchase Option") to purchase product ordered by the Debtors from Mitsubishi but not yet fully paid for or delivered to the Debtors (Private

Label Sales Agreement ¶ 12C at A-0530 through A-0531) and title to which remained with Mitsubishi (the "Pipeline Product") (Private Label Sales Agreement ¶ 8B at A-0526) in exchange for payment of the balance of the purchase price, which balance was $2,255,397.07[4] (Mitsubishi Mot. ¶ 5 at A-0520 through A-0521). After an improper and invalid attempt by Presstek to exercise the Pipeline Purchase Option (Mitsubishi Mot. ¶ 6 at A-0521), the Debtors purported to exercise the Pipeline Purchase Option with instructions to Mitsubishi to convey the Pipeline Product worth nearly $5 million to Presstek in exchange for Presstek's payment of $2,255,397.07 to Mitsubishi on behalf of the Debtors. (Mitsubishi Mot. ¶ 7 at A-0521 through A-0522). The Debtors attempted to accomplish this surrender of nearly $5 million in property for less than 50% of its value without seeking Bankruptcy Court approval.

The Committee, which had already successfully thwarted Presstek's improper attempt to exercise the Pipeline Purchase Option, ultimately succeeded in forcing Mitsubishi and Presstek to bring the dispute before the Bankruptcy Court. On November 15, 2004, Mitsubishi filed its Emergency Motion for Order Determining Validity of Exercise of Election Under Postpetition Private Label Sale Agreement (the "Mitsubishi Motion") and Presstek filed its Emergency Motion Seeking an Order Directing Mitsubishi to Comply With the Court's Sale Order (the "Presstek Motion"). (Mitsubishi Mot. at A-0519 through A-0536; Presstek Mot. at A-0537 through A-0569). Presstek and Mitsubishi each filed Objections (respectively, the "Presstek Objection" and the "Mitsubishi Objection") to the other's motion. (Mitsubishi Obj. at A-0570 through A-0576; Presstek Obj. at A-0651 through A-0682). The Committee filed a Response to the

---

[4] The Debtors had previously paid $2,545,774.94 on account of the $4,801,172.01 purchase price for the Pipeline Product.

Mitsubishi Motion and its own Motion for an Order Refunding Credit to Estates ("Committee Objection and Motion"). (Committee Obj. and Mot. At A-0577 through A-0650). The Debtors filed a Statement (a) In Response to the Mitsubishi Motion, (b) in Support of the Presstek Motion, and (c) In Response to the Committee Objection and Motion (the "Debtors' Statement"). (Debtors' Statement at A-0683 through A-0689).

On November 17, 2004, on only two days' notice, the Bankruptcy Court held a hearing to consider the Mitsubishi Motion, the Presstek Motion, the Committee Objection and Response and the Debtors' Statement. (Trans. of Nov. 17, 2004 Hearing at A-0690 through A-0735). In the Mitsubishi Motion, Mitsubishi acknowledged that if the Debtors' exercise of the Pipeline Purchase Option was invalid, then the Private Label Sales Agreement entitled the Debtors' estates to receive a refund (the "Refund") of a portion of the $2.5 million already paid by the Debtors to Mitsubishi on account of the Pipeline Product. (Mitsubishi Mot. ¶ 10 at A-0522).

Despite (i) the Sale Order's express exclusion of the Private Label Sales Agreement from the Sale, and (ii) the fact that the Debtors' only interest in the Pipeline Product arose from the Private Label Sales Agreement, the Bankruptcy Court held that Presstek had purchased the Pipeline Product as part of the Sale and that Mitsubishi was required to deliver the Pipeline Product to Presstek. (Trans. Of the November 17, 2004 Hearing pp. 39-41 at A-0728 through A-0730; Judgment at A-0736 through A-0737; Amended Judgment at A-0739 through A-0739). The Bankruptcy Court thus ordered Mitsubishi to deliver almost $5 million in Pipeline Product to Presstek in exchange for Presstek's payment of only $2,255,397.07, leaving the Debtors' estates with no consideration, no relief from any liabilities, and divested of the right to receive the refund

of up to $2.5 million. (Trans. Of the November 17, 2004 Hearing p. 41 at A-0730; Judgment at A-0736; Amended Judgment at A-0738 through A-0739). The Bankruptcy Court entered Judgment in this regard on November 17, 2004, and an Amended Judgment on November 23, 2004. (Trans. Of the November 17, 2004 Hearing p. 41 at A-0730; Judgment at A-0736; Amended Judgment at A-0738 through A-0739). The Committee filed its Notice of Appeal of the Judgment and the Amended Judgment on November 29, 2004. (Notice of Appeal at A-0740 through A-0750).

## II.    Summary of Argument

1.    The Bankruptcy Court erred in ruling that, in the context of Presstek's purchase of substantially all of the Debtors' assets, Presstek could explicitly refuse to accept assignment of the Private Label Sales Agreement, but, nonetheless, receive the benefits of that contract without accepting that contract's burdens. Presstek responds by arguing that even if it did not take an assignment of the Private Label Sales Agreement, that it nevertheless obtained the Debtor's rights under the Private Label Sales Agreement by operation of the Sale Agreement even though the Sale Order expressly excluded the Private Label Sales Agreement from assignment to Presstek.

2.    The Bankruptcy Court erred in ignoring those principals of construction that require the more specific exclusionary provision of the Sale Order to control over the more general inclusive provisions of the Sale Agreement where the Sale Order explicitly states that any inconsistency between the Sale Order and any documents executed therewith, including the Sale Agreement, would be controlled by the Sale Order. Presstek responds that based on the terms of the Sale Agreement it somehow purchased the Pipeline Product or the Debtors' rights under the Private Label Sales Agreement

notwithstanding (i) the Sale Order's express exclusion of the Private Label Sales Agreement from the Sale, and (ii) the provision of the Sale Order that provides that the Sale Order overrules any inconsistent provision of the Sale Agreement.

### III.    Statement of Facts

**A.    The Mitsubishi Private Label Sales Agreement**

With approval of the Bankruptcy Court on August 16, 2004, the Debtors entered into the Private Label Sales Agreement with Mitsubishi. (Private Label Sales Agreement attached as Exhibit A to the Mitsubishi Motion at A-0524 to A-0536). The Private Label Sales Agreement provides in pertinent part that:

- title to all Product remained with Mitsubishi until delivery to Debtors' distribution center; (Private Label Sales Agreement ¶ 8(B) at A-0526;

- Mitsubishi had the right to terminate the Private Label Sales Agreement immediately upon sale by Debtors of substantially all of their assets by providing notice (a "Termination Notice") to Debtors; (Private Label Sales Agreement ¶ 12(A)(2)(d) at A-0530 to A-0531);

- within ten days of delivery by Mitsubishi of a Termination Notice, Debtors had the right to exercise an option (the "Pipeline Purchase Option") to purchase all inventory subject to outstanding purchase orders not yet fully paid for by Debtors (the "Pipeline Product") for the full balance remaining due; (Private Label Sales Agreement ¶ 12(C) at A-0531 to A-0532); and

- after termination of the agreement, Mitsubishi is granted certain rights to resell the Pipeline Product and Debtors were granted certain rights to a refund (the "Refund") of a portion of the amounts paid by the Debtors on account of such Pipeline Product; (Private Label Sales Agreement ¶ 8(F) at A-0527 to A-0528).

As of the Closing on the Sale, the Debtors had made payments to Mitsubishi totaling

$2,545,774.94 (Mitsubishi Motion ¶ 5 at A-0520; Committee Obj. and Mot. ¶ 8 at A-0579; Debtors' Statement p. 5 at A-0687) on account of Pipeline Product that, as of the Closing, had not been fully paid for, had not been shipped to the Debtors and title to which was held by Mitsubishi, not the Debtors. (Private Label Sales Agreement ¶ 8(B) at A-0526; Mitsubishi Mot. ¶¶ 3 and 10 at A-0519 through A-0522; Mitsubishi Obj. ¶¶ 2 and 4 at A-0570 through A-0572; Committee Obj. and Mot. ¶¶ 7, 8 at A-0578 through A-0579). The balance due for the Pipeline Product was $2,255,397.07. (Letter from Jeffrey S. Herden, General Counsel and Secretary to the Debtors, to Jillian H. Acord, V.P. Sales Administration/Corporate Planning at Mitsubishi dated November 12, 2004 attached as Exhibit 3 to the Presstek Mot. at A-0565 through A-0569; Mitsubishi Mot. ¶ 5 at A-0520 through A-0521; Mitsubishi Obj. ¶ 4 at A-0571 through A-0572; Debtors' Statement p.5 at A-0687).

The Private Label Sales Agreement was not assigned to Presstek as part of the Sale. (Sale Order ¶ 9 at A-0488). In fact, the Private Label Sales Agreement prohibits the assignment thereof absent the written consent of Mitsubishi.[5] (Private Label Sales Agreement ¶ 10 at A-0530). There is no evidence in the record to indicate that as of the Closing Mitsubishi had provided its written consent to the assignment of the Private Label Sales Agreement.

**B.     The Sale and the Consistent Exclusion of the Private Label Sales Agreement from the Sale**

On July 13, 2004, the Debtors entered into the Sale Agreement with Presstek

---

[5] The Committee acknowledges that contractual anti-assignment clauses are, in most circumstances, not enforceable with respect to prepetition executory contracts. However, because the Private Label Sales Agreement is a postpetition agreement approved by the Bankruptcy Court, it is the Committee's position that the Debtors could not have assigned the Private Label Sales Agreement without the contractually required written consent of Mitsubishi.

pursuant to which the Debtors agreed to sell and Presstek agreed to buy substantially all of the Debtors' operating assets and Presstek further agreed to assume certain of the Debtors' liabilities. (Sale Agreement at A-0017 through A-0089). At the time of execution of the Sale Agreement, the Private Label Sales Agreement, executed in August 2004 (Private Label Sales Agreement at A-0524), did not exist and the Sale Agreement therefore did not and could not address the disposition of such agreement in the context of the Sale. Indeed, the Bankruptcy Court did not approve the Private Label Sales Agreement until August 16, 2004, more than one month after the Debtors and Presstek executed the Sale Agreement.

At a hearing before the Bankruptcy Court on August 23, 2004, respective counsel to the Debtors and Presstek explained to the Bankruptcy Court a modification to certain working capital covenants of the Sale Agreement relating to certain minimum inventory level requirements. (Trans. of August 23, 2004 Hearing pp. 9-12 at A-0099 through A-0101). Specifically, the Debtors' counsel informed the Bankruptcy Court that:

> . . . we have firmed up the [Sale Agreement] by revising the definition of "inventory" for purposes of the working capital test. Presstek and [KeyBank, the Debtors' primary prepetition and postpetition lender] have agreed to include up to $2.5 million of pre-paid inventory in this definition, as long as that inventory is received by November 30th. That ties into the Mitsubishi agreement that we spoke about at the last hearing, Your Honor.
> (Trans. of August 23, 2004 Hearing p. 10 at A-0099).

Later during the same hearing, upon a request by Mitsubishi's counsel for a clarification of the effect of the foregoing modification of the working capital test, counsel to Mitsubishi, counsel to the Debtors and the Bankruptcy Court engaged in the following colloquy:

Mr. Lapowsky [Mitsubishi's counsel]:    . . . [W]hen I was listening earlier today I heard for the first time the resolution of the issue of the counting of inventory that's been what's they say pre-paid.    And that's fine with Mitsubishi, provided that it's understood, and if there's nothing in the Order that would conflict with the notion that the title to that inventory - - because I think that they are primarily talking about Mitsubishi inventory - - remains with Mitsubishi until it's fully paid for.  So they can - - the Lenders certainly can do whatever they want to do in terms of counting towards borrowing basis, or that type of thing. But I just wanted to make sure that it was clear on the record that we would not be sort of backdooring some type of title or accelerated passage of title for this inventory that's going to be counted towards the borrowing base.

Mr. Gleason [Debtors' Counsel]:    Your Honor, I wish I was smart enough to think about that.  No, it's pre-paid deposits, and - -

The Court:    I think the issue here, if I understood it, was how that pre-paid inventory was going to be accounted for purposes of whether or not certain ratios that were required to be achieved under the [Sale Agreement] had or had not been achieved, thereby providing an out to Presstek to go forward.

Mr. Gleason:  Right.  We are not looking to take title to Mitsubishi's - -

The Court:    So you're not trying to change whatever rights the sellers of the inventory may have, but rather simply have agreed on the treatment of the pre-paid inventory for purposes of compliance with the reps and warranties of the [Sale Agreement].
(Trans. of August 23, 2004 Hearing pp. 39-40 at A-0128 through A-0129).

At the Sale Hearing on November 3, 2004, the issue of the impact off the Sale and the Sale Agreement on title to the Pipeline Product and the Resale License again came before the Bankruptcy Court.

Mr. Lapowsky:    Your Honor, I just wanted to point out that [Mitsubishi] had filed a limited objection to the

sale that related to a resale license that we obtained under a post-petition agreement that was entered into between Mitsubishi and [the Debtors]. And that resale license gives us the ability, after termination of that post-petition agreement, to use [the Debtors'] intellectual property to resell what I will call pipeline inventory, that is, inventory that [the Debtors] had ordered from Mitsubishi but not yet fully paid for and as to which title was not transferred. The resale license gives Mitsubishi the right to resell that inventory to third parties using [the Debtors'] trademarks, [and] patented technology. That was part of the agreement that was approved by Judge Case on August 16th and there is an Order entered with [this agreement] attached to it. So we had filed an objection saying "If you're selling free and clear, including selling the intellectual property of [the Debtors] free and clear of interests, let's just make sure that the interest that we have that's created by the resale agreement isn't wiped out. I've had - - I've discussed this issue with counsel to [the Debtors]. I think we have an agreement that that's not what is intended and that the [Sale Order], assuming [the Sale Order] is entered, would include a savings provision to make clear that the resale license is not affected by the free and clear nature of the sale.

Mr. Gleason: . . . [w]e did have an agreement with respect to the post-petition license, which I told Mr. Lapowsky yesterday we had an agreement with. So I think that's also a nonissue.
(Trans. of November 3, 2004 Hearing pp. 63-66 at A-0441 through A-0444).

The transcript of the Sale Hearing contains no opposition by Presstek to the clarifications

sought by counsel to Mitsubishi with respect to preservation of Mitsubishi's rights under

the Private Label Sales Agreement. (Trans. of the November 3, 2004 Hearing at A-0379

through A-0477).

Consistent with the foregoing statements of counsel to the Debtors and counsel to

Presstek before the Bankruptcy Court on August 23, 2004, and further consistent with the

statement of counsel to the Debtors at the Sale Hearing, the Sale Order presented to and

entered by the Bankruptcy Court contains the following decree:

10

> Notwithstanding any other provision of this Order, neither
> the Private Label Sales Agreement dated October 1, 2002
> nor the Private Label Sales Agreement dated August, 2004
> (the Postpetition Agreement"), in each case between A.B.
> Dick and [Mitsubishi] shall be deemed assumed or assumed
> and assigned to [Presstek] pursuant to this Order. The Sale
> Debtors reserve their rights to seek assumption and
> assignment in the future. In addition, the sale approved
> hereby is not free and clear of (a) any of the rights of
> Mitsubishi under the Resale License created under and
> described and defined in the Postpetition Agreement, or
> (b) any set-off or recoupment rights of Mitsubishi.
> (Sale Order ¶ 9 at A-0488).

Further, to the extent that any provision of the Sale Agreement might be construed to

convey to Presstek the Debtors' interest under the Private Label Sales Agreement in the

Pipeline Product or the Refund, the Sale Order further provides:

> To the extent of any inconsistency between the provisions
> of the [Sale Agreement], any documents executed in
> connection therewith, and this Order, the provisions
> contained herein shall govern.
> (Sale Order ¶ 22 at A-0491).

### C.    Mitsubishi's Termination of the Private Label Sales Agreement and the Debtors'/Presstek's Purported Exercise of the Pipeline Purchase Option

On November 5, 2004, following the Closing, Mitsubishi sent a Termination

Notice to the Debtors (Mitsubishi Mot. ¶ 5 at A-0520; Presstek Mot. ¶ 4 at A-0538;

Mitsubishi Obj. ¶ 4 at A-0571 through A-0572) pursuant to Section 12(A)(2) of the

Private Label Sales Agreement. (Private Label Sales Agreement ¶ 12(A)(2) at A-0530

through A-0531). Absent the timely exercise of the Pipeline Purchase Option by the

Debtors, Mitsubishi had the right to sell the goods for its account subject to its contractual

obligation under the Private Label Sales Agreement to pay the Refund in an amount equal

to a portion of approximately $2.5 million previously paid by the estates to Mitsubishi on

account of the Pipeline Product. (Private Label Sales Agreement ¶¶ 12(C) and at A-0531

584350v1                                    11

through A-0532). On November 10, 2004, Presstek purported to exercise the Pipeline Purchase Option. (Mitsubishi Mot. ¶ 6 at A-0521; Mitsubishi Obj. ¶ 5 at A-0572; Committee's Obj. and Mot. ¶ 13 at A-0579). On November 11, 2004, Mitsubishi advised Presstek in writing that, because the Private Label Sales Agreement was not assigned by the Debtors to Presstek, only the Debtors could exercise the Pipeline Purchase Option. (Mitsubishi Mot. ¶ 6 at A-0521; Mitsubishi Obj. ¶ 5 at A-0572; Committee's Obj. and Mot. ¶ 14 at A-0579). On the morning of November 12, 2004, the Debtors purported to exercise the Pipeline Purchase Option with a direction to release the Pipeline Product to Presstek. (E-mail from Robert Lapowsky, counsel to Mitsubishi, to Gary Ravert, Counsel to Presstek sent at 12:54 P.M. on November 12, 2004 attached as Exhibit B to the Committee's Obj. and Mot. at A-0646 through A-0647).

However, on the afternoon of November 12, 2004, the Debtors advised Mitsubishi that they were withdrawing the exercise of the Pipeline Purchase Option. (E-mail from H. Jeffery Schwartz, counsel to the Debtors, to James Ricciardi, counsel to the Committee, sent at 2:53 P.M. on November 12, 2004 attached as Exhibit C to the Committee's Obj. and Mot. at A-0641). The Debtors' withdrawal of the election followed receipt by counsel to the Debtors of an e-mail from counsel to the Committee stating that the Committee considered the Refund to be a valuable asset of the Debtors' estates which had not been purchased by Presstek. (E-mail from James Ricciardi, counsel to the Committee, to H. Jeffery Schwartz, counsel to the Debtors, sent at 2:41P.M. on November 12, 2004 attached as Exhibit C to the Committee's Obj. and Mot. at A-0642). The e-mail further stated that it is the Committee's position that any exercise of the Pipeline Purchase Option was outside the ordinary course of the Debtors' newly

circumscribed business and required court approval pursuant to section 363 of the Bankruptcy Code in order to be valid. (E-mail from James Ricciardi, counsel to the Committee, to H. Jeffery Schwartz, counsel to the Debtors, sent at 2:41 P.M. on November 12, 2004 attached as Exhibit C to the Committee's Obj. and Mot. at A-0642).

In response, notwithstanding the unequivocal and express exclusion of the Private Label Sales Agreement from the Sale (Sale Order ¶ 9 at A-0488), Presstek asserted that it had purchased the Pipeline Product and the Debtors' contractual right to the Refund under the Private Label Sales Agreement. (E-mail from James Goldsmith, counsel to Presstek, to James Ricciardi, counsel to the Committee, sent at 5:53 P.M. on November 12, 2004 attached as Exhibit C to the Committee's Obj. and Mot. at A-0634). Later in the day on November 12, 2004, following receipt by counsel to the Debtors of an undertaking by Presstek to hold the Debtors' estates harmless, under certain circumstances, the Debtors advised Mitsubishi that they were reinstating their exercise of the Pipeline Purchase Option. (Mitsubishi Mot. ¶ 8 at A-0522; Presstek Mot. ¶ 28 at A-0545; Mitsubishi Obj. ¶ 7 at A-0573; Committee Obj. and Mot. ¶ 18 at A-0580 through A-0581). The Pipeline Purchase Option expired at 11:59 P.M. on November 15, 2004, ten days after the notice of termination. (Private Label Sales Agreement ¶ 10(C) at A-0531 through A-0532).

### D.      The November 17, 2004, Hearing and the Bankruptcy Court's Ruling

The Bankruptcy Court conducted an evidentiary hearing on November 17, 2004, to determine whether, notwithstanding the express <u>exclusion</u> of the Private Label Sales Agreement from the Sale, the Purchaser had already purchased the Refund and/or the Pipeline Product, and also whether the Debtor could exercise the Pipeline Purchase Option for the benefit of the Purchaser. (Trans. of the November 17, 2004 Hearing at A-

584350v1                                              13

0690 through A-0735). At the November 17, 2004, hearing, the lone witness was Stephen Gray, the Debtors' Chief Restructuring Officer. Mr. Gray testified that he believed that the Debtors conveyed the Pipeline Product to Presstek based on Sections 2.1, 2.2 and 10.12 of the Sale Agreement as amended, which included the Debtors' prepaid inventory and deposits within the assets to be sold to Presstek. (Trans. of the November 17, 2004 Hearing pp. 27-33 at A-0716 through A-0722). His conclusion was further based on the fact that the Pipeline Product was included within the formula for the minimum working capital covenant of the Sale Agreement. (Trans. of the November 17, 2004 Hearing pp. 28-33 at A-0717 through A-0722). Upon cross-examination by counsel to the Committee, Mr Gray acknowledged that (i) under the Private Label Sales Agreement, title to the Pipeline Product would not pass to the Debtors until such product was delivered to the Debtors, (ii) the Pipeline Product had not been delivered to the Debtors as of November 17, 2004, and (iii) Mitsubishi had not granted the required prior written consent to the assignment of the Private Label Sales Agreement. (Trans. of the November 17, 2004 Hearing pp. 33-35 at A-0722 through A-0724).

After this testimony, the Bankruptcy Court ruled from the bench that the Debtors sold the Pipeline Product to Presstek based on the inclusion of prepaid inventory in the list of assets to be sold under the Sale Agreement. (Trans. of the November 17, 2004 Hearing pp. 38-39 at A-0727 through A-0728). The Court appears to have held that the Debtor validly exercised the Pipeline Purchase Option, but did not explain how the Debtors' exercise of that right results in Presstek having a right to take title to the Pipeline Product after paying less than half of the value of such product. The Bankruptcy Court made this ruling notwithstanding the fact that (i) the Debtors' Chief Restructuring

Officer testified that none of the conditions precedent had been satisfied in order for the Debtors to obtain title to the Pipeline Product, and (ii) the Sale Order clearly excludes the Private Label Sales Agreement from the Sale. The present appeal followed.

## IV.    <u>Argument</u>

### A.    <u>Introduction and Standard of Review</u>

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a) and applies a clearly erroneous standard of review of the Bankruptcy Court's findings of fact and a plenary or de novo review of the bankruptcy court's conclusions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3rd Cir. 1999); *Nova Hut, a.s. v. Kaiser Group Int'l Inc. (In re Kaiser Group Int'l)*, 307 B.R. 449, 453-454 (D. Del. 2004). With mixed questions of fact and law, the District Court must accept the Bankruptcy Court's findings of "historical or narrative facts unless clearly erroneous, but exercise 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3rd Cir. 1991) (quoting *Universal Minerals, Inc., v. C.A. Hughes & Co.*, 669 F.2d 98, 101-102 (3rd Cir. 1981)); *Ross v. LaRouche Industries, Inc. (In re La Rouche Industries, Inc.)*, 307 B.R. 774, 778 (D.Del. 2004).

The Bankruptcy Court committed reversible error because:

- The Debtors did not have title to the Pipeline Product as of the Closing or the November 17, 2004, hearing, and their right to receive either the Refund or the Pipeline Product was a right that existed only under the Private Label Sales Agreement;

- The Sale Order expressly excludes the Private Label Sales Agreement from the scope of the Sale;

- The Sale Order expressly trumps any inconsistent provision of the Sale Agreement;

- Prior to November 17, 2004, the intent of the Debtors and Presstek was clear based on their consistent acknowledgments that the Sale would not impact Mitsubishi's title to the Pipeline Product or its rights to resell the Pipeline Product under the Resale License;

Based on these indisputable factual premises, Presstek could not have either purchased the Pipeline Product or received the Refund without taking an assignment of the Private Label Sales Agreement. It is undisputed that the Debtors did not assign the Private Label Sales Agreement to Presstek.    Accordingly, the Bankruptcy Court improperly permitted Presstek to receive nearly $5 million worth of Pipeline Product under the Private Label Sales Agreement in exchange for only $2.25 million, thus depriving the Debtors' estates of the right to receive the Refund, which could have been as much as $2,545,774.94 million.

**B.     The Debtors Held No Interest in the Refund or the Pipeline Product Independent of the Private Label Sales Agreement and Therefore Could Convey No Such Interests to Presstek**

The central issue of this appeal is whether the Bankruptcy Court erred in concluding that the Debtors' conveyed an interest in the Refund or the Pipeline Product to Presstek in connection with the Sale. The first step in resolving this issue is to clearly identify the nature of the Debtors' property interest at issue.    "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. U.S.*, 440 U.S. 48, 55 (1979), cited by *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487 (3d Cir. 1997).

As explained above, the Debtors' right to receive the Refund and the right to purchase the Pipeline Product upon exercise of the Pipeline Purchase Option are strictly contract rights under the Private Label Sales Agreement.  The nature of the Debtors' rights is clear when one considers the only manner in which the Debtors could have enforced their right to receive either the Refund or the Pipeline Product: they would have sought to enforce their contractual rights under the Private Label Sales Agreement.  Accordingly, it is critical to understand that any and all rights of the Debtors in the Refund or the Pipeline Product were solely and strictly derived from and circumscribed by the Private Label Sales Agreement.

At the November 17, 2004, hearing, the lone witness was Stepen Gray, the Debtors' Chief Restructuring Officer.  Mr. Gray testified that he believed that the Debtors conveyed the Pipeline Product to Presstek based on (i) Sections 2.1, 2.2, and 10.12 of the Sale Agreement as amended, which included the Debtors' prepaid inventory and deposits within the assets to be sold to Presstek, and (ii) the fact that the Pipeline Product was included within the formula for the minimum working capital covenant of the Sale Agreement.  (Trans. of the November 17, 2004 Hearing pp. 27-33 at A-0716 through A-0722).  Upon cross-examination by the Committee, Mr Gray acknowledged that (i) under the Private Label Sales Agreement, title to the Pipeline Product would not pass to the Debtors until such product was delivered to the Debtors, and (ii) the Pipeline Product had not been delivered to the Debtors as of November 17, 2004.  (Trans. of the November 17, 2004 Hearing pp. 33-35 at A-0722 through A-0724).  Nevertheless, the Bankruptcy Court concluded that the inclusion of prepaid inventory and deposits within the definition of assets to be sold under the Sale Agreement are sufficient, as a matter of law, to have

permitted the Debtors to convey to Presstek property that the Debtors did not own.

The purported sale of the Pipeline Product pursuant to the Sale Agreement, which is governed by New York law (Sale Agreement ¶ 13.10 at A-0048), constitutes a contract for the sale of goods governed by the New York Uniform Commercial Code. Under New York law, a purchaser of goods can only acquire the title to the property that his seller had the power to transfer. *See* N.Y.U.C.C. § 2-403(1) ("A purchaser of goods acquires all title which his transferor had or had power to transfer . . ."); *Dweck v. Pacificorp Capital, Inc.*, 1998 WL 88742, *5 (S.D.N.Y. March 2, 1998), *citing Vanleigh Carpet Corp., v. Gene Schoor's Iron Forgen*, 318 N.Y.S.2d 402, 404 (Civ. Ct. 1971) ("[A] buyer can acquire only such title as transferor has power to transfer."). The Bankruptcy Court's ruling ignores this fundamental legal tenet and instead stands for the proposition that anybody can sell the Brooklyn Bridge if they sign a contract to do so. Such a proposition certainly has no basis in law. Simply stated, the Debtors had no more right or ability to sell the Pipeline Product or the Refund than they had to sell the Brooklyn Bridge.

Neither Presstek nor the Debtors have ever asserted that the Debtors owned the Pipeline Product at Closing. Further, neither Presstek nor the Debtors have ever asserted that the Debtors had a right to the Refund outside of the rights afforded to the Debtors under the Private Label Sales Agreement. These truths are not in dispute, and any finding or conclusion by the Bankruptcy Court to the contrary is without any basis in law or fact and must be reversed.

**C.    It is Undisputed That the Private Label Sales Agreement Was Excluded From the Sale and Was Not Assigned to Presstek Pursuant to the Sale Order**

There being no question that the Debtors' interests in the Pipeline Product and the Refund were circumscribed by the terms of the Private Label Sales Agreement, this Court

must determine whether the Bankruptcy Court erred in concluding that the Debtors conveyed their contractual interests and rights under the Private Label Sales Agreement without assigning said agreement and without the required consent of Mitsubishi.

The Sale Order expressly and unequivocally states in paragraph 22 that "[t]o the extent of any inconsistency between the provisions of the Sale Agreement, any documents executed in connection therewith, and this Order, the provisions contained herein shall govern." (Sale Order ¶ 22 at A-0491). With respect to the Private Label Sales Agreement, the Sale Order decrees that notwithstanding any other provision of the Sale Order to the contrary, the Private Label Sales Agreement could not be deemed to have been assigned to Presstek. (Sale Order ¶ 9 at A-0488). Further, the Sale Order reserves the Debtors' right to assume and assign the Private Label Sales Agreement at some future date. (Sale Order ¶ 9 at A-0488). This is evidence that the Debtors and Presstek never intended the Private Label Sales Agreement to be assigned in connection with the Sale.

Moreover, it is undisputed that Mitsubishi never provided written consent to any assignment of the Private Label Sales Agreement, as specifically required therein. (Trans. of November 17, 2004 Hearing pp. 34-35 at A-0723 through A-0724). Consequently, subsequent to the entry of the Sale Order, Presstek had no basis to assert that it had acquired the Private Label Sales Agreement. Any ruling to the contrary lacks a factual or legal basis and must be reversed.

### D.     Under Third Circuit Precedent, Presstek Could Not Have Obtained Rights Derived From the Private Label Sales Agreement Absent An Assignment Thereof

Presstek has never contended that it took an assignment of the Private Label Sales Agreement. Nevertheless, Presstek does contend, and the Bankruptcy Court actually

ruled, that Presstek somehow obtained the Debtors' rights that were derived strictly from the Private Label Sales Agreement. In a strikingly analogous case, the Court of Appeals for the Third Circuit held that a purchaser cannot acquire a debtor's rights derived from a contract if the purchaser and the debtor expressly exclude the applicable contract from the sale. *See In re CellNet Data Systems, Inc.*, 327 F.3d 242 (3d Cir. 2003).

In *CellNet*, the purchaser of a debtor's assets purchased a patent owned by the debtor, but expressly excluded from the sale transaction a license of the patented technology to a third party. After rejection of the license by the debtor, the licensee had the right to continue to exercise its rights under the license and to pay the contractual royalty payments. However, both the purchaser of the debtor's assets and the debtor asserted the exclusive right to receive the royalty payments from the licensee. The issue before the Third Circuit was whether the purchaser could refuse to accept an assignment of the license agreement but nevertheless obtain the rights under such license to receive future royalty payments from the licensee. Based on those facts, the Third Circuit ruled that the exclusion of the license contract from the asset sale barred the purchaser from obtaining any of the rights that flowed from the contract, including the right to receive the royalties.

Here, it is undisputed that at the Sale Hearing Presstek chose not to accept an assignment of the Private Label Sales Agreement. It thus follows under binding Third Circuit precedent that Presstek, just like the purchaser in *CellNet*, cannot receive the benefits of a contract that it intentionally declined to purchase.

Absent the assignment of the Private Label Sales Agreement to Presstek, the Debtors held the right to either receive the Refund or to pay approximately $2.25 million

to receive almost $5 million in Pipeline Product. In the event of the former, the Debtors'
estates would have benefited by receiving the Refund to be distributed to unsecured
creditors. In the latter event, the Debtors' estates would have had the right to sell the
nearly $5 million worth of Pipeline Product, with any amount exceeding $2.25 million
(the price paid under the Pipeline Purchase Option) being available for distribution to
unsecured creditors. In either event, the Bankruptcy Court's ruling permitted Presstek
and the Debtors ultimately to put into Presstek's hands nearly $5 million dollars of
property for no consideration. This abandonment of the Debtors' contract rights deprived
the unsecured creditors of as much as $2,545,774.94. This result is proscribed by
*CellNet*, and the Bankruptcy Court's ruling must be reversed.

### E. The Record Is Clear That the Debtors and Presstek Had No Intention To Convey The Pipeline Product

Presstek and the Debtors asserted before Judge Peterson that they mutually
intended to convey the Pipeline Product from the Debtors to Presstek under the Sale
Agreement. As evidence of this alleged mutual intent, the Debtors and Presstek point to
the modification of the working capital covenant of the Sale Agreement to include a
portion of the value of the Pipeline Product within the minimum inventory levels.
Indeed, the Debtors' and Presstek's assertions before Judge Peterson at the Bankruptcy
Court on November 17, 2004, are entirely contrary to the Debtors' statements to Judge
Case at the Bankruptcy Court on August 23, 2004, which statements Presstek did not
challenge.

Unfortunately for Presstek, the historical record in this case is replete with
evidence contrary to Presstek's revisionist tale. For example:

> • On August 23, 2004, Mitsubishi (and the Bankruptcy
> Court) sought and obtained confirmation that the Debtors

and Presstek were not "trying to change whatever rights the sellers of inventory may have, but rather simply have agreed on the treatment of the pre-paid inventory for purposes of compliance with the reps and warranties of the [Sale Agreement]."    (Trans. of the August 23, 2004 Hearing pp. 39-40 at A-0128 through A-0129);

- At the Sale Hearing, Presstek did not oppose Mitsubishi's clarifications or the language of the Sale Order regarding the non-assignment of the Private Label Sales Agreement. (Trans. of the November 3, 2004 Hearing pp. 63-66 at A-0441 through A-0444);

- At the Sale Hearing, Presstek did not challenge Mitsubishi's requested clarification that the parties did not "intend" to "wipe out" Mitsubishi's rights under the Resale License provisions of the Private Label Sales Agreement to sell the Pipeline Product to a third party of Mitsubishi's choosing upon termination of the Private Label Sales Agreement. (Trans. of the November 3, 2004 Hearing pp. 63-66 at A-0441 through A-0444); and

- At the Sale Hearing, Presstek did not challenge the statement of Debtors' counsel that the Debtors and Mitsubishi had an agreement regarding Mitsubishi's concerns over the Resale License and that those concerns were therefore a "nonissue." (Trans. of the November 3, 2004 Hearing pp. 63-66 at A-0441 through A-0444).

This Court should hold that Presstek is judicially estopped from asserting an intention to acquire the Pipeline Product under the Sale Agreement based on the Debtors' and Presstek's repeated confirmation and acquiescence, as summarized above, to every request by Mitsubishi and the Bankruptcy Court for confirmation that the Sale Agreement would not impact (i) Mitsubishi's title to the Pipeline Product, (ii) Mitsubishi's rights under the Private Label Sales Agreement, or (iii) Mitsubishi's right to resell the Pipeline Product to which it would continue to hold title. To allow Presstek to assert a contrary position after the Closing would be to permit Presstek to play "fast and loose" with this Court by asserting contradictory positions. *See McCarron v. Federal Deposit Insurance*

*Corp.*, 111 F.3d 1089, 1097 (3rd Cir. 1997) ("The purpose of judicial estoppel is to prevent a party from playing 'fast and loose' with courts by asserting contradictory positions."), *citing U.S. v. Vastola*, 989 F.2d 1318, 1324 (3rd Cir. 1993)).

With numerous opportunities to assert its claimed "intention" prior to the Closing, Presstek's persistent silence established its acquiescence to Mitsubishi's rights under the Private Label Sales Agreement. If Presstek intended to purchase the Pipeline Product through the Sale, it had an obligation to the bankruptcy court and to all of the parties in interest to voice its position at some point prior to the Closing. *See In re Telegent, Inc.*, 282 B.R. 765, 772 (Bankr. S.D. N.Y. 2002) ("The duty to speak need not be purely legal, but may be based on principles of ethics and good faith."), *citing Columbia Broad. Sys. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 378 (2d Cir. 1975) (discussing New York law). This obligation is more pronounced in a bankruptcy, where the actions of each party in interest, particularly a purchaser of a debtor's assets, may significantly affect the rights of nearly every other party in the case. *See id.* ("Bankruptcies . . . give rise to unique moral and ethical concerns because each creditor's action may affect the rights of every party in interest."). Given Presstek's acquiescence to the repeated clarifications provided to both the bankruptcy court and Mitsubishi, Presstek's current contrary position is made in bad faith, and Presstek should be estopped from doing so now. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3rd Cir. 1996) (requiring a showing of bad faith).

The Bankruptcy Court and all of the parties involved in this bankruptcy case observed Presstek's acquiescence to the comfort given by the Debtors to Mitsubishi from August 2004 through the Sale Hearing in November 2004. The parties' intentions were

clear, and the record through the Sale Hearing leads to the unequivocal conclusion that the Debtors' and Presstek's mutual intention was to leave the Private Label Sales Agreement and the Pipeline Product unaffected by the Sale, subject to Mitsubishi's rights to resell the Pipeline Product and its corresponding obligation to pay the Refund up to $2.5 million to the Debtors for the benefit of their creditors.

The record, however, is not devoid of any insight into the reason that Presstek, after the Closing, for the first time broke its silence and expressed its allegedly long held but never before stated intention to have acquired the Pipeline Product under the Sale Agreement. In Presstek's own words:

> When Presstek closed its acquisition of the AB Dick business, it discovered that AB Dick had no inventory of Mitsubishi parts, and that the pending order from Mitsubishi would be the first opportunity to acquire the inventory. Receipt of the Mitsubishi inventory is critical to Presstek . . . .
> (Presstek Mot. ¶3 at A-0538).

The record leads one to believe that Presstek discovered its newly professed "intention" after the Closing of the Sale at the same time that it discovered its "critical" need for the Pipeline Product. Regardless of the severity of the crisis faced by Presstek, such crisis was created by its refusal pay the Debtors to acquire their rights under the Private Label Sales Agreement. The Bankruptcy Court was without any legal or factual basis to save Presstek from its self-imposed dilemma, especially at the expense of up to $2.5 million to which the Debtors' creditors are entitled, and the ruling below must therefore be reversed.

> **F.    The Debtors and Presstek Acknowledged That Inclusion of the Pipeline Product in the Working Capital Covenant is Not Relevant to The Rights to the Pipeline Product Under the Private Label Sales Agreement**

Presstek argued that the Committee knew that the Pipeline Product was being transferred to Presstek as part of the Sale because the Pipeline Product was included in the working capital covenant that must have been met at the time of Closing in order for the Sale to close. This argument directly conflicts with Presstek's acquiescence to Judge Case's conclusion on August 23, 2004, that by agreeing to the working capital covenant modification in the First Amendment to the Sale Agreement, the Debtors and Presstek were "not trying to change whatever rights the sellers of the inventory may have, but rather simply have agreed on the treatment of the pre-paid inventory for purposes of compliance with the reps and warranties of the [Sale Agreement]." (Trans. of the August 23, 2004 Hearing pp. 39-40 at A-0128 through A-0129).

This is consistent with the Committee's argument on November 17, 2004 that including the Pipeline Product in the working capital covenant had no legal significance in determining who has a right to specific property because Closing covenants tied to working capital do not transfer title to property. The Committee argued on November 17, 2004, that working capital covenants merely establish a minimum level of performance that a company must reach. Judge Case confirmed this intention on August 23, 2004. Further, the fact remains that the Sale Order clearly conflicts with the interpretation of the Sale Agreement conjured by Presstek and the Debtors, and in such event the Sale Order prevails according to its terms. In any event, in transactions of this type, assets being purchased may or may not include the accounts receivable or inventory used to measure the working capital, and the inclusion of such asset in such a formula does not operate to transfer the assets absent a provision to that effect elsewhere in the Sale Agreement.

For the foregoing reasons, the ruling of the Bankruptcy Court must be reversed to the extent that it is based on the inclusion of the Pipeline Product in the minimum working capital covenant.

## V.    Conclusion

As stated above, the Debtors could not have conveyed a property interest in the Refund or the Pipeline Product greater than the rights that they possessed. Because the Debtors' rights in the Refund and the Pipeline Product were derived exclusively from and limited by the Private Label Sales Agreement, the express exclusion of the Private Label Sales Agreement from the Sale renders the separate transfer of any interest thereunder in the Refund or the Pipeline Product a legal impossibility. Further, even if the Pipeline Purchase Option was properly exercised after the Closing of the Sale, there is no legal or factual basis for the Bankruptcy Court to have concluded that Presstek was then entitled to receive the Pipeline Product for less than half of its acknowledged value. Accordingly, the ruling of the Bankruptcy Court must be reversed.

Dated:  April 15, 2005
Wilmington, Delaware

THE BAYARD FIRM

By: _Jeffrey M. Schlerf_  Signed w.p.
Jeffrey M. Schlerf (No. 3047) /  Gian Claudio Finizio
222 Delaware Ave., Suite 900         (No. 4253)
P.O. Box 25130
Wilmington, DE 19899
Tel:  302.429.4218
Fax: 302.658.6395

McGUIREWOODS LLP
Richard J. Mason, P.C.
Michael M. Schmahl
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1681
Tel: 312.849.8100
Fax: 312.849.3690

and

James H. Joseph (No. 3920)
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, PA  15222
Tel:  412.667.6000
Fax:  412.667.6050

Counsel to the Official Committee of
Unsecured Creditors of Blake of
Chicago Corp. f/k/a A.B. Dick
Company, *et al.*

Unpublished Opinion Cited in the Opening Brief of the Official
Committee of Unsecured Creditors in Support of its Appeal

Westlaw.

Not Reported in F.Supp.                                    Page 1
1998 WL 88742 (S.D.N.Y.)
(Cite as: 1998 WL 88742 (S.D.N.Y.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.


United States District Court, S.D. New York.
Meyer DWECK, Alan Tripp Singer, Bayless Jewelry,
Inc., Bobby Wilkerson, Inc.,
James E. Fitzgerald, and Leveraged Leasing
Administration Corporation, as
successor in interest to UCC Leasing, Ltd., Plaintiffs,
v.
PACIFICORP CAPITAL, INC., as successor in
interest to Thomas Nationwide Capital
Corporation, Defendant.
**No. 91 CIV.2095(MJL).**

March 2, 1998.
Noel Hauser & Associates, New York, By Noel W.
Hauser, Esq., for Plaintiffs.

Geltner and Associates, P.C., Washington, D.C., By
Michael E. Geltner, Esq., Carro, Velez, Carro &
Mitchell, L.L.P., New York, By Dasil E. Velez, Esq.,
for Defendant.

OPINION AND ORDER

LOWE, D.J.

**\*1** Before the Court is Defendant's motion for
summary judgment, pursuant to Federal Rule of Civil
Procedure 56. For the reasons stated below,
Defendant's motion is granted in part and denied in
part.

BACKGROUND
*Plaintiffs' Allegations*

Although Defendant contests many of the allegations
contained in Plaintiffs' Third Amended Complaint,
the Court summarizes those allegations for
background purposes. Thomas Nationwide Capital
Corporation ("Thomas") engaged, until September
1987, in the business of buying, selling, and leasing
computer equipment. At some point before March
31, 1984, Thomas purchased certain equipment,
which is itemized in Exhibit 1 to the Third Amended
Complaint ("Subject Equipment"). Thomas

subsequently leased the Subject Equipment to various
users ("Users") for specified periods pursuant to
equipment leases ("User Leases"). Plaintiffs allege
that, after a series of sales transactions, they
purchased the Subject Equipment and any rights that
may exist under the User Leases for the Subject
Equipment.

According to the Third Amended Complaint, prior to
1984, Thomas sold the Subject Equipment to the
Stanan Computer Corporation ("Stanan"). On March
31, 1984, Stanan sold the Subject Equipment to First
Western Government Securities, Inc. ("First
Western"). On that same day, First Western sold the
Subject Equipment to Intercontinental Pacific Group,
Inc. ("Intercontinental"). On December 31, 1984,
Intercontinental sold the Subject Equipment to UCC
Leasing, Ltd. ("UCC Leasing"). On that same day,
UCC Leasing sold the Subject Equipment, divided
into six separate contracts, to Westwind Leasing
Corp. ("Westwind"). Also on that same day,
Westwind sold the Subject Equipment to Meyer
Dweck ("Dweck"), Alan Tripp Singer ("Singer"),
Bayless Jewelry, Inc. ("Bayless"), Bobby Wilkerson,
Inc. ("Wilkerson"), and James E Fitzgerald
("Fitzgerald") (collectively the "Individual
Plaintiffs"). Each of the Individual Plaintiffs
subsequently leased their portion of the Subject
Equipment, for a period of seven years, to UCC
Leasing. In 1987, UCC Leasing assigned its interest
in the Subject Equipment to Plaintiff Leveraged
Leasing Administration Corp. In September 1987,
Thomas merged into Defendant Pacificorp Capital,
Inc. ("Pacificorp" or "Defendant").

According to the Third Amended Complaint, at each
stage the buyer purchased the equipment subject to
the Users' rights under the User Leases. In addition,
in each instance the seller assigned to the purchasing
party: (1) its rights under the User Leases ("User
Lease Rights"), and (2) its rights to enter into other or
further leases or subleases of the Subject Equipment,
to renew or extend the User Leases, and to sell the
Subject Equipment (collectively, "Further Rights").

Plaintiffs allege that Thomas and its successor,
Pacificorp, have improperly exercised the Further
Rights by re-leasing or selling the Subject Equipment
after the expiration of the User Leases. Plaintiffs
further allege that Pacificorp has improperly received
rent payments and sale proceeds from the Subject

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 88742 (S.D.N.Y.)
(Cite as: 1998 WL 88742 (S.D.N.Y.))

Equipment that belong to Plaintiffs. Plaintiffs' first claim seeks an accounting, alleging that Defendant has failed, despite Plaintiffs' demands, to account to Plaintiffs, or provide them information, with respect to the Further Rights. Plaintiffs' second claim seeks damages of $5,200,000 for breach of contract based on Defendant's allegedly wrongful exercise of the Further Rights. Plaintiffs' third claim alleges that Defendant converted equipment belonging to Plaintiffs in the amount of $1,200,000.

*Undisputed Facts*

*2 On the basis of the parties' statements submitted pursuant to Southern District of New York Local Civil Rule 3(g) ("3(g) Statements"), and supporting submissions, the following facts are undisputed. Thomas was a computer leasing company which, in 1987, was merged into Pacificorp. *See* Def.'s 3(g) Statement, ¶ ¶ 2,3; Pls.' 3(g) Statement, ¶ 1. Thomas' business was to acquire computer equipment and lease it to users who maintained possession of the equipment on their premises. *See* Def.'s 3(g) Statement, ¶ 3; Pls.' 3(g) Statement, ¶ 1. On March 31, 1984, [FN2] Thomas sold the Subject Equipment [FN2] to Stanan. *See* Def.'s 3(g) Statement, ¶ 4; Pls.' 3(g) Statement, ¶ 1. The Subject Equipment had previously been leased to Users under User Leases. *See id.* On March 31, 1984, Stanan sold the Subject Equipment to First Western. *See* Def.'s 3(g) Statement, ¶ 6; Pls.' 3(g) Statement, ¶ 1. On September 30, 1984, and December 30, 1984, Westwind sold certain computer equipment to the Individual Plaintiffs. *See* Def.'s 3(g) Statement, ¶ ¶ 13- 17; Pls.' 3(g) Statement, ¶ 1. This equipment, according to bills of sale and purchasing agreements produced by Plaintiffs, corresponds, at least in part, to the quantity, model, description, and underlying User Leases of portions of the Subject Equipment. The equipment Plaintiffs claim to have purchased was, at the date of their purchases, in the possession of the Users to whom it was leased. *See* Def.'s 3(g) Statement, ¶ 20; Pls.' 3(g) Statement, ¶ 1. On December 31, 1984, Intercontinental sold certain unidentified equipment to UCC Leasing. *See* Def.'s 3(g) Statement, ¶ 18; Pls.' 3(g) Statement, ¶ 1. Also on December 31, 1984, UCC sold certain unidentified equipment to Westwind. *See* Def.'s 3(g) Statement, ¶ 19; Pls.' 3(g) Statement, ¶ 1. Plaintiffs have never taken possession of the equipment they claim to have purchased. *See* Def.'s 3(g) Statement, ¶ 22; Pls.' 3(g) Statement, ¶ 1. The Subject Equipment is not in Defendant's possession. *See* Def.'s 3(g) Statement, ¶ 23. [FN3]

FN1. Although Plaintiffs' Third Amended Complaint alleges that the Thomas to Stanan sale occurred before 1984, Plaintiffs' response to Defendant's 3(g) Statement admits that the sale occurred on March 31, 1984. *See* Def.'s 3(g) Statement, ¶ 4; Pls.' 3(g) Statement, ¶ 1. Any inconsistency with respect to this purchase date is irrelevant for purposes of this motion.

FN2. The affidavit of Defendant's custodian of records confirms that the equipment listed in Exhibit 1 of the Third Amended Complaint is the same equipment sold by Thomas to Stanan. *Compare* Third Amended Complaint, Ex. 1 *with* Edlow Aff. ¶ ¶ 7, 8.

FN3. In their Response to Defendant's Local Rule 3(g) Statement, Plaintiffs failed to respond to Defendant's statements in Paragraph 23. Rule 3(g) provides that: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Local Southern District of New York Rule 3(g). Thus, absent a response by Plaintiffs, the allegation in Paragraph 23 is deemed an admission by Plaintiffs and is therefore undisputed.

*Disputed Facts*

The primary factual dispute between the parties concerns transactions that occurred after the purchase of the Subject Equipment by First Western on March 31, 1984 and before the sale of the Subject Equipment by Westwind to the Individual Plaintiffs. Defendant claims that, after First Western purchased the Subject Equipment from Stanan on March 31, 1984, First Western sold the Subject Equipment to Clifton Investor Services, Ltd. ("Clifton") on the same day. *See* Def.'s 3(g) Statement, ¶ 8. Defendant contends that the First Western to Clifton sale is documented by a bill of sale, a purchase agreement, a leaseback, a recognition and security agreement, and a power of attorney. *See id.* Plaintiffs admit that the documents described in Paragraph 8 of Defendant's 3(g) Statement exist. [FN4] *See* Pls.' 3(g) Statement, ¶ 3. Plaintiffs, however, contend that the purported sale of the Subject Equipment to Clifton never occurred and was aborted. *See id.* Rather, Plaintiffs allege that First Western sold the Subject Equipment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
1998 WL 88742 (S.D.N.Y.)
(Cite as: 1998 WL 88742 (S.D.N.Y.))

to Intercontinental, which in turn sold it to Westwind via UCC Leasing. Thus, Plaintiffs contend that Clifton is not in the chain of title to the Subject Equipment. Defendant maintains that no sale ever occurred between First Western and Intercontinental for the Subject Equipment. *See* Def.'s 3(g) Statement, ¶ 11.

> FN4. The Court also notes that Plaintiffs failed to respond to Paragraph 9 of Defendant's 3(g) Statement, which alleges that there was a "Recognition and Security Agreement between Stanan, First Western and Clifton referring to a sale of the Subject Equipment from First Western to Clifton and a lease from Clifton to Stanan." *See* Def.'s 3(g) Statement, ¶ 9.

### PROCEDURAL BACKGROUND

*3 On June 9, 1992, Plaintiffs filed a Second Amended Complaint. In the Second Amended Complaint, Plaintiffs alleged that the series of sales transactions for the Subject Equipment flowed from Thomas to Stanan to First Western to Clifton to Intercontinental to UCC Leasing to Westwind to the Individual Plaintiffs.

In December 1994, Defendant moved for summary judgment. Defendant argued that Plaintiffs' contract claim should be dismissed based upon several alleged defects in the chain of title, including: (1) Westwind lacked title to the equipment when it allegedly sold the equipment to the Plaintiffs because Westwind had not purchased the equipment from UCC Leasing; (2) Westwind also lacked title because its purchase agreement failed to identify the equipment it purchased from UCC Leasing; and (3) Plaintiffs presented no evidence of a sale from Clifton to Intercontinental. In response to the third argument, Plaintiffs claimed, contrary to their Second Amended Complaint, that Clifton was not in the chain of title to the Subject Equipment. Plaintiffs requested leave to amend the Second Amended Complaint to conform to that claim. Defendant also sought dismissal of Plaintiffs' accounting and conversion claims.

On September 12, 1995, the Court granted Defendant summary judgment on all three of Plaintiffs' claims. *See Dweck v. Pacificorp Capital, Inc.,* No. 91 Civ.2095, 1995 WL 552745 (S.D.N.Y. Sept. 15, 1995). First, the Court found that Plaintiffs were not entitled to an accounting because the parties lacked the requisite confidential or fiduciary relationship and no special circumstances existed to warrant such relief. *See id.* at *4. Second, the Court

dismissed Plaintiffs' contract claim based upon a defect in the chain of title. The Court found that, on September 30 and December 30, 1984, the dates Westwind allegedly sold the Subject Equipment to the Individual Plaintiffs, Westwind lacked title to the equipment. *See id.* at *5-*7. Westwind had purchased the Subject Equipment on December 31, 1984, after its sales to Plaintiffs. *See id.* at *5. Thus, Westwind had no power to convey title to the Individual Plaintiffs on the earlier dates. [FN5] *See id.* at *5-*7. Third, the Court dismissed Plaintiffs' conversion claim because they failed to establish ownership of the Subject Equipment and, even if they had established ownership, failed to adequately demand the return of the Subject Equipment. *See id.* at *7-*8.

> FN5. Because the Court relied upon this defect in the chain of title to dismiss the contract claim, the Court did not address Plaintiffs' request to amend their Complaint in order to exclude Clifton from the chain of title or Defendant's argument regarding the lack of identification of the equipment purchased by Westwind.

On appeal, the Second Circuit remanded the case to the District Court for further proceedings to establish whether diversity of citizenship existed. [FN6] *See Leveraged Leasing Administration Corp. v. Pacificorp Capital, Inc.,* 87 F.3d 44, 47 (2d Cir.1996). Notwithstanding its remand on procedural grounds, the Second Circuit addressed the substantive issues in the event that jurisdiction was properly invoked. *See id.* at 48. First, the Second Circuit found that the Court erred in dismissing the contract claim. *See id.* at 48-49. The Court of Appeals held that, although Westwind purchased the Subject Equipment on December 31, 1984, yet purported to sell the same equipment to the Individual Plaintiffs on September 30 and December 30, 1984, Westwind had the power to convey title on those dates and the sales were not void. *Id.* The Second Circuit further held that the Court erred in concluding that Plaintiffs were required to issue a demand for the return of the Subject Equipment in order to maintain a claim for conversion. *Id.* at 49-50. However, the Second Circuit noted that an action for conversion can only be maintained by the true owner of the property, and left the issue of ownership for the District Court upon remand. *See id.* at 50. The Second Circuit agreed with this Court's dismissal of the accounting claim. *See id.* at 49.

Not Reported in F.Supp.
1998 WL 88742 (S.D.N.Y.)
(Cite as: 1998 WL 88742 (S.D.N.Y.))

FN6. On appeal, Defendant asserted, for the first time, that Plaintiffs failed to properly allege diversity of citizenship. The Second Amended Complaint set forth the residences, but not the citizenships, of the Individual Plaintiffs.

*4 Upon remand, Plaintiffs moved to amend their Second Amended Complaint. Defendant consented to the amendment insofar as it cured the jurisdictional question of diversity. The Court then granted Plaintiffs leave to amend to: (1) cure the jurisdictional defect and (2) allege a new chain of title whereby First Western sold the Subject Equipment to Intercontinental without an intervening purchase by Clifton. Defendant's Answer to the Third Amended Complaint denies any alleged sale from First Western to Intercontinental and asserts that First Western sold the equipment to Clifton, the only party with a legal right to sell the equipment. *See* Def.'s Answer to Third Amended Complaint, ¶ 17. The parties conducted limited additional discovery with regard to the status of Clifton in the transactional chain.

Defendant now renews its motion for summary judgment, arguing that Plaintiffs' chain of title is defective because: (1) Clifton alone had the right to convey the Subject Equipment to UCC Leasing since Clifton, not Intercontinental, purchased the Subject Equipment from First Western, (2) Westwind never obtained proper title to the Subject Equipment because Westwind's purchase documents failed to identify the equipment purchased from UCC Leasing, and (3) the equipment allegedly purchased by Plaintiffs does not match, in certain instances, the equipment originally sold by Thomas to Stanan.

### DISCUSSION
#### I. *Summary Judgment Standard*

A court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Federal Rules of Civil Procedure "mandat[e] the entry of summary judgment, after adequate discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving

party bears the burden of showing that no genuine factual dispute exists. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted). Rather, the opposing party must produce "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202)) Summary judgment is proper only if, after drawing all inferences and resolving all ambiguities in favor of the non-moving party, it appears that no rational jury could find for the non-movant because the evidence supporting its case is so scant. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223-24 (2d Cir.1994).

#### II. *Defendant's Motion for Summary Judgment*

#### A. *Chain of Title Requirement*

*5 In order for Plaintiffs to maintain an action for breach of contract on the Subject Equipment, it is essential that Plaintiffs establish themselves as the rightful owners of the Subject Equipment. In their Third Amended Complaint, Plaintiffs allege a chain of title that runs from Thomas to Stanan to First Western to Intercontinental to UCC Leasing to Westwind to the Individual Plaintiffs. It is well-established that "[a] purchaser of goods acquires all title which his transferor had or had power to transfer ." N.Y.U.C.C. Law § 2-403 (McKinney 1993); *see also Rainbow Ranch Corp. v. Rainbow Shops, Inc.*, 89 Misc.2d 808, 392 N.Y.S.2d 796, 798 (Sup.Ct. Suffolk Cty.1977); *Vanleigh Carpet Corp. v. Gene Schoor's Iron Forge*, 65 Misc.2d 504, 318 N.Y.S.2d 402, 404 (Civ.Ct.1971) ("a buyer can acquire only such title as the transferor had a power to transfer."). Thus, Plaintiffs must establish that at each rung in their chain of title, the buyer purchased the Subject Equipment from a seller who had the power to transfer title to the Subject Equipment. If, at any stage in this chain, a buyer purchased the Subject Equipment from a seller who did not have title or the power to convey title in the Subject Equipment, then the remaining transactions as alleged in the Third Amended Complaint necessarily fail to establish Plaintiffs' ownership in the Subject Equipment.

#### B. *Alleged Defects in Plaintiffs' Chain of Title*

Not Reported in F Supp.                                                          Page 5
1998 WL 88742 (S.D.N.Y.)
(Cite as: 1998 WL 88742 (S.D.N.Y.))

1. *Sale of Subject Equipment from First Western to Clifton*

Neither party disputes that, on March 31, 1984, First Western acquired title to the Subject Equipment from Stanan, who purchased it from Thomas. According to Plaintiffs' Third Amended Complaint, First Western then sold the Subject Equipment to Intercontinental. Defendant argues that the documents and testimony establish that First Western sold the Subject Equipment to Clifton.

In support of its motion, Defendant has produced several documents evidencing a sale of the Subject Equipment from First Western to Clifton on March 31, 1984. First, Defendant submits a purchase agreement between First Western and Clifton ("Purchase Agreement"), dated March 31, 1984. [FN7] *See* Edlow Aff., Ex. 8. Attached to the Purchase Agreement is a list of the equipment purchased, which matches the list of equipment contained in Exhibit 1 to Plaintiffs' Third Amended Complaint. *Compare* Edlow Aff., Ex. 8 *with* Third Amended Complaint, Ex. 1. The Purchase Agreement further states that the seller, First Western, is delivering to the buyer, Clifton, a Bill of Sale, attached as Exhibit D to the agreement. *See id.* Defendant next submits the Bill of Sale between First Western and Clifton, dated March 31, 1984. *See* Edlow Aff., Ex. 9. On the top portion of the Bill of Sale is typewritten "Exhibit D," the reference given to it in the Purchase Agreement. *See id.* Defendant also submits a Recognition and Security Agreement ("Security Agreement") by and among First Western, as seller, Clifton, as transferee, and Stanan, as secured party, dated March 31, 1984. *See* Edlow Aff., Ex. 6. The Security Agreement states that, pursuant to the Purchase Agreement and the Bill of Sale, Clifton has acquired the rights, title, and interest in the Subject Equipment. *See id.* Finally, Defendant submits a lease between Clifton and Stanan, as contemplated in the Purchase Agreement, dated March 31, 1984, whereby Clifton leased the Subject Equipment back to Stanan for a specified period of time. *See* Edlow Supp. Dec., Ex. 19. The lease attaches a list of the equipment to be leased, which matches both the Subject Equipment listed in Exhibit 1 to the Third Amended Complaint and the equipment listed in the Purchase Agreement. *See id.*

> FN7. The Court notes that the first page of this document, which likely entitles the document and identifies the parties to the agreement, is virtually unreadable.

However, the document is signed on the last page by First Western and Clifton. Moreover, Plaintiffs have not disputed that this document purports to be a sale of the Subject Equipment from First Western to Clifton.

*6 In further support of its position, Defendant submits a document entitled "Power of Attorney," by which Clifton granted Richard Cohn ("Cohn") the power to execute all documents on its behalf in order to purchase certain equipment from First Western and lease the equipment back to Stanan. *See* Edlow Supp. Dec., Ex. 18. This document is signed by Edward Neff, the President of Clifton, and notarized. *See id.* Cohn's signature appears on behalf of Clifton on the Purchase Agreement, the Recognition and Security Agreement, and the Clifton/Stanan Lease. At his deposition, Cohn verified that his signature appeared on the Clifton/Stanan Lease. *See* Edlow Supp. Dec., Tab 8, at 29. Plaintiffs do not dispute the validity of the signatures on any of the Clifton documents.

Finally, Defendant offers the deposition testimony of Douglas Wolf ("Wolf"), the president of Intercontinental. Both parties agree that Wolf was the architect of numerous computer equipment transactions that occurred on March 31, 1984. *See* Pls.' Opp'n Mem. at 4, 6; Def.'s Mem. at 7. In a written deposition answer, Wolf testified, after reviewing a list of the Subject Equipment, that the equipment was sold by First Western to Clifton on March 31, 1984. *See* Edlow Supp. Dec., Tab 5, at 2.

As noted above, Plaintiffs do not dispute the existence of Defendant's documents or the fact that the documents purport to represent a sale of the Subject Equipment from First Western to Clifton. *See* Pls.' Response to 3(g) Statement, ¶ 3. Rather, Plaintiffs contend that, notwithstanding the Clifton documents, the sale from First Western was either nominal or aborted. *See* Pls.' Opp'n Mem. at 7; Pls.' Response to Def.'s 3(g) Statement, ¶ 3.

First, Plaintiffs assert that the deposition testimony of Cohn demonstrates that Clifton was not a "real actor" in the chain of title. *See* Pls.' Opp'n Mem. at 12. Plaintiffs argue that Cohn's testimony proves that he was acting "as a mere pawn for Wolfe and not for Clifton Securities Inc., a company he knew nothing about with respect to a transaction he knew nothing about." *See id.* Cohn's testimony, however, reveals only that he has little recollection of the events and actors in the disputed equipment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                                    Page 6
1998 WL 88742 (S.D.N.Y.)
(Cite as: 1998 WL 88742 (S.D.N.Y.))

transactions that occurred more than nine years before his deposition. *See* Pls.' Opp'n Mem., Ex. 8. Cohn's testimony does not undermine the validity of either the Power of Attorney granted to him to act on behalf of Clifton in the 1984 transactions or the documents signed by him, which transfer title of the Subject Equipment from First Western to Clifton.

The Court finds that no rational jury could review the signed documents and determine that a First Western/Clifton sale did not occur based upon Cohn's testimony that he does not recall his role or the events in the transactions. In fact, Cohn confirmed that his signature was valid and offered no testimony to suggest that the sale never occurred or that the documents were not valid. Moreover, even accepting as true Plaintiffs' contention that Cohn might have been involved at the behest of Wolf and Intercontinental, Plaintiffs have failed to demonstrate how that fact would affect the significance of an executed purchase agreement between First Western and Clifton. Plaintiffs' characterization of Clifton's role as "nominal" does not diminish Clifton's ownership of the Subject Equipment after the execution of the First Western/Clifton sale documents. [FN8]

> FN8. For the same reasons, whether or not Clifton bought the Subject Equipment as an "accommodation" for First Western for tax purposes is irrelevant. The relevant fact for this breach of contract claim is that Clifton acquired ownership.

*7 Despite the strong documentary and testimonial evidence in Defendant's favor, the Court must also consider the pleadings. Before filing their Third Amended Complaint, Plaintiffs had alleged that, on or about March 31, 1984, Clifton purchased the equipment from First Western and was therefore part of the chain of title. *See* Second Amended Complaint, ¶ ¶ 17, 18. In its Answer to the Second Amended Complaint, Defendant denied that allegation. *See* Def.'s Answer to Second Amended Complaint, ¶ 17. Defendant specifically alleged that, "although there was a transaction between First Western and Clifton being documented, Clifton and First Western nullified the transaction and it never came into being.... [C]ertain of the equipment ... was never intended to be sold by First Western to Clifton and was never so sold." *Id.* In the parties' most recent pleadings, Plaintiffs do not allege a First Western/Clifton sale and Defendant now alleges that such a sale did occur.

It is well-established in the Second Circuit that superseded pleadings, while not judicial admissions *per se,* may be introduced as evidence and considered an admission. *See United States v. McKeon,* 738 F.2d 26, 31 (2d Cir.1984). In *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.,* 32 F.2d 195, 198 (2d Cir.1929), the Second Circuit stated:

> [w]hen a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent.

(citations omitted); *see also Andrews v. Metro North Commuter Railroad Co.,* 882 F.2d 705, 707 (2d Cir.1989) (finding substantial abuse of discretion in district court's refusal to permit jury to examine original pleading and contrast it with amended pleading); *Savino v. Computer Credit, Inc.,* 960 F.Supp. 599, 601 (E.D.N.Y.1997) (noting that "a superseded pleading in a civil case may constitute an admission."); *Tiana Corp. v. Hartley,* 99 F.Supp. 670, 672 (S.D.N.Y.1951) (holding that, despite fact that defendant amended answer, allegation in original answer, although not a conclusive judicial admission, "is nevertheless competent evidence of the facts stated.").

Defendant argues that, because it adequately explained the reason for its contradictory allegations, its original pleading should not be considered by the trier of fact. *See* Def.'s Reply Mem. at 5-6. However, as noted in *Kunglig,* "[i]f the agent made the admission without adequate information, that goes to its weight, not to its admissibility." 32 F.2d at 198. The Second Circuit has explained that:

> a party thus cannot advance one version of the facts in its pleadings, concluded that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories.

*8 *McKeon,* 738 F.2d at 31. It is particularly appropriate for the jury to review Defendant's original pleading here, because Defendant had the alleged First Western/Clifton sale documents in its files and reviewed them before filing its Answer to the Second Amended Complaint. It is for the jury, not the Court, to assess the adequacy of Defendant's explanation for its reversal in position.

In light of Plaintiffs' contention that the Clifton sale

Not Reported in F.Supp.                                                                                                              Page 7
1998 WL 88742 (S.D.N.Y.)
(Cite as: 1998 WL 88742 (S.D.N.Y.))

was nullified, Defendant's previous allegation to that effect in its Answer to the Second Amended Complaint, and Defendant's current allegation that the Clifton sale occurred, the Court finds that a genuine issue of fact exists as to the chain of title. Although Defendant notes that Plaintiffs' original pleadings may also be considered admissions, this only further demonstrates the need to have a jury resolve this dispute. Accordingly, the Court denies Defendant summary judgment on this ground.

*2. Identification of Equipment Sold by Westwind to Plaintiffs*

Defendant next argues that Plaintiffs never acquired title to the Subject Equipment due to a defect in the chain of title between UCC Leasing and Westwind. See Def.'s Mem. at 13-16. In its 3(g) Statement, Defendant alleged that, "[o]n December 31, 1984, according to documents produced by plaintiffs, UCC [Leasing] executed a purchase agreement, a bill of sale and a mortgage note-security agreement reflecting a sale of some equipment to Westwind. The documents do not identify the equipment in any way, even by type, beyond 'personal property.' " Def.'s 3(g) Statement, ¶ 19. In response to Defendant's 3(g) Statement, Plaintiffs admit these allegations. See Pls ' 3(g) Statement, ¶ 1.

Under Section 2-105(2) of the Uniform Commercial Code, "[g]oods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell." N .Y.U.C.C. Law § 2-105(2) (McKinney 1993). Unless explicitly agreed upon, the identification of goods occurs "when the contract is made if it is for the sale of goods already existing and identified." N.Y.U.C.C. Law § 2-501(1)(a) (McKinney 1993). If, however, the contract is for the sale of future goods, identification occurs "when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." N.Y.U.C.C. Law § 2-501(1)(b) (McKinney 1993).

Defendant argues that, because the Westwind purchase documents contain no identification of the equipment purchased, Westwind never acquired any interest in the Subject Equipment and thus never had power to convey title in the Subject Equipment to Plaintiffs. See Def.'s Mem. at 13-16. The Court disagrees.

Plaintiffs produced to Defendant, and Defendant has

submitted to the Court, copies of the purchase agreement, bill of sale, and note and security agreement between UCC Leasing and Westwind for the purchase of the Subject Equipment. See Edlow Aff., Ex. 13, Tabs CC, DD, and EE. These documents themselves do not identify the specific equipment to be sold. Nor do the documents contain attachments, exhibits, or schedules that identify the equipment sold. The bill of sale, however, states that UCC Leasing sold to Westwind "the personal property (the 'Equipment') listed on the Schedule attached hereto." See Edlow Aff., Ex. 13, Tab CC at 1. Likewise, the purchase agreement states that UCC Leasing sold to Westwind equipment "listed and described in Schedule A attached hereto." See Edlow Aff., Ex. 13, Tab DD at 1. Thus, both documents purport to have attached a schedule identifying the equipment sold. At the very least, these agreements create an issue of fact as to whether, at the time of the sale between UCC Leasing and Westwind, the equipment was adequately identified for title to have passed to Westwind.

*9 In addition to the Westwind purchase documents, Plaintiffs have submitted the affidavit of Stanton Freeman ("Freeman"), the president of UCC Leasing at the time of these transactions. See Pls.' Opp'n Mem., Ex. 1. Freeman describes the sales flow of the Subject Equipment as originally purchased by Thomas. See id. He explains that UCC Leasing purchased the Subject Equipment and obtained a bill of sale with documents indexing the Subject Equipment, but that the identifying documents cannot be found at this late date. See id. at ¶ 10. He also notes that UCC Leasing has been out of business for several years. See id. Freeman further attests to the fact that this same equipment, originating with Thomas, was sold to Plaintiffs by UCC Leasing through Westwind. See id at ¶ ¶ 16, 17. Based on the purchase agreements themselves and the affidavit of Freeman, the Court finds that a triable issue of fact exists as to whether, at the time UCC Leasing sold the Subject Equipment to Westwind, the equipment purchased was identified in the purchase documents. Accordingly, Defendant's motion for summary judgment is denied on this ground.

*3. Identification of Equipment Purchased by Plaintiffs*

Lastly, Defendant argues that, assuming a valid chain of title to Westwind, certain inconsistencies in the Plaintiffs' purchase documentation require at least partial dismissal of Plaintiffs' Third Amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 8
1998 WL 88742 (S.D.N.Y.)
**(Cite as: 1998 WL 88742 (S.D.N.Y.))**

Complaint. Specifically, Defendant contends that the equipment identified as having been purchased pursuant to Plaintiffs' individual purchase documents does not match, in certain instances, the equipment identified in Exhibit 1 to the Third Amended Complaint. *See* Def.'s Mem. at 16-17.

Attached to the Third Amended Complaint as Exhibit 1 are lists identifying the Subject Equipment originally purchased by Thomas, leased by Thomas to the Users, and sold by Stanan to Stanan. *See* Third Amended Complaint, Ex. 1. Each individual list identifies: (1) the User who originally leased the equipment from Thomas, (2) the location of the equipment leased by that User, (3) the model numbers and descriptions of the equipment at that User's location, (4) the quantity of each model number leased to that User, and (5) the serial numbers for each item leased. *See id.* According to the Third Amended Complaint, Westwind sold the equipment identified in Exhibit 1 of the Complaint to Plaintiffs. *See* Third Amended Complaint ¶ 20.

For purposes of comparison, Defendant has submitted the purchase documents between Westwind and each Individual Plaintiff. The purchase documents identify the equipment purchased from Westwind by: (1) the model numbers and descriptions of the equipment sold, (2) the quantities of each item sold, (3) the name of the User who originally leased that equipment from Thomas, and (4) the location of the equipment. The lists do not contain serial numbers.

The Court has carefully examined and compared the lists attached to Plaintiffs' purchase documents to the lists attached to the Third Amended Complaint. The Court finds that, for the most part, the equipment identified in the two lists matches exactly. There are, however, significant discrepancies. Included among the lists attached to The Third Amended Complaint are Schedules A29, A30, A59, A60, A61, A62, and A63 ("Schedules"). The Schedules identify equipment that does not match any of the equipment allegedly purchased by Plaintiffs. Although Plaintiffs do not make any specific admissions regarding the Schedules, Plaintiffs concede that the lists attached to the Third Amended Complaint contain equipment in excess of the equipment they purchased. *See* Pls.' Opp'n Mem. at 13. Because Plaintiffs have not submitted any evidence that they purchased the equipment identified in the Schedules, the Court dismisses the Third Amended Complaint to the extent that Plaintiffs seek relief with regard to the equipment identified in the Schedules.

*\*10* Defendant further contends that the model numbers of the items allegedly purchased by Plaintiffs Wilkerson and Singer, and located at Chase Manhattan Bank and Union Carbide Corporation, respectively, do not match the model numbers listed in the Third Amended Complaint. *See* Def.'s Mem. at 18. Upon close inspection, the Court finds that the model numbers in Wilkerson's and Singer's purchase documents are identical to those listed in the Third Amended Complaint. The confusion arises from the fact that Chase Manhattan Bank and Union Carbide Corporation each leased items from Thomas to be used at more than one location. Wilkerson and Singer did not purchase all of the equipment leased by those two companies. However, Defendant need only compare the model numbers and locations of the equipment purchased by Wilkerson and Singer to the model numbers of the equipment leased by Chase Manhattan Bank and Union Carbide Corporation for those same locations to determine that they identify the same equipment.

Defendant also asserts that Plaintiff Singer's purchase documents identify additional equipment which does not match any of the equipment identified in Exhibit 1 to the Third Amended Complaint. *See* Def.'s Mem. at 18. Singer's purchase documents indicate that, among the equipment he purchased from Westwind were two "Storage Control Two Channel Switches" (model number 3880- 003) originally leased by Thomas to Electronic Data Systems Leasing Corp. at Rancho Cordova, California. The equipment lists in Exhibit 1 to the Third Amended Complaint do not include any equipment leased to that company _[FN9]_ or any equipment with a description of "Storage Control Two Channel Switches" or a model number of 3880-003. Plaintiff Singer has presented no evidence that this particular equipment was part of the Subject Equipment originally sold by Thomas to Stanan. Accordingly, Plaintiff Singer may not seek relief with respect to this specific equipment.

> FN9. Exhibit 1 does identify equipment leased to Camdisco, Inc. with an equipment location identified as "EDS" in Rockville, Maryland. Even if the location matched that of Singer's equipment, the Camdisco lease did not include any "Storage Control Two Channel Switches" or other equipment with the model number 3880-003.

Finally, Defendant contends that, according to the purchase documents of Plaintiffs Dweck and Bayless,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 88742 (S.D.N.Y.)
(Cite as: 1998 WL 88742 (S.D.N.Y.))

they each purchased the same equipment located at one particular User. *See* Def.'s Opp'n Mem. at 18. This apparent discrepancy, however, does not form the basis for summary judgment. Each Plaintiff has presented evidence which, if viewed favorably for that Plaintiff, could support a jury verdict in its favor. Thus, the jury must decide if Plaintiffs' claims are in conflict and, if so, which Plaintiff owns that particular equipment. Accordingly, the Court denies summary judgment on this ground.

### CONCLUSION

For the foregoing reasons, the Court hereby grants in part and denies in part Defendant's motion for summary judgment.

It is So Ordered.

1998 WL 88742 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

- 1:91CV02095 (Docket)
(Mar. 27, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.