# Tab 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE  A. B. DICK COMPANY, ET AL., : CHAPTER 11
     Debtors     :
           : Case No. 04-12002 (JLP)
           : JOINTLY ADMINISTERED
           :

## EMERGENCY MOTION OF MITSUBISHI IMAGING (MPM), INC. FOR ORDER DETERMINING VALIDITY OF EXERCISE OF ELECTION UNDER POSTPETITION PRIVATE LABEL SALES AGREEMENT

Mitsubishi Imaging (MPM), Inc. ("**Mitsubishi**"), by and through its counsel, hereby moves for an order determining the validity of a purported exercise of an election by A.B. Dick Company ("**ABD**") under that certain Private Label Sales Agreement dated August, 2004, by and between Mitsubishi and ABD, on the following bases:

1. This court has jurisdiction over the matters raised herein pursuant to 28 U.S.C. §1334(b). Venue is properly set in this court pursuant to 28 U.S.C. §1409(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A),(M),(N) and (O).

2. Mitsubishi and ABD are parties to an agreement (the "**Postpetition Private Label Sales Agreement**") dated August, 2004. Capitalized terms used but not defined herein shall have the meanings stated in the Postpetition Private Label Sales Agreement.

3. Pursuant to the Postpetition Private Label Sales Agreements, among other things, (a) during the term thereof, Mitsubishi agreed to sell and ABD agreed to purchase certain Products from Mitsubishi, (b) pursuant to paragraph 8F thereof, ABD agreed to pay one-third of the total invoice price of all Product identified in any Purchase Order upon acceptance by Mitsubishi of the Purchase Order, one-third within three business days of notification that Product was ready for loading on vessels for shipment to the United States and the balance within three business days of notice of arrival in the United States, (c) pursuant to paragraph 8B

1

SL1 492309v1/21172.001

thereof, title to all Product remained with Mitsubishi until delivery to ABD's distribution center, (d) pursuant to paragraph 12A(2)(d) thereof, Mitsubishi had the right to terminate the Postpetition Private Label Sales Agreement immediately upon sale by ABD of substantially all of its assets by providing notice (a "**Termination Notice**") to ABD, (e) pursuant to paragraph 12C thereof, within ten days of delivery by Mitsubishi of a Termination Notice, ABD had the right to exercise an election (the "**Pipeline Purchase Election**") to purchase all inventory subject to outstanding Purchase Orders not yet fully paid for by ABD (the "**Pipeline Product**") for the full balance remaining due, and (f) pursuant to paragraph 8F thereof, after termination of the agreement, Mitsubishi was granted certain rights to resell the Pipeline Product as to which a Pipeline Purchase Election had not been made and ABD was granted certain rights to a refund (the "**Pipeline Refund**") of a portion of the amounts paid by ABD on account of such Pipeline Product. A copy of the Postpetition Private Label Sales Agreement is attached hereto (without exhibits), marked Exhibit "A" and made part hereof.

4. On November 5, 2004, ABD sold substantially all of its assets to Silver Acquisitions Corp, a subsidiary of Presstek Inc ("**Presstek**"), however, the Postpetition Private Label Sales Agreement was not assigned to Silver or Presstek and remains a contract between ABD and Mitsubishi.

5. On November 5, 2004, following closing on the sale of substantially all of ABD's assets, Mitsubishi sent a Termination Notice to ABD. At the time that Mitsubishi provided the Termination Notice, and to the time of this motion, ABD had paid $2,545,774.94 on account of Pipeline Product and owed an additional amount of $2,255,397.07 on account of such Pipeline Product. Absent the exercise to the Pipeline Purchase Election, ABD will be entitled to a

SI.1 492309v1/21172.001

B-0112

Pipeline Refund of some portion of the $2,545,774.94 paid by ABD on account of the Pipeline Product..

6.    On November 10, 2004, Presstek purported to exercise the Pipeline Purchase Election and, by wires dated November 9, 2004 and November 10, 2004, Presstek transferred the sum of $2,255,397.07 (the "**Presstek Payments**") to Mitsubishi, purporting to represent payment in full for the Pipeline Product. On November 11, 2004, Mitsubishi advised Presstek in writing that, because the Postpetition Private Label Sales Agreement was not assigned by ABD to Presstek (or anyone else), only ABD could exercise the Pipeline Purchase Option and further advising that Mitsubishi would either hold the Presstek Payments or return them, at Presstek's option, pending determination whether the Pipeline Purchase Election has been exercised. To date, Presstek has not requested return of the Presstek Payments and Mitsubishi continues to hold them.

7.    On the morning of November 12, 2004, ABD purported to exercise the Pipeline Purchase Election with a direction to release the Pipeline Product to Presstek. However, in the afternoon of November 12, 2004, ABD advised Mitsubishi that it was withdrawing the Pipeline Purchase Election. ABD's withdrawal of the election followed receipt by counsel to ABD of an email from counsel to the Official Committee of Unsecured Creditors of ABD (the "**Committee**") stating that the Committee considered the Pipeline Refund to be a valuable asset of the ABD estate which had not been purchased by Silver or Presstek and further stating the Committee's position that any exercise of the Pipeline Purchase Option was outside the ordinary course of ABD's business and required court approval pursuant to Section 363 of the Bankruptcy Code. In response, Presstek has asserted that it believes that it has purchased the Pipeline

B-0113

Inventory and any rights ABD may have to the Pipeline Refund. The Committee has disputed that position

8.   Finally, in the evening of November 12, 2004, following receipt by counsel to ABD of an undertaking by Presstek to hold the ABD estate harmless, under certain circumstances, ABD advised Mitsubishi that it was reinstating its Pipeline Purchase Election.

9.   It is Mitsubishi's understanding that the Committee continues to take the position the Pipeline Purchase Election is invalid.

10.  If Mitsubishi were to honor the pending Pipeline Purchase Election, it would be obligated to give ABD credit, for the approximately $2.5 million paid by ABD prior to termination of the Postpetition Private Label Sales Agreement, sell the Pipeline Inventory to ABD for the approximately $2.2 million remaining due and release the Pipeline Inventory to Presstek. That result is fair assuming that the pending Pipeline Purchase Election is valid and, as a result, by giving credit for the approximately $2.5 million paid by ABD, Mitsubishi is relieved of any liability on account of the Pipeline Refund obligation. However, if Mitsubishi honors the pending Pipeline Purchase Election and it is later determined that, as asserted by the Committee, the Pipeline Purchase Election was invalid, Mitsubishi would be in the position of having provided the approximately $2.5 million credit but retaining a potential liability for the Pipeline Refund. Obviously, such result is patently unfair and not contemplated by the Postpetition Private Label Sales Agreement.

11.  Under the circumstances, Mitsubishi is entitled to a determination whether the Pipeline Purchase Election tendered by ABD is valid so that Mitsubishi can discharge its obligations under the Postpetition Private Label Sales Agreement. Such determination is required on an expedited basis because Mitsubishi has been advised by Presstek that it urgently needs the

SI.1 492309v1/21172.001

4

Pipeline Product and has threatened to sue Mitsubishi for any damages resulting from failure by Mitsubishi to release the Pipeline Product to Presstek. While Mitsubishi does not believe it has any liability to Presstek (or anyone else), prompt resolution of the dispute is in the interest of all parties.

WHEREFORE, Mitsubishi respectfully requests an Order (i) determining, whether the pending Pipeline Purchase Election is valid, and (ii) granting such other relief as is just and proper.

Dated: November 15, 2004

STEVENS & LEE, P.C.

_Thomas G. Whalen, Jr._
Thomas G. Whalen, Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Tel: (302) 425-3304
Fax: (610) 371-8512
E-mail: tgw@stevenslee.com

and

Robert Lapowsky, Esquire
1818 Market St., 29th Floor
Philadelphia, PA 19103
Tel: (215) 751-2866
Fax: (610) 371-7958
E-mail: rl@stevenslee.com

_Attorneys for Mitsubishi Imaging (MPM), Inc._

SI.1 492309v1/21172.001

5

B-0115

## PRIVATE LABEL SALES AGREEMENT

THIS PRIVATE LABEL SALES AGREEMENT made and entered into as of this ___ day of August, 2004, by and between **MITSUBISHI Imaging (MPM) , Inc.,** a Delaware Corporation, with its principal office at 555 Theodore Fremd Avenue, Rye, NY 10580 (hereinafter referred to as "MITSUBISHI") and **A.B. Dick Company,** a Delaware corporation, with its principal offices at 7400 Caldwell Avenue, Niles, IL 60714-4690 U.S.A. (hereinafter referred to as "A.B.DICK")

### WITNESSETH:

WHEREAS, MITSUBISHI is engaged in the sales of certain private label PRODUCTS (as that term is defined below) which A.B.DICK desires to purchase and distribute; and

WHEREAS, MITSUBISHI and A.B. DICK are parties to an agreement (the "Prepetition Agreement") dated October 1, 2002, pursuant to which MITSUBISHI agreed to sell and A.B. DICK agreed to purchase Products; and

WHEREAS, on July 13, 2004, A.B. DICK filed a petition for relief under Chapter 11 of the United States Bankruptcy Code; and

WHEREAS, A.B. DICK has not yet assumed or rejected the Prepetition Agreement; and

WHEREAS, MITSUBISHI is willing to continue to sell PRODUCTS to A.B.DICK for resale upon the terms and conditions herein contained; and

WHEREAS, A.B.DICK is desirous of selling PRODUCTS to the owners of A.B. DICK's Plate Makers, Digital Platesetters and other Imagesetters; and

WHEREAS, A.B.DICK has facilities and programs for training those engaged in the sale of PRODUCTS and in the technology and use of Plate Makers, Digital Platesetters, Imagesetters and PRODUCTS.

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

### 1. PRODUCTS; TERRITORY

The TERRITORY shall mean the United States, Canada and Latin America (Mexico, Central and South America, and the Caribbean).

PRODUCTS shall mean photo-sensitive, silver offset plate material manufactured by MITSUBISHI Paper Mills Ltd. ("hereinafter referred to as "MPM") for A.B.DICK, and sometimes referred to as A.B.DICK brand or trade names, including "MEGA", "MEGATEK", "MEGAPRO", "MEGA Plus" and improvements to such products, provided such improved products are silver-based. A list of all PRODUCTS included within this Agreement and their

B-0116

specifications is set forth in Exhibit A to this Agreement, which may be modified from time to time by written agreement of both parties.

## 2. SALES BETWEEN MITSUBISHI AND A.B.DICK

Subject to the provisions of this Agreement, MITSUBISHI shall sell and A.B.DICK shall purchase PRODUCTS for distribution in the TERRITORY only.

## 3. RELATIONSHIP BETWEEN MITSUBISHI AND A.B.DICK

The relationship between MITSUBISHI and A.B.DICK is solely that of seller and buyer. A.B.DICK is an independent contractor and nothing in this Agreement shall be construed to make A.B.DICK an agent, partner or employee of MITSUBISHI. Neither party has the authority to nor shall conclude any contract or agreement or make any commitment, representation or warranty on behalf of or which binds the other party, and neither party may act, or hold itself out as having the authority to act, in the name of or on behalf of the other party.

## 4. SALES PROMOTION; MINIMUM QUANTITIES

A.B.DICK shall use its best commercial efforts actively to promote the sales of PRODUCTS in the TERRITORY in an effective and aggressive manner and shall use its best commercial efforts to purchase at least the minimum quantities of PRODUCTS set forth below. As both parties recognize that changes in market conditions or technology shifts beyond the reasonable control of either party may affect the reasonableness of the minimum quantities set forth in Exhibit C, these minimum amounts will be reviewed and (if required) adjusted annually. The foregoing notwithstanding, A.B. DICK's failure to make the minimum level of purchases as set forth in Exhibit C may be grounds for the adjustment of prices in accordance with the provisions of paragraph 8(D) herein

## 5. STOCK TO BE MAINTAINED

A.B.DICK shall purchase from MITSUBISHI and maintain at its warehouse facility(ies) or distribution center(s) in the United States or Canada at all times adequate stock of PRODUCTS to fulfill its reasonably anticipated sales or other requirements within the TERRITORY.

## 6. FORECASTS; INFORMATION

A.B.DICK shall provide to MITSUBISHI by the tenth calendar day of each month a non-binding forecast detailing its estimated requirements for PRODUCTS for the subsequent six months. A.B.DICK shall furnish MITSUBISHI from time to time upon request, with information with respect to past and forecast sales and inventory of PRODUCTS, and other activities of A.B.DICK under and in support of this Agreement in the TERRITORY.

## 7. TRAINING

A.B.DICK shall provide at its expense necessary training with respect to the technology and use of PRODUCTS to all persons who are engaged in the sales of PRODUCTS

under or for A.B.DICK, including without limitation, the sales staffs of any subsidiaries, affiliated companies, resellers, distributors, sales representatives, dealers or other distribution channels utilized or engaged by A.B.DICK hereunder.

## 8. TERMS OF SALE

A. The prices of PRODUCTS to be purchased hereunder are set forth on Exhibit A. All prices are, and shall be paid, in US dollars and are FOB A.B.DICK distribution center (currently Des Plaines, IL.)

B. All PRODUCTS shall be packed for international shipment at MITSUBISHI's expense. Shipping costs to the A.B.DICK distribution center, insurance during transit, and import duties shall be paid by MITSUBISHI. Title and risk of loss of PRODUCTS shall pass to A.B.DICK at delivery to destination.

C. MITSUBISHI may increase prices at any time upon ninety (90) days' prior written notice to A.B.DICK. Except as provided in subparagraph D, MITSUBISHI shall not increase prices by more than five (5%) percent in any calendar year during the effective period of this Agreement. Orders placed by A.B.DICK prior to the effective date of a price increase shall be shipped and billed at the prices in effect at the time the Purchase Order was submitted. Orders placed by A.B.DICK during the notification period shall not exceed one and one half (1½) times its normal monthly order volume, based on trailing twelve (12) month period.

D. In the event that the exchange rate between US Dollars and Japanese Yen substantially changes, the parties shall agree in good faith on appropriate increases or decreases in price to account for such changes, without regard to the percentage limitations of subparagraph (C) of this paragraph 8 provided, however, any price change agreed to resulting from fluctuations in the exchange rate between U.S. Dollars and Japanese Yen shall be fixed for a period of at least ninety (90) days from the effective date of such change. In the event that A.B. DICK's monthly orders repeatedly do not meet the minimum quantities specified in Exhibit C including any adjustments agreed to, MITSUBISHI may at its option on sixty (60) days written notice to A.B.DICK increase prices in accordance with Exhibit D.

E. A.B.DICK or entities designated pursuant to this Agreement shall, on the Effective Date (as defined below), (i) resubmit Purchase Orders ##P261576, P261577 and P262005 (the "Existing Purchase Orders"), which had originally been submitted under the Prepetition Agreement and which shall be treated as Purchase Orders submitted under this Agreement, and (ii) submit additional Purchase Orders for Product (the "August Purchase Orders"). MITSUBISHI will take all reasonable steps to have the Products subject to Existing Purchase Orders available for shipment from Japan during the last week of August and first week of September, 2004 and the Products subject to the August Purchase Orders available for shipment from Japan during the last week of October and first week of November, 2004. If A.B. DICK desires air transportation of Product subject to any Purchase Order, A.B. DICK will so advise MITSUBISHI in writing, by facsimile, that it requests delivery by air and, in such event, A.B. DICK will pay the cost of the air transportation. As to any other purchase orders (the "Additional Purchase Orders" and, together with the Existing Purchase Orders and the August

B-0118

Purchase Orders, the "Purchase Orders"), such must be placed  within the first ten calendars days of each month beginning in  September, 2004 and must be delivered to MITSUBISHI by facsimile or overnight courier service.  Unless the Additional Purchase Order is rejected or acceptance is delayed by MITSUBISHI in writing (with reasons given) within five (5) business days of receipt, the ordered PRODUCTS will be made by MPM and shipped from Japan approximately 60 calendar days from the date of the Additional Purchase Order. The ordered PRODUCTS will be delivered to A.B. DICK's distribution center promptly after arrival into the US and clearance through US Customs. Without the written consent of MITSUBISHI, which may be withheld in MITSUBISHI's sole discretion, A.B. DICK shall not place any Purchase Orders after the earlier of the date which is five days prior to the scheduled hearing (or any continued hearing date) on A.B. DICK's motion to sell substantially all of its assets to Silver Acquisition Corp or a higher bidder and December 31, 2004.

F.  One-third (1/3) of the total invoice price of all Product identified in any Purchase Order shall be paid by A.B. DICK to MITSUBISHI upon acceptance of the Purchase Order. Another one-third (1/3) of the total (extension) price for each line item on each Purchase Order shall be paid no more than three (3) business days after notification by facsimile to A.B. DICK that all Product identified in such line item are ready for loading onto a vessel or vessels for shipment to the United States. The notice shall state the name of the vessel(s) and the port(s) at which the Products are to be loaded. The balance of the total (extension) price for a line item shall be paid no later than three (3) business days after notification to A.B. DICK by facsimile that the vessel(s) carrying such Product has (have) arrived at the port(s) within the domestic United States where the Products are to be off-loaded which port shall be the port of Chicago. All payments shall be made by wire transfer to an account or accounts designated by MITSUBISHI from time to time.  If A. B. DICK fails to make timely payment to MITSUBISHI on or before the due date for any payment, MITSUBISHI may send a notice of default to A.B. DICK by facsimile and overnight courier. If the noticed default is not cured by payment in full delivered to  MITSUBISHI within three (3) business days of the date of the notice of default, then MITSUBISHI, at its sole option and discretion, and in addition to any other remedies it may have,  may upon notice to A.B. DICK to be delivered by facsimile within ten (10) days of the date of such notice of default, either (i) cancel the Purchase Order with regard to the Product not paid for and return all monies paid by A.B.DICK towards such Product, less MITSUBISHI's costs of manufacturing, procuring, converting, shipping, returning and/or disposing of such Product plus any duty, demurrage or Customs charges, third party charges and other related costs; or (ii) sell such Product to third parties for MITSUBISHI's own account (or authorize a MITSUBISHI related entity to sell such Product to third parties) as A.B. DICK branded goods pursuant to the Resale License (defined below) or without the A.B. DICK brand. In the event that MITSUBISHI fails to affirmatively elect to proceed under option (i) or (ii) above in a timely manner, MITSUBISHI shall be deemed to have elected to proceed under option (ii). Upon the sale of such Product by MITSUBISHI pursuant to subparagraph (ii) above, MITSUBISHI will reimburse A.B. DICK for any payments A.B. DICK made to MITSUBISHI towards the total (extension) price of such Product, less any costs or expenses incurred by MITSUBISHI with regard to such Product which costs and expenses were incurred as a result of A.B. DICK's default, such as demurrage, dockage, warehouse and/or additional shipping expenses (collectively, the "MITSUBISHI Default Charges").  To the extent any MITSUBISHI Default Charges exceed the total of payments received by MITSUBISHI in connection with the sale of Product, MITSUBISHI shall have a claim against A. B. DICK which shall be entitled to an

administrative expense priority in the A.B. DICK bankruptcy proceedings. In connection with any sale of Product under subparagraph (ii) above utilizing the A.B. DICK brand, A.B. DICK hereby grants to MITSUBISHI (and any MITSUBISHI related entity effecting sale under subparagraph (ii)) a perpetual, worldwide royalty free license (the "Resale License") to use A.B. DICK trademarks and patented technology to the extent necessary to complete and sell such Product. The foregoing is a grant of a license only and neither MITSUBISHI nor any other entity shall be deemed to have acquired any ownership interest or other right not specifically granted herein in any of the said intellectual property by reason of the said license. At any time on or after termination of this Agreement, MITSUBISHI may elect, at its sole option and discretion exercised by facsimile notice delivered within ten (10) days of such termination, to exercise the rights granted pursuant to subparagraphs (i) or (ii) above as to all undelivered Product subject to the any outstanding Purchase Orders as to which an election has not already been made or been deemed made. Absent timely election by MITSUBISHI, MITSUBISHI shall be deemed to have elected to exercise rights after termination under subparagraph (ii). A.B.DICK shall be liable for interest on any overdue payment from the due date through the date payment is made in full in immediately available funds. Interest shall be calculated on a daily basis at the then-prevailing US prime rate plus two and one half (2.5%) percent. (In the event there is a discrepancy or dispute as to the appropriate prime rate, the prime rate quoted by the Wall Street Journal shall govern.)

G. The parties understand and agree that MITSUBISHI is not extending any credit line to A. B. DICK.

H. PRODUCTS listed in Exhibit A are standard sizes. In the event A.B.DICK requests a size or specifications not listed on Exhibit A, A.B.DICK shall provide the request in writing to MITSUBISHI and include a new product code number, label artwork and a forecast of projected orders. Any such request is subject to MITSUBISHI's approval and the parties' agreement on pricing, and if other than standard sizes or specifications a longer lead time.

I. At A.B. DICK's request, MITSUBISHI will drop ship PRODUCTS to location(s) designated by A.B.DICK and accepted by MITSUBISHI upon terms and conditions to be mutually agreed.

J. In recognition of the cost savings resulting from the large volume of past and current purchases of Products by A.B.DICK from MITSUBISHI, A.B.DICK shall be entitled to prices in the TERRITORY which are at least equal to the most favorable price offered by MITSUBISHI to any private label or OEM customer in such TERRITORY, provided A.B.DICK continues to purchase a reasonably larger volume of PRODUCTS in such TERRITORY than any other private label or OEM customer of MITSUBISHI. The prices offered by MITSUBISHI or its parent company to a customer pursuant to a private label agreement existing as of May 29, 2003 and any extensions or renewals of such agreement shall not be considered in determining the prices required to be offered to A.B DICK under this subparagraph J. This subparagraph shall not apply to products over 23" in roll width or products principally offered into a non competing market.

B-0120

## 9. TRADEMARKS

A.  A.B.DICK shall sell or market PRODUCTS under its own trademarks or trade names as listed in Exhibit B or under such other trademarks or trade names as the parties may from time to time agree. MITSUBISHI shall affix to the packaging of PRODUCTS, in accordance with written instructions to be supplied by A.B.DICK, such A.B.DICK trademarks, trade names, color schemes, logos or labels as may be designated by A.B.DICK (collectively referred to herein as the "A.B.DICK MARKS"), and which shall remain the exclusive property of A.B.DICK. MITSUBISHI will not sell products to others using any of the A.B.DICK MARKS, or in any packaging which incorporates a color scheme confusingly similar to A.B. DICK's, without A.B. DICK's prior written permission. A.B.DICK shall not (and shall not cause or knowingly permit any third party to) affix any trademark or trade name to any PRODUCTS purchased hereunder different from the trademark or trade name affixed by MITSUBISHI to such PRODUCTS. The restriction of the foregoing sentence shall not apply to PRODUCTS which have been manufactured solely to A.B. DICK's proprietary specifications, provided however, with regard to any such PRODUCT, that (a) A.B.DICK gives MITSUBISHI prior written notice of such PRODUCT, the trademark(s), trade name(s), label(s) or brand(s) such PRODUCT is to be sold under, and by whom. MITSUBISHI shall affix to the packaging of PRODUCTS, in accordance with written instructions to be supplied by A.B.DICK, such trademarks, trade names, color schemes, logos or labels as may be designated by A.B.DICK pursuant to the foregoing sentence.  MITSUBISHI reserves the right to reject any trademark(s), trade name(s), label(s), brand(s), including designs which may appear inappropriate to the nature of the product and/or may harm the image of the product and/or the MITSUBISHI trademark(s) or trade name(s). MITSUBISHI also reserves the right to reject if the volume for such trade mark(s), trade names(s), label(s) or brand(s) is unreasonably small.

B.  A.B.DICK represents and warrants to MITSUBISHI and MPM that use of the A.B.DICK MARKS in accordance with this Agreement or A.B. DICK's written instructions shall not constitute an infringement of any copyright, trademark, patent or any other intellectual property rights of any third party (collectively referred to as "Intellectual Property Rights"). Should any claim or dispute be asserted or arise from or in connection with an alleged infringement of any Intellectual Property Rights of a third party relating to the use of the A.B.DICK MARKS, A.B.DICK shall indemnify, defend, and hold MITSUBISHI and MPM harmless from and against any and all losses, costs, liabilities, damages, and expenses, including reasonable attorneys fees and costs, suffered, incurred or to be incurred by either or both of them in response to such a claim or dispute.

C.  A.B.DICK shall not use, directly or indirectly, in whole or in part, alone or in combination with any other words, letters, symbols or designs, the name "MITSUBISHI" or the initials (with or without periods between the letters) "MII", "MPM," or "MC", the trademark "THREE DIAMONDS" (words or design) or any other trademark or trade name that is owned or used by MITSUBISHI or MPM, in any way in connection with A.B. DICK's goods or business, including the sale, promotion, labeling or packaging of the PRODUCTS, or otherwise as part of A.B. DICK's corporate or business name or affairs,  except in the manner and only to the extent that MITSUBISHI may specifically grant written consent in advance.

D. In the event that A.B.DICK discontinues a particular size or type of PRODUCT or this Agreement terminates for any reason, A.B.DICK shall purchase from MITSUBISHI, at the cost of procurement, up to six (6) months' supply of fully or partially completed empty packaging and/or labels in MPM's and/or MITSUBISHI's possession, or in the process of being manufactured or shipped, at the time of MITSUBISHI's receipt of notice of the discontinuance or termination.

### 10. ASSIGNMENT OF AGREEMENT AND PREPETITION AGREEMENT

This Agreement shall not be assigned by either party without the prior written consent of the other. Each party reserves all rights to seek (in the case of A.B. DICK ) or oppose (in the case of MITSUBISHI) assumption and assignment of the Prepetition Agreement pursuant to the provisions of Section 365 of the Bankruptcy Code. In that regard, MITSUBISHI does not concede that the Prepetition Agreement is an executory contract subject to assumption or assumption and assignment and asserts that, in any event, under the Prepetition Agreement, MITSUBISHI has the unilateral right to set A.B DICK's credit line and that, prior to the filing of the A.B. DICK bankruptcy petition, the A.B. DICK credit line was reduced to $0. MITSUBISHI also reserves the right to move to compel assumption or rejection of the Prepetition Contract at any time.

### 11. EFFECT OF FAILURE TO ENFORCE AGREEMENT

The failure of either party to enforce at any time or for any period of time any of the provisions of this Agreement, or any of its rights hereunder, shall not be construed as a waiver of such provisions or the right of the party thereafter to enforce each and every such provision.

### 12. EFFECTIVE PERIOD; TERMINATION; DUTY TO MITIGATE

A. This Agreement shall be effective on the date (the "Effective Date") which is the later to occur of (i) the date first written above, and (ii) the date of entry of an order or orders of the Bankruptcy Court presiding over the A.B. DICK bankruptcy proceedings, in form and substance acceptable to MITSUBISHI, approving execution and delivery of this Agreement by A.B. DICK, and shall continue in effect thereafter, unless and until earlier terminated in accordance with the provisions of this Agreement. The foregoing notwithstanding, and in addition to any other rights or remedies either party may have at law or in equity:

1. either party may terminate this Agreement at any time and for any or no reason upon not less than six (6) months' prior written notice to the other party; and

2. MITSUBISHI may terminate this Agreement at any time upon (a) conversion of A.B. DICK's pending bankruptcy proceedings to a case under chapter 7 of the Bankruptcy Code, (b) the appointment of a trustee in the pending A.B. DICK bankruptcy proceedings, (c) the declaration of a default under the DIP Facility (as defined in that certain Interim Order Authorizing Certain Debtors and Debtors in Possession to Enter into Post-Petition Credit Agreement ...entered on July 15, 2004, or any other post petition financing approved by

B-0122

the Bankruptcy Court (a "Replacement DIP Facility") or termination of A.B. DICK's ability to borrow under the DIP Facility unless the A.B. DICK has substantially equivalent borrowing ability under a Replacement DIP Facility reasonably acceptable to MITSUBISHI, (d) the sale of any substantial portion of A.B. DICK's assets unless, contemporaneously, this Agreement is assigned to the buyer (it being understood that MITSUBISHI reserves all rights to object to any such assignment), (e) the entry of any order granting relief from the automatic stay allowing any person to enforce rights against any substantial portion of A.B. DICK's assets; (f) the appeal of the order of the Bankruptcy Court approving this Agreement, (g) the failure of A.B. DICK to make timely payments totaling in excess of fifty (50%) percent of the value of all outstanding Purchase Orders, and (h) the entry of any order of the Bankruptcy Court which approves assumption or assumption and assignment of the Prepetition Agreement or which subordinates any rights of setoff which MITSUBISHI might have to any other lien, it being understood that A.B.DICK does not concede that MITSUBISHI has any setoff rights.

3. MITSUBISHI may terminate this Agreement upon three (3) days notice by facsimile and overnight courier upon the appointment of an examiner in A.B. DICK's pending bankruptcy proceedings.

4. Either party may terminate this Agreement at any time in the event that the other party fails to perform any material obligation under this Agreement and fails to cure such breach or default within thirty (30) days of written notice of such breach or default from the non-breaching party.

5. A.B. DICK may terminate this Agreement immediately upon sale of substantially all of the assets of A.B. DICK.

B. Termination of this Agreement shall not affect any rights of MITSUBISHI under this Agreement to indemnification, to sell off Product (except to the extent A.B. DICK exercises its rights under paragraph 12(C) hereof) or which, by their nature, require enforcement after termination. In the event this Agreement is terminated, neither party shall be liable to the other for compensation, reimbursement, and/or damages on account of the loss of prospective profit on anticipated sales and/or on account of expenditures, investments, leases, and/or any type of commitments made in connection with the business of the other party in anticipation of business under this Agreement. UPON TERMINATION OR IN THE EVENT OF A BREACH OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES, EVEN IF THE PARTY IS APPRISED OF THE LIKELIHOOD THEREOF.

C. Upon termination of this Agreement for any reason other than termination by MITSUBISHI pursuant to paragraph 12 (A)(2)(g) above, A.B. DICK shall have the right, exercisable by written notice sent by facsimile and overnight courier and delivered to MITSUBISHI within ten (10) days of said termination, to purchase all Product subject to any outstanding Purchase Order identified in such notice by paying MITSUBISHI an amount equal to the total invoice price of the Product identified in such Purchase Orders less the sums already paid against the said Purchase Orders pursuant to paragraph 8(F) above. The said payment shall be wire transferred to MITSUBISHI on the same day that the said notice is sent. Upon receipt of

B-0123

such notice and payment, MITSUBISHI shall complete manufacture of the subject Product and ship such Product to A.B.DICK pursuant to the terms of this agreement.

D. [OMITTED].

13. **WARRANTY**

A. MITSUBISHI represents and warrants that PRODUCTS to be sold to A.B.DICK under this Agreement shall be free from defects in material and workmanship for a period of fifteen (15) months from date of manufacture and shall be in full conformance with the specifications set forth in Exhibit A at the time of shipment to A.B.DICK.

B. MITSUBISHI agrees to replace any PRODUCTS, which are proved to be defective under normal uses during such warranty period, provided a claim of an alleged defect is made to MITSUBISHI within 15 months from date of manufacture, and provided further, that upon request by MITSUBISHI, A.B.DICK shall return to MITSUBISHI at no cost to A.B.DICK any such PRODUCTS. This replacement is the sole remedy of A.B.DICK in the event of any defective goods or breach of warranty.

C. In the event that MITSUBISHI finds PRODUCTS to be defective before A.B.DICK sells PRODUCTS to their customers, and MITSUBISHI decides to recall such defective PRODUCTS, MITSUBISHI shall inform A.B.DICK in writing of such decision and shall indicate the specific PRODUCTS and batch numbers. MITSUBISHI shall also advise A.B.DICK on the recommended manner of disposal or return of such PRODUCTS.

D. MITSUBISHI shall not be responsible for any claims whatsoever arising out of or in relation to PRODUCTS purchased by A.B.DICK hereunder when such claims are determined to relate to a machine design problem.

E. THE PROVISIONS OF THIS PARAGRAPH 13 STATE MITSUBISHI'S SOLE OBLIGATION AND A.B. DICK'S AND ITS CUSTOMERS' SOLE AND EXCLUSIVE REMEDY IN THE EVENT THERE IS A PRODUCT THAT IS DEFECTIVE, DOES NOT CONFORM TO SPECIFICATIONS OR IS IN BREACH OF ANY WARRANTY. IN NO EVENT SHALL MITSUBISHI BE LIABLE FOR ANY DIRECT, SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES FOR PERSONAL INJURY OR INJURY TO PROPERTY ARISING OUT OF OR INCURRED BY A.B.DICK, ITS CUSTOMERS OR ANY THIRD PARTY IN CONNECTION WITH THE BREACH OF ANY WARRANTIES CONTAINED IN THIS AGREEMENT OR ANY DEFECT IN ANY PRODUCTS.

F. MITSUBISHI shall have no liability under any warranty or this Agreement with respect to any PRODUCTS which meet product specifications, which have been modified, altered by A.B.DICK or any of its customers, or which have been damaged through misuse, abuse, accident, neglect, or mishandling by A.B.DICK or any of its customers.

G. THE UNDERTAKINGS IN THIS PARAGRAPH 13 BY MITSUBISHI ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES WHETHER

B-0124

WRITTEN, ORAL, EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### 14. OMITTED

### 15. PRODUCT CHANGES

MITSUBISHI shall make no modifications affecting the performance of the PRODUCTS without A.B. DICK's prior written consent, which consent shall not be unreasonably withheld or delayed. Any other changes in the product specifications must be communicated to A.B.DICK through both written materials and additional technical training provided by MITSUBISHI at its expense prior to implementation of such change.

### 16. SETTLEMENT OF DISPUTES

Any dispute, controversy or claim arising out of or relating to this Agreement or the parties' relationship, which cannot be settled amicably, shall be finally determined by binding arbitration in accordance with the Commercial Dispute Resolution Procedures of the American Arbitration Association then in effect. The arbitration panel shall consist of three neutral arbitrators, and the place of the arbitration shall be New York, New York. The award may be confirmed in any court of competent jurisdiction.

### 17. FORCE MAJEURE

Neither MITSUBISHI nor A.B.DICK shall be liable for failures or delays in delivery of PRODUCTS due to causes beyond its reasonable control, such as acts of God, acts of civil or military authority, fires, strikes, lockouts or labor disputes, floods, epidemics, quarantine, restrictions, war, riot, delays in transportation, car shortages and inability due to causes beyond its reasonable control to obtain necessary labor, materials or manufacturing facilities. In the event of any such delay, the date of delivery shall be extended for a period equal to the time lost by reason of the delay.

### 18. NOTICE

Any notice or other communication required or permitted under this Agreement shall be in writing and deemed to have been duly given if it is delivered personally or sent by overnight courier service, by registered or certified mail, return receipt requested and postage prepaid or by facsimile (receipt confirmed by transmittal equipment) as set forth below (or as may be otherwise designated by the parties hereto from time to time by written notice to the other party) and shall be deemed to have been given the date of delivery if personally delivered; the next business day if sent by overnight courier service, three (3) business days after the date if sent by registered or certified mail; and the date of transmission if sent by facsimile during normal business hours, and if not, then the next business day after transmission.

Notices to MITSUBISHI shall be addressed as follows:

MITSUBISHI Imaging (MPM), Inc.
Graphic Arts Division

B-0125

555 Theodore Fremd Avenue
Rye, New York 10580
Attention: Jillian H. Acord, V.P. Sales Administration/Corporate Planning
Facsimile: (914) 921-2495

With a copy to: ~~Akiyoshi Shima,~~ Hiroshi Tomimasu President and CEO

Notices to A.B.DICK shall be addressed as follows:

A.B.DICK Company
7400 Caldwell Avenue
Nile, Illinois 60714-4690
Attention: Jeffrey Herden, General Counsel and Secretary
Facsimile: (847) 647-0634

With a copy to:

Benesch, Friedlander, Coplan & Aronoff LLP
2300 BP Tower
200 Public Square
Cleveland Ohio 44114-2378
Attn: H. Jeffrey Schwartz, Esq.
Facsimile: (216)-363-4588

### 19. GOVERNING LAW

All questions arising out of or under this Agreement and the parties' relationship shall be governed by the laws of the State of New York, without regard to its conflicts of law principles.

### 20. ENTIRE AGREEMENT

This Agreement represents the entire agreement between the parties hereto with respect to the PRODUCTS in the Territory and, with respect to Purchase Orders placed hereunder, supersedes any other agreement or understanding, written or verbal, that the A.B.DICK and MITSUBISHI and/or any related entities may have had with respect to the PRODUCTS in the Territory, including, without limitation, the Prepetition Agreement, the Sales Distribution Agreement between MITSUBISHI Corporation and A.B.DICK, dated January 1, 1990, and amended December 31, 1994, with respect to the United States, Canada and Latin America only; the Sales Distribution Agreement between MITSUBISHI Corporation and A.B.DICK, dated May 1, 1996, with respect to the United States, Canada and Latin America only; and the Sales Distribution Agreement between MITSUBISHI and A.B.DICK, dated January 1, 1998, in its entirety. The foregoing notwithstanding, if the Prepetition Agreement is assumed or assumed and assigned, the terms of the Prepetition Agreement shall control except as to any Purchase Orders submitted prior to the date of such assumption or assumption and assignment, such Purchase Orders to continue to be controlled by the terms hereof.

B-0126

## 21. MODIFICATION OF AGREEMENT

No modification, nor any future representation, promise or agreement in connection with the subject matter of this Agreement shall be binding on either party hereto unless made in writing and signed on its behalf by its duly authorized representative.

## 22. EXECUTION

A. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute and the same instrument.

B. The captions and headings in this Agreement are for convenience of reference only and shall not affect the construction or interpretation of any provision hereof.

(SIGNATURE PAGE FOLLOWS)

B-0127

IN WITNESS WHEREOF, both parties have caused this Agreement by their respective officers thereunto duly authorized as of the day and year first above written.

A.B. DICK COMPANY                    MITSUBISHI IMAGING (MPM), INC.

/s/ _____          /s/ _____
President and CEO                    Hiroshi Tomimasu
                                     President and CEO

Doc 1231297  Ver 1

# Tab 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| A.B.DICK COMPANY, *et al.* | : | Case No. 04–12002 (JLP) |
| Debtors. | : | Jointly Administered |

**STATEMENT OF THE DEBTORS:     (A) IN RESPONSE TO THE EMERGENCY MOTION OF MITSUBISHI IMAGING (MPM), INC. FOR ORDER DETERMINING VALIDITY OF EXERCISE OF ELECTION UNDER POSTPETITION PRIVATE LABEL SALES AGREEMENT; (B) IN SUPPORT OF THE EMERGENCY MOTION OF PRESSTEK, INC. SEEKING AN ORDER DIRECTING MITSUBISHI IMAGING (MPM) INC. TO COMPLY WITH THIS COURT'S SALE ORDER; AND (C) IN RESPONSE TO THE EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO COMPEL DEBTORS, SILVER AND PRESSTEK TO COMPLY WITH SALE ORDER ENTERED NOVEMBER 3, 2004 AND THE SECOND AMENDMENT TO THE ASSET PURCHASE AGREEMENT**

**I.**                                          **INTRODUCTION**

A.B.Dick Company, Paragon Corporate Holdings, Inc., Multigraphics LLC, and Interactive Media Group, Inc., debtors and debtors in possession in the above-captioned, jointly administered cases (collectively, the "Debtors"), by and through their undersigned counsel, respectfully submit this Statement:   (A) in Response to the Emergency Motion of Mitsubishi Imaging (MPM), Inc. for Order Determining Validity of Exercise of Election Under Postpetition Private Label Sales Agreement; (B) in Support of the Emergency Motion of Presstek, Inc. Seeking an Order Directing Mitsubishi Imaging (MPM) Inc. to Comply with this Court's Sale Order; and (C) in Response to the Emergency Motion of The Official Committee of Unsecured Creditors to Compel Debtors, Silver and Presstek to Comply with Sale Order Entered November 3, 2004 and the Second Amendment to the Asset Purchase Agreement.

B-0129

The Debtors respectfully submit that Mitsubishi Imaging (MPM), Inc. ("Mitsubishi") should be authorized to deliver the Pipeline Product[1] to Presstek, Inc. or Silver Acquisitions Corp. (collectively, the "Purchaser"). Such a result is consistent with and in furtherance of the terms of the Asset Purchase Agreement (the "APA") and the Sale Order. More importantly, it is in the best interests of the Debtors' former customers, employees and creditors.

**II.**                                     **FACTUAL BACKGROUND**

The Debtors and Mitsubishi were parties to a prepetition sales agreement dated October 1, 2002, pursuant to which Mitsubishi agreed to sell and the Debtors agreed to purchase certain product[2] as described therein (the "Prepetition Agreement"). A major benefit of the Prepetition Agreement was the credit line provided to the Debtors, which, *inter alia*, enabled the Debtors to pay for product when it was delivered to the Debtors.

Shortly before the petition date, Mitsubishi reduced the Debtors' credit line to $0.00. Subsequent to the petition date, Mitsubishi advised the Debtors that it would not deliver any product or accept any purchase orders unless the Debtors agreed to an Addendum which modified the Prepetition Agreement in several material respects and required the Debtors to assume the Prepetition Agreement. Given that their bankruptcy cases had only recently been filed, the Debtors exercised their business judgment and did not execute the proposed Addendum. Nevertheless, the Debtors needed to ensure an uninterrupted supply of Mitsubishi product so that the Debtors could satisfy

---

[1]      As defined in Mitsubishi's Motion.

[2]      Mitsubishi is the only source for the product at issue. This product is manufactured in Japan and may take 60 to 90 days to reach the United States.

2

customer orders.[3]  The Debtors and Mitsubishi subsequently agreed to enter into a Private Label Sales Agreement, which was approved by the Court on August 12, 2004 (the "Post Petition Agreement").  The Post Petition Agreement provided that the Debtors would pay one-third of the total invoice price upon execution of a purchase order, one-third when the product was ready for loading onto a vessel for shipment and the balance when the vessel arrived in the United States.  *See* Post Petition Agreement at Paragraph 8(F).

In the event the Debtors defaulted under the Post Petition Agreement (i.e., were unable to pay any balance owed with respect to the Pipeline Product), Mitsubishi was granted a Resale License to use the Debtors' "trademarks and patented technology to the extent necessary to complete and sell such Product."  Post Petition Agreement at Paragraph 8(F).  Upon termination of the Post Petition Agreement, the Debtors were given the right "to purchase all Product subject to any outstanding Purchase Order identified in such notice by paying MITSUBISHI an amount equal to the total invoice price of the Product identified in such Purchase Orders less the sums already paid against the said Purchase Orders pursuant to Paragraph 8(F) above."  Post Petition Agreement at Paragraph 12(C).  In other words, the Debtors obtained the right to purchase the Pipeline Product, **for which it had already made partial payment.**

With respect to assignment of the Prepetition Agreement and the Post Petition Agreement, the Post Petition Agreement provided:

> This Agreement shall not be assigned by either party without the prior written consent of the other.  Each party reserves all rights to seek (in the case of A.B. DICK ) or

---

[3]  The Debtors also were advised that if a satisfactory agreement was not timely reached, the factory in Japan would shut down for a period of time.  This would have severely impacted the Debtors' ability to remain a going concern.

3

**oppose (in the case of MITSUBISHI) assumption and assignment of the Prepetition Agreement pursuant to the provisions of Section 365 of the Bankruptcy Code. In that regard, MITSUBISHI does not concede that the Prepetition Agreement is an executory contract subject to assumption or assumption and assignment and asserts that, in any event, under the Prepetition Agreement, MITSUBISHI has the unilateral right to set A.B. DICK's credit line and that, prior to the filing of the A.B. DICK bankruptcy petition, the A.B. DICK credit line was reduced to $0. MITSUBISHI also reserves the right to move to compel assumption or rejection of the Prepetition Contract at any time.**

Post Petition Agreement at Paragraph 10 (emphasis added).

Although the Debtors reserved any rights they had to assume or assign the Prepetition Agreement, no final decision with respect to this issue was made at that time.[4] On October 1, 2004, after reviewing all of their agreements, the Debtors filed Schedules of Executory Contracts, Unexpired Leases and Related Cure Amounts of the Debtors as of September 29, 2004 and Reservation of Rights (the "October 1 Schedules").[5] The October 1 Schedules set forth eleven (11) categories of agreements the Debtors reserved the right to assume and assign.[6] Since neither the Prepetition Agreement nor the Post Petition Agreement are executory contracts, these agreements were not included in the October 1 Schedules.

---

[4] Although A.B.Dick's Schedule G – Executory Contracts and Unexpired Leases – included most all agreements A.B.Dick had with third parties, this Schedule stated **"THE SCHEDULING OF AN AGREEMENT ON THIS SCHEDULE G DOES NOT CONSTITUTE AND SHALL NOT BE DEEMED A WAIVER OF THE DEBTOR'S RIGHT TO CHALLENGE THE EXECUTORY NATURE OF THE AGREEMENT OR THE LEGAL STATUS THEREOF."** (emphasis in original).

[5] The October 1 Schedules were amended on October 6, 2004.

[6] As of this date, the Debtors have assumed and assigned all of the agreements in eight (8) of the eleven (11) categories. The only agreements presently at issue appear to be the Vendor Agreements set forth on Exhibit A to the October 1 Schedules, and other vendor agreements not set forth therein.

4

Pursuant to the Post Petition Agreement, the Debtors continued to order product from Mitsubishi and pay for it as required by Paragraph 8(F). As of the date of closing, the Debtors had issued purchase orders to Mitsubishi totaling $4,801,171.94 and had paid Mitsubishi $2,545,774.94 pursuant to Paragraph 8(F) of the Post Petition Agreement. The outstanding balance of $2,255,397 was to be paid upon delivery of the Pipeline Product to the United States.

## III.                          ARGUMENT

Pursuant to its Motion, Mitsubishi seeks direction from the Court as to whether it should release the Pipeline Product to the Purchaser. The Debtors respectfully submit that release of the Pipeline Product to the Purchaser is consistent with the terms of the APA and the Sale Order, and in furtherance of the transactions contemplated thereby.

Pursuant to Section 2.1 of the APA, the Purchaser purchased all of the Seller's "right, title and interest in and to all of the Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located . . .[.]" The purchased assets specifically included "all rights of Seller relating **to deposits and prepaid expenses, claims for refunds** and rights to offset in respect thereof . . .[.]" APA at Section 2.1(I)(emphasis added). Given the extent of the purchased assets, the Debtors respectfully submit that the Purchaser acquired any and all rights the Debtors had with respect to the Pipeline Product. This is especially true since the Purchaser would be entitled to any refund that might accrue if the Debtors terminated the Post Petition Agreement and Mitsubishi exercised its rights under the Resale License.[7]

---

[7] Although Mitsubishi has an obligation to mitigate any damages, it is unknown whether any refund would be due and owing if the Pipeline Product was sold off by Mitsubishi pursuant to Paragraph 8(F) of the Post Petition Agreement.

5

B-0133

Delivery of the Pipeline Product to the Purchaser will not give the Purchaser rights under the Post Petition Agreement. Rather, delivery of the Pipeline Product to the Purchaser is simply providing the Purchaser with the benefit of its bargain, i.e., the inventory it purchased and for which it gave the Debtors credit in the closing conditions. Section 10.12 of the APA originally stated that the Purchaser was not obligated to close the sale unless the Debtors and certain of their affiliates had a certain dollar amount of inventory. The Second Amendment to the APA modified Section 10.12 to state that, for purposes of such closing condition, prepaid deposits for inventory made by the Debtors were to be counted as inventory actually owned by the Debtors at closing. The parties would not have agreed to this provision unless the Purchaser was purchasing the estates' rights in the partially pre-paid inventory.

Consequently, the Purchaser should be entitled to receive the Pipeline Product ordered by the Debtors, which product is essential to enable the Purchaser to satisfy orders from the Debtors' former customers. To the extent it is determined that the Debtors' estates are entitled to a refund or that Presstek must assume and cure any executory contracts, that can be determined at a subsequent hearing. For purposes of clarity, the Debtors believe Schedule G contains agreements that may not be executory contracts. The Debtors further believe that the population of their executory contracts is limited to those agreements identified in the October 1 Schedules, as amended on October 6, 2004.

6

B-0134

WHEREFORE, the Debtors respectfully request that the Court enter an Order:

(i) authorizing Mitsubishi to deliver the Pipeline Product to the Purchaser; and

(ii) providing such other and further relief as this Court deems proper.

Dated: Wilmington, Delaware
       November 17, 2004

Respectfully submitted,

/s/ H. Jeffrey Schwartz
H. Jeffrey Schwartz (OBR #0014307)
John A. Gleason (OBR #0039150)
Michael D. Zaverton (OBR #0038597)
BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP
2300 BP Tower
200 Public Square
Cleveland, OH 44114-2378
(216) 363-4500
(216) 363-4588 (Facsimile)
jschwartz@bfca.com
jgleason@bfca.com
mzaverton@bfca.com

Attorneys for A.B.Dick Company, *et al.*,
Debtors and Debtors in Possession

and

/s/ Frederick B. Rosner
Frederick B. Rosner, Esq. (No. 3995)
JASPAN SCHLESINGER HOFFMAN LLP
913 Market Street, 12th Floor
Wilmington, DE 19801
Telephone: 302-351-8000/8005
Facsimile: 302-351-8010
frosner@jshllp-de.com

Local Counsel for A.B.Dick Company,
*et al.*, Debtors and Debtors in Possession

7

B-0135

# Tab 6

```
 1
 2                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 3
 4    IN RE:                    .        Chapter  11
                                .
 5    A.B. Dick Company, Inc.,  .
                                .
 6        Debtor(s).            .        Bankruptcy #04-12002 (JLP)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 7
                              Wilmington, DE
 8                           November 17, 2004
                               11:30 a.m.
 9
                    TRANSCRIPT OF TELEPHONE CONFERENCE
10              BEFORE THE HONORABLE JOHN L. PETERSON
                    UNITED STATES BANKRUPTCY JUDGE
11
12    APPEARANCES:
13    For the Debtor(s):            Frederick B. Rosner, Esq.
                                    Jaspan Schlesinger Hoffman, LLP
14                                  1201 North Orange Street-Ste. 1001
                                    Wilmington, DE 19801
15
                                    H. Jeffrey Schwartz, Esq.
16                                  Benesch Friedland Coplan
                                    & Aronoff, LLP
17                                  2300 BP Tower
                                    200 Public Square
18                                  Cleveland, OH 44114
19                                  John Gleason, Esq.
                                    Benesch Friedland Coplan
20                                  & Aronoff, LLP
                                    88 E. Broad St.-Ste. 900
21                                  Columbus, OH 43215
22    For The Official Committee: James P. Ricciardi, Esq.
      of Unsecured Creditors        McGuire Woods, LLP
23                                  77 West Wacker Drive-Ste. 4100
                                    Chicago, IL 60601
24
25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191



2

```
 1                              Ronald W. Crouch, Esq.
                                McGuire Woods, LLP
 2                              Dominion Tower
                                625 Liberty Ave.-23rd Fl.
 3                              Pittsburgh, PA 15222

 4                              Jeffrey Schlerf, Esq.
                                The Bayard Firm
 5                              222 Delaware Ave.-Ste. 900
                                Wilmington, DE 19801
 6
      For MHR Entities:        Megan N. Harper, Esq.
 7                              Landis Rath & Cobb, LLP
                                919 Market Street
 8                              Wilmington, DE 19899

 9    For Key Bank:            Jami Nimeroff, Esq.
                                Buchanan Ingersoll, PC
10                              The Nemours Building
                                1007 North Orange Street-Ste. 1110
11                              Wilmington, DE 19801

12                              Robert Folland, Esq.
                                Thompson Hine, LLP
13                              3900 Key Center
                                127 Public Square
14                              Cleveland, OH 44114

15    For Presstek, Inc.:      Stephen B. Selbst, Esq.
                                McDermott Will & Emery
16                              50 Rockefeller Plaza
                                New York, NY 10020
17
      For Mitsubishi:          Thomas G. Whalen, Jr., Esq.
18                              Stephens & Lee, PC
                                300 Delaware Ave.-Ste. 800
19                              Wilmington, DE 19801

20                              Robert Lapowsky, Esq.
                                Stephens & Lee, PC
21                              1818 Market Street-29th Fl.
                                Philadelphia, PA 19103
22
      For Esko Graphics, Inc.: Christopher D. Loizides, Esq.
23                              Loizides & Associates
                                1225 King Street
24                              Wilmington, DE 19801

25    Audio Operator:          Brandon J. McCarthy
```

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-389-0191

B-0137



3

1   Transcribing Firm:     Writer's Cramp, Inc.
                            6 Norton Rd.
2                         Monmouth Jct., NJ 08852
3                         732-329-0191

Proceedings recorded by electronic sound recording, transcript
4  produced by transcription service.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B-0138

4

## Index

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| Witnesses For Presstek: | | | | | |
| Mr. Gray | | | | | |
| (by Mr. Selbst) | 16 | | | | |
| (by Mr. Crouch) | | 33 | | | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| P-1 | Asset Purchase Agreement | * | 24 |
| P-1A | Private Label Sales Agreement | 22 | 23 |
| P-2 | First Amendment to APA | * | 24 |
| P-3 | Second Amendment to APA | * | 24 |
| P-4 | August 23rd Transcript | * | |
| P-5 | Sale Order | * | 24 |
| P-6 | Order of 11/23 Sale | * | 24 |

Opening Statements:

| by Mr. Lapowsky | 6 |
|---|---|
| by Mr. Ricciardi | 9 |
| by Mr. Gleason | 11 |
| by Mr. Selbst | 13 |

| THE COURT: Finding | 36 |
|---|---|

* Marked at previous hearing

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-389-0191*

B-0139

5

1    (Proceeding in progress)

2        THE COURT:  -- 02.  I'll have the counsel state their

3    appearances for the record please.

4        MR. ROSNER:  Good morning, Your Honor.  This is Fred

5    Rosner with Jaspan Schlesinger Hoffman, Delaware counsel to the

6    Debtors.  And on behalf of everyone in the Court, we thank Your

7    Honor for agreeing to hear the three motions on an emergency

8    basis.  We do have the three motions and they appear in the

9    agenda in the chronological order which they were filed.  Let

10   me advise the Court that the Mitsubishi Motion, which is item

11   #1, counsel is present and prepared to go forward.  They've

12   indicated they do not have a witness but, of course, they

13   reserve all rights.  The second motion is by Presstek.

14   Presstek will have one witness, Mr. Stephen Gray, who is the

15   Debtor's chief restructuring officer and was retained.  Mr.

16   Gray is with The Recovery Group, also known as TRG.  The third

17   motion is by the Creditors' Committee.  The Creditors'

18   Committee may have one witness on the issue of access to books

19   and records now in possession of Presstek.  And I believe the

20   parties would proceed in the order presented by the agenda,

21   but of course we'll defer to the Court.  If the Court would

22   like to hear the motions in a different order, that's our

23   pleasure.

24        THE COURT:  All right.  Next?

25        MR. ROSNER:  So we'll proceed, Your Honor -- we'll

B-0140

Opening Statement - Mr. Lapowsky                    6

1    proceed in the order on the agenda?

2              THE COURT:  That's right.

3              MR. ROSNER:  Okay, thank you, Your Honor.  I'm going

4    to cede the podium now.  And just a reminder to all counsel and

5    to witnesses to speak loudly and clearly into the microphone so

6    the Court can --

7              THE COURT:  Where's the witness going to sit?

8              MR. ROSNER:  The witness stand.  Your Honor -- would

9    sit at the witness stand and, you know, be sworn --

10             THE COURT:  I think maybe it would be better for me

11   for hearing this thing that the witness take -- sit up at the

12   Bench.

13             MR. ROSNER:  Sit at the bench?  Okay.  The witness

14   (indiscern.) mic but will sit at the Bench?  Okay.  That's

15   fine, Your Honor.  We'll do that.  Okay, let me cede the podium

16   to counsel to Mitsubishi.

17             MR. LAPOWSKY:  Good morning, Your Honor.  This is

18   Robert Lapowsky from Stephens & Lee.  I'm counsel to

19   Mitsubishi, and I asked to go first because Mitsubishi really

20   doesn't have a position on any of the motions that are before

21   you today that relate to the pipeline inventory.  We view

22   ourselves, really, more as a stakeholder.

23             THE COURT:  All right.

24             MR. LAPOWSKY:  But I did want to just clarify a couple

25   of things for the record.  It is Mitsubishi's position that it

*Welzer's Cramps, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0141

7

1  currently owns all of the pipeline inventory.  And if we can be

2  comfortable that there's been a valid exercise of the election,

3  then Mitsubishi is ready, willing, and able to perform under

4  the agreement, the post-petition agreement.  There was an issue

5  raised by the Debtor -- or by Presstek in its papers as to

6  whether we were disputing the authority of Mr. Herdon to have

7  made the election.

8          THE COURT:  Yes.

9          MR. LAPOWSKY:  And we don't dispute that Mr. Herdon's

10  authority -- Mr. Schwartz, A.B. Dick's lawyer has sent me an

11  email confirming that Mr. Herdon is an officer of A.B. Dick, so

12  we don't have an issue as to whether Mr. Herdon is an

13  authorized representative of A.B. Dick.  The only real issue

14  that we see is whether any officer of A.B. Dick is authorized

15  to exercise the election without a Court order.  And that's an

16  issue that was raised by the Committee, not by us.  The Debtor

17  and Presstek are taking the position that this is an ordinary

18  course act and does not require any Court approval.  And

19  Presstek has threatened to sue Mitsubishi if it doesn't

20  perform.  The Committee has taken the position that it's not

21  ordinary course and that the election is invalid, and so that

22  if Mitsubishi were to perform, Mitsubishi would be exposing

23  itself to potential liability for the refund.  So Mitsubishi

24  finds itself smack in the middle, and we are really just

25  seeking direction as to what we should be doing.

*Wilcox's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

8

1  Judge, I see three possible ways that this could come out.
2  One is that if you agreed with the Committee, that would be
3  relatively simple because then the election period would have
4  expired and we would know what we had to do.  If you conclude
5  that the act was either ordinary course or if wasn't ordinary
6  course that it's nonetheless going to be approved under a 363
7  standard, then all we would ask, Your Honor, is that the order
8  be specific in ways that would protect Mitsubishi.  And by
9  that, what I mean is that the order should specify that we're
10  authorized to -- not only the election is valid but that we're
11  authorized to deliver the goods to Presstek rather than to the
12  Debtor.  There'd be a waiver of the 10-day waiting periods
13  under 6004(g) and 7062 to the extent any of those would be
14  applicable; because I'm sure that Presstek, under those
15  circumstances, would want the product delivered immediately and
16  would not want to have to wait the appeal period.  And to the
17  extent that it was ever later determined that Mitsubishi did
18  have some obligation for the refund that it obtain an indemnity
19  from Presstek who would have, at that point, gotten the goods
20  and gotten the credit for the deposit.
21  Your Honor, that, really, is our position, and we do not
22  intend to call any witnesses or to take any positions.  Thank
23  you.
24  THE COURT:  All right.  The Unsecured Creditors'
25  Committee?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    MR. RICCIARDI:  Your Honor, James Ricciardi, of

2    McGuire Woods for the Unsecured Creditors' Committee.  I'm

3    joined here today by my partner, Ron Crouch, and also by Jeff

4    Schlerf from the Bayard Firm.  Your Honor, the Committee

5    believes the issues raised by Mitsubishi's Motion for an Order

6    determining rights to certain pipeline inventory are simple,

7    not complex as Presstek would have you believe.  It is

8    undisputed that Presstek did not take an assignment of the

9    post-petition agreement.  There are certain commercial burdens

10   that we presume they wanted to avoid in that agreement, such as

11   minimum selling quantities and minimum inventory levels.  It is

12   undisputed that only the Debtors could elect to take the

13   pipeline inventory.  It is undisputed that if the election was

14   invalid, it has now expired as of 11:59 p.m. on November 15th,

15   2004.  It is undisputed that if the election was not made

16   A.B.D. will have certain refund rights from Mitsubishi, perhaps

17   for a sum of up to $2.5 million.  It is undisputed that

18   Presstek will pay the Debtors nothing if the election is

19   exercised.

20       So what is in dispute?  The dispute concerns whether the

21   Debtors, whose only business is the business of liquidating

22   their assets, can make an election under a contract of which

23   Presstek refused to take an assignment that allows Presstek to

24   cherry-pick the pipeline inventory benefit from that A.B. Dick

25   contract without having accepted any of the other burdens of

10

1   that contract. The District of Delaware was faced with a very

2   similar situation, Your Honor, in the Cell Net case that we

3   cited to in our papers. And if I might quote the District

4   Court there, at page 593, "Because the right to receive

5   royalties arises only from those license agreements,

6   Schlumberger's exclusion of the license agreements includes the

7   right to receive royalties thereunder." In other words, an

8   asset buyer who bought substantially all of the assets and

9   excluded one contract is not entitled to any benefits under

10  that contract.

11       In addition, Your Honor, with regard to ordinary course of

12  business, many Courts have held that after the sale of an

13  operating business, almost no material transactions meet the

14  ordinary course of business test and there is a string of cases

15  beginning with In Re: Drexxel Burnam, 112 Bankruptcy Reporter

16  584, that's the Bankruptcy Court for the Southern District of

17  New York in 1990; In Re: C.B.N. Incorporated, 86 Bankruptcy

18  Reporter 303 at pages 305 to 306.

19       Furthermore, Your Honor, since this attempt at cherry-

20  picking works a forfeiture of the Estate's rights to a material

21  refund, it should need to comply with section 554, the section

22  on abandonment, as well. The Court, I think, can understand if

23  the Committee is unimpressed by Presstek's promise to make it

24  whole if Presstek's view of the law is held to be erroneous in

25  some future proceeding. Given that Court approval was not

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B-0145

Opening Statement - Mr. Gleason          11

1   obtained under either 363 or 554 and that the election option

2   has now expired, we ask the Court to order Mitsubishi to act in

3   accordance with its termination obligations under the post-

4   petition agreement and to order Presstek to cease interfering

5   with A.B. Dick's contractual rights with Mitsubishi.  Thank

6   you, Your Honor.

7          THE COURT:  Thank you.  Who's next?

8          MR. GLEASON:  Good morning, Your Honor.  John Gleason

9   from Benesch Friedland Coplan and Aronoff on behalf of the

10  Debtors.  And with me is Jeffrey Schwartz, my partner, as well

11  as Mr. Rosner who spoke earlier.  Your Honor, although the

12  Debtors appreciate and applaud the Committee's desire and

13  attempts to augment the Estates in these cases, the Debtors are

14  bound to use their best efforts to consummate the agreement

15  that they negotiated based upon the terms of that agreement and

16  their good faith understanding of the terms of that agreement.

17  To this end, Your Honor, the Debtors filed a statement this

18  morning which sets forth the Debtors' position with --

19         THE COURT:  I've read it.

20         MR. GLEASON:  You did receive it?  Thank you -- with

21  respect to the Mitsubishi inventory.  I won't rehash all of it,

22  but in short, Your Honor, the Debtors submit that based upon

23  their good faith understanding of the APA, the second amendment

24  and the Sale Order that the purchaser purchased all of the

25  Debtors' inventory, including the inventory that was on order



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

12

1    with Mitsubishi and which the Debtors have partially paid for.

2    Consequently, the Debtors respectfully submit that Mitsubishi

3    should be authorized to deliver the inventory at issue to the

4    purchaser which is in furtherance of the APA and the Sale

5    Order.  More importantly, Your Honor, this will enable the

6    purchaser to meet their obligations to the Debtors' former

7    customers and continue and enable the purchaser to continue to

8    provide employment to many of the Debtors' former employees.

9         Just to address two of the points raised here this morning

10   by counsel for Mitsubishi and counsel for the Committee.  I

11   don't believe we have an ordinary course issue here, Your

12   Honor.  What this is is simply in furtherance of the Asset

13   Purchase Agreement, the second amendment and the Sale Order.

14   More importantly, if you look at the option that the Committee

15   is asking for, it would result in Mitsubishi exercising their

16   resale rights, which may or may not result in a refund being

17   available under the post-petition agreement.  But even if there

18   are -- because -- let me just go back for a second, Mitsubishi

19   is authorized under that agreement to take out cost of sale and

20   other charges.  But even if there were a refund, not only did

21   the purchaser purchase the inventory at issue here, the

22   purchaser purchased the Debtors' refund rights.

23        So, again, although we applaud the Committee's attempt,

24   the Debtors, based on their good faith understanding of the

25   agreement, simply believe that the Mitsubishi inventory was

B-0147