Opening Statement - Mr. Selbst                    13

1    purchased and should be transferred to the purchaser.  If Your

2    Honor has any questions, I'd be happy to try to answer them.

3         THE COURT:  I think we'll go ahead.  But -- any other

4    counsel there to make a statement?

5         MR. SELBST:  Your Honor, Stephen Selbst on behalf of

6    Presstek, the purchaser.  Your Honor, I will try to be brief.

7    Mr. Ricciardi said that many things were undisputed.  There are

8    several things that are disputed.  As Mr. Gleason has just

9    said, we dispute his contention that the Debtor has the right

10   to the refund.  Your Honor, we forwarded to you a copy of the

11   Asset Purchase Agreement which is part of the record in this

12   case.  Sections 2.1(k) of the agreement, which is at page 12,

13   says that among the assets that Presstek purchased were all

14   claims against third parties relating to the asset whether

15   choate or inchoate, known or unknown, contingent or

16   noncontingent.  Section 2.1(l) says all rights of the sellers

17   relating to deposits and prepaid expenses, claims for refunds

18   and rights for offset in respect thereof.  Section 2.1(c) says

19   all inventories.

20        Your Honor, to put it in a nutshell, I agree with Mr.

21   Ricciardi about one thing:  We believe this is a simple case.

22   You're going to hear testimony this morning from Mr. Gray who

23   will testify that the Debtors believe this asset was sold as

24   part of the going concern that was sold to the Debtors, to

25   Presstek.  This is not a separate 363 transaction.  This is part

Weltz's Cramp, Inc.
Certified Court Transcribers
732-329-0191

14

1  of the original asset sale which this Court approved

2  approximately two weeks ago.  We believe that the evidence will

3  show the Debtors properly exercised the option to acquire this

4  inventory, and for that reason, Presstek acquired those rights.

5      And -- and this is put forth in our papers -- a little bit

6  of history is relevant here and you'll hear testimony about

7  that.  Back in August of 2004, at a time when the Committee was

8  objecting to the sales procedures in this case, there was a

9  covenant in the Asset Purchase Agreement.  And that covenant

10 said as a closing condition the Debtors had to have $22.7

11 million in working capital.  And Mr. Pollock on behalf of the

12 Debtors testified that, in fact, the Debtors were worried about

13 satisfying that covenant, in part because they had to make

14 prepayments to get Mitsubishi product under the post-petition

15 Mitsubishi agreement.  The Committee itself put in an objection

16 to the bid procedures on the grounds that that $22.7 million

17 covenant might not be achieved.  And so the parties entered

18 into amendment #1 and amendment #2 to the Asset Purchase

19 Agreement.  Those amendments, #'s 1 and 2, which have also been

20 forwarded to Your Honor, make it clear that for purposes of

21 calculating the working capital, the Debtors would be allowed

22 to credit $2½ million of prepaid inventory as inventory for

23 purposes of the test.  Now Presstek didn't want that changed.

24 It didn't benefit Presstek.  The Debtors and the Committee

25 pressed for that change, as you'll hear testimony.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B-0149

15

1   Why would Presstek do that?  Presstek only did it in
2   response to the Debtors' and the Committee's objections.  It
3   did not benefit Presstek.  But for the Committee, which had
4   helped press for that change, to now contend that prepaid
5   inventory was not part of the assets purchased is simply
6   inconsistent with its prior position.  And you'll hear
7   testimony about that.
8       As I said, we believe this asset was transferred pursuant
9   to Your Honor's prior order.  As Your Honor is well aware, you
10  have the authority to interpret your Sales Order, and we
11  believe that the Sales Order can and should be interpreted to
12  require Mitsubishi to deliver the product to Presstek.  And
13  there is a reason for that.  When the A.B.D. transaction
14  closed, Presstek discovered that the Debtors had no inventory
15  of the Mitsubishi product.  It had been sold off for at least
16  20 days.  The Mitsubishi product is specially manufactured for
17  A.B. Dick.  There is no other manufacturer.  Without this
18  product, Presstek simply cannot continue to fulfill customer
19  orders and rebuild the business of A.B. Dick, as Mr. Gleason
20  said, rebuild customer loyalty and ultimately preserve employee
21  jobs.  We don't think this is a hard issue.  We think the
22  testimony of Mr. Gray will clinch these points, and we look
23  forward to putting this on before Your Honor.
24          THE COURT:  All right.  Call the witness.
25          MR. FOLLAND:  Your Honor, this is Robert Folland of

B-0150

1   Thompson Hine on behalf of Key Bank, pre-petition secured

2   Lender in the case.  We do not wish to make an opening

3   statement with respect to the motion before you, but I did want

4   to -- since you're not here today, you're appearing by phone --

5   I did want to let you know that we are in the Courtroom

6   listening.  And there is an issue with respect to adequate

7   protection cash collateral that I have discussed with counsel

8   for the Creditor's Committee and counsel for the Debtor that at

9   the appropriate time we may want to put something on the

10  record.  Thank you, Your Honor.

11          THE COURT:  All right.  Thank you.

12          MR. SELBST:  Your Honor, at this time Presstek calls

13  Mr. Stephen Gray.

14          THE COURT:  You'll be sworn.

15              STEPHEN GRAY, PRESSTEK'S WITNESS, SWORN

16          THE COURT:  You spell your name for the record,

17  please?

18          MR. GRAY:  Stephen, S-T-E-P-H-E-N, middle initial S,

19  Gray, G-R-A-Y.

20          THE COURT:  Go ahead, Counsel.

21          MR. SELBST:  Thank you, Your Honor.

22                      DIRECT EXAMINATION

23  BY MR. SELBST:

24  Q.  Mr. Gray, what is your position with the Debtors?

25  A.  Chief Restructuring Officer.

*Writer's Cramp, Ina.*
*Certified Court Transcribers*
*732-329-0191*

1  Q.  And when did you assume that position?

2  A.  I believe it was July 27th, 2004.

3  Q.  As Chief Restructuring Officer of the Debtors, did you have

4  responsibility for negotiations with Mitsubishi?

5  A.  I did.

6  Q.  And what does Mitsubishi supply to the Debtors, or did it

7  supply to the Debtors?

8  A.  The principal products are polyester plate making material,

9  offset plate making material that is supplied in various

10  configurations and sizes.

11  Q.  How do the Debtors' customers use the Mitsubishi product?

12  A.  The product is used for the -- in plate making equipment.

13  It's photosensitive material that is exposed to images that

14  then are applied to the polyester plate making material and

15  then processed chemically to form a offset plate, which is used

16  to go on a printing press to print.

17  Q.  The product that Mitsubishi supplies to the Debtors, is it

18  available at this time from any other manufacturer?

19  A.  The -- a significant percentage of the product, I believe

20  roughly 60 percent of what we purchase from Mitsubishi, is

21  proprietary to A.B. Dick.  It is made to A.B. Dick's

22  specifications.  Some of it's made under A.B. Dick patents, and

23  will only fit in A.B. Dick plate making equipment.  And in

24  fact, A.B. Dick equipment can only use this particular

25  material.

1  Q.  What is the annual sales volume that the Debtors have done

2  with Mitsubishi?

3  A.  Purchases from Mitsubishi are roughly 18 to $20 million a

4  year.

5  Q.  Does that Mitsubishi one of the Debtors' primary suppliers?

6  A.  It is the Debtors' largest single supplier.

7  Q.  Okay.  Did Mitsubishi have a pre-petition agreement with

8  the Debtors?

9  A.  It did.

10 Q.  What did that agreement provide for, Mr. Gray?

11 A.  It provided for the --

12      MR. CROUCH:  Your Honor, Ronald Crouch from McGuire

13 Woods on behalf of the Official Committee of Unsecured

14 Creditors.  I think we're now going to launch into the

15 proffered testimony which is going to be to have this witness

16 discuss his interpretation and his, as counsel put it, his

17 belief as to what these various contracts provide, and I

18 believe all of that is parol evidence.  The Asset Purchase

19 Agreement, the first amendment and the second amendment are all

20 incorporated into this Court's Sale Order.  They're clear and

21 unambiguous.  This Court is certainly capable of interpreting

22 its own Sale Order.  And as to the post-petition agreement with

23 Mitsubishi and likewise with the written contract which speaks

24 for itself and I don't think that we're going to gain anything

25 in these proceedings by having witnesses parade up and continue

1    the legal argument of counsel having witnesses state what they

2    believe the contracts mean.

3          MR. SELBST:  Your Honor, respectfully, I'm laying

4    foundation.  The Committee will certainly have an opportunity

5    to cross the witness, but the witness, as Chief Restructuring

6    Officer, can certainly testify --

7          THE COURT:  Yes, the objection's overruled.

8          MR. SELBST:  Thank you, Your Honor.

9    BY MR. SELBST:

10   Q.  Now, Mr. Gray, what is your understanding of what the pre-

11   petition agreement with Mitsubishi provided for?

12   A.  It provided for the -- that is to purchase these materials

13   from Mitsubishi under certain pricing structure and volume

14   rebate structure.  And it also provided for a line of credit

15   of, I believe, it was $1.2 million.

16   Q.  At the time the Debtors filed for Chapter 11, did they have

17   any availability under that line of credit?

18   A.  No, it was maxed out.

19   Q.  Now, to shift your attention forward a small amount in

20   time, after the Debtors filed for Chapter 11, was Mitsubishi

21   willing to perform under the pre-petition agreement?

22   A.  They were not.

23   Q.  And why were they not?

24   A.  They were insisting upon the Debtors -- they were insisting

25   the Debtors assume the agreement and cure it for the payment of

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0154

1   $1.2 million.

2   Q.  Were the Debtors willing to do that?

3   A.  Debtors were not willing to do that.

4   Q.  And why were the Debtors not willing to do that?

5   A.  Well, on a business basis, the issue was the use of the

6   Estate's precious cash resources in the amount of $1.2 million

7   to pay pre-petition debt with no post-petition benefit.  Beyond

8   that, there were issues of whether or not the contract was

9   executory and could be assumed.

10          MR. SELBST:  Your Honor, I'd like to approach the

11  witness and hand him a document that's been marked for

12  identification, if I may.

13          THE COURT:  Let me go back on that.  I received

14  Exhibits 1 through 6 that were faxed to me this morning, and

15  there are also Exhibits A and A, B, C attached to the various

16  memorandums.  A lot of those documents are duplications.  Let's

17  -- if there are no objections to any of those exhibits, I'll

18  admit them all into evidence.  Are there any objection?

19          MR. SELBST:  We have no objection, certainly, Your

20  Honor.

21          THE COURT:  Which exhibit?

22          MR. SELBST:  Well, we would seek the admission of the

23  exhibits that we sent to Your Honor.

24          THE COURT:  You're going to have to identify who's

25  speaking here because I can't see --

*Writer's Cramp, Ins.*
*Certified Court Transcribers*
*732-529-0191*

Gray - Direct                                    21

1    MR. SELBST:  I'm --

2    THE COURT:  -- you.

3    MR. SELBST:  -- sorry.  I'm sorry, Your Honor.  I

4  apologize.  This -- doing this by with you not present in the

5  Courtroom is a little bit confusing to me as well and I

6  apologize.  If you could bear with me for one second.  Your

7  Honor, my office sent to you, identified as Exhibit #1, the

8  Asset Purchase Agreement; Exhibit #2, which was the first

9  amendment to the Asset Purchase Agreement; our Exhibit #3 was

10 the second amendment to the Asset Purchase Agreement; Exhibit 4

11 is the transcript of the hearing held before the Court on

12 August 23rd; Exhibit 5 is the Sale Order.  Your Honor, I

13 believe those are the exhibits that we faxed to Your Honor.

14    (Presstek's Exhibit-1 previously marked for

15 identification)

16    (Presstek's Exhibit-2 previously marked for

17 identification)

18    (Presstek's Exhibit-3 previously marked for

19 identification)

20    (Presstek's Exhibit-4 previously marked for

21 identification)

22    (Presstek's Exhibit-5 previously marked for

23 identification)

24    THE COURT:  Yes, I have Exhibit 6, too, the Order of

25 the November 3rd sale.

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Gray - Direct                              22

1    MR. SELBST:  Okay.

2    (Presstek's Exhibit-6 previously marked for

3    identification)

4    MR. SELBST:  Your Honor, there's one other document

5    that was attached to our pleading that we did not mark as an

6    exhibit, which I'd like to now mark as Exhibit-1A, which is the

7    Private Label Sales Agreement.

8    THE COURT:  The APA?

9    MR. SELBST:  No, Your Honor.  It's the Private Sales

10   Label Agreement between the Debtors and Mitsubishi.

11   THE COURT:  What was that -- was that attached to one

12   of the motions?  I don't have it.

13   MR. SELBST:  Your Honor, it was attached to Presstek's

14   objection to the Mitsubishi motion.

15   THE COURT:  All right.

16   MR. SELBST:  Okay, and it's that document I'd like to

17   mark, then, as Exhibit-1A and show to Mr. Gray.

18   THE COURT:  I'm just looking through the maze of paper

19   here.  Wait 'til I get the objection --

20   MR. SELBST:  Absolutely, Your Honor.

21   THE COURT:  -- response.  That's on Exhibit -- what's

22   that?  I have a 4.  Okay.

23   MR. SELBST:  Have you found it, Your Honor?

24   THE COURT:  Yes.

25   (Presstek's Exhibit-1A marked for identification)

1    MR. SELBST:  Your Honor, we appreciate, again, your

2  attention and your willingness to help out in these difficult

3  circumstances.  With your permission, I would approach the

4  witness, then, and ask him questions about this agreement.

5    THE COURT:  All right, go ahead.

6    MR. SELBST:  Thank you.

7  BY MR. SELBST:  .

8  Q.  Mr. Gray, I've handed you a document that I've marked for

9  identification as Presstek Exhibit-1A.  Have you seen this

10  agreement before?

11  A.  I have.

12  Q.  Are you familiar with the terms of this agreement?

13  A.  Yes.

14  Q.  Did you negotiate the business terms of this agreement on

15  behalf of the Debtors?

16  A.  Yes.

17    MR. SELBST:  Your Honor, I would move for the

18  admission of Presstek Exhibit-1A.

19    THE COURT:  Any objections?

20    MR. CROUCH:  No objections, Your Honor.

21    THE COURT:  It's admitted.

22    (Presstek's Exhibit-1A admitted into evidence)

23    MR. SELBST:  Thank you, Your Honor.

24    THE COURT:  I'm going to admit Exhibits 1, 2, 3, 5 and

25  6.  I don't think that the transcript, Exhibit 4, is going to

Gray - Direct                                24

1  be of any value.

2          (Presstek's Exhibit-1 admitted into evidence)

3          (Presstek's Exhibit-2 admitted into evidence)

4          (Presstek's Exhibit-3 admitted into evidence)

5          (Presstek's Exhibit-5 admitted into evidence)

6          (Presstek's Exhibit-6 admitted into evidence)

7          MR. SELBST:  That's fine, Your Honor.  I -- it was

8  sent to you in an abundance of caution during my preparation

9  last evening and I do not plan to utilize it at this time.

10 Okay.

11         THE COURT:  Go ahead.

12         MR. SELBST:  All right.

13 BY MR. SELBST:

14 Q:  Mr. Gray, you were saying that you were familiar with the

15 Private Label Sales Agreement.  Can you provide the Court with

16 your understanding, as a businessman, as to what that agreement

17 provides?

18 A.  It provided for the post-petition purchase of these

19 polyester plate making materials from Mitsubishi and a -- terms

20 of payment for those purchases as well as -- I think the last

21 major element was Mitsubishi's ability or the Debtors'

22 agreement to allow Mitsubishi to use its intellectual property

23 to liquidate or to mitigate Mitsubishi's damages by liquidating

24 goods that the Debtor did not pay for to the extent the Debtor

25 failed and was unable to make payments under the agreement.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0159

Gray - Direct                                                      25

1  Q.  What are the payment terms that are imposed upon the

2  Debtors for orders they place under this agreement, Mr. Gray?

3  A.  A third upon issuance of a purchase order, a third upon the

4  goods -- the completion of production, and a third upon receipt

5  of goods in the United States.

6  Q.  Between the time that this agreement was entered into and

7  the time of the sales hearing that was held before this Court

8  on November 2nd and November 3rd, did the Debtors place orders

9  under this agreement?

10  A.  Yes.

11  Q.  And approximately what is the dollar volume of those

12  orders?

13  A.  Roughly a million and a half dollars a month.

14  Q.  Okay.  What was the status of pending orders as of November

15  2nd or 3rd?

16  A.  The outstanding orders, I think, were just short of $5

17  million, about $4.8 million, against which the Debtors had paid

18  about $2½ million on -- in progress payments or payments under

19  the agreement.

20  Q.  So those were goods that as of November 2nd and November

21  3rd were still to be delivered?

22  A.  Yes.  There may have been some sitting in port which the

23  Debtor hadn't taken possession of, but they were either in

24  production, at sea, or in port at that time.

25  Q.  How did the post-petition sales agreement, the Private

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*752-329-0191*

Gray - Direct                                    26

1  Label Sales Agreement, come into being?  Who asked for it?

2  A.  Mitsubishi.

3  Q.  And why did they ask for it?

4  A.  Well, as I said earlier, we -- the Debtors were unwilling

5  to cure and assume the pre-petition agreement.  The Debtors

6  needed the ability to buy this material.  It was critical to

7  the ongoing business of -- it was the largest single product

8  category and one of the most profitable.  So we needed an

9  arrangement under which to do business with Mitsubishi in terms

10 of payment that the Debtor could support.  Mitsubishi, however,

11 was interested in -- wanted a more formal arrangement because

12 they were concerned about -- in a -- if the Debtor failed,

13 their ability to mitigate their damages for goods that were

14 already in production or produced and unpaid for that were

15 subject to copyrights and patents that were held by the Debtor.

16 Q.  Okay.  Thank you very much, Mr. Gray, for your testimony

17 about that agreement.  I'd like to turn your attention now, if

18 I may, to the Asset Purchase Agreement.  Are you familiar with

19 that agreement?

20 A.  I am.

21        MR. SELBST:  All right, Your Honor, may I approach the

22 witness to hand him a copy of the Asset Purchase Agreement?

23        THE COURT:  All right.

24        MR. SELBST:  Thank you, Your Honor.

25    (The witness receives document)

1    BY MR. SELBST:

2    Q.  Mr. Gray, I'd like to turn your attention to section 2.1 of

3    the Asset Purchase Agreement, which is on page 11.

4    A.  Yes.

5    Q.  And directing your attention to section 2.1(c), would you

6    agree that the Debtors -- that Presstek purchased all

7    inventories of the sellers under that provision?

8    A.  It says all inventories of the sellers and their

9    subsidiaries.

10   Q.  Okay.  And now, Mr. Gray, I'd like you to turn your

11   attention to page six of the agreement.

12   A.  Yes.

13   Q.  And could you read the definition of the term "inventory"

14   please?

15   A.  "All inventories of the sellers or its subsidiaries,

16   wherever located, including all finished goods, work in

17   progress, raw materials, spare parts and other materials and

18   supplies to be used or consumed by the sellers or its

19   subsidiaries in the production of finished goods."

20   Q.  Okay, thank you.  And if you could now turn to page 12.

21   A.  Uhm-hum.

22   Q.  And this is a continuation of section 2.1 which is the

23   section that describes the assets purchased by Presstek, could

24   you read clauses (k) and (l) aloud, please?

25   A.  (K) is, "all claims the seller has against third parties

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0162

1  relating to the assets, whether choate or inchoate, known or

2  unknown, contingent or noncontingent."  Which was the other one

3  you wanted?

4  Q.  (L) please, Mr. Gray.

5  A.  (L) reads, "all rights of the sellers relating to deposits

6  and prepaid expenses, claims for refunds and rights of offset

7  in respect thereof which are not excluded under section

8  2.2(g)."

9  Q.  Okay.  Now, Mr. Gray, we're going to put these clauses down

10 for a moment.  Are you familiar with the condition in the Asset

11 Purchase Agreement relating to working capital?

12 A.  I am.

13 Q.  And as of August of 2004, what did that provision provide?

14 A.  The original definition in the APA was that -- is a

15 condition for closing.  The Debtors had to have $22.7 million

16 of net working capital defined as accounts receivable, plus

17 inventories, minus the outstanding liability on the Debtors'

18 service contracts.

19 Q.  Under the original APA, did the prepayments that the

20 Debtors made to Mitsubishi count for satisfying that covenant?

21 A.  They did not.

22 Q.  Did there come a time when that covenant became a concern

23 to the Debtors?

24 A.  Yes.

25 Q.  When was that?

1   A.  Shortly -- well, I'd say late July or early August.

2   Q.  And what was the concern that the Debtors had at that time?

3   A.  As we --

4               THE COURT:  Overruled.

5           MR. SELBST:  I'm sorry, Your Honor?

6           THE COURT:  I overruled the objection.

7           MR. SELBST:  The -- I don't believe there --

8           THE COURT:  I thought there was an objection.

9           MR. SELBST:  I'm sorry, Your Honor, I don't believe

10  there was a pending objection.  The witness was simply

11  answering the question.

12              THE COURT:  All right.

13  A.  As we understood, the Debtors' position at that point,

14  which would have been early August, it was clear that the

15  original projection of $22.7 million of working capital was

16  going to be very difficult, if not impossible, to achieve.

17  BY MR. SELBST:

18  Q.  And to your knowledge, did the Committee express a concern

19  about the Debtors' ability to satisfy this covenant?

20  A.  Not to me, specifically, although I understood the

21  Committee's concern that the deal, because of that covenant,

22  was very contingent.  But I had no direct conservation with the

23  Committee.

24  Q.  Okay.  What did the Debtors do in response to these

25  concerns?

Gray - Direct                                      30

1   A.  We looked at various ways in which to make up what was --

2   what appeared to be a deficit of working capital that appeared

3   late -- by the end of July.  And the -- within our ability to

4   access cash under the D-I-P agreement.  And it was clear that

5   the best asset that we had to fill this gap were these deposits

6   or prepayments that we were making to Mitsubishi and other

7   suppliers; Mitsubishi was, by far, the largest.  And we

8   negotiated with Pressatek for the inclusion of these prepayments

9   as part of the assets in the working capital definition.

10          MR. SELBST:  Your Honor, I'd like to approach the

11  witness again and ask him to identify the first amendment to

12  the APA, which Your Honor has previously admitted.

13          THE COURT:  Go ahead.

14      (The witness receives document)

15  BY MR. SELBST:

16  Q.  Mr. Gray, I've handed you the first -- what has been

17  identified as the first amendment to the Asset Purchase

18  Agreement.  Are you familiar with that agreement, sir?

19  A.  I am.

20  Q.  And does paragraph 2 of that amendment reflect your

21  understanding of the agreement that was reached between the

22  Debtors and Pressatek with respect to prepaid inventory?

23  A.  Yes.

24  Q.  And, again, in substance, what does that provide?

25  A.  It was the expansion of the definition to include $2.5

*Walter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



B-0165

Gray - Direct                                31

1   million of prepaid inventory to the extent that it was

2   delivered -- it was to be delivered no later than November

3   30th, 2004.

4   Q.  Okay.

5          MR. SELBST:  And, Your Honor, I'd now like to approach

6   the witness and ask him to identify the second amendment to the

7   Asset Purchase --

8          THE COURT:  Go ahead.

9      (The witness receives document)

10  BY MR. SELBST:

11  Q.  Mr. Gray, I've handed you what's been identified as the

12  second amendment to the Asset Purchase Agreement.  Are you

13  familiar with that agreement?

14  A.  I am.

15  Q.  And again, directing your attention to the top of page 3,

16  Mr. Gray, you see the paragraph marked #10?

17  A.  Yes.

18  Q.  And do you see the final sentence of that paragraph, of the

19  amendment to section 10.12?

20  A.  Yes.

21  Q.  Could you read that out, please?

22  A.  "In determining the amount of inventory for purposes of the

23  calculations under this section 10.12, the parties agree that

24  seller is permitted to include prepaid deposits for inventory."

25  Q.  Okay.  And that calculation, again, is the closing covenant

B-0166

1  of $22.7 million in working capital?

2  A.  It is.

3  Q.  Okay.  Mr. Gray, do you have an understanding as a

4  businessman as to whether the Mitsubishi product was part of

5  the assets sold to Presstek under the Asset Purchase Agreement?

6          MR. CROUCH:  Objection, Your Honor.  Ron Crouch,

7  McGuire Woods, for the Committee.  We'd --

8          THE COURT:  Sustained.

9          MR. SELBST:  I'm sorry, Your Honor?

10          THE COURT:  I sustained the objection.  I don't know

11  why it's material.

12          MR. SELBST:  Okay.  All right.

13  BY MR. SELBST:

14  Q.  Mr. Gray --

15          THE COURT:  I'm going to have to decide this on the

16  basis of the agreements that are in evidence.

17          MR. SELBST:  That's fine, Your Honor.

18  BY MR. SELBST:

19  Q.  Mr. Gray, did the Debtors validly exercise the option under

20  the Private Label Sales Agreement to cause the Mitsubishi

21  product to be delivered to Presstek?

22          MR. CROUCH:  Objection, Your Honor.  It calls for a

23  legal conclusion.

24          THE COURT:  Overruled.

25  A.  Could you repeat the question?

Gray - Cross                    33

BY MR. SELBST:

Q.  Did the Debtors validly exercise the option under the Private Label Sales Agreement to cause Mitsubishi to deliver the product that was in the pipeline to Presstek?

A.  We did.

        MR. SELBST:  I have no further questions of this witness, Your Honor.

        MR. CROUCH:  Again, Your Honor, Ron Crouch, McGuire Woods, on behalf of the Official Committee.

                        CROSS EXAMINATION

BY MR. CROUCH:

Q.  I have just a very few questions for you, Mr. Gray.  If you could go back to the Private Label Sales Agreement, which I think we've marked as Exhibit-1A?

A.  Yes.

Q.  And I believe you've indicated you were involved in negotiation of this contract?

A.  Yes.

Q.  Would you take a look at paragraph 8(b), Terms of Sale, please?  It's on page 3.

A.  Yes.

Q.  And pursuant to paragraph 8(b) of the Private Label Sales Agreement, it's true, is it not, that title to their products does not pass to A.B. Dick until they are delivered to their destination?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*752-329-0191*



1  A.  That's what it says, yes.

2  Q.  And with respect to the products that we're here in Court

3  arguing about today, none of those products have been delivered

4  to that destination, is that correct?

5  A.  Well, certainly a lot of product was delivered during the

6  pendency of the Debtors' operation of the business.  Exactly

7  what was -- you know, where everything stood at closing, I

8  can't tell you, although, I believe there were goods that -- I

9  know there were goods in production, there were goods at sea

10 that were produced and there were goods in port or -- to be

11 offloaded, to be delivered to the Debtor shortly thereafter.

12 Q.  But with respect to the pipeline inventory that we're here

13 arguing about today, the pipeline inventory has not yet been

14 delivered to destination, correct?

15 A.  The -- I believe that is correct, yes.

16 Q.  And then would you please take a look at paragraph 10?

17 That's on page 7.

18 A.  Yes.

19 Q.  And that paragraph is titled, "Assignment of Agreement and

20 Pre-petition Agreement and Waiver of Certain Claims Under Pre-

21 petition Agreement."  Did I read that correctly?

22 A.  You did.

23 Q.  Now this paragraph provides, does it not, that this

24 agreement shall not be assigned by either party without the

25 prior written consent of the other, correct?

Gray - Cross                                35

1   A.  Yes.

2   Q.  Are you aware of any prior written consent of Mitsubishi to

3   an assignment of this contract to Presstek?

4   A.  I am not.

5        MR. CROUCH:  That's all I have of this witness, Your

6   Honor.

7        MR. SELBST:  I have no further questions of the

8   witness, Your Honor.

9        THE COURT:  Pardon me?

10       MR. SELBST:  Your Honor, it's Stephen Selbst again.  I

11  just want to make clear I am not seeking redirect of the

12  witness.

13       THE COURT:  (No verbal response).

14       MR. SELBST:  Your Honor, did I speak too quickly?

15       THE COURT:  Yes.

16       MR. SELBST:  I apologize.  I'm a New Yorker and I try

17  to slow myself down but sometimes old habits die hard.  What I

18  meant to say, and I apologize if I rushed, Your Honor, is that

19  I have no redirect of the witness and I believe he may be

20  excused if Your Honor -- unless Your Honor has questions for

21  him.

22       THE COURT:  I didn't pick up the last part.  Would --

23  maybe you're not close enough to the mic, I don't know.

24       MR. SELBST:  I apologize again, Your Honor.  What I

25  said is that I have no redirect for the witness --

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0170

1          THE COURT:  Right.

2          MR. SELBST:  -- and unless Your Honor has questions

3   for him --

4          THE COURT:  I don't have any questions of the witness.

5          MR. SELBST:  Thank you.

6          THE COURT:  Witness is excused.  That's all the

7   witnesses?

8      (The witness steps down)

9          MR. SELBST:  That was my sole witness, Your Honor.

10          THE COURT:  All right.  Does any other party have any

11   witnesses?

12          MR. CROUCH:  On behalf of the Committee, no, Your

13   Honor.

14          THE COURT:  Mitsubishi has no witnesses?

15          MR. LAPOWSKY:  No, Your Honor.

16          THE COURT:  All right.

17          MR. GLEASON:  And, Your Honor, the Debtors have no

18   witnesses.

19          THE COURT:  You what?  Pardon me?

20          MR. GLEASON:  The Debtors do not have witnesses

21   either.

22          THE COURT:  Right.  Okay.  The record's then closed.

23   I think that everybody has stated their position, not only in

24   their memorandums but in their opening statements.  And I think

25   that I've got a pretty good understanding, after listening to

1  witnesses and the -- reading all the exhibits.  I'm going to

2  issue the following Memorandum of Decision on the record.  The

3  Court has heard by telephonic hearing two Emergency Motions,

4  one filed by Mitsubishi Imaging, which is hereinafter been

5  designated as MPM for {quote} "an order determining validity of

6  the exercise of election under post-petition Private Label

7  Sales Agreement," {unquote}, which is Docket number -- wait

8  until I get it here -- 496, and the other filed by Presstek

9  Inc. seeking an order directing MPM to comply with the Court's

10  Sale Order, which is Docket #504.  And responses to the

11  Presstek motion have been filed by MPM, who basically concurs

12  in the motion, and the Unsecured Creditors' Committee, who

13  opposes the motion and asserts that the deposits that are

14  presently held by Mitsubishi will possibly be funds of the

15  bankruptcy estate.  There are other legal issues cited in the

16  memorandums by the Unsecured Creditors' Committee which I'll

17  touch upon.

18      The motions were set for hearing on short notice for good

19  cause.  And appearing at the hearing on November 17th were

20  counsel for MPM, Presstek, the Debtor and the Unsecured

21  Creditors' Committee and Key Bank.  Testimony was heard on

22  behalf of Presstek, and all exhibits have been admitted without

23  objection.  From the testimony and the exhibits and the

24  memorandums filed by the parties, together with their oral

25  arguments, the Court will enter this order based upon findings

B-0172

38

1  of fact which I don't think were in material dispute.  Rather,

2  this decision turns on the substance of the sales agreement

3  which is the APA and its addendums, which have been approved by

4  the Court and the Court's Order of Sale entered on November the

5  3rd, the Private Label Sales Agreement executed post-petition

6  in August 2004 between MPM and the Debtor.

7     The order of November 3rd provided in paragraph 9 that

8  none of the pre- or post-petition Private Label Sales

9  Agreements (quote) "shall be assumed or assigned and -- to be

10 assumed or assigned to Silver, which is Presstek" (unquote)

11 unless the Debtor was allowed to continue its business dealings

12 with MPM who was a major supplier of one component of the

13 Debtors' inventory.  Presstek did, however, under the APA and

14 the November 3rd order and the addendum, acquire from the

15 Debtor Debtors' inventories and rights to partially prepaid

16 orders of inventory supplied by MPM.

17    Prior to the Sale Order, the Debtor had issued purchase

18 orders marked 267409, 267411, 270466, 270467, 272994 and 273001

19 at a cost of $4 million 801,171.94 for custom plate material.

20 Pursuant to the Private Label Agreement, the Debtors, through

21 Presstek, paid MPM $2 million 545,774.94, with the remaining

22 balance to be due and payable upon delivery of the product.  In

23 other words, called pipeline products, the Debtor obtained the

24 right to purchase the pipeline product for which there was

25 already a partial payment made.  Presented by the initial

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

39

1    payment to -- the funds for the -- to purchase, the inventory

2    allowed Presstek to satisfy its customers.

3        The purchasers were -- the purchase orders were first

4    rejected and then finally reinstated by an officer of the

5    Debtor, so that they were ultimately affirmed and the contract

6    and the purchase order became valid obligations, not only to

7    the Debtor, but to MPM.  The Committee challenges the authority

8    of such officer, together with Presstek's right to pay and take

9    the inventory, on grounds that MPM and the Debtor under the

10   Label Agreement was never assumed, that they purchased it

11   outside the ordinary course of business, and that that there

12   was no authority granted by order of this Court to allow that

13   purchase order to go forward.

14       I reject those arguments.  It is clear that Presstek did

15   buy the inventory and items known as pipeline products, which

16   is the MPM manufactured product.  Presstek has -- in fact, then

17   executed a hold harmless agreement as part of the reinstatement

18   with the Debtor to hold the Debtors' estate harmless for any

19   obligation arising from the purchase order.  And upon that

20   occasion, the Debtor officer reinstated the purchase order.

21       So I find and conclude that the pipeline purchase orders

22   constituted a valid binding agreement between MPM and the

23   Debtor which must be honored by MPM due to Presstek's payment

24   of over $2.5 million.  I further conclude the product is

25   inventory, and prepaid inventory in part, and therefore subject

*Writer's Cramp, Ina.*
*Certified Court Transcribers*
*732-329-0191*

B-0174

40

1  to the Asset Purchase Agreement and addendum and the Court's

2  order.

3      As MPM properly notes in its memorandum -- I've got to get

4  it here a minute -- MPM would be obligated to give the Debtor

5  credit under the Label Sales Agreement for the $2.5 million

6  paid, deliver the inventory to the Debtor upon further payment

7  of the balance of the purchase price of over $2.2 million

8  under the conditions where Presstek holds the Debtor harmless.

9  Upon delivery, Presstek is thus entitled to the inventory under

10  the APA and its addendums approved by the Court.  MPM states

11  this result is fair, assuming that the pending pipeline

12  purchase election is valid, which I hold that it is.

13      It would be unfair, I think, and probably beyond the

14  specific terms of the various agreements, to adopt the

15  Committee's position that the pipeline purchase orders are

16  invalid or have expired under the Order of Sale as contrary to

17  the testimony given today.  That wholly would allow the

18  Committee, under the Label agreement, to enter into a dispute

19  with Presstek as to who was entitled to any of the refunds.

20  It's not necessary to get into that issue because I'm going --

21  because I've held that the contract on the purchase orders

22  between MPM and the Debtor are valid, binding agreements.

23      I accept and adopt the legal arguments and the rationale

24  set forth in Presstek's memorandum in support of its motion

25  dealing with the interpretation and the effect of the Private

B-0175

41

1  Label Sales Agreement, paragraphs 17 to 21.  And I also accept

2  the legal arguments from that memorandum set forth in

3  paragraphs 27 to 29 dealing with the purported right or refund

4  to the estate of the initial payment.

5       Therefore, I determine that MPM had a valid agreement with

6  the Debtor under Private Label Sales Agreements and Presstek

7  has a valid agreement to pay and take the pipeline inventory

8  supplied by MPM as ordered by the Debtor and paid for by

9  Presstek.  It's ordered that MPM shall be legally bound by the

10 purchase order of the inventory under -- and shall deliver such

11 products for the use and benefit of the Debtor and Presstek,

12 who is then obligated to hold the Debtor harmless by payment to

13 MPM of $2 million 255,397.00 upon delivery.  Judgment will be

14 entered accordingly to this order.  The 10-day waiting period

15 will be waived.  To get on with the third matter of --

16      MR. LAPOWSKY:  Your Honor, this is Robert Lapowsky,

17 counsel for Mitsubishi.  I had one clarification, if you would

18 entertain it at this point.  Judge?

19      THE COURT:  You mean you're not clear with a very

20 clear order?

21      MR. LAPOWSKY:  No, it was clear.  I had, in my

22 introductory remarks, I had raised -- asked for one additional

23 protection for MPM in the event that you ruled the way that you

24 have ruled.  One thing I'd ask for was that the order be

25 specific that the 10-day waiting period is being eliminated and

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0176

42

1  you've covered that.  But I -- we can't control whether there

2  is going to be an appeal or not going to be an appeal of this

3  order.  Certainly we're not appealing the order, but others

4  might.  And it seems to me that in fairness Mitsubishi ought

5  not to be -- as between Mitsubishi and Presstek, if this order

6  were ever reversed, Mitsubishi ought not to be the one at risk

7  for the refund.  So I -- that's the reason I had asked at the

8  beginning that to the extent you were going to rule in favor of

9  Presstek that the order require Presstek to indemnify

10 Mitsubishi to the extent the order was ever reversed for

11 whatever the refund would be.

12         THE COURT:  I'm not going to rule on that at this

13 time.  I'm not going to take into the eventuality what may

14 happen on appeal.  In the event that that occurs, you'll have

15 plenty of opportunity to seek that indemnity argument.

16         MR. LAPOWSKY:  Okay, Your Honor.  Thank you.

17         MR. SELBST:  Thank you, Your Honor.

18         THE COURT:  Take up item #3, Emergency Motion of the

19 Official Committee of the Unsecured -- Compel the Debtors

20 Silver and Presstek to comply with the Sale Order of November

21 3rd and the second amendment to the Asset Purchase Agreement

22 and the response thereto (indiscern.).

23         MR. RICCIARDI:  Your Honor, once again, James

24 Ricciardi of McGuire Woods for the Committee.  First, I can

25 report there were two aspects of relief that we asked for in



*Welter's Cramp, Inc.*
*Certified Court Transcriptions*
*732-329-0191*

B-0177

43

1   this Emergency Motion.  And I'm pleased to say that Presstek

2   communicated with representatives of the Creditors' Committee

3   late yesterday afternoon and indicated that there would be no

4   problem with the Committee getting access to records, so we

5   have nothing in that regard to ask you about today.

6        THE COURT:  All right.  If that matter's been resolved

7   then that will be vacated.

8        MR. RICCIARDI:  Okay, thank you, Your Honor.

9        THE COURT:  The first one is the one that bothers me.

10  I just don't understand where you're coming from here.

11       MR. RICCIARDI:  Excuse me, Your Honor.

12       THE COURT:  On the first -- the first issue.

13       MR. RICCIARDI:  You don't understand what the

14  Committee is asking for?  The relief the Committee is --

15       THE COURT:  Executory contract.

16       MR. RICCIARDI:  Excuse me?

17       THE COURT:  The assumption and assignment for the

18  executory contract?

19       MR. RICCIARDI:  Yes, well, I guess, you know, I can

20  look at it this way.  I mean, principally, Presstek has had two

21  things to say about our asking for you to order Presstek to

22  assume executory contracts in accordance with their

23  representations at the auction.  First, they said that there's

24  no statutory authority to permit the Court to compel Presstek

25  to assume any executory contracts.  And second, they say,

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*752-389-0191*

B-0178

44

1   therefore, there's no emergency. But, Your Honor, it's as if

2   Presstek forgot that it accepted your Sale Order and closed on

3   your Sale Order, including their commitments requiring them to

4   assume executory contracts. Presstek did not appeal your

5   Order. They accepted it, they are bound by it, and Your Honor

6   certainly has the authority to enforce it. Mr. Selbst, in

7   fact, conceded that earlier today when he argued on this other

8   point.

9       And, Your Honor, we brought it on by Emergency Motion

10  because we think it's not fair to the Creditors of the estate

11  to allow Presstek to continue to take the position that there

12  are no obligations attendant to those provisions that you added

13  to that order. Presstek has not only gotten the assets that

14  they've wanted, they've now gotten the pipeline inventory as

15  well. And we think it's past time for them to start making

16  good on their executory contract bid enhancement.

17      THE COURT:  I -- I'm following your argument now, and

18  I really don't have any problem with it except for one thing.

19  I think that the proper way to address this issue is to go

20  through the list of executory contracts that were scheduled by

21  the Debtor and any others that the Committee thinks that should

22  be assumed also so that I can -- if I do issue such an order

23  and direct Presstek to take action on those contracts, we can

24  specifically delineate which contract we're talking about. I

25  just think this is -- I can't determine here what contracts

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

45

1   there are. I have read the schedule of assumption of executory

2   contracts and the list thereof. Some of them they've already

3   rejected, some of them haven't been -- anything's been done on

4   it. But I think it's better that if we can get a list from the

5   Committee and then Presstek can attack that list if they want,

6   that I would entertain at this motion on December 8th on a

7   specific basis as to what assumption -- what contracts we're

8   talking about and what contracts are non-executory or may not

9   be executory. Does that make any sense to you?

10          MR. RICCIARDI: That's perfectly sensible, Your Honor,

11  and we're happy to do that. And we'll prepare a separate

12  motion and a separate list of executory contracts.

13          THE COURT: All right. And the parties will be ready

14  to go on the 8th because I won't be back down there until

15  February.

16          MR. RICCIARDI: Okay. Thank you very much, Your

17  Honor.

18          MR. SELBST: Your Honor, thank you very much. That's

19  perfectly acceptable to Presstek, of course.

20          THE COURT: All right. And I'll try to get a judgment

21  out -- faxed into the Clerk's Office this afternoon.

22          MR. SELBST: Thank you, Your Honor.

23          THE COURT: Thank you. Court will be adjourned.

24  Thank you.

25      (Court adjourned)

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

46



**CERTIFICATION**

1
2    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
3    entitled matter.

4    _Lewis Pa_____                    _12-1-04_
     Signature of Transcriber                  Date

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

# Tab 7

11-17-04; 7:55AM;USBC MONTANA                    ;406 782 1178          # 1/ 2

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

In re:

**A.B. DICK COMPANY,** *et al.,*                    Chapter 11

Debtor.                    Case Nos. 04-12002 (JLP)

## *J U D G M E N T*

This Court on November 17, 2004, heard upon expedited notice the Motion of Presstek, Inc., for Order directing Mitsubishi Imaging, Inc., to Comply with this Court's Sale Order and Mitsubishi Imaging, Inc.'s Motion for Order Determining Validity of Exercises of Election under PostPetition Private Label Sales Agreement, together with objections thereto by the Official Unsecured Creditors Committee and concurrence in each motion by the Debtor-in-Possession, and after concluding the taking of testimony and admission of all evidence, the Court entered on the record a Memorandum of Decision sustaining each motion of Presstek, Inc., and Mitsubishi Imaging, Inc., and directing entry of Judgment by the clerk, accordingly,

**IT IS ORDERED,** adjudged, and decreed that Mitsubishi Imaging, Inc., shall be and legally is bound by purchase orders 267409, 267411, 276466, 270467, 272994 and 273001, for custom plate materials and shall deliver to the Debtor and Presstek, Inc., such product and inventory, whereupon Presstek, Inc., shall hold harmless the Debtor by payment of the balance due under such purchase order in the sum of $2,255,397.00 upon delivery by Mitsubishi; and pursuant to F.R.B.P. 4001(a)(3) this Order is effective immediately, not stayed for 10 days. DATED this 17th day of November, 2004.

1

B-0182

David Bird
Clerk of the U.S. Bankruptcy Court

By _Nancy Hunt_
Deputy Clerk

2

B-0183

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                            :
                                                  :
A.B. DICK COMPANY, et al.,                        :        Case No. 04-12002 (JLP)
                                                  :        Chapter 11
        Debtor.                                   :

**AMENDED JUDGMENT**

This Court on November 17, 2004, heard upon expedited notice the Motion of Presstek, Inc., for Order directing Mitsubishi Imaging, Inc., to Comply with this Court's Sale Order and Mitsubishi Imaging, Inc.'s Motion for Order Determining Validity of Exercises of Election under PostPetition Private Label Sales Agreement, together with objections thereto by the Official Unsecured Creditors Committee and concurrence in each motion by the Debtor-in-Possession, and after concluding the taking of testimony and admission of all evidence, the Court entered on the record a Memorandum of Decision sustaining each motion of Presstek, Inc., and Mitsubishi Imaging, Inc., and directing entry of Judgment by the clerk, accordingly,

**IT IS ORDERED,** adjudged, and decreed that Mitsubishi Imaging, Inc., shall be and legally is bound by purchase orders 267409, 267411, 276466, 270467, 272994 and 273001, for custom plate materials and shall deliver to the Debtor and Presstek, Inc., such product and inventory, whereupon Presstek, Inc., shall hold harmless the Debtor by payment of the balance

B-0184

due under such purchase order in the sum of $2,255,397.00 upon delivery by Mitsubishi; and

pursuant to F.R.B.P. 4001(a)(3) this Order is effective immediately, not stayed for 10 days.

DATED this 23rd day of November, 2004.

David Bird
Clerk of the U.S. Bankruptcy Court

By _Nancy Hunt_
Deputy Clerk