all or any portion of the businesses and Assets of Seller and (ii) such transaction or transactions contemplated by any such bid or bids shall have been consummated, or (C) in the event that Seller withdraws its support for the transactions contemplated by this Agreement and seeks to have a stand alone plan of reorganization approved by the Bankruptcy Court;

(e) Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing (A) in the event Purchaser has Breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller have notified Purchaser of the Breach, and the breach has continued without cure for a period of fifteen (15) days after the notice of Breach or (B) if the Closing shall not have occurred on or before October 15, 2004, by reason of the failure of any condition precedent under Section 9 hereof (unless the failure results primarily from Seller Breaching any representation, warranty, or covenant contained in this Agreement);

(f) Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing if the Sale Order shall not have been entered by the Bankruptcy Court on or before October 15, 2004;

(g) (A) Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing but within two (2) business days following July 15, 2004 if the Petition Date is not on or before July 15, 2004; (B) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section 11.1(g)(A) above, Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing but within two (2) business days following August 27, 2004 if the date of entry of the Sales Procedure Order is not on or before August 27, 2004; (C) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section 11.1(g)(B) above, Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing but within two (2) business days following September 30, 2004 if the date of entry of the Sales Order is not on or before September 30, 2004; and (D) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section11.1(g)(C) above, Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing but within two (2) business days following October 15, 2004 if the Closing Date is not on or before October 15, 2004.

11.2    Termination Fee.  In the event that this Agreement is terminated by Purchaser or Seller pursuant to either Section 11.1(d)(B) or (C) hereof, then Seller shall pay to Purchaser the Termination Fee upon the consummation of the transaction by Seller and such other Person, in the event of a termination pursuant to Section 11.1(d)(B), or upon the submission by Seller of a stand alone plan of reorganization with the Bankruptcy Court, in the event of a termination pursuant to Section 11.1(d)(C), and Seller shall have no other liability under this Agreement to Purchaser or any of its Affiliates (other than for return of the Deposit and payment of the Termination Fee).

11.3    Effect of Termination.  Except as provided for in Section 11.2 and except for the return of the Deposit to Purchaser as a result of a termination of this Agreement pursuant to Sections 11.1(a), (b), (c), (d), (e)(B), (f) or (g), in the event that this Agreement is terminated by either Party then said termination shall be the sole remedy of the parties hereto with respect to Breaches of any covenant, representation, or warranty contained in this Agreement and none of the Parties hereto nor any of their respective directors, officers, members, or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective directors, officers, members, or Affiliates, as the case may be, pursuant to this Agreement, except upon a willful Breach by a Party (in which case that non-Breaching Party shall have all rights and remedies existing at law or in equity).  Upon any

49

B-0230

termination of this Agreement pursuant to Section 11.1, all Confidential Information of either Party shall be returned to the other Party.

## 12. TAXES.

12.1    Taxes Related To Assets and Assumed Liabilities.  All sales, use, gross-receipts, transfer, gains, excise, value-added or other similar Taxes in connection with the transfer of the Assets and the assumption of the Assumed Liabilities, and delivery of the Assets, and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment of the Assets and that are not exempt under Section 1146(c) of the Bankruptcy Code shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Seller on or prior to their due date.

(a)    Purchaser shall be liable for and pay all Taxes applicable to the Assets and Assumed Liabilities that are attributable to Taxable years or periods beginning on the Closing Date and with respect to any Straddle Period, the portion of such Straddle Period beginning on the Closing Date. For purposes of this Agreement, *"Straddle Period"* shall mean any Taxable period beginning on, or before and ending after the Closing Date.

12.2    Tax Refunds.  Any Tax refunds (including any interest related thereto) received by Purchaser, its Affiliates or successors relating to Taxes that Seller has paid shall be for the account of Seller, and Purchaser shall pay over to Seller any such amount within ten (10) business days of receipt thereof.  Purchaser shall include with its remittance to Seller copies of any correspondence, documents, or other materials received or transmitted by Purchaser with respect to the Tax refund.  Seller shall be entitled to request that Purchaser, at Seller's expense, file for and obtain any Tax refunds with respect to Tax periods or portions thereof ending on or before the Closing Date (with respect to the relevant Purchased Asset).

12.3    Cooperation on Tax Matters.  Seller and Purchaser shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense) in a timely fashion such personnel, Tax data, relevant Tax Returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (i) for the preparation by such other Party of any Tax Returns or (ii) in connection with any Tax audit or proceeding including one Party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

12.4    Retention of Tax Records.  After the Closing Date and until the expiration of all statutes of limitation applicable to Seller's liabilities for Taxes, Purchaser shall retain possession of all accounting, business, financial and Tax records and information that (i) relate to the Assets and are in existence on the Closing Date and (ii) come into existence after the Closing Date but relate to the Assets before the Closing Date, and Purchaser shall give Seller notice and an opportunity to retain any such records in the event that Purchaser determines to destroy or dispose of them during such period.  In addition, from and after the Closing Date, Purchaser shall provide to Seller and its Affiliates (after reasonable notice and during normal business hours and without charge to Seller or their Affiliates) access to the books, records, documents and other information relating to the Assets as Seller may reasonably deem necessary to (i) properly prepare for, file, prove, answer, prosecute and defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (ii) administer or complete any cases under chapter 11 of the Bankruptcy Code of or including Seller.  Such access shall include reasonable access to any computerized information systems that contain data regarding the Assets.

B-0231

**12.5    GST Election.** Each of the Purchaser and Canada Sub represents and warrants to the other that it is, or will be prior to the Closing Date, a registrant under Part X of the *Excise Tax Act* ("*ETA*") and each covenants and agrees to make the joint election contemplated by Subsection 167(1) of the ETA, if available, and the Purchaser hereby covenants and agrees to file the joint election with the Minister of National Revenue with its Goods and Services Tax ("*GST*") return for its reporting period in which the transactions contemplated by this Agreement take place. If it is determined that GST is payable by the Purchaser in respect of the supply of property contemplated by this Agreement, then the Purchaser agrees to remit all such tax payable and Canada Sub shall reimburse Purchaser for 50% of the GST in accordance with Section 12.1.

## 13. MISCELLANEOUS

**13.1    Entire Agreement.** This Agreement, the Ancillary Agreements and the Schedules hereto constitute the entire understanding and agreement of the Parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

**13.2    Assignment; Binding Upon Successors and Assigns.** Neither Party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other Party hereto; provided however, that Purchaser may assign its rights to acquire the Assets in whole or in part to an Affiliate. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**13.3    No Third Party Beneficiaries.** No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any Party hereto or any other Person unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the parties to this Agreement.

**13.4    No Joint Venture.** Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between the Parties hereto. No Party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other Party. No Party will have the power to control the activities and operations of any other, and the Parties' status is, and at all times, will continue to be, that of independent contractors with respect to each other. No Party will have any power or authority to bind or commit any other. No Party will hold itself out as having any authority or relationship in contravention of this Section.

**13.5    [Intentionally Omitted]**

**13.6    Severability.** If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to affect the intent of the parties hereto. The parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

**13.7    Section Headings.** A reference to an Article, Section or Schedule will mean an Article or Section in, or a Schedule to, this Agreement, unless otherwise explicitly set forth. The titles

B-0232

and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement. For the purposes of such construction, this Agreement will be considered as a whole.

13.8    Amendment, Extension and Waivers.  At any time prior to the Effective Time, Platinum, Purchaser, Parent and Seller may, to the extent legally allowed: (a) extend the time for performance of any of the obligations of the other party; (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant thereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such party contained herein.  Any term or provision of this Agreement may be amended.  Any agreement to any amendment, extension or waiver will be valid only if set forth in writing and signed by the party to be bound.  The waiver by a party of any Breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding Breach or default.  The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions.  The Agreement may be amended by the parties hereto at any time.

13.9    Public Announcement.  Except to the extent required to comply with Article 8 hereof, no Party hereto shall issue any press release or otherwise make any statements to any Third-Party with respect to this Agreement or the transactions contemplated hereby other than with the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.  Prior to the issuance of any announcement of this Agreement and the transactions contemplated hereby by any Party, such Party will consult with the other party regarding the content of such announcement and obtain such other Party's reasonable approval of such press release.  Notwithstanding the foregoing, either Party may issue such announcements, and make such other disclosures regarding this Agreement or the transactions contemplated hereby, as it determines are required under applicable Legal Requirements or any listing or trading agreement concerning its publicly traded securities.

13.10    Governing Law.  The validity of this Agreement the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties of this Agreement will be exclusively governed by and construed in accordance with the internal laws of the State of New York as applied to agreements entered into solely between residents of and to be performed entirely in the State of New York, without reference to that body of law relating to conflicts of law or choice of law.

13.11    Jurisdiction; Venue; Waiver of Jury Trial.

(a)  Each of the Parties to this Agreement hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining directly or indirectly to this Agreement, and all documents, instruments and agreements executed pursuant hereto or thereto, or to any matter arising herefrom (unless otherwise expressly provided for herein or therein).  To the extent permitted by law, each party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by any of the other parties hereto in any of such courts, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such party at the address to which notices are to be sent pursuant to this Agreement.  Each of the parties waives any claim that the Bankruptcy Court is an inconvenient forum or an improper forum based on lack of venue.  The choice of forum set forth in this Section 12.12 shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

52

B-0233

(b) Each party hereto hereby waives, to the fullest extent permitted by applicable Legal Requirement, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement. Each party hereto (a) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise, that the other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

13.12   Notices. Any notice or other communication required or permitted to be given under this Agreement will be in writing, will be delivered personally or by mail or express delivery, postage prepaid, and will be deemed given upon actual delivery or, if mailed by registered or certified mail, on the third business day following deposit in the mails, addressed as follows:

If to Platinum or Purchaser:

Presstek, Inc.
55 Executive Dr.
Hudson, NH 03051
Attention: President
Phone: (603) 595-7000

with a copy to:

McDermott, Will & Emery
28 State Street
Boston, MA 02109
Attention: John J. Egan III, P.C.
Phone: (617) 535-4000

If to Parent or any Seller:

c/o A.B. Dick Company
7400 Caldwell Ave.
Niles, IL 60714
Attention: President
Phone: (874) 779-1900

with a copy to:

Benesch, Friedlander, Coplan & Aronoff LLP
2300 BP Tower
200 Public Square
Cleveland, OH  44114-2378
Attention:  H. Jeffrey Schwartz, Esq.
Phone:  (216) 363-4635

or to such other address as the party in question may have furnished to the other party by written notice given in accordance with this Section 13.12.

13.13   Time is of the Essence. The parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

13.14   Counterparts. This Agreement may be executed in counterparts, each of which will be an original as regards any Party whose name appears thereon and all of which together will

53

B-0234

constitute one and the same instrument. This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all Parties reflected hereon as signatories.

13.15   Nonsurvival of Representations and Warranties:  None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing. This Section 13.15 shall not limit any covenant or agreement of the Parties contained in this Agreement or in any instrument delivered pursuant to this Agreement which by its terms applies or contemplates performance in whole or in part after the Effective Time.

13.16   Disclosure Schedule.  The parties hereto acknowledge and agree that any disclosure contained in a specific numbered section of Seller's Disclosure Schedule shall be deemed to have been disclosed for purposes of other numbered sections only to the extent such disclosure is specifically cross referenced on the relevant section of Seller's Disclosure Schedule.

13.17   Release.  In consideration of the covenants, mutual promises and other consideration set forth herein, (i) Sellers and Parent, for themselves and for their heirs, assigns, agents, principals, officers, directors, subsidiaries, Affiliates, shareholders, employees, insurers, successors and assigns, as the case may be (collectively, the "Seller Parties"), hereby release the Platinum Parties (as hereinafter defined) from any and all actions, causes of action, suits, debts, sums of money, claims and demands of any kind or description whatsoever in law or in equity which any of the Seller Parties now have or which the same may have arising out of any matter from the beginning of the world up to and including the date of this Agreement, and (ii) Platinum and Purchaser, for themselves and for their heirs, assigns, agents, principals, officers, directors, subsidiaries, Affiliates, shareholders, employees, insurers, successors and assigns, as the case may be (the "Platinum Parties"), hereby release each of the Seller Parties from any and all actions, causes of action, suits, debts, sums of money, claims and demands of any kind or description whatsoever in law or in equity which any of the Platinum Parties now have or which the same may have arising out of any matter from the beginning of the world up to and including the date of this Agreement. Notwithstanding the foregoing, the Parties hereto are not hereby releasing any rights they may have to enforce the provisions of this Agreement or of the DIP Financing against each other.

13.18   Bulk Sales Waiver.  The Purchaser hereby waives compliance by Canada Sub with the provisions of the *Bulk Sales Act (Ontario)* or similar applicable legislation of any other province of Canada (the "*Bulk Sales Act*"), and in consideration hereof, Canada Sub agrees to indemnify the Purchaser from any claims that maybe asserted against it by any creditor of Canada Sub, or any other Person, by reason of the Purchaser not having required Canada Sub to comply with the *Bulk Sales Act* or by reason of the waiver aforesaid, provided that Canada Sub shall have no liability pursuant to this Section 13.18 for any claims with respect to any debts or obligations which were agreed to be assumed by the Purchaser pursuant to this Agreement or any Ancillary Agreements delivered pursuant hereto.

[Signature Page Follows]

54

B-0235

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

PRESSTEK, INC.

By: _____
    Name: EDWARD J. MARINO
    Title: President & CEO

SILVER ACQUISITIONS CORP.

By: _____
    Name: MOOSA E. MOOSA
    Title: VP Finance + CFO, Treasurer.

PARAGON CORPORATE HOLDINGS, INC.

By: _____
    Name:
    Title:

A.B. DICK COMPANY

By: _____
    Name:
    Title:

A.B. DICK COMPANY OF CANADA LTD.

By: _____
    Name:
    Title:

INTERACTIVE MEDIA GROUP, INC.

By: _____
    Name:
    Title:

TOTAL P.03

B-0236

Execution Version

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

PRESSTEK, INC.

By: _____
    Name:
    Title:

SILVER ACQUISITIONS CORP.

By: _____
    Name:
    Title:

PARAGON CORPORATE HOLDINGS, INC.

By: _____
    Name: JEFFREY  S. HENZDEN
    Title: SECRETARY

A.B. DICK COMPANY

By: _____
    Name: JEFFREY . S. HENZDEN
    Title: SECRETARY

A.B. DICK COMPANY OF CANADA LTD.

By: _____
    Name: FREDERICK J LORD
    Title: GENERAL MANAGER

INTERACTIVE MEDIA GROUP, INC.

By: _____
    Name: Jeffrey  S. HENZDEN
    Title: SECRETARY

B-0237

Execution Version

### SELLER DISCLOSURE SCHEDULE

Capitalized terms used but not defined in this Seller Disclosure Schedule shall have the meanings set forth in the Asset Purchase Agreement (the "*Agreement*"), dated July 13, 2004 by and among Presstek, Inc., a Delaware corporation ("*Platinum*"), Seller Acquisition Corp., a Delaware corporation ("*Purchaser*"), Paragon Corporate Holdings, Inc., a Delaware corporation ("*Parent*" or "*Paragon*"), A.B. Dick Company, a Delaware corporation and a wholly-owned subsidiary of Parent ("*Seller*" or "*A.B. Dick Company*") A.B. Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of Seller ("*Canada Sub*"), and Interactive Media Group, Inc., an Ohio corporation and a wholly-owned subsidiary of Parent ("*IMG*" and together with Canada Sub and Seller, the "*Sellers*"):

Parent and Seller hereby provide this schedule of exceptions and disclosure to the Agreement. This Seller Disclosure Schedule and the information contained herein are intended to qualify only and limit the representations and warranties, agreements and covenants of Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties, agreements or covenants. Furthermore, this Seller Disclosure Schedule does not purport to disclose any agreements, contracts or instruments that may be entered into pursuant to the terms of the Agreement.

The inclusion of any matter in this Seller Disclosure Schedule in connection with any representation, warranty, covenant or agreement that is qualified as to materiality is not an admission by Seller that such matter is material. No disclosure in this Seller Disclosure Schedule relating to any possible breach or violation of any agreement or Legal Requirement shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

## SCHEDULE 2.1

### PERMITTED ENCUMBRANCES

None.

2

B-0239

## SCHEDULE 2.1(a)

## ASSUMED REAL ESTATE

Platinum/Purchaser will assume the following leases:
- Niles, IL corp. offices
- Des Plaines
- St. Louis (Fenton, MO)
- Aiea, HI
- Anaheim, CA
- Denver, CO
- Fresno, CA
- Harrisburg, PA
- Irving, TX
- Wallingford, CT
- IMG- Akron, OH
- Duluth, GA
- Des Moines, IA

- Calgary, AB
- Montreal, QC
- Vancouver, BC
- Winnipeg, MB

- UK/ Brentford
- UK/ Bristol
- UK/ Glasgow

3

B-0240

## SCHEDULE 2.1(b)

### TANGIBLE PERSONAL PROPERTY

See attached active assets depreciation list.

See also active rental depreciation list attached to schedule 3.21.

4

B-0241

### SCHEDULE 2.1(e)

### ASSUMED SELLER CONTRACTS

The following contracts will be assumed by Purchaser:
- Agreement with Kinko's
- Equipment Leases set forth on Schedule 3.21
- List of Active Rentals set forth on Schedule 3.21
- All capital leases of Seller
- All insurance policies, with the exception of any officers' and directors' insurance
- All of Seller's dealer contracts which are terminable on 30 days' notice
- Additional agreements or contracts as may be determined by Purchaser or Platinum on or before Closing

B-0242

## SCHEDULE 2.2(h)

### OTHER EXCLUDED ASSETS

None.

## <u>SCHEDULE 2.4(a)(iv)</u>

### OTHER ASSUMED LIABILITIES

None.

B-0244

## SCHEDULE 2.4(b)

### OTHER RETAINED LIABILITIES

All liabilities of Seller not specifically designated in Sections 2.4(b)(i)-(xiii) or otherwise assumed by Purchaser. Notwithstanding the foregoing, as a matter of clarification, Seller's payable due to Canada Sub shall be specifically retained by Seller.

8

B-0245

## SCHEDULE 3.1

### ORGANIZATION AND GOOD STANDING

<u>A.B. Dick Company</u> -- Qualified to do business in all States in the United States and the District of Columbia

<u>A.B. Dick Company of Canada Ltd.</u> -- Qualified to do business in Canada

<u>A.B. Dick UK Limited</u> -- Qualified to do business in United Kingdom

<u>Multigraphics LLC</u> -- Qualified to do business in the State of Delaware

<u>Itek Graphix Corp.</u> -- Qualified to do business in the State of Delaware

<u>Interactive Media Group, Inc.</u> -- Qualified to do business in the State of Ohio

9

B-0246

## SCHEDULE 3.2

### SUBSIDIARIES AND GUARANTIES

A.B. Dick Company of Canada Ltd., a Canadian corporation, of which A.B. Dick Company owns 100% of the equity interest.

A.B. Dick UK Limited, a UK corporation, of which A.B. Dick Company owns 100% of the equity interest.

Itek Graphix Corp., a Delaware corporation, of which A.B. Dick Company owns 100% of the equity interest.

Multigraphics LLC, a Delaware limited liability company, of which A.B. Dick Company owns 100% of the equity interest and is the sole member.

Interactive Media Group, Inc., an Ohio corporation, 100% owned by Paragon Corporate Holdings, Inc.

10

B-0247

## SCHEDULE 3.4

### CONSENTS

Certified copies of consents of Paragon will be provided

Canada Sub may be required to comply with the Bulk Sale law of Canada or seek an order of the courts exempting this transaction from such law.

11

## SCHEDULE 3.5

## NO VIOLATION OF CHARTER DOCUMENTS; COMPLIANCE WITH LEGAL REQUIREMENTS; GOVERNMENTAL AUTHORIZATIONS

See schedule 3.4.

The following Contracts have provisions which may result in the termination, Breach, impairment or violation thereof as a result of the execution of the Agreement and/or the consummation of the transactions contemplated thereby:

> Scan View A/S
> Scan View A/S
> AGFA Australia

From time to time since January 1, 2000, Parent, A.B. Dick Company and or its Subsidiaries have received notices or other communications from a Governmental Authority or other Person regarding an actual, alleged, possible or potential violation of, or failure to comply by A.B. Dick Company or any Subsidiary of A.B. Dick Company with, any Legal Requirement. Any such communications received by A.B. Dick Company or any Subsidiary since January 1, 2000 has been resolved, except for the following:

> *Lester Berta v. A.B. Dick Company*
> EEOC Charge No. 350-2003-83499

On June 9, 2004, A.B. Dick Company received notice from the USEPA regarding Addressograph/Multigraph being a PRP at the Chemical Recovery systems site in Elyria, Ohio.

A.B. Dick Company is authorized to do business as a foreign corporation in the District of Columbia and all states in the Unites States, except Delaware, where A.B. Dick is authorized to do business as a domestic corporation.

A.B. Dick Company also obtains various licenses, permits and other Governmental Authorizations from local Governmental Authorities where A.B. Dick has operations.

All of A.B. Dick Company's foreign subsidiaries are authorized to do business in their respective countries of incorporation.

A.B. Dick Company of Canada Ltd. also is authorized to do business in the provinces where it has employees or facilities, namely British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, Quebec and Newfoundland.

Each of Itek Graphix Corp. and Multigraphics LLC is authorized to do business in Delaware.

12

B-0249

Interactive Media Group, Inc. is authorized to do business in Ohio.

See also Schedule 3.11  [Litigation]
See also Schedule 3.14  [Absence of Certain Changes or Events]

13

B-0250

## **SCHEDULE 3.7**

### **SELLER FINANCIAL STATEMENTS**

See attached.

A.B. Dick Company has a liability for the repair/replacement of the roof at its headquarters location pursuant to the terms of the lease for that location.

In Q2 2004 Canada Sub booked an adjustment of approximately $125,000, increasing 2003 profit and decreasing 2004 profit. This was requested by Niles to be consistent with US GAAP on restructure costs.

See also Schedule 3.12  [Taxes]
See also Schedule 3.14  [Absence of Certain Changes or Events]

14

B-0251

## SCHEDULE 3.9

### ACCOUNTS RECEIVABLE

See attached.

Reserve for warranty claims, and warranty claim expense, are reported in the aggregate, not by customer.

A.B. Dick Company has a receivable due from its UK subsidiary. As of April 30, 2004, the receivable was $607,475.99

A.B. Dick Company has a payable due to its Canadian subsidiary. As of April 30, 2004, the receivable was $2,236,842.12.

See also Schedule 3.7 [Financial Statements]

15

## SCHEDULE 3.11

### LITIGATION

Pending Proceedings:

> *A.T. Publishing v. A.B. Dick Company*
> Case No. 3AN-03-08291 CI
> In the Superior Court for the State of Alaska
> Third Judicial District at Anchorage

> Brian J. Longe's claim for severance and bonus

> On June 9, 2004, A.B. Dick Company received notice from the USEPA regarding Addressograph/Multigraph being a PRP at the Chemical Recovery systems site in Elyria, Ohio.

> *MHR Capital Partners, et al. v. Paragon Corporate Holdings, et al.*
> Case No.; 529-N
> In the Court of Chancery of the State of Delaware
> In and For New Castle County

> *Gropoint Limited v. Reprocentre Group Limited (formerly Offset Distributors Limited), Offset Distributors Limited, Richard George Nobel and A.B. Dick UK Ltd.*, High Court Proceedings, Record No. 2003 No. 4944P in Dublin, Republic of Ireland.

As of the date hereof, the following sets forth any filings required to be made by A.B. Dick Company within 120 days:

> Responses due in the following cases:
> *Market Direct, Inc. v. A.B. Dick Company*
> *Windsor Manufacturing, Inc. v. A.B. Dick Company*
> *MHR Capital Partners, et al. v. Paragon Corporate Holdings, et al.*

On June 9, 2004, A.B. Dick Company received notice from the USEPA regarding Addressograph/Multigraph being a PRP at the Chemical Recovery systems site in Elyria, Ohio. A.B. Dick Company has 20 days to respond to the invitation to participate and 30 days to respond to the information requested therein. The time to respond has been extended to July 22, 2004.

A.B. Dick Company of Canada Ltd. is subject to a storm water sampling program as specified in Provincial Officer Order #004322, related to its property at 94 Brockport Road, Toronto.

16

B-0253

See attached documents regarding slander allegations received from Tanaka Offset 2000 Services Ltd.

See attached summary of potential employment litigation matters for A.B. Dick Company of Canada Ltd.

See attached summary of additional pending litigation.

See also Schedule 3.24 [Environmental Matters]

17

B-0254

## SCHEDULE 3.12

### TAXES

Since January 1, 2000, Parent and Seller have timely filed when due all Tax Returns relating to Seller and its Subsidiaries, other than 2003 federal, state and local Tax Returns for which notices of extension have been filed and are currently pending.

Parent and Seller regularly receive communications from state and local Tax authorities requesting information relating to business activities in such jurisdictions and the basis for filing or not filing Tax Returns. However, neither Parent nor Seller know of any claim that Seller or any Subsidiary is or may be subject to a material amount of unpaid Tax in any such jurisdiction. Seller has recently received notices from Tax authorities of the States of West Virginia and Alaska.

Seller is presently subject to a sales Tax audit by the Tax authorities of the States of Connecticut and Utah.

Parent and Seller regularly receive notices from state and local Tax authorities with proposed adjustments in the calculation of Taxes. However, no proposed adjustment relating to any Tax Return filed by Parent, Seller or any Subsidiary that has been proposed is material in amount.

Certain state and local Taxes will become due and payable as a result of the transactions contemplated by this Agreement. In addition, Seller and its Subsidiaries have not yet filed 2003 federal, state and local Tax Returns and there may be additional unaccrued Taxes with respect to such returns. However, Parent and Seller believe tax accruals are adequate to cover such Taxes.

Upon consummation of the transactions contemplated by this Agreement, Seller and its Subsidiaries will cease to be members of the Seller Group and the 338(h)(10) election will constitute a liquidation of Seller upon which certain state Taxes will become due and payable. Parent and Seller believe accruals for these Taxes are adequate to cover such Taxes.

See also Schedule 3.7 [Financial Statements]

18

## SCHEDULE 3.13

### REAL PROPERTY ADDRESSES

See attached schedule

The properties may be subject to liens for insurance and common area maintenance for differences in expense which has not yet been finally determined by the various landlords, and therefore not billed to A.B. Dick Company.

19

B-0256

## SCHEDULE 3.14

### ABSENCE OF CERTAIN CHANGES OR EVENTS

A.B. Dick Company received a Notice of Reclamation from Mitsubishi on July 2, 2004, relating to approximately $570,000 worth of supplies.

A.B. Dick Company has received notice from Oji that future purchases of product must be made on a cash-in-advance basis.

Pending controversy between Brian J. Longe and A.B. Dick Company regarding issues of severance and bonus

The service manager for Canada Sub was provided a salary increase of $1,875 as a result of increased duties, for a cumulative salary of $52,000.

A.B. Dick Company amended its bylaws on April 5, 2004 to provide: (A) the proper address of A.B. Dick Company's principal place of business and (B) the Board of Directors consists of not less than one or more than nine directors.

A.B. Dick Company has a liability for severance obligations incurred in connection with recent staff reductions.

A.B. Dick Company has an obligation to pay NESCO Services, Inc., an Affiliate of Parent, approximately $60,000 in connection with engineering services provided to A.B. Dick Company and/or its Subsidiaries.

Obligations incurred under the Keybank credit facility.

Obligations relating to a final payment of a lease for the paint line previously located at 6330 Touhy.

Obligations relating to equipment currently located at Chicago Press.

Obligations incurred under the Keybank special overage advances.

Canada Sub has made a loan of approximately $2,250,000 to its parent affiliate, A.B. Dick Company.

Contractual settlement agreement with Fuji and Enovation regarding termination of the Fuji dealer agreement.

Canada Sub has a contract with KPG which is subject to cancellation by KPG if the company is sold.

20

B-0257

Canada Sub's service manager has verbally indicated a desire to retire in January 2005.

A.B.Dick Company received a Notice of Reclamation from Elof Hansson, Inc., as agent for Elof Hansson K.K., on July 8, 2004 relating to approximately 2,980 rolls of electro-static offset printing paper plate.

See also Schedule 3.5 [No Violation of Charter Documents; Compliance with Legal Requirements; Governmental Authorizations]

See also Schedule 3.7 [Seller Financial Statements]

B-0258

## SCHEDULE 3.15

### OWNERSHIP OF INTELLECTUAL PROPERTY

See attached list of all copyright, mask work and trademark registrations and applications and all patents and patent applications for Seller IP Rights owned or exclusively licensed by Seller or its Subsidiaries.

A.B. Dick Company permits its dealers and resellers to sell Seller Products.

See also Schedule 3.21 [Agreements and Commitments]

22

B-0259

**SCHEDULE 3.16**

**CONFORMITY OF PRODUCTS AND SERVICES**

There may be a basis for certain customers to assert that the QP 25 line of products does not conform to specifications and to representations made to said customers.

23

**B-0260**

## <u>SCHEDULE 3.17</u>

**PRODUCT AND SERVICE WARRANTIES**

Attached hereto are standard written forms of product and service warranties and guarantees utilized by A.B. Dick Company or any Subsidiary of A.B. Dick Company as of the date of the Agreement with respect to the Seller Products and Services.

There may be a basis for certain customers to assert that the QP 25 line of products does not conform to specifications and to representations made to said customers.

24

B- 0261

## SCHEDULE 3.18

## CERTAIN EMPLOYEES; SUPPLIERS AND CUSTOMERS

See attached schedule of employee salaries.

See attached list of all suppliers, licensors and vendors to whom, since January 1, 2003, A.B. Dick Company or a Subsidiary of A.B. Dick Company has made payments of $50,000 or more.

Ryobi has drawn upon a Letter of Credit provided by A.B. Dick Company.

Customers or distributors accounting for more than two percent (2%) of the revenue of A.B. Dick Company for fiscal years ending December 31, 2002 and December 31, 2003.

| 2002 | 2003 |
|------|------|
| Minuteman Press | Minuteman Press |
| Print Image Intl (NAQP) (a consortium of small printers) | Print Image Intl (NAQP) (a consortium of small printers) |
| Deluxe Corporation | Deluxe Corporation |
| State of California (includes counties, municipalities, agencies and other political subdivisions) | |
| Kinko's | |

In connection with the termination of all of its distributorship agreements, Xeikon, a company for which A.B. Dick Company of Canada, Ltd. serves as a distributor, has terminated its distributorship agreement with A.B. Dick Company of Canada, Ltd

Canada Sub has a contract with KPG which is subject to cancellation by KPG if the company is sold.

See also Schedule 3.14 [Absence of Certain Changes or Events]

25

B-0262

## SCHEDULE 3.19

### DISABLING CODES

None.

26

**SCHEDULE 3.21**

**AGREEMENTS AND COMMITMENTS**

See attached list of contract vendors and customers.

A.B. Dick Company permits its dealers and resellers to sell A.B. Dick Products.

A.B. Dick Company has a technology development agreement with Presstek.

A.B. Dick Company has an agreement granting Kinko's preferential pricing and/or terms for service.

A.B. Dick Company has non-compete covenants with Ryobi, Konika, Hamada, Duplo, Mitsubishi, Kodak, Bourg, Standard Register, Agfa, Hamada, and Presstek

A.B. Dick Company has employment agreements with Brian J. Longe, James C. Yerkes, Mark Szafranowski and Earl Frishkorn. In addition, all employees of A.B. Dick Company are entitled to severance pursuant to the existing Human Resources policy.

See attached list of active rentals.

Canada Sub has a contract with KPG which is subject to cancellation by KPG if the company is sold.

Canada Sub is on the verge of signing a multi-year contract with Davis & Henderson, one of its largest customers.

See also Schedule 3.17  [Product and Service Warranties]
See also Schedule 3.18  [Certain Employees; Suppliers and Customers]
See also Schedule 3.22  [Employees]

27

B-0264

**SCHEDULE 3.22**

**EMPLOYEES**

It is possible that A.B. Dick Company's relationship with its general counsel, Jeffrey S. Herden, could be classified as an employer/employee relationship and not an independent contractor relationship as maintained by the company..

There is a pending controversy between Brian J. Longe and A.B. Dick Company regarding issues of severance and bonus.

Labor and other disputes may arise from the recent reductions in workforce that commenced on March 31, 2004.

A.B. Dick Company has the following Seller Employee Plans:

- A.B. Dick Company Life Insurance Plan (Plan #519).

- A.B. Dick Company Short Term Disability Plan (Plan #503).

- A.B. Dick Company Long Term Disability Plan (Plan #517).

- A.B. Dick Company Employee Health Benefit Plan (Plan #518).

- A.B. Dick Company Dental Plan (Plan #520).

- A.B. Dick Company Group Accidental Death and Dismemberment Insurance Plan.

- A.B. Dick Company Voluntary Accidental Death and Dismemberment Insurance Plan.

- A.B. Dick Company Flexible Benefits Plan.

- A.B. Dick Company 401(k) Employees' Savings and Investment Plan.

- A.B. Dick Company benefits described in A.B. Dick Company Human Resources Manual for U.S. Employees, Benefits Summary Policy (Benefits Policy Number 400).

- A.B. Dick Company Executive Long Term Disability Plan.

Since January 1, 2003, there have been 20 medical claims company wide that have exceeded $50,000.

A.B. Dick Company has the following Seller Pension Plans:

28

B-0265

- A.B. Dick Company 401(k) Employees' Savings and Investment Plan.

A.B. Dick Company has the following Seller Benefit Arrangements:

The following A.B. Dick Company Benefit Arrangements are more fully described in the A.B. Dick Human Resources Policy Manual for U.S. Employees, a copy of which is attached:

- A.B. Dick Company Relocation Policy (Employment Policies Number 107).

- A.B. Dick Company Location Closings Policy (Employment Policies Number 109).

- A.B. Dick Company Rehire Policy (Employment Policies Number 112).

- A.B. Dick Company Safety Shoes Policy (Employment Policies Number 118).

- A.B. Dick Company Hours of Work Policy (Pay & Performance Policy Number 300).

- A.B. Dick Company Pay Procedures Policy (Pay & Performance Policy Number 301).

- A.B. Dick Company Salary Administration Policy (Pay & Performance Policy Number 303).

- A.B. Dick Company Overtime-Exempt Employees Policy (Pay & Performance Policy Number 306).

- A.B. Dick Company Field Engineers Policy (Pay & Performance Policy Number 308).

- A.B. Dick Company Flexible Work Hours (Headquarters Only) Policy (Pay & Performance Policy Number 309).

- Vacation, Sick time, Holidays, Jury Duty, Bereavement, Military Leave, Separation Pay, Family Medical Leave (FMLA), and Work-Related Medical & Disability benefits listed in A.B. Dick Company Benefits Summary Policy (Benefits Policy Number 400).

- A.B. Dick Company Holidays Policy (Benefits Policy Number 401).

- A.B. Dick Company Vacation Policies (Benefits Policies Numbers 402 and 402-A).

- A.B. Dick Company Service Awards Policy (Benefits Policy Number 403).

29

B-0266

- A.B. Dick Company Referral Bonus Program (Benefits Policy Number 404).

- A.B. Dick Company Attendance -- Non-Exempt Associates Policy (Absences Policy Number 500).

- A.B. Dick Company Family Medical Leave Policy (Absences Policy Number 501).

- A.B. Dick Company Jury Duty Policy (Absences Policy Number 503).

- A.B. Dick Company Witness Duty Policy (Absences Policy Number 504).

- A.B. Dick Company Military Leave Policy (Absences Policy Number 505).

- A.B. Dick Company Bereavement Policy (Absences Policy Number 506).

- A.B. Dick Company School Visitation Policy (Absences Policy Number 507).

- A.B. Dick Company Sick Time Policy (Absences Policy Number 509).

- A.B. Dick Company Personal Leave of Absence Policy (Absences Policy Number 510).

- A.B. Dick Company Severance Policy (Termination Policy Number 600).

- A.B. Dick Company Executive Severance Bridge Policy (Termination Policy Number 601).

- A.B. Dick Company Flower Fund Policy (Miscellaneous Policy Number 700).

Canada Sub has the employee benefit plans set forth in the attached memorandum.

Canada Sub's service manager has verbally indicated a desire to retire in January 2005.

Canada Sub has a few sales agents in Canada and there may be some costs associated with contract termination.

There has been no amendment to the benefit plans except that on April 2, 2004, the Executive Severance Bridge policy was amended.

B-0267

**SCHEDULE 3.23**

**RELATIONSHIP WITH AFFILIATES**

Par Realty Co., an Affiliate of Parent, owns the real property at 7400 Caldwell Avenue, Niles, Illinois, which is leased by A.B. Dick Company.

Rogers Display, an Affiliate of Parent, provides convention display goods and services to A.B. Dick Company.

NESCO Services, Inc., an Affiliate of Parent, provides employment outplacement services and provides temporary employees to A.B. Dick Company.

See also Schedule 3.14 [Absence of Certain Changes or Events]

31

B-0268

**SCHEDULE 3.24**

**ENVIRONMENTAL MATTERS**

There may have been disposals, Release or threatened release of Hazardous Materials on, at, from or under the following facilities:

> Rexdale, Ontario
> Rochester, New York
> Holmesville, Ohio
> Lake City, South Carolina
> Miami, Florida
> Indianapolis, Indiana
> Cerritos, California
> Milford, Connecticut
> Middleton, Wisconsin
> East St. Louis, Illinois

In addition, underground tanks were removed from the following locations (sites identified above are not included):

> Birmingham, Alabama
> Costa Mesa, California
> New Bedford, Massachusetts
> Southfield, Michigan
> Suffield, Connecticut

On June 9, 2004, A.B. Dick Company received notice from the USEPA regarding Addressograph/Multigraph being a PRP at the Chemical Recovery systems site in Elyria, Ohio. A.B. Dick Company has 20 days to respond to the invitation to participate and 30 days to respond to the information requested thererin.

See also Schedule 3.11 [Litigation]

B-0269

**SCHEDULE 3.26**

**BOARD OF DIRECTORS, OFFICERS AND KEY PERSONNEL**

<u>Officers:</u>

<u>A.B. Dick Company:</u>

| | |
|---|---|
| Brian J. Longe | President & CEO |
| Gregory T. Knipp | Vice President & CFO |
| Jeffrey S. Herden | General Counsel & Secretary |
| Kenneth D. Newton | Chief Operating Officer, Equipment |
| Joyce L. Huston | Vice President – Human Resources |
| David E. Vanderwiel | Vice President – Consumables & IT |
| Laurence T. Mascia | Vice President – Sales |
| James C. Yerkes | VP & General Manager – Service |
| Lynne E. Gehrke | Vice President – Procurement |
| Scott M. MacKenzie | Vice President – Marketing |
| Jeffrey W. Mock | Vice President – Engineering |
| Steven C. Stricker | Vice President – Manufacturing |
| Douglas P. Farmer | Vice President – Distribution & Logistics |

<u>A.B. Dick Company Of Canada, Limited:</u>

| | |
|---|---|
| J. Mark Stinson | Corporate Secretary |
| Gerald Welstead | Controller |
| Fred Wood | General Manager |
| Annissa Lo | Accounting Manager |
| Jerry Leszczuk | Director Sales & Marketing |
| Robert McLean | Director of Service |

<u>A.B. Dick UK Limited:</u>

| | |
|---|---|
| Jeffrey S. Herden | Secretary |
| Quentin Baum | Managing Director |
| George Gray | Director of Operations |

<u>Itek Graphix Corp:</u>

| | |
|---|---|
| Brian J. Longe | President |
| Jeffrey S. Herden | Secretary |
| Gregory T. Knipp | Treasurer/Assistant Secretary |

<u>Multigraphics LLC:</u>

| | |
|---|---|
| Brian J. Longe | Manager |
| Gregory T. Knipp | Manager |
| Jeffrey S. Herden | Manager |

33

B- 0270

<u>Interactive Media Group, Inc.</u>
|                      |                           |
|----------------------|---------------------------|
| Andrew Holland       | President                 |
| Jeffrey S. Herden    | Secretary                 |
| Gregory T. Knipp     | Treasurer/Asst. Secretary |

**<u>Directors:</u>**

<u>A.B. Dick Company:</u>

James W. Wert      President and Chief Executive
Officer
Clanco Management Corporation
30195 Chagrin Boulevard, #250
Pepper Pike, OH 44124

<u>A.B. Dick Company of Canada, Limited:</u>

J. Mark Stinson      Attorney
Fasken Martineau DuMoulin LLP
Box 20, Toronto-Dominion Centre
Toronto, Ontario, Canada M5K
1N6

Gerald Welstead      Controller
A.B. Dick Company of Canada,
Limited
94 Brockport Drive
Rexdale, Ontario, M9W 5C5,
Canada

James W. Wert      President and Chief Executive
Officer
Clanco Management Corporation
30195 Chagrin Boulevard, #250
Pepper Pike, OH 44124

<u>A.B. Dick UK Limited:</u>

Quentin Baum      Managing Director
A.B. Dick UL Ltd.
Great West Trading Estate
983 Great West Road
Brentford, Middlesex TW8 9DN,
England

<u>Itek Graphix Corp:</u>

Brian J. Longe      President and CEO
A.B. Dick Company
7400 Caldwell Avenue
Niles, IL 60714

34

**B-0271**

<u>Interactive Media Group, Inc.</u>

                Gregory T. Knipp     Vice President and CFO
                                        A.B. Dick Company
                                        7400 Caldwell Avenue
                                        Niles, IL 60714

                Frank D. Zaffino      Chairman
                                        Paragon Corporate Holdings, Inc.
                                        7400 Caldwell Avenue
                                        Niles, IL 60714

See attached list of key personnel.

B-0272

## SCHEDULE 3.27

### INSURANCE

See attached schedule.

See also Schedule 3.7 [Seller Financial Statements]
See also Schedule 3.11 [Litigation]

36

## SCHEDULE 5.2

### CONDUCT OF BUSINESS

Seller and/or its Subsidiaries plan to adopt an appropriate Key Employee Retention Plan with key members of management.

Doc 1219245  Ver 3

B-0274