1   A.   I don't recall the exact date, I believe it was in 2002,

2   that the Paragon Board informally approached us and asked if we

3   could introduce them to any lenders.  We did, in fact, arrange

4   a meeting with them and Surberus.  We did not have a formal

5   engagement letter or a formal relationship at that time.

6   Subsequent to that --

7   Q.   Let me just step for a second --

8   A.   Yeah.

9   Q.   Are you aware of anything that transpired from those

10  informal negotiations or  the introductions that you made at

11  the request of the Debtors?

12  A.   I know there were meetings, there were discussions, I'm not

13  aware of any -- of any transaction arising out of those

14  meetings.

15  Q.   When were you next contacted, if at all, by the Debtors?

16  A.   My firm was contacted, I believe, in September of 2003.

17  Q.   And what, if anything, were you asked to do at that time?

18  A.   We were asked to advise the Debtor with respect to its

19  strategic alternatives directly as a result of their receiving

20  an expression of interest from Presstek earlier in the summer.

21  Q.   And what did your engagement consist of at that time?

22  A.   We helped the Debtor in moving its discussions along with

23  Presstek.  We added -- we acted as an interface between the

24  Debtor and Presstek for a limited period of time.  We helped

25  the Debtor begin to look at -- it wasn't the Debtor at that

Pollack - Direct                                    122

1  time -- we helped the company to look at its operations on a

2  business line basis at that time.  We acted as a financial

3  advisor, an investment banker, for a limited period of time.

4  Q.  When did that engagement end?

5  A.  In November of 2003 we were approached by the company and

6  asked if we would modify our engagement, to fix the success

7  fee, and terminate our activities.

8  Q.  Do you know why you were asked to terminate your

9  activities?

10  A.  My understanding --

11        MR. MASON:  Your Honor, I'm gonna object on the

12  grounds that this gentleman would have to speculate as to why

13  somebody asked them to terminate his activities.  There's been

14  no foundation.

15        THE COURT:  Right, okay.  Ask your foundation

16  question.

17        MR. GLEASON:  I'll rephrase the question, Your Honor?

18        THE COURT:  Yes.

19  BY MR. GLEASON:

20  Q.  Do you know why Candlewood was asked to terminate its

21  activities?

22        MR. MASON:  Again, same objection, Your Honor.

23        THE COURT:  No, overruled.  He's asking -- he's laying

24  the foundation.

25  A.  Yes.

B-0396

Pollack - Direct                                123

1  BY MR. GLEASON:

2  Q.  Why was Candlewood asked to terminate --

3          THE COURT:  Well, you've got to ask how he knows.

4  BY MR. GLEASON:

5  Q.  Okay, how do you know?

6  A.  A Board member of Paragon called and advised us.

7  Q.  Was it your understanding that the Debtors and MHR would be

8  commencing negotiations directly with Presstek at that time?

9  A.  It was my understanding that the Debtors --

10  Q.  Or the company at this time, I'm sorry.

11  A.  That the company would be handling the negotiations from

12  that point out and that they would be involving MHR.

13  Q.  When did you next hear from the Debtors -- or the company,

14  at this point?

15  A.  In May of 2004, they called and asked if we would take our

16  revised fee in stock, Presstek stock.

17  Q.  And what did you do?

18  A.  We agreed that we would do that.

19  Q.  What happened subsequently to that?

20  A.  They called again.

21  Q.  And what did -- and what were you advised at that time?

22  A.  They asked if we would waive our fee.

23  Q.  And what did you do?

24  A.  We agreed to waive our fee in full and did so.

25  Q.  So, did you receive any compensation at that point in time?

B-0397

1  A.  At that point, when we waived our fee, they agreed to pay

2  the out-of-pocket expenses we had not yet billed them for.

3  Q.  Which was?

4  A.  $8,000.

5  Q.  And that's the $8,000 that Candlewood returned a few weeks

6  ago?

7  A.  It is.

8  Q.  At that time, was it your understanding that a transaction

9  was contemplated between the company and Presstek?

10  A.  At what time?

11  Q.  At the time you were asked to waive your fee?

12  A.  Yes.

13  Q.  Did that transaction ever close?

14  A.  Not to my knowledge.

15  Q.  Were you subsequently contacted by the company again?

16  A.  Yes.

17  Q.  When was that?

18  A.  Late June 2004.

19  Q.  And what were you asked to do at that time?

20  A.  Represent the Debtors, the soon-to-be Debtors, as financial

21  advisors and investment bankers.

22  Q.  What was the status of the debt -- of the companies

23  business at that time?

24  A.  They were barely able to make their upcoming payroll.  In

25  fact, they were not able to make their payroll without an

Pollack - Direct                                    125

1   additional over advance from their secured lender.  They were

2   in the midst of negotiating a 363 stalking horse arrangement

3   with Presstek and they were discussing DIP financing with

4   Presstek and Key Bank.

5   Q.  Did you, on behalf of the company, become involved in those

6   negotiations?

7   A.  Yes, I did.

8   Q.  Let's turn to after you were retained to represent the

9   company.  What steps did you take with respect to that

10  engagement?

11  A.  We sent a member of our staff to the company to work with

12  Mr. Knipp to understand the company's current forecast and

13  projections.  We had -- we reviewed documents, we had

14  conversations with counsel, we attended meetings with the

15  company's Board, both of the companies' Boards, as well as

16  negotiating sessions with Presstek and Key.

17  Q.  Were there actual face-to-face negotiation -- negotiating

18  sessions between Presstek and Key at that time?

19  A.• Between the soon-to-be Debtors and Presstek and Key?

20  Q.  Yes.

21  A.  Yes.

22  Q.  Did the Debtor subsequently reach -- or the soon-to-be

23  Debtor -- subsequently reach an agreement with respect to a

24  stalking horse bid?

25  A.  Yes.

B-0399

1  Q.  And did the soon-to-be Debtor subsequently reach an

2  agreement with respect to post-petition financing?

3  A.  Yes.

4  Q.  Absent these agreements, do you have an opinion as to what

5  options the Debtors would have had in July 2004?

6  A.  Yes.

7  Q.  What is that opinion?

8  A.  Without those agreements and the support provided by those

9  agreements, it's my opinion that Key would not have funded the

10  next payroll.  And without a Debtor-In-Possession financing,

11  the next payroll would not have been funded, and the Debtor

12  would have had -- the Debtor had no other -- no other ready

13  alternatives that were workable in the timeframe available.

14  And I -- it's my opinion that the situation would have resulted

15  in a piece-meal liquidation of the Debtor's assets.

16  Q.  Based on your review of the Debtor's assets, do you have an

17  opinion as to whether a piece-meal liquidation would be a

18  higher and better value than a going concern sale?

19  A.  I have an initial view that it would be a lower value.  We

20  have not completed our formal liquidation analysis.

21        MR. GLEASON:  Your Honor, may I approach the witness?

22     (witness receives document)

23  BY MR. GLEASON:

24  Q.  Mr. Pollack, I handed you a document that we have marked as

25  Exhibit-1.

1        THE COURT:  Two.

2   BY MR. GLEASON:

3   Q.  Two, I'm sorry, Exhibit-2.  Can you identify this document?

4        (Debtor's Exhibit-2 previously marked for identification)

5   A.  It's a copy of the executed Asset Purchase Agreement among

6   the Debtors, Presstek, et cetera.

7   Q.  Is this the agreement with some modifications that we've

8   talked about and they -- you had talked about that is before

9   the Court today with respect to bidding procedures?

10  A.  Yes, it is.

11  Q.  Can you briefly describe the overall terms of this

12  agreement?

13  A.  The buyer is acquiring all of the assets of A.B. Dick and

14  Paragon, the assets of its Canadian subsidiary, and the stock,

15  which are the -- which is an asset of A.B. Dick or Paragon, of

16  its UK subsidiary.  It's paying $40 million in cash -- the

17  buyer is paying $40 million in cash less a credit for the

18  amounts it is -- it has advanced as a DIP.  The Debtor is

19  responsible for cure costs of specified executory contracts.  I

20  think those are the general business terms.

21  Q.  Can you describe the negotiations that took place between

22  the Debtors and Presstek with respect to this agreement?

23  A.  Yes.

24  Q.  What took place?

25  A.  Once -- I can testify to the extent that we were involved,

1   and I believe there was a first draft of the arrangement

2   prepared before our involvement.  After that, there was

3   extensive discussion over -- and negotiation -- over the

4   covenants, the material adverse effects clause, the timing, the

5   financing, the related Debtor-In-Possession financing.

6   Extensive discussion and negotiation.

7   Q.  Would you say that that negotiation became contentious at

8   times?

9   A.  There were multiple calls that lasted past 3 in the

10  morning.

11  Q.  At the time of these negotiations, were you aware of any

12  party that was interested in purchasing the Debtor's assets for

13  the consideration Presstek was offered?

14  A.  No.

15  Q.  Were the Debtors able to obtain improvements on what was

16  originally proposed in the agreement?

17  A.  Yes.

18  Q.  Can you maybe describe some of those?

19  A..  Yes.  In the material adverse effects section, the

20  Debtor --

21  Q.  Step back for one second.  Could you explain to the Court

22  what you mean by material adverse effect?

23  A.  Yes.  My understanding is that one of the conditions to

24  closing --

25  Q.  Let's first talk in general -- in general Asset Purchase

B-0402

1  Agreements during 363 sales and other sales.

2  A. Okay. In general, a material adverse effect or a mac-out

3  clause is one that provides an opportunity for the buyer to

4  ensure that what they are buying is the same at the closing

5  date as at the contract date. So in this case, this

6  arrangement was executed at some time early in July and the

7  sale will not be consummated until some significantly later

8  date. And the buyer intends to buy the business in a fashion

9  that it is today. So they want to make sure that there isn't a

10  degradation in the business, that the assets they're buying or

11  substantially similar assets, are there at the time of the

12  closing. The seller --

13  Q. Is that type of clause typical in transactions such as

14  this, given your experience?

15  A. Yes. The seller seeks to limit the subjectivity of a

16  material adverse effect clause so that it can understand the

17  conditions under which they buyer is obligated to close.

18  Q. Were you able to negotiate the material adverse effects

19  provision at all in this agreement?

20  A. Yes.

21  Q. And can you explain for the Court whether the provision

22  that is in this agreement is narrower than in other agreements

23  you have experience with?

24  A. Yes.

25  Q. How is that?

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-929-0191*

Pollack - Direct

130

1  A.  This -- the provision in this agreement is objective and

2  very specific and very limited.

3  Q.  Explain what you mean by that.

4  A.  It's a combination of two very specific tests.  Numerical

5  tests with the numerical targets, there are no subjective

6  conditions with respect to the material adverse effect.  It's

7  sales for certain periods and the level of assets at a test

8  date.

9  Q.  What would a broad material adverse effect clause be in

10  your experience?

11  A.  I have seen them as broad as there shall not be a material

12  adverse change, period.  Which --

13  Q.  With no --

14  A.  No quantification, no objectivity, no definition.  That

15  could mean, from my perspective, all kinds of things; an

16  increase in sales, a decrease in sales, a change in margin, a

17  change in the make-up of the inventory, a change in personnel,

18  loss of a particular customer, all kinds of things.

19  Q.  In your opinion, with respect to a seller who wants have

20  some assurance that a buyer will close, is the material adverse

21  effect clause in this agreement better than, for example, the

22  agreements -- the clauses you were just speaking of?

23  A.  My opinion is it's better.

24  Q.  Why is that?

25  A.  It's better because it's specific, it's quantifiable and

Writer's Cramp, Inc.

Certified Court Transcribers

732-329-0191

B-0404

1  there's no opportunity for extraneous issues to cause -- to be

2  the cause of a material adverse effect.  You either make the

3  sales and it's not a condition, or you don't.

4  Q.  I believe there's been some discussion in these cases about

5  -- as opposed to a termination event, why isn't this just a

6  adjustment at closing, a dollar adjustment at closing?  In your

7  experience, have you seen it one way or the other?

8  A.  I have seen it both ways.

9  Q.  And is there any -- with respect to this agreement, were

10  the Debtors able to obtain an adjustment to the purchase price

11  as opposed to the termination option that is available if those

12  quantifiable results are not met?

13  A.  No, the company -- the Debtor bargained hard for clauses

14  that would allow it to meet the tests in different ways.  And

15  the buyer was steadfast in their need for this type of

16  requirement with respect to the -- you're just talking about

17  the working capital?

18  Q.  Yes.

19  A.  .Yeah, with the working capital at closing, the buyer

20  advised that they would be willing to except inventory that the

21  Debtor just purchased to make up for any shortfall in working

22  capital.

23  Q.  Based on your experience, do you believe that the material

24  adverse effect provision in this agreement sufficiently

25  convinced the seller, I mean the buyer, to purchase these

1   assets?

2        MR. MASON:  I'm gonna object to that question on the

3   grounds that it is so vague.  I don't know what it means by

4   sufficiently convinced, but I'd like clarification on that

5   question.

6        MR. GLEASON:  I'll come back to that.

7   BY MR. GLEASON:

8   Q.  Mr. Pollack, based on your experience, are provisions that

9   provide a buyer an out if a business fails to meet various

10  financial targets typical in 363 sales?

11  A.  Where there's a significant period of time between the

12  contract date and the closing date, yes.

13  Q.  In these cases has anything happened post-petition that

14  would make it difficult for the Debtors to satisfy these

15  financial targets?

16  A.  Make it more difficult?

17  Q.  Yes.

18  A.  The Mitsubishi requirement for pre-payment of orders

19  initially made it more difficult.

20  Q.  Was this Mitsubishi requirement a change from the pre-

21  petition business relationship that the Debtors had had with

22  Mitsubishi?

23  A.  Yes, my understanding is that they had an open line of

24  credit pre-petition and when orders were -- the line of credit

25  was not based on commitments, it was based on deliveries.  And

B-0406

Pollack - Direct                                    133

1  what I mean by that is when you enter into a purchase order,

2  you're entering into a commitment.  When you receive the goods

3  at some later date, that's obviously a delivery.  So the credit

4  line was -- my understanding is that the credit line was

5  limited or used only by delivery, so there was no requirement

6  to fund in any way, shape or manner or -- nor was there a

7  limitation pursuant to the credit line for orders placed.  That

8  changed at the commencement of the case.  And in fact, there

9  was a very specific requirement for pre-payment.  At the time

10  orders were placed, these products were manufactured so it

11  wasn't an in-and-out type of arrangement.  I believe the

12  reasonable expectation of the dates would be you order on day

13  one, it goes into manufacturing some time thereafter, it's

14  manufactured within 30 days or so.  At the time manufacturing

15  is complete and it ships, you pay another third.  So, a third

16  at the order, a third when it ships, if it ships by boat from

17  Japan, my understanding is it's 3 to 5 weeks to arrive at the

18  Chicago location of the Debtor, and then it's the final third

19  when it arrives.

20  Q.  At the time the Asset Purchase Agreement was negotiated

21  pre-petition, were the Debtors aware that Mitsubishi would take

22  this position and change the way they had done business

23  previously?

24  A.  The company had heard -- I don't know the exact dates.  The

25  company had heard at some point that Mitsubishi had terminated

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0407

Pollack - Direct                    134

1  its line and was seeking an alternative.

2  Q.  What impact on the financial targets, or the material

3  adverse effect provisions in the Asset Purchase Agreement, did

4  that change by Mitsubishi have on the Debtors?

5  A.  There were two changes.  One was the Debtor-In-Possession

6  financing is regulated at some -- is regulated partially by the

7  amount of the over advance and when -- if the Debtor were to

8  expend funds for deposits which were not included in the

9  collateral base, the over advance would widen and we would have

10  a hard -- the Debtor would have a hard time keeping within the

11  collateral formula.  That's number one.  Number two, the Asset

12  Purchase Agreement provided for a working capital test at

13  closing.  The working capital test defined inventory and that

14  definition did not include inventory deposits.  And so had the

15  Debtor made deposits that would not have been -- deposits for

16  goods, which would not have been received by the closing date,

17  the buyer would have gotten the benefit of those deposits

18  without paying for them.  And more importantly, the Debtor

19  would not have been able to make the covenant -- its

20  projections indicated it would not have been able to make the

21  working capital covenant if those pre-payments were not

22  included.  And therefore, it would be unable to make those pre-

23  payments after a certain date, which would result in the

24  business not having inventory -- not having inventory from its

25  prime vendor available for sale after the first or second week

B-0408

1  of October, which would have resulted in a decrease in its
2  appeal to other buyers.
3  Q.  The prime vendor being Mitsubishi?
4  A.  Mitsubishi, yeah.
5  Q.  Chair of the Creditors' Committee?
6  A.  Chair of the Creditors' Committee.
7  Q.  Have agreements been reached by the Debtors and the post-
8  petition lenders to address this -- these issues?
9  A.  Yeah, yes.
10  Q.  And what are those agreements?
11  A.  To my understanding, that the post-petition lenders have
12  agreed to allow up to 2.5 million --
13  Q.  Is it 2 or 2.5?  I think I misspoke earlier.
14  A.  It's $2.5 million -- my understanding is it's $2.5 million
15  for the Debtor-In-Possession collateral base.  So that -- up to
16  $2½ million would be included as collateral in the collateral
17  base and the appropriate availability formula would be applied
18  and that would be included.  My understanding is that Presstek
19  has also agreed to amend the definition of inventory to include
20  pre-paid inventory deposits up to $2 million at the closing
21  date.
22  Q.  How does this agreement benefit the Debtors?
23  A.  In three ways.  One is the use of cash for making these
24  pre-payments is now akin to buying inventory, at least for
25  purposes of calculating the collateral.  So making the deposits

1  will not adversely affect the Debtor's calculations anymore

2  than buying regular inventory.  That's number one.  Number two,

3  by allowing the definition of inventory on the APA, together

4  with the inclusion in the collateral base, it allows the Debtor

5  to order from Mitsubishi on an organized fashion and make sure

6  that there will be a stream of product available to meet the

7  tests -- the other sales tests in the APA, as well as provide

8  the foundation of an ongoing business to any other party who

9  might be interested in bidding.

10 Q.  Now there was some testimony earlier today about the Debtor

11 -- whether or not the Debtor has drawn down on the line

12 recently. I think the testimony was that as we sit here today

13 it may be a zero.

14 A.  Yes.

15 Q.  Can you explain why that is and whether that is going to

16 change in the immediate future?

17 A.  Well, I can address the immediate needs.  Once the

18 amendments that we are talking about are approved and are

19 appropriate for the Debtor to rely on, it will immediately draw

20 down funds on the DIP to fund the next payment to Mitsubishi,

21 as well as the initial payment on the next set of orders to

22 Mitsubishi, as well as a variety of other vendors who are

23 requiring payment in advance.

24 Q.  And prior to reaching that agreement, were the Debtors --

25 did it make sense for the Debtors to draw down and send money

1  to Mitsubishi?

2  A.  The Debtors -- prior to the agreement, the Debtors only

3  drew down and made a payment to Mitsubishi for inventory that

4  would be manufactured in August and early September and

5  available for delivery and sale in late September and the first

6  week of October.

7  Q.  Do you have an understanding of what is going to be drawn

8  down on the line in the next few days and sent to Mitsubishi?

9  A.  Approximately a million dollars.

10 Q.  I want to turn to a couple of other provisions in the Asset

11 Purchase Agreement.  Are you familiar with the financial

12 representations and warranties contained in the agreement?

13 A.  Generally.

14 Q.  Are these representations and warranties typical in

15 transactions such as this, in your experience?

16 A.  I have seen transactions where they're included and

17 transactions where they're excluded.

18 Q.  During the negotiations with the buyer, did the Debtors

19 attempt to modify the agreement with respect to those

20 representations and warranties?

21 A.  We did.

22 Q.  And were you successful in some manners and not others?

23 A.  We enjoyed some success.

24 Q.  Let's turn to the -- there's a liquidated damage provision.

25 Are you familiar with that type of provision?

1  A.  Yes.

2  Q.  Is that a provision that is common or uncommon in

3  transactions such as this?

4  A.  Relatively common.

5  Q.  There is a release of the buyer in the agreement.  In your

6  experience, it that something that is common or uncommon in

7  these types of transactions?

8  A.  Relatively common.

9  Q.  Why is that?

10 A.  Buyers don't -- if you are buying the business and buying

11 the assets and paying the estate what the estate must consider

12 an appropriate amount of money, you don't want that -- those

13 dollars used then to prosecute you for some other activity.

14 Q.  Does this agreement, meaning Exhibit-2, does it have a due

15 diligence contingency contained in it?

16 A.  No, it doesn't.

17 Q.  Does this agreement have a financing contingency contained

18 in it?

19 A.  No, it does not.

20 Q.  In your experience, do other transactions -- other 363

21 sales transactions, sometimes have those types of

22 contingencies?

23 A.  They sometimes do.

24 Q.  Given the modifications we have discussed, do you have an

25 opinion as to whether the Debtors will be able to satisfy the

Pollack - Direct                                    139

1  representations and warranties in the agreement?

2  A.  I do.

3  Q.  What is that opinion?

4  A.  I believe, based on discussions with management and a

5  review of the company's updated forecast, that they will in

6  fact be able to make the financial tests included in the APA,

7  achieve those tests.

8  Q.  Now I want to turn briefly to the post-petition financing

9  agreement.  Can you describe the general terms of the post-

10 petition financing the Debtors have negotiated with Key Bank

11 and Presstek?

12 A.  Yes.

13       MR. MASON:  Judge, I'm gonna object to this question

14 only in the name of time.  If the Court would like to hear a

15 description of what's already been submitted to the Court in

16 writing, we can go through that exercise.  But I think that

17 it's really kind of not a particularly good use of our time.

18       MR. GLEASON:  Your Honor, if I could --

19    •   THE COURT:  I could take --

20       MR. GLEASON:  -- have a stipulation from Mr. Mason that

21 the Debtor's good faith in negotiating these documents is no

22 longer on the table, I would be happy to do that.  But if he's

23 going to continue to say that the Debtors did not act in good

24 faith in this case, I have to put on the record what the

25 Debtors were able to negotiate, how they got there, and why we

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0413

1  are where we are today.

2        MR. MASON:  Judge, I don't know what I'm being asked

3  to stipulate to so I'm reluctant to stipulate --

4        THE COURT:  All right then, why don't --

5        MR.  MASON:  I didn't even know good faith was an

6  issue here, but in any event, he --

7        THE COURT:  I'll -- the objection will be overruled.

8        MR. MASON:  Thank you.

9        THE COURT:  Why don't you just go ahead.

10        MR. GLEASON:  Thank you, I will try to be brief, Your

11  Honor.

12  BY MR. GLEASON:

13  Q.  Can you briefly describe the terms of the post-petition

14  financing that has been agreed to in this case?

15  A.  All right, there's approximately -- or I believe there's a

16  $7 million DIP line available to the Debtors.  It's subject to

17  a budget, which has been provided to the lenders as well as the

18  Court, and it includes tests both as to disbursements as well

19  as the magnitude of the over advance at any point in time.

20  Q.  In your experience, are you aware of cases where the

21  stalking horse bidder provides some or all of post-petition

22  financing?

23  A.  I've not been involved in a case where that's been the

24  case, where that is --

25        THE COURT:  I'm sorry, again, I didn't understand the

1  question.

2  BY MR. GLEASON:

3  Q.  Okay.  In your experience, are you aware of cases where a

4  stalking horse bidder has provided post-petition financing?

5  A.  I don't recall being in a case as an advisor where the

6  stalking horse bidder provided financing.

7  Q.  Are you familiar with the TWA case?

8  A.  No.

9  Q.  Okay.  Can you describe the negotiations that took place

10  with respect to the Debtor-In-Possession financing agreement?

11  A.  Yes.

12  Q.  What took place?

13  A.  Generally, we -- the company asked Key if it would extend

14  DIP financing, they said no.  We inquired would they allow us

15  to bring in new financing and prime them, they said no.  We had

16  a discussion with them and Presstek.  It became clear that they

17  would allow Presstek -- they wouldn't allow -- that it would

18  feasible to have Presstek provide a significant portion of the

19  financing using the collateral that Key did not have a lien on

20  as their collateral.  I forgot the rest of the question.

21  Q.  Just -- the negotiations that took place?

22  A.  Yes.

23  Q.  Were the Debtors able to obtain improvements on what was

24  originally proposed by the post-petition lenders?

25  A.  Yes.

Pollack - Direct                                          142

1  Q.  Can you explain some of those improvements for the Court?

2  A.  Yes.  We spent quite a bit of time modifying the budget and

3  negotiating with the post-petition lenders for things such as

4  cumulative disbursements, allowing cross-category

5  disbursements, so that the Debtors weren't limited in how they

6  spent their dollars and had flexibility so long as they

7  maintained the overall disbursement number, the over advance

8  number, and stayed within the borrowing limit.

9  Q.  Was the dollar amount of the DIP increased at one point?

10 A.  It was increased and decreased.

11 Q.  At one point it was $6 million, wasn't it?

12 A.  Yes, it was and at one point there were discussions of 10.

13 Q.  And it ended up?

14 A.  Seven.

15 Q.  Based on your experience, are the terms that are contained

16 in the DIP financing agreement reasonable given the facts and

17 circumstances in these cases?

18 A.  Yes, they are.

19 Q.  Mr. Pollack, I want to now briefly turn to the bid

20 procedures that were negotiated.  Based on your experience, are

21 the bid procedures that were negotiated with Presstek

22 reasonable given the facts and circumstances in these cases?

23 A.  Yes.

24 Q.  Are you familiar with some of the modifications of --

25 strike that -- did the Debtors attempt to negotiate the bid

B-0416

Pollack - Direct                                    143

1  procedures pre-petition?

2  A.  Yes.

3  Q.  Were the Debtors able to get any concessions with respect

4  to the bid procedures?

5  A.  Minor concessions.

6  Q.  Based on your experience, is that typical in these cases?

7  A.  Given the facts and circumstances here, yes.

8  Q.  I think you were in the Courtroom earlier today when there

9  was some discussion about the modifications that Presstek has

10 agreed to make with respect to the bid procedures.  Do you

11 remember that?

12 A.  Yes.

13 Q.  Based on those modifications, do you have an opinion as to

14 whether the bid procedures will enable the Debtors to

15 effectively market their assets and obtain the highest and best

16 value for the estates?

17 A.  Yes.

18 Q.  What is that opinion?

19 A.  Given the changes, I believe the Debtors have a very real

20 and fair opportunity to hold an auction process that will

21 result in the highest and best value available today for these

22 assets.

23 Q.  I want to turn briefly to the Debtor's financial advisor.

24 Are you familiar with Jeffries & Company?

25 A.  That would be the Creditor's.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-529-0191

B-0417

Pollack - Direct

144

1    THE COURT:    You mean the Committee's?

2    BY MR. GLEASON:

3    Q.    I mean the Committee's, sorry.

4    A.    By reputation.

5    Q.    When did you first meet with Jeffries & Company with

6    respect to this case?

7    A.    I had lunch with Mr. Flax I believe on August 9th.

8    Q.    When did Jeffries & Company first provide a due diligence

9    request to the Debtors?

10    A.    I believe they delivered an e-mail with that request on

11    August 13th.

12    Q.    And when did Jeffries first meet with the company?

13    A.    I believe it was August 16th or 17th, it was the Monday

14    following the 13th.

15    Q.    With respect to the modifications to the DIP, given the

16    modifications that you testified to today and you've heard

17    from Mr. Knipp's testimony, do have an opinion as to whether

18    the DIP is sufficient to enable the Debtors to preserve their

19    going concern value during the marketing process?

20    A.    I do.

21    Q.    And what is that opinion?

22    A.    Assuming that the marketing process concludes by November

23    15th, I believe that the DIP is both sufficient in duration,

24    amount, and is reasonable in cost and will allow that process

25    to move forward.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1 Q. You said the marketing process, you mean the sale process?

2 A. Yes.

3 Q. The closing date?

4 A. The closing date.

5 Q. I'm gonna turn now to efforts to obtain other financing.

6 Are you aware whether the Debtors made any efforts to obtain

7 post-petition financing from parties other than Key and

8 Presstek before the cases were filed?

9 A. Yes.

10 Q. Did they?

11 A. They did not. To my knowledge, they did not.

12 Q. Do you know why?

13 A. Yes.

14 Q. Why is that?

15      MR. MASON: I'm gonna object on the grounds, again,

16 there's no foundation.

17      THE COURT: What are we --

18      MR. MASON: Again, he's being asked to speculate why.

19      THE COURT: Just let -- ask the foundational

20 questions.

21 BY MR. GLEASON:

22 Q. Mr. Pollack, are you aware as to why the Debtors did not

23 seek post-petition financing from lenders other than Key and

24 Presstek pre-petition?

25      MR. MASON: Same objection.

Pollack - Direct                                    146

1          THE COURT:  Well, the question is are you aware?

2  A.  Yes.

3          THE COURT:  What is the basis of that awareness?

4  A.  My discussions with the Board.

5          THE COURT:  All right, why don't you follow up a bit

6  on that?

7  BY MR. GLEASON:

8  Q.  What discussions did you have with the Board in your

9  capacity as financial advisor and with respect to seeking post-

10  petition financing from entities other than Key and Presstek?

11  A.  Once we were engaged, we had discussions with respect to

12  the amount of time available to seek alternative financing

13  sources.

14  Q.  Based on your experience, did these Debtors have sufficient

15  time to obtain alternative post-petition financing from parties

16  other than Key and Presstek?

17  A.   Based on my experience and the facts and circumstances,

18  which include their inability to meet their payroll, which Mr.

19  Knipp testified to, and without an over advance and their

20  certain inability to meet their next payroll, it was my opinion

21  -- and it is my opinion that there was not sufficient time to

22  bring in an independent third party to provide DIP financing,

23  especially given the Key Bank position that they were not

24  willing to be primed, that it would have taken.

25  Q.  Have the Debtors made any efforts to obtain replacement

Pollack - Direct                                     147

1  financing on the post-petition basis?

2  A.  Yes.

3  Q.  What efforts have been made?

4  A.  We've contacted a limited number of DIP lenders.

5  Q.  Why have you contacted a limited number?

6        THE COURT:  The question is -- you used the word "we?"

7  Is that something in which you have been directly involved?

8  A.  Yes.

9        THE COURT:  All right, why don't you lay a little

10  foundation about what he has done in connection with this?

11  BY MR. GLEASON:

12  Q.  Mr. Pollack, what have you personally done with respect to

13  trying to obtain post-petition -- alternative post-petition

14  financing?

15  A.  I have called specific lenders to inquire as to their

16  interest in pursuing that type of an arrangement.

17  Q.  What is the status of these efforts?

18  A.  Two lenders have advised that they are willing to consider

19  it and they have signed confidentiality agreements and have

20  begun their diligence.  A third is to have a meeting with me

21  this week.

22  Q.  Given your experience, are Debtors in the situation these

23  Debtors find themselves in generally able to obtain replacement

24  financing?

25  A.  Not without substantial discounts from the stated principle

B- 0421

1 value of the existing loans.

2 Q.  How long would it take a new DIP lender to complete due

3 diligence and commit funding?

4 A.  My view is no less than 3 weeks for a company this size

5 with the prime collateral being foreign assets or foreign

6 securities -- securities of foreign companies.

7 Q.  Given the modifications that we've discussed this

8 afternoon, do you believe the Debtors should continue

9 aggressively seeking a replacement Debtor-In-Possession

10 financing agreement?

11 A.  I do not.  Given the duration, the amount, the conditions

12 and the cost of the financing as modified, I find it, in my

13 opinion, adequate to allow the Debtors to reach the proposed

14 auction date without restricting -- unduly restricting their

15 business activities.  I also find it unlikely that the process

16 cost and distraction result of seeking alternate financing

17 would materially add to the going concern value of the

18 enterprise.

19 Q.  Let's turn now briefly to the marketing process in this

20 case.  Can you describe for the Court the professionals that

21 are working on this engagement on behalf of Candlewood?

22 A.  There are two of my partners and two associates.

23 Q.  And what steps has Candlewood taken to market the Debtor's

24 assets as of this date?

25 A.  We assembled a buyer's list through our own sources and

1   solicitation of names and ideas from the Debtor's management.

2   We sent a teaser, which is purely an introductory letter to, I

3   believe, 150 parties.  We have contacted over 140 of those

4   parties personally by phone, haven't reach every one of them,

5   to encourage them to sign a CI and receive the Selling

6   Memorandum.  The Selling Memorandum was started prior to the

7   commencement of the case, has been worked on continuously until

8   its completion about 4 or 5 days ago.  It was substantially

9   complete awaiting the Debtor's analysis, at Candlewood's

10  request, of a break out of the results of the three main

11  business lines so that we would be able to use the Selling

12  Memorandum as a tool to identify opportunity to potential

13  buyers as opposed to just a reflection of exactly what the

14  Debtor has reported in its financial statements.

15  Q.  Does this -- explain that the three business lines --

16  A.  Sure, let me finish my answer.

17  Q.  Sure.

18  A.  We've also worked with the Debtor to establish an online

19  data room, which is effective now, which allows buyers who have

20  signed -- potential buyers who have signed a CA to view the

21  companies -- much of the companies diligence material without

22  leaving their offices.  That encourages people to participate

23  in the process, it reduces the cost and gives more flexibility

24  to the prospective party.  I'm sorry, your question was?

25  Q.  You had talked about the analysis of operations by the

1  lines.  Can you explain, one, why that wasn't available

2  previously and then what you hoped to show from that?

3  A.  Yes.  As Mr. Knipp has testified, the company records

4  revenue in three main categories; the sale of equipment, the

5  sale of supplies, and the provision of service and attendant

6  sale of service replacement parts.  Three major revenue sources

7  and three lines of businesses run by three separate operating

8  VPs, if you will.  The companies financial statements reflect

9  the sales of those three business lines, the standard margin of

10 those business lines, and from that point on, they tend to

11 lump, if you will, all of the costs associated with running all

12 of those businesses into a more general overhead and corporate

13 overhead line.  So they don't regularly report the -- and it is

14 a fact, to my knowledge, they don't ever report the operating

15 profitability by business line up through the EBITDA level.  As

16 Mr. Knipp has testified, that is a not -- that is not a simple

17 exercise and it requires the accounting staff to make certain

18 assumptions with respect to the division of those overhead

19 dollars.

20 Q.  When did they Debtors confirm that the no-shop provision in

21 the agreement was waived?

22 A.  I believe it was the end of the first week of August.

23 Q.  Why was that important to the Debtors?

24 A.  That -- the -- when that provision was waived, that

25 signaled the opportunity for Candlewood to begin marketing

1   these assets to the general public, if you will, and limited --

2   and ended the limitation honorability to talk to prospective

3   interested parties.

4   Q.  Had that no-shop not been waived previously, would the

5   Debtors and your office have been able to engage in any

6   marketing efforts with respect to these Debtors, as we sit here

7   today?

8   A.  I believe they would not have been.

9   Q.  Why is that?

10  A.  Because the no-shop required -- my understanding of the

11  arrangement was that the no-shop would not be lifted until the

12  Procedures Motion was put in force and that we wouldn't -- we

13  would not be allowed to market the assets, make any third party

14  contact, or hold any third party discussions until that was

15  lifted.

16  Q.  That was another concession that the Debtors were able to

17  obtain in these cases?

18  A.  That was.

19  Q.  If you could briefly describe for the Court the steps

20  Candlewood anticipates taking over the next few weeks to market

21  these assets?

22  A.  Yes.  We intend to contact and talk in person to every one

23  of the people on our prospective parties on our prospective

24  buyers list.  We have, I believe, 20 or 25 CAs that have gone

25  out so far.  We would expect a significant additional number of

1 CAs to be -- to go out and get executed.  That group of

2 prospective interested parties will get further attention from

3 us, regular follow-up calls inviting them to ask questions,

4 clarify things.  We will seek to understand what it is they're

5 looking at, what they're interested in.  We will seek to

6 discuss with them opportunities for them to participate in the

7 auction.  If it becomes apparent that there are parties who

8 want to buy one business line and some parties who want to buy

9 a different business line, we will attempt to negotiate with

10 the various parties to maximize the overall dollars available

11 for the estate in the sale of these assets.  And we will

12 continue talking with these interested parties until the

13 auction date.  We will also arrange for further diligence,

14 meetings with management, whatever else, reasonably -- is

15 reasonably requested.

16 Q.  All of these items you have mentioned, are they typical

17 activities that take place during this process in a 363 sale?

18 A.  I think in an appropriate one they are.

19 Q.  I want to turn briefly to the original schedule that was

20 contemplated under the bid procedures that were initially filed

21 with the Court.  What was that original schedule?

22 A.  My recollection is that the pre-petition schedule was that

23 the case would be commenced in early July.  The Procedures

24 Motion would go on very quickly.  There was an expectation that

25 it would be entered and certainly that the no-shop would be

1  lifted relatively quickly.  And I believe that the original

2  contemplation in early July was that there would be a sale and

3  a sale hearing -- an auction and a sale hearing no less -- no

4  later than September 30th, with a closing no later than October

5  15th.

6  Q.  Given the facts and circumstances of these cases, was that

7  contemplated schedule fair, adequate and reasonable to market

8  the assets to realize the highest and best value of the

9  estates?

10  A.  Given the circumstances, yes.

11  Q.  Is more time better when you're marketing assets?

12  A.  Sometimes.

13  Q.  Can assets be marketed for too long a period of time?

14  A.  Yes.

15  Q.  What factors should be considered in determining the

16  appropriate time?

17  A.  There are a number of them.  One is the companies -- or the

18  Debtor's -- the estate's ability to sustain its operations.

19  You wouldn't want to have an auction period that extended

20  beyond the company's ability to operate, that's number one.

21  Number two, you wouldn't want to market assets for such a long

22  period of time that the market would view them as stale.

23  Number three, you don't want to have them on the market for so

24  long a period of time that prospective interested parties don't

25  want to be first in the door and make a decision to wait, and

1  while they're waiting, become busy doing something else and

2  never come back.  You don't want to have an auction that is too

3  close to the end of a -- end of the year because parties will

4  then often times view it as a first quarter event instead of a

5  fourth quarter event with the belief that they would get pushed

6  off, et cetera, et cetera.

7  Q.  Let me ask you, is the present schedule, which contemplates

8  an auction of October 27th, fair, adequate and sufficient to

9  market the assets to achieve the maximum going concern value

10 given the facts and circumstances in these cases?

11 A.  I believe the auction is scheduled for the 29th.

12 Q.  You are correct.

13 A.  And I believe that it does present that opportunity.

14 Q.  Is that still your opinion even though there was no formal

15 or informal marketing process pre-petition in these cases?

16 A.  Yes, the October 29th date provides more than 9 weeks from

17 today.  We commenced contacting interested parties, I believe,

18 14 days ago.

19 Q.  After the no-shop was waived?

20 A.  Correct.  So, although August is a very slow period in the

21 {quote} {unquote} "deal business," it is a period of time where

22 -- that can be used and is being used to solicit interested

23 parties and have them negotiate and execute CAs so that the day

24 after Labor Day we are moving right along.

25 Q.  Do you have an opinion as to whether another week would be

1  sufficiently more beneficial to the Debtor's estates such that

2  the auction should be pushed out further?

3  A.  No, I don't believe another week would be material at all.

4  Q.  I want to turn now to the post-petition performance of the

5  Debtors, and Mr. Knipp has covered some of this so hopefully it

6  will not take too long.  You talked -- you testified earlier

7  about the Mitsubishi transaction, do you recall that?

8  A.  Yes.

9  Q.  Have other vendors taken the steps that have or may have a

10 negative impact on the Debtors?

11 A.  Yes.

12 Q.  What steps have these vendors taken?

13 A.  Some vendors have required cash in advance, some have

14 required COD, there have been certain development agreements

15 that have been terminated.

16 Q.  Have you reviewed the Debtors' forecast to determine

17 whether the Debtors can continue operations without post-

18 petition financing?

19 A.  Without?

20 Q.  Post-petition financing.

21 A.  Yes.

22 Q.  Okay, and by the Debtor's forecast I'm referring to, I

23 believe Exhibit-1 that is in front of you?

24     (Debtor's Exhibit-1 previously marked for identification)

25 A.  Yes.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  Q.   Is that the document or some of the documents that you have

2  reviewed?

3  A.   Yes.

4  Q.   Have you reached a conclusion on the issue of whether the

5  Debtors can continue operating without post-petition financing?

6  A.   Yes.

7  Q.   And what is that conclusion?

8  A.   That the Debtor could not sustain operations at a level to

9  sustain its going concern value without post-petition

10 financing.

11 Q.   Do you have an understanding of whether or not the Debtors

12 can operate using cash collateral?

13 A.   Yes.

14 Q.   And what is that opinion?

15 A.   Once again, that without sufficient post-petition

16 financing, cash collateral alone would not be adequate to allow

17 the Debtor to maintain its operations.

18 Q.   Based on your experience in bankruptcy matters in general

19 and in 363 sales in particular, do have an opinion as to

20 whether the Debtor-In-Possession of financing in this case was

21 negotiated at arm's length and in good faith?

22 A.   Yes.

23 Q.   What is your opinion?

24 A.   That it was.

25 Q.   And based on your experience in bankruptcy matters in

Pollack - Direct                    157

1  general and 363 sales in particular, do you have an opinion as

2  to whether the bid protections were negotiated at arm's length

3  and in good faith?

4  A.  Yes.

5  Q.  What is that opinion?

6  A.  They were.

7  Q.  Mr. Pollack, I believe Mr. Knipp had testified about a

8  press release that was issued at the time the Debtors filed

9  their cases.  Do you recall that press release?

10 A.  Yes.

11 Q.  Since that time, have any parties contacted the Debtors or

12 yourself with an alternative bid or an expression of interest

13 to serve as a stalking horse bidder?

14 A.  No.

15 Q.  Mr. Pollack, given your experience, the facts and

16 circumstances in these cases and the revisions that have been

17 agreed to with respect to the Debtor-In-Possession of

18 financing, do have an opinion as to whether the proposed

19 Debtor-In-Possession financing is in the best interest of the

20 estates?

21 A.  Yes.

22 Q.  And what is that opinion?

23 A.  That it is in the best interest of the estate.

24 Q.  And Mr. Pollack, given your experience, the facts and

25 circumstances in these cases, and the revisions that have been

B-0431

1 agreed to with respect to the bid procedures, do you have an

2 opinion as to whether the proposed bid procedures are in the

3 best interest of the cases -- of these estates?

4 A.  I do.

5 Q.  And what is that opinion?

6 A.  That they are.

7 Q.  Mr. Pollack, based on your experience, if the Debtors' Bid

8 Procedures Motion is denied and Presstek chooses not to proceed

9 with the transaction, how would you advise the Debtors to

10 proceed?

11 A.  Not to proceed with the transaction or the financing?

12 Q.  The transaction and the financing at this point.

13 A.  Assuming that there would not be post-petition financing, I

14 see no alternative to a piece-meal liquid -- a wind down and a

15 piece-meal liquidation.  To the extent there was any time

16 available between the termination and the day the financing

17 terminated, I mean, we would certainly seek to find an

18 alternative, to the extent one was available.  It's an unlikely

19 situation.

20 Q.  Do you believe such action would be in the best interest of

21 the estates?

22 A.  No.

23        MR. GLEASON:  May I have a moment, Your Honor?

24    (Pause in proceedings)

25        MR. GLEASON:  That's all I have at this time, Your

1  Honor.

2         THE COURT:  Well, let me a question.  Are you going to

3  ask any specific questions?  Maybe I missed it, are you going

4  to ask any specific questions about the bid protections?

5         MR.  GLEASON:  I believe I did, but I will.

6         THE COURT:  Well, I --

7         MR. GLEASON:  Okay.

8         THE COURT:  It wasn't to my satisfaction.

9         MR. GLEASON:  Okay, thank you, Your Honor.

10        THE COURT:  I mean, you asked him whether or not they

11  were reasonable, in good faith and so on and so forth.  I'd

12  like to understand from him his view of the two issues that are

13  really in play here; one of which is the so called

14  conditionality of the Presstek proposal and the other is

15  whether or not the break-up fee and expense reimbursement are

16  reasonable and necessary under the circumstances.

17        MR. MASON:  Judge, I would be delighted to cover all

18  of that on cross examination.

19  •      MR. GLEASON:  I'm just asking --

20        THE COURT:  I understand you -- and I assume that were

21  going to, but I thought it was maybe useful to make that part

22  of the case in chief, too.

23  BY MR. GLEASON:

24  Q.  Mr. Pollack, I believe you've talked about the (indiscern.)

25  of the representations and warranties and the covenants in the

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

732-929-0191

1  Asset Purchase Agreement.  Based on the modifications that have

2  been made, do you have an opinion as to whether the Asset

3  Purchase Agreement, which is has been marked as Exhibit-2, is

4  conditional?

5  A.  Could I ask you to rephrase that?

6  Q.  Sure.

7  A.  Conditional as --

8  Q.  I can do that.

9  A.  Okay.

10 Q.  I think -- I believe you testified that there are certain

11 requirements that the Debtors have to meet in order to force

12 Presstek to close, or that will keep -- that will require

13 Presstek to close the transaction, is that correct?

14 A.  Yes.

15 Q.  Given the Debtors' business as you -- strike that -- given

16 your understanding of the Debtors business and the

17 modifications that we've talked about today, do have an opinion

18 as to whether the Debtors will be able to satisfy the

19 requirements in the Asset Purchase Agreement such that Presstek

20 will be required to close the transaction?

21 A.  Yes.

22 Q.  And what is that opinion?

23 A.  My opinion is, with respect to the material adverse effects

24 requirements, I believe that the Debtors will be able to

25 satisfy those.  With respect to the non-financial conditions,

1  I'm probably not the best person.

2  Q.  But as you sit here today, with respect to the financial

3  outs, the -- that the Committee is -- I'd better check

4  (indiscern.) -- do you believe those outs are realistic outs

5  for Presstek today?

6  A.  I view them as very narrow and outs only if there is a

7  material change in the Debtors' business, which is not

8  contemplated in its forecast, nor is it contemplated by its

9  recent run rate.  So I don't believe that they are walk-away

10 rights.

11 Q.  I think the Committee or maybe MHR has used the term an

12 option.  Do you view this Asset Purchase Agreement, which is

13 Exhibit-2, as an option?

14       MR. MASON:  Judge, I think we're getting involved in

15 very vague questioning, and I don't think we're really being

16 directed to Your Honor's concerns about this conditionality

17 issue.

18       THE COURT:  Overruled.  I'm looking at your objection

19 and perhaps I don't -- I apologize to counsel if it seems like

20 I am maybe involving myself too much in this and not letting

21 the counsel ask the questions, but since --

22       MR. GLEASON:  I'll take all the help I can get, Your

23 Honor.

24       THE COURT:  Since it's going to be a late day or

25 maybe a late day, I'd sort of like to get to the nub of the

*Writer's Cramp, Inc.*

Certified Court Transcribers

752-929-0191

1  thing and figure out what it's all about.  What the -- Mr.

2  Pollack, things may have changed.  I know they have changed

3  with regard to the inventory issue, for example.  But the

4  Committee's supplemental objection says that the Committee's

5  fear that Presstek would be able to abandon the sale at its

6  sole discretion has been realized because they currently have a

7  right to walk away.  They then cite some testimony from you in

8  your deposition saying that the Debtors can't meet these

9  conditions of 10.12 of the APA.  And that's primarily related

10 to this question of the inventory.  So I guess my specific

11 question is, are the modifications that were made and the

12 concessions made by Presstek with regard to the inventory, both

13 as far as the DIP financing and the APA are concerned,

14 sufficient to remedy the concerns that you expressed at the

15 time of your deposition about the ability of the Debtor to meet

16 them, and therefore, the ability of Presstek to walk away.

17 A.  Your Honor, if I could give a rather long answer.  The

18 testimony I gave in my deposition was fuller than what's

19 included there.  And in my testimony, I believe I said that

20 with the modifications that we are pursuing it is my opinion

21 that they would make it.  And we did pursue those

22 modifications, we did achieve those modifications, and it is

23 still my opinion that given those modifications, our current

24 circumstances and the companies current projections, we will

25 make those tests, which is exactly what I said at my

1  deposition.

2  BY MR. GLEASON:

3  Q.  Mr. Pollack, briefly turn to the bid protections, I believe

4  we talked in general about them.  Are you familiar with a

5  break-up fee?

6  A.  Yes.

7  Q.  Can you explain your understanding of the break-up fee?

8  A.  What it is?  What it's for?

9  Q.  Yes.

10  A.  A break-up fee is to -- is typically used to induce a party

11  to provide an offer in a transaction like this and to

12  compensate them for their time, effort and expenditure of

13  dollars if they are not ultimately the successful bidder.  I

14  mean, a break-up fee is there to maintain the base -- to induce

15  parties to be bidders -- stalking horse bidders, to maintain

16  the base level of the going concern value of what you're

17  selling.

18  Q.  Based on your experience, are break-up fees reasonable and

19  necessary in 363 sales transactions?

20  A.  Where there are stalking horse bids, I believe the answer

21  is yes.

22  Q.  Is there a range of -- well, let me strike that.  How are

23  break-up fees generally calculated?

24  A.  They're typically calculated as a percentage of the

25  consideration.  And there's two components, excuse me --

1  sometimes combined, sometimes separate.  Those components are

2  the pure break-up fee and the attendant expense reimbursement.

3  Q.  In your experience, is there a range of percentage with

4  respect to -- let's first start with break-up fee, separate and

5  apart from expense reimbursement?

6  A.  There is.

7  Q.  What is that range?

8  A.  2 to 3%.

9  Q.  2 to 3%??

10 A.  Uhm-hum.

11 Q.  What about expense reimbursement?

12 A.  It is my experience that that is usually included in the 2

13 to 3%.  And typically, in many of the cases that we've -- that

14 I've been involved with, it's been 3% including the expense

15 reimbursement.

16 Q.  In this case, what is -- is there -- what is the percentage

17 of the break-up fee, including the expense reimbursement?

18 A.  I believe it's 4%.

19 Q.  What is the --

20 A.  I believe it is 4%.

21 Q.  What is the percentage with just the break-up fee?

22 A.  3%.

23 Q.  And how is the -- in this agreement, how is the expense

24 reimbursement calculated?

25 A.  Up to $500,000 based on actual expenses.

1  Q.  Did the Debtors attempt to negotiate different terms for

2  bid protections, including the break-up fee and expense

3  reimbursement?

4  A.  We did.

5  Q.  Did the Debtor have any success in doing that?

6  A.  We had them reduced to where they are.  We negotiated to

7  have them reduced further and were not able to do so.

8          MR. GLEASON:  Your Honor, I believe I've addressed --

9  or the witness has addressed the Court's specific issues if --

10         THE COURT:  Okay.

11         MR. GLEASON:  And if not, then I'm sure Mr. Mason will

12  ask.

13         THE COURT:  All right.  Are we ready for cross

14  examination?  Anybody want to take a break or should we plow

15  ahead?

16         MR. MASON:  Your choice --

17         THE COURT:  Let's plow ahead.

18         MR. MASON:  -- Judge.

19         THE COURT:  Let's plow ahead and see how we do.

20         MR. POLLACK:  Can I have some water?

21         MR. MASON:  Good afternoon, Mr. Pollack.

22         THE COURT:  Somebody has to be in charge of the

23  hydration committee here.

24         MR. POLLACK:  Witness hydration.

25         MR. GLEASON:  I'm the one that made him talk so much,

Pollack - Cross

166

1  so I'll get him some water.

2          MR. POLLACK:  Thank you.

3                  CROSS EXAMINATION

4  BY MR. MASON:

5  A.  Now, Mr. Pollack, when you came on board in mid-June,

6  circumstances for A.B. Dick were pretty desperate, weren't

7  they?

8  A.  It was the end of June.

9  Q.  I'm sorry, the end of June.

10 A.  Could you define "desperate?"

11 Q.  They appeared fairly desperate to you, didn't they?

12 A.  The company was running out of cash.  It had an inability

13 to meet its payroll without an over advance and had no clear

14 path to its next payroll.

15 Q.  And it had no cash available, but ability under its line of

16 credit with Key Bank, is that right?

17 A.  That's correct.  That's my understanding.

18 Q.  And it had -- it wasn't negotiating with anybody to sell

19 it's business over the (indiscern.), is that correct?

20 A.  When I got involved, that's correct.

21 Q.  And there wasn't anybody else that you knew of who had been

22 negotiating to possibly purchase Presstek -- or possibly

23 purchase A.B. Dick's business within the last few months prior

24 to your retention, is that correct?

25 A.  There were no -- to my knowledge, there were no other

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B-0440

1  parties, third parties, making inquiries.

2  Q.  Okay.  And it was your judgment that there really wasn't

3  any time to get a Debtor-In-Possession line?

4  A.  An alternative Debtor-In-Possession line.

5  Q.  So you did the best you could?

6  A.  Given the facts and circumstances.

7  Q.  And you had a tough negotiation, didn't you?

8  A.  It was a fairly rigorous negotiation.

9  Q.  And even though your experience showed you that a typical

10  break-up fee was 2 to 3%, you went ahead and agreed, or the

11  company went ahead and agreed to 4¼%, didn't it?

12  A.  3% break-up fee and 4¼% expense reimbursement.

13  Q.  Okay, but in your experience the expense reimbursement is

14  typically within a 2 to 3%, is it not?  That was you testimony.

15  A.  It is.  And the basis for going ahead was that the

16  overwhelming conclusion was that that point, which we were not

17  able to get the buyer to concede, was dwarfed by the overall

18  value created in the preservation of the going concern value

19  that was supported by the two related agreements, the DIP and

20  the APA.

21  Q.  Your -- Mr. Pollack, I would just ask you to answer the

22  questions that I've asked you and then --

23  A.  Sure.

24  Q.  -- your -- or the counsel for A.B. Dick or other counsel

25  can ask you to elaborate on redirect, okay?  Now Mr. Pollack,

1    when the original Asset Purchase Agreement was signed, there

2    was a no-shop provision, you testified about that, is that

3    correct?

4    A.   Could be specific?  This Asset Purchase Agreement?

5    Q.   Yes.

6    A.   The one marked Exhibit-2?

7    Q.   Yes.

8    A.   Yes, that's my understanding.

9    Q.   All right.  And you interpreted that to mean that you

10   couldn't go out looking for other buyers until that no-shop

11   provision was eliminated?

12   A.   I was advised by counsel that we could not contact other

13   buyers nor respond to inquiries.

14   Q.   Okay.  And it was your understanding that the way that that

15   was originally drafted, the no-shop provision remained in

16   effect until there was a Sale Procedures Order, isn't that

17   correct?

18   A.   It is.

19   Q.   And the Sale Procedures Order could have not been entered

20   by this Court until as late as August 27th, 2004, isn't that

21   correct?

22   A.   It could have been entered later.

23   Q.   Well, but the Agreement provides, does it not, that the

24   Sale Procedures Order as a condition to the enforceability of

25   the contract had to be entered by August 27th?

1  A.   Yes.

2  Q.   And the Asset Protection Agreement also provided that the

3  Sale Order approving the sale had to be entered no later than

4  September 30th, 2004, is that correct?

5  A.   The Asset Purchase Agreement --

6  Q.   Yes.

7  A.   -- provided that, yes.

8  Q.   So at the time of the filing of the bankruptcy, it was

9  conceivable that the Debtor was going to pay approximately

10 4.25% to Presstek as a break-up fee for the opportunity to

11 market this business from August 27th to approximately

12 September 30th, 2004?  Is that what the Asset -- the Asset

13 Purchase Agreement had originally provided for?

14 A.   Could you state a question that -- I'm not sure what I'm

15 being asked.

16 Q.   So when the Asset Purchase Agreement was signed --

17         THE COURT:  Mr. Mason, I'm going to ask you to stay

18 behind the lectern --

19    •    MR. MASON:  Sorry.

20         THE COURT:  -- for two reasons.  Number one, we

21 have -- no, three reasons.  Number one, it's the way we do

22 things here.  Number two, we have a digital recording we're

23 making and it goes in and out if you stray from the microphone.

24 And number three, we have a large number of people on the

25 telephone who are listening to your questions that way.  So I

B-0443

Pollack - Cross                                    170

1   ask all counsel to plant your feet and speak into the

2   microphone.  Thank you.

3            MR. MASON:  Thank you, Judge.

4   BY MR. MASON:

5   Q.  Mr. Pollack, when the Asset Purchase Agreement was

6   originally signed and presented to the Court, isn't it true

7   that A.B. Dick was prepared to pay approximately 4.25% of the

8   purchase price for the opportunity to possibly market the

9   business only from August 27th, 2004, the deadline for the Sale

10  Procedures Order, to sometime before September 30th, 2004, the

11  deadline for the Sale Approval Order?

12  A.  Those were the two deadlines.

13  Q.  Thank you.  Now, if Presstek walks away and defaults under

14  the Asset Protection Agreement, all the estate can recover from

15  Presstek is $2 million, is that right?

16  A.  The Asset Purchase Agreement?

17  Q.  Yes.

18  A.  I believe that is the liquidated damages for walking away.

19  Q.  Okay.

20           THE COURT:  And you need to speak up, too, Mr.

21  Pollack.

22           MR. POLLACK:  Sure.

23  BY MR. MASON:

24  Q.  And has that $2 million been given to A.B. Dick yet?

25  A.  My understanding is it's to be delivered upon the entry of

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-929-0191*

B-0444

1  a procedures order.

2  Q.  So you don't have it yet?

3  A.  I would never have it, and I don't believe the company has

4  it either.

5  Q.  Okay.  Now, you don't profess to know the value of A.B.

6  Dick's assets that would be sold under the Asset Protection

7  Agreement, do you?

8          THE COURT:  Asset Purchase Agreement.

9          MR. MASON:  I'm sorry, Asset Purchase Agreement.

10          THE COURT:  Do you have a sideline in Cayman Islands

11  work or something?

12      (Laughter)

13          THE COURT:  Mr. -- excuse me, I --

14          MR. MASON:  I have something else on my mind.

15          THE COURT:  I thought at 4 o'clock in the afternoon it

16  was time to lighten things up a little bit.  Okay, go ahead Mr.

17  Mason, I'm sorry.

18          MR. MASON:  Thank you.

19          THE COURT:  I think the record needs to be clear that

20  you're talking about the Asset Purchase Agreement.

21  BY MR. MASON:

22  Q.  Mr. Pollack, can we call the Asset Purchase Agreement the

23  APA?

24  A.  We can.

25  Q.  Okay.  And will you understand what I'm talking about?

Pollack - Cross                                172

1   A.  I will.

2   Q.  That's the agreement between Presstek and A.B. Dick that's

3   now before the Court?

4   A.  Yes.

5   Q.  All right.  Now, you don't profess, do you, to know the

6   value of the assets to be sold to Presstek under the APA, do

7   you?

8   A.  Do I know -- can you be clearer about that question -- what

9   --

10  Q.  Do you --

11  A.  I don't understand the question.

12  Q.  Do you claim to know the value of the assets that are to be

13  sold to Presstek or its affiliate under the APA?

14  A.  I know the purchase price which I believe sets the bottom

15  for the value of those assets.

16  Q.  But I'm asking you whether you know the value or profess to

17  know the value of those assets?

18  A.  I know the accounting value of the assets.  I know the sale

19  value of the assets given the APA.  I'm not sure how I could

20  know the ultimate value until the end of the auction when such

21  value is realized.

22  Q.  All right, but you haven't conducted a fair market value

23  analysis of the assets to be sold under the APA, have you?

24  A.  Correct.

25  Q.  Now, in investigating A.B. Dick's affairs, you did learn,

1  didn't you, that Presstek had made an offer to purchase A.B.'s

2  stock as recently as maybe the late spring or early summer of

3  2004? Isn't that correct?

4  A. I knew there were ongoing negotiations, yes.

5  Q. Did you not investigate whether there was, in fact, an

6  offer made by Presstek?

7  A. Could you define an offer?

8  Q. A written offer to purchase the assets.

9  A. I investigated and understood that there were ongoing

10  negotiations between the parties which resulted in a document

11  that was never executed. By all parties. But I was not

12  focused on that pre-petition activity so I was focused on what

13  I was retained to do.

14  Q. You didn't think that considering that transaction was

15  important for you to determine what the value of these assets

16  was?

17  A. I knew what prior offers were from other parties.

18  Q. I'm asking you whether you knew -- do you know as you sit

19  here now how much Presstek had offered to purchase the assets

20  of A.B. Dick in the spring and summer of 2004?

21  A. I heard testimony that there was discussions of -- I

22  believe it was 40 million in the combination of stock and cash

23  plus the assumption of certain liabilities.

24  Q. But this is the first time you ever heard any discussion on

25  this?

Pollack - Cross                               174

1    A.   No, I have heard discussion.

2    Q.   All right.   Now, before the bankruptcy case was filed, you

3    contemplated that you would have approximately 90 days to

4    complete the sale from the beginning of your retention to the

5    time of the sale?

6    A.   I think it was about 75 to 80 days, yes.

7    Q.   You told us in your deposition 90 days, didn't you?

8    A.   I don't recall.

9    Q.   Is it possible you said 90 days?

10   A.   It certainly is.

11   Q.   And at the time of the filing of the Chapter 11, you

12   thought you would have the sales book available within a couple

13   of weeks, didn't you?

14   A.   I did.

15   Q.   Okay.   And the sales book, the memorandum -- this is the

16   book that you turn over to potential purchasers of the assets

17   who have signed some kind of confidentiality agreement, is that

18   right?

19   A.   It is.

20   Q.   Have you finished that sales book yet?

21   A.   Yes.

22   Q.   And when did you first finish it?

23   A.   Last week.

24   Q.   All right, and is it in final form now?

25   A.   It is.

B-0448

1    Q.  On what day last week did you finish it?

2    A.  I don't recall.

3    Q.  Have you sent a copy to the Committee?

4    A.  I believe Jeffrey's received a copy.  I believe the

5    Committee received a copy, and I believe that you all have

6    access to the online data room.  And my understanding is that

7    it's posted there.

8    Q.  It's in final format?

9    A.  It may be modified later.  It's in a form we are confident

10   today to release to parties.  So it has been released.

11   Q.  Has it been released to anybody yet?

12   A.  Yes.

13   Q.  When was it first released?

14   A.  Last week.

15   Q.  You testified at your deposition, didn't you, that in your

16   opinion in order to maximize the value of assets, the sale

17   should be scheduled sometime between September 30th and

18   November 29th, wasn't that your testimony?

19   A.  I believe my testimony was 6 to 10 weeks from today.

20   Q.  Didn't you say in your deposition that you thought that the

21   optimal time was sometime after September 30th and sometime

22   before November 29th?

23   A.  I believe I did.

24   Q.  You contacted a number of foreign purchasers, haven't you?

25   A.  Yes we have.

1  Q.  And some of them have shown an interest in possibly making

2  a bid for A.B. Dick, haven't they?

3  A.  They've shown an interest.  I wouldn't go so far as to

4  making a bid.

5  Q.  Now, isn't it possible, based on your experience, that a

6  foreign buyer may need more time to conduct due diligence

7  before making an offer to buy a U.S. based business?

8  A.  It's my experience that foreign buyers have more difficult

9  travel schedules and have a -- often times have a different

10 corporate approval process.

11 Q.  And how many different locations does A.B. Dick have?

12 A.  Two primary.

13 Q.  And where are they?

14 A.  Rochester and Niles.

15 Q.  What other locations does it have?

16 A.  There's a list in the book.  I'd be happy --

17 Q.  Approximately how many different locations?

18 A.  I think there are some sales offices, one or two, and

19 there's a distribution center, which I consider part of

20 Niles -- near Niles.

21 Q.  So there are two locations in or about Niles?

22 A.  I'm happy to look at the book, allowed to refresh my

23 memory, and give you a specific answer.

24 Q.  So you don't recall at this point?

25 A.  I do not.

B-0450

Pollack - Cross                    177

1  Q.  And Rochester is in Rochester, New York?

2  A.  It is.

3  Q.  Did you recommend to A.B. Dick management that they give

4  Presstek the bid protection it gained in the APA?

5  A.  I discussed my opinion with the Board.

6  Q.  I'm asking you whether you recommended that they accept the

7  bid protection that was offered by Presstek in the APA.

8  A.  I recommended that to the Board, given the facts and

9  circumstances, as I've already testified to today.

10  Q.  Okay.  And the Board -- is that the Board of A.B. Dick?

11  A.  Both Boards.

12  Q.  Who is on the Board of A.B. Dick?

13  A.  James Wert.

14  Q.  Is there anybody else?

15  A.  Not to my knowledge.

16  Q.  Okay.  Would you agree that it would not make sense to

17  provide bid protection to a purchaser who does not have a

18  legally enforceable obligation to purchase assets?

19  •       THE COURT:  I'm sorry, Counsel, will you restate the

20  question.

21  BY MR. MASON:

22  Q.  Would you agree, Mr. Pollack, that it would not make sense

23  to provide bid protection to a purchaser who does not have a

24  legally enforceable obligation to purchase assets?

25  A.  The -- that would depend on the facts and circumstances

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B-0451

1   required -- related to the enforceability.  If it's absolutely

2   unenforceable in an expression of interest or an offer I would

3   wholeheartedly agree.

4   Q.  Are you familiar with paragraph 10 of the APA?

5   A.  I have read it.

6   Q.  Do you have a copy there?

7   A.  I do.

8   Q.  If I could turn your attention to it.  That's on page 46 of

9   the APA.

10  A.  Yes.

11  Q.  Do you see there are 13 different conditions --

12  A.  Yes.

13  Q.  -- 13 different numbered paragraphs?

14  A.  Yes.

15  Q.  All right, now just directing your attention to paragraph

16  10.1 on page 46, do you see there that the obligations of the

17  purchaser are dependant upon the accuracy of representations

18  and warranties?  Do you see that?

19  A.  I see the paragraph.

20  Q.  But you understand that if any one of those representations

21  or warranties proves to be untrue in any material respect, the

22  purchaser has the right to cancel the contract without any

23  liabilities to the estate?  Is that your understanding?

24  A.  That would be my understanding.

25  Q.  Now, 10.1 refers us back to paragraph 3.  Do you see that?

1  Paragraph 3 starts on page 16.

2  A.  Yes.

3  Q.  See that?  And it goes to page 33; 17 pages.  Do you see

4  that?

5  A.  I do.

6  Q.  Do you see the 28 paragraphs of representations and

7  warranties on those 17 pages?

8  A.  I do.

9  Q.  In all your years in as a bankruptcy professional have you

10  ever seen a Section 363 Asset Sale that had so many

11  representations and warranties?

12  A.  I have seen them, especially when there are assets not

13  inside of the estate that are being sold as well.

14  Q.  Now, between the time of your engagement with A.B. Dick and

15  today, what effort have you made to determine of these 17 pages

16  of representations and warranties are true and will remain true

17  up to the time of closing?

18  A.  I have focused my attention on the financial conditions

19  contained in the APA.  And I have, I think, been fairly

20  specific in my testimony today about the efforts to negotiate

21  and the success in negotiating the modifications to both the

22  APA and the DIP agreement with respect to the financial

23  conditions.

24  Q.  And the financial conditions are not contained in paragraph

25  3 of the APA, are they?

B-0453

1  A.  I think they're referenced in another paragraph.

2  Q.  They're referenced in paragraph 10.12, are they not?

3  A.  They are.

4  Q.  So your focus has not been on the 17 pages of

5  representations and warranties in paragraph 3, is that your

6  testimony?

7  A.  It is.

8  Q.  As you sit here today, then, what assurance can you give to

9  the Committee, to MHR, to the other Creditors of the estate and

10 to this Court that these representations are currently true and

11 that they will remain true up to the time of the closing?

12 A.  I can't speak to that.

13 Q.  Thank you.  Now, some of these representations and

14 warranties, in my experience, are somewhat unusual.  I just

15 want to direct your attention to paragraph 3.12 on page 20.  Do

16 you see sub-paragraph A?

17 A.  I do.

18 Q.  "Seller and each subsidiary of seller has timely filed all

19 material Federal, State, Local and Foreign returns," and so

20 forth.  What investigation have you done to make certain that

21 all these tax returns have been filed?

22 A.  I don't believe that was my responsibility.  I've made no

23 investigation.

24 Q.  Okay.  And I'd also like you to turn your attention to

25 paragraph 3.14 on page 22.  And I'm looking specifically, for

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*