Pollack - Cross                                  181

1  instance, at 13.14(A) sub 2.  "To the sellers knowledge, except

2  as set forth in section 3.14 of the seller disclosure schedule,

3  since the base balance sheet date, there has not been with

4  respect to seller or any subsidiary of seller (little 2) any

5  encumbrance placed on any of the properties of seller or any

6  subsidiary except permitted encumbrances."  See that?

7  A.  I do.

8  Q.  Now, isn't the sale supposed to be free and clear of all

9  liens and encumbrances?

10 A.  It is.

11 Q.  Can you imagine how Presstek would be injured if it turned

12 out that there was some undisclosed lien?

13     MR. GLEASON:  Your Honor, I think that calls for

14 speculation.

15 A.  I'm not a lawyer.

16     THE COURT:  Overruled.

17 A.  I'm not a lawyer.  I can't speak to what liens might

18 interfere that the Court has or doesn't have jurisdiction over,

19 what liens might be in foreign assets they're being sold that

20 are not party to this proceeding.  I can't speculate on that.

21 Is it not -- one question though, is it not subject to a

22 materiality clause?

23     MR. MASON:  Your Honor, I move to strike the witnesses

24 testimony on the grounds that there was no question.

25     THE COURT:  Granted.

1   than that which it can use to borrow money, buy inventory, and

2   include in its inventory and meet the calculation.

3   Q.  So it's your view -- well, let's take a look at the section

4   titled Combined U.S. and Canada under Working Capital Closing

5   Covenants.

6   A.  Yes.

7   Q.  Do you see that?

8   A.  I do.

9   Q.  That's the second to last at the bottom in bold title,

10  Combined U.S. and Canada?

11  A.  I see it.

12  Q.  And that shows, does it not, that in August and September

13  A.B. Dick is not going to make the working capital closing

14  covenants, does it not?

15  A.  It does -- well, no, it shows that under this analysis that

16  the forecast from operations would require the Debtor to borrow

17  $436,000 more on its line, buy inventory, and include that

18  inventory in its calculation to meet the test.  That's what it

19  shows to me.

20  Q.  All right, and how about in September?

21  A.  I'm sorry, that was September.  I apologize.  That was --

22  September 30th is the last date out here.  And if you look

23  where you pointed me to, Combined U.S. and Canada, you look at

24  the covenant line, it's a test of $22.7 million.  Tt shows here

25  that we would be -- that the Debtors would be $436,000 short,

1  BY MR. MASON:

2  Q.  Now, Mr. Pollack, turning your attention back to paragraph

3  10, page 46 at 10.2, do you see how there the enforceability of

4  the agreement against Presstek is subject to certain covenants

5  described in 10.2?

6  A.  It says, "Seller shall have performed and complied in all

7  material respects with all the covenants contained in Article 5

8  on or before the closing date, and Platinum shall have received

9  a certificate to such effect executed on behalf of seller by

10 the President, Chief Executive Officer, or Chief Financial

11 Officer of seller."

12 Q.  So it's your understanding that Presstek's obligations

13 under the APA are conditioned upon the performance of these

14 covenants in paragraph 5?

15 A.  In all material respects.

16 Q.  And -- now let's go back to paragraph 5, beginning on page

17 34, going on 5 pages to paragraph 38.  Do you see those 12

18 covenants?

19 A.  Uhm-hum.  Yes.

20 Q.  Now, between the time that you wee retained and today, what

21 efforts have you made to make certain that those covenants will

22 be complied with continuously from the time of the -- from

23 today up to the time of closing?

24 A.  With respect to 5.2, conduct of business, I have spent

25 quite a bit of time assisting the Debtors in negotiating with

1    its vendor base and with its lenders to allow it to conduct its

2    business in a fashion that would allow it to meet this.  And I

3    believe, given the concessions made today, have achieved a

4    basis for the Debtor to go forward and do that.

5    Q.   Okay, so that covers one of the, I believe, 12 paragraphs.

6    Mr. Pollack, as you sit here today, what assurance can you give

7    the Committee, MHR and the other Creditors of this estate and

8    the Court that these covenants contained in paragraph 5 of the

9    APA will be met and kept up to the time of the closing?

10   A.   I can give no assurance.

11   Q.   Thank you.  Now, I'd like to send you back to paragraph 10

12   of the APA and have you focus on paragraph 10.12, one of the

13   other conditions on which you earlier testified about.  And I

14   think we have generally referred to 10.12 as the working

15   capital condition.  See that on page 47?

16   A.   I do.

17   Q.   Now, I believe it was your testimony on direct examination

18   that with the $2 million concession given by Presstek that it

19   was your view that this condition will be met and will not

20   prevent the enforcement of the APA?

21   A.   I think my testimony was with the $2 million concession and

22   the $2½ million concession in the APA, based on the company's

23   forecast, it would be able to -- and its current operations, it

24   would be able to meet that test.

25   Q.   You said the $2½ million in the APA, did you mean the $2½

Pollack - Cross                    184

1  million --

2  A.  I'm sorry.

3  Q.  -- concession in the Debtor-In-Possession --

4  A.  I did, I'm sorry.

5  Q.  -- lending arrangement.

6  A.  2 million in the APA, 2½ million in the DIP.

7  Q.  Now, I'd like to turn you back to A.B. Dick Exhibit-1 --

8  A.  Yes.

9  Q.  -- which is titled (indiscern.) corporate holdings in

10 August 2004 forecast.

11 A.  Yes.

12     (Debtor's Exhibit-1 previously marked for identification)

13 Q.  You've made reference to that.  Did you assist in the

14 preparation of this?

15 A.  No.  In the revisions -- in the revised documents, no.

16 Q.  But I'm asking you whether you assisted in the preparation

17 of this Exhibit --

18 A.  No.

19 Q.  -- the projections and --

20 A.  The original ones, not these.

21 Q.  Okay.  And is it your understanding that these, that is

22 A.B. Dick Exhibit Number 1, is based in part on the earlier

23 version of this that you worked on?

24 A.  Yes.

25 Q.  I'd like you to go to the fourth page.  Do you see that,

B-0459

Pollack - Cross                                185

1  it's sort of an up-and-down page?

2  A.  Yes.

3  Q.  And it's titled Asset Purchase Agreement Covenant Review?

4  A.  Yes.

5  Q.  Do you see that?

6  A.  Yes.

7  Q.  Did you work on this?

8  A.  No.

9  Q.  Do you have any reason to believe this is inaccurate?

10  A.  No, but I would like to explain the meaning of it as I see

11  it.

12  Q.  Okay.

13  A.  This page analyzes the Debtor's projections as they are.

14  And to analyze -- in my view, to analyze whether or not the

15  Debtor will be able to meet the tests, one has to look at both

16  the result of this analysis and the available credit under the

17  DIP at the same timeframe.  And so the reason I say that is

18  that the Debtor has the right to buy inventory so long as it

19  has available funds and use that inventory to include it in

20  this calculation so that it can make this calculation.  So if

21  you were to look at the, for instance, the September

22  calculation, you'll see the working capital closing covenant.

23  And you look under covenant, cushion and deficit and you'll see

24  it's short $317,000.  You can then look on one of the other

25  pages and you will see that the Debtor has availability greater

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0460

Pollack - Cross                                    187

1  and if you turn one page back on the third page, there is no

2  line for September 30th, but if you look at the week ending

3  October 2nd and you go all the way down to the bottom, there's

4  as forecast of $973,000 of funds available to borrow.  And so

5  it could borrow the $460,000, buy inventory, include the

6  inventory in the test and meet the test, and still have some

7  small amount of room on its line.  It never has a large amount

8  of room.

9  Q.  And where in the budget that's approved under the Debtor-

10  In-Possession arrangement does the company have the right to

11  spend that money?

12  A.  It's allowed to -- under the DIP budget it's allowed on a

13  cumulative basis to make the total of all these -- the total

14  disbursements included in the DIP budget.

15  Q.  But can you show me where either in Exhibit-1 or in any

16  other document that the Debtor has the power to --

17  A.  Buy inventory?

18  Q.  -- make those expenditures?

19  A.  To buy inventory?

20  Q.  Yes.

21  A.  Sure, in the -- on the third page -- do you have the

22  original forecast?

23  Q.  Yes.

24  A.  Okay, I believe it doesn't go -- it only goes through some

25  date in September, I think.  Or maybe October 15th.  But you'll

B-0461

Pollack - Cross                           188

1  see there's a line under operating disbursements for inventory.
2  The Debtor can buy inventory there, and actually the Debtor can
3  use -- my understanding of the DIP arrangement is the Debtor
4  can use its full allocation of disbursements on a cumulative
5  basis at any time for reasonable business purposes. And buying
6  inventory is a -- you know, my understanding would be a
7  reasonable business purpose.
8  Q.  So it's your understanding that the budget permits the
9  Debtor to borrow all the way -- borrow it's entire line of
10 credit if it sees fit in a particular month?
11 A.  No.  My understanding of the DIP arrangement is that the
12 borrowings are limited to $7 million coupled with specific over
13 advance allowances.  And in this case, on the week ending
14 October 2nd, the adjusted over advance allowance provides room
15 of $973,000.  So there's $973,000 that the Debtor is allowed to
16 spend.  And that's you know -- buying inventory would be an
17 acceptable -- and in fact, it could buy the inventory today,
18 $463,000, have the inventory there on September 30th and meet
19 the covenant.  It's a timing activity as to when the inventory
20 is purchased.  Furthermore, if the inventory that's pre-paid
21 comes in earlier, then there's even more room on the DIP line
22 because inventory advances are only -- only provide 60% -- the
23 ratio to actual dollars spent to collateral available to borrow
24 on is 60%.  And at October 2nd, there is $1.8 million of pre-
25 paid inventory.  So actually it's -- that material likely will

1  not be here.  But if it were here, approximately $750,000 in

2  additional funds would be available to the Debtors.  But

3  because of the requirement, primarily Mitsubishi, it's limited.

4          MR. MASON:  Your Honor, if I could just have one

5  minute please.

6      (Pause in proceedings)

7  BY MR. MASON:

8  Q.  All right, Mr. Pollack now again directing you attention to

9  the fourth page of Exhibit-1, A.B. Dick Exhibit-1.  Do you see

10 the emboldened title U.K.?

11 A.  I do.

12 Q.  And do you see that there's a negative percentage along the

13 side the percent cushion/deficit --

14 A.  I do.

15 Q.  -- for U.K.?

16 A.  I do.

17 Q.  I have no further questions about that.  Now taking --

18 drawing your attention back to paragraph 10 of the APA.

19    *  (Witness locates document)

20 Q.  And directing your attention to paragraph 10.3 on page 46,

21 do you see that?

22 A.  I do.

23 Q.  There's a condition related to the absence of a material

24 adverse effect, do you see that?

25 A.  I do.

1  Q.  All right.  And material adverse effect is described on

2  page 70 of the APA, isn't it?

3  A.  It is.

4  Q.  And the material adverse effect focuses primarily on the

5  timing of shipments, does it not?

6  A.  (No verbal response).

7  Q.  The timing and the amount of shipments on a monthly basis?

8  A.  Sales.

9  Q.  I'm sorry, sales.

10  A.  Yes.

11  Q.  Now, suppose a shipment of approximately $2 million of

12  product scheduled for August 31st were to slip by a day and not

13  be sent until September, and everything else was the same as

14  projected, would the Debtors miss this test?

15  A.  Could you repeat that question?

16  Q.  Suppose a shipment of $2 million of product scheduled for

17  August 31st were to slip by a day and were not shipped until

18  the next month, isn't it true that the Debtor would miss this

19  particular test, this material adverse effect test?

20  A.  No, it depends on the amount of sales that had occurred in

21  the month up until that point.

22  Q.  And how do you define sales?

23  A.  Sales are the recording of revenue.

24  Q.  So if you write up a sale in a month but you don't ship it

25  for a couple of months, it's still included in the sales on the

1  material adverse effect is your understanding (indiscern.)?

2  A.  That wasn't what I said.  What I said was it depends on the

3  volume of -- the question I heard was if $2 million scheduled

4  to be sold on the last day of the month went to the next day of

5  the month, would they miss the test.  My response is that

6  depends on the volume of revenue the company had experienced

7  prior to the last day of the month.

8  Q.  If as a result of the timing of a shipment you did not meet

9  the shipping or sales revenue under the material adverse effect

10 clause, is that a conceivable means for Presstek to back out of

11 the agreement?

12 A.  My understanding is if we don't -- if the Debtors do not

13 achieve these revenue targets, Presstek is not obligated to

14 close.

15 Q.  And that's regardless of whether you exceed the sales

16 revenues, say in September, but fall short of them in August?

17 A.  That's correct.

18 Q.  Even though on a combined basis, the average sales revenues

19 would be greater than or equal to the levels required by

20 material adverse effect?

21 A.  Correct.

22 Q.  Thank you.  Now, there was some testimony about the razor

23 and the razor blade.  You've been involved in this business

24 since the middle of June, is that what you said?

25 A.  No.

1  Q.  Okay.  How long -- how many weeks have you actually worked

2  for this business?

3  A.  I was first involved with these businesses personally in

4  either 1999 or 2000.  The year 2000.  The engagement with

5  respect to the current bankruptcy commenced on June 29th, 2004.

6  Q.  All right, is it your testimony that it's impossible to

7  split up the divisions or the functions of this business

8  because of the so-called razor and razor blade effect, as you

9  described in your direct testimony?

10  A.  No, I don't believe I said that.

11  Q.  So it's conceivable that this business could be broken up

12  into different parts, some of which are profitable and some of

13  which are not?

14  A.  That's my view.

15  Q.  And when you worked up the offering memorandum, you

16  actually came to the conclusion that two out of the three

17  divisions have a positive EBITDA, E-B-I-T-D-A, of approximately

18  $14 million a year?

19  A.  That's not true.

20  Q.  Okay.  How much did they have for the last year?

21  A.  Well, I didn't come up with anything.

22  Q.  Okay.

23  A.  We asked the company to prepare an analysis of the business

24  lines and what their operating results would be.  The company

25  made certain assumptions and delivered that to us and we have

B-0466

1   included that in the Selling Memorandum because we believe it's

2   important -- very important information for prospective buyers

3   to understand.

4   Q.  And what was the company's projection as to the EBITDA for

5   the two profitable divisions?

6   A.  I would need the book to refresh my memory.

7   Q.  Do you have a book here in the Courtroom?

8   A.  I have a draft.  I might have a copy, yes.

9   Q.  I wonder if you could take it and see if it refreshes your

10  recollections of the answer.

11         THE COURT:  It's all right.

12  A.  Yeah, we could that.

13         MR. MASON:  Thank you, Your Honor.

14     (Witness reviews document)

15         MR. MASON:  Your Honor, perhaps this would be a good

16  time to take a short break.

17  A.  I found it.

18         THE COURT:  Well, we are going to take a break soon

19  here.

20         MR. MASON:  I would like a chance to look at it as

21  well.

22         THE COURT:  All right, how much more do you have here,

23  Counsel?

24         MR. MASON:  I would say about 3 or 4 minutes, Judge.

25         THE COURT:  And then we're going to have some -- do we

1   have anybody else who wants to cross examine?

2          MR. SELBST:  I will want to discuss the (indiscern.),

3   Your Honor.

4          THE COURT:  And how much time do you thing you're

5   going to take?

6          MR. SELBST:  My question will be very short.

7          THE COURT:  Then will we have any redirect?

8          MR. GLEASON:  Just about 5 minutes at most.

9          MR. LEPENE:  Your Honor, I will have just a couple of

10  questions.

11         THE COURT:  And then what about further witnesses.

12         MR. GLEASON:  From the Debtor's standpoint, that is

13  all of our witnesses, Your Honor.  And we'd just move for the

14  admission of our exhibits.

15         THE COURT:  What about from the other parties?

16         MR. MASON:  Judge, we have one witness.

17         THE COURT:  All right, is that all we have then is we

18  have the remainder of this witness and then one more witness?

19  Okay, we'll take a 10 minute break until 10 minutes to 5.

20  Everybody stretch their legs and let Mr. Mason look at that.

21  Let everybody focus of the goal line.

22      (Court in recess)

23         THE COURT:  Be seated.  All right, Mr. Mason, are we

24  ready here?

25         MR. MASON:  Yes I am, Judge.  Judge, the witness is

Pollack - Cross                                         195

1  going to use a confidential memorandum to refresh his

2  recollection, and I think you've already heard testimony that

3  this memorandum's only (indiscern.) the parties who've signed

4  the confidentiality agreement, so in order to maintain the

5  confidentiality of this I don't intend to mark this document as

6  an exhibit or anything like that.  But it will be used to

7  refresh the recollection.

8                CROSS EXAMINATION - (CONT'D)

9  BY MR. MASON:

10 Q.  Mr. Pollack, does that memorandum refresh your recollection

11 so that you can answer my question about what the proposed or

12 EBITDA or forecasted EBITDA for 2004 is for the three parts of

13 the A.B. Dick business?

14 A.  It does.

15 Q.  Okay.  And what are those three parts?

16 A.  Supplies business for 2004 is projected at 4.6 million,

17 service and parts is projected at 7.8 million, and the

18 equipment business is projected to have a loss of 13.3 million.

19 Q.  So if we look at sales and -- sale of supplies and service,

20 the so-called EBITDA would be just under $12½ million annually?

21 A.  Approximately, yes.

22 Q.  And isn't it true that purchasers of businesses ordinarily

23 fashion their offers based on some multiple of EBITDA?

24 A.  Very often.

25 Q.  And as I understand it, in addition to the EBITDA

B-0469

1  opportunities, the opportunities to acquire the EBITDA and

2  acquire the A.B. Dick business (indiscern.) inventory,

3  intellectual property rights, equipment and other tangible

4  assets, is that correct?

5  A.  If they bought all of the assets.

6  Q.  Just one more brief line of questioning, Mr. Pollack.  In

7  negotiating bid protections, wouldn't you agree that the

8  reasonableness of a break-up fee is dependant upon how high the

9  price is in the proposed contract?

10  A.  Could you repeat that?

11  Q.  Yeah.  In fashioning or in negotiating or agreeing to a

12  break-up fee, wouldn't you say that the amount of the offer

13  that would be rewarded with the break-up fee should be to some

14  extent dependant upon the amount of the offer?

15        THE COURT:  You mean the amount of the break-up fee

16  should be dependant upon the amount of the offer?

17        MR. MASON:  Exactly.  Thank you, Judge.

18  A.  Since they're typically and often expressed and negotiated

19  as a percentage of the purchase price, I would say yes.

20  BY MR. MASON:

21  Q.  But if the offer that came from the stalking horse was far

22  below what you believe to be the fair market value of the

23  assets, would you be inclined to give a greater break-up fee or

24  a lesser break-up fee?  All other things being equal.

25  A.  I would think that I wouldn't give anything, but you would

1   negotiate for a break-up fee that would be consistent with the

2   market, which is 2 to 3% expressed -- which is an amount

3   expressed as 2 to 3% of the purchase price without judgment as

4   to whether it's small or large.

5   Q.  So your testimony is that you would give a break-up fee for

6   any kind of an offer, but you'd only give it as a percentage of

7   the amount of the offer?

8   A.  No.  You asked me what I would negotiate for, at least

9   that's what I understood the question to be.  Maybe you should

10  ask it again.

11  Q.  My question is, is the reasonableness of the break-up fee,

12  the amount of the break-up fee, dependant upon the

13  reasonableness of the amount of the offer for the purchase

14  price -- for the purchased assets?

15  A.  It would be my opinion that if a Debtor is willing to

16  accept a stalking horse bid, the Debtor then believes that that

17  stalking horse bid provides some level of value to the estate.

18  Either it's a high bid, better than they could do elsewhere,

19  it's a bid significant enough to sustain the going concern

20  value, or that stalking horse bid provides some value to the

21  estate.  Given that the typical break-up fee is expressed as a

22  percentage of the bid price, I think that the break-up fee that

23  results is -- after the application of the percentages to the

24  price being paid is a reasonable way of developing an

25  appropriate amount.

1  Q.  So you think a break-up fee should be reward -- should be

2  awarded if it's reasonable?

3  A.  Correct.

4  Q.  Okay.  Now, do you think that the reasonableness of the

5  amount of the break-up fee should be dependant on the length of

6  time that the offer from a stalking horse remains open?

7  A.  Remains open after an auction?

8  Q.  No, remains open from the time of the execution of the

9  Asset Purchase Agreement to the time of closing.

10 A.  I think it's all relative to the specific facts and

11 circumstances.  I've been involved in transactions with break-

12 up fees that have had short gestation periods and some with

13 very long.

14 Q.  Well, for instance, all other things being equal, if the

15 offer was only open for 2 days, would you be inclined to pay a

16 greater or a lesser break-up fee than if the offer remained

17 open for 3 months?

18 A.  I think that the percentage that you would apply might

19 increase if it was 3 months over 2 days, as extreme examples.

20 Q.  All right.  And would you agree that the reasonableness of

21 the amount of the break-up fee should be dependant upon the

22 conditionality of a stalking horse bid?

23 A.  I think if you accept a stalking horse bid, you should

24 accept it -- in my experience, if you're going to negotiate

25 one, you should negotiate one which you believe you can close.

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

B-0472

1  Therefore, the application of the range that we discussed

2  before to the purchase price is an appropriate way of

3  developing that as well.

4  Q.  All right, so what you're saying is you'd pay the same

5  break-up fee regardless of the degree of conditionality of the

6  break-up -- of the stalking horse bid?

7  A.  If -- it's my opinion -- you're asking me my opinion?

8  Q.  Yes.

9  A.  My opinion is if you negotiate a stalking horse bid, it

10 should be one that you expect you can close based on your

11 negotiations and where you are.  To negotiate one you don't

12 believe you can close does not seem to me to be fruitful.

13 Q.  Mr. Pollack, do you think that the amount of the break-up

14 fee should be dependant upon the extent of the liability of the

15 stalking horse under its stalking horse bid?

16 A.  I think all of the elements you're identifying contribute

17 to the analysis of whether or not a break-up fee should be

18 included in a stalking -- in the arrangements related to a

19 stalking horse bid.  So all of the considerations you've

20 identified are ones that one should consider, take into

21 account.  And it still comes down to a range of 2 to 3% of the

22 consideration being an appropriate range, in my experience.

23        MR. MASON:  Judge, I have no further questions.

24        THE COURT:  Okay.  Mr. Selbst.

25             CROSS EXAMINATION

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-529-0191

1    BY MR. SELBST:

2    Q.  Good afternoon, Mr. Pollack.

3    A.  Good afternoon.

4    Q.  In the negotiation, to the extent that you were involved

5    with Presstek in the Debtors and in management, did Presstek

6    offer at any time any consideration to any member -- to any of

7    the old equity holders in these companies or to any employees,

8    senior management, for example?

9    A.  Not to my knowledge.

10   Q.  And you've testified that you have extensive experience in

11   negotiating 363 sales and in other transactions.   In your

12   experience, were the Debtors represented by experienced

13   counsel?

14   A.  Yes.

15   Q.  In your experience, were these negotiations over the terms

16   of the APA and over the bidding procedures, were they the

17   result of arm's length negotiations?

18   A.  Yes.

19   Q.  Now, we've heard a lot of testimony, partly from you,

20   partly from Mr. Knipp, about concessions that were made by

21   Presstek and by Key Bank to resolve some of the various

22   objections that were raised to the bidding procedures and to

23   the DIP.  And you have testified and Mr. Knipp has testified

24   about the changes in the DIP and the changes in the APA and the

25   changes to the bid procedures.  In exchange for all of these

1  various and sundry concessions, did Presstek ask or receive

2  anything in exchange or in consideration?

3  A.  No, not to my knowledge.

4  Q.  Now, Mr. Mason just spend a fair amount of time talking

5  with you about the conditionality of the book, as he referred

6  to as the agreement.  And I believe you testified that in your

7  experience, the (indiscern.) and the warranties were within

8  normal range of what is negotiated between a buyer and a

9  seller, is that correct?

10  A.  Yes.

11  Q.  I want to talk a little bit about the break-up fee again.

12  Is it your understanding that Presstek gets the break-up fee if

13  it terminates the agreement because various conditions are not

14  satisfied?

15  A.  No.

16  Q.  What are the conditions under which Presstek gets the

17  break-up fee, Mr. Pollack?

18  A.  My understanding is if the Debtor proposes a plan whose

19  value exceeds their offer within 6 months, Presstek is entitled

20  to receive their break-up fee.  If the auction is held and

21  Presstek is not the winning bidder and the company closes, the

22  estate closes with some other bidder, they are entitled to the

23  break-up fee, and if no auction is held and the assets are sold

24  to some other party within 6 months, they're entitled to the

25  break-up fee.

1  Q.  I want to make sure I got that right.  So if Presstek

2  simply says G company didn't make the sales targets, you didn't

3  make the working capital targets, Presstek doesn't get the

4  break-up fee, does it?

5  A.  That's my understanding.

6  Q.  Now, you've testified the Presstek has been involved in

7  negotiations with the company since December of '03, is that

8  correct?

9  A.  Mr. Knipp did.

10 Q.  I thought you said you also had knowledge of that.

11 A.  Actually, my understanding was they sent a letter of

12 interest in the summer of 2003.

13 Q.  Okay.  Are you aware that Presstek has disclosed publicly

14 that it has spent more than $1.2 million to date on this

15 acquisition?

16 A.  Yes.

17 Q.  Do you know what the source of that disclosure is?

18 A.  Their financial statements.

19 Q.  And where were those financial statements published?

20 A.  They're part of their SEC filings.

21 Q.  Thank you.  And are you aware the Presstek held an analysts

22 call on July 13th about the transaction?

23 A.  I had heard that.

24 Q.  Based on your involvement in negotiations, do you consider

25 Presstek to be a committed buyer?

Pollack - Cross                                    203

1   A.   Yes.

2   Q.   And based on your involvement in these negotiations, in

3   your overall experience of the cases, similar cases, do you

4   consider that Presstek did the stalking horse bid to provide

5   value to this estate?

6   A.   Yes.

7   Q.   Do you consider Presstek (indiscern.) stalking horse bid?

8   A.   Yes.

9   Q.   Taken as a whole, do you think the bidding procedures,

10  including the break-up fees and the expense reimbursements that

11  have been negotiated in this case, are fair?

12  A.   The ones that are on the table today?

13  Q.   Yes.

14  A.   Taken as a whole, I do.

15         MR. SELBST:  I have no further questions, Your Honor.

16         THE COURT:  All right, anybody else?  Okay, yes sir.

17         MR. LEPENE:  Thank you, Your Honor.

18                   CROSS EXAMINATION

19  BY MR. LEPENE:

20  Q.   Mr. Pollack, you testified on direct examination that you

21  were of the view that the Debtor-In-Possession financing being

22  provided would be sufficient to maintain the going concern

23  value if the sale process was concluded on November 15th.

24  A.   As amended, yes.

25  Q.   By November 15th?

B-0477

1   A.  Yeah, if the financing arrangements as amended --

2   Q.  Right.

3   A.  -- yes.

4   Q.  Why, in your view, is it essential that the sale process be

5   concluded by November 15 given the facts and circumstances

6   (indiscern.).

7   A.  I believe Mr. Knipp testified that the company is losing

8   money each month and that's my understanding as well.  It's

9   projected to lose money.  The considerations in a process like

10  this have to include what happens during the marketing period,

11  the pendency of the sale to the employees, vendors and

12  customers.  To the extent the sale becomes an amorphous

13  timeless or extended time period with an uncertain outcome,

14  employees tend to migrate to other positions to ensure their

15  own livelihood.  Customers, to a large degree, consider and

16  sometimes act on their own needs to ensure that their equipment

17  or whatever else will be serviced and maintained and will

18  not -- on a regular basis by reliable vendor so as not to

19  impact their own business.  Buyers as I said before, get tired;

20  after a period of time they want finality as well.  They don't

21  want to wait another week for three more prospective parties.

22  Q.  Are these the factors that cause you to conclude that this

23  company is in a very precarious financial condition at this

24  point?

25  A.  These, coupled with its limited financial ability to

1  sustain its operations.

2          MR. LEPENE:  That's all I have, Your Honor, thank you.

3          MR. GLEASON:  Just a few redirect, Your Honor.

4                  REDIRECT EXAMINATION

5  BY MR. GLEASON:

6  Q.  Mr. Pollack, I want to address a few issues raised by Mr.

7  Mason.  During your exam, Mr. Mason asked a series of questions

8  with respect to the August 27th and September 30th dates

9  contained in the Asset Purchase Agreement.  Do you recall that?

10  A.  Yes.

11  Q.  Now, the bid procedures order could have been entered much

12  earlier than August 27th, isn't that true?

13  A.  Yes.

14          MR. MASON:  Your Honor, I'm going to object.

15          THE COURT:  Overruled.  Let's just get through it.

16  BY MR. GLEASON:

17  Q.  Do you know when the Debtors filed their Bid Procedures

18  Motion?

19  A.  I believe it was within a couple of days of the

20  commencement of the case.

21  Q.  would it surprise you if it was filed the day of the case?

22  A.  No.  That's when I thought, I wasn't certain.

23  Q.  Is it your understanding that the Debtors anticipated the

24  bid procedures would be entered long before August 27th?

25  A.  Yes.  In all of our discussions we had an expectation that

1  those procedures would be entered into relatively quickly

2  allowing for the -- a more fuller time period to market the

3  assets.  And in fact, August 27th, my recollection was

4  discussed as a very outside date to make sure that there was

5  plenty of opportunity to allow for mishaps.  And in -- the

6  eventuality of mishaps resulted in an early negotiation of the

7  no-shop, which resulted in the very same opportunity.

8  Q.  That was my next -- when the Debtors learned that that

9  would not happen by -- not happen as soon as the Debtors

10  originally thought, they negotiated a (indiscern.) no-shot?

11  A.  Correct.

12  Q.  Next, Mr. Mason made that statement the estate was willing

13  to pay Presstek 4.25% so it could market the assets for that

14  period, from August 27th to September 30th.  Do you recall

15  that?

16  A.  Yes.

17  Q.  The Debtors aren't paying for the right to market their

18  assets, are they?

19  A.  No.

20  Q.  Rather, isn't a break-up fee intended to compensate a

21  bidder for its time, expense, and effort in developing an Asset

22  Purchase Agreement, setting a base line by which other bids can

23  be judged?

24  A.  Yes.

25  Q.  Is that what's happened in this case?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  A.  Yes.

2  Q.  Now Mr. Mason asked various questions about the

3  representations and the warranties in the Asset Purchase

4  Agreement.  Do you recall that?

5  A.  Yes.

6  Q.  And I believe you testified earlier that the

7  representations and warranties are common in transactions such

8  as this.

9  A.  Yes.

10 Q.  And in fact, without going through all of the

11 representations and warranties, many of these have a

12 materiality provision attached, do they not?

13 A.  Yes.

14 Q.  And many others are simply confirming the documents

15 provided by the sellers are accurate.

16        MR. MASON:  Judge, I have to object.  This is the most

17 leading direct testimony that I have ever encountered.  I mean,

18 I think -- I understand we want to get through with this, but I

19 believe that the witness should be testifying and Mr. Gleason

20 shouldn't be testifying.

21        MR. GLEASON:  No problem, Your Honor.

22        THE COURT:  Sustained.

23 BY MR. GLEASON:

24 Q.  Mr. Pollack, do you understand -- do you have an

25 understanding of whether some of the representations and

1   warranties relate to lists provided by the Debtors?  Maybe to

2   move through this, let's turn to section 3.18 on page 26.

3   A.  3 -- on what page?

4   Q.  Page 26.

5   A.  Yes.

6   Q.  What is that representation require the Debtors to do?

7   A.  3.18?

8   Q.  Yes.

9   A.  Provide lists of employees, suppliers and customers.

10  Q.  That is totally within the seller's control?

11  A.  It is.  It's a list of the seller's customers, suppliers

12  and employees.

13  Q.  I don't want to spend any more time with that.  You're

14  under -- you're -- again, your belief is that the

15  representations and warranties contained in this Asset Purchase

16  Agreement are standard for these types of transactions?

17  A.  Yes.

18  Q.  With respect to these representations and warranties, Mr.

19  Mason asked what you were going to do to ensure that they were

20  met.  Do you recall that?

21  A.  Yes.

22  Q.  That is not your obligation, is it?

23  A.  No.

24  Q.  Is it your understanding, however, that the representations

25  and warranties were accurate at the time the Asset Purchase

1  Agreement was executed?

2  A.  That's my understanding.

3  Q.  Do you have any reason to believe that the representations

4  and warranties won't be accurate at the time of closing?

5  A.  I do not.

6  Q.  Mr. Mason also talked about the material adverse effect

7  clause.  Does this clause enable the Debtors to manage their

8  business?

9  A.  The clause sets targets that the Debtor can clearly manage

10  to.  I don't believe it facilitates the management of the

11  Debtor, but it does provide specific targets that the Debtor

12  can manage its operations to.  In other words, to successfully

13  meet.

14  Q.  And is that different from other material adverse effect or

15  MAT clauses that you've seen in other agreements?

16  A.  Yes.

17  Q.  Mr. Pollack, in your opinion, does the fact that Presstek

18  is providing Debtor-In-Possession financing, does that fact

19  make it more or less likely that Presstek will close this

20  transaction?

21  A.  To me, that fact represents Presstek's interest in

22  requiring the assets is real and a substantial interest.

23  Q.  And did Presstek (indiscern.) because of alleged violations

24  of the however many pages of representations and warranties --

25  does Presstek get their break-up fee?

1   A.  I don't believe so.

2   Q.  Finally, as you sit here today, do the Debtors believe that

3   they can meet the revenue targets and other requirements

4   contained in the Asset Purchase Agreement and close this

5   transaction?

6   A.  Given the modifications achieved today, they do.

7   Q.  Finally, Mr. Mason talked a lot about the fair market value

8   of the assets.  Mr. Pollack, what is the definition of fair

9   market value?

10  A.  I believe it's what a willing buyer is prepared to pay a

11  willing seller.

12  Q.  As we sit here today, does anyone know what the fair market

13  value of these assets are?

14  A.  I don't believe so.

15  Q.  In your opinion, what is the best way for these Debtors to

16  determine either the fair market value -- which we're in

17  bankruptcy process, we may not be able to satisfy that

18  definition -- but at a minimum, the best value the Debtors can

19  reasonably expect to receive based on the facts and

20  circumstances of these cases?

21  A.  The execution of an appropriate auction process.

22  Q.  And do you believe we have negotiated an effective auction

23  process in these cases?

24  A.  I do, given all the modifications, all the changes that

25  have been represented today.

B-0484

Pollack - Redirect                                211

1          MR. GLEASON:  Thank you, I have nothing further, Your

2    Honor.  (Indiscern.) other than I need to move the admission of

3    our exhibits which are Debtor's Exhibit-1, which is the August

4    forecast which has been identified by Mr. Knipp.  Should I hand

5    them up individually, Your Honor, or do you want me to go

6    through all of them.

7          THE COURT:  Let's go through all of them.

8          MR. GLEASON:  Okay.  Exhibit-2, which is the Asset

9    Purchase Agreement which was also identified by both Mr. Knipp

10   and Mr. Pollack.  And those are the only two at this point,

11   Your Honor.

12         THE COURT:  Any objection?

13         MR. MASON:  No objection, Your Honor.

14         THE COURT:  All right.  It's ordered admitting 1 and 2.

15     (Debtor's Exhibit-1 admitted into evidence)

16     (Debtor's Exhibit-2 admitted into evidence)

17         THE COURT:  I have a couple of questions for the

18   witness before he steps down.

19   BY THE COURT:

20   Q.  Mr. Pollack, tell me again what you think the opening bid

21   is.

22   A.  The first overbid?

23   Q.  No, what their opening bid is.

24   A.  $40 million.

25   Q.  All right.  And what is the amount necessary for an initial

Pollack - Redirect                                    212

1  overbid to be higher and better under the newly renegotiated

2  terms?

3  A.  A bid on the exact same terms on the exact same documents?

4  Q.  Apples and apples.

5  A.  41-9.

6  Q.  So it's a million-nine is the hurdle amount?

7  A.  I believe so, yes.

8  Q.  And at a million-nine, that provides more value to the

9  estate -- excuse me, 41-nine, that provides more value to the

10  estate, even taking into account the payment of the break-up

11  fee?

12  A.  Yes.

13  Q.  And the break-up fee is calculated on what number -- let's

14  just use those numbers.  Let's say what happens is Presstek

15  opens 40 million.  Buyer X comes in and says 41-nine, and

16  Presstek passes.  What -- how would you calculate the break-up

17  fee and expense reimbursement?

18  A.  I would calculate it as a percentage of the total

19  consideration.  You would take 1.2 million plus whater they

20  demonstrate, and I would assume it would be all 500,000.

21  That's 1.7 million divided by --

22  Q.  That's in consideration of what their last bid was, not of

23  what the new bid was, correct?

24  A.  Correct.  That's how it's been calculated.  There --

25  Q.  So it's 1.2 million plus the documented expenses up to

B-0486

1   500,000?

2   A.  Right.

3   Q.  So that would be in this case $1.7 million?

4   A.  Correct.

5   Q.  The 200,000 provides then the incremental amount that makes

6   this is a higher and better bid.

7   A.  Correct.

8   Q.  When was the original no-shop provision to expire?

9   A.  Upon the entry of a Sales Procedures Motion.

10  Q.  Well, let's say the Sales Procedures Motion had been

11  entered as part of the first day orders, would the no-shop have

12  gone into effect at that point?

13  A.  It would have gone away at that point.  It would have -- it

14  terminated with the entry of an order, so it would have -- the

15  marketing process -- the Debtors and we as their agent would

16  have been allowed to have discussions with third parties on the

17  entry of that order.

18  Q.  So the delay and the entry of the bid procedures order also

19  then delayed, shortened, the marketing time until there was a

20  waiver of the no-shop by Presstek?

21  A.  Correct.

22  Q.  Now you indicated in questions from Mr. Selbst that you

23  were aware that Presstek had made public disclosures regarding

24  how much money had actually been spent?

25  A.  Yes.

1    Q.  Do you know from those public disclosures whether there was

2    any allocation made between the first deal and the second deal?

3    A.  I do not know.

4    Q.  Okay, I don't have any other questions.

5        THE COURT:  Anybody have any follow-up questions based

6    upon those?

7        MR. MASON:  If I may, Your Honor.

8                    RECROSS EXAMINATION

9    BY MR. MASON:

10   Q.  Mr. Pollack, the Motion for the sale procedures order was

11   not presented to the Court on the first day of this case or

12   when the first day orders were presented, were they?

13   A.  My testimony was I didn't recall and I think Counsel

14   refreshed my memory and said it was.

15       MR. MASON:  Your Honor, the record -- if they

16   stipulate on this --

17       MR. GLEASON:  It's the filing issue.  They were filed

18   on the first day, we did not make them a first day order.  It

19   was contemplated, though, that we would have a hearing in --

20   later in July, prior to August and have them -- have the bid

21   procedures entered, unfortunately we weren't able to do that.

22       THE COURT:  I'm sure this is a knowable fact.  When I

23   mentioned first day, I was not suggesting that they were

24   presented on the first day.  I was just trying to understand

25   the operation of the agreement.

1          MR. MASON:  The record --

2          THE COURT:  What I don't remember is the first hearing

3    at which they were potentially presented, but it was then

4    adjourned.

5          MR. MASON:  That's correct, Judge, and I think we can

6    stipulate that the first time it was presented was in August,

7    approximately 2 weeks ago, and that the --

8          THE COURT:  Is that the first time they were on the

9    calendar, on the agenda?

10          MR. GLEASON:  I think that was the first time they

11    were on the agenda, Your Honor, but I believe a lot happened

12    and we did not anticipate the fights we received with the

13    interim DIP.  And there was a lot of negotiations with that and

14    dates were pushed at that point.  So again, our intention was

15    to have the bid procedures entered before -- in late July, but

16    given what has happened, we were not able to do that.

17          MR. MASON:  Judge, I don't know what the intention

18    was, but I will tell you, and I'm quite emphatic about this,

19    that we have -- the Committee has never requested a

20    (indiscern.).

21          THE COURT:  All right.  We don't need -- I'm opening a

22    can of worms that does not need to be addressed.

23          MR. MASON:  The record will be clear on that.

24          THE COURT:  All right.  I think the facts are that the

25    Bid Procedure Motion was filed at the beginning of the case.

B-0489

1  It was then calendared.  It's been continued.  It's been

2  adjourned from time to time.  As I understand it, the no-shop

3  would have gone away with the entry of the order, but the

4  modifications to the order that have been presented today have

5  only been negotiated within the last 48 hours basically.  Or

6  whatever it is.  The final agreement on these changes --

7        MR. GLEASON:  The final agreement, although the no-

8  shop was done a while ago, Your Honor.

9        THE COURT:  I understand that.  But with regard to the

10 other issues we've talked about which are the overbid, for

11 example, and the October 27, October 29 and November 30th

12 dates, all of those things were just presented to me for the

13 first time today.

14       MR. GLEASON:  Those were presented.  I would say that

15 some of -- like the minimum overbid issue, some of the other --

16 I won't say minor issues -- but issues other than the

17 timeframe, those were actually in a draft of a bid procedures

18 order that was circulated to parties back at the August 12th

19 hearing, or before the August 12th hearing so --

20       THE COURT:  You would agree with me that in terms of

21 the final resting place for those concessions, other than the

22 ones where they have not been agreed to, was when they were

23 presented today.

24       MR. MASON:  That's correct, Judge.  Mr. Ricciardi

25 tells me that the statement that I just made in Court is

1  inaccurate.  Apparently while I was out of town there was an

2  agreement that was -- there was an agreement by the Committee

3  to continue the Motion on the sale procedures order from August

4  5th to August 12th.  So I was not aware of that because I was

5  on vacation.  So I do want to correct --

6         THE COURT:  All right, well let's -- anybody else have

7  anything for Mr. Pollack, or are we going to let him off the

8  hot seat?  All right, let's let him of the hot seat and let's

9  call the next, which I understand to be the final witness.

10        MR. MASON:  Your Honor, as long as we're admitting

11 evidence, I do not believe it would appropriate for me to move

12 the admission of the Committee Exhibit-A, Committee Exhibit-B,

13 Committee Exhibit-C, and Committee Exhibit-D.  Committee

14 Exhibit-A, as you may recall, is the package containing the

15 letter from the president of Presstek to A.B. Dick Company's

16 Board of Directors and others containing a 427 (indiscern.) of

17 a Stock Purchase Agreement.  Exhibit-B, which we only have one

18 copy of and I'm happy to give it to the Court, is the so-called

19 execution copy of the Stock Purchase Agreement, which was in

20 the Debtors books and records.  I'm skipping over C and going

21 to D.  D is the signature page signed by Mr. Knipp, again, also

22 in the Debtor Books and Records containing the signature that

23 was identified by Mr. Knipp himself.  And then C contained a

24 memo and letter from (indiscern.) Vice President of Presstek in

25 which he makes comments on Presstek's unwillingness to sign the

218

1  Stock Purchase Agreement. I would move the admission of those

2  documents. As I understand it, the Debtor perhaps wanted a

3  word on the relevance of those documents.

4       MR. GLEASON: Thank you, Your Honor, John Gleason on

5  behalf of the Debtors. I can't see the relevance of these

6  documents, but at the same time I -- I guess it would really go

7  the weight that the Court should afford these documents. And I

8  would just state for the record that these are documents that

9  relate to an agreement that was never executed and is not

10  before the Court and would ask then that the Court, although we

11  don't have an objection to their admission, that the Court give

12  them the weight that they are due.

13       MR. MASON: Judge, I think I heard Mr. Gleason say he

14  doesn't have any objection to their admission.

15       THE COURT: Well, to the extent he has an objection,

16  it's a relevancy objection, which is overruled, and it's

17  ordered admitting the four documents.

18       MR. MASON: Thank you.

19      (Committee's Exhibit-A admitted into evidence)

20       (Committee's Exhibit-B admitted into evidence)

21       (Committee's Exhibit-C admitted into evidence)

22       (Committee's Exhibit-D admitted into evidence)

23       THE COURT: Let's proceed.

24       MR. MASON: Mr. Carlston.

25       THE COURT: Mr. Carlston, come forward here to the

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B-0492

1  Courtroom Deputy please to be sworn.

2      DANE CARLSTON, CREDITOR COMMITTEE'S WITNESS, SWORN

3          THE COURT:  Please take a seat on the witness chair.

4  Speak up clearly into the microphone.

5                      DIRECT EXAMINATION

6  BY MR. MASON:

7  Q.  Mr. Carlston, would you please state your name and your

8  business address?

9  A.  Dane Carlston.  My business address is on 520 Madison

10 Avenue in New York.

11 Q.  What's your current occupation?

12 A.  I'm a managing director and co-head of the restructuring

13 and recapitalization group at Jeffries.

14 Q.  And could you please describe Jeffries as an organization?

15 A.  Jeffries employs approximately 1500 people.  A New York

16 Stock Exchange company engaged in the business of investment

17 banking advisory services, and sales and trading operations.

18 We raise capital for companies.  The group that I co-manage

19 focuses on advising distressed companies and restructurings and

20 recapitalizations.

21 Q.  Approximately how much people are in your group?

22 A.  Approximately 25.

23 Q.  What is your educational background since high school?

24 A.  I received a Bachelor of Arts from the University of Utah

25 and an MBA from UCLA with a concentration in finance.

Carleston - Direct                                220

Q. And when did you graduate with your degree, with your MBA?

A. In 1992.

Q. And could you briefly describe for the Court your work history since school?

A. For the last 13 years I've been employed with two firms. My first -- the first firm that I joined was Channin & Company. Channin & Company is a firm that is engaged in restructuring advisory services to both Debtors and Creditors. I left Channin and Company in 1998 and joined Jeffries & Company where I'm engaged in the same types of activities in addition to capital raising.

Q. Approximately how many sales of distressed businesses have you worked on over your career?

A. The group that I oversee has executed approximately $5 billion of distressed M&A transactions. I personally have been involved in about $2 billion of M&A transactions in the last 4 years.

Q. And how many transactions approximately?

A. In the last 4 years that's probably 10 transactions.

Q. And prior to the last 4 years, if you were to take a look at your entire career, could you estimate approximately how many distressed business sales you've been involved in?

A. Probably double that amount.

Q. Would you identify some of the specific bankruptcy sales you have worked on in the past 5 years, identifying the

B-0494

Carlston - Direct                                221

1  business and your role in it?

2  A.  Sure.  OSI Group was filed in Saint Louis.  I testified in

3  connection with that matter and was qualified as an expert

4  there.  Destiny International was filed in Delaware.  I

5  testified there.  Budget Group filed in Delaware.  We

6  represented the Unsecured Creditor's Committee.  Diamond Brands

7  filed in Delaware.  We advised the company.  Darby Cycle filed

8  in Delaware.  We advised the Creditor's Committee.  Silver

9  Cinemas filed in Delaware.  We advised the company.  Espire

10  filed in Delaware.  We advised the Creditors Committee.  Those

11  are what come to mind immediately.

12  Q.  Did the Budget Group assignment involve a Section 363 sale

13  or a sale in the Bankruptcy Court?

14  A.  They did.

15  Q.  And how about Diamond Group?

16  A.  Diamond Brand was ultimately consummated through a plan of

17  reorganization.

18  Q.  And how about Darby Cycle?

19  A.  Through a 363 sale and a plan of reorganization.

20  Q.  Silver Cinemas?

21  A.  Through a 363 sale.

22  Q.  And how about this -- I think it was Espire?

23  A.  Through is 363 sale.

24  Q.  So is it safe to say that you are familiar with the process

25  of selling distressed businesses in bankruptcy proceedings?

B-0495

1  A.  I am.

2  Q.  Typically, and I don't want to belabor, get into a lot of

3  detail on this, but could you just tell me what the process is,

4  what phases the sale procedure goes through, briefly?

5  A.  Sure.  The whole M&A process is really engaged to yield

6  highest and best value and maximized value for all Creditors,

7  and it's a process that usually commences with, particularly in

8  the case of a distressed company, helping the market to

9  understand the nuances of what went wrong with the company.

10 Oftentimes it involves a lot more intensive due diligence to

11 understand that company as a result of the distress, and so the

12 first -- the initial stage with one where the investment banker

13 does their own due diligence on the company, prepares the

14 company for a sale, and we usually engage in a 30-day marketing

15 process where buyers are identified, Confidentiality Agreements

16 are sent out, a teaser is sent out, an offering memorandum is

17 sent out to those who execute Confidentiality Agreements, all

18 with the purpose of moving it into the next phase where

19 potential acquirers are invited in to do due diligence on the

20 company, and the last stage is one where the intent is to move

21 interested parties to a contractual phase so that they can

22 close on the asset.

23 Q.  Are you familiar with the concept of bid protection?

24 A.  I am.

25 Q.  And would you describe what you believe to be bid

B-0496

1  protection?

2  A.  Bid protection is designed to award a stalking-horse bidder

3  with appropriate protections to induce them to enter into a

4  contractual agreement with the seller first.

5  Q.  And what forms can bid protection take?

6  A.  A break-up fee, minimum overbid protections, oftentimes the

7  buyer has the ability to construct an Asset Purchase Agreement.

8  Q.  What's the significance of constructing an Asset Purchase

9  Agreement?

10  A.  Ultimately that's the template that is relied upon and used

11  by other parties when they're looking at the asset.

12  Q.  In your experience in the sale of a distressed business

13  with a stalking-horse bidder, what is a typical range of

14  break-up fees?

15  A.  I think the average range if you were to take a number of

16  cases that have been filed around the country is somewhere in

17  the neighborhood of 2.4 to 2.5%.

18  Q.  And when you say 2.4 to 2.5% would that include expense

19  reimbursement?

20  A.  It would.

21  Q.  Did you hear Mr. Pollack testify that in his opinion the

22  typical range is 2 to 3%?

23  A.  I did.

24  Q.  Okay.  And you think the average is about 2.4 to 2.5%?

25  A.  Oddly, it makes sense.  It falls right in the middle of his

1  range.

2  Q.  Now, in your experience -- I'm sorry, I withdraw the

3  question.  When you represent the seller or Creditors Committee

4  of a distressed business in bankruptcy what factors do you

5  consider in determining the appropriateness of the break-up

6  fee?

7  A.  Certainly one of the issues is finality of the bidding

8  structure, knowing that they will have the wherewithal to close

9  on a transaction, and contractually they'll be obligated to do

10  so.  The extent to which they have valued the business.  Is it

11  a bid that's fully valued?  Is it a bid that represents a

12  marginal bid that's on the cusp of value, things like that.

13  Q.  What affect, if any, does the length of time the Purchase

14  Agreement from the stalking-horse bidder remains open -- what

15  affect might that have on the break-up fee?

16  A.  Well, I think -- the break-up fee is really an insurance

17  policy to protect the buyer from getting outbid by another

18  purchaser.  The longer is sale process remains open the

19  potential for that likelihood increases.

20  Q.  How did you first become familiar with the A.B. Dick

21  bankruptcy?

22  A.  It may have been through an industry rag that we read, but

23  my first concrete recollection is a phone call from one of the

24  Creditors asking us to interview with the Committee.

25  Q.  And do you remember approximately when that took place?

1  A.  It would have been shortly after the Committee organized,

2  and as I recall that was around the third week of July.

3  Q.  And were you ultimately retained by the Committee?

4  A.  We were.

5  Q.  Have you reached agreement with the Committee as to the

6  terms of your compensation and the scope of our employment?

7  A.  We have.

8  Q.  And would you please describe, briefly, what the basic

9  economic terms of your proposed retention are and what the

10 scope of your responsibilities are?

11 A.  Sure.  In a nutshell, it's a monthly retainer of $100

12 thousand and a transaction fee based on value generated, and

13 the way it's structured is that we would get no transaction fee

14 if the bid that's on the table with Presstek simply closed.  We

15 would have to create an alternative bidder or a bid of higher

16 value.  And the scope of our responsibilities is outlined in

17 our engagement letter, but in summary, it is to familiarize

18 ourselves with the business and to the extent that there is a

19 sale process that is pursued we are to assist in that process

20 and provide support to the company's adviser in making sure

21 that the asset is marketed fairly.

22 Q.  Does your organization have connections with potential

23 purchasers in the printing industry?

24 A.  We have a group that covers financial sponsors and

25 strategic acquires, and it's our custom to circulate the

B-0499

1  opportunity within Jeffries to that group so that they can

2  identify the list of potential acquires, and we would then

3  forward those names to the company.

4  Q.  And is it your understanding that you would also provide

5  advice to the Committee as to the advisability of various

6  offers as they come in?

7  A.  We would.

8  Q.  Do you understand that you cannot be compensated or obtain

9  expense reimbursement for your work unless the Court ultimately

10  approves your retention?

11  A.  I understand that thoroughly.

12  Q.  Are you familiar with the Asset Purchase Agreement between

13  and among Presstek and its affiliates and A.B. Dick and its

14  affiliates dated as of July 13th, 2004?

15  A.  I have reviewed it, yes.

16  Q.  Are you familiar with the bid protections for Presstek and

17  its affiliates in that agreement?

18  A.  I am.

19  Q.  And what are the basic bid protections?

20  A.  The bid protections as outlined by Mr. Pollack are the

21  break-up fee of $1.2 million, $500 thousand of reimbursed

22  expenses, a minimum overbid of $200 thousand, and a series of

23  dates by which the Debtor has to comply.

24  Q.  Are you familiar with the purchaser's conditions to closing

25  that are set forth in paragraph 10 in the -- I'll call it the

B-0500

1  APA, the Asset Purchase Agreement that we just referred to?

2  A.  Yes.

3  Q.  And based on your experience of working on sales of

4  distressed businesses, how would you describe the degree of

5  conditionality, or as you put it finality, of the APA?

6  A.  Well, one of reasons, in my experience, that acquires and

7  sometimes insist that companies get acquired through a 363 is

8  because the Bankruptcy Court has the power and authority to

9  expunge certain liabilities and provide protections to a buyer,

10  and so the degree to which the reps and warranties are outlined

11  in section 10 leaves open the possibility that the acquire

12  could potentially opt out of the contract if all those

13  conditions are not met.  Conditions like, for example, as all

14  of us who've worked with distressed companies before, we know

15  that sometimes employees leave because of the situation in

16  which the company is in, and there are conditions in the reps

17  and warranties that provide for an out in the event that

18  employees -- certain employees leave, or if an employee has

19  advised a superior and that superior has not in turn advised

20  the purchaser of those events, then that is in the reps and

21  warranties a condition under which the acquirer could exercise

22  an out.

23  Q.  On a scale of say, 1-to-10, with 10 being the most

24  conditional type of (inaudible) and 1 being the least

25  conditional, how would you evaluate the APA?

1  A.  You know, I've been watching the Olympics for the last week

2  and I'm still not that good at judging precisely with a score.

3  It seems like the conditions here outlined are substantial and

4  excessive and leave room for -- leave room that ideally the

5  Debtor or nobody should want, for the potential acquire to opt

6  out of the agreement, if all these conditions are not met.

7  Q.  Since Jeffries was first contacted by the Committee in this

8  case, generally, what have you done to understand the nature of

9  the proposed sale on the APA in the prepare for today's

10 testimony?

11 A.  We met with the company and their financial adviser one

12 week after getting retained for an introductory meeting.  We

13 had a follow on meeting a week after that.  We've reviewed

14 materials that were sent to us in conjunction with the due

15 diligence list that we sent out, and we've been conducting

16 on-going reviews of that material.

17 Q.  Based on your knowledge, skill, experience, training, and

18 education, and the preparation you have done in advance of your

19 testimony here today, do you have an opinion as to whether the

20 awarding of the proposed break-up fee and expense reimbursement

21 under the APA is necessary to preserve or enhance the value of

22 the A.B. Dick Estate?

23 A.  I think break-up fees are appropriate where there is

24 finality.  I think break-up fees have to be earned, and they're

25 earned by proposing finality to the extent that there are

1  conditions that the company may or may not meet, I don't think

2  it's appropriate to award a break-up fee.

3          MR. MASON:  If I could have one minute, Judge.  That

4  concludes the direct of Mr. Carlston, Your Honor.

5          THE COURT:  All right.  Do we have cross examination?

6          MR. GLEASON:  Yes, just briefly, Your Honor.

7                        CROSS EXAMINATION

8  BY MR. GLEASON:

9  Q.  Good afternoon, Mr. Carlston.

10 A.  Good afternoon.

11 Q.  We met last week.  How are you today?

12 A.  I'm well.

13 Q.  Would you agree that whether a sale process is appropriate

14 in a given case is dependent upon the facts and circumstances

15 of that particular case?

16 A.  I would.

17 Q.  Isn't it true that the availability of funding for the

18 continued operations is an important consideration in

19 determining whether a sale process is appropriate in a given

20 case?

21 A.  Yes.

22 Q.  I was -- getting ahead of myself.  Mr. Carlston, has

23 Jeffries filed a Retention Motion in this case?

24 A.  If we haven't I think it's due shortly.

25 Q.  And isn't it true that Jeffries was retained by the

1   Committee on August 2nd?

2   A.   It's true.

3   Q.   Are you aware that the Committee was formed on July 23rd?

4   A.   I'm aware of that.

5   Q.   I believe you've described for the Court the terms of

6   Jeffries' compensation.  As I understand it then Jeffries only

7   receives retainers if the stalking-horse bid is approved?

8   A.   If the stalking -- if the sale closes as is we only get our

9   retainers, because presumably we didn't do much to make it

10  close.

11  Q.   Those retainers are a minimum of $300 thousand though,

12  aren't they?

13  A.   That's correct.

14  Q.   Mr. Carlston, did you review the objection filed by the

15  Committee with respect to Candlewood's fee application?

16  A.   I did not.

17  Q.   Are you aware that the Committee outlined Jeffries'

18  compensation terms in that objection?

19  A.   I didn't review the motion.

20  Q.   So I take it you're not aware there was absolutely no

21  mention of a monthly retainer being payable to Jeffries in that

22  objection?

23  A.   I didn't review it.

24  Q.   I believe you testified earlier today that when you get

25  involved in a process you start by doing due diligence, and

Carlston - Cross                                        231

1   then a 30-day marketing period, is that correct?

2   A.  Generally, yes.

3   Q.  Does the extent of due diligence that is required, is that

4   different in different cases?

5   A.  Absolutely.

6   Q.  So if, in fact, there was a great deal of due diligence

7   with respect to a company pre-petition, and the company had

8   organized due diligence rooms, prepared documents, gathered

9   things together in a certain location, would that reduce the

10  amount of time you might need to do due diligence

11  post-petition?

12  A.  Depending on the state of the information gathered and

13  what's been put together for potential acquires to look at,

14  yes.

15  Q.  With respect to the representations and warranties, is it

16  your understanding, or isn't it true that if Presstek or Silver

17  terminates the Asset Purchase Agreement because of an alleged

18  violation of the representations and warranties they will not

19  receive the break-up fee?

20  A.  That's correct.

21  Q.  Mr. Carlston, are you familiar with -- strike that.  Mr.

22  Carlston, I believe you testified that you were the financial

23  adviser in -- to the Committee and budget?

24  A.  Yes.

25  Q.  Do you recall whether or not there were covenants,

1  representations, and warranties contained in the Asset Purchase

2  Agreement with respect to budget?

3  A.  There were.

4  Q.  So, representations and warranties are not uncommon in 363

5  sale transactions, are they?

6  A.  And they reminded us of that every time we met with them,

7  and subsequently tried to lower the purchase price by $30

8  million as a result of how broad those reps and warranties

9  were.

10 Q.  Let's go back to the question that was representations and

11 warranties were contained in that agreement?

12 A.  They were.

13       MR. GLEASON:  May I have a moment, Your Honor?

14     (Pause in proceedings)

15 BY MR. GLEASON:

16 Q.  In the budget case, Mr. Carlston, isn't it also true that

17 there was a material adverse change clause in that agreement?

18 A.  I think there was.

19 Q.  Are you aware of bankruptcy cases where the stalking-horse

20 bidder provided D-I-P financing?

21 A.  It's usually an option of last resort, and I can't think of

22 one off the top of my head where it's happened, but I know it's

23 happened before.

24 Q.  Okay.  You've been involved in this industry for 12, 13

25 years?

1    A.   Yeah.

2    Q.   Are you familiar with the case of IN RE: TWA Airlines?

3    A.   I am.

4    Q.   Are you aware that the stalking-horse bidder provided D-I-P

5    financing in that case?

6    A.   To everybody's disappointment, I think.

7    Q.   Are you familiar with the IN RE: Drefers case?

8    A.   No, I'm not.

9    Q.   How about IN RE: PC Landing Corp., which was a Delaware

10   case?

11   A.   No.

12              MR. GLEASON:  Nothing further, Your Honor.

13              THE COURT:  Any other cross examination?

14                      CROSS EXAMINATION

15   BY MR. SELBST:

16   Q.   Good afternoon, Mr. Carlston, my name is Stephen Selbst.  I

17   represent Presstek.

18   A.   Nice to meet you.

19   Q.   Nice to meet you, sir.  I have one question for you.  You

20   testified just a moment ago that you were of the opinion that

21   if the employees left the employ of the company it was a basis

22   for Presstek to terminate the agreement.  Did I understand that

23   testimony correctly?

24   A.   I believe it has to be at a certain level.

25   Q.   Could you identify for me which provision of the agreement

Carlston - Cross

234

1  that's contained in?

2  A.  Sure, if you'd like to give me the Asset Purchase

3  Agreement.

4          MR. SELBST:  May I approach, Your Honor?

5          THE COURT:  Please.

6  A.  Unless you want to stipulate that it's there.

7          MR. SELBST:  I'll withdraw the question.

8                          CROSS EXAMINATION

9  BY MR. LEPENE:

10 Q.  Mr. Carlston, I really just have a couple of questions, and

11 it goes to the terms of your retention, and if you could help

12 me with this 'cause I really must confess I'm not conversant

13 precisely with what the terms are, if the motion to approve bid

14 procedures is denied and Presstek isn't given a break-up fee

15 and they walk away from this transaction right now and someone

16 else were to come in and offered to pay $40 million and that

17 transaction is consummated, what is your fee arrangement under

18 those circumstances?

19 A.  You know, I've never read it that way, and I'd have to

20 review it to be totally honest to see if fees aren't -- the

21 intent of it was to provide a transaction fee for value added,

22 and the view was that if this transaction simply closed we

23 haven't done anything more than shepherd it across the finish

24 line.

25 Q.  Well, that's actually my question, I was previously reading

B-0508

1   --

2   A.   And we intend to file with the Bankruptcy Court and give

3   everybody including you and the Trustee and the Judge the

4   opportunity to object to it.

5   Q.   I was reading the document that was produced at your

6   deposition last week, and it seems to me that it suggests that

7   if a party other than Presstek purchases the assets, let's say

8   for $40 million, that you do earn a fee of 0.75%, based on the

9   transaction, isn't that the case?

10  A.   That may well be the case.  I'd have to read it.  I think

11  the paragraph is pretty lengthy.

12  Q.   Okay.  And that would be on top of the retention payments,

13  monthly payments?

14  A.   That's correct.

15  Q.   Okay.  So that, in fact, if the motion is denied and

16  Presstek were to walk away you'd actually be better off, or you

17  would earn more than if this transaction goes forward and

18  Presstek buys it for you.

19  A.   I guess that assumes that we were also able to generate

20  another buyer.

21          MR. LEPENE:  That's all I have, thank you, Your

22  Honor.

23          MR. MASON:  If I just may ask one question on

24  redirect?

25              REDIRECT EXAMINATION

236

1  BY MR. MASON:

2  Q.  Mr. Carlston, if the Court were to decline the request to

3  give bid protection to Presstek, and Presstek didn't

4  participate at all in the bidding process, is it your

5  understanding that if another bidder were to show up you would

6  earn some percentage on the purchase price?

7  A.  I believe so, yes.

8  Q.  Okay.  But if Presstek merely ceases to be the stalking

9  horse and nevertheless participates in an open auction and

10 becomes the successful bidder (inaudible) $40 million, is it

11 your understanding that you would get a percentage of the first

12 $40 million that would be paid by Presstek?

13 A.  I don't think we would.

14         MR. MASON:  Thank you, Your Honor.

15 BY THE COURT:

16 Q.  Mr. Carlston, is your compensation tied in any way to your

17 generating a buyer, or if the buyer is generated instead by

18 Candlewood would you still get a success fee?

19 A.  We would weigh the scope of our activities as not related

20 to directly marketing the asset.  We recognize that that

21 responsibility lies strictly with the Debtor.  So, it's more of

22 a percentage of value generated for the Estate.

23 Q.  Is it a percentage in excess of what the stalking horse is,

24 or does it start on dollar one?

25 A.  No, there's a hurdle rate, and I don't mean to have any big

B- 0510

1  mystery. This Court will receive a retention application, I

2  assume, in the next week, but there is a hurdle rate over which

3  we would earn a fee.

4  Q. So if -- let's say that the final successful bid was $45

5  million and it started at $40 million would your fee be

6  calculated on the increase from 40-to-45, or would it start at

7  0-to-45?

8  A. I believe it would be calculated on the increment, and

9  again, I'd have to read the -- I'd have to reread it, but the

10 notion is very much an incentive to create value over and above

11 the minimum hurdle.

12 Q. Now, you testified that an average break-up fee is

13 somewhere in the vicinity of 2.4, 2.5%. Do you have an opinion

14 as to whether any break-up fee is justified in this case?

15 A. As the Asset Purchase Agreement is currently constructed I

16 think it does not provide enough finality, and as such I don't

17 think the bidder has earned a break-up fee.

18 Q. And that's your opinion and conclusion taking into account

19 the modifications that have been made in terms of the financial

20 covenants, particularly with regard to the pre-paid inventory?

21 A. You know, and it's unfortunate that we hadn't had the

22 opportunity to have more collaborative conversation, but I

23 learned of that literally during Mr. Pollack's examination at

24 4:30. So, I guess I'd have to be comfortable that the Debtor's

25 projections in fact allow for them to comfortably make those

B-0511

Carlston - Redirect                              238

1  capital requirements that are imbedded in the letter.

2  Q.  Let's -- so let's put aside then the financial covenants

3  for a moment and say that you became comfortable with the

4  notion that there was not an impossible hurdle here that the

5  Debtor had to meet because these of changes with regard to the

6  pre-paid inventory, and that was taken off the table, are the

7  non-financial covenants, in your opinion, still sufficiently

8  onerous that you think there's not adequate finality with

9  regard to the document?

10 A.  Well -- and it's not just finality with respect to the

11 financial representations.  The break-up fee is really

12 considered part of an overall package that takes into account

13 the amount of time, for example, that's being allotted for the

14 asset to be shopped.  So, in light of the improvements that

15 have been made to the agreement, and there have been

16 improvements, ideally I think I'd like to see the reps and

17 warranties trimmed down to a level that recognizes the power of

18 the Bankruptcy Court in providing an asset free and clear to a

19 purchaser.  And I'd also like to see, particularly given the

20 complexity of this business, it's got two operating segments

21 that generate $19 million of EBIDTA last year and projected $13

22 million of EBIDTA this year, and it's got one big money-losing

23 segment, and I guess I'd like to see some type of effort

24 undertaken to do a break-up analysis.  Is this business worth

25 more in parts than it is altogether, and instead what's

B-0512

1  happened is the Debtor is engaged with one party for the last

2  year and it's not broken out that information to the market as

3  a whole in a way that other strategic parties or financial

4  parties can look at the asset, and I think you have to ask if

5  under the new agreement 60 days is enough to convey what the

6  story is behind those assets.  So, I'm troubled by the length

7  of time that's been accorded here.

8  Q.  And so the length of time is troubling not so much because

9  it's 60 days but because you think it doesn't give adequate

10  time to look at the business in a different way, breaking out

11  the loss-making portion from the two profitable portions?

12  A.  Well, but 60 days is part of that problem, because if it

13  were -- and I don't think -- and I'm not talking about a year

14  to shut the company, I think if you're to have any hope of

15  getting a competitive bidding process you're going to need some

16  period of time for buyers and management, frankly, and there's

17  been a lot of movement at the management level, management is

18  going to have to be very hands-on conducting in-person meetings

19  on site, and I think 60 days -- at the end of 30 days, or at

20  the end of certainly 40 days a potential buyer very much has to

21  be in contract mode.  Diligence has to be done, and that's all

22  influenced by the amount of time that management has to spend

23  in helping these buyers look at the assets.  So, I'm troubled

24  by the 60-day provision, I think 90 days would be better, I

25  recognize that we've got a financing that matures under the

B-0513

Carlston - Redirect                                    240

1  latest proposal in October so it creates an issue.

2  Q.  Well, to go back to my initial question then, what aspects

3  of this particular deal, from a finality standpoint, are the

4  most important for you in concluding that you don't think a

5  break-up fee has been earned?

6  A.  Well, from finality only, time aside, I think it's the reps

7  and warranties, assuming that the capital requirements have, in

8  fact, been resolved with this latest accommodation, and

9  presumably that's no longer an issue.  But again, given that I

10 just heard about this I'd have to be comfortable that, in fact,

11 that accommodation resolves the capital requirement.

12 Q.  Do you understand that the bid procedures that are under

13 consideration here would somehow preclude a buyer from offering

14 to purchase only the profitable segments of the business and

15 leaving the others on the table?  Leaving the equipment side on

16 the table and just buying the services and consumables?

17 A.  Well, the Asset Purchase Agreement on the table certainly

18 contemplates buying all the assets.  I'm not -- if the bidding

19 procedures are, in fact, designed to make sure that all the

20 assets are sold and don't allow for the separate marketing of

21 the profitable assets I think it's an issue.

22 Q.  Well, let's assume that it does, that it does allow the

23 separate marketing.  Does that allay some of those concerns on

24 your part?

25 A.  That it does allow the separate assets to be marketed?

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

B-0514