1  Q.  In other words, somebody could come in and say, I don't

2  want to pick up this loss-making aspect of the business, I'm

3  going to leave that on the table for the Debtor to go ahead and

4  liquidate, however they can liquidate the hard assets of that.

5  What I really want to buy are the two softer assets, the

6  service contracts --

7  A.  Right.

8  Q.  -- and the consumable part of the business, and my price

9  for that is greater than what Presstek's price is for the whole

10 ball of wax?

11 A.  Which would allow all of us to determine the highest and

12 best offer.

13 Q.  Then if that were to be the fact, if that's the way it

14 worked, would that move towards allaying that concern on your

15 part?

16 A.  With respect to that concern, yes, but I think we're still

17 left with an Asset Purchase Agreement that every single buyer

18 is going to use as a template for looking at this asset, and

19 the reps and warranties that are outlined in that agreement are

20 extensive, and there would be no incentive for any other buyer

21 to do anything other than meet that minimum threshold offered

22 by the reps and warranties.

23 Q.  Well, as I understand one of the concessions that's been

24 made is that the APA portion in the bid procedures says that --

25 instead of saying a substantially similar agreement it now says

1    a no less favorable agreement, isn't that correct?

2         MR. GLEASON:  That is correct, Your Honor.

3    BY THE COURT:

4    Q.  Does that make any difference to you on that part?

5    A.  What troubles me, Your Honor, is -- and this happens all

6    the time in distressed companies, people leave, they get tired

7    of the process, this company's been barely meeting payroll now

8    for some time.  We've heard what happens if an officer decides

9    to leave, and what happens if that's a -- and it is in the reps

10   and warranties, that is a condition that precipitates an out,

11   or what happens if in confidence an employee has come up to the

12   CRO and said, I'm thinking about leaving.  That is a condition

13   in this Asset Purchase Agreement that would precipitate an out.

14   There are broad-reaching reps and warranties in here that are

15   troubling, and reps and warranties --

16   Q.  Now -- I understand.  Now, let's say that happens.  Let's

17   just assume that that plays out, and Presstek obviously has the

18   option not the requirement that it terminate, it could waive

19   that particular default, or failure to meet the representation

20   and warranty, but let's say that it decides, you know, Mary

21   Smith, who is the chief whatever, is a critical party and

22   without Mary we're not going forward.  Then I think everybody

23   has made it clear under those circumstances there's no break-up

24   fee payable to Presstek.  What happens is, basically, the

25   Debtor is back at square one in terms of marketing the asset,

Carlston - Redirect                                          243

1  correct?

2  A.  They are.

3  Q.  So, I guess I'm trying to understand your view of the

4  relationship between the break-up fee and the departure of Mary

5  Smith, given the fact that the departure of Mary Smith does not

6  trigger the payment of a break-up fee.

7  A.  Because if Mary Smith is integral and we've awarded a

8  break-up fee to the buyer, then their feet should be held to

9  the fire.  They should not be allowed to walk.  If they're

10 asking for $1.7 million and they're providing the financing,

11 and let's face it, anybody who provides financing, if they're

12 also a buyer, has an edge.  If you're a party looking in from

13 the outside at a situation where the buyer is both a lender and

14 a stalking-horse bidder you're going to think twice about

15 spending time and energy and money in pursuing that asset.  If

16 they're going to earn a break-up fee it, in fact, has to be

17 earned, and it should not be their option to walk if Mary Smith

18 leaves.  Their feet should be held to the fire.

19 Q.  All right.

20          THE COURT:  Anybody have any questions of the witness

21 in light of the questions that I've asked.

22          MR. MASON:  No, Your Honor.

23          MR. GLEASON:  No, Your Honor.

24          THE COURT:  All right, thank you, sir, you may step

25 down.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0517

1  A.   Thank you.

2          THE COURT:  Mr. Mason, what else do we have?

3          MR. MASON:  Your Honor, we have no further witnesses,

4  and I think we're prepared for final argument on this if that's

5  how you would want to handle it.

6          THE COURT:  All right, I think that's how we ought to

7  handle it.  I think the Debtor goes first.

8          MR. MASON:  Your Honor, I will say that Mr. Ricciardi

9  is going to appear on behalf of the Committee.

10         THE COURT:  All right, thank you.  Are the proponents

11  ready?  I guess I should say the Debtor, the proponents of the

12  motion, which is the Debtor, should go first.

13         MR. GLEASON:  I will be, Your Honor, as soon as I can

14  find my notes.  Thank you, Your Honor, I will be brief, Your

15  Honor.  I think the important thing as Your Honor indicated

16  last time was the issues here, let's hear the evidence, and so

17  I think everybody knows the issue.  I think Your Honor is well

18  aware of the situation and I'm not gonna waste a whole lot of

19  time.  We'd first like to thank you for your time and patience

20  with respect to this.  As indicated in my opening remarks, we

21  believe the evidence is demonstrated by the facts in this case.

22  The Debtor's business has been slowly deteriorating.  In June

23  of this year the Debtor's  pre-petition lender advised the

24  Debtors that it would no longer continue to fund the Debtor's

25  operations.  Third, the Debtors face the real possibility that

245

1    they would be unable to make payroll in early July.  Given the

2    Debtor's various businesses, including their large service

3    segment, a loss of employees would have devastated the going

4    concern value of these businesses.  Finally, the Debtors were

5    unable to obtain alternative financing and are unable to

6    continue operations utilizing cash collateral.  Against this

7    backdrop the Debtors and their professionals engaged in arm's

8    length negotiations with Key Bank and Presstek with respect to

9    post-petition finance --

10           THE COURT:  Let me ask you about the question of

11    alternative financing.  The only evidence we really heard dealt

12    with efforts with Foothill and Servius back in '02, if I

13    remember correctly.

14           MR. GLEASON:  Yes.  But I think we also heard, Your

15    Honor, that at that point those entities did not want to go

16    forward and as Mr. Knipp testified, the Debtor's businesses

17    continued to deteriorate so that they were much worse before

18    the Debtors filed this bankruptcy petition, and they were at

19    the time Foothill and Servius declined.  And I think as

20    Mr. Pollack testified, he did not believe it made -- it was

21    really -- the Debtors did not have the time pre-petition to get

22    any alternative financing, and he also testified that on a

23    post-petition basis he does not believe, given the facts and

24    circumstances in this case, that seeking alternative financing

25    at this time is appropriate.

B-0519

246

1    THE COURT:  Although apparently some effort has been
2    made with regard to that.

3    MR. GLEASON:  Yes, we did make an effort to see if
4    there was anything out there, not knowing what would happen
5    with the other aspects of this case.  As I indicated, Your
6    Honor, we engaged in negotiations with Key Bank and Presstek
7    with respect to a post-petition financing package and the
8    stalking-horse Asset Purchase Agreement.  Were these agreements
9    perfect?  No, they were not.  But were they reasonable
10   agreements that would enable the Debtors to maintain the going
11   concern value of the businesses while enabling the Debtors to
12   fully and fairly market their assets and obtain the highest and
13   best value?  We believe, Your Honor, the evidence has clearly
14   demonstrated they were at the time and now they're even better.
15   As with similar cases, parties continue to negotiate
16   post-petition --

17   THE COURT:  Let's focus on a couple of issues --
18   MR. GLEASON:  Sure.
19   THE COURT:  -- so that we can kind of cut to the
20   chase here.  The evidence is, from both experts, in effect,
21   that this break-up fee is outside the norm, and that at the 2½%
22   or 2-to-3% level that the expenses would normally be included.
23   So, we're looking at 4¼ rather than 2½, or 4¼ rather than 2,
24   and I guess my question is, what's the justification under
25   O'Brien, which is the standard that I have to apply, that has

B-0520

247

1   been made here in this record to approve a break-up fee of that

2   amount?

3          MR. GLEASON:  Your Honor, and I will defer a lot of

4   that to Mr. Selbst, but from the Debtor's standpoint, and as

5   Mr. Pollack testified, there were negotiations, we did get it

6   reduced.  I think from a justification of O'Brien --

7          THE COURT:  But the good-faith negotiations in saying

8   this is the best we can get is not an O'Brien factor.

9          MR. GLEASON:  Correct.  I think an O'Brien factor is

10  though, as Mr. Carlston testified, one of the things that you

11  do when you start a process like this is due diligence, and I

12  think break-up fees go to compensate a bidder from doing a lot

13  of these things, getting the Debtors in a position that they

14  can market their assets.  That was done in this case, although

15  arguably it was done pre-petition by Presstek, but the Debtors

16  did put together, and the testify was a lot of due diligence

17  done getting these Debtors in a position to go to the --

18         THE COURT:  I'm going to ask Mr. Selbst the question

19  that seems to me is squarely -- not at this point, I'm going to

20  let him finish --

21         MR. SELBST:  I'm sorry.

22         THE COURT:  -- that seems to me is squarely presented

23  by the evidence, including the evidence that he adduced from

24  the witness, which is, they spent a million six, they do the

25  math, they need to get a 4.25% break-up fee in order to recover

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  the costs that they have sunk into the deal.  That that is --

2  that strikes me as what the basis of this is.  Now, there's no

3  direct evidence on that, but I think that's a reasonable

4  inference.  And so the question then becomes, if that's a

5  reasonable inference, does that pass muster under O'Brien?

6  Because particularly where there were two deals, and you know,

7  what we haven't heard, and there is no evidence in the record,

8  and I'm not going to even ask Mr. Selbst because he can't

9  testify, nobody has put a -- any of the SEC filings into

10 evidence showing, you know, how that was broken up.  How much

11 of that had to do with the Stock Purchase Agreement, how much

12 of that had to do with this, is that a reasonable amount,

13 should it be?  But that's the conclusion, that's what I'm

14 hearing that is really kind of motivating this.

15           MR. GLEASON:  And I understand, and I will say

16 though, from the Debtor's standpoint, Presstek's bid is

17 providing value to these Estates.  I would agree it maybe a

18 different bid and there were prior deals that didn't get

19 consummated, but as we sat here pre-petition, as we sit here

20 today, the Presstek bid is providing value to the Debtor's

21 Estates, it has set a floor for other bidders to hopefully come

22 and make bids and we can get in the marketing process and

23 hopefully an action process.  So, we do believe the bid has

24 brought value.  I understand --

25           THE COURT:  I understand that, but the question --

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

249

1  even if I were to agree with that the question is how much

2  value?  I mean, should it be measured by how many dollars

3  Presstek has sunk into the deal, which is really what they're

4  asking me to measure it by.  It's not measured by any evidence

5  that this would be a typical amount of break-up fee under the

6  circumstances.  It's not measured by that.  There's nobody

7  who's testified, neither expert on either side has testified

8  about that.  But rather, the only hint that we have here is

9  that this is a way for them to recover their sunk cost.  I

10  don't blame them for that.  My question is whether or not under

11  O'Brien that passes muster in the 3rd Circuit.

12        MR. GLEASON:  And I will let Mr. Selbst address that.

13  We do believe, as Mr. Pollack testified, that a percentage

14  based on the purchase price is appropriate, and that percentage

15  is up to Your Honor.  With respect to the other, I guess, big

16  issue of the finality, we believe the Asset Purchase Agreement

17  does have finality.  It does contain reps and warranties, but

18  these agreements contain reps and warranties.  The Debtors

19  believe that they can get to closing, they believe they can get

20  Presstek to close, and for all of those reasons, Your Honor, we

21  would ask the bid procedures be approved as we've modified

22  them --

23        THE COURT:  What about the Mary Smith issue, the one

24  I just raised?  We'll just call it the Mary Smith issue.  You

25  know, Mary runs out of patience.  She's got a better offer from

B-0523

1  somebody else.  She decides to leave.  Her leaving is a breach

2  under the reps and warranty, what do you think about that?  Mr.

3  Carlston's position is, they shouldn't be able to walk on

4  something like that if they're going to get a break-up fee, no

5  matter how much money they've sunk into the deal.

6           MR. GLEASON:  I have two responses to that.  One, if

7  they walk they don't get a break-up fee.  More importantly, I

8  would disagree with Mr. Carlston that everybody's gonna use the

9  exact APA.  What we have here is a situation where other

10 bidders can look at this, and this will be the negotiations

11 that go on in the discussions with bidders, of look, we're

12 going to be deciding which is the highest and best bid, and if

13 your bid doesn't have this provision, that provision, you know,

14 it may be, even at a lesser dollar amount, it may be a better,

15 higher and better bid.  And so, I think that's how you deal

16 with the Mary Smith situation, although, I also believe, Your

17 Honor, in any transaction there is an element of good faith,

18 and I believe every contract requires good faith and fair

19 dealing, and to look at one provision in an agreement that

20 says, if an executive officer resigns I have a right to

21 terminate, I think it's reasonable that a buyer has a right to

22 terminate if somebody that they believe is absolutely critical

23 to the business resigns.  I also believe that a reasonable

24 buyer will exercise good faith and will not walk from a deal

25 that they have invested a lot of time and money into just

251

1  because one person leaves.  So, I don't think you can look at

2  an agreement and go and say you have to close every potential

3  out.  That's just not the way things are done, and it's not how

4  agreements in -- outside of 363 sales are done or even inside

5  of 363 sales are done.  So, one, I just -- I think we deal with

6  Mary Smith by we let other bidders know they can submit a

7  different Asset Purchase Agreement that may be a higher and

8  better bid, but I also don't think we should lose the forest

9  for the trees and just assume that Presstek's gonna walk just

10  because somebody quits.  I think we're getting a little too

11  technical there.  So, again, Your Honor, we would ask that the

12  bid procedures be approved as modified so that we can go

13  forward with the marketing of this business.  We would also ask

14  that they be approved in such a way that we can also insure the

15  Debtors of the continued post-petition financing that we need

16  to continue operations and get to a closing.  Thank you.

17        THE COURT:  Okay.  Let me here from other proponents

18  before I hear from Jeffries.

19        MR. SELBST:  I'll try to be brief, Your Honor,

20  mindful of the hour and with my own thanks to Your Honor's time

21  and patience, thank you.

22        THE COURT:  Well, somebody told me 9 o'clock earlier,

23  so I figure we're doing great at this point.

24      (Laughter)

25        MR. SELBST:  Well, I'm hoping you're wrong

B-0525

1  (inaudible). Your Honor, as Mr. Gleason has suggested, my

2  client believes it made a fair initial offer to buy these

3  assets. It wasn't making a strangling hold on these Debtors.

4  It believed that the initial marketing periods were fair and

5  they've been negotiated at arm's length. You heard the

6  testimony that they were negotiated at arm's length between

7  experienced counsel (inaudible). We ask for what is in our

8  view customary terms in the APA, and you heard Mr. Pollack say

9  that the very conditions Presstek had asked for are customary.

10 I understand the Creditors Committee doesn't like them, but

11 they are not atypical, and that's what the evidence from Mr.

12 Pollack was. And Your Honor asked at the last hearing, you

13 want to hear about the business justifications for why

14 conditions are in here, and I'm gonna explain them, I'm gonna

15 link up the dots between the testimony you heard. You heard

16 Mr. Knipp and Mr. Pollack both say, and it really wasn't

17 contradicted by any evidence from the Creditors Committee, that

18 this company is in distress. It is in distress. The purpose,

19 and I said this in my responsive papers, Your Honor, for reps

20 and warranties and closing conditions are to make sure the

21 asset is in the same condition on the closing date that it was

22 on the contract date, and to the extent that the marketing

23 period goes on longer and you've heard about this the greater

24 the risk is that the business deteriorates. There is a

25 business justification for it. This is a business that's in

B-0526

253

1  distress and it should be uncontradicted by the evidence. We
2  wanted a reasonably prompt sale, and frankly, we wanted to
3  proffer a sale than the Creditors Committee wanted, so we
4  agreed to make modifications and Your Honor has heard at some
5  length today about all the modifications we've agreed to. That
6  wasn't our first preference but we understood that the
7  Creditors Committee had raised concerns and we were prepared to
8  stand up for this. The idea that we are in this to walk away
9  from the agreement simply isn't borne out by the record. You
10 heard again uncontradicted evidence we've been chasing this
11 company for a year, for a year. And during that year the
12 company has not gotten better, it has gotten worse, and yes,
13 the amount that we've been prepared to pay has gone down.
14 Every time we turn over another rock, respectfully, we found
15 that the company's financial and operational condition was
16 worse. But we think that we had made a fair baseline bid.
17 Now, it may turn out that other people come in and overbid us,
18 and guess what? We're gonna be there in that auction. We are
19 gonna be there in that auction. We may not win, but we're
20 gonna be there because we believe in this business. I don't
21 think the evidence suggests, given the concession, the amount
22 of time, the public amount of money that we've invested in this
23 acquisition that there's any basis to suggest that we're trying
24 to walk. You heard the testimony from Mr. Pollack, all the
25 various concessions, he didn't ask for a thing. He simply

*Weiter's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B-0527

254

1  said, okay, let's try to move this along, let's try to do the
2  right thing for this process. And what do we ask? We've asked
3  for what we believe to be reasonable bidding protections. Your
4  Honor asked under O'Brien what's the standard. The standard
5  is, what are we investing to make this process? Now, let me
6  tell you about it from my client's perspective, Your Honor. My
7  client did not intend to be a 363 buyer. Back in December of
8  '03 there was no contemplation the company would ever have to
9  seek relief, but its view is, it's an acquisition of a
10 business, and all that money it spent, and it's been more since
11 the date of the SEC filing, that's all been in preparation of
12 this bid. You can say, you know, did we break it up between
13 the stock and the asset purchase? It's the same acquisition.
14 And respectfully, Your Honor, the answer to your question is,
15 it's all (inaudible). And I understand that the evidence --
16 you know, we did, although I didn't -- we showed Your Honor
17 some other cases where the break-up fees were 3 and in some
18 cases in excess of 3%. I understand we didn't put evidence in.
19 I told Your Honor the first day we would be bound by your
20 determination what a fair break-up fee is. I think the fair
21 break-up fee is what we asked for here, and the expense
22 reimbursement, and I understand the Creditors Committee doesn't
23 like it, but you also heard from Mr. Pollack's testimony this
24 is a real bid. What about Mary Smith? There are two answers.
25 The first answer -- there are three answers, actually. The

B-0528

1  first answer is, we don't get the break-up fee.  We only get

2  the break-up fee if we do the function we were supposed to do,

3  start a bidding war that delivered higher value.  We get

4  outbid, or the company determines to do (indiscern.).  If the

5  Mary Smith thing happens, if the Mary Smith thing happens we

6  don't get -- now, with respect to Mary Smith, it's pretty

7  unlikely, and I'm prepared to argue the evidence, it's pretty

8  unlikely we're gonna use Mary Smith as an example, but I'm not

9  prepared, and respectfully don't think my client should be

10  prepared to, to consider every single possibility and simply

11  drop the reps and warranties.  They're there for a purpose, and

12  I said the purpose is make sure the asset's in the same

13  condition on the closing date that it is on the starting date.

14  I think Your Honor has heard pretty strong testimony that this

15  business needs a prompt sale, and maybe Mr. Carlston is right,

16  maybe the business ought to be disaggregated, and maybe our bid

17  should be broken out, but as Your Honor has (inaudible) the

18  Debtors are free to do that.  And all of these horrible

19  conditions that they are some unhappy about in the agreement,

20  in fact, somebody could bid without those conditions, and maybe

21  those bids will be higher and better, as I said in my

22  responsive papers.  And I've been there, Your Honor.  I've been

23  in situations where I represented clients who've made bids and

24  the Debtor comes back and says, you know, your bid's 40 but the

25  other guy's 39 he's got no conditions.  You've got to take out

1   your conditions to stay in it.  It might happen here, but I

2   don't think we should be required to do that now because I

3   think we've made, and Your Honor's heard, testimony there is a

4   reasonable and customary (inaudible).  I think the evidence

5   shows we made a real and serious bid.  Is this the highest bid

6   that's gonna come out?  Only time will tell, but I think with

7   the concessions my client has made we've afforded the Debtors a

8   real and fair opportunity to market these assets.  I think in

9   that respect we are, in fact, the legitimate stalking horse,

10  and I think for those reasons we're entitled to the break-up

11  fees and expense reimbursement we've asked for, and I would

12  respectfully ask the Court to consider those procedures.

13          THE COURT:  Thank you.

14          MR. SELBST:  You have any questions, Your Honor?

15          THE COURT:  No, thank you.

16          MR. SELBST:  Thank you.

17          THE COURT:  Let me just -- before I hear from anybody

18  else, Mr. Gleason you agree that the bid procedures, as they

19  currently exist, do allow the disaggregation and a bidder to

20  come in and say, I only want to take this and I don't want to

21  take that.  Presumably the Debtor might have to -- the

22  valuation of that may be a little tough because somebody would

23  have to make some kind of a judgment on what the liquidation

24  value is of the part left behind, and that, you know, it could

25  be anywhere from a negative number to a positive number.  So,

1  it would become a difficult issue from a valuation, but that

2  doesn't stop anybody from doing it.

3          MR. GLEASON:  No, that is correct, Your Honor.

4          THE COURT:  So, if they came and they said, you know,

5  we'll pay $45 million for the two profitable lines and we want

6  to leave behind the equipment, then that's a bid that

7  consistent with the bidding procedures.

8          MR. GLEASON:  Yes, in consultation with everybody in

9  this room.

10         THE COURT:  And presumably you would talk to the

11 Committee --

12         MR. GLEASON:  Yes.

13         THE COURT:  -- and the Committee's advisers, and you

14 would talk to, you know, the other interested parties, and a

15 decision would be reached or not reached, I mean, you know, you

16 may have a different point of view about that.  That would then

17 become and issue for the sale hearing to determine who was

18 really better -- higher and better under those circumstances.

19         MR. SELBST:  That's absolutely my understanding about

20 it.

21         THE COURT:  Okay, all right, thank you.

22         MR. LEPENE:  Your Honor, on behalf of Key Bank, we

23 also are supportive of the granting of the motion.  I think

24 from our perspective the evidence today was very telling in

25 terms of the testimony regarding the precarious and fragile

258

1  condition of the company.  It really goes to the Mary Smith
2  issue to a certain extent.  There are employee issues here,
3  there are customer issues, there are supplier issues.  There is
4  negative cash flow and Mr. Pollack testified with respect to
5  that.  Mr. Knipp testified with respect to that.  And the
6  testimony was that the D-I-P financing is sufficient to
7  maintain going-concern value if the sale process is concluded
8  by November 15th, no later than that date.  So, where we come
9  from, Your Honor, obviously we don't have any specific economic
10 interest in whether Presstek gets a break-up fee.  What we
11 believe is extremely important, not only for us but for all of
12 the other constituencies in this case, the Creditors, the
13 employees, and obviously ourselves, that we proceed with the
14 sale process.  We believe, and we've satisfied ourselves in
15 terms of listening to the evidence, having had discussions
16 prior to this hearing, that Presstek is sufficiently committed
17 to this transaction in view of the costs that they have
18 incurred, and that certainly we heard testimony with respect to
19 that.  But I think perhaps even more importantly, their role as
20 a Debtor-In-Possession lender.  Without their participation in
21 terms of that financing arrangement as the testimony has
22 demonstrated, we would be in a piecemeal liquidation at this
23 point.  So, we think that the record and the evidence
24 demonstrates a sufficient commitment on their part to proceed
25 and go forward that would justify the provisions that have been

B-0532

1   negotiated with respect to the break-up fee, but again, from

2   our standpoint, the most important thing, given the fragile

3   nature of this business, is that we get on with a sale process

4   and that we proceed along the lines that the Debtor has

5   suggested in the papers that have been filed, and therefore we

6   do support the granting of the motion.  Thank you, Your Honor.

7           THE COURT:  Thank you.

8           MR. RICCIARDI:  Your Honor, James Ricciardi, McGuire

9   Woods on behalf of the Committee.  I hope this is one of those

10  days where the guy that gets to go last wins, but you know,

11  let's see.  First, Your Honor --

12          THE COURT:  Depends on how long he takes.

13   (Laughter)

14          MR. RICCIARDI:  As an initial matter, Committee has

15  to take issue with Presstek's position that it's not compelled

16  to lend through November 15th to accommodate the new auction

17  schedule that it proposed in its written response to our

18  objections to the D-I-P and to the bid proceedings.  In fact,

19  Your Honor anticipated this tactic of Presstek at the first-day

20  hearing when the following colloquy took place, at page 35; The

21  Court, "Now, there may be precedent for that but it certainly

22  invites much closer scrutiny than it does if you have an

23  independent financial institution that is in it for the money,

24  and something, any term that may appear to have the effect of

25  limiting the marketability of the assets because of your

260

1    client's position as both the stalking horse and the D-I-P

2    lender I'm going to look at very closely." "Your Honor" -- Mr.

3    Selbst, "We are perfectly prepared to abide by the Court's

4    determination as to what fair sale procedures are." Period.

5    Full stop. "My client understands." The Court, "Although you

6    have an event of default if all of these terms that you put in

7    here are not, in fact, met." Mr. Selbst, "And I'm here to

8    represent to the Court if the Court sees fit to modify those

9    terms we will live by such terms as are modified by this

10   Court's order when the Court approves the bidding procedures.

11   I am not going to -- my client is not going to blow up the D-I-

12   P if those bidding procedures are modified, either consensually

13   or by order of this Court." So, we think Presstek is estopped

14   from taking the position that they don't have to lend through

15   November 15th, and as I said, Your Honor, they've also

16   indicated that they would accept November 15th and October 29th

17   in their two pleadings that they filed in response to our

18   objections.  So we --

19        THE COURT:  Remind me what the difference is between

20   October 27th and October 29th.

21        MR. RICCIARDI:  I believe October 27th is the date

22   the bids are due, and October 29th is the auction date.

23        THE COURT:  Okay.

24        MR. RICCIARDI:  So, I will turn now, Your Honor, to

25   the proposed break-up fee --

B-0534

261

1    THE COURT:  And then we have a hearing after that

2   with a closing no later than the 15th, is that the idea?

3        MR. RICCIARDI:  A closing no later than the 15th.  I

4   assume that the Debtors would be prepared to ask the Court to

5   waive the requirements of the rule that say that you can't

6   close an asset sale in less than 10 days.

7        THE COURT:  You know, this is somewhat off the topic,

8   and I don't mean to interrupt your argument, but you should

9   understand that I may not have this case at that point.  This

10  case may be in the hands of another Judge.  Presumably that

11  Judge would be sensitive and I'd be happy to talk to that Judge

12  about it to the timing necessary in order to get the sale

13  confirmation hearing scheduled at the particular time.  But

14  next month is my last resident month in Wilmington.  There are

15  certain matters that I may hear -- continue to hear here, but I

16  haven't made that final decision yet, and I haven't talked to

17  Judge Walrath about which ones ought to be done, and I don't

18  know what arrangements have been made for the next visiting

19  Judge yet.  So, I think you're talking the royal "we" when you

20  say the Court will work on it's schedule here rather than

21  necessarily me, and I just want to make sure everybody

22  understands that that's a distinct possibility in this case.

23       MR. RICCIARDI:  Well, I certainly understand that,

24  Your Honor, thank you.

25       THE COURT:  Okay.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-529-0191

B-0535

1    MR. RICCIARDI:  Turning to the proposed break-up fee

2  and expense reimbursement, according to certain testimony of

3  the Debtor's financial adviser about the numerous reps,

4  warranties, and business-related closing conditions of the

5  Presstek APA, indeed it appears to be the Debtor's current

6  projection that not withstanding Presstek and Key Bank's

7  concession regarding pre-paid inventory, the Debtors will not

8  be able to meet the UK Limited net assets closing condition

9  section of 10.12.  If Your Honor would want to look at A.B.

10  Dick Exhibit-1, Mr. Pollack was asked about this, and he had

11  nothing to say except that A.B. Dick 1 regarding UK Limited

12  closing conditions indicated that it was not met, that there

13  was a deficit versus the closing condition, and I don't

14  believe, Your Honor, that that's impacted in any way by the

15  prepaid inventory concession, and it's just this kind of thing,

16  there are so many of these little closing conditions, so many

17  of these reps and warranties.  Let's take, for example, the one

18  about no encumbrances other than asset --

19        •    THE COURT:  Let's not leave that last one, but what I

20  understood Mr. Pollack's testimony to be was that you could not

21  look at what is essentially the page 4 or 5 of Exhibit-1 by

22  itself.  That the so-called Asset Purchase Agreement covenant

23  review -- is that what you were looking at?

24        MR. RICCIARDI:  Yes.

25        THE COURT:  And are you looking at the last portion

263

1   of it there?

2          MR. RICCIARDI:  I am, the last line -- the last few

3   lines under UK.

4          THE COURT:  Right.  That he said that shows what the

5   deficit would be, but then what you have to look at is the

6   availability under the line and the ability to buy inventory

7   and that would bring that deficit into compliance.  And then if

8   you look at that at the same time that with regard to these

9   various items that although there's not a lot of excess money,

10  I think everybody would agree to that, that there is sufficient

11  projected availability to be able to cure that problem.

12         MR. RICCIARDI:  I think, Your Honor, that there are

13  two different tests, respectfully.  If you turn to 10.12 in the

14  Asset Purchase Agreement, the first test requires that the sum

15  of accounts receivable and inventory less the preferred revenue

16  of seller and Canada Sub shall be at least $22,700,000 on a

17  cumulative basis, and that line is represented as a covenant

18  about a third of the way up the page from the bottom of

19  $22,700,000, and it is those negative numbers that Mr. Pollack,

20  I believe, testified would be compositive numbers if pre-paid

21  inventory were allowed to be counted in the calculation as it

22  is here up to a maximum of $2 million, and if the Debtors could

23  spend available cash to buy additional inventory.  But that is

24  a separate test from the limited test which talks about $5.4

25  million in net assets, and as I understand it, I don't even

B-0537

264

1  believe that the Debtors are allowed to use funds from the D-I-

2  P loan for propping up the UK subsidiary.

3          THE COURT:  Well, where is the covenant on the 5.4

4  million in?

5          MR. RICCIARDI:  It's right there on page -- in 10.12

6  on page 48 of the Asset Purchase Agreement.

7      (Pause in proceedings)

8          THE COURT:  Okay, so, your position is that -- now,

9  this is as of closing, isn't that right?

10         MR. RICCIARDI:  It is, it is a projection, Your

11 Honor, yes.

12         THE COURT:  But I mean the test here is that --

13         MR. RICCIARDI:  The test is as of the closing.

14         THE COURT:  At the effective time, which means

15 closing basically, right.

16         MR. RICCIARDI:  Yes.

17         THE COURT:  Well, we don't really have anything here

18 that tells us about that, do we?

19    •     MR. RICCIARDI:  No, you're right, we don't, but --

20         THE COURT:  We don't have October and November.  What

21 we have are July, August, and September that would show in July

22 a deficit of $9 thousand, in August a deficit of $53 thousand,

23 and in September a deficit of $14 thousand.

24         MR. RICCIARDI:  Yes, that's correct, Your Honor, and

25 I don't see any materiality qualifier here on this 10.12.  So,

B-0538

265

1  I think a deficit of $1 thousand would breach the covenant.

2  That's the kind of thing that lurks in this Asset Purchase

3  Agreement, Your Honor.  I don't want to belabor the point, but

4  I just want to go back to one rep and warranty that was

5  discussed earlier when Mr. Pollack was on the stand, and it

6  concerns unscheduled encumbrances, and as Your Honor well knows

7  if there's an unscheduled encumbrance that comes to the

8  attention of parties, that calls for additional notice to that

9  lien holder.  It doesn't, and shouldn't give the buyer a right

10 to walk away.  The buyer's gonna get a 363 Sale Order free and

11 clear of liens.  In addition to these problematic --

12         THE COURT:  Well, let me ask you this question from a

13 practical standpoint.  The evidence here is that Presstek has

14 sunk a million six or million four, whatever the number was,

15 something like that, into this deal.  At least they have

16 disclosed in the public record I think it was a million six in

17 costs.  They will, at that point, if the projections from

18 Mr. Knipp are correct, and also Mr. Pollack I think, the end of

19 the D-I-P for some additional amount for which they're

20 obviously secured as to those assets, but they're not secured

21 -- they don't get to wrap in that $1.6 million as part of the

22 D-I-P advance.  So, they're not secured as to that.  So, there

23 may not be precisely in their materiality item, but what you're

24 suggesting to me is that I should not approve these bid

25 protections because, for the lack of a thousand dollars on the

266

1  UK subsidiary in terms of its net assets, that they'd walk from

2  the million six without any possibility of recovering it.

3           MR. RICCIARDI:  Well, no, Your Honor, I'm not asking

4  you to believe that at all because that wouldn't make common

5  sense.  What I am asking you to believe, though, is that if

6  they believe that there's a reasonable chance that that UK

7  Limited test will not be able to be met as of the closing date

8  then they have a free ride.  They can just wait, they can wait

9  through the process, they can hope somebody outbids them so

10 that they get their break-up fee, and maybe they're -- you

11 know, maybe they've had a problem in their business.  Maybe

12 they've had a labor strike and a plant was shut down for two

13 months and they are no longer sure that they can integrate this

14 business.  So, if they have a reason to walk for a thousand

15 dollars, they'll walk for a thousand dollars if they don't want

16 to do the deal.

17           THE COURT:  Yes, but if they walk for a thousand

18 dollars before the time comes then they lose the million six.

19      .     MR. RICCIARDI:  But as Your Honor --

20           THE COURT:  If they walk for the thousand dollars and

21 hope that somebody outbids them at the later time then if that

22 bid is approved then necessarily it's better for the Estate

23 than the deal they originally put on the table, because

24 otherwise it wouldn't be approved.  And so even if they got

25 paid their break-up fee, whatever it turns out to be, they --

B-0540

267

1 the Estate would be better off by definition, correct?

2      MR. RICCIARDI:  Well, in that circumstance the Estate

3 would be better off, but there's another circumstance in which

4 they can use the thousand dollars to maybe negotiate a $5

5 million price reduction because nobody else showed up.  So, you

6 know, there are plenty of things that they can do with these

7 little worms that exist in this Asset Purchase Agreement.

8 There are plenty of uses that they can put into, and they're

9 entitled to have all the protections they want.  We're not

10 trying to reform the agreement.  We're just saying that under

11 the O'Brien standard, which the Court admonished us all to

12 consider, they haven't demonstrated the necessity of paying

13 4.25% in break-up and expense reimbursements to preserve or

14 enhance the value of the Estate.  In fact, we think that they

15 haven't demonstrated the necessity on paying anything, and

16 arguably Mr. Selbst's statements to the Court indicate that

17 it's not even necessary to award the break-up fees because he

18 said, you know, we're gonna be there at that auction.  We

19 believe in this business.  We've been chasing this company for

20 a year.  So, how under O'Brien can we award a break-up fee to

21 Presstek?  Presstek's gonna be there one way or the other, and

22 that's really the reason why we don't think it's permissible

23 under O'Brien to award the break-up fee.  I just want to be

24 brief.  Two other comments.  There are two other conditions in

25 this agreement that we really, really find troubling.  The

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B-0541

268

1    first is in section 1010, and it's not a business condition,

2    it's a legal condition, and this is the condition which permits

3    Presstek to refuse to close if the Sale Order is appealed, even

4    if there is a good faith filing -- a good faith finding made by

5    the Court.  It is not common, in my experience, Your Honor, to

6    see buyers with a commitment that Mr. Selbst has indicated

7    Presstek has insist on that kind of condition.  In fact, it's

8    rare, and I don't know what Your Honor's own experience is, but

9    in my experience it's rare.

10        MR. SELBST:  Your Honor, is Mr. Ricciardi testifying

11   now?  This isn't evidence.

12        MR. RICCIARDI:  I think I'm entitled to refer to

13   other argument of counsel, Your Honor.

14        THE COURT:  What's the other one?

15        MR. RICCIARDI:  The other one is the successor

16   liability clause in the Sale Order.  The definition of Sale

17   Order, which they require in order to be committed to close.

18   It's on page 8 and it says, "Determining that the purchaser is

19   not a successor to seller or otherwise liable for any of the

20   retaining liabilities or excluded assets, and permanently

21   enjoining each and every holder of any of the retained

22   liabilities or excluded assets from commencing, continuing, or

23   otherwise pursuing or enforcing any remedy, claim, cause of

24   action, or encumbrance against purchaser or the purchased

25   assets related thereto."  If the Court is comfortable that on

B-0542

1  these facts where they're going to buy the name A.B. Dick, and

2  they're going to continue the business of A.B. Dick after the

3  acquisition if the Court could sign an order with such a

4  provision in it then that wouldn't be troublesome to the

5  Committee.  But we are mindful of the case in the 1st Circuit,

6  I think it's Sergeant -- that says -- there's a case from the

7  1st Circuit, Sergeant Arms, where it says, Your Honor, that

8  that type of a provision is not appropriate.  I'm sorry, it's

9  Savage Industries Incorporated, and it's 43 F 3d 714, 1st

10 Circuit, 1994.  So, that's an additional concern we have is

11 that another one of these worms, as I described them, in the

12 Asset Purchase Agreement.  So I guess on the basis of the not

13 only conditionality but what we view as optionality of the

14 agreement and on the basis of their not having met the burden

15 on either the amount or the need for the break-up fee we would

16 ask that the Court deny the break-up fee and the expense

17 reimbursement.

18            THE COURT:  Okay.

19            MR. RICCIARDI:  Thank you, Your Honor.

20            MR. KAY:  I'll be very brief.  Eric Kay for MHR.  We

21 echo, obviously, the statements of the Committee.  We just

22 don't think that Presstek has met the O'Brien heavy burden of

23 providing value to the Estate.  The evidence suggested that

24 that 3% is in the high range of break-up fees.  What they're

25 seeking here is 33% more than 3%, the high range of break-up

270

1   fees.  As the Committee suggests, and we agree, we don't think
2   they're entitled to anything, but they're certainly not
3   entitled to this exorbitant break-up fee.  Just one
4   clarification.  I think the parties had agreed to it but it's
5   not reflected in the Bid Procedures Order.  To the extent that
6   the Court were to award a break-up fee, I think it needs to be
7   made clear that they're not entitled to it if they're in
8   default of the agreement at the time.  The Order does not so
9   provide, and I just want to make clear that they only get their
10  break-up fee if they're not otherwise in default of the
11  agreement.  Lastly, on the option out, which is, you know, I
12  have big concerns that obviously the Creditors are the ones who
13  are gonna benefit from a sale that takes place here, and that's
14  why we're trying to make certain that we have a firm deal.  We
15  negotiated over the weekend trying to firm up this deal, and
16  Mr. Selbst indicated that Presstek is committed to this deal.
17  They're not walking away from this deal.  They will be at the
18  auction.  As a result of that, we tried to put some qualifier
19  on the reps and warranties, put some baskets on, you have to
20  show damages to the assets of X.  If Mary Smith is not there
21  but there's no harm to the assets they should not be entitled
22  to walk.  We couldn't bridge that gap.  We were trying to make
23  suggestions to bridge the gap, and you know, it couldn't be
24  done.  That's the way I've seen it done in other cases where
25  this issue comes up.  As the Debtors -- as Mr. Pollack

B-0544

271

1  testified, the Debtors did try to strip down the reps and

2  warranties to firm up the bid.  They were not successful.  I

3  can appreciate that.  Debtors don't have a lot of leverage when

4  they're negotiating stalking-horse agreements.  But I think,

5  you know, it's in the Creditor's best interest that this

6  process begins, it begins as soon as possible, and it begins

7  with a firm bid.  And I just don't think we're there, and

8  without that committed bid --

9          THE COURT:  Well, so what is it -- so what's in front

10  of me today is whether to give them the bid protection.

11          MR. KAY:  Right.

12          THE COURT:  I'm not here to rewrite the APA.

13          MR. KAY:  No, you're not here to rewrite the

14  agreement, and that's why we're not raising any of those

15  issues.  Those possibly could be sale issues, but they're not

16  issues for today, such as the release and the other problems

17  with the APA as we see it.  But what we're saying is that since

18  this isn't a firm commitment, they're not contributing value to

19  the Estate, and since they're not contributing value to the

20  Estate they haven't met their heavy burden under O'Brien for

21  any break-up fee, let alone the exorbitant break-up fee they're

22  seeking.

23          THE COURT:  Okay.

24          MR. KAY:  That's all I have, Your Honor.

25          THE COURT:  Anybody else?

B-0545

The Court - Finding                                        272

1          MR. GLEASON:  Can I make one response to that, Your

2   Honor?

3          THE COURT:  Sure.

4          MR. GLEASON:  With respect to the value of the

5   Estate, we just mentioned to the Court that but for Presstek we

6   wouldn't be here.  This case would be in piecemeal liquidation.

7   And I want to follow that up with, we've come to Phoenix three

8   times in August, and I love Phoenix in August, but if there's

9   any chance we could come to Phoenix in November that would be

10  fine.

11         THE COURT:  You particularly like it when the air

12  goes off at 6 o'clock?

13      (Laughter)

14         THE COURT:  I assume the rest of you may have noticed

15  that also.

16         ALL:  Yes.

17         THE COURT:  All right.  That used to be a technique I

18  would use if I was doing judicial settlement conferences.  I'd

19  make sure it'd run -- you know, I'd do it in July and August

20  and make sure it ran until 8 or 9 o'clock at night, and then

21  you know at that point a deal would be done, there was no

22  question about it, because all they wanted was to get out.  On

23  that note, I'm going to take 10 minutes.  I want to look at the

24  APA in light of everybody's comments, look through it one more

25  time carefully and then I'll come back and rule on the record.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0546

273

1    UNIDENTIFIED SPEAKER: Your Honor, can we take our
2 jackets off?
3         THE COURT: Yes, that's all right.
4         MR. MASON: Judge, I think you have all the exhibits
5 other than our exhibit, I think it's C, that's the execution
6 copy of the --
7         THE COURT: I have the execution copy.
8         MR. MASON: You do have it, okay.
9    (Recess)
10        THE COURT: Please be seated. All right. This
11 morning and this afternoon we've had a hearing in connection
12 with the final approval of a D-I-P agreement among the Debtor
13 and Presstek and Key Bank, and also the approval of certain
14 bidding procedures for the protection -- for the sale of the
15 assets of this company. The parties announced at the beginning
16 of the hearing with regard to the D-I-P financing that numerous
17 of the matters in dispute had been resolved and recited those
18 on the record. Frankly, I was pleased to hear that because I
19 did think, and I think I may have telegraph from some period of
20 time that a number of the provisions in the D-I-P agreement I
21 found to be excessive and would not have been prepared to
22 approve. The agreement -- the modifications that were made, I
23 think, however, substantially leveled the playing field and
24 provide the Debtor with financing that is necessary for its
25 operations while at the same time providing reasonable

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0547

274

1  protections to the D-I-P lenders.  So, with regard to the D-I-
2  P, and I understand also that -- well, I understand all parties
3  were in agreement with regard to those and that there were
4  really no open issues with regard to the D-I-P as among the
5  objecting parties, the lenders, and the Debtor, and I will
6  approve those amendments and will sign a D-I-P Order under
7  Certification of Counsel that all counsel have reviewed and
8  agree with the way the matter has been drafted.  With regard to
9  the other open issue, which is the question of bid protections,
10  well, the whole overall question of bid procedures, there was a
11  substantial number of modifications made also to that, the most
12  significant of which, in my view, are the lengthening of the
13  time that the assets will be marketed and the extension until
14  October 27th of the bid due date, October 29th is the auction
15  date, and November 15th is the closing.  Again, I think that
16  this company was operated on a very -- this procedure was very
17  compacted, and I do think that that significantly improves the
18  possibility of having an increased return to the Debtor, or in
19  the absence of any other viable bids by any other entity, at
20  least, I think, it provides an adequate period of time for the
21  professionals involved to satisfy themselves that the trees
22  have been shaken to the extent possible under the
23  circumstances.  We heard evidence today that -- about how the
24  company got into the bind that it's in, particularly with
25  regard to the liquidity crisis that led directly to the filing

275

1 of the bankruptcy. The -- it is clear to me that there was a

2 financial crisis in this company, that the company had no money

3 to deal with, and that it needed to file, and file quickly, and

4 then it needed also to move quickly to try to provide some

5 source of financing on an on-going basis, which it found from

6 Presstek. The record is thin on the question of whether or not

7 financing on terms other than the terms provided here is, in

8 fact, not available. The evidence that was provided on that is

9 that in 2002 the Debtor went to two lenders, Foothill and

10 Servius, who are well-known players in the world of financing

11 distressed companies, who declined to -- to provide financing.

12 The details of all of that were a little bit sketchy from the

13 record. We didn't know, for example, whether or not -- all we

14 know is that they declined. We don't know whether, for

15 example, if the matter had been put into a Chapter 11 so that

16 they had the protections that you would get under 364, would

17 they have considered lending under those circumstances. But in

18 any event, we know that there was some effort made. I think

19 the record also is clear that the financial circumstances of

20 the Debtor deteriorated from then until the time in the summer

21 of '04 when they literally didn't have enough money to make

22 payroll, and when Key said, enough is enough and we're not

23 advancing more than $500 thousand at this particular point, and

24 that was enough really to make the payroll. So, I do think

25 that the evidence fully supports the notion that this was a

276

1  company that was going down quickly, had run out of money, was

2  surviving, basically, on overadvances from Key Bank, and had to

3  find a solution somewhere to stop the bleeding.  That also

4  supports the notion that putting the company into a sale mode

5  as quickly as possible is a justified decision and that there

6  probably isn't enough time to have the luxury of more fully

7  developing, for example, the question of putting together a due

8  diligence package on what the company looks like if it was

9  disaggregated, and so on.  I am satisfied that the bid

10  procedures that have been put in place do allow that kind of

11  disaggregation, and in fact, I'm confident that the

12  professionals involved will, from the financial advisory

13  investment banking standpoint, will do what they can do see if

14  there is a way of selling just those lines of business, as

15  opposed to the equipment line, which obviously at this point is

16  a losing proposition.  At the same time we heard testimony, and

17  I accept it, that they are related in the sense that the

18  equipment line may be a losing proposition but it's what

19  provides the engine for the service and for the consumables.

20  So, if you don't have new equipment that business gradually

21  falls off.  So, in a sense it's a loss leader, the question is

22  whether or not it's a loss leader that you can afford because

23  the burn rate on the equipment side is very substantial.  So, I

24  did find the evidence useful and helpful with regard to the

25  company's financial history, where it got to where it was and

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B-0550

1 how it was in need of both the D-I-P financing, which will be
2 approved, and of the bidding protections.  Now, there is one
3 issue that was put on the table by Mr. Selbst, which is that
4 unless there's an agreement -- unless the bid protections are
5 satisfactory to us we have the right, basically, to walk on the
6 D-I-P, or to insist upon the terms of the D-I-P as they
7 presently exist, making the certainly not unreasonable argument
8 that nobody can force us to be an involuntary lender.  On the
9 other hand, I think it has been clear since the first day of
10 this case that the bid procedures were subject to Court
11 approval, and that Presstek had said it would live with the
12 order of the Court on the bid procedures, and would not, in
13 fact, use that as a lever to pull its D-I-P financing, and I
14 was concerned about that from the very beginning.  You all may
15 have been in TWA but I wasn't, so this is something I have not
16 seen before, frankly, where the stalking horse and the D-I-P
17 financier are the same party, and I do think it raises a number
18 of issues and changes the dynamic that typically exists in
19 Chapter 11 cases.  So, my view is that, frankly, there is no
20 linkage between the D-I-P financing and the approval of the bid
21 procedures, given the position that has been taken from the
22 beginning by Presstek.  In the absence of those statements on
23 the record, statements today on the record by Mr. Selbst when I
24 think he very candidly says that he will live with what the
25 Court has to say I think does delink those two circumstances.

1   And there has been a substantial number of concessions made by
2   Presstek.  The -- as was made clear in my colloquy with MHR's
3   counsel at the end of the hearing, this is not a hearing for me
4   to rewrite this APA and to say, well, you really should remove
5   this rep and warranty and remove that rep and warranty, and so
6   on and so forth.  That's not appropriate, that's not in front
7   of me.  It's raised in the context of whether or not given the
8   APA as it stands is a break-up fee appropriate, and if so in
9   what amount, is the negotiated amount of 3% plus the $500
10  thousand in expense reimbursements appropriate?  So, this is
11  not something I can look at on a micro level and say, we're
12  going to fix this, this, this, and this and then it's okay.
13  I've got to look at it on the macro level and say, in total as
14  a business proposition and as a legal proposition is there a
15  break-up fee justified when the stalking horse has the rights
16  and obligations that are set forth in this particular APA?
17  Now, the primary focus of the Committee's and MHR's complaints
18  are that there are too many outs for Presstek, and that it
19  really is an illusory agreement because if Presstek wants to
20  walk more likely than not it's going to find some technical
21  deviation from the terms of the APA, and that primarily focuses
22  on the representation and warranties, somewhat on the
23  covenants, and so on.  There are really two different kinds,
24  there's the financial covenants, where the Debtor's financial
25  advisor had previously testified that in the absence of

1  modifications to the -- particularly the inventory calculations

2  that they would not be able to make those -- reach those

3  financial covenants.  With the modifications that have been

4  agreed to his opinion now is, in fact, they -- it is more

5  likely than not, or it's quite likely the Debtor will meet

6  those.  Now, it was pointed out during argument that there was

7  this issue with regard to the UK net assets, and that they are

8  projected not to be sufficient.  The reality is they're not

9  really projected up to the point that's relevant, which is

10 November, the closing date, on the documents that we've seen.

11 The numbers are very close to what is required on the

12 projections that are there, but they are below, and it was

13 pointed out by Mr. Ricciardi that there is a -- there is no

14 materiality provision written in there.  Frankly, I don't find

15 that to be a very convincing argument simply for the reasons

16 that I indicated before.  It is -- looking at this from a macro

17 standpoint, if the UK net assets are 4, 5, 6, 10, $15 million

18 -- $15 thousand short of what the rep and warranty is, I find

19 it difficult to believe that that would give -- that Presstek

20 would walk.  Whether it would give Presstek leverage, of

21 course, is another question, as was suggested maybe that would

22 give them the right to come back and, you know, renegotiate the

23 deal.  But frankly, on the macro level I think it's more

24 important to get the bid procedures in place, get this deal

25 going so that the professionals can try to market the assets

B-0553

280

1    and create an environment where the market will cause changes

2    to the APA, as opposed to my imposing changes to the APA at

3    this particular point.  I think it's, as I said, I'm not going

4    to do that, but rather say that the APA is so loose that no

5    break-up fee is justified.  The argument of the objectors is

6    that because of the nature of this APA there's been no real

7    value and it's not a necessary expense under the O'Brien test

8    to pay any break-up fee here.  I don't think that that's what

9    the evidence suggests.  I think that the evidence suggests that

10   there is value of a substantial sort that has been brought to

11   the table.  If we look at the difference, let's say the Debtors

12   just noticed up a 363 sale or an auction and said whoever's

13   going to show up come and show up.  We're going to try to sell

14   the assets.  I think the fact that there is this deal

15   negotiated with Presstek is a materially better circumstance

16   than that, and that the representations and warranties,

17   although extensive, I don't find to be so restrictive that it

18   means that there is no value here that should -- that would

19   support some amount of a break-up fee being given to Presstek.

20   I do think the amount that was negotiated is not justified,

21   however.  I think it's too high.  I don't think it ought to be

22   determined by what Presstek actually has in the deal, and

23   although that's simply an inference on my part, when you do the

24   math it seems to me that there's some basis for that

25   conclusion.  At the same time, I do think that there is a basis

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
752-329-0191

B-0554

281

1  that has been made that there is value that has been brought to

2  the Estate such that a break-up fee is appropriate.  That value

3  is that they have, in fact, created a market.  This is not a

4  circumstance where, as you sometimes see, where there are many

5  parties vying to be the stalking-horse bidder.  The more

6  typical circumstance where a break-up fee is not appropriate is

7  where the other buyer shows up and says, I'll match that bid,

8  I'll bid $40 million and I don't need a break-up fee.  So, at

9  that point it's hard to say that there's any value being added

10 because the assets are sufficiently valuable and sufficiently

11 attractive that there is pre-stalking horse competition, or

12 there's competition to be the stalking horse.  In which case I

13 think there is no break-up fee that is suggested or allowed.

14 That's not the circumstance here.  Nobody else has been beating

15 down the door to buy the assets of this particular company, and

16 whatever the deficiencies of this APA are, it does exist, it is

17 there.  Presstek has spent a lot of money getting to this

18 particular point.  They haven't gone away over the course of

19 the year.  They have been willing to advance money under a D-I-

20 P loan, which they don't have to do, and that -- all of that

21 has some value that indicates that there's some reality to

22 this, more than what the objectors suggest.  So, my conclusion,

23 having looked at this, is that a break-up fee is, in fact,

24 justified, but not at the level that Presstek has negotiated.

25 I don't think that is within the realm of reasonableness.  I

B-0555

282

1  don't think it's supported by the O'Brien factors, and I don't

2  think it's supported by any of the testimony here.  All the

3  testimony from the experts is to the contrary.  So, I'll find

4  that a break-up fee inclusive of expenses of 2½% will be

5  allowed, and the bid procedures will be modified accordingly,

6  and the -- that will have an impact upon the overbids and so

7  on, too, in terms of what's necessary for the next bidder.  I

8  picked that number because it's a consensus among the experts

9  of what would be within the range of a normal break-up fee, and

10  that's my experience also.  I've seen break-up fees in that

11  amount, plus expense reimbursements or maybe a break-up fee of

12  2% plus an expense reimbursement.  I think it's better to just

13  have a flat 2½% and approve it on that basis, because I am

14  convinced that that amount of value has been brought to the

15  table.  I think with that I'm not sure there's much else I need

16  to decide unless you all tell me I'm leaving something out.

17  Other than learning how to turn the air on after hours.

18      (Laughter)

19  •    MR. GLEASON:  Your Honor, can we submit a Bid

20  Procedures Order with a Certificate of Counsel as well as

21  Certification of Counsel?

22      THE COURT:  Right.  I think what ought to be done

23  here is now there ought to be a Bid Procedures Order drafted

24  up, it shouldn't -- I don't think it's going to require much

25  change.

*Writer's Cramp, Inc.*

Certified Court Transcribers

752-329-0191

283

1          MR. GLEASON:  No.

2          THE COURT:  Those items that you've already had --

3    that's already been black lined once, and then just change that

4    and that would be the Bid Procedure Order that should be

5    submitted.

6          MR. RICCIARDI:  Your Honor, one question.  With the

7    break-up fee of 2½% including expenses, that would be a total

8    of a million, so that would mean that the bid procedures would

9    be modified so that the minimum overbid would be 41.2 million.

10   Do I understand --

11         THE COURT:  Yes, it would be 1 million plus 200

12   thousand.

13         MR. RICCIARDI:  Thank you.

14         THE COURT:  That's what I was suggesting here that

15   that's --

16         MR. GLEASON:  Yes.

17         THE COURT:  -- the other part of this I think that

18   would have to be changed so you know what the next minimum

19   overbid would be.

20         MR. GLEASON:  Lastly, Your Honor, sale hearing.  I

21   know that may not be in your Court, but how should we handle

22   that?  Should we -- we do have a space in this, and we do have

23   a notice that would go out as well.

24         THE COURT:  Well, I don't know if we can set a sale

25   hearing now.  Does that create real heartburn for you?  I'm

B- 0557

284

1 going to call Judge Walrath tomorrow and talk to her about what

2 we're going to do and how these cases ought to be -- how this

3 case ought to be handled, and I was hopeful that by now there

4 would be -- and maybe there is, maybe I just don't know whether

5 or not there's been another Judge identified to come in as of

6 October, and as I say, I've agreed to stay on through the end

7 of December, but not on a traveling to Wilmington basis,

8 because that has become -- that will be difficult for me for

9 the next three months.

10        MR. MASON:  Judge, if you were so inclined to retain

11 this case, but for it to be heard in Phoenix on behalf of the

12 Committee, the Committee would prefer to keep the case before

13 you.  I don't know if the other parties, you know, would like

14 to weigh in on that issue, and I don't know if that will

15 influence the Court at all.

16        THE COURT:  Yes, I don't -- frankly, I'd rather not

17 know.  I don't want to put counsel in the position of having to

18 sort of stand up and waive the flag and say that's great or

19 not, because I don't think that's really a fair position to put

20 counsel in front of.

21        MR. GLEASON:  No, we're fine, Your Honor.  We would

22 much rather -- you have history with the case and --

23        THE COURT:  That's much like my saying, you know, I

24 played golf with Mr. Mason last week, you really don't care

25 about that do you?

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B-0558

285

1    (Laughter)

2        MR. GLEASON:  What I hear maybe is Your Honor doesn't

3    want to say he doesn't want this case.

4        THE COURT:  No, and for me really, you know, I

5    understand when I went to Delaware I undertook the obligation

6    to hear cases, and on the one hand if there is -- if in fact

7    there is a new Judge who is coming in, effective in October,

8    then I think it makes sense to transfer that to the new Judge,

9    just like a bunch of cases were transferred to me and I got hit

10   with a bunch of stuff the first day I was there last year, and

11   that new Judge will get up to speed very quickly and will

12   understand what's going on.  On the other hand, if there's not

13   a new Judge coming in October and the result is then we don't

14   know what we're going to do with it and the case either has to

15   be transferred to one of the other visiting Judges who may be

16   staying a couple months longer than me, or to Judge Walrath or

17   Judge Walsh, who as you may know have quite a bit on their

18   plate, too, then that will have an impact upon it, which is why

19   I want to talk to Judge Walrath, who is chief Judge, and figure

20   out what to do.

21       MR. MASON:  Well, Judge, just the vast majority of

22   the professionals are not from Delaware and so almost all of us

23   have to get on a plane for every Court hearing anyhow.

24       THE COURT:  I understand that.  Part of the problem,

25   of course, is that those who are, with the exception of Mr.

B-0559

286

1    Rosner who is here, those who are from Delaware who participate
2    this now find it to be almost 11 o'clock at night back in
3    Wilmington, and I've had a number of these hearings where it
4    gets very late on the east coast, but I guess you all are used
5    to that. That's why they pay you the big bucks, right? You
6    all don't sleep anyway.

7        (Laughter)

8        THE COURT: I will, as I said, I'll talk to Judge
9    Walrath about it. I was going to wait until I go in September
10   but I don't think there's enough time. I think I ought to talk
11   to her about it and see what to do with this case after that.

12       MR. GLEASON: What we can do for the bid procedures
13   is we can maybe just put a date to be determined by the Court.
14   I think we have a little bit of time before we have to get our
15   Sale Notice in, then we do need to kind of move a little
16   promptly.

17       THE COURT: All right. Does anybody have any -- I'm
18   not inviting any reargument, I just wanted to know if there's
19   anybody who has any questions, if there's anything unclear
20   about the ruling today?

21       MR. MASON: The only question I have, Judge, is a
22   logistical one and that is that we know you're going on
23   vacation on Thursday and so I would imagine that we would have
24   to get to the Chambers these orders in conformance with your --

25       THE COURT: What I normally do with orders when I

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0560

287

1  hear -- when I'm not in Delaware is the orders get sent to me,
2  either I get forwarded e-mails that you all send to them, or I
3  get an e-mail with the docket numbers and I can log on to the
4  Delaware ECF system.  I review the orders on-line and then I
5  advise the Courtroom Deputy in Delaware that she can use my
6  signature stamp, stamp the order and have it docketed, and
7  that's the way I normally handle it because that's a lot
8  better, I think, than sending them out here, signing them,
9  FedExing them back and then it takes too much time.  I can tell
10 you I will -- you know, I'll be aware when I'm on vacation,
11 I'm not going to the Antarctic, of what's going on and I can
12 review matters electronically while I'm gone, too.  It might
13 have an impact upon what I think about certain things, but
14 that's -- that's a joke, I'm sorry.  Okay?
15         MR. GLEASON:  I'll -- I mean, I'll get orders
16 circulated tomorrow and we'll get it to them as soon as we can.
17         THE COURT:  It seems to me that there's not really
18 that much to do --
19         MR. GLEASON:  No.
20         THE COURT:  -- because you've already circulated the
21 black lines that have all of the other issues in them.
22         MR. MASON:  Judge, in the unlikely event that we were
23 to have a disagreement over precise language, is there any
24 little window of opportunity for us to at least have a
25 telephone conference with you?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

B-0561

288

1    THE COURT:  I'm sure if you contact my office we'll

2    figure out if there is such a time.  I have a trial starts at 9

3    o'clock tomorrow then I've got calendar -- 1:20, 2:30, 3:30

4    tomorrow.  I have -- I don't know if any of you are involved in

5    the Northwestern case, which is a Delaware case, that's going

6    to confirmation hearing at 9 o'clock on Wednesday and maybe

7    we'll last at least until this time on Wednesday night.  So,

8    that's what my calendar is the next two days.

9        MR. FOLLAND:  Just for clarification in scheduling,

10   Your Honor, I understand based on the Interim Order that D-I-P

11   use is going to expire at the conclusion of this hearing.  I

12   would suggest that the hearing be kept open until an order be

13   submitted to you which I understand there's going to be

14   comments coming from the Committee and I would hope to get it

15   to you say -- submitted to the Court I should say, on Thursday

16   morning.  Would that be acceptable, Your Honor?

17       THE COURT:  That's fine.  I think the record should

18   reflect that the existing Interim Order will be extended until

19   such time as the Final Order is submitted.

20       MR. GLEASON:  Thank you, Your Honor.

21       THE COURT:  That sounds like that's contingent.  All

22   right, thank you.

23       ALL:  Thank you, Your Honor.

24    (Court adjourned)

25

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

B-0562

289

**CERTIFICATION**

1

2  I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

3

4

5  Signature of Transcriber                      9-7-04
                                                    Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0563