# Tab 10

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **A.B. DICK COMPANY,** ***et al.*** | ) | **CASE NO. 04-12002 (CGC)** |
| | ) | |
| **Debtors.** | ) | **JOINTLY ADMINISTERED** |
| | ) | |
| | ) | **RELATED PLEADING No. 22, 52, 154, 158** |
| | ) | |
| | ) | **Hearing Date: August 23, 2004 at 9:30 A.M. in Phoenix, Arizona (Mountain Time)** |
| | ) | **Objection Deadline: August 22, 2004 at 11:59 P.M. (Mountain Time)** |

**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF A.B. DICK COMPANY, ET AL. TO THE MOTION OF DEBTORS FOR ENTRY OF ORDER: (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF A.B. DICK COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES; (B) AUTHORIZING PAYMENT OF AN EXPENSE REIMBURSEMENT AND TERMINATION FEE; (C) SETTING SALE HEARING DATE; AND (D) APPROVING FORM OF NOTICE**

The Official Committee of Unsecured Creditors of A.B. Dick Company, *et al.* (the "Committee"), by its counsel hereby supplements its previously-filed objection (the "Objection") to the Motion of Debtors for Entry of Order: (A) Approving Bidding Procedures for the Sale of Substantially All of the Assets of A.B. Dick Company and its Wholly Owned Subsidiaries; (B) Authorizing Payment of an Expense Reimbursement and Termination Fees; (C) Setting Sale Hearing Date; and (D) Approving Form of Notice (the "Bidding Procedures Motion"), and respectfully states as follows:

## I. Preliminary Statement

1. In the Objection, filed on August 9, 2004, the Committee objected to the Bidding Procedures Motion on numerous grounds and expressed the Committee's view that the Proposed Bidding Procedures[1] and the APA are designed to suppress competitive bidding, to protect Presstek's and Silver's (sometimes referred to collectively as "Presstek") initial offer, and to artificially depress the purchase price in any sale of the Sale Assets.

2. Following the Court's instructions at the hearing on August 12, 2004, the Committee has received some documents from and deposed or interviewed representatives of the Debtors and KeyBank.[2]

3. The facts garnered from this limited discovery support the Objection and expose the proposed sale as nothing more than an option to purchase the Debtors' business and provide a windfall for Presstek at the expense of unsecured creditors.

## II. Presstek's Initial Offer Significantly Undervalue's The Sale Assets

4. Presstek's initial offer of $40 million is significantly less than Presstek's proposed purchase price just three weeks before the Petition Date. As such, the current offer severely undervalues the Sale Assets.

5. As early as December 2003, Presstek began negotiating with the Debtors and conducting a due diligence review of the Debtors' businesses.

---

1 All capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

2 The Committee attempted to depose Mr. Moosa E. Moosa, Presstek's chief financial officer. However, Presstek's counsel has informed the Committee that Mr. Moosa would not be available prior to August 23, 2004, and has offered to produce Mr. Moosa after the hearing on August 23, 2004.

6. On or about April 27, 2004, Presstek made a "best and final" offer (the "Prior Offer") to acquire the Debtors' businesses through a proposed stock purchase agreement (the "Stock Purchase Agreement"). A true and correct copy of a letter dated April 27, 2004 (the "April 27 Letter"), including the Stock Purchase Agreement as an attachment to the April 27 Letter, is attached hereto and made a part hereof as Exhibit A.

7. Pursuant to the terms of Stock Purchase Agreement, Presstek offered to acquire all of A.B. Dick Company's issued and outstanding capital stock (owned by Paragon Corporate Holdings, Inc.) for cash and Presstek stock equal to $41.1 million. (See section 2.2 of the Stock Purchase Agreement). Additionally, section 12.10 of the Stock Purchase Agreement would have required Presstek to pay MHR a closing fee of $3.5 million. Moreover, because this transaction was structured as a stock purchase, Presstek would have assumed all of A.B. Dick Company's liabilities.

8. Assuming that the secured debt held by KeyBank was approximately equal to $23,000,000, the amount of KeyBank's secured debt on the Petition Date as stated in the DIP Motion, the true value of the Prior Offer was at least $67.6 million before accounting for any of A.B. Dick Company's unsecured debts and liabilities.

9. On or about June 17, 2004, the Debtors agreed to the terms of the Stock Purchase Agreement.[3] However, Presstek never signed the Stock Purchase Agreement.

10. On or about June 22, 2004, Presstek withdrew from the proposed stock purchase. In a letter addressed to Key Corporate Capital, Inc. but sent to the Debtors (the

[3] The Committee has requested a copy of the Stock Purchase Agreement that was signed by Mr. Knipp on behalf of the Debtors on or about June 17, 2004, but has not received it at this time. The Committee expects to receive a copy of the signed Stock Purchase Agreement prior to the hearing and to present it to the Court at the hearing on August 23, 2004.

"June 22 Letter"), Presstek indicated that KeyBank's refusal to finance the Debtors'

working capital and operating deficits resulted in Presstek's decision to walk away from

the proposed transaction.  A true and correct copy of the June 22 Letter is attached hereto

and made a part hereof as Exhibit B.

11.    A mere three weeks later, the Debtors and Presstek executed the APA,

pursuant to which Presstek would obtain the Debtors' businesses for $40 million, while

assuming virtually none of the Debtors' liabilities.  In other words, during the 21 days

following the June 22 Letter, Presstek's purchase price plummeted at least $27.6 million,

a drop of approximately 41%, without explanation.

12.    Furthermore, as discussed in the Objection, the proceeds from the sale

pursuant to the APA may be reduced by up to an additional $5.5 million to account for

any financing Presstek provides as the proposed, primary debtor in possession lender.

13.    The Committee believes that the Prior Offer, showing Presstek's valuation

of the Sale Assets only weeks before the Petition Date, suggests that the true value of the

Sale Assets is significantly higher than Presstek's initial offer.  Under these

circumstances, Presstek's APA should not benefit from any significant protections, such

as a $1.7 million breakup fee.

14.    For this reason, the Court should deny the Bidding Procedures Motion and

expose the Sale Assests to the most open and competitive bidding process possible to

maximize the value of the Sale Assets for the benefit of unsecured creditors.

**III. Presstek's Offer Is Still An Option**

15. The Committee's fear—that Presstek would be able to abandon the sale at its sole discretion—has been realized. As previously raised in the Objection, the provisions of the APA made it little more than an option to purchase the Sale Assets at Presstek's whim. The Committee vehemently reasserts this view with the added knowledge that Presstek *currently* has a right to walk away from the transaction at closing.

16. Glenn Pollack ("Pollack") of Candlewood Partners, LLC, financial advisors to the Debtors, testified in his deposition that the Debtors are not likely to be able to satisfy section 10.12 of the APA (the "Closing Condition"). Unless Presstek chooses to allow prepayments for inventory to be counted as if it were inventory, the Debtors will be unable to meet the Closing Condition, which requires that on the day of closing, the sum of the accounts receivable and inventory, less deferred revenue, (collectively the "Working Capital") of the Debtors and their Canadian subsidiary be at least "$22,700,00[sic]". Pollack testified that with a closing date of September 30, 2004, if prepaid inventory deposits were paid "and not calculated, as part of [Working Capital], that it may have difficulty meeting this [Closing Condition]." Tr. of Pollack Dep. p.89, l. 14-22. He went on to state that if the Debtors did not make the inventory prepayments, the Debtors could buy inventory from other parties to satisfy the Closing Condition, but "would then be put in the position by the middle of October where it had no inventory." *Id.* at p. 90, l. 8-13.

17. The Debtors are now faced with choosing between the lesser of two evils. On one hand they can prepay for inventory from certain suppliers and allow Presstek to abandon the transaction at closing, as it abandoned the previous deal. On the other hand, the Debtors may purchase inventory from other suppliers and reach the Working Capital required by the Closing Condition. Unfortunately, this course of action will likely leave the debtor with insufficient inventory by the middle of October.

18. The Debtors should not be allowed to approve Bidding Procedures when the underlying agreement may already be terminated by one side. This is a classic option for Presstek, save one distinct difference. An option in the normal context of contract law requires the entity receiving the option to pay for this privilege. However, Presstek asks this Court to allow them to be paid should they decide to terminate the option. The Bidding Procedures Motion should not be approved.

19. For the foregoing reasons, the Committee believes that the Bidding Procedures Motion should be denied.

## IV. Conclusion

20. The Committee's positions on the Bidding Procedures Motion and the APA have not changed. These transactions unite to form a consolidated sale process designed to suppress competitive bidding, protect Silver's initial offer, depress artificially the purchase price in any sale of the Sale Assets, and to permit a windfall for Presstek and Silver at the expense of unsecured creditors. The facts that have arisen concerning the Closing Condition have only served to bolster this view.

21. The Committee requests the Bidding Procedures Motion be denied.

## V. Reservation of Rights

22. The Committee reserves it right to respond to any arguments raised by any other party in interest at the hearing on August 23, 2004.

WHEREFORE, the Committee respectfully requests that this Court enter an Order denying the Bidding Procedures Order and permit the Committee to propose alternative bidding procedures.

Dated: August 21, 2004
Wilmington, DE

THE BAYARD FIRM

By: [signature]
Jeffrey Schlerf (No. 3047)
Mary Augustine (No. 4477)
222 Delaware Ave., Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel: 302.429.4218
Fax: 302.658.6395

MCGUIREWOODS, LLP

By: Richard J. Mason (ARDC# 1787659)
Michael M. Schmahl (ARDC# 6275860)
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1681
Tel: 312.849.8100
Fax: 312.849.3690

and

Marshall Beil
James P. Ricciardi
Shawn R. Fox
1345 Avenue of the Americas
Seventh Floor
New York, NY 10105-0106
Tel: 212.548.2100
Fax: 212.548.2150

# EXHIBIT A



PRESSTEK
A SMARTER WAY TO PRINT

The Boards of Directors
Paragon Corporate Holdings, Inc.
7400 Caldwell Avenue
Niles, Illinois 60714-3806

The Boards of Directors
A.B. Dick Company
7400 Caldwell Avenue
Niles, Illinois 60714-3806

Mark H. Rachesky, MD
President
MHR Fund Management, LLC
40 West 57th Street, Thirty-Third Floor
New York, New York 10019

April 27, 2004

Gentlemen:

Per our previous correspondence, Presstek and MHR Fund Management, LLC ("MHR") have spent a vast amount of time and resources during the last weeks constructing a fair and balanced agreement.

Through this process, Presstek has developed a best and final offer for the acquisition of A.B. Dick. To assure that both parties have the final documents, I have attached them to this note. It is important for you to understand that Presstek is done negotiating. We will discuss process or answer questions so as to achieve execution of the final documents and closure, but we will not entertain discussions related to modifying the terms of the deal. Our requirements and their timelines are as follows:

1. By the close of business on Thursday 29 April 2004, Presstek requires written agreement of the course outlined in this letter and the attached documents from the principals of Paragon and MHR. If this written agreement is not received, Presstek withdraws any and all offers to purchase the outstanding shares or assets of A.B. Dick.
2. By the close of business on Friday 30 April, Presstek must receive from Silver the final Disclosure Schedules, which will be acceptable to Presstek.
3. No later than the close of business Friday 7 May 2004, Presstek requires an executed Stock Purchase Agreement as presented in our attached final documents.
4. We will then proceed to complete signature of the final agreements with all schedules in place in time for a close by 31 May 2004.

55 Executive Drive, Hudson, NH 03051-4903 USA
Tel: (603) 595-7000 Fax: (603) 594-8575



It is clear is that all parties want to complete this transaction, but the complex nature of this deal is making it difficult to do so. This deal has been structured to accommodate the needs of all parties. These terms are reflected in the attached documents. Presstek is prepared to complete this transaction in accordance with those terms.

I look forward to your positive response to my final offer.

Sincerely,

Edward J. Marino
President and Chief Executive Officer

cc:    Hal Goldstein, MHR Fund Management, LLC
       Moosa E. Moosa, Presstek
       James F. Scafide, Presstek
       John Brim, Hill Street Capital
       John Egan, McDermott, Will and Emery

**MWE Draft**
**4/27/04**

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "***Agreement***") is entered into as of April __, 2004, by and among [Platinum], Inc., a Delaware corporation ("***Platinum***"), Silver Acquisition Corp., a Delaware corporation and a wholly-owned subsidiary of Platinum ("***Purchaser***"), [Parent] Corporate Holdings, Inc., a Delaware corporation ("***Parent***"), and [Silver], Inc., a Delaware corporation and a wholly-owned subsidiary of Parent ("***Silver***").

## RECITALS

WHEREAS, Parent owns of record and beneficially all of the issued and outstanding capital stock of Silver, consisting of 1,000 shares of Silver's common stock, [number] par value per share (said shares being referred to herein as the "***Shares***");

WHEREAS, Parent desires to sell all of the Shares to Purchaser, and Purchaser desires to acquire all of the Shares from Parent; and

WHEREAS, the Board of Directors of Silver, and the Noteholders (as defined herein) have consented to the sale of the Shares to Purchaser.

In consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, the parties agree as follows:

## 1. DEFINITIONS AND USAGE OF CERTAIN TERMS

1.1 Definitions. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

"***Accounts Receivable***" means (i) all trade accounts receivable and other rights to payment from customers of Silver or its Subsidiaries and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Silver or its Subsidiaries, and (ii) all other accounts or notes receivable of Silver or its Subsidiaries and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

"***Adjustment Amount***" shall have the meaning set forth on Schedule 1 attached hereto.

"***Affiliate***" means with respect to any Person, any Person which directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

"***Ancillary Agreements***" means any or all of the "Silver Ancillary Agreements", the "Platinum Ancillary Agreements" and any other agreements entered into by and between or among Silver, Platinum, Purchaser, Parent, [MHR], the Stakeholder Representative, the Majority Holders and/or [the ultimate parent entity of Parent] in connection with the transactions contemplated by this Agreement, including, without limitation, the Registration Rights Agreement, the Tax Indemnity Agreement and the Instructions and the Tax Indemnity Agreement, as the context requires.

"***Breach***" means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

"*Business*" means the manufacture, sale, distribution and service of offset presses, cameras and plate makers and related supplies for the graphic arts and printing industry as conducted by Silver and the Subsidiaries of Silver.

"*Business Day*" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are permitted or required to be closed.

"*CERCLA*" the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended.

"*Cleanup*" means any removal, containment, corrective action or other remediation or response actions carried out to address the requirements of any Environmental Law or Occupational Safety and Health Law, including measures to address any natural resource damages.

"*Closing Date*" means the date on which the Closing actually takes place.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Confidential Information*" means any and all of the following information of Silver or its Subsidiaries, Parent, Purchaser or Platinum that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically, or otherwise, or otherwise made available by observation, inspection or otherwise by either party (Purchaser and Platinum on the one hand or Silver and Parent collectively on the other hand) or its representatives (collectively, a "*Disclosing Party*") to the other party or its representatives (collectively, a "*Receiving Party*"):

(a) all information that is a trade secret under applicable trade secret or other law;

(b) all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, software and computer software and database technologies, systems, structures and architectures;

(c) all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, Contracts, the names and backgrounds of key personnel, and personnel training techniques and materials, however documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication; and

(d) all notes, analyses, compilations, studies, summaries, and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, on any information included in the foregoing.

"*Contract*" means, with respect to any Person, any written or oral agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation,

promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

"***Control***" (including with correlative meaning, Controlled by and under common Control with) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"***Effective Time***" means 12:01 a.m. on the Closing Date.

"***Encumbrance***" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership.

"***Environment***" means soil, land surface or subsurface strata, surface waters (including navigable waters and ocean waters), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"***Environmental, Health and Safety Liabilities***" means any cost, damages, expense, liability, obligation, or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law, which results or arises from a notice or claim made by a Governmental Authority or other Third Party or from application of any Environmental Law or Occupational Safety and Health Law, including those consisting of or relating to:

(a) any environmental, health, or safety matter or condition (including on-site or off-site contamination, safety and health matters, release of Hazardous Material and regulation of chemical substances or products or waste material);

(b) fine, penalty, judgment, award, settlement, legal or administrative proceeding, damage, loss, claim, demand or response, remedial, or inspection cost or expense arising under any Environmental Law or Occupational Safety and Health Law;

(c) financial responsibility under any Environmental Law or Occupational Safety and Health Law for Cleanup costs; or

(d) any other compliance, corrective, or remedial measures required under any Environmental Law or Occupational Safety and Health Law.

The terms "***removal***," "***remedial***," and "***response action***" include the types of activities covered by the term "***disposal***" shall have the same definition assigned thereto by CERCLA; and the term "***remediation standard***" means a numerical standard that defines the concentrations of Hazardous Materials that are permitted to remain without liability in any environmental media after completion of all investigation, removal remediation and/or containment of a Release or Threat of Release.

"***Environmental Law***" means any applicable environmental or health and safety related Legal Requirement, including those requiring or relating to:

(a) advising appropriate authorities, employees, and the public of intended or actual releases of Hazardous Materials, violations of discharge limits, or other prohibitions and the

commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b) preventing or reducing to acceptable levels, a Release, including any Release covered by a permit or license issued by a Governmental Authority;

(c) reducing the quantities, preventing the discharge, emission or release, or minimizing the hazardous characteristics of wastes that are generated and complying with waste disposal and recycling requirements;

(d) assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e) assuring that any Hazardous Materials are properly containerized, inventoried, used and stored;

(f) protecting resources, species, and ecological amenities;

(g) reducing to acceptable levels the risks inherent in the transportation of Hazardous Materials and other potentially harmful substances;

(h) Cleanup of a Release, preventing the Threat of a Release or paying the costs preventing such Threats of Release; or

(i) making responsible parties pay private parties, or groups of them, for damages done to their health or property or the Environment, or permitting self appointed representatives of the public interest to recover for injuries done to public assets.

"***Equity Rights***" means all arrangements, calls, commitments, Contracts, options, rights to subscribe to, scrip, understandings, warrants, or other binding obligations of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, shares of the capital stock of a Person or by which a Person is or may be bound to issue additional shares of its capital stock or other Equity Rights.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means any entity which is a member of: (i) a "controlled group of corporations", as defined in Section 414(b) of the Code; (ii) a group of entities under "common control", as defined in Section 414(c) of the Code; or (iii) an "affiliated service group", as defined in Section 414(m) of the Code, or treasury regulations promulgated under Section 414(o) of the Code, any of which includes Silver or any Subsidiary of Silver.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Facilities***" means any real property, leasehold or other interest in real property currently owned or operated by any Person including the Tangible Personal Property currently being used or operated by Silver or its Subsidiaries at the respective locations of the Real Property specified in Section 3.13. Notwithstanding the foregoing, for purposes of Sections 3.24, "***Facilities***" shall mean any real property, leasehold or other interest in real property currently or formerly owned or operated by Silver or its Subsidiaries, including the Real Property and Tangible Personal Property being used or operated by Silver or its Subsidiaries at the respective locations of the Real Property specified in Section 3.13.

"*GAAP*" means U.S. generally accepted accounting principles, applied on a consistent basis from period to period.

"*Governmental Authority*" means any: (a) nation, state, commonwealth, province, territory, county, municipality or district; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"*Governmental Authorization*" means any approval, consent, ratification, waiver, license, permit or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"*Ground Lease*" means any long term lease of land in which most of the rights and benefits comprising ownership of the land and the improvements thereon or to be constructed thereon, if any, are transferred to the tenant for the term thereof.

"*Ground Lease Property*" means any land, improvements and appurtenances subject to a Ground Lease in favor of Silver or its Subsidiaries.

"*Hazardous Activity*" means the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, at, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on, at, or off the Facilities.

"*Hazardous Material*" means any hazardous or toxic substance, material, or waste, including petroleum and petroleum products, which is or becomes, prior to the Closing, regulated or defined as a "hazardous substance", "pollutant", "contaminant", "toxic chemical", "hazardous material", "toxic substance", "hazardous waste" or hazardous chemical" under: (i) CERCLA; (ii) Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §§ 11001 et seq.; (iii) the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, et seq.; (iv) the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; (v) the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651, et seq.; (vi) the Solid Waste Disposal Act as amended by the Resource Conservation & Recovery Act, 42 U.S.C. §§ 6901, et seq.; (vii) regulations promulgated under any of the above statutes; or (viii) any other applicable federal, state, or local statute, ordinance, rule or regulation that has a scope or purpose similar to those identified above.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"*Inventories*" means all inventories on hand at Closing of Silver or its Subsidiaries, wherever located, including all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by Silver or its Subsidiaries in the production of finished goods.

"*knowledge*" when used with respect to any entity, means the actual knowledge of the directors and executive officers of such entity after due inquiry, and when used with respect to Silver shall also mean the actual knowledge of the directors and officers of Parent and Silver after due inquiry and when used with respect to Purchaser, shall also mean the actual knowledge of the executive officers of Platinum after due inquiry.

"*Land*" means all parcels and tracts of land in which Silver or any of its Subsidiaries has an ownership interest.

"*Lease*" means any Real Property Lease or any lease or rental agreement, license, right to use or installment or conditional sale agreement to which Silver or any Subsidiary is a party and any other Silver Contract pertaining to the leasing or use of any Tangible Personal Property.

"*Legal Requirement*" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, ordinance, by-law, principle of common law, regulation, statute, or treaty.

"*Liability*" with respect to any Person, means any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"*Majority Holders*" has the meaning specified in the Notes.

"*Material Adverse Effect*" when used in connection with an entity means any change, event, circumstance or effect that is or is reasonably likely to be materially adverse to the business, employees, assets, financial, condition, or results of operations of such entity taken as a whole with its Subsidiaries, provided, however, that no change or effect arising out of or in connection with or resulting from any of the following shall be deemed by itself or by themselves, either alone or in combination, to constitute or contribute to a Material Adverse Effect (i) a decrease in the public trading price of an entity's common stock; (ii) general economic conditions or changes generally affecting the industry in which such entity operates; or (iii) any action, omission, change, effect, circumstance or condition contemplated by this Agreement or attributable to the execution, performance or announcement of this Agreement or the transactions contemplated hereby.

"*Noteholders*" means the holders of the Notes.

"*Notes*" means Silver and Parent's promissory notes, dated [August 14, 2001] in an aggregate principal amount of [$25,000,000] issued by Silver pursuant to Silver's Offer to Exchange and Consent Solicitation Statement dated July 8, 2001, as amended and supplemented.

"*Occupational Safety and Health Law*" means any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act of 1970, as amended.

"*Order*" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"*Permitted Encumbrance*" means the encumbrances identified on Section [ ] of the Silver Disclosure Schedule, together with the following: (i) any liens of mechanics, suppliers, vendors, materialmen, laborers, employees, repairmen and other like liens arising in the ordinary course of Silver's business, securing obligations which are not due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings if and to the extent that an adequate reserve shall have been made therefor on the Closing Balance Sheet; (ii) liens incurred or deposits to secure the performance of surety and appeal bonds, bids, leases, performance and return money bonds and similar obligations, in each case in the ordinary course of business, consistent with past practice as and to the extent that

adequate reserves as determined in accordance with GAAP have been made therefor on Silver's Closing Balance Sheet; (iii) purchase money liens incurred in the ordinary course of business, consistent with past practice as and to the extent that adequate reserves as determined in accordance with GAAP have been made therefor on Silver's Closing Balance Sheet; and (iv) with respect to Real Property, privileges, easements, rights of way, licenses, covenants, zoning and other restrictions of record, which individually or in the aggregate, do not affect the current uses or marketability of such Real Property; and (v) any liens for taxes, assessments, levies, fees and other government or similar charges not due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or which are otherwise set forth on the Silver Financial Statements.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or any government or any agency or political subdivision thereof.

"*Platinum Common Stock*" means the shares of common stock of Platinum, par value $.01 per share.

"*Platinum Disclosure Schedule*" means that Disclosure Schedule dated as of the date hereof and provided by Platinum and Purchaser to Parent and Silver simultaneously with the execution and delivery of this Agreement.

"*Proceeding*" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private).

"*Real Property*" means the Land and improvements and all appurtenances thereto and any Ground Lease Property.

"*Real Property Lease*" means any Ground Lease or Space Lease.

"*Record*" means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"*Release*" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, or dumping into the Environment.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securities Laws*" means the Securities Act, the Exchange Act, the Investment Company Act of 1940, as amended, the Investment Advisors Act of 1940, as amended, the Trust Indenture Act of 1939, as amended, and the rules and regulations of the SEC and any other Governmental Authority promulgated thereunder.

"*SEC*" means the United States Securities and Exchange Commission.

"*Series B Notes*" means Parent's 9 5/8% Series B Senior Notes due 2008.

"*Silver Common Stock*" means the shares of common stock of Silver, par value $[1.00] per share.

"*Silver Contract*" means any Contract: (a) to which Silver or its Subsidiaries is a party; or (b) by which Silver or its Subsidiaries or any of their assets is bound or subject to any obligation.

"*Silver Disclosure Schedule*" means that Disclosure Schedule dated as of the date hereof and provided by Parent and Silver to Platinum and Purchaser simultaneously with the execution and delivery of this Agreement.

"*Space Lease*" means any lease or rental agreement pertaining to the occupancy of any improved space on any Land.

"*Silver Employee Plans*" means, collectively, (i) each "employee benefit plan", as defined in Section 3(3) of ERISA; and (ii) all other material written or formal plans, enforceable policies or practices or Contracts involving direct or indirect compensation or benefits (including any employment Contracts entered into between Silver or any Subsidiary of Silver and any employee of Silver or any Subsidiary of Silver) currently or previously maintained, contributed to or entered into by Silver or any Subsidiary of Silver under which Silver or any Subsidiary of Silver or any ERISA Affiliate of any of them has any present or future Liability but excluding any Silver Benefit Arrangements.

"*Subsidiary*" means, when used with reference to any Person, any corporation more than fifty percent (50%) of the outstanding voting securities of which, or any partnership, limited liability company, joint venture or other entity more than fifty percent (50%) of the total equity interest of which, is directly or indirectly owned or Controlled by such Person.

"*Tangible Personal Property*" means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned or leased by a Person (wherever located and whether or not carried on such Person's books), together with any express or implied warranty by the manufacturers or Silver's or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

"*Tax*" or "*Taxes*" means (i) any and all federal, state, local and foreign Taxes, assessments and other governmental charges, duties, impositions and liabilities relating to Taxes, including Taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property Taxes, together with all interest, penalties and additions imposed with respect to such amounts, (ii) any liability for payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated consolidated, combined or unitary group (or similar concept under state or foreign law), and (iii) any liability for amounts of the type described in clauses (i) and (ii) as a result of any express or implied obligation to indemnify another person or as a result of any obligations under any agreements or arrangements with any other person with respect to such amounts and including any liability for Taxes of a predecessor entity.

"*Third Party*" means a Person that is not a party to this Agreement or an Affiliate of a party to this Agreement.

"*Threat of Release*" or "*threatened release*" means a substantial likelihood of a Release which requires action to prevent or mitigate damage to the Environment which may result from such Release.

1.2 Usage.

(a) Interpretation. In this Agreement, unless a clear contrary intention appears:

(i) the singular number includes the plural number and vice versa;

(ii) references to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(iii) reference to any gender includes each other gender;

(iv) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(v) reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement and reenactment of such section or other provision; provided, however, that the foregoing shall not apply in instances in which the Legal Requirement refers to a specific date, time or period;

(vi) "hereunder", "hereof", "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision thereof;

(vii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(viii) "or" is used in the inclusive sense of "and/or";

(ix) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

(x) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(xi) the terms "Article", "Section", "Schedule" and "Exhibit" refer to the specified Article, Section, Schedule or Exhibit or this Agreement.

(b) Accounting Terms and Determinations. Unless otherwise specified herein, all accounting terms used therein shall be interpreted and all accounting determinations thereunder shall be made in accordance with GAAP.

(c) Legal Representation of the Parties. This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party shall not apply to any construction or interpretation hereof.

## 2. PURCHASE AND SALE OF SHARES

2.1 Purchase and Sales of Shares. Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Parent shall sell the Shares to the Purchaser, and deliver or cause to be delivered to Purchaser a certificate or certificates representing all of the Shares. Such stock certificate or certificates shall be duly endorsed in blank for transfer or shall be presented with stock powers duly executed in blank, with such signature guarantees and such other documents as may be reasonably required by Purchaser to effect a valid transfer of the Shares by Parent, free and clear of any and all Encumbrances to Purchaser.

2.2 Consideration. The consideration for the Shares (the "***Purchase Price***") will, subject to adjustment as set forth in Section 2.3, be (i) $22,600,000 in cash, (the "***Cash Payment***"), and (ii) such number of shares of Platinum Common Stock (as rounded up to the next highest whole share number, the "***Stock Payment***") as is determined by dividing $18,500,000 by the average daily closing price per share of a share of Platinum Stock as reported on The Nasdaq Stock Market for each of the three (3) consecutive trading days ending (and including) the trading day that occurs two trading days prior to (and not including) the date of the Closing (the "***Closing Price***"). The parties acknowledge and agree that (a) such number of shares of Platinum Common Stock as is determined by dividing $2,000,000 by the Closing Price (as rounded up to the next highest whole share number, the "***Holdback Amount***") shall be deducted from the Stock Payment at Closing and held in trust by the Purchaser in accordance with Section 2.3(d); and (b) that the remainder of the Purchase Price shall be distributed in accordance with the joint written instructions (the "***Instructions***") of Parent and the Majority Holders delivered to Purchaser contemporaneously with the execution of this Agreement and attached hereto as Exhibit [__] (which Instructions with regard to the Stock Payment shall be reasonably acceptable to the Purchaser); provided, that, the amount of the Purchase Price to be distributed in accordance with the Instructions shall first be reduced by the amount provided in writing to Platinum at least three (3) days prior to the Closing that represents the fees and expenses of counsel to the Majority Holders (which amount shall not exceed $300,000, such amount to be paid as of the Closing to the Majority Holders and shall be deducted from the Cash Payment at the Closing). In the Instructions, the Majority Holders shall also consent to the transactions contemplated by this Agreement, waive the "ABD Sale Rights" (as defined in the Notes), agree not to pursue or entertain an Acquisition Proposal, and otherwise cooperate in consummating the transactions contemplated by this Agreement. If, prior to the Closing, Platinum (X) recapitalizes either through a split-up of the outstanding shares of Platinum capital stock into a greater number, or through a combination of such outstanding shares into a lesser number, (Y) reorganizes, reclassifies or otherwise changes such outstanding shares into the same or a different number of shares of other classes or into securities of another company (other than through a split-up or combination of shares provided for in the previous clause), or (Z) declares a dividend outside the ordinary course of business on its outstanding shares, or, in each case, in any similar transaction, the calculation of the Stock Payment will be adjusted appropriately.

2.3 Balance Sheet Adjustment to Purchase Price

(a) Closing Balance Sheet. Not less than five (5) business days prior to Closing, Silver shall deliver to Purchaser an unaudited balance sheet of Silver (the "***Closing Balance Sheet***") and a preliminary calculation of the Adjustment Amount (the "***Closing Adjustment Amount***") as of the most recent month-end prior to the Closing Date, together with a certificate signed by the chief financial officer of the Silver and an appropriate executive officer of Parent certifying (i) that the Closing Balance Sheet was prepared in accordance with GAAP, consistently applied with the Base Balance Sheet, except for the absence of footnotes and subject to adjustments consisting of normal year-end accruals, (ii) that the Closing Balance Sheet fairly and accurately presents, in all material respects, the financial condition of Silver as of such date, and (iii) the Closing Adjustment Amount. The Closing Balance Sheet and the

calculation of the Closing Adjustment Amount shall be prepared by the chief financial officer of Silver in good faith in consultation with Platinum and Platinum's representatives after Platinum and Platinum's representatives have had access to financial information and personnel relevant to the preparation of the Closing Balance Sheet and the calculation of the Closing Adjustment Amount.

(b) Closing Date Adjustment. In the event that the Closing Adjustment Amount reflected on the Closing Balance Sheet is less than $4,330,000, then a dollar-for-dollar decrease shall be made to the Cash Payment of the Purchase Price at the Closing equal to the amount by which the Closing Adjustment Amount is less than $4,330,000. No increase shall be made to the Purchase Price based upon the Closing Adjustment Amount or the Closing Balance Sheet.

(c) Final Balance Sheet. Not later than ninety (90) days subsequent to Closing, Platinum shall deliver to Parent an unaudited balance sheet of Silver (the "***Final Balance Sheet***") and a calculation of the Adjustment Amount (the "***Final Adjustment Amount***") as of the Closing Date, together with a certificate signed by the chief financial officer of Platinum or Purchaser certifying (i) that the Final Balance Sheet was prepared in accordance with GAAP, consistently applied with the Base Balance Sheet, except for the absence of footnotes and subject to adjustments consisting of normal year-end accruals, (ii) that, to his knowledge, the Final Balance Sheet fairly and accurately presents the financial condition of Silver as of such date, and (iii) the Final Adjustment Amount.

(d) Final Adjustment. In the event that the Final Adjustment Amount reflected on the Final Balance Sheet is less than or greater than $4,330,000, then a dollar-for-dollar decrease or increase, as appropriate, shall be made to the Purchase Price based upon the difference between $4,330,000 and the Final Adjustment Amount, after taking into account any prior adjustment to the Purchase Price pursuant to Section 2.3(b). Any decrease in the Purchase Price pursuant to this Section 2.3(d) shall be satisfied first from the Holdback Amount and then from the recipients of the Cash Payment and/or the recipients of the Stock Payment [will need separate agreements to enforce]. Any portion of the Holdback Amount which is not paid to Purchaser to satisfy a decrease in the Purchase Price pursuant to this Section 2.3(d) shall be promptly paid in accordance with the Instructions, and any increase in the Purchase Price pursuant to this Section 2.3(d) shall be promptly paid in cash in accordance with the Instructions.

(e) Mechanism for Dispute. Each of the Closing Balance Sheet and Final Balance Sheet and the accompanying calculation of the Adjustment Amount shall be utilized for the purposes of Sections 2.3(a)-(d) above upon the failure of the party receiving such balance sheet to timely deliver the Balance Sheet Dispute Notice as set forth in this Section 2.3(e). Any party who receives either of the Closing Balance Sheet or Final Balance Sheet and the accompanying calculation of the Adjustment Amount shall notify the producer of such document in writing of any challenge to the Balance Sheet in question (in each case, the "***Disputed Balance Sheet***") or the accompanying calculation of the Adjustment Amount at any time prior to Closing in the case of the Closing Balance Sheet and thirty (30) days subsequent to the delivery in the case of the Final Balance Sheet (the "***Balance Sheet Dispute Notice***"). If the Balance Sheet Dispute Notice has been timely delivered, the parties shall use their good faith efforts to resolve promptly any disagreements between them concerning the Disputed Balance Sheet and the related Adjustment Amount. In the event that, despite such good faith efforts, the parties are unable to resolve any such disagreements within three (3) days after the delivery of the Balance Sheet Dispute Notice, the parties shall together appoint an independent nationally recognized accounting firm (the "***Arbitrator***") to resolve any such disagreements. In the event the dispute concerns the Closing Balance Sheet and the related Adjustment Amount, the Closing Date shall be extended by that number of days required to resolve the dispute through arbitration as set forth herein. The parties shall present their positions to the Arbitrator, together with such other materials as the Arbitrator deems appropriate. The Arbitrator shall render its decision as to such disagreements within forty-five (45) days after its

engagement and such written report shall be final, binding and conclusive upon the parties. The fees and disbursements of the Arbitrator shall be allocated to parties in the same proportion that the aggregate amount of such disputed items so submitted to the Arbitrator that is unsuccessfully disputed by the party submitting the Balance Sheet Dispute Notice bears to the total amount of such disputed items and the balance shall be paid by the party submitting the Disputed Balance Sheet. In connection with any dispute, the parties will cooperate with each other and the Arbitrator to resolve such dispute including providing any information reasonably requested.

2.4 Prohibition on Trading. Prior to the Closing, each of Platinum and Parent covenants that it will not, and it will cause its subsidiaries not to, engage in any trading in securities of Platinum, including any hedging transactions or other stock market trading activities which could be reasonably expected to influence the bid and asked prices for shares of Platinum Common Stock.

2.5 Intentionally Omitted.

2.6 Section 338(h)(10) Elections. At Platinum's request, [the ultimate parent entity of Parent] (as the common parent of the affiliated group that includes Silver (the "***Seller Group***")) shall within the time period prescribed by law for the filing thereof, join with Platinum in making a timely, irrevocable and effective election under Section 338(h)(10) of the Code and similar elections under applicable state income tax law (collectively, the "***Section 338(h)(10) Elections***") with respect to Platinum's purchase of the Shares. In connection with the Closing, Platinum and Parent's ultimate parent entity will execute blank Internal Revenue Service Forms 8023 and 8883. Platinum shall prepare Internal Revenue Service Forms 8023 and 8883 with respect to Platinum's purchase of the Shares, and such form shall be duly executed by an authorized person for each of Platinum and Parent (and the ultimate parent entity of Parent) in connection with the Closing. Platinum shall, within the time periods prescribed by law, prepare the state tax forms, if any, necessary for effectuating the Section 338(h)(10) Elections in the applicable states (the "***State Forms***") and any schedules (the "***Tax Schedules***") required to be attached to the Internal Revenue Service Forms 8023 or 8883 or the State Forms (collectively, the "Forms"), in each case in accordance with the Price Allocation. Parent shall provide any cooperation that Platinum shall reasonably require in preparing the Tax Schedules and State Forms and shall execute any State Forms presented to it by Platinum. Platinum shall duly and timely file the Forms (together with the applicable Tax Schedules) as prescribed by Treasury Regulation §1.338(h)(10)-1 (as in effect and as it may hereafter be amended) or the corresponding provisions of state income tax law. Platinum and Parent (and [ultimate parent entity of Parent]) shall prepare all relevant Tax Returns in a manner consistent with the Tax Schedules and in accordance with the allocation of purchase price determined by Platinum (the "***Price Allocation***").

2.7 Transfer Taxes. Unless otherwise specified in this Agreement, Parent, on the one hand, and the Purchaser, on the other hand, shall each be responsible for one half of all sales, transfer, value added and similar Taxes and all recording and filing fees that may be imposed, assessed or payable by reason of the sale and transfer of the Shares pursuant to this Agreement. Purchaser agrees, and agrees to cause Silver to take any commercially reasonable actions requested by the other that would reduce the amount of such taxes imposed with respect to the transactions contemplated by this Agreement.

2.8 Closing. The purchase and sale provided for in this Agreement (the "***Closing***") will take place at the offices of Purchaser's counsel, McDermott, Will & Emery, 28 State Street, Boston, Massachusetts 02109, at 10:00 a.m. (local time) on the date that is five (5) Business Days following the satisfaction of the Closing conditions set forth in Article 8 and Article 9 (other than, but subject to the satisfaction of, those conditions that by their nature are to be satisfied at the Closing), unless Purchaser and Silver agree otherwise. Subject to the provisions of Article 10, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this

Section 2.8 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement. In such a situation, the Closing will occur as soon as practicable, subject to Article 10.

## 3. REPRESENTATIONS AND WARRANTIES OF PARENT AND SILVER

Except as set forth in the Silver Disclosure Schedule delivered to Platinum herewith, the parts of which are numbered to correspond to the Section numbers of this Agreement and which thereby qualify the corresponding representations and warranties contained in this Article 3, Parent and Silver hereby jointly and severally represent and warrant to Platinum as follows:

3.1 Organization and Good Standing. Silver and each Subsidiary of Silver is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority, and all requisite qualifications to do business as a foreign corporation, to conduct its business in the manner in which its business is currently being conducted, except where the failure to be so organized, existing or in good standing or to have such power, authority or qualifications would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect on Silver. All jurisdictions in which Silver and each Subsidiary of Silver is duly qualified or registered to do business as a foreign corporation is listed on Section 3.1 of the Silver Disclosure Schedule. Seller has delivered or made available to Platinum a true and correct copy of its certificate of incorporation and bylaws and similar governing instruments of each of its Subsidiaries, each as amended to date (collectively, the "*Silver Charter Documents*"), and each such instrument is in full force and effect. Neither Silver nor any Subsidiary is in violation of any of the provisions of the Silver Charter Documents.

3.2 Subsidiaries. Each of Silver's Subsidiaries are listed on Section 3.2 of the Silver Disclosure Schedule, each of which is directly or indirectly wholly-owned by Silver. Except as set forth in Section 3.2 of the Silver Disclosure Schedule, Silver does not have any other Subsidiaries or any interest, direct or indirect, in any corporation, partnership, joint venture, limited liability company or other business entity. Neither Silver nor any Subsidiary of Silver has agreed or is obligated to make, or is bound by any Contract, letter of intent, option, insurance policy, or benefit plan as in effect as of the date hereof pursuant to which it is required to make any future investment in or capital contribution to any other Person. Except as set forth in Section 3.2 of the Silver Disclosure Schedule, neither Silver, nor any Subsidiary, has, at any time, been a general partner of any general partnership, limited partnership or other entity or manager or member of any limited liability company. Section 3.2 of the Silver Disclosure Schedule indicates the jurisdiction of organization of each entity listed therein and Silver's direct or indirect equity interest therein.

3.3 Capitalization.

(a) Authorized/Outstanding Capital Stock. As of the date hereof, the authorized capital stock of Silver consists solely of 1,000,000 shares of Silver Common Stock. As of the date hereof, there are issued and outstanding 1,000 shares of Silver Common Stock, all of which are owned, beneficially and of record, by Parent. All issued and outstanding shares of Silver Common Stock have been duly authorized and validly issued and are fully paid and nonassessable are not subject to any right of rescission, are not subject to preemptive rights and have been offered, issued, sold and delivered by Silver in compliance with all registration or qualification requirements (or applicable exemptions therefrom) of applicable federal and state securities laws. Section 3.3(a) of the Silver Disclosure Schedule sets forth the authorized and issued and outstanding capital stock of each Subsidiary of Silver. There are no outstanding stockholder agreements, voting trusts, proxies or other Contracts to which

Silver, any such Subsidiary of Silver or, to Silver's knowledge, to which any other Person is a party, relating to the voting of any shares of Silver or any such Subsidiary's capital stock.

(b) Options/Warrants/Rights. There is no: (i) outstanding preemptive right, stock appreciation right, subscription, option, call, warrant or right (whether or not currently exercisable) to acquire from Parent or Silver or, to Silver's knowledge, from any other Person, any shares of Silver Common Stock or other securities of Silver or any Subsidiary of Silver; (ii) outstanding security, instrument or obligation issued by Silver or Affiliates of Silver, that is or may become convertible into or exchangeable for any shares of Silver Common Stock or other securities of Silver or any Subsidiary of Silver; (iii) stockholders' rights plan (or similar plan commonly referred to as a "poison pill") or Contract under which Silver or any successor of Silver is or may become obligated to sell or otherwise issue any shares of its capital stock or any securities of any Subsidiary of Silver; (iv) Contract to which Parent or Silver is a party relating to the voting or registration of or restricting any Person from purchasing, selling, pledging or otherwise disposing of (or granting any option or similar right with respect to) any shares of Silver Common Stock or any securities of any Subsidiary of Silver; (v) liability for dividends accrued but unpaid; or (vi) condition or circumstance, to Silver's knowledge, that likely would directly or indirectly give rise to or provide a basis for the assertion of a claim by any Person to the effect that such Person is entitled to acquire or receive any shares of capital stock or other securities of Silver or any Subsidiary of Silver, including but not limited to promises to issue or grant securities of Silver or to recommend to Silver's board of directors to issue or grant securities of Silver or any Subsidiary of Silver.

(c) Title to Shares. Parent has valid title to the Shares and the legal right and power, and all authorizations and approvals required by law, to enter into this Agreement, and to sell, transfer and deliver the Shares to Purchaser; (ii) Parent has not sold, assigned or otherwise transferred to any third party any of its right, title or interest in or to any of the Shares; and (iii) there exists no Encumbrance on or relating to any of the shares of Silver Common Stock. To Silver's knowledge: (x) no Person has claimed any interest in any additional shares of Silver Common Stock, or any options, warrants or other securities of Silver or any securities of any Subsidiary of Silver, except for the Shares owned by Parent; and (y) no third party has made, or has, any claim of entitlement to receive any shares of the capital stock of Silver or any securities of any Subsidiary of Silver, any warrants or other rights to acquire any capital stock of Silver or any other securities of Silver or any securities of any Subsidiary of Silver.

3.4 Power, Authorization and Non-Contravention.

(a) Silver and each Subsidiary of Silver has the right, corporate power, legal capacity and authority to: (i) carry on its business as now conducted; (ii) own, operate and lease its properties in the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under all Silver Contracts, and (iv) enter into and perform its obligations under this Agreement and all agreements to which it is or will be a party that are required to be executed pursuant to or in connection with this Agreement (the "*Silver Ancillary Agreements*"); except in the case of clauses (i), (ii) and (iii) of this Section 3.4 where the failure to have such power, capacity or authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate and stockholder action on the part of Silver, including by the Board of Directors of Silver for purposes of Section 203 of the Delaware General Corporation Law. The written consent of Parent, as the sole stockholder of Silver, and the consents of the Noteholders that have been obtained, certified copies of which have previously been delivered to Purchaser, are sufficient for the approval of the transactions contemplated hereby by Silver's stockholders and no other approval of any holder of any securities of Silver is required in connection with the consummation of the transactions contemplated hereby.

(b) No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by Silver or any Subsidiary of Silver in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for: (i) the consents set forth in Section 3.4(b) of the Silver Disclosure Schedule, (ii) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state securities (or related) laws and the Antitrust Filings and (iii) such other consents, authorizations, filings, approvals and registrations which if not obtained or made would not be material to Silver, Platinum or Purchaser or their respective businesses or assets or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

(c) This Agreement and the Silver Ancillary Agreements are, or when executed and delivered by Silver and the other parties thereto will be, valid and binding obligations of Parent and Silver (to the extent a party thereto) enforceable against Parent and Silver (to the extent a party hereto) in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies; provided, however, that the Silver Ancillary Agreements will not be effective until the earlier of the Effective Time and the date provided for therein.

3.5 No Violation of Charter Documents and Contracts; Compliance with Legal Authorizations; Governmental Authorizations.

(a) Neither the execution and delivery of this Agreement or any Silver Ancillary Agreement, nor the consummation of the transactions provided for herein or therein, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of any provision of the Silver Charter Documents, as currently in effect, except as set forth in Section 3.5 of the Silver Disclosure Schedule, or any material Silver Contract, which termination, Breach, impairment or violation of any material Silver Contract, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect on Silver.

(b) Except as set forth in Section 3.5(b) of the Silver Disclosure Schedule:

(i) each of Silver and each Subsidiary of Silver is, and at all times since January 1, 2000 has been, in material compliance with each Legal Requirement that is or was applicable to it or to the conduct of operation of its business or the ownership or use of any of Silver's assets;

(ii) no event has occurred or circumstance currently exists that (with or without notice or lapse of time) constitute or will result in a violation by Silver or any Subsidiary of Silver of, or a failure on the part of Silver or any Subsidiary of Silver to comply with, any Legal Requirement; and

(iii) neither Silver nor any Subsidiary of Silver has received, at any time since January 1, 2000, any notice or other communication from any Governmental Authority or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply by Silver or any Subsidiary of Silver with, any Legal Requirement.

(c) Section 3.5(c) of the Silver Disclosure Schedule contains a complete and accurate list of each material Governmental Authorization that are collectively necessary to permit Silver to lawfully conduct and operate its business in the manner it currently conducts and operates its business and

to permit Silver to own and use its assets in the manner in which it currently owns and uses such assets. Each Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule is valid and in full force and effect. Except as set forth in Section 3.5(c) of the Silver Disclosure Schedule:

(i) each of Silver and each Subsidiary of Silver is, and at all times since January 1, 2000 has been, in full compliance with all of the material terms and requirements of each Governmental Authorization identified or required to be identified in Section 3.5(c) of the Silver Disclosure Schedule;

(ii) no event has occurred or circumstance currently exists that may (with or without notice or lapse of time) (A) constitute or will result directly or indirectly in a violation of or a failure to comply with any material term or requirement of any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule, or (B) will result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any material Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule;

(iii) neither Silver nor any Subsidiary of Silver have received, at any time since January 1, 2000, any notice or other communication from any Governmental Authority or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any material term or requirement of any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any material Governmental Authorization listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule; and

(iv) all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Section 3.5(c) of the Silver Disclosure Schedule have been duly filed on a timely basis with the appropriate Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities.

3.6 Documents and Disclosures.

(a) Silver has made available to Platinum for examination true and complete copies of all documents and information listed in the Silver Disclosure Schedule or other exhibits called for by this Agreement, as well as (i) Silver's minute book containing all records of all proceedings, consents, actions and meetings of the stockholders, the Board of Directors and any committees of the Board of Directors of Silver; (ii) all Governmental Authorizations, permits, Orders and consents issued by any regulatory agency or other Governmental Authority with respect to Silver and/or the Business and (iii) all of the foregoing documents and information with respect to the Subsidiaries of Silver.

(b) There has not been any violation of any of the provisions of the Silver Charter Documents, or of any resolution adopted by the stockholders or boards of directors, of Silver or any Subsidiary of Silver, and to Silver's knowledge, no event has occurred and is continuing, and no condition or circumstance exists, that likely would (with or without notice and/or lapse of time) constitute or result directly or indirectly in such a violation.

(c) The books of account, stock records, minute books and other records of Silver and its Subsidiaries: (i) are in all material respects true and complete, (ii) have been maintained in

accordance with reasonable business practices and (iii) accurately and fairly reflect in all material respects the transactions and dispositions of the assets of Silver and its Subsidiaries.

3.7 Silver Financial Statements. Included in Section 3.7 of the Silver Disclosure Schedule are the consolidated financial statements of Silver (including, in each case, any related notes thereto) for the fiscal years ended December 31, 2001, 2002 and 2003 (the "***Silver Financial Statements***") and each: (i) was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto); (ii) fairly present in all material respects the consolidated financial position of Silver and the Subsidiaries of Silver as at the respective dates thereof and the consolidated results of Silver's operations and cash flows for the periods indicated, except that the unaudited interim financial statements may not contain footnotes and were or are subject to normal and recurring year end adjustments which are not material. Except as set forth on Section 3.7 of the Silver Disclosure Schedule, since December 31, 2003 (the "***Base Balance Sheet Date***"), neither Silver nor any Subsidiary of Silver has any liabilities required under GAAP to be set forth on a balance sheet (absolute, accrued, contingent or otherwise) except for liabilities incurred since the Base Balance Sheet Date in the ordinary course of business consistent with past practices which are not, individually or in the aggregate, material to the business, results of operations or financial condition of Silver and the Subsidiaries of Silver taken as a whole and liabilities incurred in connection with this Agreement. There has been no change in Silver's accounting policies during the periods covered by the Silver Financial Statements, except as described in the notes to the Silver Financial Statements. Silver has no material debt, liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that is not reflected, reserved against or disclosed in the Silver Financial Statements or under Section 3.7 of the Silver Disclosure Schedule, except for those that may have been incurred after the Base Balance Sheet Date in the ordinary course of Silver's business, consistent with past practice and that in an aggregate do not exceed $50,000, and those that occur after the date of this Agreement will be in compliance with this Agreement or with the express written consent of Platinum.

3.8 Intentionally Omitted.

3.9 Accounts Receivable. The Accounts Receivable shown in the balance sheet contained in the Silver Financial Statements as of December 31, 2003 (the "***Base Balance Sheet***") arose in the ordinary course of business consistent with past practice. Allowances for doubtful accounts and warranty returns are adequate and have been prepared in accordance with GAAP consistently applied and in accordance with the past practices of Silver and its Subsidiaries. The Accounts Receivable of Silver and its Subsidiaries arising after the Base Balance Sheet Date and prior to the Closing Date arose or will arise in the ordinary course of business consistent with past practice. To the knowledge of Silver, the Accounts Receivable represent bona fide accounts due from third parties in arms-length transactions, are not subject to any material claim of offset, recoupment, credit setoff or counter-claim and it has no knowledge of any specific facts or circumstances (whether asserted or unasserted) that could give rise to any such claim in any such case, except to the extent otherwise reflected in the allowances for doubtful accounts as provided for in the Base Balance Sheet or, with respect to Accounts Receivable arising after December 31, 2003 and prior to the Closing Date, as determined in the ordinary course of business consistent with the past practices of Silver and its Subsidiaries. No material amount of Accounts Receivable are contingent upon the performance by Silver or any of its Subsidiaries of any obligation or Contract other than normal warranty repair and replacement and other than products' progress bills in the ordinary course of business consistent with past practice. No Person has any Encumbrance on any of such Accounts Receivable and no agreement for deduction or discount has been made with respect to any of such receivables. Section 3.9 of the Silver Disclosure Schedule sets forth an aging of Accounts Receivable of Silver and its Subsidiaries in the aggregate and by customer, and indicates the amounts of allowances for doubtful accounts and warranty returns and the amounts of Accounts Receivable which are

subject to asserted warranty claims. Section 3.9 of the Silver Disclosure Schedule sets forth such amounts of Accounts Receivable which are subject to asserted warranty claims known to Silver by customers and information regarding asserted warranty claims known to Silver made within the last year, including the type and amounts of such claims. Except as set forth on Section 3.9 of the Silver Disclosure Schedule, Silver has no Accounts Receivable from any person, firm or corporation which is affiliated with Silver or from any director, officer or employee or Affiliate of Silver, Parent or any Subsidiary of Silver.

3.10 Banking Relations. All of the arrangements which Silver and the Subsidiaries have with any banking institutions are described in Section 3.10 of the Silver Disclosure Schedule, indicating with respect to each such arrangement the type of arrangement maintained (such as checking account, borrowing arrangement, safe deposit box, etc.) and the Person or Persons authorized in respect thereof.

3.11 Litigation. There is no Proceeding pending against Silver or any of its Subsidiaries, nor, to Silver's knowledge, is any Proceeding threatened against Silver or any of its Subsidiaries before any Governmental Authority or arbitrator that, if determined adversely to Silver or any of its Subsidiaries, may reasonably be expected to have a Material Adverse Effect on Silver or the Business. As of the date hereof, Section 3.11 of the Silver Disclosure Schedule sets forth any filings required to be made by Silver within 120 days of the date hereof in connection with any Proceeding. There is no material unsatisfied adverse judgment, decree, injunction or ruling of a Governmental Authority or arbitrator outstanding against Silver or any of its Subsidiaries. There is no Proceeding pending as to which Silver has received notice of assertion against Silver, which in any manner could prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement.

3.12 Taxes.

(a) Parent, Silver and each Subsidiary of Silver have timely filed all material federal, state, local and foreign returns, reports, estimates, information statements or other documents or information required to be supplied to any "Tax" authority relating to "Taxes" required to be filed by or on behalf of Parent, Silver and each Subsidiary of Silver ("*Tax Returns*"). Such Tax Returns are true, correct and complete. Parent, Silver and each Subsidiary of Silver have paid all material Taxes required to be paid, has made all necessary estimated tax payments, and has no liability for Taxes in excess of the amount so paid, except to the extent adequate reserves as determined in accordance with GAAP have been established in the Silver Financial Statements and the Closing Balance Sheet, or, with respect to Taxes that are not yet due on or prior to the date of this Agreement and which have become due thereafter, adequate reserves as determined in accordance with GAAP have been established by Parent or Silver prior to the Closing.

(b) Parent, Silver and each Subsidiary of Silver have withheld and paid all material Taxes required by applicable law to be withheld and paid in connection with any amounts paid or owing to any employee, independent producer or contractor, creditor, stockholder, or other third party.

(c) No claim has ever been made by a Governmental Authority in a jurisdiction where Silver or any Subsidiary of Silver does not file Tax Returns that Silver or any Subsidiary of Silver is or may be subject to a material amount of taxation by that jurisdiction.

(d) None of Parent, Silver nor any Subsidiary of Silver have been delinquent in the payment of any material Tax nor is there any material Tax deficiency outstanding, or to the knowledge of Parent, proposed or assessed against Parent, Silver or any Subsidiary of Silver, nor have Parent, Silver or any Subsidiary of Silver executed any currently effective waiver of any statute of limitations on or

extending the period for the assessment or collection of any material Tax. Parent, Silver and each Subsidiary of Silver have disclosed on their respective federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income tax within the meaning of Section 6662 of the Code.

(e) No audit or other examination of any Tax Return of Parent, Silver or any Subsidiary of Silver by any Tax authority is presently in progress, nor have Parent, Silver or any Subsidiary of Silver been notified of any request for such an audit or other examination.

(f) No adjustment relating to any Tax Returns filed by Parent, Silver or any Subsidiary of Silver has been proposed in writing formally or informally by any Tax authority to Parent, Silver or any Subsidiary of Silver or any representative thereof.

(g) None of Parent, Silver nor any Subsidiary of Silver have any liability for unpaid Taxes which has not been accrued for or reserved on the Closing Balance Sheet in accordance with GAAP, whether asserted or unasserted, contingent or otherwise, other than any liability for unpaid Taxes that may have accrued since the Closing Balance Sheet Date in connection with the operation of the business of Parent, Silver or the Subsidiaries of Silver in the ordinary course.

(h) There is no agreement, plan or arrangement to which any of Parent, Silver or any Subsidiary of Silver is a party, including this Agreement and the agreements entered into in connection with this Agreement, covering any employee or former employee of Parent, Silver or any Subsidiary of Silver, individually or collectively, would be reasonably likely to give rise to the payment of any amount that would not be deductible pursuant to Sections 280G, 404 or 162(m) of the Code. There is no contract, agreement, plan or arrangement to which the Parent, Silver or any Subsidiary of Silver is a party or by which it is bound to compensate any individual for excise Taxes paid pursuant to Section 4999 of the Code.

(i) None of Parent, Silver nor any Subsidiary of Silver have filed any consent agreement under former Section 341(f) of the Code or agreed to have Section 341(f)(2) of the Code apply to any disposition of a subsection (f) asset (as defined in Section 341(f)(4) of the Code) owned by Parent.

(j) Except as set forth in Section 3.12(j) of the Silver Disclosure Schedule, none of Parent, Silver nor any Subsidiary of Silver are party to or has any obligation under any Tax-sharing, Tax indemnity or Tax allocation agreement or arrangement.

(k) None of Parent, Silver or any Subsidiary of Silver have been required to include any adjustment in Taxable income for any Tax period (or portion thereof) ending after the Effective Time pursuant to Section 481 of the Code or any comparable provision under state or foreign Tax laws as a result of transactions, events or accounting methods employed prior to the Closing Date.

(l) None of Silver's or any of its Subsidiaries' assets are Tax exempt use property within the meaning of Section 168(h) of the Code.

(m) Neither Silver nor any Subsidiary of Silver (a) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a member of the Seller Group) from or (b) has any liability for the Taxes of any person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

(n) Neither Silver nor any of its Subsidiaries has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(o) None of Parent, Silver or any Subsidiary of Silver have distributed stock of another Person, or had its stock distributed by another Person, in a transaction that was purported to be governed in whole or part by Section 355 of the Code within the last two years.

(p) No Taxes will be due and no payments or liabilities of Silver or its Affiliates will be triggered as a result of the sale of the Shares or the consummation of the transactions contemplated by this Agreement.

3.13 Title to Properties.

(a) Silver and each of its Subsidiaries have good and marketable title to all of their respective assets as shown on the Base Balance Sheet, or with respect to leased assets, valid leasehold interests in, or with respect to licensed assets, valid licenses to use, free and clear of all Encumbrances (other than Permitted Encumbrances). The machinery and equipment included in the assets as shown on the Base Balance Sheet are in all material respects in good condition and repair, normal wear and tear excepted, and all leases of real or personal property to which Silver or any Subsidiary of Silver is a party are fully effective and afford Silver or such Subsidiary peaceful and undisturbed possession of the subject matter of the lease. Neither Silver nor any Subsidiary of Silver is in violation of any zoning, building, or safety ordinance, regulation or requirement or other law or regulation applicable to the operation of owned or leased properties, and Silver has not received any notice of such violation with which it has not complied or had waived, in each case, which individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect on Silver.

(b) Section 3.13(b) of the Silver Disclosure Schedule sets forth the addresses and uses of all Real Property that Silver, its predecessors, Affiliates or its Subsidiaries own, lease or sublease or have ever owned, leased or subleased since January 1, 2003. All leases of Real Property or Tangible Personal Property to which Silver or any Subsidiary of Silver is a party are effective and afford Silver quiet enjoyment of the subject matter of the lease. As a result of the transactions contemplated by this Agreement, Purchaser will obtain a valid ownership or leasehold interest in all Tangible Personal Property that Silver or its Subsidiaries currently own or lease and all Real Property that Silver or its Subsidiaries currently own or lease, as of the date of this Agreement, in each case free and clear of all Encumbrances of any kind, except Permitted Encumbrances and: (i) mechanics', carriers', workers' and other similar liens arising in the ordinary course of business, and (ii) liens for current Taxes not yet due and payable.

3.14 Absence of Certain Changes or Events. Since the Base Balance Sheet Date, Silver and its Subsidiaries have carried on their business in the ordinary course substantially in accordance with the procedures and practices in effect on the Base Balance Sheet Date.

(a) Except as set forth under Section 3.14 of the Silver Disclosure Schedule, since the Base Balance Sheet Date there has not been with respect to Silver or any Subsidiary of Silver:

(i) any change, event, circumstance or effect, which by itself or in conjunction with all other such changes, whether or not arising in the ordinary course of business, has had or would reasonably be expected to have a Material Adverse Effect on Silver or its Subsidiaries' ability to conduct the Business as presently conducted, or that is reasonably likely to

impede the performance by Silver of its obligations under this Agreement or any of the Silver Ancillary Agreements;

(ii) any Encumbrance placed on any of the properties of Silver or any Subsidiary of Silver except Permitted Encumbrances;

(iii) any liability incurred by Silver or any Subsidiary of Silver other than in the ordinary course of business or which obligations or liabilities do not exceed in the aggregate $50,000 through the date of this Agreement;

(iv) any purchase, license, sale or other disposition, or any agreement or other arrangement for the purchase, license, sale or other disposition, of any assets other than in the ordinary course of business and consistent with past practice or which do not exceed the aggregate $50,000 through the date of this Agreement;

(v) any material damage, destruction or loss of any material property or asset, whether or not covered by insurance;

(vi) any material labor dispute or material claim of unfair labor practices;

(vii) any increase in the compensation payable or to become payable to any of Silver's or any of its Subsidiary's officers, employees or agents earning compensation at an anticipated annual rate in excess of $50,000, or any bonus payment or arrangement made to or with any of such officers, employees, consultants or agents; or any increase in the compensation payable or to become payable to any of Silver's or any of its Subsidiary's other officers, employees, consultants or agents (other than normal annual raises for non-officers in the ordinary course of business consistent with past practice) or any bonus payment or arrangement made to or with any of such officers, employees or agents other than normal bonuses or compensation increases granted prior to the date of this Agreement as disclosed under Section 3.14 of the Silver Disclosure Schedule;

(viii) any material change with respect to the executive officers of Silver or any Subsidiary of Silver; or

(ix) any loss of one or more material customers of Silver or any Subsidiary of Silver, which, individually or in the aggregate, account for more than five percent (5%) of the consolidated revenues of Silver and its Subsidiaries as of the Base Balance Sheet Date.

(b) Except as set forth under Section 3.14 of the Silver Disclosure Schedule, since the Base Balance Sheet Date neither Silver nor any Subsidiary of Silver has:

(i) amended their certificates of incorporation, bylaws or any other organizational document;

(ii) made any material payment or discharged any material Encumbrance or Liability;

(iii) incurred any material obligation or liability to any of their employees, officers, directors, stockholders or Affiliates, or any loans or advances made to any of its employees, officers, directors, stockholders or Affiliates, except normal compensation and reasonable travel related expense allowances payable to employees, officers or directors;

(iv) declared, set aside or paid any dividend on, or made any other distribution in respect of, their capital stock, or made any changes in any rights, preferences, privileges or restrictions of any of their outstanding capital stock;

(v) effected or been a party to any transaction relating to a merger, consolidation, sale of all or substantially all of their assets, or similar transaction; or accepted or otherwise entered into any Acquisition Proposal (as defined in Section 5.3);

(vi) executed, amended, relinquished, terminated or failed to renew any material Contract, including any lease, transaction or legally binding commitment other than in the ordinary course of their business (nor has there been any written or oral indication or assertion by the other party thereto of its desire to so amend, relinquish, terminate or not renew any such Contract, lease transaction or legally binding commitment);

(vii) deferred the payment of any accounts payable outside the ordinary course of business provided any discount, accommodation or other concession made outside the ordinary course of business in order to accelerate or induce the collection of any receivable;

(viii) incurred indebtedness for borrowed money, entered into any capital lease or guaranteed any such indebtedness other than in the ordinary course of their business, and not in excess of $50,000 in the aggregate; or

(ix) entered into any other material transaction or taken any other material action outside the ordinary course of their business.

3.15 Intellectual Property.

(a) Definition. As used herein, the term "***Intellectual Property Rights***" shall mean all worldwide industrial and intellectual property rights, including patents, patent applications, patent rights, trademarks (registered and/or at common law), trademark applications, trade names, service marks, service mark applications, URLs, works of authorship, copyrights, copyright registrations and applications for registration, mask work rights, moral rights, franchises, licenses, inventories, know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections, all source and object code, algorithms, architecture, structure, display screens, layouts, inventions, development tools and all documentation and media constituting, describing or relating to the above, including manuals, memoranda and records.

(b) Ownership of Intellectual Property. Silver and each Subsidiary of Silver own all right, title and interest in, or have licenses (sufficient for the conduct of its business as presently conducted) to all Intellectual Property Rights used in and reasonably necessary to the conduct of its business as presently conducted including the business of the development, design, maintenance, sale, licensing, installation and use of Silver's and its Subsidiaries' products and the sale of commercial services using such Intellectual Property Rights (with such Intellectual Property Rights being hereinafter collectively referred to as the "***Silver IP Rights***"). Except as set forth in Section 3.15(b) of the Silver Disclosure Schedule, Silver and its Subsidiaries have the exclusive, unrestricted, worldwide right to design, develop, use, reproduce, manufacture, sell, license and distribute all of their products and services (such products and services being set forth under Section 3.15(b) of the Silver Disclosure Schedule and hereinafter collectively referred to as the "***Silver Products and Services***") and the right to use all of their customer and supplier lists except where the failure to have such right would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver. Except as set forth under Section 3.15(b) of the Silver Disclosure Schedule, neither Silver nor any Subsidiary of Silver have

granted any reseller, distributor, sales representative, original equipment manufacturer, value added reseller or other third party any right to reproduce, manufacture, sell, license or distribute any of its products or services in any market segment or geographic location and which right is continuing as of the date of this Agreement. Set forth under Section 3.15(b) of the Silver Disclosure Schedule is a true and complete list of all copyright, mask work and trademark registrations and applications and all patents and patent applications for Silver IP Rights owned or exclusively licensed by Silver or its Subsidiaries. Silver is not aware of any loss, cancellation, termination or expiration of any such registration or patent except as set forth on Section 3.15(b) of the Silver Disclosure Schedule. To the knowledge of Silver, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby does not constitute a material Breach of any instrument or agreement governing any Silver IP Right, will not cause forfeiture or termination or give rise to a right of forfeiture or termination of any Silver IP Right or materially impair the right of Silver to use, sell or license any Silver IP Right or portion thereof except where such breach, forfeiture, termination or impairment would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver or the Business.

(c) No Violation of Rights of Others. To the knowledge of Silver, the business of Silver and each Subsidiary of Silver and the design, development, use, manufacture, sale, license or provision of any Silver Product and Service does not, and the use, manufacture, sale, license or provision of any Silver Product or Service after the Effective Time will not, cause Silver or any Subsidiary of Silver to infringe or violate any of the Intellectual Property Rights of any other Person. To the knowledge of Silver, neither Silver nor any Subsidiary of Silver have received any written or oral claim or notice of infringement or potential infringement of the Intellectual Property Rights of any other Person. Neither Silver nor any Subsidiary of Silver are using any confidential information or trade secrets of third party, including, but not limited to, any past or present employees or their respective past employers. To the knowledge of Silver, there are no royalties, honoraria, fees or other payments payable by Silver or any Subsidiary of Silver to any Person by reason of the ownership, use, license, sale, or disposition of the Silver IP Rights (other than as set forth under Section 3.15(b) of the Silver Disclosure Schedule.

(d) Protection of Rights. Silver has taken all commercially reasonable and necessary steps designed to safeguard and maintain the secrecy and confidentiality of, and its proprietary rights in, all Silver IP Rights. To the knowledge of Silver, there is no material unauthorized use, infringement or misappropriation of any Silver IP Rights by any Third Party, including, to the knowledge of Silver, any Silver employee or Subsidiary of Silver employee.

3.16 Conformity of Products and Services. All Silver Products and Services delivered or provided by Silver or any Subsidiary of Silver to customers on or prior to the Closing Date conform in all material respects (to the extent required in Contracts with such customers) to applicable contractual commitments, express and implied warranties, product specifications and product documentation and to any representations provided to customers and neither Silver nor any Subsidiary of Silver have any material liability (and, to Silver's knowledge, there is no legitimate basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand against Silver or any Subsidiary giving rise to any material liability relating to the foregoing Contracts) for replacement or repair thereof or other damages in connection therewith in excess of any reserves therefor reflected on the Base Balance Sheet or, with respect to any such material liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP in accordance with the past practices of Silver and its Subsidiaries.

3.17 Product and Service Warranties. Set forth on Section 3.17 of the Silver Disclosure Schedule are the standard written forms of product and service warranties and guarantees utilized by Silver or any Subsidiary of Silver as of the date of this Agreement with respect to the Silver Products and Services. Except as set forth on Section 3.17 of the Silver Disclosure Schedule, during a

period of three (3) years prior to the Closing Date, neither Silver nor any Subsidiary of Silver have made any other written material warranties (which remain in effect) with regard to Silver Products and Services. There are not existing or threatened in writing, product liability, warranty or other similar claims against Silver or any Subsidiary of Silver alleging that any Silver Products and Services are defective or fail to meet any product or service warranty except for such claims (i) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver or (ii) any Liability which is not in excess of any reserves therefor reflected on the Base Balance Sheet or, with respect to any such Liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP in accordance with the past practices of Silver and its Subsidiaries and reflected on the Closing Balance Sheet. Except as set forth on Section 3.17 of the Silver Disclosure Schedule, there are (a) no inherent design defects or systemic or chronic problems in any Silver Products and Services that are known to Silver or any Subsidiary of Silver and (b) no liabilities that are known to Silver or any Subsidiary of Silver for warranty or other claims or returns with respect to any Silver Products and Services relating to any such defects or problems in excess of any reserves therefor reflected on the Base Balance Sheet or, with respect to any such material Liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP in accordance with the past practices of Silver and its Subsidiaries and reflected on the Closing Balance Sheet. GEC Incorporated has agreed in writing to indemnify Silver for any liability for injury or damage to persons or other property related to products sold by Silver, and that indemnification remains in full force and effect and will continue in full force and effect following the Closing.

3.18 List of Certain Employees; Suppliers and Customers.

(a) Section 3.18(a) of the Silver Disclosure Schedule sets forth a detailed description of all compensation, including salary, bonus and deferred compensation paid or payable, for each officer, employee, consultant and independent contractor of Silver and the Subsidiaries of Silver who individually received compensation in excess of $50,000 for the fiscal year ended December 31, 2003 or is anticipated to receive compensation in excess of $50,000 for the fiscal year ending December 31, 2004.

(b) Section 3.18(b) of the Silver Disclosure Schedule sets forth a list of all suppliers, licensors and vendors of Silver or the Subsidiaries to whom, since January 1, 2003, Silver or the Subsidiaries of Silver made payments aggregating $50,000 or more, showing, with respect to each, the name, address and dollar value involved. No such supplier, licensor or vendor has canceled or otherwise terminated or materially reduced its business with Silver or its Subsidiaries or materially and adversely modified its relationship with Silver or its Subsidiaries nor, to the knowledge of Silver, does any supplier, licensor or vendor, have any plan or intention to do so.

(c) Section 3.18(c) of the Silver Disclosure Schedule sets forth the name of each customer or distributor of Silver or its Subsidiaries who accounted for more than two percent (2%) of the revenues of Silver for the fiscal year(s) ending December 31, 2002 and December 31, 2003 (the "***Customers***") showing with respect to each, the name, address and dollar value involved. Except as set forth in Section 3.18(c) of the Silver Disclosure Schedule, between December 31, 2002 and the date of this Agreement, no Customer of Silver or its Subsidiaries has canceled or otherwise terminated its relationship with Silver or its Subsidiaries, or not renewed or accepted any maintenance agreements, or has decreased materially its purchases of Silver Products and Services. No Customer has, to the knowledge of the Silver, any plan or intention to terminate, to cancel or otherwise materially and adversely modify its relationship with Silver or its Subsidiaries or to decrease materially or limit its purchase or distribution of Silver Products and Services.

3.19 Intentionally Omitted.

3.20 Compliance with Laws. Silver and each Subsidiary of Silver have complied, or prior to the Closing Date will have complied, and is or will be at the Closing Date in compliance, in all material respects, with all laws, ordinances, regulations and rules, and all Orders, writs, injunctions, awards, judgments and decrees, applicable to Silver or any of its Subsidiary, or to the assets, properties and business of Silver or any Subsidiary of Silver, except where the failure to comply with any such laws would not, individually or in the aggregate reasonably be expected to have a Material Adverse Effect on Silver or the Business.

Silver and each of its Subsidiaries have received all material permits, approvals and Governmental Authorizations from, and has made all material filings with, third parties, including Governmental Authorities, that are necessary to the conduct of its business as presently conducted.

3.21 Agreements and Commitments. Except as set forth under Section 3.21 of the Silver Disclosure Schedule and delivered or made available by Silver to Platinum on or prior to the Closing Date, as of the date hereof, neither Silver nor any Subsidiary of Silver is a party or subject to any agreement, obligation or commitment that is material to Silver, its financial condition or business or which is described below, including the following:

(a) any Contract providing for payments by or to Silver or any Subsidiary of Silver in an amount with respect to any single transaction, or series of related transactions, of (i) $50,000 or more in the ordinary course of business or (ii) $25,000 or more not in the ordinary course of business;

(b) any Contract to which Silver or any Subsidiary of Silver is a party (i) with respect to Silver IP Rights licensed or transferred to any third party (other than standard agreements with customers arising in the ordinary course of business consistent with past practice, the forms of which have been delivered to Platinum or its counsel); and (ii) pursuant to which a third party has licensed or transferred any Intellectual Property Rights to Silver or any Subsidiary of Silver reasonably necessary for the conduct of its business as of the date hereof (except for commercially available, non-customized software sold at retail and not embedded in Silver Products and Services or sub-licensed to customers of Silver or its Subsidiaries);

(c) any agreement by Silver or any Subsidiary of Silver to encumber, transfer or sell any material rights in or with respect to any material Silver IP Rights except non-exclusive software licenses;

(d) any Contract providing for development of technology for Silver or any Subsidiary of Silver which technology (i) is used or incorporated in any Silver Products or Services currently distributed or performed by Silver or any Subsidiary of Silver or (ii) is anticipated to be used or incorporated in any planned products or services of Silver or a Subsidiary of Silver, or any Contract that requires Silver or any Subsidiary of Silver to perform specified development work for a third party.

(e) any Contract currently in force for hosting, data center, transaction processing or other services related to the Silver's website;

(f) any agreement for the sale or lease of real or personal property involving more than $50,000 per year;

(g) any dealer, distributor, sales representative, original equipment manufacturer, value added remarketer or other agreement for the distribution of Silver's Products or Services (other than standard agreements arising in the ordinary course of business consistent with past practice, the forms of which have been delivered to Platinum or its counsel);

(h) any franchise agreement;

(i) any Contract granting most favored nation pricing and/or terms to any customer, licensee, purchaser, reseller, promoter or remarketer of any of Silver or its Subsidiaries' products or services;

(j) any joint venture Contract or arrangement or any other agreement that involves a sharing of profits with other Persons or the payment of royalties to any other Person;

(k) any instrument evidencing indebtedness for borrowed money by way of direct loan, sale of debt securities, purchase money obligation, conditional sale, guarantee or otherwise, except for trade indebtedness or any advance to any employee of Silver or any Subsidiary of Silver incurred or made in the ordinary course of business, and except as disclosed in the Silver Financial Statements;

(l) any Contract containing covenants purporting to limit Silver's or any of its Subsidiaries' freedom to compete in any line of business in any geographic area or to sell products or services to a specific entity or within an identified territory or industry or requiring Silver to make payments to any third parties in connection with any such sales;

(m) any Contract currently in force to provide source code to any third party for any product or technology;

(n) any Contract for the employment of any officer, employee or consultant of Silver or any Subsidiary of Silver or any other type of Contract or understanding with any officer, employee or consultant of Silver or any Subsidiary of Silver that is not immediately terminable by Silver or the Subsidiary of Silver without cost or liability;

(o) any Contract for consulting or similar services with a term of more than sixty (60) days and which is not terminable without penalty with notice of sixty (60) days or less; or

(p) any other material Contract entered into outside the ordinary course of business.

All agreements, obligations and commitments listed in Section 3.21 of the Silver Disclosure Schedule, are valid and in full force and effect, and except as expressly noted, a true and complete copy of each has been delivered or made available to Platinum. Except as noted on Section 3.21 of the Silver Disclosure Schedule, neither Silver nor, to the knowledge of Silver, any other party, is in material Breach of or default under any material term of any such agreement, obligation or commitment except where such breach or default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Silver or the Business. Neither Silver nor any Subsidiary of Silver has any liability for renegotiation of government Contracts or sub-Contracts which individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect on Silver or the Business.

3.22 Employees.

(a) General Compliance. Silver and each of its Subsidiaries is in compliance in all material respects with all applicable laws and Contracts relating to employment, employment practices, wages, hours, and terms and conditions of employment, including, employee compensation matters, and has correctly classified employees as exempt employees and non-exempt employees under the Fair Labor Standards Act. Except as set forth under Section 3.22(a) of the Silver Disclosure Schedule, neither Silver nor any Subsidiary of Silver has employment or consulting Contracts currently in effect that are not terminable at will (other than agreements with the sole purpose of providing for the confidentiality of

proprietary information or assignment of inventions). All independent contractors have been properly classified as independent contractors for the purposes of federal and applicable state Tax laws, laws applicable to employee benefits and other applicable laws. All employees of Silver or any Subsidiary of Silver located in the United States are legally permitted to be employed by Silver or such Subsidiary in the United States of America. Silver will have no liability to any employee or to any organization or any other entity as a result of the termination of any employee leasing arrangement.

(b) Good Labor Relations. Each of Silver and its Subsidiaries: (i) has never been and is not now subject to a union organizing effort; (ii) is not subject to any collective bargaining agreement with respect to any of its employees; (iii) is not subject to any other Contract with any trade or labor union, employees' association or similar organization; and (iv) has no current labor disputes and has had no material labor disputes or claims of unfair labor practices since January 1, 2000. Silver and its Subsidiaries have good labor relations, and have no knowledge of any facts indicating that its consummation of the transactions contemplated hereby will have a Material Adverse Effect on such labor relations. Between January 1, 2003 and the date of this Agreement, to Silver's knowledge, no executive officer of Silver or any of its Subsidiaries, or material number of other employees of Silver or any of its Subsidiaries, has given notice that such employee intends to terminate his or her employment with Silver or any such Subsidiary. As of the date of this Agreement, Silver has no knowledge that any key personnel or other employees intend to leave its or a Subsidiary's employment. There are no controversies pending or, to Silver's knowledge, threatened, between Silver or any of its Subsidiaries and any of their employees that would be reasonably likely to result in a Material Adverse Effect on Silver.

(c) Employee Plans. Section 3.22(c) of the Silver Disclosure Schedule identifies each Silver Employee Plan and copies of all other Silver Employee Plans (and, if applicable, related trust agreements) and all related documents, amendments and material written interpretations (including summary plan descriptions) thereto have been delivered or made available to Platinum or its counsel, together with, to the extent applicable, the two most recent annual reports (Form 5500, including, if applicable, Schedule B thereto) prepared in connection with any such Silver Employee Plan. No "prohibited transaction," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred with respect to any Silver Employee Plan which is covered by Title I of ERISA which would result in a material liability to Silver, excluding transactions effected pursuant to a statutory or administrative exemption. Nothing done or omitted to be done and no transaction or holding of any asset under or in connection with any Silver Employee Plan has or will make Silver, any Subsidiary of Silver or any Silver or Subsidiary officer or director subject to any material liability under Title I of ERISA or liability for any material Tax or penalty pursuant to Sections 4972, 4975, 4976 or 4979 of the Code or Section 502 of ERISA. Except as set forth in Section 3.22(c) of the Silver Disclosure Schedule, no Silver Employee Plans will be subject to any surrender fees or service fees upon termination other than the normal and reasonable administrative fees associated with the termination of benefit plans. All contributions due from Silver or any Subsidiary of Silver with respect to any of the Silver Employee Plans have been made as required under such plans and, to the extent applicable, ERISA, other than contributions accrued in the ordinary course of business consistent with past practice, all of which have been paid or will be paid when and as required or, if not required to be made, have been accrued on the Silver Financial Statements. Silver and each of its Subsidiaries have performed in all material respects all obligations required to be performed by it under each Silver Employee Plan, and each Silver Employee Plan has been maintained substantially in compliance with its terms and with the requirements prescribed by any and all statutes, Orders, rules and regulations, including ERISA and the Code, which are applicable to such Silver Employee Plans. All individuals who, pursuant to the terms of any Silver Employee Plans, are entitled to participate in any Silver Employee Plan, currently are participating in such Silver Employee Plan or have been offered an opportunity to do so. Except as set forth under Section 3.22(c) of the Silver Disclosure Schedule, to Silver's knowledge, no employee of Silver or any of its Subsidiaries, and no person subject to any health plan of Silver or any of its Subsidiaries has made medical claims through such health plan

during the 12 months preceding the date hereof for more than $50,000 in the aggregate for which Silver is responsible, or has any catastrophic illness.

(d) Pension Plans. All Silver Employee Plans which individually or collectively would constitute an "employee pension benefit plan", as defined in Section 3(2) of ERISA (collectively, the "***Silver Pension Plans***"), are identified as such under Section 3.22(d) of the Silver Disclosure Schedule. Any Silver Pension Plan which is intended to be qualified under Section 401(a) of the Code (a "***Silver 401(a) Plan***") has received a favorable determination from the Internal Revenue Service with respect to its tax-qualified status. No Silver Pension Plan constitutes, or has since the enactment of ERISA constituted, a "multiemployer plan," as defined in Section 3(37) of ERISA. No Silver Pension Plans are subject to Title IV of ERISA. Silver has delivered to Platinum or its counsel a complete and correct copy of the most recent Internal Revenue Service determination letter with respect to each Silver 401(a) Plan, if any exists.

(e) Benefit Arrangements. Section 3.22(e) of the Silver Disclosure Schedule lists each employment, severance (including all post-employment liabilities) or other similar Contract or policy and each Contract providing for insurance coverage (including any self-insured arrangements), workers' benefits, vacation benefits, severance benefits, disability benefits, death benefits, hospitalization benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement insurance, compensation or benefits for employees, consultants or directors which: (i) is not a Silver Employee Plan; (ii) is entered into, maintained or contributed to by Silver or any Subsidiary of Silver; and (iii) covers any employee or former employee or independent contractor or consultant of Silver or any Subsidiary of Silver. Such Contracts and policies as are described in this Section 3.22(e) are herein referred to collectively as the "***Silver Benefit Arrangements***." Each Silver Benefit Arrangement has been maintained in substantial compliance with its terms and with the requirements prescribed by any and all statutes, Orders, rules and regulations which are applicable to such Silver Benefit Arrangement. Silver has delivered to Platinum or its counsel a complete and correct copy or description of each Silver Benefit Arrangement. All individuals who, pursuant to the terms of any Silver Benefit Arrangement, are entitled to participate in any such Silver Benefit Arrangement, are currently participating in such Silver Benefit Arrangement or have been offered an opportunity to do so and have declined.

(f) Benefit Changes. Except as set forth in Section 3.22(f) of the Silver Disclosure Schedule since January 1, 2003, there has been no amendment to, written interpretation or announcement (whether or not written) by Silver or any Subsidiary of Silver relating to, or change in employee participation or coverage under, any Silver Employee Plan or Silver Benefit Arrangement that would increase materially the expense of maintaining such Silver Employee Plan or Silver Benefit Arrangement in the future.

(g) COBRA Compliance. Silver and each of its Subsidiaries has complied in all material respects prior to the date hereof, with the continuation coverage requirements of Section 4980B of the Code and the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("***COBRA***"), Sections 601 through 608 of ERISA, the American Civil Disabilities Act of 1990, as amended, and the Family Medical Leave Act of 1993, as amended, and the regulations thereunder, and no material Tax payable on account of Section 4980B of the Code has been incurred with respect to any current or former employees (or their beneficiaries) of Silver or any Subsidiary of Silver.

(h) No Violation of Contracts. To the knowledge of Silver, no employee or consultant of Silver or any Subsidiary of Silver is in violation of any term of any employment Contract, patent disclosure agreement, non-competition agreement, or any other Contract, or any restrictive

covenant relating to the right of any such employee to be employed by Silver or any Subsidiary of Silver, or to use Intellectual Property Rights of others.

3.23 Relationships with Affiliates. Except as disclosed in Section 3.23 of the Silver Disclosure Schedule, neither Silver nor Parent nor any Affiliate of any of them has, or since January 1, 2000 has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to Silver's business. Neither Silver nor Parent nor any Affiliate of any of them owns, or since January 1, 2000 has owned, of record or as a beneficial owner, an equity interest in any other financial or profit interest in any Person that has (a) had business dealings or a material financial interest in any transaction with Silver other than business dealings or transactions disclosed in Section 3.23 of the Silver Disclosure Schedule, each of which has been conducted in the ordinary course of business with Silver at substantially prevailing market prices and on substantially prevailing market terms, or (b) engaged in competition with Silver with respect to any line of the products or services of Silver (a "***Competing Business***") in any market presently served by Silver or its Subsidiaries, except for ownership of less than one percent of the outstanding capital stock of any Competing Business with securities listed on any national or regional securities exchange or that have been registered under Section 12(g) of the Exchange Act. Except as set forth in Section 3.23 of the Silver Disclosure Schedule, neither Silver nor Parent nor any Affiliate of any of them is a party to any Contract with, or has any claim or right against, Silver or any Subsidiary of Silver.

3.24 Environmental Matters.

(a) As of the Closing, to the knowledge of Silver, except in compliance with Environmental Laws and Occupational Safety and Health Laws, or in a manner that could not reasonably be expected to subject Silver or any Subsidiary of Silver to material liability, no Hazardous Materials are present, at on or under any Facility currently owned, operated, or leased by Silver, any predecessor, any Subsidiary of Silver or any former subsidiary, or were present on, at or under any other Facility at the time it ceased to be owned, operated or leased by Silver, any predecessor, any Subsidiary of Silver or any former subsidiary. To the knowledge of Silver, neither Silver nor any Person for whose conduct it is or may be held responsible, or any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to any Facility or any other property or assets (whether real, personal, or mixed) in which Silver has or had an interest except in full compliance with all applicable Environmental Laws.

(b) To the knowledge of Silver, and except as set forth on Section 3.24 of the Silver Disclosure Schedule, during the time that Silver, any predecessor of Silver, any Subsidiary of Silver or any former subsidiary of Silver has owned or leased a Facility:

(i) there have been no disposals, Release or threatened release of Hazardous Materials on, at, from or under any Facility;

(ii) no Hazardous Materials have been transported from any Facilities to any site or facility now listed or proposed for listing on the National Priorities List, at 40 C.F.R. Part 300, or any listing with a similar scope or purpose published by any state authority;

(iii) there has been no litigation, proceeding or administrative action brought, threatened in writing against Parent, Silver, any predecessor of Silver, any Subsidiary of Silver or any former subsidiary, or any settlement reached by Parent, Silver, any predecessor of Silver, any Subsidiary of Silver or any former subsidiary with, any party or parties alleging the presence, disposal, Release or threatened release of any Hazardous Materials on, at, from or under any such Facility or that otherwise relates to Hazardous Activity; and