(iv)     there has been no written notification from a Governmental Authority or third party, nor is there any litigation, proceeding, or administrative action that has been brought or has been threatened in writing against Parent, Silver or any Subsidiary of Silver with respect to violation of an Environment Law or the existence of Environmental, Health and Safety Liabilities held by or with respect to any Facility.

(c)     Except as set forth on Section 3.24 of the Silver Disclosure Schedule, Silver has no knowledge of any presence, disposal, Release or threatened release of Hazardous Materials on, from or under, or, except in compliance with Environmental Laws and Occupational Safety and Health Laws, the conduct of any Hazardous Activity at, any Facility that may have occurred prior to Silver, a Subsidiary of Silver or former subsidiary having taken possession of any such Facility.

(d)     Silver has delivered to Purchaser true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Silver or any of its Subsidiaries pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by Silver, or any Subsidiary of Silver or any other Person for whose conduct it is or may be held responsible, with Environmental Laws.

(e)     None of (i) the Stock Purchase Agreement dated as of December 19, 1996 by and among GEC Incorporated ("GEC") and Parent, (ii) the Assumption Agreement dated as of January 17, 1997 by and among GEC, Silver and Parent or (iii) the Guaranty dated as of January 17, 1997 by and between Parent and General Electric Company plc have not been amended or terminated and continue in full force and effect in accordance with their terms (the "GEC Agreements").

3.25     [Intentionally Omitted]

3.26     Board of Directors, Officers and Key Personnel.  Section 3.26 of the Silver Disclosure Schedule accurately sets forth, as of the date of this Agreement: (a) the name and title of each of Silver's officers and its Subsidiaries' officers; (b) the name and title of supervisory, developmental or other key personnel of Silver and its Subsidiaries; and (c) the name, principal occupation and address of each member of Silver's board of directors and its Subsidiaries' boards of directors.

3.27     Insurance.  Silver and each Subsidiary of Silver maintains, and at all times since its inception has maintained, fire and casualty, workers compensation, general liability, business interruption and product liability insurance (which current policies are listed under Section 3.27 of the Silver Disclosure Schedule) which it believes to be reasonably prudent for similarly sized and similarly situated businesses.  Section 3.27 of the Silver Disclosure Schedule sets forth all material claims made under Silver's insurance policies since January 1, 2001 and the premiums that apply with respect to such insurance policies as of the date of this Agreement.  As of the date hereof, the insurance policies set forth on Section 3.27 of the Silver Disclosure Schedule are in full force and effect and Silver is not in default with respect to any material provision contained in such insurance policies nor has Silver failed to give any notice of any claim under insurance policies in due and timely fashion, nor has any coverage for current claims been denied, except where such default or failure as of the date of this Agreement, individually or in the aggregate, could not reasonably be expected to result in a cost to Silver in excess of Ten Thousand Dollars ($10,000).

3.28     Investment Banking and Brokerage Fees.  Except as set forth on Section 3.28 of the Silver Disclosure Schedule, Silver has not incurred or become liable for any broker's or finder's fees, banking fee or similar compensation relating to or in connection with the transactions contemplated hereby.

BST99 1394460-13.069646.0011

B-0603

3.29     Accuracy of Disclosure. This Agreement, its exhibits and schedules, and any of the certificates or documents to be delivered by Silver or Parent to Platinum or Purchaser under this Agreement, taken together, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which such statements were made, not misleading.

3.30     No Other Representations. Except as set forth in this Article 3 or otherwise in this Agreement or any Ancillary Agreement, neither Parent nor Silver makes, and no party shall be entitled to rely upon, any representation or warranty as to any fact or matter other than as expressly set forth herein or therein.

## 4.     REPRESENTATIONS AND WARRANTIES OF PLATINUM AND PURCHASER

Except as set forth in the Platinum Disclosure Schedule, the parts of which are numbered to correspond to the Section numbers of this Agreement and which thereby qualify the corresponding representations and warranties contained in this Article 4, each of Platinum and Purchaser, where applicable, hereby represents and warrants jointly and severally to Silver and Parent as follows:

4.1     Organization and Good Standing. Each of Platinum and Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority, and all requisite qualifications to do business as a foreign corporation, to conduct its business in the manner in which its business is currently being conducted, except where the failure to be so organized, existing or to have such power, authority or qualifications would not, individually or in the aggregate, could be reasonably expected to have a Material Adverse Effect on Platinum. Platinum has delivered or made available to Silver a true and correct copy of its and Purchaser's certificate of incorporation and bylaws, each as amended to date (collectively, the "*Platinum Charter Documents*"), and each such instrument is in full force and effect. Platinum is not in violation of any of the provisions of the Platinum Charter Documents. Platinum has delivered or made available to Silver all proposed or considered amendments to the Platinum Charter Documents.

4.2     Capitalization.

(a)     Authorized/Outstanding Capital Stock. The authorized capital stock of Platinum consisted solely of 75,000,000 shares of Platinum Common Stock and 1,000,000 shares of Platinum preferred stock. As of the date hereof, there are issued and outstanding _____ shares of Platinum Common Stock and no shares of Platinum preferred stock.

(b)     The authorized capital stock of Purchaser consists of 1,000 shares of common stock, $0.01 par value per share, all of which, as of the date hereof, are issued and outstanding and are held by Platinum. All of the outstanding shares of Purchaser's common stock have been duly authorized and validly issued, and are fully paid and nonassessable. Purchaser was formed for the purpose of purchasing the Shares and has no material assets or liabilities except as necessary for such purpose.

(c)     All of the issued and outstanding Platinum Common Stock are, and the shares of Platinum Common Stock to be issued to Silver, when issued in accordance with the provisions of this Agreement, will be duly and validly issued and fully paid and nonassessable. None of the shares of Platinum Common Stock to be issued to Silver will be issued in violation of any preemptive rights and, assuming the accuracy of certain representations made by Silver and Parent regarding Securities Laws, have been offered, issued, sold and delivered in compliance with all registration or qualification requirements (or applicable exemptions therefrom) of applicable Securities Laws and state securities or

31

B-0604

"Blue Sky" laws. Except as otherwise disclosed in the Platinum SEC documents filed as of the date hereof, there are no outstanding stockholder agreement, voting trusts, proxies or Contracts to which Platinum, Purchaser or, to Platinum's knowledge, to which any other Person is a party, relating to the voting of any shares of Platinum's capital stock.

(d)    Options/Warrants/Rights.  As of the date hereof, options to purchase _____ shares of Platinum Common Stock have been issued and are outstanding and warrants to purchase _____ shares of Platinum Common Stock have been issued and are outstanding. Except as set forth in this Section 4.2, there is no: (i) outstanding shares of capital stock or other equity securities of Platinum; (ii) outstanding preemptive right, stock appreciation right, subscription, option, call, warrant or right (whether or not currently exercisable) to acquire from Platinum any shares of Platinum Common Stock or other securities of Platinum or any Subsidiary of Platinum; (iii) outstanding security, instrument or obligation issued by Platinum or any Subsidiary of Platinum, that is or may become convertible into or exchangeable for any shares of Platinum Common Stock or other securities of Platinum or any Subsidiary of Platinum; (iv) stockholders' rights plan (or similar plan commonly referred to as a "poison pill") under which Platinum or any successor of Platinum is or may become obligated to sell or otherwise issue any shares of its capital stock or any securities of any Subsidiary of Platinum; (v) Contract to which Platinum is a party relating to the voting or registration of or restricting any Person from purchasing, selling, pledging or otherwise disposing of (or granting any option or similar right with respect to) any shares of Platinum Common Stock or any securities of any Subsidiary of Platinum; or (vi) liability for dividends accrued but unpaid.

4.3    Power, Authorization and Non-Contravention.

(a)    Each of Platinum and Purchaser has the corporate power, legal capacity and authority to (i) carry on its business as now conducted; (ii) own, operate and lease its properties in the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under Contracts to which Platinum or any of its Subsidiaries is a party or bound; and (iv) enter into and perform its obligations under this Agreement, and all agreements to which Platinum or Purchaser is or will be a party that are required to be executed pursuant to this Agreement (the "*Platinum Ancillary Agreements*"); except in the case of clauses (i), (ii), (iii) and (iv) of this Section 4.3 where the failure to have such power, capacity or authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Platinum or Purchaser. The execution, delivery and performance of this Agreement and the Platinum Ancillary Agreements have been duly and validly approved and authorized by Platinum's Board of Directors and Purchaser's Board of Directors, as applicable. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate and stockholder action on the part of Platinum and Purchaser. The written consent of Platinum, as the sole stockholder of Purchaser, a certified copy of which has previously been delivered to Silver, is sufficient for the approval, and no other approval of any holder of any securities of Platinum is required in connection with, the consummation of the transactions contemplated hereby.

(b)    No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person is required to be obtained or made by Platinum or Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) the filing with the SEC of a Current Report on Form 8-K with respect to the purchase of the Shares in accordance with the Exchange Act, (ii) the filing with the NASDAQ Stock Market of a Notification Form for Listing of Additional Shares with respect to the shares of Platinum Common Stock issued to Silver, (iii) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state securities (or related) laws, the Antitrust Filings and (iv) such other consents, authorizations, filings,

32

approvals and registrations which if not obtained or made would not be material to Platinum or Purchaser or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

(c) This Agreement and the Platinum Ancillary Agreements are, or when executed by Platinum and Purchaser (as applicable) and the other parties thereto will be, valid and binding obligations of Platinum and Purchaser, to the extent a party thereto, enforceable against Platinum and Purchaser, to the extent a party thereto, in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies; provided, however, that the Platinum Ancillary Agreements will not be effective until the earlier of the Effective Time or the date provided for therein.

4.4    No Violation of Charter Documents, Contracts or Laws.  Neither the execution and delivery of this Agreement or any Platinum Ancillary Agreement, nor the consummation of the transactions provided for herein or therein, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of: (a) any provision of the certificate of incorporation, bylaws or other charter documents of Platinum or Purchaser, as currently in effect; (b) any material Contract to which Platinum or any of its Subsidiaries is a party or bound; or (c) any federal, state, local or foreign judgment, writ, decree, Order, statute, rule or regulation applicable to Platinum any Subsidiary of Platinum or any of their respective assets or properties.

4.5    SEC Filings.  Platinum has filed all forms, reports and documents required to be filed by Platinum with the SEC since January 1, 2001. All such required forms, reports and documents are referred to herein as the "*Platinum SEC Documents.*" As of their respective dates, the Platinum SEC Documents: (i) were prepared in accordance with the requirements of the Securities Laws and other laws applicable to such Platinum SEC Documents; and (ii) did not at the time they were filed (or if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except to the extent corrected prior to the date of this Agreement by a subsequently filed Platinum SEC Document.

4.6    Platinum Financial Statements.  Each of the consolidated financial statements (including, in each case, any related notes thereto) contained in the Platinum SEC Documents (the "*Platinum Financial Statements*") (i) complied in all material respects with the published rules and regulations of the SEC with respect thereto; (ii) was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto or, in the case of unaudited interim financial statements, as may be permitted by the SEC on Form 10-Q, Form 8-K or any successor form under the Exchange Act); and (iii) fairly presented the consolidated financial position of Platinum and its subsidiaries as at the respective dates thereof and the consolidated results of Platinum's operations and cash flows for the periods indicated, except that the unaudited interim financial statements may not contain footnotes and were or are subject to normal and recurring year-end adjustments. The balance sheet of Platinum contained in the Platinum SEC Documents as of January 3, 2004 is hereinafter referred to as the "*Platinum Balance Sheet*", with January 3, 2004 hereinafter referred to as the "*Platinum Balance Sheet Date*". Except as disclosed in the Platinum Financial Statements, since the Platinum Balance Sheet Date neither Platinum nor any of its subsidiaries has any liabilities required under GAAP to be set forth on a balance sheet (absolute, accrued, contingent or otherwise) except for liabilities incurred since the Platinum Balance Sheet Date in the ordinary course of business consistent with past practices which are not, individually or in the aggregate, material to the business, results of operations or financial condition of Platinum and its subsidiaries taken as a whole and liabilities

33

B-0606

incurred in connection with this Agreement. There has been no change in Platinum's accounting policies, except as described in the notes to the Platinum Financial Statements.

4.7    Financing. Platinum has a commitment letter, as attached to <u>Section 4.7 of the Platinum Disclosure Schedule</u>, for a credit facility (the "Credit Facility") which, if funded in accordance with its terms, together with available cash on hand, will provide sufficient funds to deliver the Purchase Price and all associated costs and expenses to Parent and to consummate the transactions contemplated by this Agreement.

4.8    Accuracy of Disclosure. This Agreement, its exhibits and schedules, and any of the certificates or documents to be delivered by Platinum or Purchaser to Silver or Parent under this Agreement, taken together, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which such statements were made, not misleading.

4.9    Litigation. Except as disclosed in the Platinum SEC Documents filed as of the date hereof or as set forth in <u>Section 4.9 of the Platinum Disclosure Schedule</u>, there is no Proceeding pending against Platinum or any Subsidiary of Platinum, nor, to Platinum's knowledge, is any Proceeding threatened against Platinum or any Subsidiary of Platinum before any Governmental Authority or arbitrator that, if determined adversely to Platinum or any Subsidiary of Platinum, may reasonably be expected to have a Material Adverse Effect on Platinum. There is no Proceeding pending as to which Platinum has received written notice of assertion against Platinum, which in any manner could prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement.

4.10    Absence of Certain Changes or Events.

(a)    Since the Platinum Balance Sheet Date, Platinum and its Subsidiaries have carried on their business in the ordinary course substantially in accordance with the procedures and practices in effect on the Platinum Balance Sheet Date. Except as set forth under <u>Section 4.10 of the Platinum Disclosure Schedule</u> or in the Platinum SEC Documents filed as of the date hereof, since the Platinum Balance Sheet Date there has not been with respect to Platinum or any Subsidiary of Platinum any change, event, circumstance or effect, which by itself or in conjunction with all other such changes, whether or not arising in the ordinary course of business, has had or can reasonably be expected to have a Material Adverse Effect on Platinum or on Platinum's or its Subsidiary's ability to conduct their respective businesses as presently conducted, or that is reasonably likely to impede the performance by Platinum or Purchaser of their obligations under this Agreement or any of the Platinum Ancillary Agreements

(b)    Except as set forth under <u>Section 4.10 of the Platinum Disclosure Schedule</u> or in the Platinum SEC Documents filed as of the date hereof, since the Platinum Balance Sheet Date Platinum has not:

(i)    amended its certificate of incorporation, bylaws or any other organizational document;

(ii)    sold, issued, granted or authorized the issuance or grant of: (A) any shares of its capital stock of any class or other security; (B) any option, call, warrant, obligation, subscription, or other right to acquire any capital stock or any other security; or (C) any instrument convertible into or exchangeable for any capital stock or other security (in each case except for options and other equity awards granted in the ordinary course of business) with respect to any such event that would not require Stockholder approval.

34

B-0607

(iii)     declared, set aside or paid any dividend on, or made any other distribution in respect of, its capital stock, or made any changes in any rights, preferences, privileges or restrictions of any of its outstanding capital stock; and

(iv)     effected any split, stock dividend, combination or recapitalization of its capital stock or any direct or indirect redemption, purchase or other acquisition by Platinum of its capital stock.

(v)     taken any action that should be reasonably expected to materially delay, impair or alter the ability of Platinum to consummate the transactions contemplated hereunder.

4.11     **Investment Banking and Brokerage Fees.** Except as set forth on Section 4.11 of the Platinum Disclosure Schedule, Purchaser has not incurred or become liable for any broker's or finder's fees, banking fee or similar compensation relating to or in connection with the transactions contemplated hereby.

4.12     **No Other Representations.** Except as set forth in this Article 4 or otherwise in this Agreement or any Ancillary Agreement, neither Platinum nor Purchaser makes, and no party shall be entitled to rely upon, any representation or warranty as to any fact or matter other than as expressly set forth herein or therein.

5.     **PARENT AND SILVER COVENANTS**

5.1     **Advice of Changes.** During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, Parent and/or Silver will promptly advise Platinum in writing of: (i) the discovery by Silver of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Parent, Silver or any Subsidiary of Silver contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Silver, Parent, or any Subsidiary of Silver contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that representations and warranties which are confined to a specific date shall speak as of that date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of Silver pursuant to this Agreement or any Ancillary Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 9 impossible or unlikely; and (v) any Material Adverse Effect on Silver.

5.2     **Conduct of Business.** During the period from the date of this Agreement until the earlier to occur of (a) the Closing or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, Silver and each of its Subsidiaries shall, except to the extent that Platinum shall otherwise consent in writing (which consent shall not be unreasonably withheld or delayed), carry on the Business in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted and in compliance in all material respects with all applicable laws and regulations, pay its debts and Taxes when due, pay or perform other material obligations when due, and use all commercially reasonable efforts consistent with past practices and policies to (i) preserve intact its present business organization, (ii) keep available the services of its present officers, (iii) preserve its relationships with customers, suppliers, licensors, licensees, and others with which it has business dealings, (iv) maintain Silver's assets in good working condition and repair according to the standards it has maintained as of the date of this Agreement, subject only to ordinary wear and tear, and (v) keep in full force all insurance policies identified under Section 3.27 of the Silver Disclosure Schedule and obtain, renew or extend any insurance consistent with past practices for the Business and Silver's assets. In addition, during that

35

period, Silver will promptly notify Platinum of any material event involving the operation of the Business or Silver's assets consistent with the agreements contained herein.

In addition, during the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, except as provided otherwise herein or as approved or recommended by Platinum in writing Silver and its Subsidiaries will not, and Parent will cause Silver and its Subsidiaries not to, without the prior written consent of Platinum, which consent shall not be unreasonably withheld or delayed:

(a)     sell, lease, license, encumber or otherwise dispose of any of the assets of Silver or any Subsidiary of Silver which individually or in the aggregate, are material to the Business or which have a book value in excess of $50,000, other than sales of products to customers and resellers on commercially reasonable terms effected in the ordinary course of business consistent with past practice;

(b)     incur any indebtedness for borrowed money, enter into any capital leases or guarantee any such indebtedness or capital leases of any other Person or enter into any "keep well" or other agreement to maintain any financial statement condition or enter into any arrangement having the economic effect of any of the foregoing, which obligations, liabilities or indebtedness exceed $50,000 in the aggregate;

(c)     except as required under agreements existing as of the date of this Agreement as set forth under Section 5.2(c) of the Silver Disclosure Schedule, grant or pay any bonus, royalty, severance or termination pay or increased salary or other compensation to any officer, director, employee, consultant or agent of Silver or its Subsidiaries or enter into any new employment agreement or a consulting agreement which provides for payment of more than $50,000 annually with any such Person, or enter into any new agreement or plan of the type described in Sections 3.22(c) or 3.22(e);

(d)     enter into, amend, modify or terminate any Contract, except in the ordinary course of business consistent with past practice and to the extent such action would not require disclosure under Section 3.21, or waive, release, compromise or assign any material rights or claims;

(e)     issue or sell any shares of the capital stock of any class of any Subsidiary of Silver or any other of such Subsidiary's securities, or issue, grant or create any Equity Rights;

(f)     acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, limited liability company, association or other business organization or division thereof; or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to the Business or enter into any joint ventures, partnerships or limited liability companies, or enter into strategic relationships or alliances, which are material, individually or in the aggregate, to the Business;

(g)     make or permit to be made any capital expenditures, or make or commit or commit or agree to make any payments that would be classified as expenses under GAAP in each case which exceed $50,000 in any one transaction or the terms of which transactions are not in the ordinary course of business consistent with past practice;

(h)     materially change its business practices or policies with respect to the Silver Products and Services or its customers;

36

BST99 1394460-13.069646.0011

B- 0609

(i)    materially revalue any of its assets or, except as required by GAAP, make any change in accounting methods, principles or practices, or agree to any material audit assessment by any tax authority or make any tax election;

(j)    lend any amount to any Person, other than loans made to Subsidiaries of Silver that will be repaid in full prior to the Effective Time, in an amount not to exceed $50,000, and advances for reasonable travel related expenses which are incurred in the ordinary course of business consistent with past practice, not material in amount, which travel related expenses shall be documented by receipts for the claimed amounts in accordance with past practice;

(k)    make any material payments outside the ordinary course of business consistent with past practice;

(l)    take any action which would have a Material Adverse Effect on Silver; or

(m)    agree to do, or permit a Subsidiary to do or agree to do, any of the things described in the preceding clauses 5.2(a) through (l).

Notwithstanding anything to the contrary contained therein, Silver may distribute cash immediately prior to the Closing; provided, however, that the Silver may not distribute the $_____ held in escrow in accordance with the terms of the Escrow Agreement dated January 18, 2000 by and among Multigraphics, Inc., Datacard Corporation and Harris Trust and Savings Bank, as the same may have been amended (the "Harris Escrow Agreement"), and such $_____ shall remain in escrow pursuant to the Harris Escrow Agreement.

5.3    No Solicitation.

(a)    From and after the date of this Agreement until the Effective Time or termination of this Agreement pursuant to Article 10, Parent will not, nor will it authorize or permit Silver and their Subsidiaries or any of their respective officers, directors, stockholders, affiliates or employees or any investment banker, attorney or other advisor or representative retained by any of them to, directly or indirectly take any action to solicit, initiate, seek or encourage or support any inquiry, proposal or offer from, furnish any information to, or participate in any negotiations with, any Person regarding any acquisition of Parent, Silver or any of its Subsidiaries, any merger or consolidation with or involving, or any acquisition of any material portion of the stock or assets of Parent, Silver or any of its Subsidiaries or any material license of any Intellectual Property Rights of Parent, Silver or the Subsidiaries (any of the foregoing being referred to in this Agreement as an "*Acquisition Proposal*") or enter into an agreement concerning any Acquisition Proposal with any party other than Platinum and Purchaser.

(b)    Each of Parent and Silver as promptly as reasonably practicable: (i) shall advise Platinum in writing of any Acquisition Proposal or request which Parent or Silver reasonably believes could lead to an Acquisition Proposal, the material terms and conditions of such request, inquiry or Acquisition Proposal, and the identity of the Person or group making any such request, inquiry or Acquisition Proposal, and (ii), upon the request of Platinum, notify such Person or group of Parent's and Silver's obligations under this Agreement and their intention to abide by them. Each of Parent and Silver will keep Platinum informed as promptly as practicable in all material respects of amendments to any such request, inquiry or Acquisition Proposal.

5.4    Regulatory Approvals. Each of Parent and Silver will execute and file, or join in the execution and filing, of any application or other document that may be necessary in order to obtain the authorization, approval or consent of any Governmental Authority, whether federal, state, local or foreign,

37

B-0610

which may be reasonably required, or which Platinum may reasonably request, in connection with the consummation of the transactions provided for in this Agreement. Each of Parent and Silver will use commercially reasonable efforts to obtain or assist Platinum in obtaining all such authorizations, approvals and consents.

5.5     Necessary Consents. Each of Parent and Silver will use all commercially reasonable efforts to obtain such written consents and take such other actions as may be necessary or appropriate for Parent or Silver, in addition to those set forth in Section 5.4 and Section 7.10, to allow the consummation of the transactions provided for herein and to facilitate and allow Platinum to carry on Silver's Business after the Closing Date including the obtaining of any consents required to assign the Silver Contracts to Purchaser.

5.6     Securities Laws. Each of Parent and Silver shall use commercially reasonable efforts to assist Platinum to the extent necessary to comply with the securities laws of all jurisdictions applicable in connection with the issuance of the Stock Payment; provided, however, each of Parent and Silver shall not for any purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction where it is not so qualified, or to subject itself to taxation in any such jurisdiction, or to execute a general consent to service of process unless it is already subject to service in such jurisdiction.

5.7     Litigation. Parent or Silver will notify Platinum in writing promptly after learning of any action, suit, proceeding or investigation by or before any court, board or governmental agency, initiated or threatened against Parent or Silver relating to the Business or for the purpose or with the effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or which, if adversely determined, could be reasonably expected to have a Material Adverse Effect on Silver, the Business or Silver's assets. If Parent or Silver becomes subject to a review by the Internal Revenue Service or any other taxing agency or authority for periods prior to the Closing Date, and such review has the potential to materially affect the liability of Platinum or any Subsidiary of Platinum for any taxes due with respect to a taxable period ending after the Closing Date, Parent or Silver (as the case may be) shall keep Platinum informed on a regular basis of the nature of such proceedings and shall consider in good faith any recommendations made by Platinum as to the conduct and settlement of such proceedings. In no event will Parent enter into, or permit Silver to enter into, any settlement or other stipulation with respect to any such review without the written consent of Platinum, which consent will not be unreasonably withheld.

5.8     Notification of Employee Problems. Parent or Silver will promptly notify Platinum if any of Parent's or Silver's officers becomes aware that any of the key personnel listed under Section 3.26 of the Silver Disclosure Schedule intends to leave Silver's employ.

5.9     Satisfaction of Closing Conditions. Silver and Parent will use their commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent which are set forth in Article 9 or elsewhere in this Agreement on or before the Closing. Subject to the terms and conditions of this Agreement, Silver and Parent will use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

5.10     Confidentiality. Silver and Parent agree that Silver, Parent and their respective officers, directors, agents and representatives, will hold in strict confidence, and will not use or disclose, any Confidential Information or proprietary data obtained from Purchaser or Platinum with respect to Purchaser or Platinum except for the purpose of evaluating, negotiating and completing the transactions

BST99 1394460-13.069646 0011

B-0611

contemplated hereby. Information generally known in Platinum's industry or which has been disclosed to Silver or Parent by Third Parties which have a right to do so shall not be deemed Confidential Information or proprietary data for purposes of this Agreement. If the transactions contemplated by this Agreement are not consummated, Silver and Parent will return to Platinum (or certify that they have destroyed) all copies of such Confidential Information and proprietary data, including, but not limited to, financial information, customer lists, business and corporate records, worksheets, test reports, tax returns, lists, memoranda, and other documents prepared by or made available to Silver in connection with the transactions contemplated hereby.

     5.11   <u>Access to Information</u>. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, subject to the terms and conditions hereof relating to the confidentiality and use of confidential and proprietary information, and subject to compliance with applicable laws (including, but not limited to, antitrust laws), Parent and Silver will provide Platinum and its agents with reasonable access, during regular business hours, to the employees of Silver and its Subsidiaries and Parent and to the files, books, records and offices of Silver and the Subsidiaries, including, without limitation, any and all information relating to Silver's and its Subsidiaries' Taxes, . commitments, Contracts, leases, licenses, real, personal and intangible property (including any Intellectual Property Rights), and financial condition. Silver will cause its accountants to cooperate with Platinum and its agents in making available all financial information reasonably requested, including, without limitation, the right to examine all working papers pertaining to all financial statements prepared or audited by such accountants.

     5.12   <u>Parent Release</u>. By execution of this Agreement but subject to the consummation of the Closing, Parent releases all claims it may have against the Majority Holders.

**6.   COVENANTS OF PLATINUM AND PURCHASER**

     6.1   <u>Advice of Changes</u>. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, Platinum and Purchaser will promptly advise Silver in writing of: (i) the discovery by Platinum or Purchaser of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Platinum or Purchaser contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Platinum or Purchaser contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that the representations and warranties which are confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of Platinum pursuant to this Agreement or any Ancillary Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 8 impossible or unlikely; and (v) any Material Adverse Effect on Platinum.

     6.2   <u>Conduct of Business</u>.

     (a)   During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, Platinum and each of its Subsidiaries shall, except to the extent that Silver shall otherwise consent in writing, which consent shall not be unreasonably withheld or delayed, carry on its business in the usual, regular ordinary course, in substantially the same manner as heretofore conducted and in compliance in all material respects with all applicable laws and regulations, pay its debts and Taxes when due, pay or perform other material obligations when due, and use all commercially reasonable efforts

BST99 1394460-13 069646.0011

B-0612

consistent with past practices and policies to preserve intact its present business organization. In addition, during that period, Platinum will promptly notify Silver of any material event involving the operation of its businesses.

(b) In addition, during the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, neither Platinum nor Purchaser will, without the prior written consent of Silver, which consent shall not be unreasonably withheld or delayed:

(i) amend its Certificate of Incorporation or Bylaws, in each case, in any manner adverse to the holders of Purchaser common stock;

(ii) except (i) for this Agreement, (ii) pursuant to the terms of stock options outstanding as of the date hereof and (iii) pursuant to the terms thereof in existence on the date hereof or with respect to options to purchase not more than an aggregate of [_____] shares of Platinum Common Stock, issue or sell any shares of the capital stock of Platinum or any other of its securities, or issue, grant or create any Equity Rights if any such issuance or sale would require the approval of Platinum's stockholders; and

(iii) to do or agree to do, or permit a Subsidiary to do or agree to do, any of the things described in the preceding (a) and (b).

6.3    Regulatory Approvals. Platinum will execute and file, or join in the execution and filing of, any application or other document that may be necessary in order to obtain the authorization, approval or consent of any Governmental Authority, federal, state, local or foreign, which may be reasonably required, or which Silver may reasonably request, in connection with the consummation of the transactions provided for in this Agreement. Platinum will use commercially reasonable efforts to obtain all such authorizations, approvals and consents.

6.4    Litigation. Platinum will notify Silver in writing promptly after learning of any action, suit, investigation, litigation or proceeding threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or which would be reasonably expected to have a Material Adverse Effect on Platinum.

6.5    Satisfaction of Conditions Precedent. Upon the terms and subject to the conditions of this Agreement, Platinum will use commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent which are set forth in Article 8 on or before the Closing Date, including to obtain the Credit Facility. Upon the terms and subject to the conditions of this Agreement, Platinum will use commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated as promptly as practicable, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part in order to effect the transactions provided for herein. Platinum will allow [MHR] to discuss the status of the financing contemplated by the Credit Facility with the lenders thereunder or with substitute lenders.

6.6    Blue Sky Laws. Platinum shall take such steps as may be necessary to comply with all applicable Securities Laws as well as the securities laws of all states which are applicable in connection with the transactions contemplated by this Agreement.

40

BST99 1394460-13.069646 0011

B-0613

6.7    NASDAQ Listing. Platinum agrees to take all necessary steps for listing on the NASDAQ National Market the shares of Platinum Common Stock issuable in connection with the transactions contemplated by this Agreement.

6.8    Confidentiality. Purchaser and Platinum agree that, unless and until the Closing has been consummated, Purchaser, Platinum and their officers, directors, agents and representatives, will hold in strict confidence, and will not use or disclose, any Confidential Information or proprietary data obtained from Silver or Parent with respect to Silver or Parent except for the purpose of evaluating, negotiating and completing the transactions contemplated hereby. Information generally known in Silver's industry or which has been disclosed to Purchaser or Platinum by Third Parties which have a right to do so shall not be deemed Confidential Information or proprietary data for purposes of this Agreement. If the transactions contemplated by this Agreement are not consummated, Purchaser and Platinum will return to Silver (or certify that they have destroyed) all copies of such Confidential Information and proprietary data, including, but not limited to financial information, customer lists, business and corporate records, worksheets, test reports, tax returns, lists, memoranda, and other documents prepared by or made available to Purchaser and Platinum in connection with the transactions contemplated hereby.

6.9    Access to Information. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 10 hereof, subject to the terms and conditions hereof relating to the confidentiality and use of confidential and proprietary information, and subject to compliance with applicable laws (including, but not limited to antitrust laws), Purchaser and Platinum will provide the Majority Holder and its agents with reasonable access, during regular business hours, to the executive officers of Platinum.

7.    **ADDITIONAL COVENANTS**

7.1    Liability for Taxes.

(a)    Parent shall be liable for and will pay (i) any Taxes caused by or resulting from the sale of the Shares (including, without limitation, all Taxes arising from the Section 338(h)(10) Elections), (ii) any Taxes imposed on or incurred by Silver arising out of the inclusion of Silver in the Seller Group, any predecessor group or any combined, consolidated, unitary or similar group (a "*Group*") prior to the Closing Date, (iii) any federal, state or foreign income Taxes imposed on or incurred by Silver or any Subsidiary of Silver (or any Group with respect to the taxable items of Silver or any Subsidiary of Silver) for any taxable period ending on or before the Closing Date (or the portion, determined as described in paragraph (c) of this Section 7.1, of any such Taxes for any taxable period beginning on or before and ending after the Closing Date which is allocable to the portion of such period occurring on or before the Closing Date (the "*Pre Closing Period*")) and (iv) any attorneys' fees or other costs incurred by Platinum or Silver in connection with any payment from Parent under this paragraph (a) of Section 7.1 [provided, that Parent shall not be liable for any of the foregoing to the extent the amount has been included in the calculation of the Final Adjustment Amount]. [The ultimate parent entity of Parent] and Parent have entered into an agreement with Platinum in the form of Exhibit ____ pursuant to which they have, among other matters, agreed to indemnify Platinum and its affiliates for certain Taxes in accordance with the terms and conditions of such agreement (the "Tax Indemnity Agreement).

(b)    Platinum shall be liable for, and shall pay any Taxes imposed on or incurred by or with respect to Silver for which Parent is not liable under paragraph (a) of this Section 7.1.

41

B-0614

(c)    Whenever it is necessary for purposes of paragraph (a) or (b) of this Section 7.1 to determine the portion of any Taxes imposed on or incurred by Silver (or any Group) for a taxable period beginning on or before and ending after the Closing Date which is allocable to the Pre Closing Period, the determination shall be made, in the case of Taxes which are not measured by, or based upon, production or net income, on a per diem basis, except any consequences of the Section 338(h)(10) Elections shall be excluded, and, in the case of other Taxes, by assuming that the Pre Closing Period constitutes a separate taxable period of Silver and by taking into account the actual taxable events occurring during such period (except that exemptions, allowances and deductions for a taxable period beginning on or before and ending after the Closing Date that are calculated on an annual or periodic basis, such as the deduction for depreciation, shall be apportioned to the Pre Closing Period ratably on a per diem basis and any consequences of the Section 338(h)(10) Elections shall be excluded).

(d)    Parent and Platinum will, to the extent permitted by applicable law, elect with the relevant taxing authorities to close all taxable periods of Silver and each Subsidiary of Silver as of the close of business on the Closing Date.

(e)    Platinum agrees to pay to Parent any refund received after the Closing Date by Platinum or Silver, in respect of any Taxes for which Parent is liable under paragraph (a) of this Section 7.1, except to the extent such refund is shown as an asset on the Final Balance Sheet. Parent agrees to pay to Platinum any refund received by Parent in respect of any Taxes for which Platinum is liable under paragraph (b) of this Section 7.1. The parties shall cooperate in order to take all necessary steps to claim any such refund. Any such refund received by a party for the account of the other party shall be paid to such other party within thirty (30) days after such refund is received.

(f)    Parent and Platinum agree that any payment made with respect to Taxes pursuant to this Section 7.1 shall be treated by the parties on their Tax Returns as an adjustment to the Purchase Price for the Silver Common Stock.

(g)    Notwithstanding anything in this Agreement to the contrary, the amount of any payment under Section 7.1(a) or 7.1(b) shall be reduced by the amount of any Tax benefit actually realized by the party making the claim for such payment after giving effect to the obligations under this Section 7.1.

7.2    Tax Proceedings.  In the event Platinum or Silver or any of their Affiliates receives notice (the "*Proceeding Notice*") of any examination, claim, adjustment or other proceeding with respect to the liability of Silver or any Subsidiary of Silver for Taxes for any period for which Parent is or may be liable under paragraph (a) of Section 7.1, Platinum shall notify Parent in writing thereof (the "*Platinum Notice*") no later than the earlier of (a) thirty (30) days after the receipt by Platinum, Silver or any of their Affiliates of the Proceeding Notice, or (b) ten (10) days prior to the deadline for responding to the Proceeding Notice.  As to any such Taxes for which Parent is solely liable under paragraph (a) of Section 7.1, Parent shall be entitled at its expense to control or settle the contest of such examination, claim, adjustment or other proceeding, provided that (a) Parent notifies Platinum in writing that it desires to do so no later than the earlier of (i) thirty (30) days after receipt of the Platinum Notice, or (ii) ten (10) days prior to the deadline for responding to the Proceeding Notice; (b) Parent provides Platinum with adequate assurance that it will satisfy such Taxes in full; and (c) any resolution of the matter will result in no liability or adverse Tax or other consequence to Platinum or its Affiliates.  Subject to the preceding sentence, the parties shall cooperate with each other and with their respective Affiliates, and will consult with each other, in the negotiation and settlement of any proceeding described in this Section 7.2.  Failure by Platinum to comply with its obligations under this Section 7.2 will not relieve Parent of any liability it may have to Platinum, except to the extent Parent is materially prejudiced thereby.

42

B-0615

7.3     Payment of Taxes. All Taxes with respect to Silver shall be paid by the party that is legally responsible therefor. Except as otherwise provided in Sections 7.1-7.3, any amount to which a party is entitled under Sections 7.1-7.3 shall be promptly paid to such party by the party obligated to make such payment following written notice to the party so obligated stating that the Taxes to which such amount relates are due and providing details supporting the calculation of such amount.

7.4     Tax Returns. All Tax Returns which relate to any Taxes of Silver shall be prepared and filed by the party that is legally responsible therefor. All taxable items of Silver for the period beginning on January 1 of the calendar year in which the Closing occurs and extending through the Closing (and, to the extent required in the applicable regulations, through the close of business on the Closing Date, but in no event including items arising from transactions by Silver outside the ordinary course of business after the Closing) will be included in the consolidated federal income Tax Return of the Seller Group and will be reported on a basis consistent with previously filed Tax Returns. Platinum and its affiliates, including Silver, shall cooperate with Parent and shall make available all necessary records and timely take all action necessary to allow Parent and its affiliates to prepare and file the Tax Returns which they are responsible for preparing and filing under this Section 7.4. Parent will prepare all Tax Returns of Silver and its Subsidiaries that relates to a tax period beginning on or before the Closing Date, and Platinum shall, and shall cause Silver and its Subsidiaries and Platinum's other Affiliates to, cooperate fully to assure that each such return is signed by a person with authority to sign such return under applicable law, that any extensions for filing such return that are determined to be necessary or appropriate by Parent are obtained, and that such return is timely filed.

(a)     For any taxable period of Silver or any Subsidiary of Silver that includes (but does not end on) the Closing Date, Platinum will timely prepare and file the Tax Returns required to be filed and will pay all Taxes due with respect to such Tax Returns; provided that Parent will remit to Platinum not less than ten (10) calendar days prior to the due date of any such Tax Return, any amount owed by Parent pursuant to Section 7.1(a) with respect to the taxable periods covered by such Tax Return. All such Tax Returns will be prepared on a basis reasonably consistent with the past practice of Silver and its Subsidiaries, provided that such basis is not otherwise inconsistent with applicable law. Platinum will furnish such Tax Returns to Parent for its review and comment at least thirty (30) calendar days prior to the due date for filing such Tax Returns.

(b)     For any taxable period of Silver and any Subsidiary of Silver that ends on or before the Closing Date for which a Tax Return is due after the Closing Date, Parent will timely prepare and file all Tax Returns required to be filed and will pay all Taxes due with respect to such Tax Returns. All such Tax Returns will be prepared on a basis reasonably consistent with the past practice of Silver and any Subsidiary of Silver, provided that such basis is not otherwise inconsistent with applicable law. Platinum will have the right to review and comment on any separate Silver or any Subsidiary of Silver Tax Returns prepared by Parent at least thirty (30) calendar days prior to the due date for filing such Tax Returns.

7.5     Tax Allocation Arrangements. Effective as of the Closing, all liabilities and obligations between Silver or any Subsidiary of Silver, on one hand, and Parent and any Affiliates thereof, on the other hand, under any tax indemnity, sharing, allocation or similar agreement or arrangement in effect prior to the Closing shall be extinguished in full, and any liabilities or rights existing under any such agreement or arrangement shall cease to exist and shall no longer be enforceable. Parent and its Affiliates shall execute any documents necessary to effectuate the provisions of this Section 7.5.

7.6     Cooperation and Exchange of Information. Each party will provide, or cause to be provided, to the other party copies of all correspondence received from any taxing authority by such

43

B-0616

party or any of its Affiliates in connection with the liability of Silver or any Subsidiary of Silver for Taxes for any period for which such other party is or may be liable under paragraph (a) or (b) of Section 7.1. The parties will provide each other with such cooperation and information as they may reasonably request of each other in preparing or filing any Tax Return or claim for refund, in determining a liability or a right of refund or in conducting any audit or other proceeding in respect of Taxes imposed on the parties or their respective Affiliates. The parties and their Affiliates will preserve and retain all Tax Returns, schedules, work papers and all material records or other documents relating to any such Tax Returns, claims, audits or other proceedings until the expiration of the statutory period of limitations (including extensions) of taxable periods to which such documents relate and until the final determination of any payments which may be required with respect to such periods under this Agreement and shall make such documents available to the other party or any affiliate thereof, and their respective officers, employees and agents, upon reasonable notice and at reasonable times, it being understood that such representatives shall be entitled to make copies of any such books and records relating to Silver as they shall deem necessary. Any information obtained pursuant to this Section 7.6 shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refunds or in conducting any audit or other proceeding. Each of Parent and Platinum shall pay the reasonable out-of-pocket expenses incurred by the other's Affiliates or representatives in providing the cooperation and information required by this Section 7.6 at its own expense.

7.7     Conflict. In the event of a conflict between the provisions of Sections 7.1-7.8 and any other provisions of this Agreement, the provisions of Sections 7.1-7.8 shall control.

7.8     Assistance and Cooperation. Each of Parent and Platinum (and their respective Affiliates) shall, with respect to items (a) and (b) below, at the expense of the requesting party, otherwise at their own expense:

(a)     assist the other party in preparing any Tax returns which such other party is responsible for preparing and filing in accordance with this Agreement;

(b)     cooperate fully in preparing for any audits of, or disputes with Taxing authorities regarding, any Tax returns relating to Silver or the Subsidiaries;

(c)     make available to the other and to any Taxing authority as reasonably requested all information, records, and documents relating to Taxes concerning Silver or the Subsidiaries;

(d)     make available to the other and to any Taxing authority as reasonably requested employees and independent auditors to provide explanations and additional information relating to Taxes concerning Silver or the Subsidiaries;

(e)     provide timely notice to the other in writing of any pending or threatened Tax audits, assessments or Tax proceedings with respect to Silver or the Subsidiaries for taxable periods for which the other may have a liability under this Agreement;

(f)     furnish the other with copies of all correspondence received from any Taxing authority in connection with any Tax audit or Tax proceedings with respect to any taxable period for which the other may have a liability under this Agreement; and

(g)     retain any books and records that could reasonably be expected to be necessary or useful in connection with Platinum's preparation of any Tax returns, or for any audit, examination, or proceeding relating to Taxes. Such books and records shall be retained until the expiration of the applicable statute of limitations (including extensions thereof to the extent the party has been notified

B-0617

thereof); provided, however, that in the event of an audit, examination, investigation or proceeding has been instituted prior to the expiration of the applicable statute of limitations (or in the event of any claim under this Agreement), the books and records shall be retained until there is a final determination thereof (and the time for any appeal has expired).

7.9     Non-Competition, Non-Solicitation and Non-Disparagement.

(a)     Non-Competition. For a period of five (5) years after the Closing Date, neither Silver nor Parent shall, anywhere in the world, directly or indirectly invest in, own, manage, operate, finance, control, advise, or render services to, or guarantee the obligations of, any Person engaged in or planning to become engaged in the Business; provided, however, that Silver or Parent may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Exchange Act.

(b)     Non-Solicitation. For a period of five (5) years after the Closing Date, neither Silver nor Parent shall, directly or indirectly:

(i)     solicit the business of any Person who is a customer of Purchaser; or

(ii)     cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Silver on the Closing Date or within the year preceding the Closing Date to cease doing business with Purchaser, to deal with any competitor of Purchaser, or in any way interfere with its relationship with Purchaser.

(c)     Non-Disparagement. After the Closing Date, the parties will not disparage the other parties or any of their respective shareholders, directors, officers, employees or agents.

(d)     Modification of Covenant. If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 7.9(a) through (c) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration, or geographic area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 7.9 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 7.9 is reasonable and necessary to protect and preserve Purchaser's legitimate business interests and the value of the Business and the Shares and to prevent any unfair advantage being conferred on Silver or Parent.

7.10     Further Assurances. Parent agrees that if, at any time before or after the Effective Time, Platinum considers or is advised that any further deeds, assignments or assurances are reasonably necessary or desirable to vest, perfect or confirm in Purchaser title to the Shares and the use by Platinum, Purchaser or Silver of Silver's assets (including as a result of any failure to obtain the consent of any third party), Parent shall, and shall cause Silver to, execute and deliver all such proper deeds, assignments and assurances and do all other things reasonably necessary to vest, perfect or confirm title to such property or rights in Purchaser and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement, including using all reasonable efforts to secure the consent of Ernst & Young LLP to file the audited Silver Financial Statements as part of a filing with the SEC by Platinum. In addition, Parent will remit to Silver all checks or payments received by it subsequent to the Effective Time which constitute Silver assets.

45

B-0618

7.11    Registration of Shares. Subject to execution of the Registration Rights Agreement substantially in the form attached hereto as Exhibit [ ] (the "Registration Rights Agreement"), holders of Platinum Common Stock issued by Platinum in connection with the transaction contemplated by this Agreement who receive such shares in accordance with the terms of this Agreement shall have the benefit of the Registration Rights Agreement.

7.12    Transfer of Shares. Parent agrees that it shall not sell or otherwise transfer any of the shares of Platinum Common Stock issued by Platinum in the transaction contemplated by this Agreement without registration under the Securities Act, pursuant to Rule 144 (or any successor rule) under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act, provided that where such transfer is to be effected pursuant to an exemption from the registration requirements of the Securities Act, Parent shall provide Platinum with an opinion of counsel reasonably satisfactory to Platinum that no violation of the Securities Act will be involved in such transfer, and Parent fully understands and agrees that it must bear the total economic risk of its purchase for an indefinite period of time because, among other reasons, none of such shares have been registered under the Securities Act or under the securities laws of any applicable state or other jurisdiction and, therefor, cannot be resold, pledged, assigned or otherwise disposed of unless subsequently registered under the Securities Act and under the applicable securities laws of such states or jurisdictions or an exemption from such registration is available. Parent understands that Platinum is under no obligation to register its shares on Parent's behalf except as provided in the Registration Rights Agreements. Parent understands the lack of liquidity and restrictions on transfer of such shares.

7.13    Stakeholder Representative.

(a)     [MHR] shall be constituted and appointed as agent (the "*Stakeholder Representative*") for and on behalf of the stockholder of Silver to give and receive notices and communications, to agree to, negotiate, and enter into, on behalf of the stockholder of Silver, amendments, consents and waivers under this Agreement and the other agreements contemplated by this Agreement. No bond shall be required of the Stakeholder Representative, and the Stakeholder Representative shall receive no compensation for his services. Notices or communications to or from the Stakeholder Representative shall constitute notice to or from the stockholder of Silver.

(b)     The Stakeholder Representative shall not be liable for any act done or omitted hereunder as Stakeholder Representative for any error of judgment or any mistake of fact or law or for anything which it may do or refrain from doing in connection herewith, except as may result from its own gross negligence or willful misconduct. The stockholder of Silver shall indemnify the Stakeholder Representative and hold it harmless against any loss, liability or expense incurred without gross negligence or willful misconduct on the part of the Stakeholder Representative and arising out of or in connection with the acceptance or administration of his duties hereunder.

(c)     A decision, act, consent or instruction of the Stakeholder Representative in respect of any action under this Agreement shall constitute a decision of the Stockholder of Silver and shall be final, binding and conclusive upon such stockholder of Silver, and Platinum may rely upon any decision, act, consent or instruction of the Stakeholder Representative hereunder as being the decision, act, consent or instruction of the stockholder of Silver. Platinum is hereby relieved from any liability to any person (including the stockholder of Silver) for any acts done by it in accordance with such decision, act, consent or instruction of the Stakeholder Representative.

7.14    Filings. The parties agree that, based upon the current facts known to them, no Antitrust Filings (as hereinafter defined) nor Other Filings (as hereinafter defined) are required. Notwithstanding the foregoing, in the event that Antitrust Filings (as hereinafter defined) or Other Filings

46

B-0619

(as hereinafter defined) are required, as promptly as practicable after the date of this Agreement, each of Parent, the ultimate parent entity of Parent, Silver and Platinum will prepare and file (i) with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice Notification and Report Forms relating to the transactions contemplated herein if required by the HSR Act, as well as comparable notification forms required by the merger notification or control laws and regulations of any other applicable jurisdiction (the "*Antitrust Filings*") and (ii) any other filings required to be filed by them under the Exchange Act, the Securities Act or any other Federal, state or foreign laws relating to the transactions contemplated by this Agreement (the "*Other Filings*"). Parent, Silver and Platinum each shall promptly supply the other with any information which may be required in order to effectuate any filings pursuant to this Section 7.14. Neither Platinum nor any of its Affiliates shall be under any obligation to make proposals, execute or carry out agreements or submit to orders providing for the sale or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets or categories of assets of Platinum, any of its Affiliates or subsidiaries, or imposing or seeking to impose any limitation on the ability of Platinum or any of its Affiliates or subsidiaries to conduct their business or own such assets or to acquire, hold or exercise full rights of ownership of the Shares to be acquired.

7.15    Joint Participation. Each of Parent, Silver and Platinum will notify the other promptly upon the receipt of any comments from the government officials in connection with any filing made pursuant hereto and of any request by any government officials for amendments or supplements to the Antitrust Filings or for additional information and will supply the other with copies of all correspondence between such party or any of its representatives, on the one hand, any government officials, on the other hand, with respect to the Antitrust Filings. Each of Parent, Silver and Platinum will use commercially reasonable efforts to cause all documents that it is responsible for filing with regulatory authorities under this Section 7.15 to comply in all material respects with all applicable Legal Requirements and the rules and regulations promulgated thereunder. Whenever any event occurs which is required to be set forth in an amendment or supplement to the Antitrust Filings, Parent, Silver or Platinum, as the case may be, will promptly inform the other of such occurrence and cooperate in filing with the appropriate Governmental Authority such amendment or supplement.

7.16    Environmental Protection. Each of Parent, Silver and Platinum agree to cooperate in gathering information prior to the Closing necessary to pursue the purchase of environmental insurance to cover some or all of the potential environmental liabilities related to one or more of the Silver facilities or other matters for which Silver or its Affiliates may have potential environmental liability ("Environmental Insurance"). Should Platinum purchase Environmental Insurance at any time during the thirty-six (36) month period following the date of the Closing, Platinum shall include as additional insured Platinum and the members of the Board of Directors of each of Silver and Parent (the "*Insured*") provided that the coverage of the Insured would be subordinated to that of Platinum and other insured parties and further provided that Platinum would direct the defense of any claim brought against Platinum and the Insured.

7.17    Consents and Releases. Parent agrees to use commercially reasonable efforts to obtain or cause to be obtained general releases of all claims in favor of Platinum and its officers, directors, agents and employees, and each Person, if any who Controls or may Control Platinum, from the Noteholders and the holders of the Series B Notes.

8.    CONDITIONS TO OBLIGATIONS OF PARENT

Parent's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Parent, but only in a writing signed on behalf of Parent by an authorized officer).

47

B-0620

8.1    Accuracy of Representations and Warranties. Each of the representations and warranties of Platinum and Purchaser set forth in Article 4 of this Agreement shall be true and correct on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date, except where any such failures to be true and correct would not in the aggregate have a Material Adverse Effect on Platinum.

8.2    Covenants. Platinum and Purchaser shall have performed and complied in all material respects with all of its covenants contained in Article 6 on or before the Closing Date.

8.3    Absence of Material Adverse Effect. No Material Adverse Effect with respect to Platinum shall have occurred since the date of this Agreement and be continuing.

8.4    Compliance with Law. There shall be no Order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

8.5    Government Consents. There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other actions, as may be required to consummate the sale of the Shares by any regulatory authority having jurisdiction over the parties and the actions herein proposed to be taken, including satisfaction of all requirements under applicable Securities Laws and state "Blue Sky" or securities laws.

8.6    Hart-Scott-Rodino Compliance. Any applicable waiting periods under the HSR Act and the merger notification or control laws and regulations of any other applicable jurisdictions, shall have expired or early termination shall have been granted if notification under the HSR Act or other applicable merger notification or control laws are necessary.

8.7    Absence of Litigation. No litigation or proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement. No litigation or proceeding shall be pending which could reasonably be expected to have a Material Adverse Effect on Platinum that has not been previously disclosed to Silver herein.

8.8    Opinion of Platinum Counsel. Silver shall have received from McDermott, Will & Emery, counsel to Platinum, an opinion letter in the form attached hereto as Exhibit [___] dated as of the Closing Date.

8.9    Other Deliveries. Purchaser shall have delivered to Silver and Parent and/or their designee, as the case may be:

(a)    the Purchase Price, as such amount may be adjusted in accordance with Section 2.3, Section 2.4 and/or Section 2.5; provided that delivery of the Purchase Price shall include the treatment of the Holdback Amount in accordance with Section 2.2 and 2.3(d);

(b)    the Registration Rights Agreement in the form attached hereto as Exhibit [___], duly executed by Purchaser; and

BST99 1394460-13.069646.0011

B-0621

(c)     a certificate executed by Purchaser and Platinum as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing in accordance with Section 8.1 and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing in accordance with Section 8.2;

(d)     a certificate of the Secretary of Purchaser certifying, as complete and accurate as of the Closing, copies of the Platinum Charter Documents, certifying all requisite resolutions or actions of Purchaser's board of directors approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Purchaser executing this Agreement and any other documents relating to the transactions contemplated by this Agreement;

9.    CONDITIONS TO OBLIGATIONS OF PLATINUM AND PURCHASER

The obligations of Platinum and Purchaser hereunder are subject to the fulfillment or satisfaction on, and as of the Closing, of each of the following conditions (any one or more of which may be waived by Platinum, but only in a writing signed on behalf of Platinum by an authorized officer):

9.1    Accuracy of Representations and Warranties.  Each of the representations and warranties of Parent and Silver set forth in Article 3 of this Agreement shall be true and correct on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that, to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct on and as of the date hereof and on and as of such particular date as if made on and as of such particular date, except where any such failures to be true and correct would not in the aggregate have a Material Adverse Effect on Parent, Silver or the Business.

9.2    Covenants.  Parent and Silver shall have performed and complied in all material respects with all of its covenants contained in Article 5 on or before the Closing Date, and Platinum shall have received a certificate to such effect executed on behalf of Silver by the President, Chief Executive Officer or Chief Financial Officer of Silver.

9.3    Absence of Material Adverse Effect.  No Material Adverse Effect with respect to Silver shall have occurred since the date of this Agreement and be continuing.

9.4    Compliance with Law.  There shall be no Order, decree, or ruling by any court or governmental agency or threat thereof, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

9.5    Government Consents.  There shall have been obtained at or prior to the Closing Date such permits or authorizations and there shall have been taken such other action, as may be required to consummate the sale of the Shares by any regulatory authority having jurisdiction over the parties and the actions herein proposed to be taken, including satisfaction of all requirements under applicable federal and state securities laws.

9.6    Third-Party Consents; Assignments; Other Documents.  Platinum shall have received:  (a) duly executed copies of all third-party consents, approvals, assignments, waivers, authorizations, permits or other certificates set forth on Section 9.6 of the Silver Disclosure Schedule; and (b) any other written consents, assignments, waivers, authorizations or other certificates where, in the case of this clause (b), the failure to have received the same would have a Material Adverse Effect on Silver,

49

B-0622

including any consents required to continue in effect any Contracts of Silver or any Subsidiary of Silver which are individually or in the aggregate material to Silver.

9.7     Releases and GEC Indemnity.

(a)     Each of Silver's directors and officers, the Majority Holders, Parent, and the ultimate parent entity of Parent shall have executed and delivered to Purchaser a general release of all claims, which he, she or it may have (in any capacity) against Platinum, Purchaser, Silver or any Subsidiary of Silver, subject to the agreements set forth on Section 9.7 of the Silver Disclosure Schedule, in substantially the form of Exhibit __ (the **"Releases"**). The Releases will provide that the sole recourse for indemnification of Silver's officers and directors shall be from directors and officers' insurance purchased by Silver prior to the Closing.

(b)     Parent and its Affiliates (other than Silver) shall have assigned to Platinum and its Affiliates all rights they have under the GEC Agreements.

9.8     Opinions of Counsel. Platinum shall have received from Squire, Sanders & Dempsey, counsel to Parent and Silver, an opinion letter dated as of the Closing Date in the form attached hereto as Exhibit [    ].

9.9     Hart-Scott-Rodino Compliance. Any applicable waiting periods under the HSR Act and the merger notification or control laws and regulations of any other applicable jurisdictions, if necessary, shall have expired or early termination shall have been granted.

9.10    Closing Balance Sheet. Silver shall have delivered to Platinum the Closing Balance Sheet in format and presentation similar to the Base Balance Sheet and if necessary the appropriate adjustment shall be made to the Cash Payment of the Purchase Price as set forth in Section 2.3(b).

9.11    Absence of Litigation. No litigation or proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement. No litigation or proceeding shall be pending which could reasonably be expected to have a Material Adverse Effect on Silver or the Business.

9.12    [Intentionally Omitted]

9.13    [Intentionally Omitted]

9.14    Other Indebtedness. Parent and Silver shall have (i) satisfied all obligations to KeyBank, the holders of the Series B Senior Notes and any creditors holding Encumbrances on the Shares or the assets of Silver or any Subsidiary of Silver, (ii) delivered pay-off letters and releases, in form and substance reasonably satisfactory to Platinum, of any Encumbrances on the Shares or the assets of Silver or any Subsidiary of Silver, (iii) delivered the consents of the Majority Holders, which shall evidence the Majority Holders' consents to the transactions contemplated by this Agreement and the allocation of the Purchase Price as set forth in the Instructions and (iv) satisfied the obligations of the Noteholders as provided in the Notes.

9.15    [Intentionally Omitted].

9.16    Other Deliveries. Silver shall have delivered to Purchaser and Platinum the following:

50

BST99 1394460-13.069646.0011

(a)    for each leasehold interest in Real Property identified on <u>Section 3.13(b) of the Silver Disclosure Schedule</u>, a consent of the landlord with respect to the change of control of Silver, if required by the lease for such Real Property or such other appropriate document or instrument of transfer, as the case may require, each in form and substance satisfactory to Purchaser and its counsel and executed by Silver and/or its Subsidiaries and the landlord for such Real Property;

(b)    such other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Parent, Seller and/or its Subsidiaries;

(c)    fully executed instruments to effect changes to the signing and authorization authority with respect to the bank and other accounts set forth on <u>Section 3.10 of the Silver Disclosure Schedule;</u>

(d)    a certificate executed by Silver and Parent as to the accuracy of their representations and warranties as of the date of this Agreement and as of the Closing in accordance with Section 9.1 and as to their compliance with and performance of their covenants and obligations to be performed or complied with at or before the Closing in accordance with Section 9.2;

(e)    a certificate of the Secretary of Parent certifying, as complete and accurate as of the Closing, copies of the Parent's charter documents, certifying all requisite resolutions or actions of Parent's board of directors and shareholders approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Parent executing this Agreement and any other document relating to the transactions contemplated by this Agreement;

(f)    a certificate of the Secretary of Silver certifying, as complete and accurate as of the Closing, copies of the Silver Charter Documents, certifying all requisite resolutions or actions of Silver's board of directors and shareholders approving the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement and certifying to the incumbency and signatures of the officers of Silver executing this Agreement and any other document relating to the transactions contemplated by this Agreement; and

(g)    resignations of all officers and directors of Silver and all Subsidiaries of Silver.

9.17    <u>Financing</u>. Platinum and Purchaser shall have obtained and have the ability to draw upon a credit facility or other source of financing on commercially reasonable terms and in an amount of at least $50,000,000; provided, that, this condition shall be deemed satisfied if Platinum and Purchaser shall have obtained senior secured financing to replace Platinum's existing financing in the amount of $50,000,000 at a rate of interest not to exceed LIBOR plus 350 basis points per year and with a maturity date no earlier than the fifth (5th) anniversary of the Closing.

9.18    <u>Financial Statements</u>. Silver shall have delivered a copy of its unaudited financial statements for the period ended March 31, 2004, certified by its chief financial officer and an appropriate executive officer of Parent as being prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto). Silver also shall have delivered (i) a copy of the Silver Financial Statements audited by Ernst & Young LLP, which shall contain no material variations from the Silver Financial Statements included as part of the Silver Disclosure Schedule and the audit report for which shall contain no adverse opinion or disclaimer of opinion or qualification or modification as to uncertainty, accounting principal, or audit scope and (ii)

51

B-0624

the consent of Ernst & Young LLP to file the audited Silver Financial Statements as part of a filing with the SEC by Platinum.

9.19    Closing. Silver shall have taken the actions described in Schedule 9.19. [Schedule 9.19 will contain a condition to closing that the CEO and COO of Silver be terminated and that releases and other agreements (non-competes) acceptable to Purchaser be executed.]

**10.    TERMINATION OF AGREEMENT**

10.1    Right to Terminate.

(a)    This Agreement may be terminated and the purchase of the Shares abandoned at any time prior to the Effective Time:

(i)    by the mutual written consent of Parent, [MHR], and Platinum;

(ii)    by either Parent or Platinum, if such party (including its stockholders) is not in material Breach of any representation, warranty, covenant or agreement contained in this Agreement, and such other party is in material Breach of any representation, warranty, covenant or agreement contained in this Agreement, or if any representation of such other party will have become untrue, in either case to an extent that would cause the conditions set forth in Article 8 (for Silver) or Article 9 (for Platinum) not to be satisfied and such breaching party fails to cure such material Breach within 15 days of written notice of such material Breach from the non-Breaching party (except that no cure period will be provided for a Breach which by its nature cannot be cured);

(iii)    by either Parent or Platinum, if the Closing shall not have been consummated by May 31, 2004 for any reason; provided, however, that the right to terminate this Agreement under this Section 10(a)(iii) shall not be available to any party whose action or failure to act has been a principal cause of or resulted in the failure of the Closing to occur on or before such date and such action or failure to act constitutes a Breach of this Agreement;

(iv)    by either Parent or Platinum, if there is a final nonappealable Order of a federal or state court in effect preventing consummation of the transactions contemplated by this Agreement, or if any statute, rule, regulation or Order is enacted, promulgated or issued or deemed applicable to the purchase of the Shares by any Governmental Authority that would make consummation of the purchase of the Shares illegal; or

(v)    by either Parent or Platinum, if a Material Adverse Effect occurs with respect to the other party.

10.2    Termination Procedures. If either party wishes to terminate this Agreement pursuant to Section 10.1, such party shall deliver to the other party a written notice stating that such party is terminating this Agreement and setting forth a brief description of the basis of such termination. Termination of this Agreement will be effective upon the delivery of such notice.

10.3    Continuing Obligations. In the event of the termination of this Agreement as provided in Section 10.1, this Agreement shall be of no further force or effect, except (i) as set forth in this Section 10.3, 10.4 and Article 12, each of which shall survive the termination of this Agreement, and (ii) nothing herein shall relieve any party from liability for any fraud or intentional or willful Breach of this Agreement. No termination of this Agreement shall affect the obligations of the parties pursuant to

52

B-0625

this Agreement or any other Contract to maintain the confidentiality of information regarding the other party, all of which obligations shall survive termination of this Agreement in accordance with their terms.

10.4    Effect of Termination.

(a)     In the event of termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to this Article 10, no party hereto (or any of its directors or officers) shall have any liability or further obligation to any other party hereto, except (i) as provided in subsection (b) of this Section 10.4 and (ii) under the provisions of Sections hereof, which provisions shall survive such termination and abandonment, and except that, notwithstanding any other provision of this Agreement or any Ancillary Agreement, none of the parties hereto shall be relieved or released from any liabilities or further obligations arising from or in connection with any fraud or intentional or willful breach of its obligations under this Agreement or any Ancillary Agreement.

(b)     In the event of the termination of this Agreement by Platinum as a result of Silver or Parent considering or accepting an Acquisition Proposal in violation of Section 5.3, then the Silver shall pay to Platinum, by wire transfer of immediately available funds, One Million Dollars ($1,000,000). All amounts payable pursuant to this Section 10.4(b) shall be paid promptly, but in no event later than two Business Days following the date of such termination.

## 11.    NONSURVIVAL OF REPRESENTATIONS AND WARRANTIES

11.1    None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Effective Time. This Section 11.1 shall not limit any covenant or agreement of the parties contained in this Agreement or in any Ancillary Agreement which by its terms applies or contemplates performance in whole or in part after the Effective Time.

## 12.    MISCELLANEOUS

12.1    Entire Agreement. This Agreement, the Ancillary Agreements and the exhibits hereto constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the parties with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

12.2    Assignment; Binding Upon Successors and Assigns. Neither party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other party hereto; provided however, that Purchaser may assign its rights to acquire the Shares in whole or in part to an Affiliate. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

12.3    Third Party Beneficiaries. No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee or any party hereto or any other Person unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the parties to this Agreement. Notwithstanding the foregoing, in part because the Majority Holder has, in lieu of exercising the ABD Sale right (as defined in the Notes), consented to this Agreement and the transactions described herein, the Majority Holders are expressly made third party beneficiaries of Section 5.12 of this Agreement, provided that the Majority Holders shall have no liability

53

B-0626

or any duties as a third party beneficiary, except as set forth in this Agreement or in any Ancillary Agreement.

12.4    No Joint Venture. Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between the parties hereto. No party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other party. No party will have the power to control the activities and operations of any other, and the parties' status is, and at all times, will continue to be, that of independent contractors with respect to each other. No party will have any power or authority to bind or commit any other. No party will hold itself out as having any authority or relationship in contravention of this Section.

12.5    Construction of Agreement. This Agreement has been negotiated by the respective parties hereto and their attorneys and have been reviewed by each party hereto. Accordingly, no ambiguity in the language hereof will be construed for or against either party.

12.6    Severability. If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

12.7    Section Headings. A reference to an Article, Section, Exhibit or Schedule will mean an Article or Section in, or an Exhibit or Schedule to, this Agreement, unless otherwise explicitly set forth. The titles and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement. For the purposes of such construction, this Agreement will be considered as a whole.

12.8    Exercise of Rights, Amendment, Extension and Waivers. At any time prior to the Effective Time, Platinum, Purchaser, Parent and Silver may, to the extent legally allowed: (a) extend the time for performance of any of the obligations of the other party; (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant thereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such party contained herein. Any term or provision of this Agreement may be amended. Any agreement to any amendment, extension, waiver or any other notice of any exercise of any right will be valid only if set forth in writing and signed by the party to be bound; provided, that any such action by Parent and/or Silver shall require a writing signed by the Majority Holders. The waiver by a party of any Breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding Breach or default. The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions. This Agreement may be amended by the parties hereto and the Majority Holders at any time.

12.9    Public Announcement. No party hereto shall issue any press release or otherwise make any statements to any Third-Party with respect to this Agreement or the transactions contemplated hereby other than with the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Prior to the issuance of any announcement of this Agreement and the transactions contemplated hereby by any party, such party will consult with the other party regarding the content of such announcement and obtain such other party's reasonable approval of such press release. Notwithstanding the foregoing, either party may issue such announcements, and make such other disclosures regarding this Agreement or the transactions contemplated hereby, as it determines are

54

B-0627

required under applicable laws, regulatory rules or any listing or trading agreement concerning its publicly traded securities.

12.10  Fees and Expenses.  All filing fees relating to Antitrust Filings and Other Filings shall be paid equally by Parent and Platinum.  Except as otherwise expressly provided herein, all other fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including the fees of a party's own accountants, attorneys, investment bankers and other professionals, shall be paid by the party incurring such expenses, whether or not the purchase and sale of the Shares is consummated; provided, however, that Parent shall be responsible for such fees and expenses of Silver and its Affiliates.  Notwithstanding the foregoing, in the event that the purchase and sale of the Shares contemplated by this Agreement is not consummated solely as a result of Platinum's failure to fulfill that closing condition requiring Platinum to obtain adequate financing as set forth in Section 9.17 hereof, then Platinum shall reimburse the Stakeholder Representative for its documented, reasonable, out-of-pocket professional fees and expenses actually incurred and paid by them for services rendered to enable the purchase and sale of the Shares, such fees and expenses not to exceed $300,000.  In the event that the purchase and sale of the Shares contemplated by this Agreement is consummated, Platinum agrees to pay [MHR] at the Closing a fee of $3,500,000, which shall be paid in shares of Platinum Common Stock valued at the Closing Price (rounded up to the next highest whole share number).

12.11  Governing Law.  The validity of this Agreement the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties of this Agreement will be exclusively governed by and construed in accordance with the internal laws of the State of New York as applied to agreements entered into solely between residents of and to be performed entirely in the State of New York, without reference to that body of law relating to conflicts of law or choice of law.

12.12  Jurisdiction; Venue; Waiver of Jury Trial.

(a)  Each of the parties to this Agreement hereby agrees that the state and federal courts of the State of New York shall have jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining directly or indirectly to this Agreement, and all documents, instruments and agreements executed pursuant hereto or thereto, or to any matter arising herefrom (unless otherwise expressly provided for herein or therein).  To the extent permitted by law, each party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by any of the other parties hereto in any of such courts, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such party at the address to which notices are to be sent pursuant to this Agreement.  Each of the parties waives any claim that New York is an inconvenient forum or an improper forum based on lack of venue.  The choice of forum set forth in this Section 12.12 shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

(b)  Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement.  Each party hereto (i) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise, that the other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

12.13  Remedies.  It is specifically understood and agreed that any Breach of the provisions of this Agreement by any Person subject hereto will result in irreparable injury to the other

55

B-0628

parties hereto, that the remedy at law alone will be an inadequate remedy for such Breach, and that, in addition to any other remedies which they may have, such other parties may enforce their respective rights by actions for specific performance (to the extent permitted by law). Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law on such party, and the exercise of any one remedy will not preclude the exercise of any other.

12.14   Notices.  All notices, requests and other communications hereunder must be in writing, and will be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed (registered or certified mail) to the parties at the following addresses or facsimile numbers:

| | |
|---|---|
| If to Platinum or Purchaser: | Platinum, Inc. [Address] |
| | Attention: Facsimile No.: [                    ] |
| with a copy to: | McDermott, Will & Emery 28 State Street Boston, MA 02109 Attention: John J. Egan III, P.C. Phone: (617) 535-4000 Facsimile No.: (617) 535-3800 |
| If to Parent or Silver (prior to the Closing): | [Parent] Corporate Holding Inc. [Address] |
| | Attention: Phone: _____ |
| with a copy to: | Squire, Sanders & Dempsey L.L.P. 4900 Key Tower 27 Public Square Cleveland, OH 44114 Attention: David A. Zagore, Esq. Facsimile No.: [            ] |
| with a copy to: | MHR Fund Management LLC 40 West 57th Street 33rd Floor New York, New York 10019 Attention: Hal Goldstein, Esq. Facsimile No.: 212-262-9356 |
| with a copy to: | Clifford Chance US LLP 200 Park Avenue New York, New York 10166 Attention: Alan M. Christenfeld, Esq. Richard D. Pritz, Esq. |

56

B-0629

Facsimile No.: 212-878-8375

All such notices, requests and other communications will (i) if delivered personally to the address as provided in this Section 12.14, be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided in this Section 12.14, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above to the address as provided in this Section 12.14, be deemed given upon receipt (in each case, regardless of whether such notice is received by any other Person to whom a copy of such notice, request or other communication is to be delivered pursuant to this Section 12.14). Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

12.15    Time is of the Essence.  The parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

12.16    Counterparts.  This Agreement may be executed in counterparts, each of which will be an original as regards any party whose name appears thereon and all of which together will constitute one and the same instrument.  This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of both parties reflected hereon as signatories.

[Signature Page Follows]

57

B-0630

**MWE Draft**
**4/27/04**

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the date first above written.

[PLATINUM], INC.

By:_____
    Name:
    Title:

SILVER ACQUISITION CORP.

By:_____
    Name:
    Title:

[SILVER], INC.

By:_____
    Name:
    Title:

[PARENT] CORPORATE HOLDINGS, INC.

By:_____
    Name:
    Title:

<u>Schedule 1</u>

*"Adjustment Amount"* shall mean the dollar amount determined as set forth in this <u>Schedule 1</u>:

      1.     The sum of Silver's Net Accounts Receivable, Net Inventory, Prepaid Expenses and Other Current Assets;

<u>minus</u>

      2.     The sum of Silver's Accounts Payable, Accrued Liabilities, Customer Advances, and Other Current Liabilities.

The categories of assets and liabilities referenced in this Schedule 1 correspond to the categories contained in the Base Balance Sheet, and the assets and liabilities shall be categorized in a manner consistent with the Base Balance Sheet and in accordance with GAAP. Notwithstanding the foregoing, all checks for which Silver is an obligor and which remain outstanding shall constitute Accrued Liabilities for purposes of the Adjustment Amount. Notwithstanding anything to the contrary contained in this Agreement, it is a condition to Closing that each of Silver's directors and officers, the Majority Holders, Parent and the [ultimate parent entity of Parent] shall have executed and delivered to Purchaser a general release of all claims (collectively, "Parent Liabilities"), which he, she or it may have (in any capacity) against Platinum, Purchaser, Silver or any Subsidiary of Silver, subject to the agreements set forth on <u>Section 9.7 of the Silver Disclosure Schedule,</u> and Parent Liabilities shall not be assumed or retained by Silver.

MWE DRAFT
APRIL 27, 2004

STOCK PURCHASE AGREEMENT

BY AND AMONG

[PLATINUM], INC.,

SILVER ACQUISITION CORP.,

[PARENT] CORPORATE HOLDINGS, INC.

AND

[SILVER], INC.

DATED AS OF APRIL ___, 2004

BST99 1394460-13.069646.0011

B-0633

**EXHIBITS AND SCHEDULES**
**[TO BE COMPLETED]**

B- 0634

## TABLE OF CONTENTS

Page

1.  DEFINITIONS AND USAGE OF CERTAIN TERMS ..................................................1
    1.1  Definitions ..................................................................................................1
    1.2  Usage ...........................................................................................................9

2.  PURCHASE AND SALE OF SHARES .....................................................................10
    2.1  Purchase and Sales of Shares ...................................................................10
    2.2  Consideration .............................................................................................10
    2.3  Balance Sheet Adjustment to Purchase Price...........................................10
    2.4  Prohibition on Trading ..............................................................................12
    2.5  Intentionally Omitted ................................................................................12
    2.6  Section 338(h)(10) Elections ....................................................................12
    2.7  Transfer Taxes ...........................................................................................12
    2.8  Closing.......................................................................................................12

3.  REPRESENTATIONS AND WARRANTIES OF PARENT AND SILVER.................13
    3.1  Organization and Good Standing ..............................................................13
    3.2  Subsidiaries ...............................................................................................13
    3.3  Capitalization.............................................................................................13
    3.4  Power, Authorization and Non-Contravention..........................................14
    3.5  No Violation of Charter Documents and Contracts; Compliance with
         Legal Authorizations; Governmental Authorizations ...............................15
    3.6  Documents and Disclosures ......................................................................16
    3.7  Silver Financial Statements ......................................................................17
    3.8  Intentionally Omitted ................................................................................17
    3.9  Accounts Receivable .................................................................................17
    3.10 Banking Relations .....................................................................................18
    3.11 Litigation ...................................................................................................18
    3.12 Taxes ..........................................................................................................18
    3.13 Title to Properties .....................................................................................20
    3.14 Absence of Certain Changes or Events .....................................................20
    3.15 Intellectual Property .................................................................................22
    3.16 Conformity of Products and Services........................................................23
    3.17 Product and Service Warranties ...............................................................23
    3.18 List of Certain Employees; Suppliers and Customers...............................24
    3.19 Intentionally Omitted ................................................................................24
    3.20 Compliance with Laws..............................................................................25
    3.21 Agreements and Commitments ..................................................................25
    3.22 Employees ..................................................................................................26
    3.23 Relationships with Affiliates .....................................................................29
    3.24 Environmental Matters..............................................................................29
    3.25 [Intentionally Omitted]..............................................................................30
    3.26 Board of Directors, Officers and Key Personnel.......................................30

B-0635

**TABLE OF CONTENTS**
(continued)

Page

3.27   Insurance .................................................................30
3.28   Investment Banking and Brokerage Fees..........................30
3.29   Accuracy of Disclosure ...........................................31
3.30   No Other Representations ........................................31

4.   REPRESENTATIONS AND WARRANTIES OF PLATINUM AND
     PURCHASER ................................................................31
     4.1    Organization and Good Standing ...........................31
     4.2    Capitalization........................................................31
     4.3    Power, Authorization and Non-Contravention............32
     4.4    No Violation of Charter Documents, Contracts or Laws.....33
     4.5    SEC Filings...........................................................33
     4.6    Platinum Financial Statements ...............................33
     4.7    Financing .............................................................34
     4.8    Accuracy of Disclosure .........................................34
     4.9    Litigation .............................................................34
     4.10   Absence of Certain Changes or Events ....................34
     4.11   Investment Banking and Brokerage Fees..................35
     4.12   No Other Representations .....................................35

5.   PARENT AND SILVER COVENANTS ...............................35
     5.1    Advice of Changes ...............................................35
     5.2    Conduct of Business.............................................35
     5.3    No Solicitation .....................................................37
     5.4    Regulatory Approvals............................................37
     5.5    Necessary Consents .............................................38
     5.6    Securities Laws....................................................38
     5.7    Litigation .............................................................38
     5.8    Notification of Employee Problems .........................38
     5.9    Satisfaction of Closing Conditions..........................38
     5.10   Confidentiality......................................................38
     5.11   Access to Information ...........................................39
     5.12   Parent Release .....................................................39

6.   COVENANTS OF PLATINUM AND PURCHASER...............39
     6.1    Advice of Changes ...............................................39
     6.2    Conduct of Business.............................................39
     6.3    Regulatory Approvals............................................40
     6.4    Litigation .............................................................40
     6.5    Satisfaction of Conditions Precedent .....................40
     6.6    Blue Sky Laws......................................................40
     6.7    NASDAQ Listing....................................................41

B-0636

**TABLE OF CONTENTS**
(continued)

|  |  |  | **Page** |
|---|---|---|---|
| | 6.8 | Confidentiality | 41 |
| | 6.9 | Access to Information | 41 |
| **7.** | | **ADDITIONAL COVENANTS** | **41** |
| | 7.1 | Liability for Taxes | 41 |
| | 7.2 | Tax Proceedings | 42 |
| | 7.3 | Payment of Taxes | 43 |
| | 7.4 | Tax Returns | 43 |
| | 7.5 | Tax Allocation Arrangements | 43 |
| | 7.6 | Cooperation and Exchange of Information | 43 |
| | 7.7 | Conflict | 44 |
| | 7.8 | Assistance and Cooperation | 44 |
| | 7.9 | Non-Competition, Non-Solicitation and Non-Disparagement | 45 |
| | 7.10 | Further Assurances | 45 |
| | 7.11 | Registration of Shares | 46 |
| | 7.12 | Transfer of Shares | 46 |
| | 7.13 | Stakeholder Representative | 46 |
| | 7.14 | Filings | 46 |
| | 7.15 | Joint Participation | 47 |
| | 7.16 | Environmental Protection | 47 |
| | 7.17 | Consents and Releases | 47 |
| **8.** | | **CONDITIONS TO OBLIGATIONS OF PARENT** | **47** |
| | 8.1 | Accuracy of Representations and Warranties | 48 |
| | 8.2 | Covenants | 48 |
| | 8.3 | Absence of Material Adverse Effect | 48 |
| | 8.4 | Compliance with Law | 48 |
| | 8.5 | Government Consents | 48 |
| | 8.6 | Hart-Scott-Rodino Compliance | 48 |
| | 8.7 | Absence of Litigation | 48 |
| | 8.8 | Opinion of Platinum Counsel | 48 |
| | 8.9 | Other Deliveries | 48 |
| **9.** | | **CONDITIONS TO OBLIGATIONS OF PLATINUM AND PURCHASER** | **49** |
| | 9.1 | Accuracy of Representations and Warranties | 49 |
| | 9.2 | Covenants | 49 |
| | 9.3 | Absence of Material Adverse Effect | 49 |
| | 9.4 | Compliance with Law | 49 |
| | 9.5 | Government Consents | 49 |
| | 9.6 | Third-Party Consents; Assignments; Other Documents | 49 |
| | 9.7 | Releases and GEC Indemnity | 50 |
| | 9.8 | Opinions of Counsel | 50 |

B-0637

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| 9.9 | Hart-Scott-Rodino Compliance | 50 |
| 9.10 | Closing Balance Sheet | 50 |
| 9.11 | Absence of Litigation | 50 |
| 9.12 | [Intentionally Omitted] | 50 |
| 9.13 | .[Intentionally Omitted] | 50 |
| 9.14 | Other Indebtedness | 50 |
| 9.15 | [Intentionally Omitted] | 50 |
| 9.16 | Other Deliveries | 50 |
| 9.17 | Financing | 51 |
| 9.18 | Financial Statements | 51 |
| 9.19 | Closing | 52 |

**10.   TERMINATION OF AGREEMENT ................................................. 52**

| | | |
|---|---|---|
| 10.1 | Right to Terminate | 52 |
| 10.2 | Termination Procedures | 52 |
| 10.3 | Continuing Obligations | 52 |
| 10.4 | Effect of Termination | 53 |

**11.   NONSURVIVAL OF REPRESENTATIONS AND WARRANTIES ................ 53**

**12.   MISCELLANEOUS ................................................................. 53**

| | | |
|---|---|---|
| 12.1 | Entire Agreement | 53 |
| 12.2 | Assignment; Binding Upon Successors and Assigns | 53 |
| 12.3 | Third Party Beneficiaries | 53 |
| 12.4 | No Joint Venture | 54 |
| 12.5 | Construction of Agreement | 54 |
| 12.6 | Severability | 54 |
| 12.7 | Section Headings | 54 |
| 12.8 | Exercise of Rights, Amendment, Extension and Waivers | 54 |
| 12.9 | Public Announcement | 54 |
| 12.10 | Fees and Expenses | 55 |
| 12.11 | Governing Law | 55 |
| 12.12 | Jurisdiction; Venue; Waiver of Jury Trial | 55 |
| 12.13 | Remedies | 55 |
| 12.14 | Notices | 56 |
| 12.15 | Time is of the Essence | 57 |
| 12.16 | Counterparts | 57 |

B-0638

# EXHIBIT B

B-0639


**:::PRESSTEK**
A SMARTER WAY TO PRINT

June 22, 2004

CONFIDENTIAL

Key Corporate Capital, Inc.
7400 Coldwell Avenue
Niles, Illinois 60714
Attention: Michael Lugli

Re:    <u>A.B. Dick Company (the "Company")</u>

Dear Sirs:

Reference is made to the proposed transaction (the "Proposed Transaction") involving the purchase by Presstek of the capital stock of the Company from Paragon Corporate Holdings, Inc. ("Paragon"), and to the Credit and Security Agreement ("Credit Agreement") dated as of April 1, 1998, as amended, among Paragon and Key Corporate Capital, Inc. ("Key") and related agreements, including the Subsidiary Guaranty Agreement and Security Agreement of the Company dated as of April 1, 1998, as amended.

As you know, pursuant to the terms of the relevant documents related to the Proposed Transaction, Presstek cannot consider proceeding with the Proposed Transaction unless Key (i) approves the Proposed Transaction and (ii) continues to fund the Company's working capital and operating deficits, as it has in the past. Recently, you have stated Key's unwillingness to provide further funding and have indicated that Key will not approve the Proposed Transaction unless Presstek provides a commitment for the necessary financing for the working capital and operating deficits of the Company through the closing of, the Proposed Transaction (the "Interim Period"). Key has further indicated that such a commitment must be provided by today. Presstek has considered this request and hereby informs Key that Presstek is unwilling to provide such financing.

Because Key has indicated that it would not grant approval of the Proposed Transaction unless Presstek provided the commitment to fund the working capital and operating deficits of the Company during the Interim Period, and because Presstek will not provide such a commitment, we conclude that Key has denied approval of the Proposed Transaction.

Sincerely,

Moosa E. Moosa
Vice President-Finance and CFO

cc:    Paragon Corporate Holdings, Inc.
       MHR Fund Management LLC

55 Executive Drive, Hudson, NH  03051-4903 USA
Tel: (603) 595-7000  Fax: (603) 594-9575
www.presstek.com