# Tab 11

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| —————————————————X | | |
| In re: | ) | |
| | ) | **Chapter 11** |
| A.B. DICK COMPANY., *et al.,* | ) | **Case Nos. 04-12002 (JLP)** |
| | ) | **(Jointly Administered)** |
| | ) | |
| Debtors. | ) | |
| —————————————————X | | |

## NOTICE OF FILING OF FIRST AMENDMENT
## TO ASSET PURCHASE AGREEMENT

Please take notice that Presstek, Inc., by and through its undersigned counsel, has

filed First Amendment to Asset Purchase Agreement with the Court on January 6, 2005.

Dated: January 6, 2005                    **MONZACK AND MONACO, P.A.**


\_\_/s/ Francis A. Monaco, Jr.\_\_\_\_
Francis A. Monaco, Jr., Esq. (#2078)
Joseph J. Bodnar, Esq. (#2512)
1201 Orange Street, Ste. 400
Wilmington, DE 19801
(302) 656-8162

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst
Lawrence Slattery
Gary Ravert
50 Rockefeller Plaza
New York, New York 10020
(212) 547-5400

*Of Counsel*
*Attorneys for Presstek, Inc.*

39729

B- 0641

## FIRST AMENDMENT TO
## ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement (this *"Amendment"*) is entered effective as of the __ day of August, 2004, by and among Presstek, Inc., a Delaware corporation (*"Platinum"*), Silver Acquisitions Corp., a Delaware corporation (*"Purchaser"*), Paragon Corporate Holdings, Inc., a Delaware corporation (*"Parent"*), A.B. Dick Company, a Delaware corporation and a wholly-owned subsidiary of Parent (*"Seller"*), A.B. Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of Seller (*"Canada Sub"*) and Interactive Media Group, Inc., an Ohio corporation and a wholly-owned subsidiary of Parent (*"IMG"* and together with Canada Sub and Seller, the *"Sellers"*). Platinum, Purchaser, Parent and the Sellers may be referred to herein individually as a *"Party"* or collectively as the *"Parties."*

### RECITALS

WHEREAS, the Parties entered into a certain Asset Purchase Agreement dated July 13, 2004, (the *"Asset Purchase Agreement"*); and

WHEREAS, Section 13.8 of the Asset Purchase Agreement provides that it may be amended in a writing signed by the Parties to be bound.

NOW, THEREFORE, in order to induce the Parties to consummate the transactions contemplated by the Asset Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by all Parties hereto, the Parties agree as follows:

1.      Section 8.3 of the Asset Purchase Agreement is hereby deleted in its entirety and such provision shall have no further force and effect.

2.      Section 10.12 of the Asset Purchase Agreement is hereby deleted in its entirety and replaced with the following:

> "10.12 Accounts Receivable and Inventory. (i) At the Effective Time, the sum of accounts receivable and inventory, less deferred revenue, of Seller and Canada Sub shall be at least $22,700,000 on a cumulative basis, and (ii) Limited shall have $5,400,000 in net assets (including the intercompany payable due Seller of $1,600,000), in each case measured in accordance with GAAP. In determining the amount of inventory for purposes of the calculations under this Section 10.12, the Parties agree that Seller is permitted to include pre-paid inventory to the extent that such pre-paid inventory (A) does not exceed $2.5 million in the aggregate and (B) is scheduled to be delivered no later than November 30, 2004."

3.      Except as explicitly set forth in this Amendment, the Parties hereby reaffirm the Asset Purchase Agreement in its entirety.

B-0642

4.    The validity of this Amendment, the construction of its terms and the interpretation and enforcement of the rights and duties of the Parties of this Amendment will be exclusively governed by and construed in accordance with the internal laws of the State of New York as applied to agreements entered into solely between residents of and to be performed entirely in the State of New York, without reference to that body of law relating to conflicts of law or choice of law.

5.    This Amendment may be executed in counterparts, each of which will be an original as regards any Party whose name appears thereon and all of which together will constitute one and the same instrument. This Amendment will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all the Parties reflected hereon as signatories.

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment as of the date first written above.

PRESSTEK, INC.

By: /s/ Edward J. Marino
Name:  Edward J. Marino
Title:   President and CEO


SILVER ACQUISITIONS CORP.


By: /s/ Edward J. Marino
Name:  Edward J. Marino
Title:   President and CEO

PARAGON CORPORATE HOLDINGS, INC.

By: /s/ Jeffrey S. Herden
Name:  Jeffrey S. Herden
Title:   Secretary


A.B. DICK COMPANY


By: /s/ Stephen S. Gray
Name:  Stephen S. Gray
Title:   CRO


A.B. DICK COMPANY OF CANADA, LTD.


By: Gerry Welstead
Name:  Gerry Welstead
Title:   Contoller


INTERACTIVE MEDIA GROUP, INC.


By: /s/ Jeffrey S. Herden
Name:  Jeffrey S. Herden
Title:   Secretary

Doc 1224836  Ver 2

**B-0643**

# Tab 12

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

————————————————X
In re:                                    )
                                          )        Chapter 11
A.B. DICK COMPANY., *et al.*,             )        Case Nos. 04-12002 (JLP)
                                          )        (Jointly Administered)
                                          )
                      Debtors.            )
————————————————X

## NOTICE OF FILING OF SECOND AMENDMENT
## TO ASSET PURCHASE AGREEMENT

Please take notice that Presstek, Inc., by and through its undersigned counsel, has

filed Second Amendment to Asset Purchase Agreement with the Court on January 6,

2005.

Dated: January 6, 2005                    MONZACK AND MONACO, P.A.


                                          __/s/ Francis A. Monaco, Jr.____
                                          Francis A. Monaco, Jr., Esq. (#2078)
                                          Joseph J. Bodnar, Esq. (#2512)
                                          1201 Orange Street, Ste. 400
                                          Wilmington, DE 19801
                                          (302) 656-8162

                                          McDERMOTT WILL & EMERY LLP
                                          Stephen B. Selbst
                                          Lawrence Slattery
                                          Gary Ravert
                                          50 Rockefeller Plaza
                                          New York, New York 10020
                                          (212) 547-5400

                                          *Of Counsel*
                                          *Attorneys for Presstek, Inc.*

39729

B-0644

## SECOND AMENDMENT TO
## ASSET PURCHASE AGREEMENT

This Second Amendment to Asset Purchase Agreement (this *"Amendment"*) is entered into as of the 5th day of November, 2004, by and among Presstek, Inc., a Delaware corporation (*"Platinum"*), Silver Acquisitions Corp., a Delaware corporation (*"Purchaser"*), Paragon Corporate Holdings, Inc., a Delaware corporation (*"Parent"*), A.B. Dick Company, a Delaware corporation and a wholly-owned subsidiary of Parent (*"Seller"*), A.B. Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of Seller (*"Canada Sub"*) and Interactive Media Group, Inc., an Ohio corporation and a wholly-owned subsidiary of Parent (*"IMG"* and together with Canada Sub and Seller, the *"Sellers"*). Platinum, Purchaser, Parent and the Sellers may be referred to herein individually as a *"Party"* or collectively as the *"Parties."*

### RECITALS

WHEREAS, the Parties entered into a certain Asset Purchase Agreement dated July 13, 2004, as amended by the First Amendment to Asset Purchase Agreement, dated as of August __, 2004 (as amended, the *"Asset Purchase Agreement"*); and

WHEREAS, Section 13.8 of the Asset Purchase Agreement provides that it may be amended in a writing signed by the Parties to be bound.

NOW, THEREFORE, in order to induce the Parties to consummate the transactions contemplated by the Asset Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by all Parties hereto, the Parties agree as follows:

1.      Capitalized terms used herein and not defined shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2.      Purchaser and Platinum hereby agree that Section 2.1(e) of the Seller Disclosure Schedule is final and agreed upon as of the date hereof.

3.      Notwithstanding anything to the contrary contained in Sections 2.1 and 2.2 of the Asset Purchase Agreement, the Sellers agree to assign and the Purchaser hereby agrees to assume the Sellers' retirement plans including Seller's 401(k) Employees Savings & Investment Plan and Canada Sub's Variable Investment Policy and Seller's Great West Health Care medical plan.

4.      Section 2.3 of the Asset Purchase Agreement is hereby amended by adding the following clause at the end of the paragraph"

"; provided, however that the Parties agree not to allocate more that $3,200,000 of the Purchase Price to the Canada Sub for the Assets in Canada."

B- 0645

5.    Section 2.4(a) of the Asset Purchase Agreement is hereby amended, in accordance with the sale order of the Bankruptcy Court for the District of Delaware, entered on November 3, 2004 (the "Sale Order"), by adding the following paragraphs after clause (iv):

"(v)    any  Liability for medical claims made with respect to or by any current employees of the Seller or IMG for periods prior to Closing but that are incurred but not reported as of the Closing, provided that the Seller is current on payment of all such medical claims in accordance with past practice in its ordinary course of dealing;

(vi)    any Liability for Assumed Seller Contracts that the Purchaser has agreed to assume as set forth in Section 2.1(e) of the Seller Disclosure Schedule (except for the Assumed Seller Lease Contracts) in order to cure such contracts as may be assumed by Purchaser and assigned by the Sellers under Sections 363 and 365 of the Bankruptcy Code (for purposes hereof, the term "Assumed Seller Lease Contracts" shall mean those contracts that are contemplated by the Sale Order, inclusive of Exhibit "1" thereto);

(vii)    any Liability for Assumed Seller Lease Contracts that the Purchaser has agreed to assume in order to cure such contracts assumed by Purchaser and assigned by the Sellers under Sections 363 and 365 of the Bankruptcy Code but only to the extent that such Liability exceeds $500,000 in the aggregate; and

(viii)   any Liability for sales commissions earned in the ordinary course of business by current employees of the Seller whose place of employment is located in the United States for periods prior to Closing but that are unpaid as of Closing, provided however that the Purchaser shall not be responsible for any amount exceeding $425,000 in the aggregate."

6.    Section 2.4(b) of the Asset Purchase Agreement is hereby amended by adding the phrase "Except as set forth in Section 2.4(a)(v)," before Section 2.4(b)(v).

7.    Section 2.4(b) of the Asset Purchase Agreement is hereby amended by adding the following paragraph after clause (xiv):

"Notwithstanding anything to the contrary contained in this Section 2.4(b), it is the intent of the parties that all Liabilities of Limited, except those for Taxes as set forth in clause (ii) above, shall be assumed by Purchaser pursuant to the transfer of ownership of Limited's shares from Seller to Purchaser."

8.    The provisions of Article 8 and Section 11.2 of the Asset Purchase Agreement are hereby modified to conform to the terms of the Bidding Procedures Order, entered by the Bankruptcy Court on September 16, 2004.

9.    Purchaser and Platinum hereby waive the conditions set forth in Section 10.6 of the Asset Purchase Agreement; provided that Sellers make commercially reasonable efforts to obtain the consents set forth in Section 3.4(b) of the Seller Disclosure Schedule through November 5, 2004, and that on or before November 5, 2004, Seller gives the Purchaser reasonable assurances that it will use commercially reasonable efforts (which shall not require Seller to expend any funds) to obtain such consents in a reasonable time frame post-closing.

B-0646

10.    Section 10.12 of the Asset Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"10.12  Accounts Receivable and Inventory. (i) At the Effective Time, the sum of accounts receivable and inventory, less deferred revenue, of Seller and Canada Sub shall be at least $22,700,000 on a cumulative basis, and (ii) Limited shall have $5,400,000 in net assets (including the intercompany payable due to Seller from Limited in the amount of $1,600,000), in each case measured in accordance with GAAP.  In determining the amount of inventory for purposes of the calculations under this Section 10.12, the Parties agree that Seller is permitted to include pre-paid deposits for inventory."

11.    Purchaser and Platinum hereby waive the conditions set forth in Section 10.13 of the Asset Purchase Agreement; provided that Purchaser and Platinum receive, on or before November 5, 2004, reasonable assurances that the Reviewers will deliver the financial statements and other documents required by Section 10.13 within a reasonable time period after the Closing, including without limitation confirmation from the Reviewers as to the current status of the review as of the Closing, and an escrow of funds reasonably sufficient to pay for the fees and expenses to be incurred by the Reviewers to complete their work.

12.    Section 11.1 of the Asset Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"11.1  Termination of Agreement.   Certain of the Parties may terminate this Agreement as provided below:

a.    Purchaser and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

b.    Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing in the event (A) Seller has within the then previous ten (10) business days given Purchaser any notice pursuant to Section 5.1 above and the development that is the subject of the notice (i) has occurred between the date hereof and the Closing (ii) has caused a Material Adverse Effect or (B) if the Closing shall not have occurred on or before November 15, 2004, by reason of the failure of any condition precedent under Section 10 hereof (unless the failure results primarily from Purchaser itself Breaching any representation, warranty, or covenant contained in this Agreement);

c.    Purchaser or Seller may terminate this Agreement by giving written notice to the other party at any time prior to Closing in the event that (i) Seller has accepted or selected, and the Bankruptcy Court has approved, the bid or bids (including a credit bid) of any Person or Persons other than Purchaser or any of its Affiliates to purchase all or any portion of Seller's businesses or Assets, and such transaction or transactions contemplated by any such bid or bids has been consummated, or (ii) Seller withdraws its support for the transactions contemplated by this Agreement and seeks to have a stand-alone plan of reorganization confirmed by the Court;

B-0647

    d.    Purchaser or Seller may terminate this Agreement by giving written notice to the other party at any time prior to Closing if the Sale Order shall not have been entered by the Bankruptcy Court on or before November 15, 2004;

    e.    Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to Closing if any condition precedent under Section 10 hereof shall fail to be satisfied or is incapable of being satisfied as of the Closing (unless the failure results primarily from Purchaser itself Breaching any representation, warranty, or covenant contained in this Agreement); provided however, Purchaser's closing of the transactions contemplated by this Agreement shall constitute a waiver of any condition precedent under Section 10 hereof that is not satisfied as of the Closing; or

    f.    Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to Closing if (A) any condition precedent under Section 9 hereof shall fail to be satisfied or is incapable of being satisfied as of the Closing or (B) Purchaser has Breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller has notified Purchaser of such Breach and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach (unless the failure results primarily from Seller itself Breaching any representation, warranty, or covenant contained in this Agreement); provided however, Seller's closing of the transactions contemplated by this Agreement shall constitute a waiver of any condition precedent under Section 9 hereof that is not satisfied as of the Closing."

    13.    Section 11.3 of the Asset Purchase Agreement is hereby deleted in its entirety and replaced with the following:

    "11.3    Effect of Termination. Except as provided in Sections 11.2 or 2.5, in the event that this Agreement is terminated by either Party then said termination shall be the sole remedy of the Parties with respect to Breaches of any covenant, representation, or warranty contained in this Agreement and none of the Parties nor any of their respective directors, officers, members, or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective directors, officer, members, or Affiliates, as the case may be, pursuant to this Agreement, except upon a willful Breach by a Party (in which case the non-Breaching Parties shall have all rights and remedies existing at law or in equity). Upon any termination of this Agreement pursuant to Section 11.1, all Confidential Information of any Party shall be returned to the other Parties."

    14.    Section 2.5 of the Asset Purchase Agreement is hereby deleted in its entirety and replaced with the following:

    "2.5    Deposit. An earnest money deposit (the "Deposit") in the amount of the Two Million Dollars ($2,000,000) shall be paid by Purchaser on the entry of the Sale Procedures Order (as defined in Section 8.1) into an escrow account in accordance with a customary escrow agreement (the "Escrow Agreement"). The Deposit shall be applied to the Purchase Price payable by Purchaser on the Closing Date. If this Agreement shall be terminated by any Party pursuant to Section 11.1, other than a termination pursuant to Section 11.1(f) as a result of any Breach of a representation, warranty or covenant by

4

B-0648

Purchaser, then the Deposit shall be returned to Purchaser. If this Agreement shall be terminated by Seller pursuant to Section 11.1(f) as a result of a Breach of a representation, warranty or covenant by Purchaser, then the Deposit shall be paid to Seller. Notwithstanding any other provision to the contrary contained herein, the Deposit shall be the sole and exclusive remedy of Seller against Platinum and Purchaser under this Agreement."

15.   Seller's Disclosure Schedules to the Asset Purchase Agreement are hereby amended to include the disclosures listed on Exhibit A attached hereto and incorporated herein, and the sections of the Asset Purchase Agreement referenced in such Exhibit A are hereby deemed to be qualified by reference to such disclosures to the extent that such qualification does not already exist in such section.

16.   Purchaser and Platinum hereby waive any Breach of any representation, warranty or covenant of any other Party to the Asset Purchase Agreement that either Purchaser or Platinum is aware of as of the date hereof or that may exist as a result of the disclosures contained in this Amendment. Both Purchaser and Platinum acknowledge and confirm that as of the date hereof they are not aware of (a) the occurrence of any Material Adverse Effect with respect to Seller since the date of the Asset Purchase Agreement, (b) the existence of any Order by any Governmental Authority, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by the Asset Purchase Agreement, (c) any material permit or authorization that must be obtained and has not been already obtained from, or any other action that must be taken and has not already been taken by, any Governmental Authority having jurisdiction over the parties and the actions proposed to be taken pursuant to the Asset Purchase Agreement (other than the entry of the Sale Order by the Bankruptcy Court), or (d) the existence of any pending litigation or pending proceeding that could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, or any of the transactions provided for in this Agreement or that could reasonably be expected to have a Material Adverse Effect on Seller, the Assets, the Assumed Liabilities or the business to be conducted with the Assets by Purchaser other than the instant proceedings in the Bankruptcy Court.

17.   Seller, Parent, Canada Sub and IMG hereby waive any Breach of any representation, warranty or covenant of any other Party to the Asset Purchase Agreement that any of Seller, Parent, Canada Sub or IMG is aware of as of the date hereof or that may exist as a result of the disclosures contained in this Amendment. Each of Seller, Parent, Canada Sub and IMG acknowledge and confirm that as of the date hereof they are not aware of (a) the occurrence of any material adverse effect with respect to Platinum since May 31, 2004, (b) the existence of any Order by any Governmental Authority, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by the Asset Purchase Agreement, (c) any material permit or authorization that must be obtained and has not been already obtained from, or any other action that must be taken and has not already been taken by, any Governmental Authority having jurisdiction over the parties and the actions proposed to be taken pursuant to the Asset Purchase Agreement (other than the entry of the Sale Order by the Bankruptcy Court), or (d) the existence of any pending litigation or pending proceeding that could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, or any of the transactions provided for in this Agreement or that could reasonably be expected to

B-0649

have a Material Adverse Effect on Platinum, other than the instant proceedings in the Bankruptcy Court.

18.    From the Effective Time, Platinum and Purchaser hereby agree to provide Sellers, its professionals, the official committee of unsecured creditors, and its professionals with reasonable access, during regular business hours, to the Sellers' business records to pursue and/or defend estate claims, provided that Platinum and/or Purchaser are reimbursed for their reasonable expenses in connection therewith.

19.    Except as explicitly set forth in this Amendment, the Parties hereby reaffirm the Asset Purchase Agreement in its entirety.

20.    The validity of this Amendment, the construction of its terms and the interpretation and enforcement of the rights and duties of the Parties of this Amendment will be exclusively governed by and construed in accordance with the internal laws of the State of New York as applied to agreements entered into solely between residents of and to be performed entirely in the State of New York, without reference to that body of law relating to conflicts of law or choice of law.

21.    This Amendment may be executed in counterparts, each of which will be an original as regards any Party whose name appears thereon and all of which together will constitute one and the same instrument.  This Amendment will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all the Parties reflected hereon as signatories.

22.    Parent and Seller agree that if Platinum or Purchaser considers or is advised that further actions, deeds, assignments or assurances, as such are identified on a schedule provided by the Platinum or Purchaser at Closing, are reasonably necessary or desirable to sell, convey, assign, transfer and deliver the Assets to the Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances, Parent and Seller shall take all reasonable actions, execute and deliver all such proper deeds, assignments and assurances and do all other things reasonably necessary to vest, perfect or confirm title to such Assets or rights in Purchaser and take all such other lawful and reasonably necessary action to carry out the purposes of Asset Purchase Agreement, including without limitation Sellers using their commercially reasonable efforts (which shall not require Seller to expend any funds) to assist the Parent, Purchaser and Reviewers in completing the review required by Section 10.13 of the Asset Purchase Agreement.

23.    The Parties understand and agree that the amendments to the Asset Purchase Agreement made by this Amendment are with the understanding that the Closing will occur by 11:59 p.m. EST on November 5, 2004 and upon such Closing shall be deemed effective as of 12:01 a.m. EST on November 5, 2004.  To the extent that the Closing does not occur effectively as of such time, the Parties agree to negotiate in good faith to amend this Amendment and the Asset Purchase Agreement in consideration of the actual date of the Closing.

*[Signature Page to Follow]*

B-0650

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment as of the date first written above.

PRESSTEK, INC.

By: /s/ Edward J. Marino
Name:  Edward J. Marino
Title:    President and CEO


SILVER ACQUISITIONS CORP.

By: /s/ Edward J. Marino
Name:  Edward J. Marino
Title:    President and CEO


PARAGON CORPORATE HOLDINGS, INC.

By: /s/ Jeffrey S. Herden
Name:  Jeffrey S. Herden
Title:    Secretary


A.B. DICK COMPANY

By: /s/ Stephen S. Gray
Name:  Stephen S. Gray
Title:    CRO


A.B. DICK COMPANY OF CANADA, LTD.

By: Gerry Welstead
Name:  Gerry Welstead
Title:    Contoller


INTERACTIVE MEDIA GROUP, INC.

By: /s/ Jeffrey S. Herden
Name:  Jeffrey S. Herden
Title:    Secretary

## EXHIBIT A

Section 3.4(b):

Consent of the counter-party is required in order to assign the following contracts of Canada Sub:

- Lease for real property in Montreal (St. Laurent), Quebec

- Lease for real property in Winnipeg, Manitoba

- Lease for real property in Calgary, Alberta

- Lease for real property in Vancouver, British Columbia

- Equipment Lease with Delphi Solutions Corp., as assigned to De Lage Landen Financial Services Canada Inc. (relating to Panasonic digital phase equipment at Canada Sub's Calgary facility)

- Equipment Lease with Delphi Solutions Corp., as assigned to De Lage Landen Financial Services Canada Inc. (relating to wireless telephone equipment at Canada Sub's Toronto facility)

- Equipment Lease #6110 with Delphi Solutions Corp., as assigned to De Lage Landen Financial Services Canada Inc. (relating to call center management software, server and other equipment at Canada Sub's Toronto facility)

- Equipment Lease #14148 with Delphi Solutions Corp., as assigned to Associates Capital Limited (relating to equipment at Canada Sub's Calgary facility)

Section 3.13(b):

Limited has registered a specific equitable charge in favor of National Westminster Bank Plc to support the company's working bank facilities including:

- Standby L/C – Hamada – Yen 24m

- HM Customers and Excise Bond – £240,000

- Foreign Exchange – £100,000

- Bank Line Payment Manager Settlement Limit – £200,000 (in respect of customers' credit card payments)

- BACS – £210,000 (in respect of customers' direct debt, direct credit and standing order payments)

Details of these charges are attached.

B-0652

**Section 3.14(b)(viii):**

Limited leases vehicles under an umbrella master agreement. A schedule of vehicle leasing costs is attached.

**Section 3.15(b).(c) & (d):**

Sellers acquired certain Intellectual Property Rights in connection with their purchase of Itek Graphix Corp. and the paperwork related to Sellers' ownership of many of such Intellectual Property Rights in foreign countries were never fully completed by Morgan Finnegan, the law firm hired by Sellers to complete such paperwork, due to Sellers' inability to pay for such services. To Sellers' Knowledge, attached is a list of the Intellectual Property Rights that have outstanding foreign registration issues.

**Section 3.17:**

Limited uses a different maintenance agreement and order detail form than A.B. Dick. Copies of these forms are attached along with a list of customers with extended warranty periods.

**Section 3.18(a):**

Attached is a list of employees of Limited with compensation in excess of $50,000.

**Section 3.18(b):**

Attached is a list of vendors and suppliers for Limited.

**Section 3.21(g):**

Attached is a form distribution agreement used by Limited and the list of distributors subject to this agreement.

**Section 3.21(i) & (p):**

Limited is party to an agreement with Rhemai 1 B.V., whereby Limited is obligated to sell products to Rhemai at cost. Rhemai was formerly partly owned by Limited and these special pricing terms formed part of the sale agreement. A copy of the agreement, which terminates in 2005, is attached.

**Section 3.21(n):**

English law does not permit employment agreements to be immediately terminable. Limited's standard terms and conditions of employment are consistent with the minimum notice periods prescribed by English law and are summarized as follows:

- One week notice period during the initial probationary period;



- Following completion of the probationary period, employment may be terminated by the employee on giving one month's prior written notice;

B-0653



- Following completion of the probationary period, employment may be terminated by Limited on giving the greater of one month's prior written notice or one week's written notice for each complete year of service, up to a maximum of 12 week's written notice.

Attached are the standard terms and conditions of employment and individual offer letters to employees of Limited.

<u>Section 3.22(c) & (e):</u>

Please refer to the details of the benefit packages offered to all employees of Limited pursuant to the standard terms and conditions of employment referenced in Section 3.21(n) above.

<u>Section 3.26(b):</u>

Attached is a list of current key personnel at Limited.

<u>Section 3.27:</u>

There have been two claims under Limited's death-in-service insurance policy:

- £73,500 paid in July 2002 in respect of Mr. C. Rathod's death-in-service; and

- £48,000 paid in February 2002 in respect of Mr. D. Bradshaw's death-in-service.





B-0654

# Tab 13



FILED
2004 DEC 13 AM 11:13
US BANKRUPTCY COURT
DISTRICT OF DELAWARE
CLERK

1

2        UNITED STATES BANKRUPTCY COURT
             DISTRICT OF DELAWARE

3

4    IN RE:                         .      Chapter  11

5    A.B. Dick Company, Inc.,       .

6         Debtor(s).               .      Bankruptcy #04-12002 (JLP)

7    ..............................................................

8                    Wilmington, DE
                     November 3, 2004
                       9:00 a.m.

9

10                  TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE JOHN L. PETERSON
             UNITED STATES BANKRUPTCY JUDGE

11

12   APPEARANCES:

13   For the Debtor(s):          Frederick B. Rosner, Esq.
                                 Jaspan Schlesinger Hoffman, LLP
14            '                  1201 North Orange Street-Ste. 1001
                                 Wilmington, DE 19801

15
                                 H. Jeffrey Schwartz, Esq.
16                               Benesch Friedlander Coplan
                                 & Aronoff, LLP
17                               2300 BP Tower
                                 200 Public Square
18                               Cleveland, OH 44114

19                               John F. Stock, Esq.
                                 Benesch Friedlander Coplan
20                               & Aronoff, LLP
                                 88 E. Broad St.-Ste. 900
21                               Columbus, OH 43215

22                               John Gleason, Esq.
                                 Benesch Friedlander Coplan
23                               & Aronoff, LLP
                                 88 E. Broad St.-Ste. 900
24                               Columbus, OH 43215

25

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191



2

```
1                              Mark A. Phillips, Esq.
                               Benesch Friedlander Coplan
2                              & Aronoff, LLP
                               2300 BP Tower
3                              200 Public Square
                               Cleveland, OH 44114
4
   For The Official Committee: James P. Ricciardi, Esq.
5  of Unsecured Creditors     McGuire Woods, LLP
                               77 West Wacker Drive-Ste. 4100
6                              Chicago, IL 60601

7                              James Joseph, Esq.
                               McGuire Woods, LLP
8                              Dominion Tower
                               625 Liberty Ave.-23rd Fl.
9                              Pittsburgh, PA 15222

10                             Ronald W. Crouch, Esq.
                               McGuire Woods, LLP
11                             Dominion Tower
                               625 Liberty Ave.-23rd Fl.
12                             Pittsburgh, PA 15222

13                             Jeffrey Schlerf, Esq.
                               The Bayard Firm
14                             222 Delaware Ave.-Ste. 900
                               Wilmington, DE 19801
15
   For MHR Entities:          Megan N. Harper, Esq.
16                             Landis Rath & Cobb, LLP
                               919 Market Street
17                             Wilmington, DE 19899

18                             David S. Rosner, Esq.
                               Kasowitz Benson Torres
19                             & Friedman, LLP
                               1633 Broadway
20                             New York, NY 10019

21                             Michael M. Fay, Esq.
                               Kasowitz Benson Torres
22                             & Friedman, LLP
                               1633 Broadway
23                             New York, NY 10019

24

25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0656

3

| | | |
|---|---|---|
| 1 | For Key Bank: | Margaret M. Manning, Esq. |
| 2 | | Buchanan Ingersoll, PC |
| | | The Nemours Building |
| | | 1007 North Orange Street-Ste. 1110 |
| 3 | | Wilmington, DE 19801 |
| 4 | | Robert Polland, Esq. |
| | | Thompson Hine, LLP |
| 5 | | 3900 Key Center |
| | | 127 Public Square |
| 6 | | Cleveland, OH 44114 |
| 7 | For Presstek, Inc.: | Stephen B. Selbst, Esq. |
| | | McDermott Will & Emery |
| 8 | | 50 Rockefeller Plaza |
| | | New York, NY 10020 |
| 9 | | |
| | | Gary O. Ravert, Esq. |
| 10 | | McDermott Will & Emery |
| | | 50 Rockefeller Plaza |
| 11 | | New York, NY 10020 |
| 12 | | Lawrence J. Slattery, Esq. |
| | | McDermott Will & Emery |
| 13 | | 50 Rockefeller Plaza |
| | | New York, NY 10020 |
| 14 | | |
| | | Francis A. Monaco, Jr., Esq. |
| 15 | | Monzack & Monaco, PA |
| | | 400 Commerce Center |
| 16 | | Twelfth & Orange Streets |
| | | Wilmington, DE 19899 |
| 17 | | |
| 18 | For Mitsubishi: | Thomas G. Whalen, Jr., Esq. |
| | | Stevens & Lee, PC |
| | | 300 Delaware Ave.-Ste. 800 |
| 19 | | Wilmington, DE 19801 |
| 20 | | Robert Lapowsky, Esq. |
| | | Stevens & Lee, PC |
| 21 | | 1818 Market Street-29th Fl. |
| | | Philadelphia, PA 19103 |
| 22 | | |
| 23 | For Data Card: | Karen McKinley, Esq. |
| | | Richards Layton & Finger |
| | | One Rodney Square |
| 24 | | Wilmington, DE 19899 |
| 25 | | |

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0657

4



| | |
|---|---|
| For Esko Graphics, Inc.: | Christopher D. Loizides, Esq. |
| | Loizides & Associates |
| | 1225 King Street |
| | Wilmington, DE 19801 |
| | |
| Audio Operator: | Brandon J. McCarthy |
| | |
| Transcribing Firm: | Writer's Cramp, Inc. |
| | 6 Norton Rd. |
| | Monmouth Jct., NJ 08852 |
| | 732-329-0191 |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0658

5

### Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Debtor:** | | | | | |
| Mr. Polleck | | | | | |
| (by Mr. Fay) | 6 | | | | |
| (by Mr. Selbst) | 34 | | | | |

| **EXHIBITS:** | | **Marked** | **Received** |
|---|---|---|---|
| MHR-C | Term Sheet | 17 | |
| MHR-B | Purchase Agreement cost document | 19 | |

**Closing Statements:**

| Mr. Ricciardi | 37 |
|---|---|
| Mr. Selbst | 39 |
| Mr. Joseph | 41 |
| Mr. Gleason | 45 |
| Mr. D. Rosner | 48 |
| Mr. Firestone | 66 |
| Mr. Folland | 67 |
| Mr. Loizides | 69 |
| Mr. Stock | 75 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-5x9-0191

Polleck - Cross                                   6

1      THE CLERK:  All rise.  The United States Bankruptcy

2  Court for the District of Delaware is now in session.

3      THE COURT:  Please be seated.  Is the witness here?

4  You can take the stand please.  Now you may cross examine.

5      MR. FAY:  Thank you, Your Honor.

6      GLEN POLLECK, DEBTOR'S WITNESS, PREVIOUSLY SWORN

7                    CROSS EXAMNATION

8  BY MR. FAY:

9  Q.  Good morning, Mr. Polleck.  My name is Michael Fay, I'm an

10  attorney for the MHR Entities.  I have a few questions for you.

11  Yesterday during your testimony you stated that you were

12  retained by the Debtors on June 30th, 2004, is that correct?

13  A.  I believe I said June 29th or June 30th.

14  Q.  Okay.  All right.  Had you been in the employ under any

15  retention with the Debtors prior to that date?

16  A.  My firm had.

17  Q.  Okay.  Had you been involved, though?

18  A.  Yes.

19  Q.  Okay.  And what had you done prior to that date?

20  A.  In, I believe, 2000, my former firm was retained to provide

21  financial advice with respect to the Debtors' proposed

22  restructuring plan.

23  Q.  Okay.  And what was that former firm?

24  A.  (Indiscern.).

25  Q.  Right.  And that retention was in or about September of



*Writer's Cramp, Ina.*
*Certified Court Transcribers*
732-329-0191

B-0660

Polleck - Cross                                7

1  2003, correct?

2  A.  No.

3  Q.  All right.  When was it?

4  A.  I believe it was 2000, and my involvement terminated in

5  July of (indiscern.).  Candlewood was subsequantly engaged.

6  Q.  Okay.  But you were not at Candlewood when it was

7  subsequently engaged, is that correct?

8  A.  No, I was.

9  Q.  You were, okay.  When was that engagement?

10  A.  That was, I believe, in September (indiscern.).

11  Q.  Okay.  And what was the purpose of that engagement?

12  A.  Presstek had made -- had provided an expression of interest

13  to (indiscern.) and the directors and officers of Paragon had

14  decided that'they would like assistance in evaluating their

15  (indiscern.) at that time.

16  Q.  Okay.  And for how long did that retention last?

17  A.  My recollection is that our engagement was modified

18  sometime in November or December of 2003.  The modification

19  resulted in our agreeing to a reduced fee (indiscern.) Presstek

20  (indiscern.) released from an obligation (indiscern.).

21  Q.  Okay.  So from November of 2003 to June 29th or 30th of

22  2004 what, if anything, did you do for the Debtors?

23  A.  I received a call in May of 2000 where the Debtors asked if

24  we would agree to accept our fee in stocks, instead of cash

25  (indiscern.) I received a call in June, I believe, where the

*Wilter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B- 0661

Polleck - Cross                                   8

1   Debtors asked if we would waive our fee (indiscern.).

2   Q.  Okay.  Other than those two calls, any other involvement

3   with the Debtors during that time frame, from November 2003, to

4   June 29th or 30th, 2004?

5   A.  Not that I recall.

6   Q.  Is it your understanding that prior to the negotiation and

7   execution of the Asset Purchase Agreement that's at issue in

8   this bankruptcy there was a Stock Purchase Agreement among the

9   parties?

10   A.  You're asking if I --

11   Q.  Do you understand that that's a fact?

12   A.  I understand that there was (indiscern.).

13   Q.  Okay.  Has anyone told you that that Stock Purchase

14   Agreement was escrowed on or about June 16th, 2004?

15   A.  I've heard that there was an escrow.

16   Q.  Okay.  Have you ever read the escrow?

17   A.  I have not.

18   Q.  Have you ever read the Stock Purchase Agreement?

19   A.  Only a small section.

20   Q.  What small section did you read?

21   A.  Relating to the adjustment (indiscern.).

22   Q.  The Stock Purchase Agreement had a provision that allowed

23   for adjustment in the purchase price if financial statements

24   were provided five days, I believe it was, before closing that

25   showed financial deterioration in the Debtors, correct?

1  A.  I'm not certain.  I didn't read the entire statement.  I

2  have no basis -- no one has ever showed me the entire agreement

3  (indiscern.) No one has ever showed me an escrow -- executed

4  Escrow Agreement.

5  Q.  Okay.  Why did you read that small section of the Stock

6  Purchase Agreement?

7  A.  Counsel asked me to.

8  Q.  What counsel?

9  A.  Debtors' counsel.

10 Q.  Okay.  Did you then provide any analysis of that small

11 section that you read?

12 A.  I did not.

13 Q.  Did you use that in any way to value any claims the Debtors

14 might have against Presstek under the Stock Purchase Agreement?

15 A.  I did not.

16 Q.  Have you done any valuation of the claims that the Debtors

17 might have under the Stock Purchase Agreement against Presstek?

18 A.  I have not.

19 Q.  I believe you testified yesterday that in your past you've

20 served as a bankruptcy Trustee, is that correct?

21 A.  I have.

22 Q.  Based on that experience, is it your opinion that some

23 valuation of the Debtors' claims under the Stock Purchase

24 Agreement should be done before those claims are released?

25 A.  It is.

1  Q. And yet you haven't done that, correct?

2  A. I relied on counsel.

3  Q. But my question is, you have not done that valuation,

4  right?

5  A. I'm not a lawyer.

6  Q. Have you done a valuation of the claims that the Debtors

7  might have against Presstek under the Stock Purchase Agreement?

8  A. Can you define valuation?  Do you mean the likelihood of

9  legal success?

10  Q. The value of the claim.  Have you put a value on that

11  claim?

12  A. No.

13  Q. Do you know anyone that has?

14  A. Yes.

15  Q. Who?

16  A. Counsel.

17  Q. Has counsel provided you with that valuation?

18  A. Provided advice to the Board.

19  Q. What did counsel tell the Board?

20       MR. PHILLIPS:  Objection.  That is privileged

21  information, I believe.

22       THE COURT:  Well, what counsel?

23  A. Debtors' counsel.

24       THE COURT:  Were you there?

25  A. I was.

B- 0664

1          MR. FAY:  Your Honor, I think if the Board relied on

2    this --

3          THE COURT:  Overruled.  You may answer.

4    A.  Counsel advised that the likelihood that the value claim

5    exceeding a million dollars was, I don't remember the exact

6    words, fairly (indiscern.).

7    BY MR. FAY:

8    Q.  Have you done any valuation -- other than counsel, did

9    anyone else provide an opinion about the value of the claim to

10   the Board?

11   A.  No.

12   Q.  Have you done an evaluation of the difference in the value

13   of a Stock Purchase Agreement versus the Asset Purchase

14   Agreement to the Estate?

15   A.  Could you repeat the question?

16   Q.  Have you done an evaluation of the difference in the value

17   that the Estates would have received, or the Debtors would have

18   received, from the Stock Purchase Agreement versus the value

19   that they're now receiving under the Asset Purchase Agreement?

20   A.  I have not done an evaluation.

21   Q.  Do you know who Hal Goldstein is?

22   A.  I do.

23   Q.  And you've had discussions with Hal Goldstein, correct?

24   A.  Yes.

25   Q.  Telephone discussions recently, correct?

*Wilter's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*



1  A.  Yes.

2  Q.  Hal Goldstein is a representative of the MHR Entities,

3  right?

4  A.  Yes.

5  Q.  And you told Hal Goldstein that you thought the claim under

6  the SPA could be worth as much as $30 million, correct?

7  A.  Hal told me that.

8  Q.  And what did you say in response?

9  A.  I said that the difference in the values may have well be

10 that.

11 Q.  Okay.  So you agreed --

12 A.  No.  I said the difference in the values of what one might

13 consider the value of the SPA, given what others have told me,

14 and what I believe the value of this (indiscern.).

15 Q.  May be $30 million, correct?

16 A.  Maybe.

17 Q.  Okay.  Did you tell counsel that the difference in the

18 value under the Stock Purchase Agreement versus the value under

19 the Asset Purchase Agreement may be $30 million?  Did you tell

20 counsel that?

21 A.  I think we had discussions regarding what the differences

22 of the values given certain assumptions.

23 Q.  Okay.  And did the number 30 million come up?

24 A.  Probably.

25 Q.  Okay.  In making its presentation, or their presentation to

Polleck - Cross                                              13

1  the Board, did counsel mention that the difference in the value

2  between the Stock Purchase Agreement and the Asset Purchase

3  Agreement may be $30 million?

4  A.  I believe they did.

5  Q.  Did they then tell the Board how you go from $30 million to

6  $1 million?

7  A.  They provided a legal -- not a written opinion but a legal

8  consultation, however you describe it.

9  Q.  Okay.  What did they say?  How do we go from a claim that

10 may be worth $30 million to one where real time as counsel it's

11 unlikely to even be worth a million?

12 A.  My recollection is there was a discussion of the claims in

13 relation to whether or not there were obligations (indiscern.)

14 closing.

15 Q.  Okay.  Did counsel provide the Board with any legal

16 memoranda?

17 A.  Not to my recollection.

18 Q.  Did they cite any cases?

19 A.  I don't recall.

20 Q.  You don't recall if they did.  Did they make reference to

21 the fact that any claims under the escrow or the Stock Purchase

22 Agreement would be governed by New York law?

23 A.  I don't recall.

24 Q.  Did they hand out copies of any New York cases?

25 A.  I don't believe so.

B-0667

1  Q.  Okay.  Did they cite any legal principles or anything that

2  you recognize as a legal principle?

3  A.  I believe they did.

4  Q.  What did they say?

5  A.  I don't have a verbatim recollection of what they said.

6  Q.  Okay.  If you can remember.  Can you remember?

7  A.  Yes.  I believe they discussed the nature of the contract,

8  contract obligations, and whether or not -- and this is just my

9  recollection --

10 Q.  Sure.

11 A.   -- whether or not the execution of an Escrow Agreement

12 constituted an obligation to close (indiscern.).

13 Q.  Did they discussion the concept of a condition precedent?

14 A.  With respect to (indiscern.)?

15 Q.  Right.  To -- with respect to the escrow, did --

16 A.  There was a discussion of the -- of Key Bank (indiscern.).

17 Q.  Okay.  Did they discuss the concept of materiality?

18 A.  I believe there was some discussion about that.

19 Q.  Did they cite any case law or hand out any memoranda on

20 materiality, to your knowledge?

21 A.  I testified a moment ago, no.

22 Q.  Okay.  And did they discuss the concept of condition

23 precedent in the waiver of condition precedents?

24 A.  I don't recall the exact discussion (indiscern.).

25 Q.  Okay.  But $30 million did come up, correct?

B-0668

Polleck - Cross                                    15

1   A.  I believe so.

2   Q.  Okay.

3   A.  That the claim was significantly larger (indiscern.).

4   Q.  Okay.  And what was -- do you remember the law firm, what

5   lawyers made this presentation?

6   A.  Mr. Phillips.

7   Q.  Mr. Phillips did.  Did Mr. Phillips provide the Board with

8   any of the deposition transcripts of the depositions that he

9   took prior to this board meeting in this matter?

10  A.  I don't know.

11  Q.  Well, I'm just asking you.  Did he do it at this meeting?

12  A.  No.

13  Q.  Okay.  Did he cite any of the testimony that was obtained

14  through those depositions to the Board?

15  A.  I believe he did.

16  Q.  Do you remember who he cited?

17  A.  I don't.

18  Q.  Did he cite any of the testimony from Mr. Lugly of Key

19  Bank?

20  A.  I don't recall (indiscern.).

21  Q.  Did he tell the Board that on June 22nd, 2004, Key Bank had

22  sent a letter to Presstek consenting to further funding for the

23  Debtors?

24  A.  There were a lot of conversations, and I'm trying to

25  remember (indiscern.).  I clearly did hear it, but I can't

*Witter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



B- 0669

1  recall if it was at the board meeting, but I did (indiscern.).

2  Q.  Okay.  Was a copy of that letter handed out to the Board

3  members?

4  A.  I don't believe so.

5  Q.  Based on your testimony, Mr. Polleck, it would be fair to

6  say that you were not involved in the negotiations of the Stock

7  Purchase Agreement, correct?

8  A.  Correct.

9  Q.  And any negotiations of the Asset Purchase Agreement that

10  occurred before June 29th or June 30th of 2004, you weren't

11  involved in those negotiations either, correct?

12  A.  Correct.

13  Q.  After June 29th or 30th of 2004, were there ever

14  negotiations about the purchase price under the Asset Purchase

15  Agreement?

16  A.  There were negotiations over the conditions (indiscern.)

17  impact on the purchase price.  There were not negotiations

18  (indiscern.).

19  Q.  Okay.  So at least during your involvement the Debtors

20  never went to Presstek and said, "40 million is not enough, we

21  want 41, or 42, or 43," correct?

22  A.  We would continually say we want 40.

23  Q.  And Presstek never backed down, right?

24  A.  Presstek did not back down.

25  Q.  Okay.  Do you know when --

B-0670

Polleck - Cross                    17

1  A.  No.  On some of the conditions we would have impacted the

2  price they did back down.

3  Q.  But they never backed down on the purchase price of 40

4  million, right?

5  A.  No.

6  Q.  Okay.  Do you know when Presstek first communicated that

7  price of 40 million to the Debtors?

8  A.  I've seen correspondence that indicates it was maybe a week

9  before I became involved.

10  Q.  Right.  On the 23rd of June, 2004, Presstek had drafted a

11  term sheet that showed the $40 million purchase price, correct?

12  A.  Do you have it?

13  Q.  Yes, I do.  Let's look at it.

14  A.  I don't.

15         MR. PHILLIPS:  Your Honor, may I approach the

16  witness?

17         THE COURT:  Yes.

18         MR. FAY:  Mark this as Exhibit-C, MHR Exhibit-C.

19         (MHR's Exhibit-C marked for identification)

20  BY MR. FAY:

21  Q.  And Mr. Polleck, I would refer you to the second page of

22  this exhibit, which reads, "June 23rd, 2004, Term Sheet,"

23  right?

24  A.  Yes.

25  Q.  And in this term sheet in paragraph 2, acquisition, there's

Polleck - Cross                                        18

1  a purchase price of $40 million cash, correct?

2  A.  Yes.

3  Q.  And the final APA, which was executed on or about July 13,

4  2004, had a final purchase price of $40 million cash, correct?

5  A.  Yes.

6  Q.  Okay.  Have you ever seen this term sheet before?

7  A.  Yes, although when I became involved there was already a

8  draft of the APA that we worked off of.

9  Q.  Okay.  Has anyone informed you upon what date Presstek

10  terminated the Escrow Agreement that you had heard about?

11  A.  I have an understanding that it was in the middle of June,

12  but I don't (indiscern.).

13  Q.  Has anyone ever told you that it was on June 22nd, 2004,

14  the day before that term sheet?

15  A.  I believe I heard that in a deposition.

16  Q.  Okay.  Do you have any reason to disagree with that fact?

17  A.  I have no reason to agree or disagree.

18  Q.  Okay.  During the course of your retention by the Debtors,

19  have you ever participated in a discussion where

20  representatives of the Debtor have referred to the fact that

21  one day after Presstek terminated the escrow or the Stock

22  Purchase Agreement, Presstek had drafted a term sheet for a $40

23  million Asset Purchase Agreement?

24  A.  I heard that in a deposition.

25  Q.  Other than the deposition, any other discussions?

B-0672

Polleck - Cross                                    19

1   A.  A discussion of the deposition.

2   Q.  Okay.  But other than that?

3   A.  I don't recall.

4   Q.  Have you attended board meetings of the Debtors since your

5   retention on June 29th or 30th, 2004?

6   A.  Yes, I have.

7   Q.  At any board meeting was that issue discussed, the fact

8   that Presstek had drafted a term sheet for a $40 million Asset

9   Purchase Agreement the day after it terminated the Stock

10  Purchase Agreement?

11  A.  I didn't attend the board meetings when these documents

12  were presented so I don't know if that discussion was held.

13  From the time I began (indiscern.) already been discussed

14  (indiscern.).

15  Q.  Okay.  And you can't -- you would not be able to testify

16  today as to any of the conduct of Presstek in June, or May, or

17  April 2004, prior to your retention of June 29th or 30th,

18  correct?

19  A.  Not from (indiscern.).

20  Q.  Let me show you another document, Mr. Polleck, and ask you

21  if you've seen this.

22          MR. FAY:  We've marked this as Exhibit-D.

23          (MHR's Exhibit-D marked for identification)

24  BY MR. FAY:

25  Q.  It is your understanding, Mr. Polleck, that prior to the

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0673

1  hearing on today and yesterday there has been discovery in this

2  contested matter?

3  A.  Yes.

4  Q.  And you've actually attended some of the depositions,

5  correct?

6  A.  Until I was asked to leave.

7  Q.  Okay.  And it's further your understanding the documents

8  have been produced as part of that discovery process, correct?

9  A.  Correct.

10  Q.  Okay.  And Presstek has produced documents, right?

11  A.  I believe so, yes.

12  Q.  Have you reviewed any of the documents that Presstek has

13  produced?

14  A.  Only at the depositions.

15  Q.  Okay.  The document I just handed you I'll represent to you

16  is a document produced to us by Presstek during the discovery

17  process.  Have you ever reviewed this?

18  A.  At the deposition.

19  Q.  Okay.  Did counsel ask you to review it or you just

20  happened to look through it while you were there?

21  A.  I received a copy (indiscern.).

22  Q.  Okay.  Was this at the deposition of Mr. Muso?

23  A.  It was.

24  Q.  Okay.  If you recall from that deposition, we then had a

25  discussion with Mr. Muso about the valuation of the Stock

B-0674

1  Purchase Agreement versus the Asset Purchase Agreement,

2  correct?

3  A.  I believe so.

4  Q.  Okay.  And we discussed the fact that on this first page of

5  Exhibit-D Presstek was calculating the cost of the Stock

6  Purchase Agreement versus the cost of the Asset Purchase

7  Agreement, correct?

8  A.  Consideration, yes.

9  Q.  Okay.  And the Stock Purchase Agreement, the cost was 89.1

10  million, correct?

11  A.  What this paper says.

12  Q.  All right.  And the Asset Purchase Agreement was 48

13  million, correct?

14  A.  That is what this paper says.

15  Q.  For over $41 million in savings, right?

16  A.  Correct.

17  Q.  Okay.  During your retention --

18  A.  I would note that there is a category, two categories in

19  here, one called environmental, and one called (indiscern.) one

20  called working capital (indiscern.).  With respect to the Stock

21  Purchase Agreement, those categories total approximately 38.5

22  million.  Those, in my understanding, are estimates.  I have no

23  idea where they came from (indiscern.) Presstek will spend

24  after its acquisition.  If one looks under the section 363 deal

25  there's a $5 million amount under restructuring, which again,

Polleck - Cross                                        22

1    is an amount that they would expect to spend once the

2    (indiscern.) company.  Looking further above that, it says in

3    the previous deal, in the section 363 deal, the purchase price

4    -- the purchase price on the previous deal at 47.6 million,

5    purchase price under the 363 deal is 40 million.  There are, of

6    course, differences because the 47 million includes the

7    assumption of working capital obligations, and the 363 deal

8    does not include the assumption of working capital obligations.

9    However, the next three numbers as I described appear to me to

10   be post-acquisition costs borne by Presstek not directly

11   related to considerations of the Debtor.

12   Q.  Right, but there is at least -- there's a component of

13   consideration to the Debtors here, correct?

14   A.  Well, to the extent that those liabilities are real, the

15   restructuring is probably not a component to the Debtor.  The

16   working capital replenishment is not a component to the Debtor.

17   Q.  Under the Asset Purchase Agreement I believe we heard

18   yesterday that Unsecured Creditors will receive approximately

19   $4 million, correct?

20   A.  Correct.

21   Q.  If Presstek had bought the stock of the Debtor, of A.B.

22   Dick, the Creditors -- Presstek would be obligated to the

23   Creditors for 100% of their debt, correct?

24   A.  I agree.  That's not reflected in that.

25   Q.  Okay.

B-0676