1   A.  That's not what I see on this schedule.

2   Q.  But that's a truism, right?

3   A.  I believe that is correct, I haven't read the Stock

4   Purchase Agreement, but you would assume that the acquisition

5   of the stock would result in their becoming obligated for the

6   working capital obligation, and the debt as well.

7   Q.  And that's how you got the maybe $30 million figure that

8   you and Mr. Goldstein discussed, correct?

9   A.  That's how I would view it, but that is not what's on the

10  paper.

11  Q.  That's fine.  These are the costs that Presstek viewed,

12  correct?

13  A.  I can't -- this is what Presstek appears to be Presstek's

14  evaluation of the its (indiscern.) internal costs after owning

15  it for some period of time.

16  Q.  Right.  And they're saying in this document that the cost,

17  their estimates of cost, is $41 million, Correct?

18  A.  Their estimates of these two columns are $41 million

19  (indiscern.).

20  Q.  Okay.

21  A.  I don't believe -- it is not, in my opinion, an estimate of

22  cost.  This is what it takes for them to buy the company,

23  restructure it into what they want it to be.  This is not

24  (indiscern.) cost (indiscern.).  This includes converting it to

25  the Presstek model, whatever that might be.

B-0677

1    Q.   Okay.  But it stills shows a $41 million savings to

2    Presstek under their estimate, correct?

3    A.   Yes.

4    Q.   Okay.  Was that ever discussed during your retention by the

5    Debtors?  Did anyone pull out this document, sit around and

6    say, "You know, in one day's time Presstek, by its own

7    calculations, saved $41 million."

8    A.   Yes.

9    Q.   When did that happen?

10   A.   At the deposition (indiscern.).

11   Q.   Other than at the deposition, did those discussions occur

12   during your retention by the Debtor?

13   A.   There was from time to time general discuss that they saved

14   a significant amount of money on a regular basis, but it was

15   never -- this document was not produced and it was not

16   (indiscern.).

17   Q.   Okay.  How much unsecured debt is there, Mr. Polleck?  An

18   estimate.

19   A.   Could you -- well, there's $5 million, I believe

20   (indiscern.), approximately $5 million from the old notes,

21   there's the $25 or $28 million (indiscern.) notes.  I believe

22   there's between (indiscern.).

23   Q.   And for all of that under the APA we have an estimate of

24   about $4 million, correct?

25   A.   It's actually a little greater than that based on whatever

B- 0678

Polleck - Cross                                25

1  (indiscern.).

2  Q.  Okay.  But it's in that range, right?

3  A.  Four to eight.

4  Q.  That's not what was testified to yesterday, correct?

5  A.  Well, I said it's based on what cures, if any, Presstek

6  would pay on its own for those contracts (indiscern.).

7  Q.  Okay.  But the document we looked at yesterday basically

8  said 3½ and then I think the testimony was we're gonna add

9  about another 400 to that, correct?

10  A.  That was what would be as a result of proceeds into the

11  Estate.  I think -- wasn't their question different than that?

12  What was your question?

13  Q.  What are the proceeds coming into the Estate for the

14  benefit of Unsecureds?

15  A.  I think it was total proceeds, but into the Estate is about

16  $4 million.

17  Q.  Okay.  And the unsecured debt that you just referred to,

18  it's your understanding that if the Stock Purchase Agreement

19  had closed Presstek would have taken responsibility for those

20  debts, correct?

21  A.  Yes.

22  Q.  Yesterday you also testified that you conducted a

23  liquidation analysis of the Debtors, is that right?

24  A.  Yes.

25  Q.  And I believe you said that the midpoint of your

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Polleck - Cross                                    26

1  calculation was 16 million?

2  A.  Yes.

3  Q.  In conducting that liquidation analysis did you add any

4  value for the claims that the Debtors might have against

5  Presstek under the Stock Purchase Agreement?

6  A.  The liquidation of the assets the claim was valued at

7  approximately the number I described.

8  Q.  One million dollars.

9  A.  Actually half.

10  Q.  $500 thousand?

11  A.  Yes.

12  Q.  And that was based on the advice of counsel?

13  A.  That was based on the only evaluation that we had

14  available.

15  Q.  Okay.  And that was an evaluation by Mr. Phillips, is that

16  correct?

17  A.  Correct.

18  Q.  Did anyone at the Debtors suggest that maybe a second

19  opinion should be obtained?

20  A.  Actually, we considered what it might have to be, what the

21  value might have to be, given the liquidation of the assets

22  (indiscern.).

23  Q.  But my question was, during your discussions with

24  representatives of the Debtors was it ever suggested that a

25  second opinion about the value of this claim should be

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  obtained?

2  A.  No, because we approached the issue by saying if we

3  liquidate the assets (indiscern.) how much do the claims have

4  to be worth to get to the equivalent dollar amount

5  (indiscern.).

6  Q.  And what was that?

7  A.  It was (indiscern.).

8  Q.  What was the high point of your range?

9  A.  Twenty-one, I think.

10  Q.  Twenty-one.  So if you had a $21 million high point, and

11  you had a $30 million claim, that'd be 51 million, right?

12  A.  If you hit the high point, yes.

13  Q.  Okay.  In your discussions --

14  A.  That would have to be the claim (indiscern.).

15  Q.  Correct.

16  A.  That would have after all legal costs, contingencies

17  (indiscern.).  You also have to consider the time value of

18  money.

19  Q.  Excuse me, I'm sorry, Mr. Polleck, what were you saying?

20  A.  Go ahead.

21  Q.  You were adding the thought that you would also have to

22  factor in the time value of money on any recovery.

23  A.  The costs of achieving (indiscern.) the time value of money

24  related to when that recovery (indiscern.) of the Estate

25  (indiscern.).

*Writer's Cramp, Ina.*
*Certified Court Transcribers*
*732-329-0191*

B-0681

1    Q.  Okay.  If the Presstek deal is not approved today, wouldn't

2    you try to sell the Debtors as a going concern?

3    A.  If the Presstek deal is not approved today I think that our

4    plan would be to find a way to replace the D-I-P, if possible

5    (indiscern.) if not possible (indiscern.) there's nothing

6    possible yet (indiscern.) find a way to close (indiscern.).

7    Q.  Okay.  And would you in an effort to close a transaction

8    before the D-I-P expires would you approach Comvest or New

9    England Partners?

10   A.  Of course.

11   Q.  What have you done since July -- I'm sorry.  What have you

12   done since June 29th or 30th, 2004, to replace the D-I-P on a

13   stand alone basis?

14   A.  I don't recall every institution I've talked to, but I've

15   talked to CIT, Chase, (indiscern.) and (indiscern.).

16   Q.  When did you do this?

17   A.  I started in July.  I began (indiscern.) for the lenders

18   and private sources (indiscern.).

19   Q.  Okay.  Have you done anything in September or October?

20   A.  Actually, we have continued to provide information to many

21   of those lenders.  As I testified yesterday, they were

22   interested in pursuing their ability to finance whoever might

23   show up (indiscern.) have been able to independently provide

24   liquidity to (indiscern.) or been willing to (indiscern.).

25   Q.  Okay.  In the months of September and October did you

B-0682


1  contact any other potential financiers of the Debtors' D-I-P on

2  a stand alone basis?

3  A.  There were some.  The Committee provided some (indiscern.)

4  provided information as well (indiscern.) as recently as

5  yesterday.

6  Q.  Did you contact anyone, though?

7  A.  My firm did.

8  Q.  Okay.  Who at your firm would have done that?

9  A.  Lynn.

10  Q.  Okay.  What's her full name?

11  A.  Lynn Carpenter.

12  Q.  Okay.  But she did, you -- she might have contacted some

13  additional lenders, but you didn't, correct?

14  A.  I continued discussing it with the lenders (indiscern.).

15  Q.  Okay.  During your testimony yesterday you mentioned the

16  restructuring plan that had been developed for the Debtors,

17  correct?

18  A.  I believe so.

19  Q.  And you -- I believe you testified that one of the reasons

20  you viewed it as unreasonable is that it was dependant on the

21  Joint Development Agreement with Presstek?

22  A.  I'm not sure I said unreasonable.

23  Q.  Was the restructuring plan -- was that plan dependant on a

24  continuation of that Joint Development Agreement?

25  A.  It was.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  Q.  Okay.  Isn't it the case though that the A.B. Dick
2  technology that goes into those products, the Freedom and the
3  Vector product, could be used for somebody else's technology?
4  A.  My understanding is there's a 6 to 18 month development
5  period, and the product that would result -- I'm not an
6  engineer -- the product that would result (indiscern.)
7  effective and efficient as the product (indiscern.) coming out
8  (indiscern.).
9  Q.  But it could be done.  You could go and find a different
10 vendor, correct?
11 A.  You would get an alternative product.  You would not get
12 the same product.
13 Q.  Okay.  During your retention by the Debtors, are you aware
14 of any effort to contact other vendors who might be able to
15 supply the technology needed for the Vector and Freedom
16 products?
17 A.  I'm not certain what the CRO did in regard to (indiscern.).
18 I know that they evaluated it because they discussed it with
19 me.
20 Q.  Okay.  You also referred in your testimony to discussions
21 you had with various parties that expressed an interest in
22 acquiring the assets of A.B. Dick, right?
23 A.  Correct.
24 Q.  Okay.
25 A.  Well, they were not all acquiring the assets.

B-0684

Polleck - Cross                              31

1   Q.  But they expressed some interest in the fact that an

2   auction was being held, correct?

3   A.  Correct.

4   Q.  Okay.  Did you tell any of those entities that there was a

5   claim that might be worth as much as $30 million against

6   Presstek?

7   A.  I told everyone of the parties who was interested in being

8   a proponent of a plan -- part of a plan (indiscern.) that there

9   was an interest in the part (indiscern.) bidding in retaining

10  whatever claim may be there and that those parties (indiscern.)

11  valuable would have a plan for that claim (indiscern.).  It was

12  left with the (indiscern.).

13  Q.  Did you give any of those parties who expressed an interest

14  a value of the claim, or tell them the claim might be worth as

15  much as $30 million?

16  A.  I told them -- I gave no expression of value with regard to

17  my opinion.  I said there were others (indiscern.).

18  Q.  Did you use the number it might be worth as much as $30

19  million?

20  A.  I probably said they believe it might be worth as much as

21  $30 million.

22  Q.  Okay.  Did you provide any of these interested parties with

23  any opinions of the Debtors about the value of these claims?

24  A.  I think -- my recollection is that I told all of the

25  parties that it was my view that the ability to leave that



Polleck - Cross                                32

1  claim for the Creditors would be a tie breaker.  That was the

2  kind of discussion (indiscern.).

3  Q.  Okay.

4  A.  Since we didn't provide value, we never scheduled it as a

5  value in our analysis, except for the $1 value, it was always

6  the concept of, this is what the Creditors believe.

7  Q.  Okay.  So it was never the concept of this is what the

8  Debtors believe, correct?

9  A.  (Indiscern.).

10  Q.  How is your firm being compensated in this matter,

11  Mr. Polleck?

12  A.  We have a monthly retainer and success fee.

13  Q.  And what is the success fee?

14  A.  My recollection is that it is 500 -- up to $42 million for

15  a Presstek sale is $500 thousand (indiscern.) plus a formula

16  that escalates the value (indiscern.) if there's a

17  restructuring we receive $500 thousand plus the (indiscern.).

18  Q.  If --

19  A.  And if there's a third party -- I'm sorry.

20  Q.  Go ahead.

21  A.  If there's a third party we receive the same retainer, 50%

22  (indiscern.) and I think it's 1¼% of the purchase price of the

23  (indiscern.).

24  Q.  Okay.  If this Presstek deal is approved today will your

25  firm receive a success fee?

B- 0686

Polleck - Cross                                33

1   A.   Yes.

2   Q.   Okay.

3   A.   Well, if the Judge allows it.

4   Q.   Okay.  If the Judge allows your success fee you'll receive

5   a fee, correct?

6   A.   Correct.

7   Q.   Okay.  To your knowledge, has any firm that is not

8   receiving a success fee for the Presstek deal conducted a

9   liquidation analysis of the Debtors?

10  A.   Yes.

11  Q.   And who's that?

12  A.   Schuler Andrews.

13  Q.   That's the financial advisor to Key Bank, correct?

14  A.   Correct.

15  Q.   Any financial advisor to the Debtors that has conducted a

16  liquidation analysis that's not receiving a success fee?

17  A.   Not to my knowledge.

18  Q.   Have you provided the Board of Paragon or A.B. Dick with a

19  fairness opinion about the Asset Purchase Agreement?

20  A.   No.

21  Q.   Do you intend to?

22  A.   No.

23  Q.   Have you been asked to?

24  A.   No.

25       MR. FAY:  That's all I have, Your Honor.

*Weitzer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1          THE COURT:  Thank you.  Anyone else have any

2   questions of this witness?

3          MR. SELBST:  Your Honor, I do.

4          THE COURT:  You may proceed.

5                      CROSS-EXAMINATION

6   BY MR. SELBST:

7   Q.  Good morning, Mr. Polleck.  Mr. Polleck, on your cross

8   examination by Mr. Fay you were asked a series of questions

9   about the Stock Purchase Agreement.  Do you recall those?

10  A.  Yes.

11  Q.  And he asked you on a number of occasions if Presstek had

12  completed the acquisition under the Stock Purchase Agreement

13  whether Presstek would have been responsible for the claims.

14  Do you remember those questions?

15  A.  Yes.

16  Q.  But isn't it correct that if there'd been a stock purchase

17  that it would have been A.B. Dick that would have been

18  responsible for those claims?

19  A.  Yes.

20  Q.  Okay.  Thank you.  Now, you also testified in your direct

21  yesterday a little bit about the alternative bids.  Do you

22  recall that testimony, or the alternative expressions of

23  interest?

24  A.  Yes.

25  Q.  And I believe you also testified that in the negotiations

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  other the past weekend Presstek increased the value of its bid

2  by approximately $1.6 million by taking on the tail medical

3  expenses, do you recall that?

4  A.  Yes.

5  Q.  And you also testified that Presstek had agreed to assume

6  the sales commissions, correct?

7  A.  Half of the sales commissions (indiscern.).

8  Q.  If I represent to you that Presstek's agreement, in fact,

9  is to accept all of those commissions up to $425 thousand do

10 you have any reason to disagree with that?

11 A.  No.  (Indiscern.).

12 Q.  So, if there's going to be an alternative bid it would have

13 to be not just bigger than the $40 million cash purchase price,

14 it would have to be bigger than the $40 million cash purchase

15 price increased by the tail medical, increased by the

16 commissions, and increased by the break-up fee, isn't that

17 correct?

18 A.  Yes.

19 Q.  For it to provide more value to the Estate?

20 A.  Coupled with limitation on the cure, coupled with the

21 changes to the working capital (indiscern.).

22 Q.  And I believe you testified yesterday that the alternative

23 expressions of interest both contemplated a Plan of

24 Reorganization, isn't that correct?

25 A.  Yes.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



1   Q.  And a plan would take two, three, maybe more months to

2   confirm, isn't that correct?

3   A.  At least three, I believe.

4   Q.  Okay.  And I believe there's been testimony from Mr. Gray

5   that during those three months the Debtors would lose $4 to $5

6   million, isn't that correct?

7   A.  Yes.

8   Q.  And that would have to be funded, correct?

9   A.  Yes.

10  Q.  And there'd be interest cost on the D-I-P, assuming you

11  could find a D-I-P?

12  A.  Correct.

13  Q.  So really even if you took the $50ish million of these

14  other bids and accepted them at face they're really not even

15  providing equivalent value to what's on the table today, are

16  they?

17  A.  Under that (indiscern.).

18  Q.  Okay, that's all.

19          MR. SELBST:   No further questions, Your Honor.

20          THE COURT:  Thank you.  Any redirect?

21          MR. RICCIARDI:  No, Your Honor.

22          THE COURT:  You're excused.  Any other witnesses on

23  behalf of the Debtor?

24          MR. RICCIARDI:  No more witnesses, Your Honor.

25          THE COURT:  Well, the objecting party for the -- about

B- 0690

1    the Committee (indiscern.).  No, the Committee.

2    　　　MR. RICCIARDI:  Your Honor, we don't have any

3    witnesses.  I don't know if you want to hear some argument or

4    some statement now.

5    　　　THE COURT:  As soon as I close the record.

6    　　　MR. RICCIARDI:  Very well, thanks.

7    　　　THE COURT:  MHR, your client have any witnesses?

8    　　　MR. D. ROSNER:  No, sir.

9    　　　THE COURT:  Any further evidence?

10    　　　MR. D. ROSNER:  Not other than has been submitted.

11    　　　THE COURT:  All right.  I'll deem the record closed.

12    You can make a closing statement if you wish.  Anyone for the

13    Debtor?

14    　　　MR. STOCK:  Your Honor, I already had an opening

15    statement.  I --

16    　　　THE COURT:  All right.

17    　　　MR. STOCK:  -- would like to reserve a rebuttal

18    until --

19    　　　THE COURT:  That would be fine.

20    　　　MR. STOCK:  -- the other, the opponents.

21    　　　THE COURT:  Committee?

22    　　　MR. RICCIARDI:  Your Honor, James Ricciardi of McGuire

23    Woods on behalf of the Committee.  We came here to this hearing

24    yesterday prepared to support the sale and prepared to withdraw

25    our objection; however, there is a difficulty, perhaps it's a



B-0691

38

1  misunderstanding, between Presstek and the Committee about

2  certain bid enhancements that were made at the auction.  And we

3  have been advised by Presstek's counsel this morning that they

4  will designate no contracts to be assumed, and I believe that

5  that is inconsistent with the description of the bid

6  enhancement that they made at the auction.  May I hand you a

7  transcript from the auction, Your Honor?

8          THE COURT:  Yes.  What page?

9          MR. RICCIARDI:  Page 9 to start, please, Your Honor.

10  Mr. Pollock, who you just heard testify, towards the bottom

11  third of the page in clarifying the bid enhancement of Presstek

12  with regard to executory contract says, "The only clarifying

13  comment is that the executory contracts are still to be assumed

14  and assigned with Presstek being responsible for the cures

15  other than the $500,000 Mr. Scaffidi mentioned."  Mr. Scaffidi,

16  who is a representative of Presstek at the auction, went on to

17  say, "There may be some contracts that are not signed but that

18  won't affect the liability of the Estate."  That is, in the

19  Committee's view, entirely inconsistent with the position

20  they're taking today that there will be no contracts.  In fact,

21  we thought that Mr. Scaffidi was saying that most of the

22  contracts would be assumed and we need a clarification from

23  Presstek before we can make a decision as to how we're going to

24  ask Your Honor to rule.  Also, Your Honor, with regard to

25  another item involving cures, on page 8, the first full

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191



1  paragraph on the page, the second item is to remove from the

2  estate the responsibility of curing all contracts with the

3  exception of certain leases that have been provided by the

4  company with a total liability not to exceed $500,000.  That is

5  to say that only $500,000 will remain with the Estate in those

6  obligations.

7         THE COURT:  Well, why don't you just propose that an

8  Order approving the sale and we'll include that in the Order

9  and if they don't like it and don't abide by it, it's all over

10 with.

11        MR. RICCIARDI:  Well, include -- we can certainly

12 include the cap of $500,000.  But that doesn't resolve the

13 issue, Your Honor.  Obviously, there are two ways of

14 distributing funds to Unsecured Creditors.  One is in terms of

15 a distribution from the Estate.  The other is in terms of cure

16 payments.  And we believe that they were committing to make

17 substantial cure payments as part of their bid enhancement.

18 And we can't understand how they can take the position that

19 they are not assuming any contracts right now.  So I would

20 welcome clarification from Presstek.

21        THE COURT:  All right.  Is the Purchaser here?

22        MR. SELBST:  Your Honor, there's -- we believe there

23 has been a misunderstanding between the Committee and Presstek.

24 We have provided the Debtors a list of the contracts to be

25 assumed.  We do not believe, and Mr. Scaffidi was present at

B-0693

40

1    the auction, that we made a blanket assumption of all cure

2    costs.  We told the Committee and it also appears in the

3    transcript, that we would designate by the close of business,

4    the list of the contracts that we would assume and we have

5    designated that.  That's not going to get the Committee as much

6    in cure costs as they hoped, but we did exactly what we said we

7    were going to do at the auction which was by five o'clock

8    yesterday we provided a list to the Debtors of the contracts to

9    be assumed.  But if you read the entire transcript it says

10   there may be some contracts that won't be assumed.  The --

11   Presstek was in the process of evaluating those contracts and

12   without question, Your Honor, the cost of cure were a material

13   consideration in deciding which to assume and which not to be

14   assumed.  But if you read the transcript in its entirety, it

15   says by five o'clock tomorrow, which means yesterday, we would

16   provide the Debtors with a list and that's what we did.

17          THE COURT:  What is the amount of money that -- what

18   is the amount involved in those contracts that you are not

19   assumed and are they executory?

20          MR. SELBST:  That we are not assuming?

21          THE COURT:  Yes.

22          MR. SELBST:  If you could give me one moment, Your

23   Honor.  Your Honor, the Debtors actually have a different view

24   than we do on this.  I can give you my own client's view but

25   Mr. Gleason advises me that the Debtors have a different view

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

1   as to what these cure costs are.  If you could give me a

2   moment, I can confer with my client.  You may want to hear from

3   Mr. Gleason while I have a moment.

4          THE COURT:  Are these contracts all executory?

5          MR. SELBST:  That is one of the subjects of

6   discussion.  The Debtor's view is that some of the contracts

7   which are at issue here are not executory and are not capable

8   of being assumed or assigned under any circumstances and

9   actually as to those contracts which the Debtors believe are

10  non executory, we're not proposing to assume any of those at

11  this point.

12         THE COURT:  Okay, how much -- what contracts are you

13  assuming?  Have you got the list there?

14         MR. SELBST:  Yeah, I have a list here.  It's --

15         THE COURT:  Has the Committee been provided that list?

16         MR. SELBST:  Yes, Your Honor.

17         MR. JOSEPH:  James Joseph of McGuire Woods, Your

18  Honor, yes, we have.

19         THE COURT:  And that list you don't agree with, is

20  that --

21         MR. JOSEPH:  The list that we've been given lists --

22  it includes only --

23         THE COURT:  Come on.  You've got come forward to get

24  on the record.

25         MR. JOSEPH:  Again, James Joseph of McGuire Woods for



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

42

1  the Committee.  The list that we've been given, and that I've

2  discussed with Mr. Gleason and counsel for Presstek includes

3  only leases, real and personal property leases.  It is, for the

4  most part, the real and personal property lists -- excuse me,

5  leases listed on Exhibits, I believe it was, -B, -C, and -D of

6  the schedules that were filed with the Court.  At issue and the

7  way the Committee sees it, the real issue at the auction was

8  sort of two buckets:  executory contracts and leases.  And the

9  leases are on this schedule, are we believe based on the

10  statements at the auction, subject to a cure cap in terms of

11  the Estate's liability of $500,000.  What our concern is and

12  value that we perceive to be coming are a second bucket of non-

13  leases.  The contracts -- vendor contracts that were primarily

14  listed on Exhibit-A as well as other significant contracts on

15  Exhibit-A.  With respect to those cure costs, that was at the

16  auction, something the Committee believed to be, as Mr.

17  Ricciardi stated, another mechanism of providing substantial

18  value to certain members of the Unsecured Creditor

19  constituency.  And we viewed the comments of Mr. Scaffidi to

20  be, with respect that some contracts may not be assumed,

21  carrying with that and that being his clarification, that there

22  certainly would be some contracts, speaking again of the bucket

23  of contracts and not leases, that would be assumed.  And as we

24  stand here today, we have Presstek stating that other than

25  those leases that are listed, they will be taking no executory



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B- 0696

43

1   contracts.

2          (MHR's Exhibit-A previously marked for identification)

3          (MHR's Exhibit-B previously marked for identification)

4          (MHR's Exhibit-C previously marked for identification)

5          (MHR's Exhibit-D previously marked for identification)

6          MR. SELBST:  Your Honor, I -- the papers that I've

7   been handed by Debtor's counsel as the ones identified by my

8   client simply are inconsistent with that.  Yes, it involves the

9   real property leases, yes, it involves capital leases, yes, it

10  involves operating leases, but also includes all reseller

11  agreements, all domestic distributor agreements, all

12  international distributor agreements, all customer service

13  agreements, and some other confidentiality agreements.  But it

14  is clear that it is not simply the leases, Your Honor.

15         THE COURT:  Well, do you agree that only $500,000 of

16  the non-lease agreements would be left with the Estate

17  obligation?

18         MR. SELBST:  That's correct.  Because to the extent

19  that we are not -- well, I want to be very -- I want to be --

20         THE COURT:  And your company, then, as the Buyer will

21  assume everything over $500,000?

22         MR. SELBST:  No, no.  I --

23         THE COURT:  What did Mr. -- what did your

24  representative say then -- mean then, when he said that is to

25  say that only $500,000 will remain with the Estate and those

*Weitzer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0697

. 44

1   obligations?

2           MR. SELBST:  To the extent --

3           THE COURT:  What did he mean by that?

4           MR. SELBST:  He's here and you could ask him, Your

5   Honor, but I think what he meant -- what I think he meant was

6   to the extent that we assume the contracts, those liabilities

7   will be assumed, but if you read the entire transcript what it

8   says is there are some agreements that are not going to be

9   assumed.  At the time that he made that he was still in the

10  process of evaluating the agreements that would be assumed and

11  would not be assumed.

12          THE COURT:  Second item is to remove from the Estate

13  the responsibility of curing all contracts with the exception

14  of certain leases that have been provided by the company with a

15  total liability not to exceed 500,000.  That is to say that

16  only $500,000 will remain with the estate and those

17  obligations.  That's all the contract.

18          MR. SELBST:  As I said and, Your Honor, I'm happy to

19  call Mr. Scaffidi if you would like to reopen the record.  I

20  think what he intended to say was --

21          THE COURT:  Well, if there's not going to be any

22  agreement on this, there's not going to be any confirmation.

23          MR. SELBST:  I understand your position, Your Honor.

24          THE COURT:  So, you better give this --

25          MR. SELBST:  Understood, Your Honor.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191



B-0698

Closing Statement - Mr. Gleason                45

1        THE COURT:  I'm not going to write the agreement.

2        MR. SELBST:  Understood, Your Honor.

3        THE COURT:  The Debtor have anything else to say on

4   this issue?

5        MR. GLEASON:  Thank you, Your Honor.  John Gleason,

6   Benesch, Friedlander, Coplan and Aronoff on behalf of the

7   Debtors.  Let me give the Court some background on how we got

8   here.  Pursuant to paragraph 2(j) of the Bid Procedures Order,

9   the Debtors filed a schedule of leases and executory contracts

10  that they reserved the right to assume and assign along with

11  the calculation of the required cure amounts.  The Debtors

12  filed that schedule on October 1st.  Because of a computer

13  glitch of the PDF'ing, we supplemented that on October 6th and

14  the Trumble Group served out both of those schedules on that

15  date.  We received several objections to those cure amounts and

16  I can go through those later if necessary.  I believe we have

17  resolved all of those for the purposes of the sale hearing.  I

18  think it's important to note that the terms of the original

19  asset Purchase Agreement required the Debtors to pay all cure

20  amounts as a deduct of the purchase price.  The agreement set

21  forth on the schedules filed by the Debtors contemplated

22  approximately $2.24 million of cures.  It included -- I think

23  as there's been some discussion, certain vendor agreements,

24  real property leases, capital leases, operating leases, the

25  joint venture agreement with Presstek which the Debtors did



*Walter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0699

46

1  reserve the right to assume and assign, reseller agreements,

2  domestic distributor agreements, international distributor

3  agreements, customer service agreements, confidentiality

4  agreements and an agreement with a company called HP Indigo.

5  Those, again with the reservation of rights that was set forth

6  in the schedules, were the only contracts that the Debtors

7  believed were executory and subject to assumption and

8  assignment, cures totaling $2.24 million.  What happened after

9  that was that Presstek indicated that they believed certain

10  other Vendor agreements and that's really what we're talking

11  about, Your Honor, I think is the only thing that is in

12  dispute, that certain Vendor agreements which potentially

13  totaled an additional $5 million in cure amounts were executory

14  and subject to assumption and assignment by the Debtors.  More

15  importantly, subject to the Debtors having to pay those cure

16  amounts as a deduct to the purchase price.  So from the

17  Debtor's standpoint, prior to the modifications to the Asset

18  Purchase Agreement, it was agreed -- that were agreed to over

19  the weekend and yesterday, depending on how Your Honor ruled on

20  those disputed agreements, the Debtors faced a potential deduct

21  of $7 million to the purchase price.  What was agreed to was

22  that the maximum deduct to the purchase price was $500,000 on

23  the specific agreements that Presstek or Silver indicated that

24  they would like assumed and assigned.  And I do have, Your

25  Honor, for ease of reference, I think I've handed it out to

B-0700



47

1    most parties, I -- if I may approach?

2         THE COURT:  Yes.

3         MR. GLEASON:  This is just copies of the two schedules

4    that we filed and I have struck out the agreements that are

5    not, as of today, being assumed and assigned by the Debtors.

6    Those cure amounts total approximately $400,000.  I think it

7    should also be noted that the big agreements that are the

8    subject of the Committee -- or the Committee wanting assumed

9    and assigned or to the Committee's belief that Presstek was

10   going to assume the contracts, mainly include Mitsubishi, a

11   company called Esko-Graphics and Konica Minolta.  None of those

12   contracts, and I think the cures on those three agreements

13   total approximately $3 million, those agreements were not on

14   the Debtor's original schedules because the Debtors do not

15   believe those are executory.  And so, you know, where we are

16   today, we do have the agreements that the Debtors are prepared

17   to assume and assign to Silver and cure amounts of, we believe,

18   somewhat less than $500,000, although, I think as Mr. Selbst

19   indicated, the Debtor's liability would be capped at $500,000.

20        THE COURT:  Okay.

21        MR. GLEASON:  If you have any questions or -- I know

22   it's somewhat confusing but --

23        THE COURT:  Well, are you handing up an agreement that

24   is just about as indefinite as those that were submitted by

25   Harbor and that other bidder?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Closing Statement - Mr. D. Rosner                48

1    MR. GLEASON:  The Debtors don't believe so, Your

2  Honor.

3    THE COURT:  How about the Committee?

4    MR. RICCIARDI:  Your Honor, when I alluded to page 9

5  of the transcript before, I left out one line in what I read

6  and that's at the bottom of the page, Mr. Scaffidi again,

7  "there may be some contracts that are not assigned but that

8  won't affect the liability of the Estate."  He was certainly

9  making every effort to have people present at the auction

10  believe that there was gonna to be insignificant or immaterial

11  rejection damages created from this transaction.  And that's

12  why he said there may be "some contracts that are not

13  assigned."  And I, as I said, again, I just -- the Committee is

14  going to have to consider the position it's going to take if

15  Presstek does not make some movement in this regard.

16    THE COURT:  Anyone else?

17    MR. D. ROSNER:  Do you want to hear from MHR, Your

18  Honor?

19    THE COURT:  Yes, you may go ahead.

20    MR. D. ROSNER:  MHR does not need to reconsider its

21  position.  We're still against approval of the sale for several

22  reasons, Your Honor, that I think bear mention at least on the

23  record.  We are the largest Creditor of this Estate.  We own

24  over $18.3 million in notes that were exchanged for other debt

25  obligations that we had with the company back in 2001 in an

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



B-0702

49

1  effort to create an interest-free environment for the Debtor to
2  be able to operate from 2001 going forward.  So we had debt
3  notes, we exchanged them for other debt notes but they were of
4  a kind that did not bear cash pay interest, so that we hoped to
5  approve the liquidity of the company so that it wouldn't end up
6  in an eventual bankruptcy.  It did, nevertheless, end up in an
7  eventual bankruptcy several years later and that's why we are
8  now the largest Creditor.  We have the largest stake in the
9  outcome of this auction in terms of what Unsecured Creditors
10 are going to get, if anything, from the sale.  We are -- Mr.
11 Ricciardi's largest -- the beneficiary, I'd say the largest
12 institution for which his fiduciaries act and the largest
13 institution with the most dollars at stake for whom the Debtors
14 act from the perspective of the Unsecured Creditors.  Certainly
15 not Key Bank; Key Bank has obviously been able to act for
16 itself.  On the facts, the record before Your Honor, the
17 documents that have been submitted, the record that was able to
18 be created in the brief time getting up to the sale hearing, we
19 submit that the Court cannot grant Presstek a legitimate, good
20 faith finding as required under Abbott's Dairies and, Your
21 Honor, under Abbott's Dairies, that good faith finding is
22 required, and I believe Your Honor adopted and applied Abbott's
23 Dairies in your own decision in Alpha Industries and Presstek
24 would have to be found to have acted in good faith and that
25 means without fraud, without evidence of collusion, without



Writer's Cramp, Inc.
Certified Court Transcribers
732-389-0191

50

1  taking unfair advantage of bidders, and with integrity and
2  honesty of purpose.  The Debtors, of course, have the burden of
3  proof on that.  They've offered nothing other than a financial
4  advisor, not a business person, saying that he saw spirited
5  discussions, even though the price was set seven days before he
6  got there and the price never changed.  And by the way, that
7  price, and we can't lose this fact, that price was set the day
8  after Presstek terminated this Stock Purchase Agreement.  For
9  11 months, they were taking due diligence negotiating a Stock
10  Purchase Agreement all up to June 22nd when Presstek sends out
11  a notice saying, "We terminate because Key Bank hasn't
12  consented."  Of course on the same day, Key Bank did consent to
13  continue funding so the actual reason they called the
14  termination, doesn't exist.  So you've got a document that was
15  only turned over to us in discovery.  We only learned about
16  this document just a few weeks ago, the actual Key Bank
17  consent.  So it's hard for me to believe Mr. Polleck when he
18  says that he told bidders about the existence of a claim.  We
19  didn't know how good the claim was until we got this document
20  in discovery just a few weeks ago.  We certainly know that he
21  didn't know it.  But in any event, one day after Presstek calls
22  a termination after 11 months of negotiation, they have a magic
23  term sheet that's ready to be handed out with a $40 million
24  purchase price that has not moved.  It's been 40 million and,
25  by the way, that 40 million is less than half of what was under



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

B-0704

51

1   the Stock Purchase Agreement.  June 22nd, they're in contract
2   to close, at around a value to this company of about, I don't
3   know, $90 million.  June 23rd, before Mr. Polleck shows up on
4   the scene again in order to take the APA, I think as he
5   testified which was already drafted at that point and kind of
6   bring it to the Court and do nothing much else other than that,
7   we're down to 40 million.  There's been no evidence of good
8   faith that's been presented, no Presstek witness, no company
9   witness, no board member.  We've heard about board meetings but
10  certainly nobody here to testify about.  And, Your Honor, I
11  think you just saw, right here in Court, the third Presstek
12  retrade of the deal.  We've discussed at length the second
13  Presstek retrade, but just on Monday, I think the auction
14  transcript is dated November 1st, on Monday, in order to block
15  out both Comvest and Harbor and recall, Your Honor, Comvest
16  admittedly came to the table and said, "Guys, we want to get
17  there but we need a little bit more time.  We think we're going
18  to get there, but we're new to the game, we need a little bit
19  more time.  We need a week."  I spoke to Comvest.  I personally
20  spoke to their attorney who said, "Can you just get us a little
21  bit of time so we can get there?"  Presstek, apparently, said,
22  "No, we got to get this thing done on November 2nd because I
23  got to make sure that Comvest doesn't get in and Comvest
24  doesn't figure out this company and figure out that it can make
25  a better offer.  So I'm going to dangle, once again, an offer

B-0705

52

1  in front of the company, that I'm gonna assume all these
2  contracts, and I'm gonna pay all these liabilities, and I'm
3  gonna enhance the purchase price but then, once I know which
4  way the Court's going, and we're here and we're in Court, I'm
5  gonna then withdraw that claim and we're gonna be back to where
6  we were," which is what we just saw happen.  And I would tell
7  you, Your Honor, that's the third Presstek retrade.  On that
8  basis alone, I don't think Your Honor could find that there's
9  been good faith in the negotiation process.  I think it would
10  be just the opposite.  The SPA that Presstek signed paid in
11  full all Unsecured Creditors.  Mr. Charlie wouldn't be hired, I
12  wouldn't be here, there'd be no reason for us to be here unless
13  there was an eventual default and a problem in the future and
14  who knows if we'd be here in Delaware.  But that SPA was
15  breached and it was on a procured default, and it's important
16  for the Court, in our opinion, to take notice of the type of
17  default that was called.  It wasn't a default of deteriorating
18  financial condition 'cause you could hardly, even Presstek
19  couldn't say that.  They'd been watching this thing for 11
20  months.  They said that the bank didn't consent, but the bank
21  did consent.  And they knew it 'cause the bank gave them the
22  consent letter.  So they knew it but yet they called -- and
23  remember who the escrow agent was.  This wasn't like going to
24  J.P. Morgan Chase or CitiBank as an escrow agent and saying,
25  "Escrow must now be broken, the signature pages must be



Wilter's Cramp, Ina.
Certified Court Transcribers
732-329-0191

53

1  released because here the stated condition under this document
2  has been met." Presstek was the escrow agent so Presstek told
3  itself, "Escrow hasn't been satisfied, we're not closing," and
4  then waited a few hours and delivered the real deal. It's the
5  classic, I mean, you never -- we always talk about it,
6  bankruptcy practitioners talk about, "Be careful that you don't
7  get yourself into a one-bid auction, 'cause if you get into a
8  one-bid auction, what they're going to do is bring you up to
9  the final date and then they're gonna cut the bid in half."
10 Well, Presstek actually did that. This is actually the first
11 time I've seen a company actually cut its bid literally in half
12 in a one-bid auction. Unfortunately, the Debtor here didn't,
13 apparently, see that coming, neither its Chief Restructuring
14 Officer nor its financial advisor saw that coming because they
15 didn't create the alternative to Presstek. In any other
16 matter, you create the alternative by making sure that you've
17 got a reasonable restructuring plan that can be done on a
18 stand-alone basis that you've exhausted every possibility to
19 get DIP financing in place. Talk to the Cerberus of the world,
20 talk to MHR. We actually were trying to come up with proposals
21 to throw financing in even though we're not obligated to and
22 got pushed back on it as opposed to being able to present
23 something. So we did not have a restructuring plan alternative
24 and you left Presstek in a position of being a one-bid auction.
25 And in the one-bid auction, and, again, this is with the view

54

1  if you know you're selling the Enron pipeline assets, you know,

2  if you know you're selling a valuable entity that people have

3  expressed interest in before, then you have a reasonable belief

4  that the market may be able to dictate the value of this

5  company.  But Mr. Polleck, who used to be right there -- Mr.

6  Polleck had tried to sell this company twice before.  I mean,

7  he was engaged when he was with Brown Gibbons in 2000, he was

8  re-engaged in '03, he knew that there were likely not going to

9  be a bunch of other bidders.  And so leaving it to just

10  Presstek was not a very good exercise of business judgment.

11  After Presstek breached the SPA and the Escrow Agreement, it

12  then not -- then says an APA where it requires a release of

13  that very valuable asset.  I'll talk a minute about what

14  apparently Mr. Phillips said to the Board, although, that was

15  apparently not substantiated with any legal analysis or any

16  factual analysis.  We've done our own legal and factual

17  analysis on the claim and, by the way, Your Honor, MHR is a

18  third-party beneficiary of the APA as to a certain amount, and

19  MHR will be pursuing its rights against Presstek for a breach

20  of the Stock Purchase Agreement under its rights as a third-

21  party beneficiary.  I don't believe and I don't want to say it

22  definitively so that it can be used against me, I don't believe

23  that we can sue for the full amount under the SPA but we are a

24  third-party beneficiary and we will be pursuing Presstek.

25  THE COURT:  Well, what if I-- in order of approving



*Walter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

55

1 the sale, what if I assign that claim to your client and let

2 you proceed against Presstek?

3         MR. D. ROSNER:  Then we would most likely withdraw our

4 objection to the sale.  And I can make a quick phone call and

5 get you that answer but I'm pretty sure --

6         THE COURT:  Well --

7         MR. D. ROSNER:  -- that would be the answer.

8         THE COURT:  -- there's not going to be time for a

9 phone call.  You take it or leave it.

10        MR. D. ROSNER:  We'll take it.

11        THE COURT:  Just like they're going to take it or

12 leave it.

13        MR. D. ROSNER:  We'll take it.

14        THE COURT:  Okay.

15        MR. D. ROSNER:  Okay.  In terms of the claim, the

16 claim that we're talking about now and the validity of the

17 claim and the materiality of the claim, and why one cannot, I

18 think the Chief Restructuring Officer testified that when he's

19 a Chapter 11 Trustee, he does not just abandon claims for no

20 consideration and here he recognizes that he neither evaluated

21 nor accepted a valuation of that claim.  But I would look no

22 further, Your Honor, than the -- I don't know how many pages

23 this is -- this is what Presstek filed on midnight,

24 approximately midnight, maybe it was like ten o'clock --

25        THE COURT:  Yes.

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

B-0709

56

1        MR. D. ROSNER:   -- I'm not sure, right before the

2 hearing yesterday to explain all the reasons that it doesn't

3 think there is a good claim.  Now, you know, I'm not saying

4 that we should have a mini-trial on the claim right now, but

5 you've seen what we say, you see Presstek has not dismissed

6 this in a page but they've spent quite a bit of time trying to

7 explain what their defenses are to the claim.  That would tell

8 you right there, you know that you've got a tryable claim and

9 it's one that's being released without consideration as

10 procured by the actual purchaser here.  But now we can actually

11 add insult to injury to what Presstek actually did.  Presstek,

12 just days before the bankruptcy, five days I believe, to be

13 exact, before the bankruptcy was filed before this Court,

14 Presstek used its 11 months of due diligence to all of a sudden

15 {quote} "discover" that A.B. Dick was insolvent and if A.B.

16 Dick was insolvent it could then terminate, so-called terminate

17 the joint -- the valuable Joint Development Agreement that

18 we've heard for this Vector product and for a new valuable line

19 of products.  They could terminate it and keep it from other

20 bidders.  Now we know it's valuable.  Everyone's testified that

21 it's valuable.  We also know that Comvest in their bid said,

22 "That's a very important contract.  We need that."  Presstek

23 terminated it five days before the bankruptcy while they're in

24 contract to buy all of the assets on the basis that they've

25 just discovered that the company was insolvent.  The company's

B-0710

57

1  been insolvent for three years, they pled that in their

2  complaint against us.  The company was insolvent when it

3  entered into the Joint Development Agreement.  The company was

4  insolvent the entire 11 months that Presstek was doing due

5  diligence, but five days before the bankruptcy when they knew

6  there would be other bidders that would be coming in to look at

7  this, Presstek terminated it and stripped the Debtor of this

8  asset.  Of course the Debtor hasn't really analyzed whether it

9  could -- whether that termination was valid.  Debtor hasn't

10  analyzed whether that --

11        MR. PHILLIPS:  Your Honor --

12        MR. D. ROSNER:  -- termination was actually --

13        MR. PHILLIPS:  -- we are going so far beyond the

14  record here --

15        THE COURT:  I -- that's true.

16        MR. PHILLIPS:  -- in terms of what Mr. Rosner is

17  offering here.  He is, in fact, and I would be happy to put Mr.

18  Rosner on the stand if he does want to testify as to all the

19  supposed bids that he's offering in this closing.

20        MR. D. ROSNER:  I think the facts are set forth in the

21  declaration in the exhibits that were attached to the

22  declaration.  Every fact that I'm talking about, the witnesses

23  testified that they didn't evaluate whether the Joint

24  Development Agreement, whether that termination was valid.  The

25  Chief Restructuring Officer -- I asked him about it, whether it

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*751-389-0191*

B-0711

58

1   was valid, whether it had been looked into.  So I don't know

2   what fact you're talking about, but that's the fact that I was

3   just explaining.

4           THE COURT:  Go ahead.

5           MR. D. ROSNER:  Thank you, Your Honor.  Your Honor, we

6   believe that the contention that a Purchaser can insulate its

7   bad conduct by setting a scheme into motion, having that bad

8   conduct move right up until the date that it signs the Asset

9   Purchase Agreement and then having set the scheme in place, but

10  not necessarily doing anything more during the sale processes,

11  is a spurious type of allegation.  It really just gets rid of

12  the whole idea of who is a good faith Purchaser and who's not.

13  One cannot, Your Honor, possibly, in my opinion, strong arm an

14  insolvent company into a corner, exacerbate its leverage to

15  breach a Purchase agreement, fraudulently procure a default,

16  cuts its offer literally in half, demand a release from

17  liability, terminate the Debtor's most valuable contract to

18  restrict it from other bidders and then obtain this Court,

19  which is a Court of equity as we all know, this Court's

20  imprimatur as a good faith purchaser.  If that's the case, if

21  that can happen, there is no good faith requirement in this

22  Court, there is no Abbott's Dairies in this Court, if Presstek

23  can actually get a good faith finding.  Second, there really is

24  no real value being provided to the Unsecures.  Well, we've

25  just seen that even the little value that the unsecureds

*Welter's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

B-0712



59

1  thought they were getting on our behalf, I would note, has been

2  retraded again today.  So even that -- even the 3½ million

3  doesn't sound like it's there.  But is the 3½ million actually

4  there?  The administrative expenses of this estate are already

5  somewhere -- projected to be somewhere between 900 to $1.5

6  million over budget.  What else is going on in this Estate

7  besides this sale?  The Debtors have sued MHR so there's a

8  lawsuit against us right now that's pending.  We've answered

9  and so that's one lawsuit that's out there.  The Debtors

10  apparently, I learned, they haven't had time to analyze the

11  termination under the Joint development agreement, but I

12  learned yesterday they filed a Motion to amend their complaint

13  against MHR to add a new count.  So that's kind of a second

14  lawsuit.  The Debtors have also sued the class -- sued in a

15  class action other note holders so that's now a third lawsuit.

16  The Unsecured Creditors have sued the Lenders.  So that's a

17  fourth lawsuit.  And we haven't gotten to a plan, we haven't

18  gotten to a disclosure statement, we haven't gotten to an

19  analysis of preferences and fraudulent conveyances.  My

20  experience, this is experiential, that $3½ million  is not

21  going to be there.  There's going to be possibly a residual

22  interest for unsecured Creditors in a litigation trust that

23  they want to fund or get to a contingency.  But that is very

24  scarce resources under this sale plan right now.  And remember,

25  all the employees are being terminated under the APA so this

60

1    view of, "We must be a going concern, we must preserve jobs and

2    we must protect the unsecured Creditors," versus this

3    liquidation, this is a liquidation.  That's what's happening

4    and, frankly, if you didn't approve the sale, which you

5    shouldn't approve the sale, what they would do is they'd cobble

6    something together.  They'd go back to Comvest, they'd go back

7    to Harbor, they'd do something but it wouldn't be releasing

8    Presstek, it wouldn't be giving up every right this Estate has,

9    it'd be right sizing the leverage a little bit so that the

10   Unsecured Creditors could actually accomplish something in this

11   case other than sue MHR which is what the company's been doing.

12   Fair value.  The Debtors have said this is fair value because

13   the market has spoken.  We heard about the market speaking for

14   quite awhile, well, I would instruct counsel, I'm sure he

15   remembers, is that a market only speaks correctly when it's a

16   fully disclosed market.  That's what the SEC is for, that's

17   what registration statements are for and that's what in

18   bankruptcy typically disclosure statements are for, is to make

19   sure there's full disclosure so that a market can react.  Okay.

20   There's been no disclosure about the claim against Presstek.

21   People didn't know about the claim against Presstek.  People

22   didn't know the value of the claim against Presstek.  What the

23   purpose of the release in section 13.17 of the APA was.  That

24   wasn't available to the market.  People weren't bidding on that

25   basis.  Judge Case, you know, counsel pointed out what Judge

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

61

1   Case -- some certain findings that Judge Case made on August

2   23rd. He didn't know about the claim against Presstek that was

3   being released. He didn't know that Key Bank had actually

4   consented. He didn't know that the procured default that

5   Presstek had argued was actually false. He didn't hear about

6   the terminated Joint Development agreement. These things were

7   not available to the market, so I would tell you that the

8   market did not speak. This is not just an inefficiency of a

9   market. It's a nondisclosed market and, therefore, you cannot

10  find that there's been fair value 'cause there's been no fair

11  valuation of the claims that's been shared with bidders. No

12  legal analysis, no factual analysis, no documents provided,

13  nothing. We discovered it in discovery. We called the

14  unsecured Creditors and said, "Pay attention. This is real.

15  This looks good. This looks right." The Unsecured Creditors

16  then got involved and said, "You know what? You're right.

17  This does look real, this does look good, let's go." And then

18  they objected to the sale, too, and they were ready to sell out

19  for what they settled for yesterday which doesn't sound like

20  they got. We're not, 'cause we value the claim, much higher

21  than that and we don't think Presstek is -- we don't think that

22  this is a fair sale of these assets. Remember, there is an

23  alternative. The chief restructuring officer testified that

24  the trend of the company now is turning to cash flow positive.

25  This is the trough but we're heading in -- it sounds like the



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

62

1   company is trending out.  There's no question that -- remember

2   that Presstek is the D-I-P Lender here.  They didn't pick

3   November 15th by accident.  I mean, there's a design here.

4   This is the last step of the scheme, not the first step of the

5   scheme.  So this is all procured to leverage this Court into

6   making -- there being no decision other than being able to

7   sell.  That's the very thing that happened in Abbott's Dairies

8   that the Court said is ripe with possibilities of collusion,

9   when the company walks in with an Interim Agreement and says to

10  the Court, "We have no choice, Your Honor.  We're out of money,

11  the Interim Agreement says we have to do this and we have to do

12  it now."  The Judge, Bankruptcy Judge signed the Order.  Third

13  Circuit reversed it and said, "You can't do that.  You can't

14  just come in with no good faith and leverage a company and

15  leave the Bankruptcy Judge with no option."  There are options

16  here.  We've got a room full of professionals here that will

17  come up with the options.  How to replace the D-I-P financing,

18  how to extend the D-I-P financing.  Believe me, Key Bank's not

19  gonna be coming in here to be seeking foreclosure on these

20  assets tomorrow.  They're gonna work something out.  We don't

21  have to approve Presstek as the only possibility right now.

22  And release the claim.  No fair value, no good faith, no

23  benefit to the Estate, and I would say all of that adds up to

24  no legitimate business purpose for being here.  Thank you, Your

25  Honor.

Writer's Cramp, Inc.
Certified Court Transcribers
732-989-0191

B-0716