## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

```
-----------------------------------------------------X
In re:                                )
                                      )        Chapter 11
BLAKE OF CHICAGO CORP., et al.,       )        Case Nos. 04-12002 (JLP)
                                      )        (Jointly Administered)
                        Debtors.      )
-----------------------------------------------------X
OFFICIAL COMMITTEE                    )
OF UNSECURED CREDITORS,               )
                                      )        Appeal No. 04-CV-1566
                     Appellants,      )
                                      )
             v.                       )
                                      )
PRESSTEK, INC.                        )
                                      )
                        Appellee      )
-----------------------------------------------------X
```

## ANSWERING BRIEF OF APPELLEE PRESSTEK, INC.

MONZACK AND MONACO, P.A
Francis A. Monaco, Jr. (#2078)
1201 Orange Street, Ste. 400
Wilmington, Delaware 19801

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst
Lawrence J. Slattery
Gary O. Ravert
50 Rockefeller Plaza
New York, New York 10020
(212) 547-5400

*Attorneys for Appellee*

Dated:  May 13, 2005

TABLE OF CONTENTS

Page

COUNTER-STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING.......... 1

SUMMARY OF ARGUMENT ......................................................................................... 2

STATEMENT OF FACTS ............................................................................................... 3

STANDARD OF REVIEW ON APPEAL ...................................................................... 11

ARGUMENT ................................................................................................................... 12

     I.     The Bankruptcy Court Properly Interpreted the
            Terms of Its Sale Order and the Amended APA ................................................ 12

     II.    The Bankruptcy Court's Ruling Reflects the Clear and
            Unambiguous Intent of the Debtors to Convey the Debtors'
            Interest in the Pipeline Inventory to Presstek ..................................................... 13

     III.   If the Debtors Were Entitled to a Refund of the Deposit Paid
            To Mitsubishi, Presstek Acquired the Debtors' Rights to Such
            Refunds and Deposits ......................................................................................... 20

     IV.   Appellant is Estopped From Claiming That The Pre-paid
            Inventory is Not "Inventory" in These Cases ..................................................... 21

CONCLUSION................................................................................................................. 22

NYK 964293-4.069646.0011

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,
197 F.3d 76 (3d Cir. 1999) ........................................................................13

*Fellheimer, Eichen and Braverman P.C. v. Charter Techs., Inc.*,
57 F.3d 1215 (3d Cir. 1995) .....................................................................13

*Haines v. Liggett Group, Inc.*, 975 F.2d 81 (3d Cir. 1992) ...............................13

*In re Advanced Min. Systems, Inc.*, 189 B.R. 36 (S.D.N.Y. 1995) ....................15

*In re Buckhead America Corp.*, 180 B.R. 83 (D.Del.1995) ...............................14

*In re CellNet Data Systems, Inc.*, 327 F.3d 242 (3rd Cir. 2003)........................16

*In re Chicago, M., S.P. & P.R. Co.*, 648 F.2d 1261 (7th Cir. 1981)...................15

*In re Kaiser Group Intern., Inc.*, 307 B.R. 449 (D. Del 2004)  ........................13

*In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002)...............................21

*Mellon Bank, N.A. v. Metropolitan Communications, Inc.*,
945 F.2d 635 (3d Cir., 1991) ....................................................................13

*United States Gypsum Co.*, 333 U.S. 364 (1948) ............................................14

*Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98 (3d Cir. 1981)  .................13

**FEDERAL STATUTES**

11 U.S.C. 365(n) ............................................................................................16

**FEDERAL RULES**

Fed.R.Bankr.P. 8013 ......................................................................................13

NYK 964293-4.069646.0011

Appellee, Presstek, Inc. ("Presstek"), respectfully submits this Answering Brief in Opposition to the Appeal of the Official Committee of Unsecured Creditors (the "Committee") from the order of the United States Bankruptcy Court for the District of Delaware, dated November 17, 2004, as amended on November 23, 2004 (the "Pipeline Inventory Judgment") directing Mitsubishi Imaging (MPM), Inc. ("Mitsubishi") to deliver certain product to Presstek, the purchaser of substantially all of the above-captioned debtors' (the "Debtors") assets. (The actual purchaser was a subsidiary of Presstek. For convenience in this Brief, 'Presstek' will be used to refer to both Presstek and its acquisition subsidiary.)

**COUNTER-STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

This is an appeal from the entry of the Pipeline Inventory Judgment in which the Bankruptcy Court interpreted the sale order (the "Sale Order") approving the sale of substantially of the Debtors' assets to Presstek (the "Sale") pursuant to the asset purchase agreement, dated July 13, 2004, as amended (the "APA"). (Notice of Appeal, B001). Shortly after the closing of the Sale, Presstek attempted to complete the purchase of partially paid inventory ordered by the Debtors (the "Pipeline Inventory") from Mitsubishi by wiring approximately $2.2 million to Mitsubishi. (Presstek Emergency Motion at 6 – 7, B009 – B010). Consistent with their understanding of the Sale Order and APA, the Debtors directed Mitsubishi to deliver the Pipeline Inventory to Presstek. (Exhibit to Presstek Emergency Motion, B032 – B034). Through various communications with the Debtors and Mitsubishi, the Committee blocked the delivery of the Pipeline Inventory to Presstek. (Committee Obj., Exs. B and C, B091 – B0109).

Presstek and Mitsubishi simultaneously filed motions for clarification of the Sale Order and APA and for a determination of whether the Debtors had properly directed Mitsubishi to deliver the Pipeline Inventory. (Presstek Emergency Motion, B004, Mitsubishi Emergency

Motion, B0111).  The Debtors filed a written response supporting Presstek's position.  (Debtors' Resp. to Emergency Motions, B0129).  The Committee, which had previously insisted that the prepaid inventory be included in the working capital acquired by Presstek, objected and took the position that the prepaid inventory was *not* part of the assets purchased.  (Committee Obj. at B0042 – B0047).  On November 17, 2004, the Bankruptcy Court held an evidentiary hearing on the matter.  (November 17, 2004 Hearing Transcript ("Tr."), B0136).  The Court, interpreting its own Sale Order and the APA, determined that Presstek "acquire[d] . . . the  . . .Debtors' inventories and rights to partially prepaid orders of inventory supplied by [Mitsubishi]."  (*Id*. at 38: 13 – 16, B0173; see also Pipeline Inventory Judgment, B0182).  The Committee appealed that ruling.  (B001).

## SUMMARY OF ARGUMENT

Appellant's challenge to the Bankruptcy Court's Pipeline Inventory Judgment should be rejected in its entirety for the following reasons:

The Bankruptcy Court's interpretation of its own Sale Order is entitled to substantial deference.

The amended APA clearly and unambiguously provides that Presstek acquired all of the Debtors' interest in the Pipeline Inventory.

Even if the Bankruptcy Court improperly concluded that Presstek acquired the Pipeline Inventory pursuant to the Sale Order and APA, the APA provides that Presstek would receive any refund due to the Debtors because Presstek acquired all of the Debtors' interest in refunds, deposits and prepaid deposits.

Appellant's demand that prepaid inventory be included in the working capital calculation estopps it from arguing now that the Presstek did not acquire the Debtors' rights to Pipeline Inventory under the Sale Order and APA.

## STATEMENT OF FACTS

On July 13, 2004 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases are being jointly administered.  On the Petition Date, the Debtors and Presstek entered into the APA. (APA, B0202).

On July 22, 2004, the Debtors filed a motion seeking authority to sell their business to Presstek pursuant to the terms the APA (the "Sale Motion").  (Sale Motion, B0186). The Committee objected.  At a hearing on August 23, 2004 the Bankruptcy Court rejected the Committee's objections and approved bidding procedures for a Section 363 sale of the Debtors' Assets.  The Court then designated Presstek as the stalking horse bidder (the "August 23rd Hearing").  (August 23, 2004 Hearing Tr. at 273 – 282, B0547 – B0556).

After a lengthy solicitation process, the Debtors held an auction on November 1, 2004.  Presstek was the only party to submit a bid that conformed to the approved bidding procedures.  (Auction Tr. at 18:15-23, B0083).  On November 3, 2004, after a two-day hearing, the Bankruptcy Court entered the Sale Order.  (Sale Order, B0050).  The Sale to Presstek closed on November 5, 2004.

**The APA**

Pursuant to the APA, Presstek purchased substantially all of the Debtors' Assets as a going concern.  Section 2.1 of APA provides that Presstek would acquire all of the Seller's right, title and interest in and to all of the Seller's property and assets, real personal or mixed,

tangible and intangible, of every kind and description, wherever located, including the following:[1]

> (c)     all Inventories of Sellers and their Subsidiaries; . .
>
> (k)     all claims of Seller against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or non-contingent; . . .
>
> (l)     all rights of Seller relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof which are not excluded under Section 2.2(g) (relating solely to real property interests)[.]"

(APA at 11 – 12, B0213 – B0214).

The APA defined "Inventory" as "all inventories of the Seller or its Subsidiaries, wherever located, including all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by the Seller or its Subsidiaries in the production of finished goods."  (APA at 6, B0208).

**Mitsubishi**

Mitsubishi was the Debtors' single largest supplier and held a large prepetition trade claim.  (August 23rd Hearing Tr.:  135: 3 – 6, B0409; Nov. 17th Hearing Tr. at 18: 5 – 9, B0153).  Mitsubishi's claim was based on its contracts to manufacture proprietary parts for the Debtors.  (Nov. 17th Hearing Tr. at 17: 11 – 25, B0152).  In August, 2004, Stephen Gray, the Debtors' Chief Restructuring Officer, was in negotiations with Mitsubishi over whether to assume the Debtors' prepetition agreement with Mitsubishi, which had an asserted cure amount of $1.2 million.  (*Id*. at 19 – 20: 24 – 25, 1, B0154 – B0155).  Mitsubishi wanted its prepetition contract assumed and its cure amount paid.  Mr. Gray was unwilling to burden the estate with such a large cure amount.  As a result, Mitsubishi required that the Debtors enter into a new post-

---

[1] Unless otherwise provided, capitalized terms used herein, but not defined herein, shall have the meaning ascribed to them in the APA.

- 4 -

petition contract if they wanted Mitsubishi to continue the manufacture of proprietary parts. (Debtors' Resp. at 2, B0130).

The Debtors and Mitsubishi subsequently entered into the post-petition contract referred to as the "Private Label Sales Agreement" dated as of August 2004. The agreement required the Debtors to prepay for new product orders. It further provided that the Debtors pay one-third of the purchase price upon placing an order, another one-third when the order was ready to ship from Japan, and the final one-third upon arrival of the product in port. (Private Label Sales Agreement at ¶8.F, B0022 – B0023).

**The Private Label Sales Agreement Upsets the Working Capital Test Under the APA**

The Debtors' obligation prepay under the Private Label Sales Agreement created problems for its obligations under the APA, thereby affecting the sale of Debtors' assets. Specifically, the Debtors and the Appellant were concerned because the APA required the Debtors had to maintain a working capital level of $22,700,000 as a closing condition. The amount of the Mitsubishi prepayments did not count toward satisfying this requirement. (Committee Supp. Obj. at 5, B0568). The Appellant then objected to the Sale Motion claiming that the Debtors' inability to meet the working capital covenant of the APA made the APA too conditional and that Presstek could walk away from the sale. (*Id*. at 5 – 6, B0568 – B0569). In fact, at the August 23rd Hearing, the Appellant proclaimed that this issue was its "number one" focus. (August 23rd Hearing Tr. at 30: 2 – 6, B0304).

Appellant then argued that unless the prepayments to Mitsubishi were included in the definition of working capital, it was unlikely that the Debtors could meet the APA's working capital requirements. (Committee Supp. Obj. at 5 – 6, B0568 – B0569). In addition, Appellant argued that if the prepayments were not included in working capital then Presstek would acquire

- 5 -

the prepaid inventory without giving the Debtors any credit for it.  (Committee Supp. Obj. at 2, 6, B0565, B0569).

In response to these concerns, Presstek agreed to include up to $2.5 million in prepaid inventory in the definition of working capital.  The APA was then amended to reflect that change.  (First Amendment to APA, B0641, Second Amendment to APA, B0644, August 23rd Tr. at 10: 16 – 21, B0284).

In light of this history, it is clear that the Committee was fully aware that pre-paid inventory was intended to be included among the assets sold to Presstek.

**The Private Label Sales Agreement and the Sale of the Debtors' Assets to Presstek**

By its terms, Mitsubishi could terminate the Private Label Sales Agreement upon a sale of the Debtors' assets.  (Private Label Sales Agreement at Section at ¶ 12.A.2(d), B0026).  The day after the sale to Presstek closed, Mitsubishi sent a letter purporting to terminate the agreement (the "Termination Letter").  (Presstek Emergency Motion at 6, B0009).  According to the Termination Letter, Debtors had ten days to exercise an option (the "Option") to purchase the Pipeline Inventory by paying the balance due of  $2,255,397. (*Id*).[2]

At the time of the Sale on November 5, 2004, Debtors had been sold out of the inventory manufactured by Mitsubishi for at least 20 days.  (Presstek Emergency Motion at 6, B0009).  Because the Pipeline Inventory is specially made to Debtors' specifications, the orders for the Pipeline Inventory could not be timely filled by any other manufacturer except Mitsubishi.  (*Id*.)**.**  In recognition of this emergent need, Presstek immediately effected two wire

---

[2]    Section 12.C of the Private Label Sales Agreement provides that in the event of a termination of the Private Label Sales Agreement, the Debtors "shall have the right, exercisable by written notice . . . delivered to Mitsubishi within ten (10) days of . . . termination, to Purchase all [Pipeline Inventory] subject to any outstanding Purchase Order identified in such notice by paying Mitsubishi an amount equal to the total purchase price of the Product identified in such Purchase Orders less sums already paid . . ."  (Private Label Sales Agreement at ¶12.C, B0026 – B0027).

transfer payments totaling $2,255,397.  (*Id*. at 6 – 7, B0009 – B0010).  The transfers covered the total amounts due and unpaid to Mitsubishi.  (*Id*. at 6 - 7, B0009 - B0010).

After Presstek made this payment, Debtors were in a position to exercise the Option.  They did so by letter dated November 12, 2004, and authorized Mitsubishi to release the Pipeline Inventory to Presstek, specifically referencing the purchase orders at issue on this appeal.  (Ex. to Presstek Emergency Motion, B0032 – B0034).  Appellant opposed the delivery of the Pipeline Inventory to Presstek, claiming that the Estate might receive a valuable refund if the Debtors breached under the purchase orders and Mitsubishi exercised its rights to cover.  (Exs. B and C to Committee Obj., B0091 – B0110).  Appellant's then required the Debtor withdrew its consent to the exercise of the Option.  (*Id*., B0101)

To address these concerns, Presstek issued the following blanket, unqualified, and absolute indemnification of the estates in connection with the exercise of the Option:

> This letter confirms that you have reinstated the exercise of the purchase option under Private Label Sales Agreement between Mitsubishi and A.B. Dick based on Presstek's agreement that it will hold the estate harmless and put the estate in a position of no prejudice, legal, financial or otherwise, as if the option had never been exercised, if it is adjudicated by final and unappealable judgment that the estates of A.B. Dick are entitled to a refund pursuant to the Private Label Sales Agreement.  Presstek further agrees that this agreement is absolute and unqualified.  Please confirm that based on this agreement the purchase option is reinstated.

(Presstek Emergency Motion at 9, B0012).

After receipt of this indemnification, the Debtors reinstated the Option.  (*Id*.) Mitsubishi nonetheless refused to deliver the Product to Presstek and immediately sought direction from the Bankruptcy Court (the "Mitsubishi Emergency Motion").  (Mitsubishi Emergency Motion, B0111).  At the same time, Presstek filed its motion for an order directing Mitsubishi to comply with the Sale Order (the "Presstek Emergency Motion").  (Presstek Emergency Motion, B0004**).**  Appellant then filed an objection to the Presstek Emergency

- 7 -

Motion, (Committee Obj., B0037), and the Debtors filed a response in support of the Presstek

Emergency Motion. (Debtors' Resp., B0129).

**The November 17, 2004 Hearing on the Presstek and Mitsubishi Emergency Motions**

On November 17, 2004, the Bankruptcy Court held a hearing on the Presstek

Emergency Motion, Mitsubishi Emergency Motion, and the Committee Objection (which

included a Motion for an Order Refunding Credit to the Estates). Counsel to the Debtors stated

the Debtors' position with respect to Presstek's Motion and the Pipeline Inventory:

> Mr. Gleason:  . . . Your Honor, the Debtors submit that based upon their good
> faith understanding of the APA, the second amendment and the Sale Order that
> the purchaser purchased all of the Debtors' inventory, including the inventory that
> was on order with Mitsubishi and which the Debtors have partially paid for.
> Consequently, the Debtors respectfully submit that Mitsubishi should be
> authorized to deliver the inventory at issue to the purchaser which is in
> furtherance of the APA and Sale Order. (Nov. 17th Hearing Tr. at 12 – 13: 22 –
> 25, 1 – 5, B0147 – B0148).

At the hearing, the Debtors' Chief Restructuring Officer, Stephen Gray, testified

as to the Debtors' understanding of the APA, the First and Second Amendment thereto, and the

Sale Order. (Nov. 17th Hearing Tr. at 16 – 35, B0151 – B0170). He explained that after the

bankruptcy filing Mitsubishi was unwilling to supply product unless the Debtors agreed to pay

the cure costs of $1.2 million on the pre-petition contract with Mitsubishi. (*Id*. at 19 - 20: 24 –

25, 1; 26: 4 – 5, B0154 – B0155). The Debtors needed the Mitsubishi product, which was the

"largest single product category and one of the most profitable." (Tr. 26:  5 – 8, B0161). That

led to the postpetition Private Label Sales Agreement. (Private Label Sales Agreement, B0019).

Mr. Gray then testified as to the Debtors' understanding that Presstek acquired all

of the Debtors' "inventories . . ., claims the [Debtors] ha[ve] against third parties (such as

Mitsubishi) . . ., [and] all rights of [Debtors] relating to deposits and prepaid expenses, claims for

refunds and rights of offset[.]" of the Debtors. (*Id*. at 27 - 28: 8 – 25, 1 – 7, B0162 – B0163).

- 8 -

Finally, Mr. Gray explained how the Pipeline Inventory came to be included in the calculation of the Debtors working capital under the APA. "The Debtors had to have $22.7 million of net working capital defined as accounts receivable, plus inventories, minus the outstanding liability on the Debtors' service contracts." The prepayments made to Mitsubishi did not count toward satisfying that covenant. In late July or early August, this became a concern for Debtors, appeared that the covenant would be "very difficult, if not impossible to achieve." At approximately this time, Mr. Gray became aware of the Appellant's concern that "because of that covenant, [the deal] was very contingent." (*Id*. at 28 to 29; B0163-64)

To address this concern, the Debtors "negotiated with Presstek for the inclusion of [the prepayments] *as part of the assets* in the working capital definition. (*Id*. at 30: 8 – 9, B0165) (emphasis added). Mr. Gray testified that the agreement on the working capital adjustment was embodied in the First Amendment to the APA, dated as of August 2004. (*Id*. at 30 - 31: 20 – 25, 1 – 3, B0165 – B0166). He further testified that the Second Amendment to the APA, dated November 5, 2004, provides that "the parties agree that the [Debtors] are permitted to include prepaid deposits for inventory." (*Id*. at 31: 22 – 25, B0166) (Second Amendment to APA ¶10, B0644 – B0654).

In response, Appellant put on no witnesses and offered no evidence to rebut the Mr. Gray's testimony.

**The Bankruptcy Court's Findings**

The Bankruptcy Court issued its Memorandum of Decision on the record, (Nov. 17th Tr. at 37 – 41, B0172 – B0176), based on the exhibits, each admitted without objection, the testimony of the Debtors Chief Restructuring Officer, the memorandums filed by the parties, and

the oral arguments.  (*Id*. at 37:  21 – 25, B0172).  In that decision the Bankruptcy Court

explained that the issue

> turns on the substance of the sales agreement which is the APA and its
> addendums, which have been approved by the Court and Court's Order of Sale
> entered on November the 3rd, the Private Label Sales Agreement executed post-
> petition in August between [Mitsubishi] and the Debtor[s].  (*Id*. at 38: 2 – 6,
> B0173).

The Bankruptcy Court explicitly distinguished the rights under the Private Label

Sales Agreement from the rights Presstek acquired under the Sale Order.  (*Id*. at 38:  7 – 16,

B0173).  The Court concluded that

> Presstek did, however, under the APA and the November 3rd order (the Sale
> Order) and the addendum, acquire from the Debtor Debtors' inventories and
> rights to partially prepaid orders of inventory supplied by [Mitsubishi]. (*Id*. at 38:
> 12 – 16, B0173).

The Court further found that the Debtors "obtained the right to purchase the

pipeline product for which there was already a partial payment made."  (*Id*. at 38: 23 – 25,

B0173).  As to Appellant's arguments that the purchase orders were not validly elected and that

Presstek did not have the right to the inventory, the Court responded:

> I reject those arguments.  It is clear that Presstek did buy the inventory and items
> known as pipeline products, which is the [Mitsubishi] manufactured product. . .
>
> So I find and conclude that the pipeline purchase orders constituted a valid
> binding agreement between [Mitsubishi] and the Debtor which must be honored
> by [Mitsubishi] due to Presstek's payment of over $2.5 million [sic].  I further
> conclude the product is inventory, and prepaid inventory in part, and therefore
> subject to the Asset Purchase Agreement and addendum and the Court's order.
> (*Id*. at 39 - 40: 14 – 25, 1 – 2, B0174 – B0175).
>
> Presstek is thus entitled to the inventory under the APA and its addendums
> approved by the Court.  [Mitsubishi] states this result is fair, assuming that the
> pending pipeline purchase election is valid, which I hold that it is."  (*Id*. at 40: 10
> – 12, B0175).

The Court entered the Pipeline Inventory Judgment on November 17, 2004, as amended on November 21, 2004,[3] which directed Mitsubishi to deliver the Pipeline Inventory to Presstek.  That order – in which the Bankruptcy Court was interpreting the terms of its own Sale Order – is challenged on this appeal.

## STANDARD OF REVIEW ON APPEAL

This Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. *In re Kaiser Group Intern., Inc.*, 307 B.R. 449, 453 -454 (D. Del. 2004) (citing *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir.1999)); see also Fed.R.Bankr.P. 8013 (findings of fact shall not be set aside unless clearly erroneous).  With mixed questions of law and fact, the District Court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir.1981)).

A factual finding is clearly erroneous if it is "complete devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data," *Fellheimer, Eichen and Braverman P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d cir. 1995), or where some evidence supports the finding but the reviewing court is left with "the definite and firm conviction that a mistake has been made." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir. 1992) (quoting *United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

---

[3] The Pipeline Inventory Judgment was apparently amended because it was mistakenly captioned "United States Bankruptcy Court for the District of *Nevada*".

**ARGUMENT**

The Committee's arguments on appeal must fail for the same reason they failed in the Bankruptcy Court:  the parties to the APA intended that Presstek acquire the Debtors' rights to the Pipeline Inventory.  First, the Bankruptcy Court's interpretation of its own Sale Order in support of Presstek's and the Debtors' position is entitled to deference from the District Court.  Second, as the Bankruptcy Court explicitly found, Presstek acquired the Pipeline Inventory under the Sale Order and the terms of the APA.  Third, even if the Bankruptcy Court was incorrect in its ruling that Presstek acquired the Debtors rights to prepaid orders of inventory, the Committee's arguments on appeal must still fail because, as the Bankruptcy Court also concluded, Presstek acquired the all of the Debtors' all rights to deposits, prepaid expenses, and claims for refunds.  Finally, the Committee should be estopped from advancing arguments that are directly contrary to arguments advanced before the Bankruptcy Court during the August 23rd Hearing.  As set forth below, the appeal should be denied.

I.    **The Bankruptcy Court Properly Interpreted the Terms of Its Sale Order and the Amended APA**

Presstek's Emergency Motion sought an order directing Mitsubishi to comply with the Sale Order.  The Mitsubishi Emergency Motion sought an order determining the validity of the exercise of the Purchase Option.  At the November 17, 2004 hearing, the Bankruptcy Court granted the Presstek's Motion and direct Mitsubishi to comply with the Sale Order.  In so doing, the Bankruptcy Court interpreted its own Sale Order and APA.  Its interpretation is entitled to significant deference from this Court.  *In re Buckhead America Corp.*, 180 B.R. 83, 88 (D. Del. 1995) ("An appellate court will not reverse a [lower] court's interpretation of its own order unless the record clearly shows an abuse of discretion") (internal quotes omitted); *see also In re Advanced Min. Systems, Inc.*,  189 B.R. 36, 40 (S.D.N.Y. 1995) ("The lower court's

interpretation of its own order is entitled to great weight on appeal, and will be accepted, absent a compelling basis to hold otherwise."); *In re Chicago, M., S.P. & P.R. Co.*, 648 F.2d 1261, 1264 (7th Cir. 1981) ("Absent a compelling basis to hold otherwise a court's interpretation of its own order in the decision appealed from is entitled to great weight.").

Here, the Bankruptcy Court was in the best position to understand the terms of the Sale Order and amended APA. In fact, at the November 17th Hearing Appellant's own counsel conceded that

> "[t]he Asset Purchase Agreement, the first and second amendment are all incorporated into this Court's Sale Order. They're clear and unambiguous. *This Court is certainly capable of interpreting its own Sale Order.*"

(Nov. 17th Hearing Tr. at 18, B0153).

The Bankruptcy Court was in the best position to determine the scope of its own Order. Its refusal to accept Appellant's interpretation of the APA (a contract to which Appellant was not a party) is by no means an abuse of discretion. Consequently, this Court should defer to the Bankruptcy Court's interpretation.

## II.    The Bankruptcy Court's Ruling Reflects the Clear and Unambiguous Intent of the Debtors to Convey the Debtors' Interest in the Pipeline Inventory to Presstek

The Bankruptcy Court's ruling clearly reflects the intent of the parties to the APA to convey to Presstek the Debtors' rights to partially prepaid orders of inventory supplied by Mitsubishi. As described above, the Debtors' own Chief Restructuring Officer, Mr. Gray -- who was personally involved in the negotiation of the APA and the First and Second Amendments thereto -- testified that the Debtors' interest in the prepaid orders were considered to be part of the Debtors inventory under the APA.

The contractual language support the understanding of the Bankruptcy Court and the Debtors' CRO. The APA provides that Presstek acquired all of the Debtors' "right, title and

interest in and to all of the [Debtors'] property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located . . .[.]"  (APA at 11, B0213). Pursuant to Section 2.1(c), Presstek acquired all of Inventories of the Debtors.  The language of Section 1.1 of the APA makes it abundantly clear that the term 'inventory' was to be given the broadest meaning.  It provides that "inventory" means "all inventories . . . wherever located, including all finished goods, work in process, raw materials, spare parts and all other materials and supplies of to be used or consumed by [the Debtors] in the production of finished goods." (*Id*. at 6, B0208).  Section 2.1 further provides that Presstek acquired "all claims of [the Debtors] against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or non-contingent."  (*Id*. at 6, B0213).  Accordingly, the language of the APA indicates that any interest the Debtors had in the Pipeline Inventory was acquired by Presstek.

### The Cell Net Decision does not Affect the Bankruptcy Court's Order

Notwithstanding the explicit language in the APA and the clear intent of the parties, the Committee argues that the ruling in *In re CellNet Data Systems, Inc.*, 327 F.3d 242 (3rd Cir. 2003) controls here.  As noted in the opening line of the *CellNet* decision, however, that case involved elections under Section 365(n) of the Bankruptcy Code.    *CellNet Data Systems, Inc.*, 327 F.3d 242, 243 – 244.  As such, it has no relevance to this appeal.  In *CellNet*, the debtor, CellNet Data Systems, Inc. ("CellNet"), was a licensor of intellectual property relating to wireless meter reading.  *Id.* at 243 – 244.  When CellNet was on the verge of bankruptcy, Schlumberger Resource Management Services, Inc. ("Schlumberger") proposed to purchase CellNet's assets.  CellNet's assets included certain licensing agreements with BCN Data Systems, Inc. ("BCN").  *Id.* at 245.

CellNet filed for bankruptcy on February 4, 2000.  *Id.* On March 1, 2000, Schlumberger and CellNet entered into an asset purchase agreement that provided that

- 14 -

Schlumberger would acquire the substantially all of the assets of CellNet, except for certain excluded assets. The asset purchase agreement included a provision that permitted Schlumberger to unilaterally exclude certain assets from the purchase. *Id.* By letter dated March 24, 2000 (the "March 24th Letter"), Schlumberger elected to exercise its right to exclude the BCN licensing agreements. *Id.* At that time, both CellNet and Schlumberger knew that there was the possibility that, when CellNet moved to reject the BCN licensing agreements, BCN might assert its rights under section 365(n) of the Bankruptcy Code. *Id.* Under section 365(n), BCN would be entitled to elect to retain its rights under the licensing agreements with CellNet, which would generate royalty income under those agreements in the future. 11 U.S.C. 365(n). Nonetheless, Schlumberger chose to exclude those assets and both parties reserved their rights to determination as to who would be entitled to the royalties in BCN elected under section 365(n).

CellNet rejected the BCN licensing agreements and BCN elected to continue under those agreements pursuant to section 365(n). *Id.* at 246. The election generated approximately $2.2 million in royalties. Schlumberger claimed that it acquired those royalties as part of the sale. *Id.* Schlumberger argued that notwithstanding the explicit exclusion of the BCN agreements, the royalties related to the assets it *purchased*. *Id.* at 246 – 247. The Bankruptcy Court and District Court disagreed with Schlumberger; the Third Circuit affirmed. "Both the Bankruptcy Court and District Court found that Schlumberger had separated ownership from its rights by the plain language of the [asset purchase agreement and March 24th Letter]." *Id*. at 247. The Third Circuit agreed. *Id.*

Here, Presstek sought only that which it explicitly bargained for under the APA. The Bankruptcy Court agreed. Unlike the Debtors in *CellNet*, which disputed Schlumberger's rights, *the Debtors here support Presstek's position.* Significantly the Debtors stated that

"delivery of the Pipeline [Inventory] to [Presstek] . . .simply provid[es] . . . [Presstek] with the benefit of its bargain, *i.e.*, the inventory it purchased and for which it gave the Debtors credit in the closing conditions." (Debtors' Resp. at 6, B0134).  The Debtors further stated that the "Second Amendment to the APA modified section 10.12 to state that, for the purposes of such closing condition, prepaid deposits for inventory made by the Debtors *were to be counted as inventory actually owned by the Debtors at closing*.  The parties would not have agreed to this provision unless [Presstek] was purchasing the estates' rights in the partially pre-paid inventory." (emphasis supplied) (*Id.*).

In fact, the only similarity between *CellNet* and the present case is that in both cases the debtor and the purchaser agreed that the governing documents accurately represented the parties intentions.  Here, it was the intention of Presstek and the Debtors that Presstek acquire the Debtors' inventories and rights to partially prepaid orders of inventory supplied by Mitsubishi.  After an evidentiary hearing on the matter, and hearing testimony from the Debtors Chief Restructuring Officer, the Bankruptcy Court agreed.

**Transfer of Title to the Pipeline Inventory is Irrelevant to the Present Dispute**

Appellant attempts to obfuscate the real issue (*i.e.* that Presstek acquired whatever rights the Debtors had to the Pipeline Inventory) by raising a passage of title argument.  The Committee claims that the *Debtors* held no interest in any potential refund or in the Pipeline Inventory and therefore could convey no such interests to Presstek.  (Opening Brief at 16.)  In support, Appellant argues that because title to the Product had not passed to Debtors, they could not pass title on to Presstek.  Pursuant to the Sale Order and APA, however, the Debtors transferred what ever *interest* they had in inventory, prepaid purchase orders, deposits, prepayments, and refunds.  Appellants certainly can not argue that Debtors had no *interest* in the Product.

- 16 -

The Debtors acknowledged on the record at the November 17th Hearing that they transferred their interest in the Pipeline Inventory.  The Bankruptcy Court agreed.  Accordingly, in making continual references to passage of title and an illusory potential refund under the Private Label Sales Agreement, Appellant simply refuses to acknowledge the obvious and undisputed facts: in the APA Debtors' sold their *interests* to Presstek.

**Resale Provision**

The Committee next argues that inclusion of a provision (the "Resale Provision") in paragraph 9 of the Sale Order, which protects Mitsubishi's re-sale rights, somehow precludes Presstek from acquiring assets specifically bargained for (and insisted upon by Appellant) under the APA, and the First and Second Amendments thereto.  (Opening Brief at 19.).  First, the provision at issue was inserted in the Sale Order at the insistence of Mitsubishi not Presstek.  At the August 23rd Hearing, counsel to Mitsubishi stated Mitsubishi's concern on the record:

> Mr. Lapowsky:  Judge, the issue that we had raised in our objection sounds like it has been covered.  That is the protection of set-off rights.

(Aug. 23rd Hearing Tr. 39: 1 – 17, B0313).

At the Sale Hearing, counsel to Mitsubishi requested explicit clarification that nothing in the Sale Order would hamper its Resale License with respect to the Pipeline Inventory in the event that the Debtors defaulted.  (Nov. 3rd Hearing Tr. at 63 – 65, B0717 – B0719).  At the November 17th Hearing, Stephen Gray confirmed his understanding that Mitsubishi's primary concern was its resale rights.  (Nov. 17th Tr. at 26:  10 – 15, B0161).  In fact, Mitsubishi stated that if that protective language was not included in the Sale Order, it would not withdraw its objection to the Sale.  (*Id*. at 63 -64, B0717 –B0718).  Therefore, contrary to the Committee's argument, the inclusion of the Resale Provision was inserted to protect Mitsubishi's rights, not to cut off the Debtors' rights (and the Debtors' rights to sell those rights) in the Pipeline Inventory.

- 17 -

**Presstek was not Estopped from Claiming Rights to the Pipeline Inventory**

The Committee further argues that Presstek should be judicially estopped from asserting an intention to acquire the Pipeline Inventory because Presstek (a) is playing "fast and loose" with the Court because it purportedly acquiesced and confirmed that the Sale would not affect Mitsubishi's rights under the Private Label Sales Agreement, and (b) it purportedly had a duty to "voice its position at some point prior to closing." (Opening Brief at 22-23). In support of its first argument, Appellant cites hearing transcripts where one or more parties stated on the record that the Sale would not affect Mitsubishi's Resale License if the Debtors' defaulted under the Private Label Sales Agreement. However, these excerpts do not bear upon whether Presstek intended to acquire the Pipeline Inventory, and to the extend they do, they support the Debtors and Presstek's mutual intention to transfer the Debtors rights to the Pipeline Inventory. The Bankruptcy Court considered this argument and agreed with the Debtor and Presstek.

If any party to this appeal could be said to be playing 'fast and loose' with the Court, (Opening Brief at 22 – 23), it is the Committee. As discussed herein, the Committee's position on the Pipeline Inventory in flatly contradictory to its position before the Bankruptcy Court at the August 23rd Hearing, and in its Supplemental Objection when it argued for the inclusion of prepaid inventory in the definition of working capital. (Committee Supp. Obj. at 5, B0568 (citing the deposition of Glenn Pollack in which Pollack states that "[u]nless Presstek chooses to allow prepayments for inventory to be counted as if it were inventory, the Debtors will be unable to meet the [working capital] Closing Condition[.]")).

In its second argument, the Committee asserts that Presstek's silence when Mitsubishi's Resale License was discussed on the record now precludes Presstek from asserting any rights to the Pipeline Inventory. However, this argument assumes that Presstek was attempting to acquire property outside of the amended APA and Sale Order. As stated herein,

- 18 -

Presstek and the Debtors believed that the purchase of the Debtors' assets included the Debtors' rights to the Pipeline Inventory and any potential refund related thereto. Therefore, the cases cited by the Committee on the duty to speak are inapplicable here.

Appellant garners no support by citing to In *In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002). That case involved a plan of reorganization, the success of which depended on administrative creditors accepting less than 100 cents on the dollar. The debtors sent out requests to all administrative creditors for their consent to this treatment. The failure of these creditors to respond jeopardized the entire reorganization. *Teligent,* 282 B.R. 765, 772. The court concluded that those creditors that failed to respond were deemed to accept the plan, because silence in the face of an offer is "subject to question and reconsideration" where passivity would threaten the reorganization. *Teligent*, 282 B.R. at 772.

*Teligent* is simply inapplicable here. Appellant cannot, allege that it ever explicitly or implicitly asked Presstek if it intended to acquire the Pipeline Inventory. Had it done so, Presstek would certainly have indicated that it considered any inventory to be part of the assets purchased, especially since it had explicitly adjusted the definition of working capital to include prepaid inventory. Presstek certainly had no further duty to speak up than what was explicitly stated regarding the prepaid inventory on the record at the Bidding Procedures Hearing, or in the APA, or First and Second Amendments thereto. In light of the many public references to the Pipeline Inventory, the Committee simply cannot credibly argue that Presstek acted in bad faith, particularly when the Debtors agree with Presstek's interpretation. Accordingly, the case law on bad faith that is cited by the Committee is inapposite.

III.    **If the Debtors Were Entitled to a Refund of the Deposit Paid To Mitsubishi,**
       **Presstek Acquired the Debtors' Rights to Such Refunds and Deposits**

      Appellant also contends that Presstek has no interest in the purportedly substantial

potential refund due from Mitsubishi.  In support of this assertion, Appellant points to section 8.F

of the Private Label Sales Agreement, which provides that if the Debtors fail to make a payment,

Mitsubishi

> "may (i) cancel the Purchase Order (as defined in the Private Label Sales
> Agreement) with regard to the [Pipeline Inventory] not paid for and return all
> monies paid by [the Debtors] toward such [Pipeline Inventory], less Mitsubishi's
> costs . . . ; or (ii) sell such [Pipeline Inventory] to third parties for Mitsubishi's
> own account . . ."

(Private Label Sales Agreement Sec. 8.F, B0022 – B0023).

      In the event Mitsubishi fails to affirmatively elect either option, Mitsubishi is

deemed to have elected option (ii), (*Id.*, B0023) and would be obliged to sell the Pipeline

Inventory and, after recovering its costs, refund the remainder to Debtors.  (*Id.*).  Accordingly, in

the event of a termination event, Mitsubishi had the right to re-sell the Pipeline Inventory, which

incorporated the Debtors' intellectual property (the "Resale License").  (Private Label Sales

Agreement Sec. 8.F, B0022 – B0023, Nov. 3rd Sale Hearing Tr. at 63, B0717).

      Again, Section 2.1(l) of the APA specifically provided that the purchased assets

included all of the Debtors' "*rights  . . . relating to deposits and prepaid expenses, and claims for*

*refunds and rights to offset in respect thereof . . .*"  (APA at 12, B0214).  This language could not

be more clear.  In fact, in the Debtors' written response in support of Presstek's motion it stated

that

> "[g]iven the extent of the purchased assets, the Debtors respectfully submit that
> [Presstek] acquired any and all rights the Debtors had with respect to the Pipeline
> [Inventory].  This is especially true since [Presstek] would be entitled to any
> refund that might accrue [under the Private Label Sales Agreement]."

(Debtors' Resp. at 5, B0133).

- 20 -

Moreover, Appellant's "refund" is illusory.  Appellant states approximately eight times that value of the refund is *up to* $2.5 million.  (Opening Brief at 1, 4, 5, 11, 16, 21, 24).  Put in context, the refund would be $2.5 million if Mitsubishi's costs *were zero.*  Appellant presented no witnesses and offered no evidence at the November 17th Hearing.  Appellant's purported refund, therefore, is purely a matter of speculation.  In any event, what ever the amount, the refund would have gone to Presstek under the Section 2.1(l) of the APA.

In sum, Presstek, the Debtors, and the Bankruptcy Court all agreed that if a refund were due under the Private Label Sales Agreement, it would belong to Presstek pursuant to the terms of Section 2.1(l) of the APA.

## IV.    Appellant is Estopped From Claiming That The Pre-paid Inventory is Not "Inventory" in These Cases

The August 2004 amendment to the APA relating to prepaid inventory makes it clear that Mitsubishi and the Appellant knew that prepaid inventory was intended to be included among the assets Presstek was purchasing under the APA.  If Presstek were not going to get the benefit of that inventory, it would have had no reason to accept that amendment.  Most importantly, it was *Appellant* that specifically pushed Presstek to agree to that amendment.  Appellant should not be heard to argue that the Pipeline Inventory is not among the assets that Presstek purchased.

Indeed, the issue of whether the Debtors would be able to satisfy the working capital covenant in the APA was created by the demands of Mitsubishi that the Debtors make substantial pre-payments under the Private Label Sales Agreement.  At the time, Mitsubishi Chaired the Committee.  The Committee, in its capacity as Appellant herein, can not now claim that prepaid inventory was not included in the definition of inventory.  Had they done so before the sale, Debtors would not have satisfied a condition required for closing.  Appellant, having

- 21 -

benefited from the sale,. it cannot be allowed to renege on its agreement.  To allow that result would be to grant the Appellant an unjustified windfall.

## CONCLUSION

This appeal should be denied in its entirety.

Dated:  May 13, 2005

MONZACK AND MONACO, P.A


___/s/ Francis A. Monaco, Jr.
Francis A. Monaco, Jr. (Bar No. 2078)
1201 Orange Street, Ste. 400
Wilmington, Delaware 19801

McDERMOTT WILL & EMERY LLP
Stephen B. Selbst
Lawrence J. Slattery
Gary Ravert
50 Rockefeller Plaza
New York, New York 10020
(212) 547-5400

*Attorneys for Appellee*

NYK 964293-4.069646.0011