UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **BLAKE OF CHICAGO, CORP. f/k/a A.B. DICK COMPANY,** *et al.,* | Case No. 04-12002 (JLP) |
| Debtors. | Jointly Administered |
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS,** | |
| Appellant, | Appeal No. 04-CV-1566 |
| v. | |
| **PRESSTEK, INC.,** | |
| Appellee. | |

**REPLY BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF ITS APPEAL**

Dated: May 27, 2005
Wilmington, Delaware

THE BAYARD FIRM
Jeffrey M. Schlerf (No. 3047)
GianClaudio Finizio (No. 4253)
222 Delaware Ave. Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel: 302.429.4218
Fax: 302.658.6395

McGUIREWOODS LLP
Richard J. Mason, P.C.
Michael M. Schmahl
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1681
Tel: 312.849.8100
Fax: 312.849.3690

and

James H. Joseph (No. 3920)
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, PA 15222
Tel: 412.667.6000
Fax: 412.667.6050

Counsel to the Official Committee of Unsecured
Creditors of Blake of Chicago Corp. f/k/a A.B. Dick
Company, *et al.*

589208v1

# TABLE OF CONTENTS

**Page**

I.    Introduction ........................................................................................................ 1

II.    Reply to Presstek's Answering Brief .................................................................. 4

      1.    This Court Should Not Defer to Judge Peterson's
          Interpretation of the Sale Order ...................................................... 4

      2.    The Intent of the Debtors and Presstek with Respect to the
          Pipeline Product Was Clear and Unambiguous – The
          Pipeline Product Was Not To Be Sold To Presstek ....................... 6

      3.    Based on Applicable Law and the Plain Language of the
          Sale Agreement, Presstek Did Not Purchase the Refund ........... 13

      4.    The Committee's Interpretation of the Working Capital
          Covenant Is Fully and Unequivocally Supported By the
          Record and Was Expressly Endorsed by Judge Case .................. 15

III.    Conclusion ........................................................................................................ 18

589208v1

i

\\FIN\245315.2

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re CellNet Data Systems, Inc.*, 327 F.3d 242.................................................................7

*In re Oneida Motor Freight*, 848 F.2d 414.........................................................................12

The Official Committee of Unsecured Creditors of Blake of Chicago Corp. f/k/a A.B. Dick Company, *et al.*[1] (the "Committee"), the appellant herein, submitted its Opening Brief in this Appeal on April 15, 2005. Presstek, Inc. filed its Answering Brief on May 13, 2005, pursuant to an Amended Scheduling Order agreed to by the Committee. The Committee now respectfully submits this Reply Brief[2] in support of its appeal from the November 17 and 23, 2004, Judgments (together, the "Judgment") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") ruling that Presstek, Inc. and Silver Acquisitions Corp., its wholly owned acquisition subsidiary (collectively "Presstek")[3] could purchase from debtor A.B. Dick Company $5 million in property that A.B. Dick Company did not own.

## I.    Introduction

In its Answering Brief, Presstek raises the following four arguments in support of its position that it purchased the Debtors' interest in either the Pipeline Product or the Refund:

- The Bankruptcy Court properly interpreted the Sale Order and the Sale Agreement notwithstanding the facts that (i) the Sale Order expressly preserved Mitsubishi's right to sell the Pipeline Product to third

---

[1] The four affiliated debtors in these jointly-administered cases include A.B. Dick Company (case no. 04-12002), Paragon Corporate Holdings, Inc. ("Paragon") (case no. 04-12006), Multigraphics LLC ("Multigraphics") (case no. 04-12003), and Interactive Media Group, Inc. ("Interactive Media") (04-12005). For ease of reference, each and all of these debtors are referred to interchangeably and collectively in this Reply Brief as the "Debtors" unless the specific debtor is otherwise noted.

[2] Unless otherwise defined herein, capitalized terms used in this Reply Brief shall have the meanings given to such terms in the Committee's Opening Brief.

[3] For ease of reference, Presstek, Inc. and Silver Acquisitions Corp. are referred to interchangeably and collectively in this Reply Brief as "Presstek."

589208v1
589208v1

1

parties, and (ii) the Sale Order expressly prevails over the Sale Agreement to the extent of any inconsistency between them;

- Presstek and the Debtor Intended for the Pipeline Product to be sold to Presstek notwithstanding the fact that the record through the Sale Hearing, including the Sale Order, clearly reflects the shared intent and understanding of all parties that the Sale would not in any way impair Mitsubishi's right to sell the Pipeline Product to a third party;

- Presstek Purchased the Debtor's contractual right to receive the Refund notwithstanding the exclusion from the Sale of the Private Label Sales Agreement from which the Debtors' right to receive the Refund was solely derived; and

- Due to the working capital covenant amendments approved by the Bankruptcy Court in August 2004, the Committee is estopped from claiming that the Pipeline Product was excluded from the Sale notwithstanding the plain language of the Sale Agreement and the fact that Judge Case specifically confirmed on the record that such amendment was not intended to have the result now advocated by Presstek.

In specific response to the arguments raised in Presstek's Answering Brief, this Court should reject Presstek's arguments and reverse the ruling of the Bankruptcy Court allowing Presstek to denude this estate of approximately $2.5 million worth of property without any consideration, because:

- The deference normally accorded to the Bankruptcy Court on appeal is not appropriate and should not control based on the specific facts, law and procedural history of this case;

- The Bankruptcy Court's finding of the alleged "clear and unambiguous intent" of Presstek and the Debtors with respect to the Pipeline Product was first announced to the Committee, Mitsubishi, the Bankruptcy Court and all other parties in interest only after the Closing of the Sale and, in fact, contradicts the clear and unambiguous record of this case before both Judge Case and Judge Peterson through the Sale Hearing;

- There was no basis in the record before the Bankruptcy Court to hold that Presstek purchased the Debtors' contractual interest in the Refund because (i) as a matter of law Presstek could not acquire the Private Label Sales Agreement, which provided the sole legal basis for such rights, and (ii) the Sale Agreement provides that Presstek did not acquire any of the Debtors' rights against third parties to the extent that such rights relate solely to an asset excluded from the Sale; and

- The Committee is not estopped from taking a position with respect to the effect of the working capital amendment when such position was clearly and unequivocally stated by Judge Case, confirmed by the Debtors and to which Presstek acquiesced.

## II.    Reply to Presstek's Answering Brief

### 1.    This Court Should Not Defer to Judge Peterson's Interpretation of the Sale Order

As a general premise for its entire Answering Brief, Presstek states that this Court must yield to Judge Peterson's interpretation of the Sale Order. While the Committee does not dispute this general rule, this Court must consider the context in which the Judgments were entered and the record before the Bankruptcy Court at that time. In light of this context and record, this Court is not only justified, but compelled, to reverse the Judgments based on (i) the fact that the Judgments were entered on only two days' notice with limited opportunity for legal argument by the Committee, (ii) the fact that Judge Peterson interpreted the Sale Agreement in contravention of the plain language of that agreement and the Sale Order without a reasonable explanation as to how he arrived at his conclusion, (iii) the fact that the Bankruptcy Court's ruling has no factual or legal basis on the record of this case through the Sale Hearing,[4] and (iv) the fact that Judge Peterson inherited this case from Judge Case only days prior to the Sale Hearing.

The Judgment was entered on November 17, 2004, a mere two days after the relevant motions were filed, on November 15, 2004. Judge Peterson decided this multimillion dollar issue, which could represent repayment of ten percent of the unsecured debts in this case, by telephonic hearing with minimal notice, minimal briefing and minimal opportunity for argument by counsel. Further, Judge Peterson's ruling was a Memorandum of Decision read into the record without recess. Therefore, this Court may appropriately ponder whether Judge Peterson properly and thoroughly considered

---

[4] The Committee has addressed the complete absence of a factual or legal basis for the Judgment and the Amended Judgment in the Committee's Opening Brief. Further, Sections II.2 through II.4 of this Reply Brief address some related arguments raised by Presstek in its Answering Brief.

the arguments of counsel at the November 17, 2004, hearing. In this context, the various other errors below are more than adequate to overcome any appropriate deference to the Bankruptcy Court's Judgments.

Considering the decision on the record that is incorporated into the Judgments, it is important to note that Judge Peterson actually interpreted the Sale Agreement, not the Sale Order. Indeed, ruling from the bench, he stated that "this decision turns on the substance of the [Sale Agreement] and its addendums." It is also significant that Judge Peterson apparently determined what he meant by the Judgment after considering "testimony and the exhibits" at the November 17, 2004, hearing. It appears that the Judgment does not reflect Judge Peterson's intention with respect to the Sale Order on November 3, 2005, but instead, at best, may reflect Presstek's post-Closing intent as described for the first time by Presstek on November 17, 2004. Presstek's alleged post-Closing intent to acquire the Pipeline Product was not considered in approving the Sale, and this Court should not defer to such a post-Sale intention.

In determining the meaning of the Sale Agreement and the intention of the parties, Judge Peterson was disadvantaged by his lack of involvement in the case from the Petition Date through a long and contentious series of hearings on debtor-in-possession financing, the bid procedures, and employee and retiree matters. Judge Case presided over these chapter 11 proceedings through all of those issues and was familiar with the numerous and voluminous pleadings filed and issues raised on a docket with in excess of 450 entries as of the Sale Hearing. Indeed, Judge Peterson's first real contact with this case was the Sale Hearing nearly four months after the Petition Date. The Judgments were issued a mere two weeks later, following his second hearing in these cases. Unlike

traditional litigation, a chapter 11 bankruptcy case is a fluid process with many different parties in interest addressing a series of contested matters that may appear unrelated but all of which are part of the larger context of a chapter 11 sale or reorganization process. Unfortunately, Judge Peterson lacked firsthand knowledge of the prior proceedings, the tenor of the hearings, and the ebb and flow of this large and complex chapter 11 case. Instead, he determined the parties' alleged intentions lacking a complete understanding of the context of the case and the course that Judge Case and the parties had taken leading to the Sale Hearing.  In sum, Judge Peterson lacked personal knowledge of the prior proceedings regarding the Pipeline Product, the Private Label Sales Agreement and the working capital covenant amendment to the Sale Agreement.  Accordingly, the Judgments are not entitled to the same degree of deference to which they may be entitled had they been entered by a judge with complete and historical firsthand knowledge of this case, the Private Label Sales Agreement, and the Sale Agreement.

> **2.**      **The Intent of the Debtors and Presstek with Respect to the Pipeline Product Was Clear and Unambiguous – The Pipeline Product Was Not To Be Sold To Presstek**

As an initial matter, the intentions of the Debtors and Presstek are irrelevant in determining whether the Sale Agreement and Sale Order provide for the Debtors' sale to Presstek of either of the Pipeline Product or the Refund.  Presstek nevertheless argues that the Judgments reflect Presstek's and the Debtors' "clear and unambiguous" intentions.  Indeed, the Committee agrees with Presstek that the Sale Agreement, the Sale Order and the proceedings in this case reflect a clear and unambiguous intention of Presstek and the Debtors with respect to the Pipeline Product.  However, as explained in

the Committee's Opening Brief and as clarified herein, the clear and unambiguous intention of all of the parties was that the Pipeline Product was not to be sold to Presstek.

Presstek's argument is based on its post-Closing interpretation of the language of the Sale Agreement. Interestingly, Presstek provides no independent explanation for its interpretation of the language in the Sale Agreement, but instead rejects in a conclusory manner the law and logical reasoning advanced by the Committee in its Opening Brief. Specifically, Presstek argues that:

> (a)    The Third Circuit's decision in *In re CellNet Data Systems, Inc.*, 327 F.3d 242 (3d Cir. 2003), is not applicable to this Appeal;

> (b)    Whether the Debtors held title to the Pipeline Product is "irrelevant" to whether the Debtors could convey such title to Presstek;

> (c)    The express preservation of Mitsubishi's rights to sell the Pipeline Product to a third party under the Resale License is not inconsistent with the Bankruptcy Court's conclusion that Presstek and the Debtors "clearly and unambiguously" intended for Presstek to purchase the Pipeline Product as part of the Sale; and

> (d)    Presstek had no obligation to speak in opposition to Mitsubishi's repeated assertions on the record of its right to resell the Pipeline Product because the existence of such right is somehow consistent with the Debtors' alleged prior conveyance of the same product to Presstek.

For the reasons set forth in the Committee's Opening Brief, and as discussed further below, Presstek's argument is not only puzzling, but lacks any basis in law or fact. In fact, Presstek's position appears to rely greatly on hindsight and revisionist history.

### *In re CellNet Data Systems, Inc.* Is Applicable and Dispositive

In its Answering Brief, Presstek erroneously concludes that the Third Circuit opinion in *In re CellNet Data Systems, Inc.*, 327 F.3d 242 (3d Cir. 2003), "has no

589208v1
589208v1

7

\\FIN\245315.2

relevance to this appeal" because the contract at issue in *CellNet* was an intellectual property license and the debtor's rights under the contract post-closing arose by operation of section 365(n) of the Bankruptcy Code. However, this alleged distinction is a red herring. The issue here is not the legal basis for the Debtors' post-closing rights under the Private Label Sales Agreement, but instead, regardless of the nature of such basis, whether Presstek could legally acquire such rights without taking an assignment of the contract. On that issue, *CellNet* is relevant, binding precedent that requires the reversal of the Judgments.

In *CellNet*, the purchaser expressly chose to exclude the contract from the assets that it acquired. After the closing, the debtor rejected the contract, and the non-debtor licensee "revived" the contract by exercising its rights under section 365(n).[5] At that point, as far as the licensee's obligations to make royalty payments was concerned, the debtor and licensee were in the same position as if the contract had not been rejected and section 365(n) had no further impact on the ruling. The issue in *CellNet* was whether, after the licensee made its election under section 365(n), whether the debtor or the purchaser had the right to receive the benefits of the contract that the buyer had expressly excluded from the sale.

Here, the Private Label Sales Agreement was never rejected. After the Closing, the Bankruptcy Court was faced with the same issue that the Third Circuit addressed in *CellNet*: who has the right to receive the benefits under a contract (the Private Label Sales Agreement in this inctance) that was expressly excluded from the Sale? Whether

---

[5] Section 365(n) permits non-debtor licensees to elect to retain certain licensing rights in the event a debtor-licensor rejects the license, subject to the licensee's obligations to continue to make all royalty payments required to be made under the license.

those rights existed based on the revival of a license under section 365(n) or simply because the contract remained extant is not relevant. In this case, the Bankruptcy Court ignored this Third Circuit precedent and held that Presstek could acquire rights under a contract that it had expressly excluded from the Sale.

As the Third Circuit noted with respect to the royalty payments in *CellNet*, "if [the buyer] had wanted the royalties, they only needed to purchase the License Agreement or contract with [the debtor] for the royalties as part of the Purchase Agreement. As they did neither, they are not entitled to the royalties from the BCN License Agreements. *Id*. at 252. Similarly, if Presstek had wanted the Pipeline Product or the Refund, it needed only to purchase the Private Label Sales Agreement from the Debtors. As explained in the Committee's Opening Brief and throughout this Reply Brief, Presstek did not purchase the Private Label Sales Agreement or the Debtors' rights with respect to the Pipeline Product or the Refund as made plain by the clear and unambiguous definitions of "Assets" and "Excluded Assets" in the Sale Agreement. *Cellnet* is binding precedent, and this Court must reverse the Judgments of the Bankruptcy Court.

### Title to the Pipeline Product is Critically Relevant to the Debtors' Ability to Sell the Pipeline Product

Presstek argues that whether the Debtors held title to the Pipeline Product is irrelevant to this appeal because Presstek asserts only that it acquired whatever rights the Debtors had in the Pipeline Product. Presumably, this is the same meritless argument asserted by everyone who has ever tried to sell or buy the Brooklyn Bridge. Presstek accuses the Committee of "obfuscat[ing] the real issue." If Presstek is confused regarding the Committee's title argument, it is not due to any "obfuscation" by the

Committee.  Rather, Presstek's confusion arises out of the fact that it simply misses the point.  As the Committee explained in its Opening Brief, the Debtors could transfer to Presstek only the interest held by them.  That interest arose solely out of the Private Label Sales Agreement.  The Private Label Sales Agreement was not assigned to Presstek. Consequently, the Debtors' rights to the Pipeline Product under that agreement were not conveyed to Presstek.  In its Answering Brief, Presstek does not explain the nature or extent of the interest that it allegedly acquired in the Pipeline Product.  That is because such an explanation does not exist on the facts of record here or as a matter of law.  Far from obfuscating the real issue, this logic is so elementary that it compels reversal of the Bankruptcy Court's ruling because the Judgments were clearly erroneous.

### The Preservation of Mitsubishi's Rights Under the Resale License is Mutually Exclusive of a Conveyance of the Pipeline Product to Presstek Under the Sale Agreement

At a hearing before Judge Case on August 23, 2004, at the Sale Hearing before Judge Peterson on November 3, 2004, and in the Sale Order, Mitsubishi vigilantly protected its rights under the Resale License contained in the Private Label Sales Agreement.  Presstek argues that Mitsubishi's preservation of its right to sell the Pipeline Product to a third party is somehow consistent with Presstek's alleged intention as of August 23, 2004, and as of the Sale Hearing to purchase the Pipeline Product from the Debtors.  If one assumes that Presstek and the Debtors intended that at the Closing the Debtors would convey some unspecified but meaningful interest in the Pipeline Product to Presstek resulting in Presstek somehow acquiring title to the Pipeline Product, then the rights preserved by Mitsubishi to resell the Pipeline Product would disappear.

The Private Label Sales Agreement authorized Mitsubishi to terminate the agreement upon a sale of the debtors' assets, and, if the Debtor elected not to exercise the Pipeline Purchase Option then Mitsubishi would be permitted to exercise its rights under the Resale License by selling the Pipeline Product to a third party. Presstek acknowledges that Mitsubishi's rights under the Private Label Sales Agreement were unaffected by the Sale Order and, as noted above, it acknowledges that it did not take an assignment of the agreement. Accordingly, Presstek implicitly acknowledges that Mitsubishi had the right to terminate the agreement, that Presstek had no contractual right to exercise the Pipeline Purchase Option, and that Mitsubishi could sell the Pipeline Product to a third party. Presstek's argument obviously fails because it does not explain how Presstek could have held rights in the Pipeline Product concurrent with Mitsubishi's acknowledged right to sell such product to another buyer. If Presstek held an interest in the Pipeline Product, Mitsubishi's resale rights would have been impaired. The record below is clear that neither Judge Case nor any of the parties intended the Sale to in any way impact Mitsubishi's rights under the Private Label Sales Agreement and the Resale License. As such, the ruling of the Bankruptcy Court should be reversed on this clear error.

### Presstek's Possum Act Cannot Be Rewarded Regarding Its Intentions with Respect to the Pipeline Product

At the August 23, 2004, hearing, Judge Case confirmed his understanding that the working capital covenant amendment was not intended to affect, among others, Mitsubishi's rights to "pre-paid inventory" to which Mitsubishi held title. Counsel to Presstek was in attendance at the hearing and participated in the hearing, but said absolutely nothing upon hearing this confirmation by Judge Case. On November 3, 2004,

589208v1
589208v1

11

counsel to Mitsubishi rose to obtain confirmation from the Court and the parties that Mitsubishi's rights to sell the Pipeline Product under the Resale License would not be impaired by the Sale. Indeed, the Debtors, Presstek and the Committee all agreed to the language to this effect that was included in the Sale Order.

After the Closing, Presstek for the first time informed Mitsubishi and the Committee of its belief that it had unfettered rights in the Pipeline Product that effectively eliminated Mitsubishi's rights under the Resale License. Having sat in silence in response to Mitsubishi's preservation of its rights at the August 23, 2004, hearing, and later having agreed to language in the Sale Order protecting Mitsubishi's rights to sell the Pipeline Product to a third party, Presstek is estopped from now arguing that the Sale Agreement was clearly and unambiguously intended to result in the sale of the Pipeline Product to Presstek. This Court should not countenance Presstek's possum act during this case.

The doctrine of judicial estoppel is intended "to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted." *In re Oneida Motor Freight*, 848 F.2d 414, 419 (3d Cir. 1988). Presstek does not dispute the general rule of judicial estoppel, but instead simply challenges the applicability of one of the five cases cited by the Committee in its Opening Brief with respect to judicial estoppel. The real thrust of Presstek's challenge to the applicability of judicial estoppel is that the Committee did not directly ask Presstek about its intentions regarding the Pipeline Product. (Answering Brief at p. 19). However, judicial estoppel is not intended to evaluate the conduct between parties, but instead "looks to the connection between the litigant and the judicial system . . . ." *In re Oneida*, 848 F.2d at 419.

Here, on August 23, 2004, Judge Case sought to confirm his understanding of the intended effect of the amended working capital covenant. In doing so, with Presstek's counsel present, Judge Case confirmed that the amendment to the working capital covenant was for a limited purpose and was not intended to affect any vendor's right to prepaid inventory. (Trans. of August 23, 2004 Hearing pp. 39-40 at A-0128 through A-0129). Presstek's counsel, faced with Judge Case's expression of the Bankruptcy Court's understanding of the amendment that formed the basis for his approval of the covenant, remained silent. Just as in the *Oneida* case, here Presstek's "silence . . . is deafening." *In re Oneida*, 848 F.2d at 417. Presstek cannot be heard now to argue that the very same covenant amendment evidences its intention to acquire an interest in the Pipeline Product that would impair Mitsubishi's rights under the Private Label Sales Agreement.

### 3. Based on Applicable Law and the Plain Language of the Sale Agreement, Presstek Did Not Purchase the Refund

In its Answering Brief, Presstek argues that under Section 2.1(l) of the Sale Agreement it purchased "all rights of [the Debtors] to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof which are not excluded under 2.2(g)." (Answering Brief at p. 4). For the same reasons that Presstek could not, as a matter of law, have purchased the Debtors' interest in the Pipeline Product absent an assignment of the Private Label Sales Agreement, Presstek could not have purchased the Debtors' contractual right to receive the Refund. Simply stated, the Debtors' sole avenue to recover the Refund from Mitsubishi would have been to assert their rights under the Private Label Sales Agreement. That is, the Debtors' right to receive the Refund from Mitsubishi was solely and strictly created by and derived from the Private Label Sales Agreement. Because the Debtors did not assign that agreement to Presstek, Presstek, as a

589208v1
589208v1

13

matter of law, could not purchase the Debtors' right to the Refund. Presstek's stated post-Closing intention cannot change this result. While Section 2.1(l) may provide generally for Presstek's purchase of refund rights and deposits, Presstek cites no law for its proposition that it can purchase a refund existing under a contract without taking an assignment of that contract. Such a conclusion flies in the face of the long accepted maxim that a purchaser that seeks to obtain the benefits of a contract must also take its burdens.

In addition, and equally fundamental, Presstek's argument completely ignores the first paragraph of Section 2.1. That Section describes the "Assets" to be sold in general terms and introduces the list of such Assets with the phrase "including the following (but excluding the Excluded Assets (as defined below)) . . . ." (Sale Agreement ¶ 2.1 at A-0028 through A-0029). Section 2.2(j) of the Sale Agreement defines the "Excluded Assets" in relevant part as follows:

> 2.2 Excluded Assets    *Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement*, the following assets of [the Debtors] (collectively the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets, and shall remain the property of [the Debtors] after the Closing:
>
> * * *
>
>     (j)    **claims against third parties to the extent related solely to any Excluded Asset or Excluded Liabilities.**

(Sale Agreement ¶ 2.2 at A-0029 through A-0030) (emphasis added).

At no time during this case, at the Sale Hearing, at the November 17, 2004, hearing or in any pleading filed by Presstek in this Appeal has Presstek ever asserted that

589208v1
589208v1

14

it acquired the Private Label Sales Agreement; it is undisputed that the Private Label Sales Agreement was excluded from the Sale. Similarly, it is beyond dispute that the Debtors' right to seek the Refund from Mitsubishi is a claim against a third party. Therefore, based on the clear and unambiguous language of Sections 2.1 and 2.2(j) of the Sale Agreement, the Refund constitutes an Excluded Asset that was not sold to Presstek as part of the Sale. As such, the Refund remains property of the bankruptcy estates.

The relief granted by the Sale Order was a sale of the Debtors' "Assets," which by definition do not include the Refund. (Sale Agreement ¶¶ 2.1. and 2.2 at A-0028 through A-0030). If Presstek actually intended to purchase the right to the Refund, it should have taken an assignment of the Private Label Sales Agreement, or, at a minimum, amended Sections 2.1 and 2.2 of the sale Agreement to make its intentions clear. Instead, Presstek did absolutely nothing until after the Closing. The plain language of the Sale Order and the Sale Agreement is clear - the Refund was not among the Assets sold to Presstek. For the foregoing reasons, the Bankruptcy Court's Judgments have no basis in fact or law and the Sale Order must be reversed.

### 4. The Committee's Interpretation of the Working Capital Covenant Is Fully and Unequivocally Supported By the Record and Was Expressly Endorsed by Judge Case

In its Answering Brief, Presstek argues that the inclusion in the amended working capital covenant of up to $2.5 million in value of the Pipeline Product reflects the parties' intention that the Pipeline Product constituted an Asset to be sold to Presstek. Presstek continues to gloss over the distinction between the purpose and effect of covenants versus conveyance provisions in a sale agreement. A covenant sets a minimum threshold that may provide the buyer the right to terminate the agreement if the threshold is not met, or

may result in a modification or adjustment to the agreement. By contrast, conveyance provisions go to the heart of the transaction and define exactly what assets the seller intends to sell and the buyer intends to buy.

In this case, Section 10.12 of the Sale Agreement in its original form limited Presstek's obligation to consummate the Sale by requiring that "the sum of accounts receivable and inventory, less deferred revenue, of [the Debtors] and [their Canadian subsidiary] shall be at least $22.7 million on a cumulative basis." (Sale Agreement ¶ 10.12 at A-0043 through A-0044). As modified by the First Amendment, Section 10.12 clarified that "[i]n determining the amount of inventory for purposes of the calculations under this Section 10.12, [Presstek and the Debtors] agree that the Seller is permitted to include pre-paid inventory to the extent that such pre-paid inventory (A) does not exceed $2.5 million in the aggregate and (B) is scheduled to be delivered no later than November 30, 2004." (First Amendment to the Sale Agreement at A-0765). Critically, the Debtors and Presstek never amended the defined term "Inventories" as used in Section 2.1 of the Sale Agreement to include "pre-paid inventory." Instead, the amended performance covenant of Section 10.12 is the only provision in the Sale Agreement that clarifies that inventory includes pre-paid inventory. Moreover, such clarification is expressly limited to the calculation purposes of Section 10.12, and even in the context of that Section the amended terms do not mandate the inclusion of "pre-paid inventory" in the formula. Rather, if the formula resulted in a number in excess of $22.7 million without consideration of the "pre-paid inventory" then the pre-paid inventory would not be included in determining whether the working capital covenant was satisfied. Thus, the inclusion of prepaid inventory is not even an absolute with respect to the working capital

covenant, much less with respect to the Presstek's stated post-Closing intention to acquire the prepaid inventory based on this covenant. This covenant is entirely irrelevant to any determination of the meaning of the conveyance provisions of the Sale Agreement.

Against the backdrop of this language in the Sale Agreement, on August 23, 2004, Judge Case and the parties clearly established the intended impact of the amendments to the working capital covenant. Nearly three months later and after the Closing, Presstek for the first time alleged that its intention in August and as of the Closing was to purchase the Pipeline Product in connection with the Sale. To the contrary, Judge Case confirmed, and the parties agreed, either expressly or by their silence, as follows that they were "not trying to change whatever rights the sellers of that inventory may have, but rather simply have agreed on the treatment of the pre-paid inventory for purposes of compliance with the reps and warranties of the [Sale Agreement]." (Trans. of the August 23, 2004 Hearing pp. 39-40 at A-0128 through A-0129).

Presstek's argument that the working capital covenant amendment served to include the Pipeline Product within the scope of the Assets to be sold to Presstek is directly contrary to Judge Case's clarification on August 23, 2004. Presstek's argument falters once again when pitted against the clear and unambiguous language of the Sale Agreement when Sections 2.1, 2.2(j) and 10.12 are viewed together with the unaltered definition of Inventories in the Sale Agreement. The Judgments are clearly erroneous as they lack any basis in fact under the record below and the plain language of the Sale Agreement, and this Court should therefore reverse the Judgments.

### III.    Conclusion

As stated above, the Debtors could not have conveyed a property interest in the Refund or the Pipeline Product greater than the rights that they possessed.  Because the Debtors' rights in the Refund and the Pipeline Product were derived exclusively from and limited by the Private Label Sales Agreement, the express exclusion of the Private Label Sales Agreement from the Sale renders the separate transfer of any interest thereunder in the Refund or the Pipeline Product a legal impossibility.  This result is inescapable upon analysis of (i) the limited scope and purpose of the working capital covenant amendment, (ii) the definition of Inventories in the Sale Agreement, and (iii) the breadth of the exclusionary provisions of Section 2.2 of the Sale Agreement.  Finally, the Bankruptcy Court's ruling that the Debtors contracted to sell the Pipeline Product to Presstek is directly and inexplicably contrary to Mitsubishi's undisputed reservation of its rights to sell the Pipeline Product to any third party under the Resale License.  This reservation is clearly and unequivocally established on the record below and in the Sale Order.  The Bankruptcy Court improperly permitted Presstek to alter its bargain after the Closing at the expense of unsecured creditors.  Accordingly, the ruling of the Bankruptcy Court must be reversed.

Dated:  May 27, 2005
Wilmington, Delaware

THE BAYARD FIRM

By:

Jeffrey M. Schlerf (No. 3047)
GianClaudio Finizio (No. 4253)
222 Delaware Ave., Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel:  302.429.4218
Fax:  302.658.6395

McGUIREWOODS LLP
Richard J. Mason, P.C.
Michael M. Schmahl
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1681
Tel:  312.849.8100
Fax:  312.849.3690

and

James H. Joseph (No. 3920)
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, PA  15222
Tel:  412.667.6000
Fax:  412.667.6050

Counsel to the Official Committee of
Unsecured Creditors of Blake of
Chicago Corp. f/k/a A.B. Dick
Company, *et al.*

589208v1
589208v1

\\FIN\245315.2

19