# Tab 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------x
In re                            :      Chapter 11
                                 :
A.B. DICK COMPANY, et al.,       :      Case Nos. 04-12002 (CGC)
                                 :
        Debtors.                 :      Jointly Administered
                                 :
---------------------------------x
```

### MOTION FOR ORDER: (A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF A.B. DICK COMPANY AND ITS WHOLLY OWNED SUBSIDIARIES, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (C) GRANTING RELATED RELIEF

A.B. Dick Company ("A.B. Dick"), Paragon Corporate Holdings, Inc. ("Paragon"), Multigraphics LLC, and Interactive Media Group, Inc., the debtors and debtors in possession in the above-captioned jointly administered chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion") this Court, pursuant to sections 105(a), 363(b) and (f), and 365(f) of Title 11 (the "Bankruptcy Code") of the United States Code and Rules 2002(a)(2), (c)(1), (k), and (m), 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an Order: (A) authorizing the sale of substantially all of the assets of A.B. Dick and its wholly owned subsidiaries, free and clear of all liens, claims and encumbrances, to Silver Acquisitions Corp. ("Silver"), or to any other party that submits a higher and better offer (the "Sale"); (B) authorizing the Debtors to assume and assign to Silver certain executory contracts and unexpired leases; and (C) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 provide the statutory bases for the relief sought herein.

**BACKGROUND**

2.      On July 13, 2004 (the "Petition Date"), the Debtors each filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their property and assets as debtors in possession. No trustee, examiner or committee of creditors has yet been appointed in these chapter 11 cases.

**Description of the Debtors' Businesses**

3.      In 1884, Albert Blake Dick, the founder of A.B. Dick, revolutionized document reproduction when he partnered with Thomas Edison to invent the world's first mimeograph. Throughout the 20th century, A.B. Dick continued to grow its printing equipment business by pioneering a series of technological advances, including the development of printers that could reproduce photographs without negatives in the 1960's. In March 2000, A.B. Dick took on its present corporate form and significantly increased its market share when it integrated with Multigraphics Inc., another printing company.

4.      A.B. Dick is presently a leading global supplier to the graphic arts and printing industry, manufacturing and marketing equipment and supplies for the global quick print and small commercial printing markets. Its business has three product lines: (a) pre-press, press and other related equipment; (b) supplies; and (c) after-market repair service and replacement parts. A.B. Dick manufactures its own products – sold under the A.B. Dick®, Multigraphics® and Itek Graphix® brand names – and distributes certain products manufactured by third parties. A.B. Dick sells its products and services through a network of branches and independent distributors

2

A- 0002

in the United States, its subsidiaries in Canada and the United Kingdom, and independent distributors in other countries. Its customers include commercial, in-house and convenience printers, publishing companies, educational institutions and graphic design firms.

5.    A.B. Dick and Interactive Media Group, Inc., corporations organized under the laws of the states of Delaware and Ohio respectively, are wholly owned, direct subsidiaries of Paragon, a privately held holding company incorporated under the laws of the state of Delaware and headquartered in Niles, Illinois. A.B. Dick is the sole member of Multigraphics LLC, a limited liability company organized under the laws of the state of Delaware, and the owner of A.B. Dick Company of Canada, Ltd. and A.B. Dick UK Limited (collectively, the "Foreign Subsidiaries"). Together with the Foreign Subsidiaries, the Debtors – who employ approximately 700 employees in their operations – collectively provide a full range of high quality prepress, press and post-press equipment, supplies and technical services to a broad national and international customer base.

**Events Leading to the Chapter 11 Filing**

6.    In recent years, the Debtors began to experience weakened sales reflecting, in part, the impact of changing technologies in their industry that reduced demand for Debtors' products. This decline in sales was exacerbated by the effects of September 11, 2001 and the subsequent worldwide economic recession.

7.    In the months preceding the commencement of the Debtors' chapter 11 cases, Debtors' management evaluated the Debtors' financial situation and determined that the value of the Debtors' businesses would be maximized if certain of the Debtors' businesses were sold on a going concern basis. In late 2003, the Debtors entered into negotiations for a going concern sale of certain of their businesses with Presstek, Inc. ("Presstek"), another manufacturer of printing equipment. During the course of these negotiations, the Debtors ' financial condition continued to deteriorate such that immediately prior to the Petition Date the Debtors found themselves struggling to pay suppliers and meet payroll.

3

8.    Shortly before the Petition Date, Presstek, Silver Acquisitions Corp. ("Silver") and the Debtors entered into an Asset Purchase Agreement, pursuant to which the Debtors agreed, among other things, to the commencement of cases under chapter 11 of the Bankruptcy Code to effectuate a sale to Silver of substantially all of the assets of A.B. Dick and its wholly owned subsidiaries on a going concern basis, free and clear of liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code.

### Summary of the Terms of the Proposed Sale

9.    The Debtors have determined that, in light of existing limitations on available funding for the Debtors' operations and the probable value that would be attained were the Debtors' assets to be liquidated on a piecemeal basis, that the best interests of the Debtors' creditors, customers and employees will be served by the expedient marketing and sale of the businesses and assets of A.B. Dick and its wholly owned subsidiaries (the "Assets") on a going concern basis to the purchaser making the highest and best offer.

10.    Silver (an entity owned by Presstek) and the Debtors have negotiated the terms of an Asset Purchase Agreement (the "APA," a copy of which is annexed hereto, without attachments, as Exhibit A), pursuant to which the Debtors propose to sell the Assets to Silver for $40 million (the "Purchase Price") pursuant to sections 363(b) and (f) of the Bankruptcy Code, free and clear of any interest, lien, claim, encumbrance or security interest of any other party, including but not limited to any administrative expense or priority claim asserted in the Debtors' chapter 11 cases. In addition, the Debtors will also assume and assign to Silver certain of their unexpired leases and executory contracts in accordance with section 365 of the Bankruptcy Code (collectively, the "Assigned Contracts and Leases," and, individually, an "Assigned Contract" or an "Assigned Lease").

11.    The APA also provides for the sale of substantial assets of A.B. Dick's Canadian subsidiary, as well as A.B. Dick's stock in its British subsidiary, A.B. Dick UK Limited. Neither of those Foreign Subsidiaries are debtors in possession in these chapter 11 cases. Thus, the

4

Debtors do not seek any bankruptcy protections from the Court (*e.g.*, a sale free and clear of liens) with respect to the sale of the Foreign Subsidiaries' assets or stock, as applicable.

12.    Contemporaneously herewith, the Debtors have filed a motion (the "Sales Procedures Motion") for entry of an order approving auction bidding and other procedures with respect to the proposed sale of the Assets (the "Bidding Procedures"). Among other things, the Bidding Procedures require potential bidders for the Assets to demonstrate the financial wherewithal to consummate the Sale and make a 10% cash deposit (such bidders, as defined more fully in the Bidding Procedures, being "Qualified Bidders"). If any Qualified Bidder(s) emerge, the Debtors would conduct an auction of the Assets, thereafter seeking Court approval of the highest and best bid, if any.

13.    As an incentive to Silver to undertake the costly due diligence necessary to pursue a $40 million transaction, the Bidding Procedures also require the Debtors (or Key, if it successfully credit bids for the Assets) to pay Silver a $1,200,000 break-up fee (the "Break-Up Fee")[1] and reimburse Silver's expenses up to $500,000 if Silver is outbid (or if the Debtors opt to withdraw this Motion and prosecute a plan of reorganization).

### RELIEF REQUESTED AND REASONS THEREFOR

#### Authorization of the Sale Out of the Ordinary Course of the Debtors' Businesses Pursuant to Bankruptcy Code Section 363(b)

14.    Pursuant to Bankruptcy Code sections 363(b) and (f), the Debtors seek authority to sell the Assets to Silver (or the highest and best bidder), free and clear of all liens, claims and encumbrances. Although section 363 of the Bankruptcy Code does not provide an express standard for determining whether the court should approve any particular proposed use, sale, or lease of estate property, case law consistently applies an "articulated business judgment" standard.[2]

---

[1]    Denominated a "Termination Fee" in the APA.

[2]    *See, e.g., Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); accord *Stephens Indus., Inc. v. McClung (In re McClung)*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.

A- 0005

15.    Additionally, under section 363 of the Bankruptcy Code, a court is not allowed to substitute its business judgment for that of the debtor.[3] Rather, the court is required to ascertain whether the debtor itself has articulated a valid business justification for the proposed transaction.[4] This is consistent with the "broad authority to operate the business of a debtor . . . [which] indicates congressional intent to limit court involvement in business decisions by a trustee . . . . [so that] a court may not interfere with a reasonable business decision made in good faith by a trustee."[5]

16.    The Court's power to authorize a sale under section 363(b) of the Bankruptcy Code is to be exercised at its discretion, utilizing a flexible, case-by-case approach.[6] The key consideration is the Court's finding that a good business reason exists for the sale.[7]

> [T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business . . . . Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the assets of the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

---

1983); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D.Utah 1981).

[3]    *See, e.g., In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 678 (Bankr. S.D.N.Y. 1989); *In re Highway Equip. Co.*, 61 B.R. 58, 60 (Bankr. S.D. Ohio 1986).

[4]    *See, e.g., Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979).

[5]    *In re Airlift Int'l, Inc.*, 18 B.R. 787, 789 (Bankr. S.D. Fla. 1982).

[6]    *See In re Baldwin United Corp.*, 43 B.R. 905 (Bankr. S.D. Ohio 1984).

[7]    *See Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986).

A- 0006

> This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.[8]

17.    Here, sound business justifications support this Court's approval of the proposed sale of the Assets. The Debtors believe the proposed Sale will maximize the value of the Assets for the benefit of their estates. Moreover, the Debtors believe that a going concern sale of the Assets will generate greater value to their estates than will be received in a piecemeal liquidation. Significantly, the $40 million Purchase Price exceeds the approximately $25 million of senior debt secured by the Assets. Maximization of asset value is a sound business purpose, warranting authorization of the sale of the Assets.

18.    Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.[9] In this instance, the Bidding Procedures contemplate that following the Debtors' marketing efforts, the Assets will be submitted to an auction process to ensure that the best possible price is obtained. An auction is sufficient to establish that one has paid "value" for assets of a bankruptcy estate, where the auction sale has itself been conducted in good faith.[10] Moreover, the opportunity for competitive bidding provides assurance that the Debtors are receiving the highest and best offer for the Assets under the circumstances of their chapter 11 cases.

---

[8]    *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. BAP 1988), citing *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983).

[9]    *In re Integrated Resources Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y.), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993); *In re Atlanta Packaging Products, Inc.* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (debtor's duty with respect to sales is to obtain the highest price or greatest overall benefit for the estate); *In re Wilson Freight Co.*, 30 B.R. 971, 975 (Bankr. S.D.N.Y. 1983) (debtor's paramount duty in connection with a sale is to obtain the best price).

[10]    *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986). Moreover, the Sixth Circuit has indicated that a party would need to show fraud or collusion between the Purchaser, the other bidders and the debtor in order to demonstrate a lack of good faith. *Richards v. Swinebroad and Denton Auctioneers*, No. 84-5896, 1985 WL 13526, at *3 n.2 (6th Cir. July 3, 1985). The Debtors submit that any asset purchase agreement entered into as a result of the Bidding procedures will be an arms-length, negotiated transaction and thus entitled to the protections of section 363(m) of the Bankruptcy Code.

A- 0007

### Authorization of the Sale Free and Clear of Liens, Claims and Encumbrances Pursuant to Bankruptcy Code Section 363(f)

19.    The Debtors seek an Order authorizing the Sale free and clear of all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code. Under section 363(f), a debtor may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

    i.    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    ii.    such entity consents;

    iii.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    iv.    such interest is in bona fide dispute; or

    v.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[11]

20.    Here, sections 363(f)(2) is satisfied with respect to the liens of KeyBank National Association ("Key"), the Debtors' senior prepetition secured lender, because Key has consented to the Sale free and clear. Section 363(f)(5) is satisfied with respect to any other liens, claims, encumbrances or security interests asserted against the Assets because they are capable of being satisfied by money, and will attach to the proceeds of the Sale in the same order of priority as existed on the Petition Date. Further, the Debtors believe that the Bidding Procedures will generate proceeds in excess of the aggregate value of all liens on the Assets, thus satisfying section 363(f)(3) with respect to all such liens. Accordingly, as at least one of the disjunctive provisions of Bankruptcy Code section 363(f) is satisfied with respect to the various interests in the Assets, the Assets can be sold free and clear of liens, claims, encumbrances and interests under section 363(f) of the Bankruptcy Code, with the liens and claims of any entity claiming an

---

[11]    *See* 11 U.S.C. §363(f).

A- 0008

interest therein attaching to the Sale proceeds with the same validity and priority as existed on the Petition Date pursuant to section 363(e) of the Bankruptcy Code.

### Determination of Purchaser as Good Faith Purchaser
### Pursuant to Bankruptcy Code Section 363(m)

21.    When a bankruptcy court authorizes a sale of assets pursuant to section 363(b), it is required to make a finding with respect to the "good faith" of the purchaser.[12]  The purpose of that requirement is to facilitate the operation of section 363(m) of the Bankruptcy Code, which provides a safe harbor for purchasers of a debtor's property when the purchase is made in "good faith."

22.    The Debtors submit that Silver constitutes a good faith purchaser under section 363(m).  The negotiations between the Debtors and Silver were at all times conducted at arms-length and in good faith.  Silver is not an insider or affiliate of the Debtors (although the APA permits Silver to continue to employ some or all of the Debtors' management at Silver's discretion).  Moreover, throughout the negotiations, the Debtors have worked diligently to maximize value to the estates.  Accordingly, the Debtors respectfully request that the Court enter a finding that Silver is a good faith purchaser within the purview of Bankruptcy Code section 363(m).

23.    Additionally, the process of marketing and selling the Assets is designed to ensure a good faith sale thereof to any purchaser other than Silver.  The Assets will be extensively marketed by the Debtors and Candlewood in accordance with the Bidding Procedures.  Among other things, the Bidding Procedures provide for a fair auction process (if a bidder other than Silver meets certain financial and other qualifications) that will ensure an arms-length, good faith sale.  The Bidding Procedures, moreover, are designed with the intent of encouraging competitive bidding, thereby maximizing value.  Accordingly, the Debtors respectfully request · that, if the Court approves the sale of the Assets as requested, it make a determination that the

---

[12]    *See Abbots Dairies,* 788 F.2d at 149-50.

9

purchaser is a good faith purchaser within the purview of section 363(m) of the Bankruptcy Code.

### Authorization of the Assumption and Assignment of the
### Assigned Leases and Contracts pursuant to Bankruptcy Code Section 365

24.    The Debtors seek authorization to assume and assign the Assigned Contracts and Leases to Silver (or the highest and best offeror) pursuant to section 365(a) of the Bankruptcy Code.

25.    Under section 365(a), a debtor may assume and assign executory contracts or unexpired leases if assumption and assignment reflects the debtor's sound business judgment.[13] The Bankruptcy Code, however, provides little guidance as to the standards to be applied by a court in approving an assumption or rejection. Drawing on law predating the enactment of the Bankruptcy Code, the predominant test is described as the business judgment rule or business judgment test.[14]    The business judgment test is the same test applied to judicial review of corporate decisions outside bankruptcy.[15]    This test analyzes the impact that continued performance under the executory contract or unexpired lease will have on the estate. Assumption or rejection of the contract or lease will be approved upon a mere showing that the action will benefit the estate.[16]

26.    In addition to the business judgment test, section 365(b)(1) of the Bankruptcy Code further provides that a debtor may not assume an executory contract or unexpired lease unless, at the time of assumption, the debtor: (a) cures defaults; (b) compensates the non-debtor

---

[13]    See *Sharon Steel Corp. v. National Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (standard for assuming or rejecting leases is the business judgment test).

[14]    See *In re Kong*, 162 B.R. 86, 94 (Bankr. E.D.N.Y. 1993); *In re Minges*, 602 F.2d 38 (2nd Cir. 1979); *In re Child World*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re Stable Mews Assocs.*, 41 B.R. 594 (Bankr. S.D.N.Y. 1984).

[15]    See *Johnson v. Fairco Corp.*, 61 B.R. 317 (N.D. Ill. 1986).

[16]    See *In re Chestnut Ridge Plaza Assocs., L.P.*, 156 B.R. 477 (Bankr. W.D. Pa. 1993) (test is best interest of the estate); *Bezanson v. Metropolitan Ins. & Annuity Co.*, 952 F.2d 1 (1st Cir. Me. 1991), *reh'g, en banc, denied*, 1992 U.S. App. LEXIS 14625 (1st Cir. Jan. 7, 1992), *cert. denied*, 120 L. Ed. 2d 871, 112 S. Ct. 2994 (U.S. 1992); *but see In re Klein Sleep Products, Inc.*, 78 F.3d 18 (2nd Cir. 1996) (assumption should not permitted until confirmation in chapter 11 reorganization context).

10

party to the lease or contract for any actual pecuniary loss resulting from defaults; and (c) provides adequate assurance of future performance.[17]

27.    In the present case, the Debtors seek not only to assume the Assigned Contracts and Leases, but also to assign the Assigned Contracts and Leases to Silver or the highest and best bidder. Section 365(f) of the Bankruptcy Code addresses assumption of executory contracts and unexpired leases and provides, in pertinent part:

> (1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection
> . . . .
>
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.[18]

28.    As set forth in section 365(f) of the Bankruptcy Code, the assignment of a properly assumed contract or lease is to be permitted by the Court only if the debtor has assumed the contract or lease in compliance with all of the terms of section 365 of the Bankruptcy Code and if the debtor provides the other party to the contract or lease with adequate assurance of future performance by the assignee of the contract or lease.[19]

29.    Here, in accordance with the Bidding Procedures, the Debtors will have filed and served a schedule of the Assigned Contracts and Leases on all parties to such agreements as soon as is practicable, and in no event later than ten (10) days prior to the hearing on this Motion (the "Sale Hearing"), which schedule will include the Debtors' calculation of the amount they believe

---

[17]    See 11 U.S.C § 365(b)(1).
[18]    11 U.S.C. § 365(f)(1)-(2).
[19]    See 11 U.S.C. § 365(f)(2).

A- 0011

must be paid to cure all defaults under each of the Assigned Contracts and Leases (collectively, the "Cure Amounts"). As set forth more specifically in the Bidding Procedures, parties to the Assigned Leases and Contracts who do not object to the Debtors' calculation of Cure Amounts will be bound to accept those calculations.

30.     The Debtors have not completed their calculation of the Cure Amounts. However, the Cure Amounts will be calculated and scheduled to include what the Debtors believe are any actual or pecuniary losses from an existing defaults, if any, under the Assigned Contracts and Leases. Consequently, the amounts necessary to pay the Cure Amounts as scheduled or determined by the Court will compensate or provide adequate assurance that the Debtors will compensate the appropriate party for any such actual or pecuniary loss.

31.     Any assumption and assignment of an Assigned Contract or Assigned Lease will be subject to any applicable provisions of the Bankruptcy Code. The proposed terms and conditions set forth herein are designed to ensure that the assignees, if any, are financially able and prepared to undertake all of the obligations of the Assigned Contracts or Leases. In addition, the availability of the Sale Hearing gives the Court and other parties in interest an appropriate opportunity to evaluate any assignment issues.

32.     The Debtors assert that under the circumstances, the Assigned Contracts and Leases can be properly assumed in compliance with section 365 of the Bankruptcy Code. First, as set forth above, the assumption of the Assigned Contracts and Leases by the Debtors complies with the requirements of section 365 because assumption clearly satisfies the "business judgment test." The Debtors' satisfaction of the business judgment test is demonstrated by the benefit to the Debtors' estates which will accrue as a result of the Debtors' ability to close the Sale on the terms and in the manner provided in the Bidding Procedures and from the savings realized as a result of: (a) the purchaser's assumption of the Debtors' obligations under the Assigned Contracts and Leases; and (b) the avoidance of a potential rejection damages claims and possible administrative expense claims.

33.    Second, all monetary defaults under the Assigned Contracts and Leases will be cured because, at the time of assumption, the Debtors anticipate that funds will be available from the Purchase Price to pay all Cure Amounts owing on the Assigned Contracts and Leases.

34.    Third, given the primary purpose of section 365(f)(2) of the Bankruptcy Code, the Debtors believe that the requirement of adequate assurance of future performance will be easily satisfied. Adequate assurance of future performance is to be determined on a case by case basis to insure that the other party to the contact or lease gets the benefit of the bargain for which he has contracted.[20] A landlord or a party to a contract, however, is not entitled to greater rights than are given by the lease or contract.[21] Specifically, the Bidding Procedures are designed to produce a Sale to a purchaser that will have sufficient financial wherewithal not only to close the Sale, but also to perform all of the Debtors' obligations under each of the Assigned Contracts and Leases.[22] Under these circumstances, the Debtors submit that the requisite adequate assurances of future performance pursuant to section 365 of the Bankruptcy Code with respect to the potential assumption and assignment of the Assigned Contracts or Leases will be demonstrated at the Sale Hearing. Accordingly, the Court should authorize the assumption and assignment of the Assigned Contracts and Leases to Silver or the highest and best bidder.

### Waiver of 10-Day Stays of Bankruptcy Rules 6004(g) and 6006(d)

35.    The Debtors request that the Court enter an Order waiving the 10-day stays of Bankruptcy Rules 6004(g) and 6006(d). In light of the structure afforded by the Bidding Procedures and the opportunity for objections to this Motion prior to the hearing thereon, such waiver is appropriate under the circumstances.

---

[20]    *See Chera v. 991 Blvd. Realty Corp. (In re National Shoes, Inc.)*, 20 B.R. 55,59 (Bankr. S.D.N.Y. 1982).

[21]    *See In re Lafayette Radio Electronics Corp.*, 9 B.R. 993 (Bankr. E.D.N.Y. 1981).

[22]    *See In re Bygaph*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) (Congress intended that the words "adequate assurance" be given a practical, pragmatic construction, and is to be determined under the facts of each particular case").

A- 0013

## NOTICE

36.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been given to: (a) the United States Trustee for this region; (b) the Debtors' thirty largest unsecured creditors; and (c) KeyBank National Association, agent for the proposed postpetition lenders and prepetition lender. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

37.     No prior request for the relief sought in this Motion has been made to this or to any other court.

A- 0014

WHEREFORE, the Debtors respectfully request entry of an Order: (A) authorizing the sale of substantially all of the assets of the Debtors, free and clear of all liens, claims and encumbrances, to Silver, or to any other party that submits a higher and better offer; (B) authorizing the Debtors to assume and assign to Silver the Assigned Leases and Contracts; and (C) granting such other and further relief as the Court deems just and proper.

Dated: Cleveland, Ohio
July 22, 2004

Respectfully submitted,

*/s/ H. Jeffrey Schwartz*
H. Jeffrey Schwartz (OBR #0014307)
John A. Gleason (OBR #0039150)
Michael D. Zaverton (OBR #0038597)
BENESCH, FRIEDLANDER,
   COPLAN & ARONOFF LLP
2300 BP Tower
200 Public Square
Cleveland, OH 44114-2378
(216) 363-4500
(216) 363-4588 (Facsimile)
jschwartz@bfca.com
jgleason@bfca.com
mzaverton@bfca.com

Proposed Attorneys for A.B. Dick Company, *et al.*,
Debtors and Debtors in Possession

and

*/s/ Frederick B. Rosner*
Frederick B. Rosner, Esq. (No. 3995)
JASPAN SCHLESINGER HOFFMAN LLP
1201 North Orange Street, Suite 1001
Wilmington, DE 19801
Telephone: 302-351-8000/8005
Facsimile: 302-351-8010
frosner@jshllp-de.com

Proposed Local Counsel for A.B.Dick Company,
*et al.*, Debtors and Debtors in Possession

15

# EXHIBIT A

Execution Version

ASSET PURCHASE AGREEMENT

BY AND AMONG

PRESSTEK, INC.,

SILVER ACQUISITIONS CORP.,

PARAGON CORPORATE HOLDINGS, INC.,

A.B. DICK COMPANY,

INTERACTIVE MEDIA GROUP, INC.

AND

A.B. DICK COMPANY OF CANADA, LTD.

DATED AS OF JULY 13, 2004

Execution Version

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*") is entered into as of July 13, 2004, by and among Presstek, Inc., a Delaware corporation ("*Platinum*"), Silver Acquisitions Corp., a Delaware corporation ("*Purchaser*"), Paragon Corporate Holdings, Inc., a Delaware corporation ("*Parent*"), A.B. Dick Company, a Delaware corporation and a wholly-owned subsidiary of Parent ("*Seller*"), A.B. Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of Seller ("*Canada Sub*") and Interactive Media Group, Inc., an Ohio corporation and a wholly-owned subsidiary of Parent ("*IMG*" and together with Canada Sub and Seller, the "*Sellers*"). Platinum, Purchaser, Parent and the Sellers may be referred to herein individually as a "*Party*" or collectively as the "*Parties*."

### RECITALS

WHEREAS, Seller expects to file, pursuant to the terms of this Agreement, in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), a petition in bankruptcy under Chapter 11 of the Bankruptcy Code (as hereinafter defined);

WHEREAS, the Sellers currently wish to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Assets (as hereinafter defined), together with the Assumed Liabilities (as hereinafter defined), of Seller upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Purchaser wishes to purchase and take delivery of such Assets and Assumed Liabilities upon such terms and subject to such conditions; and

WHEREAS, the Parties expect that the Assets will be sold pursuant to a Sale Order (as hereinafter defined) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include the assumption and assignment of certain executory contracts, unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

## 1. DEFINITIONS AND USAGE OF CERTAIN TERMS

1.1 Definitions. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

"*Accounts Receivable*" means (i) all trade accounts receivable and other rights to payment from customers of Seller or its Subsidiaries and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Seller or its Subsidiaries, and (ii) all other accounts or notes receivable of Seller or its Subsidiaries and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

"*Affiliate*" means with respect to any Person, any Person which directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

"*Ancillary Agreements*" means either of or both the "Seller Ancillary Agreements" and the "Platinum Ancillary Agreements" as the context requires.

"*Bankruptcy Action*" means the occurrence of any of the following events with respect to any Seller: (i) the appointment of a receiver, trustee or liquidator for all or a substantial part of its assets; (ii) the making of a general assignment for the benefit of creditors; (iii) the filing of any petition or commencement of any proceeding for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions, or extensions; or (iv) the filing against it of any petition or the commencement of any proceeding against it for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions or extensions.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Section 101, *et seq.*, as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

"*Bankruptcy Court*" has the meaning set forth in the preface above.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules.

"*Breach*" means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

"*Business*" means the business conducted by the Sellers on the date hereof.

"*Business Day*" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are permitted or required to be closed.

"*Cash Equivalents*" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by an agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year after the date of acquisition thereof; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year after the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Corporation or Moody's Investors Service, Inc. (or, if at any time neither Standard & Poor's Corporation nor Moody's Investors Service, Inc. shall be rating such obligations, then from such other nationally recognized rating services reasonably acceptable to the DIP Lenders) and not listed in Credit Watch published by Standard & Poor's Corporation; (iii) commercial paper, other than commercial paper issued by the Seller or its Subsidiaries, maturing no more than ninety (90) days after the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 or P-1 from either Standard & Poor's Corporation or Moody's Investors Service, Inc. (or, if at any time neither Standard & Poor's Corporation nor Moody's Investors Service, Inc. shall be rating such obligations, then the highest rating; from such other nationally recognized rating services reasonably acceptable to the DIP Lenders); (iv) domestic and Eurodollar certificates of deposit or time deposits or bankers' acceptances maturing within ninety (90) days after the date of acquisition thereof issued by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia or Canada having combined capital and surplus of not less than $500,000,000; (v) repurchase obligations of the type referred to in clauses (i) through (iv) above; and (vi) money market

2

and mutual funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above and cash.

"*Chapter 11 Case*" means the voluntary case which will be commenced by Seller under Chapter 11 of the Bankruptcy Code pursuant to this agreement and the Bankruptcy Court.

"*Closing Date*" means the date on which the Closing actually takes place.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Competing Bid*" has the meaning set forth in Section 8.3(c) hereof.

"*Competing Bidder*" has the meaning set forth in Section 8.3(c) hereof.

"*Confidential Information*" means any and all of the following information of Seller or its Subsidiaries, Parent, Purchaser or Platinum that has been or may hereafter be disclosed in any form, whether in writing, orally, electronically, or otherwise, or otherwise made available by observation, inspection or otherwise by either party (Purchaser and Platinum on the one hand or Seller and Parent collectively on the other hand) or its representatives (collectively, a "*Disclosing Party*") to the other party or its representatives (collectively, a "*Receiving Party*"):

        (a)    all information that is a trade secret under applicable trade secret or other law;

        (b)    all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, software and computer software and database technologies, systems, structures and architectures;

        (c)    all information concerning the business and affairs of the Disclosing Party (which includes historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, Contracts, the names and backgrounds of key personnel, and personnel training techniques and materials, however documented), and all information obtained from review of the Disclosing Party's documents or property or discussions with the Disclosing Party regardless of the form of the communication; and

        (d)    all notes, analyses, complications, studies, summaries, and other material prepared by the Receiving Party to the extent containing or based, in whole or in part, on any information included in the foregoing.

"*Contract*" means, with respect to any Person, any written agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation, promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

"*Control*" (including with correlative meaning, Controlled by and under common Control with) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or

A- 0020

cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"*DIP Financing*" means that certain $7,000,000 senior secured loan facility dated July __, 2004 between Seller as borrower and KeyBank, N.A. as agent for the DIP Lenders.

"*DIP Lenders*" means KeyBank, N.A. and Platinum.

"*Effective Time*" means 11:59 p.m. on the Closing Date.

"*Encumbrance*" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership.

"*Environment*" means soil, land surface or subsurface strata, surface waters (including navigable waters and ocean waters), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"*Environmental, Health and Safety Liabilities*" means any cost, damages, expense, liability, obligation, or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law, which either results from a notice or claim by a Governmental Authority or other Third Party or application of any Environmental Law or Occupational Safety and Health Law, including those consisting of or relating to:

    (a)    any environmental, health, or safety matter or condition (including on-site or off-site contamination, safety and health matters, and regulation of chemical substances or products);

    (b)    fine, penalty, judgment, award, settlement, legal or administrative proceeding, damage, loss, claim, demand or response, remedial, or inspection cost or expense arising under any Environmental Law or Occupational Safety and Health Law;

    (c)    financial responsibility under any Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any cleanup, removal, containment, or other remediation or response actions ("*Cleanup*") required by any Environmental Law or Occupational Safety and Health Law and for any natural resource damages; or

    (d)    any other compliance, corrective, or remedial measures required under any Environmental Law or Occupational Safety and Health Law.

The terms "*removal*," "*remedial*," and "*response action*" include the types of activities covered by the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq., as amended ("*CERCLA*") and "remediation standard" means a numerical standard that defines the concentrations of Hazardous Materials that are permitted to remain without liability in any environmental media after completion of all investigation, remediation and/or containment of a release of Hazardous Materials.

"*Environmental Law*" means any applicable environmental or health and safety related Legal Requirement, including those requiring or relating to:

4

(a)     advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or Hazardous Materials, violations of discharge limits, or other prohibitions and the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b)     preventing or reducing to acceptable levels the release of Hazardous Materials into the Environment, including such discharges, emissions and releases under permits and licenses issued by a Governmental Authority;

(c)     reducing the quantities, preventing the discharge, emission or release, or minimizing the hazardous characteristics of wastes that are generated and complying with waste disposal and recycling requirements;

(d)     assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)     assuring that any Hazardous Materials are properly containerized, used and stored;

(f)     protecting resources, species, or ecological amenities;

(g)     reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances;

(h)     cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or

(i)     making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self appointed representatives of the public interest to recover for injuries done to public assets.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means any entity which is a member of: (i) a "controlled group of corporations", as defined in Section 414(b) of the Code; (ii) a group of entities under "common control", as defined in Section 414(c) of the Code; or (iii) an "affiliated service group", as defined in Section 414(m) of the Code, or treasury regulations promulgated under Section 414(o) of the Code, any of which includes Seller or any Subsidiary of Seller.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Facilities*" means any real property, leasehold or other interest in real property currently owned or operated by any Person including the Tangible Personal Property currently being used or operated by Seller or its Subsidiaries at the respective locations of the Real Property specified in Section 3.13. Notwithstanding the foregoing, for purposes of Sections 3.24 and 11.6, "*Facilities*" shall mean any real property, leasehold or other interest in real property currently or formerly owned or operated by Seller or its Subsidiaries, including the Real Property and Tangible Personal Property being used or operated by Seller or its Subsidiaries at the respective locations of the Real Property specified in Section 3.13.

"*Final Order*" shall mean an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to

A- 0022

appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for reargument has been taken or been made and is pending for argument.

"*GAAP*" means U.S. generally accepted accounting principles, applied on a consistent basis from period to period.

"*Governmental Authority*" means any: (a) nation, state, commonwealth, province, territory, county, municipality or district; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"*Governmental Authorization*" any approval, consent, ratification, waiver, license, permit or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"*Ground Lease*" means any long term lease of land in which most of the rights and benefits comprising ownership of the land and the improvements thereon or to be constructed thereon, if any, are transferred to the tenant for the term thereof.

"*Ground Lease Property*" means any land, improvements and appurtenances subject to a Ground Lease in favor of Seller or its Subsidiaries.

"*Inventories*" all inventories of the Seller or its Subsidiaries, wherever located, including all finished goods, work in process, raw materials, spare parts and all other materials and supplies to be used or consumed by Seller or its Subsidiaries in the production of finished goods.

"*Investment*" means, with respect to any Person, (i) any purchase or other acquisition by that Person of Securities, or of a beneficial interest in Securities, issued by any other Person, (ii) any purchase by that Person of all or substantially all of the assets of a business conducted by another Person, and (iii) any direct or indirect loan, advance (other than prepaid expenses, accounts receivable, advances to employees and similar items made or incurred in the ordinary course of business as presently conducted) or capital contribution by that Person to any other Person, including all indebtedness to such Person arising from a sale of property by such Person other than in the ordinary course of its business. The amount of any Investment shall be the original cost of such Investment, plus the cost of all additions thereto less the amount of any return of capital or principal to the extent such return is in cash with respect to such Investment without any adjustments for increases or decreases in value or write-ups, write-downs or write-offs with respect to such Investment.

"*knowledge*" when used with respect to any entity, means the actual knowledge of the directors and executive officers of such entity after due inquiry, and when used with respect to Seller shall also mean the actual knowledge of the directors and officers of Parent after due inquiry and when used with respect to Purchaser, shall also mean the actual knowledge of the executive officers of Platinum after due inquiry.

"*Land*" means all parcels and tracts of land in which Seller or any of its Subsidiary has an ownership interest.

6

A- 0023

"*Lease*" means any Real Property Lease or any lease or rental agreement, license, right to use or installment and conditional sale agreement to which Seller or any Subsidiary is a party and any other Seller Contract pertaining to the leasing or use of any Tangible Personal Property.

"*Legal Requirement*" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, ordinance, by-law, principle of common law, regulation, statute, or treaty.

"*Liability*" with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"*Limited*" means A.B.Dick UK Limited, a wholly-owned subsidiary of Seller organized in the United Kingdom.

"*Material Adverse Effect*" means

(a) if Seller shall fail to recognize a minimum of (i) $8,200,000 in revenue from its U.S. operations (or $11,000,000 on a consolidated basis) for the month of July, 2004, (ii) $8,750,000 in revenue from its U.S. operations (or $11,500,000 on a consolidated basis) for the month of August, 2004 and (iii) $9,750,000 in revenue from its U.S. operations (or $12,750,000 on a consolidated basis) for the month of September, 2004, measured in each case in accordance with GAAP; but excluding in each case any "Material Adverse Effect" arising from or related to the outbreak of civil unrest, hostilities, terrorist activities, or war (whether or not formally declared) which causes, in a measurable manner, the Material Adverse Effect, or

(b) any inability of the Seller to transfer to the Purchaser, and the Purchaser to acquire, the Assets, or

(c) any material increase or other material adverse change in the nature of the Assumed Liabilities, taken as a whole.

"*Occupational Safety and Health Law*" means any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"*Order*" any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator.

"*Permitted Encumbrance*" means the encumbrances identified on Section 2.1 of the Seller Disclosure Schedule, together with the following: (i) any liens of mechanics, suppliers, vendors, materialmen, laborers, employees, repairmen and other like liens arising in the ordinary course of Seller's business securing obligations which are not due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings if and to the extent that an adequate reserve shall have been made therefor on Seller' balance sheet; (ii) liens incurred or deposits to secure the performance of surety and appeal bonds, bids, leases, performance and return money bonds and similar obligations, in

7

each case in the ordinary course of business, consistent with past practice as and to the extent that adequate reserves have been made therefor on Seller' balance sheet; (iii) purchase money liens incurred in the ordinary course of business, consistent with past practice as and to the extent that adequate reserves have been made therefor on Seller' balance sheet; and (iv) with respect to Real Property, privileges, easements, rights of way, licenses, covenants, zoning and other restrictions of record, which individually or in the aggregate, do not affect the current uses or marketability of the Real Property.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or any government or any agency or political subdivision thereof.

"*Petition Date*" means the date on which the Seller files the Chapter 11 Case.

"*Proceeding*" any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private).

"*Real Property*" means the Land and improvements and all appurtenances thereto and any Ground Lease Property.

"*Real Property Lease*" means any Ground Lease or Space Lease.

"*Record*" means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"*Release*" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, or dumping into the Environment.

"*Restricted Payment*" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of capital stock of, partnership interest of or other equity interest of Seller or its Subsidiaries now or hereafter outstanding (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of capital stock of, partnership interest of or other equity interest of, Seller or its Subsidiaries now or hereafter outstanding, (iii) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to, any permitted subordinated indebtedness, (iv) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of capital stock of, partnership interest of or other equity interest of, Seller or its Subsidiaries now or hereafter outstanding, or (v) any other payment or distribution made by Sellers to Parent or to another Affiliate of Sellers (other than inter-company loans permitted under the DIP Financing).

"*Sale Order*" shall mean one or more orders of the Bankruptcy Court, in form and substance reasonably satisfactory to Platinum, and Purchaser and consistent with the terms of this Agreement, (i) authorizing the sale of the Assets to Purchaser, free and clear of any and all Liens, (ii) finding that Purchaser is a good faith purchaser of the Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated, (iii) approving the assignment to and assumption by Purchaser of the Assumed Contracts and declaring that all Assumed Contracts are valid and binding and in full force and effect, (iv) determining that Purchaser is not a successor to Seller or otherwise liable for any of the Retained Liabilities or Excluded Assets and

8

A- 0025

permanently enjoining each and every holder of any of the Retained Liabilities or Excluded Assets from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Purchaser or the Purchased Assets related thereto, and (v) the consummation of the transactions contemplated herein.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securities Laws*" means the Securities Act, the Exchange Act, the Investment Company Act of 1940, as amended, the Investment Advisors Act of 1940, as amended, the Trust Indenture Act of 1939, as amended, and the rules and regulations of the SEC and any other Governmental Authority promulgated thereunder.

"*SEC*" means the United States Securities and Exchange Commission.

"*Seller Contract*" means any Contract: (a) to which Seller or its Subsidiaries is a party; or (b) by which Seller or its Subsidiaries or any of their assets is bound or subject to any obligation.

"*Seller Disclosure Schedule*" means that Disclosure Schedule dated as of the date hereof and provided by Parent and Seller to Platinum and Purchaser simultaneously with the execution and delivery of this Agreement.

"*Space Lease*" means any lease or rental agreement pertaining to the occupancy of any improved space on any Land.

"*Securities*" means any stock, shares, voting trust certificates, bonds, debentures, notes or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or any certificates of interest, shares, or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire any of the foregoing, but shall not include any evidence of the DIP Financing.

"*Seller Employee Plans*" means, collectively, (i) each "employee benefit plan", as defined in Section 3(3) of ERISA; and (ii) all other written or formal plans, enforceable policies or practices or Contracts involving direct or indirect compensation or benefits (including any employment Contracts entered into between Seller or any Subsidiary of Seller and any employee of Seller or any Subsidiary of Seller) currently or previously maintained, contributed to or entered into by Seller or any Subsidiary of Seller under which Seller or any Subsidiary of Seller of any ERISA Affiliate has any present or future Liability.

"*Subsidiary*" means, when used with reference to any Person, any corporation more than fifty percent (50%) of the outstanding voting securities of which, or any partnership, limited liability company, joint venture or other entity more than fifty percent (50%) of the total equity interest of which, is directly or indirectly owned or Controlled by such Person.

"*Tangible Personal Property*" means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned or leased by a Person (wherever located and whether or not carried on such Person's books), together with any express or implied warranty by the manufacturers or Seller or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

9

"***Third Party***" means a Person that is not a party to this Agreement or an Affiliate of a party to this Agreement.

"***Third Party Claim***" means any claim against any Indemnified Person by a Third Party, whether or not involving a Proceeding.

"***Threat of Release***" mean a substantial likelihood of a Release which requires action to prevent or mitigate damage to the Environment which may result from such Release.

    1.2 Usage

        (a) Interpretation. In this Agreement, unless a clear contrary intention appears:

           (i) the singular number includes the plural number and vice versa;

           (ii) references to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

           (iii) reference to any gender includes each other gender;

           (iv) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

           (v) reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement and reenactment of such section or other provision; provided, however, that the foregoing shall not apply in instances in which the Legal Requirement refers to a specific date, time or period;

           (vi) "hereunder", "hereof", "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision thereof;

           (vii) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

           (viii) "or" is used in the inclusive sense of "and/or";

           (ix) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding";

           (x) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto, and

           (xi) all references to "dollars" or "$" shall mean U.S. dollars.

10

(b) <u>Accounting Terms and Determinations</u>. Unless otherwise specified herein, all accounting terms used therein shall be interpreted and all accounting determinations thereunder shall be made in accordance with GAAP.

(c) <u>Legal Representation of the Parties</u>. This Agreement was negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party shall not apply to any construction or interpretation hereof.

## 2. SALE AND TRANSFER OF ASSETS; CLOSING

2.1 <u>Assets to be Sold</u>. Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Sellers shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances (including those set forth on <u>Schedule 2.1</u>), and Purchaser shall purchase and acquire from Sellers, Sellers' right, title and interest in and to all of Sellers' property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, including the following (but excluding the Excluded Assets (as defined below)):

(a) all Real Property and Real Property Leases described in <u>Section 2.1(a) of the Seller Disclosure Schedule</u> currently owned or leased by Seller or any of its Subsidiaries (the "*Assumed Real Estate*"), but excluding the Real Property and Real Property Leases relating to Seller's facilities in Rexdale, Ontario and Henrietta, New York (together, the "*Excluded Real Estate Interests*");

(b) all Tangible Personal Property of Seller and its Subsidiaries, including those items described in <u>Schedule 2.1(b) of the Seller Disclosure Schedule</u>;

(c) all Inventories of Sellers and their Subsidiaries;

(d) all Accounts Receivable of Sellers and their Subsidiaries, including all intercompany receivables due to Seller;

(e) all Seller Contracts set forth on <u>Schedule 2.1(e) of the Seller Disclosure Schedule</u>, and all other Seller Contracts and outstanding offers or solicitations made by or to Seller to enter into any Contract after the date hereof that are made in accordance with the provisions of this Agreement, in each case which are assignable by their terms or with respect to which consent to assignment is obtained (the "*Assumed Seller Contracts*");

(f) all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to Purchaser, including those listed in <u>Section 3.5(c) of the Seller Disclosure Schedule</u>;

(g) all data and Records related to the operations of Seller, including client and customer lists and Records, referral sources, research and development reports and Records, production reports and Records, service and warranty Records, equipment logs, operating guides and manuals, financial and accounting Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records (all in the state in which such records and information presently exists) and, subject to Legal Requirements, copies of all personnel Records and other Records described in Section 2.2(m);

11

(h) all of the intangible rights and property of Seller, including Intellectual Property Rights (as defined in Section 3.15), good-will, telephone and telecopy numbers to the extent transferable, and e-mail addresses, websites and listings and those items listed in Section 3.15(b) of the Seller Disclosure Schedule;

(i) All rights (including all Intellectual Property Rights) of the Seller in and to the trademarks, service marks, trade names, trade dress and other names and brand identifiers held or used by any of the Seller or its Subsidiaries, including, without limitation, the name "A.B. Dick Company," "A.B. Dick Company of Canada, Ltd." and "A.B. Dick UK Limited" and the applications and registrations therefore identified in Section 3.15(b) of the Seller Disclosure Schedule (collectively, the "*Marks*"), and further including all filings associated therewith and all specimens, samples, illustrations and files, correspondence, records or other documentation arising from or relating to such registrations, applications, and filings;

(j) all insurance benefits, including rights and proceeds, arising from or relating to the Assets or the Assumed Liabilities prior to the Effective Time, unless expended in accordance with this Agreement;

(k) all claims of Seller against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or non-contingent;

(l) all rights of Seller relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof which are not excluded under Section 2.2(g);

(m) all of the capital stock of Limited; and

(n) certain assets of Canada Sub, as more fully described on a schedule to be provided by Purchaser prior to the Closing.

All of the foregoing property and assets are herein referred to collectively as the "*Assets*".

Notwithstanding the foregoing, the transfer of the Assets pursuant to this Agreement shall not include the assumption of any Liability in respect thereof unless the Purchaser expressly assumes such Liability pursuant to Section 2.4(a).

2.2 Excluded Assets  Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "*Excluded Assets*") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets, and shall remain the property of Seller after the Closing:

(a) all cash and cash equivalents;

(b) except for Limited, the shares of capital stock of each Subsidiary of Seller;

(c) all of the Seller Contracts listed in Schedule 3.21 of the Seller Disclosure Schedule, with the specific exception of the Assumed Seller Contracts described in Section 2.1(e) (the "*Excluded Seller Contracts*");

(d) all current claims for refund of Taxes and other governmental charges of whatever nature;

12

A- 0029

(e) all rights in connection with and assets of the Seller Employee Plans);

(f) all rights of Seller under this Agreement, the Bill of Sale, the Assignment and Assumption Agreement and the Escrow Agreement;

(g) the Excluded Real Property Interests and all Governmental Authorizations relating exclusively to the operation of such Real Property;

(h) personal property and assets expressly designated in Schedule 2.2(h) of the Seller Disclosure Schedule;

(i) any prepaid or current assets relating to directors' fees, affiliate company charges and bank fees and charges;

(j) claims against third parties to the extent related solely to any Excluded Asset or Excluded Liabilities;

(k) all insurance policies, including all rights, benefits and proceeds thereunder (except to the extent specified in Section 2.1(j) and (k));

(l) Seller's corporate seals, stock Record books, corporate Record books containing minutes of meetings of directors and stockholders; Tax returns and Records, books of account and ledgers and such other Records having to do solely with the Seller's organization or stock capitalization or Excluded Assets or Excluded Liabilities;

(m) all personnel Records and other Records that Seller is required by law to retain in its possession; and

(n) Seller's claims, causes of action, choices of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance action under any other applicable provisions of the Bankruptcy Code.

2.3 Consideration. The consideration for the Assets (the "*Purchase Price*") will be Forty Million Dollars ($40,000,000), which is payable in cash and by converting any amount of principal, interest or any other obligation (including, without limitation, fees or costs) which is owed by Seller or Parent to Platinum or its Affiliates on account of the DIP Financing, and the assumption of the Assumed Liabilities as provided in Section 2.4.

2.4 Liabilities.

(a) Assumed Liabilities. Subject to Section 2.4(b) and effective as of the Effective Time, Purchaser shall assume and become responsible for and shall thereafter pay, perform, and discharge in accordance with their terms the following Liabilities of Seller (the "*Assumed Liabilities*"):

(i)    Any liability arising after the Effective Time under the Assumed Real Estate Leases;

(ii)    any Liability to Seller's customers under written warranty agreements in the forms disclosed in Section 3.17 of the Seller Disclosure Schedule given by Seller to its customers in the ordinary course of business prior to the Effective Time;

13

(iii)     any Liability arising after the Effective Time under the Assumed Seller Contracts; and

(iv)     any Liability of Seller described on Schedule 2.4(a)(iv) of the Seller Disclosure Schedule.

(b) Retained Liabilities.  The Retained Liabilities shall remain the sole responsibility of and shall be retained by Seller. "*Retained Liabilities*" shall mean every Liability of Seller and every Liability of any Subsidiary of Seller, other than the Assumed Liabilities, including:

(i)     any Liability arising out of or relating to products of Seller to the extent manufactured or sold prior to the Effective Time other than to the extent assumed under Section 2.4(a)(ii), (iii), or (iv);

(ii)     any Liability for Taxes, including (A) any Taxes arising as a result of Seller's, Limited's or any Subsidiary's operation of its business or ownership of the Assets prior to the Effective Time, (B) subject to Section 12.1, any Taxes that will arise as a result of the sale of the Assets pursuant to this Agreement and (C) any deferred Taxes of any nature;

(iii)     any Liability under any Seller Contract (other than the Assumed Seller Contracts) and including without limitation any Liability arising out of or relating to Seller's credit facilities, trade payables, indebtedness for money borrowed, amounts due to Affiliates or any security interest related thereto;

(iv)     any Environmental, Health and Safety Liabilities, in each case relating to a period or occurrence prior to the Effective Time relating to Seller or its predecessors, Subsidiaries or Affiliates, the operation of the Business, or the leasing, ownership or operation of any Real Property, including, without limitation any such liabilities related to any Real Property listed on Schedule 3.13(c) of the Seller Disclosure Schedule;

(v)     any Liability under the Seller Employee Plans or relating to payroll, vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits, or any other employee plans or benefits of any kind for Seller's employees or former employees, or both;

(vi)     any Liability under any employment, severance, retention or termination agreement with any employee of Seller or any of its Affiliates;

(vii)     any Liability arising out of or relating to any employee grievance whether or not the affected employees are hired by Purchaser;

(viii)     any Liability of Seller to any Affiliate of Seller;

(ix)     any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Seller, Parent or any Subsidiary;

(x)     any Liability to distribute or otherwise apply all of any part of the consideration received hereunder;

14

(xi)    any Liability arising out of any Proceeding pending as of the Effective Time, whether or not set forth in the Seller Disclosure Schedule;

(xii)    any Liability of Seller under this Agreement or any other document executed in connection with the transactions contemplated hereby;

(xiii)    any Liability of Seller based upon Seller's acts or omissions occurring after the Effective Time; and

(xiv)    any Liability of Seller not specifically described above but which may otherwise be set forth in Schedule 2.4(b).

2.5 Deposit. An earnest money deposit (the "*Deposit*") in the amount of Two Million Dollars ($2,000,000) shall be paid by Purchaser on the entry of the Sale Procedures Order (as defined in Section 8.1) into an escrow account in accordance with customary escrow agreement (the "*Escrow Agreement*"). The Deposit shall be applied to the Purchase Price payable by Purchaser on the Closing Date. If this Agreement shall be terminated by any Party hereto pursuant to Sections 11.1(a), (b), (c), (d), (e)(B), (f) or (g), or in the event that a Person other than Purchaser or an Affiliate of Purchaser purchases all or any portion of the Assets, then the Deposit shall be returned to Purchaser. If this Agreement shall be terminated by Seller pursuant to Section 11.1(e)(A), hereof, the Deposit shall be paid to Seller. Notwithstanding any other provision to the contrary contained herein, the Deposit shall be the sole and exclusive remedy of Seller against Platinum and Purchaser under this Agreement.

2.6 Tax Allocation of Purchase Price. Purchaser and Seller agree that the Purchase Price shall be allocated among the Assets in accordance with an allocation to be prepared by Purchaser and agreed upon by Seller and Parent, which agreement shall not be unreasonably withheld. Such allocation shall be in accordance with Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder and such other laws as may be applicable to the Assets of Canada Sub. Purchaser and Seller shall report and file all of their respective Tax Returns (including amended Tax Returns and claims for refund) consistent with such allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any taxing authority or in any other proceedings). Purchaser and Seller shall cooperate in the filing of any forms (including Forms 8594) with respect to such allocation. Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation, and shall not be an admission of and shall not be evidence of the value of any of the Assets in the Seller's Chapter 11 Case or any other related proceeding, and shall be for Tax purposes only; provided, however, that the portion of the Purchase Price allocated to the Assets to be purchased from IMG or from Canada Sub shall be paid directly to those entities.

2.7 Closing. The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of McDermott Will & Emery LLP in Boston, Massachusetts commencing at 9:00 a.m. local time on the Monday following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date as Purchaser and Seller may mutually determine (the "*Closing Date*"). The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within fifteen (15) calendar days after the Bankruptcy Court has entered the Sale Order approving such sale to Purchaser.

A- 0032

3. **REPRESENTATIONS AND WARRANTIES OF SELLER**

In connection with this Section 3, all representations and warranties of Seller set forth in the following Sections 3.1 through 3.28 shall apply to both IMG and to Seller. Except as set forth in the Seller Disclosure Schedule delivered to Platinum and Purchaser herewith, the parts of which are numbered to correspond to the Section numbers of this Agreement and which thereby qualify the corresponding representations and warranties contained in this Article 3, Seller hereby represents and warrants to Platinum and Purchaser, subject to the effects of the anticipated filing of the Chapter 11 Case, as follows:

3.1 <u>Organization and Good Standing</u>. Seller and each Subsidiary of Seller is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority, and all requisite qualifications to do business as a foreign corporation, to conduct its business in the manner in which its business is currently being conducted, except where the failure to be so organized, existing or in good standing or to have such power, authority or qualifications would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect on Seller. All jurisdictions in which Seller and each Subsidiary of Seller is duly qualified or registered to do business as a foreign corporation is listed on <u>Section 3.1 of the Seller Disclosure Schedule</u>. Seller has delivered or made available to Platinum a true and correct copy of its certificate of incorporation and bylaws and similar governing instruments of each of its Subsidiaries, each as amended to date (collectively, the "*Seller Charter Documents*"), and each such instrument is in full force and effect. Neither Seller nor any Subsidiary is in violation of any of the provisions of the Seller Charter Documents.

3.2 <u>Subsidiaries and Guaranties</u>. Each of Seller's Subsidiaries are listed on <u>Section 3.2 of the Seller Disclosure Schedule</u>, each of which is directly or indirectly wholly-owned by Seller. Except as set forth in <u>Section 3.2 of the Seller Disclosure Schedule</u>, Seller does not have any other Subsidiaries or any interest, direct or indirect, in any corporation, partnership, joint venture, limited liability company or other business entity. <u>Section 3.2 of the Seller Disclosure Schedule</u> indicates the jurisdiction of organization of each entity listed therein and Seller's direct or indirect equity interest therein.

3.3 [Intentionally Omitted]

3.4 <u>Power, Authorization and Non-Contravention</u>.

(a) Seller and each Subsidiary of Seller has the requisite corporate power, legal capacity and authority to: (i) carry on its business as now conducted; (ii) own, operate and lease its properties in the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under all Seller Contracts constituting Assets to be purchased under Section 2.1, and (iv) upon entry of the Sale Order (as defined in Section 8.1(b)) enter into and perform its obligations under this Agreement and all agreements to which it is or will be a party that are required to be executed pursuant to or in connection with this Agreement (the "*Seller Ancillary Agreements*"); except in the case of clause (iii) of this Section 3.4 where the failure to have such power, capacity or authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller, the Business or the Assets. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate and stockholder action on the part of Seller. The written consent of Parent, as the sole stockholder of Seller, a certified copy of which has previously been delivered to Purchaser, is sufficient for the approval of the transactions contemplated hereby by Seller's stockholders and no other approval of any holder of any

16

A- 0033

securities of Seller is required in connection with the consummation of the transactions contemplated hereby.

(b)  No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by Seller or any Subsidiary of Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for: (i) the consents set forth in Section 3.4(b) of the Seller Disclosure Schedule, (ii) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state Securities (or related) Laws and the Antitrust Filings and (iii) such other consents, authorizations, filings, approvals and registrations which if not obtained or made would not be material to Seller, Platinum or Purchaser or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

(c)  Upon entry of the Sale Order, this Agreement and the Seller Ancillary Agreements are, or when executed and delivered by Seller and Canada Sub and the other parties thereto will be, valid and binding obligations of Seller and Canada Sub (to the extent a party thereto) enforceable against Parent, Seller and Canada Sub (to the extent a party hereto) in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization, or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies; provided, however, that the Seller Ancillary Agreements will not be effective until the earlier of the Effective Time or the date provided for therein.

3.5  No Violation of Charter Documents and Contracts; Compliance with Legal Authorizations; Governmental Authorizations.

(a)  Neither the execution and delivery of this Agreement or any Seller Ancillary Agreement, nor the consummation of the transactions provided for herein or therein will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of any provision of the Seller Charter Documents, as currently in effect, except as set forth in Section 3.5 of the Seller Disclosure Schedule, or any material Assumed Seller Contract.

(b)  Except as set forth in Section 3.5(b) of the Seller Disclosure Schedule:

(i)      Each of Seller and each Subsidiary of Seller is, and, to Seller's knowledge, at all times since January 1, 2000 has been, in material compliance with each Legal Requirement that is or was applicable to it or to the conduct of operation of its business or the ownership or use of any of the Assets;

(ii)     no event has occurred or circumstance currently exists that (with or without notice or lapse of time) constitutes or will result in a violation by Seller or any Subsidiary of Seller of, or a failure on the part of Seller or any Subsidiary of Seller to comply with, any applicable material Legal Requirement; and

(iii)    Each of Seller and each Subsidiary of Seller has not received, at any time since January 1, 2000, any written notice or, to Seller's knowledge, other communication from any Governmental Authority or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply by Seller or any Subsidiary of Seller with, any applicable material Legal Requirement.

17

A- 0034

(c) Section 3.5(c) of the Seller Disclosure Schedule contains a complete and accurate list of each material Governmental Authorization that are collectively necessary to permit Seller to lawfully conduct and operate its business in the manner it currently conducts and operates its business and to permit Seller to own and use the Assets in the manner in which it currently owns and uses such Assets. To Seller's knowledge, each Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule is valid and in full force and effect. Except as set forth in Section 3.5(c) of the Seller Disclosure Schedule:

(i)    Each of Seller and each Subsidiary of Seller is, and at all times since January 1, 2000 has been, in full compliance with all of the material terms and requirements of each Governmental Authorization identified or required to be identified in Section 3.5(c) of the Seller Disclosure Schedule;

(ii)    To Seller's knowledge, no event has occurred since January 1, 2000 or circumstance currently exists that (with or without notice or lapse of time) (A) constitutes or will result directly or indirectly in a violation of or a failure to comply with any material term or requirement of any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule, or (B) will result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule;

(iii)    Seller has not received, at any time since January 1, 2000, any written notice or, to Seller's knowledge, other communication from any Governmental Authority or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply by Seller or any Subsidiary of Seller with any term or requirement of any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule; and

(iv)    all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Section 3.5(c) of the Seller Disclosure Schedule have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authorities, except to the extent that such failure would not have a Material Adverse Effect on Seller.

3.6 Documents and Disclosures.

(a) Seller has made available to Platinum for examination true and complete copies of all documents and information listed in the Seller Disclosure Schedule, as well as (i) Seller's minute book containing all records of all proceedings, consents, actions and meetings of the stockholders, the Board of Directors and any committees of the Board of Directors of Seller; (ii) all Governmental Authorizations, permits, Orders and consents issued by any regulatory agency or other Governmental Authority with respect to Seller and (iii) all of the foregoing documents and information with respect to the Subsidiaries.

18

(b) There has not been any violation of any of the provisions of the Seller Charter Documents, or of any resolution adopted by the stockholders or boards of directors, of Seller or any Subsidiary of Seller, and to Seller's knowledge, no event has occurred and is continuing, and no condition or circumstance exists, that likely would (with or without notice and/or lapse of time) constitute or result directly or indirectly in such a violation.

(c) The books of account, stock records, minute books and other records of Seller and its Subsidiaries: (i) are in all material respects true and complete, (ii) have been maintained in accordance with reasonable business practices and (iii) accurately and fairly reflect in all material respects the transactions and dispositions of the assets of Seller and its Subsidiaries.

3.7 Seller Financial Statements. Included in Section 3.7 of the Seller Disclosure Schedule are the consolidated financial statements of Seller (including, in each case, any related notes thereto) for the fiscal years ended December 31, 2002 and 2003 (the "*Seller Financial Statements*") and for the three-month period ended March 31, 2004 and each: (i) was prepared in accordance with GAAP (except as may be indicated in the notes thereto); (ii) fairly present in all material respects the consolidated financial position of Seller and the Subsidiaries as at the respective dates thereof and the consolidated results of Seller's operations and cash flows for the periods indicated, except that the unaudited interim financial statements do not contain any footnotes and were or are subject to normal and recurring year-end adjustments and (iii) contain no adverse opinion or disclaimer of opinion and except as set forth in Section 3.7 of the Seller Disclosure Schedule were not qualified or modified as to uncertainty, audit scope or accounting principal. Except as set forth on Section 3.7 of the Seller Disclosure Schedule, since December 31, 2003 (the "*Base Balance Date*"), neither Seller nor any Subsidiary has any Liabilities required under GAAP to be set forth on a balance sheet (absolute, accrued, contingent or otherwise) except for Liabilities incurred since the Base Balance Sheet Date in the ordinary course of business consistent with past practices which are not, individually or in the aggregate, material to the business, results of operations or financial condition of Seller and the Subsidiaries taken as a whole and Liabilities incurred in connection with this Agreement. There has been no change in Seller's accounting policies during the periods covered by the Seller Financial Statements, except as described in the notes to the Seller Financial Statements. Seller has no material debt, Liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that is not reflected, reserved against or disclosed in the Seller Financial Statements or under Section 3.7 of the Seller Disclosure Schedule, except for those that may have been incurred after the Base Balance Sheet Date in the ordinary course of Seller's business, consistent with past practice and that are in an aggregate amount not to exceed $50,000, and (ii) those that occur after the date of this Agreement in compliance with this Agreement or with the express written consent of Platinum.

3.8 Internal Control Over Financial Reporting. Seller has implemented a process, designed by, or under the supervision of, Seller's principal executive and principal financial officers, and effected by Seller's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of the preparation of financial statements in accordance with GAAP and includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Seller and its Subsidiaries; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of Seller and its Subsidiaries are being made only in accordance with authorizations of management and directors of Seller and its Subsidiaries; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Seller's assets.

19

A-0035.01

3.9 <u>Accounts Receivable</u>. The Accounts Receivable shown in the December 31, 2003 balance sheet contained in the Seller Financial Statements (the "*Base Balance Sheet*") and which constitute Assets to be purchased under Section 2.1 arose in the ordinary course of business consistent with past practice. Allowances for doubtful accounts and warranty returns are adequate and have been prepared in accordance with GAAP and in accordance with the past practices of Seller and its Subsidiaries. The Accounts Receivable of Seller and its Subsidiaries constituting Assets to be purchased under Section 2.1 arising after the Base Balance Sheet Date and prior to the Closing Date arose and will arise in the ordinary course of business consistent with past practice. To the knowledge of Seller, the Accounts Receivable are not subject to any material claim of offset, recoupment, setoff or counter-claim and it has no knowledge of any specific facts or circumstances (whether asserted or unasserted) that could give rise to any such claim in any such case, except to the extent otherwise reflected in the allowances for doubtful accounts as provided for in the Base Balance Sheet or, with respect to Accounts Receivable arising after the Base Balance Sheet Date and prior to the Closing Date, as determined in the ordinary course of business consistent with the past practices of Seller and its Subsidiaries. Except as set forth in <u>Section 3.9 of the Seller Disclosure Schedule</u>, no material amount of Accounts Receivable are contingent upon the performance by Seller or any of its Subsidiaries of any obligation or Contract other than normal warranty repair and replacement and other than products' progress bills in the ordinary course of business consistent with past practice. No Person has any Encumbrance on any of such Accounts Receivable and no agreement for deduction or discount has been made with respect to any of such Accounts Receivable. <u>Section 3.9 of the Seller Disclosure Schedule</u> sets forth an aging of Accounts Receivable of Seller and its Subsidiaries in the aggregate and by customer, and indicates the amounts of allowances for doubtful accounts and warranty returns and <u>Section 3.9 of the Seller Disclosure Schedule</u> sets forth such amounts of Accounts Receivable which are subject to asserted warranty claims known to Seller by information regarding asserted warranty claims known to Seller made within the last year, including the type and amounts of such claims. Except as set forth on Section 3.9 of the Seller Disclosure Schedule, Seller has no Accounts Receivable from any person, firm or corporation which is affiliated with Seller or from any director, officer or employee or Affiliate of Seller, Parent or any Subsidiary of Seller.

       3.10   [Intentionally Omitted]

       3.11   <u>Litigation</u>. Except as set forth in <u>Section 3.11 of the Seller Disclosure Schedule</u>, there is no Proceeding pending against Seller or any of its Subsidiaries, nor, to Seller's knowledge, is any Proceeding threatened against Seller or any of its Subsidiaries before any Governmental Authority or arbitrator that, if determined adversely to Seller or any of its Subsidiaries, may reasonably be expected to have a Material Adverse Effect on Seller, the Business or the Assets. There is no material unsatisfied adverse Order of a Governmental Authority or arbitrator outstanding against Seller or any of its Subsidiaries. There is no Proceeding pending as to which Seller has received notice of assertion against Seller, which in any manner could prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement.

       3.12   <u>Taxes</u>.

       (a)   Seller and each Subsidiary of Seller has timely filed all material federal, state, local and foreign returns, reports, estimates, information statements or other documents or information ("*Returns*") required to be supplied to any "Tax" (as defined below) authority relating to "Taxes" (as defined below) required to be filed by or on behalf of Seller, and each Subsidiary of Seller. Such Returns are true, correct and complete in all material respects. Seller and each Subsidiary of Seller has paid all material Taxes required to be paid, has made all necessary estimated Tax payments, and has no Liability for Taxes in excess of the amount so paid, except to the extent adequate reserves have been

established in the Seller Financial Statements or, with respect to Taxes that are not yet due on or prior to the date of this Agreement and which have become due thereafter, adequate reserves have been established by Seller and each Subsidiary of Seller prior to the Closing Date.

(b) Seller and each Subsidiary of Seller has withheld and paid all material Taxes required by applicable Legal Requirement to be withheld and paid in connection with any amounts paid or owing to any employee, independent producer or contractor, creditor, stockholder, or other Third Party.

(c) To Seller's knowledge, no claim has ever been made by a Governmental Authority in a jurisdiction where Seller or any Subsidiary of Seller does not file Tax Returns that Seller, or any Subsidiary of Seller is or may be subject to Taxation by that jurisdiction.

(d) Except as set forth in Section 3.12(d) of the Seller Disclosure Schedule, neither Seller nor any Subsidiary of Seller is party to or has any obligation under any Tax-sharing, Tax indemnity or Tax allocation agreement or arrangement.

For the purposes of this Agreement, "*Tax*" or "*Taxes*" refers to (i) any and all federal, state, local and foreign Taxes, assessments and other governmental charges, duties, impositions and Liabilities relating to Taxes, including Taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property Taxes, together with all interest, penalties and additions imposed with respect to such amounts, (ii) any Liability for payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, and (iii) any Liability for amounts of the type described in clauses (i) and (ii) as a result of any express or implied obligation to indemnify another Person or as a result of any obligations under any agreements or arrangements with any other person with respect to such amounts and including any Liability for Taxes of a predecessor entity.

3.13    Sufficiency of Assets; Title to Properties.

(a) The Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business in the manner presently operated by Seller and includes substantially all of the operating assets of Seller, subject to any Excluded Assets or Retained Liabilities.

(b) Seller and each of the Subsidiaries have good and marketable title to all of their respective Assets as shown on the Base Balance Sheet, or with respect to leased Assets, valid leasehold interests in, or with respect to licensed Assets, valid licenses to use, free and clear of all Encumbrances (other than Permitted Encumbrances). The machinery and equipment included in the Assets are in all material respects in good condition and repair, normal wear and tear excepted, and all Leases of Real Property or Tangible Personal Property to which Seller or any Subsidiary of Seller is a party are fully effective and afford Seller or such Subsidiary peaceful and undisturbed possession of the subject matter of the Lease. To Seller's Knowledge, neither Seller nor any Subsidiary is in violation of any zoning, building, or safety ordinance, regulation or requirement or other Legal Requirement applicable to the operation of owned or leased properties, and Seller has not received any notice of such violation with which it has not complied or had waived.

(c) Section 3.13(c) of the Seller Disclosure Schedule sets forth the addresses and uses of all Real Property that Seller, its predecessors, Affiliates or the Subsidiaries own, lease or sublease or have ever owned, leased or subleased since January 1, 2003. All Leases of Real Property or Tangible Personal Property constituting Assets to which Seller or any Subsidiary of Seller is a party are

21

A-0035.03

effective and afford Seller peaceful and undisturbed possession of the subject matter of the Lease. As a result of the transactions contemplated by this Agreement, Purchaser will obtain a valid ownership or leasehold interest in all Tangible Personal Property that Seller or its Subsidiaries currently own or lease and all Real Property that Seller or its Subsidiaries currently own or lease, as of the date of this Agreement, (subject to any Real Property retained by Seller or its Subsidiaries as Excluded Assets), in each case free and clear of all title defects and Encumbrances of any kind, except (i) Permitted Encumbrances; (ii) mechanics', carriers', workers' and other similar liens arising in the ordinary course of business, and (iii) liens for current Taxes not yet due and payable.

3.14    Absence of Certain Changes or Events. Excluding the effect of filing and administration of the Chapter 11 Case, since the Base Balance Sheet Date, Seller and the Subsidiaries have carried on their business in the ordinary course substantially in accordance with the procedures and practices in effect on the Base Balance Sheet Date.

(a) To Seller's knowledge, except as set forth under Section 3.14 of the Seller Disclosure Schedule, since the Base Balance Sheet Date there has not been with respect to Seller or any Subsidiary of Seller:

(i)    any change, event, circumstance or effect, which by itself or in conjunction with all other such changes, whether or not arising in the ordinary course of business, has had or would reasonably be expected to have a Material Adverse Effect on Seller or on Seller's or its Subsidiaries' ability to conduct the Business as presently conducted, or that is reasonably likely to impede the performance by Seller of its obligations under this Agreement or any of the Seller Ancillary Agreements;

(ii)    any Encumbrance placed on any of the properties of Seller or any Subsidiary except Permitted Encumbrances;

(iii)    any Liability incurred by Seller or any Subsidiary of Seller other than trade accounts payable and other Liabilities arising in the ordinary course of business;

(iv)    any purchase, license, sale or other disposition, or any agreement or other arrangement for the purchase, license, sale or other disposition, of any of the Assets other than in the ordinary course of business and consistent with past practice or which do not exceed in the aggregate $50,000 through the date of this Agreement;

(v)    any material damage, destruction or loss of any material property or asset, whether or not covered by insurance;

(vi)    any material labor dispute or material claim of unfair labor practices;

(vii)    any increase in the compensation payable or to become payable to any of Seller's or any of its Subsidiary's officers, employees or agents earning compensation at an anticipated annual rate in excess of $50,000, or any bonus payment or arrangement made to or with any of such officers, employees, consultants or agents; or any increase in the compensation payable or to become payable to any of Seller's or any of its Subsidiary's other officers, employees, consultants or agents (other than normal annual raises for non-officers in the ordinary course of business consistent with past practice) or any bonus payment or arrangement made to or with any of such officers, employees or agents other than normal bonuses or

22

compensation increases granted prior to the date of this Agreement as disclosed under
Section 3.14 of the Seller Disclosure Schedule;

(viii)    any termination or resignation of any executive officer of Seller
or any Subsidiary of Seller; or

(ix)    any loss of one or more material customers of Seller or any
Subsidiary of Seller, which, individually or in the aggregate, account for more than five percent
(5%) of the consolidated revenues of Seller and its Subsidiaries as of the Base Balance Sheet
Date.

(b)  Except as set forth under Section 3.14 of the Seller Disclosure Schedule,
since the Base Balance Sheet Date neither Seller nor any Subsidiary of Seller has:

(i)    amended their certificates of incorporation, bylaws or any other
organizational document of a Subsidiary of Seller;

(ii)    made any material payment or discharged any material
Encumbrance or Liability of Seller or any Subsidiary;

(iii)    incurred any material obligation or Liability to any of their
employees, officers, directors, stockholders or Affiliates, or any loans or advances made to any
of its employees, officers, directors, stockholders or Affiliates, except normal compensation and
reasonable travel related expense allowances payable to employees, officers or directors;

(iv)    declared, set aside or paid any dividend on, or made any other
distribution in respect of, their capital stock, or made any changes in any rights, preferences,
privileges or restrictions of any of their outstanding capital stock;

(v)    effected or been a party to any transaction relating to a merger,
consolidation, sale of all or substantially all of their assets, or similar transaction; or accepted or
otherwise entered into any Acquisition Proposal (as defined in Section 5.6);

(vi)    executed, amended, relinquished, terminated or failed to renew
any material Contract constituting an Asset, lease, transaction or legally binding commitment
other than in the ordinary course of their business (nor has there been any written or oral
indication or assertion by the other party thereto of its desire to so amend, relinquish, terminate
or not renew any such Contract, lease transaction or legally binding commitment);

(vii)    deferred the payment of any accounts payable outside the
ordinary course of business or provided any discount, accommodation or other concession
outside the ordinary course of business in order to accelerate or induce the collection of any
receivable;

(viii)    incurred indebtedness for borrowed money, entered into any
capital lease or guaranteed any such indebtedness other than in the ordinary course of their
business, and not in excess of $50,000 in the aggregate; or

23

(ix)    entered into any other material transaction or taken any other material action outside the ordinary course of their business (other than as disclosed in <u>Section 3.14 of the Seller Disclosure Schedule</u>).

3.15    <u>Intellectual Property</u>.

(a) <u>Definition</u>. As used herein, the term "***Intellectual Property Rights***" shall mean all worldwide industrial and intellectual property rights, including, patents, patent applications, patent rights, trademarks (registered and/or at common law), trademark applications, trade names, service marks, service mark applications, URLs, works of authorship, copyrights, copyright registrations and applications for registration, mask work rights, moral rights, franchises, licenses, inventories, know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections, all source and object code, algorithms, architecture, structure, display screens, layouts, inventions, development tools and all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

(b) <u>Ownership of Intellectual Property</u>. Seller and each Subsidiary of Seller owns all right, title and interest in, or has license to use (sufficient for the conduct of its business as presently conducted), all Intellectual Property Rights used in or reasonably necessary to the conduct of its business as presently conducted including the business of the development, design, maintenance, sale, licensing, installation and use of Seller and its Subsidiary products and the sale of commercial services using such Intellectual Property Rights (with such Intellectual Property Rights being hereinafter collectively referred to as the "*Seller IP Rights*"). To Seller's Knowledge, except as set forth in <u>Section 3.15(b) of the Seller Disclosure Schedule</u>, Seller and its Subsidiaries have the exclusive, unrestricted, worldwide right to design, develop, use, reproduce, manufacture, sell, license and distribute all of its products and services (such products and services being set forth under <u>Section 3.15(b) of the Seller Disclosure Schedule</u> and hereinafter collectively referred to as the "*Seller Products and Services*") except where the failure to have such right would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller. Except as set forth under <u>Section 3.15(b) of the Seller Disclosure Schedule</u>, neither Seller nor any Subsidiary of Seller has granted any reseller, distributor, sales representative, original equipment manufacturer, value added reseller or other third party any right to reproduce, manufacture, sell, license or distribute any of its products or services in any market segment or geographic location and which right is continuing as of the date of this Agreement. Set forth under <u>Section 3.15(b) of the Seller Disclosure Schedule</u> is a true and complete list of all copyright, mask work, trademarks, service marks, trade names, trade dress and other names and brand identifiers held or used by the Seller and trademark registrations and applications and all patents and patent applications for Seller IP Rights owned or exclusively licensed by Seller or its Subsidiaries. Seller is not aware of any loss, cancellation, termination or expiration of any such registration or patent except as set forth on <u>Section 3.15(b) of the Seller Disclosure Schedule</u>. To Seller's knowledge, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not constitute a material Breach of any instrument or agreement governing any Seller IP Right, will not cause forfeiture or termination or give rise to a right of forfeiture or termination of any Seller IP Right or materially impair the right of Seller to use, sell or license any Seller IP Right or portion thereof except where such breach, forfeiture, termination or impairment would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller, the Business or the Assets.

(c) <u>No Violation of Rights of Others</u>. To Seller's knowledge, the business of Seller and each Subsidiary of Seller and the design, development, use, manufacture, sale, license or provision of any Seller Product and Service does not, and the use, manufacture, sale, license or

24

provision of any Seller Product or Service after the Effective Time will not cause Seller or any Subsidiary of Seller to infringe or violate any of the Intellectual Property Rights of any other Person. Neither Seller nor any Subsidiary of Seller has received any written or oral claim or notice of infringement or potential infringement of the Intellectual Property Rights of any other Person. To Seller's Knowledge, neither Seller nor any Subsidiary of Seller is using any confidential information or trade secrets of any Third Party, including, but not limited to, any past or present employees or their respective past employers. To Seller's knowledge, there are no royalties, honoraria, fees or other payments payable by Seller or any Subsidiary of Seller to any Person by reason of the ownership, use, license, sale, or disposition of the Seller IP Rights (other than as set forth under Section 3.15(b) of the Seller Disclosure Schedule.

(d) <u>Protection of Rights</u>. Seller has taken all commercially reasonable steps designed to safeguard and maintain the secrecy and confidentiality of, and its proprietary rights in, all Seller IP Rights. To the knowledge of Seller, there is no material unauthorized use, infringement or misappropriation of any Seller IP Rights by any Third Party, including, to the knowledge of Seller, any Seller employee or Subsidiary of Seller employee. Seller has made available to Platinum copies of all agreements that Seller has with its officers, employees and consultants regarding the protection of proprietary information and the assignment to Seller of all Intellectual Property Rights arising from the services performed for Seller or any Subsidiary by such Persons.

3.16    <u>Conformity of Products and Services</u>. Except as set forth in <u>Section 3.16 of the Seller Disclosure Schedule</u>, all Seller Products and Services delivered or provided by Seller or any Subsidiary of Seller to customers on or prior to the Closing Date conform in all material respects (to the extent required in Contracts with such customers) to applicable contractual commitments, express and implied warranties, product specifications and product documentation and to any representations provided to customers, and neither Seller nor any Subsidiary of Seller has any material Liability (and, to Seller's knowledge, there is no legitimate basis for any present or future Proceeding against Seller or any Subsidiary giving rise to any material Liability relating to the foregoing Contracts) for replacement or repair thereof or other damages in connection therewith in excess of any reserves therefore reflected on the Base Balance Sheet, or, with respect to any such material Liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP and in accordance with the past practices of Seller and its Subsidiaries.

3.17    <u>Product and Service Warranties</u>. Set forth on <u>Section 3.17 of the Seller Disclosure Schedule</u> are the standard written forms of product and service warranties and guarantees utilized by Seller or any Subsidiary of Seller as of the date of this Agreement with respect to the Seller Products and Services. To Seller's knowledge, except as set forth on <u>Section 3.17 of the Seller Disclosure Schedule</u>, during a period of three (3) years prior to the Closing Date, neither Seller nor any Subsidiary of Seller has made any other written material warranties (which remain in effect) with regard to Seller Products and Services. There are not existing or threatened in writing, product liability, warranty or other similar claims against Seller or any Subsidiary of Seller alleging that any Seller Products and Services are defective or fail to meet any product or service warranty except for such claims (i) that would not, individually or in the aggregate, be expected to have a Material Adverse Effect on Seller, or (ii) Liability which is not in excess of any reserves therefor reflected on the Base Balance Sheet or, with respect to any such material Liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP and in accordance with the past practices of Seller and its Subsidiaries. Except as set forth on <u>Section 3.17 of the Seller Disclosure Schedule</u>, there are (a) no inherent design defects or systemic or chronic problems in any Seller Products and Services that are known to Seller or any Subsidiary of Seller and (b) no Liabilities that are known to Seller or any Subsidiary of Seller for warranty or other claims or returns with respect to any Seller

25

Products and Services relating to any such defects or problems in excess of any reserves therefor reflected on the Base Balance Sheet or, with respect to any such material Liability arising after the Base Balance Sheet Date and prior to the Closing Date, such reserves as determined in accordance with GAAP and in accordance with the past practices of Seller and its Subsidiaries.

      3.18    List of Certain Employees; Suppliers and Customers.

      (a)  Section 3.18(a) of the Seller Disclosure Schedule sets forth a detailed description of all compensation, including salary, bonus and deferred compensation paid or payable, for each officer, employee, consultant and independent contractor of Seller and the Subsidiaries who individually received compensation in excess of $50,000 for the fiscal year ended December 31, 2003 or is anticipated to receive compensation in excess of $50,000 for the fiscal year ending December 31, 2004.

      (b)  Section 3.18(b) of the Seller Disclosure Schedule sets forth a list of all suppliers, licensors and vendors of Seller or the Subsidiaries to whom, since January 1, 2003, Seller or the Subsidiaries made payments aggregating $50,000 or more, showing, with respect to each, the name, address and dollar value involved. No such supplier, licensor or vendor has canceled or otherwise terminated or materially reduced its business with Seller or the Subsidiaries or materially and adversely modified its relationship with Seller or the Subsidiaries nor, to the knowledge of Seller, does any supplier, licensor or vendor, have any plan or intention to do so.

      (c)  Section 3.18(c) of the Seller Disclosure Schedule sets forth the name of each customer or distributor of Seller or the Subsidiaries who accounted for more than two percent (2%) of the revenues of Seller for the fiscal year(s) ending December 31, 2002 and December 31, 2003 (the "*Customers*") showing with respect to each, the name, address and dollar value involved. Except as set forth in Section 3.18(c) of the Seller Disclosure Schedule, between December 31, 2002 and the date of this Agreement, no Customer of Seller or the Subsidiaries has canceled or otherwise terminated its relationship with Seller or the Subsidiaries, or not renewed or accepted any maintenance agreements, or has decreased materially its purchases of Seller Products and Services. No Customer has, to the knowledge of the Seller, any plan or intention to terminate, to cancel or otherwise materially and adversely modify its relationship with Seller or the Subsidiaries or to decrease materially or limit its purchase or distribution of Seller Products and Services.

      3.19    Disabling Codes. To Seller's knowledge, the software used in the Seller Products and Services are free of any disabling codes or instructions (a "*Disabling Code*"), and any virus or other intentionally created, undocumented contaminant (a "*Contaminant*"), that may, or may be used to, access, modify, delete, damage or disable the Systems (as defined below) or that may result in damage thereto. Software obtained from Third Party suppliers is, to Seller's knowledge, free of any Disabling Codes or Contaminants that may, or may be used to, access, modify, delete, damage or disable any of the Systems (as defined below) or that might result in damage thereto. Seller has taken commercially reasonable steps and implemented commercially reasonable procedures to ensure that its internal computer systems (consisting of hardware, software, databases or embedded control systems, "*Systems*") are free from Disabling Codes and Contaminants. To Seller's knowledge, except as may be set forth in Section 3.19 of the Seller Disclosure Schedule, Seller has in place appropriate disaster recovery plans, procedures and facilities and has taken all reasonable steps to safeguard its Systems and restrict unauthorized access thereto.

26

A-0035.08

3.20    Compliance with Laws. Seller and each Subsidiary of Seller has complied, or prior to the Closing Date will have complied, and is or will be at the Closing Date in compliance, in all material respects, with all Legal Requirements, and all Orders applicable to Seller or any Subsidiary, or to the Assets, properties and business of Seller or any Subsidiary, except where the failure to comply with any such Legal Requirements would not, individually or in the aggregate reasonably be expected to have a Material Adverse Effect on Seller, the Business or the Assets.

Seller and each Subsidiary has received all material permits, approvals and Governmental Authorizations from, and has made all material filings with, Third Parties, including Governmental Authorities, that are necessary to the conduct of its business as presently conducted.

3.21    Agreements and Commitments. Except as set forth under Section 3.21 of the Seller Disclosure Schedule and delivered or made available by Seller to Platinum on or prior to the Closing Date, as of the date hereof, neither Seller nor any Subsidiary of Seller is a party or subject to any agreement, obligation or commitment that is material to Seller, its financial condition or business or which is described below, including but not limited to the following:

(a) any Contract providing for payments by or to Seller or any Subsidiary of Seller in an amount with respect to any single transaction, or series of related transactions, of (i) $50,000 or more in the ordinary course of business or (ii) $25,000 or more not in the ordinary course of business;

(b) any Contract to which Seller or any Subsidiary of Seller is a party (i) with respect to Seller IP Rights licensed or transferred to any Third Party (other than standard agreements with customers arising in the ordinary course of business consistent with past practice, the forms of which have been delivered to Platinum or its counsel); and (ii) pursuant to which a Third Party has licensed or transferred any Intellectual Property Rights to Seller or any Subsidiary of Seller reasonably necessary for the conduct of its business as of the date hereof (except for commercially available, non-customized software sold at retail and not embedded in Seller Products and Services or sub-licensed to customers of Seller or its Subsidiaries);

(c) any agreement by Seller or any Subsidiary of Seller to encumber, transfer or sell any material rights in or with respect to any Seller IP Rights except non-exclusive software licenses;

(d) any Contract providing for development of technology for Seller which technology (i) is used or incorporated in any Seller Products or Services currently distributed or performed by Seller or any Subsidiary of Seller or (ii) is anticipated to be used or incorporated in any planned products or services of Seller or a Subsidiary of Seller, or any Contract that requires Seller to perform specified development work for a Third Party.

(e) any Contract currently in force for hosting, data center, transaction processing or other services related to Seller's website;

(f) any agreement for the sale or lease of Tangible Personal Property involving more than $50,000 per year;

(g) any dealer, distributor, sales representative, original equipment manufacturer, value added remarketer or other agreement for the distribution of Seller's Products or Services (other than standard agreements arising in the ordinary course of business consistent with past practice, the forms of which have been delivered to Platinum or its counsel);

27

(h) any franchise agreement;

(i) any Contract granting most favored nation pricing and/or terms to any customer, licensee, purchaser, reseller, promoter or remarketer of any of Seller or its Subsidiaries' products or services;

(j) any joint venture Contract or arrangement or any other agreement that involves a sharing of profits with other Persons or the payment of royalties to any other Person;

(k) any instrument evidencing indebtedness for borrowed money by way of direct loan, sale of debt securities, purchase money obligation, conditional sale, guarantee or otherwise, except for trade indebtedness or any advance to any employee of Seller or of any Subsidiary of Seller incurred or made in the ordinary course of business, and except as disclosed in the Seller Financial Statements;

(l) any Contract containing covenants purporting to limit Seller's or any of its Subsidiary's freedom to compete in any line of business in any geographic area or to sell products or services to a specific entity;

(m) any Contract currently in force to provide source code to any Third Party for any product or technology;

(n) any Contract for the employment of any officer, employee or consultant of Seller or any Subsidiary of Seller or any other type of Contract or understanding with any officer, employee or consultant of Seller or any Subsidiary of Seller that is not immediately terminable by Seller or the Subsidiary of Seller without cost or liability;

(o) any Contract for consulting or similar services with a term of more than sixty (60) days and which is not terminable without penalty with notice of sixty (60) days or less; or

(p) any other material Contract entered into outside the ordinary course of business.

To Seller's knowledge, all agreements, obligations and commitments listed in Section 3.21 of the Seller Disclosure Schedule, are valid and in full force and effect, and except as expressly noted, a true and complete copy of each has been delivered or made available to Platinum. Except as noted on Section 3.21 of the Seller Disclosure Schedule, neither Seller nor, to the knowledge of Seller, any other party, is in material Breach of or default under any material term of any such agreement, obligation or commitment except where such breach or default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Seller, the Business or the Assets. Neither Seller nor any Subsidiary of Seller has any liability for renegotiation of government Contracts or sub-Contracts which individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect on Seller, the Business or the Assets.

3.22    Employees.

(a) General Compliance. Seller and each of the Subsidiaries is in compliance in all material respects with all applicable Legal Requirements and Contracts relating to employment, employment practices, wages, hours, and terms and conditions of employment, including, but not limited to, employee compensation matters, and to Seller's Knowledge has, correctly classified employees as exempt employees and non-exempt employees under the Fair Labor Standards Act.

28

A-0035.10

Except as set forth under <u>Section 3.22(a) of the Seller Disclosure Schedule</u>, neither Seller nor any Subsidiary of Seller has employment or consulting Contracts currently in effect that are not terminable at will (other than agreements with the sole purpose of providing for the confidentiality of proprietary information or assignment of inventions). To Seller's Knowledge and except as set forth in <u>Section 3.22 of the Seller Disclosure Schedule</u>, all independent contractors have been properly classified as independent contractors for the purposes of federal and applicable state Tax laws, laws applicable to employee benefits and other applicable laws. All employees of Seller or any Subsidiary of Seller located in the United States are legally permitted to be employed by Seller or such Subsidiary in the United States of America. Seller will have no liability to any employee or to any organization or any other entity as a result of the termination of any employee leasing arrangement.

(b) <u>Good Labor Relations</u>. Seller and each of the Subsidiaries: (i) has never been since January 1, 2000, and is not now, subject to a union organizing effort; (ii) is not subject to any collective bargaining agreement with respect to any of its employees; (iii) is not subject to any other Contract with any trade or labor union, employees' association or similar organization; and (iv) has no current labor disputes and has had no material labor disputes or claims of unfair labor practices since January 1, 2000. Seller and the Subsidiaries have good labor relations, and have no knowledge of any facts indicating that the consummation of the transactions contemplated hereby will have a Material Adverse Effect on such labor relations. Between January 1, 2003 and the date of this Agreement, to Seller's knowledge, no executive officer of Seller or any of its Subsidiaries, or material number of other employees of Seller or any of its Subsidiaries, has given notice that such employee intends to terminate his or her employment with Seller or any such Subsidiary. As of the date of this Agreement, Seller has no knowledge that any key personnel or other employees intend to leave its or a Subsidiary's employment. There are no controversies pending or, to Seller's knowledge, threatened, between Seller or any Subsidiary and any of their employees that would be reasonably likely to result in Seller incurring any material Liability that could reasonably be expected to result in a Material Adverse Effect on Seller.

(c) <u>Employee Plans</u>. Section 3.22(c) of the Seller Disclosure Schedule identifies each Seller Employee Plans. Copies of all other Seller Employee Plans (and, if applicable, related trust agreements) and all related documents, amendments and material written interpretations (including summary plan descriptions) thereto have been delivered or made available to Platinum or its counsel, together with, to the extent applicable, the two most recent annual reports (Form 5500, including, if applicable, Schedule B thereto) prepared in connection with any such Seller Employee Plan. No "prohibited transaction," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred with respect to any Seller Employee Plan which is covered by Title I of ERISA which would result in a material Liability to Seller, excluding transactions effected pursuant to a statutory or administrative exemption. Nothing done or omitted to be done and no transaction or holding of any asset under or in connection with any Seller Employee Plan has or will make Seller, any Subsidiary or any Seller or Subsidiary officer or director subject to any material Liability under Title I of ERISA or Liability for any material Tax or penalty pursuant to Sections 4972, 4975, 4976 or 4979 of the Code or Section 502 of ERISA. Except as set forth in <u>Section 3.22(c) of the Seller Disclosure Schedule</u>, no Seller Employee Plans will be subject to any surrender fees or service fees upon termination other than the normal and reasonable administrative fees associated with the termination of benefit plans. All contributions due from Seller or any Subsidiary with respect to any of the Seller Employee Plans have been made as required under such plans and, to the extent applicable, ERISA, other than contributions accrued in the ordinary course of business consistent with past practice, all of which have been paid or will be paid when and as required or, if not required to be made, have been accrued on the Seller Financial Statements. Seller and each of the Subsidiaries has performed in all material respects all obligations required to be performed by it under each Seller Employee Plan, and each Seller Employee

A-0035.11

Plan has been maintained materially in compliance with its terms and with the requirements prescribed by any and all Legal Requirements, which are applicable to such Seller Employee Plans. All individuals who, pursuant to the terms of any Seller Employee Plans, are entitled to participate in any Seller Employee Plan, currently are participating in such Seller Employee Plan or have been offered an opportunity to do so. Except as set forth under Section 3.22(c) of the Seller Disclosure Schedule, to Seller's knowledge, no employee of Seller or any of its Subsidiaries, and no Person subject to any health plan of Seller or any of its Subsidiaries has made medical claims through such health plan during the 12 months preceding the date hereof for more than $50,000 in the aggregate for which Seller is responsible.

(d) Pension Plans. All Seller Employee Plans which individually or collectively would constitute an "employee pension benefit plan", as defined in Section 3(2) of ERISA (collectively, the "*Seller Pension Plans*"), are identified as such under Section 3.22(d) of the Seller Disclosure Schedule. Any Seller Pension Plan which is intended to be qualified under Section 401(a) of the Code (a "*Seller 401(a) Plan*") has received a favorable determination from the Internal Revenue Service with respect to its tax exempt status. No Seller Pension Plan constitutes, or has since the enactment of ERISA constituted, a "multiemployer plan", as defined in Section 3(37) of ERISA. No Seller Pension Plans are subject to Title IV of ERISA. Seller has delivered to Platinum or its counsel a complete and correct copy of the most recent Internal Revenue Service determination letter with respect to each Seller 401(a) Plan, if any exists.

(e) Benefit Arrangements. Section 3.22(e) of the Seller Disclosure Schedule lists each employment, severance (including all post-employment liabilities) or other similar Contract or policy and each Contract providing for insurance coverage (including any self-insured arrangements), workers' benefits, vacation benefits, severance benefits, disability benefits, death benefits, hospitalization benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock purchase, phantom stock, stock appreciation or other forms of incentive compensation or post-retirement insurance, compensation or benefits for employees, consultants or directors which: (i) is not a Seller Employee Plan; (ii) is entered into, maintained or contributed to by Seller or any Subsidiary; and (iii) covers any employee or former employee or independent contractor or consultant of Seller or any Subsidiary. Such Contracts and policies as are described in this Section 3.22(e) are herein referred to collectively as the "*Seller Benefit Arrangements*." Each Seller Benefit Arrangement has been maintained in material compliance with its terms and with the requirements prescribed by any and all statutes, Orders, rules and regulations which are applicable to such Seller Benefit Arrangement. Seller has delivered to Platinum or its counsel a complete and correct copy or description of each Seller Benefit Arrangement. All individuals who, pursuant to the terms of any Seller Benefit Arrangement, are entitled to participate in any such Seller Benefit Arrangement, are currently participating in such Seller Benefit Arrangement or have been offered an opportunity to do so and have declined.

(f) Benefit Changes. Except as set forth in Section 3.22(f) of the Seller Disclosure Schedule since January 1, 2003, there has been no amendment to, written interpretation or announcement (whether or not written) by Seller or any Subsidiary of Seller relating to, or change in employee participation or coverage under, any Seller Employee Plan or Seller Benefit Arrangement that would increase materially the expense of maintaining such Seller Employee Plan or Seller Benefit Arrangement in the future.

(g) COBRA Compliance. Seller and, to the extent applicable, each of the Subsidiaries has complied in all material respects prior to the date hereof, with the continuation coverage requirements of Section 4980B of the Code and the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*"), Sections 601 through 608 of ERISA, the American with Disabilities Act of 1990, as amended, and the Family Medical Leave Act of 1993, as

30

amended, and the regulations thereunder, and no material Tax payable on account of Section 4980B of the Code has been incurred with respect to any current or former employees (or their beneficiaries) of Seller or any Subsidiary.

(h) <u>No Violation of Contracts</u>. To the knowledge of Seller, no employee or consultant of Seller or any Subsidiary of Seller is in violation of any term of any employment Contract, patent disclosure agreement, non-competition agreement, or any other Contract, or any restrictive covenant relating to the right of any such employee to be employed by Seller or any Subsidiary of Seller, or to use Intellectual Property Rights of others. To Seller's knowledge, the mere fact of employment of any Seller or Subsidiary employee does not subject Seller to any Liability other than for compensation and benefits earned in the ordinary course of business.

3.23    <u>Relationships with Affiliates</u>. Except as disclosed in <u>Section 3.23 of the Seller Disclosure Schedule</u>, neither Parent nor any Affiliate of Parent (except Seller) has, or since January 1, 2001 has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to Seller's business. Neither Seller nor Parent nor any Affiliate of any of them owns, or since January 1, 2001 has owned, of record or as a beneficial owner, an equity interest or any other financial or profit interest in any Person that has (a) had business dealings or a material financial interest in any transaction with Seller other than business dealings or transactions disclosed in <u>Section 3.23 of the Seller Disclosure Schedule</u>, each of which has been conducted in the ordinary course of business with Seller at substantially prevailing market prices and on substantially prevailing market terms, or (b) engaged in competition with Seller with respect to any line of the Seller Products and Services (a "*Competing Business*") in any market presently served by Seller, except for ownership of less than one percent (1%) of the outstanding capital stock of any Competing Business with securities listed on any national or regional securities exchange or that have been registered under Section 12(g) of the Exchange Act. Except as set forth in <u>Section 3.23 of the Seller Disclosure Schedule</u>, neither Seller nor Parent nor any Affiliate of any of them is a party to any Contract with, or has any claim or right against, Seller or any Subsidiary of Seller.

3.24    <u>Environmental Matters</u>.

(a) For the purposes of this Agreement, the terms "*disposal*," "*release*," and "*threatened release*" shall have the definitions assigned thereto by CERCLA. For the purposes of this Agreement, "*Hazardous Materials*" shall mean any hazardous or toxic substance, material or waste which is or becomes prior to the Closing regulated under, or defined as a "hazardous substance," "pollutant," "contaminant," "toxic chemical," "hazardous material," "toxic substance" or "hazardous chemical" under: (i) CERCLA; (ii) the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. Section 11001 et seq.; (iii) the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq.; (iv) the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq.; (v) the Occupational Safety and Health Act of 1970, 29 U.S.C. Section 651 et seq.; (vi) regulations promulgated under any of the above statutes; or (vii) any other applicable federal, state or local statute, ordinance, rule or regulation that has a scope or purpose similar to those identified above. For purposes of this Agreement, the term "*Hazardous Activity*" means the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities.

31