(b)  To Seller's Knowledge, as of the Closing, except in compliance with Environmental Laws or in a manner that could not reasonably be expected to subject Seller or any Subsidiary of Seller to material Liability, no Hazardous Materials are present on or under any Facility currently owned, operated, or leased by Seller, any predecessor, any Subsidiary of Seller or any former subsidiary, or were present on any other Facility at the time it ceased to be owned, operated or leased by Seller, any predecessor, any Subsidiary of Seller or any former subsidiary. Neither Seller nor any Person for whose conduct it is or may be held responsible, or to the knowledge of Seller, any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to any Facility or any other property or assets (whether real, personal, or mixed) in which Seller has or had an interest except in full compliance with all applicable Environmental Laws.

(c)  To Seller's knowledge, except as set forth on <u>Section 3.24 of the Seller Disclosure Schedule</u> during the time that Seller, any predecessor, Subsidiary of Seller or any former subsidiary has owned or leased a Facility:

(i)  there have been no disposals, releases or threatened releases of Hazardous Materials on, from or under such Facility;

(ii)  no Hazardous Materials have been transported from such Facilities to any site or facility now listed or proposed for listing on the National Priorities List, at 40 C.F.R. Part 300, or any list with a similar scope or purpose published by any state authority; and

(iii)  there has been no litigation, proceeding or administrative action brought, threatened in writing against Parent, Seller, any predecessor of Seller, any Subsidiary of Seller or any former subsidiary, or any settlement reached by Parent, Seller, any predecessor of Seller, any Subsidiary of Seller or any former subsidiary with, any party or parties alleging the presence, disposal, release or threatened release of any Hazardous Materials on, from or under any of such Facility or that otherwise relates to Hazardous Activity.

(d)  Except as set forth in <u>Section 3.24(d) of the Seller Disclosure Schedule</u>, Seller has no knowledge of any presence, disposals, releases or threatened releases of Hazardous Materials on, from or under any of Facility that may have occurred prior to Seller, a Subsidiary of Seller or former subsidiary having taken possession of any of such Facility.

(e)  Seller has delivered to Purchaser true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Seller pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by Seller or any other Person for whose conduct it is or may be held responsible, with Environmental Laws.

3.25    [Intentionally Omitted].

3.26    <u>Board of Directors, Officers and Key Personnel</u>.  Section 3.26 of the Seller <u>Disclosure Schedule</u> accurately sets forth, as of the date of this Agreement: (a) the name and title of each of Seller's officers and its Subsidiaries' officers; (b) the name and title of supervisory, developmental or other key personnel of Seller and its Subsidiaries; and (c) the name, principal occupation and address of each member of Seller's board of directors and its Subsidiaries' boards of directors.

A-0035.14

3.27    Insurance. Seller and each Subsidiary of Seller maintains, fire and casualty, workers compensation, general liability, business interruption and product liability insurance (which current policies are listed under Section 3.27 of the Seller Disclosure Schedule) which it believes to be reasonably prudent for similarly sized and similarly situated businesses. Section 3.27 of the Seller Disclosure Schedule sets forth all material claims made under insurance policies since January 1, 2001 and the premiums that apply with respect to such insurance policies as of the date of this Agreement.

3.28    Accuracy of Disclosure. To Seller's knowledge, this Agreement, its Schedules, and any of the certificates or documents to be delivered by Seller or Parent to Platinum under this Agreement, taken together, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which such statements were made, not misleading.

## 4. REPRESENTATIONS AND WARRANTIES OF PLATINUM AND PURCHASER

Except as set forth in the Platinum Disclosure Schedule, the parts of which are numbered to correspond to the Section numbers of this Agreement and which thereby qualify the corresponding representations and warranties contained in this Article 4, each of Platinum and Purchaser, where applicable, hereby represents and warrants jointly and severally to Seller as follows:

4.1    Organization and Good Standing. Each of Platinum and Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority, and all requisite qualifications to do business as a foreign corporation, to conduct its business in the manner in which its business is currently being conducted, except where the failure to be so organized, existing or in good standing or to have such power, authority or qualifications would not, individually or in the aggregate, could be reasonably expected to have a material adverse effect on Platinum. Platinum has delivered or made available to Seller a true and correct copy of its and Purchaser's certificate of incorporation and bylaws, each as amended to date (collectively, the "*Platinum Charter Documents*"), and each such instrument is in full force and effect. Platinum is not in violation of any of the provisions of the Platinum Charter Documents. Platinum has delivered or made available to Seller all proposed or considered amendments to the Platinum Charter Documents.

4.2 Power, Authorization and Non-Contravention.

(a) Each of Platinum and Purchaser has the corporate power, legal capacity and authority to (i) carry on its business as now conducted; (ii) own, operate and lease its properties in the manner in which its properties are currently owned, used and leased; (iii) perform its obligations under Contracts to which Platinum or any of its Subsidiaries is a party or bound, enter into and perform its obligations under this Agreement, and all agreements to which Platinum or Purchaser is or will be a party that are required to be executed pursuant to this Agreement (the "*Platinum Ancillary Agreements*"); except in the case of clauses (i), (ii) and (iii) of this Section 4.2 where the failure to have such power, capacity or authority would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Platinum or Purchaser. The execution, delivery and performance of this Agreement and the Platinum Ancillary Agreements have been duly and validly approved and authorized by Platinum's Board of Directors and Purchaser's Board of Directors, as applicable. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate and stockholder action on the part of Platinum and Purchaser. The written consent of Platinum, as the sole stockholder of Purchaser, a certified copy of which has previously been delivered to Seller, is sufficient for the approval, and no

33

other approval of any holder of any securities of Platinum is required in connection with the consummation of the transactions contemplated hereby.

(b) No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person is required to be obtained or made by Platinum or Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) the filing with the SEC of a Current Report on Form 8-K with respect to the purchase of the Assets in accordance with the Exchange Act, (ii) such consents, approvals, Orders, authorizations, registrations, declarations and filings as may be required under applicable federal, foreign and state Securities (or related) Laws, and (iii) such other consents, authorizations, filings, approvals and registrations which if not obtained or made would not be material to Platinum or Purchaser or prevent, alter or materially delay the consummation of the transactions contemplated hereby.

(c) This Agreement and the Platinum Ancillary Agreements are, or when executed by Platinum and Purchaser (as applicable) and the other parties thereto will be, valid and binding obligations of Platinum and Purchaser, to the extent a party thereto, enforceable against Platinum and Purchaser, to the extent a party thereto in accordance with their respective terms, except as to the effect, if any, of (i) applicable bankruptcy and insolvency, moratorium, reorganization or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

4.3 No Violation of Charter Documents, Contracts or Laws. Neither the execution and delivery of this Agreement or any Platinum Ancillary Agreement, nor the consummation of the transactions provided for herein or therein, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of: (a) any provision of the Platinum Charter Documents, as currently in effect; (b) any material Contract to which Platinum or any of its Subsidiaries is a party or bound; or (c) any federal, state, local or foreign judgment, writ, decree, Order, statute, rule or regulation applicable to Platinum any Subsidiary of Platinum or any of their respective assets or properties.

4.4 Financing. Platinum has a commitment letter, as attached to Section 4.4 of the Platinum Disclosure Schedule, for a credit facility (the "*Credit Facility*") which, if funded in accordance with its terms, together with available cash on hand, will provide sufficient funds to deliver the Purchase Price and all associated costs and expenses to Parent and to consummate the transactions contemplated by this Agreement.

4.5 Accuracy of Disclosure. This Agreement, its Schedules, and any of the certificates or documents to be delivered by Platinum or Purchaser to Seller or Parent under this Agreement, taken together, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which such statements were made, not misleading.

## 5. SELLER COVENANTS

5.1 Advice of Changes. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, Seller will promptly advise Platinum in writing of: (i) the discovery by Seller of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Seller contained in this Agreement untrue or

34

inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Seller contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that representations and warranties which are confined to a specific date shall speak as of that date), untrue or inaccurate in any material respect; (iii) any Breach of any covenant or obligation of Seller pursuant to this Agreement or any Ancillary Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any of the conditions set forth in Article 10 impossible or unlikely; and (v) any Material Adverse Effect on Seller.

5.2 <u>Conduct of Business</u>. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, Seller and each of its Subsidiaries shall, except as contemplated by this Agreement or to the extent that Platinum shall otherwise consent in writing (which consent shall not be unreasonably withheld or delayed), carry on the Business in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted and in compliance in all material respects with all applicable Legal Requirements and, subject to orders of the Bankruptcy Court and otherwise to the requirements of the Bankruptcy Code, pay its debts and Taxes when due, pay or perform other material obligations when due, and use all commercially reasonable efforts consistent with past practices and policies to (i) preserve intact its present business organization, (ii) make available the services of its present officers, (iii) preserve its relationships with customers, suppliers, licensors, licensees, and others with which it has business dealings, (iv) maintain the Assets in good working condition and repair according to the standards it has maintained as of the date of this Agreement, subject only to ordinary wear and tear, and (v) keep in full force all insurance policies identified under <u>Section 3.27 of the Seller Disclosure Schedule</u> and obtain, renew or extend any insurance required for the Business and the Assets. In addition, during that period, Seller will promptly notify Platinum of any material event involving the operation of the Business or the Assets consistent with the agreements contained herein.

In addition, during the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, except as provided otherwise herein or as approved or recommended by Platinum in writing, Seller and its Subsidiaries will not, without the prior written consent of Platinum, which consent shall not be unreasonably withheld or delayed:

(a)  sell, lease, license, encumber or otherwise dispose of any of the Assets which individually or in the aggregate, are material to the Business or which have a book value in excess of $50,000, other than sales of products to customers and resellers on commercially reasonable terms effected in the ordinary course of business consistent with past practice;

(b)  incur any indebtedness for money borrowed (other than the DIP Financing), enter into any capital leases or guarantee any such indebtedness or capital of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition or enter into any arrangement having the economic effect of any of the foregoing, which obligations, liabilities or indebtedness exceed $50,000 in the aggregate

(c)  except as required under agreements existing as of the date of this Agreement or as set forth under <u>Section 5.2(c) of the Seller Disclosure Schedule</u>, grant or pay any bonus, royalty, severance or termination pay or increased salary or other compensation to any officer, director, employee, consultant or agent of Seller or enter into any new employment agreement or a consulting agreement which provides for payment of more than $50,000 annually with any such Person, or enter into any new agreement or plan of the type described in Sections 3.22(c) or 3.22(e);

35

(d) enter into, amend, modify or terminate any Assumed Seller Contract, except in the ordinary course of business consistent with past practice and to the extent such action would not require disclosure under Section 3.14, or waive, release, compromise or assign any material rights or claims;

(e) issue or sell any shares of the capital stock of any class of any Subsidiary of Seller or any other of such Subsidiary's securities, or issue, grant or create any securities exercisable for or convertible into such securities;

(f) acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, limited liability company, association or other business organization or division thereof; or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to the Business or enter into any joint ventures, partnerships or limited liability companies, or enter into strategic relationships or alliances, which are material, individually or in the aggregate, to the Business;

(g) make or permit to be made any capital expenditures, or make or commit or agree to make any payments that would be classified as expenses under GAAP in each case which exceed $50,000 in any one transaction or the terms of which transactions are not in the ordinary course of business consistent with past practice;

(h) materially change its business practices or policies with respect to the Seller Products and Services or its customers;

(i) materially revalue any of its assets or, except as required by GAAP, make any change in accounting methods, principles or practices, or agree to any material audit assessment by any Tax authority or make any Tax election;

(j) lend any amount to any Person, other than loans made to Subsidiaries of Seller that will be repaid in full prior to the Effective Time, in an amount not to exceed $50,000, and advances for reasonable travel related expenses which are incurred in the ordinary course of business consistent with past practice, not material in amount, which travel related expenses shall be documented by receipts for the claimed amounts in accordance with past practice;

(k) make any material payments outside the ordinary course of business consistent with past practice;

(l) take any action which would have a Material Adverse Effect on Seller other than as contemplated herein;

(m) declare or make any Restricted Payments;

(n) directly or indirectly, make or own any Investment, except:

     (i)     Investments in Cash Equivalents;

     (ii)    Investments by any Subsidiary existing on the Filing Date; or

36

A-0035.18

(iii)    Investments received (but not purchased) in connection with the bankruptcy or reorganization of a customer of Seller or any Subsidiary or received in settlement of delinquent obligations of or disputes with the customers of Seller or any Subsidiary in the ordinary course of business.

(o) agree to do, or permit a Subsidiary to do or agree to do, any of the things described in the preceding clauses 5.2(a) through (n).

5.3 <u>Regulatory Approvals</u>. Seller will execute and file, or join in the execution and filing, of any application or other document that may be necessary in order to obtain any Governmental Authorization, which may be reasonably required, or which Platinum may reasonably request, in connection with the consummation of the transactions provided for in this Agreement. Seller will use all commercially reasonable efforts to obtain or assist Platinum in obtaining all such Governmental Authorizations.

5.4 <u>Necessary Consents</u>. Seller will use all commercially reasonable efforts to obtain such written consents and take such other actions as may be necessary or appropriate for Seller, in addition to those set forth in Section 5.3, to allow the consummation of the transactions provided for herein and to facilitate and allow Platinum to carry on Seller's Business after the Closing Date, including the obtaining of any consents required to assign the Assumed Seller Contracts to Purchaser.

5.5 <u>Securities Laws</u>. Seller shall use all reasonable efforts to assist Platinum to the extent necessary to comply with the Securities Laws of all jurisdictions applicable in connection transactions contemplated by this Agreement.

5.6 <u>Litigation</u>. Seller will notify Platinum in writing promptly after learning of any Proceeding by or before any Governmental Authority initiated or threatened against Parent or Seller relating to the Business or the Assets or for the purpose or with the effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or which, if adversely determined, would be reasonably expected to have a Material Adverse Effect on Seller, the Business, the Assets or the Assumed Liabilities. If Parent or Seller becomes subject to a review by the Internal Revenue Service or any other Taxing agency or authority for periods prior to the Closing Date, and such review has the potential to materially affect the Liability of Platinum or any Subsidiary of Platinum for any Taxes due with respect to a Taxable period ending after the Closing Date, Parent or Seller (as the case may be) shall keep Platinum informed on a regular basis of the nature of such Proceedings and shall consider in good faith any recommendations made by Platinum as to the conduct and settlement of such Proceedings. In no event will Parent or Seller enter into any settlement or other stipulation with respect to any such review without the written consent of Platinum, which consent will not be unreasonably withheld.

5.7 <u>Notification of Employee Problems</u>. Parent or Seller will promptly notify Platinum if any of Parent's or Seller's officers becomes aware that any of the key personnel listed under <u>Section 3.26 of the Seller Disclosure Schedule</u> intends to leave Seller's employ.

5.8 <u>Satisfaction of Closing Conditions</u>. Seller will use its commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent which are set forth in Article 10 on or before the Closing. Subject to the terms and conditions of this Agreement, Seller will use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and

37

authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

5.9 <u>Confidentiality</u>. Seller and Parent agree that Seller, Parent and their respective officers, directors, agents and representatives, will hold in strict confidence, and will not use or disclose, any Confidential Information or proprietary data obtained from Purchaser or Platinum with respect to Purchaser or Platinum except for the purpose of evaluating, negotiating and completing the transactions contemplated hereby. Information generally known in Platinum's industry or which has been disclosed to Seller or Parent by Third Parties which have a right to do so shall not be deemed Confidential Information or proprietary data for purposes of this Agreement. If the transactions contemplated by this Agreement are not consummated, Seller and Parent will return to Platinum (or certify that they have destroyed) all copies of such Confidential Information and proprietary data, including, but not limited to financial information, customer lists, business and corporate records, worksheets, test reports, Tax returns, lists, memoranda, and other documents prepared by or made available to Seller in connection with the transactions contemplated hereby.

5.10 <u>Change of Name</u>. On or before the Closing Date, Seller shall (i) amend the Seller Charter Documents and take all other actions necessary to change its name to one sufficiently dissimilar to Seller's present name, in Purchaser's judgment, to avoid confusion; and (ii) take all actions requested by Purchaser to enable Purchaser to change its name to Seller's present name. In addition, from and after the Effective Time, none of Seller or its Subsidiaries shall use the present name of Seller or its Subsidiaries, or any variation thereof.

5.11 <u>Access to Information</u>. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time or (b) the termination of this Agreement in accordance with the provisions of Article 11 hereof, subject to the terms and conditions hereof relating to the confidentiality and use of confidential and proprietary information, and subject to compliance with applicable Legal Requirement (including, but not limited to, antitrust laws) Seller will provide Platinum and its agents with reasonable access, during regular business hours, to the files, books, records and offices of Seller and the Subsidiaries, including, without limitation, any and all information relating to Seller and Subsidiary Taxes, commitments, Contracts, Leases, licenses, real, personal and intangible property (including any Intellectual Property Rights), and financial condition. Seller will cause its accountants to cooperate with Platinum and its agents in making available all financial information reasonably requested, including, without limitation, the right to examine all working papers pertaining to all financial statements prepared or audited by such accountants.

5.12 <u>Canadian Employee Matters</u>. Prior to the Closing Date, Seller or Canada Sub shall terminate such employees of Canada Sub as shall be set forth on a schedule to be provided to Seller not later than ten (10) days prior to the Effective Time; provided, however, that such number of terminated employees shall not be greater than forty-nine (49). Seller agrees that it or Canada Sub shall be responsible for any severance or termination obligations of Canada Sub with respect to any such terminated employees, that such employees shall be terminated in a manner so as to prevent Purchaser from incurring any liability with respect to such terminations (including without limitation, all payments required by applicable labor or employment standards legislation) and Seller shall also terminate any and all Seller Employee Plans prior to Closing as directed by Platinum or Purchaser.

## 6. COVENANTS OF PLATINUM AND PURCHASER

6.1 <u>Advice of Changes</u>. During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with

38

the provisions of Article 11 hereof, Platinum and Purchaser will promptly advise Seller in writing of:
(i) the discovery by Platinum or Purchaser of any event, condition, fact or circumstance occurring on or
prior to the date of this Agreement that would render any representation or warranty by Platinum or
Purchaser contained in this Agreement untrue or inaccurate in any material respect; (ii) any event,
condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any
representation or warranty by Platinum or Purchaser contained in this Agreement, if made on or as of the
date of such event or the Closing Date (provided that the representations and warranties which are
confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect;
(iii) any Breach of any covenant or obligation of Platinum pursuant to this Agreement or any Ancillary
Agreement; (iv) any event, condition, fact or circumstance that may make the timely satisfaction of any
of the conditions set forth in Article 9 impossible or unlikely; and (v) any material adverse effect on
Platinum.

  6.2 <u>Regulatory Approvals</u>. Platinum will execute and file, or join in the execution and
filing of, any application or other document that may be necessary in order to obtain any Governmental
Authorization, which may be reasonably required, or which Seller may reasonably request, in connection
with the consummation of the transactions provided for in this Agreement. Platinum will use
commercially reasonable efforts to obtain all such Governmental Authorization.

  6.3 <u>Litigation</u>. Platinum will notify Seller in writing promptly after learning of any
Proceeding threatened or pending for the purpose or with the probable effect of enjoining or preventing
the consummation of any of the transactions contemplated by this Agreement, or which would be
reasonably expected to have a material adverse effect on Platinum.

  6.4 <u>Satisfaction of Conditions Precedent</u>. Upon the terms and subject to the conditions
of this Agreement, Platinum will use commercially reasonable efforts to satisfy or cause to be satisfied
all the conditions precedent which are set forth in Article 9 on or before the Closing Date. Upon the
terms and subject to the conditions of this Agreement, Platinum will use commercially reasonable efforts
to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the
generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all
filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part
in order to effect the transactions provided for herein.

  6.5 <u>Confidentiality</u>. Purchaser and Platinum agree that, unless and until the Closing has
been consummated. Purchaser, Platinum and their officers, directors, agents and representatives, will
hold in strict confidence, and will not use or disclose, any Confidential Information or proprietary data
obtained from Seller or its Subsidiaries with respect to Seller or its Subsidiaries except for the purpose of
evaluating, negotiating and completing the transactions contemplated hereby. Information generally
known in Seller's industry or which has been disclosed to Purchaser or Platinum by Third Parties which
have a right to do so shall not be deemed Confidential Information or proprietary data for purposes of
this Agreement. If the transactions contemplated by this Agreement are not consummated, Purchaser and
Platinum will return to Seller (or certify that they have destroyed) all copies of such Confidential
Information and proprietary data, including, but not limited to financial information, customer lists,
business and corporate records, worksheets, test reports, Tax returns, lists, memoranda, and other
documents prepared by or made available to Purchaser and Platinum in connection with the transactions
hereby.

  6.6 <u>Office Space</u>. For a period of six (6) months after the Closing Date, or such longer
or shorter period of time as Purchaser and Seller shall mutually agree, Purchaser shall provide Seller with
reasonable office space at the former headquarters of Seller located in Niles, IL consisting of one (1)

39

office for use by Seller in administering the remainder of the Chapter 11 Case. Purchaser shall not be obligated to provide Seller with any secretarial staff, computer access or other support services, except access to an external telephone line, as needed.

## 7. ADDITIONAL COVENANTS

### 7.1 Non-Competition, Non-Solicitation and Non-Disparagement.

(a) Non-Competition. For a period of five (5) years after the Closing Date, neither Seller nor Parent shall, anywhere in the world, directly or indirectly invest in, own, manage, operate, finance, control, advise, or render services to, or guarantee the obligations of, any Person engaged in or planning to become engaged in the Business or any business that competes with the Business; provided, however, that Seller or Parent may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Exchange Act.

(b) Non-Solicitation. For a period of five (5) years after the Closing Date, neither Seller nor Parent shall, directly or indirectly:

(i)        solicit the business of any Person who is an active customer of Purchaser; or

(ii)       cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Seller on the Closing Date or within the year preceding the Closing Date to cease doing business with Purchaser, to deal with any competitor of Purchaser, or in any way interfere with its relationship with Purchaser.

(c) Non-Disparagement. After the Closing Date, the Parties will not disparage the other parties or any of their respective shareholders, directors, officers, employees or agents.

(d) Modification of Covenant. If a final Order of a Governmental Authority of competent jurisdiction determines that any term or provision contained in Section 7.1(a) through (c) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration, or geographic area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable, and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 7.1 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 7.1 is reasonable and necessary to protect and preserve Purchaser's legitimate business interests and the value of the Assets and to prevent any unfair advantage being conferred on Seller or Parent.

7.2 Further Assurances. Parent and Seller agree that if, at any time before or after the Effective Time, Platinum considers or is advised that any further deeds, assignments or assurances are reasonably necessary or desirable to vest, perfect or confirm in Purchaser's assumption of the Assumed Liabilities, Parent and Seller shall execute and deliver all such proper deeds, assignments and assurances and do all other things reasonably necessary to vest, perfect or confirm title to such property or rights in Purchaser and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement. In addition, from and after the Closing Date, Seller agrees that it will (i) remit to Purchaser

40

all checks or payments received by it subsequent to the Effective Time which constitute Purchaser's assumption of the Assumed Liabilities s and (ii) collect any and all insurance proceeds resulting from claims relating to the business which constitutes Purchaser's assumption of the Assumed Liabilities and remit such sums directly to Purchaser. Platinum and Purchaser agree that if, at any time before or after the Effective Time, Seller considers or is advised that any further instruments of assumption or assurances are reasonable necessary or desirable to confirm Purchaser's assumption of the Assumed Liabilities, Platinum shall execute and deliver all such proper instruments and assurances and do all other things reasonably necessary to confirm Purchaser's assumption of the Assumed Liabilities, and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement.

7.3 <u>Filings</u>. The parties agree that, based upon the current facts known to them, no Antitrust Filings (as hereinafter defined) nor Other Filings (as hereinafter defined) are required. Notwithstanding the foregoing, in the event that Antitrust Filings (as hereinafter defined) or Other Filings (as hereinafter defined) are required, as promptly as practicable after the date of this Agreement, each of Parent, N.E.S. Investment Co., Sellers and Platinum will prepare and file (i) with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice Notification and Report Forms relating to the transactions contemplated herein if required by the HSR Act, as well as comparable notification forms required by the merger notification or control laws and regulations of any other applicable jurisdiction (the "*Antitrust Filings*") and (ii) any other filings required to be filed by them under the Exchange Act, the Securities Act or any other Federal, state or foreign laws relating to the transactions contemplated by this Agreement (the "*Other Filings*"). Parent, Sellers and Platinum each shall promptly supply the other with any information which may be required in order to effectuate any filings pursuant to this Section 7.3. Neither Platinum nor any of its Affiliates on the one hand, nor Parent nor any of its Affiliates on the other hand, shall be under any obligation to make proposals, execute or carry out agreements or submit to orders providing for the sale or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets or categories of assets of such party or any of its Affiliates, or imposing or seeking to impose any limitation on the ability of Platinum or any of its Affiliates or subsidiaries on the one hand or Parent or any of its Affiliates or subsidiaries on the other hand, to conduct their business or own such assets or to acquire, hold or exercise full rights of ownership of the Assets to be acquired.

## 8. BANKRUPTCY PROCEDURES, ETC.

8.1 <u>Motion and Notice Regarding Approval of Bid Procedures</u>. On or before July 15, 2004, Seller shall file a motion (the "*Sale Procedures Motion*") and give sufficient notice in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules seeking Bankruptcy Court approval of sale and bidding procedures consistent with the terms of this Section 8, including, without limitation, the Termination Fee described in Section 8.10 and the Expense Reimbursement described in Section 8.9, and Seller shall seek prompt entry of an order of the Bankruptcy Court granting the Sale Procedures Motion (the "*Sale Procedures Order*"), which approves bid procedures substantially similar to those requested in the Sale Procedures Motion after sufficient notice has been given. Upon approval of the sale and bidding procedures, Seller shall distribute a copy of the Sale Procedures Order (in the form of notice approved by the Bankruptcy Court) to all entities who have expressed an interest in acquiring the Assets.

8.2 <u>Motion and Notice Regarding Sale of Acquired Assets and Assumption and Assignment of Certain Acquired Assets</u>. On or before July 15, 2004, Seller shall file a motion (the "*Sale Motion*") and give sufficient notice in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules seeking Bankruptcy Court approval pursuant to Bankruptcy Code Section 363 of (1) a sale of the Assets to the Purchaser, and (2) to the extent required under the Bankruptcy Code or other

41

applicable law, approval pursuant to Bankruptcy Code Section 365 of assumption and assignment of certain of the Assets in accordance with the terms and conditions of this Agreement, Seller shall seek prompt entry of an order of the Bankruptcy Court granting the Sale Motion (the *"Sale Order"*) after sufficient notice has been given.

       8.3 <u>No Talk/No Shop Provision</u>. From the date of this Agreement through the approval or non-approval of Sale Procedures Order by the Bankruptcy Court, Seller shall cease any and all activities, discussions or negotiations with any parties with respect to the sale of Seller's Assets or business and neither Seller nor its employees, consultants, agents or representatives shall solicit, accept or in any way seek to further any offer to purchase any Assets of Seller, or any other entity to be formed through the restructuring of Seller or take any other action inconsistent with the transactions contained in this Agreement.

       8.4 <u>Determination of "Qualifying Bidder" Status</u>. In order to participate in the bidding process and be deemed a "Qualifying Bidder,"[1] each bidder other than the Purchaser, must, on or before the Bid Deadline (defined below) deliver to counsel to the Seller, Benesch, Friedlander, Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, OH 44114-2378, Attn:  H. Jeffrey Schwartz, Esq. ("*BFCA*"):

       (a)  an earnest money deposit in the amount of 10% of the gross amount of the purchase price set forth in such bid (the *"Qualified Bidder Deposit"*) by cashier's or certified check (made payable to the Seller) or wire transfer of immediately available fund, which deposit shall be held by an escrow agent selected by Seller in accordance with the terms of an escrow agreement to be provided by Seller;

       (b)  a written offer or group of offers (a *"Qualifying Bid"*) that:

    i.  states that such Qualifying Bidder offers to purchase the Assets upon the terms and conditions as substantially set forth in this Agreement or through a merger or alternative structure on such different or additional terms as appropriate and desirable, for such transaction structure (which terms and conditions shall be no less favorable to Seller as the terms and conditions contained in the Agreement);

    ii.  states that such Qualifying Bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisition of the Assets on terms and conditions no less favorable to Seller than the terms and conditions contained in the Agreement;

    iii.  states that such Qualifying Bidder is financially capable of consummating a transaction substantially similar to the transactions contemplated by this Agreement;

    iv.  contains such financial and other information that will allow Seller to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated;

---

[1] The Purchaser will be deemed a Qualifying Bidder and the Agreement constitutes a Qualifying Bid for all purposes.

A- 0038

v.  is likely to result in a value to Seller that is more than the aggregate of the value of the sum of: (1) the Purchase Price; plus (2) $1,200,000 (the maximum amount of the Termination Fee; plus: (C) $500,000 (the maximum amount of the Expense Reimbursement); plus (D) $400,000;

vi.  does not contain any due diligence or financing contingencies of any kind; and

vii.  contains evidence that the bidder has received debt and/or equity funding commitments sufficient in the aggregate to finance the purchase of the assets proposed to be acquired, which evidence may include, without limitation, evidence of sources of equity or debt financing for payment of the purchase price, copies of commitment letters, and the identity of contact persons at the financing institutions issues such commitment letters.

At Seller's sole discretion, bids that do not substantially conform to the foregoing and the procedures set forth in the Sales Procedures Order may not be accepted. Seller shall have the right to negotiate with any bidder with respect to clarification or enhancement of such bidder's bid.

8.5  Requests for Information: All potential bidders shall be required to submit any requests for information with respect to Seller's Businesses or Assets or requests for access to Seller's employees, management or officers and directors to discuss Seller's businesses or Assets directly to Candlewood Partners ("*Candlewood*"), the Seller's financial consultants, and in no event shall any bidders be granted any such access other than by means of access through Candlewood. From the date of the approval of the Bidding Procedures Order, (1) if Seller supplies any information regarding Seller's Business to a potential bidder not heretofore given to Purchaser, Seller shall further provide Purchaser with a copy of such information within 24 hours of providing that information to any other potential bidder; and (2) with respect to any bid, term sheet, or written expression of interest by any other party for any Asset or Assets of Seller, or any other reorganization proposal, submitted prior to the Bid Deadline (defined below), Seller shall provide Purchaser with prompt notice of such proposal and a copy of such proposal within 48 hours of Seller's receipt thereof.

8.6  Bid Deadline.

(a)  All Qualifying Bids must be submitted to BFCA so as to be received not later than 5:00 p.m. (prevailing Eastern Time) on September 21, 2004 (the "*Bid Deadline*"). After the expiration of the Bid Deadline, BFCA shall promptly provide copies of all bids received to (i) Seller's Delaware counsel, (ii) Purchaser's Delaware counsel, (iii) John J. Egan, III McDermott Will & Emery LLP, 28 South Street, Boston, Massachusetts 02109 and Stephen B. Selbst, McDermott Will & Emery LLP, 50 Rockefeller Plaza, New York, New York 10020 and (iv) counsel for KeyBank N.A., Alan R. Lepene, Esq., Thompson Hine LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114-1291.

(b)  If Seller does not receive any Qualifying Bids by the Bid Deadline, counsel for Seller shall report the same to the Bankruptcy Court and Seller shall proceed to seek prompt entry of the Sale Order authorizing consummation of the transactions contemplated by this Agreement.

8.7  Auction. In the event that Seller timely receives one or more Qualifying Bids other than the bid of Purchaser, Seller shall conduct an auction (the "*Auction*"). The Auction will take place no later than 10:00 a.m. (prevailing Eastern time) on September 27, 2004 at the offices of Benesch,

43

Friedlander, Coplan & Aronoff LLP in Cleveland, Ohio or at such other place, date and time as may be designated in writing by the Seller. The Auction shall be governed by the following procedures:

(a) only Seller, representatives of KeyBank, N.A., representatives of the Creditors' Committee, if any, and any Qualifying Bidders (and the professionals for each of the foregoing) shall be entitled to attend and be heard at the Auction;

(b) only the Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(c) the Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

(d) bidding shall commence at an amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

(e) Qualifying Bidders may then submit successive bids;

(f) the minimum bidding increment shall be $200,000; and

(g) the Auction shall continue until there is only one offer that the Seller determines, subject to Bankruptcy Court approval, is the highest and/or best Qualifying Bid (the *"Prevailing Bid"*). In making this decision, Seller shall consider without limitation the amount of the purchase price, the form of consideration being offered, the likelihood of the Bidder's ability to close a transaction and, the timing thereof, and the net benefit to Seller's estate. The Qualifying Bidder that submits the Prevailing Bid shall become the *"Prevailing Bidder,"* and shall have such rights and responsibilities of the purchaser, as set forth in the applicable asset purchase agreement. Within one (1) day after adjournment of the Auction, the Prevailing Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made.

8.8  Sale Hearing. The Prevailing Bid (or if no Qualifying Bid other than that of Purchaser is received, the offer made by Purchaser) will be subject to approval by the Bankruptcy Court. The Sale Hearing (as defined herein) shall be held not later than September 30, 2004 and may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

8.9  Expense Reimbursement: In the event of a termination of this Agreement pursuant to Sections 11.1(d)(B) and (C) only, Seller will reimburse the Purchaser for all actual out-of-pocket costs and expenses (including professional fees) reasonably incurred by Platinum and Purchaser in connection with the transactions contemplated by the Agreement, up to a maximum of $500,000 (the "Expense Reimbursement").

8.10  Termination Fee: In the event of a termination of this Agreement pursuant to Sections 11.1(d)(B) and (C) only, Seller will be obliged to pay Purchaser an amount equal to $1,200,000, plus the Expense Reimbursement (the *"Termination Fee"*). The Termination Fee shall be due and payable in accordance with Paragraph 11.2 herein. Seller's obligation to pay the Termination Fee shall be given administrative expense priority pursuant to 11 U.S.C. Section 507(a)(1).

44

8.11    <u>Defense of Orders</u>. Seller, at its sole cost and expense, shall defend the Sale Procedures Order and the Sale Order in the event that Purchaser elects, in its sole discretion, to close the purchase of the Assets notwithstanding the pendency of any motion for reconsideration or appeal of such Orders and shall promptly reimburse Purchaser for its reasonable attorneys' fees and costs in entering an appearance and in participating in such reconsideration or appeal.

### 9. CONDITIONS TO OBLIGATIONS OF SELLER

Seller's and Parent's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Seller, but only in writing signed on behalf of Seller by an authorized officer):

9.1    <u>Accuracy of Representations and Warranties</u>. Each of the representations and warranties of Platinum and Purchaser set forth in Article 4 of this Agreement shall be true and correct in all material respects (or in all respects, to the extent any such representation and warranty is already qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date.

9.2    <u>Covenants</u>. Platinum and Purchaser shall have performed and complied in all material respects with all of its covenants contained in Article 6 on or before the Closing Date.

9.3    <u>Absence of Material Adverse Effect</u>. No material adverse effect with respect to Platinum shall have occurred since May 31, 2004 and be continuing but excluding any material adverse effect arising from or related to the public announcement of the transactions contemplated by this Agreement or the DIP Financing, the outbreak of civil unrest, hostilities, terrorist activities, or war (whether or not formally declared) which causes, in a measurable manner, the material adverse effect.

9.4    <u>Compliance with Law</u>. There shall be no Order by any Governmental Authority or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

9.5    <u>Government Consents</u>. There shall have been obtained at or prior to the Closing Date such permits or authorizations, and there shall have been taken such other actions, as may be required to consummate the sale of Assets by any regulatory authority having jurisdiction over the Parties and the actions herein proposed to be taken, including but not limited to satisfaction of all requirements under applicable Securities Laws and state "Blue Sky" or securities laws.

9.6    <u>Absence of Litigation</u>. No litigation or proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement. No litigation or proceeding shall be pending which could reasonably be expected to have a material adverse effect on Platinum that has not been previously disclosed to Seller herein.

9.7    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order.

45

9.8  Other Deliveries.  Purchaser shall have delivered to Seller and Parent and/or their designee, as the case may be, the Assignment and Assumption Agreement and any Assignment and Assumption of Lease, each duly executed by Purchaser.

## 10. CONDITIONS TO OBLIGATIONS OF PLATINUM

The obligations of Platinum hereunder are subject to the fulfillment or satisfaction on, and as of the Closing, of each of the following conditions (any one or more of which may be waived by Platinum, but only in a writing signed on behalf of Platinum by its Chief Executive Officer or Chief Financial Officer):

10.1  Accuracy of Representations and Warranties.  Each of the representations and warranties of Parent and Seller set forth in Article 3 of this Agreement shall be true and correct in all material respects (or in all respects, to the extent any such representation and warranty is already qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that, to the extent such representations and warranties address matters only as of a particular date, such representations and warranties shall, to such extent, be true and correct on and as of the date hereof and on and as of such particular date as if made on and as of such particular date.

10.2  Covenants.  Seller shall have performed and complied in all material respects with all of its covenants contained in Article 5 on or before the Closing Date, and Platinum shall have received a certificate to such effect executed on behalf of Seller by the President, Chief Executive Officer or Chief Financial Officer of Seller.

10.3  Absence of Material Adverse Effect.  No Material Adverse Effect with respect to Seller shall have occurred since the date of this Agreement and be continuing.

10.4  Compliance with Law.  There shall be no Order by any Governmental Authority, or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

10.5  Government Consents.  There shall have been obtained at or prior to the Closing Date such material permits or authorizations and there shall have been taken such other action, as shall be reasonably required to consummate the sale of Assets by any Governmental Authority having jurisdiction over the parties and the actions herein proposed to be taken, including but not limited to material satisfaction of all requirements under applicable federal and state Securities Laws.

10.6  Third-Party Consents; Assignments; Other Documents.  Subject to the provisions of Sections 363 and 365 of the Bankruptcy Code, Platinum shall have received:  (a) duly executed copies of all material Third-Party consents, approvals, assignments, waivers, authorizations, permits or other certificates set forth on Section 3.4(b) of the Seller Disclosure Schedule; and, to the extent necessary, (b) any other written consents, assignments, waivers, authorizations or other certificates where, in the case of this clause (b), the failure to have received the same would have a Material Adverse Effect on the Assets or the business to be conducted with the Assets by Purchaser, including any consents required to assign any of the Assumed Seller Contracts which are individually or in the aggregate material to Seller.

10.7  [Intentionally Omitted]

A- 0042

10.8    Indemnity.  Parent, Sellers and their Affiliates shall have assigned to Platinum and its Affiliates all rights they have relating to the Assets under that certain Stock Purchase Agreement dated as of December 19, 1996 between GEC Incorporated and Paragon Corporate Holdings, Inc. and other documents executed in connection therewith.

10.9    Absence of Litigation.  No litigation or proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement.  No litigation or proceeding shall be pending which could reasonably be expected to have a Material Adverse Effect on Seller, the Assets, the Assumed Liabilities or the business to be conducted with the Assets by Purchaser.

10.10    Sale Order.  The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order.  Notwithstanding the foregoing, nothing in this Agreement shall preclude Sellers from consummating the transactions contemplated herein if Purchaser, in its sole discretion, waives the requirement that the Sale Order shall have become a Final Order.  No notice of such waiver of this condition or any other condition to the Closing need be given except to Seller, it being the intention of the Parties that Purchaser shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Order becoming a Final Order.

10.11    Other Deliveries.  Seller shall have delivered to Purchaser and Platinum the following:

(a)  a customary bill of sale for all of the Assets which are Tangible Personal Property (the "*Bill of Sale*"), duly executed by Seller and/or its Subsidiaries;

(b)  a customary assignment of all of the Assets which are intangible personal property, which assignment shall also contain Purchaser's undertaking and assumption of the Assumed Liabilities (the "*Assignment and Assumption Agreement*"), executed by Seller and/or its Subsidiaries;

(c)  for each interest in Real Property identified on Section 3.13(c) of the Seller Disclosure Schedule which is not one of the Excluded Real Estate Interests, a recordable quitclaim deed, a customary Assignment and Assumption of Lease or such other appropriate document or instrument of transfer, as the case may require, and in the case of the Excluded Real Estate Interests, a lease or sublease, as the case may require, to Purchaser for $1 for six months, each in form and substance satisfactory to Purchaser and its counsel and executed by Seller and/or its Subsidiaries;

(d)  customary assignments of all Seller IP Rights and customary separate assignments of all registered trademarks, servicemarks, patents and copyrights, and all applications therefore executed by Seller and/or its Subsidiaries; and

(e)  such other deeds, bill of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Seller and/or its Subsidiaries.

10.12    Accounts Receivable and Inventory.  (i) At the Effective Time, the sum of accounts receivable and inventory, less deferred revenue, of Seller and Canada Sub shall be at least

47

$22,700,00 on a cumulative basis, and (ii) Limited shall have $5,400,000 in net assets (including the intercompany payable due Seller of $1,600,000), in each case measured in accordance with GAAP.

10.13   Financial Statements.   Seller shall have delivered a copy of its unaudited financial statements for the period ended June 30, 2004 reviewed by Ernst & Young LLP, or another national or regional accounting firm registered with the Public Company Accounting Oversight Board (the "*Reviewer*") and certified by its chief financial officer and an appropriate executive officer of Parent as being prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto). Purchaser and Platinum shall have the sole right to approve and accept the Reviewer and the terms of such firm's engagement, such approval and acceptance not to be unreasonably withheld. Seller also shall have delivered a draft of (i) such Seller financial statements and audit report which, if the transaction contemplated by this Agreement is consummated, shall contain no adverse opinion or disclaimer of opinion or qualification or modification as to uncertainty, accounting principal, or audit scope, in such form (audited or unaudited), as will be required in order for Platinum to comply with Form 8-K under the rules of the Securities and Exchange Commission (the "*Updated Financial Statements*") and (ii) the consent of the Reviewer to file the audited Updated Financial Statements as part of a filing with the SEC by Platinum, assuming the consummation of such transaction.

## 11. TERMINATION

11.1   Termination of Agreement.   Certain of the Parties may terminate this Agreement as provided below:

(a) Purchaser and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b) Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing in the event (A) Seller has within the then previous ten (10) business days given Purchaser any notice pursuant to Section 5.1 above and (B) the development that is the subject of the notice has caused the representations and warranties in Section 3 above to not be true and correct in all material respects, (except to the extent that any such representation or warranty is qualified by terms such as "material" and "Material Adverse Effect," in which case if such development that is the subject of the notice has caused the representation or warranty in Section 3 above to not be true and correct in all respects) and such result has not been cured within fifteen (15) days of the date of such notice;

(c) Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (A) in the event Seller has Breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Purchaser has notified Seller of the Breach, and the Breach has continued without cure for a period of fifteen (15) days after the notice of Breach or (B) if the Closing shall not have occurred on or before October 15, 2004, by reason of the failure of any condition precedent under Section 10 hereof (unless the failure results primarily from Purchaser itself Breaching any representation, warranty, or covenant contained in this Agreement);

(d) Purchaser or Seller may terminate this Agreement by giving written notice to the other party at any time prior to Closing (A) if the Sale Procedures Order shall not have been entered by the Bankruptcy Court within forty-five (45) days following the Petition Date, (B) (i) in the event Seller has accepted or selected, and the Bankruptcy Court shall have approved, the bids or bids (including a credit bid) of any Person or Persons other than Purchaser or any of its Affiliates to purchase

48

all or any portion of the businesses and Assets of Seller and (ii) such transaction or transactions contemplated by any such bid or bids shall have been consummated, or (C) in the event that Seller withdraws its support for the transactions contemplated by this Agreement and seeks to have a stand alone plan of reorganization approved by the Bankruptcy Court;

(e)  Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing (A) in the event Purchaser has Breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller have notified Purchaser of the Breach, and the breach has continued without cure for a period of fifteen (15) days after the notice of Breach or (B) if the Closing shall not have occurred on or before October 15, 2004, by reason of the failure of any condition precedent under Section 9 hereof (unless the failure results primarily from Seller Breaching any representation, warranty, or covenant contained in this Agreement);

(f)  Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to the Closing if the Sale Order shall not have been entered by the Bankruptcy Court on or before October 15, 2004;

(g)  (A) Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing but within two (2) business days following July 15, 2004 if the Petition Date is not on or before July 15, 2004; (B) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section 11.1(g)(A) above, Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing but within two (2) business days following August 27, 2004 if the date of entry of the Sales Procedure Order is not on or before August 27, 2004; (C) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section 11.1(g)(B) above, Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing but within two (2) business days following September 30, 2004 if the date of entry of the Sales Order is not on or before September 30, 2004; and (D) to the extent that Purchaser does not terminate this Agreement within such two (2) day period pursuant to Section11.1(g)(C) above, Purchaser may terminate this Agreement by giving written notice to Seller at any time prior to the Closing but within two (2) business days following October 15, 2004 if the Closing Date is not on or before October 15, 2004.

11.2  <u>Termination Fee.</u>  In the event that this Agreement is terminated by Purchaser or Seller pursuant to either Section 11.1(d)(B) or (C) hereof, then Seller shall pay to Purchaser the Termination Fee upon the consummation of the transaction by Seller and such other Person, in the event of a termination pursuant to Section 11.1(d)(B), or upon the submission by Seller of a stand alone plan of reorganization with the Bankruptcy Court, in the event of a termination pursuant to Section 11.1(d)(C), and Seller shall have no other liability under this Agreement to Purchaser or any of its Affiliates (other than for return of the Deposit and payment of the Termination Fee).

11.3  <u>Effect of Termination.</u>  Except as provided for in Section 11.2 and except for the return of the Deposit to Purchaser as a result of a termination of this Agreement pursuant to Sections 11.1(a), (b), (c), (d), (e)(B), (f) or (g), in the event that this Agreement is terminated by either Party then said termination shall be the sole remedy of the parties hereto with respect to Breaches of any covenant, representation, or warranty contained in this Agreement and none of the Parties hereto nor any of their respective directors, officers, members, or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective directors, officers, members, or Affiliates, as the case may be, pursuant to this Agreement, except upon a willful Breach by a Party (in which case that non-Breaching Party shall have all rights and remedies existing at law or in equity).  Upon any

termination of this Agreement pursuant to Section 11.1, all Confidential Information of either Party shall be returned to the other Party.

## 12. TAXES.

   12.1    Taxes Related To Assets and Assumed Liabilities.  All sales, use, gross-receipts, transfer, gains, excise, value-added or other similar Taxes in connection with the transfer of the Assets and the assumption of the Assumed Liabilities, and delivery of the Assets, and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment of the Assets and that are not exempt under Section 1146(c) of the Bankruptcy Code shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Seller on or prior to their due date.

   (a)  Purchaser shall be liable for and pay all Taxes applicable to the Assets and Assumed Liabilities that are attributable to Taxable years or periods beginning on the Closing Date and with respect to any Straddle Period, the portion of such Straddle Period beginning on the Closing Date. For purposes of this Agreement, *"Straddle Period"* shall mean any Taxable period beginning on, or before and ending after the Closing Date.

   12.2    Tax Refunds.  Any Tax refunds (including any interest related thereto) received by Purchaser, its Affiliates or successors relating to Taxes that Seller has paid shall be for the account of Seller, and Purchaser shall pay over to Seller any such amount within ten (10) business days of receipt thereof. Purchaser shall include with its remittance to Seller copies of any correspondence, documents, or other materials received or transmitted by Purchaser with respect to the Tax refund. Seller shall be entitled to request that Purchaser, at Seller's expense, file for and obtain any Tax refunds with respect to Tax periods or portions thereof ending on or before the Closing Date (with respect to the relevant Purchased Asset).

   12.3    Cooperation on Tax Matters.  Seller and Purchaser shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense) in a timely fashion such personnel, Tax data, relevant Tax Returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (i) for the preparation by such other Party of any Tax Returns or (ii) in connection with any Tax audit or proceeding including one Party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

   12.4    Retention of Tax Records.  After the Closing Date and until the expiration of all statutes of limitation applicable to Seller's liabilities for Taxes, Purchaser shall retain possession of all accounting, business, financial and Tax records and information that (i) relate to the Assets and are in existence on the Closing Date and (ii) come into existence after the Closing Date but relate to the Assets before the Closing Date, and Purchaser shall give Seller notice and an opportunity to retain any such records in the event that Purchaser determines to destroy or dispose of them during such period.  In addition, from and after the Closing Date, Purchaser shall provide to Seller and its Affiliates (after reasonable notice and during normal business hours and without charge to Seller or their Affiliates) access to the books, records, documents and other information relating to the Assets as Seller may reasonably deem necessary to (i) properly prepare for, file, prove, answer, prosecute and defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (ii) administer or complete any cases under chapter 11 of the Bankruptcy Code of or including Seller.  Such access shall include reasonable access to any computerized information systems that contain data regarding the Assets.

A- 0046

12.5    GST Election. Each of the Purchaser and Canada Sub represents and warrants to the other that it is, or will be prior to the Closing Date, a registrant under Part X of the *Excise Tax Act* ("*ETA*") and each covenants and agrees to make the joint election contemplated by Subsection 167(1) of the ETA, if available, and the Purchaser hereby covenants and agrees to file the joint election with the Minister of National Revenue with its Goods and Services Tax ("*GST*") return for its reporting period in which the transactions contemplated by this Agreement take place. If it is determined that GST is payable by the Purchaser in respect of the supply of property contemplated by this Agreement, then the Purchaser agrees to remit all such tax payable and Canada Sub shall reimburse Purchaser for 50% of the GST in accordance with Section 12.1.

## 13. MISCELLANEOUS

13.1    Entire Agreement. This Agreement, the Ancillary Agreements and the Schedules hereto constitute the entire understanding and agreement of the Parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

13.2    Assignment; Binding Upon Successors and Assigns. Neither Party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other Party hereto; provided however, that Purchaser may assign its rights to acquire the Assets in whole or in part to an Affiliate. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

13.3    No Third Party Beneficiaries. No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any Party hereto or any other Person unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the parties to this Agreement.

13.4    No Joint Venture. Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between the Parties hereto. No Party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other Party. No Party will have the power to control the activities and operations of any other, and the Parties' status is, and at all times, will continue to be, that of independent contractors with respect to each other. No Party will have any power or authority to bind or commit any other. No Party will hold itself out as having any authority or relationship in contravention of this Section.

13.5    [Intentionally Omitted]

13.6    Severability. If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to affect the intent of the parties hereto. The parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

13.7    Section Headings. A reference to an Article, Section or Schedule will mean an Article or Section in, or a Schedule to, this Agreement, unless otherwise explicitly set forth. The titles

51

and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement. For the purposes of such construction, this Agreement will be considered as a whole.

13.8    Amendment, Extension and Waivers.  At any time prior to the Effective Time, Platinum, Purchaser, Parent and Seller may, to the extent legally allowed: (a) extend the time for performance of any of the obligations of the other party; (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant thereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such party contained herein.  Any term or provision of this Agreement may be amended.  Any agreement to any amendment, extension or waiver will be valid only if set forth in writing and signed by the party to be bound.  The waiver by a party of any Breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding Breach or default.  The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions.  The Agreement may be amended by the parties hereto at any time.

13.9    Public Announcement.  Except to the extent required to comply with Article 8 hereof, no Party hereto shall issue any press release or otherwise make any statements to any Third-Party with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.  Prior to the issuance of any announcement of this Agreement and the transactions contemplated hereby by any Party, such Party will consult with the other party regarding the content of such announcement and obtain such other Party's reasonable approval of such press release.  Notwithstanding the foregoing, either Party may issue such announcements, and make such other disclosures regarding this Agreement or the transactions contemplated hereby, as it determines are required under applicable Legal Requirements or any listing or trading agreement concerning its publicly traded securities.

13.10    Governing Law.  The validity of this Agreement the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties of this Agreement will be exclusively governed by and construed in accordance with the internal laws of the State of New York as applied to agreements entered into solely between residents of and to be performed entirely in the State of New York, without reference to that body of law relating to conflicts of law or choice of law.

13.11    Jurisdiction; Venue; Waiver of Jury Trial.

(a) Each of the Parties to this Agreement hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining directly or indirectly to this Agreement, and all documents, instruments and agreements executed pursuant hereto or thereto, or to any matter arising herefrom (unless otherwise expressly provided for herein or therein).  To the extent permitted by law, each party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by any of the other parties hereto in any of such courts, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such party at the address to which notices are to be sent pursuant to this Agreement.  Each of the parties waives any claim that the Bankruptcy Court is an inconvenient forum or an improper forum based on lack of venue.  The choice of forum set forth in this Section 12.12 shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

52

A- 0048

(b) Each party hereto hereby waives, to the fullest extent permitted by applicable Legal Requirement, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement. Each party hereto (a) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise, that the other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

13.12    Notices. Any notice or other communication required or permitted to be given under this Agreement will be in writing, will be delivered personally or by mail or express delivery, postage prepaid, and will be deemed given upon actual delivery or, if mailed by registered or certified mail, on the third business day following deposit in the mails, addressed as follows:

If to Platinum or Purchaser:

> Presstek, Inc.
> 55 Executive Dr.
> Hudson, NH 03051
> Attention: President
> Phone: (603) 595-7000

with a copy to:

> McDermott, Will & Emery
> 28 State Street
> Boston, MA 02109
> Attention: John J. Egan III, P.C.
> Phone: (617) 535-4000

If to Parent or any Seller:

> c/o A.B. Dick Company
> 7400 Caldwell Ave.
> Niles, IL 60714
> Attention: President
> Phone: (874) 779-1900

with a copy to:

> Benesch, Friedlander, Coplan & Aronoff LLP
> 2300 BP Tower
> 200 Public Square
> Cleveland, OH  44114-2378
> Attention: H. Jeffrey Schwartz, Esq.
> Phone: (216) 363-4635

or to such other address as the party in question may have furnished to the other party by written notice given in accordance with this Section 13.12.

13.13    Time is of the Essence. The parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

13.14    Counterparts. This Agreement may be executed in counterparts, each of which will be an original as regards any Party whose name appears thereon and all of which together will

53

A- 0049

constitute one and the same instrument. This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all Parties reflected hereon as signatories.

13.15  <u>Nonsurvival of Representations and Warranties</u>:  None of the representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing. This Section 13.15 shall not limit any covenant or agreement of the Parties contained in this Agreement or in any instrument delivered pursuant to this Agreement which by its terms applies or contemplates performance in whole or in part after the Effective Time.

13.16  <u>Disclosure Schedule</u>.  The parties hereto acknowledge and agree that any disclosure contained in a specific numbered section of Seller's Disclosure Schedule shall be deemed to have been disclosed for purposes of other numbered sections only to the extent such disclosure is specifically cross referenced on the relevant section of Seller's Disclosure Schedule.

13.17  <u>Release</u>.  In consideration of the covenants, mutual promises and other consideration set forth herein, (i) Sellers and Parent, for themselves and for their heirs, assigns, agents, principals, officers, directors, subsidiaries, Affiliates, shareholders, employees, insurers, successors and assigns, as the case may be (collectively, the "Seller Parties"), hereby release the Platinum Parties (as hereinafter defined) from any and all actions, causes of action, suits, debts, sums of money, claims and demands of any kind or description whatsoever in law or in equity which any of the Seller Parties now have or which the same may have arising out of any matter from the beginning of the world up to and including the date of this Agreement, and (ii) Platinum and Purchaser, for themselves and for their heirs, assigns, agents, principals, officers, directors, subsidiaries, Affiliates, shareholders, employees, insurers, successors and assigns, as the case may be (the "Platinum Parties"), hereby release each of the Seller Parties from any and all actions, causes of action, suits, debts, sums of money, claims and demands of any kind or description whatsoever in law or in equity which any of the Platinum Parties now have or which the same may have arising out of any matter from the beginning of the world up to and including the date of this Agreement. Notwithstanding the foregoing, the Parties hereto are not hereby releasing any rights they may have to enforce the provisions of this Agreement or of the DIP Financing against each other.

13.18  <u>Bulk Sales Waiver</u>.  The Purchaser hereby waives compliance by Canada Sub with the provisions of the *Bulk Sales Act (Ontario)* or similar applicable legislation of any other province of Canada (the *"Bulk Sales Act"*), and in consideration hereof, Canada Sub agrees to indemnify the Purchaser from any claims that maybe asserted against it by any creditor of Canada Sub, or any other Person, by reason of the Purchaser not having required Canada Sub to comply with the *Bulk Sales Act* or by reason of the waiver aforesaid, provided that Canada Sub shall have no liability pursuant to this Section 13.18 for any claims with respect to any debts or obligations which were agreed to be assumed by the Purchaser pursuant to this Agreement or any Ancillary Agreements delivered pursuant hereto.

[Signature Page Follows]

54

A- 0050

JUL-12-2004  06:53                                    P.03/03

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

PRESSTEK, INC.

By: _____
      Name: EDWARD J. MARINO
      Title: President & CEO

SILVER ACQUISITIONS CORP.

By _____
      Name: MOOSA E. MOOSA
      Title: VP Finance & CFO, Treasurer.

PARAGON CORPORATE HOLDINGS, INC.

By:_____
      Name:
      Title:

A.B. DICK COMPANY

By:_____
      Name:
      Title:

A.B. DICK COMPANY OF CANADA LTD.

By: _____
      Name:
      Title:

INTERACTIVE MEDIA GROUP, INC.

By: _____
      Name:
      Title:

                              TOTAL P.03

07/13/2004  07:53    4166755986                    ABDICK ACTG                        PAGE  02
07/13/04  06:47 FAX 847 6470834        ABD EXEC OFFICE                            ☑002

Execution Version

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

PRESSTEK, INC.

By:_____
   Name:
   Title:

SILVER ACQUISITIONS CORP.

By:_____
   Name:
   Title:

PARAGON CORPORATE HOLDINGS, INC.

By: _____
   Name: JEFFREY  S. HERZBERG
   Title: SECRETARY

A.B. DICK COMPANY

By: _____
   Name: JEFFREY  S. HERZBERG
   Title: SECRETARY

A.B. DICK COMPANY OF CANADA LTD.

By: _____
   Name: FREDERICK J LLOYD
   Title: GENERAL MANAGER

INTERACTIVE MEDIA GROUP, INC.

By: _____
   Name: JEFFREY  S. HERZBERG
   Title: SECRETARY

Execution Version

## SELLER DISCLOSURE SCHEDULE

Capitalized terms used but not defined in this Seller Disclosure Schedule shall have the meanings set forth in the Asset Purchase Agreement (the "*Agreement*"), dated July 13, 2004 by and among Presstek, Inc., a Delaware corporation ("*Platinum*"), Seller Acquisition Corp., a Delaware corporation ("*Purchaser*"), Paragon Corporate Holdings, Inc., a Delaware corporation ("*Parent*" or "*Paragon* "), A.B. Dick Company, a Delaware corporation and a wholly-owned subsidiary of Parent ("*Seller*" or "*A.B. Dick Company*") A.B. Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of Seller ("*Canada Sub*"), and Interactive Media Group, Inc., an Ohio corporation and a wholly-owned subsidiary of Parent ("*IMG*" and together with Canada Sub and Seller, the "*Sellers*"):

Parent and Seller hereby provide this schedule of exceptions and disclosure to the Agreement. This Seller Disclosure Schedule and the information contained herein are intended to qualify only and limit the representations and warranties, agreements and covenants of Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties, agreements or covenants. Furthermore, this Seller Disclosure Schedule does not purport to disclose any agreements, contracts or instruments that may be entered into pursuant to the terms of the Agreement.

The inclusion of any matter in this Seller Disclosure Schedule in connection with any representation, warranty, covenant or agreement that is qualified as to materiality is not an admission by Seller that such matter is material. No disclosure in this Seller Disclosure Schedule relating to any possible breach or violation of any agreement or Legal Requirement shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

## SCHEDULE 2.1

### PERMITTED ENCUMBRANCES

None.

2

A- 0054

## SCHEDULE 2.1(a)

### ASSUMED REAL ESTATE

Platinum/Purchaser will assume the following leases:
- Niles, IL corp. offices
- Des Plaines
- St. Louis (Fenton, MO)
- Aiea, HI
- Anaheim, CA
- Denver, CO
- Fresno, CA
- Harrisburg, PA
- Irving, TX
- Wallingford, CT
- IMG- Akron, OH
- Duluth, GA
- Des Moines, IA

- Calgary, AB
- Montreal, QC
- Vancouver, BC
- Winnipeg, MB

- UK/ Brentford
- UK/ Bristol
- UK/ Glasgow

3

## SCHEDULE 2.1(b)

### TANGIBLE PERSONAL PROPERTY

See attached active assets depreciation list.

See also active rental depreciation list attached to schedule 3.21.

4

## SCHEDULE 2.1(e)

### ASSUMED SELLER CONTRACTS

The following contracts will be assumed by Purchaser:
- Agreement with Kinko's
- Equipment Leases set forth on Schedule 3.21
- List of Active Rentals set forth on Schedule 3.21
- All capital leases of Seller
- All insurance policies, with the exception of any officers' and directors' insurance
- All of Seller's dealer contracts which are terminable on 30 days' notice
- Additional agreements or contracts as may be determined by Purchaser or Platinum on or before Closing

5

## SCHEDULE 2.2(h)

### OTHER EXCLUDED ASSETS

None.

6

## SCHEDULE 2.4(a)(iv)

### OTHER ASSUMED LIABILITIES

None.

7

## SCHEDULE 2.4(b)

## OTHER RETAINED LIABILITIES

All liabilities of Seller not specifically designated in Sections 2.4(b)(i)-(xiii) or otherwise assumed by Purchaser. Notwithstanding the foregoing, as a matter of clarification, Seller's payable due to Canada Sub shall be specifically retained by Seller.

8

### SCHEDULE 3.1

### ORGANIZATION AND GOOD STANDING

A.B. Dick Company – Qualified to do business in all States in the United States and the District of Columbia

A.B. Dick Company of Canada Ltd. – Qualified to do business in Canada

A.B. Dick UK Limited – Qualified to do business in United Kingdom

Multigraphics LLC – Qualified to do business in the State of Delaware

Itek Graphix Corp. – Qualified to do business in the State of Delaware

Interactive Media Group, Inc. – Qualified to do business in the State of Ohio

A- 0061

## SCHEDULE 3.2

### SUBSIDIARIES AND GUARANTIES

A.B. Dick Company of Canada Ltd., a Canadian corporation, of which A.B. Dick Company owns 100% of the equity interest.

A.B. Dick UK Limited, a UK corporation, of which A.B. Dick Company owns 100% of the equity interest.

Itek Graphix Corp., a Delaware corporation, of which A.B. Dick Company owns 100% of the equity interest.

Multigraphics LLC, a Delaware limited liability company, of which A.B. Dick Company owns 100% of the equity interest and is the sole member.

Interactive Media Group, Inc., an Ohio corporation, 100% owned by Paragon Corporate Holdings, Inc.

10

A- 0062

## SCHEDULE 3.4

### CONSENTS

Certified copies of consents of Paragon will be provided

Canada Sub may be required to comply with the Bulk Sale law of Canada or seek an order of the courts exempting this transaction from such law.

11

## SCHEDULE 3.5

## NO VIOLATION OF CHARTER DOCUMENTS; COMPLIANCE WITH LEGAL REQUIREMENTS; GOVERNMENTAL AUTHORIZATIONS

See schedule 3.4.

The following Contracts have provisions which may result in the termination, Breach, impairment or violation thereof as a result of the execution of the Agreement and/or the consummation of the transactions contemplated thereby:

> Scan View A/S
> Scan View A/S
> AGFA Australia

From time to time since January 1, 2000, Parent, A.B. Dick Company and or its Subsidiaries have received notices or other communications from a Governmental Authority or other Person regarding an actual, alleged, possible or potential violation of, or failure to comply by A.B. Dick Company or any Subsidiary of A.B. Dick Company with, any Legal Requirement. Any such communications received by A.B. Dick Company or any Subsidiary since January 1, 2000 has been resolved, except for the following:

> *Lester Berta v. A.B. Dick Company*
> EEOC Charge No. 350-2003-83499

On June 9, 2004, A.B. Dick Company received notice from the USEPA regarding Addressograph/Multigraph being a PRP at the Chemical Recovery systems site in Elyria, Ohio.

A.B. Dick Company is authorized to do business as a foreign corporation in the District of Columbia and all states in the Unites States, except Delaware, where A.B. Dick is authorized to do business as a domestic corporation.

A.B. Dick Company also obtains various licenses, permits and other Governmental Authorizations from local Governmental Authorities where A.B. Dick has operations.

All of A.B. Dick Company's foreign subsidiaries are authorized to do business in their respective countries of incorporation.

A.B. Dick Company of Canada Ltd. also is authorized to do business in the provinces where it has employees or facilities, namely British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, Quebec and Newfoundland.

Each of Itek Graphix Corp. and Multigraphics LLC is authorized to do business in Delaware.

A- 0064

Interactive Media Group, Inc. is authorized to do business in Ohio.

See also Schedule 3.11  [Litigation]
See also Schedule 3.14  [Absence of Certain Changes or Events]

13

A- 0065

## SCHEDULE 3.7

### SELLER FINANCIAL STATEMENTS

See attached.

A.B. Dick Company has a liability for the repair/replacement of the roof at its headquarters location pursuant to the terms of the lease for that location.

In Q2 2004 Canada Sub booked an adjustment of approximately $125,000, increasing 2003 profit and decreasing 2004 profit. This was requested by Niles to be consistent with US GAAP on restructure costs.

See also Schedule 3.12 [Taxes]
See also Schedule 3.14 [Absence of Certain Changes or Events]

14

A- 0066

## SCHEDULE 3.9

### ACCOUNTS RECEIVABLE

See attached.

Reserve for warranty claims, and warranty claim expense, are reported in the aggregate, not by customer.

A.B. Dick Company has a receivable due from its UK subsidiary. As of April 30, 2004, the receivable was $607,475.99

A.B. Dick Company has a payable due to its Canadian subsidiary. As of April 30, 2004, the receivable was $2,236,842.12.

See also Schedule 3.7 [Financial Statements]

15

## SCHEDULE 3.11

### LITIGATION

Pending Proceedings:

*A.T. Publishing v. A.B. Dick Company*
Case No. 3AN-03-08291 CI
In the Superior Court for the State of Alaska
Third Judicial District at Anchorage

Brian J. Longe's claim for severance and bonus

On June 9, 2004, A.B. Dick Company received notice from the USEPA regarding Addressograph/Multigraph being a PRP at the Chemical Recovery systems site in Elyria, Ohio.

*MHR Capital Partners, et al. v. Paragon Corporate Holdings, et al.*
Case No.; 529-N
In the Court of Chancery of the State of Delaware
In and For New Castle County

*Gropoint Limited v. Reprocentre Group Limited (formerly Offset Distributors Limited), Offset Distributors Limited, Richard George Nobel and A.B. Dick UK Ltd*, High Court Proceedings, Record No. 2003 No. 4944P in Dublin, Republic of Ireland.

As of the date hereof, the following sets forth any filings required to be made by A.B. Dick Company within 120 days:

Responses due in the following cases:
*Market Direct, Inc. v. A.B. Dick Company*
*Windsor Manufacturing, Inc. v. A.B. Dick Company*
*MHR Capital Partners, et al. v. Paragon Corporate Holdings, et al.*

On June 9, 2004, A.B. Dick Company received notice from the USEPA regarding Addressograph/Multigraph being a PRP at the Chemical Recovery systems site in Elyria, Ohio. A.B. Dick Company has 20 days to respond to the invitation to participate and 30 days to respond to the information requested therein. The time to respond has been extended to July 22, 2004.

A.B. Dick Company of Canada Ltd. is subject to a storm water sampling program as specified in Provincial Officer Order #004322, related to its property at 94 Brockport Road, Toronto.

16

See attached documents regarding slander allegations received from Tanaka Offset 2000 Services Ltd.

See attached summary of potential employment litigation matters for A.B. Dick Company of Canada Ltd.

See attached summary of additional pending litigation.

See also Schedule 3.24 [Environmental Matters]

17

A- 0069

**SCHEDULE 3.12**

**TAXES**

Since January 1, 2000, Parent and Seller have timely filed when due all Tax Returns relating to Seller and its Subsidiaries, other than 2003 federal, state and local Tax Returns for which notices of extension have been filed and are currently pending.

Parent and Seller regularly receive communications from state and local Tax authorities requesting information relating to business activities in such jurisdictions and the basis for filing or not filing Tax Returns. However, neither Parent nor Seller know of any claim that Seller or any Subsidiary is or may be subject to a material amount of unpaid Tax in any such jurisdiction. Seller has recently received notices from Tax authorities of the States of West Virginia and Alaska.

Seller is presently subject to a sales Tax audit by the Tax authorities of the States of Connecticut and Utah.

Parent and Seller regularly receive notices from state and local Tax authorities with proposed adjustments in the calculation of Taxes. However, no proposed adjustment relating to any Tax Return filed by Parent, Seller or any Subsidiary that has been proposed is material in amount.

Certain state and local Taxes will become due and payable as a result of the transactions contemplated by this Agreement. In addition, Seller and its Subsidiaries have not yet filed 2003 federal, state and local Tax Returns and there may be additional unaccrued Taxes with respect to such returns. However, Parent and Seller believe tax accruals are adequate to cover such Taxes.

Upon consummation of the transactions contemplated by this Agreement, Seller and its Subsidiaries will cease to be members of the Seller Group and the 338(h)(10) election will constitute a liquidation of Seller upon which certain state Taxes will become due and payable. Parent and Seller believe accruals for these Taxes are adequate to cover such Taxes.

See also Schedule 3.7 [Financial Statements]

18

## SCHEDULE 3.13

## REAL PROPERTY ADDRESSES

See attached schedule

The properties may be subject to liens for insurance and common area maintenance for differences in expense which has not yet been finally determined by the various landlords, and therefore not billed to A.B. Dick Company.

19

## SCHEDULE 3.14

### ABSENCE OF CERTAIN CHANGES OR EVENTS

A.B. Dick Company received a Notice of Reclamation from Mitsubishi on July 2, 2004, relating to approximately $570,000 worth of supplies.

A.B. Dick Company has received notice from Oji that future purchases of product must be made on a cash-in-advance basis.

Pending controversy between Brian J. Longe and A.B. Dick Company regarding issues of severance and bonus

The service manager for Canada Sub was provided a salary increase of $1,875 as a result of increased duties, for a cumulative salary of $52,000.

A.B. Dick Company amended its bylaws on April 5, 2004 to provide: (A) the proper address of A.B. Dick Company's principal place of business and (B) the Board of Directors consists of not less than one or more than nine directors.

A.B. Dick Company has a liability for severance obligations incurred in connection with recent staff reductions.

A.B. Dick Company has an obligation to pay NESCO Services, Inc., an Affiliate of Parent, approximately $60,000 in connection with engineering services provided to A.B. Dick Company and/or its Subsidiaries.

Obligations incurred under the Keybank credit facility.

Obligations relating to a final payment of a lease for the paint line previously located at 6330 Touhy.

Obligations relating to equipment currently located at Chicago Press.

Obligations incurred under the Keybank special overage advances.

Canada Sub has made a loan of approximately $2,250,000 to its parent affiliate, A.B. Dick Company.

Contractual settlement agreement with Fuji and Enovation regarding termination of the Fuji dealer agreement.

Canada Sub has a contract with KPG which is subject to cancellation by KPG if the company is sold.

20

Canada Sub's service manager has verbally indicated a desire to retire in January 2005.

A.B.Dick Company received a Notice of Reclamation from Elof Hansson, Inc., as agent for Elof Hansson K.K., on July 8, 2004 relating to approximately 2,980 rolls of electro-static offset printing paper plate.

See also Schedule 3.5  [No Violation of Charter Documents; Compliance with Legal Requirements; Governmental Authorizations]

See also Schedule 3.7  [Seller Financial Statements]

21

## SCHEDULE 3.15

### OWNERSHIP OF INTELLECTUAL PROPERTY

See attached list of all copyright, mask work and trademark registrations and applications and all patents and patent applications for Seller IP Rights owned or exclusively licensed by Seller or its Subsidiaries.

A.B. Dick Company permits its dealers and resellers to sell Seller Products.

See also Schedule 3.21 [Agreements and Commitments]

22

## SCHEDULE 3.16

### CONFORMITY OF PRODUCTS AND SERVICES

There may be a basis for certain customers to assert that the QP 25 line of products does not conform to specifications and to representations made to said customers.

23

## SCHEDULE 3.17

### PRODUCT AND SERVICE WARRANTIES

Attached hereto are standard written forms of product and service warranties and guarantees utilized by A.B. Dick Company or any Subsidiary of A.B. Dick Company as of the date of the Agreement with respect to the Seller Products and Services.

There may be a basis for certain customers to assert that the QP 25 line of products does not conform to specifications and to representations made to said customers.

24

## SCHEDULE 3.18

### CERTAIN EMPLOYEES; SUPPLIERS AND CUSTOMERS

See attached schedule of employee salaries.

See attached list of all suppliers, licensors and vendors to whom, since January 1, 2003, A.B. Dick Company or a Subsidiary of A.B. Dick Company has made payments of $50,000 or more.

Ryobi has drawn upon a Letter of Credit provided by A.B. Dick Company.

Customers or distributors accounting for more than two percent (2%) of the revenue of A.B. Dick Company for fiscal years ending December 31, 2002 and December 31, 2003.

| 2002 | 2003 |
|------|------|
| Minuteman Press | Minuteman Press |
| Print Image Intl (NAQP) (a consortium of small printers) | Print Image Intl (NAQP) (a consortium of small printers) |
| Deluxe Corporation | Deluxe Corporation |
| State of California (includes counties, municipalities, agencies and other political subdivisions) | |
| Kinko's | |

In connection with the termination of all of its distributorship agreements, Xeikon, a company for which A.B. Dick Company of Canada, Ltd. serves as a distributor, has terminated its distributorship agreement with A.B. Dick Company of Canada, Ltd

Canada Sub has a contract with KPG which is subject to cancellation by KPG if the company is sold.

See also Schedule 3.14 [Absence of Certain Changes or Events]

25

A- 0077

## SCHEDULE 3.19

### DISABLING CODES

None.

26

A- 0078

## SCHEDULE 3.21

### AGREEMENTS AND COMMITMENTS

See attached list of contract vendors and customers.

A.B. Dick Company permits its dealers and resellers to sell A.B. Dick Products.

A.B. Dick Company has a technology development agreement with Presstek.

A.B. Dick Company has an agreement granting Kinko's preferential pricing and/or terms for service.

A.B. Dick Company has non-compete covenants with Ryobi, Konika, Hamada, Duplo, Mitsubishi, Kodak, Bourg, Standard Register, Agfa, Hamada, and Presstek

A.B. Dick Company has employment agreements with Brian J. Longe, James C. Yerkes, Mark Szafranowski and Earl Frishkorn. In addition, all employees of A.B. Dick Company are entitled to severance pursuant to the existing Human Resources policy.

See attached list of active rentals.

Canada Sub has a contract with KPG which is subject to cancellation by KPG if the company is sold.

Canada Sub is on the verge of signing a multi-year contract with Davis & Henderson, one of its largest customers.

See also Schedule 3.17 [Product and Service Warranties]
See also Schedule 3.18 [Certain Employees; Suppliers and Customers]
See also Schedule 3.22 [Employees]

27

A- 0079

## SCHEDULE 3.22

### EMPLOYEES

It is possible that A.B. Dick Company's relationship with its general counsel, Jeffrey S. Herden, could be classified as an employer/employee relationship and not an independent contractor relationship as maintained by the company..

There is a pending controversy between Brian J. Longe and A.B. Dick Company regarding issues of severance and bonus.

Labor and other disputes may arise from the recent reductions in workforce that commenced on March 31, 2004.

A.B. Dick Company has the following Seller Employee Plans:

- A.B. Dick Company Life Insurance Plan (Plan #519).

- A.B. Dick Company Short Term Disability Plan (Plan #503).

- A.B. Dick Company Long Term Disability Plan (Plan #517).

- A.B. Dick Company Employee Health Benefit Plan (Plan #518).

- A.B. Dick Company Dental Plan (Plan #520).

- A.B. Dick Company Group Accidental Death and Dismemberment Insurance Plan.

- A.B. Dick Company Voluntary Accidental Death and Dismemberment Insurance Plan.

- A.B. Dick Company Flexible Benefits Plan.

- A.B. Dick Company 401(k) Employees' Savings and Investment Plan.

- A.B. Dick Company benefits described in A.B. Dick Company Human Resources Manual for U.S. Employees, Benefits Summary Policy (Benefits Policy Number 400).

- A.B. Dick Company Executive Long Term Disability Plan.

Since January 1, 2003, there have been 20 medical claims company wide that have exceeded $50,000.

A.B. Dick Company has the following Seller Pension Plans:

28

A- 0080

- A.B. Dick Company 401(k) Employees' Savings and Investment Plan.

A.B. Dick Company has the following Seller Benefit Arrangements:

The following A.B. Dick Company Benefit Arrangements are more fully described in the A.B. Dick Human Resources Policy Manual for U.S. Employees, a copy of which is attached:

- A.B. Dick Company Relocation Policy (Employment Policies Number 107).

- A.B. Dick Company Location Closings Policy (Employment Policies Number 109).

- A.B. Dick Company Rehire Policy (Employment Policies Number 112).

- A.B. Dick Company Safety Shoes Policy (Employment Policies Number 118).

- A.B. Dick Company Hours of Work Policy (Pay & Performance Policy Number 300).

- A.B. Dick Company Pay Procedures Policy (Pay & Performance Policy Number 301).

- A.B. Dick Company Salary Administration Policy (Pay & Performance Policy Number 303).

- A.B. Dick Company Overtime-Exempt Employees Policy (Pay & Performance Policy Number 306).

- A.B. Dick Company Field Engineers Policy (Pay & Performance Policy Number 308).

- A.B. Dick Company Flexible Work Hours (Headquarters Only) Policy (Pay & Performance Policy Number 309).

- Vacation, Sick time, Holidays, Jury Duty, Bereavement, Military Leave, Separation Pay, Family Medical Leave (FMLA), and Work-Related Medical & Disability benefits listed in A.B. Dick Company Benefits Summary Policy (Benefits Policy Number 400).

- A.B. Dick Company Holidays Policy (Benefits Policy Number 401).

- A.B. Dick Company Vacation Policies (Benefits Policies Numbers 402 and 402-A).

- A.B. Dick Company Service Awards Policy (Benefits Policy Number 403).

29

- A.B. Dick Company Referral Bonus Program (Benefits Policy Number 404).

- A.B. Dick Company Attendance – Non-Exempt Associates Policy (Absences Policy Number 500).

- A.B. Dick Company Family Medical Leave Policy (Absences Policy Number 501).

- A.B. Dick Company Jury Duty Policy (Absences Policy Number 503).

- A.B. Dick Company Witness Duty Policy (Absences Policy Number 504).

- A.B. Dick Company Military Leave Policy (Absences Policy Number 505).

- A.B. Dick Company Bereavement Policy (Absences Policy Number 506).

- A.B. Dick Company School Visitation Policy (Absences Policy Number 507).

- A.B. Dick Company Sick Time Policy (Absences Policy Number 509).

- A.B. Dick Company Personal Leave of Absence Policy (Absences Policy Number 510).

- A.B. Dick Company Severance Policy (Termination Policy Number 600).

- A.B. Dick Company Executive Severance Bridge Policy (Termination Policy Number 601).

- A.B. Dick Company Flower Fund Policy (Miscellaneous Policy Number 700).

Canada Sub has the employee benefit plans set forth in the attached memorandum.

Canada Sub's service manager has verbally indicated a desire to retire in January 2005.

Canada Sub has a few sales agents in Canada and there may be some costs associated with contract termination.

There has been no amendment to the benefit plans except that on April 2, 2004, the Executive Severance Bridge policy was amended.

30

## SCHEDULE 3.23

### RELATIONSHIP WITH AFFILIATES

Par Realty Co., an Affiliate of Parent, owns the real property at 7400 Caldwell Avenue, Niles, Illinois, which is leased by A.B. Dick Company.

Rogers Display, an Affiliate of Parent, provides convention display goods and services to A.B. Dick Company.

NESCO Services, Inc., an Affiliate of Parent, provides employment outplacement services and provides temporary employees to A.B. Dick Company.

See also Schedule 3.14 [Absence of Certain Changes or Events]

31

## SCHEDULE 3.24

### ENVIRONMENTAL MATTERS

There may have been disposals, Release or threatened release of Hazardous Materials on, at, from or under the following facilities:

> Rexdale, Ontario
> Rochester, New York
> Holmesville, Ohio
> Lake City, South Carolina
> Miami, Florida
> Indianapolis, Indiana
> Cerritos, California
> Milford, Connecticut
> Middleton, Wisconsin
> East St. Louis, Illinois

In addition, underground tanks were removed from the following locations (sites identified above are not included):

> Birmingham, Alabama
> Costa Mesa, California
> New Bedford, Massachusetts
> Southfield, Michigan
> Suffield, Connecticut

On June 9, 2004, A.B. Dick Company received notice from the USEPA regarding Addressograph/Multigraph being a PRP at the Chemical Recovery systems site in Elyria, Ohio. A.B. Dick Company has 20 days to respond to the invitation to participate and 30 days to respond to the information requested thererin.

See also Schedule 3.11 [Litigation]

A- 0084

## SCHEDULE 3.26

### BOARD OF DIRECTORS, OFFICERS AND KEY PERSONNEL

**Officers:**

**A.B. Dick Company:**

| | |
|---|---|
| Brian J. Longe | President & CEO |
| Gregory T. Knipp | Vice President & CFO |
| Jeffrey S. Herden | General Counsel & Secretary |
| Kenneth D. Newton | Chief Operating Officer, Equipment |
| Joyce L. Huston | Vice President – Human Resources |
| David E. Vanderwiel | Vice President – Consumables & IT |
| Laurence T. Mascia | Vice President – Sales |
| James C. Yerkes | VP & General Manager – Service |
| Lynne E. Gehrke | Vice President – Procurement |
| Scott M. MacKenzie | Vice President – Marketing |
| Jeffrey W. Mock | Vice President – Engineering |
| Steven C. Stricker | Vice President – Manufacturing |
| Douglas P. Farmer | Vice President – Distribution & Logistics |

**A.B. Dick Company Of Canada, Limited:**

| | |
|---|---|
| J. Mark Stinson | Corporate Secretary |
| Gerald Welstead | Controller |
| Fred Wood | General Manager |
| Annissa Lo | Accounting Manager |
| Jerry Leszczuk | Director Sales & Marketing |
| Robert McLean | Director of Service |

**A.B. Dick UK Limited:**

| | |
|---|---|
| Jeffrey S. Herden | Secretary |
| Quentin Baum | Managing Director |
| George Gray | Director of Operations |

**Itek Graphix Corp:**

| | |
|---|---|
| Brian J. Longe | President |
| Jeffrey S. Herden | Secretary |
| Gregory T. Knipp | Treasurer/Assistant Secretary |

**Multigraphics LLC:**

| | |
|---|---|
| Brian J. Longe | Manager |
| Gregory T. Knipp | Manager |
| Jeffrey S. Herden | Manager |

33

A- 0085

Interactive Media Group, Inc.

|                    |                          |
|--------------------|--------------------------|
| Andrew Holland     | President                |
| Jeffrey S. Herden  | Secretary                |
| Gregory T. Knipp   | Treasurer/Asst. Secretary|

## Directors:

A.B. Dick Company:

James W. Wert      President and Chief Executive
Officer
Clanco Management Corporation
30195 Chagrin Boulevard, #250
Pepper Pike, OH  44124

A.B. Dick Company of Canada, Limited:

J. Mark Stinson      Attorney
Fasken Martineau DuMoulin LLP
Box 20, Toronto-Dominion Centre
Toronto, Ontario, Canada M5K
1N6

Gerald Welstead      Controller
A.B. Dick Company of Canada,
Limited
94 Brockport Drive
Rexdale, Ontario, M9W 5C5,
Canada

James W. Wert      President and Chief Executive
Officer
Clanco Management Corporation
30195 Chagrin Boulevard, #250
Pepper Pike, OH  44124

A.B. Dick UK Limited:

Quentin Baum      Managing Director
A.B. Dick UL Ltd.
Great West Trading Estate
983 Great West Road
Brentford, Middlesex TW8 9DN,
England

Itek Graphix Corp:

Brian J. Longe      President and CEO
A.B. Dick Company
7400 Caldwell Avenue
Niles, IL 60714

A- 0086

Interactive Media Group, Inc.

|                   |                                |
|-------------------|--------------------------------|
| Gregory T. Knipp  | Vice President and CFO         |
|                   | A.B. Dick Company              |
|                   | 7400 Caldwell Avenue           |
|                   | Niles, IL 60714                |
|                   |                                |
| Frank D. Zaffino  | Chairman                       |
|                   | Paragon Corporate Holdings, Inc. |
|                   | 7400 Caldwell Avenue           |
|                   | Niles, IL 60714                |

See attached list of key personnel.

35

A- 0087

## SCHEDULE 3.27

### INSURANCE

See attached schedule.

See also Schedule 3.7  [Seller Financial Statements]
See also Schedule 3.11  [Litigation]

36

## SCHEDULE 5.2

### CONDUCT OF BUSINESS

Seller and/or its Subsidiaries plan to adopt an appropriate Key Employee Retention Plan with key members of management.

Doc 1219245  Ver 3

A- 0089