1  A.  Yes, on a $200,000,000 revenue company.

2  Q.  Okay.  Now how about at the end of January '04 liquidity

3  analysis?  Where was A.B. Dick with respect to the borrowing

4  base and the extent --

5  A.  Okay.

6  Q.  -- of the credit line with Key Bank?

7  A.  The report there shows that we were under -- we're over-

8  advanced, if you will, by $63,000, which means our utilization

9  exceeded our borrowing base formula.  However, there's a lag in

10  reporting this.  At the time that we actually came upon the end

11  of January we probably had a couple hundred thousand dollars of

12  favorable liquidity that got chewed up once we closed the books

13  at the end of the month.

14  Q.  Okay.  I don't want to go through each of the lines --

15  A.  Right.

16  Q.  I don't want to go through each of the lines --

17  A.  Right.

18  Q.  -- with respect to actual February, March, April, May and

19  June.  Those figures are all on that exhibit, correct?

20  A.  Right, that's correct.

21  Q.  All right, why don't you just read for us the liquidity

22  position of Paragon Corporate Holdings with respect to the Key

23  Bank credit line for those months?

24  A.  Okay, January was a negative $63,000, February was a

25  negative $7,000, March was a negative $3,000, April was a

Knipp - Direct                           70

1   negative $313,000, May was a negative $1. -- $1 million,

2   212,000 and June was a negative $3 million, 98,000.

3   Q.  As CFO of these corporations, what does that tell you?

4   A.  We're out of money.

5   BY THE COURT:

6   Q.  Well, you're more than out of money.

7   A.  Yes.

8   Q.  What -- was there a source of funding those -- that

9   negative liquidity?

10  A.  Basically, what happened here --

11  Q.  In other words, were there advances in excess of what the

12  formula allowed --

13  A.  Yes, there were.

14  Q.  -- from Key Bank?

15  A.  But we didn't know it -- the way this always happens is

16  that if you get a week or so to true everything up and at the

17  time, what happens is that you true up -- there's certain

18  reserves that get taken out of your gross inventory and your

19  gross receivable balances.  For instance, on the receivables,

20  they exclude receivables that are over 90 days old.  We don't

21  know what those are until two days after month end.  So what

22  this means here is that at the time, our over 90's may have

23  gone up -- over 90 day old receivables may have gone up at the

24  time we closed business on Friday, but we didn't know it until

25  after the fact.  And so, on -- with Heinset, we are over

Knipp - Direct                    71

1   advanced, but at the time, we didn't know we were until a few

2   days after month end.

3   BY MR. STOCK:

4   Q.  All right, now you testified earlier that the credit

5   facility was extended in April of 2003 for a year, so that

6   means it's, by it's terms, to expire in April 2004, correct?

7   A.  That's correct.

8   Q.  During this period we're studying?

9   A.  Right.

10  Q.  All right.  Did you have -- did you meet with Key Bank to

11  discuss with them extending the credit?

12  A.  Yes, we did.  I personally visited them in March of 2004,

13  based on the anticipated end date of April 15, 2004 under the

14  facility.

15  Q.  You mentioned before (indiscern.) of the forecasting or

16  modeling --

17  A.  Right.

18  Q.  -- with respect to the credit facility.  When you met with

19  Key Bank did you have a forecast or --

20  A.  Yes, we did.

21  Q.  -- model for purposes of your discussion?

22  A.  That was the --

23          MR. MASON:  Your Honor, I'm gonna object.  Your Honor,

24  this is all very interesting information and I think it's

25  something that ought to be covered at some point, but as I

1  understand it, the issue before the Court is whether or not we

2  have a reasonable bid protection to Presstek. And all this

3  information, at this point, seems to be irrelevant to that

4  particular issue. So, if there's some transitional issues that

5  we've got to cover, some basic information, I don't mind going

6  through it. I think we've already covered the basic

7  information at this point. We're beyond the scope of what I

8  think the hearing is intended to cover.

9      THE COURT:  Well, I'll overrule the objection. I

10  assume that counsel is laying the foundation for the issues

11  that need to be resolved and will not take more time than is

12  necessary to do that.

13      MR. STOCK:  Yes, and I will simply take my cue from

14  the Court, Your Honor. It's my understanding that at the

15  initial exchange of papers on these motions, there was some

16  questioning as to the good faith of the Debtor. And I think as

17  well, though it's not my water to carry, of Presstek and the

18  terms of the initial deal. If we're now being told that that's

19  no longer an issue and that is all irrelevant, then I don't

20  need to make a record here as to the dire straits and the lack

21  of alternatives that A.B. Dick Company had when they attempted

22  to negotiate this deal in July.

23      THE COURT:  I -- personally, I think that's relevant

24  and I'm interested in knowing about it. And I think we ought

25  to move along. We don't need to over build the record on that.

Knipp - Direct                                    73

1    But we're up to a point here in April of '04 where the -- where
2    the Key Bank line was expiring by its own terms as I understand
3    it.
4         MR. STOCK:  Right.
5         THE COURT:  In April there was a substantial jump
6    negatively in the liquidity, and in May, June, July, that
7    becomes a torrent in the next few months there.
8         MR. MASON:  Yes.
9         MR. KNIPP:  That's correct.
10        THE COURT:  So, I mean, I'm interested in
11   understanding why that happened, how that happened.
12        MR. KNIPP:  Okay.
13        THE COURT:  What the background of that was and then
14   the -- then tie into whatever business decisions the Debtor was
15   making with regard to post, you know -- the timing of the
16   filing in the middle of all of this and then the negotiation of
17   the post-petition financing and understanding how that all
18   works together.
19        MR. STOCK:  And --
20        THE COURT:  Which I assumed is where you were going.
21        MR. STOCK:  I'm trying to get there as ardently as I'm
22   capable, Your Honor.  I'll try to move along.
23   BY MR. STOCK:
24   Q.  What did the forecast show --
25   A.  Okay.

Knipp - Direct                                          74

1  Q.  -- that you were sharing with Key Bank at that time you
2  were attempting to renew the credit line in April of '04?
3  A.  Basically show that the liquidity would be negative in the
4  months of July and August.
5  Q.  Was the discussion with Key Bank -- was the basis upon
6  which you were discussing additional lending continuing normal
7  billing concern operations of A.B. Dick?
8  A.  Well, the issue at the time was is when we met Key Bank had
9  been monitoring the company's discussions with Presstek in
10 regard to the sale of the company to Presstek.  The
11 negotiations had gone on for quite a long time, this is my
12 understanding of it.  The -- I should point out that the
13 negotiations were, in fact, handled at the ownership level of
14 A. B. Dick Paragon, and I was brought in from the operations
15 side to talk about the operating side of the business.  But
16 they were concerned about the lack of progression in getting to
17 a final sale of the Presstek transaction.  And on that basis
18 alone, they at that point in time -- we met that day in March,
19 and they came back a few days later and said that they would
20 extend the bank agreement until the middle of July under the
21 assumption that the Presstek sale would be consummated by then.
22         THE COURT:  We're going to have to stop in a few
23 minutes.
24 A.  Yeah.
25         THE COURT:  So let me just ask you, if I could ask --

Knipp - Direct                              75

1          MR. STOCK:  Absolutely, Your Honor.

2          THE COURT:  -- a couple of questions, at this point.

3   BY THE COURT:

4   Q.  When did the negotiations first start, if you know, with

5   regard to the sale of the business to Presstek?

6   A.  Okay, I heard, from -- that they started in the summer of

7   last year.

8   Q.  You were not personally involved?

9   A.  No, I did not get involved until December.  I was brought

10  under a confidentiality --

11  Q.  December of '03?

12  A.  '03, under a confidentiality agreement.

13  Q.  So, at the time that you became specifically, personally

14  involved --

15  A.  Right.

16  Q.  -- it was your understanding that it had been going on for

17  a period of months?

18  A.  Yes.

19  Q.  And then after that, do you have personal knowledge about

20  what happened with regard to those negotiations?

21  A.  Not directly, no.  I was not involved in the direct

22  negotiations.

23  Q.  And what was your role in connection with the initial

24  Presstek deal?

25  A.  I provided due diligence information in terms of the

A-0164

1 operations of the company over the past 3 or 4 years.

2 Q.  Did you understand the structure of the proposed deal, the

3 price to be paid, the manner in which it was to be done --

4 A.  I had heard --

5 Q.  -- and that sort of thing?

6 A.  -- the number out at one point -- it's around $63 million

7 at one point, and that changed though.  It -- from what I

8 understand it -- and I -- this could be maybe rumor -- is that

9 I heard it would start out as an asset purchase then it went to

10 a stock purchase.

11 Q.  But you were not, in any event --

12 A.  No.

13 Q.  -- directly involved in that?

14 A.  No.

15 Q.  So you're not really the one with the knowledge of how all

16 of that happened to the extent --

17 A.  Right.

18 Q.  -- that's relevant?

19 A.  Right.

20        MR. MASON:  You did?

21 BY THE COURT:

22 Q.  But at some point, we were involved in the discussions with

23 Key Bank about the extension of the loan beyond the maturity in

24 April?

25 A.  Well, what happened there was that the meeting we had in

1    March -- attending that meeting with me were Frank Sefina, the

2    Chairman of Paragon Corporate Holdings, Inc. and John Fountain,

3    who is a Board Member for Paragon Corporate Holdings.   I

4    attended with them to provide operational financial support to

5    the meeting.

6    Q.   You were physically present at the meeting?

7    A.   Yes, I was.

8    Q.   And as a result of that meeting, you say there was an

9    extension until July?

10   A.   'Til about July 15th, I recall, yes.

11   Q.   And that was in connection with the underlying assumption

12   that the business plan was to sell the business to Presstek --

13   A.   Yes.

14   Q.   -- and that the deal would put together one way or the

15   other by then?

16   A.   Right.

17   Q.   Okay.

18        MR. STOCK:  Thank you, Your Honor.

19   BY MR. STOCK:

20   Q.   Advances were made by Key Bank after --

21   A.   Okay --

22   Q.   -- the agreement to an extension is --

23   A.   Yes, what happened was, as you can see on the schedule

24   here, we were negative 300,000 and the end of April, which was

25   a timing issue.  However, we actually jumped up to 1.2 million



*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-929-0191*

Knipp - Direct                                           78

1  in May.  And what Key Bank had agreed to do through amendments

2  to the agreement, they gave us two $1 million over advances in

3  the month of May, which means is that the formula for the

4  borrowing base wasn't sufficient and therefore, they just --

5  they extended beyond the terms of the original agreement.

6  Q.  Was there a million dollar over advance in June?

7  A.  Yes there was.

8  Q.  Approximately when was that?

9  A.  Around June -- the middle of June -- June 18th.  Our

10 payroll was on June 18th, so I gotta believe it was right

11 around that time.

12 Q.  Payroll is 1.3 million twice a month?

13 A.  Yes it is.

14 Q.  Okay.

15 A.  Or every other Friday.

16 Q.  Every other Friday?

17 A.  Right.

18 Q.  How -- what were you to do or -- what was going to be the

19 source of funds for the next payroll to come due on July 2?

20 A.  Okay, on July 2nd, the day before pay day, I received a

21 call from our banker, Mike Lugley.  He asked me how things were

22 for the payroll the next day.  I said we needed about -- I

23 recall at the time -- around 900,000.  Michael informed me that

24 the bank was only willing to extend a half a million dollars,

25 and that was the limit that they were gonna go on the over

Knipp – Direct                                      79

1   advance.  So, that would be cumulative three and a half million

2   dollars of over advance.

3   Q.  So you were $400 short for payroll?

4   A.  400,000, which I had to delay freight payments, which are

5   due every Friday and -- that was a couple hundred thousand.

6   And I was able to extract some cash out of our foreign

7   subsidiary in Canada on a temporary basis.  You know, one of

8   these things were you give it to me today, I'll give it back to

9   you next week to cover your payroll, Canada's payroll.

10  Q.  The next $1.3 million payroll would be due 14 days later.

11  A.  On June -- July 16th.

12  Q.  What contingencies did you have at that point --

13  A.  We had none.

14  Q.  -- and what -- let me continue.

15  A.  Oh, sorry.

16  Q.  Once Key Bank told you they would not lend any money?

17  A.  We had no contingencies, we had no sources of liquidity.

18          THE COURT:  Is that a good place to stop for the mid-

19  day break?

20          MR. STOCK:  Yes, Your Honor.  I literally think I may

21  have two, three questions.

22          THE COURT:  All right.

23          MR. STOCK:  I'm done on my direct.

24          THE COURT:  Let's go ahead.  Do that.

25  BY MR. STOCK:

A- 0168

Knipp - Direct                              80

1  Q.  Well, had you, on behalf of A.B. Dick, attempted to obtain

2  financing for operations from a source other than Key prior to

3  this point?

4  A.  Yes, a year and a half before that, in the Fall of 2002,

5  the company, largely through the owners, NES Investment

6  Company, had contacted Foothill Capital as well as a company

7  called Surberus, who are -- they lend to financially distressed

8  companies, often referred to as lenders of last resort.  And

9  they declined to extend financing to us.

10  Q.  So in July 2004, once Key Bank told you they would not lend

11  anymore, were you aware of any other source --

12  A.  No, I was not.

13  Q.  -- to obtain funds for payroll?

14  A.  No.

15  BY THE COURT:

16  Q.  Do you know if there was an effort made again in July of

17  2004 to contact lenders such as Foothill or Surberus?

18  A.  I do not know.

19  BY MR. STOCK:

20  Q.  How was the financial position of A.B. Dick back in late

21  2002, early 2003 when Foothill and Surberus turned down A.B.

22  Dick compared to its financial situation in July 2004?

23  A.  Well, at that time we had, under the borrowing advance

24  formulas Key Bank, we had about $5 million liquidity; $3

25  million under the bank line and about $2 million in cash -- $2½

A-0169

Knipp - Direct                                    81

1  million dollars of cash.

2  Q.  That was when you were turned down?

3  A.  Yes.

4  Q.  Okay.  And how about July 2004, how was the financial

5  position from here?

6  A.  We were over advanced by $3½ million dollars.

7  Q.  Substantially worse financial position?

8  A.  Yes.

9  Q.  Okay.  What happened next, to your knowledge?

10  A.  That was on July 2nd.  We met our payroll, we just squeaked

11  by.  And within the next week and a half, we filed bankruptcy

12  on July 13.

13  Q.  Was there a press release upon the filing of the

14  bankruptcy?

15  A.  Yes, there was.

16  Q.  Okay.  Upon the filing of the bankruptcy and the press

17  release announcing the filing of the bankruptcy, have you as

18  CFO of A.B. Dick Company or Paragon Corporate Holdings, been

19  approached by anyone other than Presstek to buy the stock or

20  the assets of those corporations?

21  A.  I have not.

22        MR. STOCK:  No further questions, Your Honor.  Thank

23  you.

24        THE COURT:  All right, thank you.  We'll take a break

25  at this point.  As I say, the afternoon is clear.  I know that

A- 0170

Knipp - Direct                                    82

1  probably is not great for some people's plane reservations but
2  that's the way it goes.  I will try to be back maybe by 1:15
3  and we'll stop -- start no later than 1:30 this afternoon and
4  then, as I say, we have the afternoon to proceed.  Thank you.
5  We'll be adjourned.
6        (Court in recess)
7           THE COURT:  Please be seated.  Are you ready to
8  proceed with Mr. Knipp?
9           MR. MASON:  Yes, Judge.  Some of the parties have
10 asked me if we can get some idea of the Court's scheduling.  I
11 know that it's difficult to predict because the Court doesn't
12 know how long this hearing is going to take place, nor do the
13 parties.  But how long would you expect to go, Your Honor,
14 if --
15          THE COURT:  Well, I expect to go as long as it takes
16 to get it done.
17          MR. MASON:  Okay.
18          THE COURT:  I don't know what that means but, really,
19 I don't think I have any time tomorrow.  And I don't have any
20 time on Wednesday, and I'm leaving on Thursday morning.  So
21 today is your day, and if that means we go until it's dark,
22 then we go until it's dark.
23          MR. MASON:  Okay.
24          THE COURT:  Okay?
25          MR. MASON:  That's helpful, Your Honor.

CROSS EXAMINATION

BY MR. MASON:

Q.  Good afternoon, Mr. Knipp.  Mr. Knipp, in or about May of 2004, how much was the -- how much was the debt owed to the bank?

A.  I don't have that number off the top of my head.  I can say that the over advance was in the million-two range.  I don't have that exhibit with me, I didn't bring it back.

Q.  Okay.  I'm gonna give you --

A.  Yeah.

Q.  Is there something that would refresh your recollection?

A.  Yeah.

Q.  And that's the Exhibit-1 that you looked at a little bit earlier?

A.  Yes, yeah.

Q.  I don't have the precise copy that you were given.

A.  Okay.

Q.  I'm giving you a copy that is --

       THE COURT:  What happened to the Exhibit?

       MR. GLEASON:  Where is it?  I don't know.

       THE COURT:  We haven't admitted this Exhibit.  Do you want admit this Exhibit, Counsel?

       MR. STOCK:  Well, I would move after the end of the -- his testimony to admit it, yes.  We stipulated, I believe, as to -- was this authenticity or not?

1    THE COURT:  Do we have an issue with regard to this?
2  Is there an objection to the admissibility of this evidence?
3    MR. MASON:  Judge, we may have.  The document has
4  many, many different pages in it, and I think at the end of
5  this cross examination I would have a better idea of whether
6  we're gonna have an objection --
7    THE COURT:  Well where's the -- the exhibit that he
8  was referring to before?  Let's make sure we're dealing with
9  the same thing as we had before.
10    (Counsel confer)
11    MR. MASON:  Thank you, Judge.  We have the deposition
12  version of the same document.
13    (Debtor's Exhibit-1 previously marked for identification)
14  BY MR. MASON:
15  Q.  Mr. Knipp, do you now have Exhibit #1?
16  A.  Yes, I do.
17  Q.  And does that refresh your recollection as to what the debt
18  was to the bank as of May 1, 2004?
19  A.  Yes it does.
20  Q.  And what was that debt?
21  A.  Including the letters of credit, $20 million, 934.
22  Q.  How much was it for June 2004?
23  A.  June was at $23 million, 148,000.
24  Q.  And July?
25  A.  $22 million, 953,000.

Knipp - Cross                                85

1  Q.  And approximately how much was it as of the time of the

2  filing of the bankruptcy?

3  A.  $23 million, 112.  Somewhere around there.

4  Q.  Okay.  And at the time of the filing of the bankruptcy,

5  approximately how much in accounts receivable did A.B. Dick

6  have that was subject to the bank security interest?

7  A.  I say $18 million, roughly.

8  Q.  Okay.

9  A.  Domestic receivables, that is.

10 Q.  And are those the only receivables that are subject to the

11 bank security interest?

12 A.  Yes.

13 Q.  And how about the inventory that is -- there was as of the

14 time of filing the bankruptcy, subject to --

15 A.  Net inventory -- inventory net or reserves -- I want to say

16 in the $11 to $12 million range.

17 Q.  And was there equipment at the time of the filing of

18 bankruptcy that the bank alleged a security interest in?

19 A.  Yes.

20 Q.  And what was the cost of that equipment?

21 A.  Well, the net book value's around $3.2 million.

22 Q.  And by the way, when we spoke about the (indiscern.) being

23 $12 million as of the time of the bankruptcy, was that at the

24 lower of cost or market?

25 A.  Yes it is.

1    Q.  What other significant assets has the bank claimed security

2    interest in as of the time of the filing of bankruptcy?

3    A.  Those are the major assets.  I do know that -- that we have

4    stock in our foreign subsidiaries, and I'm not exactly sure

5    whether they had an interest in that stock or not, Canada and

6    the UK.

7    Q.  And now, does the -- does A.B. Dick have intellectual

8    property rights?

9    A.  Yes.

10   Q.  Does it have patents?

11   A.  Yes.

12   Q.  And approximately how many patents does it have?

13   A.  I can't answer that.

14   Q.  Can you give us some estimate?  Is it more than 25?

15   A.  I don't want to speculate.  I don't know.

16   Q.  Are you aware of any new and innovative patents of A.B.

17   Dick?

18   A.  No, I mean, we are working together with Presstek on a

19   joint development of a metal plate maker using Presstek's laser

20   imaging technology, but that is not our patent, that is their

21   patent.

22   Q.  Was there an agreement between Presstek and A.B. Dick

23   concerning the development of that plate maker?

24   A.  Yes there is.

25   Q.  And have you seen that agreement?

Case 1:04-cv-01566-KAJ   Document 20-5   Filed 01/20/2006   Page 19 of 73

Knipp - Cross                                    87

1    A.   Yes.

2    Q.   And what -- can you summarize the terms of it?

3    A.   I cannot.

4    Q.   When was that agreement entered into, approximately?

5    A.   I'm not exactly sure.  I believe in the springtime.  I have

6    not focused on that agreement though, I just know of it.

7    Q.   In the Spring of 2004?

8    A.   Yes.  It could be earlier.

9    Q.   And are you familiar with any effort by Presstek to

10   terminate that agreement?

11   A.   No I'm not.

12        (Pause in proceedings)

13   Q.   Now, many of the products that are produced by A.B. Dick --

14   or, I'm sorry, strike that.  Many of the products that are

15   produced for A.B. Dick by its suppliers, are subject to A.B.

16   Dick's patents, are they not?

17   A.   Yes.  I wouldn't say many, I know of some.

18   Q.   All right, now you earlier testified that beginning around

19   2 -- December of 2003, you began to work on the due diligence

20   for a stock or asset sale?

21   A.   Early December, yes.

22   Q.   Okay, and that was Presstek?

23   A.   Yes.

24   Q.   I'm gonna show you what we've marked as Committee Exhibit-A

25   for identification of which appears to be a letter dated April

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

A-0176

1  27, 2004 and a draft Stock Purchase Agreement.

2      (Committee's Exhibit-A previously marked for

3  identification)

4          MR. MASON:  Your Honor, I have already previously told

5  the parties --

6          MR. SELBST:  I don't have copies of these, Mr. Mason.

7          MR. MASON:  I'm sorry, Mr. Selbst.  I believe that I

8  have a copy for you, but I don't have copies generally for

9  everybody.

10         THE COURT:  Is this what was attached to your

11  objection?

12         MR. MASON:  Yes, it was, Your Honor.  You do,

13  therefore, have a copy?

14         THE COURT:  I don't think I have a printed out copy so

15  I would need one if you have -- but, just for the benefit of

16  other parties, if you have that objection.

17         MR. SELBST:  I don't have an objection with it.

18         MR. MASON:  Uhm --

19         THE COURT:  How many copies do you have?

20         MR. MASON:  Your Honor, unfortunately -- I have one

21  for Mr. Selbst and there is one for the Court and -- I

22  apologize for --

23         THE COURT:  Have we marked one too?

24         MR. MASON:  Yes, and I've given it to the witness.

25  This would be Committee Exhibit-A.

Knipp - Cross                                89

1        THE COURT:  Yes, let's call this A.  We'll have -- the

2    Debtors exhibits will be numerical, these will be alphabetic.

3        MR. MASON:  Thank you, Your Honor.

4    BY MR. MASON:

5    Q.  Now, first of all, have you ever seen this before?

6    A.  No, I have not.

7    Q.  You've never seen the cover letter?

8    A.  No.

9    Q.  And have you ever seen the Stock Purchase Agreement?

10   A.  I received a draft of the stock purchase agreement sometime

11   around the first half of May.  I had attended a meeting in New

12   York when they were doing negotiations with MHR's offices.  And

13   based on that meeting, it was decided that I should get a copy

14   of that agreement.

15   Q.  And does this appear to be a copy of the agreement which

16   you received?

17   A.  The fact that it says "Stock Purchase Agreement" that's all

18   I can say, I mean --

19   Q.  Well can you -- can you take a couple of --

20        MR. MASON:  Let me advise the Court that Mr. Gleason

21   and I have agreed that this document is authentic, that it

22   is -- was in books and records, although Mr. Gleason has

23   reserved his right to object to the admission of this document

24   on the grounds of relevancy.

25        MR. GLEASON:  I would state for the record, Your

1    Honor, it was in the Debtors books and records. That does not

2    mean that Mr. Knipp ever saw it.

3    BY MR. MASON:

4    Q.  Mr. Mitt -- Mr. Knipp, does that appear to be the agreement

5    that you saw, the draft agreement, in or about May of 2004?

6    A.  Well, that was 2 or 3 months ago and I mean, yeah, I mean,

7    it's a Stock Purchase Agreement. Whether it's the same

8    agreement, I can't tell you that.

9    Q.  Okay. Mr. Knipp, you -- you earlier testified that you

10   were generally familiar with a Stock Purchase Agreement between

11   A.B. Dick and Presstek, is that right?

12   A.  Generally familiar, I was aware of it.

13   Q.  You were aware of it?

14   A.  Yes.

15   Q.  I'd like to turn your attention to page 10 of Exhibit-A,

16   and in particular, focus you on paragraph 2.2, which is titled

17   "Consideration".

18        (Witness examines document)

19   BY MR. MASON:

20   Q.  Mr. Knipp, in the early portion of paragraph 2.2, there

21   appears to be a purchase price for the stock of A.B. Dick of

22   $22 million, 600,000 in cash and $18 million, 500,000 in

23   Presstek stock. Do you see that?

24   A.  Yes, I do.

25   Q.  Is that consistent with your understanding of the agreement

1  that was proposed to A.B. Dick by Presstek in April or May of

2  2004?

3  A.  I had heard of terms in that -- that level, yes.

4  Q.  And I'd like to also turn your attention to page 50 of this

5  agreement, and in particular, paragraph 9.14, titled "Other

6  Indebtedness".  And that paragraph seems to indicate that

7  Presstek would not be assuming either the Key Bank debt or the

8  obligations of A.B. Dick to certain note holders.  Is that your

9  understanding of the way the Stock Purchase Agreement we've

10  earlier discussed --

11  A.  I was never given a clarification as what -- how the debt

12  was gonna be dissolved.

13  Q.  Now, in April 2004, what was the debt of A.B. Dick other

14  than the debt owed to Key Bank and to the note holders?

15  A.  You mean A.B. Dick or Paragon?  'Cause A.B. Dick has no

16  debt other than the fact that it's got trade payables and some

17  accrued liabilities and the deferred service obligations.

18  Q.  Okay.  Well, what were the -- then let me ask you this --

19  what were -- what was the debt of A.B. Dick in April 2004?

20  A.  A.B. Dick on it's books would have had accounts payable,

21  would have had accrued liabilities, it would have had differed

22  service revenue, it would have had some capital lease

23  obligations and it would have had probably an inter-company

24  balance owing to Paragon.

25  Q.  I'm looking at the 15th page of Exhibit-1.

Knipp - Cross                                    92

1          THE COURT:  1 or A?  Oh, 1.

2          MR. MASON:  This is 1.

3          MR. GLEASON:  What's it say on the bottom right there?

4          MR. MASON:  Ah, it doesn't say anything.

5          MR. GLEASON:  In the little -- to the top --

6          MR. KNIPP:  To the top -- "Reconsolidated" or "US"?

7   BY MR. MASON:

8   Q.  Down in the right-hand corner it says, "2004 FCST

9   Board.xls/bsus --

10  A.  Okay.

11  Q.  Do you see that?

12  A.  Yes.

13  Q.  Okay, am I'm correct in reading this to mean, under

14  "Current Liabilities," that as of April 2004, the total current

15  liabilities of A.B. Dick were approximately $39 million?

16  A.  It says here the current liabilities are $40 million, 500.

17  On May, you're saying?

18  Q.  I'm sorry, I said in April.

19  A.  Oh, April -- 30 million, 981, yes.

20  Q.  Okay.  And for May?

21  A.  $40 million.

22  Q.  $40 million, 504,000?

23  A.  Right, right.

24  Q.  And for June, $37 million, 899,000?

25  A.  Correct.

A- 0181

Knipp - Cross                                93

1  Q.  Is that correct?

2  A.  Yes.

3  Q.  And is this consistent with your recollection of how much

4  debt A.B. Dick had under current liabilities as of those days?

5  A.  Yes.

6      (Pause in proceedings)

7      MR. MASON:  Now Judge, again, a little commentary.  I

8  just received a copy of the signed Stock Purchase Agreement

9  from Mr. Gleason and I think we just have a little bit of a

10 communication gap.  I thought he was gonna give me a copy with

11 the signature on it.  So I only have a non-signed copy, which

12 is titled "Execution Copy" and I just received it.  And it's my

13 understanding that we have stipulated that this is also part of

14 books and records of A.B. Dick, and Mr. Gleason is reserving

15 his right to argue that this document is irrelevant.

16     MR. GLEASON:  Your Honor, let me make up what I'm --

17 kind of colloquy on this -- but this document was produced to

18 the Committee last week, was identified by the Committee's

19 general -- or the Debtor's general counsel.  The Committee was

20 advised at that time that the Debtors did not have a signed

21 copy of that document.  We would look for a signed copy and

22 provide it.  2 days ago, we advised the Committee that we did

23 not have a signed copy of the agreement, although we had signed

24 signature pages.  Because what happened, I believe -- Mr. Knipp

25 can testify to this -- he was sent signature pages, signed the

1  signature pages and sent them back.  Those pages were being

2  held pending consummation of the agreement if it ever was

3  consummated, which it was not.  So, I guess to be clear, this

4  is a document that is in the books and records of the company.

5  We do not have a signed copy of that agreement.  Mr. Mason does

6  have the signature pages for this document, as well as several

7  other documents that were (indiscern.).

8          MR. SELBST:  John, identify signed by whom and not

9  signed by whom.

10         MR. GLEASON:  Yes, it was the signature pages that we

11 provided, signed by Greg Knipp, on behalf of A.B. Dick.  We do

12 understand that there's a signature page that was signed by

13 Paragon as well.  It was not signed by Presstek or Silver.

14         MR. MASON:  I just wanted to point out to the Court

15 that I only have one copy of this document, and I am sorry that

16 I don't have more copies.  But in any event, I -- now, Mr.

17 Knipp --

18         THE COURT:  Is this different from Committee Exhibit-

19 A?

20         MR. MASON:  It is different in non-material respects,

21 Your Honor.  There are some blanks in Committee Exhibit-A that

22 seem to be filled in Committee Exhibit-B.

23         THE COURT:  Okay.

24 BY MR. MASON:

25 Q.  All right, Mr. Knipp, I'm now gonna show you what we've

1  marked as Committee Exhibit-B and ask you if you are familiar

2  with that document?

3      (Committee's Exhibit-B previously marked for

4  identification)

5  A.  I did sign signature pages to a Stock Purchase Agreement

6  that I believed to be the execution copy, but I have not

7  actually seen any Stock Purchase Agreement other than that one

8  that was sent to me in early part of May.

9  Q.  I'm gonna show you what we've marked as Committee

10 Exhibit-D, and the record should reflect that I've skipped over

11 C; we'll go back to C.

12      (Committee's Exhibit-D previously marked for

13 identification)

14      MR. MASON:  Your Honor -- then I have another copy for

15 anybody who wants to take a look at it.

16      (Pause in proceedings)

17      THE COURT:  That's his signature?

18      MR. MASON:  That's his signature.

19      THE COURT:  Okay.

20 BY MR. MASON:

21 Q.  First of all, Mr. Knipp, is that your signature on

22 Committee Exhibit-D?

23 A.  Yes, it appears to be.

24 Q.  And is this your understanding the -- of the document that

25 you signed agreeing on behalf of A.B. Dick to the Stock

Knipp - Cross                                     96

1   Purchase Agreement, which we marked as Exhibit-B?

2   A.   Yes.

3   Q.   Thank you.

4        (Pause in proceedings)

5   Q.   And were you granted authority by A.B. Dick to sign that

6   signature page, Exhibit-D?

7   A.   Yes I am.  Yes I was.

8   Q.   I'm now gonna show you what we've marked as A.B. Dick --

9   I'm sorry, that's Committee Exhibit-C.

10       (Committee's Exhibit-C previously marked for

11  identification)

12  A.   Okay.

13       MR. MASON:  And Your Honor, I will represent to the

14  Court again that Mr. Gleason and I agreed that this is an

15  authentic document that was taken out of the books and records

16  of A.B. Dick.  And again, I believe that Mr. Gleason's only

17  possible objection to this is on the grounds of relevancy.

18       MR. GLEASON:  We do stipulate the authenticity, Your

19  Honor.

20       THE COURT:  I'm sorry, I didn't understand what you

21  said, Mr. Gleason.

22       MR. GLEASON:  We do stipulate to the authenticity of

23  the document.

24       THE COURT:  Okay, thank you.

25  BY MR. MASON:

A- 0185

1  Q.  On the third page of Exhibit-C, there is a letter dated

2  June 22nd, 2004 signed by what appears to be a gentleman named

3  Musa Emusa.  Do you see that?

4  A.  Yes, I do.

5  Q.  Have you ever seen this letter before?

6  A.  I'm not sure.  I saw a letter right around this time that

7  talked about -- I'm trying to read the whole letter through --

8  is this where Presstek has declined to go through with the

9  transaction?

10 Q.  That was my question to you.

11 A.  Yeah, I heard of that and I didn't read the letter very

12 closely, I just heard there was a letter, yeah.

13 Q.  What was your understanding of Presstek's willingness to go

14 ahead with the Stock Purchase Agreement that we've marked as

15 Exhibit-B in or about June 2004?

16 A.  It was my understanding that they decided not to go through

17 with the transaction based on circumstances that they learned

18 or -- at that point in time.  I don't want to use the word

19 "learned," but whatever they -- for whatever reason.

20 Q.  Did you attend a dinner of Presstek and A.B. Dick

21 executives in Chicago shortly after the filing of the

22 bankruptcy?

23 A.  Yes I did.

24 Q.  And was Presstek's president there?

25 A.  Yes they were -- yes he was.

1  Q.  And who is that?

2  A.  Ed Marino.

3  Q.  And was A.B. Dick's then president there?

4  A.  Yes he was.

5  Q.  And what is his name?

6  A.  Brian Long.

7  Q.  And where was that meeting?

8  A.  A restaurant -- I don't recall the name of the restaurant,

9  it was -- there's several in that area near our offices in

10  Niles, Illinois.

11  Q.  Okay.

12  A.  It was actually in Rosemont, Illinois, that's where the

13  restaurant was at.

14  Q.  All right, and who else was present?

15  A.  Musa Emusa was there from Presstek; Michael McCarthy from

16  Presstek; and then the executive staff of A.B. Dick Company.

17  Q.  How many executives from A.B. Dick were present?

18  A.  Without giving a specific count, probably around 10, eight

19  to 10.

20  Q.  And at that meeting, did you hear Presstek's president tell

21  Mr. Long, the President of --

22        MR. GLEASON:  Objection, Your Honor, this is -- he's

23  trying to elicit hearsay.  He's seeking a declaration by a

24  statement made by a Presstek executive who's clearly not in

25  this Courtroom.

1        MR. MASON:  Judge, I -- this would be a party

2  admission to be admission against interest.  Presstek is here.

3  They're a party to this proceeding.

4        THE COURT:  Overruled.

5  BY MR. MASON:

6  Q.  At that meeting, did you hear Presstek's President tell Mr.

7  Brian Long, A.B. Dick's President --

8        THE COURT:  Why don't you just ask him if he heard

9  anything from the one to the other, rather than ask --

10 A.  What I heard was a general statement to that effect.

11       THE COURT:  To what effect?

12 A.  It wasn't directed directly at Mr. Long necessarily.

13       THE COURT:  I just -- first I want to know whether or

14 not you heard some conversation as a foundational matter then

15 you can ask the follow-up question.

16 BY MR. MASON:

17 Q.  Did you hear any conversation --

18 A.  Yes, I did.

19 Q.  -- among the parties?  Did you hear Mr. Marino, the

20 President of Presstek, say anything to Mr. Long, the President

21 of A.B. Dick?

22 A.  He -- he made a comment to that effect, what you just

23 indicated about the CFO -- CEO.  But he didn't necessarily, as

24 I recall, look directly --

26       THE COURT:  I don't understand --

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

A- 0188

1   A.  -- at Mr. Long.

2          THE COURT:  -- what you said.

3          MR. MASON:  Mr. Knipp, I --

4          THE COURT:  He hasn't -- he hadn't said anything yet.

5   A.  Oh, okay.

6          MR. MASON:  I think you were anticipating --

7   A.  Okay.

8          MR. MASON: -- my question.

9   A.  All right.

10  BY MR. MASON:

11  Q.  Would you please describe to the Court as best you recall

12  what statement you heard being made by Mr. Marino to Mr. Long?

13  A.  Well -- what did you ask me before -- so I'm perfectly

14  clear on this?

15  Q.  Yes.  Did you hear Mr. Marino say anything to Mr. Long at

16  that meeting, yes or no?

17  A.  Not directly to Mr. Long.

18  Q.  Did you hear Mr. Marino say anything to the executives

19  assembled at that meeting?

20  A.  He said a lot of things.

21  Q.  Okay.  Did you hear him say anything about the longevity of

22  a CEO of a company?

23  A.  Yes, I did.

24  Q.  And what did he say, to the best of your recollection?

25  A.  The average longevity of a CEO is 4 years, or 4.2 years, or

1  something to that effect.

2  Q.  Okay.  And was Mr. Long there at that time this statement

3  was made?

4  A.  Yes he was.

5  Q.  And did Mr. Long later get fired by A.B. Dick?

6  A.  He was terminated, yes.

7  Q.  Okay.  And how much after that meeting was he terminated?

8  A.  It was around the end of July.  That meeting was on July

9  14th, the dinner meeting was.

10 Q.  Okay.  So the dinner meeting was the day after the filing

11 of the bankruptcy.  At the dinner meeting, Mr. Marino made that

12 statement and 2 weeks later, Mr. Long was discharged?

13 A.  Yes.

14 Q.  What does each -- you talked about the three-legged stool,

15 describing the operations of A.B. Dick.  What does each of the

16 leg of the stool generate in revenue and EBITDA, E-B-I-T-D-A?

17 A.  Okay, they are -- let me just think about if for a

18 second -- in 2003, equipment business generated about $50

19 million in revenue.  And when you define EBITDA, it's a very

20 subjective number, but it was definitely negative on the

21 equipment side, okay?  And the reason why I say it's -- it's

22 subjective is -- there's a lot of common costs that get shared

23 amongst the three business units.  And it's up to the holder to

24 decide how they want to allocate those cost out.  But needless

25 to say that the -- the equipment business lost -- could lose

Knipp - Cross                                      102

1  money anywhere from, you know, 5 to 13, 14 million, depending

2  on how you allocate the cost.  The supplies business is about

3  $85 million and probably makes around 9 -- on that same basis -

4  - in the $9 million, $10 million range.  And --

5  Q.  That's 9 to 10 million positive?

6  A.  Positive, yes.

7  Q.  EBITDA?

8  A.  Yes, and the service business, that's about a $55 million

9  business, companywide.  And that probably generates at least 5

10  to 10 million itself.

11  Q.  So, the supply division, if I could call it that, and the

12  service division, if I could call it that, generates EBITDA of

13  somewhere between 15 and $20 million a year?

14  A.  Combined?

15  Q.  Yes.

16  A.  On a -- that allocation basis, yes, but again, that can

17  range probably 10 -- 5 million down to 10 to 20 million, I

18  guess, depending on how you look at it.

19  Q.  Has the company management considered shutting down the

20  losing division and continuing to operate the more profitable

21  divisions?

22  A.  No, not to my recollection, not in my discussions.

23  Q.  Now --

24  A.  I need to explain something there though --

25  Q.  How --

A- 0191

1  A.  Okay.

2  Q.  Now, you earlier testified that somebody tried to find

3  Debtor-In-Podssession financing for A.B. Dick, is that correct?

4  A.  Yes.

5  Q.  And were you involved in that?

6  A.  Providing due diligence information.  But the discussions

7  with the powers to be from the lending institutions were

8  handled through the ownership structure of Paragon.

9  Q.  And what -- how long did these discussions take place?

10  A.  Well, when I got involved, it was probably in the late fall

11  of the year 2000, and they terminated in the early winter of

12  2003.

13  Q.  I'm sorry, Mr. Knipp, I think that maybe we got our days a

14  little bit confused.  Did you mean to say that you commenced

15  discussions in the year 2000?

16  A.  2002, I'm -- did I -- I meant to say 2002.

17  Q.  I'm asking you, and I'm just looking for clarification --

18  A.  Yeah.

19  Q.  I'm asking you -- you had earlier testified that it was

20  your understanding that A.B. Dick had approached two potential

21  sources of Debtor-In-Possession lending for this bankruptcy.

22  A.  Right.

23  Q.  And I'm asking you when that approach took place, as best

24  you know?

25  A.  The Fall of 2002.

1  Q.  The Fall of 2002?

2  A.  Yeah.

3  Q.  And when did those discussions end?

4  A.  I'm not exactly sure.  I was asked for information from

5  time to time, but I believe they ended right -- January,

6  February of 2003.

7  Q.  Okay.

8  A.  About the same time that Key Bank, our current lender, gave

9  us an amendment to our existing agreement.

10 Q.  Okay.  So, since January or February of 2003, there has

11 been no effort by A.B. Dick, as best you know, to find the

12 Debtor-In-Possession financing lender --

13 A.  I don't want to say, the best I know --

14 Q.  -- other than by Presstek?

15 A.  The -- as I mentioned before, the ownership structure

16 conducts inquiries on their own to find alternative sources of

17 financing.  Whether they've done that or not, I can't tell you.

18 But I do know that they engage in those kind of discussions

19 from time to time.

20 Q.  And so this company was -- the implication of your

21 statement is that the company was considering bankruptcy as

22 early as late 2002?

23 A.  No, I can't say that, I don't know that at all.

24 Q.  Well you said that you were participating in due diligence

25 for Debtor-In-Possession lending --

1 A.  No, no, alternative financing to the Key Bank agreement,

2 the Key Bank Revolving Credit Agreement.  Under no -- make it

3 clear, if I said before it was Debtor-In-Possession financing,

4 it was not, it was just financing.

5 Q.  I see.

6 A.  Regular --

7 Q.  And so my question to you, and I don't mean to confuse you

8 --

9 A.  Yeah.

10 Q.  I want to make sure that the record is clear --

11 A.  Yeah.

12 Q.  Did you ever participate in an effort by doing due

13 diligence or otherwise to obtain Debtor-In-Possession

14 financing for this bankruptcy proceeding?

15 A.  No, I did not.

16     (Pause in proceedings)

17         MR. MASON:  Your Honor, if I could just have one

18 minute?

19   ▸ (Pause in proceedings)

20 BY MR. MASON:

21 Q.  Currently, how much money is borrowed on the Debtor-In-

22 Possession, the line?

23 A.  Right now, it's probably around zero.

24 Q.  Was there ever any money borrowed from the Debtor-In-

25 Possession line?

Knipp - Cross                                106

1  A.  I believe a week ago it was up towards a million dollars.

2  Q.  Okay, but it's down to zero at this point?

3  A.  Yeah, it fluctuates based on the timing of payrolls.

4  Q.  Mr. Knipp, thank you.

5        MR. MASON:  Judge, thank you.

6        THE COURT:  Do we have other cross examination?

7                    CROSS EXAMINATION

8  BY MR. SELBST:

9  Q.  Good afternoon, Mr. Knipp.  My name is Stephen Selbst, I

10  represent Presstek.  Mr. Knipp, I want to direct your attention

11  back to the meeting where you testified to a few moments ago

12  between Presstek executives and A.B. Dick executives.  At that

13  meeting, did you ever hear anyone from Presstek tell anyone at

14  A.B. Dick to fire Mr. Long?

15  A.  No.

16  Q.  Did you ever hear it at any other time?

17  A.  No.

18  Q.  Did you ever hear about anyone at Presstek telling A.B.

19  Dick to fire Mr. Long?

20  A.  No.

21  Q.  Thank you.  Now, I also want to direct your attention to

22  the various forms of the Stock Purchase Agreement that were the

23  subject of your earlier testimony.  Did you ever see a signed

24  signature page from Presstek to that Agreement?

25  A.  No I did not.

1    ME. SELBST:  Nothing further.

2                      CROSS EXAMINATION

3  BY MR. LEPENE:

4  Q.  Mr. Knipp, I just have one or two questions.  You testified

5  in response to a question from Mr. Mason that at the time of

6  the filing, that bank debt was about 23 million, do you recall

7  that?

8  A.  Yes.

9  Q.  And you testified that the receivables at that time were

10  about 18 million, do you recall that?

11  A.  Yes.

12  Q.  And that's on a book basis, is that correct?

13  A.  That's -- 18 million is the gross number.  I'd say net or

14  reserves are probably closer to 16½ to 17.

15  Q.  Okay.  And inventory at that time, you testified, was 11 to

16  12 million?

17  A.  Yes.

18  Q.  Again, on a book basis?

19  A.  Yes.

20  Q.  Okay.  You don't have any idea, do you, if this company

21  were to cease operating and were to liquidate, what the

22  recoveries --

23  A.  No, I don't.

24  Q.  -- would be and it's receivables?  Let me finish the

25  question.

1  A.  Okay.

2  Q.  You don't have any idea what that would be, do you?

3  A.  No.

4  Q.  And the same with the inventory, if this company were to

5  cease to operate and were to be liquidated, you don't have any

6  idea of what the recovery on the inventory would be, do you?

7  A.  No.

8  Q.  Thank you.

9          MR. STOCK:  Redirect, Your Honor.

10                 REDIRECT EXAMINATION

11 BY MR. STOCK:

12 Q.  Greg, Mr. Mason asked you whether the company had

13 considered shutting down the less profitable division, I

14 believe was the term that he used.

15 A.  Right.

16 Q.  Was there any -- is there any formal division of functions

17 under A.B. Dick?

18 A.  No.

19 Q.  Okay.

20 A.  Let me say this, though.  There are different operating VPs

21 that run the equipment business, the service business and the

22 supplies business, but they're not formal legal divisions.

23 Q.  And why has that not been considered?

24          MR. MASON:  Your Honor, I'm gonna object to that

25 question.  There's been no foundation.  This gentleman has

1  testified --

2            THE COURT:  Sustained.  If you lay foundation, or if

3  he knows why, then he can testify.

4  BY MR. STOCK:

5  Q.  Do you know why?

6  A.  Can you repeat the question please?

7  Q.  Yes.  Mr. Mason asked you whether or not the company has

8  considered shutting down a less profitable division.

9  A.  Right.

10 Q.  Remember that?

11 A.  Yes.

12 Q.  He apparently thought you may have knowledge regarding that

13 and I'm following up.

14 A.  No.

15 Q.  Do you have knowledge regarding that?

16 A.  No I don't.

17 Q.  Okay.

18           MR. STOCK:  No further questions.

19           THE COURT:  I have a couple of questions.

20 BY THE COURT:

21 Q.  Mr. Knipp, from the time the case was filed, can you give

22 me a history of what's been drawn and re-paid on the DIP line?

23 A.  I don't have those numbers exactly but I would anticipate

24 that probably a million to a million and a half has been drawn

25 on the DIP line and re-paid; it fluctuates up and down.

Knipp - Redirect                                    110

1   Q.  That's re-paid from collection of receivables?

2   A.  Yes it is.

3   Q.  Right now it's at zero?

4   A.  Yes.

5   Q.  You would expect it to go -- do you expect the company to

6   be back into the line sometime soon?

7   A.  Yes.

8   Q.  Does that come on a bi-weekly basis, having to do with

9   inventory?

10  A.  Well it has to do with the business plan as well.  Yes,

11  we're -- our forecast shows that we're going to be buying more

12  inventory to fund Mitsubishi and other vendors to get product

13  in and --

14  Q.  What do your forecasts show that you will actually meet on

15  the DIP line between now and November?

16  A.  I want to say 5 to $6 million.

17  Q.  On a revolving basis, up and down?

18  A.  Yes, but tracking upwards.

19  Q.  And what are the primary purposes for which that money will

20  be used?

21  A.  To buy inventory and also to fund the operations of the

22  business.  The business is expected to lose money in the next 3

23  months.

24  Q.  And also to pay the costs of the bankruptcy case?

25  A.  Those are included in that, yes.

Writer's Cramp, Inc.
Certified Court Transcribers
792-329-0191

Pollack - Voir Dire                         111

1   Q.  And to pay the inventory?

2   A.  Yes.

3   Q.  Purchase inventory?

4   A.  Yes.

5   Q.  Okay, thank you.

6           THE COURT:  Any questions from anybody based upon my

7   questions to the witness?

8           ALL:  (No verbal response).

9           THE COURT:  If not, you can step down, Sir.

10          MR. KNIPP:  Do I leave these Exhibits here?

11          THE COURT:  Please leave them there, yes.  All right,

12  what's next?

13          MR. GLEASON:  Your Honor, the Debtors would call Glenn

14  Pollack.

15          THE COURT:  Mr. Pollack, come forward here to the

16  Courtroom Deputy to be sworn.

17          GLENN POLLACK, DEBTOR'S WITNESS, SWORN

18          THE COURT:  Mr. Pollack, please take a seat to my

19  right in the witness chair and speak up clearly into the

20  microphone.  Okay, Mr. Gleason.

21          MR. GLEASON:  Thank you, Your Honor.

22                          VOIR DIRE

23  BY MR. GLEASON:

24  Q.  Could you please state your name for the record?

25  A.  Glenn Pollack.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0200

Pollock - Voir Dire                     112

1   Q.  Can you describe for the Court your educational background
2   after high school?
3   A.  I received a degree in Accounting from Boston University
4   and I'm a Certified Public Account, currently inactive.
5   Q.  Can you describe before the Court your work history after
6   high school?
7   A.  My employment after college began with Touche, Ross as an
8   accountant in Boston in 1980.  In 1983 I went to work as the
9   CFO of a troubled advertising agency.  In 1984 I joined Sideman
10  & Associates, a workout firm in Cleveland, Ohio.  That firm
11  merged into Price Waterhouse in 1988 or 1989.  I remained with
12  Price Waterhouse in their workout consulting group.  In 1990 I
13  became the CEO of one of the Price Waterhouse workout clients,
14  called A & W Foods.  That business ran until October of '94.
15  Then I opened Pollack & Associates, a financial advisory firm.
16  That business was merged into a middle market investment bank
17  by the name of Brown, Gibbons & Lange in 1996.  In 2001 I
18  formed Candlewood Partners with two other gentleman.
19  Q.  Can you describe for the Court your experience with
20  distressed companies?
21  A.  Since 1984, I have been at a variety of companies --
22  troubled companies -- CEO, Receiver, Chapter 11 Trustee,
23  Financial Advisor, Investment Banker, Consultant for a wide
24  variety of clients.
25  Q.  Let's turn to the -- to your experience in bankruptcy

1  matters.  You indicate a Chapter 11 Trustee, are there any

2  other type of bankruptcy related as opposed to out of

3  bankruptcy related matters?

4  A.  I've been a Receiver, I have also acted as Financial

5  Advisor and Investment Banker for a number of Chapter 11

6  Debtors.

7  Q.  Can you describe for the Court generally what a Financial

8  Advisor does on behalf of a Debtor in bankruptcy, both pre- and

9  post-petition?

10  A.  Yes.  Depending upon the timeframe in the case in which

11  you're hired, your activities might include helping management

12  and the Board analyze their strategic options, helping to

13  develop forecasts, help to develop financing alternatives, to

14  the extent it's appropriate, begin the production of a selling

15  memorandum, the assembly of a list of interested parties,

16  negotiations with potential parties.  There's a wide variety of

17  activities.

18  Q.  Those last items you mentioned, are they also related to

19  what an Investment Banker does in bankruptcy or are they

20  separate?

21  A.  They are related to an Investment Banker; there's an

22  interesting line.

23  Q.  Have you ever been involved in a 363 sale process?

24  A.  Yes.

25  Q.  Can you give the Court an idea of how many of those sale

Pollack - Direct                               114

1    processes you have been involved in?

2    A.  Over the last 20 years it's certainly been more than 30.

3    Q.  Have you been involved in Plans of Reorganization?

4    A.  Yes.

5    Q.  Approximately how many?

6    A.  Over the last 20 years, five to 10, 15.

7    Q.  Have you ever testified as an expert witness with respect

8    to bankruptcy transactions?

9    A.  Yes.

10   Q.  In what cases?

11   A.  I don't recall all of them, but Optical Datacom, General

12   Industries --

13   Q.  Where -- let's step back -- where was Optical Datacom?

14   A.  Delaware.  General Industries, Delaware.  Often my

15   testimony would be proffered.  It was last week in Manhattan,

16   in Ohio, in a variety -- I don't recall all of them, sorry.

17        MR. GLEASON:  Your Honor, at this time, I would like

18   to term Mr. Pollack as an expert witness with respect to

19   financial advisory and investment banking services in

20   bankruptcy.

21        THE COURT:  Any objection?

22        MR. MASON:  No objection, Your Honor.

23        THE COURT:  All right, he will be so designated.

24                   DIRECT EXAMINATION

25   BY MR. GLEASON:

1  Q.  Mr. Pollack, can you describe your understanding of the

2  general focus of a 363 sale?

3  A.  A 363 sale is typically used as a vehicle to maximize the

4  value -- the going concern value of an estate by providing for

5  -- providing an opportunity for a buyer to acquire assets

6  businesses without regard to the liabilities, and therefore, to

7  pay the largest price possible while the liabilities are dealt

8  with at a later time based on the value received in the sale.

9  Q.  Have you been involved in 363 sales where a stalking horse

10  has been used?

11  A.  Yes.

12  Q.  Can you describe for the Court your understanding of why a

13  stalking horse would be used in a 363 sale?

14  A.  A stalking horse is often used to establish a base -- for

15  two reasons.  One is to establish a baseline value that other

16  bidders can view as a target that they must over-achieve if

17  they wish to acquire the assets.  And two, it is often used as

18  a method to advise all the Parties-In-Interest that the

19  business will continue operating and it's a business that

20  should be supported and yes, it is in Chapter 11 today, but

21  here's a stalking horse that will provide for an ongoing

22  business and therefore allow it to maintain its going concern

23  value -- going concern value during the auction process.

24  Q.  Would you say there's a typical process used with respect

25  to 363 sales?

Pollack - Direct                                    116

1   A.   Yes.

2   Q.   Could you describe that process?

3   A.   The process depends a little bit on the level of activity,

4   pre and post, but it typically includes an investment banker or

5   some other party producing a list of potential interested

6   parties, distributing a teaser to those parties.  In our -- in

7   our shop, we use the teaser as an introduction then we call

8   every single party to invite them to sign a confidentially

9   agreement and receive a copy of the Selling Memorandum, which

10  we prepare with the company, which describes the business and

11  the opportunities.  After they have evaluated that, we

12  typically, for those who are interested, facilitate further

13  diligence, review of certain files, meet management, see the

14  company's operations, etc.  We participate and attempt to

15  forment negotiations towards a value greater than the stalking

16  horse, if there is one.  We facilitate those discussions and

17  try and bring as many parties as possible to an auction that

18  will create an environment to maximize the  going concern value

19  of the estate, the assets they're selling.

20  Q.   Is there a typical timeframe involved in any 363 sale

21  process?

22  A.   I think they vary widely.

23  Q.   What considerations go into deciding what an appropriate

24  timeframe might be in a particular case?

25  A.   The size and complexity of the business.  The amount of

1  pre-filing marketing that has occurred.  The company's ability

2  -- the Debtor's ability to sustain its operations.  The terms

3  under which the stalking horse bid, if there is one, provide.

4  The nature of the potential interested parties.  You know,

5  specifically, if all of the parties are foreign, then you might

6  expect to have a longer marketing process to accommodate their

7  needs.  If all of the parties are going to be financial, you

8  could have a much shorter marketing period because those

9  parties are able to move quicker.  There's a wide variety of --

10  Q.  Is there any one consideration that's more important than

11  others?

12  A.  I think the over-riding consideration would be the

13  maintenance of the going concern value of the Debtor.

14  Q.  When you say maintenance of the going concern value, what

15  do you mean?

16  A.  Most Debtors have -- have operations that lose money and

17  they have a limited amount of financing.  And so there's a

18  limited amount of time that they can remain in operation,

19  maintain the -- we'll call it the run rate, the amount of

20  business they're doing and -- within the financing they have

21  available.

22  Q.  In your experience, does a going concern sale of a business

23  as opposed to a piece-meal liquidation, generally result in

24  more value from estate?

25  A.  It generally does.

1  Q.  Why is that?

2  A.  Piece-meal liquidation typically results in the sale of

3  assets at or below their book value.  And it's based on a party

4  who believes that they can either buy those assets and

5  liquidate them for a price greater than what they bought them,

6  or can buy those assets and re-start a business off those

7  assets.  The typical sale as a going concern, the buying party

8  is paying at some level for good will, for the on-going

9  operations of the business.

10  Q.  You had, I believe, were in the Courtroom when Mr. Knipp

11  was testifying and referenced the razor/razor blade situation?

12  A.  Yes.

13  Q.  Is that, in your experience, -- how does that play into

14  whether you have a going concern or a piece-meal liquidation?

15  A.  The ability to continue servicing the -- the -- providing

16  the razor blades to the razor customers is critical in

17  maintaining the ongoing going concern value.  If you were to

18  stop providing the service of the equipment in the field, some

19  other party would likely step into that void and that customer

20  would be gone from the Debtor forever, or for some period of

21  time, certainly.

22  Q.  What if you were to stop selling the equipment that you

23  service?  Is it the same?

24      MR. MASON:  Your Honor, I'm gonna object.  I'm trying

25  to figure out what relevancy that this line questioning has to

1  the question the whether or not Presstek is entitled to bid

2  protection, which I think is supposed to be the focus of this

3  hearing.

4          THE COURT:  Overruled.  I assume that counsel will

5  soon get to his point.

6          MR. GLEASON:  Thank you, Your Honor.

7  A.  Could you repeat the question?

8  BY MR. GLEASON:

9  Q.  Yes.  You, I believe, testified that if you get rid of the

10 service you will lose customers that are buying the equipment.

11 Is the same true if you get rid of the equipment, you may lose

12 the service?

13 A.  In the razor blade/razor model, the assumption is once the

14 equipment or razor is out in the field, until its use expires

15 in the field, you'll be able to supply it with razor blades and

16 continue to service it.  So, although your market would dwindle

17 as those businesses took the equipment out of service, you

18 would continue to have the ability to sell into that market.

19 Q.  But then when the razor is gone, would you want to also

20 then sell another razor?

21 A.  You would.

22 Q.  Because then you can sell razor blades?

23 A.  It's -- it's an annuity stream.  You create a new annuity

24 stream -- the opportunity for a new annuity stream every time

25 you sell one of the pieces of equipment or razors.

Pollack - Direct                                    120

1  Q.  Mr. Pollack, let's turn to the Debtors in these cases.

2  When did you first learn of these Debtors?

3  A.  I believe it was 1998 or 1999.

4  Q.  How did you first learn of these Debtors?

5  A.  Paragon hired my former firm to sell Curtis Industries on

6  its behalf.

7  Q.  When did that engagement end?

8  A.  My recollection is somewhere between '98 and late '99.

9  Q.  Did you subsequently become involved with the Debtors

10 again?

11 A.  Yes, I did.

12 Q.  When was that?

13 A.  Sometime between late '99 and 2000.

14 Q.  And what were you asked to do at that time?

15 A.  To advise them with respect to the negotiations with their

16 bondholders.

17 Q.  And what happened with that engagement -- or during that

18 engagement?

19 A.  We advised Paragon, with respect to its alternative and --

20 its alternatives and its negotiating strategies.  We assisted

21 them in their negotiations with MHR as the primary bond holder.

22 And the company completed an exchange of those bonds with, I

23 believe, 97 or 98% of the bond holders sometime in August 2001.

24 Q.  What was your next engagement or involvement with the

25 Debtors?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0209

Pollack - Direct                    121

1   A.  I don't recall the exact date, I believe it was in 2002,

2   that the Paragon Board informally approached us and asked if we

3   could introduce them to any lenders.  We did, in fact, arrange

4   a meeting with them and Surberus.  We did not have a formal

5   engagement letter or a formal relationship at that time.

6   Subsequent to that --

7   Q.  Let me just step for a second --

8   A.  Yeah.

9   Q.  Are you aware of anything that transpired from those

10  informal negotiations or  the introductions that you made at

11  the request of the Debtors?

12  A.  I know there were meetings, there were discussions, I'm not

13  aware of any -- of any transaction arising out of those

14  meetings.

15  Q.  When were you next contacted, if at all, by the Debtors?

16  A.  My firm was contacted, I believe, in September of 2003.

17  Q.  And what, if anything, were you asked to do at that time?

18  A.  We were asked to advise the Debtor with respect to its

19  strategic alternatives directly as a result of their receiving

20  an expression of interest from Presstek earlier in the summer.

21  Q.  And what did your engagement consist of at that time?

22  A.  We helped the Debtor in moving its discussions along with

23  Presstek.  We added -- we acted as an interface between the

24  Debtor and Presstek for a limited period of time.  We helped

25  the Debtor begin to look at -- it wasn't the Debtor at that

Pollack - Direct                              122

1    time -- we helped the company to look at its operations on a

2    business line basis at that time.  We acted as a financial

3    advisor, an investment banker, for a limited period of time.

4    Q.  When did that engagement end?

5    A.  In November of 2003 we were approached by the company and

6    asked if we would modify our engagement, to fix the success

7    fee, and terminate our activities.

8    Q.  Do you know why you were asked to terminate your

9    activities?

10   A.  My understanding --

11        MR. MASON:  Your Honor, I'm gonna object on the

12   grounds that this gentleman would have to speculate as to why

13   somebody asked them to terminate his activities.  There's been

14   no foundation.

15        THE COURT:  Right, okay.  Ask your foundation

16   question.

17        MR. GLEASON:  I'll rephrase the question, Your Honor?

18        THE COURT:  Yes.

19   BY MR. GLEASON:

20   Q.  Do you know why Candlewood was asked to terminate its

21   activities?

22        MR. MASON:  Again, same objection, Your Honor.

23        THE COURT:  No, overruled.  He's asking -- he's laying

24   the foundation.

25   A.  Yes.

1    BY MR. GLEASON:

2    Q.  Why was Candlewood asked to terminate --

3             THE COURT:  Well, you've got to ask how he knows.

4    BY MR. GLEASON:

5    Q.  Okay, how do you know?

6    A.  A Board member of Paragon called and advised us.

7    Q.  Was it your understanding that the Debtors and MHR would be

8    commencing negotiations directly with Presstek at that time?

9    A.  It was my understanding that the Debtors --

10   Q.  Or the company at this time, I'm sorry.

11   A.  That the company would be handling the negotiations from

12   that point out and that they would be involving MHR.

13   Q.  When did you next hear from the Debtors -- or the company,

14   at this point?

15   A.  In May of 2004, they called and asked if we would take our

16   revised fee in stock, Presstek stock.

17   Q.  And what did you do?

18   A.  We agreed that we would do that.

19   Q.  What happened subsequently to that?

20   A.  They called again.

21   Q.  And what did -- and what were you advised at that time?

22   A.  They asked if we would waive our fee.

23   Q.  And what did you do?

24   A.  We agreed to waive our fee in full and did so.

25   Q.  So, did you receive any compensation at that point in time?

1  A.  At that point, when we waived our fee, they agreed to pay

2  the out-of-pocket expenses we had not yet billed them for.

3  Q.  Which was?

4  A.  $8,000.

5  Q.  And that's the $8,000 that Candlewood returned a few weeks

6  ago?

7  A.  It is.

8  Q.  At that time, was it your understanding that a transaction

9  was contemplated between the company and Presstek?

10 A.  At what time?

11 Q.  At the time you were asked to waive your fee?

12 A.  Yes.

13 Q.  Did that transaction ever close?

14 A.  Not to my knowledge.

15 Q.  Were you subsequently contacted by the company again?

16 A.  Yes.

17 Q.  When was that?

18 A.  Late June 2004.

19 Q.  And what were you asked to do at that time?

20 A.  Represent the Debtors, the soon-to-be Debtors, as financial

21 advisors and investment bankers.

22 Q.  What was the status of the debt -- of the companies

23 business at that time?

24 A.  They were barely able to make their upcoming payroll.  In

25 fact, they were not able to make their payroll without an

1  additional over advance from their secured lender.  They were

2  in the midst of negotiating a 363 stalking horse arrangement

3  with Presstek and they were discussing DIP financing with

4  Presstek and Key Bank.

5  Q.  Did you, on behalf of the company, become involved in those

6  negotiations?

7  A.  Yes, I did.

8  Q.  Let's turn to after you were retained to represent the

9  company.  What steps did you take with respect to that

10  engagement?

11  A.  We sent a member of our staff to the company to work with

12  Mr. Knipp to understand the company's current forecast and

13  projections.  We had -- we reviewed documents, we had

14  conversations with counsel, we attended meetings with the

15  company's Board, both of the companies' Boards, as well as

16  negotiating sessions with Presstek and Key.

17  Q.  Were there actual face-to-face negotiation -- negotiating

18  sessions between Presstek and Key at that time?

19  A. • Between the soon-to-be Debtors and Presstek and Key?

20  Q.  Yes.

21  A.  Yes.

22  Q.  Did the Debtor subsequently reach -- or the soon-to-be

23  Debtor -- subsequently reach an agreement with respect to a

24  stalking horse bid?

25  A.  Yes.

Pollack - Direct                                126

1   Q.  And did the soon-to-be Debtor subsequently reach an

2   agreement with respect to post-petition financing?

3   A.  Yes.

4   Q.  Absent these agreements, do you have an opinion as to what

5   options the Debtors would have had in July 2004?

6   A.  Yes.

7   Q.  What is that opinion?

8   A.  Without those agreements and the support provided by those

9   agreements, it's my opinion that Key would not have funded the

10  next payroll.  And without a Debtor-In-Possession financing,

11  the next payroll would not have been funded, and the Debtor

12  would have had -- the Debtor had no other -- no other ready

13  alternatives that were workable in the timeframe available.

14  And I -- it's my opinion that the situation would have resulted

15  in a piece-meal liquidation of the Debtor's assets.

16  Q.  Based on your review of the Debtor's assets, do you have an

17  opinion as to whether a piece-meal liquidation would be a

18  higher and better value than a going concern sale?

19  A.  I have an initial view that it would be a lower value.  We

20  have not completed our formal liquidation analysis.

21       MR. GLEASON:  Your Honor, may I approach the witness?

22     (witness receives document)

23  BY MR. GLEASON:

24  Q.  Mr. Pollack, I handed you a document that we have marked as

25  Exhibit-1.

A- 0215

1       THE COURT:   Two.

2   BY MR. GLEASON:

3   Q.  Two, I'm sorry, Exhibit-2.  Can you identify this document?

4       (Debtor's Exhibit-2 previously marked for identification)

5   A.  It's a copy of the executed Asset Purchase Agreement among

6   the Debtors, Presstek, et cetera.

7   Q.  Is this the agreement with some modifications that we've

8   talked about and they -- you had talked about that is before

9   the Court today with respect to bidding procedures?

10  A.  Yes, it is.

11  Q.  Can you briefly describe the overall terms of this

12  agreement?

13  A.  The buyer is acquiring all of the assets of A.B. Dick and

14  Paragon, the assets of its Canadian subsidiary, and the stock,

15  which are the -- which is an asset of A.B. Dick or Paragon, of

16  its UK subsidiary.  It's paying $40 million in cash -- the

17  buyer is paying $40 million in cash less a credit for the

18  amounts it is -- it has advanced as a DIP.  The Debtor is

19  responsible for cure costs of specified executory contracts.  I

20  think those are the general business terms.

21  Q.  Can you describe the negotiations that took place between

22  the Debtors and Presstek with respect to this agreement?

23  A.  Yes.

24  Q.  What took place?

25  A.  Once -- I can testify to the extent that we were involved,

Pollack - Direct                                    128

1  and I believe there was a first draft of the arrangement

2  prepared before our involvement.  After that, there was

3  extensive discussion over -- and negotiation -- over the

4  covenants, the material adverse effects clause, the timing, the

5  financing, the related Debtor-In-Possession financing.

6  Extensive discussion and negotiation.

7  Q.  Would you say that that negotiation became contentious at

8  times?

9  A.  There were multiple calls that lasted past 3 in the

10  morning.

11  Q.  At the time of these negotiations, were you aware of any

12  party that was interested in purchasing the Debtor's assets for

13  the consideration Presstek was offered?

14  A.  No.

15  Q.  Were the Debtors able to obtain improvements on what was

16  originally proposed in the agreement?

17  A.  Yes.

18  Q.  Can you maybe describe some of those?

19  A.  Yes.  In the material adverse effects section, the

20  Debtor --

21  Q.  Step back for one second.  Could you explain to the Court

22  what you mean by material adverse effect?

23  A.  Yes.  My understanding is that one of the conditions to

24  closing --

25  Q.  Let's first talk in general -- in general Asset Purchase

1  Agreements during 363 sales and other sales.

2  A.  Okay.  In general, a material adverse effect or a mac-out

3  clause is one that provides an opportunity for the buyer to

4  ensure that what they are buying is the same at the closing

5  date as at the contract date.  So in this case, this

6  arrangement was executed at some time early in July and the

7  sale will not be consummated until some significantly later

8  date.  And the buyer intends to buy the business in a fashion

9  that it is today.  So they want to make sure that there isn't a

10 degradation in the business, that the assets they're buying or

11 substantially similar assets, are there at the time of the

12 closing.  The seller --

13 Q.  Is that type of clause typical in transactions such as

14 this, given your experience?

15 A.  Yes.  The seller seeks to limit the subjectivity of a

16 material adverse effect clause so that it can understand the

17 conditions under which they buyer is obligated to close.

18 Q.  Were you able to negotiate the material adverse effects

19 provision at all in this agreement?

20 A.  Yes.

21 Q.  And can you explain for the Court whether the provision

22 that is in this agreement is narrower than in other agreements

23 you have experience with?

24 A.  Yes.

25 Q.  How is that?

Pollack - Direct

130

1  A.   This -- the provision in this agreement is objective and
2  very specific and very limited.
3  Q.   Explain what you mean by that.
4  A.   It's a combination of two very specific tests.  Numerical
5  tests with the numerical targets, there are no subjective
6  conditions with respect to the material adverse effect.  It's
7  sales for certain periods and the level of assets at a test
8  date.
9  Q.   What would a broad material adverse effect clause be in
10 your experience?
11 A.   I have seen them as broad as there shall not be a material
12 adverse change, period.  Which --
13 Q.   With no --
14 A.   No quantification, no objectivity, no definition.  That
15 could mean, from my perspective, all kinds of things; an
16 increase in sales, a decrease in sales, a change in margin, a
17 change in the make-up of the inventory, a change in personnel,
18 loss of a particular customer, all kinds of things.
19 Q.   In your opinion, with respect to a seller who wants have
20 some assurance that a buyer will close, is the material adverse
21 effect clause in this agreement better than, for example, the
22 agreements -- the clauses you were just speaking of?
23 A.   My opinion is it's better.
24 Q.   Why is that?
25 A.   It's better because it's specific, it's quantifiable and

1  there's no opportunity for extraneous issues to cause -- to be

2  the cause of a material adverse effect.  You either make the

3  sales and it's not a condition, or you don't.

4  Q.  I believe there's been some discussion in these cases about

5  -- as opposed to a termination event, why isn't this just a

6  adjustment at closing, a dollar adjustment at closing?  In your

7  experience, have you seen it one way or the other?

8  A.  I have seen it both ways.

9  Q.  And is there any -- with respect to this agreement, were

10 the Debtors able to obtain an adjustment to the purchase price

11 as opposed to the termination option that is available if those

12 quantifiable results are not met?

13 A.  No, the company -- the Debtor bargained hard for clauses

14 that would allow it to meet the tests in different ways.  And

15 the buyer was steadfast in their need for this type of

16 requirement with respect to the -- you're just talking about

17 the working capital?

18 Q.  Yes.

19 A. .Yeah, with the working capital at closing, the buyer

20 advised that they would be willing to except inventory that the

21 Debtor just purchased to make up for any shortfall in working

22 capital.

23 Q.  Based on your experience, do you believe that the material

24 adverse effect provision in this agreement sufficiently

25 convinced the seller, I mean the buyer, to purchase these

1  assets?

2          MR. MASON:  I'm gonna object to that question on the

3  grounds that it is so vague.  I don't know what it means by

4  sufficiently convinced, but I'd like clarification on that

5  question.

6          MR. GLEASON:  I'll come back to that.

7  BY MR. GLEASON:

8  Q.  Mr. Pollack, based on your experience, are provisions that

9  provide a buyer an out if a business fails to meet various

10 financial targets typical in 363 sales?

11 A.  Where there's a significant period of time between the

12 contract date and the closing date, yes.

13 Q.  In these cases has anything happened post-petition that

14 would make it difficult for the Debtors to satisfy these

15 financial targets?

16 A.  Make it more difficult?

17 Q.  Yes.

18 A.  The Mitsubishi requirement for pre-payment of orders

19 initially made it more difficult.

20 Q.  Was this Mitsubishi requirement a change from the pre-

21 petition business relationship that the Debtors had had with

22 Mitsubishi?

23 A.  Yes, my understanding is that they had an open line of

24 credit pre-petition and when orders were -- the line of credit

25 was not based on commitments, it was based on deliveries.  And



Pollack - Direct                                    133

1  what I mean by that is when you enter into a purchase order,
2  you're entering into a commitment. When you receive the goods
3  at some later date, that's obviously a delivery. So the credit
4  line was -- my understanding is that the credit line was
5  limited or used only by delivery, so there was no requirement
6  to fund in any way, shape or manner or -- nor was there a
7  limitation pursuant to the credit line for orders placed. That
8  changed at the commencement of the case. And in fact, there
9  was a very specific requirement for pre-payment. At the time
10 orders were placed, these products were manufactured so it
11 wasn't an in-and-out type of arrangement. I believe the
12 reasonable expectation of the dates would be you order on day
13 one, it goes into manufacturing some time thereafter, it's
14 manufactured within 30 days or so. At the time manufacturing
15 is complete and it ships, you pay another third. So, a third
16 at the order, a third when it ships, if it ships by boat from
17 Japan, my understanding is it's 3 to 5 weeks to arrive at the
18 Chicago location of the Debtor, and then it's the final third
19 when it arrives.
20 Q.  At the time the Asset Purchase Agreement was negotiated
21 pre-petition, were the Debtors aware that Mitsubishi would take
22 this position and change the way they had done business
23 previously?
24 A.  The company had heard -- I don't know the exact dates. The
25 company had heard at some point that Mitsubishi had terminated

Writer's Cramp, Inc.
Certified Court Transcribers
732-929-0191

1   its line and was seeking an alternative.

2   Q.   What impact on the financial targets, or the material

3   adverse effect provisions in the Asset Purchase Agreement, did

4   that change by Mitsubishi have on the Debtors?

5   A.   There were two changes.  One was the Debtor-In-Possession

6   financing is regulated at some -- is regulated partially by the

7   amount of the over advance and when -- if the Debtor were to

8   expend funds for deposits which were not included in the

9   collateral base, the over advance would widen and we would have

10  a hard -- the Debtor would have a hard time keeping within the

11  collateral formula.  That's number one.  Number two, the Asset

12  Purchase Agreement provided for a working capital test at

13  closing.  The working capital test defined inventory and that

14  definition did not include inventory deposits.  And so had the

15  Debtor made deposits that would not have been -- deposits for

16  goods, which would not have been received by the closing date,

17  the buyer would have gotten the benefit of those deposits

18  without paying for them.  And more importantly, the Debtor

19  would not have been able to make the covenant -- its

20  projections indicated it would not have been able to make the

21  working capital covenant if those pre-payments were not

22  included.  And therefore, it would be unable to make those pre-

23  payments after a certain date, which would result in the

24  business not having inventory -- not having inventory from its

25  prime vendor available for sale after the first or second week

1  of October, which would have resulted in a decrease in its

2  appeal to other buyers.

3  Q.  The prime vendor being Mitsubishi?

4  A.  Mitsubishi, yeah.

5  Q.  Chair of the Creditors' Committee?

6  A.  Chair of the Creditors' Committee.

7  Q.  Have agreements been reached by the Debtors and the post-

8  petition lenders to address this -- these issues?

9  A.  Yeah, yes.

10  Q.  And what are those agreements?

11  A.  To my understanding, that the post-petition lenders have

12  agreed to allow up to 2.5 million --

13  Q.  Is it 2 or 2.5?  I think I misspoke earlier.

14  A.  It's $2.5 million -- my understanding is it's $2.5 million

15  for the Debtor-In-Possession collateral base.  So that -- up to

16  $2½ million would be included as collateral in the collateral

17  base and the appropriate availability formula would be applied

18  and that would be included.  My understanding is that Presstek

19  has also agreed to amend the definition of inventory to include

20  pre-paid inventory deposits up to $2 million at the closing

21  date.

22  Q.  How does this agreement benefit the Debtors?

23  A.  In three ways.  One is the use of cash for making these

24  pre-payments is now akin to buying inventory, at least for

25  purposes of calculating the collateral.  So making the deposits

1  will not adversely affect the Debtor's calculations anymore

2  than buying regular inventory.  That's number one.  Number two,

3  by allowing the definition of inventory on the APA, together

4  with the inclusion in the collateral base, it allows the Debtor

5  to order from Mitsubishi on an organized fashion and make sure

6  that there will be a stream of product available to meet the

7  tests -- the other sales tests in the APA, as well as provide

8  the foundation of an ongoing business to any other party who

9  might be interested in bidding.

10 Q.  Now there was some testimony earlier today about the Debtor

11 -- whether or not the Debtor has drawn down on the line

12 recently. I think the testimony was that as we sit here today

13 it may be a zero.

14 A.  Yes.

15 Q.  Can you explain why that is and whether that is going to

16 change in the immediate future?

17 A.  Well, I can address the immediate needs.  Once the

18 amendments that we are talking about are approved and are

19 appropriate for the Debtor to rely on, it will immediately draw

20 down funds on the DIP to fund the next payment to Mitsubishi,

21 as well as the initial payment on the next set of orders to

22 Mitsubishi, as well as a variety of other vendors who are

23 requiring payment in advance.

24 Q.  And prior to reaching that agreement, were the Debtors --

25 did it make sense for the Debtors to draw down and send money

1  to Mitsubishi?

2  A.    The Debtors -- prior to the agreement, the Debtors only

3  drew down and made a payment to Mitsubishi for inventory that

4  would be manufactured in August and early September and

5  available for delivery and sale in late September and the first

6  week of October.

7  Q.    Do you have an understanding of what is going to be drawn

8  down on the line in the next few days and sent to Mitsubishi?

9  A.    Approximately a million dollars.

10 Q.    I want to turn to a couple of other provisions in the Asset

11 Purchase Agreement.  Are you familiar with the financial

12 representations and warranties contained in the agreement?

13 A.    Generally.

14 Q.    Are these representations and warranties typical in

15 transactions such as this, in your experience?

16 A.    I have seen transactions where they're included and

17 transactions where they're excluded.

18 Q.    During the negotiations with the buyer, did the Debtors

19 attempt to modify the agreement with respect to those

20 representations and warranties?

21 A.    We did.

22 Q.    And were you successful in some manners and not others?

23 A.    We enjoyed some success.

24 Q.    Let's turn to the -- there's a liquidated damage provision.

25 Are you familiar with that type of provision?

1  A.  Yes.

2  Q.  Is that a provision that is common or uncommon in

3  transactions such as this?

4  A.  Relatively common.

5  Q.  There is a release of the buyer in the agreement.  In your

6  experience, it that something that is common or uncommon in

7  these types of transactions?

8  A.  Relatively common.

9  Q.  Why is that?

10  A.  Buyers don't -- if you are buying the business and buying

11  the assets and paying the estate what the estate must consider

12  an appropriate amount of money, you don't want that -- those

13  dollars used then to prosecute you for some other activity.

14  Q.  Does this agreement, meaning Exhibit-2, does it have a due

15  diligence contingency contained in it?

16  A.  No, it doesn't.

17  Q.  Does this agreement have a financing contingency contained

18  in it?

19  A.  No, it does not.

20  Q.  In your experience, do other transactions -- other 363

21  sales transactions, sometimes have those types of

22  contingencies?

23  A.  They sometimes do.

24  Q.  Given the modifications we have discussed, do you have an

25  opinion as to whether the Debtors will be able to satisfy the

A- 0227

Pollack - Direct                                    139

1  representations and warranties in the agreement?

2  A.  I do.

3  Q.  What is that opinion?

4  A.  I believe, based on discussions with management and a

5  review of the company's updated forecast, that they will in

6  fact be able to make the financial tests included in the APA,

7  achieve those tests.

8  Q.  Now I want to turn briefly to the post-petition financing

9  agreement.  Can you describe the general terms of the post-

10 petition financing the Debtors have negotiated with Key Bank

11 and Presstek?

12 A.  Yes.

13       MR. MASON:  Judge, I'm gonna object to this question

14 only in the name of time.  If the Court would like to hear a

15 description of what's already been submitted to the Court in

16 writing, we can go through that exercise.  But I think that

17 it's really kind of not a particularly good use of our time.

18       MR. GLEASON:  Your Honor, if I could --

19    .   THE COURT:  I could take --

20       MR. GLEASON:  -- have a stipulation from Mr. Mason that

21 the Debtor's good faith in negotiating these documents is no

22 longer on the table, I would be happy to do that.  But if he's

23 going to continue to say that the Debtors did not act in good

24 faith in this case, I have to put on the record what the

25 Debtors were able to negotiate, how they got there, and why we

A- 0228

Pollack - Direct                                         140

1   are where we are today.

2          MR. MASON:  Judge, I don't know what I'm being asked

3   to stipulate to so I'm reluctant to stipulate --

4          THE COURT:  All right then, why don't --

5          MR. MASON:  I didn't even know good faith was an

6   issue here, but in any event, he --

7          THE COURT:  I'll -- the objection will be overruled.

8          MR. MASON:  Thank you.

9          THE COURT:  Why don't you just go ahead.

10         MR. GLEASON:  Thank you, I will try to be brief, Your

11  Honor.

12  BY MR. GLEASON:

13  Q.  Can you briefly describe the terms of the post-petition

14  financing that has been agreed to in this case?

15  A.  All right, there's approximately -- or I believe there's a

16  $7 million DIP line available to the Debtors.  It's subject to

17  a budget, which has been provided to the lenders as well as the

18  Court, and it includes tests both as to disbursements as well

19  as the magnitude of the over advance at any point in time.

20  Q.  In your experience, are you aware of cases where the

21  stalking horse bidder provides some or all of post-petition

22  financing?

23  A.  I've not been involved in a case where that's been the

24  case, where that is --

25         THE COURT:  I'm sorry, again, I didn't understand the

1  question.

2  BY MR. GLEASON:

3  Q.  Okay.  In your experience, are you aware of cases where a

4  stalking horse bidder has provided post-petition financing?

5  A.  I don't recall being in a case as an advisor where the

6  stalking horse bidder provided financing.

7  Q.  Are you familiar with the TWA case?

8  A.  No.

9  Q.  Okay.  Can you describe the negotiations that took place

10 with respect to the Debtor-In-Possession financing agreement?

11 A.  Yes.

12 Q.  What took place?

13 A.  Generally, we -- the company asked Key if it would extend

14 DIP financing, they said no.  We inquired would they allow us

15 to bring in new financing and prime them, they said no.  We had

16 a discussion with them and Presstek.  It became clear that they

17 would allow Presstek -- they wouldn't allow -- that it would

18 feasible to have Presstek provide a significant portion of the

19 financing using the collateral that Key did not have a lien on

20 as their collateral.  I forgot the rest of the question.

21 Q.  Just -- the negotiations that took place?

22 A.  Yes.

23 Q.  Were the Debtors able to obtain improvements on what was

24 originally proposed by the post-petition lenders?

25 A.  Yes.