Pollack - Direct                                    142

1  Q.  Can you explain some of those improvements for the Court?

2  A.  Yes.  We spent quite a bit of time modifying the budget and

3  negotiating with the post-petition lenders for things such as

4  cumulative disbursements, allowing cross-category

5  disbursements, so that the Debtors weren't limited in how they

6  spent their dollars and had flexibility so long as they

7  maintained the overall disbursement number, the over advance

8  number, and stayed within the borrowing limit.

9  Q.  Was the dollar amount of the DIP increased at one point?

10 A.  It was increased and decreased.

11 Q.  At one point it was $6 million, wasn't it?

12 A.  Yes, it was and at one point there were discussions of 10.

13 Q.  And it ended up?

14 A.  Seven.

15 Q.  Based on your experience, are the terms that are contained

16 in the DIP financing agreement reasonable given the facts and

17 circumstances in these cases?

18 A.  Yes, they are.

19 Q.  Mr. Pollack, I want to now briefly turn to the bid

20 procedures that were negotiated.  Based on your experience, are

21 the bid procedures that were negotiated with Presstek

22 reasonable given the facts and circumstances in these cases?

23 A.  Yes.

24 Q.  Are you familiar with some of the modifications of --

25 strike that -- did the Debtors attempt to negotiate the bid

A- 0231



Pollack - Direct                                    143

1  procedures pre-petition?

2  A.  Yes.

3  Q.  Were the Debtors able to get any concessions with respect

4  to the bid procedures?

5  A.  Minor concessions.

6  Q.  Based on your experience, is that typical in these cases?

7  A.  Given the facts and circumstances here, yes.

8  Q.  I think you were in the Courtroom earlier today when there

9  was some discussion about the modifications that Presstek has

10  agreed to make with respect to the bid procedures.  Do you

11  remember that?

12  A.  Yes.

13  Q.  Based on those modifications, do you have an opinion as to

14  whether the bid procedures will enable the Debtors to

15  effectively market their assets and obtain the highest and best

16  value for the estates?

17  A.  Yes.

18  Q.  What is that opinion?

19  A.  Given the changes, I believe the Debtors have a very real

20  and fair opportunity to hold an auction process that will

21  result in the highest and best value available today for these

22  assets.

23  Q.  I want to turn briefly to the Debtor's financial advisor.

24  Are you familiar with Jeffries & Company?

25  A.  That would be the Creditor's.

Pollack - Direct                                        144

1    THE COURT:  You mean the Committee's?

2  BY MR. GLEASON:

3  Q.  I mean the Committee's, sorry.

4  A.  By reputation.

5  Q.  When did you first meet with Jeffries & Company with

6  respect to this case?

7  A.  I had lunch with Mr. Flax I believe on August 9th.

8  Q.  When did Jeffries & Company first provide a due diligence

9  request to the Debtors?

10  A.  I believe they delivered an e-mail with that request on

11  August 13th.

12  Q.  And when did Jeffries first meet with the company?

13  A.  I believe it was August 16th or 17th, it was the Monday

14  following the 13th.

15  Q.  With respect to the modifications to the DIP, given the

16  modifications that you testified to today and you've heard

17  from Mr. Knipp's testimony, do have an opinion as to whether

18  the DIP is sufficient to enable the Debtors to preserve their

19  going concern value during the marketing process?

20  A.  I do.

21  Q.  And what is that opinion?

22  A.  Assuming that the marketing process concludes by November

23  15th, I believe that the DIP is both sufficient in duration,

24  amount, and is reasonable in cost and will allow that process

25  to move forward.

A- 0233

1  Q.  You said the marketing process, you mean the sale process?

2  A.  Yes.

3  Q.  The closing date?

4  A.  The closing date.

5  Q.  I'm gonna turn now to efforts to obtain other financing.

6  Are you aware whether the Debtors made any efforts to obtain

7  post-petition financing from parties other than Key and

8  Presstek before the cases were filed?

9  A.  Yes.

10  Q.  Did they?

11  A.  They did not.  To my knowledge, they did not.

12  Q.  Do you know why?

13  A.  Yes.

14  Q.  Why is that?

15       MR. MASON:  I'm gonna object on the grounds, again,

16  there's no foundation.

17       THE COURT:  What are we --

18       MR. MASON:  Again, he's being asked to speculate why.

19       THE COURT:  Just let -- ask the foundational

20  questions.

21  BY MR. GLEASON:

22  Q.  Mr. Pollack, are you aware as to why the Debtors did not

23  seek post-petition financing from lenders other than Key and

24  Presstek pre-petition?

25       MR. MASON:  Same objection.

1    THE COURT:  Well, the question is are you aware?

2  A.  Yes.

3    THE COURT:  What is the basis of that awareness?

4  A.  My discussions with the Board.

5    THE COURT:  All right, why don't you follow up a bit

6  on that?

7  BY MR. GLEASON:

8  Q.  What discussions did you have with the Board in your

9  capacity as financial advisor and with respect to seeking post-

10  petition financing from entities other than Key and Presstek?

11  A.  Once we were engaged, we had discussions with respect to

12  the amount of time available to seek alternative financing

13  sources.

14  Q.  Based on your experience, did these Debtors have sufficient

15  time to obtain alternative post-petition financing from parties

16  other than Key and Presstek?

17  A.  Based on my experience and the facts and circumstances,

18  which include their inability to meet their payroll, which Mr.

19  Knipp testified to, and without an over advance and their

20  certain inability to meet their next payroll, it was my opinion

21  -- and it is my opinion that there was not sufficient time to

22  bring in an independent third party to provide DIP financing,

23  especially given the Key Bank position that they were not

24  willing to be primed, that it would have taken.

25  Q.  Have the Debtors made any efforts to obtain replacement

A- 0235

Pollack - Direct                                    147

1  financing on the post-petition basis?

2  A.  Yes.

3  Q.  What efforts have been made?

4  A.  We've contacted a limited number of DIP lenders.

5  Q.  Why have you contacted a limited number?

6      THE COURT:  The question is -- you used the word "we?"

7  Is that something in which you have been directly involved?

8  A.  Yes.

9      THE COURT:  All right, why don't you lay a little

10 foundation about what he has done in connection with this?

11 BY MR. GLEASON:

12 Q.  Mr. Pollack, what have you personally done with respect to

13 trying to obtain post-petition -- alternative post-petition

14 financing?

15 A.  I have called specific lenders to inquire as to their

16 interest in pursuing that type of an arrangement.

17 Q.  What is the status of these efforts?

18 A.  Two lenders have advised that they are willing to consider

19 it and they have signed confidentiality agreements and have

20 begun their diligence.  A third is to have a meeting with me

21 this week.

22 Q.  Given your experience, are Debtors in the situation these

23 Debtors find themselves in generally able to obtain replacement

24 financing?

25 A.  Not without substantial discounts from the stated principle

A- 0236

1  value of the existing loans.

2  Q.  How long would it take a new DIP lender to complete due

3  diligence and commit funding?

4  A.  My view is no less than 3 weeks for a company this size

5  with the prime collateral being foreign assets or foreign

6  securities -- securities of foreign companies.

7  Q.  Given the modifications that we've discussed this

8  afternoon, do you believe the Debtors should continue

9  aggressively seeking a replacement Debtor-In-Possession

10  financing agreement?

11  A.  I do not.  Given the duration, the amount, the conditions

12  and the cost of the financing as modified, I find it, in my

13  opinion, adequate to allow the Debtors to reach the proposed

14  auction date without restricting -- unduly restricting their

15  business activities.  I also find it unlikely that the process

16  cost and distraction result of seeking alternate financing

17  would materially add to the going concern value of the

18  enterprise.

19  Q.  Let's turn now briefly to the marketing process in this

20  case.  Can you describe for the Court the professionals that

21  are working on this engagement on behalf of Candlewood?

22  A.  There are two of my partners and two associates.

23  Q.  And what steps has Candlewood taken to market the Debtor's

24  assets as of this date?

25  A.  We assembled a buyer's list through our own sources and

1  solicitation of names and ideas from the Debtor's management.

2  We sent a teaser, which is purely an introductory letter to, I

3  believe, 150 parties.  We have contacted over 140 of those

4  parties personally by phone, haven't reach every one of them,

5  to encourage them to sign a CI and receive the Selling

6  Memorandum.  The Selling Memorandum was started prior to the

7  commencement of the case, has been worked on continuously until

8  its completion about 4 or 5 days ago.  It was substantially

9  complete awaiting the Debtor's analysis, at Candlewood's

10 request, of a break out of the results of the three main

11 business lines so that we would be able to use the Selling

12 Memorandum as a tool to identify opportunity to potential

13 buyers as opposed to just a reflection of exactly what the

14 Debtor has reported in its financial statements.

15 Q.  Does this -- explain that the three business lines --

16 A.  Sure, let me finish my answer.

17 Q.  Sure.

18 A.  We've also worked with the Debtor to establish an online

19 data room, which is effective now, which allows buyers who have

20 signed -- potential buyers who have signed a CA to view the

21 companies -- much of the companies diligence material without

22 leaving their offices.  That encourages people to participate

23 in the process, it reduces the cost and gives more flexibility

24 to the prospective party.  I'm sorry, your question was?

25 Q.  You had talked about the analysis of operations by the

1  lines.  Can you explain, one, why that wasn't available

2  previously and then what you hoped to show from that?

3  A.  Yes.  As Mr. Knipp has testified, the company records

4  revenue in three main categories; the sale of equipment, the

5  sale of supplies, and the provision of service and attendant

6  sale of service replacement parts.  Three major revenue sources

7  and three lines of businesses run by three separate operating

8  VPs, if you will.  The companies financial statements reflect

9  the sales of those three business lines, the standard margin of

10  those business lines, and from that point on, they tend to

11  lump, if you will, all of the costs associated with running all

12  of those businesses into a more general overhead and corporate

13  overhead line.  So they don't regularly report the -- and it is

14  a fact, to my knowledge, they don't ever report the operating

15  profitability by business line up through the EBITDA level.  As

16  Mr. Knipp has testified, that is a not -- that is not a simple

17  exercise and it requires the accounting staff to make certain

18  assumptions with respect to the division of those overhead

19  dollars.

20  Q.  When did they Debtors confirm that the no-shop provision in

21  the agreement was waived?

22  A.  I believe it was the end of the first week of August.

23  Q.  Why was that important to the Debtors?

24  A.  That -- the -- when that provision was waived, that

25  signaled the opportunity for Candlewood to begin marketing

A- 0239

1  these assets to the general public, if you will, and limited --

2  and ended the limitation honorability to talk to prospective

3  interested parties.

4  Q.  Had that no-shop not been waived previously, would the

5  Debtors and your office have been able to engage in any

6  marketing efforts with respect to these Debtors, as we sit here

7  today?

8  A.  I believe they would not have been.

9  Q.  Why is that?

10 A.  Because the no-shop required -- my understanding of the

11 arrangement was that the no-shop would not be lifted until the

12 Procedures Motion was put in force and that we wouldn't -- we

13 would not be allowed to market the assets, make any third party

14 contact, or hold any third party discussions until that was

15 lifted.

16 Q.  That was another concession that the Debtors were able to

17 obtain in these cases?

18 A.  That was.

19 Q.  If you could briefly describe for the Court the steps

20 Candlewood anticipates taking over the next few weeks to market

21 these assets?

22 A.  Yes.  We intend to contact and talk in person to every one

23 of the people on our prospective parties on our prospective

24 buyers list.  We have, I believe, 20 or 25 CAs that have gone

25 out so far.  We would expect a significant additional number of

Pollack - Direct                                      152

1  CAs to be -- to go out and get executed.  That group of

2  prospective interested parties will get further attention from

3  us, regular follow-up calls inviting them to ask questions,

4  clarify things.  We will seek to understand what it is they're

5  looking at, what they're interested in.  We will seek to

6  discuss with them opportunities for them to participate in the

7  auction.  If it becomes apparent that there are parties who

8  want to buy one business line and some parties who want to buy

9  a different business line, we will attempt to negotiate with

10 the various parties to maximize the overall dollars available

11 for the estate in the sale of these assets.  And we will

12 continue talking with these interested parties until the

13 auction date.  We will also arrange for further diligence,

14 meetings with management, whatever else, reasonably -- is

15 reasonably requested.

16 Q.  All of these items you have mentioned, are they typical

17 activities that take place during this process in a 363 sale?

18 A.  I think in an appropriate one they are.

19 Q.  I want to turn briefly to the original schedule that was

20 contemplated under the bid procedures that were initially filed

21 with the Court.  What was that original schedule?

22 A.  My recollection is that the pre-petition schedule was that

23 the case would be commenced in early July.  The Procedures

24 Motion would go on very quickly.  There was an expectation that

25 it would be entered and certainly that the no-shop would be

A- 0241

1  lifted relatively quickly.  And I believe that the original

2  contemplation in early July was that there would be a sale and

3  a sale hearing -- an auction and a sale hearing no less -- no

4  later than September 30th, with a closing no later than October

5  15th.

6  Q.  Given the facts and circumstances of these cases, was that

7  contemplated schedule fair, adequate and reasonable to market

8  the assets to realize the highest and best value of the

9  estates?

10 A.  Given the circumstances, yes.

11 Q.  Is more time better when you're marketing assets?

12 A.  Sometimes.

13 Q.  Can assets be marketed for too long a period of time?

14 A.  Yes.

15 Q.  What factors should be considered in determining the

16 appropriate time?

17 A.  There are a number of them.  One is the companies -- or the

18 Debtor's -- the estate's ability to sustain its operations.

19 You wouldn't want to have an auction period that extended

20 beyond the company's ability to operate, that's number one.

21 Number two, you wouldn't want to market assets for such a long

22 period of time that the market would view them as stale.

23 Number three, you don't want to have them on the market for so

24 long a period of time that prospective interested parties don't

25 want to be first in the door and make a decision to wait, and

1  while they're waiting, become busy doing something else and

2  never come back.  You don't want to have an auction that is too

3  close to the end of a -- end of the year because parties will

4  then often times view it as a first quarter event instead of a

5  fourth quarter event with the belief that they would get pushed

6  off, et cetera, et cetera.

7  Q.  Let me ask you, is the present schedule, which contemplates

8  an auction of October 27th, fair, adequate and sufficient to

9  market the assets to achieve the maximum going concern value

10 given the facts and circumstances in these cases?

11 A.  I believe the auction is scheduled for the 29th.

12 Q.  You are correct.

13 A.  And I believe that it does present that opportunity.

14 Q.  Is that still your opinion even though there was no formal

15 or informal marketing process pre-petition in these cases?

16 A.  Yes, the October 29th date provides more than 9 weeks from

17 today.  We commenced contacting interested parties, I believe,

18 14 days ago.

19 Q.  After the no-shop was waived?

20 A.  Correct.  So, although August is a very slow period in the

21 {quote} {unquote} "deal business," it is a period of time where

22 -- that can be used and is being used to solicit interested

23 parties and have them negotiate and execute CAs so that the day

24 after Labor Day we are moving right along.

25 Q.  Do you have an opinion as to whether another week would be

1  sufficiently more beneficial to the Debtor's estates such that

2  the auction should be pushed out further?

3  A.  No, I don't believe another week would be material at all.

4  Q.  I want to turn now to the post-petition performance of the

5  Debtors, and Mr. Knipp has covered some of this so hopefully it

6  will not take too long.  You talked -- you testified earlier

7  about the Mitsubishi transaction, do you recall that?

8  A.  Yes.

9  Q.  Have other vendors taken the steps that have or may have a

10 negative impact on the Debtors?

11 A.  Yes.

12 Q.  What steps have these vendors taken?

13 A.  Some vendors have required cash in advance, some have

14 required COD, there have been certain development agreements

15 that have been terminated.

16 Q.  Have you reviewed the Debtors' forecast to determine

17 whether the Debtors can continue operations without post-

18 petition financing?

19 A.  Without?

20 Q.  Post-petition financing.

21 A.  Yes.

22 Q.  Okay, and by the Debtor's forecast I'm referring to, I

23 believe Exhibit-1 that is in front of you?

24    (Debtor's Exhibit-1 previously marked for identification)

25 A.  Yes.

Pollack - Direct                              156

1  Q.  Is that the document or some of the documents that you have

2  reviewed?

3  A.  Yes.

4  Q.  Have you reached a conclusion on the issue of whether the

5  Debtors can continue operating without post-petition financing?

6  A.  Yes.

7  Q.  And what is that conclusion?

8  A.  That the Debtor could not sustain operations at a level to

9  sustain its going concern value without post-petition

10 financing.

11 Q.  Do you have an understanding of whether or not the Debtors

12 can operate using cash collateral?

13 A.  Yes.

14 Q.  And what is that opinion?

15 A.  Once again, that without sufficient post-petition

16 financing, cash collateral alone would not be adequate to allow

17 the Debtor to maintain its operations.

18 Q.  Based on your experience in bankruptcy matters in general

19 and in 363 sales in particular, do have an opinion as to

20 whether the Debtor-In-Possession of financing in this case was

21 negotiated at arm's length and in good faith?

22 A.  Yes.

23 Q.  What is your opinion?

24 A.  That it was.

25 Q.  And based on your experience in bankruptcy matters in

A- 0245

Pollack - Direct                                    157

1  general and 363 sales in particular, do you have an opinion as

2  to whether the bid protections were negotiated at arm's length

3  and in good faith?

4  A.   Yes.

5  Q.   What is that opinion?

6  A.   They were.

7  Q.   Mr. Pollack, I believe Mr. Knipp had testified about a

8  press release that was issued at the time the Debtors filed

9  their cases.  Do you recall that press release?

10  A.   Yes.

11  Q.   Since that time, have any parties contacted the Debtors or

12  yourself with an alternative bid or an expression of interest

13  to serve as a stalking horse bidder?

14  A.   No.

15  Q.   Mr. Pollack, given your experience, the facts and

16  circumstances in these cases and the revisions that have been

17  agreed to with respect to the Debtor-In-Possession of

18  financing, do have an opinion as to whether the proposed

19  Debtor-In-Possession financing is in the best interest of the

20  estates?

21  A.   Yes.

22  Q.   And what is that opinion?

23  A.   That it is in the best interest of the estate.

24  Q.   And Mr. Pollack, given your experience, the facts and

25  circumstances in these cases, and the revisions that have been

1  agreed to with respect to the bid procedures, do you have an

2  opinion as to whether the proposed bid procedures are in the

3  best interest of the cases -- of these estates?

4  A.  I do.

5  Q.  And what is that opinion?

6  A.  That they are.

7  Q.  Mr. Pollack, based on your experience, if the Debtors' Bid

8  Procedures Motion is denied and Presstek chooses not to proceed

9  with the transaction, how would you advise the Debtors to

10 proceed?

11 A.  Not to proceed with the transaction or the financing?

12 Q.  The transaction and the financing at this point.

13 A.  Assuming that there would not be post-petition financing, I

14 see no alternative to a piece-meal liquid -- a wind down and a

15 piece-meal liquidation.  To the extent there was any time

16 available between the termination and the day the financing

17 terminated, I mean, we would certainly seek to find an

18 alternative, to the extent one was available.  It's an unlikely

19 situation.

20 Q.  Do you believe such action would be in the best interest of

21 the estates?

22 A.  No.

23          MR. GLEASON:  May I have a moment, Your Honor?

24      (Pause in proceedings)

25          MR. GLEASON:  That's all I have at this time, Your

A- 0247

Pollack - Direct                                    159

1  Honor.

2        THE COURT:  Well, let me a question.  Are you going to

3  ask any specific questions?  Maybe I missed it, are you going

4  to ask any specific questions about the bid protections?

5        MR. GLEASON:  I believe I did, but I will.

6        THE COURT:  Well, I --

7        MR. GLEASON:  Okay.

8        THE COURT:  It wasn't to my satisfaction.

9        MR. GLEASON: Okay, thank you, Your Honor.

10        THE COURT:  I mean, you asked him whether or not they

11  were reasonable, in good faith and so on and so forth.  I'd

12  like to understand from him his view of the two issues that are

13  really in play here; one of which is the so called

14  conditionality of the Presstek proposal and the other is

15  whether or not the break-up fee and expense reimbursement are

16  reasonable and necessary under the circumstances.

17        MR. MASON:  Judge, I would be delighted to cover all

18  of that on cross examination.

19        MR. GLEASON:  I'm just asking --

20        THE COURT:  I understand you -- and I assume that were

21  going to, but I thought it was maybe useful to make that part

22  of the case in chief, too.

23  BY MR. GLEASON:

24  Q.  Mr. Pollack, I believe you've talked about the (indiscern.)

25  of the representations and warranties and the covenants in the

A- 0248

Pollack - Direct                                    160

1   Asset Purchase Agreement.  Based on the modifications that have

2   been made, do you have an opinion as to whether the Asset

3   Purchase Agreement, which is has been marked as Exhibit-2, is

4   conditional?

5   A.   Could I ask you to rephrase that?

6   Q.   Sure.

7   A.   Conditional as --

8   Q.   I can do that.

9   A.   Okay.

10  Q.   I think -- I believe you testified that there are certain

11  requirements that the Debtors have to meet in order to force

12  Presstek to close, or that will keep -- that will require

13  Presstek to close the transaction, is that correct?

14  A.   Yes.

15  Q.   Given the Debtors' business as you -- strike that -- given

16  your understanding of the Debtors business and the

17  modifications that we've talked about today, do have an opinion

18  as to whether the Debtors will be able to satisfy the

19  requirements in the Asset Purchase Agreement such that Presstek

20  will be required to close the transaction?

21  A.   Yes.

22  Q.   And what is that opinion?

23  A.   My opinion is, with respect to the material adverse effects

24  requirements, I believe that the Debtors will be able to

25  satisfy those.  With respect to the non-financial conditions,

A- 0249

1  I'm probably not the best person.

2  Q.  But as you sit here today, with respect to the financial

3  outs, the -- that the Committee is -- I'd better check

4  (indiscern.) -- do you believe those outs are realistic outs

5  for Presstek today?

6  A.  I view them as very narrow and outs only if there is a

7  material change in the Debtors' business, which is not

8  contemplated in its forecast, nor is it contemplated by its

9  recent run rate.  So I don't believe that they are walk-away

10  rights.

11  Q.  I think the Committee or maybe MHR has used the term an

12  option.  Do you view this Asset Purchase Agreement, which is

13  Exhibit-2, as an option?

14          MR. MASON:  Judge, I think we're getting involved in

15  very vague questioning, and I don't think we're really being

16  directed to Your Honor's concerns about this conditionality

17  issue.

18          THE COURT:  Overruled.  I'm looking at your objection

19  and perhaps I don't -- I apologize to counsel if it seems like

20  I am maybe involving myself too much in this and not letting

21  the counsel ask the questions, but since --

22          MR. GLEASON:  I'll take all the help I can get, Your

23  Honor.

24          THE COURT:  Since it's going to be a late day or

25  maybe a late day, I'd sort of like to get to the nub of the

1  thing and figure out what it's all about.  What the -- Mr.

2  Pollack, things may have changed.  I know they have changed

3  with regard to the inventory issue, for example.  But the

4  Committee's supplemental objection says that the Committee's

5  fear that Presstek would be able to abandon the sale at its

6  sole discretion has been realized because they currently have a

7  right to walk away.  They then cite some testimony from you in

8  your deposition saying that the Debtors can't meet these

9  conditions of 10.12 of the APA.  And that's primarily related

10 to this question of the inventory.  So I guess my specific

11 question is, are the modifications that were made and the

12 concessions made by Presstek with regard to the inventory, both

13 as far as the DIP financing and the APA are concerned,

14 sufficient to remedy the concerns that you expressed at the

15 time of your deposition about the ability of the Debtor to meet

16 them, and therefore, the ability of Presstek to walk away.

17 A.  Your Honor, if I could give a rather long answer.  The

18 testimony I gave in my deposition was fuller than what's

19 included there.  And in my testimony, I believe I said that

20 with the modifications that we are pursuing it is my opinion

21 that they would make it.  And we did pursue those

22 modifications, we did achieve those modifications, and it is

23 still my opinion that given those modifications, our current

24 circumstances and the companies current projections, we will

25 make those tests, which is exactly what I said at my

Pollack - Direct                                    163

1  deposition.

2  BY MR. GLEASON:

3  Q.  Mr. Pollack, briefly turn to the bid protections, I believe

4  we talked in general about them.  Are you familiar with a

5  break-up fee?

6  A.  Yes.

7  Q.  Can you explain your understanding of the break-up fee?

8  A.  What it is?  What it's for?

9  Q.  Yes.

10  A.  A break-up fee is to -- is typically used to induce a party

11  to provide an offer in a transaction like this and to

12  compensate them for their time, effort and expenditure of

13  dollars if they are not ultimately the successful bidder.  I

14  mean, a break-up fee is there to maintain the base -- to induce

15  parties to be bidders -- stalking horse bidders, to maintain

16  the base level of the going concern value of what you're

17  selling.

18  Q.  Based on your experience, are break-up fees reasonable and

19  necessary in 363 sales transactions?

20  A.  Where there are stalking horse bids, I believe the answer

21  is yes.

22  Q.  Is there a range of -- well, let me strike that.  How are

23  break-up fees generally calculated?

24  A.  They're typically calculated as a percentage of the

25  consideration.  And there's two components, excuse me --

Pollack - Direct                                    164

1   sometimes combined, sometimes separate.  Those components are

2   the pure break-up fee and the attendant expense reimbursement.

3   Q.  In your experience, is there a range of percentage with

4   respect to -- let's first start with break-up fee, separate and

5   apart from expense reimbursement?

6   A.  There is.

7   Q.  What is that range?

8   A.  2 to 3%.

9   Q.  2 to 3%??

10  A.  Uhm-hum.

11  Q.  What about expense reimbursement?

12  A.  It is my experience that that is usually included in the 2

13  to 3%.  And typically, in many of the cases that we've -- that

14  I've been involved with, it's been 3% including the expense

15  reimbursement.

16  Q.  In this case, what is -- is there -- what is the percentage

17  of the break-up fee, including the expense reimbursement?

18  A.  I believe it's 4%.

19  Q.  What is the --

20  A.  I believe it is 4%.

21  Q.  What is the percentage with just the break-up fee?

22  A.  3%.

23  Q.  And how is the -- in this agreement, how is the expense

24  reimbursement calculated?

25  A.  Up to $500,000 based on actual expenses.

A- 0253

1  Q.  Did the Debtors attempt to negotiate different terms for

2  bid protections, including the break-up fee and expense

3  reimbursement?

4  A.  We did.

5  Q.  Did the Debtor have any success in doing that?

6  A.  We had them reduced to where they are.  We negotiated to

7  have them reduced further and were not able to do so.

8          MR. GLEASON:  Your Honor, I believe I've addressed --

9  or the witness has addressed the Court's specific issues if --

10         THE COURT:  Okay.

11         MR. GLEASON:  And if not, then I'm sure Mr. Mason will

12 ask.

13         THE COURT:  All right.  Are we ready for cross

14 examination?  Anybody want to take a break or should we plow

15 ahead?

16         MR. MASON:  Your choice --

17         THE COURT:  Let's plow ahead.

18         MR. MASON:  -- Judge.

19         THE COURT:  Let's plow ahead and see how we do.

20         MR. POLLACK:  Can I have some water?

21         MR. MASON:  Good afternoon, Mr. Pollack.

22         THE COURT:  Somebody has to be in charge of the

23 hydration committee here.

24         MR. POLLACK:  Witness hydration.

25         MR. GLEASON:  I'm the one that made him talk so much,

1    so I'll get him some water.

2          MR. POLLACK:  Thank you.

3                  CROSS EXAMINATION

4    BY MR. MASON:

5    A.  Now, Mr. Pollack, when you came on board in mid-June,

6    circumstances for A.B. Dick were pretty desperate, weren't

7    they?

8    A.  It was the end of June.

9    Q.  I'm sorry, the end of June.

10   A.  Could you define "desperate?"

11   Q.  They appeared fairly desperate to you, didn't they?

12   A.  The company was running out of cash.  It had an inability

13   to meet its payroll without an over advance and had no clear

14   path to its next payroll.

15   Q.  And it had no cash available, but ability under its line of

16   credit with Key Bank, is that right?

17   A.  That's correct.  That's my understanding.

18   Q.  And it had -- it wasn't negotiating with anybody to sell

19   it's business over the (indiscern.), is that correct?

20   A.  When I got involved, that's correct.

21   Q.  And there wasn't anybody else that you knew of who had been

22   negotiating to possibly purchase Presstek -- or possibly

23   purchase A.B. Dick's business within the last few months prior

24   to your retention, is that correct?

25   A.  There were no -- to my knowledge, there were no other

1   parties, third parties, making inquiries.

2   Q.  Okay.  And it was your judgment that there really wasn't

3   any time to get a Debtor-In-Possession line?

4   A.  An alternative Debtor-In-Possession line.

5   Q.  So you did the best you could?

6   A.  Given the facts and circumstances.

7   Q.  And you had a tough negotiation, didn't you?

8   A.  It was a fairly rigorous negotiation.

9   Q.  And even though your experience showed you that a typical

10  break-up fee was 2 to 3%, you went ahead and agreed, or the

11  company went ahead and agreed to 4¼%, didn't it?

12  A.  3% break-up fee and 4¼% expense reimbursement.

13  Q.  Okay, but in your experience the expense reimbursement is

14  typically within a 2 to 3%, is it not?  That was you testimony.

15  A.  It is.  And the basis for going ahead was that the

16  overwhelming conclusion was that that point, which we were not

17  able to get the buyer to concede, was dwarfed by the overall

18  value created in the preservation of the going concern value

19  that was supported by the two related agreements, the DIP and

20  the APA.

21  Q.  Your -- Mr. Pollack, I would just ask you to answer the

22  questions that I've asked you and then --

23  A.  Sure.

24  Q.  -- your -- or the counsel for A.B. Dick or other counsel

25  can ask you to elaborate on redirect, okay?  Now Mr. Pollack,

1  when the original Asset Purchase Agreement was signed, there

2  was a no-shop provision, you testified about that, is that

3  correct?

4  A.  Could be specific?  This Asset Purchase Agreement?

5  Q.  Yes.

6  A.  The one marked Exhibit-2?

7  Q.  Yes.

8  A.  Yes, that's my understanding.

9  Q.  All right.  And you interpreted that to mean that you

10 couldn't go out looking for other buyers until that no-shop

11 provision was eliminated?

12 A.  I was advised by counsel that we could not contact other

13 buyers nor respond to inquiries.

14 Q.  Okay.  And it was your understanding that the way that that

15 was originally drafted, the no-shop provision remained in

16 effect until there was a Sale Procedures Order, isn't that

17 correct?

18 A.  It is.

19 Q.  And the Sale Procedures Order could have not been entered

20 by this Court until as late as August 27th, 2004, isn't that

21 correct?

22 A.  It could have been entered later.

23 Q.  Well, but the Agreement provides, does it not, that the

24 Sale Procedures Order as a condition to the enforceability of

25 the contract had to be entered by August 27th?

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-529-0191

A- 0257

1    A.   Yes.

2    Q.   And the Asset Protection Agreement also provided that the

3    Sale Order approving the sale had to be entered no later than

4    September 30th, 2004, is that correct?

5    A.   The Asset Purchase Agreement --

6    Q.   Yes.

7    A.   -- provided that, yes.

8    Q.   So at the time of the filing of the bankruptcy, it was

9    conceivable that the Debtor was going to pay approximately

10   4.25% to Presstek as a break-up fee for the opportunity to

11   market this business from August 27th to approximately

12   September 30th, 2004?  Is that what the Asset -- the Asset

13   Purchase Agreement had originally provided for?

14   A.   Could you state a question that -- I'm not sure what I'm

15   being asked.

16   Q.   So when the Asset Purchase Agreement was signed --

17        THE COURT:  Mr. Mason, I'm going to ask you to stay

18   behind the lectern --

19        MR. MASON:  Sorry.

20        THE COURT:  -- for two reasons.  Number one, we

21   have -- no, three reasons.  Number one, it's the way we do

22   things here.  Number two, we have a digital recording we're

23   making and it goes in and out if you stray from the microphone.

24   And number three, we have a large number of people on the

25   telephone who are listening to your questions that way.  So I

1   ask all counsel to plant your feet and speak into the

2   microphone.  Thank you.

3         MR. MASON:  Thank you, Judge.

4   BY MR. MASON:

5   Q.  Mr. Pollack, when the Asset Purchase Agreement was

6   originally signed and presented to the Court, isn't it true

7   that A.B. Dick was prepared to pay approximately 4.25% of the

8   purchase price for the opportunity to possibly market the

9   business only from August 27th, 2004, the deadline for the Sale

10  Procedures Order, to sometime before September 30th, 2004, the

11  deadline for the Sale Approval Order?

12  A.  Those were the two deadlines.

13  Q.  Thank you.  Now, if Presstek walks away and defaults under

14  the Asset Protection Agreement, all the estate can recover from

15  Presstek is $2 million, is that right?

16  A.  The Asset Purchase Agreement?

17  Q.  Yes.

18  A.  I believe that is the liquidated damages for walking away.

19  Q.  Okay.

20        THE COURT:  And you need to speak up, too, Mr.

21  Pollack.

22        MR. POLLACK:  Sure.

23  BY MR. MASON:

24  Q.  And has that $2 million been given to A.B. Dick yet?

25  A.  My understanding is it's to be delivered upon the entry of

1  a procedures order.

2  Q.  So you don't have it yet?

3  A.  I would never have it, and I don't believe the company has

4  it either.

5  Q.  Okay.  Now, you don't profess to know the value of A.B.

6  Dick's assets that would be sold under the Asset Protection

7  Agreement, do you?

8          THE COURT:  Asset Purchase Agreement.

9          MR. MASON:  I'm sorry, Asset Purchase Agreement.

10          THE COURT:  Do you have a sideline in Cayman Islands

11  work or something?

12      (Laughter)

13          THE COURT:  Mr. -- excuse me, I --

14          MR. MASON:  I have something else on my mind.

15          THE COURT:  I thought at 4 o'clock in the afternoon it

16  was time to lighten things up a little bit.  Okay, go ahead Mr.

17  Mason, I'm sorry.

18          MR. MASON:  Thank you.

19          THE COURT:  I think the record needs to be clear that

20  you're talking about the Asset Purchase Agreement.

21  BY MR. MASON:

22  Q.  Mr. Pollack, can we call the Asset Purchase Agreement the

23  APA?

24  A.  We can.

25  Q.  Okay.  And will you understand what I'm talking about?

Pollack - Cross                                                 172

1   A.  I will.

2   Q.  That's the agreement between Presstek and A.B. Dick that's

3   now before the Court?

4   A.  Yes.

5   Q.  All right.  Now, you don't profess, do you, to know the

6   value of the assets to be sold to Presstek under the APA, do

7   you?

8   A.  Do I know -- can you be clearer about that question -- what

9   --

10  Q.  Do you --

11  A.  I don't understand the question.

12  Q.  Do you claim to know the value of the assets that are to be

13  sold to Presstek or its affiliate under the APA?

14  A.  I know the purchase price which I believe sets the bottom

15  for the value of those assets.

16  Q.  But I'm asking you whether you know the value or profess to

17  know the value of those assets?

18  A.  I know the accounting value of the assets.  I know the sale

19  value of the assets given the APA.  I'm not sure how I could

20  know the ultimate value until the end of the auction when such

21  value is realized.

22  Q.  All right, but you haven't conducted a fair market value

23  analysis of the assets to be sold under the APA, have you?

24  A.  Correct.

25  Q.  Now, in investigating A.B. Dick's affairs, you did learn,

A- 0261

Pollack - Cross                                    173

1  didn't you, that Presstek had made an offer to purchase A.B.'s

2  stock as recently as maybe the late spring or early summer of

3  2004? Isn't that correct?

4  A.  I knew there were ongoing negotiations, yes.

5  Q.  Did you not investigate whether there was, in fact, an

6  offer made by Presstek?

7  A.  Could you define an offer?

8  Q.  A written offer to purchase the assets.

9  A.  I investigated and understood that there were ongoing

10 negotiations between the parties which resulted in a document

11 that was never executed.  By all parties.  But I was not

12 focused on that pre-petition activity so I was focused on what

13 I was retained to do.

14 Q.  You didn't think that considering that transaction was

15 important for you to determine what the value of these assets

16 was?

17 A.  I knew what prior offers were from other parties.

18 Q.  I'm asking you whether you knew -- do you know as you sit

19 here now how much Presstek had offered to purchase the assets

20 of A.B. Dick in the spring and summer of 2004?

21 A.  I heard testimony that there was discussions of -- I

22 believe it was 40 million in the combination of stock and cash

23 plus the assumption of certain liabilities.

24 Q.  But this is the first time you ever heard any discussion on

25 this?

A- 0262

Pollack - Cross                                    174

1   A.  No, I have heard discussion.

2   Q.  All right.  Now, before the bankruptcy case was filed, you

3   contemplated that you would have approximately 90 days to

4   complete the sale from the beginning of your retention to the

5   time of the sale?

6   A.  I think it was about 75 to 80 days, yes.

7   Q.  You told us in your deposition 90 days, didn't you?

8   A.  I don't recall.

9   Q.  Is it possible you said 90 days?

10  A.  It certainly is.

11  Q.  And at the time of the filing of the Chapter 11, you

12  thought you would have the sales book available within a couple

13  of weeks, didn't you?

14  A.  I did.

15  Q.  Okay.  And the sales book, the memorandum -- this is the

16  book that you turn over to potential purchasers of the assets

17  who have signed some kind of confidentiality agreement, is that

18  right?

19  A.  It is.

20  Q.  Have you finished that sales book yet?

21  A.  Yes.

22  Q.  And when did you first finish it?

23  A.  Last week.

24  Q.  All right, and is it in final form now?

25  A.  It is.

Pollack - Cross                              175

1  Q.  On what day last week did you finish it?

2  A.  I don't recall.

3  Q.  Have you sent a copy to the Committee?

4  A.  I believe Jeffrey's received a copy.  I believe the

5  Committee received a copy, and I believe that you all have

6  access to the online data room.  And my understanding is that

7  it's posted there.

8  Q.  It's in final format?

9  A.  It may be modified later.  It's in a form we are confident

10 today to release to parties.  So it has been released.

11 Q.  Has it been released to anybody yet?

12 A.  Yes.

13 Q.  When was it first released?

14 A.  Last week.

15 Q.  You testified at your deposition, didn't you, that in your

16 opinion in order to maximize the value of assets, the sale

17 should be scheduled sometime between September 30th and

18 November 29th, wasn't that your testimony?

19 A.  I believe my testimony was 6 to 10 weeks from today.

20 Q.  Didn't you say in your deposition that you thought that the

21 optimal time was sometime after September 30th and sometime

22 before November 29th?

23 A.  I believe I did.

24 Q.  You contacted a number of foreign purchasers, haven't you?

25 A.  Yes we have.

1  Q.  And some of them have shown an interest in possibly making

2  a bid for A.B. Dick, haven't they?

3  A.  They've shown an interest.  I wouldn't go so far as to

4  making a bid.

5  Q.  Now, isn't it possible, based on your experience, that a

6  foreign buyer may need more time to conduct due diligence

7  before making an offer to buy a U.S. based business?

8  A.  It's my experience that foreign buyers have more difficult

9  travel schedules and have a -- often times have a different

10  corporate approval process.

11  Q.  And how many different locations does A.B. Dick have?

12  A.  Two primary.

13  Q.  And where are they?

14  A.  Rochester and Niles.

15  Q.  What other locations does it have?

16  A.  There's a list in the book.  I'd be happy --

17  Q.  Approximately how many different locations?

18  A.  I think there are some sales offices, one or two, and

19  there's a distribution center, which I consider part of

20  Niles -- near Niles.

21  Q.  So there are two locations in or about Niles?

22  A.  I'm happy to look at the book, allowed to refresh my

23  memory, and give you a specific answer.

24  Q.  So you don't recall at this point?

25  A.  I do not.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0265

Pollack - Cross                          177

1  Q.  And Rochester is in Rochester, New York?

2  A.  It is.

3  Q.  Did you recommend to A.B. Dick management that they give

4  Presstek the bid protection it gained in the APA?

5  A.  I discussed my opinion with the Board.

6  Q.  I'm asking you whether you recommended that they accept the

7  bid protection that was offered by Presstek in the APA.

8  A.  I recommended that to the Board, given the facts and

9  circumstances, as I've already testified to today.

10  Q.  Okay.  And the Board -- is that the Board of A.B. Dick?

11  A.  Both Boards.

12  Q.  Who is on the Board of A.B. Dick?

13  A.  James Wert.

14  Q.  Is there anybody else?

15  A.  Not to my knowledge.

16  Q.  Okay.  Would you agree that it would not make sense to

17  provide bid protection to a purchaser who does not have a

18  legally enforceable obligation to purchase assets?

19    •      THE COURT:  I'm sorry, Counsel, will you restate the

20  question.

21  BY MR. MASON:

22  Q.  Would you agree, Mr. Pollack, that it would not make sense

23  to provide bid protection to a purchaser who does not have a

24  legally enforceable obligation to purchase assets?

25  A.  The -- that would depend on the facts and circumstances

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0266

Pollack - Cross                                         178

1   required -- related to the enforceability.  If it's absolutely
2   unenforceable in an expression of interest or an offer I would
3   wholeheartedly agree.
4   Q.  Are you familiar with paragraph 10 of the APA?
5   A.  I have read it.
6   Q.  Do you have a copy there?
7   A.  I do.
8   Q.  If I could turn your attention to it.  That's on page 46 of
9   the APA.
10  A.  Yes.
11  Q.  Do you see there are 13 different conditions --
12  A.  Yes.
13  Q.  -- 13 different numbered paragraphs?
14  A.  Yes.
15  Q.  All right, now just directing your attention to paragraph
16  10.1 on page 46, do you see there that the obligations of the
17  purchaser are dependant upon the accuracy of representations
18  and warranties?  Do you see that?
19  A,  I see the paragraph.
20  Q.  But you understand that if any one of those representations
21  or warranties proves to be untrue in any material respect, the
22  purchaser has the right to cancel the contract without any
23  liabilities to the estate?  Is that your understanding?
24  A.  That would be my understanding.
25  Q.  Now, 10.1 refers us back to paragraph 3.  Do you see that?

1 Paragraph 3 starts on page 16.

2 A.  Yes.

3 Q.  See that?  And it goes to page 33; 17 pages.  Do you see

4 that?

5 A.  I do.

6 Q.  Do you see the 28 paragraphs of representations and

7 warranties on those 17 pages?

8 A.  I do.

9 Q.  In all your years in as a bankruptcy professional have you

10 ever seen a Section 363 Asset Sale that had so many

11 representations and warranties?

12 A.  I have seen them, especially when there are assets not

13 inside of the estate that are being sold as well.

14 Q.  Now, between the time of your engagement with A.B. Dick and

15 today, what effort have you made to determine of these 17 pages

16 of representations and warranties are true and will remain true

17 up to the time of closing?

18 A.  I have focused my attention on the financial conditions

19 contained in the APA.  And I have, I think, been fairly

20 specific in my testimony today about the efforts to negotiate

21 and the success in negotiating the modifications to both the

22 APA and the DIP agreement with respect to the financial

23 conditions.

24 Q.  And the financial conditions are not contained in paragraph

25 3 of the APA, are they?

A- 0268

1  A.  I think they're referenced in another paragraph.

2  Q.  They're referenced in paragraph 10.12, are they not?

3  A.  They are.

4  Q.  So your focus has not been on the 17 pages of

5  representations and warranties in paragraph 3, is that your

6  testimony?

7  A.  It is.

8  Q.  As you sit here today, then, what assurance can you give to

9  the Committee, to MHR, to the other Creditors of the estate and

10 to this Court that these representations are currently true and

11 that they will remain true up to the time of the closing?

12 A.  I can't speak to that.

13 Q.  Thank you.  Now, some of these representations and

14 warranties, in my experience, are somewhat unusual.  I just

15 want to direct your attention to paragraph 3.12 on page 20.  Do

16 you see sub-paragraph A?

17 A.  I do.

18 Q.  "Seller and each subsidiary of seller has timely filed all

19 material Federal, State, Local and Foreign returns," and so

20 forth.  What investigation have you done to make certain that

21 all these tax returns have been filed?

22 A.  I don't believe that was my responsibility.  I've made no

23 investigation.

24 Q.  Okay.  And I'd also like you to turn your attention to

25 paragraph 3.14 on page 22.  And I'm looking specifically, for

A- 0269

Pollack - Cross                              181

1  instance, at 13.14(A) sub 2.  "To the sellers knowledge, except

2  as set forth in section 3.14 of the seller disclosure schedule,

3  since the base balance sheet date, there has not been with

4  respect to seller or any subsidiary of seller (little 2) any

5  encumbrance placed on any of the properties of seller or any

6  subsidiary except permitted encumbrances."  See that?

7  A.  I do.

8  Q.  Now, isn't the sale supposed to be free and clear of all

9  liens and encumbrances?

10  A.  It is.

11  Q.  Can you imagine how Presstek would be injured if it turned

12  out that there was some undisclosed lien?

13       MR. GLEASON:  Your Honor, I think that calls for

14  speculation.

15  A.  I'm not a lawyer.

16       THE COURT:  Overruled.

17  A.  I'm not a lawyer.  I can't speak to what liens might

18  interfere that the Court has or doesn't have jurisdiction over,

19  what liens might be in foreign assets they're being sold that

20  are not party to this proceeding.  I can't speculate on that.

21  Is it not -- one question though, is it not subject to a

22  materiality clause?

23       MR. MASON:  Your Honor, I move to strike the witnesses

24  testimony on the grounds that there was no question.

25       THE COURT:  Granted.

1  than that which it can use to borrow money, buy inventory, and

2  include in its inventory and meet the calculation.

3  Q.  So it's your view -- well, let's take a look at the section

4  titled Combined U.S. and Canada under Working Capital Closing

5  Covenants.

6  A.  Yes.

7  Q.  Do you see that?

8  A.  I do.

9  Q.  That's the second to last at the bottom in bold title,

10  Combined U.S. and Canada?

11  A.  I see it.

12  Q.  And that shows, does it not, that in August and September

13  A.B. Dick is not going to make the working capital closing

14  covenants, does it not?

15  A.  It does -- well, no, it shows that under this analysis that

16  the forecast from operations would require the Debtor to borrow

17  $436,000 more on its line, buy inventory, and include that

18  inventory in its calculation to meet the test.  That's what it

19  shows to me.

20  Q.  All right, and how about in September?

21  A.  I'm sorry, that was September.  I apologize.  That was --

22  September 30th is the last date out here.  And if you look

23  where you pointed me to, Combined U.S. and Canada, you look at

24  the covenant line, it's a test of $22.7 million.  Tt shows here

25  that we would be -- that the Debtors would be $436,000 short,

Pollack - Cross                                    182

1  BY MR. MASON:

2  Q.  Now, Mr. Pollack, turning your attention back to paragraph

3  10, page 46 at 10.2, do you see how there the enforceability of

4  the agreement against Presstek is subject to certain covenants

5  described in 10.2?

6  A.  It says, "Seller shall have performed and complied in all

7  material respects with all the covenants contained in Article 5

8  on or before the closing date, and Platinum shall have received

9  a certificate to such effect executed on behalf of seller by

10  the President, Chief Executive Officer, or Chief Financial

11  Officer of seller."

12  Q.  So it's your understanding that Presstek's obligations

13  under the APA are conditioned upon the performance of these

14  covenants in paragraph 5?

15  A.  In all material respects.

16  Q.  And -- now let's go back to paragraph 5, beginning on page

17  34, going on 5 pages to paragraph 38.  Do you see those 12

18  covenants?

19  A.  Uhm-hum.  Yes.

20  Q.  Now, between the time that you wee retained and today, what

21  efforts have you made to make certain that those covenants will

22  be complied with continuously from the time of the -- from

23  today up to the time of closing?

24  A.  With respect to 5.2, conduct of business, I have spent

25  quite a bit of time assisting the Debtors in negotiating with

1 its vendor base and with its lenders to allow it to conduct its

2 business in a fashion that would allow it to meet this. And I

3 believe, given the concessions made today, have achieved a

4 basis for the Debtor to go forward and do that.

5 Q. Okay, so that covers one of the, I believe, 12 paragraphs.

6 Mr. Pollack, as you sit here today, what assurance can you give

7 the Committee, MHR and the other Creditors of this estate and

8 the Court that these covenants contained in paragraph 5 of the

9 APA will be met and kept up to the time of the closing?

10 A. I can give no assurance.

11 Q. Thank you. Now, I'd like to send you back to paragraph 10

12 of the APA and have you focus on paragraph 10.12, one of the

13 other conditions on which you earlier testified about. And I

14 think we have generally referred to 10.12 as the working

15 capital condition. See that on page 47?

16 A. I do.

17 Q. Now, I believe it was your testimony on direct examination

18 that with the $2 million concession given by Presstek that it

19 was your view that this condition will be met and will not

20 prevent the enforcement of the APA?

21 A. I think my testimony was with the $2 million concession and

22 the $2½ million concession in the APA, based on the company's

23 forecast, it would be able to -- and its current operations, it

24 would be able to meet that test.

25 Q. You said the $2½ million in the APA, did you mean the $2½

Pollack - Cross                                    184

1 million --

2 A.  I'm sorry.

3 Q.  -- concession in the Debtor-In-Possession --

4 A.  I did, I'm sorry.

5 Q.  -- lending arrangement.

6 A.  2 million in the APA, 2½ million in the DIP.

7 Q.  Now, I'd like to turn you back to A.B. Dick Exhibit-1 --

8 A.  Yes.

9 Q.  -- which is titled (indiscern.) corporate holdings in

10 August 2004 forecast.

11 A.  Yes.

12     (Debtor's Exhibit-1 previously marked for identification)

13 Q.  You've made reference to that.  Did you assist in the

14 preparation of this?

15 A.  No.  In the revisions -- in the revised documents, no.

16 Q.  But I'm asking you whether you assisted in the preparation

17 of this Exhibit --

18 A.  No.

19 Q.,  -- the projections and --

20 A.  The original ones, not these.

21 Q.  Okay.  And is it your understanding that these, that is

22 A.B. Dick Exhibit Number 1, is based in part on the earlier

23 version of this that you worked on?

24 A.  Yes.

25 Q.  I'd like you to go to the fourth page.  Do you see that,

Pollack - Cross                                    185

1  it's sort of an up-and-down page?

2  A.  Yes.

3  Q.  And it's titled Asset Purchase Agreement Covenant Review?

4  A.  Yes.

5  Q.  Do you see that?

6  A.  Yes.

7  Q.  Did you work on this?

8  A.  No.

9  Q.  Do you have any reason to believe this is inaccurate?

10 A.  No, but I would like to explain the meaning of it as I see

11 it.

12 Q.  Okay.

13 A.  This page analyzes the Debtor's projections as they are.

14 And to analyze -- in my view, to analyze whether or not the

15 Debtor will be able to meet the tests, one has to look at both

16 the result of this analysis and the available credit under the

17 DIP at the same timeframe.  And so the reason I say that is

18 that the Debtor has the right to buy inventory so long as it

19 has available funds and use that inventory to include it in

20 this calculation so that it can make this calculation.  So if

21 you were to look at the, for instance, the September

22 calculation, you'll see the working capital closing covenant.

23 And you look under covenant, cushion and deficit and you'll see

24 it's short $317,000.  You can then look on one of the other

25 pages and you will see that the Debtor has availability greater

A- 0275

1    and if you turn one page back on the third page, there is no
2    line for September 30th, but if you look at the week ending
3    October 2nd and you go all the way down to the bottom, there's
4    as forecast of $973,000 of funds available to borrow.  And so
5    it could borrow the $460,000, buy inventory, include the
6    inventory in the test and meet the test, and still have some
7    small amount of room on its line.  It never has a large amount
8    of room.
9    Q.  And where in the budget that's approved under the Debtor-
10   In-Possession arrangement does the company have the right to
11   spend that money?
12   A.  It's allowed to -- under the DIP budget it's allowed on a
13   cumulative basis to make the total of all these -- the total
14   disbursements included in the DIP budget.
15   Q.  But can you show me where either in Exhibit-1 or in any
16   other document that the Debtor has the power to --
17   A.  Buy inventory?
18   Q.  -- make those expenditures?
19   A.  To buy inventory?
20   Q.  Yes.
21   A.  Sure, in the -- on the third page -- do you have the
22   original forecast?
23   Q.  Yes.
24   A.  Okay, I believe it doesn't go -- it only goes through some
25   date in September, I think.  Or maybe October 15th.  But you'll

Pollack - Cross                                    188

1  see there's a line under operating disbursements for inventory.
2  The Debtor can buy inventory there, and actually the Debtor can
3  use -- my understanding of the DIP arrangement is the Debtor
4  can use its full allocation of disbursements on a cumulative
5  basis at any time for reasonable business purposes.  And buying
6  inventory is a -- you know, my understanding would be a
7  reasonable business purpose.
8  Q.  So it's your understanding that the budget permits the
9  Debtor to borrow all the way -- borrow it's entire line of
10 credit if it sees fit in a particular month?
11 A.  No.  My understanding of the DIP arrangement is that the
12 borrowings are limited to $7 million coupled with specific over
13 advance allowances.  And in this case, on the week ending
14 October 2nd, the adjusted over advance allowance provides room
15 of $973,000.  So there's $973,000 that the Debtor is allowed to
16 spend.  And that's you know -- buying inventory would be an
17 acceptable -- and in fact, it could buy the inventory today,
18 $463,000, have the inventory there on September 30th and meet
19 the covenant.  It's a timing activity as to when the inventory
20 is purchased.  Furthermore, if the inventory that's pre-paid
21 comes in earlier, then there's even more room on the DIP line
22 because inventory advances are only -- only provide 60% -- the
23 ratio to actual dollars spent to collateral available to borrow
24 on is 60%.  And at October 2nd, there is $1.8 million of pre-
25 paid inventory.  So actually it's -- that material likely will

A- 0277