# Tab 3





FILED
2004 DEC 13 AM 11:13
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

1

2          UNITED STATES BANKRUPTCY COURT
              DISTRICT OF DELAWARE
3

4    IN RE:                    .        Chapter  11
                               .
5    A.B. Dick Company, Inc.,  .
                               .
6         Debtor(s).           .        Bankruptcy #04-12002 (JLP)
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
7
                         Wilmington, DE
8                        November 3, 2004
                           9:00 a.m.
9
                     TRANSCRIPT OF HEARING
10       BEFORE THE HONORABLE JOHN L. PETERSON
             UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For the Debtor(s):         Frederick B. Rosner, Esq.
                                Jaspan Schlesinger Hoffman, LLP
14                              1201 North Orange Street-Ste. 1001
                                Wilmington, DE 19801
15
                                H. Jeffrey Schwartz, Esq.
16                              Benesch Friedlander Coplan
                                & Aronoff, LLP
17                              2300 BP Tower
                                200 Public Square
18                              Cleveland, OH 44114

19                              John F. Stock, Esq.
                                Benesch Friedlander Coplan
20                              & Aronoff, LLP
                                88 E. Broad St.-Ste. 900
21                              Columbus, OH 43215

22                              John Gleason, Esq.
                                Benesch Friedlander Coplan
23                              & Aronoff, LLP
                                88 E. Broad St.-Ste. 900
24                              Columbus, OH 43215

25

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

2



```
 1                              Mark A. Phillips, Esq.
                                Benesch Friedlander Coplan
 2                              & Aronoff, LLP
                                2300 BP Tower
 3                              200 Public Square
                                Cleveland, OH 44114
 4
     For The Official Committee: James P. Ricciardi, Esq.
 5   of Unsecured Creditors      McGuire Woods, LLP
                                77 West Wacker Drive-Ste. 4100
 6                              Chicago, IL 60601

 7                              James Joseph, Esq.
                                McGuire Woods, LLP
 8                              Dominion Tower
                                625 Liberty Ave.-23rd Fl.
 9                              Pittsburgh, PA 15222

10                              Ronald W. Crouch, Esq.
                                McGuire Woods, LLP
11                              Dominion Tower
                                625 Liberty Ave.-23rd Fl.
12                              Pittsburgh, PA 15222

13                              Jeffrey Schlerf, Esq.
                                The Bayard Firm
14                              222 Delaware Ave.-Ste. 900
                                Wilmington, DE 19801
15
     For MHR Entities:           Megan N. Harper, Esq.
16                              Landis Rath & Cobb, LLP
                                919 Market Street
17                              Wilmington, DE 19899

18                              David S. Rosner, Esq.
                                Kasowitz Benson Torres
19                              & Friedman, LLP
                                1633 Broadway
20                              New York, NY 10019

21                              Michael M. Fay, Esq.
                                Kasowitz Benson Torres
22                              & Friedman, LLP
                                1633 Broadway
23                              New York, NY 10019

24

25
```

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

3

| | | |
|---|---|---|
| 1 | For Key Bank: | Margaret M. Manning, Esq. |
| | | Buchanan Ingersoll, PC |
| 2 | | The Nemours Building |
| | | 1007 North Orange Street-Ste. 1110 |
| 3 | | Wilmington, DE 19801 |
| 4 | | Robert Polland, Esq. |
| | | Thompson Hine, LLP |
| 5 | | 3900 Key Center |
| | | 127 Public Square |
| 6 | | Cleveland, OH 44114 |
| 7 | For Presstek, Inc.: | Stephen B. Selbst, Esq. |
| | | McDermott Will & Emery |
| 8 | | 50 Rockefeller Plaza |
| | | New York, NY 10020 |
| 9 | | Gary O. Ravert, Esq. |
| 10 | | McDermott Will & Emery |
| | | 50 Rockefeller Plaza |
| 11 | | New York, NY 10020 |
| 12 | | Lawrence J. Slattery, Esq. |
| | | McDermott Will & Emery |
| 13 | | 50 Rockefeller Plaza |
| | | New York, NY 10020 |
| 14 | | Francis A. Monaco, Jr., Esq. |
| 15 | | Monzack & Monaco, PA |
| | | 400 Commerce Center |
| 16 | | Twelfth & Orange Streets |
| | | Wilmington, DE 19899 |
| 17 | For Mitsubishi: | Thomas G. Whalen, Jr., Esq. |
| 18 | | Stevens & Lee, PC |
| | | 300 Delaware Ave.-Ste. 800 |
| 19 | | Wilmington, DE 19801 |
| 20 | | Robert Lapowsky, Esq. |
| | | Stevens & Lee, PC |
| 21 | | 1818 Market Street-29th Fl. |
| | | Philadelphia, PA 19103 |
| 22 | | |
| | For Data Card: | Karen McKinley, Esq. |
| 23 | | Richards Layton & Finger |
| | | One Rodney Square |
| 24 | | Wilmington, DE 19899 |
| 25 | | |

A- 0381



4

```
1   For Esko Graphics, Inc.:    Christopher D. Loizides, Esq.
                                Loizides & Associates
2                               1225 King Street
                                Wilmington, DE 19801
3
    Audio Operator:             Brandon J. McCarthy
4
    Transcribing Firm:          Writer's Cramp, Inc.
5                               6 Norton Rd.
                                Monmouth Jct., NJ 08852
6                               732-329-0191

7   Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

5

```
1                              Index
                                                      Further
2                   Direct Cross Redirect Recross Redirect

3   Witnesses For The
    Debtor:
4
      Mr. Polleck
5     (by Mr. Fay)                  6
      (by Mr. Selbst)              34
6
7   EXHIBITS:                                    Marked  Received

8     MHR-C   Term Sheet                           17
      MHR-B   Purchase Agreement cost document     19
9
10  Closing Statements:

11    Mr. Ricciardi                               37
      Mr. Selbst                                  39
12    Mr. Joseph                                  41
      Mr. Gleason                                 45
13    Mr. D. Rosner                               48
      Mr. Firestone                               66
14    Mr. Folland                                 67
      Mr. Loizides                                69
15    Mr. Stock                                   75

16

17

18

19

20

21

22

23

24

25
```



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

Polleck - Cross                    6

1       THE CLERK:  All rise.  The United States Bankruptcy

2  Court for the District of Delaware is now in session.

3       THE COURT:  Please be seated.  Is the witness here?

4  You can take the stand please.  Now you may cross examine.

5       MR. FAY:  Thank you, Your Honor.

6       GLEN POLLECK, DEBTOR'S WITNESS, PREVIOUSLY SWORN

7                    CROSS EXAMNATION

8  BY MR. FAY:

9  Q.  Good morning, Mr. Polleck.  My name is Michael Fay, I'm an

10  attorney for the MHR Entities.  I have a few questions for you.

11  Yesterday during your testimony you stated that you were

12  retained by the Debtors on June 30th, 2004, is that correct?

13  A.  I believe I said June 29th or June 30th.

14  Q.  Okay.  All right.  Had you been in the employ under any

15  retention with the Debtors prior to that date?

16  A.  My firm had.

17  Q.  Okay.  Had you been involved, though?

18  A.  Yes.

19  Q.  Okay.  And what had you done prior to that date?

20  A.  In, I believe, 2000, my former firm was retained to provide

21  financial advice with respect to the Debtors' proposed

22  restructuring plan.

23  Q.  Okay.  And what was that former firm?

24  A.  (Indiscern.).

25  Q.  Right.  And that retention was in or about September of



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Polleck - Cross                                    7

1   2003, correct?

2   A.  No.

3   Q.  All right.  When was it?

4   A.  I believe it was 2000, and my involvement terminated in

5   July of (indiscern.).  Candlewood was subsequently engaged.

6   Q.  Okay.  But you were not at Candlewood when it was

7   subsequently engaged, is that correct?

8   A.  No, I was.

9   Q.  You were, okay.  When was that engagement?

10  A.  That was, I believe, in September (indiscern.).

11  Q.  Okay.  And what was the purpose of that engagement?

12  A.  Presstek had made -- had provided an expression of interest

13  to (indiscern.) and the directors and officers of Paragon had

14  decided that they would like assistance in evaluating their

15  (indiscern.) at that time.

16  Q.  Okay.  And for how long did that retention last?

17  A.  My recollection is that our engagement was modified

18  sometime in November or December of 2003.  The modification

19  resulted in our agreeing to a reduced fee (indiscern.) Presstek

20  (indiscern.) released from an obligation (indiscern.).

21  Q.  Okay.  So from November of 2003 to June 29th or 30th of

22  2004 what, if anything, did you do for the Debtors?

23  A.  I received a call in May of 2000 where the Debtors asked if

24  we would agree to accept our fee in stocks, instead of cash

25  (indiscern.) I received a call in June, I believe, where the

Polleck - Cross                                                8

1   Debtors asked if we would waive our fee (indiscern.).

2   Q.  Okay.  Other than those two calls, any other involvement

3   with the Debtors during that time frame, from November 2003, to

4   June 29th or 30th, 2004?

5   A.  Not that I recall.

6   Q.  Is it your understanding that prior to the negotiation and

7   execution of the Asset Purchase Agreement that's at issue in

8   this bankruptcy there was a Stock Purchase Agreement among the

9   parties?

10  A.  You're asking if I --

11  Q.  Do you understand that that's a fact?

12  A.  I understand that there was (indiscern.).

13  Q.  Okay.  Has anyone told you that that Stock Purchase

14  Agreement was escrowed on or about June 16th, 2004?

15  A.  I've heard that there was an escrow.

16  Q.  Okay.  Have you ever read the escrow?

17  A.  I have not.

18  Q.  Have you ever read the Stock Purchase Agreement?

19  A.  Only a small section.

20  Q.  What small section did you read?

21  A.  Relating to the adjustment (indiscern.).

22  Q.  The Stock Purchase Agreement had a provision that allowed

23  for adjustment in the purchase price if financial statements

24  were provided five days, I believe it was, before closing that

25  showed financial deterioration in the Debtors, correct?

*Writer's Cramp, Ino.*
Certified Court Transcribers
732-329-0191

Polleck - Cross                          9

1  A. I'm not certain. I didn't read the entire statement. I

2  have no basis -- no one has ever showed me the entire agreement

3  (indiscern.) No one has ever showed me an escrow -- executed

4  Escrow Agreement.

5  Q. Okay. Why did you read that small section of the Stock

6  Purchase Agreement?

7  A. Counsel asked me to.

8  Q. What counsel?

9  A. Debtors' counsel.

10  Q. Okay. Did you then provide any analysis of that small

11  section that you read?

12  A. I did not.

13  Q. Did you use that in any way to value any claims the Debtors

14  might have against Presstek under the Stock Purchase Agreement?

15  A. I did not.

16  Q. Have you done any valuation of the claims that the Debtors

17  might have under the Stock Purchase Agreement against Presstek?

18  A. I have not.

19  Q. I believe you testified yesterday that in your past you've

20  served as a bankruptcy Trustee, is that correct?

21  A. I have.

22  Q. Based on that experience, is it your opinion that some

23  valuation of the Debtors' claims under the Stock Purchase

24  Agreement should be done before those claims are released?

25  A. It is.

*Writer's Cramp, Ina.*
Certified Court Transcribers
732-329-0191

Polleck - Cross                                    10

1  Q.  And yet you haven't done that, correct?

2  A.  I relied on counsel.

3  Q.  But my question is, you have not done that valuation,

4  right?

5  A.  I'm not a lawyer.

6  Q.  Have you done a valuation of the claims that the Debtors

7  might have against Presstek under the Stock Purchase Agreement?

8  A.  Can you define valuation?  Do you mean the likelihood of

9  legal success?

10  Q.  The value of the claim.  Have you put a value on that

11  claim?

12  A.  No.

13  Q.  Do you know anyone that has?

14  A.  Yes.

15  Q.  Who?

16  A.  Counsel.

17  Q.  Has counsel provided you with that valuation?

18  A.  Provided advice to the Board.

19  Q.  What did counsel tell the Board?

20       MR. PHILLIPS:  Objection.  That is privileged

21  information, I believe.

22       THE COURT:  Well, what counsel?

23  A.  Debtors' counsel.

24       THE COURT:  Were you there?

25  A.  I was.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191



1      MR. FAY:  Your Honor, I think if the Board relied on

2  this --

3      THE COURT:  Overruled.  You may answer.

4  A.  Counsel advised that the likelihood that the value claim

5  exceeding a million dollars was, I don't remember the exact

6  words, fairly (indiscern.).

7  BY MR. FAY:

8  Q.  Have you done any valuation -- other than counsel, did

9  anyone else provide an opinion about the value of the claim to

10  the Board?

11  A.  No.

12  Q.  Have you done an evaluation of the difference in the value

13  of a Stock Purchase Agreement versus the Asset Purchase

14  Agreement to the Estate?

15  A.  Could you repeat the question?

16  Q.  Have you done an evaluation of the difference in the value

17  that the Estates would have received, or the Debtors would have

18  received, from the Stock Purchase Agreement versus the value

19  that they're now receiving under the Asset Purchase Agreement?

20  A.  I have not done an evaluation.

21  Q.  Do you know who Hal Goldstein is?

22  A.  I do.

23  Q.  And you've had discussions with Hal Goldstein, correct?

24  A.  Yes.

25  Q.  Telephone discussions recently, correct?



Polleck - Cross                    12

1   A.  Yes.

2   Q.  Hal Goldstein is a representative of the MHR Entities,

3   right?

4   A.  Yes.

5   Q.  And you told Hal Goldstein that you thought the claim under

6   the SPA could be worth as much as $30 million, correct?

7   A.  Hal told me that.

8   Q.  And what did you say in response?

9   A.  I said that the difference in the values may have well be

10  that.

11  Q.  Okay.  So you agreed --

12  A.  No.  I said the difference in the values of what one might

13  consider the value of the SPA, given what others have told me,

14  and what I believe the value of this (indiscern.).

15  Q.  May be $30 million, correct?

16  A.  Maybe.

17  Q.  Okay.  Did you tell counsel that the difference in the

18  value under the Stock Purchase Agreement versus the value under

19  the Asset Purchase Agreement may be $30 million?  Did you tell

20  counsel that?

21  A.  I think we had discussions regarding what the differences

22  of the values given certain assumptions.

23  Q.  Okay.  And did the number 30 million come up?

24  A.  Probably.

25  Q.  Okay.  In making its presentation, or their presentation to



1  the Board, did counsel mention that the difference in the value

2  between the Stock Purchase Agreement and the Asset Purchase

3  Agreement may be $30 million?

4  A.  I believe they did.

5  Q.  Did they then tell the Board how you go from $30 million to

6  $1 million?

7  A.  They provided a legal -- not a written opinion but a legal

8  consultation, however you describe it.

9  Q.  Okay.  What did they say?  How do we go from a claim that

10 may be worth $30 million to one where real time as counsel it's

11 unlikely to even be worth a million?

12 A.  My recollection is there was a discussion of the claims in

13 relation to whether or not there were obligations (indiscern.)

14 closing.

15 Q.  Okay.  Did counsel provide the Board with any legal

16 memoranda?

17 A.  Not to my recollection.

18 Q.  Did they cite any cases?

19 A.  I don't recall.

20 Q.  You don't recall if they did.  Did they make reference to

21 the fact that any claims under the escrow or the Stock Purchase

22 Agreement would be governed by New York law?

23 A.  I don't recall.

24 Q.  Did they hand out copies of any New York cases?

25 A.  I don't believe so.



Writer's Cramp, Inc.
Certified Court Transcribers
792-929-0191

Polleck - Cross                                    14

1   Q.  Okay.  Did they cite any legal principles or anything that

2   you recognize as a legal principle?

3   A.  I believe they did.

4   Q.  What did they say?

5   A.  I don't have a verbatim recollection of what they said.

6   Q.  Okay.  If you can remember.  Can you remember?

7   A.  Yes.  I believe they discussed the nature of the contract,

8   contract obligations, and whether or not -- and this is just my

9   recollection --

10  Q.  Sure.

11  A.  -- whether or not the execution of an Escrow Agreement

12  constituted an obligation to close (indiscern.).

13  Q.  Did they discussion the concept of a condition precedent?

14  A.  With respect to (indiscern.)?

15  Q.  Right.  To -- with respect to the escrow, did --

16  A.  There was a discussion of the -- of Key Bank (indiscern.).

17  Q.  Okay.  Did they discuss the concept of materiality?

18  A.  I believe there was some discussion about that.

19  Q.  Did they cite any case law or hand out any memoranda on

20  materiality, to your knowledge?

21  A.  I testified a moment ago, no.

22  Q.  Okay.  And did they discuss the concept of condition

23  precedent in the waiver of condition precedents?

24  A.  I don't recall the exact discussion (indiscern.).

25  Q.  Okay.  But $30 million did come up, correct?



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

A- 0392

1   A.  I believe so.

2   Q.  Okay.

3   A.  That the claim was significantly larger (indiscern.).

4   Q.  Okay.  And what was -- do you remember the law firm, what

5   lawyers made this presentation?

6   A.  Mr. Phillips.

7   Q.  Mr. Phillips did.  Did Mr. Phillips provide the Board with

8   any of the deposition transcripts of the depositions that he

9   took prior to this board meeting in this matter?

10  A.  I don't know.

11  Q.  Well, I'm just asking you.  Did he do it at this meeting?

12  A.  No.

13  Q.  Okay.  Did he cite any of the testimony that was obtained

14  through those depositions to the Board?

15  A.  I believe he did.

16  Q.  Do you remember who he cited?

17  A.  I don't.

18  Q.  Did he cite any of the testimony from Mr. Lugly of Key

19  Bank?

20  A.  I don't recall (indiscern.).

21  Q.  Did he tell the Board that on June 22nd, 2004, Key Bank had

22  sent a letter to Presstek consenting to further funding for the

23  Debtors?

24  A.  There were a lot of conversations, and I'm trying to

25  remember (indiscern.).  I clearly did hear it, but I can't

Writer's Cramp, Inc.
Certified Court Transcribers
732-929-0191



Polleck - Cross                    16

1   recall if it was at the board meeting, but I did (indiscern.).

2   Q.  Okay.  Was a copy of that letter handed out to the Board

3   members?

4   A.  I don't believe so.

5   Q.  Based on your testimony, Mr. Polleck, it would be fair to

6   say that you were not involved in the negotiations of the Stock

7   Purchase Agreement, correct?

8   A.  Correct.

9   Q.  And any negotiations of the Asset Purchase Agreement that

10  occurred before June 29th or June 30th of 2004, you weren't

11  involved in those negotiations either, correct?

12  A.  Correct.

13  Q.  After June 29th or 30th of 2004, were there ever

14  negotiations about the purchase price under the Asset Purchase

15  Agreement?

16  A.  There were negotiations over the conditions (indiscern.)

17  impact on the purchase price.  There were not negotiations

18  (indiscern.).

19  Q.  Okay.  So at least during your involvement the Debtors

20  never went to Presstek and said, "40 million is not enough, we

21  want 41, or 42, or 43," correct?

22  A.  We would continually say we want 40.

23  Q.  And Presstek never backed down, right?

24  A.  Presstek did not back down.

25  Q.  Okay.  Do you know when --

A- 0394

1   A.  No.  On some of the conditions we would have impacted the

2   price they did back down.

3   Q.  But they never backed down on the purchase price of 40

4   million, right?

5   A.  No.

6   Q.  Okay.  Do you know when Presstek first communicated that

7   price of 40 million to the Debtors?

8   A.  I've seen correspondence that indicates it was maybe a week

9   before I became involved.

10  Q.  Right.  On the 23rd of June, 2004, Presstek had drafted a

11  term sheet that showed the $40 million purchase price, correct?

12  A.  Do you have it?

13  Q.  Yes, I do.  Let's look at it.

14  A.  I don't.

15          MR. PHILLIPS:  Your Honor, may I approach the

16  witness?

17          THE COURT:  Yes.

18          MR. FAY:  Mark this as Exhibit-C, MHR Exhibit-C.

19          (MHR's Exhibit-C marked for identification)

20  BY MR. FAY:

21  Q.  And Mr. Polleck, I would refer you to the second page of

22  this exhibit, which reads, "June 23rd, 2004, Term Sheet,"

23  right?

24  A.  Yes.

25  Q.  And in this term sheet in paragraph 2, acquisition, there's

Polleck - Cross                                18

1    a purchase price of $40 million cash, correct?

2    A.   Yes.

3    Q.   And the final APA, which was executed on or about July 13,

4    2004, had a final purchase price of $40 million cash, correct?

5    A.   Yes.

6    Q.   Okay.  Have you ever seen this term sheet before?

7    A.   Yes, although when I became involved there was already a

8    draft of the APA that we worked off of.

9    Q.   Okay.  Has anyone informed you upon what date Presstek

10   terminated the Escrow Agreement that you had heard about?

11   A.   I have an understanding that it was in the middle of June,

12   but I don't (indiscern.).

13   Q.   Has anyone ever told you that it was on June 22nd, 2004,

14   the day before that term sheet?

15   A.   I believe I heard that in a deposition.

16   Q.   Okay.  Do you have any reason to disagree with that fact?

17   A.   I have no reason to agree or disagree.

18   Q.   Okay.  During the course of your retention by the Debtors,

19   have you ever participated in a discussion where

20   representatives of the Debtor have referred to the fact that

21   one day after Presstek terminated the escrow or the Stock

22   Purchase Agreement, Presstek had drafted a term sheet for a $40

23   million Asset Purchase Agreement?

24   A.   I heard that in a deposition.

25   Q.   Other than the deposition, any other discussions?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0396

Polleck - Cross                                    19

1   A.   A discussion of the deposition.

2   Q.   Okay.  But other than that?

3   A.   I don't recall.

4   Q.   Have you attended board meetings of the Debtors since your

5   retention on June 29th or 30th, 2004?

6   A.   Yes, I have.

7   Q.   At any board meeting was that issue discussed, the fact

8   that Presstek had drafted a term sheet for a $40 million Asset

9   Purchase Agreement the day after it terminated the Stock

10  Purchase Agreement?

11  A.   I didn't attend the board meetings when these documents

12  were presented so I don't know if that discussion was held.

13  From the time I began (indiscern.) already been discussed

14  (indiscern.).

15  Q.   Okay.  And you can't -- you would not be able to testify

16  today as to any of the conduct of Presstek in June, or May, or

17  April 2004, prior to your retention of June 29th or 30th,

18  correct?

19  A.   Not from (indiscern.).

20  Q.   Let me show you another document, Mr. Polleck, and ask you

21  if you've seen this.

22       MR. FAY:  We've marked this as Exhibit-D.

23       (MHR's Exhibit-D marked for identification)

24  BY MR. FAY:

25  Q.   It is your understanding, Mr. Polleck, that prior to the

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-389-0191*

Polleck - Cross                    20

1  hearing on today and yesterday there has been discovery in this

2  contested matter?

3  A.  Yes.

4  Q.  And you've actually attended some of the depositions,

5  correct?

6  A.  Until I was asked to leave.

7  Q.  Okay.  And it's further your understanding the documents

8  have been produced as part of that discovery process, correct?

9  A.  Correct.

10  Q.  Okay.  And Presstek has produced documents, right?

11  A.  I believe so, yes.

12  Q.  Have you reviewed any of the documents that Presstek has

13  produced?

14  A.  Only at the depositions.

15  Q.  Okay.  The document I just handed you I'll represent to you

16  is a document produced to us by Presstek during the discovery

17  process.  Have you ever reviewed this?

18  A.  At the deposition.

19  Q.  Okay.  Did counsel ask you to review it or you just

20  happened to look through it while you were there?

21  A.  I received a copy (indiscern.).

22  Q.  Okay.  Was this at the deposition of Mr. Muso?

23  A.  It was.

24  Q.  Okay.  If you recall from that deposition, we then had a

25  discussion with Mr. Muso about the valuation of the Stock

Writer's Cramp, Ìnc.

Certified Court Transcribers

732-329-0191

1  Purchase Agreement versus the Asset Purchase Agreement,
2  correct?
3  A.  I believe so.
4  Q.  Okay.  And we discussed the fact that on this first page of
5  Exhibit-D Presstek was calculating the cost of the Stock
6  Purchase Agreement versus the cost of the Asset Purchase
7  Agreement, correct?
8  A.  Consideration, yes.
9  Q.  Okay.  And the Stock Purchase Agreement, the cost was 89.1
10 million, correct?
11 A.  What this paper says.
12 Q.  All right.  And the Asset Purchase Agreement was 48
13 million, correct?
14 A.  That is what this paper says.
15 Q.  For over $41 million in savings, right?
16 A.  Correct.
17 Q.  Okay.  During your retention --
18 A.  I would note that there is a category, two categories in
19 here, one called environmental, and one called (indiscern.) one
20 called working capital (indiscern).  With respect to the Stock
21 Purchase Agreement, those categories total approximately 38.5
22 million.  Those, in my understanding, are estimates.  I have no
23 idea where they came from (indiscern.) Presstek will spend
24 after its acquisition.  If one looks under the section 363 deal
25 there's a $5 million amount under restructuring, which again,



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

A- 0399

1  is an amount that they would expect to spend once the

2  (indiscern.) company.  Looking further above that, it says in

3  the previous deal, in the section 363 deal, the purchase price

4  -- the purchase price on the previous deal at 47.6 million,

5  purchase price under the 363 deal is 40 million.  There are, of

6  course, differences because the 47 million includes the

7  assumption of working capital obligations, and the 363 deal

8  does not include the assumption of working capital obligations.

9  However, the next three numbers as I described appear to me to

10  be post-acquisition costs borne by Presstek not directly

11  related to considerations of the Debtor.

12  Q.  Right, but there is at least -- there's a component of

13  consideration to the Debtors here, correct?

14  A.  Well, to the extent that those liabilities are real, the

15  restructuring is probably not a component to the Debtor.  The

16  working capital replenishment is not a component to the Debtor.

17  Q.  Under the Asset Purchase Agreement I believe we heard

18  yesterday that Unsecured Creditors will receive approximately

19  $4 million, correct?

20  A.  Correct.

21  Q.  If Presstek had bought the stock of the Debtor, of A.B.

22  Dick, the Creditors -- Presstek would be obligated to the

23  Creditors for 100% of their debt, correct?

24  A.  I agree.  That's not reflected in that.

25  Q.  Okay.



Polleck - Cross                                    23

1   A.   That's not what I see on this schedule.

2   Q.   But that's a truism, right?

3   A.   I believe that is correct, I haven't read the Stock

4   Purchase Agreement, but you would assume that the acquisition

5   of the stock would result in their becoming obligated for the

6   working capital obligation, and the debt as well.

7   Q.   And that's how you got the maybe $30 million figure that

8   you and Mr. Goldstein discussed, correct?

9   A.   That's how I would view it, but that is not what's on the

10  paper.

11  Q.   That's fine.  These are the costs that Presstek viewed,

12  correct?

13  A.   I can't -- this is what Presstek appears to be Presstek's

14  evaluation of the its (indiscern.) internal costs after owning

15  it for some period of time.

16  Q.   Right.  And they're saying in this document that the cost,

17  their estimates of cost, is $41 million, Correct?

18  A.   Their estimates of these two columns are $41 million

19  (indiscern.).

20  Q.   Okay.

21  A.   I don't believe -- it is not, in my opinion, an estimate of

22  cost.  This is what it takes for them to buy the company,

23  restructure it into what they want it to be.  This is not

24  (indiscern.) cost (indiscern.).  This includes converting it to

25  the Presstek model, whatever that might be.

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

A- 0401

Polleck - Cross                                   24

1   Q.   Okay.  But it stills shows a $41 million savings to

2   Presstek under their estimate, correct?

3   A.   Yes.

4   Q.   Okay.  Was that ever discussed during your retention by the

5   Debtors?  Did anyone pull out this document, sit around and

6   say, "You know, in one day's time Presstek, by its own

7   calculations, saved $41 million."

8   A.   Yes.

9   Q.   When did that happen?

10  A.   At the deposition (indiscern.).

11  Q.   Other than at the deposition, did those discussions occur

12  during your retention by the Debtor?

13  A.   There was from time to time general discuss that they saved

14  a significant amount of money on a regular basis, but it was

15  never -- this document was not produced and it was not

16  (indiscern.).

17  Q.   Okay.  How much unsecured debt is there, Mr. Polleck?  An

18  estimate.

19  A.   Could you -- well, there's $5 million, I believe

20  (indiscern.), approximately $5 million from the old notes,

21  there's the $25 or $28 million (indiscern.) notes.  I believe

22  there's between (indiscern.).

23  Q.   And for all of that under the APA we have an estimate of

24  about $4 million, correct?

25  A.   It's actually a little greater than that based on whatever

*Walter's Cramp, Inc.*
Certified Court Transcribers
792-929-0191



Polleck - Cross                                    25

(indiscern.).

Q.  Okay.  But it's in that range, right?

A.  Four to eight.

Q.  That's not what was testified to yesterday, correct?

A.  Well, I said it's based on what cures, if any, Presstek

would pay on its own for those contracts (indiscern.).

Q.  Okay.  But the document we looked at yesterday basically

said 3½ and then I think the testimony was we're gonna add

about another 400 to that, correct?

A.  That was what would be as a result of proceeds into the

Estate.  I think -- wasn't their question different than that?

What was your question?

Q.  What are the proceeds coming into the Estate for the

benefit of Unsecureds?

A.  I think it was total proceeds, but into the Estate is about

$4 million.

Q.  Okay.  And the unsecured debt that you just referred to,

it's your understanding that if the Stock Purchase Agreement

had closed Presstek would have taken responsibility for those

debts, correct?

A.  Yes.

Q.  Yesterday you also testified that you conducted a

liquidation analysis of the Debtors, is that right?

A.  Yes.

Q.  And I believe you said that the midpoint of your

A- 0403

Polleck - Cross                                26

1  calculation was 16 million?

2  A.  Yes.

3  Q.  In conducting that liquidation analysis did you add any

4  value for the claims that the Debtors might have against

5  Presstek under the Stock Purchase Agreement?

6  A.  The liquidation of the assets the claim was valued at

7  approximately the number I described.

8  Q.  One million dollars.

9  A.  Actually half.

10  Q.  $500 thousand?

11  A.  Yes.

12  Q.  And that was based on the advice of counsel?

13  A.  That was based on the only evaluation that we had

14  available.

15  Q.  Okay.  And that was an evaluation by Mr. Phillips, is that

16  correct?

17  A.  Correct.

18  Q.  Did anyone at the Debtors suggest that maybe a second

19  opinion should be obtained?

20  A.  Actually, we considered what it might have to be, what the

21  value might have to be, given the liquidation of the assets

22  (indiscern.).

23  Q.  But my question was, during your discussions with

24  representatives of the Debtors was it ever suggested that a

25  second opinion about the value of this claim should be

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0404

Polleck ~ Cross                27

1  obtained?

2  A.  No, because we approached the issue by saying if we

3  liquidate the assets (indiscern.) how much do the claims have

4  to be worth to get to the equivalent dollar amount

5  (indiscern.).

6  Q.  And what was that?

7  A.  It was (indiscern.).

8  Q.  What was the high point of your range?

9  A.  Twenty-one, I think.

10 Q.  Twenty-one.  So if you had a $21 million high point, and

11 you had a $30 million claim, that'd be 51 million, right?

12 A.  If you hit the high point, yes.

13 Q.  Okay.  In your discussions --

14 A.  That would have to be the claim (indiscern.).

15 Q.  Correct.

16 A.  That would have after all legal costs, contingencies

17 (indiscern.).  You also have to consider the time value of

18 money.

19 Q.  Excuse me, I'm sorry, Mr. Polleck, what were you saying?

20 A.  Go ahead.

21 Q.  You were adding the thought that you would also have to

22 factor in the time value of money on any recovery.

23 A.  The costs of achieving (indiscern.) the time value of money

24 related to when that recovery (indiscern.) of the Estate

25 (indiscern.).



*Welter's Cramp, Ins.*
*Certified Court Transcribers*
*731-379-0191*

Polleck - Cross                                                    28

1  Q.  Okay.  If the Presstek deal is not approved today, wouldn't

2  you try to sell the Debtors as a going concern?

3  A.  If the Presstek deal is not approved today I think that our

4  plan would be to find a way to replace the D-I-P, if possible

5  (indiscern.) if not possible (indiscern.) there's nothing

6  possible yet (indiscern.) find a way to close (indiscern.).

7  Q.  Okay.  And would you in an effort to close a transaction

8  before the D-I-P expires would you approach Comvest or New

9  England Partners?

10 A.  Of course.

11 Q.  What have you done since July -- I'm sorry.  What have you

12 done since June 29th or 30th, 2004, to replace the D-I-P on a

13 stand alone basis?

14 A.  I don't recall every institution I've talked to, but I've

15 talked to CIT, Chase, (indiscern.) and (indiscern.).

16 Q.  When did you do this?

17 A.  I started in July.  I began (indiscern.) for the lenders

18 and private sources (indiscern.).

19 Q.  Okay.  Have you done anything in September or October?

20 A.  Actually, we have continued to provide information to many

21 of those lenders.  As I testified yesterday, they were

22 interested in pursuing their ability to finance whoever might

23 show up (indiscern.) have been able to independently provide

24 liquidity to (indiscern.) or been willing to (indiscern.).

25 Q.  Okay.  In the months of September and October did you

Walter's Cramp, Inc.
Certified Court Transcribers
730-329-0191



Polleck - Cross                    29

1   contact any other potential financiers of the Debtors' D-I-P on

2   a stand alone basis?

3   A.  There were some.  The Committee provided some (indiscern.)

4   provided information as well (indiscern.) as recently as

5   yesterday.

6   Q.  Did you contact anyone, though?

7   A.  My firm did.

8   Q.  Okay.  Who at your firm would have done that?

9   A.  Lynn.

10  Q.  Okay.  What's her full name?

11  A.  Lynn Carpenter.

12  Q.  Okay.  But she did, you -- she might have contacted some

13  additional lenders, but you didn't, correct?

14  A.  I continued discussing it with the lenders (indiscern.).

15  Q.  Okay.  During your testimony yesterday you mentioned the

16  restructuring plan that had been developed for the Debtors,

17  correct?

18  A.  I believe so.

19  Q.  And you -- I believe you testified that one of the reasons

20  you viewed it as unreasonable is that it was dependant on the

21  Joint Development Agreement with Presstek?

22  A.  I'm not sure I said unreasonable.

23  Q.  Was the restructuring plan -- was that plan dependant on a

24  continuation of that Joint Development Agreement?

25  A.  It was.

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

Polleck - Cross                               30

Q.  Okay.  Isn't it the case though that the A.B. Dick
technology that goes into those products, the Freedom and the
Vector product, could be used for somebody else's technology?
A.  My understanding is there's a 6 to 18 month development
period, and the product that would result -- I'm not an
engineer -- the product that would result (indiscern.)
effective and efficient as the product (indiscern.) coming out
(indiscern.).
Q.  But it could be done.  You could go and find a different
vendor, correct?
A.  You would get an alternative product.  You would not get
the same product.
Q.  Okay.  During your retention by the Debtors, are you aware
of any effort to contact other vendors who might be able to
supply the technology needed for the Vector and Freedom
products?
A.  I'm not certain what the CRO did in regard to (indiscern.).
I know that they evaluated it because they discussed it with
me.
Q.  Okay.  You also referred in your testimony to discussions
you had with various parties that expressed an interest in
acquiring the assets of A.B. Dick, right?
A.  Correct.
Q.  Okay.
A.  Well, they were not all acquiring the assets.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191



1  Q.  But they expressed some interest in the fact that an

2  auction was being held, correct?

3  A.  Correct.

4  Q.  Okay.  Did you tell any of those entities that there was a

5  claim that might be worth as much as $30 million against

6  Presstek?

7  A.  I told everyone of the parties who was interested in being

8  a proponent of a plan -- part of a plan (indiscern.) that there

9  was an interest in the part (indiscern.) bidding in retaining

10  whatever claim may be there and that those parties (indiscern.)

11  valuable would have a plan for that claim (indiscern.).  It was

12  left with the (indiscern.).

13  Q.  Did you give any of those parties who expressed an interest

14  a value of the claim, or tell them the claim might be worth as

15  much as $30 million?

16  A.  I told them -- I gave no expression of value with regard to

17  my opinion.  I said there were others (indiscern.).

18  Q.  Did you use the number it might be worth as much as $30

19  million?

20  A.  I probably said they believe it might be worth as much as

21  $30 million.

22  Q.  Okay.  Did you provide any of these interested parties with

23  any opinions of the Debtors about the value of these claims?

24  A.  I think -- my recollection is that I told all of the

25  parties that it was my view that the ability to leave that

1 claim for the Creditors would be a tie breaker.  That was the
2 kind of discussion (indiscern.).
3 Q.  Okay.
4 A.  Since we didn't provide value, we never scheduled it as a
5 value in our analysis, except for the $1 value, it was always
6 the concept of, this is what the Creditors believe.
7 Q.  Okay.  So it was never the concept of this is what the
8 Debtors believe, correct?
9 A.  (Indiscern.).
10 Q.  How is your firm being compensated in this matter,
11 Mr. Polleck?
12 A.  We have a monthly retainer and success fee.
13 Q.  And what is the success fee?
14 A.  My recollection is that it is 500 -- up to $42 million for
15 a Presstek sale is $500 thousand (indiscern.) plus a formula
16 that escalates the value (indiscern.) if there's a
17 restructuring we receive $500 thousand plus the (indiscern.).
18 Q.  If --
19 A.  And if there's a third party -- I'm sorry.
20 Q.  Go ahead.
21 A.  If there's a third party we receive the same retainer, 50%
22 (indiscern.) and I think it's 1½% of the purchase price of the
23 (indiscern.).
24 Q.  Okay.  If this Presstek deal is approved today will your
25 firm receive a success fee?

Polleck - Cross                                    33

1   A.  Yes.

2   Q.  Okay.

3   A.  Well, if the Judge allows it.

4   Q.  Okay.  If the Judge allows your success fee you'll receive

5   a fee, correct?

6   A.  Correct.

7   Q.  Okay.  To your knowledge, has any firm that is not

8   receiving a success fee for the Presstek deal conducted a

9   liquidation analysis of the Debtors?

10  A.  Yes.

11  Q.  And who's that?

12  A.  Schuler Andrews.

13  Q.  That's the financial advisor to Key Bank, correct?

14  A.  Correct.

15  Q.  Any financial advisor to the Debtors that has conducted a

16  liquidation analysis that's not receiving a success fee?

17  A.  Not to my knowledge.

18  Q.  Have you provided the Board of Paragon or A.B. Dick with a

19  fairness opinion about the Asset Purchase Agreement?

20  A.  No.

21  Q.  Do you intend to?

22  A.  No.

23  Q.  Have you been asked to?

24  A.  No.

25          MR. FAY:  That's all I have, Your Honor.



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

1    THE COURT:  Thank you.  Anyone else have any
2  questions of this witness?
3    MR. SELBST:  Your Honor, I do.
4    THE COURT:  You may proceed.
5            CROSS-EXAMINATION
6  BY MR. SELBST:
7  Q.  Good morning, Mr. Polleck.  Mr. Polleck, on your cross
8  examination by Mr. Fay you were asked a series of questions
9  about the Stock Purchase Agreement.  Do you recall those?
10  A.  Yes.
11  Q.  And he asked you on a number of occasions if Presstek had
12  completed the acquisition under the Stock Purchase Agreement
13  whether Presstek would have been responsible for the claims.
14  Do you remember those questions?
15  A.  Yes.
16  Q.  But isn't it correct that if there'd been a stock purchase
17  that it would have been A.B. Dick that would have been
18  responsible for those claims?
19  A.  Yes.
20  Q.  Okay.  Thank you.  Now, you also testified in your direct
21  yesterday a little bit about the alternative bids.  Do you
22  recall that testimony, or the alternative expressions of
23  interest?
24  A.  Yes.
25  Q.  And I believe you also testified that in the negotiations

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  other the past weekend Presstek increased the value of its bid

2  by approximately $1.6 million by taking on the tail medical

3  expenses, do you recall that?

4  A.  Yes.

5  Q.  And you also testified that Presstek had agreed to assume

6  the sales commissions, correct?

7  A.  Half of the sales commissions (indiscern.).

8  Q.  If I represent to you that Presstek's agreement, in fact,

9  is to accept all of those commissions up to $425 thousand do

10 you have any reason to disagree with that?

11 A.  No.  (Indiscern.).

12 Q.  So, if there's going to be an alternative bid it would have

13 to be not just bigger than the $40 million cash purchase price,

14 it would have to be bigger than the $40 million cash purchase

15 price increased by the tail medical, increased by the

16 commissions, and increased by the break-up fee, isn't that

17 correct?

18 A.  Yes.

19 Q.  For it to provide more value to the Estate?

20 A.  Coupled with limitation on the cure, coupled with the

21 changes to the working capital (indiscern.).

22 Q.  And I believe you testified yesterday that the alternative

23 expressions of interest both contemplated a Plan of

24 Reorganization, isn't that correct?

25 A.  Yes.



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

Polleck - Cross                    36

1  Q.  And a plan would take two, three, maybe more months to

2  confirm, isn't that correct?

3  A.  At least three, I believe.

4  Q.  Okay.  And I believe there's been testimony from Mr. Gray

5  that during those three months the Debtors would lose $4 to $5

6  million, isn't that correct?

7  A.  Yes.

8  Q.  And that would have to be funded, correct?

9  A.  Yes.

10 Q.  And there'd be interest cost on the D-I-P, assuming you

11 could find a D-I-P?

12 A.  Correct.

13 Q.  So really even if you took the $50ish million of these

14 other bids and accepted them at face they're really not even

15 providing equivalent value to what's on the table today, are

16 they?

17 A.  Under that (indiscern.).

18 Q.  Okay, that's all.

19         MR. SELBST:  No further questions, Your Honor.

20         THE COURT:  Thank you.  Any redirect?

21         MR. RICCIARDI:  No, Your Honor.

22         THE COURT:  You're excused.  Any other witnesses on

23 behalf of the Debtor?

24         MR. RICCIARDI:  No more witnesses, Your Honor.

25         THE COURT:  Well, the objecting party for the -- about



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

1    the Committee (indiscern.).  No, the Committee.

2          MR. RICCIARDI:  Your Honor, we don't have any

3    witnesses.  I don't know if you want to hear some argument or

4    some statement now.

5          THE COURT:  As soon as I close the record.

6          MR. RICCIARDI:  Very well, thanks.

7          THE COURT:  MHR, your client have any witnesses?

8          MR. D. ROSNER:  No, sir.

9          THE COURT:  Any further evidence?

10         MR. D. ROSNER:  Not other than has been submitted.

11         THE COURT:  All right.  I'll deem the record closed.

12   You can make a closing statement if you wish.  Anyone for the

13   Debtor?

14         MR. STOCK:  Your Honor, I already had an opening

15   statement.  I --

16         THE COURT:  All right.

17         MR. STOCK:  -- would like to reserve a rebuttal

18   until --

19         THE COURT:  That would be fine.

20         MR. STOCK:  -- the other, the opponents.

21         THE COURT:  Committee?

22         MR. RICCIARDI:  Your Honor, James Ricciardi of McGuire

23   Woods on behalf of the Committee.  We came here to this hearing

24   yesterday prepared to support the sale and prepared to withdraw

25   our objection; however, there is a difficulty, perhaps it's a



Writer's Cramp, Inc.
Certified Court Transcribers
732-929-0191

38

1  misunderstanding, between Presstek and the Committee about
2  certain bid enhancements that were made at the auction.  And we
3  have been advised by Presstek's counsel this morning that they
4  will designate no contracts to be assumed, and I believe that
5  that is inconsistent with the description of the bid
6  enhancement that they made at the auction.  May I hand you a
7  transcript from the auction, Your Honor?
8          THE COURT:  Yes.  What page?
9          MR. RICCIARDI:  Page 9 to start, please, Your Honor.
10  Mr. Pollock, who you just heard testify, towards the bottom
11  third of the page in clarifying the bid enhancement of Presstek
12  with regard to executory contract says, "The only clarifying
13  comment is that the executory contracts are still to be assumed
14  and assigned with Presstek being responsible for the cures
15  other than the $500,000 Mr. Scaffidi mentioned."  Mr. Scaffidi,
16  who is a representative of Presstek at the auction, went on to
17  say, "There may be some contracts that are not signed but that
18  won't affect the liability of the Estate."  That is, in the
19  Committee's view, entirely inconsistent with the position
20  they're taking today that there will be no contracts.  In fact,
21  we thought that Mr. Scaffidi was saying that most of the
22  contracts would be assumed and we need a clarification from
23  Presstek before we can make a decision as to how we're going to
24  ask Your Honor to rule.  Also, Your Honor, with regard to
25  another item involving cures, on page 8, the first full

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191



A- 0416

1  paragraph on the page, the second item is to remove from the

2  estate the responsibility of curing all contracts with the

3  exception of certain leases that have been provided by the

4  company with a total liability not to exceed $500,000.  That is

5  to say that only $500,000 will remain with the Estate in those

6  obligations.

7       THE COURT:  Well, why don't you just propose that an

8  Order approving the sale and we'll include that in the Order

9  and if they don't like it and don't abide by it, it's all over

10  with.

11       MR. RICCIARDI:  Well, include -- we can certainly

12  include the cap of $500,000.  But that doesn't resolve the

13  issue, Your Honor.  Obviously, there are two ways of

14  distributing funds to Unsecured Creditors.  One is in terms of

15  a distribution from the Estate.  The other is in terms of cure

16  payments.  And we believe that they were committing to make

17  substantial cure payments as part of their bid enhancement.

18  And we can't understand how they can take the position that

19  they are not assuming any contracts right now.  So I would

20  welcome clarification from Presstek.

21       THE COURT:  All right.  Is the Purchaser here?

22       MR. SELBST:  Your Honor, there's -- we believe there

23  has been a misunderstanding between the Committee and Presstek.

24  We have provided the Debtors a list of the contracts to be

25  assumed.  We do not believe, and Mr. Scaffidi was present at

Writer's Cramp, Inc.
Certified Court Transcribers
732-389-0191



40

1  the auction, that we made a blanket assumption of all cure

2  costs. We told the Committee and it also appears in the

3  transcript, that we would designate by the close of business,

4  the list of the contracts that we would assume and we have

5  designated that. That's not going to get the Committee as much

6  in cure costs as they hoped, but we did exactly what we said we

7  were going to do at the auction which was by five o'clock

8  yesterday we provided a list to the Debtors of the contracts to

9  be assumed. But if you read the entire transcript it says

10  there may be some contracts that won't be assumed. The --

11  Presstek was in the process of evaluating those contracts and

12  without question, Your Honor, the cost of cure were a material

13  consideration in deciding which to assume and which not to be

14  assumed. But if you read the transcript in its entirety, it

15  says by five o'clock tomorrow, which means yesterday, we would

16  provide the Debtors with a list and that's what we did.

17         THE COURT: What is the amount of money that -- what

18  is the amount involved in those contracts that you are not

19  assumed and are they executory?

20         MR. SELBST: That we are not assuming?

21         THE COURT: Yes.

22         MR. SELBST: If you could give me one moment, Your

23  Honor. Your Honor, the Debtors actually have a different view

24  than we do on this. I can give you my own client's view but

25  Mr. Gleason advises me that the Debtors have a different view

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



Closing Statement - Mr. Joseph                    41

1    as to what these cure costs are.  If you could give me a

2    moment, I can confer with my client.  You may want to hear from

3    Mr. Gleason while I have a moment.

4            THE COURT:  Are these contracts all executory?

5            MR. SELBST:  That is one of the subjects of

6    discussion.  The Debtor's view is that some of the contracts

7    which are at issue here are not executory and are not capable

8    of being assumed or assigned under any circumstances and

9    actually as to those contracts which the Debtors believe are

10   non executory, we're not proposing to assume any of those at

11   this point.

12           THE COURT:  Okay, how much -- what contracts are you

13   assuming?  Have you got the list there?

14           MR. SELBST:  Yeah, I have a list here.  It's --

15           THE COURT:  Has the Committee been provided that list?

16           MR. SELBST:  Yes, Your Honor.

17           MR. JOSEPH:  James Joseph of McGuire Woods, Your

18   Honor, yes, we have.

19           THE COURT:  And that list you don't agree with, is

20   that --

21           MR. JOSEPH:  The list that we've been given lists --

22   it includes only --

23           THE COURT:  Come on.  You've got come forward to get

24   on the record.

25           MR. JOSEPH:  Again, James Joseph of McGuire Woods for



*Writer's Cramp, Inc.*
Certified Court Transcribers
731-329-0191

42

1  the Committee.  The list that we've been given, and that I've

2  discussed with Mr. Gleason and counsel for Presstek includes

3  only leases, real and personal property leases.  It is, for the

4  most part, the real and personal property lists -- excuse me,

5  leases listed on Exhibits, I believe it was, -B, -C, and -D of

6  the schedules that were filed with the Court.  At issue and the

7  way the Committee sees it, the real issue at the auction was

8  sort of two buckets:  executory contracts and leases.  And the

9  leases are on this schedule, are we believe based on the

10 statements at the auction, subject to a cure cap in terms of

11 the Estate's liability of $500,000.  What our concern is and

12 value that we perceive to be coming are a second bucket of non-

13 leases.  The contracts -- vendor contracts that were primarily

14 listed on Exhibit-A as well as other significant contracts on

15 Exhibit-A.  With respect to those cure costs, that was at the

16 auction, something the Committee believed to be, as Mr.

17 Ricciardi stated, another mechanism of providing substantial

18 value to certain members of the Unsecured Creditor

19 constituency.  And we viewed the comments of Mr. Scaffidi to

20 be, with respect that some contracts may not be assumed,

21 carrying with that and that being his clarification, that there

22 certainly would be some contracts, speaking again of the bucket

23 of contracts and not leases, that would be assumed.  And as we

24 stand here today, we have Presstek stating that other than

25 those leases that are listed, they will be taking no executory



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

A- 0420

43

contracts.

(MHR's Exhibit-A previously marked for identification)

(MHR's Exhibit-B previously marked for identification)

(MHR's Exhibit-C previously marked for identification)

(MHR's Exhibit-D previously marked for identification)

MR. SELBST: Your Honor, I -- the papers that I've been handed by Debtor's counsel as the ones identified by my client simply are inconsistent with that. Yes, it involves the real property leases, yes, it involves capital leases, yes, it involves operating leases, but also includes all reseller agreements, all domestic distributor agreements, all international distributor agreements, all customer service agreements, and some other confidentiality agreements. But it is clear that it is not simply the leases, Your Honor.

THE COURT: Well, do you agree that only $500,000 of the non-lease agreements would be left with the Estate obligation?

MR. SELBST: That's correct. Because to the extent that we are not -- well, I want to be very -- I want to be --

THE COURT: And your company, then, as the Buyer will assume everything over $500,000?

MR. SELBST: No, no. I --

THE COURT: What did Mr. -- what did your representative say then -- mean then, when he said that is to say that only $500,000 will remain with the Estate and those



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-929-0191

44

1  obligations?

2       MR. SELBST:  To the extent --

3       THE COURT:  What did he mean by that?

4       MR. SELBST:  He's here and you could ask him, Your

5  Honor, but I think what he meant -- what I think he meant was

6  to the extent that we assume the contracts, those liabilities

7  will be assumed, but if you read the entire transcript what it

8  says is there are some agreements that are not going to be

9  assumed.  At the time that he made that he was still in the

10 process of evaluating the agreements that would be assumed and

11 would not be assumed.

12      THE COURT:  Second item is to remove from the Estate

13 the responsibility of curing all contracts with the exception

14 of certain leases that have been provided by the company with a

15 total liability not to exceed 500,000.  That is to say that

16 only $500,000 will remain with the estate and those

17 obligations.  That's all the contract.

18      MR. SELBST:  As I said and, Your Honor, I'm happy to

19 call Mr. Scaffidi if you would like to reopen the record.  I

20 think what he intended to say was --

21      THE COURT:  Well, if there's not going to be any

22 agreement on this, there's not going to be any confirmation.

23      MR. SELBST:  I understand your position, Your Honor.

24      THE COURT:  So, you better give this --

25      MR. SELBST:  Understood, Your Honor.

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

1      THE COURT:  I'm not going to write the agreement.

2      MR. SELBST:  Understood, Your Honor.

3      THE COURT:  The Debtor have anything else to say on

4  this issue?

5      MR. GLEASON:  Thank you, Your Honor.  John Gleason,

6  Benesch, Friedlander, Coplan and Aronoff on behalf of the

7  Debtors.  Let me give the Court some background on how we got

8  here.  Pursuant to paragraph 2(j) of the Bid Procedures Order,

9  the Debtors filed a schedule of leases and executory contracts

10  that they reserved the right to assume and assign along with

11  the calculation of the required cure amounts.  The Debtors

12  filed that schedule on October 1st.  Because of a computer

13  glitch of the PDF'ing, we supplemented that on October 6th and

14  the Trumble Group served out both of those schedules on that

15  date.  We received several objections to those cure amounts and

16  I can go through those later if necessary.  I believe we have

17  resolved all of those for the purposes of the sale hearing.  I

18  think it's important to note that the terms of the original

19  asset Purchase Agreement required the Debtors to pay all cure

20  amounts as a deduct of the purchase price.  The agreement set

21  forth on the schedules filed by the Debtors contemplated

22  approximately $2.24 million of cures.  It included -- I think

23  as there's been some discussion, certain vendor agreements,

24  real property leases, capital leases, operating leases, the

25  joint venture agreement with Presstek which the Debtors did



A- 0423

1 reserve the right to assume and assign, reseller agreements,

2 domestic distributor agreements, international distributor

3 agreements, customer service agreements, confidentiality

4 agreements and an agreement with a company called HP Indigo.

5 Those, again with the reservation of rights that was set forth

6 in the schedules, were the only contracts that the Debtors

7 believed were executory and subject to assumption and

8 assignment, cures totaling $2.24 million.  What happened after

9 that was that Presstek indicated that they believed certain

10 other Vendor agreements and that's really what we're talking

11 about, Your Honor, I think is the only thing that is in

12 dispute, that certain Vendor agreements which potentially

13 totaled an additional $5 million in cure amounts were executory

14 and subject to assumption and assignment by the Debtors.  More

15 importantly, subject to the Debtors having to pay those cure

16 amounts as a deduct to the purchase price.  So from the

17 Debtor's standpoint, prior to the modifications to the Asset

18 Purchase Agreement, it was agreed -- that were agreed to over

19 the weekend and yesterday, depending on how Your Honor ruled on

20 those disputed agreements, the Debtors faced a potential deduct

21 of $7 million to the purchase price.  What was agreed to was

22 that the maximum deduct to the purchase price was $500,000 on

23 the specific agreements that Presstek or Silver indicated that

24 they would like assumed and assigned.  And I do have, Your

25 Honor, for ease of reference, I think I've handed it out to



47

1    most parties, I -- if I may approach?

2         THE COURT:  Yes.

3         MR. GLEASON:  This is just copies of the two schedules

4    that we filed and I have struck out the agreements that are

5    not, as of today, being assumed and assigned by the Debtors.

6    Those cure amounts total approximately $400,000.  I think it

7    should also be noted that the big agreements that are the

8    subject of the Committee -- or the Committee wanting assumed

9    and assigned or to the Committee's belief that Presstek was

10   going to assume the contracts, mainly include Mitsubishi, a

11   company called Esko-Graphics and Konica Minolta.  None of those

12   contracts, and I think the cures on those three agreements

13   total approximately $3 million, those agreements were not on

14   the Debtor's original schedules because the Debtors do not

15   believe those are executory.  And so, you know, where we are

16   today, we do have the agreements that the Debtors are prepared

17   to assume and assign to Silver and cure amounts of, we believe,

18   somewhat less than $500,000, although, I think as Mr. Selbst

19   indicated, the Debtor's liability would be capped at $500,000.

20        THE COURT:  Okay.

21        MR. GLEASON:  If you have any questions or -- I know

22   it's somewhat confusing but --

23        THE COURT:  Well, are you handing up an agreement that

24   is just about as indefinite as those that were submitted by

25   Harbor and that other bidder?



*Writer's Cramp, Inc.*
Certified Court Transcribers
732-929-0191