# Tab 4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
----------------------------------x
In re                             :    Chapter 11
                                  :
A.B. DICK COMPANY, et al.         :    Case No. 04–12002 (JLP)
                                  :
         Debtors.                 :    Jointly Administered
----------------------------------x
```

ORDER, PURSUANT TO SECTIONS 105(a), 363(b) AND (f) AND 365(f)
OF THE BANKRUPTCY CODE AND RULES 2002(a)(2), (c)(1), (k) AND (m),
6004 AND 6006 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE, APPROVING (1) THE SALE, PURSUANT TO THE ASSET PURCHASE
AGREEMENT DATED JULY 13, 2004, OF (a) SUBSTANTIALLY ALL OF THE
ASSETS OF THE A.B. DICK COMPANY AND THE A.B. DICK COMPANY OF
CANADA, LTD., AND (b) THE CAPITAL STOCK OF THE A.B. DICK U.K. LIMITED
TO SILVER ACQUISITIONS CORP., FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS; AND (2) THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO SILVER ACQUISITIONS CORP.

Came on for hearing (the "Hearing") on the 2nd and 3rd days of November, 2004,

the *Motion for Order (A) Authorizing Sale of Substantially All of the Assets of A.B. Dick Company*

*and its Wholly Owned Subsidiaries Free and Clear of Liens, Claims and Encumbrances; (B)*

*Authorizing Assumption and Assignment of Certain Unexpired Leases and Executory Contracts;*

*and (C) Granting Related Relief* (the "Motion")[1] filed on July 22, 2004 by A.B. Dick Company

("A.B.Dick"), Paragon Corporate Holdings, Inc., Multigraphics LLC, and Interactive Media

Group, Inc. (collectively, the "Debtors"), the debtors and debtors in possession in the above-

captioned jointly administered chapter 11 cases; the Court having reviewed the Motion and all

objections thereto and having heard the statements in support of the objections and in support of

the relief requested in the Motion at the Hearing; and upon the Motion and the record of the

---

[1]    • All capitalized terms not otherwise defined herein shall have the meanings ascribed to
them in the Motion.

#103423

Hearing and all other proceedings had before the Court; after due deliberation and good cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.   The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.   Proper, timely, adequate, and sufficient notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities in accordance with sections 102, 105(a), 363, and 365 of Title 11 (the "Bankruptcy Code") of the United States Code, Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and in compliance with the Bidding Procedures Order, including, but not limited to the following parties in interest: (i) the United States Trustee for the District of Delaware, (ii) the attorneys for KeyBank National Association as administrative agent under the DIP Credit Agreement, (iii) the attorneys for the official committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors' Committee"), (iv) the attorneys for the MHR Entities, (v) the attorneys for Presstek, Inc. ("Presstek") and Silver Acquisitions Corp. ("Silver"), (vi) all parties that have submitted written requests to the Debtors to purchase the Assets within two months prior to the date hereof, (vii) all parties that are known to assert a security interest, lien, or claim in the Assets, (viii) the Internal Revenue Service, (ix) parties to the Assumed Seller Contracts, (x) all applicable state and local taxing authorities and (xi) all creditors listed in the schedules filed by A.B.Dick. In addition, in compliance with the terms of the Bidding Procedures Order, notice of

---

[2]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

2

A- 0479

the Motion, the Bidding Procedures, and Sale was published in a printing industry trade journal and also published in the national edition of the WALL STREET JOURNAL on September 20, 2004.

        C.      All objections to the relief requested in the Motion were either resolved prior to or at the Hearing or should be overruled.

        D.      A prompt closing of the transactions contemplated by the Asset Purchase Agreement, dated July 13, 2004, among Paragon Corporate Holdings, Inc. ("Paragon" or "Parent"), A.B.Dick, A.B.Dick Company of Canada, Ltd., a Canada corporation and wholly-owned subsidiary of A.B.Dick ("Canada Sub"), and Interactive Media Group, Inc., a wholly owned subsidiary of Parent ("IMG" and together with A.B.Dick, the "Sale Debtors"), and Presstek and Silver, as guarantor and purchaser respectively as amended by the First and Second Amendments to such Asset Purchase Agreement and as further amended at the Auction and at the Hearing (as amended, the "Asset Purchase Agreement") is essential and is in the best interests of Sale Debtors and their estates. The terms of the Asset Purchase Agreement are the best terms that have been offered for sale of the Assets (as such term is defined in the Asset Purchase Agreement).

        E.      Upon the execution, delivery, and closing of the Asset Purchase Agreement, the Assets to be sold and the interests to be assigned will have been acquired by Silver in good faith and as the result of arm's length negotiations.

        F.      No consents or approvals are required for the Sale Debtors to consummate the sale of the Assets other than the consent and approval of this Court and those set forth in the Asset Purchase Agreement. Neither the execution of the Asset Purchase Agreement nor the consummation of the sale of the Assets in accordance with its terms will constitute a violation of

A- 0480

any provision of any of Sale Debtors' organizational documents or any other instrument, law, regulation or ordinance by which the Sale Debtors are bound.

G.    The Sale Debtors are the legal and equitable owner of the Assets (other than the Assets owned by Canada Sub) and, upon entry of this Sale Order, the Sale Debtors will have full corporate power and authority to consummate the sale contemplated by the Asset Purchase Agreement. The Asset Purchase Agreement and the sale have been duly and validly authorized by all necessary corporate action required of each of the Parent and the Sale Debtors.

H.    This Order and the consummation of the transactions contemplated by the Asset Purchase Agreement are supported by good business reasons, and will serve the best interests of the Sale Debtors, their estates and their creditors by maximizing the values to be obtained from the Assets.

I.    The Asset Purchase Agreement was negotiated, proposed, and entered into by the Parent and the Sale Debtors, on one hand, and Presstek and Silver, on the other hand, without collusion, in good faith, and from arm's-length bargaining positions. Neither Presstek nor Silver is an "insider" of the Debtors, as that term is defined in section 101 of the Bankruptcy Code. None of the Debtors, Presstek, or Silver have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

J.    Silver is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

K.    The consideration to be provided by Silver pursuant to the Asset Purchase Agreement: (i) is fair and reasonable; (ii) is the highest and otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy

4

Code and the Uniform Fraudulent Conveyance Act (7A part II, U.L.A. 2 (1999)) or the Uniform Fraudulent Transfer Act (7A part II, U.L.A. 66 (1999)) or any similar laws of any state whose law is applicable to the transactions contemplated by the Asset Purchase Agreement.

   L. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.

   M. The consummation of the sale of the Assets pursuant to the Asset Purchase Agreement will be a legal, valid, and effective sale of the Assets to Silver, and vests or will vest Silver with all of the Sale Debtors' right, title, and interest in and to the Assets free and clear of liens, claims, (including, but not limited to any and all "claims" as defined in section 101(5) of the Bankruptcy Code), defenses to claims, including rights of setoff and recoupments, security interests, pledges, hypothecations, encumbrances or other interests, and any and all rights and claims under any bulk transfer statutes and similar laws, whether arising by agreement, by statute or otherwise and whether arising before, on or after the date on which these chapter 11 cases were commenced, whether known or unknown, including liens of any of the Debtors' creditors, vendors, suppliers, employees, lessors or any other third party (collectively "Liens") in accordance with section 363(f) of the Bankruptcy Code because one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. All parties with Liens against the Assets, if any, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the Motion, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against Silver, Silver's affiliates or any agent of the foregoing to recover any claim which such person or entity has solely against the Sale Debtors or any of their wholly owned subsidiaries. Failure to sell the

5

A- 0482

Assets free and clear of Liens would be substantially less benefit to, and would adversely affect, the Sale Debtors' bankruptcy estates.

N.     Brokers were not involved in consummating the Sale. Therefore, except as otherwise provided by prior Order of this Court, no agent, broker, person or firm acting or purporting to act on behalf of Parent, the Sale Debtors, Silver, or Presstek is or will be entitled to any commission, broker's fee or finder's fee from any of the parties to the Asset Purchase Agreement or any other person respecting the Sale.

O.     The Asset Purchase Agreement is a valid and binding contract between the Paragon, as parent, and A.B.Dick, Canada Sub and IMG, as sellers, and Presstek and Silver, as guarantor and purchaser, and is enforceable according to its terms.

P.     Unless an objection has been timely filed with the Bankruptcy Court, the amounts set forth on (i) Exhibits A – C to the SCHEDULES OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND RELATED CURE AMOUNTS OF THE DEBTORS AS OF SEPTEMBER 29, 2004 AND RESERVATION OF RIGHTS, dated October 1, 2004, and (ii) Exhibit D to the SUPPLEMENT TO SCHEDULES OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND RELATED CURE AMOUNTS OF THE DEBTORS AS OF SEPTEMBER 29, 2004 AND RESERVATION OF RIGHTS, dated October 6, 2004 (collectively, the "Schedule of Cure Amounts"), or if disputed, the amounts agreed to in writing by the objecting party and the Sale Debtors, are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(1) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code). There are no defaults under the Assumed Seller Contracts except as specified in the Schedule of Cure Amounts. Any anti-assignment provision

6

of any of the Assumed Seller Contracts is unenforceable pursuant to section 365(e) and (f) of the Bankruptcy Code.

(i)    all Reseller Agreements, Domestic Distribution Agreements, International Distributor Agreements, Customer Service Agreements, including bundler agreements and agreements with governmental entities, and Material Confidentiality Agreements, each as set forth in the Schedule of Cure Amounts;

(ii)    all of the unexpired real estate leases listed in Exhibit B to the Schedule of Cure Amounts, except the real property leases on property located in Niles, IL, and, Rochester, NY;

(iii)    all of the unexpired capital leases listed in Exhibit C to the Schedule of Cure Amounts; and

(iv)    all of the unexpired leases listed in Exhibit D to the Schedule of Cure Amounts.

Q.    Representatives of the Sale Debtors and Presstek and Silver made the following representations with respect to the assumption and assignment of executory contracts on the record at the auction on November 1, 2004:

> MR. SCAFIDE:  The second item is to remove from the estate the responsibility of curing all contracts with the exception of certain leases that have been provided by the company with a total liability not to exceed $500,000.  That is to say that only $500,000 will remain with the estate on those obligations.
>
> . . .
>
> MR. POLLACK:  The only clarifying comment is that the executory contracts are still being assumed with Presstek being responsible for the cures, other than the $500,000 Mr. Scafide mentioned.
>
> MR. SCAFIDE:  There may be some contracts that are not assigned. But that won't affect the liability of the estate.

A copy of the Auction Transcript is attached hereto.

R.     Presstek and Silver agreed, at the auction held on Monday November 1, 2004, and also stated on record at the Hearing, that the Sale Debtors' liability for cure obligations under the Sale Debtors (a) unexpired real estate leases (excluding Rochester, NY and Niles, IL.), (b) unexpired capital leases and (c) unexpired operating leases listed on the Schedule of Cure Amounts (collectively, the "Assumed Leases"), shall not exceed $500,000. Silver shall be liable for payment of all cure obligations with respect to the Assumed Leases in excess of $500,000.

S.     The Assumed Seller Contracts do not include any employment contracts.

T.     Adequate assurance of future performance has been demonstrated by or on behalf of Presstek and Silver with respect to the Assumed Seller Contracts.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Motion is granted and approved in all respects as provided herein (other than with respect to matters already addressed by the Bidding Procedures Order) and all objections thereto, to the extent not withdrawn prior to or at the Hearing, are hereby overruled.

2.     Pursuant to sections 363 and 365 of the Bankruptcy Code, the sale, conveyance, and assignment of the Assets, including the Sale Debtors' assignment of the Assumed Seller Contracts, pursuant to the Asset Purchase Agreement (the "Sale") *as modified* is approved, and the Sale Debtors are authorized and directed to execute any and all documents, instruments and papers and to take all actions necessary and appropriate to effectuate, implement and consummate the transactions contemplated by the Asset Purchase Agreement in consideration of the purchase price specified therein, including assigning and transferring to Silver all of the Sale Debtors' right, title and interest (including common law rights) in and to all of the Sale Debtors' intangible property included among the Assets except as otherwise explicitly provided by the

8

Asset Purchase Agreement. Without limiting the foregoing, the Sale Debtors are authorized and directed to close and consummate the Asset Purchase Agreement and all other agreements and documents related to and contemplated thereby (collectively, the "Disposition Documents"), which agreements and documents hereby are authorized and approved in all respects.

3.    The transfers of the Assets by the Sale Debtors to Silver are legal, valid and effective transfers and shall vest Silver with all right, title and interest of the Sale Debtors in and to the Assets pursuant to section 363(f) of the Bankruptcy Code, free and clear of any and all Liens. Any and all such Liens shall attach to the proceeds of the Sale, with the same priority, validity, force and effect as they now have against the Assets.

4.    The sale of the Sale Debtors' Assets pursuant to this Order and the Disposition Documents shall be binding upon Paragon, the Sale Debtors, Silver, all creditors, and shareholders of Paragon and the Sale Debtors, all of the parties to the Assumed Seller Contracts, all persons having or asserting a claim against, or an interest in Paragon, the Sale Debtors, or the Assets, and all parties to any actions or proceedings that directly or indirectly contest the power or authority of the Sale Debtors to sell, assign and convey the Assets or that seek to enjoin any such sale, assignment or conveyance.

5.    Any party having the right to consent to the assumption or assignment of the Assumed Seller Contracts that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code. The hearing on all Cure Claims objections filed with the Court, to the extent not resolved prior to or at the Hearing, are hereby continued to the December omnibus hearing date in these chapter 11 cases.

9

A- 0486

6.    Notwithstanding any provisions of this Order to the contrary, the assumption and assignment of executory contracts shall be governed by the following statements of representatives of the Debtors and Presstek and Silver made on the record at the auction on November 1, 2004:

> MR. SCAFIDE:  The second item is to remove from the estate the responsibility of curing all contracts with the exception of certain leases that have been provided by the company with a total liability not to exceed $500,000.  That is to say that only $500,000 will remain with the estate on those obligations.
> . . .
>
> MR. POLLACK:  The only clarifying comment is that the executory contracts are still being assumed with Presstek being responsible for the cures, other than the $500,000 Mr. Scafide mentioned.
>
> MR. SCAFIDE:  There may be some contracts that are not assigned. But that won't affect the liability of the estate.

7.    The Sale Debtors, Silver, and/or Presstek (in their sole and absolute discretion) may add or remove executory contracts or unexpired leases from the list of Assumed Seller Contracts up until Closing of the Sale.  In the event (a) one or more executory contracts or unexpired leases is added or removed after the entry of this Order, but before the Closing, (b) Silver and/or Presstek designate an executory contract or unexpired lease for assumption and assignment that was not listed on the Schedule of Cure Amounts or (c) a non-Debtor party to an Assumed Seller Contract did not receive adequate notice, the Sale Debtors shall file an amended Schedule of Cure Amounts and serve notice of added or removed executory contracts or unexpired leases on the non-Debtor parties to such executory contracts or unexpired leases.  The affected non-Debtor parties shall have 10 days from the date of service of such notice of amended Schedule of Cure Amounts to file and serve an objection to the assumption and assignment and/or cure obligation stated therein; failure by such non-Debtor party to object to 

10

such assumption and assignment shall be deemed a waiver of any and all objections thereto. Nothing shall require Silver and/or Presstek without its consent.

8.      The Sale Debtors' liability for cure obligations under the Assumed Leases shall not exceed $500,000. Silver shall be liable for payment of all cure obligations with respect to the Assumed Leases in excess of $500,000.

9.      Notwithstanding any other provision of this Order, neither the Private Label Sales Agreement dated October 1, 2002 nor the Private Label Sales Agreement dated August, 2004 (the "Postpetition Agreement"), in each case between A.B.Dick and Mitsubishi Imaging (MPM), Inc. ("Mitsubishi") shall be deemed assumed or assumed and assigned to Silver pursuant to this Order. The Sale Debtors reserve their rights to seek assumption and assignment in the future. In addition, the sale approved hereby is not free and clear of (a) any of the rights of Mitsubishi under the Resale License created under and described and defined in the Postpetition Agreement or (b) any set-off or recoupment rights of Mitsubishi.

10.     Neither Presstek nor Silver has acquired any liabilities of the Sale Debtors other than the Assumed Liabilities, and all persons and/or entities are hereby permanently enjoined and restrained from asserting or prosecuting any claim against Presstek, Silver or their respective affiliates or agents, other than claims on account of Assumed Liabilities, to recover on any claim such person had, has or may have against the Sale Debtors, their estates or the Assets relating to the ownership, use and/or operation of the Assets prior to the effective date of the Sale.

11.     Except for obligations of the Sale Debtors to pay the cure amounts as set forth in the Schedule of Cure Amounts, or any amendments thereto, each non-Debtor party to an Assumed Seller Contract is hereby forever barred, estopped, and permanently enjoined from

11

asserting against the Sale Debtors, Presstek, and/or Silver any defaults or additional amounts existing as of the Closing whether disclosed or undisclosed, whether known or unknown, and such non-Debtor parties are also forever barred, estopped, and permanently enjoined from asserting against Presstek and/or Silver any counterclaim, defense, setoff, or any other claim or defense assertable against the Sale Debtors.

12.    To the extent permitted by law, except for Assumed Liabilities, none of Presstek, Silver or any of their respective affiliates shall be liable, either directly or indirectly, as successor, transferee or otherwise, for any liabilities of the Sale Debtors or any of their affiliates (whether under federal or state law or otherwise) as a result of the sale of the Assets.

13.    There shall be no rent accelerations, assignment fees, increases or any other fees charged to Silver or any of its affiliates or designees as a result of Sale Debtors' assumption or assignment to Silver of the Assumed Seller Contracts, and the validity of such assumption or assignment shall not be affected by any dispute between the Sale Debtors or any of their affiliates and any counterparty to any Assumed Seller Contract, and the Assumed Seller Contracts, upon assignment to Silver, shall be deemed valid and binding and in full force and effect in accordance with their terms, and any anti-assignment provision of any of the Assumed Seller Contracts is unenforceable pursuant to section 365(e) and (f) of the Bankruptcy Code. There are no defaults under the Assumed Seller Contracts except as specified in the Schedule of Cure Amounts.

14.    The transactions contemplated by the Asset Purchase Agreement have been undertaken by Presstek and Silver and Paragon and the Sale Debtors at arm's-length and without collusion, and Presstek and Silver will acquire the Assets pursuant to the Asset Purchase Agreement and the Disposition Documents, in good faith within the meaning of section 363(m)

12

of the Bankruptcy Code, and Presstek and Silver are entitled to all of the protections in accordance therewith. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the transactions contemplated by the Asset Purchase Agreement shall not affect the validity of the sale of the Assets, unless such authorization is duly stayed pending such appeal.

15.     The consideration provided by Silver for the Assets under the Asset Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

16.     The so-called "bulk-sale" laws in all applicable jurisdictions in the United States are waived or inapplicable as to the transactions contemplated by the Asset Purchase Agreement, and such transactions are hereby deemed to be under or in contemplation of a plan to be confirmed under section 1129 of the Bankruptcy Code.

17.     The provisions of this Order are non-severable and mutually dependent.

18.     This Order and all provisions of the Disposition Documents shall be binding upon any successors and assigns of Paragon and the Sale Debtors, including without limitation, any trustee, receiver, or examiner in these chapter 11 cases or in any superseding proceedings under chapter 7 of the Bankruptcy Code.

19.     Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases or any order of this Court confirming such plan or any other order entered in these chapter 11 cases shall conflict with or derogate from the provisions of the Asset Purchase Agreement, to the extent modified by this Order, or the terms of this Order.

20.     The Asset Purchase Agreement, the Disposition Documents, or any other instruments delivered in connection with the consummation of the transactions contemplated by

13

the Asset Purchase Agreement may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors or their estates.

21.    The failure specifically to include any particular provisions of the Asset Purchase Agreement or the Disposition Documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement or the Disposition Documents be authorized and approved in their entirety.

22.    To the extent of any inconsistency between the provisions of the Asset Purchase Agreement, any documents executed in connection therewith, and this Order, the provisions contained herein shall govern.

23.    This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6006(d), 7062 or otherwise.

24.    To the extent not withdrawn, or rendered moot by the provisions contained herein, all objections to the Motion, if any, are overruled.

25.    The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe and enforce the provisions of the Asset Purchase Agreement and the Order in all respects and, further, to hear and determine any and all disputes between the Paragon, the Sale Debtors and/or Presstek and Silver, as the case may be, and any non-seller party to, among other things, any Assumed Seller Contracts, concerning inter alia, the Sale Debtors' assignment thereof to Silver under the Asset Purchase Agreement of any Assets, and any claims against the Sale Debtors arising under any agreements relating to Excluded Liabilities and any dispute

14

A- 0491

between Silver and the Sale Debtors as to their respective obligations with respect to any asset or

liability of or claim against the Sale Debtors or otherwise arising hereunder.

Dated: November 3, 2004
        Wilmington, Delaware

UNITED STATES BANKRUPTCY JUDGE

15



EXHIBIT "A"

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                      )
                            )
A.B. DICK COMPANY, et al., ) Case No. 04-12002(CGC)
                            )
        Debtors.            )


Jaspan Schlesinger Hoffman LLP
913 Market Street — 12th Floor
Wilmington, Delaware

Monday, November 1, 2004
4:50 p.m.


-- TRANSCRIPT OF AUCTION PROCEEDINGS --


WILCOX & FETZER
1330 King Street — Wilmington, Delaware  19801
(302) 655-0477

2

1           MR. SCHWARTZ:  This auction proceeding is

2    commenced pursuant to amended order, A, approving bidding

3    procedures for the sale of substantially all of the

4    assets of ABD Company and its wholly-owned subsidiaries;

5    B, authorizing payment of an expense reimbursement and

6    termination fee; C, setting sale hearing date; and, D,

7    approving form of notice that was entered by the Court on

8    or about September 15th, 2004.

9            For the record, I am H. Jeffrey Schwartz

10   from Benesch, Friedlander, Coplan & Aronoff, counsel —

11          A VOICE:  Could you speak up?  It's hard to

12   hear you on the conference bridge.

13          MR. SCHWARTZ:  Okay.  I'll get closer to the

14   speaker.

15          A VOICE:  Thank you.

16          MR. SCHWARTZ:  H. Jeffrey Schwartz from

17   Benesch, Friedlander, Coplan & Aronoff, counsel to the

18   debtors-in-possession.

19          Also here from Benesch Friedlander are

20   Mark Phillips.  And participating telephonically from

21   Benesch Friedlander are Greg Gale and — anyone else,

22   Greg?

23          MR. GALE:  John Gambaccini and

24   Michael Zaverton.

3

1          MR. SCHWARTZ:  And also on behalf of the

2     debtors-in-possession, we have the corporate secretary,

3     Jeffrey Herden, H-E-R-D-E-N.

4               We have from Candlewood Partners

5     Glenn Pollack and Lynn, L-Y-N-N, Carpenter.

6               We have the chief restructuring officer,

7     Stephen Gray, from The Recovery Group and John Calabrese

8     from The Recovery Group.

9               And that's everybody on behalf of the

10    debtors --

11              A VOICE:  Hello?  You're still drifting in

12    and out.  I'm sorry.

13              MR. SCHWARTZ:  Okay.  That's everyone for

14    the debtors-in-possession.

15              For the creditors' committee, Jim you want

16    to identify yourself?

17              MR. RICCIARDI:  James Ricciardi of McGuire

18    Woods.

19              MR. SCHLERF:  Also, Jeffrey Schlerf from

20    The Bayard Firm.

21              MR. RICCIARDI:  Jeffrey Schlerf of

22    The Bayard Firm also with us.

23              MR. SCHWARTZ:  And for KeyBank?

24              MR. FOLLAND:  This is Robert Folland of

4

1    Thompson Hine on behalf of secured creditor KeyBank, N.A.

2              MR. SCHWARTZ:  Okay.  And on behalf of

3    Presstek, we have present...

4              MR. MOOSA:  Moosa E. Moosa.

5              MR. SCHWARTZ:  And we have as well...

6              MR. SCAFIDE:  James Scafide, corporate

7    counsel.

8              MR. SCHWARTZ:  And we have participating

9    telephonically on behalf of Presstek two gentlemen from

10   the McDermott, Will & Emery firm.

11             Gentlemen, if you could, please, identify

12   yourselves for the record?

13             MR. EGAN:  John Egan.

14             MR. SLATTERY:  Lawrence Slattery.  And also

15   with me is Gary Ravert, R-A-V-E-R-T.

16             MR. GOLDSMITH:  And also Jim Goldsmith.

17             MR. SCHWARTZ:  That's it on behalf of the

18   McDermott Will attorneys participating telephonically?

19             A VOICE:  Yes.

20             MR. SCHWARTZ:  So we have also...

21             MS. KOWALCZYK:  Noelle Kowalczyk on behalf

22   of the MHR entities.

23             MR. SCHWARTZ:  Okay.  And anyone else on

24   behalf of MHR entities participating?

5

1          MS. KOWALCZYK:  No.

2          MR. SCHWARTZ:  Alan, do you want to identify

3    the Comvest parties?

4          MR. KADISH:  Alan Kadish, K-A-D-I-S-H,

5    Greenberg Traurig in New York.

6          On the line also is a principal of Comvest,

7    Carl Kleidman.

8          Carl, why don't you identify yourself by

9    voice?

10          MR. KLEIDMAN:  Hi, everyone.  It's

11    Carl Kleidman.  Last name is K-L-E-I-D-M-A-N.  And I'm

12    one of the partners at Comvest.

13          MR. SCHWARTZ:  Okay.  Is there anyone

14    present in the room or present telephonically who has not

15    identified him or herself?

16          MR. McCARTHY:  Yes.  Michael McCarthy,

17    Presstek.

18          MR. SCHWARTZ:  Thank you.

19          Okay.  At this time, the debtors understand

20    that Presstek has improved its bid.  So at this time, I

21    would ask a representative of Presstek to read into the

22    record with some specificity --

23          MS. KOWALCZYK:  Jeffrey, before we do that,

24    can I put a statement on the record?

6

1          MR. SCHWARTZ:  Sure.

2          MS. KOWALCZYK:  Thank you.

3          This is Noelle Kowalczyk on behalf of

4   MHR Capital Partners, MHR Institutional Partners, MHRM LP

5   and MHR Fund Management.

6          I would like to state on the record that the

7   MHR entities oppose the board's decision to proceed with

8   the auction of ABD's assets today.  The MHR entities

9   believe that to do so will result in ABD's assets being

10   purchased by Presstek under the terms of the July 13th,

11   2004 asset purchase agreement.

12          As many of you know, the asset purchase

13   agreement intentionally releases and forever extinguishes

14   the only significant asset available for the satisfaction

15   of the unsecured creditors' claims; that is, the debtors'

16   breach of contract action against Presstek under the

17   terms of the June 16th, 2004 stock purchase and escrow

18   agreements.

19          In light of this fact, the MHR entities

20   believe that to proceed is in blatant violation of ABD's

21   and Paragon's fiduciary obligations to the creditors.

22          As you know, offers to purchase ABD's assets

23   have been received from two additional bidders:  Comvest

24   and Harbor.  Our analyses indicate that neither the

7

1    debtors nor debtors' secured creditors will suffer any

2    prejudice from adjourning the auction for a reasonable

3    period of time for negotiation with Comvest and/or

4    Harbor.

5        The MHR entities remind each and every one

6    of you that each board member owes a fiduciary duty to

7    seek and approve a plan or sale that would achieve the

8    greatest value for the debtors' estates and, thus,

9    maximize the value ultimately distributed among the

10   debtors' creditors.

11       A sale to Presstek in no way furthers this

12   goal.  And the MHR entities urge you to reconsider your

13   decision to proceed with the auction today.

14       Thank you.

15       MR. SCHWARTZ:  Thank you for your statement.

16       For the record, the debtors-in-possession

17   disagree with that statement in general and in each of

18   its particulars, and will not state anything further.

19       At this point, the debtors-in-possession

20   request that Presstek put into the record with

21   specificity the improvements that it is offering the

22   estate with respect to the stalkinghorse bid as defined

23   in the order.

24       MR. SCAFIDE:  This is Jim Scafide for

8

1  Presstek.  There are three components to the modification
2  of our bid.  The first is that a closing be effective as
3  of 11:59 Friday, November 5th.  That is to coincide with
4  payroll.

5          The second item is to remove from the estate
6  the responsibility of curing all contracts, with the
7  exception of certain leases that have been provided by
8  the company with a total liability not to exceed
9  $500,000.  That is to say that only $500,000 will remain
10  with the estate in those obligations.

11          And the third is, as identified by the
12  debtor-in-possession, the medical trail liabilities for
13  current employees will be assumed by Presstek as well.

14          MS. KOWALCZYK:  What's the dollar value on
15  that?

16          MR. SCAFIDE:  As listed -- Glenn, what was
17  that document called?  What is this document called?

18          MR. POLLACK:  Presstek bid analysis.

19          MR. SCAFIDE:  The Presstek bid analysis
20  document estimate --

21          MR. SCHWARTZ:  Which has been provided to
22  MBR and the committee and Key on Friday, last Friday,
23  October 29th.

24          MR. POLLACK:  1.65 million.

9

```
 1              MR. SCAFIDE:  Thank you.
 2              MR. SCHWARTZ:  We're going to go off the
 3    record for one second.
 4              (Discussion was held off the record.)
 5              MR. SCAFIDE:  Apparently there's a fourth
 6    item.  I misspoke.  There's a fourth item.  Inclusion of
 7    prepaid inventory deposits in full in the calculation of
 8    working capital required in the net working capital test
 9    included in the APA.
10              MR. SCHWARTZ:  Off the record for a second.
11              (Discussion was held off the record.)
12              MR. SCHWARTZ:  Are there any other items --
13    I'm asking Mr. Pollack.  Any other items that the
14    debtors-in-possession understand to be included in the
15    improvements made by Presstek to the stalkinghorse bid?
16              MR. POLLACK:  The only clarifying comment is
17    that the executory contracts are still to be assumed and
18    assigned with Presstek being responsible for the cures,
19    other than the 500,000 Mr. Scafide mentioned.
20              MR. SCAFIDE:  There may be some contracts
21    that are not assigned.  But that won't affect the
22    liability of the estate.
23              MR. POLLACK:  Okay.  That's it.
24              MR. SCHWARTZ:  So for the record, just --
```

10

1    for example, with respect to the Oji contract — what's

2    the full name of that contract?

3              MR. GRAY:  Oji, O-J-I.

4              You do understand that the Oji contract --

5    Oji has denied the extension of exclusivity in that

6    contract?

7              MR. SCHWARTZ:  And that it's Presstek's sole

8    responsibility any payment thereunder...

9              MR. SCAFIDE:  Yes.

10             MR. SCHWARTZ:  Let the record reflect

11   Mr. Scafide's acceptance of that.

12             MR. GRAY:  We can't assume and assign that.

13             MR. SCHWARTZ:  That's understood.

14             MR. GRAY:  Then we have the accounting and

15   foreign consent issues for closing.  We ought to have

16   that on the record.

17             There was the outstanding issue as to

18   whether the accounting -- the required accounting by

19   Ernst & Young and Troy & Orleans that are required in the

20   APA --

21             MR. SCHWARTZ:  The financial review --

22             MR. GRAY:  -- for closing financial review

23   of the '03 numbers and the -- I'm sorry.  Finalizing the

24   '03 audit and the review of the 9/30/04 numbers as to

11

1  whether or not that can be accomplished by Friday and

2  whether you will close with that not accomplished on

3  Friday.

4          MR. SCHWARTZ:  So the question is, are you

5  waiving that requirement under the APA to effect a

6  closing on Friday?

7          MR. SCAFIDE:  One moment.

8          MR. POLLACK:  Excuse me.  While you're

9  considering that, the other issue is that all of the

10 foreign -- it's unlikely that all of the foreign

11 consents --

12         MR. SCAFIDE:  We think we worked through

13 that.

14         MR. POLLACK:  Okay.

15         MR. SCHWARTZ:  Off the record.

16         (Discussion was held off the record.)

17         MR. SCAFIDE:  Could you restate the

18 question?

19         MR. SCHWARTZ:  The question is with regard

20 to the financial review required under the APA, is

21 Preastek waiving that in connection with a November 5th

22 or thereabouts closing?

23         MR. SCAFIDE:  We're willing to make this a

24 post closing condition provided we're given adequate

12

1  assurances that it will be provided within a reasonable

2  amount of time.

3          MR. MOOSA:  We had a discussion with the CFO

4  at the debtor company, and it seems to me that it should

5  not be a problem in terms of getting the financial --

6          A VOICE:  Gentlemen, the folks in Delaware,

7  if you guys don't talk directly into the bridge, those of

8  us on the call can't hear.

9          MR. MOOSA:  Our discussion with the CFO at

10  A.B. Dick indicates that they're likely to get these

11  financials in place by Friday.  If it's not, then we

12  would revert to --

13          MR. SCHWARTZ:  So that for purposes of the

14  auction, is it correct to state that Presstek is willing

15  to waive the condition that the financial review be

16  completed in a satisfactory manner on or about November

17  5th provided that on or about November 5th it receives

18  reasonable assurances that such a review will be

19  completed in a timely manner?

20          MR. SCAFIDE:  Reasonable amount of time,

21  yes.

22          MR. GRAY:  Just to be clear, the '04 review

23  and the completion of the '04 audit?

24          MR. MOOSA:  Correct.

13

1          MR. HERDEN:  '03 audit.

2          MR. SCHWARTZ:  Thank you.

3          Mr. Pollack, any further...

4          MR. POLLACK:  Foreign consents.

5          MR. GRAY:  Or any consents.  Because we

6    might not have --

7          MR. SCAFIDE:  Yeah, I think we'll use the

8    same mechanism.  To the extent that they're non-material,

9    we'll certainly waive them.  We have to go through the

10   contracts and make a list.  We're doing that currently.

11   But I don't expect --

12         MR. POLLACK:  So could you possibly repeat

13   the same language and apply it to this?

14         MR. SCAFIDE:  To the extent that they're not

15   provided on or about November 5th, we would waive them,

16   provided that on or about November 5th we're provided

17   reasonable assurances that they'll be provided within a

18   reasonable amount of time.

19         MR. SCHWARTZ:  Well put.  Thank you.

20         MR. POLLACK:  Thank you.

21         MR. SCHWARTZ:  Does the committee wish to

22   make a statement at this time?

23         MR. RICCIARDI:  The committee has a question

24   at this time.  You said that the contracts which you

14

1   would be responsible for the cure of, that you would make

2   a decision about those contracts. And you would not

3   assume them all, but you would pay the cure costs above

4   500,000 on the ones you did assume. For how long are you

5   going to have to make that decision? Because

6   obviously --

7           MR. SCAFIDE: Tomorrow.

8           MR. RICCIARDI: Okay.

9           MR. SCAFIDE: By the close of business

10  tomorrow we'll have the list.

11          A VOICE: Whoever is speaking, you're

12  cutting out.

13          MR. SCAFIDE: By the close of business

14  tomorrow.

15          MR. SCHWARTZ: Jim, is that --

16          MR. RICCIARDI: Yes, because I wanted to

17  make sure we weren't going to have --

18          MR. SCHWARTZ: I understand. I want to make

19  sure the committee has a full and fair opportunity to ask

20  questions.

21          Mr. Folland, on behalf of KeyBank, do you

22  have any questions?

23          MR. FOLLAND: I do not have any questions at

24  this time. Thank you, gentlemen.

15

1        MS. KOWALCZYK:  No questions.

2        MR. SCHWARTZ:  Ms. Kowalczyk has no

3    questions.

4            Anybody on the phone have questions for

5    Presstek?

6            Any party in interest have questions for

7    Presstek?

8        MR. GALE:  This is Greg Gale.  In speaking

9    with Jim Goldsmith and John Egan earlier today, it was

10   mentioned to me that Presstek may require a transition

11   services agreement.  This is the first time that at least

12   I had heard the transition services agreement.  And I was

13   wondering if Presstek could comment on what they need?

14   And I want to make sure that there's no financial

15   commitment that is required of the estate after close.

16       MR. EGAN:  Greg, this is John Egan.  I

17   believe that's actually in the APA.

18       MR. SCHWARTZ:  So to the extent that a

19   transition services agreement is required, it is as

20   provided for in the APA and Presstek stands on that and

21   does not modify or amend that in any respect.

22       MR. SCAFIDE:  That is correct.

23       MR. SCHWARTZ:  At this time, then, I would

24   ask does any party wish to, likewise, modify its

16

1   indication of interest, expression of interest or the

2   like?

3           And I'm referring directly to the

4   representatives of Comvest and if there's a

5   representative of Harbor on the phone.  I'm also

6   directing that to the MHR entities' representative.

7           Since you're in the room, Ms. Kowalczyk,

8   would you care to comment?

9           MS. KOWALCZYK:  I think the statement I gave

10  at the beginning of the auction sets forth our position

11  adequately.

12          MR. SCHWARTZ:  So you're resting on that?

13          MS. KOWALCZYK:  Yes.

14          MR. SCHWARTZ:  Thank you.

15          Mr. Kadish, do you have any modification,

16  improvement on the indication of interest provided by

17  Comvest to the debtors-in-possession?

18          MR. KADISH:  I think for this moment we have

19  no change in our position.  I'll let Carl speak behind me

20  if he disagrees.  But I would hold open our expression of

21  interest notwithstanding the announcements made today.

22          Carl.

23          MR. KLEIDMAN:  I think that's correct.  You

24  know, I'd like to go on the record we are still very



17

1     interested in presenting a bid to the company.  We stand

2     ready and committed to move forward as expeditiously as

3     we can within the time frame that we had laid out, and to

4     be in a position to solidify our bid by the end of next

5     week.

6                    MR. SCHWARTZ:  On behalf of the

7     debtors-in-possession, we thank you for that statements.

8                    Any other party wishing to make -- I don't

9     know -- a statement on improving the bid or otherwise?

10                   Is there a representative from Harbor on the

11    phone?

12                   Hearing none --

13                   MR. EGAN:  Excuse me.  This is John Egan.

14                   Jim Scafide?

15                   MR. SCAFIDE:  Yes.

16                   MR. EGAN:  On the question of transition

17    services, I believe most of the stuff relating to office

18    space and leases is covered by the APA.  I think, as an

19    element of closing early on Friday, the one other aspect

20    was, if needed, I think we wanted to pursue getting

21    payroll and accounting services, but we would pay the

22    estate for those services at cost; is that correct?

23                   MR. SCAFIDE:  That's correct.

24                   MR. SCHWARTZ:  Thank you for that



18

1   clarification.

2           MR. SCAFIDE:  Just for purposes of

3   clarification, in addition to that, there may be other

4   personnel-related services that would also be paid to the

5   estate at cost.  We don't expect the estate to assume any

6   costs, any liabilities associated with the transition

7   services agreement.

8           MR. SCHWARTZ:  So, please, correct me if I'm

9   misstating this, but Presstek in its improvements to the

10  stalkinghorse bid is not imposing, does not purport to

11  impose any financial obligations on the

12  debtors-in-possession or their estates; is that correct?

13          MR. SCAFIDE:  That's correct.

14          MR. SCHWARTZ:  Thank you.

15          On behalf of the debtors-in-possession, I

16  hereby declare the Presstek bid as improved on the record

17  to constitute the prevailing bid as defined in paragraph

18  Romanette four on page 6 of the order -- the order being

19  a defined term of the order under which I convened this

20  auction.  And I hereby designate on behalf of

21  debtors-in-possession Presstek to be the prevailing

22  bidder.

23          And I state for the record that the

24  debtors-in-possession will proceed with the sale hearing

A- 0511


19

1   at 2:00 p.m. tomorrow as contemplated under the order.

2   And I hereby declare the auction proceedings to be

3   closed.   Thank you for your attendance.

4             (Proceedings concluded at 5:18 p.m.)

5

6                        -   -   -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

20

State of Delaware    )
                     )
County of New Castle )


C E R T I F I C A T E

     I, Patricia L. Shelton, Notary Public, do hereby

certify that the foregoing record, pages 2 to 19

inclusive, is a true and accurate transcript of my

stenographic notes taken on Monday, November 1, 2004, in

the above-captioned matter.

     IN WITNESS WHEREOF, I have hereunto set my hand

and seal this 2nd day of November, 2004, at Wilmington.



               Patricia L. Shelton
               Certification No. 104-RPR
               (Expires January 31, 2005)

# EXHIBIT "1"



**A.B.DICK.SCHEDULE G-Executory Contracts**
**CAPITAL LEASES**
**CURE AMOUNTS AS OF SEPTEMBER 25, 2004**

| Vendor Number | Name | Lease Number | Address | City | State | Zip | Cure Amount |
|---|---|---|---|---|---|---|---|
| MS2107 | Newcourt Leasing | 683278 707674 | 21146 Network Place | Chicago | IL | 60673 | $29,436.00 |
| 0385255 | CitiCapital | 0118288-000 | P.O. Box 8500-9805 | Philadelphia | PA | 19178 | $10,245.00 |
| I0B8 | IBM Corporation | 577249 | 91272 Collections Center Dr. | Chicago | IL | 60697 | $17,211.00 |
| H220 | Hewlett-Packard | 36854A 33357A | P.O. Box 403285 | Atlanta | GA | 30381 | $6,491.00 |
| 0622000 | OFC Capital | 0205093 0209013 0306023 | P.O. Box 530101, Dept. GA00010 | Atlanta | GA | 30353 | $35,796 |
| MS152 | Insight Global Finance | 180282-8 180282-5 | 21146 Network Place | Chicago | IL | 60673 | $39,360 |
| O207 | OFSI | 200-0591815-001 | Department AT 40302 | Atlanta | GA | 31182 | $4,630.00 |
| | | | | | | | $143,339.00 |

See Rider

## Real Estate Leases

| Location | Address | Lease Expiration Date | Cure Amount as of 9/25/04 |
|---|---|---|---|
| **Dist Ctrs:** | | | |
| IL | 201 Oakton<br>Des Plaines | 2/28/2005 | $ 74,203 00 |
| TX* | 2749 W. Airport Freeway<br>Irving | 3/31/2007 | $ - |
| PA | 1549 Bobali Dr.<br>Harrisburg | 12/31/2006 | $ 7,925 00 |
| CO | 2500 W. Eighth Ave.<br>Denver | 2/28/2005 | $ 6,734.00 |
| CA* | 4057 W. Shaw Ave., #110<br>Fresno 93722 | 7/31/2007 | $ - |
| **Field Service:** | | | |
| CA* | 2121 W. Crescent Ave.<br>Suite F<br>Anaheim 92801 | 11/30/2005 | $ - |
| CT | 329 Main St.<br>Unit 108<br>Yalesville 06492 | 12/31/2005 | $ 875.00 |
| HI | 98-029 Hekaha St.<br>Aiea 69701 | 12/31/2004 | $ 1,230.00 |
| MO | 914 S. Highway Dr.<br>Fenton 63026 | 12/31/2004 | $ 5,958.00 |
| IA | 2500 72nd St.<br>Des Moines 50322 | Month-to-Month | $ 561.00 |
| **IMG:** | | | |
| OH | 190 N. Union St., #300<br>Akron 44304 | 1/15/2006 | $ 2,859.00 |
| **Field Sales:** | | | |
| GA | 8810-A Medlock Bridge Rd.<br>Suite 205<br>Duluth 30097 (Southern Reg.) | 3/8/2004 | $ 1,100.00 |
| Total real estate leases cure amount | | | $ 101,245.00 |

* July 2004 rent checked cleared account before Chapter 11 filing



A.B. Dick Company
Operating Leases -- Machinery and Equipment

| Vendor | Item or Department | Lease # | Address1 | Address2 | City | ST | ZIP | pm | past |
|---|---|---|---|---|---|---|---|---|---|
| Assoc. Material Handling | Des Plaines | 850/15110 | 1830 W. Hawthorne Lane | 550 Forbes Blvd. | Carol Stream | IL | 60185-1835 | 2059 | 1456 |
| Chicagoland Mat. Handling | Des Plaines | 41670012 | 1830 W. Hawthorne Lane | | West Chicago | IL | 60185 | 680 | 680 |
| Chicagoland Mat. Handling | Des Plaines | 42070613 | 1830 W. Hawthorne Lane | | West Chicago | IL | 60185 | 680 | 680 |
| Chicagoland Mat. Handling | Des Plaines | 81070303 | 1830 W. Hawthorne Lane | | West Chicago | IL | 60185 | 680 | 680 |
| Chicagoland Mat. Handling | Des Plaines | 81072004 | 1830 W. Hawthorne Lane | | West Chicago | IL | 60185 | 680 | 680 |
| Chicagoland Mat. Handling | Des Plaines | 81072005 | 1830 W. Hawthorne Lane | | West Chicago | IL | 60185 | 417 | 947 |
| Chicagoland Mat. Handling | Dista | 43962248 | 1830 W. Hawthorne Lane | | West Chicago | IL | 60185 | | |
| Citicorp Leasing Inc | Des Plaines | 496510 | | P.O.Box 6500-4618 | Philadelphia | PA | 19178-5206 | 1113 | 1112 |
| Citicorp Leasing Inc | Des Plaines | 496158 | | P.O.Box 6500-4618 | Philadelphia | PA | 19178-5206 | | 1094 |
| Citicorp Vendor Finance | 2 Canon (R2200's) | 3028371 | | P O BOX 7247-0322 | Philadelphia | PA | 19170-0322 | 534 | 1073 |
| Citicorp Vendor Finance | Canon (R3300/R3100) | 3038574 | | P O BOX 7247-0322 | Philadelphia | PA | 19170-0322 | 1008 | 4544 |
| Citicorp Vendor Finance | C 5 Canon (R3300's) | 3038370 | | P O BOX 7247-0322 | Philadelphia | PA | 19170-0322 | 4476 | 8852 |
| Citicorp Vendor Finance | 2 Canon (R420's) | 3034578 | | P O BOX 7247-0322 | Philadelphia | PA | 19170-0322 | 1641 | 3703 |
| Citicorp Vendor Finance | 3 Canon (R420's) | 3034572 | | P O BOX 7247-0322 | Philadelphia | PA | 19170-0322 | 1099 | 2327 |
| Citicorp Vendor Finance | Ricoh Copier at IMD | 3071831 | | P O BOX 7247-0322 | Philadelphia | PA | 19170-0322 | 378 | 378 |
| Fleet Capital Leasing | Panasonic Faxes | 007-1104035-000 | | P O BOX 371992 | Pittsburgh | PA | 19290-7092 | 0 | 3321 |
| Forklifts Inc. | Harrisburg | 004715 | | 741 Independence Avenue | Mechanicsburg | PA | 17055 | 82 | 481 |
| Forklifts Inc. | Harrisburg | 004716 & later | | 741 Independence Avenue | Mechanicsburg | PA | 17055 | 82 | 441 |
| Financorp-Polydial Ins. | Inwood | 295164 | | P.O. Box 40233 | Carol Stream | IL | 60185 | | 8317 |
| Hewlett Packard Finance | Computer- BUG - CO/G3 | 5001253.3 | | 21719 NETWORK PLACE | Chicago | IL | 32333-0101 | 3929 | 7656 |
| Insight Global Finance | Computers and Equipment | 155252 | | 21719 NETWORK PLACE | Chicago | IL | 60674-1311 | 4518 | 8524 |
| Insight Global Finance | Computers and Equipment | 155252 | | 21719 NETWORK PLACE | Chicago | IL | 60674-1311 | 1942 | 3744 |
| Insight Global Finance | Computers and Equipment | 155253 | | 21719 NETWORK PLACE | Chicago | IL | 60674-1211 | 3736 | 5299 |
| Insight Global Finance | Computers and Equipment | 155253 | | 21719 NETWORK PLACE | Chicago | IL | 60674-1211 | | 755 |
| Insight Global Finance | Marketing | 0052409-001 | | P.O. Box 1310-0310290 | Philadelphia | PA | 19101-3534 | 378 | 4700 |
| Matrix Leasing | Hitachi RoAd bearing | 0101-043 | DEPT GA03010 | | Alberta | GA | 32343-0101 | | 4650 |
| OFC Crystal | Computers | 0205092 | c/o A&I Financial | P O BOX 530150 | Roswell | GA | 32276 | | 27100 |
| OFC Crystal | Europage Systems | 0206007 | c/o A&I Financial | 575 Colonial Park Drive | Roswell | GA | 32343-0101 | | 750 |
| PBCC | US Office Solutions | 02022021 | DEPT GA03010 | P O BOX 530150 | Alberta | GA | 32343-0101 | | |
| PBCC | Mail Room Equipm'l | 51162232 | | P O BOX 850400 | LOUISVILLE | KY | 40285-0490 | 1248 | 447 |
| PBCC | Mail Room Equipm'l | 51162232 | | P O BOX 850400 | LOUISVILLE | KY | 40285-0490 | 1243 | |
| PBCC | Anaheim, CA | 5384734 | | P O BOX 850400 | LOUISVILLE | KY | 40285-0490 | 2085 | 447 |
| PBCC | Mailing - East Sales | 4355672 | | P O BOX 850400 | LOUISVILLE | KY | 40285-0490 | 192 | 354 |
| PBCC | Mailing - IMD * | 5334848 | | P O BOX 850400 | LOUISVILLE | KY | 40285-0490 | 200 | 379 |
| Pitney Bowes Inc. | Mailing - Eastern Service | 1164218968 renew each quarter | | P O BOX 850400 | LOUISVILLE | KY | 40285-0490 | 250 | 0 |
| | | | | | | | | 54 | |

**RIDER TO EXHIBIT 1**

In addition to the Cure Amounts set forth in Exhibit 1 attached hereto, the Debtors, subject to the aggregate cap of $500,000 set forth herein, shall pay all post-petition amounts due (such amounts to be determined after giving effect to any credits under the Assumed Leases and any right of setoff of the Debtors) under the Assumed Leases as of the closing of the Sale, with Presstek and/or Silver responsible to pay all such amounts in excess of the aforementioned cap of $500,000; provided, however, that liability for rent under the Assumed Leases shall be pro rated between the Debtors and Presstek and/or Silver based on the actual date of the closing of the Sale.