# Tab 11

1

2  UNITED STATES BANKRUPTCY COURT
   DISTRICT OF DELAWARE

3

4  IN RE:                        .        Chapter  11
                                 .
5  A.B. Dick Company, Inc.,      .
                                 .
6        Debtor(s).              .        Bankruptcy #04-12002 (JLP)

   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

7

                          Wilmington, DE
8                         November 17, 2004
                          11:30 a.m.

9
                   TRANSCRIPT OF TELEPHONE CONFERENCE
10       BEFORE THE HONORABLE JOHN L. PETERSON
                UNITED STATES BANKRUPTCY JUDGE

11

12  APPEARANCES:

13  For the Debtor(s):            Frederick B. Rosner, Esq.
                                  Jaspan Schlesinger Hoffman, LLP
14                                1201 North Orange Street-Ste. 1001
                                  Wilmington, DE 19801

15
                                  H. Jeffrey Schwartz, Esq.
16                                Benesch Friedland Coplan
                                  & Aronoff, LLP
17                                2300 BP Tower
                                  200 Public Square
18                                Cleveland, OH 44114

19                                John Gleason, Esq.
                                  Benesch Friedland Coplan
20                                & Aronoff, LLP
                                  88 E. Broad St.-Ste. 900
21                                Columbus, OH 43215

22  For The Official Committee:  James P. Ricciardi, Esq.
    of Unsecured Creditors        McGuire Woods, LLP
23                                77 West Wacker Drive-Ste. 4100
                                  Chicago, IL 60601

24

25



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



2

|   |   |
|---|---|
| 1 | Ronald W. Crouch, Esq. |
| 2 | McGuire Woods, LLP |
|   | Dominion Tower |
| 3 | 625 Liberty Ave.-23rd Fl. |
|   | Pittsburgh, PA 15222 |
| 4 | Jeffrey Schlerf, Esq. |
|   | The Bayard Firm |
| 5 | 222 Delaware Ave.-Ste. 900 |
|   | Wilmington, DE 19801 |

```
1                                Ronald W. Crouch, Esq.
                                 McGuire Woods, LLP
2                                Dominion Tower
                                 625 Liberty Ave.-23rd Fl.
3                                Pittsburgh, PA 15222

4                                Jeffrey Schlerf, Esq.
                                 The Bayard Firm
5                                222 Delaware Ave.-Ste. 900
                                 Wilmington, DE 19801
6
    For MHR Entities:            Megan N. Harper, Esq.
7                                Landis Rath & Cobb, LLP
                                 919 Market Street
8                                Wilmington, DE 19899

9   For Key Bank:                Jami Nimeroff, Esq.
                                 Buchanan Ingersoll, PC
10                               The Nemours Building
                                 1007 North Orange Street-Ste. 1110
11                               Wilmington, DE 19801

12                               Robert Folland, Esq.
                                 Thompson Hine, LLP
13                               3900 Key Center
                                 127 Public Square
14                               Cleveland, OH 44114

15  For Presstek, Inc.:          Stephen B. Selbst, Esq.
                                 McDermott Will & Emery
16                               50 Rockefeller Plaza
                                 New York, NY 10020
17
    For Mitsubishi:              Thomas G. Whalen, Jr., Esq.
18                               Stephens & Lee, PC
                                 300 Delaware Ave.-Ste. 800
19                               Wilmington, DE 19801

20                               Robert Lapowsky, Esq.
                                 Stephens & Lee, PC
21                               1818 Market Street-29th Fl.
                                 Philadelphia, PA 19103
22
    For Esko Graphics, Inc.:     Christopher D. Loizides, Esq.
23                               Loizides & Associates
                                 1225 King Street
24                               Wilmington, DE 19801

25  Audio Operator:              Brandon J. McCarthy
```

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-389-0191



A- 0691



3

| 1 | Transcribing Firm: | Writer's Cramp, Inc. |
|---|---|---|
| 2 | | 6 Norton Rd. |
| | | Monmouth Jct., NJ 08852 |
| 3 | | 732-329-0191 |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

4

```
 1                          Index
                                           Further
 2                  Direct Cross Redirect Recross Redirect

 3   Witnesses For
       Presstek:

 4     Mr. Gray
 5     (by Mr. Selbst)      16
       (by Mr. Crouch)           33

 6

 7   EXHIBITS:                          Marked   Received

 8     P-1    Asset Purchase Agreement      *       24
       P-1A   Private Label Sales Agreement 22      23
 9     P-2    First Amendment to APA        *       24
       P-3    Second Amendment to APA       *       24
10     P-4    August 23rd Transcript        *
       P-5    Sale Order                    *       24
11     P-6    Order of 11/23 Sale           *       24

12
     Opening Statements:
13
       by Mr. Lapowsky        6
14     by Mr. Ricciardi       9
       by Mr. Gleason        11
15     by Mr. Selbst         13

16

17   THE COURT: Finding      36

18

19   * Marked at previous hearing

20

21

22

23

24

25
```

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-389-0191

A- 0693

5

1    (Proceeding in progress)

2        THE COURT:  -- 02.  I'll have the counsel state their

3    appearances for the record please.

4        MR. ROSNER:  Good morning, Your Honor.  This is Fred

5    Rosner with Jaspan Schlesinger Hoffman, Delaware counsel to the

6    Debtors.  And on behalf of everyone in the Court, we thank Your

7    Honor for agreeing to hear the three motions on an emergency

8    basis.  We do have the three motions and they appear in the

9    agenda in the chronological order which they were filed.  Let

10   me advise the Court that the Mitsubishi Motion, which is item

11   #1, counsel is present and prepared to go forward.  They've

12   indicated they do not have a witness but, of course, they

13   reserve all rights.  The second motion is by Presstek.

14   Presstek will have one witness, Mr. Stephen Gray, who is the

15   Debtor's chief restructuring officer and was retained.  Mr.

16   Gray is with The Recovery Group, also known as TRG.  The third

17   motion is by the Creditors' Committee.  The Creditors'

18   Committee may have one witness on the issue of access to books

19   and records now in possession of Presstek.  And I believe the

20   parties would proceed in the order presented by the agenda,

21   but of course we'll defer to the Court.  If the Court would

22   like to hear the motions in a different order, that's our

23   pleasure.

24       THE COURT:  All right.  Next?

25       MR. ROSNER:  So we'll proceed, Your Honor -- we'll

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-929-0191

A- 0694

1  proceed in the order on the agenda?

2      THE COURT:  That's right.

3      MR. ROSNER:  Okay, thank you, Your Honor.  I'm going

4  to cede the podium now.  And just a reminder to all counsel and

5  to witnesses to speak loudly and clearly into the microphone so

6  the Court can --

7      THE COURT:  Where's the witness going to sit?

8      MR. ROSNER:  The witness stand.  Your Honor -- would

9  sit at the witness stand and, you know, be sworn --

10     THE COURT:  I think maybe it would be better for me

11 for hearing this thing that the witness take -- sit up at the

12 Bench.

13     MR. ROSNER:  Sit at the bench?  Okay.  The witness

14 (indiscern.) mic but will sit at the Bench?  Okay.  That's

15 fine, Your Honor.  We'll do that.  Okay, let me cede the podium

16 to counsel to Mitsubishi.

17     MR. LAPOWSKY:  Good morning, Your Honor.  This is

18 Robert Lapowsky from Stephens & Lee.  I'm counsel to

19 Mitsubishi, and I asked to go first because Mitsubishi really

20 doesn't have a position on any of the motions that are before

21 you today that relate to the pipeline inventory.  We view

22 ourselves, really, more as a stakeholder.

23     THE COURT:  All right.

24     MR. LAPOWSKY:  But I did want to just clarify a couple

25 of things for the record.  It is Mitsubishi's position that it

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

1  currently owns all of the pipeline inventory.  And if we can be

2  comfortable that there's been a valid exercise of the election,

3  then Mitsubishi is ready, willing, and able to perform under

4  the agreement, the post-petition agreement.  There was an issue

5  raised by the Debtor -- or by Presstek in its papers as to

6  whether we were disputing the authority of Mr. Herdon to have

7  made the election.

8          THE COURT:  Yes.

9          MR. LAPOWSKY:  And we don't dispute that Mr. Herdon's

10  authority -- Mr. Schwartz, A.B. Dick's lawyer has sent me an

11  email confirming that Mr. Herdon is an officer of A.B. Dick, so

12  we don't have an issue as to whether Mr. Herdon is an

13  authorized representative of A.B. Dick.  The only real issue

14  that we see is whether any officer of A.B. Dick is authorized

15  to exercise the election without a Court order.  And that's an

16  issue that was raised by the Committee, not by us.  The Debtor

17  and Presstek are taking the position that this is an ordinary

18  course act and does not require any Court approval.  And

19  Presstek has threatened to sue Mitsubishi if it doesn't

20  perform.  The Committee has taken the position that it's not

21  ordinary course and that the election is invalid, and so that

22  if Mitsubishi were to perform, Mitsubishi would be exposing

23  itself to potential liability for the refund.  So Mitsubishi

24  finds itself smack in the middle, and we are really just

25  seeking direction as to what we should be doing.

8

1    Judge, I see three possible ways that this could come out.
2    One is that if you agreed with the Committee, that would be
3    relatively simple because then the election period would have
4    expired and we would know what we had to do.  If you conclude
5    that the act was either ordinary course or if wasn't ordinary
6    course that it's nonetheless going to be approved under a 363
7    standard, then all we would ask, Your Honor, is that the order
8    be specific in ways that would protect Mitsubishi.  And by
9    that, what I mean is that the order should specify that we're
10   authorized to -- not only the election is valid but that we're
11   authorized to deliver the goods to Presstek rather than to the
12   Debtor.  There'd be a waiver of the 10-day waiting periods
13   under 6004(g) and 7062 to the extent any of those would be
14   applicable, because I'm sure that Presstek, under those
15   circumstances, would want the product delivered immediately and
16   would not want to have to wait the appeal period.  And to the
17   extent that it was ever later determined that Mitsubishi did
18   have some obligation for the refund that it obtain an indemnity
19   from Presstek who would have, at that point, gotten the goods
20   and gotten the credit for the deposit.
21        Your Honor, that, really, is our position, and we do not
22   intend to call any witnesses or to take any positions.  Thank
23   you.
24        THE COURT:  All right.  The Unsecured Creditors'
25   Committee?

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-329-0191

A- 0697

1    MR. RICCIARDI:  Your Honor, James Ricciardi, of

2  McGuire Woods for the Unsecured Creditors' Committee.  I'm

3  joined here today by my partner, Ron Crouch, and also by Jeff

4  Schlerf from the Bayard Firm.  Your Honor, the Committee

5  believes the issues raised by Mitsubishi's Motion for an Order

6  determining rights to certain pipeline inventory are simple,

7  not complex as Presstek would have you believe.  It is

8  undisputed that Presstek did not take an assignment of the

9  post-petition agreement.  There are certain commercial burdens

10  that we presume they wanted to avoid in that agreement, such as

11  minimum selling quantities and minimum inventory levels.  It is

12  undisputed that only the Debtors could elect to take the

13  pipeline inventory.  It is undisputed that if the election was

14  invalid, it has now expired as of 11:59 p.m. on November 15th,

15  2004.  It is undisputed that if the election was not made

16  A.B.D. will have certain refund rights from Mitsubishi, perhaps

17  for a sum of up to $2.5 million.  It is undisputed that

18  Presstek will pay the Debtors nothing if the election is

19  exercised.

20     So what is in dispute?  The dispute concerns whether the

21  Debtors, whose only business is the business of liquidating

22  their assets, can make an election under a contract of which

23  Presstek refused to take an assignment that allows Presstek to

24  cherry-pick the pipeline inventory benefit from that A.B. Dick

25  contract without having accepted any of the other burdens of

10

1   that contract.  The District of Delaware was faced with a very

2   similar situation, Your Honor, in the Cell Net case that we

3   cited to in our papers.  And if I might quote the District

4   Court there, at page 593, "Because the right to receive

5   royalties arises only from those license agreements,

6   Schlumberger's exclusion of the license agreements includes the

7   right to receive royalties thereunder."  In other words, an

8   asset buyer who bought substantially all of the assets and

9   excluded one contract is not entitled to any benefits under

10  that contract.

11       In addition, Your Honor, with regard to ordinary course of

12  business, many Courts have held that after the sale of an

13  operating business, almost no material transactions meet the

14  ordinary course of business test and there is a string of cases

15  beginning with In Re: Drexxel Burnam, 112 Bankruptcy Reporter

16  584, that's the Bankruptcy Court for the Southern District of

17  New York in 1990; In Re: C.E.N. Incorporated, 86 Bankruptcy

18  Reporter 303 at pages 305 to 306.

19       Furthermore, Your Honor, since this attempt at cherry-

20  picking works a forfeiture of the Estate's rights to a material

21  refund, it should need to comply with section 554, the section

22  on abandonment, as well.  The Court, I think, can understand if

23  the Committee is unimpressed by Presstek's promise to make it

24  whole if Presstek's view of the law is held to be erroneous in

25  some future proceeding.  Given that Court approval was not

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-929-0191

1  obtained under either 363 or 554 and that the election option

2  has now expired, we ask the Court to order Mitsubishi to act in

3  accordance with its termination obligations under the post-

4  petition agreement and to order Presstek to cease interfering

5  with A.B. Dick's contractual rights with Mitsubishi.  Thank

6  you, Your Honor.

7          THE COURT:  Thank you.  Who's next?

8          MR. GLEASON:  Good morning, Your Honor.  John Gleason

9  from Benesch Friedland Coplan and Aronoff on behalf of the

10  Debtors.  And with me is Jeffrey Schwartz, my partner, as well

11  as Mr. Rosner who spoke earlier.  Your Honor, although the

12  Debtors appreciate and applaud the Committee's desire and

13  attempts to augment the Estates in these cases, the Debtors are

14  bound to use their best efforts to consummate the agreement

15  that they negotiated based upon the terms of that agreement and

16  their good faith understanding of the terms of that agreement.

17  To this end, Your Honor, the Debtors filed a statement this

18  morning which sets forth the Debtors' position with --

19          THE COURT:  I've read it.

20          MR. GLEASON:  You did receive it?  Thank you -- with

21  respect to the Mitsubishi inventory.  I won't rehash all of it,

22  but in short, Your Honor, the Debtors submit that based upon

23  their good faith understanding of the APA, the second amendment

24  and the Sale Order that the purchaser purchased all of the

25  Debtors' inventory, including the inventory that was on order

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



12

1   with Mitsubishi and which the Debtors have partially paid for.
2   Consequently, the Debtors respectfully submit that Mitsubishi
3   should be authorized to deliver the inventory at issue to the
4   purchaser which is in furtherance of the APA and the Sale
5   Order.  More importantly, Your Honor, this will enable the
6   purchaser to meet their obligations to the Debtors' former
7   customers and continue and enable the purchaser to continue to
8   provide employment to many of the Debtors' former employees.
9       Just to address two of the points raised here this morning
10  by counsel for Mitsubishi and counsel for the Committee.  I
11  don't believe we have an ordinary course issue here, Your
12  Honor.  What this is is simply in furtherance of the Asset
13  Purchase Agreement, the second amendment and the Sale Order.
14  More importantly, if you look at the option that the Committee
15  is asking for, it would result in Mitsubishi exercising their
16  resale rights, which may or may not result in a refund being
17  available under the post-petition agreement.  But even if there
18  are -- because -- let me just go back for a second, Mitsubishi
19  is authorized under that agreement to take out cost of sale and
20  other charges.  But even if there were a refund, not only did
21  the purchaser purchase the inventory at issue here, the
22  purchaser purchased the Debtors' refund rights.
23      So, again, although we applaud the Committee's attempt,
24  the Debtors, based on their good faith understanding of the
25  agreement, simply believe that the Mitsubishi inventory was

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-389-0191

A- 0701

1  purchased and should be transferred to the purchaser.  If Your

2  Honor has any questions, I'd be happy to try to answer them.

3          THE COURT:  I think we'll go ahead.  But -- any other

4  counsel there to make a statement?

5          MR. SELBST:  Your Honor, Stephen Selbst on behalf of

6  Presstek, the purchaser.  Your Honor, I will try to be brief.

7  Mr. Ricciardi said that many things were undisputed.  There are

8  several things that are disputed.  As Mr. Gleason has just

9  said, we dispute his contention that the Debtor has the right

10 to the refund.  Your Honor, we forwarded to you a copy of the

11 Asset Purchase Agreement which is part of the record in this

12 case.  Sections 2.1(k) of the agreement, which is at page 12,

13 says that among the assets that Presstek purchased were all

14 claims against third parties relating to the asset whether

15 choate or inchoate, known or unknown, contingent or

16 noncontingent.  Section 2.1(l) says all rights of the sellers

17 relating to deposits and prepaid expenses, claims for refunds

18 and rights for offset in respect thereof.  Section 2.1(c) says

19 all inventories.

20         Your Honor, to put it in a nutshell, I agree with Mr.

21 Ricciardi about one thing:  We believe this is a simple case.

22 You're going to hear testimony this morning from Mr. Gray who

23 will testify that the Debtors believe this asset was sold as

24 part of the going concern that was sold to the Debtors, to

25 Presstek. This is not a separate 363 transaction.  This is part

14

1   of the original asset sale which this Court approved

2   approximately two weeks ago. We believe that the evidence will

3   show the Debtors properly exercised the option to acquire this

4   inventory, and for that reason, Presstek acquired those rights.

5       And -- and this is put forth in our papers -- a little bit

6   of history is relevant here and you'll hear testimony about

7   that. Back in August of 2004, at a time when the Committee was

8   objecting to the sales procedures in this case, there was a

9   covenant in the Asset Purchase Agreement. And that covenant

10  said as a closing condition the Debtors had to have $22.7

11  million in working capital. And Mr. Pollock on behalf of the

12  Debtors testified that, in fact, the Debtors were worried about

13  satisfying that covenant, in part because they had to make

14  prepayments to get Mitsubishi product under the post-petition

15  Mitsubishi agreement. The Committee itself put in an objection

16  to the bid procedures on the grounds that that $22.7 million

17  covenant might not be achieved. And so the parties entered

18  into amendment #1 and amendment #2 to the Asset Purchase

19  Agreement. Those amendments, #'s 1 and 2, which have also been

20  forwarded to Your Honor, make it clear that for purposes of

21  calculating the working capital, the Debtors would be allowed

22  to credit $2¼ million of prepaid inventory as inventory for

23  purposes of the test. Now Presstek didn't want that changed.

24  It didn't benefit Presstek. The Debtors and the Committee

25  pressed for that change, as you'll hear testimony.

15

1   Why would Presstek do that?  Presstek only did it in
2  response to the Debtors' and the Committee's objections.  It
3  did not benefit Presstek.  But for the Committee, which had
4  helped press for that change, to now contend that prepaid
5  inventory was not part of the assets purchased is simply
6  inconsistent with its prior position.  And you'll hear
7  testimony about that.
8       As I said, we believe this asset was transferred pursuant
9  to Your Honor's prior order.  As Your Honor is well aware, you
10 have the authority to interpret your Sales Order, and we
11 believe that the Sales Order can and should be interpreted to
12 require Mitsubishi to deliver the product to Presstek.  And
13 there is a reason for that.  When the A.B.D. transaction
14 closed, Presstek discovered that the Debtors had no inventory
15 of the Mitsubishi product.  It had been sold off for at least
16 20 days.  The Mitsubishi product is specially manufactured for
17 A.B. Dick.  There is no other manufacturer.  Without this
18 product, Presstek simply cannot continue to fulfill customer
19 orders and rebuild the business of A.B. Dick, as Mr. Gleason
20 said, rebuild customer loyalty and ultimately preserve employee
21 jobs.  We don't think this is a hard issue.  We think the
22 testimony of Mr. Gray will clinch these points, and we look
23 forward to putting this on before Your Honor.
24       THE COURT:  All right.  Call the witness.
25       MR. FOLLAND:  Your Honor, this is Robert Folland of

Gray - Direct                                            16

1  Thompson Hine on behalf of Key Bank, pre-petition secured

2  Lender in the case.  We do not wish to make an opening

3  statement with respect to the motion before you, but I did want

4  to -- since you're not here today, you're appearing by phone --

5  I did want to let you know that we are in the Courtroom

6  listening.  And there is an issue with respect to adequate

7  protection cash collateral that I have discussed with counsel

8  for the Creditor's Committee and counsel for the Debtor that at

9  the appropriate time we may want to put something on the

10 record.  Thank you, Your Honor.

11         THE COURT:  All right.  Thank you.

12         MR. SELBST:  Your Honor, at this time Presstek calls

13 Mr. Stephen Gray.

14         THE COURT:  You'll be sworn.

15             STEPHEN GRAY, PRESSTEK'S WITNESS, SWORN

16         THE COURT:  You spell your name for the record,

17 please?

18         MR. GRAY:  Stephen, S-T-E-P-H-E-N, middle initial S,

19 Gray, G-R-A-Y.

20         THE COURT:  Go ahead, Counsel.

21         MR. SELBST:  Thank you, Your Honor.

22                     DIRECT EXAMINATION

23 BY MR. SELBST:

24 Q.  Mr. Gray, what is your position with the Debtors?

25 A.  Chief Restructuring Officer.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

A- 0705

Gray - Direct                    17

1   Q.  And when did you assume that position?

2   A.  I believe it was July 27th, 2004.

3   Q.  As Chief Restructuring Officer of the Debtors, did you have

4   responsibility for negotiations with Mitsubishi?

5   A.  I did.

6   Q.  And what does Mitsubishi supply to the Debtors, or did it

7   supply to the Debtors?

8   A.  The principal products are polyester plate making material,

9   offset plate making material that is supplied in various

10  configurations and sizes.

11  Q.  How do the Debtors' customers use the Mitsubishi product?

12  A.  The product is used for the -- in plate making equipment.

13  It's photosensitive material that is exposed to images that

14  then are applied to the polyester plate making material and

15  then processed chemically to form a offset plate, which is used

16  to go on a printing press to print.

17  Q.  The product that Mitsubishi supplies to the Debtors, is it

18  available at this time from any other manufacturer?

19  A.  The -- a significant percentage of the product, I believe

20  roughly 60 percent of what we purchase from Mitsubishi, is

21  proprietary to A.B. Dick.  It is made to A.B. Dick's

22  specifications.  Some of it's made under A.B. Dick patents, and

23  will only fit in A.B. Dick plate making equipment.  And in

24  fact, A.B. Dick equipment can only use this particular

25  material.

1  Q.  What is the annual sales volume that the Debtors have done

2  with Mitsubishi?

3  A.  Purchases from Mitsubishi are roughly 18 to $20 million a

4  year.

5  Q.  Does that Mitsubishi one of the Debtors' primary suppliers?

6  A.  It is the Debtors' largest single supplier.

7  Q.  Okay.  Did Mitsubishi have a pre-petition agreement with

8  the Debtors?

9  A.  It did.

10  Q.  What did that agreement provide for, Mr. Gray?

11  A.  It provided for the --

12      MR. CROUCH:  Your Honor, Ronald Crouch from McGuire

13  Woods on behalf of the Official Committee of Unsecured

14  Creditors.  I think we're now going to launch into the

15  proffered testimony which is going to be to have this witness

16  discuss his interpretation and his, as counsel put it, his

17  belief as to what these various contracts provide, and I

18  believe all of that is parol evidence.  The Asset Purchase

19  Agreement, the first amendment and the second amendment are all

20  incorporated into this Court's Sale Order.  They're clear and

21  unambiguous.  This Court is certainly capable of interpreting

22  its own Sale Order.  And as to the post-petition agreement with

23  Mitsubishi and likewise with the written contract which speaks

24  for itself and I don't think that we're going to gain anything

25  in these proceedings by having witnesses parade up and continue

1  the legal argument of counsel having witnesses state what they

2  believe the contracts mean.

3          MR. SELBST:  Your Honor, respectfully, I'm laying

4  foundation.  The Committee will certainly have an opportunity

5  to cross the witness, but the witness, as Chief Restructuring

6  Officer, can certainly testify --

7          THE COURT:  Yes, the objection's overruled.

8          MR. SELBST:  Thank you, Your Honor.

9  BY MR. SELBST:

10 Q.  Now, Mr. Gray, what is your understanding of what the pre-

11 petition agreement with Mitsubishi provided for?

12 A.  It provided for the -- that is to purchase these materials

13 from Mitsubishi under certain pricing structure and volume

14 rebate structure.  And it also provided for a line of credit

15 of, I believe, it was $1.2 million.

16 Q.  At the time the Debtors filed for Chapter 11, did they have

17 any availability under that line of credit?

18 A.  No, it was maxed out.

19 Q.  Now, to shift your attention forward a small amount in

20 time, after the Debtors filed for Chapter 11, was Mitsubishi

21 willing to perform under the pre-petition agreement?

22 A.  They were not.

23 Q.  And why were they not?

24 A.  They were insisting upon the Debtors -- they were insisting

25 the Debtors assume the agreement and cure it for the payment of

Gray - Direct                                          20

1   $1.2 million.

2   Q.  Were the Debtors willing to do that?

3   A.  Debtors were not willing to do that.

4   Q.  And why were the Debtors not willing to do that?

5   A.  Well, on a business basis, the issue was the use of the

6   Estate's precious cash resources in the amount of $1.2 million

7   to pay pre-petition debt with no post-petition benefit.  Beyond

8   that, there were issues of whether or not the contract was

9   executory and could be assumed.

10          MR. SELBST:  Your Honor, I'd like to approach the

11  witness and hand him a document that's been marked for

12  identification, if I may.

13          THE COURT:  Let me go back on that.  I received

14  Exhibits 1 through 6 that were faxed to me this morning, and

15  there are also Exhibits A and A, B, C attached to the various

16  memorandums.  A lot of those documents are duplications.  Let's

17  -- if there are no objections to any of those exhibits, I'll

18  admit them all into evidence.  Are there any objection?

19          MR. SELBST:  We have no objection, certainly, Your

20  Honor.

21          THE COURT:  Which exhibit?

22          MR. SELBST:  Well, we would seek the admission of the

23  exhibits that we sent to Your Honor.

24          THE COURT:  You're going to have to identify who's

25  speaking here because I can't see --

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-528-0191

Gray - Direct                                          21

1      MR. SELBST:  I'm --

2      THE COURT:  -- you.

3      MR. SELBST:  -- sorry.  I'm sorry, Your Honor.  I

4  apologize.  This -- doing this by with you not present in the

5  Courtroom is a little bit confusing to me as well and I

6  apologize.  If you could bear with me for one second.  Your

7  Honor, my office sent to you, identified as Exhibit #1, the

8  Asset Purchase Agreement; Exhibit #2, which was the first

9  amendment to the Asset Purchase Agreement; our Exhibit #3 was

10  the second amendment to the Asset Purchase Agreement; Exhibit 4

11  is the transcript of the hearing held before the Court on

12  August 23rd; Exhibit 5 is the Sale Order.  Your Honor, I

13  believe those are the exhibits that we faxed to Your Honor.

14      (Presstek's Exhibit-1 previously marked for

15  identification)

16      (Presstek's Exhibit-2 previously marked for

17  identification)

18      (Presstek's Exhibit-3 previously marked for

19  identification)

20      (Presstek's Exhibit-4 previously marked for

21  identification)

22      (Presstek's Exhibit-5 previously marked for

23  identification)

24      THE COURT:  Yes, I have Exhibit 6, too, the Order of

25  the November 3rd sale.

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

1      MR. SELBST:  Okay.

2      (Presstek's Exhibit-6 previously marked for

3  identification)

4      MR. SELBST:  Your Honor, there's one other document

5  that was attached to our pleading that we did not mark as an

6  exhibit, which I'd like to now mark as Exhibit-1A, which is the

7  Private Label Sales Agreement.

8      THE COURT:  The APA?

9      MR. SELBST:  No, Your Honor.  It's the Private Sales

10  Label Agreement between the Debtors and Mitsubishi.

11      THE COURT:  What was that -- was that attached to one

12  of the motions?  I don't have it.

13      MR. SELBST:  Your Honor, it was attached to Presstek's

14  objection to the Mitsubishi motion.

15      THE COURT:  All right.

16      MR. SELBST:  Okay, and it's that document I'd like to

17  mark, then, as Exhibit-1A and show to Mr. Gray.

18      THE COURT:  I'm just looking through the maze of paper

19  here.  Wait 'til I get the objection --

20      MR. SELBST:  Absolutely, Your Honor.

21      THE COURT:  -- response.  That's on Exhibit -- what's

22  that?  I have a 4.  Okay.

23      MR. SELBST:  Have you found it, Your Honor?

24      THE COURT:  Yes.

25      (Presstek's Exhibit-1A marked for identification)

Gray - Direct                                23

1        MR. SELBST:  Your Honor, we appreciate, again, your

2   attention and your willingness to help out in these difficult

3   circumstances.  With your permission, I would approach the

4   witness, then, and ask him questions about this agreement.

5        THE COURT:  All right, go ahead.

6        MR. SELBST:  Thank you.

7   BY MR. SELBST:

8   Q.  Mr. Gray, I've handed you a document that I've marked for

9   identification as Presstek Exhibit-1A.  Have you seen this

10  agreement before?

11  A.  I have.

12  Q.  Are you familiar with the terms of this agreement?

13  A.  Yes.

14  Q.  Did you negotiate the business terms of this agreement on

15  behalf of the Debtors?

16  A.  Yes.

17        MR. SELBST:  Your Honor, I would move for the

18  admission of Presstek Exhibit-1A.

19        THE COURT:  Any objections?

20        MR. CROUCH:  No objections, Your Honor.

21        THE COURT:  It's admitted.

22    (Presstek's Exhibit-1A admitted into evidence)

23        MR. SELBST:  Thank you, Your Honor.

24        THE COURT:  I'm going to admit Exhibits 1, 2, 3, 5 and

25  6.  I don't think that the transcript, Exhibit 4, is going to

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

A- 0712

Gray - Direct                                      24

1   be of any value.

2        (Presstek's Exhibit-1 admitted into evidence)

3        (Presstek's Exhibit-2 admitted into evidence)

4        (Presstek's Exhibit-3 admitted into evidence)

5        (Presstek's Exhibit-5 admitted into evidence)

6        (Presstek's Exhibit-6 admitted into evidence)

7        MR. SELBST:  That's fine, Your Honor.  I -- it was

8   sent to you in an abundance of caution during my preparation

9   last evening and I do not plan to utilize it at this time.

10  Okay.

11       THE COURT:  Go ahead.

12       MR. SELBST:  All right.

13  BY MR. SELBST:

14  Q.  Mr. Gray, you were saying that you were familiar with the

15  Private Label Sales Agreement.  Can you provide the Court with

16  your understanding, as a businessman, as to what that agreement

17  provides?

18  A.  It provided for the post-petition purchase of these

19  polyester plate making materials from Mitsubishi and a -- terms

20  of payment for those purchases as well as -- I think the last

21  major element was Mitsubishi's ability or the Debtors'

22  agreement to allow Mitsubishi to use its intellectual property

23  to liquidate or to mitigate Mitsubishi's damages by liquidating

24  goods that the Debtor did not pay for to the extent the Debtor

25  failed and was unable to make payments under the agreement.

1  Q.  What are the payment terms that are imposed upon the

2  Debtors for orders they place under this agreement, Mr. Gray?

3  A.  A third upon issuance of a purchase order, a third upon the

4  goods -- the completion of production, and a third upon receipt

5  of goods in the United States.

6  Q.  Between the time that this agreement was entered into and

7  the time of the sales hearing that was held before this Court

8  on November 2nd and November 3rd, did the Debtors place orders

9  under this agreement?

10 A.  Yes.

11 Q.  And approximately what is the dollar volume of those

12 orders?

13 A.  Roughly a million and a half dollars a month.

14 Q.  Okay.  What was the status of pending orders as of November

15 2nd or 3rd?

16 A.  The outstanding orders, I think, were just short of $5

17 million, about $4.8 million, against which the Debtors had paid

18 about $2½ million on -- in progress payments or payments under

19 the agreement.

20 Q.  So those were goods that as of November 2nd and November

21 3rd were still to be delivered?

22 A.  Yes.  There may have been some sitting in port which the

23 Debtor hadn't taken possession of, but they were either in

24 production, at sea, or in port at that time.

25 Q.  How did the post-petition sales agreement, the Private

1  Label Sales Agreement, come into being?  Who asked for it?

2  A.  Mitsubishi.

3  Q.  And why did they ask for it?

4  A.  Well, as I said earlier, we -- the Debtors were unwilling

5  to cure and assume the pre-petition agreement.  The Debtors

6  needed the ability to buy this material.  It was critical to

7  the ongoing business of -- it was the largest single product

8  category and one of the most profitable.  So we needed an

9  arrangement under which to do business with Mitsubishi in terms

10 of payment that the Debtor could support.  Mitsubishi, however,

11 was interested in -- wanted a more formal arrangement because

12 they were concerned about -- in a -- if the Debtor failed,

13 their ability to mitigate their damages for goods that were

14 already in production or produced and unpaid for that were

15 subject to copyrights and patents that were held by the Debtor.

16 Q.  Okay.  Thank you very much, Mr. Gray, for your testimony

17 about that agreement.  I'd like to turn your attention now, if

18 I may, to the Asset Purchase Agreement.  Are you familiar with

19 that agreement?

20 A.  I am.

21       MR. SELBST:  All right, Your Honor, may I approach the

22 witness to hand him a copy of the Asset Purchase Agreement?

23       THE COURT:  All right.

24       MR. SELBST:  Thank you, Your Honor.

25    (The witness receives document)



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

A- 0715

Gray - Direct                                27

BY MR. SELBST:

Q. Mr. Gray, I'd like to turn your attention to section 2.1 of the Asset Purchase Agreement, which is on page 11.

A. Yes.

Q. And directing your attention to section 2.1(c), would you agree that the Debtors -- that Presstek purchased all inventories of the sellers under that provision?

A. It says all inventories of the sellers and their subsidiaries.

Q. Okay. And now, Mr. Gray, I'd like you to turn your attention to page six of the agreement.

A. Yes.

Q. And could you read the definition of the term "inventory" please?

A. "All inventories of the sellers or its subsidiaries, wherever located, including all finished goods, work in progress, raw materials, spare parts and other materials and supplies to be used or consumed by the sellers or its subsidiaries in the production of finished goods."

Q. Okay, thank you. And if you could now turn to page 12.

A. Uhm-hum.

Q. And this is a continuation of section 2.1 which is the section that describes the assets purchased by Presstek, could you read clauses (k) and (l) aloud, please?

A. (K) is, "all claims the seller has against third parties

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

A- 0716

1   relating to the assets, whether choate or inchoate, known or
2   unknown, contingent or noncontingent." Which was the other one
3   you wanted?
4   Q.  (L) please, Mr. Gray.
5   A.  (L) reads, "all rights of the sellers relating to deposits
6   and prepaid expenses, claims for refunds and rights of offset
7   in respect thereof which are not excluded under section
8   2.2(g)."
9   Q.  Okay.  Now, Mr. Gray, we're going to put these clauses down
10  for a moment.  Are you familiar with the condition in the Asset
11  Purchase Agreement relating to working capital?
12  A.  I am.
13  Q.  And as of August of 2004, what did that provision provide?
14  A.  The original definition in the APA was that -- is a
15  condition for closing.  The Debtors had to have $22.7 million
16  of net working capital defined as accounts receivable, plus
17  inventories, minus the outstanding liability on the Debtors'
18  service contracts.
19  Q.  Under the original APA, did the prepayments that the
20  Debtors made to Mitsubishi count for satisfying that covenant?
21  A.  They did not.
22  Q.  Did there come a time when that covenant became a concern
23  to the Debtors?
24  A.  Yes.
25  Q.  When was that?

Gray - Direct                                   29

1   A.   Shortly -- well, I'd say late July or early August.

2   Q.   And what was the concern that the Debtors had at that time?

3   A.   As we --

4            THE COURT:  Overruled.

5            MR. SELBST:  I'm sorry, Your Honor?

6            THE COURT:  I overruled the objection.

7            MR. SELBST:  The -- I don't believe there --

8            THE COURT:  I thought there was an objection.

9            MR. SELBST:  I'm sorry, Your Honor, I don't believe

10  there was a pending objection.  The witness was simply

11  answering the question.

12           THE COURT:  All right.

13  A.   As we understood, the Debtors' position at that point,

14  which would have been early August, it was clear that the

15  original projection of $22.7 million of working capital was

16  going to be very difficult, if not impossible, to achieve.

17  BY MR. SELBST:

18  Q.   And to your knowledge, did the Committee express a concern

19  about the Debtors' ability to satisfy this covenant?

20  A.   Not to me, specifically, although I understood the

21  Committee's concern that the deal, because of that covenant,

22  was very contingent.  But I had no direct conservation with the

23  Committee.

24  Q.   Okay.  What did the Debtors do in response to these

25  concerns?



*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Gray - Direct                                                30

1  A.  We looked at various ways in which to make up what was --

2  what appeared to be a deficit of working capital that appeared

3  late -- by the end of July.  And the -- within our ability to

4  access cash under the D-I-P agreement.  And it was clear that

5  the best asset that we had to fill this gap were these deposits

6  or prepayments that we were making to Mitsubishi and other

7  suppliers; Mitsubishi was, by far, the largest.  And we

8  negotiated with Presstek for the inclusion of these prepayments

9  as part of the assets in the working capital definition.

10        MR. SELBST:  Your Honor, I'd like to approach the

11  witness again and ask him to identify the first amendment to

12  the APA, which Your Honor has previously admitted.

13        THE COURT:  Go ahead.

14     (The witness receives document)

15  BY MR. SELBST:

16  Q.  Mr. Gray, I've handed you the first -- what has been

17  identified as the first amendment to the Asset Purchase

18  Agreement.  Are you familiar with that agreement, sir?

19  A.  I am.

20  Q.  And does paragraph 2 of that amendment reflect your

21  understanding of the agreement that was reached between the

22  Debtors and Presstek with respect to prepaid inventory?

23  A.  Yes.

24  Q.  And, again, in substance, what does that provide?

25  A.  It was the expansion of the definition to include $2.5

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



Gray - Direct                                    31

1  million of prepaid inventory to the extent that it was

2  delivered -- it was to be delivered no later than November

3  30th, 2004.

4  Q.  Okay.

5        MR. SELBST:  And, Your Honor, I'd now like to approach

6  the witness and ask him to identify the second amendment to the

7  Asset Purchase --

8        THE COURT:  Go ahead.

9     (The witness receives document)

10 BY MR. SELBST:

11 Q.  Mr. Gray, I've handed you what's been identified as the

12 second amendment to the Asset Purchase Agreement.  Are you

13 familiar with that agreement?

14 A.  I am.

15 Q.  And again, directing your attention to the top of page 3,

16 Mr. Gray, you see the paragraph marked #10?

17 A.  Yes.

18 Q.  And do you see the final sentence of that paragraph, of the

19 amendment to section 10.12?

20 A.  Yes.

21 Q.  Could you read that out, please?

22 A.  "In determining the amount of inventory for purposes of the

23 calculations under this section 10.12, the parties agree that

24 seller is permitted to include prepaid deposits for inventory."

25 Q.  Okay.  And that calculation, again, is the closing covenant

Welter's Cramp, Inc.
Certified Court Transcribers
732-329-0191

Gray - Direct                                    32

1   of $22.7 million in working capital?

2   A.  It is.

3   Q.  Okay.  Mr. Gray, do you have an understanding as a

4   businessman as to whether the Mitsubishi product was part of

5   the assets sold to Presstek under the Asset Purchase Agreement?

6            MR. CROUCH:  Objection, Your Honor.  Ron Crouch,

7   McGuire Woods, for the Committee.  We'd --

8            THE COURT:  Sustained.

9            MR. SELBST:  I'm sorry, Your Honor?

10            THE COURT:  I sustained the objection.  I don't know

11   why it's material.

12            MR. SELBST:  Okay.  All right.

13   BY MR. SELBST:

14   Q.  Mr. Gray --

15            THE COURT:  I'm going to have to decide this on the

16   basis of the agreements that are in evidence.

17            MR. SELBST:  That's fine, Your Honor.

18   BY MR. SELBST:

19   Q.  Mr. Gray, did the Debtors validly exercise the option under

20   the Private Label Sales Agreement to cause the Mitsubishi

21   product to be delivered to Presstek?

22            MR. CROUCH:  Objection, Your Honor.  It calls for a

23   legal conclusion.

24            THE COURT:  Overruled.

25   A.  Could you repeat the question?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*

Gray - Cross                                      33

1   BY MR. SELBST:

2   Q.  Did the Debtors validly exercise the option under the

3   Private Label Sales Agreement to cause Mitsubishi to deliver

4   the product that was in the pipeline to Presstek?

5   A.  We did.

6          MR. SELBST:  I have no further questions of this

7   witness, Your Honor.

8          MR. CROUCH:  Again, Your Honor, Ron Crouch, McGuire

9   Woods, on behalf of the Official Committee.

10                     CROSS EXAMINATION

11  BY MR. CROUCH:

12  Q.  I have just a very few questions for you, Mr. Gray.  If you

13  could go back to the Private Label Sales Agreement, which I

14  think we've marked as Exhibit-1A?

15  A.  Yes.

16  Q.  And I believe you've indicated you were involved in

17  negotiation of this contract?

18  A.  Yes.

19  Q.  Would you take a look at paragraph 8(b), Terms of Sale,

20  please?  It's on page 3.

21  A.  Yes.

22  Q.  And pursuant to paragraph 8(b) of the Private Label Sales

23  Agreement, it's true, is it not, that title to their products

24  does not pass to A.B. Dick until they are delivered to their

25  destination?

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



Gray - Cross                34

1   A.  That's what it says, yes.

2   Q.  And with respect to the products that we're here in Court

3   arguing about today, none of those products have been delivered

4   to their destination, is that correct?

5   A.  Well, certainly a lot of product was delivered during the

6   pendency of the Debtors' operation of the business.  Exactly

7   what was -- you know, where everything stood at closing, I

8   can't tell you, although, I believe there were goods that -- I

9   know there were goods in production, there were goods at sea

10  that were produced and there were goods in port or -- to be

11  offloaded, to be delivered to the Debtor shortly thereafter.

12  Q.  But with respect to the pipeline inventory that we're here

13  arguing about today, the pipeline inventory has not yet been

14  delivered to destination, correct?

15  A.  The -- I believe that is correct, yes.

16  Q.  And then would you please take a look at paragraph 10?

17  That's on page 7.

18  A.  Yes.

19  Q.  And that paragraph is titled, "Assignment of Agreement and

20  Pre-petition Agreement and Waiver of Certain Claims Under Pre-

21  petition Agreement."  Did I read that correctly?

22  A.  You did.

23  Q.  Now this paragraph provides, does it not, that this

24  agreement shall not be assigned by either party without the

25  prior written consent of the other, correct?

Gray - Cross                          35

1   A.   Yes.

2   Q.   Are you aware of any prior written consent of Mitsubishi to

3   an assignment of this contract to Presstek?

4   A.   I am not.

5        MR. CROUCH:  That's all I have of this witness, Your

6   Honor.

7        MR. SELBST:  I have no further questions of the

8   witness, Your Honor.

9        THE COURT:  Pardon me?

10       MR. SELBST:  Your Honor, it's Stephen Selbst again.  I

11  just want to make clear I am not seeking redirect of the

12  witness.

13       THE COURT:  (No verbal response).

14       MR. SELBST:  Your Honor, did I speak too quickly?

15       THE COURT:  Yes.

16       MR. SELBST:  I apologize.  I'm a New Yorker and I try

17  to slow myself down but sometimes old habits die hard.  What I

18  meant to say, and I apologize if I rushed, Your Honor, is that

19  I have no redirect of the witness and I believe he may be

20  excused if Your Honor -- unless Your Honor has questions for

21  him.

22       THE COURT:  I didn't pick up the last part.  Would --

23  maybe you're not close enough to the mic, I don't know.

24       MR. SELBST:  I apologize again, Your Honor.  What I

25  said is that I have no redirect for the witness --

The Court - Finding                36

1    THE COURT:  Right.

2    MR. SELBST:  -- and unless Your Honor has questions

3  for him --

4    THE COURT:  I don't have any questions of the witness.

5    MR. SELBST:  Thank you.

6    THE COURT:  Witness is excused.  That's all the

7  witnesses?

8    (The witness steps down)

9    MR. SELBST:  That was my sole witness, Your Honor.

10    THE COURT:  All right.  Does any other party have any

11  witnesses?

12    MR. CROUCH:  On behalf of the Committee, no, Your

13  Honor.

14    THE COURT:  Mitsubishi has no witnesses?

15    MR. LAPOWSKY:  No, Your Honor.

16    THE COURT:  All right.

17    MR. GLEASON:  And, Your Honor, the Debtors have no

18  witnesses.

19    THE COURT:  You what?  Pardon me?

20    MR. GLEASON:  The Debtors do not have witnesses

21  either.

22    THE COURT:  Right.  Okay.  The record's then closed.

23  I think that everybody has stated their position, not only in

24  their memorandums but in their opening statements.  And I think

25  that I've got a pretty good understanding, after listening to

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191



1  witnesses and the -- reading all the exhibits.  I'm going to

2  issue the following Memorandum of Decision on the record.  The

3  Court has heard by telephonic hearing two Emergency Motions,

4  one filed by Mitsubishi Imaging, which is hereinafter been

5  designated as MPM for {quote} "an order determining validity of

6  the exercise of election under post-petition Private Label

7  Sales Agreement," {unquote}, which is Docket number -- wait

8  until I get it here -- 496, and the other filed by Presstek

9  Inc. seeking an order directing MPM to comply with the Court's

10  Sale Order, which is Docket #504.  And responses to the

11  Presstek motion have been filed by MPM, who basically concurs

12  in the motion, and the Unsecured Creditors' Committee, who

13  opposes the motion and asserts that the deposits that are

14  presently held by Mitsubishi will possibly be funds of the

15  bankruptcy estate.  There are other legal issues cited in the

16  memorandums by the Unsecured Creditors' Committee which I'll

17  touch upon.

18      The motions were set for hearing on short notice for good

19  cause.  And appearing at the hearing on November 17th were

20  counsel for MPM, Presstek, the Debtor and the Unsecured

21  Creditors' Committee and Key Bank.  Testimony was heard on

22  behalf of Presstek, and all exhibits have been admitted without

23  objection.  From the testimony and the exhibits and the

24  memorandums filed by the parties, together with their oral

25  arguments, the Court will enter this order based upon findings

38

1   of fact which I don't think were in material dispute.  Rather,
2   this decision turns on the substance of the sales agreement
3   which is the APA and its addendums, which have been approved by
4   the Court and the Court's Order of Sale entered on November the
5   3rd, the Private Label Sales Agreement executed post-petition
6   in August 2004 between MPM and the Debtor.
7       The order of November 3rd provided in paragraph 9 that
8   none of the pre- or post-petition Private Label Sales
9   Agreements (quote) "shall be assumed or assigned and -- to be
10  assumed or assigned to Silver, which is Presstek" (unquote)
11  unless the Debtor was allowed to continue its business dealings
12  with MPM who was a major supplier of one component of the
13  Debtors' inventory.  Presstek did, however, under the APA and
14  the November 3rd order and the addendum, acquire from the
15  Debtor Debtors' inventories and rights to partially prepaid
16  orders of inventory supplied by MPM.
17      Prior to the Sale Order, the Debtor had issued purchase
18  orders marked 267409, 267411, 270466, 270467, 272994 and 273001
19  at a cost of $4 million 801,171.94 for custom plate material.
20  Pursuant to the Private Label Agreement, the Debtors, through
21  Presstek, paid MPM $2 million 545,774.94, with the remaining
22  balance to be due and payable upon delivery of the product.  In
23  other words, called pipeline products, the Debtor obtained the
24  right to purchase the pipeline product for which there was
25  already a partial payment made.  Presented by the initial

Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191



39

1  payment to -- the funds for the -- to purchase, the inventory

2  allowed Presstek to satisfy its customers.

3      The purchasers were -- the purchase orders were first

4  rejected and then finally reinstated by an officer of the

5  Debtor, so that they were ultimately affirmed and the contract

6  and the purchase order became valid obligations, not only to

7  the Debtor, but to MPM.  The Committee challenges the authority

8  of such officer, together with Presstek's right to pay and take

9  the inventory, on grounds that MPM and the Debtor under the

10  Label Agreement was never assumed, that they purchased it

11  outside the ordinary course of business, and that that there

12  was no authority granted by order of this Court to allow that

13  purchase order to go forward.

14      I reject those arguments.  It is clear that Presstek did

15  buy the inventory and items known as pipeline products, which

16  is the MPM manufactured product.  Presstek has -- in fact, then

17  executed a hold harmless agreement as part of the reinstatement

18  with the Debtor to hold the Debtors' estate harmless for any

19  obligation arising from the purchase order.  And upon that

20  occasion, the Debtor officer reinstated the purchase order.

21      So I find and conclude that the pipeline purchase orders

22  constituted a valid binding agreement between MPM and the

23  Debtor which must be honored by MPM due to Presstek's payment

24  of over $2.5 million.  I further conclude the product is

25  inventory, and prepaid inventory in part, and therefore subject



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

40

1  to the Asset Purchase Agreement and addendum and the Court's

2  order.

3      As MPM properly notes in its memorandum -- I've got to get

4  it here a minute -- MPM would be obligated to give the Debtor

5  credit under the Label Sales Agreement for the $2.5 million

6  paid, deliver the inventory to the Debtor upon further payment

7  of the balance of the purchase price of over $2.2 million

8  under the conditions where Presstek holds the Debtor harmless.

9  Upon delivery, Presstek is thus entitled to the inventory under

10  the APA and its addendums approved by the Court.  MPM states

11  this result is fair, assuming that the pending pipeline

12  purchase election is valid, which I hold that it is.

13      It would be unfair, I think, and probably beyond the

14  specific terms of the various agreements, to adopt the

15  Committee's position that the pipeline purchase orders are

16  invalid or have expired under the Order of Sale as contrary to

17  the testimony given today.  That wholly would allow the

18  Committee, under the Label agreement, to enter into a dispute

19  with Presstek as to who was entitled to any of the refunds.

20  It's not necessary to get into that issue because I'm going --

21  because I've held that the contract on the purchase orders

22  between MPM and the Debtor are valid, binding agreements.

23      I accept and adopt the legal arguments and the rationale

24  set forth in Presstek's memorandum in support of its motion

25  dealing with the interpretation and the effect of the Private

*Walter's Cramp, Inc.*
*Certified Court Transcribers*
732-389-0191



A- 0729

41

1  Label Sales Agreement, paragraphs 17 to 21. And I also accept

2  the legal arguments from that memorandum set forth in

3  paragraphs 27 to 29 dealing with the purported right or refund

4  to the estate of the initial payment.

5        Therefore, I determine that MPM had a valid agreement with

6  the Debtor under Private Label Sales Agreements and Presstek

7  has a valid agreement to pay and take the pipeline inventory

8  supplied by MPM as ordered by the Debtor and paid for by

9  Presstek. It's ordered that MPM shall be legally bound by the

10  purchase order of the inventory under -- and shall deliver such

11  products for the use and benefit of the Debtor and Presstek,

12  who is then obligated to hold the Debtor harmless by payment to

13  MPM of $2 million 255,397.00 upon delivery. Judgment will be

14  entered accordingly to this order. The 10-day waiting period

15  will be waived. To get on with the third matter of --

16        MR. LAPOWSKY: Your Honor, this is Robert Lapowsky,

17  counsel for Mitsubishi. I had one clarification, if you would

18  entertain it at this point. Judge?

19        THE COURT: You mean you're not clear with a very

20  clear order?

21        MR. LAPOWSKY: No, it was clear. I had, in my

22  introductory remarks, I had raised -- asked for one additional

23  protection for MPM in the event that you ruled the way that you

24  have ruled. One thing I'd ask for was that the order be

25  specific that the 10-day waiting period is being eliminated and

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



42

1  you've covered that.  But I -- we can't control whether there

2  is going to be an appeal or not going to be an appeal of this

3  order.  Certainly we're not appealing the order, but others

4  might.  And it seems to me that in fairness Mitsubishi ought

5  not to be -- as between Mitsubishi and Presstek, if this order

6  were ever reversed, Mitsubishi ought not to be the one at risk

7  for the refund.  So I -- that's the reason I had asked at the

8  beginning that to the extent you were going to rule in favor of

9  Presstek that the order require Presstek to indemnify

10  Mitsubishi to the extent the order was ever reversed for

11  whatever the refund would be.

12          THE COURT:  I'm not going to rule on that at this

13  time.  I'm not going to take into the eventuality what may

14  happen on appeal.  In the event that that occurs, you'll have

15  plenty of opportunity to seek that indemnity argument.

16          MR. LAPOWSKY:  Okay, Your Honor.  Thank you.

17          MR. SELBST:  Thank you, Your Honor.

18          THE COURT:  Take up item #3, Emergency Motion of the

19  Official Committee of the Unsecured -- Compel the Debtors

20  Silver and Presstek to comply with the Sale Order of November

21  3rd and the second amendment to the Asset Purchase Agreement

22  and the response thereto (indiscern.).

23          MR. RICCIARDI:  Your Honor, once again, James

24  Ricciardi of McGuire Woods for the Committee.  First, I can

25  report there were two aspects of relief that we asked for in

*Writer's Cramp, Inc.*
Certified Court Transcribers
732-529-0191



43

1    this Emergency Motion.  And I'm pleased to say that Presstek

2    communicated with representatives of the Creditors' Committee

3    late yesterday afternoon and indicated that there would be no

4    problem with the Committee getting access to records, so we

5    have nothing in that regard to ask you about today.

6              THE COURT:  All right.  If that matter's been resolved

7    then that will be vacated.

8              MR. RICCIARDI:  Okay, thank you, Your Honor.

9              THE COURT:  The first one is the one that bothers me.

10   I just don't understand where you're coming from here.

11             MR. RICCIARDI:  Excuse me, Your Honor.

12             THE COURT:  On the first -- the first issue.

13             MR. RICCIARDI:  You don't understand what the

14   Committee is asking for?  The relief the Committee is --

15             THE COURT:  Executory contract.

16             MR. RICCIARDI:  Excuse me?

17             THE COURT:  The assumption and assignment for the

18   executory contract?

19             MR. RICCIARDI:  Yes, well, I guess, you know, I can

20   look at it this way.  I mean, principally, Presstek has had two

21   things to say about our asking for you to order Presstek to

22   assume executory contracts in accordance with their

23   representations at the auction.  First, they said that there's

24   no statutory authority to permit the Court to compel Presstek

25   to assume any executory contracts.  And second, they say,

*Writer's Cramp, Ana.*
*Certified Court Transcribers*
*732-329-0191*



44

1　therefore, there's no emergency.  But, Your Honor, it's as if

2　Presstek forgot that it accepted your Sale Order and closed on

3　your Sale Order, including their commitments requiring them to

4　assume executory contracts.  Presstek did not appeal your

5　Order.  They accepted it, they are bound by it, and Your Honor

6　certainly has the authority to enforce it.  Mr. Selbst, in

7　fact, conceded that earlier today when he argued on this other

8　point.

9　　　　And, Your Honor, we brought it on by Emergency Motion

10　because we think it's not fair to the Creditors of the estate

11　to allow Presstek to continue to take the position that there

12　are no obligations attendant to those provisions that you added

13　to that order.  Presstek has not only gotten the assets that

14　they've wanted, they've now gotten the pipeline inventory as

15　well.  And we think it's past time for them to start making

16　good on their executory contract bid enhancement.

17　　　　THE COURT:  I -- I'm following your argument now, and

18　I really don't have any problem with it except for one thing.

19　I think that the proper way to address this issue is to go

20　through the list of executory contracts that were scheduled by

21　the Debtor and any others that the Committee thinks that should

22　be assumed also so that I can -- if I do issue such an order

23　and direct Presstek to take action on those contracts, we can

24　specifically delineate which contract we're talking about.  I

25　just think this is -- I can't determine here what contracts

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
*732-329-0191*



45

1  there are.  I have read the schedule of assumption of executory

2  contracts and the list thereof.  Some of them they've already

3  rejected, some of them haven't been -- anything's been done on

4  it.  But I think it's better that if we can get a list from the

5  Committee and then Presstek can attack that list if they want,

6  that I would entertain at this motion on December 8th on a

7  specific basis as to what assumption -- what contracts we're

8  talking about and what contracts are non-executory or may not

9  be executory.  Does that make any sense to you?

10      MR. RICCIARDI:  That's perfectly sensible, Your Honor,

11  and we're happy to do that.  And we'll prepare a separate

12  motion and a separate list of executory contracts.

13      THE COURT:  All right.  And the parties will be ready

14  to go on the 8th because I won't be back down there until

15  February.

16      MR. RICCIARDI:  Okay.  Thank you very much, Your

17  Honor.

18      MR. SELBST:  Your Honor, thank you very much.  That's

19  perfectly acceptable to Presstek, of course.

20      THE COURT:  All right.  And I'll try to get a judgment

21  out -- faxed into the Clerk's Office this afternoon.

22      MR. SELBST:  Thank you, Your Honor.

23      THE COURT:  Thank you.  Court will be adjourned.

24  Thank you.

25      (Court adjourned)



Writer's Cramp, Inc.
Certified Court Transcribers
732-329-0191

46



**CERTIFICATION**

1

I certify that the foregoing is a correct transcript from the
2  electronic sound recording of the proceedings in the above-
entitled matter.
3

4  _Lewis Pa_____          121-04
   Signature of Transcriber                Date
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Writer's Cramp, Inc.*
*Certified Court Transcribers*
732-329-0191

A- 0735